IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DELOITTE CONSULTING LLP and<br>DELOITTE DEVELOPMENT LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. _____ |
| | ) | |
| SAGITEC SOLUTIONS, LLC, | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiffs Deloitte Consulting LLP and Deloitte Development LLC (collectively, "Deloitte"), for their Complaint, demand a trial by jury on all issues so triable and allege as follows against Defendant Sagitec Solutions LLC ("Sagitec"):

## NATURE OF THE ACTION

1.      Deloitte brings this lawsuit to protect its innovative and valuable technology. Sagitec stole Deloitte's copyrighted Unemployment Framework for Automated Claim & Tax Services ("uFACTS") computer program and related trade secret materials, used them to develop Sagitec's competing Neosurance software, and continues **to this day** to sell Neosurance to customers across the United States.  When confronted with its wrong-doing, Sagitec purposefully misled Deloitte, government investigators, a plethora of state government agencies, and the public so that it could continue to profit from Deloitte's investment of creativity, effort, and money in developing uFACTS.  Sagitec's unlawful actions have deprived Deloitte of revenue to which it is entitled as the true owner of the uFACTS solution, and they must be stopped.

2.      To assist government agencies in efficiently providing unemployment insurance ("UI") benefits to their citizens, Deloitte spent two decades, millions of dollars, and tens of

thousands of person-hours to develop uFACTS.  Specifically, uFACTS has been under

continuous development and offered to clients since 2003.  Dozens of states have deployed

uFACTS to modernize their UI systems, and those states have seen marked improvements in

productivity, better-informed decision-making, and increased customer satisfaction.  To

accomplish that feat, Deloitte and its predecessors invested significant resources not only in

creating the initial version of uFACTS, but also in developing increasingly sophisticated

iterations over the past two decades.  As a result, uFACTS has been and continues to be a

significant source of revenue for Deloitte.

3.    Deloitte's investment in uFACTS is protected by both copyright and trade secret

law.  Throughout Deloitte's investment in uFACTS, Deloitte and its developers made a series of

original, creative choices designed to make uFACTS an effective, efficient, and first-class

solution for state government agencies and U.S. citizens.  To protect those investments, Deloitte

took affirmative steps to keep its innovative uFACTS solutions confidential, ranging from access

controls, non-disclosure and confidentiality agreements, and restrictions on the use of uFACTS

material.

4.    Rather than developing its own product, Sagitec targeted key employees from

Deloitte's UI practice who had access to Deloitte's uFACTS software.  Sagitec then enticed them

to launch Sagitec's competing UI practice, which did not even exist until Sagitec populated it

with former Deloitte personnel.  Sagitec also, upon information and belief, induced Deloitte's

employees to copy the uFACTS computer program and related trade secret materials, bring them

to Sagitec, and use them to develop Neosurance.  Sagitec's machinations achieved the desired

result: by using Deloitte's copyrighted software and trade secrets, Sagitec went from having no

UI product to winning its first bid—to provide a software system to process UI benefit claims,

2

taxes, and appeals to the Maryland-West Virginia Consortium for a payment of up to approximately $70 million—in an unprecedented two years, competing against Deloitte with Deloitte's own technology.

5.      Deloitte is not alone in its concern that Sagitec unlawfully misappropriated the technology underpinning the uFACTS solution.  Following a lengthy investigation by the U.S. Attorney's Office for the Southern District of West Virginia, two of the former Deloitte employees whom Sagitec enticed away, David Minkkinen and Sivaraman "Siva" Sambasivam, were recently indicted by a grand jury for, among other things, misappropriating trade secrets related to uFACTS.  In particular, the indictment states that "numerous Deloitte files" including trade secret information such as source code were used by "numerous Sagitec employees" to design and develop Neosurance.  It also states that employees other than Minkkinen and Sambasivam were involved in the conspiracy to steal and use Deloitte's trade secrets, and then concealed Sagitec's possession of Deloitte's trade secrets.

6.      This civil litigation seeks to address Sagitec's role in the misappropriation of Deloitte's trade secrets and infringement of Deloitte's copyrights.  Consistent with the intentional acts of deception by its employees, Sagitec did not alert Deloitte of the theft or return the pilfered materials.  Even when Deloitte approached Sagitec with its concerns that its technology had been taken, Sagitec did not stop.  Instead, it continued to profit.  Despite a state and federal government investigation that resulted in criminal indictments against Sagitec's employees for stealing this material from Deloitte, using it for Sagitec's own profit, and trying to cover it up, Sagitec has brazenly continued to market Deloitte's intellectual property as its own. Sagitec has even attempted to compete head-to-head against Deloitte for new projects, using the very same material stolen from Deloitte itself.  And it continues to profit to this day.

3

7.     Rather than take responsibility, Sagitec consistently has attempted to cover its tracks.  Sagitec not only denied any wrongdoing but also took affirmative steps to shake Deloitte and others off its tail by, for example, claiming falsely to have undertaken its own detailed inspection of the Neosurance solution.  Yet, although Sagitec told Deloitte that its inspection found that none of Deloitte's intellectual property was taken, upon information and belief, Sagitec knew that was untrue.  Sagitec and its employees similarly misled and misrepresented the facts to government investigators, so effectively in one instance that one state was convinced to completely close an investigation prompted by suspicions that Sagitec did not develop Neosurance on its own.  But now that a grand jury has indicted two of the former Deloitte employees who spearheaded Sagitec's scheme, Sagitec's attempt to hide its infringement and misappropriation has finally begun to unravel.

8.     Sagitec's shameless misappropriation of Deloitte's trade secrets and infringement of Deloitte's copyrights have harmed Deloitte to Sagitec's benefit: Sagitec was able to race its stolen Neosurance solution to market at breakneck speed, benefit from Deloitte's years of innovative thinking and significant investments of time and money, and then repeatedly compete directly against Deloitte while using Deloitte's own intellectual property against it.  It is now clear that, without this Court's intervention, Sagitec will continue its unlawful behavior to the detriment of Deloitte, state governments that rely on UI software, and the public at large.  Deloitte brings this case to protect its proprietary and confidential uFACTS software and its investments therein.  Deloitte also seeks injunctive and declaratory relief and recovery of monetary damages for the harm that has been caused by Sagitec's theft.

## **PARTIES**

9.     Plaintiff Deloitte Consulting LLP is a Delaware partnership with its principal offices located at 30 Rockefeller Plaza, New York, New York.

10. Plaintiff Deloitte Development LLC is a Delaware company with its principal offices located at 30 Rockefeller Plaza, New York, New York.

11. Deloitte is qualified to do business in Delaware and New York and is doing business in Delaware and New York.

12. Defendant Sagitec Solutions LLC is a Nevada company with its principal offices located at 422 County Road D East, Saint Paul, Minnesota. On information and belief, Sagitec is registered to do business in Delaware and has a registered agent for that purpose in Delaware.

## JURISDICTION AND VENUE

13. This civil action seeks damages, injunctive relief, and other equitable relief under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq*., New York state law, and the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.* ("DTSA"). This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1338(b). This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

14. This Court has personal jurisdiction over Sagitec because, upon information and belief, it has regularly and systematically transacted business in Delaware, purposefully directed its activities at Delaware, purposefully availed itself of the benefits of doing business in Delaware, committed acts of trade secret misappropriation in Delaware, and committed, contributed to, and/or induced acts of copyright infringement in Delaware. For example, Sagitec has bid on and won contracts to provide products and services, including in the market for UI software, to the State of Delaware. In particular, on information and belief, in 2020 Sagitec won its bid to implement Delaware's Pandemic Unemployment Assistance solution using its Neosurance software and therefore purposefully availed itself of the privileges and benefits of doing business in the state, including by contracting with the State of Delaware's Department of Labor to provide software and services within the state. Moreover, upon information and belief,

Sagitec has and continues to provide such software and related services to the State of Delaware. In other words, Sagitec has infringed Deloitte's copyrights and used Deloitte's misappropriated trade secrets in this District repeatedly and purposefully.

15.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400.  This district is an appropriate and convenient forum for the parties and witnesses because, upon information and belief, operative facts related to Deloitte's claims occurred in this District, sources of proof (which are expected to be available predominantly through electronic means) are available with relative ease within this District, the parties have sufficient means to travel to this District (as demonstrated at least by Sagitec's solicitation of business within this District), and the District is familiar with governing law, among other reasons.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

### I.     Deloitte and Its Innovative uFACTS Computer Program

16.     Deloitte is a global professional services network founded in 1845.  Deloitte's consulting practice operates across a wide range of industries with the goal of helping businesses and government agencies solve complex problems and operate more efficiently.  Deloitte is able to bring about transformational change in partnership with its clients through the application of deep domain expertise and cutting-edge technological solutions.

17.     Deloitte's Government & Public Sector practice in particular has assisted federal, state, and local government agencies for decades by improving and modernizing their processes and technologies to deliver best-in-class solutions to the public.

18.     Among other capabilities, Deloitte offers software solutions for managing state UI programs.  The United States Department of Labor's UI program provides benefits to workers who become unemployed and meet certain eligibility requirements.  All fifty states, plus the District of Columbia and territories of Puerto Rico and the U.S. Virgin Islands, administer their

own UI programs and set their own UI benefits eligibility guidelines, subject to certain minimum requirements established by federal law.

19.     In or around 2003, BearingPoint Inc. (Deloitte's predecessor in developing the uFACTS solution) observed that UI solutions of the time had numerous flaws and were ripe for innovation.  For example, existing UI solutions relied on mainframe technology dating back to the 1970s.  This older technology made such solutions inflexible because complicated programming was required whenever rules or regulations changed.  These legacy systems were also difficult to maintain, relied on aging hardware, could not integrate seamlessly with other government information technology systems, and required manual data entry from paper forms using an on-premise computer terminal.  As a result, existing UI systems were slow, inefficient, error-prone, and inaccessible to the broader public, such as the employers and employees who are required to submit information so that state agencies can levy taxes and dispense benefits appropriately.  BearingPoint recognized that UI systems could benefit from emerging client-server technology, which would enable the use of a self-service portal for employers, claimants, and administrators, allowing data to be submitted and reviewed in a streamlined process. BearingPoint also realized that UI systems for multiple states could be developed and maintained quickly and efficiently by first generating a "framework" system that provided developers with a suite of flexible "building blocks" that could be combined and adapted to suit the unique and constantly changing needs of each client.

20.     Prior to securing its first UI project, BearingPoint began developing the framework and software that would become the uFACTS solution.  BearingPoint was therefore able to demonstrate the value of uFACTS to interested customers during the bidding process.

21.     uFACTS is a customizable enterprise application for managing UI claims, appeals, and wage determinations.  The uFACTS solution framework is comprised of adaptable, reusable software assets and templates that accelerate the design, development, implementation, and ongoing operations of state UI programs.

22.     BearingPoint completed the first deployable version of uFACTS in 2007, in conjunction with a UI project for the State of Minnesota.

23.     Deloitte acquired substantially all of the assets of BearingPoint's North American public services business in May 2009, including the uFACTS solution and the intellectual property pertaining thereto, to which Deloitte continued to develop and create new material as described in greater detail below.

## II.     The uFACTS Computer Program Is Protected by Copyright

24.     The uFACTS computer program is of great value not only to Deloitte, but also to state government agencies across the United States and the citizens of those states.  It is the product of Deloitte's vast investment of resources, including time, effort, talent, creativity, and money.  It also embodies a series of original, creative choices by Deloitte and constitutes copyrightable subject matter under the copyright laws of the United States.

25.     Deloitte owns the copyrights for the uFACTS computer program (the "uFACTS Computer Program"), which were duly registered with the U.S. Copyright Office as Registration Nos. TX 8-559-593, TX 8-559-594, and TX 8-559-595.  True and correct copies of Deloitte's Certificates of Registration issued by the U.S. Copyright Office prior to the filing of this complaint are attached hereto as **Exhibit 1**.  Those certificates show the date on which they were issued for each registration.

26.     The uFACTS Computer Program—which includes source code, libraries, configurations, settings, logic, routines, scripts, and database schemas (as embodied in data

dictionaries)—is an original, creative computer program that was the product of many years of engineering discretion and substantial skills, resources, and creative energies.  For example, when developing software for UI systems, Deloitte chose from a wide range of options for structuring the organization and appearance of the user interface; the names, structures, and purposes of libraries, commands, and prompts; the algorithms that facilitate the program's functionality; the business logic underlying the program's operation; and the structure and taxonomy of the database used to store and retrieve information used by the program.

27.     Deloitte is the sole owner and proprietor of all right, title, and interest in and to the copyrights in the uFACTS Computer Program.  The copyrights in the uFACTS Computer Program are presently valid and subsisting and were valid and subsisting at all times affecting the matters complained of herein.

## III.    The uFACTS Trade Secrets Are Proprietary

28.     In addition to its copyrights, Deloitte owns trade secrets in its uFACTS solution, including (1) the application software that Deloitte develops and installs for clients, which consists of source code, libraries, configurations, settings, logic, routines, scripts, and database schemas (as embodied in data dictionaries) (the "uFACTS Application"); (2) design assets used by Deloitte to develop specific instances of the uFACTS software, including specification documentation and use cases (the "uFACTS Design"); and (3) the development framework used by Deloitte's software developers to implement the various components of the uFACTS application software (the "uFACTS Framework") (collectively, the "uFACTS Trade Secrets").

29.     **uFACTS Application:**  Deloitte develops proprietary application software for its clients, which includes the source code, libraries, configurations, settings, logic, routines, scripts, and database schemas that enable uFACTS to operate.  The software, which is embodied in source code and related material, is written in one or more computer-readable programming

languages or data structures, and specifies the detailed operation and structure of uFACTS.
Access to source code and related material provides insight into how Deloitte solved specific
programming problems and implemented uFACTS to address various client needs to create a
complete UI solution.

30.     Deloitte's uFACTS Application trade secrets include the non-public portions of
the registered uFACTS Computer Program, described above, as well as subsequent versions and
improvements that Deloitte has continued to develop.

31.     **uFACTS Design:**  Deloitte also generates design assets related to uFACTS that
describe in plain language how the software is intended to operate.  Deloitte's developers use
design assets to develop specific instances and features of the uFACTS software.  Certain such
assets describe specific modules or functions of the software, including, for example, the ordered
steps a user may execute using the module or function, the forms or information that will be
displayed to the user at each step, the data that may be accepted from the user, the structure of
the data and its location and identification in the database schema, and any interfaces with other
modules and functions.  They also tell a developer the purpose of the software to be implemented
from an end-user's perspective, and therefore provide additional insight into the source code and
other related material described above.  Deloitte's design assets are based upon and relate to the
uFACTS Application, and are used in conjunction with it.

32.     **uFACTS Framework:**  Deloitte further maintains a proprietary uFACTS
development framework, which is distinct from the uFACTS application software delivered to
clients, and is used by Deloitte's software developers to efficiently implement such application
software.  The uFACTS development framework consists of reusable and customizable software
packages that can be used to generate the uFACTS application software for customers.  The

uFACTS Framework includes both the software components and related confidential documentation.  Access to Deloitte's uFACTS Framework, when combined with its library of design assets, would allow rapid development of a complete uFACTS implementation customized to a client's needs.

33.     Deloitte has invested significant effort and money in developing the uFACTS Trade Secrets.  For example, Deloitte expended years of full-time effort building out the first version of uFACTS.  Deloitte has devoted millions of dollars and tens of thousands of person-hours to continue to develop the uFACTS Trade Secrets.  Deloitte derives economic value and gains a continued competitive advantage from the secrecy of the uFACTS Trade Secrets, in the form of revenue Deloitte earns from using the uFACTS Trade Secrets to develop UI solutions for state governments.

34.     The uFACTS Trade Secrets are highly confidential, and are maintained by Deloitte in strict confidence to protect their value and the substantial investments Deloitte has made to develop them.  For example, access to the uFACTS Trade Secrets is restricted to only select individuals, and even then, only subject to strict confidentiality and non-disclosure agreements.

35.     Further, as a condition of their employment and as part of their employment agreement, Deloitte's employees sign confidentiality agreements pursuant to which they agree, among other things, to not make improper use of any of Deloitte's confidential information or trade secrets.  In particular, they acknowledge that, by virtue of their employment with Deloitte, they will acquire and be exposed to, have access to, and make use of and/or create confidential information belonging to Deloitte.  Such confidential information consists of information not generally known to the public and which provides Deloitte a competitive advantage, and

11

expressly includes forms of intellectual property such as trade secrets and copyrightable software.  Deloitte's employees agree to hold in trust and confidence all such confidential information and further agree to only use such confidential information for the benefit of Deloitte and to not disclose any such confidential information to anyone outside of Deloitte without written authorization.  The confidentiality agreements described above are governed by New York law.

36.     In addition, Deloitte's policies require that upon termination of employment, employees must cease using and may not retain any Deloitte property whatsoever, including intellectual property and confidential information.

37.     Moreover, Deloitte's agreements with its clients include provisions protecting Deloitte's intellectual property and trade secrets.  For example, statements of work with state agencies recognize that Deloitte owns proprietary software, solutions or other proprietary material and information, including uFACTS.  They also recognize Deloitte owns the derivative works created based on Deloitte-owned proprietary software and other proprietary material and information.  Those agreements stipulate that Deloitte will retain "all right, title, and interest in" such software and information, and the client expressly agrees that its possession or use of uFACTS does "not transfer to it any title or ownership."  Moreover, the client is required to acknowledge that uFACTS technology, source code, and related information "are considered a trade secret" of Deloitte and therefore the client must agree not to "disclose such information to third parties," nor to "copy, modify, distribute or transfer by any means, display, sublicense, rent, reverse engineer, decompile or disassemble" uFACTS without authorization.  In sum, Deloitte grants its clients the right to use uFACTS, and in exchange those clients promise to maintain the confidentiality of any uFACTS trade secrets that, out of necessity, come into their possession.

38.     Accordingly, Deloitte's uFACTS Trade Secrets are not publicly known, nor are they generally known within any relevant industry, and are not susceptible to reverse engineering or independent discovery and would be difficult for others to acquire or duplicate through proper means.

**IV.     Sagitec Stole Deloitte's uFACTS Computer Program and uFACTS Trade Secrets**

39.     Sagitec improperly obtained and without authorization used Deloitte's uFACTS Computer Program and uFACTS Trade Secrets, largely through former Deloitte employees including David Minkkinen and Siva Sambasivam.  Both Minkkinen and Sambasivam have since been criminally indicted for misappropriating uFACTS technology for the benefit of Sagitec.  Upon information and belief, the actions of Minkkinen and Sambasivam described in the indictment were performed in the course of their work for Sagitec and at Sagitec's direction.

40.     Sagitec was founded in 2004 as a software provider serving the pension and benefits industry.  Upon information and belief, Sagitec did not offer any UI solutions until after hiring Minkkinen and Sambasivam to launch its Labor and Employment practice.

41.     Minkkinen was Deloitte Consulting's Labor and Employment Practice Leader from the time of Deloitte's acquisition of the uFACTS solution and its associated intellectual property from BearingPoint until he left Deloitte for Sagitec.  While at Deloitte (and BearingPoint prior to that), Minkkinen was the lead partner for UI modernization products in Minnesota, Florida, and Massachusetts.  Minkkinen led the team that developed the uFACTS solution framework and therefore had unfettered access to Deloitte's uFACTS software and designs, including the uFACTS Computer Program and uFACTS Trade Secrets.  Sagitec hired Minkkinen to become a senior partner overseeing Sagitec's new UI practice.

42.     Sambasivam was Deloitte Consulting's Lead System Architect for the uFACTS Solution Framework from Deloitte's acquisition of the uFACTS solution and its associated

intellectual property from BearingPoint until he left Deloitte for Sagitec. Sambasivam likewise had access to Deloitte's uFACTS Computer Program and uFACTS Trade Secrets.  Sagitec hired Sambasivam to become a senior partner overseeing client service delivery for Sagitec's new UI practice.

43.     Minkkinen and Sambasivam were instrumental in providing Sagitec with the information it needed to launch a UI practice.  Upon information and belief, before departing from Deloitte and after being offered jobs at Sagitec, Minkkinen and/or Sambasivam, without authorization and in violation of their confidentiality obligations to Deloitte, copied, downloaded, retained and/or transmitted Deloitte confidential information such as Deloitte's uFACTS Computer Program and uFACTS Trade Secrets, including at least the uFACTS source code, data dictionaries, and use cases.

44.     At least nine other Deloitte research and development personnel left Deloitte to work for Sagitec on its competing UI solution after Minkkinen and Sambasivam arrived.  All such employees would have had direct access to Deloitte's uFACTS solution, and as explained above, expressly agreed as a condition of their employment with Deloitte to hold Deloitte's proprietary and confidential information (including the uFACTS Trade Secrets) in strict confidence and not to retain or use any Deloitte property (including the uFACTS Computer Program and uFACTS Trade Secrets) after leaving Deloitte.

45.     Sagitec wasted no time leveraging the wealth of Deloitte proprietary and confidential information it now improperly possessed.  Upon information and belief, Sagitec employees, including at least Minkkinen and Sambasivam, copied, downloaded, obtained, and transmitted numerous Deloitte files to Sagitec, including the uFACTS Computer Program and

uFACTS Trade Secrets.  Sagitec's employees subsequently used them to design, develop, and market Sagitec's UI solution, Neosurance.

46.     For example, upon information and belief, Sagitec employees used the uFACTS Computer Program and uFACTS Trade Secrets by, among other things, directly incorporating one or more elements from the uFACTS source code and data dictionaries into Sagitec's Neosurance UI solution, without authorization, and selling, licensing, and distributing Neosurance to others.  In particular, Sagitec incorporated at least Deloitte's uFACTS data dictionaries into Neosurance, as evidenced by the significant overlap and similarity of field names and structure between the proprietary uFACTS data model and that of the Neosurance product sold to Washington, D.C. after Sagitec came into possession of the uFACTS Computer Program and uFACTS Trade Secrets.  On information and belief, Sagitec has continued to use and distribute the Neosurance software product incorporating such elements, including Deloitte's uFACTS data dictionaries.

47.     Additionally, upon information and belief, Sagitec employees used the uFACTS Trade Secrets by, among other things, reviewing uFACTS source code, data dictionaries, and other design assets and developing the Neosurance UI solution to incorporate identical or equivalent functionality that operates in the same manner.

48.     Moreover, upon information and belief, Sagitec employees, including Minkkinen and Sambasivam, accessed, used, and disclosed Deloitte's proprietary and confidential "uFACTS Solution Framework" documentation, which comprises hundreds of pages of detailed descriptions of the functionality of the uFACTS Framework, to develop Sagitec's competing Neosurance software.

49.     Upon information and belief, Sagitec's use of the uFACTS Trade Secrets and copying of the uFACTS Computer Program allowed Sagitec to accelerate the development of its competing Neosurance solution and bring Neosurance to market faster than it would have without access to the uFACTS Computer Program and uFACTS Trade Secrets.  Further, upon information and belief, Sagitec unlawfully used and copied, and is continuing to use and copy, Deloitte's uFACTS Computer Program and uFACTS Trade Secrets as part of the Neosurance Solution, including in its software and design.

50.     As a result of Sagitec's copyright infringement and misappropriation, by 2019, Sagitec was able to boast that it had "won 5 out of the last 6 procurements for state-wide UI modernization projects" including those in the states of Maryland, Ohio, West Virginia, South Carolina, and the District of Columbia.  By 2021, Sagitec had additionally sold and implemented its infringing Neosurance software for the states of Delaware, North Carolina, and Texas, as shown in the following illustration generated by Sagitec:



51.     In several instances, Sagitec has won those bids ***against Deloitte***, thereby

obtaining financial benefits from the use of Deloitte's uFACTS Computer Program and uFACTS

Trade Secrets to which Deloitte is solely entitled.

52.     On information and belief, state and federal agents began to investigate Sagitec's

possession and use of the uFACTS Trade Secrets.  On August 23, 2022, a federal grand jury,

having reviewed the evidence from that investigation, indicted Minkkinen and Sambasivam on a

range of criminal charges, including criminal trade secret misappropriation, conspiracy, and

making false statements, for their part in stealing and covering up the theft of Deloitte's uFACTS

Trade Secrets while they were Sagitec employees working on Sagitec's infringing Neosurance

solution.

53.     Even after the indictment, Sagitec has continued to offer its infringing Neosurance application to other states, including in direct competition with Deloitte.

**V.      Sagitec Conceals Its Theft**

54.     Upon information and belief, Sagitec took affirmative steps to conceal its infringement and misappropriation.  For example, Sagitec denied having in its possession any of Deloitte's uFACTS solution or related documentation and further refused to permit an independent code review to confirm that Sagitec in fact did not possess any of Deloitte's intellectual property.

55.     In addition, upon information and belief, Sagitec employees Minkkinen and/or Sambasivam represented that Sagitec had not obtained any software, source code, or artifacts authored by Deloitte despite knowing that, in fact, they had retained precisely that same information and conveyed it to others at Sagitec to develop Neosurance.  They also represented that no Deloitte software, source code, or artifacts had been incorporated into Sagitec's Neosurance software despite knowing that, in fact, they and others at Sagitec had incorporated and relied upon Deloitte's uFACTS Computer Program and uFACTS Trade Secrets in the course of developing of Neosurance.  Those assertions were false, and apparently did not stop there. The indictments of Minkkinen and Sambasivam include a charge of making "materially false, fictitious, and fraudulent statement[s]" to the government in connection with Sagitec's theft and misappropriation based on these representations.

56.     Moreover, upon information and belief, after using Deloitte's uFACTS Computer Program and uFACTS Trade Secrets to develop Neosurance, Sagitec took steps to conceal evidence of its possession of Deloitte's uFACTS Computer Program and uFACTS Trade Secrets in an attempt to cover up its unauthorized possession and use of such information.

**VI.    Deloitte Was and Continues to Be Harmed by Sagitec's Conduct**

57.    Deloitte has been harmed, and continues to be harmed, by Sagitec's conduct. Upon information and belief, among other things, Sagitec (1) profits commercially by infringing the uFACTS Computer Program and misappropriating the uFACTS Trade Secrets, (2) reduces and causes substantial harm to the value of the uFACTS Computer Program and uFACTS Trade Secrets, and (3) wrongfully deprives Deloitte of revenue and profit by using the uFACTS Computer Program and uFACTS Trade Secrets for its own financial benefit.

58.    Upon information and belief, Sagitec also has profited, and continues to profit, commercially by competing unfairly with Deloitte through the unauthorized use of Deloitte's intellectual property and unjustly enriching itself at Deloitte's expense.  As a result, Deloitte has been damaged by Sagitec's conduct in an amount to be determined according to proof at trial.

59.    Unless enjoined by this Court, upon information and belief, Sagitec intends to continue to infringe upon Deloitte's copyrights and profit from the misappropriation of the uFACTS Trade Secrets.  Accordingly, Deloitte has suffered irreparable harm and will continue to suffer irreparable harm unless Sagitec is enjoined from using, promoting, licensing, and/or selling its infringing Neosurance software.  Deloitte has no adequate remedy at law to redress all of the injuries that Sagitec has caused and intends to cause by its conduct.  Deloitte will continue to suffer irreparable damages until Sagitec's actions alleged above are enjoined by this Court.

60.    Deloitte has suffered all of the foregoing harms in New York, where Deloitte's headquarters is located and which provides the governing law for the confidentiality agreements that protect Deloitte's trade secrets and other confidential information.

## COUNT I
**Copyright Infringement (17 U.S.C. § 101 *et seq.*)**

61.     Deloitte repeats and realleges each and every allegation set forth above as though fully set forth herein.

62.     The uFACTS Computer Program is an original, creative work, and it is copyrightable subject matter under the copyright laws of the United States.

63.     Deloitte is the owner of valid copyrights in the uFACTS Computer Program, and the Register of Copyrights has issued valid Certificates of Registration for it as indicated in Exhibit 1.

64.     Deloitte has complied in all respects with 17 U.S.C. §§ 101 *et seq.*, and has secured the exclusive rights and privileges in and to the copyrights in the uFACTS Computer Program.

65.     As alleged above, Sagitec has infringed and will continue to infringe Deloitte's copyrights in the uFACTS Computer Program by, *inter alia*, reproducing, distributing, and creating derivative works based on it without any authorization or other permission from Deloitte.  Moreover, Sagitec provided the infringing Neosurance software to its customers knowingly and, by doing so, materially contributed to the infringing use of those works.  Sagitec has and had the right and ability to stop or limit such infringing use, and it chose not to do so because it profited from the use of the Neosurance software.  Likewise, Sagitec worked with related entities to develop and sell Neosurance, which itself constituted a direct infringement. Sagitec materially contributed to that use and profited from it while declining its right and ability to stop or limit it.  As a result, in addition to Sagitec's direct liability for its own actions, it is indirectly liable for any infringement by its related entities and customers.

66.     Sagitec's infringement of Deloitte's copyright has been deliberate, willful, and in utter disregard of Deloitte's rights.

67.     Upon information and belief, and as a direct and proximate result of its wrongful conduct, Sagitec has obtained benefits to which Sagitec is not entitled.

68.     As a direct and proximate result of Sagitec's wrongful conduct, Deloitte has been substantially and irreparably harmed in an amount not readily capable of determination.  Unless restrained by this Court, Sagitec will cause further irreparable injury to Deloitte.

69.     Deloitte is entitled to injunctive relief enjoining Sagitec, its agents and employees, and all persons acting in concert or participation with it, from engaging in any further infringement of Deloitte's copyrighted uFACTS solution and computer programs, as embodied in the uFACTS Computer Program.

70.     Deloitte is further entitled to recover from Sagitec the damages and costs it has sustained and will sustain, and any gains, profits, and advantages obtained by Sagitec as a result of its acts of infringement as alleged above.  At present, the amount of such damages, gains, profits, and advantages cannot be fully ascertained by Deloitte, but will be established according to proof at trial.

## <u>COUNT II</u>
**Trade Secret Misappropriation under New York Law**

71.     Deloitte repeats and realleges each and every allegation set forth above as though fully set forth herein.

72.     Sagitec's actions, as set forth herein, constitute trade secret misappropriation under New York law.  New York law applies because New York has the most significant relationship to the claim, at least because Deloitte is headquartered in New York and New York supplies the governing law for the confidentiality agreements that protect Deloitte's trade secrets.

Moreover, Deloitte has suffered both economic and intangible harms in New York based on the location of its principal place of business.

73.     Deloitte's uFACTS Trade Secrets, as described above, are protectable under New York law as a compilation of information that is used in Deloitte's business and that gives Deloitte an opportunity to obtain an advantage over competitors who do not know or use the uFACTS Trade Secrets.

74.     Deloitte took extensive measures to maintain the secrecy and confidentiality of the uFACTS Trade Secrets, including by requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Deloitte's trade secrets.  Deloitte's uFACTS Trade Secrets cannot be properly acquired or duplicated because of the limited number of individuals who are authorized to access such information, and the contractual obligations imposed on such individuals.  The uFACTS Trade Secrets are not otherwise known outside of Deloitte's business.

75.     The uFACTS Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, others who could obtain economic value from the use or disclosure of the uFACTS Trade Secrets.  The uFACTS Trade Secrets are therefore valuable to Deloitte and would be valuable to its competitors.

76.     Deloitte has expended significant effort and money to develop the uFACTS Trade Secrets, which would be exceedingly difficult to properly acquire or duplicate by others.

77.     Sagitec misappropriated the uFACTS Trade Secrets by acquiring the uFACTS Trade Secrets with knowledge or reason to know that the uFACTS Trade Secrets were acquired by improper means or without express or implied consent.

78.     The acquisition of the uFACTS Trade Secrets was improper because Deloitte employees who disclosed the uFACTS Trade Secrets to Sagitec, including at least Minkkinen and Sambasivam, did so in violation of confidentiality obligations owed to Deloitte.  Sagitec was aware or had reason to know that the Deloitte employees from whom it acquired the uFACTS Trade Secrets had a duty to maintain the confidentiality of the uFACTS Trade Secrets.

79.     Sagitec's conduct constitutes knowing, willful, and malicious misappropriation Deloitte's trade secrets to gain economic value from that information.

80.     As a result of Sagitec's actions, Deloitte has suffered direct and consequential damages, and is entitled to recover compensatory damages, including opportunity costs and punitive damages in an amount to be proven at trial.  Moreover, as a direct and proximate result of Sagitec's current and continued misappropriation of Deloitte's trade secrets, Deloitte has suffered will suffer imminent and irreparable harm.

81.     Deloitte has no adequate remedy at law.  Unless enjoined by this Court, Defendants' acts of misappropriation will continue and Deloitte will continue to suffer irreparable harm.

## <u>COUNT III</u>
**Trade Secret Misappropriation under the DTSA**

82.     Deloitte repeats and realleges each and every allegation set forth above as though fully set forth herein.

83.     Sagitec's actions, as set forth herein, constitute misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1839, *et seq.*

84.     Deloitte owns and possesses confidential information, including business, technical, and engineering information related to Deloitte's products and services, including the uFACTS Trade Secrets described above, which are protectable as trade secrets.

85.     The uFACTS Trade Secrets are used in connection with Deloitte's products and services, which are offered throughout the United States.

86.     Deloitte took reasonable measures to maintain the secrecy and confidentiality of the uFACTS Trade Secrets, including by requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Deloitte's trade secrets.  Deloitte's uFACTS Trade Secrets cannot be properly acquired or duplicated because of the limited number of individuals who are authorized to access such information, and the contractual obligations imposed on such individuals.

87.     The uFACTS Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, others who could obtain economic value from the use or disclosure of the uFACTS Trade Secrets.

88.     Sagitec misappropriated the uFACTS Trade Secrets by acquiring the uFACTS Trade Secrets with knowledge or reason to know that the uFACTS Trade Secrets were acquired by improper means or without express or implied consent.

89.     The acquisition of the uFACTS Trade Secrets was improper because Deloitte employees who disclosed the uFACTS Trade Secrets to Sagitec, including at least Minkkinen and Sambasivam, did so in violation of confidentiality obligations owed to Deloitte.  Sagitec was aware or had reason to know that it acquired the uFACTS Trade Secrets from Deloitte employees who had a duty to maintain the confidentiality of the uFACTS Trade Secrets.

90.     Sagitec's conduct constitutes knowing, willful, and malicious misappropriation Deloitte's trade secrets to gain economic value from that information.

91.     As a result of Sagitec's actions, Deloitte has suffered direct and consequential damages, and is entitled to recover compensatory damages, including opportunity costs and punitive damages in an amount to be proven at trial.

92.     As a direct and proximate result of Sagitec's current and continued misappropriation of Deloitte's trade secrets, Deloitte has suffered will suffer imminent and irreparable harm.

93.     Deloitte has no adequate remedy at law.  Unless enjoined by this Court, Defendants' acts of misappropriation will continue and Deloitte will continue to suffer irreparable harm.

## COUNT IV
### Unfair Competition under New York Law

94.     Deloitte repeats and realleges each and every allegation set forth above as though fully set forth herein.

95.     Deloitte devoted substantial amounts of time, effort, money, talent, and creativity to the development of its trade secrets and other confidential information pertaining to uFACTS. Deloitte has taken reasonable steps to maintain the secrecy of such confidential information and trade secrets, including by requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Deloitte's trade secrets and confidential information.  These confidential and proprietary trade secrets, which belong exclusively to Deloitte, are of substantial economic value and have conferred a competitive advantage on Deloitte.

96.     Sagitec has induced Deloitte employees and former employees to disclose to it, in violation of their contractual and fiduciary obligations to Deloitte, Deloitte's trade secrets and other confidential and proprietary information.

25

97.     Sagitec also has misappropriated Deloitte's trade secrets and other confidential and proprietary information, which Deloitte uses to provide technology solutions and services for UI software, to accelerate Sagitec's entry into the market for such solutions and services and enable it to compete with Deloitte in that market, which Sagitec would otherwise have been unable to do as rapidly as it did.

98.     Deloitte has no adequate remedy at law. Unless enjoined by this Court, Sagitec's acts of unfair competition will continue and Deloitte will continue to suffer irreparable harm.

## COUNT V
## Unjust Enrichment under New York Law

99.     Deloitte repeats and realleges each and every allegation set forth above as though fully set forth herein.

100.     Sagitec has been enriched and has benefitted from its use of Deloitte's trade secrets by, for example, accelerating the development of Sagitec's competing products and services, thereby gaining an unfair commercial advantage over Deloitte.

101.     Sagitec has been enriched at Deloitte's expense, as Deloitte has devoted substantial amounts of time, money, effort, talent, and creativity to the development of its intellectual property, including the confidential information and trade secrets relating to uFACTS.

102.     Sagitec knew that targeting Deloitte's employees, including the Sagitec Employees, and inducing them to disclose Deloitte's trade secrets and other confidential information would harm Deloitte.

103.     In light of Sagitec's inequitable  conduct, including its intentional and knowing misappropriation of Deloitte's intellectual property and confidential information, including its

trade secrets, for the purpose of exploiting and utilizing the trade secrets for Sagitec's own financial benefit, equity and good conscience require restitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Deloitte respectfully requests judgement against Sagitec as follows:

A.   Find that Sagitec has misappropriated the uFACTS Trade Secrets;

B.   Find that Sagitec has infringed the uFACTS Copyrights;

C.   Find a substantial likelihood that Sagitec will continue to misappropriate Deloitte's uFACTS Trade Secrets and infringe Deloitte's uFACTS Copyrights unless enjoined from doing so;

D.   Find that Sagitec has engaged in unfair competition;

E.   Find that Sagitec has unjustly enriched itself at Deloitte's expense;

F.   Issue a preliminary and permanent injunction enjoining Sagitec and its officers, managers, directors, agents, servants, employees, attorneys, licensees, successors, assigns, customers, and all other persons, firms, and corporations acting in concert or participation with them, from: (1) directly or indirectly infringing Deloitte's copyrights, including, but not limited to, reproducing, distributing, creating derivative works based upon, publicly performing, or displaying any of Deloitte's computer programs; and (2) using or disclosing Deloitte's trade secrets by, among other things, using the uFACTS software or designs for financial benefit.

G.   Order Sagitec to return all copies of Deloitte's uFACTS Computer Program and uFACTS Trade Secrets;

H.   Order impoundment or destruction of all infringing articles under 17 U.S.C. § 503, including, as necessary, while the present action is pending;

27

I.      Order Sagitec to render a full and complete accounting to Deloitte for Sagitec's profits, gains, advantages, or the value of the business opportunities received and costs or expenses avoided from the foregoing acts of infringement and misappropriation;

J.      Enter judgment for Deloitte against Sagitec for all damages suffered by Deloitte and for any profits, gains, or enrichment by Sagitec attributable to the misappropriation of Deloitte's trade secrets and infringement of Deloitte's copyrights;

K.      Enter judgement against Sagitec for monetary damages to compensate Deloitte for the harms described above, which may include the value of the software and designs taken; Deloitte's lost profits, unjust enrichment and disgorgement of profits; and expenses incurred by Deloitte in investigating Sagitec's misconduct;

L.      Award Deloitte compensatory relief for Sagitec's misappropriation of the uFACTS Trade Secrets;

M.      Award Deloitte punitive and enhanced damages and attorneys' fees for Sagitec's willful misappropriation of the uFACTS Trade Secrets;

N.      Award actual damages and infringer's profits under 17 U.S.C. § 504(b) for Sagitec's infringement of the uFACTS Copyrights;

O.      Award pre-judgment and post-judgment interest, costs, and expenses to the fullest extent available on the foregoing; and

P.      Grant such other, further, and different relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff Deloitte demands a trial by jury on all issues so triable in this action.

_/s/ John W. Shaw_
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
_Attorneys for Plaintiffs Deloitte Consulting LLP_
_and Deloitte Development LLC_

OF COUNSEL:
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Gregg F. LoCascio
Patrick Arnett
Nick Teleky
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave NW
Washington, DC 20004
(202) 389-5000

John F. Hartmann
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Dated: March 23, 2023