# EXHIBIT 1

Services ▾   Industries ▾   Insights ▾   Careers ▾

Search  🔍  🔍  🌐 US-EN ▾  📞  👤



Services

# Unemployment Claims Management Services
## Innovating to improve the integration and performance of UI programs

Outdated unemployment insurance (UI) management solutions are keeping many organizations from focusing on bigger, more pressing business and operational challenges. Learn how Deloitte's Unemployment Framework for Automated Claim & Tax Services (uFACTS) solution can help you cut through the complexity of unemployment insurance claims and tax matters to transform your organization.

## Transform the way you manage UI claims, taxes, and integrity efforts

In an uncertain economy, unemployment insurance claims can surge overnight. It's easy to see how staying focused on broader business objectives—all while managing new unemployment insurance claims, wage determinations, fraudulent applications, and unemployment insurance appeals—can feel like an uphill battle.

Deloitte's uFACTS™ solution was designed to streamline the process of managing unemployment insurance claims, appeals and wage determinations, freeing you to focus on solving pressing business challenges. Its open architecture is transformative in terms of technological advancement and capability; yet, it's compatible with multiple hardware systems for more choice, greater cost-efficiency, and easier integration. The result is a highly flexible and robust foundation that you can adapt as demand grows and unemployment insurance claims and appeals fluctuate.

❝ We have continued our relationship with Deloitte solely because we have been so pleased with their exceptionally high level of service,

innovative and collaborative approach, and professionalism. We consider Deloitte our partner in our continued pursuit of excellence

in administering and delivering the UI and workforce programs to New Mexico's businesses and jobless workers.

—Sue Anne Athens, chief information officer,
New Mexico Department of Workforce Solutions

## Streamline UI management with one user-friendly platform

Short for Unemployment Insurance Framework for Automated Claims and Tax Services, our uFACTS solution offers the fullest and most comprehensive capabilities in the marketplace. Its modern, web-based system architecture gives uFACTS robust tax and benefits functionality without compromising its capacity for necessary core services. Already at work in multiple states, uFACTS's user-friendly framework consists of:

- A complete code base

- Requirements artifacts

- Use cases

- Supplemental specification documents

- Code artifacts and generators

- Data models

uFACTS's proprietary foundation is the first of its kind to come to market, and is built upon seven basic system components that can be customized to meet your unique organization requirements and business goals. These include:

- **Tax Services**—uFACTS performs the core employer business processes associated with managing the revenue functions of a UI program.

- **Benefits Services**—uFACTS addresses the primary processes involved in the benefits side of your business.

- **Adjudication and Appeals Services**—uFACTS facilitates the collection, scheduling, and determination of unemployment insurance appeals.

- **Program Integrity Services**—uFACTS supports the establishment, prevention, detection, investigation, and collection of overpayments of UI benefits. uFACTS includes our innovative uDetect overpayment prevention capabilities.

- **Economic Research Services and Integrity**—uFACTS provides economic research to the US Department of Labor's (USDOL) Bureau of Labor Statistics (BLS), Employment and Training (ETA) Administration, and users of labor market information.

- **Administrative Services**—uFACTS streamlines the administrative and staff operations involved in running a UI agency.

- **Common Services**—uFACTS provides important functionality crossing all business processes and functional areas supported by each department within the UI agency, as well as other external state and federal agencies.

By placing all the components of unemployment insurance management services components on a single, innovative platform, uFACTS eliminates the labor-intensive process of reentering the same data on different platforms.

## uFacts: Where innovation meets insight

Our uFACTS platform has the largest installed base of any UI management solution in the market. It's just one of the ways Deloitte is rethinking unemployment insurance and workforce management services. Other innovations include:

- The first integrated UI tax and benefit solution in the market

- The largest number of successful UI implementations in the market

- The first combined UI tax and claims implementation in the country

- The first use of predictive analytics and behavioral nudging in UI program design

- The first integrated portal for third-party administrators

- The first UI modernization project to receive the annual recognition award for "Best Government to Citizen" implementation by the National Association of State Chief Information Officers (NASCIO)

The uFACTS platform demonstrates Deloitte's unique ability to combine technical experience with intelligent business insights to deliver dependable and secure technology solutions. Put its powerful technology to work for your business, and increase your flexibility and efficiency with a proven user-friendly interface, reliable service, and high return on investment.

## Get in touch



### Scott Malm

Labor Workforce Development Leader

smalm@deloitte.com    |    +1 651 246 5075

[in]

Scott is a principal in Deloitte Consulting LLP's Government & Public Services practice and serves as the market offering lead for our Labor Workforce Development practice. He has worked with US and i... More



### Latest news from @DeloitteGov

Sharing insights, events, research, and more

**Join the conversation**

Recommendations



**Closing the talent gap**

Five ways government and business can team up to reskill workers



**Reinventing workforce development**

Making job training more effective



**Public Sector Labor and Workforce Development Services**

Learn more about our practice



**Trends in government innovation**

Insights to action

| Contact us | Search jobs | Submit RFP | Subscribe to Deloitte Insights |
|---|---|---|---|

Global office directory  |  **US office locations**  |  🌐 US-EN ⌄

**About Deloitte**

About Deloitte

Client stories

My Deloitte

Deloitte Insights

Email subscriptions

Press releases

Submit RFP

US office locations

Alumni

Global office directory

Newsroom

Dbriefs webcasts

**Contact us**

f           https://www.facebook.com/DeloitteUS

𝕏           https://www.twitter.com/deloitteus

in          https://www.linkedin.com/company/deloitte/

▶           https://www.youtube.com/user/DeloitteLLP

D           http://www.glassdoor.com/Overview/Working-at-Deloitte-EI_IE2763.11,19.htm

⌾           https://www.instagram.com/lifeatdeloitteus/

**Making it Millennial**
Public policy and the next generation

**The secret to successful change**

**Addressing homelessness with data analytics**
A data-driven approach to homelessness

## Services

Tax

Consulting

Audit & Assurance

Deloitte Private

M&A and Restructuring

Risk & Financial Advisory

AI & Analytics

Cloud

Diversity, Equity & Inclusion

## Industries

Consumer

Energy, Resources & Industrials

Financial Services

Government & Public Services

Life Sciences & Health Care

Technology, Media & Telecommunications

# Careers

Careers

Students

Experienced Professionals

Job Search

Life at Deloitte

Alumni Relations

---

About Deloitte | Terms of Use | Privacy | Privacy Shield | Cookies | Cookie Settings | Legal Information for Job Seekers | Labor Condition Applications | Do Not Sell or Share My Personal Information

© 2023. See Terms of Use for more information.

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee ("DTTL"), its network of member firms, and their related entities. DTTL and each of its member firms are legally separate and independent entities. DTTL (also referred to as "Deloitte Global") does not provide services to clients. In the United States, Deloitte refers to one or more of the US member firms of DTTL, their related entities that operate using the "Deloitte" name in the United States and their respective affiliates. Certain services may not be available to attest clients under the rules and regulations of public accounting. Please see www.deloitte.com/about to learn more about our global network of member firms.



# EXHIBIT 2

**Services** ⌄    **Industries** ⌄    **Insights** ⌄    **Careers** ⌄

Search    🔍    🔍    🌐 US-EN ⌄    📞    

**People**

# Scott Malm

Labor Workforce Development Leader

✉ smalm@deloitte.com    📞 +1 651 246 5075    in

50 S 6th Street
Suite 2800
Minneapolis
MN
United States
55402-1844

📍 View map

Scott is a principal in Deloitte Consulting LLP's Government & Public Services practice and serves as the market offering lead for our Labor Workforce Development practice. He has worked with US and international public sector agencies for more than 15 years and has completed award-winning business and system modernization projects for multiple labor workforce development clients. Scott also serves as the public sector chief people officer.



Latest from Scott Malm

**See more conversations on Twitter.**

Contact us

Search jobs

Submit RFP

Subscribe to Deloitte Insights

Global office directory | US office locations

US-EN ⌄

About Deloitte

About Deloitte

Client stories

My Deloitte

Deloitte Insights

Email subscriptions

Press releases

Submit RFP

US office locations

Alumni

Global office directory

Newsroom

Dbriefs webcasts

**Contact us**

f   https://www.facebook.com/DeloitteUS

🐦   https://www.twitter.com/deloitteus

in   https://www.linkedin.com/company/deloitte/

▶   https://www.youtube.com/user/DeloitteLLP

ᴅ   http://www.glassdoor.com/Overview/Working-at-Deloitte-EI_IE2763.11,19.htm

📷   https://www.instagram.com/lifeatdeloitteus/

**Reinventing workforce development**
Making job training more effective

**Public Sector Labor and Workforce Development Services**

Learn more about our practice


**Deloitte's Child Support Solutions Practice**

Improving service delivery for child support agencies

## Services

Tax

Consulting

Audit & Assurance

Deloitte Private

M&A and Restructuring

Risk & Financial Advisory

AI & Analytics

Cloud

Diversity, Equity & Inclusion

## Industries

Consumer

Energy, Resources & Industrials

Financial Services

Government & Public Services

Life Sciences & Health Care

Technology, Media & Telecommunications

## Careers

Careers

Students

Experienced Professionals

Job Search

Life at Deloitte

Alumni Relations

About Deloitte | Terms of Use | Privacy | Privacy Shield | Cookies | Cookie Settings |

Legal Information for Job Seekers | Labor Condition Applications | Do Not Sell or Share My Personal Information

© 2023. See Terms of Use for more information.

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee ("DTTL"), its network of member firms, and their related entities. DTTL and each of its member firms are legally separate and independent entities. DTTL (also referred to as "Deloitte Global") does not provide services to clients. In the United States, Deloitte refers to one or more of the US member firms of DTTL, their related entities that operate using the "Deloitte" name in the United States and their respective affiliates. Certain services may not be available to attest clients under the rules and regulations of public accounting. Please see www.deloitte.com/about to learn more about our global network of member firms.



Official Professional Services Sponsor

Professional Services means audit, tax, consulting, and advisory.

36 USC 220506

# EXHIBIT 3

**Deloitte.**

News | 07 Sep 2022 | New York , NY

# Deloitte reports record FY2022 revenue

**Key highlights:**

- *Deloitte reports record FY2022 revenue of US$59.3 billion, a 19.6% increase in local currency*

- *Recognized for the fourth consecutive year by Brand Finance ⬈ as the strongest and most valuable commercial services brand in the world; ranks as one of the world's best workplaces*

- *Workforce expanded to approximately 415,000 globally*

**New York, NY, 8 September 2022**—Deloitte today reported aggregate global revenue of US$59.3 billion for the fiscal year ending 31 May 2022 (FY2022), a 19.6% increase in local currency from FY2021. In seven years, Deloitte revenue has grown US$24 billion, or 69%, in USD terms.

"Over the past several years, we have steered a remarkable course to become the leading professional services organization in the world. The power of our multi-disciplinary and private partnership model along with our global strategy drives our performance, allowing Deloitte to serve clients with distinction, take care of our people, give back to our communities, and uphold the public's trust," **says Punit**

**Renjen, Deloitte Global CEO**. "These principles have also helped us successfully navigate another tumultuous year of further unexpected shocks—from geopolitical conflicts to an ongoing pandemic to extreme environmental events and the highest inflation in a generation. By staying true to our purpose to make an impact that matters, our people have demonstrated their resilience by flexing and adapting to meet the challenges of the past year, all the while focusing on building better futures —for our people, clients, and communities."

## Guiding clients' journeys of transformation

At a time when uncertainty has become the new normal and change is happening at warp speed, Deloitte has proven it has the agility and capabilities to rise to the most unexpected challenges, while helping clients do the same.

In April, we announced a first-of-its-kind "partnership with purpose" with the **International Olympic Committee (IOC)**. Through this partnership, Deloitte will provide a global team with wide-ranging management and business consulting capabilities to support the IOC with its digital transformation strategy, advance the IOC's Olympic Agenda 2020+5 goal, and drive initiatives related to sustainability, diversity, equity and inclusion, and athlete career transition and well-being.

As Deloitte continues to take **measurable, decisive actions on climate change** throughout our operations and business, we are also assembling one of the largest global networks of sustainability capability through Deloitte's Sustainability & Climate practice, to help clients accelerate their journeys to a more sustainable future.

We have sustained our **relentless focus on quality**. We have transformed our Audit & Assurance practice through use of new technologies, training, and process improvement. As a result, Deloitte continues to be an industry leader in audit quality.

Through the power of our global organization, delivery centers, and strong collaboration between Consulting, Advisory, and Tax, we have increased our global alliance and ecosystems sales by 23% from the previous year, contributing to ~27% of Deloitte's FY2022 aggregate sales. We have strengthened our relationships with 15 alliances globally by co-creating innovative assets, going big on social venture initiatives (e.g., Sustainability and Climate, Diversity and Inclusion), and executing ecosystem strategies that drive short and long-term benefits to clients.

Among the businesses, Consulting revenue grew fastest at 24.4% in USD, followed by Financial Advisory, which grew 22.1%. Technology, Media & Telecommunications (TMT) was the fastest growing industry, followed by Financial Services. Among the regions, the Americas grew the fastest at 22.1%, followed by Asia Pacific (APAC) at 17.1%.

- **Audit & Assurance (A&A)** continued its commitment to quality, integrity, and independence in upholding Deloitte's vital role in the financial reporting ecosystem. Ongoing investments in the development of our A&A practitioners, solutions, and technologies enabled Deloitte to redefine what's possible in corporate reporting, audit, and assurance. This includes a critical focus on climate and sustainability and ESG reporting to further help clients provide transparent, reliable, and meaningful performance disclosures that respond to evolving market demands and stakeholder needs. Audit & Assurance revenue grew 8.7% in USD.

- **Consulting** helped clients build organizational resilience, pivot business models, and shape better futures using its scale, depth of experience, and breadth of offerings to deliver a full suite of Advise, Implement, and Operate services. We continued to invest in, and accelerate, digital transformation and help clients address sustainability and climate initiatives by scaling our practices in software engineering, artificial intelligence, and cloud and edge computing. Our practitioners continued to deliver solutions built with alliances and ecosystems and evolve cloud-based industry solutions like Converge$^{TM}$. We made targeted acquisitions to enhance our services in areas such as product engineering and digital content production. Consulting revenue grew 24.4% in USD.

- **Financial Advisory** supported clients on more than 10,000 transactions this year, covering the M&A lifecycle, debt and capital strategies, and Turnaround & Restructuring programs. Our Forensic practice collaborated with public, private, and third-party organizations around the world to identify vulnerabilities to global financial crime and design solutions for information sharing, legislative reform, and asset recovery. Our practitioners advised clients on strategies to drive sustainability and climate opportunities, model net-zero transformations, and strengthen stakeholder trust. Our Infrastructure practice shaped the future of mobility by improving transportation options for more than one billion people. Financial Advisory revenue grew 22.1% in USD.

- **Risk Advisory** developed sophisticated solutions to support organizations' evolving risk and regulatory needs. An example is RegHub, which enhances how companies structure, source, and manage compliance using digital cloud

platforms to track and address regulatory change. In addition, Deloitte Cyber practitioners used leading-edge technology to help clients protect against, and respond to, an array of cyber risks. Practitioners in Deloitte Cyber Operate teams also assisted global companies with digital identity and threat detection and response. Risk Advisory revenue grew 19.5% in USD.

- **Tax** guided clients through the shifting tax and economic landscape, helping them navigate the global push for tax transparency, the digitization of tax authorities, and other complex challenges arising from global tax reforms. With advanced tools that automate processes, speed response times, and improve accuracy, Deloitte worked together with clients to anticipate and address these issues, including major implications for data quality and access. At the same time, the acceleration of new business models drove demand for solutions to transform the way clients operate tax functions through outsourcing, in-sourcing, and co-sourcing routine compliance and reporting activities.

- Similarly, **Legal** helped clients transform with tech-based solutions for managing contract lifecycles, collaborating with advisors in real-time, and automating routine tasks, which improve the accuracy and speed of processes while producing cost efficiencies. Where permissible under local laws and regulations, Deloitte Legal practices also worked with clients to help them manage their intellectual property, navigate compliance with ESG regulations, navigate transactions and streamline contracts, and design and roll out policies to address the changing work environment and resolve disputes. Tax & Legal revenue grew by 11.5% in USD.

# Supporting our people and society

Our growth is powered by empowering our people to lead with purpose and enable them to develop their careers and thrive in an equitable and inclusive environment. To enable this, our member firms around the world have enhanced total rewards and added benefits. They have implemented new ways of working focused on flexibility to improve our people's well-being. Our culture, underpinned by Deloitte's Shared Values, encourages our people to take care of each other and connect to make a positive impact for our clients, our planet, and the communities in which we live.

Through our World*Impact* initiatives, we are focused on making a tangible impact on society's biggest challenges and creating a more sustainable and equitable world. In FY2022, our societal impact investment was US$284 million, bringing our seven-year investment total to US$1.7 billion.

**Aiding Ukraine:** Our commitment to our people also means supporting them when the unthinkable happens. When Russia invaded Ukraine, Deloitte responded swiftly to assist our people in Ukraine and move their families to safety. Our member firms and people around the world demonstrated incredible solidarity to support humanitarian response efforts, raising more than US$7 million in financial donations and providing in-kind, volunteer, and pro bono support to organizations across the region. We also joined the Tent Partnership for Refugees ↗, committing to support people forced to flee their homes in Ukraine, including supporting Ukrainian refugee women across Europe ↗. Deloitte is committed to supporting education, skills building, and employment opportunities for refugees and displaced persons around the world.

**World*Climate***: Climate change is the defining global challenge of our time. Through our World*Climate* strategy, we are making responsible climate choices within our organization and beyond. We launched a climate learning program last year, resulting in more than 300,000 professionals completing the learning, and 95% of professionals committing to reducing their climate impact. Recognizing that we must work with others to create the needed change, last year we joined the Glasgow Financial Alliance for Net Zero (GFANZ) ↗ and the World Economic Forum's First Movers Coalition ↗.

**World*Class***: We have accelerated progress toward our World*Class* ambition to reach 100 million individuals by 2030. Through our World*Class* Education Challenge ↗, we selected 12 innovators dedicated to addressing education challenges in their communities across Africa and Asia. We are applying our business skills to help scale their solutions to enable more of the world's students to have access to the highest quality education.

- In Nigeria, Job Oyebisi co-founded StanLab, a 3D virtual laboratory app where teachers set up virtual labs for students to learn, practice, and master STEM subjects. Deloitte Africa is supporting the expansion of their virtual 3D science laboratory platform to 10 new countries across Africa by 2023.

- In India, Utsav Kheria works directly with parents and educators to transform childhood education. Through Rocket Learning's tech-savvy program, they have reached one million children aged three to eight by sharing daily learning activities with parents via messaging applications. Deloitte India is helping Utsav scale his work even further, allowing him to reach more children, and expanding the ages he serves, too.

In FY2022, Deloitte reached 13.6 million individuals through more than 1,150 World*Class* programs and initiatives around the world. Since 2017, we have reached 34 million individuals.

**Diversity, equity, and inclusion (DEI):** Our global DEI strategy—ALL *IN*—emphasizes a workplace culture founded on respect and characterized by inclusive behaviors and an appreciation for diversity in all forms. ALL IN is focused not only on helping all our people live our values and thrive in a culture that is always respectful and inclusive, but also on designing and implementing specific interventions that can make a positive impact when it comes to our DEI aspirational goals.

Throughout the year, Deloitte has developed a range of internal resources—from inclusive leadership training and conversation guides to practical tips, programs, learning resources, and guidance on DEI-related topics, including race, LGBT+ inclusion, gender balance, mental health, neurodiversity, and disability.

**Learning and development:** Deloitte continued to provide virtual learning as part of a hybrid approach to professional development and to complement in-person training programs.

As our offices around the world reopened, learning teams worked to balance in-person classroom activities and virtual learning delivery. Deloitte University (DU) is our cultural home, providing in-person moments that matter—augmented by online learning programs. As the pandemic recedes, DU will be an even more important place for our people and leaders to meet safely in a renewed context of inclusion and physical and mental well-being. Time spent together in person at DU is focused on capability building, coaching, mentoring, and making connections.

We are also leveraging our virtual learning platform, which uses artificial intelligence to provide customized, online learning options covering more than 400,000 learning assets from internal and external sources. The platform personalizes learning based on the learner's needs and interests and democratizes the process by giving our people both a voice and a choice in their learning while enabling collaboration and individual contribution. By the end of FY2022, more than 360,000 of our people had accessed the platform.

**Measuring and reporting our ESG progress:** We continue to make progress toward our science-based targets, with renewable energy increasing to 91% compared to our

base year of FY2019 when it only made-up 12% of energy. We continue to communicate to our suppliers the importance we place on addressing climate and now have more than 240 suppliers who have set science-based targets, up from 130 suppliers last year. This year we were honored to be named as a Supplier Engagement Leader by CDP, a leading global nonprofit that promotes corporate environmental reporting. This recognition for effectively engaging our suppliers on climate change is awarded to only the top 8% of organizations who made disclosures to CDP on climate matters. Deloitte is committed to transparency when reporting our emissions. This includes a public CDP disclosure, a global report following the recommendations of the Task Force on Climate Related Financial Disclosures, and our Global Impact Report, which follows the standards of the Global Reporting Initiative and includes disclosure of the Stakeholder Capitalism Metrics.

"This is a decisive decade. The role public policy makers, NGOs, and, particularly, business leaders need to play is changing. As the world evolves, the challenges we face are becoming as complex as they are unpredictable," **adds Renjen**. "By working together to develop and scale solutions for addressing climate change, advancing equity, and returning to economic growth, among other issues, we can lead the way in building better futures for more of the world's people."

To learn more about Deloitte's societal impact and FY2022 performance, please read our 2022 Global Impact Report.

**About Deloitte**

"Deloitte," "us," "we" and "our" refer to one or more of Deloitte Touche Tohmatsu Limited ("DTTL"), its global network of member firms, and their related entities (collectively, the "Deloitte organization"). DTTL (also referred to as "Deloitte Global") and each of its member firms and related entities are legally separate and independent entities, which cannot obligate or bind each other in respect of third parties. DTTL and each DTTL member firm and related entity is liable only for its own

acts and omissions, and not those of each other. DTTL does not provide services to clients. Please see www.deloitte.com/about to learn more.

Deloitte provides industry-leading audit and assurance, tax and legal, consulting, financial advisory, and risk advisory services to nearly 90% of the Fortune Global 500® and thousands of private companies. Our professionals deliver measurable and lasting results that help reinforce public trust in capital markets, enable clients to transform and thrive, and lead the way toward a stronger economy, a more equitable society and a sustainable world. Building on its 175-plus year history, Deloitte spans more than 150 countries and territories. Learn how Deloitte's approximately 415,000 people worldwide make an impact that matters at www.deloitte.com.

**Press contact(s):**

**Steve Dutton**
Deloitte Global Communications
Tel: +1 202 738 7586
Mobile: +1 202 734 3207
sdutton@deloitte.com

**Claire Hassett**
Global Communications
Deloitte Global
Tel: +1-703-251-1207
clhassett@deloitte.com

## Key Contact



**Punit Renjen**

Deloitte Global CEO
Emeritus

✉ **punit@deloitte.com**

# Recommendations

Deloitte and SAP Expand Sustainable Operations to Help Clients Successfully Navigate the Rapid Pace of Change in Climate-Driven Transformation

New sustainability offerings and asset roadmap—built on SAP technology—can help clients navigate industry disruption and embed higher-level sustainability solutions in end-to-end strategies.

10 Aug 2022
**News**

## Deloitte Digital Recognized by MuleSoft With Six Awards,...

Top honors in the Americas and EMEA demonstrate excellence in API-led digital transformation for global enterprises.

24 Mar 2022

**News**

## Deloitte Named a Leader in IDC MarketScape for...

Deloitte has been named a Leader in the IDC MarketScape analysis of worldwide managed security services (MSS) providers for...

NEW YORK, NY, US  |  16 Sep 2022

**News**

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited ("DTTL"), its global network of member firms, and their related entities (collectively, the "Deloitte organization"). DTTL (also referred to as "Deloitte Global") and each of its member firms and related entities are legally separate and independent entities, which cannot obligate or bind each other in respect of third parties. DTTL and each DTTL member firm and related entity is liable only for its own acts and omissions, and not those of each other. DTTL does not provide services to clients. Please see www.deloitte.com/about to learn more.

© 2023. For information, contact Deloitte Global.

# EXHIBIT 4

Comparison of Districts Within the Third Circuit — 12-Month Period Ending December 31, 2022

| | | | DE | NJ | PA,E | PA,M | PA,W | VI |
|---|---|---|---|---|---|---|---|---|
| **Overall Caseload Statistics** | Filings | | 1,819 | 9,998 | 6,495 | 2,713 | 3,383 | 232 |
| | Terminations | | 2,193 | 9,906 | 7,081 | 2,952 | 3,594 | 304 |
| | Pending | | 2,078 | 63,988 | 9,280 | 3,753 | 3,754 | 1,360 |
| | Percent Change in Total Filings Current Year | Over Last Year | -8.7 | -56.6 | -6.1 | -3.7 | -6.8 | -53.5 |
| | | Over 2010 | -12.5 | -40.1 | -20.4 | -13.3 | 3.2 | -13.1 |
| | Number of Judgeships | | 4 | 17 | 22 | 6 | 10 | 2 |
| | Vacant Judgeship Months [1] | | 0.0 | 16.5 | 48.0 | 15.0 | 0.0 | 0.0 |
| **Actions per Judgeship** | **Filings** | Total | 455 | 588 | 295 | 452 | 338 | 116 |
| | | Civil | 426 | 533 | 267 | 356 | 283 | 70 |
| | | Criminal Felony | 26 | 43 | 20 | 79 | 42 | 44 |
| | | Supervised Release Hearings | 4 | 13 | 8 | 18 | 13 | 2 |
| | Pending Cases | | 520 | 3,764 | 422 | 626 | 375 | 680 |
| | Weighted Filings [1] | | 775 | 478 | 270 | 423 | 295 | - |
| | Terminations | | 548 | 583 | 322 | 492 | 359 | 152 |
| | Trials Completed | | 23 | 7 | 7 | 26 | 23 | 10 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 15.0 | 13.3 | 21.1 | 21.9 | 21.0 | 24.4 |
| | | Civil [1] | 8.0 | 9.8 | 6.5 | 12.7 | 6.6 | 16.7 |
| | From Filing to Trial [1] (Civil Only) | | 33.7 | 52.9 | 23.9 | 45.6 | 34.2 | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [1] | | 313 | 27,140 | 2,370 | 285 | 134 | 191 |
| | | | 16.6 | 43.5 | 29.5 | 11.2 | 5.3 | 44.4 |
| | Average Number of Felony Defendants Filed per Case | | 1.3 | 1.1 | 1.2 | 1.3 | 1.3 | 1.8 |
| | Jurors | Avg. Present for Jury Selection | 42.4 | 105.1 | 59.0 | 58.1 | 43.6 | 78.8 |
| | | Percent Not Selected or Challenged | 39.1 | 41.9 | 44.1 | 37.0 | 32.5 | 37.7 |

**Comparison of Districts Within the Eighth Circuit — 12-Month Period Ending December 31, 2022**

| | | | AR,E | AR,W | IA,N | IA,S | MN | MO,E | MO,W | NE | ND | SD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Overall Caseload Statistics** | Filings | | 2,655 | 1,164 | 999 | 1,154 | 4,078 | 3,078 | 2,849 | 1,394 | 793 | 1,289 |
| | Terminations | | 2,542 | 1,198 | 1,026 | 1,177 | 3,983 | 3,455 | 3,004 | 1,375 | 768 | 1,369 |
| | Pending | | 3,202 | 1,109 | 679 | 873 | 8,123 | 2,957 | 3,024 | 1,382 | 965 | 1,062 |
| | Percent Change in Total Filings Current Year | Over Last Year | 11.6 | 5.7 | -2.3 | -1.8 | -53.9 | -3.3 | -7.3 | -12.3 | -1.2 | -2.4 |
| | | Over 2010 | 2.9 | -6.8 | -14.5 | -8.0 | -36.9 | -32.1 | -14.0 | -11.5 | -3.6 | -4.9 |
| | Number of Judgeships | | 5 | 3 | 2 | 3 | 7 | 8 | 6 | 3 | 2 | 3 |
| | Vacant Judgeship Months [1] | | 0.0 | 12.0 | 0.0 | 0.0 | 12.0 | 0.0 | 0.0 | 0.0 | 0.0 | 12.0 |
| **Actions per Judgeship** | **Filings** | Total | 531 | 388 | 500 | 385 | 583 | 385 | 475 | 465 | 397 | 430 |
| | | Civil | 382 | 287 | 207 | 179 | 458 | 206 | 300 | 237 | 111 | 108 |
| | | Criminal Felony | 117 | 82 | 171 | 136 | 60 | 122 | 120 | 169 | 205 | 184 |
| | | Supervised Release Hearings | 32 | 20 | 122 | 70 | 65 | 57 | 55 | 59 | 82 | 138 |
| | Pending Cases | | 640 | 370 | 340 | 291 | 1,160 | 370 | 504 | 461 | 483 | 354 |
| | Weighted Filings [1] | | 475 | 344 | 421 | 361 | 468 | 373 | 411 | 453 | 422 | 420 |
| | Terminations | | 508 | 399 | 513 | 392 | 569 | 432 | 501 | 458 | 384 | 456 |
| | Trials Completed | | 16 | 12 | 65 | 41 | 9 | 20 | 18 | 12 | 27 | 48 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 27.5 | 9.8 | 10.4 | 11.4 | 15.3 | 15.6 | 21.0 | 13.5 | 14.9 | 11.5 |
| | | Civil | 12.2 | 11.7 | 8.8 | 11.0 | 5.5 | 10.3 | 8.2 | 6.8 | 13.5 | 10.4 |
| | From Filing to Trial [1] (Civil Only) | | 28.9 | - | - | - | 41.2 | 39.3 | 27.3 | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [1] | | 75 | 22 | 13 | 27 | 243 | 125 | 112 | 41 | 55 | 58 |
| | | | 4.0 | 3.2 | 3.6 | 5.7 | 3.2 | 8.2 | 7.5 | 6.6 | 19.0 | 14.5 |
| | Average Number of Felony Defendants Filed per Case | | 1.5 | 1.4 | 1.2 | 1.3 | 1.5 | 1.2 | 1.5 | 1.2 | 1.7 | 1.2 |
| | Jurors | Avg. Present for Jury Selection | 35.3 | 50.8 | 44.0 | 38.3 | 56.7 | 39.6 | 37.3 | 35.7 | 40.7 | 45.0 |
| | | Percent Not Selected or Challenged | 45.1 | 46.8 | 29.7 | 18.9 | 47.9 | 43.4 | 26.4 | 23.9 | 29.1 | 23.0 |

# EXHIBIT 5



820 First Street NE, Suite 510
Washington, DC 20002

Tel: 202-408-1080
Fax: 202-408-1056

center@cbpp.org
www.cbpp.org

Updated July 30, 2014

# Introduction to Unemployment Insurance

By Chad Stone and William Chen

The federal-state unemployment insurance system (UI) helps many people who have lost their jobs by temporarily replacing part of their wages while they look for work.  Created in 1935, it is a form of social insurance in which taxes collected from employers are paid into the system on behalf of working people to provide them with income support if they lose their jobs.  The system also helps sustain consumer demand during economic downturns by providing a continuing stream of dollars for families to spend.

The basic unemployment insurance program is run by the states, although the U.S. Department of Labor oversees the system.  The basic program in most states provides up to 26 weeks of benefits to unemployed workers, replacing about half of their previous wages, on average.  States provide most of the funding and pay for the actual benefits provided to workers; the federal government pays only the administrative costs.  Although states are subject to a few federal requirements, they are generally able to set their own eligibility criteria and benefit levels.

The permanent Extended Benefits (EB) program typically provides an additional 13 or 20 weeks of compensation to jobless workers who have exhausted their regular benefits in states where the unemployment situation has worsened dramatically (regardless of whether the national economy is in recession).  The total number of weeks available depends on a state's unemployment rate and its unemployment insurance laws.  Normally the federal government and the states split the cost of EB, but the 2009 Recovery Act authorized temporary full federal funding, which continued through 2013.

During recessions and while unemployment remains high during recoveries, the federal government has historically created temporary, wholly federally funded programs providing further weeks of benefits.  The most recent such program, Emergency Unemployment Compensation (EUC), ran from June 2008 through December 2013.  (Efforts to enact a further temporary extension have so far been unsuccessful.)  Some states also may offer additional benefits under separate state-funded programs.

Temporary federal programs implemented during recessions are fully federally funded.  However, the length and depth of the protracted economic slump following the 2007-2009 Great Recession has exacerbated serious solvency problems in most states' regular UI programs that they have not yet addressed.

1

The following analysis explains:

- the structure and goals of the UI system;
- who is eligible for unemployment insurance;
- what kind of benefits are available;
- what additional benefits are available during economic downturns;
- how unemployment insurance is funded and current solvency issues; and
- how unemployment insurance affects the economy.

## The Structure and Goals of the UI System

UI is a joint federal-state system that features extensive state flexibility. As Franklin D. Roosevelt's Committee on Economic Security, which provided the basic blueprint for what would become the Social Security Act, stated, "The States shall have broad freedom to set up the type of unemployment compensation they wish."[1]

Federal requirements for state UI systems are minimal and are designed to ensure both that UI provides a basic level of protection for eligible workers and that the program serves as a macroeconomic stabilizer in times of economic weakness. Federal law defines unemployment compensation as "cash benefits payable to individuals with respect to their unemployment"[2] and lays out a few basic requirements, principally the following two:

- "all money withdrawn from the unemployment fund of the State shall be used solely in the payment of unemployment compensation";[3] and
- states cannot impose excessively burdensome "methods of administration" that block access for otherwise eligible individuals.[4]

These requirements ensure that states maintain programs that offer a basic level of protection to workers with a sufficient employment record and who lose their jobs through no fault of their own. Within these basic protections, states are free to choose and adjust employer tax rates, benefit levels and duration, and eligibility criteria, such as the extent and duration of prior employment necessary to qualify for benefits.[5]

---

[1] Frances Perkins, "Report to the President of the Committee on Economic Security," Committee on Economic Security, 1935, http://www.ssa.gov/history/reports/ces.html.

[2] Section 3306(h) of the Federal Unemployment Tax Act.

[3] Section 3304(a)(4) of the Federal Unemployment Tax Act.

[4] Section 303(a)(1) of the Social Security Act.

[5] For a comparison of state UI laws and significant provisions see Department of Labor, Employment and Training Administration, "Comparison of State Unemployment Laws," http://ows.doleta.gov/unemploy/comparison2014.asp.

## Who Is Eligible for Unemployment Insurance?

To qualify for unemployment insurance benefits, a person must:

(1) have lost a job through no fault of his or her own;

(2) be "able to work, available to work, and actively seeking work;" and

(3) have earned at least a certain amount of money during a "base period" prior to becoming unemployed.

States vary considerably in how they apply these general criteria. For example, some states do not cover part-time workers unless they are willing to take a full-time job, while other states allow these workers to qualify even if they are seeking another part-time job. Also, states have some choice about the base period of employment used to determine eligibility.[6]

Since the late 1950s, fewer than half of unemployed workers have actually received unemployment insurance, except during recessions.[7] To be sure, unemployment insurance is not designed to cover all unemployed workers; it does not cover people who leave a job voluntarily, people looking for their first job, and re-entrants who previously left the labor force voluntarily. But the growing percentage of unemployed workers who meet the basic criteria described above yet fail to satisfy their *state's* eligibility criteria — often established decades ago (in a very different labor market) — has made it harder for UI to fulfill its mission.

In 1994, President Clinton and congressional leaders appointed a bipartisan Advisory Council on Unemployment Compensation to address these problems.[8] The commission identified a number of serious problems with UI eligibility and other rules and recommended a series of reforms. While some states instituted some of the reforms, the federal government made no comprehensive effort to consider the recommendations until very recently. The 2009 Recovery Act made $7 billion available through 2011 to states that modernized their unemployment insurance law to expand eligibility; 38 states plus Washington, D.C., Puerto Rico, and the U.S. Virgin Islands received federal funds under this provision.

## What Benefits Does Unemployment Insurance Provide?

Workers receive unemployment benefits from the state where they were employed, even if they reside in a different state. When someone applies for benefits — typically over the phone or online — the state determines whether the person is eligible and the amount of benefits for which he or

---

[6] The "standard base period" is the first four of the last five completed calendar quarters at the time the person files for benefits, but states can adopt an "alternative base period" consisting of the four most recent complete calendar quarters.

[7] The share was less than 40 percent prior to the start of the Great Recession; it went much higher as job losses mounted through the 2009-2010 winter but subsequently receded to about 40 percent by the end of 2013. The rate goes up in recessions because those who have lost their jobs account for a larger fraction of the unemployed and because people unemployed for 27 weeks or longer may continue to receive benefits through temporary, federally funded programs. With the lapse of temporary federal benefits at the end of 2013, the rate fell to under 30 percent over the first half of 2014.

[8] This blue-ribbon panel headed by former Bureau of Labor Statistics Commissioner Janet Norwood conducted an extensive review and made recommendations for improving the UI system in a number of areas, including eligibility and trust fund solvency.

she qualifies.  The benefits provided to any particular individual will vary in two respects:  the number of weeks that they last and their weekly dollar amount.

*Number of weeks.*  While some states simply provide the same number of weeks of benefits to all unemployed workers, most states vary the number of weeks according to the amount of a worker's past earnings, whether the worker had earnings in each of the four calendar quarters that make up the base period, and how evenly those earnings were distributed over the base period.

In most states, workers are eligible for a maximum of 26 weeks,[9] although many UI recipients qualify for fewer than the maximum number of weeks because of uneven earnings or a brief work history.  In normal economic times, most workers find new jobs before using the maximum number of weeks available; before the recession that began in December 2007, the average duration of benefits for UI recipients was 15 weeks.[10]

*Dollar amount.*  The average unemployment benefit is a little more than $300 per week.  However, individual benefit levels vary greatly depending on the state and the worker's previous earnings.  In addition, in several states, workers receive higher benefits if they have dependents.

State laws typically aim to replace about half of a worker's previous earnings up to a maximum benefit level.  The maximum state-provided benefit in 2014 ranges from $133 in Puerto Rico and $235 in Mississippi (the lowest for a state) to $679 ($1,019 with dependents) in Massachusetts.[11] Because the benefit is capped, UI benefits replace a smaller share of previous earnings for higher-wage workers than lower-wage workers.  In 2013, the most recent year for which data are available, the average UI recipient nationwide got a benefit that replaced 46.6 percent of his or her earnings, but that "replacement ratio" ranged from 33.9 percent in Alaska to 54.3 percent in Hawaii.[12]

## What Additional Benefits Are Available During Economic Downturns?

Three types of programs can potentially provide extra weeks of benefits to workers in states where unemployment has increased significantly:  (1) temporary federal programs that Congress generally establishes during national economic downturns; (2) the permanent federal-state Extended Benefits (EB) program, which is available to hard-hit states even when the national economy is not performing poorly; and (3) additional temporary or permanent programs that states sometimes put

---

[9] Eight states offer fewer than 26 weeks of benefits:  Michigan (20 weeks), Missouri (20), South Carolina (20), Arkansas (25), Florida (12 to 23 weeks depending on the unemployment rate), Georgia (12 to 20 weeks depending on the unemployment rate), North Carolina (12 to 20 weeks depending on the unemployment rate), and Kansas (16, 20, or 26 weeks depending on the unemployment rate).  Two states offer more than 26 weeks:  Montana (28) and Massachusetts (30, only when federal emergency benefits are not in effect).

[10] Data from U.S. Department of Labor Employment and Training Administration's Unemployment Insurance Chartbook, http://workforcesecurity.doleta.gov/unemploy/chartbook.asp.

[11] Department of Labor Employment and Training Administration, "Comparison of State Unemployment Laws: Monetary Entitlement," https://ows.doleta.gov/unemploy/pdf/uilawcompar/2014/monetary.pdf.

[12] Data available at http://workforcesecurity.doleta.gov/unemploy/docs/repl_FY13.txt.

in place.[13]  The dollar amount of additional benefits an individual receives is typically the same as his or her regular state benefits and the duration is based on the duration of those regular benefits.[14]

*Temporary emergency federal benefits.*  When unemployment is high during recessions and in the early stages of recoveries, the federal government has historically funded additional weeks of emergency benefits for workers who have exhausted their regular state-provided UI benefits.  In response to the recent Great Recession, lawmakers enacted the Emergency Unemployment Compensation (EUC) program.  At its peak, EUC provided up to 34 weeks of emergency federal benefits in all states and up to 53 weeks in states with unemployment rates of 8.5 percent or higher.

With long-term unemployment at unprecedented levels in the wake of the Great Recession, policymakers extended the program past its scheduled expiration date several times.  They did, however, reduce the maximum number of weeks available in February 2012[15] (see Table 1) and then allowed the program to expire altogether at the end of 2013.  (Efforts to restore the program in 2014 have foundered.)

*The permanent Extended Benefits program.*  Congress enacted the EB program in 1970 to provide additional weeks of benefits to workers in high-unemployment states who have exhausted their regular, state-provided UI benefits.  Normally, the federal government and the states split the cost of EB equally.  However, the federal government began to fully fund the program on a temporary basis following enactment of the Recovery Act in February 2009.  States resumed responsibility for their half of the funding in 2014.

A state must provide up to 13 weeks of EB when the insured unemployment rate (IUR)[16] — the number of UI recipients as a percentage of the total number of people working in jobs in which they would potentially be eligible for UI[17] — reaches at least 5 percent and if the IUR is at least 20 percent higher than it was during the same period in each of the previous two years.[18]

---

[13] For current information on the maximum number of weeks UI benefits are available in each state, please refer to "Policy Basics: How Many Weeks of Unemployment Compensation Are Available?" Center on Budget and Policy Priorities, http://www.cbpp.org/files/PolicyBasics_UI_Weeks.pdf.

[14] The Recovery Act temporarily increased weekly benefit amounts by $25 a week for all UI recipients.  This Federal Additional Compensation was available for individuals receiving UI from February 2009 until December 2010 (individuals who claimed UI after May 27, 2010 were not eligible for the increased benefits, but those who had entered the system prior to this date received the extra $25 until December 2010).

[15] See Hannah Shaw and Chad Stone, "Conference Agreement Far Better For Unemployed Workers and UI System Than Original House Bill," Center on Budget and Policy Priorities, February 17, 2012, http://www.cbpp.org/cms/index.cfm?fa=view&id=3686.

[16] The maximum duration of EB is the lower of 13 weeks or half of the duration of regular benefits.  Therefore, the maximum duration of EB in states that have cut the duration of regular benefits is less than 13 weeks (e.g., 10 weeks are available in a state with a maximum of 20 weeks of regular benefits).

[17] Most workers in the United States — 81.9 percent of the civilian labor force in 2010 — work in jobs in which they are eligible for UI (i.e., their employers are required to contribute money to the federal unemployment program).  However, employees of certain non-profit organizations, state and local governments, certain agricultural labor and some domestic services, as well as individuals who are self-employed, are not eligible for federal unemployment compensation.

[18] Technically the measure used is the average insured unemployment rate (IUR) over the preceding 13 weeks.

| Table 1 | |
|---|---|
| **Additional Weeks of Unemployment Benefits Available, 2013** | |
| **Program and Unemployment Rate Threshold** | **Additional Weeks** |
| *Emergency Unemployment Compensation (EUC)\** | |
|     Less than 6 percent | 14 |
|     at least 6 percent, but less than 7 percent | 28 |
|     at least 7 percent, but less than 9 percent | 37 |
|     at least 9 percent | 47 |
| *Extended Benefits (EB)\*\** | |
|     at least 6.5 percent, but less than 8 percent | 13 |
|     at least 8 percent | 20 |

\* EUC is not currently in effect

\*\* These unemployment rates apply to states that have enacted the optional trigger and that also satisfy the look-back provision described in the text.

Note:  States that offer fewer than 26 weeks of regular benefits have proportionally fewer federal benefits available for those who file for UI.

States can also adopt optional triggers based on their *total* unemployment rate (TUR) — the number of unemployed people as a percentage of the total labor force (both employed and unemployed).[19]  Under these optional triggers, states can offer up to 13 or 20 weeks of EB if the TUR reaches certain thresholds (see Table 1) and is at least 10 percent higher than in the same period in either of the two preceding years.  The optional triggers are more likely to activate EB than the IUR trigger, and many states that did not already have the optional triggers in place adopted them to take advantage of Recovery Act funding.[20]

The "look back" provision in the EB program — the requirement that a state's unemployment rate not only exceed certain thresholds but be significantly higher than in previous years — did not anticipate a recession in which large numbers of states would experience as protracted a period of very high unemployment as occurred in the Great Recession.  Facing a prolonged economic slump, Congress accorded states the option of temporarily adopting a three-year "look back" in 2010, which many did.  This provision was in effect through the end of 2013, although most states have not satisfied even that look-back requirement since 2012.

Before 2012, states with high unemployment rates that adopted the optional EB triggers provided a maximum of 99 weeks of UI (26 weeks of regular, 53 weeks of EUC, and 20 weeks of EB).  For all practical purposes that number fell to 73 weeks (26 weeks of regular UI and 47 weeks of EUC, and that only in a couple of states with unemployment of at least 9 percent) in 2013.

---

[19] Technically the measure used is the average total unemployment rate (TUR) over the preceding three months.

[20] Many of the states that adopted optional triggers made them contingent on full federal funding of EB; in 2014 only 11 states had the optional trigger in law.

*State programs.*  During some downturns, some states have used their own funds to provide additional weeks of benefits to jobless workers who exhaust all other forms of unemployment benefits.  Some states also have *permanent* programs that provide additional benefits, but very few are currently in effect, generally because of flawed triggers or inadequate funds.

*Work sharing.*  UI is designed to provide financial assistance to workers who lose their jobs through no fault of their own.  An alternative approach — known as work sharing or short-time compensation — avoids layoffs and the potential for temporary unemployment spells to turn into long-term unemployment by allowing employers to set up suitable arrangements in which employers reduce the hours of a larger number of workers, who can then apply for UI to replace some of their lost earnings.  Work sharing appears to have held down unemployment in Germany during the Great Recession and 2012 legislation expanded the U.S. work-sharing program.[21]  Despite its attractiveness as a way to reduce layoffs and long-term unemployment, work sharing has yet to become widely embraced in the United States.

## How Is Unemployment Insurance Funded?

### UI Taxes

The basic UI system is funded by taxes that employers pay on behalf of their employees.[22]  While technically employers pay both the federal and state taxes, economists generally regard the tax as falling on workers on the theory that the dollars employers pay in tax would otherwise go into workers' paychecks.

States levy taxes on employers to finance regular UI benefits for unemployed workers (the federal government typically picks up the full tab for temporary emergency UI benefit programs such as EUC).  The federal government also levies a UI tax on employers, under the Federal Unemployment Tax Act (FUTA), to finance the administration of state UI programs.  This tax also supports the account that has been used to pay for extended weeks of benefits during most recessions[23] and the fund from which states can borrow when necessary to pay regular state UI benefits.[24]

The federal tax is equal to 0.6 percent of the first $7,000 paid annually to each employee.[25]  This tax is regressive; because most workers earn more than $7,000 per year, they are effectively paying the same flat tax of $42 per year regardless of income.  FUTA taxes thus represent a much smaller share of the wages of high-wage workers than low-wage workers.

---

[21] Neil Ridley and George Wentworth, "A Breakthrough for Work Sharing," Center for Law and Social Policy and National Employment Law Project, April 2012, http://www.nelp.org/page/-/UI/2012/BreakthroughForWorkSharing.pdf?nocdn=1.

[22] State UI taxes are explicitly deducted from employees' pay in Alaska, New Jersey, and Pennsylvania.

[23] These are funded out of general Treasury funds, as EUC was.

[24] In the Great Recession, however, states' borrowing for their UI programs has far exceeded the available federal UI trust fund reserves, and the federal trust fund is borrowing, in turn, from the U.S. Treasury to make the loans to the states.

[25] Technically, the gross FUTA tax rate is 6.0 percent, but states with UI programs approved by the Department of Labor and no delinquent loans from the federal trust fund receive a 5.4 percent credit, making the effective tax rate 0.6 percent.  An additional 0.2 percent FUTA surtax was established in 1982 — raising the per-employee federal UI tax rate to 6.2 percent ($56 on the first $7,000 paid) — but Congress allowed it to lapse in July 2011.

If, in better economic times, federal trust fund balances grow large enough, the law stipulates that additional transfers be made automatically to the states.[26]  These "Reed Act" transfers (named after the 1954 legislation establishing this policy) go directly into state unemployment trust funds.  States can use this money only for unemployment insurance but are not required to use it to improve or expand their UI benefits.

The state UI tax is levied not on a firm's entire payroll but rather on an initial dollar amount, called the taxable wage base, of each employee's earnings.  The minimum taxable wage base that a state can use is $7,000 per employee.  This minimum taxable base is by law the same as the taxable wage base for the federal UI tax and has not been increased since 1983.[27]  The median state taxable wage base in 2012 was $12,000.[28]

An employer's tax paid per employee is determined by the taxable wage base and the tax rate. Each employer's tax rate is determined by its "experience rating," which in turn is based on the employer's history of laying off workers who then receive UI benefits.  Businesses with higher layoff rates face a higher UI tax rate and thereby contribute more to the program that supports these workers than businesses with lower layoff rates.  On average, employers contributed $489 per worker to state UI programs in 2012 (less than 1.0 percent of total wages paid),[29] but that amount varies greatly across states and among employers within states.  Due to the caps on taxable earnings, the state unemployment insurance tax is, like the federal tax, regressive.

## Solvency Issues

The U.S. unemployment insurance system was designed to be "forward funded."  That is, states are supposed to levy taxes on employers to build up balances in their UI trust funds during periods of healthy economic growth, and then draw down those balances to provide payments to unemployed workers during local or national economic downturns and recessions.  Forward funding ensures that when recessions hit, unemployment payments will help sustain laid-off workers and their families, whose spending in turn will support the economy when consumer demand is weak.

Rather than forward fund their programs, however, many states adopted a "pay-as-you-go" approach that held taxes artificially low when the economy was healthy instead of preparing for recession by building adequate trust fund reserves.

Though more than a decade had passed since the 1994 bipartisan advisory council urged states to return to forward financing,[30] many states kept state UI taxes artificially low and by 2008 had actually reduced their UI tax rates to historically low levels.[31]

---

[26] Reed Act distributions have been made in only eight years:  from 1956 through 1958 and from 1998 through 2002.

[27] Technically, states may set their taxable wage bases below the $7,000 federal taxable wage base, but the law requires the federal government to sharply increase federal UI taxes on employers in states that fail to meet this minimum.  As a result, no state sets its taxable wage base below $7,000.

[28] The lowest state taxable wage base in 2012 was $7,000 (in Arizona, California, and Puerto Rico); the highest was $41,300 in Washington.  Washington is one of 18 states where the taxable wage base is automatically adjusted to keep up with wage growth (typically on an annual basis).

[29] Calculations based on data from Department of Labor Employment and Training Administration, "Financial Data Handbook 394 Report," http://www.ows.doleta.gov/unemploy/hb394.asp.

[30] In its recommendations, the Advisory Council on Unemployment Compensation wrote, "During the past decade, many states with low or negative trust fund reserves have found themselves in the position of either having to increase

8

Therefore, a number of states' UI trust funds were inadequately prepared for the Great Recession, and most states had to borrow from the federal government to help pay benefits. Because unemployment is expected to remain high for some time, such borrowing will likely continue for the next few years.[32]

States are required to fully repay the loans, with interest, within two years of borrowing the funds. If a state does not repay the full amount, the federal government will recoup its funds by effectively raising the federal tax on employers within the state each year until the loan is repaid.[33] As a result, employers in 11 states and the Virgin Islands face higher FUTA tax rates for the 2014 tax year.[34]

## Unemployment Insurance as Economic Stimulus

Unemployment benefits are designed first to relieve distress for jobless workers and their families. In recessions and the early stages of recoveries, however, they provide an additional benefit: stimulating economic activity and job creation. In fact, a major reason Congress created the basic UI program during the Great Depression was to help boost the economy and jobs.

The problem for most businesses in an economic slump is not lack of capacity to meet existing demand but lack of demand to fully utilize their existing capacity. To stop the destruction of jobs and begin to put people back to work, it is critical to stimulate demand. One of the best ways to do this is to target financial relief toward unemployed workers who need a replacement for lost income. People whose income is disrupted in a recession and who lack the savings to tide them over are the ones most likely to spend quickly any added income they receive. Thus, policies that put customers in stores with money to spend will likely do more to close the output gap and create jobs than, for example, business tax breaks.

---

taxes on employers in the midst of an economic downturn, or having to take measures to restrict eligibility and benefits for the unemployed. . . . The Council believes that it would be in the interest of the nation to begin to restore the forward-funding nature of the Unemployment Insurance system, resulting in a building up of reserves during good economic times and a drawing down of reserves during recessions." Advisory Council on Unemployment Compensation, *Report and Recommendations,* February 1994.

[31] In inflation-adjusted dollars, average UI taxes per employee in 2008 were less than 80 percent of the 1994 average and only a little over half of the 1984 average. The Department of Labor found that 28 states made significant legislative reductions of UI taxes between 1995 and 2001. "National UI Issues Conference: State UI Taxes and Trust Fund Solvency," Presentation by Ronald Wilus, U.S. Department of Labor, June 22, 2010.

[32] Thirty-five states and the U.S. Virgin Islands borrowed during 2008 through 2011. Total outstanding loans peaked at more than $47 billion in mid-2010. In June 2014, 11 states and the Virgin Islands had outstanding loans totaling $14 billion; see http://www.workforcesecurity.doleta.gov/unemploy/budget.asp#tfloans.

[33] Technically, the FUTA credit is reduced, raising the effective FUTA tax by 0.3 percent each year ($21 a worker in the first year loans are due, $42 per worker in the next year, and so on). Employers in borrowing states are responsible for paying down the loan balances through the reduced FUTA credit, but states themselves are responsible for paying interest to the federal Treasury on the loans. States typically finance the interest repayments by raising taxes on employers.

[34] Unless their loans are repaid by November 10, 2014, employers in Delaware will pay an additional $63 a worker, employers in eight states (AR, CA, CT, KY, NY, NC, OH, RI) and the Virgin Islands will pay an additional $84 a worker, and employers in two states (IN, SC) will pay an additional $105 a worker; see http://www.workforcesecurity.doleta.gov/unemploy/docs/potential_credit_states_2014.xlsx. For more, see Michael Leachman, "Bill for Adequate Unemployment Insurance Taxes Now Coming Due in Many States," *Off the Charts* blog, Center on Budget and Policy Priorities, January 30, 2012, http://www.offthechartsblog.org/bill-for-inadequate-unemployment-insurance-taxes-now-coming-due-in-many-states/.

As the Congressional Budget Office (CBO) has explained, unemployment insurance "adds to overall demand and raises employment over what it otherwise would have been during periods of economic weakness."[35]  UI benefits are targeted toward involuntarily unemployed workers whose income has fallen, a group that tends to be concentrated in the areas and industries that a slowdown affects most.  Supporting spending by unemployed workers in hard-pressed communities helps prevent the spread of layoffs and job losses in those communities.

Because the jobs that greater UI spending preserves or creates are so diffused through the economy, estimating their magnitude requires statistical analysis rather than direct enumeration. Nevertheless, most economists believe the policy is highly effective.  CBO consistently ranks assistance for unemployed workers as one of the most effective policies for generating economic growth and creating jobs — even rating it first among the 11 spending and tax measures evaluated in a 2011 report.[36]  Mark Zandi, chief economist of Moody's Analytics, estimates that each dollar of UI benefits generates $1.55 in new economic activity in the first year.[37]

A Labor Department report commissioned during the George W. Bush Administration and released in 2010 reinforced CBO's conclusion.  It found that in the depths of the Great Recession, federal emergency UI benefits boosted employment by about 750,000 jobs.  (Regular, state-provided UI benefits boosted employment by an additional 1 million jobs.)[38]

## Conclusion

More than 70 years after its inception, unemployment insurance continues to provide a valuable cushion against income losses from temporary unemployment.  It also serves as an effective automatic stabilizer for the overall economy by shoring up workers' purchasing power during economic downturns.  The basic compact that the UI system has embodied since its creation under President Roosevelt in 1935 is that people who have amassed a sufficient record of work, and on whose behalf UI taxes have faithfully been paid, should receive temporary UI benefits if they are laid off and are searching for a new job.  As the economy emerges from the recession, policymakers will face the challenge of continuing to fulfill this compact while putting the system back on a sound financial footing.

---

[35] Congressional Budget Office, "Unemployment Insurance Benefits and Family Income of the Unemployed," November 17, 2010,

http://www.cbo.gov/ftpdocs/119xx/doc11960/11-17-UnemploymentInsurance.pdf.

[36] Douglas Elmendorf, "Policies for Increasing Economic Growth and Employment in 2012 and 2013," testimony before the Senate Budget Committee, Congressional Budget Office, November 15, 2011, http://www.cbo.gov/ftpdocs/124xx/doc12437/11-15-Outlook_Stimulus_Testimony.pdf.

[37] Mark Zandi, "Bolstering the Economy: Helping American Families by Reauthorizing the Payroll Tax Cut and UI Benefits," testimony before the Joint Economic Committee, February 7, 2012, https://www.economy.com/mark-zandi/documents/2012-02-07-JEC-Payroll-Tax.pdf.

[38] Wayne Vroman, "The Role of Unemployment Insurance as an Automatic Stabilizer During a Recession," Department of Labor, July 2010, http://wdr.doleta.gov/research/FullText_Documents/ETAOP2010-10.pdf.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 15, 2023, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

OF COUNSEL:

Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Gregg F. LoCascio
Patrick Arnett
Nicholas Teleky
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave NW
Washington, DC 20004
(202) 389-5000

John F. Hartmann
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

John W. Shaw
Andrew E. Russell
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com

*Attorneys for Plaintiffs Deloitte Consulting
LLP and Deloitte Development LLC*

/s/ Anne Shea Gaza
YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Sagitec Solutions, LLC*