IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| DELOITTE CONSULTING LLP and DELOITTE DEVELOPMENT LLC, | ) ) ) |
| Plaintiffs, | ) C.A. No. 23-325-WCB ) |
| v. | ) **REDACTED - PUBLIC VERSION** ) |
| SAGITEC SOLUTIONS, LLC, | ) ) |
| Defendant. | ) ) |

## LETTER TO THE HONORABLE WILLIAM C. BRYSON
## ON BEHALF OF DEFENDANT SAGITEC SOLUTIONS, LLC

OF COUNSEL:

Christopher K. Larus
David A. Prange
Rajin S. Olson
Brandon A. Carmack
Demitri M. Dawson
ROBINS KAPLAN LLP
800 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500
clarus@robinskaplan.com
dprange@robinskaplan.com
rolson@robinskaplan.com
bcarmack@robinskaplan.com
ddawson@robinskaplan.com

Rebecca Bact
ROBINS KAPLAN LLP
800 Boylston Street
Boston, MA 02199
(617) 859-2740
rbact@robinskaplan.com

Dated:  April 26, 2024
Public Version Filed:  May 3, 2024

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Defendant*
*Sagitec Solutions, LLC*

Dear Judge Bryson,

Plaintiffs Deloitte Consulting LLP and Deloitte Development (collectively, "Deloitte") have refused to meet their obligations regarding the privilege log required by this Court's Protective Order (D.I. 70) and Fed. R. Civ. P. 26(a)(5)(B) and failed to fully respond to two interrogatories served by Defendant Sagitec Solutions, LLC ("Sagitec"). Sagitec respectfully asks the Court to order Deloitte to: (1) supplement its privilege log to identify responsive in-house attorney documents from named custodians, or, in the alternative, to produce those documents; (2) supplement its response to Interrogatory No. 14, to include the factual bases for its claimed entitlement to copyright damages and (3) supplement its response to Interrogatory No. 15, to identify when and with what project each enumerated alleged trade secret was first developed.

**I.      The Court should order Deloitte to Log Responsive Documents Involving Deloitte In-House Counsel as Privileged or, in the Alternative, Produce Those Documents.**

Deloitte has failed to search for, produce, or identify on a privilege log internal communications and documents of three Deloitte in-house counsel, each of whom were identified as custodians pursuant to the parties' ESI stipulation (D.I. 71). Sagitec identified these three custodians because each was either directly involved in communications with government investigators (Jin-Hendel and Fink) or in contract negotiations with Deloitte clients (Harris). After Deloitte's document production and service of its privilege log, and through the meet-and-confer process, it became apparent that Deloitte only searched in-house counsel communications with individuals external to Deloitte, but did not search for, produce, and/or log internal Deloitte communications involving these three custodians. Ex. 4 at 2-4. Deloitte asserts that it is not obligated to do so. *Id.* at 2. Deloitte's position is inconsistent with the Protective Order and Rule 26(b)(5)(A).

These Deloitte in-house counsel internal communications, whether produced or identified on a privilege log, are highly relevant to Sagitec's statute of limitations defense. Specifically, these communications reflect Deloitte's activity, if any, relating to Deloitte's action upon being notified by state and federal authorities regarding alleged Sagitec trade secret misappropriation. Presently, Deloitte's privilege log reflects almost no activity in the relevant period of 2016 through 2018, during which time government investigators communicated with Deloitte regarding the investigation into alleged trade secret theft and Deloitte sent Sagitec two separate cease and desist letters regarding the same. Ex. 5 at 1. Sagitec should receive discovery on what actions, if any, Deloitte undertook to investigate Sagitec's alleged use of Deloitte's intellectual property during this time period, and who within Deloitte was involved in communications regarding Deloitte's decision not to pursue suit during the relevant statutory periods. This is particularly important given that Deloitte has argued that Sagitec allegedly concealed its use of Deloitte materials, an argument that puts at issue Deloitte's diligence during this time frame. D.I. 1, ¶¶ 7; 54; D.I. 40 at 11. Deloitte also argued more discovery was needed on the statute of limitations issue. D.I. 105 at 3. If true, Deloitte cannot withhold relevant discovery from Sagitec.

Deloitte seeks to excuse its discovery failure by claiming an alleged agreement between the parties that would allow Deloitte to avoid searching for, producing, or logging any internal in-house counsel communications. No such agreement exists. When Sagitec named Deloitte's three in-house counsel as custodians, Deloitte raised privilege concerns as to their internal communications. In response, Sagitec indicated it would not press for *production* of those documents at that time. Ex. 1. But Sagitec never offered Deloitte any permanent relief and

certainly never offered to excuse Deloitte from its obligation to *log* privileged communications. *Id.* The communication on which Deloitte relies did not even mention privilege logs. *Id.* Soon after, Sagitec requested a log of any withheld documents (whether withheld as privileged or otherwise identified as in-house counsel internal communications), which it repeated and clarified numerous times. Ex. 2 at 4; Ex. 3 at 2, 9-10, 13. Sagitec believed this issue was resolved when, at a March 1 meet and confer, the parties agreed to a mutual exchange of privilege logs on March 22, 2024. Ex. 3 at 1. But when served, Deloitte's log lacked the expected communications of its in-house counsel.

At bottom, and despite Deloitte's protests to date, there is no "agreement" that permits Deloitte to avoid its obligations. As reflected by the extensive discovery communications among counsel, there was no meeting of the minds. *See, e.g.*, *VTech Const., Inc. v. McGonigle*, No. CA 09-970-SLR, 2011 WL 30985, at *3 (D. Del. Jan. 5, 2011) (no agreement without meeting of the minds). Indeed, there is no reason for Sagitec to give up logging of Deloitte communications from in-house counsel who were directly involved in the Deloitte activity that led to the filing of this case years too late, particularly when Fed. R. Civ. P. 26(b)(5)(A) and the Section 16(a) of the Protective Order compel production of at least a log of such communications. Deloitte may claim burden, as it has alluded to in pre-motion communications, but preparing an appropriate privilege log is a basic, mandatory litigation task that *any plaintiff* should expect to complete. Or, in place of any attempt to justify its failures, Deloitte may, as it has in correspondence, raise collateral and unfounded issues to distract the Court.

Because Deloitte has failed to provide a privilege log that fully complies with the Federal Rules and the Protective Order, Sagitec requests that Deloitte be ordered to supplement its privilege log to reflect all Deloitte in-house counsel internal communications from or with custodians Jin-Hendel, Fink, and Harris, or in the alternative, to produce these documents.

## II.     The Court Should Order Deloitte to Identify the Factual Basis for Claimed Copyright Damages.

Sagitec's Interrogatory No. 14 asks Deloitte, as to its copyright infringement claim, to identify acts that form the basis for Deloitte's copyright damages claim, "provide an itemization/quantification of each element/category of related damage to which You contend You are entitled," and the basis therefor. Ex. 6 at 123. Served in addition to Sagitec's general damages interrogatory (No. 8), Sagitec seeks to determine the factual bases for Deloitte's contention that it is owed copyright damages, which are limited to a specific three-year damages look-back period. *See, e.g.*, *Sohm v. Scholastic Inc.*, 959 F.3d 39, 52 (2d Cir. 2020) (citing *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014)); *see also Blake v. JP Morgan Chase Bank NA*, 927 F.3d 701, 707 (3d Cir. 2019).

Deloitte's response fails to meaningfully respond to the interrogatory—to explain why it is entitled to copyright damages. Deloitte reiterates its claims of misappropriation and infringement at a high level, incorporating its responses to Interrogatory Nos. 2 (trade secret misappropriation—irrelevant here) and 13 (copyright contentions, which are not connected to time period or to conduct, but to instances of code). Ex. 6 at 124. To the extent Deloitte identifies conduct, it is unbounded in terms of when the alleged actionable infringement occurred, with Deloitte generally stating that copying ███████████████████████████████

2

████████████████████████ *Id.* at 124-125. Deloitte's answer does not make clear what instances of conduct Deloitte believes gives rise to damages within the relevant time period. Nor does Deloitte's response explain how it quantifies those damages, what facts Deloitte relies upon to demonstrate its damages, or what evidence, if any, Deloitte contends supports its damages claim.  Deloitte should be ordered to supplement its response to Interrogatory No. 14 to specify the time period for which it seeks damages for its copyright claim, the conduct during that time period it believes constituted infringement, and a quantification of the related damages it seeks.

## III.     The Court Should Order Deloitte to Identify the Time Period and Project During Which Each Enumerated Alleged Trade Secret Was Developed.

Interrogatory No. 15 asks Deloitte to "[i]identify and describe when and in association with what project each Asserted Trade Secret You identified in Your response(s) to Interrogatory 1" was developed. Ex. 6 at 126. Instead of answering, Deloitte provides the following high-level statement:

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████ *Id.* at 127-128. This ignores that Deloitte has purported to identify 74 different trade secrets with reasonable particularity, as ordered by the Court, and Deloitte's short response does not describe the development process for any particular trade secret or associate any alleged trade secret with any particular project.

The information requested is highly relevant to Sagitec's defense, because many, if not all, of the alleged trade secrets Deloitte asserts in this case are owned by third-party government entities and not Deloitte. For example, Deloitte's contract with Massachusetts makes clear that Massachusetts owns the deliverables provided to it by Deloitte, and also owns derivative works arising from those deliverables. *See* Ex. 7 ("[Massachusetts] is entitled to ownership and possession of all deliverables purchased or developed with State funds."); Ex. 8 at 7.4.2, 7.4.4. While Deloitte apparently disputes the plain language of these contracts, Deloitte's arguments do not place the requested development information beyond discovery. Sagitec is entitled to know which of the asserted trade secrets was developed for the Massachusetts project or derived therefrom. This information is relevant to who owns and may assert the purported trade secrets. Moreover, when a trade secret came into being is relevant to extent of use and age, and impacts Deloitte's damages claim, which must be shown on a trade secret-by-trade secret basis. *See O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1075 (N.D. Cal. 2005).

To date, Deloitte has offered no meaningful reason why it has not and cannot provide the information requested by the interrogatory. Deloitte has simply refused, claiming its answer complies. But, as plaintiff, Deloitte "b[ears] the burden of proving [its trade secret] claim as to each claimed trade secret." *Mattel, Inc. v. MGA Ent., Inc.*, No. CV 04-9049 DOC RNBX, 2011 WL 3420571, at *5 (C.D. Cal. Aug. 4, 2011). It is less burdensome and more appropriate to provide this information in interrogatory form than to address development of each trade secret in depositions for the first time. *Guest Tek Interactive Entertainment, Ltd. v. Nomadix, Inc.*, C.A. No. 18-1394-RGA, Order (D. Del. Dec. 18, 2020). The Court should order Deloitte to provide Sagitec this information.

Sagitec respectfully requests the Court order Deloitte to provide discovery as set forth above.

OF COUNSEL:

Christopher K. Larus
David A. Prange
Rajin S. Olson
Brandon A. Carmack
Demitri M. Dawson
ROBINS KAPLAN LLP
800 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500
clarus@robinskaplan.com
dprange@robinskaplan.com
rolson@robinskaplan.com
bcarmack@robinskaplan.com
ddawson@robinskaplan.com

Rebecca Bact
ROBINS KAPLAN LLP
800 Boylston Street
Boston, MA 02199
(617) 859-2740
rbact@robinskaplan.com

Dated: April 26, 2024

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Robert M. Vrana*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Defendant*
*Sagitec Solutions, LLC*

cc: All Counsel of Record (via email)

31588737

4

# EXHIBIT 1

**Bact, Rebecca**

| | |
|---|---|
| **From:** | Olson, Rajin S. |
| **Sent:** | Thursday, December 28, 2023 9:03 PM |
| **To:** | Arnett, Patrick; Prange, David A.; Carmack, Brandon A.; Larus, Christopher K.; Bact, Rebecca; *agaza@ycst.com; *RVrana@ycst.com; THARTZELL@ycst.com; RK-Sagitec |
| **Cc:** | #Deloitte Sagitec; *jshaw@shawkeller.com; Andrew Russell |
| **Subject:** | RE: Deloitte Consulting LLP et al. v. Sagitec Solutions LLC -- Deloitte Search Terms and Custodians |

Counsel,

Thank you for providing Deloitte's search terms last week. We note that although we first proposed on October 31, 2023 that the parties exchange search terms on November 10, and that although Deloitte repeatedly indicated via email that search terms would be forthcoming sooner, Deloitte did not send its search terms until December 20.

Deloitte's proposed search terms do not encompass the full scope of relevant communications, including communications that may support Sagitec's defenses or undermine Deloitte's claims. Accordingly, at this time, Sagitec proposes the below additional search terms identified in red. Sagitec reserves all rights to request that Deloitte apply additional search terms.

1. Sagitec
2. Neosurance
3. (uFACTS OR "unemployment insurance") AND (QUEST OR "Quality Unemployment System Transformation") AND ("use case" OR "use cases")
4. (uFACTS OR "unemployment insurance") AND (QUEST OR "Quality Unemployment System Transformation") AND (specification)
5. (uFACTS OR "unemployment insurance") AND (QUEST OR "Quality Unemployment System Transformation") AND (database)
6. (uFACTS OR "unemployment insurance") AND (QUEST OR "Quality Unemployment System Transformation") AND ("data dictionary")
7. (uFACTS OR "unemployment insurance") AND (QUEST OR "Quality Unemployment System Transformation") AND (schema)
8. (uFACTS OR "unemployment insurance") AND (QUEST OR "Quality Unemployment System Transformation") AND (sql)
9. (uFACTS OR "unemployment insurance") AND (QUEST OR "Quality Unemployment System Transformation") AND (framework)
10. (uFACTS OR "unemployment insurance") AND (QUEST OR "Quality Unemployment System Transformation") AND (architecture)
11. (uFACTS OR "unemployment insurance") AND (QUEST OR "Quality Unemployment System Transformation") AND ("flow diagram")
12. (uFACTS OR "unemployment insurance") AND (DWS OR "Department of Workforce Solutions") AND ("use case" OR "use cases")
13. (uFACTS OR "unemployment insurance") AND (DWS OR "Department of Workforce Solutions") AND (specification)
14. (uFACTS OR "unemployment insurance") AND (DWS OR "Department of Workforce Solutions") AND (database)
15. (uFACTS OR "unemployment insurance") AND (DWS OR "Department of Workforce Solutions") AND ("data dictionary")
16. (uFACTS OR "unemployment insurance") AND (DWS OR "Department of Workforce Solutions") AND (schema)
17. (uFACTS OR "unemployment insurance") AND (DWS OR "Department of Workforce Solutions") AND (sql)
18. (uFACTS OR "unemployment insurance") AND (DWS OR "Department of Workforce Solutions") AND (framework)
19. (uFACTS OR "unemployment insurance") AND (DWS OR "Department of Workforce Solutions") AND (architecture)
20. (uFACTS OR "unemployment insurance") AND (DWS OR "Department of Workforce Solutions") AND ("flow diagram")
21. (uFACTS OR "unemployment insurance") AND ("UI TIP" OR UITIP) AND ("use case" OR "use cases")
22. (uFACTS OR "unemployment insurance") AND ("UI TIP" OR UITIP) AND (specification)
23. (uFACTS OR "unemployment insurance") AND ("UI TIP" OR UITIP) AND (database)
24. (uFACTS OR "unemployment insurance") AND ("UI TIP" OR UITIP) AND ("data dictionary")

25. (uFACTS OR "unemployment insurance") AND ("UI TIP" OR UITIP) AND (schema)
26. (uFACTS OR "unemployment insurance") AND ("UI TIP" OR UITIP) AND (sql)
27. (uFACTS OR "unemployment insurance") AND ("UI TIP" OR UITIP) AND (framework)
28. (uFACTS OR "unemployment insurance") AND ("UI TIP" OR UITIP) AND (architecture)
29. (uFACTS OR "unemployment insurance") AND ("UI TIP" OR UITIP) AND ("flow diagram")
30. @usdoj.gov
31. Cogar
32. Heath
33. "Jon Storage" OR "Jonathan Storage"
34. Harilla
35. "Jim Powers" OR "James Powers"
36. "West Virginia Commission on Special Investigations" OR "CSI"
37. @wvcsi.gov
38. Keene
39. (uFACTS OR "unemployment insurance") AND copyright*
40. (uFACTS OR "unemployment insurance") AND ("trade secret" OR "trade secrets")
41. (uFACTS OR "unemployment insurance") AND misappropriat*
42. (uFACTS OR "unemployment insurance") AND confidential*
43. (uFACTS OR "unemployment insurance") AND (clearance OR investigat*)
44. (uFACTS OR "unemployment insurance") AND (concept* OR research* OR design* OR develop* OR test* OR launch* OR enhance* OR maintain* OR operat* OR market*)
45. (uFACTS OR "unemployment insurance") AND (steal* OR stole* OR theft* OR disclos* OR take*)
46. (uFACTS OR "unemployment insurance") AND (train* OR present*)
47. (uFACTS OR "unemployment insurance") AND (permission* OR "need-to-know" OR "need to know" OR protect* OR access*)
48. (uFACTS OR "unemployment insurance") AND (contract* OR agreement* OR "nondisclosure" OR "NDA")
49. "Delaware Department of Labor" OR "Delaware DoL" OR "DEDOL" OR "DE DOL"
50. DE-PUA OR "DE PUA"
51. ("Department of Employment Services" AND (DC or District of Columbia)) OR "DOES (DC)"
52. "Employer Self Service Portal" OR ("ESSP" AND (DC or District of Columbia))
53. "ESSP-PFML" OR "Paid Family Medical Leave" OR "Paid Family Leave" OR "PFML" OR "PFL"
54. "Employer Tax System" OR "DCETS" OR "ETS"
55. "Ohio Department of Job and Family Services" OR "ODJFS" OR "DJFS"
56. "State of Ohio Unemployment Resource for Claimants and Employers" OR ("SOURCE" AND (OH or Ohio))
57. "Maryland Division of Unemployment Insurance" OR "MDUI" OR ""MD DUI" OR "DUI"
58. (Beacon AND (MD or Maryland)) OR "BEACON-PUA" OR "BEACON PUA"
59. "North Carolina Division of Employment Security" OR "NCDES" OR "NC DEC" OR "DES"
60. "State Unemployment Insurance Tax System" OR "NC-SUITS" OR "NCSUITS" OR "NC SUITS"
61. "South Carolina Department of Employment and Workforce" OR ("SCDEW" AND (SC or "South Carolina")) OR "SC DEW" OR ("DEW" AND (SC or "South Carolina"))
62. "SC-SUITS" OR "SCSUITS" OR "SC SUITS"
63. "Texas Workforce Commission" OR "TWC" OR "TX WC"
64. "West Virginia Unemployment Insurance" OR "WVUI" OR "WV UI"

We also request that Deloitte search for the following terms, date-limited to January 1, 2013 to present:

65. Minkkinen OR Mink
66. Sambasivam OR Siva

We again renew our request that Deloitte identify additional custodians in possession of responsive documents, which we originally made via email on November 28, 2023. As noted in that email, Deloitte identified just three custodians from whom Deloitte proposed to collect information: Scott Malm, Anil Gosu, and Sivaraman Sambasivam. This limited identification is not reasonable or credible given the scope of the case Deloitte chose to assert, including in view of the RFPs Sagitec served and about which the parties have already met and conferred, as reflected in our letter of December 6, 2023. Deloitte's refusal to identify additional custodians with responsive documents prejudices Sagitec's ability to defend itself. Please (1) identify additional custodians or (2) confirm Deloitte will not do so and provide the basis for Deloitte's refusal.

As for the additional custodians identified by Sagitec, we respond as follows:

- **Mark Dion**: Sagitec has already produced notes from an interview of David Minkkinen conducted by Madel PA in connection with the investigative report. Copies of the report have been produced at SAGITEC-DEL_00000014

and SAGITEC-DEL_00043597. Copies of the interview notes have been produced at SAGITEC-DEL_00043839 and SAGITEC-DEL_00044699. According to the interview notes, Mr. Minkkinen indicated that Mr. Dion was involved in providing Deloitte documents and emails to Mr. Minkkinen. Among documents and emails for which Mr. Dion is a custodian, Sagitec seeks at least (1) correspondence and documents relating to Mr. Minkkinen's departure, including as related to any provision of Deloitte documents or materials to Mr. Minkkinen, (2) correspondence and documents relating to any other former Deloitte employee's departure for such employees that later went to Sagitec, including as related to any provision of Deloitte documents or materials to such employees, and (3) correspondence and documents relating to any statements made or instructions given as to which documents or materials are confidential, trade secret, or copyrighted. Such information is relevant at least to Deloitte's reasonable measures—or lack thereof—to protect any alleged trade secrets.

- **Annica Jin-Hendel, Jaclyn Fink, and Timothy Harris:** In an effort to reduce Deloitte's burden to identify non-privileged documents, Sagitec is willing to forgo <u>internal</u> Deloitte communications with these individuals at this time. However, <u>external</u> communications, including with DOJ personnel, state investigative agencies, and other third parties are non-privileged and relevant at least to Sagitec's defenses (such as statute of limitations, laches, and ownership) and Deloitte's allegations.

- **Darren McGann:** Mr. Minkkinen referred to Mr. McGann in one of his interviews. *See* SAGITEC-DEL_00043763 at 767. Mr. Minkkinen indicated he was not sure if Mr. McGann had been associated with KPMG or Deloitte. *Id.* Based on your representations, it appears that Mr. McGann likely was and continues to be affiliated with KPMG, not Deloitte. As such, Sagitec agrees to remove Mr. McGann from its list of requested custodians.

We look forward to your response regarding Deloitte's search terms and custodians. Given the upcoming substantial completion deadline of January 19, 2024, we request Deloitte's response by January 4, 2024.

Best regards,

Rajin

---

**From:** Arnett, Patrick <patrick.arnett@kirkland.com>
**Sent:** Wednesday, December 20, 2023 3:25 PM
**To:** Prange, David A. <DPrange@RobinsKaplan.com>; Carmack, Brandon A. <BCarmack@RobinsKaplan.com>; Larus, Christopher K. <CLarus@RobinsKaplan.com>; Olson, Rajin S. <ROlson@RobinsKaplan.com>; Bact, Rebecca <RBact@RobinsKaplan.com>; *agaza@ycst.com <agaza@ycst.com>; *RVrana@ycst.com <RVrana@ycst.com>; THARTZELL@ycst.com; RK-Sagitec <RK-Sagitec@RobinsKaplan.com>
**Cc:** #Deloitte Sagitec <Deloitte-Sagitec@kirkland.com>; *jshaw@shawkeller.com <jshaw@shawkeller.com>; Andrew Russell <arussell@shawkeller.com>
**Subject:** [EXTERNAL] Deloitte Consulting LLP et al. v. Sagitec Solutions LLC -- Deloitte Search Terms and Custodians

Dear Counsel:

Below please find the search terms Deloitte intends to apply.  Please let us know if Sagitec has any proposed modifications or additions as soon as possible.

1. Sagitec
2. Neosurance
3. (uFACTS OR "unemployment insurance") AND (QUEST OR "Quality Unemployment System Transformation") AND ("use case" OR "use cases")
4. (uFACTS OR "unemployment insurance") AND (QUEST OR "Quality Unemployment System Transformation") AND (specification)
5. (uFACTS OR "unemployment insurance") AND (QUEST OR "Quality Unemployment System Transformation") AND (database)
6. (uFACTS OR "unemployment insurance") AND (QUEST OR "Quality Unemployment System Transformation") AND ("data dictionary")
7. (uFACTS OR "unemployment insurance") AND (QUEST OR "Quality Unemployment System Transformation") AND (schema)
8. (uFACTS OR "unemployment insurance") AND (QUEST OR "Quality Unemployment System Transformation") AND (sql)

9. (uFACTS OR "unemployment insurance") AND (QUEST OR "Quality Unemployment System Transformation") AND (framework)
10. (uFACTS OR "unemployment insurance") AND (QUEST OR "Quality Unemployment System Transformation") AND (architecture)
11. (uFACTS OR "unemployment insurance") AND (QUEST OR "Quality Unemployment System Transformation") AND ("flow diagram")
12. (uFACTS OR "unemployment insurance") AND (DWS OR "Department of Workforce Solutions") AND ("use case" OR "use cases")
13. (uFACTS OR "unemployment insurance") AND (DWS OR "Department of Workforce Solutions") AND (specification)
14. (uFACTS OR "unemployment insurance") AND (DWS OR "Department of Workforce Solutions") AND (database)
15. (uFACTS OR "unemployment insurance") AND (DWS OR "Department of Workforce Solutions") AND ("data dictionary")
16. (uFACTS OR "unemployment insurance") AND (DWS OR "Department of Workforce Solutions") AND (schema)
17. (uFACTS OR "unemployment insurance") AND (DWS OR "Department of Workforce Solutions") AND (sql)
18. (uFACTS OR "unemployment insurance") AND (DWS OR "Department of Workforce Solutions") AND (framework)
19. (uFACTS OR "unemployment insurance") AND (DWS OR "Department of Workforce Solutions") AND (architecture)
20. (uFACTS OR "unemployment insurance") AND (DWS OR "Department of Workforce Solutions") AND ("flow diagram")
21. (uFACTS OR "unemployment insurance") AND ("UI TIP" OR UITIP) AND ("use case" OR "use cases")
22. (uFACTS OR "unemployment insurance") AND ("UI TIP" OR UITIP) AND (specification)
23. (uFACTS OR "unemployment insurance") AND ("UI TIP" OR UITIP) AND (database)
24. (uFACTS OR "unemployment insurance") AND ("UI TIP" OR UITIP) AND ("data dictionary")
25. (uFACTS OR "unemployment insurance") AND ("UI TIP" OR UITIP) AND (schema)
26. (uFACTS OR "unemployment insurance") AND ("UI TIP" OR UITIP) AND (sql)
27. (uFACTS OR "unemployment insurance") AND ("UI TIP" OR UITIP) AND (framework)
28. (uFACTS OR "unemployment insurance") AND ("UI TIP" OR UITIP) AND (architecture)
29. (uFACTS OR "unemployment insurance") AND ("UI TIP" OR UITIP) AND ("flow diagram")

In addition, we have considered Sagitec's request to collect non-privileged, responsive ESI from additional custodians identified by Sagitec. Before we can provide a definitive response as to Deloitte's willingness to collect ESI from these custodians, we require additional information concerning the types of documents Sagitec seeks from these custodians and the relevance of such documents to the case.

- **Mark Dion:** Mr. Dion is an information technology professional with no responsibilities relating to the uFACTS solution. Accordingly, we expect his ESI to have tangential relevance, if any, to the parties' claims and defenses in this case. To help us whether assess whether collecting and searching Mr. Dion's ESI would be proportional to the needs of the case, can Sagitec articulate the types of relevant documents it believes are in Mr. Dion's custodial files?

- **Annica Jin-Hendel, Jaclyn Fink, and Timothy Harris:** As you know, Ms. Jin-Hendel is Deloitte's Associate General Counsel responsible for managing Deloitte's intellectual property litigation. Ms. Fink was formerly in-house counsel for Deloitte, and Mr. Harris was a Deputy General Counsel for BearingPoint. Accordingly, searching these proposed custodian's ESI raises significant privilege issues and would be highly burdensome and disproportionate to the needs of the case. Can Sagitec articulate the types of relevant, non-privileged documents it believes are in the custodial files of the Deloitte current and former in-house counsel whom Sagitec requested, so that we may better assess Sagitec's request?

As we noted before, it does not appear that Darren McGann was ever a Deloitte employee. We look forward to your response.

Best regards,
Patrick

**Patrick Arnett**
he / him / his
_____
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Ave NW, Washington DC 20004
**T** +1 202 389 5160   **M** +1 646 352 3502
**F** +1 202 389 5200
_____
patrick.arnett@kirkland.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# EXHIBIT 2



ROBINS KAPLAN L.L.P.

800 LASALLE AVENUE          612 349 8500 TEL
SUITE 2800                  612 339 4181 FAX
MINNEAPOLIS, MN  55402      ROBINSKAPLAN.COM

DAVID A. PRANGE
612 349 0131 TEL
DPRANGE@ROBINSKAPLAN.COM

*Via E-Mail*
*CONFIDENTIAL*

January 29, 2024

Patrick Arnett
Nick Teleky
Kirkland & Ellis LLP
1301 Pennsylvania Ave. NW
Washington, DC  20004

   Re: *Deloitte Consulting LLP v. Sagitec Solutions, LLC*
     Case No. 23-cv-325-WCB (D. Del.)
     Re:  Deloitte's Document Production as of the Substantial Completion Date

Counsel:

   We write to record significant deficiencies in Deloitte's document production as of the substantial completion deadline of January 19, 2024, which has, of course, now passed. Sagitec requests immediate supplementation on deficiencies identified below, and a meet-and-confer, by Friday, February 2, 2024, to the extent a meet-and-confer is needed.

   First, we memorialize that Deloitte has produced only 42,420 documents in total as of the substantial completion deadline, compared to Sagitec's production of 546,915 documents by that same date.  While the responsive and relevant documents possessed by each party may not be entirely equivalent, the discrepancy is striking, and this alone suggests that Deloitte's production may not in fact be substantially complete.

   Second, Deloitte has failed to comply with both the language and spirit of the Stipulated ESI Protocol jointly agreed to by the parties and entered by the Court by failing to produce documents from agreed custodians and by failing to disclose its search protocol. The parties agreed to and filed the ESI Protocol on October 24, 2023, and it was entered by the Court on October 27, 2023. D.I. 69, D.I. 71. Under the provisions of the ESI Protocol (Section IV.B), the parties were to disclose, negotiate, and agree on custodians.  Further, each party was to disclose search terms, after which the other party could add additional search terms if the initial list was lacking.

   Sagitec first disclosed its proposed custodians on October 30, 2023, and search terms on November 28, 2023.  In contrast, Deloitte did not provide its proposed custodians and search terms until December 20, 2023—having never provided even a proposal prior to the initial substantial completion deadline of December 15, 2023 and then only

Patrick Arnett                                              *Via E-Mail*
January 29, 2024                                        *CONFIDENTIAL*
Page 2

providing its first proposal less than a month prior to the eventual deadline. While Deloitte responded to Sagitec's email proposing additional search terms and custodians, Deloitte never responded to Sagitec's next email, sent January 8, 2024, which laid out remaining disputes, including the identification of additional custodians. Nor did Deloitte respond to Sagitec's follow up email on January 17, 2024. Instead, Deloitte made its production on January 19, 2024 without ever responding to Sagitec, without providing documents from all the agreed custodians, and without ever disclosing what search terms and parameters Deloitte applied.

**Failure to produce from agreed custodians**: In the correspondence between the parties, Deloitte agreed to only seven custodians: Scott Malm, Anil Gosu, Sivaraman Sambasivam, Mark Dion, Annica Jin-Hendel, Jaclyn Fink, and Timothy Harris. In its email of January 8, 2024, Sagitec challenged Deloitte's refusal to identify sufficient custodians, in number and in terms of topics covered by Sagitec's Requests for Production, noting that Deloitte had failed to identify custodians covering the following topics:

> individuals involved in development of the various uFACTS projects with state customers, individuals involved in communication or transmission of purported Deloitte information with those clients or other external sources, individuals involved in marketing, communications with sales prospects, or contracting, or individuals involved in administering policies or other measures related to maintaining secrecy or confidentiality of Deloitte's intellectual property… includ[ing] Deloitte uFACTs project managers or others.

Further, pursuant to the ESI Protocol, Sagitec identified the additional custodian David Minkkinen.

Disappointingly, it appears Deloitte did not even produce documents collected from the list of the seven acknowledged and agreed custodians. Rather, our analysis of the production shows the following breakdown:

| Custodian | Number of Documents |
|---|---|
| Deloitte | 1 |
| Mark Dion | 13 |
| Anil Kumar Gosu | 11,667 |
| Scott Malm | 19,549 |
| Sivaraman Sambasivam | 6,989 |

As the above shows, even though the parties had agreed that Deloitte would collect and produce documents from Annica Jin-Hendel, Jaclyn Fink, and Timothy Harris, none were provided. Further, though Sagitec properly named David Minkkinen as an additional custodian under Section IV.B of the ESI Protocol, no documents were provided from him.

Please confirm Deloitte will immediately produce documents from the four above-identified custodians. Additionally, please respond to Sagitec's request that you name

Patrick Arnett                                          *Via E-Mail*
January 29, 2024                                      *CONFIDENTIAL*
Page 3

additional custodians to provide documents relevant to at least contracting, marketing, and development of Deloitte's relevant uFACTS projects. If custodians that have been identified have yielded no documents produced, please identify whether there were potentially responsive documents collected from that custodian; we will identify other custodians.

Please confirm on the scope of custodian identification and search by February 2.

**Failure to disclose search protocol applied:** While Deloitte has disclosed its proposed search terms and some revisions per Sagitec's requests, there were many areas still in negotiation when Deloitte abruptly stopped responding to Sagitec's correspondence. These subjects included:

- Whether Deloitte would apply Sagitec's proposed search terms related to the United States Department of Justice and the related criminal investigation (Sagitec's proposed terms 30-38);

- The time period Deloitte would apply to the collection and production of documents from custodian Mark Dion; and

- Whether Deloitte would produce external emails for custodians Annica Jin-Hendel, Jaclyn Fink, and Timothy Harris.

Rather than resolve these issues or even simply identifying its final search terms and search protocol, Deloitte proceeded without ever responding to Sagitec's January 8 letter. Please immediately identify Deloitte's final search terms and search protocol applied for Deloitte's January 19, 2024 production.

Considering the total number of documents produced by Deloitte, Sagitec's requested additional search terms and production requests do not exceed the obligations the Federal Rules of Civil Procedure, and particularly Rule 26, impose on Deloitte, particularly considering that Deloitte is a plaintiff. Sagitec requests that Deloitte supplement its document production consistent with the additional parameters proposed by Sagitec in its email of January 8, 2024. Sagitec requests production of all responsive documents by February 2.

**Failure to produce any communications between Deloitte and the Department of Justice or about the Department of Justice and related investigations:** Sagitec expressly requested production of all communications and materials exchanged between Deloitte and the Department of Justice or any other investigative body.  *See* Sagitec RFP Nos. 76-81. Prior to Deloitte's production, as recorded in your email to us of January 3, 2024 and our responsive email to you on January 8, 2024, the parties agreed that Deloitte would produce communications and materials exchanged between Deloitte and the Department of Justice and the West Virginia Commission on Special Investigations, and merely disagreed as to whether it would accomplish this production via search terms

Patrick Arnett                                          *Via E-Mail*
January 29, 2024                                     *CONFIDENTIAL*
Page 4

(Sagitec's proposal) or metadata (Deloitte's proposal). Regardless of what Deloitte
ultimately did, there is no evidence of any communications with the Department of Justice
or the West Virginia Commission on Special Investigations, other than a single calendar
invitation evidencing that certain Deloitte employees planned to "debrief from DOJ call."
DEL00374583. It is entirely implausible that this is the only communication relative to
Deloitte's interactions with the DOJ and WVCSI—especially as this produced document
references prior communications. Please confirm you have, as agreed, produced all
communications and materials exchanged between Deloitte and the various government
entities including at least the Department of Justice and the West Virginia Commission on
Special Investigations, as well as all of Deloitte's internal communications regarding the
criminal investigation. If Deloitte has not, Sagitec requests supplementation by February 2.

        Further, while Sagitec has agreed to refrain from pressing for internal
communications from Annica Jin-Hendel, Jaclyn Fink, and Timothy Harris given concerns
regarding privilege, we now request a log, pursuant to Section 16 of the Protective Order,
documenting all withheld internal communications held by these custodians regarding
discussions with the DOJ, WVCSI, or other investigative body. We also request that
documents withheld not for privilege, but based on the parties' agreement, be logged.
Alternatively, we request that Deloitte produce any non-privileged internal
communications. Sagitec requests that this log (or the internal communication documents)
be provided by February 9.

        Sagitec has just begun its review of Deloitte's production and reserves all rights to
raise further issues, which it anticipates will be necessary. Given Judge Bryson's guidance
to the parties to meet and confer "in a cooperative mood" such that the parties do not
appear before him "again soon" (Jan. 16, 2024 Hr'g Tr. at 32:11-15), we expect Deloitte to
act expeditiously to resolve the issues above, including by at least:

- producing documents held by all agreed custodians;
- providing a log of withheld internal communications;
- disclosing the search terms and protocols applied to its January 19, 2024
  production; and
- resolving all disputes described in Sagitec's January 8, 2024 email regarding
  Deloitte's production, including but not limited to producing all external
  communications with government investigators and all internal communications
  pertaining thereto.

We request Deloitte's supplementation by February 2, 2024 unless otherwise noted. If a
meet and confer is necessary, we are available February 2, 2024 between 11-4 ET.

Patrick Arnett
January 29, 2024
Page 5

*Via E-Mail*
*CONFIDENTIAL*

Sincerely,

*/s/ David A. Prange*
David A. Prange
Partner

# EXHIBIT 3

## Bact, Rebecca

| | |
|---|---|
| **From:** | Bact, Rebecca |
| **Sent:** | Friday, March 1, 2024 11:56 AM |
| **To:** | Arnett, Patrick; Andrew E. Russell Esquire (arussell@shawkeller.com); #Deloitte Sagitec; LoCascio, Gregg F.; Hartmann, John F.; *jshaw@shawkeller.com; Simmons, Joshua L.; Teleky, Nick |
| **Cc:** | Carmack, Brandon A.; Larus, Christopher K.; Prange, David A.; Dawson, Demitri M.; *agaza@ycst.com; Keith, Colin A.; Olson, Rajin S.; 'RK-Sagitec'; *RVrana@ycst.com; Hartzell, Thomas |
| **Subject:** | RE: Deloitte Consulting LLP et al. v. Sagitec Solutions LLC -- Renewed request for meet and confer on Deloitte's discovery deficiencies |

Patrick,

Thank you for a productive meet and confer.  Here are my take aways:

- <u>Interrogatory supplementation</u>: Deloitte will supplement its responses to Interrogatory Nos. 2, 8, and 9 by a date certain to be provided on Monday, March 4 or Tuesday, March 5.  The date certain will be in the range of March 15-March 22.
  - o The supplement to Rog 2 will associate the assertions of misappropriation with the Deloitte's enumeration in its supplement to Rog 1.
  - o The supplement to Rog 8 will provide the factual underpinnings of Deloitte's damages claim as available from the current discovery produced.
  - o The supplement to Rog 9 will provide a complete universe of relevant bids and the result of the bid (whether Deloitte won), and will look to provide customer contact and date ranges of the bid process or project undertaken.
- <u>Privilege logs</u>: Deloitte will either agree to a mutual exchange of privilege logs on March 15 or will propose a date in that range on Monday, March 4 or Tuesday, March 5.
- <u>Custodians</u>: Deloitte believes RFP documents include a list of individuals involved on a project by project basis and will provide Bates numbers when confirming those documents have been produced.  Sagitec will then identify custodians as quickly as possible.
- <u>Additional search terms:</u> Deloitte will review the proposed exchange of additional search terms and either agree or provide a counterproposal on Monday, March 4 or Tuesday, March 5.
- <u>Subpoenas:</u> Deloitte confirms it will subpoena the list of people (other than the deceased individual) identified by Sagitec in its supplement to Interrogatory No. 7.  Sagitec will provide contact information for counsel or individuals to the extent available.  Sagitec will provide the Minnesota response to the subpoena.  Sagitec will provide the other state responses when complete and when processed, which we hope will be in the near term.

We look forward to following up with you on these issues early next week.

Thank you,
Rebecca

---

**From:** Bact, Rebecca
**Sent:** Thursday, February 29, 2024 9:39 AM
**To:** Arnett, Patrick <patrick.arnett@kirkland.com>; Andrew E. Russell Esquire (arussell@shawkeller.com) <arussell@shawkeller.com>; #Deloitte Sagitec <Deloitte-Sagitec@kirkland.com>; LoCascio, Gregg F. <glocascio@kirkland.com>; Hartmann, John F. <jhartmann@kirkland.com>; *jshaw@shawkeller.com <jshaw@shawkeller.com>; Simmons, Joshua L. <joshua.simmons@kirkland.com>; Teleky, Nick <nick.teleky@kirkland.com>
**Cc:** Carmack, Brandon A. <BCarmack@RobinsKaplan.com>; Larus, Christopher K. <CLarus@RobinsKaplan.com>; Prange,

David A. <DPrange@RobinsKaplan.com>; Dawson, Demitri M. <DDawson@RobinsKaplan.com>; *agaza@ycst.com <agaza@ycst.com>; Keith, Colin A. <CKeith@ycst.com>; Olson, Rajin S. <ROlson@RobinsKaplan.com>; RK-Sagitec <RK-Sagitec@RobinsKaplan.com>; *RVrana@ycst.com <RVrana@ycst.com>; Hartzell, Thomas <THARTZELL@ycst.com>
**Subject:** RE: Deloitte Consulting LLP et al. v. Sagitec Solutions LLC -- Renewed request for meet and confer on Deloitte's discovery deficiencies

Patrick,

Thank you for your response and proposed availability to meet and confer. We are available tomorrow, Friday, March 1 at 10:30 AM ET.  Please send an invitation.

First, we appreciate that Deloitte plans to supplement its interrogatory responses to Sagitec's Interrogatory Nos. 2, 8, and 9.  In order to ensure that the identified deficiencies are addressed, we propose discussing them, as well as a date certain by when Deloitte will supplement, at the meet and confer.  As to any further supplementation of Interrogatory No. 1, we note that you state we are at an impasse; to the contrary, Sagitec is unaware of a ripe dispute, and finds any characterization of an "impasse" to be premature.

Second, we have differing interpretations of the parties' emails and agreements regarding the production of internal communications related to the DOJ/criminal investigation.  Regardless, the parties are in agreement that we should agree to a mutual exchange of privilege logs.  As you know, we proposed such an exchange on March 15, 2024 in our email to you of February 23 (from Rajin Olson), which you are considering.  Please confirm March 15 is workable for Deloitte or propose a different date for consideration.  Relatedly, as you note, in our earlier emails, Sagitec agreed to forgo internal emails involving Deloitte's in-house counsel "at th[at] time."  At ***this*** time, including in view of the documents Deloitte has produced, we continue to request any non-privileged (or non-logged) responsive internal emails related to the DOJ and/or criminal investigation, and a log of any such emails that ~~are~~ Deloitte claims are privileged.

Third, we continue to find it inconceivable that you believe three custodians total are a sufficient number to search for all of the relevant ESI pertaining to uFACTS.  You have not once explained how the three individuals you name cover the areas Sagitec has repeatedly identified, which we again identify here: management, development, and marketing of Deloitte's UI projects, as well as individuals responsible for secrecy maintenance.  Because Deloitte has not shared the names of relevant individuals, despite Sagitec's repeated efforts, on January 11, 2024, Sagitec served further discovery requests intending to obtain information from Deloitte necessary to name further custodians, including organizational charts and other documents sufficient to identify individuals with relevant roles who might be appropriate custodians. (RFP Nos. 102-105).  In its February 12 responses, Deloitte agreed to produce documents responsive to at least RFP Nos. 102 and 103.  Please produce such documents (or identify them by Bates number if already produced) immediately so that Sagitec can identify additional custodians.

Fourth, we do not believe we have misstated any agreement between the parties as to Deloitte's production.  You reserved the right to further narrow certain of your terms—but you never made any proposal to do so.  Then you produced documents on a narrower scope than you had previously disclosed, and did not disclose what you did produce until we requested your protocol at least two separate times in correspondence.  We also note you have not responded to our request for explanation as to why you unilaterally applied undisclosed limitations to ***agreed*** terms 49-64 by adding date restrictions as well as the term "AND 'unemployment insurance,'" which was affirmatively contrary to the parties' agreement on terms 49-64.  Further, you applied unnecessary limiting terms to uncommon last names like Cogar and Harrilla in terms 30-38.

Regardless, we are willing to entertain an exchange of further documents based on expanding our search protocol if Deloitte is willing to do the same, where each side should produce the below identified documents by March 22.  This will involve Deloitte agreeing to produce documents as follows:
- Terms 30-38: Additional documents returned from a search that removes the first name limiters to terms 31 and 34 (Cogar and Harrilla)

- Terms 49-64: Additional documents returned from a search that removes the "AND 'unemployment insurance'" term
- Applying the following revised versions of terms 39-48 (which we have again and again explained go to how Deloitte viewed its alleged trade secrets and extent to which it protected them—essential elements of Deloitte's burden, and documents pertaining to which Sagitec is entitled):
  - 39. (uFACTS OR "unemployment insurance") w/20 copyright*
  - 40. (uFACTS OR "unemployment insurance") w/20 ("trade secret" OR "trade secrets")
  - 41. (uFACTS OR "unemployment insurance") w/20 misappropriat*
  - 42. (uFACTS OR "unemployment insurance") w/20 confidential*
  - 43. (uFACTS OR "unemployment insurance") w/20 (clearance OR investigat*)
  - ~~44. (uFACTS OR "unemployment insurance") w/20 (concept* OR research* OR design* OR develop* OR test* OR launch* OR enhance* OR maintain* OR operat* OR market*)~~
  - 45. (uFACTS OR "unemployment insurance") w/20 (steal* OR stole* OR theft* OR disclos* ~~OR take*~~)
  - ~~46. (uFACTS OR "unemployment insurance") w/20 (train* OR present*)~~
  - 47. (uFACTS OR "unemployment insurance") w/20 (permission* OR "need-to-know" OR "need to know" OR protect* OR access*)
  - 48. (uFACTS OR "unemployment insurance") w/20 (~~contract* OR agreement* OR~~ "nondisclosure" OR "NDA")

If Deloitte agrees to the above production to address Sagitec's concerns, Sagitec is willing to consider producing documents without date restriction as to the below terms (prior to which we had produced with a 2016 date restriction).  By making this proposal, Sagitec does not concede there is any evidence of any misappropriation at any time, including after 2016.

- "Minnesota Department of Employment and Economic Development" OR "MN DEED" OR "DEED" AND (design OR "use case" OR database OR schema OR specification OR change order OR interface OR framework OR algorithm OR architecture OR demo OR mockup OR "user flow" OR "product documentation" OR manual OR "data sheet" OR "user guide" OR concept* OR research* OR design* OR develop* OR test* OR launch* OR enhance* OR maintain* OR operat* OR market*)
- ("Unemployment Insurance Technology Initiative Project" OR UITIP OR "UI TIP") AND (design OR "use case" OR database OR schema OR specification OR change order OR interface OR framework OR algorithm OR architecture OR demo OR mockup OR "user flow" OR "product documentation" OR manual OR "data sheet" OR "user guide" OR concept* OR research* OR design* OR develop* OR test* OR launch* OR enhance* OR maintain* OR operat* OR market*)
- "New Mexico Department of Workforce Solutions" OR "DWS" OR "NMDWS" OR "NM DWS" AND (design OR "use case" OR database OR schema OR specification OR change order OR interface OR framework OR algorithm OR architecture OR demo OR mockup OR "user flow" OR "product documentation" OR manual OR "data sheet" OR "user guide" OR concept* OR research* OR design* OR develop* OR test* OR launch* OR enhance* OR maintain* OR operat* OR market*)
- "Massachusetts Division of Unemployment Assistance" OR ("DUA" AND (MA or Massachusetts)) AND (design OR "use case" OR database OR schema OR specification OR change order OR interface OR framework OR algorithm OR architecture OR demo OR mockup OR "user flow" OR "product documentation" OR manual OR "data sheet" OR "user guide" OR concept* OR research* OR design* OR develop* OR test* OR launch* OR enhance* OR maintain* OR operat* OR market*)
- "Quest" OR "QUEST" OR "Quality Unemployment System Transformation" AND (design OR "use case" OR database OR schema OR specification OR change order OR interface OR framework OR algorithm OR architecture OR demo OR mockup OR "user flow" OR "product documentation" OR manual OR "data sheet" OR "user guide" OR concept* OR research* OR design* OR develop* OR test* OR launch* OR enhance* OR maintain* OR operat* OR market*)

While these were not numbered 4-7 and 9 in our final list on January 4, I believe these are the terms you reference as such in your email.  Please confirm, and please let us know if you can agree to this exchange or if we should discuss further during our Friday meet and confer.

Finally, as to subpoenas, we are in the process of receiving and processing the state entity productions, which we will produce to you when they are complete.  We have not received anything from Mr. Minkkinen as of now.  As to Sagitec's employees, you still refuse to actually name the people you intend to subpoena.  Please inform us of an actual list of subpoenas you intend to issue and we will provide the contact information for those individuals and/or their counsel, to the extent available.

We look forward to addressing these issues tomorrow at 10:30 ET.

Best,
Rebecca

---

**From:** Arnett, Patrick <patrick.arnett@kirkland.com>
**Sent:** Tuesday, February 27, 2024 3:43 PM
**To:** Bact, Rebecca <RBact@RobinsKaplan.com>; Andrew E. Russell Esquire (arussell@shawkeller.com) <arussell@shawkeller.com>; #Deloitte Sagitec <Deloitte-Sagitec@kirkland.com>; LoCascio, Gregg F. <glocascio@kirkland.com>; Hartmann, John F. <jhartmann@kirkland.com>; *jshaw@shawkeller.com <jshaw@shawkeller.com>; Simmons, Joshua L. <joshua.simmons@kirkland.com>; Teleky, Nick <nick.teleky@kirkland.com>
**Cc:** Carmack, Brandon A. <BCarmack@RobinsKaplan.com>; Larus, Christopher K. <CLarus@RobinsKaplan.com>; Prange, David A. <DPrange@RobinsKaplan.com>; Dawson, Demitri M. <DDawson@RobinsKaplan.com>; *agaza@ycst.com <agaza@ycst.com>; Keith, Colin A. <CKeith@ycst.com>; Olson, Rajin S. <ROlson@RobinsKaplan.com>; RK-Sagitec <RK-Sagitec@RobinsKaplan.com>; *RVrana@ycst.com <RVrana@ycst.com>; Hartzell, Thomas <THARTZELL@ycst.com>
**Subject:** [EXTERNAL] RE: Deloitte Consulting LLP et al. v. Sagitec Solutions LLC -- Renewed request for meet and confer on Deloitte's discovery deficiencies

Rebecca,

Your email of February 16 misstates the extent to which the parties reached agreement, if at all, on Sagitec's proposed terms.  As you know, Sagitec was only entitled to propose ten additional terms (*see* D.I. 71 at 4), but instead requested 37 additional terms that resulted in an unreasonable volume of documents.  Deloitte's counterproposals were expressly conditioned on achieving a "reasonable volume," and should the parties be unable to agree on an approach that resulted in a reasonable volume, Deloitte expressly "reserve[d] the right to insist that Sagitec comply with the ESI order by limiting itself to ten additional terms."  1/3/2024 Email from P. Arnett.  Moreover, Deloitte's counterproposals clearly indicated that they did not reflect final agreements, but instead were subject to additional narrowing should the modified terms continue to yield an reasonable volume of documents.  *See id.* ("we reserve the right to propose additional limitations if proximity searching alone does not result in a reasonable number of documents").

Moreover, Sagitec has never explained why its additional proposed terms are necessary in light of the terms Deloitte has already used to search its ESI, especially given the overbroad nature of Sagitec's terms.  Purely by way of example, a random sampling of documents based on Sagitec's proposed term 56 resulted in numerous documents that happened to contain the interjection "Oh" (not a reference to Ohio) and the word "source" used in a generic context (*e.g.*, as in the origin of something), demonstrating that Sagitec's terms are not narrowly targeted to surface responsive documents.  Similarly, terms such as "take" and "investigate" yield documents completely unrelated to "Deloitte's internal view of uFACTS and its intellectual property characterizations," which Sagitec apparently contends is the purpose of such terms.  For example, such terms appear in phrases such as "take a look at" and "please investigate" as used in routine interactions that have nothing to do with Sagitec's defenses in this case.  Accordingly, absent further narrowing by Sagitec to achieve a reasonable number of additional documents, Deloitte declines to apply Sagitec's additional requested terms beyond the modified versions Deloitte has already employed.

Regarding custodians, as we have repeatedly stated, Deloitte conducted a reasonable investigation and determined that Messrs. Malm, Gosu, and Sambasivam are the custodians most likely to possess documents responsive to Sagitec's requests because each held senior positions within the business unit that developed and offered uFACTS and had significant responsibilities relating to the uFACTS solution throughout the relevant timeframe.  As you also know, a significant number of Deloitte employees with responsibilities relating to the uFACTS solution left to work for Sagitec, and Deloitte is unaware, after its investigation, of other potential custodians who are likely to possess unique, responsive information that cannot be obtained from the custodians Deloitte already identified.  In addition, Deloitte has produced

significant quantities of non-custodial documents reflecting Deloitte's ownership of the uFACTS solution and measures taken to protect its secrecy.  We therefore disagree that Deloitte is required to identify additional custodians to satisfy its discovery obligations, and note that despite multiple opportunities to do so after Deloitte made its position clear in an email dated January 3, 2024, Sagitec has not requested any additional custodians aside from Mr. Minkkinen.

Concerning Sagitec's new demand that Deloitte provide a log of internal emails from custodians Jin-Hendel, Fink, and Harris, this is contrary to the parties' earlier agreements.  In particular, Deloitte offered to "search" their external communications for documents responsive to Sagitec's requests.  1/3/2024 Email from P. Arnett; *see also* 12/28/2023 Email from R. Olson ("Sagitec is willing to forgo internal Deloitte communications with these individuals at this time.").  In response, Sagitec asked Deloitte to "simply exclude Deloitte domains and produce all others on which the search terms hit."  1/8/2024 Email from R. Bact.  Sagitec's request incorrectly presupposes that Deloitte would still undertake the needless burden of reviewing the very internal communications that Sagitec agreed to forgo, which would defeat the purpose of the parties' agreement—namely, to "reduce Deloitte's burden to identify non-privileged documents" as Sagitec acknowledged in its email of December 28, 2023.  We nonetheless remain open to discussing a reasonable and mutual timetable for exchanging privilege logs for withheld documents within the scope of documents the parties agreed to review, consistent with the protective order.

As stated in my February 9 email, in light of Sagitec's refusal to search its employees' personal storage or files for any Deloitte Property they continue to possess, we intend to subpoena the Sagitec employees who formerly worked at Deloitte, including the employees identified in Sagitec's Response to Deloitte's Interrogatory No. 7 (except Bernt Peterson).  As we understand that Sagitec refuses to accept subpoenas on their behalf, please promptly provide the current addresses where each may be served with a subpoena (or if represented by counsel, their counsel's address).

Thank you for confirming that Sagitec intends to produce documents it receives pursuant to third-party subpoenas it has served.  As Sagitec's subpoenas to certain state agencies have been outstanding for over two months, and its subpoena to Mr. Minkkinen nearly three weeks, please let us know the status of Sagitec's efforts to obtain compliance with those subpoenas, including when we can expect to start receiving any documents Sagitec has or expects to receive.

Regarding Sagitec's unilateral decision to apply a date-range cut-off of 2016 for search terms related to Deloitte projects for which Sagitec apparently possessed documents after that date, Deloitte renews its request that Sagitec apply search terms 4–7 and 9 without any date restriction.  Sagitec has professed that it is "unaware of any allegation of misappropriation that carries forward beyond the 2016 time period" and apparently bases its refusal to search after that date in part because it has already produced the "Sharepoint sites for the Maryland-West Virginia consortium project, which is the precursor to all later Sagitec projects."  12/21/2023 Email from R. Bact.  However, Deloitte's allegations from the start have included that Sagitec's misappropriation and infringement continues to the present day, *see* D.I. 1 ¶¶ 1, 6, 8, 14, 46, 49, 58–59, 65, 80–81, 92–93, and Sagitec's own production confirms that there are references to Deloitte projects after 2016.  *See, e.g.*, SAGITEC-DEL_00052544; SAGITEC-DEL_00052564; SAGITEC-DEL_00052630; SAGITEC-DEL_00052662.  Any documents dated after 2016 showing that Sagitec continued to possess and use Deloitte Property—including property developed by Deloitte in connection with the Minnesota, Massachusetts, or New Mexico projects—are therefore highly relevant and Sagitec has no basis to refuse searching for such documents.  If, as Sagitec seems to suggest, it has not used documents pertaining to these projects since 2016, then we would expect the burden of searching for any such documents to be minimal and Sagitec to be eager to demonstrate that its misappropriation has ceased.  If, on the other hand, Sagitec is withholding numerous post-2016 documents showing its continued use of Deloitte property, Deloitte has been, and continues to be, prejudiced by Sagitec's refusal.

Thank you for confirming that Sagitec does not agree that its post-January 16 document production constitutes good cause for Deloitte to supplement its interrogatory responses.  We believe we are at an impasse on this issue.

With respect to the categories of information sought in Sagitec's letter dated February 15, Deloitte intends to timely supplement its interrogatory responses, including its responses to Sagitec's Interrogatories No. 2, 8, and 9, although it will not be able to do so by Sagitec's arbitrary deadline of March 1.  Sagitec's decision to serve the vast majority of its production between January 19 and February 9, including individual volumes that took several days each to process, has hampered Deloitte's ability to efficiently review the documents necessary to supplement at least its response to Interrogatories No. 2 and 8.  Regarding Interrogatory No. 9, Deloitte can agree to provide an identification of potential customers to whom Deloitte offered uFACTS but who ultimately chose neither Sagitec nor Deloitte, to the extent such information can be found after a reasonable search.

The soonest we are available to meet and confer is Friday at 10 am ET.  Let us know if that works for you.

Regards,
Patrick

**Patrick Arnett**
he / him / his

KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave NW, Washington DC 20004
**T** +1 202 389 5160   **M** +1 646 352 3502
**F** +1 202 389 5200

patrick.arnett@kirkland.com

**From:** Bact, Rebecca <RBact@RobinsKaplan.com>
**Sent:** Monday, February 26, 2024 10:10 AM
**To:** Arnett, Patrick <patrick.arnett@kirkland.com>; Andrew E. Russell Esquire (arussell@shawkeller.com)
<arussell@shawkeller.com>; #Deloitte Sagitec <Deloitte-Sagitec@kirkland.com>; LoCascio, Gregg F.
<glocascio@kirkland.com>; Hartmann, John F. <jhartmann@kirkland.com>; *jshaw@shawkeller.com
<jshaw@shawkeller.com>; Simmons, Joshua L. <joshua.simmons@kirkland.com>; Teleky, Nick
<nick.teleky@kirkland.com>
**Cc:** Carmack, Brandon A. <BCarmack@RobinsKaplan.com>; Larus, Christopher K. <CLarus@RobinsKaplan.com>; Prange,
David A. <DPrange@RobinsKaplan.com>; Dawson, Demitri M. <DDawson@RobinsKaplan.com>; *agaza@ycst.com
<agaza@ycst.com>; Keith, Colin A. <CKeith@ycst.com>; Olson, Rajin S. <ROlson@RobinsKaplan.com>; RK-Sagitec <RK-
Sagitec@RobinsKaplan.com>; *RVrana@ycst.com <RVrana@ycst.com>; Hartzell, Thomas <THARTZELL@ycst.com>
**Subject:** RE: Deloitte Consulting LLP et al. v. Sagitec Solutions LLC -- Renewed request for meet and confer on Deloitte's
discovery deficiencies

Patrick,

I write again to follow up on my email of February 16, below, which requested that Deloitte inform us of its plans
regarding custodians to cover gaps in its document search as well as a plan for addressing internal emails from in-house
counsel custodians by February 20, as well as a supplemented production to bring Deloitte's production in line with
what the parties agreed to on January 8, by February 23, 2024.  Neither of these things occurred, and you have not
responded in any way to my ten-day-old email.

Further, you did not in any way respond to our letter of February 15, 2024 (reattached for convenience), identifying
deficiencies in Deloitte's interrogatory responses and requesting a meet and confer on February 21 or 22, 2024.

We propose a meet and confer call this week on all of these issues.  We are free Wednesday, February 28 other than 3-4
ET or anytime Thursday, February 29.  Given that these issues have long been pending, please respond with your
availability no later than close of business tomorrow, February 27, 2024.

Thank you,
Rebecca

**From:** Bact, Rebecca
**Sent:** Friday, February 16, 2024 12:29 PM
**To:** Arnett, Patrick <patrick.arnett@kirkland.com>; Andrew E. Russell Esquire (arussell@shawkeller.com)
<arussell@shawkeller.com>; #Deloitte Sagitec <Deloitte-Sagitec@kirkland.com>; LoCascio, Gregg F.
<glocascio@kirkland.com>; Hartmann, John F. <jhartmann@kirkland.com>; *jshaw@shawkeller.com
<jshaw@shawkeller.com>; Simmons, Joshua L. <joshua.simmons@kirkland.com>; Teleky, Nick
<nick.teleky@kirkland.com>
**Cc:** Carmack, Brandon A. <BCarmack@RobinsKaplan.com>; Larus, Christopher K. <CLarus@RobinsKaplan.com>; Prange,
David A. <DPrange@RobinsKaplan.com>; Dawson, Demitri M. <DDawson@RobinsKaplan.com>; *agaza@ycst.com
<agaza@ycst.com>; Keith, Colin A. <CKeith@ycst.com>; Olson, Rajin S. <ROlson@RobinsKaplan.com>; RK-Sagitec <RK-

Sagitec@RobinsKaplan.com>; *RVrana@ycst.com <RVrana@ycst.com>; Hartzell, Thomas <THARTZELL@ycst.com>
**Subject:** RE: Deloitte Consulting LLP et al. v. Sagitec Solutions LLC -- Correspondence

Patrick,

We are in receipt of your email below.

**<u>Deloitte's Document Protocol/Search Terms</u>**

First, while we appreciate that you finally have disclosed the search protocol you applied to your document production of January 19 (after we repeatedly requested it, through our letter of January 29 and email of February 6), we are disturbed to find that it deviates in numerous, significant ways from the agreements we made through correspondence in advance of the production. At the time, we thought there were small areas of remaining dispute with most items having been agreed to; it turns out you did not abide by those agreements that had already been made. In particular, I draw your attention to your own statements in your email of January 3, in the column to the left, my statements agreeing to your proposals in the center, and to your own statements on February 9 in the column to the right.

| Terms | January 3 email from Arnett to Bact | January 8 Bact email to Arnett | February 9 email from Arnett to Bact |
|---|---|---|---|
| Terms 39-48 | **Terms 39–48:** Collectively these terms would add approximately 188,000 unique documents to review (i.e., beyond those Deloitte has already agreed to review based on its proposed search terms and custodians), which is unduly burdensome in proportion to the relevance of the information sought. Consistent with the approach proposed by Sagitec with respect to Deloitte's requested additional terms (Nos. 28–31), we suggest using proximity restrictions to works towards a manageable hit count. We propose starting with w/20 and narrowing from there if the hit counts remain excessive, although we reserve the right to propose additional limitations if proximity searching alone does not result in a reasonable number of documents. Let us know if this works for Sagitec. | **Terms 39-48:** We can agree to a "within 20" limiting parameter for these terms but reserve the right to revisit this after examining Deloitte's production. If further discovery suggests this limitation has excluded relevant documents, we may revisit this limitation. | Sagitec's requested terms 39–48, which pair uFACTS with many incredibly common words such as "investigate" and "take," among others, are unduly burdensome, especially in light of the fact that Deloitte has already searched for and produced documents based on broad terms such as "Sagitec" and "Neosurance," and has produced documents relevant to the development and implementation of uFACTS. Deloitte is willing to consider substantially narrowed terms, if Sagitec can show that they are needed in light of the documents Deloitte has already produced. |
| Terms 49-64 | **Terms 49–64:** Collectively these terms would add approximately 125,000 unique documents to review. As the parties discussed on the December 28 meet-and-confer in the context of similar terms that Sagitec initially proposed for its own document search, state agency names standing alone are likely to return high volumes of irrelevant results. We therefore invite Sagitec to propose a set of narrowing criteria that can be | **Terms 49-64:** We can agree to your revisions to the term nos. 52-61 as laid out below. We take it that, because you did not spell out any revisions to terms 49-51 and 62-64, you will apply those as proposed by Sagitec. Please confirm. | As to terms 49–64, which Deloitte understands are based on the projects identified in Sagitec's Response to Deloitte's Interrogatory No. 1, numerous of these terms reference state agencies with responsibilities that extend beyond unemployment insurance. Moreover, Sagitec's terms produced unduly burdensome results for time periods prior to Sagitec bidding on and delivering Neosurance, which would be plainly irrelevant. Accordingly, and in the |

applied consistently to these terms and which reflect the relevant information Sagitec is seeking.  In addition, we propose the following revisions to ensure that terms that are non-specific to any state project are paired with a state name or abbreviation.

52.    ("Employer Self Service Portal" OR ("ESSP") AND (DC or "District of Columbia"))

53.    ("ESSP-PFML" OR "Paid Family Medical Leave" OR "Paid Family Leave" OR "PFML" OR "PFL") **AND (DC or "District of Columbia")**

54.    ("Employer Tax System" OR "DCETS" OR "ETS") **AND (DC or "District of Columbia")**

57.    "Maryland Division of Unemployment Insurance" OR "MDUI" OR "~~"~~MD DUI" OR ("DUI" **AND (MD or Maryland))**

59.    "North Carolina Division of Employment Security" OR "NCDES" OR "NC DE~~C~~S" OR ("DES" **AND (NC or "North Carolina"))**

60.    **(NC or "North Carolina") AND** "State Unemployment Insurance Tax System") OR "NC-SUITS" OR "NCSUITS" OR "NC SUITS"

61.    "South Carolina Department of Employment and Workforce" OR ("SCDEW ~~AND (SC or "South Carolina")~~) OR "SC DEW" OR ("DEW" AND (SC or "South Carolina"))

interest of narrowing the scope of disputed terms, Deloitte can agree to use the following modified terms within the indicated date ranges, which are based on the contract and delivery dates from Sagitec's Response to Deloitte's Interrogatory No. 1.  For clarity, Deloitte would agree to use a date range starting with the entire year in which Sagitec contracted with the relevant state entity and ending with the entire year in which Sagitec delivered the software.

49.    ("Delaware Department of Labor" OR "Delaware DoL" OR "DEDOL" OR "DE DOL") <mark>AND "unemployment insurance"</mark> **-- 2020**

50.    DE-PUA OR "DE PUA" **-- 2020**

51.    (("Department of Employment Services" AND (DC or District of Columbia)) OR "DOES (DC)") <mark>AND "unemployment insurance"</mark> **-- 2014**

52.    ("Employer Self Service Portal" OR "ESSP") AND (DC or "District of Columbia") **-- 2014**

53.    "ESSP-PFML" OR (("Paid Family Medical Leave" OR "Paid Family Leave" OR "PFML" OR "PFL") AND (DC or "District of Columbia")) **-- 2019**

54.    "DCETS" OR (("Employer Tax System" OR "ETS") AND (DC or "District of Columbia")) **-- 2019**

55.    ("Ohio Department of Job and Family Services" OR "ODJFS" OR "DJFS") <mark>AND "unemployment insurance"</mark> **-- 2018–2021**

56.    "State of Ohio Unemployment Resource for Claimants and Employers" OR ("SOURCE" AND (OH or Ohio)) **-- 2018–2021**

57.    "Maryland Division of Unemployment Insurance" OR "MDUI" OR "MD DUI" OR ("DUI" AND (MD or Maryland)) **-- 2015–2016**

58.    (Beacon AND (MD or Maryland)) OR "BEACON-PUA" OR "BEACON PUA" **-- 2015–2016**

59.    ("North Carolina Division of Employment Security" OR "NCDES" OR "NC DES" OR ("DES" AND (NC or "North Carolina"))) <mark>AND "unemployment insurance"</mark> **-- 2022–2023**

60.    ((NC or "North Carolina") AND "State Unemployment

| | | | Insurance Tax System") OR "NC-SUITS" OR "NCSUITS" OR "NC SUITS" **-- 2022–2023**<br>61.     ("South Carolina Department of Employment and Workforce" OR "SCDEW" OR "SC DEW" OR ("DEW" AND (SC or "South Carolina"))) AND "unemployment insurance" **-- 2016–2018**<br>62.     "SC-SUITS" OR "SCSUITS" OR "SC SUITS" **-- 2016–2018**<br>63.     ("Texas Workforce Commission" OR "TWC" OR "TX WC") AND "unemployment insurance" **-- 2021**<br>64.     "West Virginia Unemployment Insurance" OR "WVUI" OR "WV UI" **-- 2015–2016** |

As you can see, in both cases, you made a proposal, we agreed, and from there, you unilaterally applied additional limitations to the terms and protocols—all without disclosing until we had at least twice urged in correspondence after the fact.  For example, though you proposed limiting parameters to terms 39-48, to which we agreed, you did not in fact search them at all and now demand we explain their relevance.  Though we should not have to explain given our prior agreement, it is clear on their face that these terms are essential to demonstrating Deloitte's internal view of uFACTS and its intellectual property characterizations, as well as discussions of how it was used by others.  These terms are essential to the case and to Sagitec's defenses, and we request that you apply the agreed search term parameters (including your proposed limitations, to which we agreed) and provide the resulting documents no later than February 19, a full month after the substantial completion deadline.

Second, you applied additional, undisclosed limitations to terms 49-64, though the parties had an agreement, after the fact and again without disclosing.  Principally, you added date restrictions''—which we are still reviewing and reserve the right to object to—as well as the term "AND 'unemployment insurance'"—a term almost no one in the industry would use (instead of, for example, "UI"), effectively nullifying the terms' utility.  Again, we request that you apply the agreed search protocol laid out in your January 3 email—an offer which we accepted—and produce the resulting documents no later than February 19.

Third, we are happy to see that you accepted our suggestion to apply terms 30-38, instead of relying on metadata, but we do not understand the limitations you applied to uncommon last names like Cogar and Harrilla.  We accept that "Heath," "Powers," or "Storage" alone might produce irrelevant results.  However, we request that you search for "Cogar" and "Harrilla" without first name limiters and produce those results to us no later than February 23.

**Deloitte's Custodians:**

As to custodians, you continue to refuse to explain how your current seven custodians cover the areas of the case that we have repeatedly identified as not being covered, including management, development, and marketing of Deloitte's UI projects, as well as individuals responsible for secrecy maintenance.  Please affirmatively explain how these areas are covered by your current custodians, no later than February 20.  We will continue to pursue this issue until you have produced documents from 10 relevant custodians who cover all aspects of Deloitte's discovery obligations.

As to the internal emails from custodians Jin-Hendel, Fink, and Harris, we never requested that you not search internal domains.  We agreed that you need not **produce** internal emails, meaning that we would not force you to make a privilege call on each document.  Instead, we have made clear that we want a log of the internal emails that hit on the search terms—whether they are privileged or not. We are still entitled at least to see the information that would be on a privilege log.  If this is not agreeable, we will need all non-privileged internal emails from those three custodians, as well

as a privilege log of the internal emails withheld for privilege.  Please provide your suggested plan no later than February 20.

**Remaining Issues**

As to supplementation of Deloitte's response to Interrogatory No. 1, as you recognize, you are permitted to ***request*** permission to supplement for good cause.  1/16/2024 H'rg Tr. at 30:6-31:5 ("I think we have to get more specificity with respect to the trade secrets in Interrogatory Number 1. The safety valve is that if something pops up unexpectedly that turns out to be within the scope of one of your trade secrets that hasn't been specifically identified earlier, ***you have room to make a request for supplementation upon showing a good cause***." (emphasis added)).  We do not agree that Sagitec's post-January 16 document production constitutes good cause to supplement per se, and if and when Deloitte believes it has good cause to supplement its trade secret identification, we expect that request to supplement to be laid out explicitly, for the parties to meet and confer thereon, and if there is a dispute, for the parties to address through motion practice before the Court.

We understand you continue to dispute Sagitec's application of a 2016 date cutoff to document production related to Deloitte's projects.  We do not, however, see a request.  Please explain what you are looking for and we can properly respond.

Finally, we reiterate that we do not have access to Sagitec employees' personal storage or files.  We object to any subpoena to a Sagitec employee that seeks Sagitec-held documents as an improper run-around of the ESI order.  To the extent you intend to subpoena personal files of Sagitec employees, that is outside Sagitec's possession, custody, and control.  Please inform us if you intend to subpoena particular Sagitec employees and we can let you know if they are represented by counsel.  We do intend to produce to Deloitte the documents we receive pursuant to third party subpoenas we have served, and expect the same from you, should Deloitte serve subpoenas.

We expect your response on the above items by February 20, and Deloitte's document production as agreed on January 8 when we accepted your offers of document protocols by February 23.

Best,
Rebecca

---

**From:** Arnett, Patrick <patrick.arnett@kirkland.com>
**Sent:** Friday, February 9, 2024 11:15 PM
**To:** Bact, Rebecca <RBact@RobinsKaplan.com>; Andrew E. Russell Esquire (arussell@shawkeller.com) <arussell@shawkeller.com>; #Deloitte Sagitec <Deloitte-Sagitec@kirkland.com>; LoCascio, Gregg F. <glocascio@kirkland.com>; Hartmann, John F. <jhartmann@kirkland.com>; *jshaw@shawkeller.com <jshaw@shawkeller.com>; Simmons, Joshua L. <joshua.simmons@kirkland.com>; Teleky, Nick <nick.teleky@kirkland.com>
**Cc:** Carmack, Brandon A. <BCarmack@RobinsKaplan.com>; Larus, Christopher K. <CLarus@RobinsKaplan.com>; Prange, David A. <DPrange@RobinsKaplan.com>; Dawson, Demitri M. <DDawson@RobinsKaplan.com>; *agaza@ycst.com <agaza@ycst.com>; Keith, Colin A. <CKeith@ycst.com>; Olson, Rajin S. <ROlson@RobinsKaplan.com>; RK-Sagitec <RK-Sagitec@RobinsKaplan.com>; *RVrana@ycst.com <RVrana@ycst.com>; Hartzell, Thomas <THARTZELL@ycst.com>
**Subject:** [EXTERNAL] RE: Deloitte Consulting LLP et al. v. Sagitec Solutions LLC -- Correspondence

Rebecca,

Thank you for confirming that Sagitec is willing to consider requests for additional and necessary discovery.  At a minimum, Deloitte maintains that Sagitec's unilateral decision to use a 2016 date cut off for searches relating to Deloitte projects is improper, not least because Sagitec's own production demonstrates that Sagitec employees circulated materials relating to those projects after that time, and continued to use such materials.  *See, e.g.*, SAGITEC-

DEL_00052630; SAGITEC-DEL_00052655; SAGITEC-DEL_00052662.  Deloitte reserves the right to identify additional deficiencies in due course.

Regarding the search terms and parameters Deloitte employed, Deloitte used the 29 terms it originally disclosed (which is a greater number of terms than Sagitec originally proposed for itself), plus Sagitec's requested terms 65 and 66 without modification.  Deloitte's chosen terms include some that are very broad (such as "Sagitec" and "Neosurance") as well as terms that were tailored to locate documents relevant to the development and implementation of uFACTS.  Deloitte also separately searched for, located, and produced documents reflecting the uFACTS trade secrets and RFP materials for relevant projects, among other documents.  Sagitec's request that Deloitte employ 37 additional terms is well above the limit permitted by the ESI order, D.I. 71 at 4, and would result in an unreasonable volume of documents.  Nonetheless, Deloitte used Sagitec's terms 30–38 with the following highlighted modifications, which were necessary due to the volume of irrelevant documents swept in by Sagitec's original terms.  In addition, Deloitte used a date range of 1/1/2016 and later, which we understand encompasses the beginning of the government's investigation.

30.  @usdoj.gov
31.  Cogar w/3 (Andrew OR Andy)
32.  Heath w/3 (Candina OR Candy)
33.  Storage w/3 (Jon OR Jonathan)
34.  Harrilla w/3 (Joseph OR Joe)
35.  Powers w/3 (Jim OR James)
36.  "West Virginia Commission on Special Investigations" OR ("CSI" AND "WV")
37.  @wvcsi.gov
38.  Keene w/3 (Gregory OR Greg)

Sagitec's remaining requested terms are disproportionate given the searches Deloitte has already conducted.  In particular, terms 39–64 yield over 320,000 hits.  As to terms 49–64, which Deloitte understands are based on the projects identified in Sagitec's Response to Deloitte's Interrogatory No. 1, numerous of these terms reference state agencies with responsibilities that extend beyond unemployment insurance.  Moreover, Sagitec's terms produced unduly burdensome results for time periods prior to Sagitec bidding on and delivering Neosurance, which would be plainly irrelevant.  Accordingly, and in the interest of narrowing the scope of disputed terms, Deloitte can agree to use the following modified terms within the indicated date ranges, which are based on the contract and delivery dates from Sagitec's Response to Deloitte's Interrogatory No. 1.  For clarity, Deloitte would agree to use a date range starting with the entire year in which Sagitec contracted with the relevant state entity and ending with the entire year in which Sagitec delivered the software.

49.  ("Delaware Department of Labor" OR "Delaware DoL" OR "DEDOL" OR "DE DOL") AND "unemployment insurance" -- 2020
50.  DE-PUA OR "DE PUA" -- 2020
51.  (("Department of Employment Services" AND (DC or District of Columbia)) OR "DOES (DC)") AND "unemployment insurance" -- 2014
52.  ("Employer Self Service Portal" OR "ESSP") AND (DC or "District of Columbia") -- 2014
53.  "ESSP-PFML" OR (("Paid Family Medical Leave" OR "Paid Family Leave" OR "PFML" OR "PFL") AND (DC or "District of Columbia")) -- 2019
54.  "DCETS" OR (("Employer Tax System" OR "ETS") AND (DC or "District of Columbia")) -- 2019
55.  "Ohio Department of Job and Family Services" OR "ODJFS" OR "DJFS") AND "unemployment insurance" -- 2018–2021
56.  "State of Ohio Unemployment Resource for Claimants and Employers" OR ("SOURCE" AND (OH or Ohio)) -- 2018–2021
57.  "Maryland Division of Unemployment Insurance" OR "MDUI" OR "MD DUI" OR ("DUI" AND (MD or Maryland)) -- 2015–2016
58.  (Beacon AND (MD or Maryland)) OR "BEACON-PUA" OR "BEACON PUA" -- 2015–2016
59.  ("North Carolina Division of Employment Security" OR "NCDES" OR "NC DES" OR ("DES" AND (NC or "North Carolina")) AND "unemployment insurance" -- 2022–2023
60.  ((NC or "North Carolina") AND "State Unemployment Insurance Tax System") OR "NC-SUITS" OR "NCSUITS" OR "NC SUITS" -- 2022–2023
61.  ("South Carolina Department of Employment and Workforce" OR "SCDEW" OR "SC DEW" OR ("DEW" AND (SC or "South Carolina"))) AND "unemployment insurance" -- 2016–2018
62.  "SC-SUITS" OR "SCSUITS" OR "SC SUITS" -- 2016–2018
63.  ("Texas Workforce Commission" OR "TWC" OR "TX WC") AND "unemployment insurance" -- 2021
64.  "West Virginia Unemployment Insurance" OR "WVUI" OR "WV UI" -- 2015–2016

Sagitec's requested terms 39–48, which pair uFACTS with many incredibly common words such as "investigate" and "take," among others, are unduly burdensome, especially in light of the fact that Deloitte has already searched for and produced documents based on broad terms such as "Sagitec" and "Neosurance," and has produced documents relevant to the development and implementation of uFACTS. Deloitte is willing to consider substantially narrowed terms, if Sagitec can show that they are needed in light of the documents Deloitte has already produced.

Turning to Deloitte's identification of custodians, we continue to maintain that Deloitte's selection of custodians is reasonable and disagree that Deloitte is required to identify additional unspecified custodians. Indeed, the ESI order specifically contemplates that a party may identify fewer than 10 custodians, and the other party may "identify additional custodians" in that case. D.I. 71 at 4–5. Regarding Sagitec's identification of David Minkkinen, Deloitte conducted a reasonable search and determined that Mr. Minkkinen's email and laptop data was purged in 2013, shortly after his departure from Deloitte, consistent with Deloitte's document retention practices and policies. Nevertheless, Deloitte has produced ESI in which Mr. Minkkinen was involved from the files of other custodians.

Regarding Sagitec's request that Deloitte provide a log of withheld communications relating to the DOJ or other criminal investigation, we are open to discussing a reasonable and mutual timetable for the parties to produce privilege logs. However, we are confused by your request that Deloitte log documents "based on … the parties' agreement that Deloitte need not produce those documents." If Sagitec is referring to its agreement that Deloitte need not search internal emails for the attorney custodians, then Deloitte will not be able to provide such a log because, following Sagitec's request, Deloitte "exclude[d] Deloitte domains" before applying search terms. 1/8/2024 R. Bact Email. Accordingly, and consistent with the parties' agreement, Deloitte will not log such excluded documents. If Sagitec had something else in mind, please let us know.

Next, we disagree with Sagitec's interpretation of the Court's application of a good cause standard for supplementing Deloitte's response to Sagitec's Interrogatory No. 1. As you note, the Court specifically stated that a request would be allowed "if something pops up unexpectedly that turns out to be within the scope of one of [Deloitte's] trade secrets that hasn't been specifically identified earlier." 1/16/24 Hearing Tr. at 30:6–31:5. When the Court provided this guidance, Sagitec had yet to produce the over 600,000 documents that it waited until the substantial completion deadline to produce (as well as another 140,000+ pages produced just today). Accordingly, Deloitte could not have been aware of the full scope of Sagitec's misappropriation when it supplemented, and any additional trade secrets found within Sagitec's recent productions that did not appear in its initial production would necessarily be "unexpected." Thus, Deloitte's position is that it will have good cause to supplement after it has had the opportunity to complete its review of Sagitec's recent productions, which, as we noted before, were delivered after the deadline for substantial completion of document production and took a significant amount of time to load into a review platform. If Sagitec disagrees that this satisfies the good cause standard articulated by the Court, please let us know so we may consider whether to inform the Court of Sagitec's voluminous, belated production to determine whether it merits further supplementation by Deloitte.

Finally, while we disagree that searching for Deloitte property in the possession of Sagitec's employees is beyond Sagitec's discovery obligations, in view of Sagitec's refusal we intend to subpoena the remaining Sagitec employees who formerly worked at Deloitte. Please confirm that you will accept subpoenas on their behalf, or provide current addresses for at least the employees identified in Sagitec's Response to Deloitte's Interrogatory No. 7, as supplemented. Please also confirm, consistent with Sagitec's agreement to produce documents in response to Deloitte's Request for Production No. 106, that Sagitec will produce any documents it has received or will receive in response to subpoenas it has issued or will issue in this case. We also request that Sagitec produce, or copy us going forward, on any communications with parties it has subpoenaed concerning compliance with those subpoenas.

Regards,
Patrick

**Patrick Arnett**
he / him / his

**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Ave NW, Washington DC 20004
**T** +1 202 389 5160   **M** +1 646 352 3502
**F** +1 202 389 5200

patrick.arnett@kirkland.com

**From:** Bact, Rebecca <RBact@RobinsKaplan.com>
**Sent:** Tuesday, February 6, 2024 2:13 PM

**To:** Arnett, Patrick <patrick.arnett@kirkland.com>; Andrew E. Russell Esquire (arussell@shawkeller.com) <arussell@shawkeller.com>; #Deloitte Sagitec <Deloitte-Sagitec@kirkland.com>; LoCascio, Gregg F. <glocascio@kirkland.com>; Hartmann, John F. <jhartmann@kirkland.com>; *jshaw@shawkeller.com <jshaw@shawkeller.com>; Simmons, Joshua L. <joshua.simmons@kirkland.com>; Teleky, Nick <nick.teleky@kirkland.com>
**Cc:** Carmack, Brandon A. <BCarmack@RobinsKaplan.com>; Larus, Christopher K. <CLarus@RobinsKaplan.com>; Prange, David A. <DPrange@RobinsKaplan.com>; Dawson, Demitri M. <DDawson@RobinsKaplan.com>; *agaza@ycst.com <agaza@ycst.com>; Keith, Colin A. <CKeith@ycst.com>; Olson, Rajin S. <ROlson@RobinsKaplan.com>; RK-Sagitec <RK-Sagitec@RobinsKaplan.com>; *RVrana@ycst.com <RVrana@ycst.com>; Hartzell, Thomas <THARTZELL@ycst.com>
**Subject:** RE: Deloitte Consulting LLP et al. v. Sagitec Solutions LLC -- Correspondence

Patrick,

We are in receipt of your email below, and respond to your points in turn.

With regard to the protocol applied by Sagitec to its own production of documents, my email of January 4, 2024, referenced by you, explained that proportionate to the needs of the case, and due to Deloitte's failure to adequately identify its trade secrets, Sagitec had done its best to determine an appropriate protocol, and that "[s]hould Deloitte believe it is entitled to more documents than those that will be produced (subject to review) based on the search terms and parameters below, we are willing to negotiate further after Deloitte has received and reviewed the below production." Once Deloitte has defined its trade secrets and has also had an opportunity to review Sagitec's recent productions, Sagitec is ready and willing—as it stated in advance and always has been—to negotiate whatever further production Deloitte demonstrates is reasonable and necessary under the discovery rules.

We further note that Deloitte has not responded to Sagitec's request in our letter of January 29, requesting that Deloitte disclose the parameters or protocol it applied to arrive at Deloitte's January 19, 2024 production. Sagitec needs this information, contemplated by the ESI Stipulation, in order to determine what further negotiation is necessary. We also note that Deloitte continues to refuse to identify adequate custodians, which is contrary to both the spirit and the letter of the ESI Stipulation Deloitte agreed to and which was entered by the Court. While our original requested date of February 2 has passed, we now request that you provide this information by February 9.

We continue to request, additionally, that Deloitte provide a log of all internal communications related to the DOJ or other criminal investigation, whether based on privilege or the parties' agreement that Deloitte need not produce those documents, no later than February 9.

Next, we respond to your declaration that you may supplement your response to Interrogatory No. 1 under Rule 26(e), which is directly contrary to the Court's order. The Court's order that Deloitte supplement its response to Sagitec's Interrogatory No. 1 in no way depended on further document production from Sagitec. Indeed, the Court stated that, as of the hearing on January 16, "it seems to me that there's sufficient production to move to [Deloitte] the obligation to more thoroughly describe your trade secrets." 1/16/24 Hr'g Tr. at 11:5-8. Rather, where Deloitte was ordered to identify its trade secrets on the basis of production prior to January 16, Deloitte may only further supplement its trade secret identification for good cause. Id. at 30:6-31:5 ("I think we have to get more specificity with respect to the trade secrets in Interrogatory Number 1. The safety valve is that if something pops up unexpectedly that turns out to be within the scope of one of your trade secrets that hasn't been specifically identified earlier, you have room to make a request for supplementation upon showing a good cause."). Therefore, Deloitte's entitlement to supplement its response to Interrogatory No. 1 depends not on having an opportunity to review Sagitec's post-January 16 production, but on the Court's articulation of good cause laid out at the above citation, and there is no right to supplement under Rule 26(e) to reserve. To be clear, after Deloitte supplements later today, we expect that any further supplementation will be done with leave of the Court, after meeting and conferring and related motion practice.

Finally, we clarify that Sagitec did not collect the documents produced from Mr. Sadasivam, but received them through Mr. Sadasivam and his counsel. We confirm that we have no access to, nor will we search, any personal files for any

other Sagitec employee who formerly worked at Deloitte.  This is because they are not in Sagitec's possession, custody, or control, and are therefore beyond Sagitec's discovery obligations.

We look forward to receiving the document protocol applied to Deloitte's document production; the identification of at least four additional custodians to include Mr. Minkinnen and to cover the topics laid out in our January 29 letter; and the log of withheld documents relating to the DOJ and the criminal investigation, all by February 9, as well as Deloitte's supplemented interrogatory responses later today.

Best regards,
Rebecca

---

**From:** Arnett, Patrick <patrick.arnett@kirkland.com>
**Sent:** Friday, February 2, 2024 7:04 PM
**To:** Bact, Rebecca <RBact@RobinsKaplan.com>; Andrew E. Russell Esquire (arussell@shawkeller.com) <arussell@shawkeller.com>; #Deloitte Sagitec <Deloitte-Sagitec@kirkland.com>; LoCascio, Gregg F. <glocascio@kirkland.com>; Hartmann, John F. <jhartmann@kirkland.com>; *jshaw@shawkeller.com <jshaw@shawkeller.com>; Simmons, Joshua L. <joshua.simmons@kirkland.com>; Teleky, Nick <nick.teleky@kirkland.com>
**Cc:** Carmack, Brandon A. <BCarmack@RobinsKaplan.com>; Larus, Christopher K. <CLarus@RobinsKaplan.com>; Prange, David A. <DPrange@RobinsKaplan.com>; Dawson, Demitri M. <DDawson@RobinsKaplan.com>; *agaza@ycst.com <agaza@ycst.com>; Keith, Colin A. <CKeith@ycst.com>; Olson, Rajin S. <ROlson@RobinsKaplan.com>; RK-Sagitec <RK-Sagitec@RobinsKaplan.com>; *RVrana@ycst.com <RVrana@ycst.com>; Hartzell, Thomas <THARTZELL@ycst.com>
**Subject:** [EXTERNAL] RE: Deloitte Consulting LLP et al. v. Sagitec Solutions LLC -- Correspondence

Dear counsel:

We are in receipt of your letter dated January 29, 2024, concerning alleged deficiencies in Deloitte's document production.  While we disagree with the contentions in your letter and will follow up with a more detailed response, we note that Sagitec refused to apply the search parameters Deloitte requested and unilaterally proceeded with its production using inappropriate date restrictions.  1/4/2024 R. Bact Email.  Deloitte will provide specific instances of the deficiencies in Sagitec's production in due course, and any meet and confer on document production issues should cover those deficiencies as well.

Moreover, Deloitte disagrees that the sheer volume of Sagitec's production has any bearing on its adequacy.  Indeed, Sagitec's recent productions, comprising approximately 725 GB of material spanning nearly 4.5 million pages of documents, were mailed between January 19 and 26 and were delivered after the deadline for substantial completion of document production.  This timing is notable given that Sagitec responded to Deloitte's first set of RFPs on October 19, 2023, three months earlier, indicating that it would produce documents in response to 55 of Deloitte's requests.  Due to the volume of these productions, they are continuing to take substantial time to extract and load into a review platform, and will require significant time to review for substance in their entirety.  Deloitte will supplement its responses to Interrogatory No. 1 (among others) by February 6 as previously agreed.  It, however, will do so based on the information reasonably available to it, which does not include the contents of the voluminous productions that Deloitte received as recently as this past Monday.  Therefore, Deloitte reserves its right to further supplement its responses pursuant to Rule 26(e).

Finally, we observe that Sagitec produced documents bearing production numbers prefixed with the name of a former Deloitte employee, Karthik Sadasivam, which appear to have been collected from his personal Gmail account.  Sagitec has previously represented that it does not have access to at least Messrs. Minkkinen and Sambasivam "for the purpose of determining what information, if any, they possess" in response to certain discovery requests.  Sagitec's Objections and Responses to Deloitte's First RFPs, at 9.  Please confirm for each Sagitec employee who formerly worked at Deloitte, including at least those identified in Sagitec's response to Deloitte's RFP No. 7 as supplemented, whether Sagitec has or will search such employee's personal files and email accounts for responsive documents, and if not explain Sagitec's basis for not doing so.

Regards,

Patrick Arnett

he / him / his

**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Ave NW, Washington DC 20004
**T** +1 202 389 5160   **M** +1 646 352 3502
**F** +1 202 389 5200

patrick.arnett@kirkland.com

**From:** Bact, Rebecca <RBact@RobinsKaplan.com>
**Sent:** Monday, January 29, 2024 5:07 PM
**To:** Andrew E. Russell Esquire (arussell@shawkeller.com) <arussell@shawkeller.com>; #Deloitte Sagitec <Deloitte-Sagitec@kirkland.com>; LoCascio, Gregg F. <glocascio@kirkland.com>; Hartmann, John F. <jhartmann@kirkland.com>; *jshaw@shawkeller.com <jshaw@shawkeller.com>; Simmons, Joshua L. <joshua.simmons@kirkland.com>; Teleky, Nick <nick.teleky@kirkland.com>; Arnett, Patrick <patrick.arnett@kirkland.com>
**Cc:** Carmack, Brandon A. <BCarmack@RobinsKaplan.com>; Larus, Christopher K. <CLarus@RobinsKaplan.com>; Prange, David A. <DPrange@RobinsKaplan.com>; Dawson, Demitri M. <DDawson@RobinsKaplan.com>; *agaza@ycst.com <agaza@ycst.com>; Keith, Colin A. <CKeith@ycst.com>; Olson, Rajin S. <ROlson@RobinsKaplan.com>; RK-Sagitec <RK-Sagitec@RobinsKaplan.com>; *RVrana@ycst.com <RVrana@ycst.com>; Hartzell, Thomas <THARTZELL@ycst.com>
**Subject:** Deloitte Consulting LLP et al. v. Sagitec Solutions LLC -- Correspondence

Counsel,

Please see the attached correspondence from David Prange in the above-named matter.

Best,
Rebecca


Rebecca Bact

Robins Kaplan LLP | 800 Boylston Street | Suite 2500 | Boston, MA  02199
p  617 859 2740 | f  617 267 8288 | Pronouns: she/her/hers
RBact@RobinsKaplan.com| RobinsKaplan.com


_____

Information contained in this e-mail transmission may be privileged, confidential and covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521.

If you are not the intended recipient, do not read, distribute, or reproduce this transmission.

If you have received this e-mail transmission in error, please notify us immediately of the error by return email and please delete the message from your system.

Pursuant to requirements related to practice before the U. S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U. S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

Thank you in advance for your cooperation.

15

Robins Kaplan LLP

http://www.robinskaplan.com

_____

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.


The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.


The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# EXHIBIT 4

## Bact, Rebecca

| | |
|---|---|
| **From:** | Bact, Rebecca |
| **Sent:** | Friday, April 12, 2024 4:49 PM |
| **To:** | Kim, Stephany S.; Olson, Rajin S.; Dillon, Erika; Prange, David A.; Carmack, Brandon A.; Larus, Christopher K.; *agaza@ycst.com; *RVrana@ycst.com; THARTZELL@ycst.com; RK-Sagitec; Barrett, Tamara J. |
| **Cc:** | Andrew Russell; *jshaw@shawkeller.com; #Deloitte Sagitec |
| **Subject:** | RE: DDel - 1:23-cv-00325-WCB Deloitte Consulting et al v. Sagitec Solutions - Service - Written Discovery and Privilege Log |

Stephany,

Thank you for your correspondence, though we note it took you two weeks to respond to our questions.  Unfortunately, your email does not resolve Sagitec's significant concerns with Deloitte's privilege log.

First, you state that Deloitte has produced communications "between Deloitte and the government."  Sagitec understands this and has received those documents, but would not expect them to be on a log, since they are not privileged communications and are not internal to Deloitte.  Rather, Sagitec refers to any internal communications within Deloitte around that time that Deloitte considers privileged.

Second, it is Deloitte that mischaracterizes the agreement between the parties on these internal communications, to the extent there ever was one. Indeed, Deloitte has repeatedly misconstrued any agreement the parties may have reached regarding internal communications between Deloitte employees regarding communications with the DOJ or the WV CSI.  To the extent Sagitec agreed to temporarily forgo the collection of internal communications from custodians Jin-Hendel, Fink, and Harris, Sagitec has always maintained that it needs either the communications or a log of those communications (see 1/29/2024 Prange letter to Arnett, 2/16/2024 Bact email to Arnett, 2/29/2024 Bact email to Arnett).  As clarified almost two months ago, "we never requested that you not search internal domains," but merely offered to postpone Deloitte's need to make a privilege call on each document at that time.  2/16/2024 Bact email to Arnett ("We agreed that you need not **produce** internal emails, meaning that we would not force you to make a privilege call on each document.  Instead, we have made clear that we want a log of the internal emails that hit on the search terms—whether they are privileged or not. We are still entitled at least to see the information that would be on a privilege log.").  We believed that the parties had resolved this issue when we met and conferred on March 1 and established a timeline for the mutual exchange of privilege logs—which we thought would include these internal communications. 2/29/2024 Bact email to Arnett.  Since we were obviously mistaken, the dispute remains live.

As to the dispute, to the extent that Deloitte relies on Sagitec's "agreement," given the fact that the parties do not view the "agreement" as having the same terms, it is now clear that there was no meeting of the minds and consequently no agreement at all. If we cannot come to actual agreement on this issue at our next meet and confer, under which Deloitte agrees to (1) produce non-privileged internal communications and a log of privileged internal communications or (2) log all internal communications on its privilege log, Sagitec will move to compel in the immediate term.

Third, you have failed to address the absence of certain categories of documents from your log that are not the subject of any purported agreement between the parties and are further required by the protective order. For example, it is incredible that there are no communications between Deloitte personnel and Kristen McCallion of Fish and Richardson, who drafted correspondence regarding the claims Deloitte now asserts in 2018.  SAGITECDEL_00000004; SAGITEC-DEL_00000011.  Please explain if Deloitte is purposefully withholding communications with Fish and Richardson from its privilege log, or has engaged in any other such categorical withholding, such as from certain external lawyers or for certain date ranges, as well as any rationale for doing so. The same can be said for communications between Deloitte

and any other counsel prior to the filing of this lawsuit, i.e. Kirkland & Ellis. Alternatively, please supplement your privilege log to include those communications.

Finally, with regard to your statement as to non-Deloitte or unclear authors for documents identified on Deloitte's privilege log, please confirm that all such cases are in fact for attachments attached to privileged communications that have been otherwise logged.

Given that Deloitte has been on notice of Sagitec's identified deficiencies for over two weeks, we expect your investigation of these concerns to conclude in the immediate term. Please confirm you will update your privilege log to remedy these issues, and also respond to all of Sagitec's identified concerns, no later than April 16, 2024.

Best,
Rebecca

Rebecca Bact

**ROBINS ▬ KAPLAN**LLP

Robins Kaplan LLP | 800 Boylston Street | Suite 2500 | Boston, MA 02199
p 617 859 2740 | f 617 267 8288 | Pronouns: she/her/hers
RBact@RobinsKaplan.com| RobinsKaplan.com

---

**From:** Kim, Stephany S. <stephany.kim@kirkland.com>
**Sent:** Tuesday, April 9, 2024 8:40 PM
**To:** Olson, Rajin S. <ROlson@RobinsKaplan.com>; Dillon, Erika <erika.dillon@kirkland.com>; Prange, David A. <DPrange@RobinsKaplan.com>; Carmack, Brandon A. <BCarmack@RobinsKaplan.com>; Larus, Christopher K. <CLarus@RobinsKaplan.com>; *agaza@ycst.com <agaza@ycst.com>; *RVrana@ycst.com <RVrana@ycst.com>; THARTZELL@ycst.com; RK-Sagitec <RK-Sagitec@RobinsKaplan.com>; Barrett, Tamara J. <TBarrett@RobinsKaplan.com>
**Cc:** Andrew Russell <arussell@shawkeller.com>; *jshaw@shawkeller.com <jshaw@shawkeller.com>; #Deloitte Sagitec <Deloitte-Sagitec@kirkland.com>
**Subject:** [EXTERNAL] RE: DDel - 1:23-cv-00325-WCB Deloitte Consulting et al v. Sagitec Solutions - Service - Written Discovery and Privilege Log

Dear Rajin,

Thank you for bringing these matters to our attention. While Deloitte does not agree that its privilege log is facially deficient or otherwise improper, we are investigating your concerns and will update the privilege log as soon as practicable. Deloitte notes, however, that some of Sagitec's requests are based on incorrect understandings of the parties' prior agreements and the requirements detailed in the Protective Order, D.I. 70.

First, Sagitec asserts its belief that Deloitte's privilege log should include "communications around the times that the government was communicating with Deloitte" concerning government investigations of Sagitec. Deloitte has already produced such communications between Deloitte and the government. In particular, Deloitte has produced nearly 2,500 pages of documents from custodian Annica Jin-Hendel responsive to Sagitec's requests, including but not limited to communications between Deloitte and Jim Powers from the West Virginia Commission on Special Investigations. *E.g.*, DEL000477246 – 000479700. Because these documents were not withheld, they do not appear on the privilege log.

Second, your characterization of the parties' agreement as to Deloitte's privileged internal communications is incorrect. Not only has Deloitte never "agreed to log privileged internal communications collected from" Deloitte's in-house attorneys, as your email asserts, but Sagitec affirmatively agreed "to forgo internal Deloitte communications with these individuals" months ago. 12/28/2023 Email from R. Olson (emphasis in original); *see* 1/3/2024 Email from P.

Arnett ("We appreciate Sagitec's willingness to forgo internal Deloitte communications with [Annica Jin-Hendel and Jaclyn Fink].")  Far from "reversing course," Deloitte has consistently and repeatedly objected to Sagitec's unreasonable request that Deloitte log such internal communications.  *See* 12/20/2023 Email from P. Arnett; 2/27/2024 Email from P. Arnett.  Further, contrary to your assertions now, this topic never came up during our March 1, 2024 meet and confer, as evidenced by the lack of a record of any such agreement.  *See* 3/1/2024 Email from R. Bact (memorializing the parties' March 1 meet and confer with no mention of logging privileged in-house internal communications); 3/6/2024 Email from P. Arnett (same).  And as we have explained, Sagitec's request is contrary to the parties' prior agreements, would needlessly require Deloitte to review the very communications that Sagitec agreed to forgo, and would require Deloitte to undertake a review that is highly burdensome and disproportionate to the needs of the case.

Lastly, to provide more clarity as to the information available to Sagitec, Deloitte confirms that it provided the metadata authors of the documents for email attachments when available, in compliance with the Protective Order, D.I. 70.  To the extent that these author names are unclear, the files otherwise do not have a readily identifiable author.  Deloitte also confirms that the asterisks within Deloitte's privilege log indicate individuals who are attorneys or legal professionals acting at the direction of an attorney.

Best,
Stephany

**Stephany S. Kim**

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue, New York, NY 10022
**T** +1 212 341 7784  **M** +1 332 271 4068
**F** +1 212 446 4900

stephany.kim@kirkland.com

---

**From:** Olson, Rajin S. <ROlson@RobinsKaplan.com>
**Sent:** Wednesday, March 27, 2024 5:15 PM
**To:** Dillon, Erika <erika.dillon@kirkland.com>; Prange, David A. <DPrange@RobinsKaplan.com>; Carmack, Brandon A. <BCarmack@RobinsKaplan.com>; Larus, Christopher K. <CLarus@RobinsKaplan.com>; *agaza@ycst.com <agaza@ycst.com>; *RVrana@ycst.com <RVrana@ycst.com>; THARTZELL@ycst.com; RK-Sagitec <RK-Sagitec@RobinsKaplan.com>; Barrett, Tamara J. <TBarrett@RobinsKaplan.com>
**Cc:** Andrew Russell <arussell@shawkeller.com>; *jshaw@shawkeller.com <jshaw@shawkeller.com>; #Deloitte Sagitec <Deloitte-Sagitec@kirkland.com>
**Subject:** RE: DDel - 1:23-cv-00325-WCB Deloitte Consulting et al v. Sagitec Solutions - Service - Written Discovery and Privilege Log

Counsel,

Deloitte's privilege log appears facially deficient for several reasons. Deloitte's log comprises just 169 entries over nine years, including no entries at all in 2018. We would expect far more entries overall, including, but not limited to, communications in 2018 and other communications around the times that the government was communicating with Deloitte and the times that Deloitte was communicating with Sagitec. It appears that there are whole swathes of communications that Deloitte has improperly excluded from logging, and at a minimum, the basis for such exclusion is not clear. We request additional information by March 29 and productions from Deloitte by April 5 as follows.

1. Is Deloitte categorically withholding the logging of any communications? The documents Deloitte has produced to date confirm there are almost certainly additional communications involving Deloitte's lawyers before Deloitte filed suit in March 2023. As just one example, Deloitte did not include any communications with Kristen McCallion, or others at Fish and Richrdson, on the privilege log. If Deloitte is categorically withholding any communications from logging, please provide by March 29 the date range of any such communications withheld from logging and the basis for withholding any category of communications.

2.   During the parties' March 1 meet and confer, we understood that Deloitte had agreed to log privileged internal communications collected from Ms. Jin-Hendel or Ms. Fink. If Deloitte is now reversing course and excluding from logging any documents collected solely from Ms. Jin-Hendel or Ms. Fink (as opposed to duplicative documents collected also from Mr. Malm, Mr. Gosu, or other custodians), please supplement the privilege log by April 5 to include these entries. Alternatively, please provide by March 29 the basis for Deloitte's position of not logging these communications.

3.   Several documents on the privilege log appear to be non-privileged. For example, the documents that are identified as PRIV0020-26 appear to include non-privileged documents, including documents authored by "Jim Powers" or "powersj," and a document authored by "Kirti Kumbhare," who is a Sagitec employee who has never worked for Deloitte. Please produce these non-privileged documents and any other non-privileged documents on the log by April 5.

4.   The identity of many authors is unclear, including "Id1ot," "ITPO," "OGC Support," "Deloitte_tbh," "PC USER," "ServUS," "DoIT," and "WIL151093." Please confirm by March 29 the identity of these authors and whether they are internal or external to Deloitte.

5.   Deloitte included an asterisk after several names without explanation. Please confirm by March 29 if the asterisk is intended to indicate that the individual is an attorney.

We request Deloitte's response by no later than this Friday, March 29. Sagitec is continuing to review Deloitte's privilege log and reserves all rights to request additional information or otherwise challenge Deloitte's privilege log.

Best regards,

Rajin

**From:** Dillon, Erika <erika.dillon@kirkland.com>
**Sent:** Friday, March 22, 2024 3:46 PM
**To:** Olson, Rajin S. <ROlson@RobinsKaplan.com>; Prange, David A. <DPrange@RobinsKaplan.com>; Carmack, Brandon A. <BCarmack@RobinsKaplan.com>; Larus, Christopher K. <CLarus@RobinsKaplan.com>; *agaza@ycst.com <agaza@ycst.com>; *RVrana@ycst.com <RVrana@ycst.com>; THARTZELL@ycst.com; RK-Sagitec <RK-Sagitec@RobinsKaplan.com>; Barrett, Tamara J. <TBarrett@RobinsKaplan.com>
**Cc:** Andrew Russell <arussell@shawkeller.com>; *jshaw@shawkeller.com <jshaw@shawkeller.com>; #Deloitte Sagitec <Deloitte-Sagitec@kirkland.com>
**Subject:** [EXTERNAL] DDel - 1:23-cv-00325-WCB Deloitte Consulting et al v. Sagitec Solutions - Service - Written Discovery and Privilege Log

Counsel,

Please see the attached.

Thank you,

**Erika Dillon**
Senior Paralegal
She/Her/Hers
_____
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue, New York, NY 10022
**T** +1 212 909 3495
**F** +1 212 446 4900
_____

erika.dillon@kirkland.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of

this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

_____

Information contained in this e-mail transmission may be privileged, confidential and covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521.

If you are not the intended recipient, do not read, distribute, or reproduce this transmission.

If you have received this e-mail transmission in error, please notify us immediately of the error by return email and please delete the message from your system.

Pursuant to requirements related to practice before the U. S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U. S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

Thank you in advance for your cooperation.

Robins Kaplan LLP
http://www.robinskaplan.com
_____

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# EXHIBIT 5

# Redacted in its Entirety

# EXHIBIT 6

# Redacted in its Entirety

# EXHIBIT 7

*Exhibit B*

Confidential Common Interest Privileged and Work Product Privileged

# COMMONWEALTH TERMS AND CONDITIONS



This Commonwealth Terms and Conditions form is jointly issued by the Executive Office for Administration and Finance (ANF), the Office of the Comptroller (CTR) and the Operational Services Division (OSD) for use by all Commonwealth of Massachusetts ("State") Departments and Contractors. *Any changes or electronic alterations by either the Department or the Contractor to the official version of this form, as jointly published by ANF, CTR and OSD, shall be void.* Upon execution of these Commonwealth Terms and Conditions by the Contractor and filing as prescribed by the Office of the Comptroller, these Commonwealth Terms and Conditions will be incorporated by reference into any Contract for Commodities and Services executed by the Contractor and any State Department, in the absence of a superseding law or regulation requiring a different Contract form. Performance shall include services rendered, obligations due, costs incurred, commodities and deliverables provided and accepted by the Department, programs provided or other commitments authorized under a Contract. A deliverable shall include any tangible product to be delivered as an element of performance under a Contract. The Commonwealth is entitled to ownership and possession of all deliverables purchased or developed with State funds. Contract shall mean the Standard Contract Form issued jointly by ANF, CTR and OSD.

**1.** ***Contract Effective Start Date.*** Notwithstanding verbal or other representations by the parties, or an earlier start date indicated in a Contract, the effective start date of performance under a Contract shall be the date a Contract has been executed by an authorized signatory of the Contractor, the Department, a later date specified in the Contract or the date of any approvals required by law or regulation, whichever is later.

**2.** ***Payments And Compensation.*** The Contractor shall only be compensated for performance delivered and accepted by the Department in accordance with the specific terms and conditions of a Contract. All Contract payments are subject to appropriation pursuant to M.G.L. C. 29, §26, or the availability of sufficient non-appropriated funds for the purposes of a Contract, and shall be subject to intercept pursuant to M.G.L. C. 7A, §3 and 815 CMR 9.00. Overpayments shall be reimbursed by the Contractor or may be offset by the Department from future payments in accordance with state finance law. Acceptance by the Contractor of any payment or partial payment, without any written objection by the Contractor, shall in each instance operate as a release and discharge of the State from all claims, liabilities or other obligations relating to the performance of a Contract.

**3.** ***Contractor Payment Mechanism.*** All Contractors will be paid using the Payment Voucher System unless a different payment mechanism is required. The Contractor shall timely submit invoices (Payment Vouchers - Form PV) and supporting documentation as prescribed in a Contract. The Department shall review and return rejected invoices within fifteen (15) days of receipt with a written explanation for rejection. Payments shall be made in accordance with the bill paying policy issued by the Office of the Comptroller and 815 CMR 4.00, provided that payment periods listed in a Contract of less than forty-five (45) days from the date of receipt of an invoice shall be effective only to enable a Department to take advantage of early payment incentives and shall not subject any payment made within the forty-five (45) day period to a penalty. The Contractor Payroll System, shall be used only for "Individual Contractors" who have been determined to be "Contract Employees" as a result of the Department's completion of an Internal Revenue Service SS-8 form in accordance with the Omnibus Budget Reconciliation Act (OBRA) 1990, and shall automatically process all state and federal mandated payroll, tax and retirement deductions.

**4.** ***Contract Termination Or Suspension.*** A Contract shall terminate on the date specified in a Contract, unless this date is properly amended in accordance with all applicable laws and regulations prior to this date, or unless terminated or suspended under this Section upon prior written notice to the Contractor. The Department may terminate a Contract without cause and without penalty, or may terminate or suspend a Contract if the Contractor breaches any material term or condition or fails to perform or fulfill any material obligation required by a Contract, or in the event of an elimination of an appropriation or availability of sufficient funds for the purposes of a Contract, or in the event of an unforeseen public emergency mandating immediate Department action. Upon immediate notification to the other party, neither the Department nor the Contractor shall be deemed to be in breach for failure or delay in performance due to Acts of God or other causes factually beyond their control and without their fault or negligence. Subcontractor

failure to perform or price increases due to market fluctuations or product availability will not be deemed factually beyond the Contractor's control.

**5.** ***Written Notice.*** Any notice shall be deemed delivered and received when submitted in writing in person or when delivered by any other appropriate method evidencing actual receipt by the Department or the Contractor. Any written notice of termination or suspension delivered to the Contractor shall state the effective date and period of the notice, the reasons for the termination or suspension, if applicable, any alleged breach or failure to perform, a reasonable period to cure any alleged breach or failure to perform, if applicable, and any instructions or restrictions concerning allowable activities, costs or expenditures by the Contractor during the notice period.

**6.** ***Confidentiality.*** The Contractor shall comply with M.G.L. C. 66A if the Contractor becomes a "holder" of "personal data". The Contractor shall also protect the physical security and restrict any access to personal or other Department data in the Contractor's possession, or used by the Contractor in the performance of a Contract, which shall include, but is not limited to the Department's public records, documents, files, software, equipment or systems.

**7.** ***Record-keeping And Retention, Inspection Of Records.*** The Contractor shall maintain records, books, files and other data as specified in a Contract and in such detail as shall properly substantiate claims for payment under a Contract, for a minimum retention period of seven (7) years beginning on the first day after the final payment under a Contract, or such longer period as is necessary for the resolution of any litigation, claim, negotiation, audit or other inquiry involving a Contract. The Department shall have access, as well as any parties identified under Executive Order 195, during the Contractor's regular business hours and upon reasonable prior notice, to such records, including on-site reviews and reproduction of such records at a reasonable expense.

**8.** ***Assignment.*** The Contractor may not assign or delegate, in whole or in part, or otherwise transfer any liability, responsibility, obligation, duty or interest under a Contract, with the exception that the Contractor shall be authorized to assign present and prospective claims for money due to the Contractor pursuant to a Contract in accordance with M.G.L. C. 106, §9-318. The Contractor must provide sufficient notice of assignment and supporting documentation to enable the Department to verify and implement the assignment. Payments to third party assignees will be processed as if such payments were being made directly to the Contractor and these payments will be subject to intercept, offset, counter claims or any other Department rights which are available to the Department or the State against the Contractor.

**9.** ***Subcontracting By Contractor.*** Any subcontract entered into by the Contractor for the purposes of fulfilling the obligations under a Contract must be in writing, authorized in advance by the Department and shall be consistent with and subject to the provisions of these Commonwealth Terms and Conditions and a Contract. Subcontracts will not relieve or discharge the Contractor from any duty, obligation, responsibility or liability arising under a Contract. The Department is entitled to copies of all subcontracts and shall not be bound by any provisions contained in a subcontract to which it is not a party.

**10.** ***Affirmative Action, Non-Discrimination In Hiring And Employment.*** The Contractor shall comply with all federal and state laws, rules and regulations promoting fair employment practices or prohibiting employment discrimination and unfair labor practices and shall not discriminate in the hiring of any applicant for employment nor shall any qualified employee be demoted, discharged or otherwise subject to discrimination in the tenure, position, promotional opportunities, wages, benefits or terms and conditions of their employment because of race, color, national origin, ancestry, age, sex, religion, disability, handicap, sexual orientation or for exercising any rights afforded by law. The Contractor commits to purchasing supplies and services from certified minority or women-owned businesses, small businesses or businesses owned by socially or economically disadvantaged persons or persons with disabilities.

**11.** ***Indemnification.*** Unless otherwise exempted by law, the Contractor shall indemnify and hold harmless the State, including the Department, its agents, officers and employees against any and all claims, liabilities and costs for any personal injury or property damages, patent or copyright infringement or other damages that the State may sustain which arise out of or in connection with the Contractor's performance of a Contract, including but not limited to the negligence, reckless or intentional conduct of the Contractor, its agents, officers, employees or subcontractors. The Contractor shall at no time be considered an agent or representative of the Department or the State. After prompt notification of a claim by the State, the Contractor shall have an opportunity to participate in the defense of such claim and any negotiated

Confidential Common Interest Privileged and Work Product Privileged

# COMMONWEALTH TERMS AND CONDITIONS



settlement agreement or judgment. The State shall not be liable for any costs incurred by the Contractor arising under this paragraph. Any indemnification of the Contractor shall be subject to appropriation and applicable law.

**12. _Waivers._** Forbearance or indulgence in any form or manner by a party shall not be construed as a waiver, nor in any way limit the legal or equitable remedies available to that party. No waiver by either party of any default or breach shall constitute a waiver of any subsequent default or breach.

**13. _Risk Of Loss._** The Contractor shall bear the risk of loss for any Contractor materials used for a Contract and for all deliverables, Department personal or other data which is in the possession of the Contractor or used by the Contractor in the performance of a Contract until possession, ownership and full legal title to the deliverables are transferred to and accepted by the Department.

**14. _Forum, Choice of Law And Mediation._** Any actions arising out of a Contract shall be governed by the laws of Massachusetts, and shall be brought and maintained in a State or federal court in Massachusetts which shall have exclusive jurisdiction thereof. The Department, with the approval of the Attorney General's Office, and the Contractor may agree to voluntary mediation through the Massachusetts Office of Dispute Resolution (MODR) of any Contract dispute and will share the costs of such mediation. No legal or equitable rights of the parties shall be limited by this Section.

**15. _Contract Boilerplate Interpretation, Severability, Conflicts With Law, Integration._** Any amendment or attachment to any Contract which contains conflicting language or has the affect of a deleting, replacing or modifying any printed language of these Commonwealth Terms and Conditions, as officially

published by ANF, CTR and OSD, shall be interpreted as superseded by the official printed language. If any provision of a Contract is found to be superseded by state or federal law or regulation, in whole or in part, then both parties shall be relieved of all obligations under that provision only to the extent necessary to comply with the superseding law, provided however, that the remaining provisions of the Contract, or portions thereof, shall be enforced to the fullest extent permitted by law. All amendments must be executed by the parties in accordance with Section 1. of these Commonwealth Terms and Conditions and filed with the original record copy of a Contract as prescribed by CTR. The printed language of the Standard Contract Form, as officially published by ANF, CTR and OSD, which incorporates by reference these Commonwealth Terms and Conditions, shall supersede any conflicting verbal or written agreements relating to the performance of a Contract, or attached thereto, including contract forms, purchase orders or invoices of the Contractor. The order of priority of documents to interpret a Contract shall be as follows: the printed language of the Commonwealth Terms and Conditions, the Standard Contract Form, the Department's Request for Response (RFR) solicitation document and the Contractor's Response to the RFR solicitation, excluding any language stricken by a Department as unacceptable and including any negotiated terms and conditions allowable pursuant to law or regulation.

**IN WITNESS WHEREOF, The Contractor certify under the pains and penalties of perjury that it shall comply with these Commonwealth Terms and Conditions for any applicable Contract executed with the Commonwealth as certified by their authorized signatory below:**

CONTRACTOR AUTHORIZED SIGNATORY: _Kathy Karich_
(signature)

Print Name: _Kathy Karich_

Title: _Managing Director_

Date: _4/12/05_

(Check One): ✓ Organization _____ Individual

Full Legal Organization or Individual Name: _Bearing Point, Inc_

Doing Business As: Name (If Different): _____

Tax Identification Number: _2 2 3 6 8 0 5 0 5_

Address: _99 High Street   Boston, MA 02110_

Telephone: _617-378-3573_   FAX: _617-988-0675_

---

*INSTRUCTIONS FOR FILING THE COMMONWEALTH TERMS AND CONDITIONS*
A "Request for Verification of Taxation Reporting Information" form (Massachusetts Substitute W-9 Format), that contains the Contractor's correct TIN, name and legal address information, must be on file with the Office of the Comptroller. If the Contractor has not previously filed this form with the Comptroller, or if the information contained on a previously filed form has changed, please fill out a W-9 form and return it attached to the executed COMMONWEALTH TERMS AND CONDITIONS.

If the Contractor is responding to a Request for Response (RFR), the COMMONWEALTH TERMS AND CONDITIONS must be submitted with the Response to RFR or as specified in the RFR. Otherwise, Departments or Contractors must timely submit the completed and properly executed COMMONWEALTH TERMS AND CONDITIONS (and the W-9 form if applicable) to the*: Payee and Payments Unit, Office of the Comptroller, 9th Floor, One Ashburton Place, Boston, MA 02108* in order to record the filing of this form on the MMARS Vendor File. Contractors are required to execute and file this form only once.

---

Confidential Common Interest Privileged and Work Product Privileged

# EXHIBIT 8

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Statement of Work**
**Between**
**The Division of Unemployment Assistance**
**And**
**BearingPoint, Inc.**
**For the**
**DUA Quality Unemployment System Transformation**
**(QUEST) Project**

**May 18, 2007**





1

Highly Confidential

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final
**Table of Contents**

1. INTRODUCTION .................................................................................................. 4
2. OVERVIEW, EFFECTIVE DATE AND TERM.................................................. 4
3. SINGLE POINT OF CONTACT ......................................................................... 5
4. SYSTEM SECURITY ......................................................................................... 6
5. ACCEPTANCE OR REJECTION PROCESS ..................................................... 6
6. PROJECT MANAGEMENT ............................................................................... 7
   6.1 Project Managers ......................................................................................... 7
      6.1.1 DUA Project Manager ......................................................................... 7
      6.1.2 Vendor Project Manager ...................................................................... 8
   6.2 Issue Resolution .......................................................................................... 9
   6.3 Changes in Scope of Work .......................................................................... 9
   6.4 Key Personnel .............................................................................................. 9
   6.5 Equipment, Work Space, Office Supplies ................................................. 10
   6.6 Related Project Knowledge........................................................................ 11
   6.7 IP Agreement for Vendor's Employees, Contractors and Agents ........... 11
   6.8 Project Responsibilities.............................................................................. 11
7. ADDITIONAL TERMS...................................................................................... 11
   7.1 Definitions.................................................................................................. 11
   7.2 Code Review .............................................................................................. 11
   7.3 Warranty .................................................................................................... 12
   7.4 Title and Intellectual Property Rights........................................................ 12
      7.4.1 Definition of Property ....................................................................... 12
      7.4.2 Source of Property ............................................................................ 13
      7.4.3 Contractor Property and License ....................................................... 13
      7.4.4 Commonwealth Property ................................................................... 15
      7.4.5 Clearance............................................................................................ 16
   7.5 DUA's Responsibilities.............................................................................. 16
   7.6 Software Configuration Management Procedures ..................................... 17
   7.7 Other Terms ............................................................................................... 17
8. PROJECT SCOPE AND MILESTONES........................................................... 18
   8.1 Project Scope ............................................................................................. 18
   8.2 Task Descriptions....................................................................................... 18
   8.3 Milestones by Fiscal Year (FY2007 – FY2011)........................................ 22
9. DELIVERABLE SCHEDULE AND PAYMENT TERMS ............................... 23
   9.1 FY2007 (June 2007) .................................................................................. 24
   9.2 FY2008 (July 2007 to June 2008)............................................................. 24
   9.3 FY2009 (July 2008 to June 2009)............................................................. 25
   9.4 FY2010 (July 2009 to June 2010)............................................................. 26
   9.5 FY2011 (July 2010 to June 2011)............................................................. 28
   9.6 Total Cost, all Deliverables....................................................................... 29
   9.7 Statement of Work Assumptions and Conditions...................................... 29
   9.8 Project Tools .............................................................................................. 36




2

DEL00406163

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

Appendix A: Deliverable Acceptance Criteria (Example) ................................................ 40
Appendix B: Deliverable Acceptance Form .................................................................... 41
Appendix C: CORI ......................................................................................................... 42
Appendix D: Information Technology Resource Policy .................................................. 43
Appendix E: Confidentiality Statement .......................................................................... 48
Appendix F: IP Agreement for Vendor's employees etc. ............................................... 49
Appendix G: Scope, Use Case Statements ..................................................................... 53
    Revenue Increment ................................................................................................. 53
    Benefits Increment ................................................................................................. 65
Appendix H: DOR Confidentiality Acknowledgement .................................................. 94





3

DEL00406164

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# 1. INTRODUCTION

This document will serve as a statement of work (SOW) between the Department of Workforce Development (DWD), Division of Unemployment Assistance (DUA), and BearingPoint, Inc. ("BearingPoint") to apply to work on the DUA QUEST Project (QUEST). For the purposes of this Statement of Work, BearingPoint will function as the prime contractor. Any subcontractors identified by BearingPoint in their proposal to DUA are hereby accepted and approved by DUA. The entire agreement between the parties (the "Agreement") consists of the following documents in the following order of precedence:

The Standard Terms and Conditions

The Commonwealth's Standard Form Contract

RFR ITS23

BearingPoint's response to RFR ITS23

This SOW

RFQ DUA_QUEST_06-06 as amended plus Vendor Questions and Answers

BearingPoint's Response to RFQ DUA_QUEST_06-06

# 2. OVERVIEW, EFFECTIVE DATE AND TERM

The Vision of the DUA QUEST Project is to design and implement a comprehensive set of Unemployment Insurance (UI), UI Health Insurance processes and an Unemployment information system solution that when completed defines the standard of quality in state unemployment services.

1. Re-engineer the UI business model (subject to approval from Sponsors and Steering Committee).

2. Define the Business Requirements

3. Design and implement a software solution that represents the process model, business requirements and the needs of DUA.

4. Design appropriate technology architecture to support solution and business requirements

5. Develop an Implementation plan that minimizes any risk to the DUA business.

   a. System Performance and User Acceptance Testing

   b. Data Migration, (historical data)





4

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

    c.  Training Plan

    d.  Cutover Plan, (open claims, active accounts)

6.  The DUA Project Manager will ensure that sufficient DUA process and technical expertise is created internal to DUA to provide design, development and implementation skills throughout the duration of the project and more importantly, these experts will remain in-house to maintain and adapt the completed QUEST solution to future demands.

Each Deliverable agreed to be provided under this SOW will be approved by the DUA Project Manager after review and acceptance by the DUA QUEST Project Team and Steering Committee pursuant to the acceptance process specified in section 5 of this SOW.

This SOW shall become effective on the date on which it is executed by both parties and shall terminate on July 31, 2011, unless terminated or expired earlier pursuant to the terms of this SOW. Notwithstanding the foregoing, sections 7.3, 7.4 and 9 shall survive the termination of this SOW.

The term of this SOW, subject to the terms, assumptions and conditions of this Agreement, shall be 50 months commencing on June 1, 2007 and ending on July 31, 2011.

# 3. SINGLE POINT OF CONTACT

BearingPoint and DUA will each assign a single point of project management contact with respect to this SOW. It is anticipated that the contact person will not change during the period the SOW is in force. In the event that a change is necessary, the party requesting the change will provide prompt written notice to the other. In the event a change occurs because of a non-emergency, two-week written notice is required. For a change resulting from an emergency, prompt notice is required.

 BearingPoint's contact person is:

David Czelusniak
Senior Manager
2 Hampshire Street Suite 410
Foxboro, MA 02035
Phone: 508-216-2397
Email: david.czelusniak@bearingpoint.com

DUA's contact person is:

Robert Velten
Director DUA Technology
19 Staniford Street
Boston, MA 02114
Phone: 617-626-6599





5

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

Email: rvelten@detma.org

# 4. SYSTEM SECURITY

As part of its work effort, BearingPoint will be required to use Commonwealth data and IT resources in order to fulfill part of its specified tasks. For purposes of this work effort, "Commonwealth Data" shall mean data provided by DUA to BearingPoint, which will physically reside at a DUA location. In connection with such data that would be in BearingPoint's possession and custody for the purposes of the Project, BearingPoint will implement commercially reasonable safeguards necessary to:

- Prevent unauthorized access to Commonwealth Data from any public or private network

- Prevent unauthorized physical access to any information technology resources involved in the development effort and

- Prevent interception and manipulation of data during transmission to and from any servers.

BearingPoint will notify DUA immediately when it learns if any breaches to any system have occurred causing possible unauthorized access to, interception of and/or manipulation of Commonwealth Data.

# 5. ACCEPTANCE OR REJECTION PROCESS

BearingPoint will submit the required deliverables specified in this SOW to the DUA Project Manager for approval and acceptance. DUA will review work product for each of the deliverables and evaluate whether each deliverable has clearly met in all material respects the criteria established in this SOW and the relevant specifications.

BearingPoint and DUA will incorporate the use of Deliverable Expectations Documents (DED) in order to further define the contents and scope of each deliverable. The DED documents will include the purpose of each deliverable, the assumptions and constraints for each deliverable and the approach for each deliverable. DUA will develop acceptance criteria for each deliverable and achieve agreement with BearingPoint on the Acceptance Criteria. In the event the parties cannot agree on any DED or the Acceptance Criteria, the parties shall escalate the issue for resolution pursuant to clause 6.2 herein. DUA and the QUEST project will use the acceptance criteria documented by DUA, using the process described above, in order to determine if deliverables are complete and accepted. Once reviewed and favorably evaluated, the deliverables will be deemed acceptable.

Unless another acceptance period has been agreed to in a DED for a particular deliverable, within ten (10) business days of receipt of each deliverable, the DUA Project Manager will notify BearingPoint, in writing, of the acceptance or rejection of said deliverable using the acceptance criteria specified in this section or as specifically agreed pursuant to this SOW between the parties for the particular deliverable. A form signed by DUA shall indicate acceptance or rejection, (see the form attached in Appendix B). BearingPoint shall acknowledge receipt of the form in writing. Any rejection will





6

include a written description of the defects of the deliverable. Failure of DUA to accept or reject the deliverable within the specified period, or DUA's using the deliverable in its business environment, will constitute acceptance by DUA and the Commonwealth of the said deliverable. Deliverables accepted at any stage of the QUEST project shall be deemed accepted for any subsequent stages of QUEST.

Unless another specific period has been agreed to in a DED for a particular deliverable, BearingPoint upon receipt of a deliverable rejection will act within ten (10) business days to correct the specified defects and deliver an updated version of the deliverable to DUA. DUA will then have an additional 5 (five) business days from receipt of the updated deliverable to notify BearingPoint, in writing, of the acceptance or rejection of the updated deliverable. Any such rejections will include a description of the way in which the updated deliverable fails to correct the previously reported deficiency. No additional deficiencies will be raised through additional review. Rather, the additional DUA review is to confirm that previously reported deficiencies have been addressed. DUA and BearingPoint will each have the opportunity to negotiate an extended Acceptance/Rejection date or cure period, as applicable, if the work product or deliverable is of significant size to warrant it. Following any acceptance of a deliverable which requires additional work to be entirely compliant with the pertinent deliverable design specifications, and until the next delivery, BearingPoint will use reasonable efforts to provide a prompt correction or workaround.

# 6. PROJECT MANAGEMENT

## 6.1 Project Managers

### 6.1.1 DUA Project Manager

Project management of this engagement will be performed by DUA. DUA's project manager will:

- Work closely with BearingPoint's Project Manager to ensure successful completion of the project.

- Ensure that the DUA QUEST Project Team and BearingPoint are working together to complete project tasks and deliverables.

- Work with BearingPoint's Project Manager to develop the Project Management Plan and approve any/all plans.

- Agree with BearingPoint on all project artifacts to be created and maintained as part of the project.

- Review weekly status reports and conduct weekly meetings with BearingPoint and DUA QUEST Project Team, as necessary.

- Coordinate participation with assistance from DUA QUEST Project Team from DUA, DWD, other Agencies or software vendors as required during the engagement.



**Massachusetts Department of**
**Workforce**
**Development**
Division of Unemployment Assistance

7

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

- Coordinate DUA's review of the deliverables and sign an acceptance form to signify acceptance for each accepted deliverable.

- Provide DUA dedicated project staff as follows, (dedicated staff will arrange for additional DUA staff participation as needed):

  o Benefits Team Leader: Jane Welch, (3 additional members)

  o Revenue Team Leader: Theresa DeMarco, (2 additional members)

  o Appeals/Hearings Team Lead: Mark Dobbins

  o Program Integrity Team Lead: Joan Pearson

  o QUEST Project Team Lead: Harriet Mermes, (BOR Team Lead)

  o QUEST Technical Team Lead: Ken Zimmerman, (5 additional members)

  4 .NET developers provided by DUA will be focused on the following:

    ▪ System Interfaces, such as 1099/IRS, TPA downloadable files and legacy system interfaces

    ▪ Reports such as ETA, economic research and other management reports

    ▪ QUEST development tasks as assigned

  o Finance/Economic Research Team Lead: TBD

DUA's Project Manager reports to Ed Malmborg, DUA Director, who reports to Suzanne Bump, Secretary, Executive Office of Labor and Workforce Development.

Robert Velten, DUA Project Manager will work directly with BearingPoint's Project Manager. Ed Malmborg, Director DUA will sign this SOW and all amendments hereto on behalf of DUA.

## 6.1.2 Vendor Project Manager

The BearingPoint Project Manager will:

- Serve as an interface between the DUA Project Manager and all BearingPoint personnel participating in this engagement.

- Develop and maintain the Project Management Plan, in consultation with the DUA Project Manager.

- Facilitate regular communication with the DUA Project Manager, including weekly status reports/updates, and review the project performance against the project plan.

- Facilitate weekly project status meetings for the duration of the engagement.

- Update the project plan on a weekly basis and distribute plan with status at weekly meetings for the duration of the engagement.





8

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

- Develop plans to mitigate project issues or risks and obtain approval from the DUA Project Manager.

- Sign acceptance forms to acknowledge their receipt from DUA.

- Be responsible for the management and deployment of BearingPoint personnel.

  Jonathan Slusarz, BearingPoint's Project Manager reports to David Minkkinen, Project Managing Director, who reports to Kathy Karich, Regional Managing Director, who reports to Catherine Pomanti, Executive Vice President and SLED Leader. Either Kathy Karich or Catherine Pomanti, being the authorized signatories named in BearingPoint's response to ITS23, will sign this SOW and all amendments thereto on behalf of BearingPoint.

## 6.2 Issue Resolution

The project managers from each organization bear the primary responsibility for ensuring issue resolution. If they determine that they are unable to resolve an issue, they are responsible for escalating the issue to Ed Malmborg, DUA Director and Kathy Karich, BearingPoint Regional Managing Director for resolution.

## 6.3 Changes in Scope of Work

The project manager who would like to request a change in scope, schedule or price for this engagement will provide the suggested change in writing to the other parties' project manager. The project managers will jointly determine whether the change impacts the schedule and/or cost. The parties can mutually agree to the change through a written amendment to this SOW but any scope, schedule or price change requires the approval of the Steering Committee. No change shall become effective unless agreed upon in writing by both parties. If either party's act or omission to perform its obligation(s) hereunder has an adverse effect on the performance of the project, including without limitation causing delays, the affected party shall notify the other party of such adverse effect in writing. If, in the opinion of the affected party, the adverse effect requires any change in the project's scope, schedule or pricing, such party should propose such change pursuant to this clause 6.3. If the project managers cannot agree on any change proposed pursuant to this clause 6.3 in a reasonable time (not to exceed 5 days), the issue shall be escalated for resolution pursuant to clause 6.2 above. It is anticipated that early in the project the parties will develop and mutually agree a Change Order Procedure that will be applicable for any changes in scope, schedule or price proposed pursuant to this SOW.

## 6.4 Key Personnel

BearingPoint agrees to provide the following personnel for the following amounts of time for the duration of this project:





9

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final
**TABLE 1**
**KEY PERSONNEL**

| Staff Members | Role | Time Commitment expressed as percentage of full time |
|---|---|---|
| Jonathan Slusarz | Project Manager | 100% |
| Joe Valorose | Benefits Leader | 100% during Benefits Increment |
| Harpreet Kaur | Revenue Leader | 100% during Revenue Increment |
| Marcellus Mascarenhas | Technical Team Leader | 100% |

BearingPoint will assign all of the foregoing key personnel to this engagement on the time basis set forth in Table 1. DUA requires that all key personnel remain on the project throughout the life of their specific project assignment, (exclusive of vacation, sick leave, training or administrative tasks). BearingPoint's key personnel on this project and under this SOW is defined as follows: 1) Project Manager; 2) Benefits Leader; 3) Revenue Leader; 4) Technical Team Leader. In the event that a change in the key personnel is necessary as a result of an emergency or other event, prompt written notice shall be provided by the BearingPoint Project Manager. In the event of a replacement of the key personnel due to circumstances beyond BearingPoint's reasonable control (including without limitation due to the key personnel's illness or incapacity, departure from BearingPoint, personal reasons or if the personnel's performance is in BearingPoint's opinion unsatisfactory), BearingPoint shall tender to the DUA Project Manager resume(s) of the proposed replacement within ten (10) business days of BearingPoint's knowledge of the key personnel's departure. BearingPoint is expected to provide replacement personnel with equal or better skill sets and experiences as the departing personnel.

Non-key personnel assigned by BearingPoint must meet with DUA approval, such approval will not be unreasonably withheld and will not interfere with BearingPoint's ability to deliver the project.

BearingPoint will be required to complete a "request" for Criminal Offender Record Information (Appendix C) for all staff participating in this engagement. Each member of the BearingPoint Team read and sign an Information Technology Resource Policy (Appendix D), the Confidentiality Statement (Appendix E), and the DOR Confidentiality Acknowledgement for wage records (Appendix H) as designated by DUA and attached as indicated. Failure to complete and/or sign these documents or if the CORI reveals matters that DUA deems inappropriate will disqualify the individual/s from participating in this engagement.

## 6.5 Equipment, Work Space, Office Supplies

DUA will provide one office, workspace for up to 35 BearingPoint Project team members, standard office equipment, and standard network connectivity and access to DUA systems provided to state employees for BearingPoint team members working on-





10

DEL00406171

site for activities defined in Project deliverables, as required by this SOW. DUA is providing a common Project workspace for all DUA and BearingPoint project team members. Two conference rooms (capacity 8-10) will be made available to the project team during the project and testing and training areas will be provided by DUA. DUA will provide administrative support to BearingPoint for scheduling meetings. BearingPoint will submit a list of employees who will need access to the building and to state systems as required for execution of this SOW.

## 6.6 Related Project Knowledge

In addition to the "Statewide Contract IT Specifications" and all other terms of ITS23, BearingPoint shall, prior to commencing any other work under this SOW, become familiar with the following documents: DUA QUEST Program Initiation Document and DUA QUEST BPR Vision Document.

## 6.7 IP Agreement for Vendor's Employees, Contractors and Agents

BearingPoint shall ensure that all BearingPoint personnel providing services under this SOW, regardless of whether they are BearingPoint's employees, contractors, or agents, shall, prior to rendering any services under this SOW, sign the "Intellectual Property Agreement for Vendor's Employees, Contractors and Agents," in a form attached as Appendix F hereof which is included as one of the ITS23 documents, and return signed copies of the same to the DUA Project Manager prior to the delivery of any services under this SOW.

## 6.8 Project Responsibilities

Due to the size and complexity of the QUEST Project, DUA and BearingPoint each have responsibilities to the project and each other to ensure that the project is delivered successfully. To the extent that either party can not meet their responsibilities for any reason, either party can invoke the procedures outlined in section 6.2 and/or 6.3 of this SOW.

# 7. ADDITIONAL TERMS

## 7.1 Definitions

The terms used in this SOW, unless defined herein, shall have the meaning ascribed to them in the other documents that constitute the Agreement between the parties as stated within section 1 of this document.

## 7.2 Code Review

BearingPoint shall comply with the code review policy as mutually agreed to in writing between the parties.





11

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

## 7.3 Warranty

BearingPoint's services shall be performed in a professional and workmanlike manner and in accordance with the detailed design specifications as agreed between the parties in writing (referred to herein also as "Rational Design Artifacts"). BearingPoint warrants that for a period of ninety (90) days following delivery ("Warranty Period") (1) the deliverables will substantially conform to the detailed design specifications as agreed between the parties in writing; (2) all media on which BearingPoint provides any software under this SOW shall be free from defects; (3) all code developed and delivered by BearingPoint, (exclusive of third party software purchased by DUA) under this SOW shall be free of Trojan horses, back doors, and other malicious code in the code developed by BearingPoint for this QUEST project; and (4) all software delivered by BearingPoint shall perform in all material respects in conformance with the detailed design specifications ('Rational Design Artifacts') agreed to in writing between the parties.   Any material nonconformance that prevents the operation of a system component identified in Appendix G (a Use Case or collection of Use Cases), or prevents users from proceeding with the correct workflow which requires a workaround that is identified in writing during the Warranty Period (defined hereinafter as "Defect") will be repaired by BearingPoint at their expense.  All other non-conformities will be addressed internally by DUA personnel or pursuant to a separate maintenance agreement that may be agreed between the parties. In no event shall BearingPoint be responsible for non-conformities caused by DUA or its personnel or contractors, or caused by third party products or services, including without limitation network or connection based non-conformities. It is DUA's responsibility to assess the cause and severity of an issue prior to invoking BearingPoint warranty.  In the event BearingPoint concludes that an issue claimed by DUA under the preceding warranty is not covered by the BearingPoint warranty and DUA agrees with this conclusion, BearingPoint may charge DUA based on its standard rates for the time spent investigating or fixing the issue.  THESE ARE THE EXPRESS WARRANTIES WITH RESPECT TO THE DELIVERABLES AND SOFTWARE UNDER THIS PROJECT.  BEARINGPOINT DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.  Any changes, repairs, modifications, adjustments or other fixes made by DUA, its personnel or contractors to the QUEST solution and not approved in writing by BearingPoint shall void BearingPoint warranty for the impacted portion of QUEST.  If the parties cannot come to agreement, the issue will be escalated in accordance with section 6.2 of this SOW in order to determine if the issue is within or outside the warranty and where such item is outside of the warranty, DUA shall compensate BearingPoint as provided for above.

## 7.4 Title and Intellectual Property Rights

### 7.4.1 Definition of Property

The intellectual property required by BearingPoint to develop, and/or install and test QUEST (hereinafter the "Property") may consist of computer programs (in object and source code form), scripts, data, documentation, the audio, visual and audiovisual content





12

DEL00406173

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

related to the layout and graphic presentation of the QUEST solution, text, photographs, video, pictures, animation, sound recordings, training materials, images, techniques, methods, algorithms, program images, text visible on the Internet, HTML code and images, illustrations, graphics, pages, storyboards, writings, drawings, sketches, models, samples, data, other technical or business information, and other works of authorship fixed in any tangible medium. The QUEST solution is an unemployment insurance information system involving intellectual property derived from three sources described below in clause 7.4.2 and with technical and functional specifications in accordance with this SOW ("QUEST").

## 7.4.2 Source of Property

This engagement will involve intellectual property derived from three different sources: (1) third party software and other products' (as specified in section 9.8 of this SOW to be licensed/obtained by DUA, including without limitation Microsoft, Oracle, IIS, Filenet) and any derivative works thereof ("Third Party Property"); (2) BearingPoint owned or licensed preexisting or proprietary software, solutions or other proprietary material and information (including without limitation ProvenCourse Methodology and uFACTS, but excluding Third Party Property and derivative works thereof.) and derivative works created for DUA based on the BearingPoint owned or licensed preexisting or proprietary software, solutions or other proprietary material and information (altogether herein "Contractor Property") and (3) software and material and information developed by BearingPoint in the course of developing the QUEST solution and specifically for the purposes of delivering QUEST to DUA under this SOW and other than Contractor Property or Third Party Property or derivative work thereof ("QUEST IP") . Ownership of the first category of intellectual property is addressed in separate agreements between the DUA and the third party contractors and resellers of such software. The following paragraphs of the Statement of Work address ownership rights in the second and third categories of intellectual property. For the purposes of this SOW, derivative works shall mean works defined as derivative works in 17 U.S.C.§ 101 and further defined as all Developments and Property associated with the migration of the uFACTS Solution Framework to a .NET architecture/application including but not limited to all core unemployment insurance functions but excluding specific Commonwealth of Massachusetts requirements that are developed originally and exclusively for DUA.

## 7.4.3 Contractor Property and License

BearingPoint will retain all right, title and interest in and to all Contractor Property. DUA acknowledges and agrees that its possession, installation or use of Contractor Property will not transfer to it any title or ownership to such Contractor Property. DUA further acknowledges and agrees that the uFACTS Unemployment Insurance Solution (which will be the basis for the QUEST solution), excluding the Third Party Property, is BearingPoint's proprietary technology and/or is licensed to BearingPoint such that the technology and its source code are considered a trade secret of BearingPoint or third party licensor.





13

DEL00406174

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

DUA acknowledges that the Contractor Property contains or constitutes commercially valuable and proprietary trade secrets of the Contractor or other third parties, the development of which involved the expenditure of substantial time and money and the use of skilled development experts. DUA acknowledges that the Contractor Property is being disclosed to DUA to be used only as expressly permitted under the terms of this SOW and the license specified herein. DUA will take no affirmative steps to disclose such information to third parties, and, if required to do so under the Commonwealth's Public Records Law, M.G.L. c. 66, S 10, or by legal process, will promptly notify BearingPoint of the imminent disclosure so that BearingPoint can take steps to defend itself against such disclosure.

Except as expressly authorized in this clause 7.4 of the Statement of Work, DUA will not copy, modify, distribute or transfer by any means, display, sublicense, rent, reverse engineer, decompile or disassemble the Contractor Property.

Subject to the terms herein and upon the full and final payment for the deliverables containing the Contractor Property, BearingPoint grants to DUA and the Commonwealth a fully-paid, royalty-free, non-exclusive, non-transferable, worldwide, irrevocable, perpetual, license to use the Contractor Property by DUA with the deliverable provided to DUA by BearingPoint, and to make, or grant a limited sublicense to third party contractors to make, use, reproduce, distribute, modify, reverse engineer, decompile or disassemble or create derivative works based upon the Contractor Property solely for DUA's needs related to the QUEST solution, in any media now known or hereafter known, but only to the extent reasonably necessary for DUA's use and exploitation of the deliverables within the QUEST solution. The foregoing license expressly prohibits DUA or DUA's contractors to make, use, license, modify or create derivative works of the Contractor Property for reasons other than for the use in relation with the QUEST solution by DUA. In the event the Commonwealth does not provide funding for the work under this SOW, or does not fully fund the work hereunder at any stage, the license granted pursuant to this paragraph of 7.4.3 is hereby restricted so that no third party vendors or contractors of DUA will be authorized to make, use, license, the Contractor Property. In the event of agency reorganization within Commonwealth, the rights and obligations of DUA herein shall be applicable to DUA's successor agency.

Notwithstanding anything contained herein to the contrary, and notwithstanding DUA's use of the Contractor Property under the license created herein, BearingPoint shall have all the rights and incidents of ownership with respect to the Contractor Property, including the right to use such property for any purpose whatsoever and to grant licenses in the same to third parties.

During the term of the associated Statement of Work and immediately upon any expiration or termination thereof for any reason, BearingPoint will provide to DUA the most current copies of any Contractor Property to which DUA has rights pursuant to the foregoing, including any related documentation.





14

*DUA QUEST Project*
*Division of Unemployment Assistance*
*BearingPoint SOW- Revision 4.0 Final*

### 7.4.4 Commonwealth Property

In conformance with the Commonwealth's Standard Terms and Conditions, on the date on which DUA reimburses BearingPoint for a deliverable accepted by DUA under the terms of this Statement of Work, all of BearingPoint's right, title and interest in the QUEST IP developed originally and exclusively by BearingPoint under the terms of this Statement of Work for the purposes of DUA's QUEST project shall pass to and vest in the Commonwealth, including all copyright, patent, trade secret, trademark and other intellectual property rights created by BearingPoint in the QUEST IP, and any causes of action relating to or based upon such work (hereinafter the "Commonwealth Property"). Subject to clause 7.4.3., BearingPoint hereby assigns to the Commonwealth as of the date on which DUA reimburses BearingPoint for such deliverables, all intellectual property rights in the QUEST IP that it may now or hereafter possess in the Commonwealth Property related to such deliverable and all derivative works thereof. BearingPoint also agrees to execute all documents and take all actions that may be reasonably necessary to confirm such rights, including providing any code originally developed under this SOW and used exclusively to develop such Commonwealth Property for DUA and the documentation for such code. BearingPoint acknowledges that there are currently and that there may be future rights that the Commonwealth may otherwise become entitled to with respect to Commonwealth property that does not yet exist, as well as new uses, media, means and forms of exploitation, current or future technology yet to be developed, and that BearingPoint specifically intends the foregoing ownership or rights by the Commonwealth to include all such now known or unknown uses, media and forms of exploitation.

BearingPoint agrees to take such actions as may be reasonably requested by DUA to evidence the transfer of ownership of or license to intellectual property rights described in this section.

DUA expressly acknowledges that BearingPoint will continue to market and sell Contractor Property, including the uFACTS Framework and Solution and its derivative works to other clients. Nothing in this SOW shall be deemed to transfer or assign BearingPoint's rights in or concerning the uFACTS framework and solution, including without limitation BearingPoint's right to continue to use, modify, enhance, expand and create derivatives of the uFACTS framework or solution for itself or others. For the purposes of clarification, DUA acknowledges that nothing in this clause 7.4.4 or the SOW prevents BearingPoint from developing and using deliverables similar to the deliverables provided to DUA under this SOW for its own purposes or for third parties, as long as BearingPoint does not use or disclose DUA's confidential information or material. Any knowledge, principles or experience learned, obtained or remembered by BearingPoint in implementing QUEST for DUA can be used by BearingPoint and its personnel again for BearingPoint or others.





15

DEL00406176

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

DUA and BearingPoint expressly acknowledge the rights, obligations and interest associated with the ownership and licensing of the intellectual property rights herein, including but not limited to this Section 7.4 and Appendix F, are material to both parties and reflect the parties' agreement and intent. The parties further acknowledge the clarifications to the intellectual property rights in this Statement of Work were negotiated and entered into with the expectation they are fully enforceable. Should any questions or issues arise relative to the clarifications, the parties agree to negotiate in good faith to resolve the questions or issues in a way that gives the greatest effect to the parties' agreement and intent. In the event any of the Contractor Property, as defined herein, is subsequently determined to be the Commonwealth Property then all such transferred Contractor Property shall be subject to the following: DUA hereby grants to BearingPoint permission to use the Commonwealth Property with a right to copy, reproduce, distribute, reverse engineer, decompile, disassemble, modify, license, sub-license, create and use all derivative works based upon the Commonwealth Property for itself or others, to the extent that no confidential information of DUA is disclosed to any third parties.

### 7.4.5 Clearance

BearingPoint will not be responsible for providing any third party hardware or software for the purposes of the QUEST solution implementation. All third party software and hardware for the QUEST solution will be purchased or licensed directly by DUA. DUA represents to BearingPoint that it has obtained or will obtain all rights, grants, assignments, conveyances, licenses, permissions and authorizations necessary or incidental to any materials owned by third parties supplied or specified by it for incorporation in the deliverables to be used or developed for DUA under the QUEST solution. With respect to any services performed on the QUEST solution's deliverables by BearingPoint subcontractors, BearingPoint represents to DUA that it has obtained or will obtain all rights, grants, assignments, conveyances, licenses, permissions and authorizations necessary or incidental to any materials owned by these subcontractors supplied or specified by it for incorporation in the deliverables to be developed for DUA under QUEST.

## *7.5 DUA's Responsibilities*

In addition to the tasks set forth in section 6.5 Equipment, Work Space, Office Supplies, DUA shall be responsible for the following:

DUA's Project Manager will procure all hardware and third party software for the QUEST software solution including development, test, production and Disaster Recovery hardware; required commercial off the shelf software including Microsoft O/S, IIS, Oracle and Filenet. A Microsoft Sharepoint Project Server will be provided to maintain project documentation and IBM Requisite Pro software will be provided with 25 virtual licenses to record and track "requirements".

**Changes to Source Systems** – DUA is responsible for any application modifications (if necessary) to existing DUA legacy systems.



16

DEL00406177

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Hardware and Software** – DUA will provide the network and operating infrastructure necessary to support the QUEST System such as network connectivity, server back ups, appropriate fire walls, redundant equipment (e.g., Application Servers), etc. DUA will provide the Oracle database software and sufficient licenses to support the QUEST System. DUA will purchase, install and configure for use, all required hardware and software prior to the development of the QUEST System. DUA will pay for all hardware and software and its installation and configuration, (non-UI solution software) for all technical environments.

**Software Licensing -** DUA will provide third party software for the project as indicated in section 9.8 Project Tools.

**Network Operations** – DUA is responsible for network redundancy, performance and availability (e.g., redundant NICs, switches, capacity, etc.).

**Systems Management** – DUA will use its existing network management tools and processes for monitoring hardware performance, security threats, backup, disaster recovery, etc.

DUA shall cooperate with BearingPoint in its rendering of the Services, including, without limitation, making timely decisions, providing BearingPoint with timely access to appropriate data, information and personnel of DUA according to agreed upon Timeframes and Project Plans.

## 7.6 Software Configuration Management Procedures

BearingPoint will ensure DUA that at a minimum the following are met:

The basic functions of Configuration Management:

- **Identification** - specifying and identifying all components of the final product.
- **Control** - the ability to agree and 'freeze' products and then to make changes only with the agreement of appropriate named authorities. Once a product has been approved, the motto is 'Nothing moves and nothing changes without authorization'.
- **Status accounting** - the recording and reporting of all current and historical data concerned with each product.
- **Verification** - a series of reviews and configuration audits to ensure that there is conformity between all projects products and the authorized state of products as registered in the Configuration Management records.
- **Source Safe will be used.**

This will be met by BearingPoint as part of the Fiscal Year 2008 Plan as identified in section 8.

## 7.7 Other Terms

- In clarification of the Commonwealth Terms and Conditions (clause 4), prior to any termination or suspension of BearingPoint for breach pursuant to the Commonwealth Terms and Conditions (clause 4), DUA shall provide a written





17

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

notice of and a reasonable opportunity to BearingPoint (at least 15 business days) to remedy any material breach or BearingPoint's failure to perform or fulfill its material obligations.

- In the event of any termination of this SOW by DUA for reasons other than for the uncured material breach by BearingPoint pursuant to the preceding paragraph, DUA shall reimburse BearingPoint for fees and expenses associated with the services performed prior to the termination date, including any deliverables or services in progress, and for any reasonable fees, costs or expenses documented by BearingPoint as incurred due to such termination of the Contract by DUA.

# 8. PROJECT SCOPE AND MILESTONES

This section describes the tasks and deliverables that BearingPoint will provide to DUA and the tasks that BearingPoint will complete by the end of the engagement described in this SOW. Deliverables will be considered "complete" when all the acceptance criteria set forth in this SOW have been met or the prescribed review period for each deliverable or task has expired without written response from DUA. The task/deliverable numbers are referred to in subsequent sections throughout this SOW.

**DUA will use a Microsoft Sharepoint Collaboration site to maintain all documentation for the project. All project Team Members including BearingPoint will use this site to store and manage project documents and artifacts.** All written documents shall be delivered in electronic format, capable of being completely and accurately reproduced by computer software on a laser printer. All itemized and/or annotated lists shall be delivered in computer spreadsheets, capable of being imported to Microsoft Excel, PowerPoint or Word. All meetings shall be held in the Hurley Building QUEST Project Area unless agreed to otherwise by the Project Managers. Meetings must be scheduled in advance, with reasonable accommodation of attendees' schedules. All meeting results will be described in a follow-up report generated by the BearingPoint Project Manager and approved by the DUA Project Manager.

## 8.1 Project Scope

The scope of the QUEST project is defined by the tasks and deliverables specified below and the Use Case Statements in Appendix G.

## 8.2 Task Descriptions

The following task list describes the major tasks to be performed on the QUEST project. These tasks will be expanded upon to create a detailed project work plan that will be used to monitor progress throughout the project.





18

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Task Name | Task Description |
|---|---|
| Task 1. Project Management | Perform project management activities for the life of the project. |
| Task 1.1. Develop and Maintain Project Work Plan | Develop a detailed project plan that outlines tasks, resources, timeframes, milestones, and deliverables for the QUEST Project and update the project plan regularly to track progress and plan for future tasks. |
| Task 1.2. Execute FasTrack Tasks | Begin using the Capability Maturity Model Integration (CMMI) quality processes and process controls. CMMI defined processes are important tools for managing project risk and for managing quality in the application development process. |
| Task 1.3. Conduct Project Execution and Control | Manage the success of the QUEST project through experienced planning, careful tracking, and accurate reporting. |
| Task 1.4. Conduct Contract Closeout | Finalize the QUEST project and close out the contract. |
| Task 2. Project Initiation | Perform project initiation activities. |
| Task 2.1. Conduct Project Kickoff | Initiate the QUEST project and make the plans necessary for a successful project. |
| Task 2.2. Develop a Communications Strategy and Plan | Detail the guiding principles for project communication and outline all communications events and messages to be deployed during the life of the project. |
| Task 3. Project Inception | Perform overall requirements definition, business process design and technical architecture design.. |
| Task 3.1. Develop Business Requirements | Perform an overall functional decomposition for QUEST and assist DUA in deciding which major system component (benefits / revenue) will be developed and implemented as Increment 1 and which will be Increment 2.<br><br>Develop the requirements for all functions of the QUEST system using the uFACTS Solution Framework design artifacts and DUA's unique requirements and MA laws as a baseline. Track each requirement by business area, technical area, functional release, and stage of development. Document changes needed in the uFACTS Solution Framework. |
| Task 3.2. Design Business Processes | Develop the business processes for all functions of the QUEST system using the uFACTS Solution Framework, the existing Massachusetts process flows, and the project goals as input. Document changes needed in the uFACTS Solution Framework. |





19

DEL00406180

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Task Name | Task Description |
|---|---|
| Task 3.3. Design the Technical Architecture | Design the technical architecture for the QUEST system and integrate it with the existing DUA infrastructure based on DUA's needs and the architecture requirements from the RFQ and proposal. This includes developing a final architecture diagram and confirming what hardware and software will be needed and in what quantity. The architecture will address design, development, and testing. |
| Task 3.4. Develop the Technical Infrastructure | Build the technical foundation for developing and implementing the UI system. |
| Task 3.5. Plan the Knowledge Transfer | Define a strategy to transfer knowledge to members of the QUEST project team for the respective functional releases, including knowledge of technical areas, project management, and business process reengineering, requirements, and training and testing leading practices. |
| Task 4. Increment 1 | Perform the design, development and implementation tasks for the Increment 1 functionality. |
| Task 4.1. Perform Increment 1 Inception Tasks | Review Increment 1 requirements and plan functions to be developed. |
| Task 4.1.1. Review Requirements and Process Flows | Review the process flows, usability requirements, data design, and requirements for Increment 1 functionality that was developed as part of the project inception task. |
| Task 4.1.2. Determine Functions Included in Increment 1 | Work collaboratively with DUA to identify the functions that will be part of Increment 1. |
| Task 4.2. Elaborate Increment 1 | Design Increment 1 functionality. |
| Task 4.2.1. Conduct JAD Sessions | Identify where the uFACTS Solution Framework design meets the needs of DUA and where additions, deletions, or changes need to occur. The JAD sessions are vital to providing DUA with a forum for validating that the QUEST system meets their needs and requirements. |





20

DEL00406181

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Task Name | Task Description |
|---|---|
| Task 4.2.2. Design Use Cases | Move from requirements and process flows into detailed use case system modeling and design by further defining the business processes and modeling the web-server-based objects and batch business objects. These objects will be further defined during detail design. |
| Task 4.3. Construct Increment 1 | Build and test Increment 1 functionality. |
| Task 4.3.1. Develop System Functionality | Develop, unit test, and perform initial integration testing of the application components associated with the increment. Unit testing will be conducted in an informal manner and used to verify that transactions and business processes are working according to their design specifications. |
| Task 4.3.2. Test System Functionality | Thoroughly test Increment 1 functionality to help verify that the application is ready to be deployed. |
| Task 4.4. Transition to the New System | Transition Increment 1 functionality into production use. |
| Task 4.4.1. Test User Acceptance | Assist DUA in conducting user acceptance testing (UAT) of the QUEST system. The UAT team will use the UAT plan to test the application. During UAT, the project team will support the testers in the execution of their test plans and use the testing tools to provide additional verification of system performance. |
| Task 4.4.2. Convert QUEST Data | Convert necessary data and develop the bridging interfaces necessary to support the QUEST system. |
| Task 4.4.3. Create the Production Infrastructure | Create the production environment and integrate it with DUA production infrastructure. |
| Task 4.4.4. Develop a Contingency and Disaster Recovery Plan | Define and implement a contingency plan for protecting project assets. Identify disaster recovery procedures and locations based on DUA standards and uFACTS artifacts. |





21

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Task Name | Task Description |
|---|---|
| Task 4.4.5. Train Users | Develop and implement plans that address the specific needs of DUA end users and help effectively transition them to the new business processes. Conduct technical training and support end-user training for the implementation and use of the increment. |
| Task 4.4.6. Develop System Documentation | Build and deliver technical and user documentation to support system administration and training. System documentation comprises user manuals and the operations manual. |
| Task 4.4.7. Deploy Increment 1 | Implement an operational QUEST increment and deploy it to DUA and its users. |
| Task 5. Increment 2 | **NOTE: The tasks and sub-tasks for Increment 2 will be the same as those performed for Increment 1.  Along with the other project tasks, these will be identified in detail and tracked on the approved project plan.** |
| Task 6. Operations | Plan for and operate QUEST system in production. |
| Task 6.1. Establish Maintenance and Confirm Transition | Develop the maintenance procedures and system operations agreements. |
| Task 6.2. Operate and Support the System | Provide systems operations support including warranty support for a three-month period. |

## 8.3 Milestones by Fiscal Year (FY2007 – FY2011)

The table below lists the major project milestones by fiscal year.

| Fiscal Year | QUEST Milestone | Completion Date |
|---|---|---|
| FY 2008 | Functional Decomposition of QUEST functionality | July 2007 |





22

DEL00406183

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Fiscal Year | QUEST Milestone | Completion Date |
|---|---|---|
| FY 2008 | Installation of uFACTS Solution Framework | August 2007 |
| FY 2008 | Completion of documented business process design (To be Process Model) and requirements definition | March 2008 |
| FY 2008 | Design appropriate technology architecture to support solution and business requirements | April 2008 |
| FY 2009 | Final detailed software design specification for Increment 1 core function: Benefits or Revenue. Decisions to be made on Appeal and Hearing, Program Integrity, and Economic Research. | September 2008 |
| FY 2009 | Final system construction for Increment 1 core function. | May 2009 |
| FY 2010 | System and User Acceptance Testing of Increment 1 core function | September 2009 |
| FY 2010 | Conversion/go-live of Increment 1 core function | October 2009 |
| FY 2010 | Final Detailed software design specification of Increment 2 core function: Benefits or Revenue | March 2010 |
| FY 2011 | Final system construction for Increment 2 core function. | November 2010 |
| FY 2011 | System and User Acceptance Testing of Increment 2 core function | March 2011 |
| FY 2011 | Conversion/go-live of Increment 2 core function | April 2011 |
| FY 2012 | Contract Close out | July 2011 |

# 9. DELIVERABLE SCHEDULE AND PAYMENT TERMS

BearingPoint agrees to invoice DUA for the deliverables or work completed per the requirements set forth in the Statement of Work. DUA will make payments to BearingPoint only after receiving an accurate invoice for deliverables completed and accepted pursuant to Section 5 of this SOW. Payment for specific tasks and deliverables shall be made in accordance with the tables in sections 9.1 through 9.6 below.

Payments will be made in accordance with the Commonwealth's bill paying policy.





23

DEL00406184

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

## 9.1 FY2007 (June 2007)

| Deliverable | | Price |
|---|---|---|
| **Project Work Plan and Project Management Plan Deliverable** | Details the tasks to be performed and associated time frames in Microsoft Project. DUA and BearingPoint will jointly review, revise, detail, and submit the project plan associated with this work effort. Also includes a communication plan and other project management procedures for the project team. | $800,000 |
| **Deliverable Expectation Documents.** | Contains a description of all deliverables to be produced on the project. Outlines, at a high level, the purpose, assumptions and constraints, and approach of each deliverable. This has proven to be a very successful tool in setting expectations for project deliverables. | $280,000 |
| **Sub-Total FY2007** | | **$1,080,000.00** |

## 9.2 FY2008 (July 2007 to June 2008)

| Deliverable | | Price |
|---|---|---|
| **Functional Design Definition Deliverable** | The Functional Design Definition Deliverable will contain a high-level decomposition of the functionality to be delivered for the entire QUEST system. This deliverable will identify the high-level use case definitions, groupings of use cases into functional components and a mapping of DUA business objectives and use case functionality. | $600,000 |
| **Initial CMMI Plans Deliverable** | Contains the project-management plans required by CMMI, including the issue-management, change-management, software quality assurance (SQA), software quality management (SQM), and risk management plans. | $1,400,000 |
| **uFACTS Framework Installation Deliverable** | Certifies that the uFACTS framework is installed at the QUEST project site. The Rational environment will be set-up and design artifacts loaded before requirements and to-be process flows are customized for DUA. | $1,080,000 |
| **Requirements and Business Process Plan Deliverable** | Defines the requirements management and business process design discipline to be executed throughout the duration of the project. Finalizes the Rational artifacts that will be produced as part of requirements and business process flows. | $600,000 |





24

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Deliverable | | Price |
|---|---|---|
| **Requirements Definition Deliverable** | Contains the requirements for all system functions. DUA and BearingPoint will collaboratively develop this deliverable, using the results of the gap analysis between the requirements needed for QUEST and the uFACTS functionality. | $2,480,000 |
| **Business Process Design Deliverable** | Contains the process flows for all the new system's functions and other Rational artifacts. | $2,560,000 |
| **Technical Architecture Deliverable** | Details the components of the architecture, including version levels and configuration. Consists of network diagrams, server placement, access requirements, firewall ports and services needed, security requirements, backup requirements, and bandwidth requirements. | $400,000 |
| **Increment 1 Increment Plan Deliverable** | Defines the scope of functionality in Increment 1. The plan will address when Appeals and Hearing, Program Integrity, and Economic Research will be designed and developed. | $440,000 |
| **Increment 1 Knowledge Transfer Plan Deliverable** | Describes how we will manage the mentoring, coaching, and knowledge transfer to DUA team members throughout all Increment 1 project activities. | $200,000 |
| **Initial Increment 1 Detailed Design Deliverable** | Provides an initial set of design documents for an initial subset of components included in the first iteration of Increment 1. Includes use cases and activity diagrams. | $1,800,000 |
| **Sub-Total FY2008** | | **$11,560,000.00** |

## 9.3 FY2009 (July 2008 to June 2009)

| Deliverable | | Price |
|---|---|---|
| **Systems Configuration Plan Deliverable** | Defines the configuration management discipline to be executed throughout the duration of the project for the QUEST application. | $400,000 |
| **Final Increment 1 Detailed Design Deliverable** | Provides final design documentation for the components included in Increment 1. Includes a requirements-to-design traceability matrix to document that all requirements are captured in the design. | $1,400,000 |
| **Increment 1 Interface Integration Plan** | Describes the approach to develop the necessary Increment 1 system interfaces and integrate them into the QUEST system. | $240,000 |





25

DEL00406186

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Deliverable | | Price |
|---|---|---|
| **Increment 1 Training Plan Deliverable** | Provides an overview of training methodology and approach. Identifies the Increment 1 training courses, number of sessions, and associated course objectives, including the training method for all training material to be developed (such as classroom, computer-based training [CBT], etc.). Addresses procedures for implementing and maintaining a training database. | $920,000 |
| **Increment 1 Conversion and Data Migration Plan Deliverable** | Includes the approach for designing and developing data conversion programs, testing the conversion process, and converting the data for the Increment 1 functionality. Elaborates how the integrity and confidentiality of the data will be protected throughout the conversion process. Include a crosswalk of each system data structure and the relevant conversion rules. Defines the approach to migrating historical data and cutover planning for open claims and active employer data. | $1,280,000 |
| **Increment 1 System Test Plan** | Outline the system performance testing, system testing, and UAT approach and acceptance criteria. | $560,000 |
| **Increment 1 Construction Deliverable** | Documents that Increment 1 system code components have been developed and unit tested. | $2,040,000 |
| **Increment 1 System Test Deliverable** | Documents that Increment 1 system code components have completed an initial round of system testing. Includes a traceability matrix between the test scripts and the use cases documenting that all application functionality was tested. | $1,800,000 |
| **Increment 1 Contingency and Disaster Recovery Plan Deliverable** | Plans for resolving risks and maintaining the current production capability if the Increment 1 implementation is delayed. Addresses strategies for business and system continuity in the case of implementation issues. Addresses disaster recovery procedures and physical locations. | $300,000 |
| **Sub-Total FY2009** | | **$8,940,000.00** |

## 9.4 FY2010 (July 2009 to June 2010)

| Deliverable | | Price |
|---|---|---|
| **Increment 1 Training Completion Letter** | States that technical training and user train-the-trainer training for Increment 1 has been completed. Includes training materials. | $400,000 |
| **Increment 1 UAT Completion Deliverable** | States that support for state-sponsored UAT procedures is complete. | $440,000 |





26

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Deliverable | | Price |
|---|---|---|
| **Increment 1 Conversion Completion Deliverable** | Documents that conversion of legacy data necessary to support the Increment 1 implementation is complete. | $1,080,000 |
| **Increment 1 System Documentation Deliverable** | Contains the maintenance manual, data dictionary, and help text. For some of the components, this deliverable may reference online material rather than paper copy. | $676,000 |
| **Increment 1 Maintenance Procedures Deliverable** | Describes the Increment 1 maintenance, operations, and support procedures. | $600,000 |
| **Increment 1 Implementation Completion Deliverable** | States that all implementation activities have been completed and Increment 1 functionality is operational. | $1,040,000 |
| **Increment 1 Transition Completion Letter Deliverable** | States that Increment 1 transition activities are complete. The application and infrastructure components are in production. | $840,000 |
| **Increment 2 Increment Plan Deliverable** | Defines the scope of functionality in Increment 2. Contains the approach to integrating the Increment 2 functionality with the implemented Increment 1 functionality. | $440,000 |
| **Increment 2 Knowledge Transfer Plan Deliverable** | Describes how we will manage the mentoring, coaching, and knowledge transfer to DUA team members throughout all Increment 2 project activities. | $200,000 |
| **Initial Increment 2 Detailed Design Deliverable** | Provides an initial set of design documentation for an initial subset of components included in the first iteration of Increment 2. Includes use cases and activity diagrams. | $1,800,000 |
| **Final Increment 2 Detailed Design Deliverable** | Provides final design documentation for the components included in Increment 2. Includes a requirements-to-design traceability matrix to document that all requirements are captured in the design. | $1,400,000 |
| **Increment 2 Interface Integration Plan** | Describes the approach to develop the necessary Increment 2 system interfaces and integrate them into the QUEST system. | $240,000 |





27

DEL00406188

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Deliverable | | Price |
|---|---|---|
| **Increment 2 Training Plan Deliverable** | Provides an overview of training methodology and approach. Identifies the Increment 2 training courses, number of sessions, and associated course objectives, including the training method for all training material to be developed (such as classroom, computer-based training [CBT], etc.). Addresses procedures for implementing and maintaining a training database. | $180,000 |
| **Increment 2 Conversion and Data Migration Plan Deliverable** | Includes the approach for designing and developing data conversion programs, testing the conversion process, and converting the data for the Increment 2 functionality.<br><br>Elaborates how the integrity and confidentiality of the data will be protected throughout the conversion process. Include a crosswalk of each system data structure and the relevant conversion rules. Defines the approach to migrating historical data and cutover planning for open claims and active employer data. | $272,000 |
| **Sub-Total FY2010** | | **$9,608,000.00** |

## 9.5 FY2011 (July 2010 to June 2011)

| Deliverable | | Price |
|---|---|---|
| **Increment 2 System Test Plan** | Outline the system performance testing, system testing, and UAT approach and acceptance criteria for Increment 2. | $560,000 |
| **Increment 2 Construction Deliverable** | Documents that Increment 2 system code components have been developed and unit tested. | $1,800,000 |
| **Increment 2 System Test Deliverable** | Documents that Increment 2 system code components have completed an initial round of system testing. Includes a traceability matrix between the test scripts and the use cases documenting that all application functionality was tested. | $1,680,000 |
| **Increment 2 Contingency and Disaster Recovery Plan Deliverable** | Plan for resolving risks and maintaining the current production capability if the Increment 2 implementation is delayed. Addresses strategies for business and system continuity in the case of implementation issues. Addresses disaster recovery procedures and physical locations. | $300,000 |
| **Increment 2 Training Completion Letter** | States that technical training and user train-the-trainer training for Increment 2 has been completed. Includes training materials. | $400,000 |
| **Increment 2 UAT Completion Deliverable** | States that support for state-sponsored UAT procedures is complete. | $440,000 |



**Massachusetts Department of**
**Workforce**
**Development**
*Division of Unemployment Assistance*

28

DEL00406189

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Deliverable | | Price |
|---|---|---|
| **Increment 2 Conversion Completion Deliverable** | Documents that conversion of legacy data necessary to support the Increment 2 implementation is complete. | $1,080,000 |
| **Increment 2 System Documentation Deliverable** | Contains the maintenance manual, data dictionary, and help text. For some of the components, it may reference online material rather than paper copy. | $676,000 |
| **Increment 2 Maintenance Procedures Deliverable** | Describes the Increment 2 maintenance, operations, and support procedures. | $200,000 |
| **Increment 2 Implementation Completion Deliverable** | States that all implementation activities have been completed and Increment 2 functionality is operational. | $760,000 |
| **Increment 2 Transition Completion Letter Deliverable** | States that Increment 2 transition activities are complete.  The application and infrastructure components are in production. | $640,000 |
| **Contract Closeout Deliverable** | Contains verification that issues have been addressed and formal deliverables accepted. It also contains lessons learned. | $276,000 |
| **Sub-Total FY2011** | | **$8,812,000.00** |

## 9.6 Total Cost, all Deliverables

| Total Deliverables | Total Price |
|---|---|
| **Total:  FY2007 through FY2011** | **$40,000,000.00** |

## 9.7 Statement of Work Assumptions and Conditions

This Statement of Work was developed based on and is subject to the following factors, assumptions and conditions:

- **Scope** - This document serves to provide a common understanding of the DUA QUEST project scope; however, the final scope will be defined during the project in Joint Requirement Management (JRM) sessions and Joint Application Design (JAD) sessions, resulting in a final set of requirements and an approved design.





29

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

- **Sequencing Functions** - The combined DUA and BearingPoint project management team will collaborate on the decision regarding how to sequence the major QUEST functions (Revenue and Benefits). This decision will be made early in the project and the final project work plan will be revised based on the sequencing decision.

- **Project Work Plan** - The project work plan, included in this statement of work (SOW) assumes a May 2007 project start date. A more detailed final project work plan will be developed early in the project.

- **Methodology** – This Statement of Work assumes the use of BearingPoint's ProvenCourse methodology. BearingPoint believes the use of this methodology will help deliver an unemployment system that meets the requirements of this SOW while minimizing the risks of the project. BearingPoint and DUA will work together during the inception phase of the project to develop the final work plan for this SOW.

- **User Representative Authority** – BearingPoint's approach to system design and implementation is highly concentrated, visual, and relies heavily on focus group work sessions with the user representatives to validate business and technical requirements. The project work plan will assume and require that user representatives attending design sessions have full authority necessary to direct BearingPoint's analysts and make final decisions regarding the functionality of the system.

- **DUA Involvement on Project Team** – BearingPoint has not included any direct labor costs for DUA staff in the cost of any project deliverables. DUA will provide staff with an adequate level of experience and authority that can be fully integrated into the project team as an important part of the knowledge transfer process that will allow DUA to take full ownership of the project upon implementation. In the Engagement Definition task, BearingPoint and DUA will work together to define the participation requirements and expectations for the DUA staff. DUA's commitment of staff resources to this project is essential to the success of the project and to DUA's ability to operate the system after implementation. DUA staff assigned to the project will complete their detailed assignments as defined in the mutually agreed to work plan within the time frames identified.

- **Access to DUA Staff and Subject Matter Experts** –BearingPoint will have timely access to DUA subject matter experts to assist in identifying business rules, resolving business process discrepancies, and answering ad hoc questions. These subject matter experts will, in turn, solicit input from division managers on any areas where policy or procedure is undefined. The follow up on issues requiring DUA input and decision-making will be completed within the time frames identified in the work plan.

- **Prompt Deliverable Sign-off** – Approval and sign-off on all deliverables will occur promptly within ten (10) business days of submittal unless a different time period has been agreed to between the parties in the deliverable expectation document (DED) for a particular deliverable, in which case such period specified in the DED shall be used for acceptance pursuant to the DED and section 5 of this SOW. If formal sign-off has not occurred within the specified timeframe, the deliverable will be considered accepted. Refer to Section 5 of the SOW for general acceptance terms.




30

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

- **Schedule Adjustments** – BearingPoint has estimated the hours and costs required to complete this project on the basis of their understanding of QUEST scope, the information provided in the RFQ, and their previous system implementation experience. During any given phase of this project, some tasks may not take as long as estimated and other tasks may take longer than estimated. In these instances, BearingPoint and DUA will work together to adjust deliverable time schedules and dates to make the most efficient use of the time and budget allocated, including pursuant to section 6.3 of the SOW.

- **Requirements for Additional Hours/Budget** – If BearingPoint has problems meeting their responsibilities because of situations outside of their control or because of additional tasks or requirements identified during the project that were not originally estimated, they will assess and determine the impact to the project, and adjust the project schedule to remedy the situation if possible. However, BearingPoint and DUA may agree that the unexpected problems or scope requirements necessitate an increase in the scope of the project by approving a change order that adds budget and/or time to the project pursuant to section 6.3 of the SOW. Examples of problems outside of BearingPoint control include, without limitation:

  o Delays in delivery of the hardware and licensed software that is required prior to system implementation
  o Changes to legislation
  o Changes to validated business requirements
  o Turnover of key DUA staff
  o Low or infrequent DUA participation
  o Inadequate communication with or cooperation from DUA Sponsors, staff and external stakeholders, including untimely provision of required information, materials, staff or approvals
  o Late, incomplete, or inconsistent information from DUA Sponsors, or other external stakeholders
  o Lack of testing or training facilities or staff to complete their responsibilities
  o Changes to DUA Architecture Standards
  o Changes to Project Management/Reporting Requirements
  o Changes to Federal contracting requirements
  o Changes to Federal funding availability

- **System Training Requirements** – The following assumptions and conditions apply to DUA training requirements:

  o ***Training Participants' Baseline Knowledge and Skill Level*** – DUA training participants will enter the classroom with a thorough understanding of DUA business rules upon which the new System is based. Training participants will have a basic knowledge of PCs and operating system functions before attending system functionality training.





31

DEL00406192

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

○ **End-User Training** – The project team will address the training requirements in accordance with Section 6.2 of the RFQ and the answer to question #57C in the bidder's question and answer document. If DUA determines that there is a need for additional training, BearingPoint will work with DUA to identify the additional required training. In accordance with the requirements of the RFQ, the project will utilize a "train the trainer" approach combined with self-paced training for the overall end-user training approach.

○ **Technical Training** – BearingPoint will provide technical and operations training for DUA technical and system administration staff. The details and number of sessions performed will be discussed and agreed between BearingPoint and DUA during the project and documented in the deliverable expectation document (DED) for technical training. DUA will assign system administration and technical resources with the requisite knowledge and skill to learn how to provide long-term support to the QUEST System. These staff will also work with the project team during the development and deployment of the QUEST System to allow for a more effective knowledge transfer.

- **DUA Acceptance Testing Requirements** – The following assumptions and conditions apply to DUA acceptance testing:

  ○ User Acceptance Testing (UAT) is the responsibility of DUA. DUA, with BearingPoint's assistance, will prepare the User Acceptance Test Plan, and DUA will execute that plan agreed between the parties. BearingPoint's Project team will create an acceptance test region and a test database structure. It is the responsibility of DUA to populate the acceptance test database. DUA may use test scenarios and test scripts that BearingPoint develops for the System Test as part of the Acceptance Test. BearingPoint and DUA will work together to define acceptance criteria and this criteria will be documented in the deliverable expectation document (DED) for user acceptance testing. DUA will not unreasonably withhold or delay acceptance of the system.

  ○ BearingPoint will review and comment on the User Acceptance Test plan. BearingPoint will provide technical assistance to DUA's acceptance test team in the maintenance of the acceptance test region. Where necessary, BearingPoint will assist DUA's acceptance test team in interpreting the results of the test. BearingPoint will discuss the findings with DUA and resolve agreed upon defects in a timely manner.

  ○ DUA will provide staffing to assist with and participate in the system, performance, parallel, and user acceptance testing of the application in the timeframes allocated in the final detailed work plan that is accepted by DUA.

  ○ There will be an acceptance testing period of 60-90 days for each of the QUEST System core functions. If acceptance testing extends beyond this duration due to reasons outside of BearingPoint's control, upon agreement BearingPoint will negotiate additional support for DUA acceptance testing activities.





32

DEL00406193

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

o   Upon DUA acceptance of each QUEST system core function, DUA and BearingPoint will work together to implement the core function according to the approved project work plan.  DUA will not unreasonably delay the implementation of a QUEST system core function after it has been accepted.

- **Performance Testing** – BearingPoint will develop a Performance Test Plan as a part of the overall System Test Plan. The Performance Test Plan will define the scope and duration of the performance testing activities as well as the mutually agreed upon acceptable performance criteria for the application.  These criteria will be documented in the deliverable expectation document (DED) for The Performance Test Plan.  BearingPoint will execute that plan to test the performance of the QUEST System in accordance with the criteria specified in the DED.  The Mercury Interactive Suite of tools will be used for performance testing.

- **System Design Artifacts** – The system design, including all appropriate Rational Design artifacts, will be based on current Federal, state and local policies and procedures.  Any requested modifications to these policies and procedures after the detailed design has been approved will be negotiated for determination of priority and contractual impact.

- **Data Conversion** – The budget proposed for data conversion under QUEST in BearingPoint's proposal is based on the information provided in the RFQ and the questions answered through the procurement process (specifically answer #57D).  BearingPoint will provide services to convert the required data from the following 8 primary databases: UI Benefits, UI Hearings (Appeals), UI Trade Readjustment Allowances, Revenue (TAX), Wage Records, Revenue (Reimbursable Employer), Revenue (Universal Health Insurance – UHI) and AAA/WPA.  BearingPoint will work collaboratively with DUA in order to determine which data elements from these 8 databases should be converted to the new system.  If data from additional systems is required for QUEST or additional conversion support, such change will be agreed between the parties via a change order pursuant to section 6.3 of the SOW.

  DUA will perform any data purification processes necessary to cleanse the data and provide the data in the format BearingPoint requests.  BearingPoint's approach to conversion requires the provision of "scrubbed" ASCII extract files from the existing production systems.  DUA and BearingPoint agree that converting errors into the new System database should be avoided.  Unnecessary and incomplete data will be identified and dealt with by DUA staff. Consequently, while BearingPoint will provide DUA with the specifications for these extract files, DUA is responsible for identifying and correcting such errors prior to conversion.  Data conversion for production is assumed to be a one-time process.  In order to perform the data mapping, BearingPoint resources will need access to knowledgeable technical staff that understand the legacy data sources and data structures.  DUA will provide access to that staff and will assist in the mapping of legacy data.

- **Integration and Interface Design and Development** – The budget for integration and interfaces is based on the information provided in the RFQ Section 4.3.  As a





33

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

result, BearingPoint will provide services to develop inbound/outbound interfaces for the following systems:

| | |
|---|---|
| o  UIRR | o  IRS |
| o  CSC (SAVE) | o  Railroad Retirement |
| o  BOA/Sovereign | o  Placement |
| o  MMARS |      Accountable System |
| o  Intercept | o  MOSES |
| o  DOR | o  SDDS |
| o  Industrial Accident | o  MSP |
|      Board | o  202 System |
| o  Mass Highway | o  HR/Personnel |
| o  State Police | o  Secretary of State |
| | (incoming e-mail) |

BearingPoint will work collaboratively with DUA in order to determine the requirements for these interfaces in the Inception Phase of the project. Detailed specifications for these interfaces will be created in the Elaboration Phase of the project. In order to perform the mapping necessary to design system interfaces, BearingPoint resources will need access to knowledgeable technical staff that understands the legacy data sources and data structures.  DUA will provide timely access to that staff.  If additional interfaces are required for QUEST, BearingPoint will negotiate with DUA for the necessary additional interface design and development support.

- **Interfacing to Existing Employment System (MOSES)** – QUEST will be designed to capture certain re-employment data for purposes of interfacing with MOSES system. The planned QUEST solution supports these interface capabilities.

- **FileNet Integration Services -** BearingPoint's scope of services includes integrating the QUEST solution with FileNet's P8 document imaging platform.  BearingPoint and DUA will work together in the project to determine any necessary upgrades to the FileNet software.  FileNet upgrades will be the responsibility of DUA.  BearingPoint is not responsible for any upgrades to the FileNet software under this SOW.  Under this SOW, BearingPoint is responsible for providing integration services between QUEST and FileNet P8. DUA is responsible for obtaining any necessary FileNet software licenses and/or upgrades and in a timely manner enabling BearingPoint to perform the integration services hereunder.

- **Change Management Services -** DUA will manage Change Management and Communications activities on the project. BearingPoint will provide advice and reasonable assistance in these areas of the project. BearingPoint is not responsible for conducting any additional activities in this area of the project.

- **Disaster Recovery Services -** BearingPoint will provide design recommendations for disaster recovery as follows: technical design, hardware configuration, network




34

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

design and contingency planning. BearingPoint is not responsible for the implementation of or costs for a Disaster Recovery site.

- **MSP Program** – The MSP program is considered out of scope for the QUEST project.

- **IVR Integration Assumptions** – The following assumptions and conditions apply to IVR integration:

  o The current functional services offered through the Massachusetts DUA IVR will be maintained and implemented with the QUEST project. No functions will be added, nor reduced, through the IVR self service delivery channel.

  o The IVR will be integrated with the QUEST application, calling business rules developed in the QUEST application.

  o Any change to the Avaya physical architecture and hardware is out of scope for the QUEST project. BearingPoint is not responsible for any changes to the Avaya production environment needed to support the new QUEST system. DUA is responsible for upgrading the current Avaya IVR/Call center to a recent release in order to integrate the IVR functions with the QUEST Benefits functionality providing both a development and production capability for the QUEST project. BearingPoint will develop the useable API's within the QUEST system for the Avaya IVR CTI/PBX solution to use.

  o BearingPoint is not responsible for call routing outside of the IVR (e.g. how a call presents to the IVR, or bounces out to a staff member).

- **Hardware and Software Specifications** – Hardware, software and physical infrastructure specifications and pricing will be prepared by the DUA and BearingPoint project team during the first phase of the project. The QUEST hardware and network topology implementation will be a collaborative effort between DUA and BearingPoint in order to optimize system performance and minimize risk points in the topology.

- **Data Warehouse** – The creation of a data warehouse is not in BearingPoint's scope for the QUEST project.

- **Fail-Over Expectations** – Meeting the fail over expectations identified in the QUEST RFQ is a joint responsibility between BearingPoint and DUA. The expectations for system fail-over are met in as far as the uFACTS Solution Framework is concerned, as specified in BearingPoint's proposal in response to the RFQ. However, meeting these expectations for the overall QUEST solution goes beyond the core uFACTS Solution Framework. There are several other variables that will impact the QUEST solution's ability to meet these expectations, such as, the network infrastructure and operating system, the physical hardware being used, the Avaya (IVR/ACD) system, the FileNet and Crystal Reports software, as well as various other integral components to the overall QUEST solution. These components need to be implemented with the fail-over expectations in mind. Several of these





35

Highly Confidential

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

components are the responsibility of DUA, including without limitation the management and implementation of the network infrastructure and physical technical infrastructure. BearingPoint and DUA will work together to define an appropriate enterprise-wide solution to meet the fail-over expectations, given these variables.

- **System Response Time and Up Time Expectations** – The satisfaction of these expectations is a joint responsibility between BearingPoint and DUA. The system response time for the uFACTS Solution Framework is on average within the 3-8 second range specified in the RFQ, based on previous production implementations. Based on the business requirements defined by DUA, the QUEST system may need to perform additional calculations that may exceed this average response time for certain scenarios. BearingPoint and DUA will work together to identify these more resource-intensive scenarios and work to optimize them to the extent possible within the project scope. BearingPoint and DUA will also discuss and agree to system response time and system up time acceptance criteria which will be documented in the deliverable expectation document (DED) for production implementation. These criteria will include recognition of the execution of the nightly batch processes and database backup processes.

- **Requirements** – Unless a system or business requirement has been mutually agreed to between the parties and is specified as such in the SOW, a mutually agreed to DED, or an approved project deliverable, it is deemed aspirational only. Such aspirational or undocumented requirements are not the responsibility of BearingPoint and are not covered by the warranty provisions of this contract. For the purposes of clarification, system expectations and project success criteria in the RFQ are aspirational only and not considered agreed upon requirements.

### *9.8 Project Tools*

The project tools to be utilized during the project are listed below. BearingPoint is not responsible for providing any third party hardware or software for the purposes of QUEST. All third party software and hardware for QUEST will be purchased or licensed directly by DUA. The parties will coordinate throughout the project to ensure that licensing and purchasing of the third parties software and hardware does not adversely affect the project schedule.

| Project Phase | | | | |
|---|---|---|---|---|
| **Activity / Technique** | **Tool** | **Provided By** | **Estimated Number of Licenses** | **Available For Use By** |
| **Project Management Phase** | | | | |
| Project Methodology | BearingPoint ProvenCourse™ Methodology | BearingPoint | Unlimited | Project Start |





36

DEL00406197

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Project Phase | | | | |
|---|---|---|---|---|
| **Activity / Technique** | **Tool** | **Provided By** | **Estimated Number of Licenses** | **Available For Use By** |
| Collaboration | Microsoft SharePoint (version 2007) | DUA | 75 | Project Start |
| Project Documentation | Microsoft Office (version 2007) | DUA | 41 | Project Start |
| Project Plans Management & Maintenance | Microsoft Project (version 2007) | DUA | 10 | Project Start |
| Quality Management | FasTrack Templates | BearingPoint | Unlimited | Project Start |
| **BPR and Inception Phase** | | | | |
| Requirements Management & Traceability | IBM Rational Suite (RequisitePro) version 7.0 | DUA | 20 Named , 10 Floating | July 2007 |
| Process Modeling | Microsoft Visio (version 2007) | DUA | 10 | Project Start |
| Base-line UI Requirements | BearingPoint uFACTS Solution Framework (excluding Third Party Property) | BearingPoint | Unlimited | July 2007 |
| Use Case Development | IBM Rational Suite (Rational Rose Modeler) version 7.0 | DUA | 20 Named and 5 Floating | July 2007 |
| Use Case Modeling | IBM Rational Suite (Rational Rose Modeler) version 7.0 | DUA | 20 Named and 5 Floating | July 2007 |
| Activity Diagramming | IBM Rational Suite (Rational Rose Modeler) version 7.0 | DUA | 20 Named and 5 Floating | July 2007 |
| Use Case Development | Dreamweaver 8 | DUA | 13 | July 2007 |
| **Elaboration Phase** | | | | |
| Base-line UI Use Cases | BearingPoint uFACTS Solution Framework (excluding Third Party Property) | BearingPoint | Unlimited | July 2007 |
| UML Analysis & Design Artifacts | IBM Rational Suite (Rational Rose Modeler) version 7.0 | DUA | 20 Named and 5 Floating | July 2007 |





37

DEL00406198

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Project Phase | | | | |
|---|---|---|---|---|
| **Activity / Technique** | **Tool** | **Provided By** | **Estimated Number of Licenses** | **Available For Use By** |
| Architectural Diagrams | IBM Rational Suite (Rational Rose Modeler), Microsoft Visio, Microsoft Visual SourceSafe, Microsoft Office | DUA | N/A | July 2007 |
| Base-line UI Data Model | BearingPoint uFACTS Solution Framework (excluding Third Party Property) | BearingPoint | Unlimited | July 2007 |
| Database Modeling | Oracle Designer (version 10g) | DUA | 5 | July 2007 |
| **Construction Phase** | | | | |
| Base-line UI System Components | BearingPoint uFACTS Solution Framework (excluding Third Party Property) | BearingPoint | Unlimited | July 2007 |
| Code Generation & Unit/Integration Testing | Visual Studio Team System 2007 | DUA | 35 | July 2007 |
| System Testing & Regression Testing | Mercury Interactive Suite (specific products below all provided by DUA) | DUA | Licensing by product below | Dec 2007 |
| | Test Director for Quality Center 9.0 | | 15 users | |
| | Quick Test Pro | | 5 concurrent | |
| | Test Director Defect Manager | | 10 concurrent | |
| | LoadRunner 8.1 Controllers and Monitors | | Site license | |
| | LoadRunner Web Virtual User | | 500 licenses | |
| | Client Side Monitors | | Site license | |
| | Web Server Performance Monitors | | Site license | |
| | Web Application Server Performance Monitors | | Site license | |





38

DEL00406199

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Project Phase | | | | |
|---|---|---|---|---|
| **Activity / Technique** | **Tool** | **Provided By** | **Estimated Number of Licenses** | **Available For Use By** |
| | Database Server Resource Monitors | | Site license | |
| Database Management, Development & Testing | Oracle Designer (version 10g) | DUA | 5 | July 2007 |
| Reporting | Crystal Reports Developer Edition XI | DUA | 10 | Oct 2007 |
| Reporting | Crystal Reports Server | DUA | 10 concurrent | March 2008 |
| Correspondence Generation | SoftArtisans OfficeWriter for .NET | DUA | None | Oct 2007 |
| Development Artifact Version & Change Control | Microsoft Visual Studio Team Foundation Server (Visual SourceSafe) | DUA | 35 | July 2007 |
| User Managed Rules Engine | ILOG Rules for .NET Rule Starter Pack Development . | DUA | 10 | Oct 2007 |
| User Managed Rules Engine | ILOG Rules for .NET Rule  Prod and Test | DUA | 20CPU | March 2008 |
| Online Help generation | RoboHelp Office Professional for .NET (version 6) | DUA | 5 | March 2008 |
| Database  Manage and Query | Toad for Oracle Professional 9.0 | DUA | 60 | July 2007 |
| Transition Phase | | | | |
| Self-paced / Computer Based Training | Macromedia Captivate (version 2) | DUA | 5 | March 2008 |
| User Acceptance Testing | Mercury Interactive Suite | DUA | , See above | Dec 2007 |





39

Highly Confidential

DEL00406200

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Appendix A: Deliverable Acceptance Criteria (Example)





40

Highly Confidential

DEL00406201

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Appendix B: Deliverable Acceptance Form

## DELIVERABLE ACCEPTANCE FORM
### *DUA QUEST PROJECT*

| DELIVERABLE NAME AND NUMBER: | DESCRIPTION: |
|---|---|
| ACCEPTANCE CRITERIA: | |

Project Manager Acceptance

☐ Approved   ☐ Disapproved

Name _____   Signature _____   Date _____

Steering Committee review date, (if required):

Remarks:

Conditions to Acceptance

| Description | Resolution Date | Assigned to: |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

Disapproved Deliverable

New Deliverable complete by date:

| Reason/Issue Description | Resolution Date | Assigned to: |
|---|---|---|
| | | |
| | | |





41

Highly Confidential



# THE COMMONWEALTH OF MASSACHUSETTS
# DEPARTMENT OF WORKFORCE DEVELOPMENT

## Appendix C: CORI

DEVAL L. PATRICK
GOVERNOR

SUZANNE M. BUMP
DIRECTOR

TIMOTHY P. MURRAY
LT. GOVERNOR

Executive Office of Public Safety
Criminal History Systems Board
200 Arlington Street, Suite 2200
Chelsea, MA   02150

GMADET
G

Dear Sirs:

The Department has been certified by the Criminal History Systems Board for access to conviction and pending criminal case data concerning prospective, otherwise-qualified employees.  As an applicant for the position of _____ within the _____ department/career center, I understand that a criminal record check will be conducted for conviction and pending criminal case information only and that it will not necessarily disqualify me.  The information below is correct to the best of my knowledge.

### APPLICANT INFORMATION (PLEASE PRINT)

_____   _____

**LAST NAME**                **FIRST NAME**              **MIDDLE NAME**

_____   _____

**MAIDEN NAME or ALIAS (if applicable)**         **PLACE OF BIRTH**

_____   _____

**DATE OF BIRTH**      **SOCIAL SECURITY NUMBER**   **MOTHER'S MAIDEN NAME**

**ADDRESS:** _____

_____

_____

_____   _____

**APPLICANT'S SIGNATURE**                **DATE**

---

The following information must be verified by the <u>hiring Manager</u> by reviewing a form of government issued photographic identification and attaching a copy of that identification.

**SEX:** _____   **HEIGHT:** ____ft. ____in.   **WEIGHT:** _____   **EYE COLOR:** _____

**STATE DRIVER'S LICENSE NUMBER:** _____

The above information was verified by: _____ from _____ on _____

          Date                         Manager's Name                Unit/Office

---

**Send <u>original</u> form, copy of ID AND resume to:**   Internal Control & Security Department
                                                          19 Staniford Street, Boston, MA 02114

**REQUESTED BY:** _ Internal Control & Security Department _____
          19 Staniford Street, Boston, MA 02114 - Phone: (617) 626-6680

**CHARLES F. HURLEY BUILDING · 19 STANIFORD STREET · BOSTON, MA 02114**
*Division of Unemployment Assistance*

Highly Confidential

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Appendix D: Information Technology Resource Policy



**Massachusetts Department of**
# Workforce
**Development**

## Information Technology Resources Policy
**Effective: July, 1998                    Last revision: December 2006**

This document formalizes the policy for employees of the Department of Workforce Development,
contractors and other authorized users (hereafter "users") on the use of information technology resources ("Agency ITRs"), including computers, printers and other peripherals, programs, data, local and wide area networks, the Internet, E-mail, facsimile machines, photocopiers, pagers, telephone and cellular phones, voicemail and two-way radios. Use of Agency ITRs by any users shall constitute acceptance of the terms of this policy and any such additional policies.

### 1. User Responsibilities

It is the responsibility of any user of Agency ITRs to read, understand, and follow this policy. In addition, users are expected to exercise reasonable judgment in interpreting this policy and in making decisions about the use of Agency ITRs. Any user with questions regarding the application or meaning of this policy should seek clarification from appropriate management. The Agency reserves the right to recoup any costs incurred for unauthorized use of ITR. Failure to observe this policy may subject users to disciplinary action, including termination of employment.

### 2. Acceptable Uses

The Department of Workforce Development firmly believe that Agency ITRs empower users and make their jobs more fulfilling by allowing them to deliver better services at lower costs. As such, users are encouraged to use Agency ITRs to the fullest extent in pursuit of the Agency's goals and objectives.

### 3. Unacceptable Uses of Agency ITRs

It is unacceptable for any user to use Agency ITRs:

o in furtherance of any illegal act, including violation of any criminal or civil laws or regulations, whether state or federal;
o for any political purpose;
o for any commercial purpose;
o to send threatening or harassing messages, whether sexual or otherwise;
o to access or share sexually explicit, obscene, or otherwise inappropriate materials;
o to infringe any intellectual property rights;



43



*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

o to gain, or attempt to gain, unauthorized access to any computer or network;
o for any use that causes interference with or disruption of network users and resources, including propagation of computer viruses or other harmful programs;
o to intercept communications intended for other persons;
o to misrepresent either the Agency or a person's role at the Agency;
o to distribute chain letters;
o to access on-line gambling sites; or
o to libel or otherwise defame any person.

## 4. Data Confidentiality

In the course of performing their jobs, users may often have access to confidential or proprietary information, such as personal data about identifiable individuals or commercial information about business organizations. Under no circumstances is it permissible for users to acquire access to confidential data unless such access is required by their jobs. Under no circumstances may users disseminate any confidential information, unless such dissemination is required by their jobs.

## 5. Copyright Protection

Computer programs are valuable intellectual property. Software publishers can be very aggressive in protecting their property rights from infringement. In addition to software, legal protections can also exist for any information published on the Internet, such as the text and graphics on a web site. As such, it is important that users respect the rights of intellectual property owners. Users should exercise care and judgment when copying or distributing computer programs or information that could reasonably be expected to be copyrighted.

## 6. Computer Viruses

Users should exercise reasonable precautions in order to prevent the introduction of a computer virus into the local area or wide area networks. Virus scanning software should be used to check any software downloaded from the Internet or obtained from any questionable source. In addition, executable files (program files that end in ".exe") should not be stored on or run from network drives. Finally, it is a good practice to scan floppy disks periodically to see if they have been infected.

## 7. Network Security

Most desktop computers are connected to a local area network, which links computers within the Agency and, through the wide area network, to most other computers in state government. As such, it is critically important that users take particular care to avoid compromising the security of the network. Most importantly, users should never share their passwords with anyone else, and should promptly notify the DWD Information Security Office (part of the DWD Internal Control & Security Department) if they suspect their passwords have been compromised. In addition, users who will be leaving their PCs unattended for extended periods should either log off the network or have a password protected screensaver in operation. Finally, no user is allowed to access the

*Massachusetts Department of*
**Workforce**
***Development***
Division of Unemployment Assistance

**BearingPoint**

44

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

Internet or other external networks via modem unless they have received specific permission from DWD Information Security Office.

## 8. E-mail

When using e-mail, there are several points users should consider. First, because e-mail addresses identify the organization that sent the message (user@detma.org), users should consider e-mail messages to be the equivalent of letters sent on official letterhead. For the same reason, users should ensure that all e-mails are written in a professional and courteous tone. Finally, although many users regard e-mail as being like a telephone in offering a quick, informal way to communicate, users should remember that e-mails can be stored, copied, printed, or forwarded by recipients. As such, users
should not write anything in an e-mail message that they would not feel just as comfortable putting into a memorandum.

## 9. No Expectation of Privacy

Agency ITRs are the property of the Commonwealth of Massachusetts and are to be used in conformance with this policy. The Agency retains, when reasonable and in pursuit of legitimate needs for supervision, control, and the efficient and proper operation of the workplace, the right to inspect any user's computer, any data contained in it, and any data sent or received by that computer. Users should be aware that network administrators, in order to ensure proper network operations, routinely monitor network traffic. Use of Agency ITRs constitutes express consent for the Agency to monitor and/or inspect any data that users create or receive, any messages they send or receive, and any web sites that they access. The Agency does not intend to monitor the content of telephone conversations without prior notice. However, the usage of telephone communication is monitored for the performance of agency operations, maintenance, auditing, security, or investigative functions.

## 10. Remote Access

Some users will be authorized by the Agency for remote access to e-mail and other applications. Access is authorized for the same purposes as other Agency resources, i.e., business use. Managers should approve remote access only for those users which have a job-related need to access Agency resources remotely. Users authorized for remote access to e-mail and other applications are required to read, sign and comply with the terms and conditions explained in the Remote Access User Certification Agreement, which is Attachment B to this policy.

**All users of the Agency's Information Technology Resources are required to read and comply with this policy. Additionally, all users are required to sign (along with the responsible Department of Workforce Development manager) and submit Attachment A to this policy, the ITR Policy Acknowledgement Form.**





45

DEL00406206

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Users requesting remote access are required to read, comply, sign (along with the responsible Department of Workforce Development manager) and submit the Remote Access User Certification Agreement, which is Attachment B to this policy.**

### ATTACHMENT "A"

### INFORMATION TECHNOLOGY RESOURCES POLICY

### ACKNOWLEDGMENT FORM FOR EMPLOYEES & NON-EMPLOYEES

### Section 1: to be completed by employee or non-employee

I hereby acknowledge receipt of the Policy concerning the use of Department of Workforce Development (DWD) Information Technology Resources. I understand that as:

Check One:        ☐ an employee          ☐ a non-employee

using ITR resources of the Commonwealth, it is my responsibility to read and comply with the requirements of this Policy.

_____        _____

**PRINT NAME**                                          **ORGANIZATION / COMPANY**
**(non-employees)**

_____        _____/_____/_____

**SIGNATURE**                                             **DATE**

### Section 2: to be completed by Manager responsible for employee or non-employee

As the DWD's Manager responsible for the above named individual, I understand that it is my responsibility to monitor the above named individual's compliance with the ITR Policy and to notify the Internal Control and Security (ICS) Department of any violations. I also understand that I must notify ICS when the above named individual's services conclude so that his/her access is promptly terminated.

**PRINT NAME**

_____        _____/_____/_____

**SIGNATURE**                                             **DATE**





46

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Please return completed original Acknowledgement form to:**

Department of Workforce Development
Internal Control and Security Department
19 Staniford Street, 4th Floor
Boston, MA 02114

Rev.  12/06




47

Highly Confidential

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Appendix E: Confidentiality Statement



Confidentiality
202006.pdf





48

Highly Confidential

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Appendix F: IP Agreement for Vendor's employees etc.

Intellectual Property Agreement for Contractor's Employees, Consultants and Agents Confidentiality, Assignment of Inventions and Representation of Non-Infringement Agreement; Other Representations

The undersigned hereby acknowledges that he or she is an employee or consultant to of the following contractor of the Commonwealth of Massachusetts:

Name of Contractor: _____ ("Contractor")

and desires to be assigned by the Contractor to perform services for the Commonwealth, and that the Contractor desires to assign you to perform services on one or more projects for the Commonwealth, but only under the condition that you sign this Agreement and agree to be bound by all of its terms and conditions.

NOW THEREFORE, in consideration of your assignment to work for the Commonwealth, the access you have to the confidential information of the Commonwealth, and for other good and valuable consideration, the parties agree as follows:

1. <u>Confidentiality of the Commonwealth's Materials.</u>  You agree that both during your assignment at the Commonwealth and thereafter you will not use for your own benefit, divulge or disclose to anyone except to persons within the Commonwealth whose positions require them to know it, any information not already lawfully available to the public concerning the Commonwealth ("Confidential Information"), including but not limited to information regarding any web site of the Commonwealth, any e-commerce products or services, any web development strategy, any financial information or any information regarding users of or vendors to the Commonwealth's web sites.  Confidential Information also includes, without limitation, any technical data, design, pattern, formula, computer program, source code, object code, algorithm, subroutine, manual, product specification, or plan for a new, revised or existing product or web site; any business, marketing, financial or sales information; and the present or future plans of the Commonwealth with respect to the development of its web sites and web services.

2. <u>All Developments the Property of the Commonwealth.</u>  All confidential, proprietary or other trade secret information and all other works of authorship, trademarks, trade names, discoveries, invention, processes, methods and improvements, conceived, developed, or otherwise made by you, alone or with





49

others, and in any way relating to the Commonwealth or any of its web development projects, whether or not patentable or subject to copyright protection and whether or not reduced to tangible form or reduced to practice during the period of your assignment with the Commonwealth ("Developments") shall be the sole property of the Contractor's customer, the Commonwealth. To the maximum extent permitted by law, you hereby waive all moral rights in any Developments. You agree to disclose all Developments promptly, fully and in writing to the Commonwealth promptly after development of the same, and at any time upon request. You agree to, and hereby do assign to the Commonwealth all your right, title and interest throughout the world in and to all Developments without any obligation on the part of the Commonwealth to pay royalties or any other consideration to you in respect of such Developments. You agree to assist the Contractors customer the Commonwealth, (without charge, but at no cost to you) to obtain and maintain for itself such rights.

3. Return of the Commonwealth's Materials. At the time of the termination of your assignment with the Commonwealth, you agree to return to the Commonwealth all Commonwealth materials, documents and property, in your possession or control, including without limitation, all materials relating to work done while assigned by the Contractor to projects for Commonwealth or relating to the processes and materials of the Commonwealth. You also agree to return to the Commonwealth all materials concerning past, present and future or potential products and/or services of the Commonwealth. You also agree to return to the Commonwealth all materials provided by persons doing business with the Commonwealth and all teaching materials provided by the Commonwealth.

4. Representation of Non-Infringement. You hereby represent and warrant that, to your best knowledge, no software, no web content and no other intellectual property that you develop during your assignment to and deliver to the Commonwealth, and no Developments made by you and assigned to the Commonwealth pursuant to Section 2 above, shall infringe a patent, copyright, trade secret or other proprietary or intellectual property right of any third party.

5. No Conflicting Agreements. You represent and warrant that you are not a party to any agreement or arrangement which would constitute a conflict of interest with the obligations undertaken hereunder or would prevent you from carrying out your obligations hereunder. The existence of an Employment or similar agreement with BearingPoint or if you are an employee or consultant to a BearingPoint subcontractor on this project, then with that subcontractor by which you assign ownership of Intellectual Property rights to BearingPoint or the Subcontractor shall not constitute a conflict with this Agreement regarding Intellectual Property rights.

6. Tax Payments. You hereby represent and warrant that you have paid all due state and federal taxes, or, if your tax status is in dispute or in the process of





50

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

settlement, that you have responded as directed and within the required timeframes to all communications received from the state or federal government.

7. <u>You acknowledge that you are not an employee of any Massachusetts state or municipal government agency, and are not entitled to any benefits, guarantees or other rights granted to state or municipal government agencies, including but not limited to group insurance, disability insurance, paid vacations, sick leave or other leave, retirements plans, health plans, or premium overtime pay.</u> Should you be deemed to be entitled to receive any such benefits by operation of law or otherwise, you expressly waive any claim or entitlement to receiving such benefits from Massachusetts state or municipal government agencies.

8. <u>Miscellaneous:</u>

(a) The Commonwealth is a third party beneficiary of this Agreement with full rights to enforce its terms directly.

(b) With respect to section 1 of this Agreement and for the purposes of this engagement, BearingPoint employees, independent consultants and subcontractors' employees and consultants are considered "persons within the Commonwealth".

(c) This Agreement contains the entire agreement between the parties with respect to the subject matter hereof, superseding any previous oral or written agreements.

(d) Your obligations under this Agreement shall survive the termination of your assignment with the Commonwealth regardless of the manner of or reasons for such termination. Your obligations under this Agreement shall be binding upon and shall inure to the benefits of the heirs, assigns, executors, administrators and representatives of the parties.

(e) You agree that the terms of this Agreement are reasonable and properly required for the adequate protection of our customer the Commonwealth's legitimate business interests. You agree that in the event that any of the provisions of this Agreement are determined by a court of competent jurisdiction to be contrary to any applicable statute, law, rule, or policy or for any reason unenforceable as written, then such court may modify any of such provisions so as to permit enforcement thereof to the maximum extent permissible as thus modified. Further, you agree that any finding by a court of competent jurisdiction that any provision of this Agreement is contrary to any applicable stature, law, or policy or for any reason unenforceable as written shall have no effect upon any other provisions and all other provisions shall remain in full force and effect.





51

DEL00406212

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

(f) You agree that any breach of this Agreement will cause immediate and irreparable harm to the Contractor's customer the Commonwealth not compensable by monetary damages and that the Commonwealth will be entitled to obtain injunctive relief, in addition to all other relief, in any court of competent jurisdiction, to enforce the terms of this Agreement, without having to prove or show any actual damage to the Commonwealth.

(g) No failure to insist upon strict compliance with any of the terms, covenants, or conditions hereof, and no delay or omission in exercising any right under this Agreement, will operate as a waiver of such terms, covenants, conditions or rights. A waiver or consent given on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

(h) This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to the doctrine of conflicts of law. This Agreement is executed under seal.

The undersigned believes that this agreement imposes reasonable standards of conduct for all of the employees and the contractors on assignment at the Commonwealth, and that this agreement will serve to best protect the interests of all involved parties. If you agree with the terms set forth herein, please sign and return this Agreement.

Agreed and Accepted:

Name of Employee or Consultant: _____

Signature: _____

Date: _____

Name of Contractor: _____

Signature: _____

Name: _____

Title: _____

Date: _____





52

DEL00406213

DUA QUEST Project
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Appendix G: Scope, Use Case Statements

## Revenue Increment

- Register Employer Account Subsystem
- Wage Detail and Tax Report Subsystem
- Payment Processing Subsystem
- Collections Subsystem
- Maintain Employer Account Subsystem

- Tax Rate Calculation Subsystem
- Benefit Paid Charge Subsystem
- Field Audit Subsystem
- Third Party Administrator Interface Subsystem

**Register Employer Account Subsystem**

BearingPoint will develop the functionality to register a new employer account; this includes calling the necessary functionality to compute an experience rate for liability determinations; determining reporting status; and triggering the appropriate correspondence. BearingPoint will develop the capability for Employers to self-register based on formally accepted DUA specific business requirements.

Major functions will be made available online. We will address functionality of employer registration, such as employer liability, employer entity types (i.e., LLC and Corporations), and reimbursing accounts; additionally, we will address third party administrator (agent) registration. Each account type, or process, will be managed through a slightly different – yet similar – process. The following use cases and business processes have been identified for this module:

**Register Employer Account Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Initiate Existing Employer Self-Service Account** | This use case is designed specifically for employer and third party administrator conversion and new system adoption. The process allows currently registered employers and agents to logon to the system, using an established security profile, and access their self-service account. The process displays current employer data, and request employers to complete or update missing data. Upon completion, the employer will have established a permanent username and password, updated their account data, and initiated their self-service system. |
| **Create and Register Employer Account** | This use case begins when a Registrant provides required registration information using the Employer Self Service portal; or, an authorized UI Staff assists a Registrant to register an Unemployment Insurance (UI) Employer Account. This use case ends when the Business Entity is assigned the appropriate dates of service and has established an Employer Profile. The use case calls several rate calculation use cases; validates an employer's data; and determines current and future liability, pending fees, and open reporting requirements. Includes getting a DUA ID number. Includes the initiation of appropriate Contributory or Reimbursable payment method. |

53

DEL00406214

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Register Third Party Administrator / Employer Agent** | This use case begins when a new Employer Representative (Third Party Administrator or Agent) provides the necessary information to represent Massachusetts companies in Unemployment Insurance. The process creates an Agent Account and allows employers to select the agency for representation based on established roles (power of attorney). |
| **Reactivate Employer Account** | This use case begins when an Employer wishes to Reinstate their Employer Account after a period of termination. The System reinstates the Employer Account and calculates the experience rate including experience factors from the previously terminated account. This use case ends when the System updates the Employer Account and sends notification of the Reinstate Adjustment.  Includes Staff view. |

**Tax Rate Calculation Subsystem**

The Tax Rate Calculation subsystem holds the logic to manage employer tax rates; or the changes of those rates. The module manages the annual rate assignment to all employers, individual employer liability determinations, and modifications in rate due to mergers, acquisitions, or change in legal entity. The rate computation will factor in special conditions, such as Tax and Revenue executions and delinquencies that might impact the calculation. The following use cases have been identified for this module:

**Tax Rate Calculation Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Determine Employer Liability** | This use case begins after a business entity submits required information to register for an Unemployment Insurance Account. If data submitted during the registration portion of the process indicates potential liability, this process will determine if the entity has met its liability threshold and a liability determination will be made. This use case ends when the business entity receives notification of the liability determination. |
| **Assign Initial Premium Rate** | This use case begins once the Registrant has submitted the required information to register for an Unemployment Insurance Account and has met the liability threshold necessary to assign an initial premium rate. This use case ends when the business entity receives notification of the assigned initial premium rate.  Includes industry specific rate calculation. |
| **Process Succession- Merger Adjustment** | This use case begins when a Succession Adjustment is initiated on an employer account. This occurs when a business entity takes over all or part of an existing business entity in Massachusetts. An Employer or Authorized UI Staff initiates this type of adjustment while maintaining the Employer Account. This use case ends with the determination of the succession adjustment is approved or denied via the system workflow and rates are calculated. Includes mergers/consolidations. |
| **Process Change of Legal Entity Adjustment** | This use case begins when a business changes its legal entity type. The change can trigger a rate adjustment. This use case ends with the determination of the entity adjustment is approved or denied via the system workflow and rates are calculated. |

54

DEL00406215

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Process Tax-Paying to Reimbursing / Reimbursing to Tax-Paying Adjustment** | This use case holds the rules to change an employer's reporting status from contributory to reimbursing. The use case assigns the appropriate rates, transfers the necessary experience, and modifies the employer's status. |
| **Calculate or Adjust Individual Employer Rates** | This use case is designed to re-calculate an individual employer's rate due to a change in business situation; assign a new rate based on UI staff decisions; or modify rates due to historic account changes. |
| **Voluntary Contributions Adjustment** | This use case begins when a contributing employer submits a voluntary contribution in order to buy down the premium rate assigned to their Employer Account. Once the amount of the buy down is decided and payment is confirmed, the system adjusts the rate for that employer account. This use case ends when the system updates the employer account with the voluntary contribution adjustment information and the Employer is issued the new premium rate confirmation. |
| **Calculate Annual Rate** | This use case is triggered by the trigger date that initiates the annual rate calculation. The system will calculate the annual rate for the next year for each active, liable, premium paying employer account. This approach allows the core function for calculating a rate to be available to other adjustments that require a rate re-calculation. A notification of the rate will be generated and sent. The flow ends with the Employer Account updated for the next year. The primary functional areas are: Generating certain rate calculation parameters, Accepting certain rate calculation parameters entered by authorized UI staff, Issuing the rate notification to the employer, Updating the Employer Profile. |
| **Calculate Solvency Rate** | Will be part of above Use Case or a stand-alone. |

**Maintain Employer Account Subsystem**

The system will support account maintenance via employer or agent self-service or staff use; this will allow users to control information such as demographics, contact information, security roles and power of attorney, and business change information. The following use cases have been identified for this module:

**Maintain Employer Account Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Change of Reporting Method Adjustment** | The Change of Reporting Method Adjustment use case begins when the authorized user requests a Change of Reporting Method. Authorized UI staff approves or denies the Change of Reporting Method request. The employer accounts are updated and, if appropriate, the rate is calculated and assigned. This use case ends when determination of Change of Reporting Method is sent. Includes Staff ability. |

55

Highly Confidential

DEL00406216

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Assign Worker Status Determinations** | This use case begins when a request is made to review certain information provided by a firm and/or worker in order to properly classify a particular worker or class of workers. The use case ends when authorized UI staff issues a formal determination classifying the worker(s) in question as an employee or independent contractor. Includes Staff request (Benefits to Status/Field to Status/ Employer to Status by mail). |
| **View Employer Account Profile and History** | This use case begins when an authorized user enters the Employer Self Service Portal for viewing employer account information. The profile and history outlines major components (i.e., status, entity type, threshold dates, etc) within the employer's account; this includes history. This use case ends when the authorized user views the necessary information and exits the application. |
| **Maintain Third Party Administrator Roles (Power of Attorney)** | This use case outlines the process for employers to assign "Update and Submit" or "View Only" roles, based on system functions, to Third Party Administrators. The online Power of Attorney agreement allows an authorized agent to act on an employer's behalf and/or receive the employer's nonpublic information in certain defined situations. |
| **Maintain User (Employer) Roles** | This use case allows employers to manage individual staff responsibilities (roles) within the system. The roles can be defined by system function down to the reporting unit level. |
| **Suspend or cease Employer Account** | The use case outlines how an employer, agent, staff or system can suspend or cease an employer's account. |
| **Maintain Reporting Units** | This use case manages the location information for an employer's reporting units. Each reporting unit is assigned a number (cross-matched with wage reporting) and provided an address. The process allows employers to create new, update current, or close old reporting units. |
| **Maintain Owner Officer Information** | This use case manages owner/officer information and history; including percent of ownership, dates, and contact information. |
| **Maintain Third Party Administrator Mailing Address** | This use case manages the mailing addresses of third party administrators. The centralized address maintenance prevents one agent from holding multiple addresses for the same function. |
| **Maintain Employer Mailing Address** | This use case manages employer mailing addresses; this includes management of multiple addresses for the purposes of appropriate correspondence management. This includes all addresses as defined by DUA. |
| **Maintain Employer Name** | This use case allows employers to change their "doing business as" and "legal name".   Legal documentation is required before a legal name change can take place in the system. |

56

DEL00406217

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Administrate Employer and Third Party Administrator Searches** | This use case outlines the agent and staff functions of searching for employer accounts. The process also includes staff functionality for searching agent accounts. The agent – employer search only allows agents to search on employers with which they hold a power of attorney. |
| **View, Hold or Cancel Correspondence** | This use case provides the logic to view sent correspondence; hold created but not sent correspondence for later delivery; and, cancel correspondence.  This is a staff function. |
| **Administer Account Resolution** | This use case provides UI Staff the ability to review delinquent accounts via a report or on-line views, determine their true account status, and terminate or update the account as necessary. |

**Wage Detail and Tax Report Subsystem**

The QUEST system will accept employer and third party wage detail information from a variety of sources; however, electronic file transfer and manual submission of records will be the primary modes of submission. The Wage Detail and Tax Report subsystem provides for the collection of wage detail and tax reports; calculation of taxes (based on specific Massachusetts factors); adjusting wage records and tax reports; viewing wage record and submission history; and forecasting future tax liabilities. The sub module also assigns appropriate penalties and fees, and provides a report to track potential SUTA dumping activity. The following use cases have been identified for this module, and include the business processes directly related to the wage report:

**Wage Detail and Tax Report Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Submit Wage Detail Report** | This use case begins when an employer or employer representative receives a reminder to submit wage detail and uses Employer Self Service to prepare, review, verify, and submit, a wage detail report. The process also allows staff to submit wage records as necessary. This use case calls the "Process and Calculate Taxes Due" use case and integrates closely with the payments sub module and processes. The design incorporates FTP, file upload, manual, copy-from-previous, zero-wage, and estimate/exception wage reporting models. The use case will include, or require extension, the UHI and other fund collection and tax-report only functionality. This use case ends when the employer has submitted the quarterly (calendar quarter) wage information. |
| **DOR Wage Detail** | DUA is currently seeking to change the way Wage Detail is collected today.  Employers submit wages to DOR and DOR then provides a file back to DUA which we receive/hold in a separate Wage Record DB.  We are building a business case and are will attempt to reverse this process having employers submit wage detail directly to us. |

57

DEL00406218

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Process and Calculate Taxes Due** | This use case begins when an employer, staff or employer representative has successfully entered, and the System has validated, a Wage Detail Report. The System must then calculate the taxable wages, necessary fees (i.e., healthcare assessment), and total amount due. This use case ends when the taxes due calculations are complete, and the data is displayed and/or applied to the employers account. |
| **Process Non-Submission Penalties** | This use case begins when an employer does not submit a wage detail on the necessary due date. The non-submission triggers a series of penalties and statements; these penalties are designed to motivate the employer to submit the required wage report. This use case ends when the delinquent employer submits the wage detail report; or, when the penalty(ies) is/are forwarded onto the Collections and Account Resolution for processing. |
| **Submit Wage Adjustments** | This use case begins when an Employer, Staff, or employer representative accesses the system to review and edit a previously submitted wage report. This use case ends when the System captures the wage adjustment information and re-calculates / updates the employer's tax liability. |
| **Transfer Wage Detail Adjustments** | The use case begins when a UI Staff identifies a need to shift previously reported wage detail records from one employer's account to another; this situation is usually the result of a succession between two businesses or a multi-business owner reporting wages in error. UI Staff move appropriate employee records/wages between employer accounts, and the System modifies the tax due to each employer. The use case ends when the wage detail is removed from an employer account and added to another employer account, the employer accounts are updated, and statements are sent. |
| **View Wage Detail History** | This use case begins when a user enters an employer's account, for the purposes of managing a UI Revenue Account, to view individual or a select quarter of wage records. This use case ends when the user views the necessary information. |
| **View Wage and Tax Report Submission History** | This use case begins when an employer, staff or employer representative enters the system to view the submission transactions, error reports, and results for each original or adjusted wage or tax reporting transaction. This use case ends when the user views the necessary information. |
| **Process SUTA Dumping Report** | This use case is managed within the general Tax Services Reporting module. The reports logic creates a list of employers who share common employees between quarters. SUTA dumping report needs more parameters other than similar employees between quarters:  Owners / officers' legal address business type etc.  Will be determined during design. |

**Payment Processing Subsystem**

The QUEST Tax and Revenue system will provide a standard interface to receive payment data from other systems, such as ACH Credit and ACH Debit. The payment process will also incorporate paper check processing and voucher creation. BearingPoint will use uFACTS to guide the design for managing employer, agent, Massachusetts's

58

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

state-agency, out-of-state and Federal payments. Payments received will be automatically allocated based on allocation or hierarchy rules provided by DUA.

The design will include error management from external systems (i.e., dishonored checks or incorrectly assigned ACH Credit payments), and reversal or adjustment of those transactions. QUEST will provide functionality to accept reversal and adjustment transactions via a file and to perform the appropriate accounting adjustments. Refund processing, fiscal reporting, and re-certification management are also included. The following use cases have been identified for this module, and encompass business processes related to funds processing:

**Payment Processing Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Employer Makes Payment** | This use case begins when an employer has identified a debt on the account and has opted to make a payment. The employer, in a single and secure transaction, submits a full or partial payment. This use case ends when receipt of payment has been confirmed.  Includes processing paper check payments. |
| **Agent Makes Payment** | This use case begins when an employer representative has identified a debt on their client's accounts and has opted to make an individual or bulk payment. The employer representative, in a single and secure transaction, submits a full or partial payment on behalf of the employer(s). This use case ends when receipt of payment has been confirmed. |
| **Other State and Federal Government Makes Payment**<br><br>**When?** | This use case begins when another state or Federal Government submits a payment. The agency, in a single and secure transaction, submits a full or partial payment on behalf of the employer(s). This use case ends when receipt of payment has been confirmed.<br><br>Move to employer charge. |
| **Submit and Reconcile Payment** | This use case begins when a UI Staff identifies an electronic payment error; the situation occurs when an employer submits an ACH Credit file to the correct bank account but does not complete other components of the file correctly. The staff member maps the correct employer account to the completed payment, assigns the payment to the employer's account, and transfers the appropriate funds. |
| **Post and Deposit Payment**<br><br>**Also PID** | This use case begins when an employer payment has been accepted by the System. The system will deposit payments from employers to the financial institutions and post payments to the employer accounts. These payments include current and past due UI Tax and Fees, current and past due reimbursable charges, penalty and interest charges, collection costs, and fees. The use case ends when the payment is deposited into the UI Account.<br><br>Revenue requires electronic payments; PID may need credit cards/EFT. During design, we will address how payments are applied against what hierarchy. |
| **Process Dishonored Payment** | This use case begins with a notification from the banking institutions that a payment has been rejected. The rejected payment is "backed-out" of the employers account (following the reverse hierarchy) and assigns the necessary penalties and/or fees to the account. |

59

DEL00406220

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Process Employer Requests for Refunds** | The use case begins when an employer identifies an account credit and wishes to reclaim the funds. The employer requests the funds through the System. The use case ends when the System submits the refund, updates the account, and notifies the employer of actions taken.  Thresholds and rules will be determined during design. |
| **Produce IRS Certification and Re-Certification File** | This use case begins when the IRS sends an annual FUTA Identification Data Tape to DUA. The FUTA Certification process is the method the IRS uses to verify with the Department that the credit for UI taxes claimed by employers on their annual Federal Tax and Revenue return was actually paid to the Massachusetts Unemployment Fund. The system creates the necessary re-certification file for submission to the IRS. The use case ends when the system returns a FUTA Certification data file to the IRS. |
| **Re-Certification of Tax Paid** | This use case begins when an employer or IRS agent or employer requests a certification of wages and taxes paid for a specific calendar quarter and year. The system allows employers, staff, or employer representatives to view Re-Certification information (940C) online; appropriate correspondence can be submitted to the IRS if requested online. The use case ends when the employer either prints a copy of the certification report; or, the UI staff sends an electronic or paper copy to the employer/IRS agent. |
| **Staff Review Account Details** | This use case provides staff an opportunity to review employer and employer representative payments; this includes groups of payments (i.e., ACH Debit, Paper Checks, and ACH Credit) down to the individual payment level. |
| **Fiscal and Revenue Reporting** | Fiscal and Revenue reporting is housed in the base reporting infrastructure of uFACTS; however, there are critical base criteria that need inclusion in the payments process. The Fiscal and Revenue reporting component includes tracking of Benefits Paid Charges, Contributory Employer Payments, Receivables, Daily Balancing, Fund allocation, and Collected Debt.  Overpayments collections are included here. |
| **Processing accounts without DUA id number** | Processing and tracking payments of accounts that have not been assigned a DUA id number.<br><br>We will examine the opportunity to modify this process with an improved process that does not allow payments without proper registration. |
| **Payment Deferral** | This use case describes deferring two-thirds or some other partial payment of quarterly payments to be paid in full by the third quarter. |

**Collections Subsystem**

The QUEST system will include functionality and specific subcomponents designed to support the collections business process. QUEST will support aging and tracking of receivables, and allow collections specialists to choose from a variety of collections mechanisms. Reporting and correspondence will be developed to support the system functionality. The following use cases have been identified for this module:

60

DEL00406221

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Collections Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Collect Established Debt** | This use case begins when an employer account becomes past due. The main flow is only applied to established debt. An Overdue Account Statement is sent to the employer indicating the employer must pay the debt within a stated timeframe after which the debt, if it meets referral rules, will be referred to debt collection within DUA. The use case ends when the debt is resolved. |
| **Conduct Debtor Resolution Activities** | This use case identifies and executes steps that need to be taken to prepare owner/officer information for a Personal Liability Determination. Specifically, this will involve the System finding Owner/Officer records that are out of date or incomplete and routing them to UI Staff to be updated. |
| **Compromise of Penalty, Interest and Fees** | This use case begins when an Employer requests a compromise of penalty, interest or fees. This use case ends when the UI Staff has acted on the request, and the System notifies the employer of actions taken. |
| **Establish Payment Plan** | This use case describes the process of creating a payment plan. The use case progresses with UI Staff negotiating the terms of the proposed payment plan and gathering the require information for the proposed plan. It also covers the steps the System uses to monitor the plan status after it is put into place. |
| **Manually Hold Debt** | This use case manages individual debt items and prevents them from collection referral. The process also incorporates electronically recalling a debt from collections.  Includes lien and bankruptcy processing identified by reason codes for debt holds. |
| **Process Delinquent Debt** | This use case covers the flow of established, delinquent debt from the System. It begins when debt is established. The system will indicate when debt has reached the necessary conditions for processing debt (i.e., First Notice, Second Notice, and Payment Plan/Compromise). This use case also covers the activity of establishing interest or penalties on delinquent debts. |

**Benefits Paid Charge Subsystem**

The QUEST Tax and Revenue system will accept benefit paid charges and adjustments from benefits processing activity. The sub module tracks benefits paid charge transactions, and allows staff to manually adjust transactions, and creates a downloadable charge file for employers. Accounts for reimbursable employers are assigned the appropriate debits to their account. In many States, State Agency Accounts are treated specially. The following use cases have been identified for this module:

61

DEL00406222

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Benefits Paid Charge Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Process Benefit Paid Charge and Non-Charge Data** **(This use case may need to be implemented with Benefits Increment.)** | This use case documents how to process the benefits paid and charge to employer accounts. It is the process effects of Benefits Paid/Charged on Benefit Account. Benefits Paid/Charged is not considered a separate "system", but rather one component of an integrated whole. |
| **Process Manual Benefits Paid Charge Adjustments** **(This use case may need to be implemented with Benefits Increment.)** | This use case begins when a UI Staff person wishes to adjust charges for an employer. It describes the steps needed to accomplish manual adjustments to the Benefits Charge transaction. A manual adjustment is an adjustment that is not accommodated by the automatic adjustment process; these adjustments are considered anomalies, but may be required to accommodate an employer's account. This use case ends when charges have been successfully adjusted. |
| **View Online Benefits Paid Charge Statement** | This use case begins when an employer wishes to view their charge statement of account, or charges in general. It describes the steps that an employer goes through to view their statement of account. The statement of account includes the employer charges from the last period and historically, along with any outstanding balance due, if a reimbursable employer. The use case ends after an employer has successfully viewed their charges. |
| **Create Employer Benefits Paid Charge Statement** | This use case describes the steps necessary for generating an employer charge statement. It begins when the system starts the process based on an automated batch scheduler. The charge statements can take a variety of forms, but each type must communicate the same content – employer charge activity for that period. The use case has slightly different requirements depending on the employer type, and the communication option that the employer has chosen; paper or electronic. The process ends when the employer charge statements have been generated. |
| **Create Employer Benefits Paid Charge Download File** | This use case describes the steps necessary for generating a delimited file of Benefits Paid Charge transactions. The file is created and displayed to be downloaded by employers online. |
| **Employer Protest Charges** | This is a placeholder for design concerns.  This use case describes the employer's ability to protest benefit charges on a particular statement. There would be a connection from Appeals back to Accounts control to handle any adjustment. |

**Field Audit Subsystem**

The QUEST system will provide a set of data validation routines that automatically identify discrepancies between wage reports, Tax and Revenue reports and payments (integrity checks). Where possible, these routines will force employers to reconcile as

62

DEL00406223

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

part of the wage submission process to eliminate any manual effort associated with reconciliation or data cleansing. However, we realize that the QUEST system must support the full range of balancing and reconciliation activities.

Additionally, the QUEST system will provide mechanisms to randomly and conditionally generate data for initiating, tracking, and executing field audits. This includes generating notices, notifying employers of scheduled activities, assigning resources, creating data extracts, and recording findings, as well as others. The following use cases have been identified for this module:

**Field Audit Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Generate Field Audit** | This use case describes the automated process of random selection, or targeted random selection, of employer accounts. The employer accounts are placed in a queue for field audit staff to process; based on pre-determined auditor factors (i.e., zip code or industry type). |
| **Administer Field Audit** | This use case begins when the System and/or Field Auditor selects an employer for an audit. The Use Case involves the activities necessary for required Federal Employer Audit Compliance. These audits may be triggered by a random selection process or by targeted criteria. This use case ends when an audit is complete, findings letter is submitted, and the audit is saved and approved by management.  This excludes an offline process.  Audits will be done via connection to QUEST system. |
| **Administer Field Audit Referrals** | This use case begins when a UI Field Auditor receives a referral or investigation request from another UI Staff member; or to respond to an employer request for assistance. The use case ends when the field auditor has addressed the referral/request, documented the actions, and updated the System as necessary. |
| **Review Field Audit** | This use case outlines the process necessary for management review of field audits; managing quality control. The process incorporates workflow functionality to return audits to staff once audit is complete or  if quality is not met based on design. |

**Third Party Administrator Interface Subsystem**

The Third Party Administrator Interface subsystem provides a set of functionality that focuses on processing large volume, multi-employer records. The following use cases have been identified for this module in order to provide this functionality:

**Third Party Administrator Interface Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Process Agent FTP Wage Report File** | The design artifact outlines the file format and processing rules for submitting an agent file – containing multiple employer records. This includes error handling and file rejection rules. |
| **Create Agent FTP Wage Report Acknowledgement File** | The design artifact outlines the file format submitted to large agents upon processing a bulk agent file. The file provides validation of submission and error information. |

63

DEL00406224

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Process Agent Role Assignment File** | The design artifact outlines the file format submitted by large agents to self-assign power-of-attorney in a bulk fashion. NOTE: The process is recommended for conversion purposes only. |
| **Process Agent FTP Benefits Paid Charge File** | The design artifact outlines the file format for providing Benefits Paid Charge transaction detail for agents on all their client accounts. |
| **Process Agent Employer Rate File** | The design artifact outlines the file format for providing agents rate information for their client accounts. |
| **Process Other Bulk Filing** | Will be determined if needed during design. |

**Unemployment Health Insurance (UHI)**

| Use Case | Brief Use Case Description |
|---|---|
| **Match Revenue Processes** | The system will be fully integrated and follow similar processes to Revenue collections. |

64

DEL00406225

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Benefits Increment

BearingPoint will implement a Benefits module that aligns with the specific business requirements of Massachusetts Department of Unemployment Assistance. The module will include initial and continued claims, monetary and non-monetary determinations, adjudication, benefit payments and control, 1099 processing, fraud detection and recovery, as well as implementing and supporting various other programs and services such as Work Share, UHI, TRA, Child Support Recovery, and Trust Fund accounting. The tasks required to deliver this module will include:

- Design
- Construction
- Conversion
- Testing

BearingPoint will customize uFACTS' Benefits Services components to DUA's specific business and technical requirements. uFACTS will be modified based on subject matter experts and claimant focus group sessions. BearingPoint will also develop, based on formally accepted DUA project management requirements, the necessary interfaces to new and existing external and internal entities; exact interfaces or interface portions will be determined during detail design. Interface channels (i.e., s FTP, Online, and magnetic tape) will be examined for each interface. BearingPoint will deliver the following subsystems and assess the associated subsystem use cases for implementation:

- Initial Claim Subsystem
- Process Benefit Determination
- Benefit Payments
- View and Maintain Benefit Account
- Integrations Services
- Appeal Processing
- Program Integrity
- Economic Research
- Unemployment Health Insurance

**Initial Claim subsystem**

Initial Claim subsystem includes the necessary functionality for supporting claimants, employers and UI Staff throughout the initial claim application process. The design of this subsystem will include designing customer-facing functionality that allows claimants to apply for existing types of program benefits, including Standard Unemployment Insurance, Disaster Unemployment Assistance (DUA), Work Share, UHI, Extensions, and Trade Readjustment Allowance (TRA). The following use cases have been identified for the Initial Claim Subsystem:

65

DEL00406226

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Initial Claim subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **View Preliminary Information** | This use case begins when a claimant selects "Apply for Unemployment Benefits Online" from the self-service website. The purpose of this use case is to provide cursory education on the following topic areas: When Should I File, Information Checklist, Who Qualifies for Benefits, How Benefits are Calculated, Web Page Viewing Tips, and System Security. This use case is complete when the claimant selects "Start the Unemployment Benefit Application" and then agrees to the data privacy authorization. |
| **Process Initial Questions** | The use case begins after the claimant selects "yes" to the data privacy authorization and submits. The system then displays the Initial Questions, which determine:<br>• If the potential claimant is able to apply for unemployment benefits.<br>• The type of application format presented to the claimant in order to obtain the appropriate data to establish a benefit account.<br>• The use case ends when the claimant has successfully answered the required initial questions. |
| **Authenticate Claimant** | This use case begins after the claimant has answered the initial questions. The claimant will enter personal information that will be sent to SSA and US CIS through an interface for verification. If a claimant's information is not validated by SSA or US CIS, he/she will have limited system access, and the system will place a non-monetary hold on his/her account. The claimant will then be directed to assign him/herself a password. This use case ends when the claimant has successfully chosen a password.   During the design we will determine which entities need to cross-referenced and how; real-time versus batch. |
| **Collect General Information** | This use case begins after the claimant has assigned him/herself a password. The purpose of this use case is to collect the claimant's demographic information for statistical and work search purposes. This use case ends when the claimant has answered all the required questions.  Capture profiling, dependency information and claimants preferred method of payment.  Will determine this during design. |
| **Collect Employment Information** | This use case begins after the claimant has answered the general questions. The purpose of this use case is to collect the claimant's Massachusetts, federal, military and/or combined wage employment information from the beginning of his/her base period date to the current date. The use case ends when the claimant's employment information has been successfully entered and validated by the system. |

66

DEL00406227

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Activate DUA Option** | This use case begins after multiple off line preconditions steps are completed when an authorized Disaster Administrator has received notification from the Department of Labor that a Disaster has been declared in a Massachusetts County (ies). This Use case involves establishing the system framework that will be used to initiate the availability of benefits once a disaster has been declared. The administrator will define a new disaster record, or modify an existing record within the Disaster Benefits Framework. This creates a new disaster master record, to be stored in the framework that will then allow the system to accept and validate applications. Using the defined system framework criteria, the system could then compare, approve or deny eligibility for benefits for Disaster Unemployment Assistance. This use case ends when a DUA framework record has been successfully created or modified by an authorized administrator. |
| **Process DUA Application** | This use case begins when a claimant applies for DUA benefits. The claimant is required to submit specific information for making a determination of Disaster Unemployment Assistance (DUA) benefits. This use case ends when a claimant has completed all the necessary sections of the DUA application. |
| **Process RED Application** | Applies to Section 30/RED, similar to above. |
| **Activate Extension Option** | This use case begins when an authorized user wishes to define a new extension program within the Benefits Module. This creates a new extension option that can then be subsequently applied for by claimants when their account meets the necessary qualifying characteristics. This use case ends when an extension option has been successfully activated. |
| **Process Work Share Application** | The purpose of this use case is to describe the steps that an employer would need to perform to process an application to become a work share employer. An employer is required to meet several business requirements before their organization is considered by UI for work share eligibility. Once an employer has submitted all required information for the employer work share application, this use case is complete.  Includes workflow to staff for approval. |
| **Process Trade Readjustment Allowance** | This use case begins when an authorized TRA worker completes the applicable sections of the TRA application into the Benefits Module for consideration of TRA benefits. From this application, the Benefits module will determine if the claimant is eligible for any of the TRA programs. These include Alternative Trade Adjustment Assistance (ATAA), Trade Readjustment Allowance (TRA), and / or Health Coverage Tax Credit (HCTC). This use case ends when the authorized TRA Worker has completed all the necessary sections of the TRA application.  This use case needs to modified during design to include a "SHORT" version of UI claim/denial then work flowed to TRA |
| **Process Extension Application** | This use case begins when a claimant decides to apply for an extension of benefits. When a claimant decides to apply for an extension, several questions must be asked that pertain to the original account, plus the claimant's current circumstances. This use case ends when a claimant has completed all the necessary sections of the extension application. |

67

Highly Confidential

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Review, Edit, & Confirm** | This use case begins when the claimant has completed one or more sections of the application for benefits, and wishes to review his/her responses. This use case will describe the steps that the claimant goes through in the process of reviewing their registration questions and answers, and to edit those answers if necessary, as well as to submit the final confirmation of those answers. The use case ends after the claimant has either saved their application for later processing or submitted it after confirmation. |
| **Establish Claim** | The purpose of this use case is to describe the steps that the system must proceed through in order to create an account based on information submitted within an application. The system creates accounts when the claimant submits the application. Applications are analyzed by the system to determine the program and account type, along with all applicable information necessary for determining benefit amounts. This use case is complete once an account has been established, along with any necessary issues for UI Staff to review. |
| **Login Claimant** | This use case begins when a claimant has selected "Existing Account" from the "Getting Started with Massachusetts Unemployment Insurance Benefits". The claimant will then enter his/her ID (TBD) and password. If the claimant cannot remember his/her password, he/she will have an opportunity to reassign one. The use case ends when the claimant has logged into the system using the correct SSN and password. |
| **LADT** | This Use Case describes the functionality needed for UI to interface with the Interstate Statistical Data Exchange (commonly called the LADT) which in turn supports the exchange (incoming/ outgoing) of claims and related statistical data between States. The interface sends out initial and continued claims data for commuters and claimants that have Massachusetts Benefit Accounts but have residences out of Massachusetts. The interface receives and processes initial and continued claims data for commuters and claimants who have claims in other states but reside in Massachusetts. This Use Case details of the data to be exchanged, the record layout, and the process for exchanging the data. |

**Process Benefit Determination**

The purpose of this subsystem is to determine claimant eligibility for Regular and Special UI program benefits. The use cases in this subsystem will: Identify claimant monetary and non-monetary eligibility and issues; Calculate the Weekly Benefit Amount (WBA) and the Maximum Benefit Amount (MBA) specific to the claimant program type; and Issue a single or combined benefit determination to the employer or claimant. The following use cases have been identified for the Process Benefit Determination Subsystem:

68

DEL00406229

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Process Benefit Determination**

| Use Case | Brief Use Case Description |
|---|---|
| **Collect Eligibility Information** | This use case begins when the claimant is requested to answer non-monetary eligibility information. Based upon the claimant's answers, the claimant will be required to provide additional fact-finding information, which is stored for review by UI staff. The use case ends when the claimant has completed entry of the eligibility information. |
| **Collect Separation Information** | This use case begins when the claimant is requested to enter separation Information. For each employer the claimant indicates the reason for separation. The claimant can select only one reason for separation for each employer. Based on the reason, claimants may be required to provide additional information (fact-finding) which is stored on the database for later review by UI staff. This use case ends when the claimant has completed entry of the required separation information. |
| **Manage Non Monetary Issues** | This use case was created in order to consolidate the documentation of all non-monetary issues that will be tracked by the system. The use case defines the list of issues and for each describes what processes/ use cases create the issue, how the issue will affect the claimant and how the issue will be routed to adjudication staff for processing. This use case ends when the issue has been routed to the appropriate workflow queue. |
| **Gather Fact Finding** | This use case begins when a non-monetary issue has been identified. The use case describes the fact-finding questionnaire that will be sent to the issues interested parties (claimants, employers, doctors, etc). The use case also describes the functionality for receiving fact-finding questionnaires. The use case ends when all questionnaires have been returned or when the time limit set for the return of the questionnaires has past. |
| **Adjudication** | This use case begins when UI staff selects a Non-Monetary issue from Workflow. UI staff reviews all information associated with the Non-Monetary issue and determines if the Non-Monetary issue is correct, if additional information is needed, or if another Non-Monetary issue has been identified. UI staff makes a determination by selecting the findings, conclusions and statute. UI staff determines if the Non-Monetary determination should be combined with other determinations. This use case ends when the system updates the claimant and employer accounts.  The level of complexity will be reviewed during design. |
| **Auto Adjudicate Non-Monetary** | This use case begins when the issue identified by the system meets the user defined business rules for an auto adjudicated determination. System will make the determination and issue the correspondence to the employer or claimant as applicable. This use case ends when correspondence is issued and the system updates the claimant and/or employer account.  The level of complexity will be reduced in design. |
| **Modify Non Monetary Determination** | This use case begins when UI Staff identify that a previous non-monetary determination should be modified. Once UI Staff has entered the data for modification, the system updates the system processes that are affected by the update and issues correspondence to the claimant and/or employer as necessary. This use case ends when correspondence is issued and the claimant and/or employer account is updated. |

69

DEL00406230

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **View Non-Monetary** | This use case begins when a User accesses the "View Non-Monetary" functionality. The system will display the non-monetary determination and status. This use case ends when user exits this functionality. |
| **Calculate Pre-monetary (internal)** | This use case begins when authorized staff accesses the Pre-monetary Review screen. The user will enter an SSN and determine which base period the system should use to calculate a potential claimant's Weekly Benefit Amount and Maximum Benefit Amount. This use case ends once the system has retrieved and displayed the appropriate wage detail records and calculated and displayed both the Weekly Benefit Amount and Maximum Benefit Amount. |
| **Calculate Pre-monetary external** | This use case begins when the claimant wishes to receive a pre-monetary estimate of his/her unemployment benefits. The purpose of this use case is to provide the claimant with an estimate of his/her weekly benefit amount and maximum benefit amount based on the claimant's wage detail records. This use case ends after the claimant has viewed his/her pr-monetary estimate. |
| **Request and Receive Wages** | This use case begins after an initial application has been filed. If during the initial application the claimant indicated federal, military, and/or other state employment this use case processes the wage response(s) from ICON. If the claimant failed to indicate these types of employment upfront but later indicate missing wages this use case incorporates the functionality for staff invoked wage requests as well as the processing of wage responses. Finally, if a claimant indicates missing or incorrect MA wages this use case incorporates the functionality to modify MA wages. This use case ends once the wages (MA, other state, federal, and/or military) are received and handed over to the Calculate Monetary use case. |
| **Calculate Monetary** | This use case begins when the claimant has completed registration and has indicated they are requesting Regular or Special Program UI benefits. Special Programs include: Temporary Extended Unemployment Compensation (TEUC), state Extended Benefits (EB), Disaster Unemployment Assistance (DUA), and Shared Work. The purpose of this use case is to identify the employers that will be charged when a claimant receives benefits and to determine if the claimant has the wages necessary to be monetarily eligible to receive regular UI benefits or meets the monetary guidelines associated with Special Program UI benefits. This use case contains the business rules necessary to determine the claimants Regular or Special Program Weekly Unemployment Benefit Amount (WBA) and Maximum Unemployment Benefit Amount (MBA). Business rules will determine if a combined determination is issued to the claimant. This use case ends when the system calculates the claimants WBA and MBA and issues the necessary correspondence. Includes: Automatic calculations of monetary by Ma. Program; TRA/Red and/or workers comp., seasonal, school.  Updates to payment records, overpayments. |
| | Notification to claimant/employer of eligibility or payment charge |
| | Appeal form must be sent to either claimant or employer |

70

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Process Amended Monetary** | This use case may be initiated based on the following: Claimant request for wage information has been returned through the ICON system or returned by a Massachusetts employer, claimant account updates (determination or appeal decision), employer correction to wage detail or the claimant has requested an alternate base period. This use case contains business rules that address Regular and Special Program re-determinations. The system will include internet based, and integrated voice response (IVR) service channels, for this option. Staff workflow would be created for monetary information received on paper. Upon receipt of the information the system re-calculates the claimants Regular or Special Program WBA and MBA and updates the benefit charge and wage detail processes. Business rules will determine if a combined determination is issued to the claimant. This use case ends when the claimant and employer account are updated to reflect the wage information and the necessary correspondence is issued to the claimant and employer. |
| **Process Effective Dated Monetary** | This use case begins when a claimant has submitted an application with employment identified by business rules as having a wage limitation. The system will use the wages in wage detail to calculate the MBA/WBA and based on the effective begin and end dates identified by the claimant will establish the effective date of the monetary and calculate the MBA/WBA. One the claimant has reached the end date of the limitation, the system releases the wages, issues the correspondence to the employer/claimant and updates the claimant account. |
| **Process Combined Wage Claim** | This use case begins when another state requests wages from MA by sending an IB4 request (either through the ICON interface or via mail). This use case describes the steps taken to determine whether there are wages that can be transferred from MA to the other state for the SSN being requested. The use case ends with the sending of an IB4 response to the other state which will either transfer wages or notify the other state that wages could not be transferred and why. This use case includes billing of other states for their share of combined wage claims, and reporting of that activity to state and federal agencies. In addition this use case incorporates Interfacing with electronic flows of funds from other systems (e.g. the payments from other states that are received in Massachusetts through the federal UTF financial transfer system) |

**Benefit Payments Subsystem**

The Benefit Payments subsystem incorporates functionality to determine continued weekly or bi-weekly eligibility as well as functionality to correlate payments with the proper program type. The Benefit Payment process also includes the calculation of payment based on monetary benefit entitlement, non-monetary holds, disqualifications and eligibility deductions, and deductions such as wages earned, child support and/or overpayment offsets, etc. The System will dispense payments and update the claimant benefit account to reflect payments and/or payment adjustments as well as the employer account benefits paid records. This subsystem also includes use cases related to the calculation, establishment, and recovery of overpayments. The following use cases have been identified for the Benefit Payments Subsystem:

71

DEL00406232

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Benefit Payments Subsystem**

| Use Cases | Brief Use Case Description |
|---|---|
| **Collect Claimant Earnings Information** | This use case will collect all earnings that the claimant would have had during the request for payment period. The Claimant would have supplied all earnings from any wages, military income, and self employment income. The system would also ask the claimant if he/she had returned to work during the requested week's period. |
| **Collect Claimant Separation Information** | This use case gathers the fact-finding necessary to adjudicate separation issues. Will utilize questionnaires developed by the Determinations process. In addition, information can be gathered if a claimant indicates they have refused work, or identify an additional separation in the request payment. |
| **Collect Availability Information** | This use case gathers information regarding the claimant's ability and availability for work. If potential issues are identified related to the claimant's ability and availability, the claimant will be prompted to complete the appropriate questionnaire. |
| **Collect Other Source of Income Information** | This Use case begins when a claimant indicates within the Request for Payment Process that they have Other Income. The system routes the claimant to complete the necessary information regarding Other Income. |
| **Confirm Request Benefit for Payment** | This use case describes the functionality associated with the claimant's request for payment, including the data elements that appear, and which are editable. |
| **Determine Benefit Payment Distribution** | This use case describes the technical requirements needed to correctly distribute benefit payment monies to the proper entities (i.e., child support, state and federal taxes, etc.). |
| **Process DUA Request for Benefit Payment** | This use case describes the unique functionality and information captured when the claimant is applying for benefits under the Disaster Unemployment Assistance program. |
| **Generate Benefit Payment** | This use case begins when a claimant or UI Staff has successfully submitted a request for payment for a week, or if UI Staff makes an adjustment to a payment (PFRC) to be made. This use case ends when the all weeks requested to be paid have been processed. |
| **Initiate Cross Match Detection** | This use case begins when the System runs or UI staff initiates one of several cross match queries This use case ends when the requested cross match query is complete. |
| **Process Claimant Account Adjustments** | This use case begins when an adjustment to a processed Overpayment debt payment is required. This use case end when the Overpayment debt payment has been updated. |
| **Process Check Cancellations** | This use case documents requirements related to the processing of cancelled checks. |
| **Process Check Reconciliation** | This use case describes the process to reconcile outgoing checks with US Bank. |

72

DEL00406233

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Cases | Brief Use Case Description |
|---|---|
| **View and Generate 1099-G** | This use case begins when a claimant or UI Staff wishes to view a 1099-G. The System will display the most recent year available for the claimant, and will allow a claimant or UI Staff to view and print previous years' data as well, in the proscribed 1099-G format. This use case also includes the necessary business rules for processing the annual 1099 job that generates the annual 1099-Gs. This use case ends when a user has successfully viewed a 1099-G. |
| **Process Overpayments**<br><br>**Applies to PID** | This use case begins when a regular or special program overpayment has been identified due to a monetary re-determination, account update, appeal decision, or discovered via one of the cross match queries. This use case ends when the system updates the account to accurately reflect the debt and the necessary correspondence is issued to the employer or claimant. |
| **Process Request for Benefit Payment**<br><br>**Applies to PID** | This use case begins when a claimant accesses the continued request option via IVR or the internet to process a weekly or bi-weekly request for Regular or Special Program benefit payment. This use case ends when the Claimant has successfully submitted their request for payment. Upon submission, the System deducts any overpayment offset or other deductions and calculates the benefit payment. |
| **Process Underpayments** | This use case begins when it has been determined that a claimant has been underpaid resulting from an appeal or adjudication. The system will issue the appropriate payment resulting from the underpayment. |
| **Process Shared Work Request for Benefit Payment** | This use case begins when a claimant requests partial Unemployment Insurance Benefits while continuing to work for a pre-approved employer of the Shared Work Program. This use case ends when the claimant receives payment. |
| **Process TRA Request for Benefit Payment** | This use cases describes the unique functionality and information captured when the claimant is applying for benefits under the Trade Adjustment Assistance Act. |
| **Validate Payment Calculation** | This use case begins when a claimant has successfully submitted his/her request for payment and received a confirmation notice This use case ends when the weeks requested have been validated and/or calculated |
| **Validate Work Search Verification** | This use case will validate the claimant's ongoing work search effort. |
| **Work Search Verification** | This use case will gather information regarding the claimant's ongoing search for employment. Claimants will be randomly identified and selected during the request for benefit payment. |
| **Process Claimant Payment Plan**<br><br>**Applies to PID** | This use case begins when a claimant requests a payment plan. This use case ends when the system updates the account to reflect the creation of an approved payment plan. |

73

DEL00406234

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Cases | Brief Use Case Description |
|---|---|
| **Process Claimant Refund**<br>**Applies to PID** | This use case is initiated when UI has over-collected Claimant debt. This use case begins when either the System or UI Staff identifies a refund is due the Claimant. This use case ends when the check is cashed or cancelled.  Credit balances should not automatically be refunded by the system.  Hold and verify must be done. |
| **Process Debt Payment**<br>**Applies to PID** | This use case begins when the Claimant initiates a debt payment transaction. This use case ends when the System has been updated with debt payment information and has generated a payment confirmation number. This use case includes electronic access to Lockbox Transactions images for improved reporting capability. |
| **Process  Collections** | This use case begins when a debt has been determined uncollectible through available UI collection methods and ends when the debt has been assigned for additional collection actions |
| **Refer Debt for Revenue Recapture** | This use case begins when the system determines a claimant account debt meets business rule eligibility for referred to the State of Massachusetts Department of Revenue (DOR) for tax intercept. This use case ends when the debt is satisfied and tax intercept is no longer necessary. |
| **Process Online Underpayments** | The Use Case begins when manual intervention is required for the generation of an Underpayment. The use case ends when an Underpayment is created, and the determination has been updated. |
| **Process Online Overpayments**<br>**Applies to PID** | The Use Case begins when manual intervention is required for the generation of an overpayment. The use case ends when an overpayment is created, and the determination has been updated. |
| **Employer Workshare** | Employer will verify and enter work schedules.  Will be determined during design. |

**View and Maintain Benefit Claim**

This subsystem describes the ability of the claimant to maintain information about their claim, and for UI Staff to maintain information about a claimant. For the claimant, this includes the claimant's ability to maintain information including address, requesting a wage correction, viewing their payment and withholding history, requesting a check replacement, viewing and printing a 1099-G, and submitting any tax withholding and direct deposit information. A claimant will only have access to their account through the authentication of their identity using a UI-assigned user ID and self-assigned password. For a UI Staff person, the view and maintenance features will be enhanced from that functionality available only to claimants, and will include enhanced access to claimant and claim history, as well as appropriate internal maintenance functions, such as appeals and determinations. Employer access to claimant information will include viewing information directly related to unemployment charges and employer fact-finding, as well as applicable appeal updates. The following use cases have been identified for the View and Maintain Benefit Account Sub-System:

74

DEL00406235

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**View and Maintain Benefit Claim**

| Use Case | Brief Use Case Description |
|---|---|
| **Resolve Authentication Issue** | This use case begins when a claimant attempts to access the UI System. This is a UCS to re-authenticate claimants who were not authenticated via SSA - possibly due to basic transposition of SSN. Allows staff to authenticate those claimants. Simple process and uses authentication process code. |
| **Determine Correct Path** | The purpose of this use case is to describe the steps that the system must take to determine the available options for the claimant, and the message(s) to display to the claimant. Both of these items (options and messages) are dependent on many factors related to the program and account status for the individual. This use case is complete once the System has successfully analyzed the program and account status, and determined the appropriate options and messages to display to the individual. |
| **Manage Password** | This use case begins when a claimant chooses to change their password. The System will allow the claimant to change their password to another value. The use case ends when the claimant's password has been successfully changed. |
| **Reactivate Account** | The purpose of this use case is to document the steps and business rules for the Reactivate Account process. A claimant must reactivate their account after a predetermined amount of time has passed since their last request for payment. The claimant must confirm existing key information before reactivation, and then is required to provide information based on their response to a series of preliminary questions. The use case is complete when the claimant has submitted their account reactivation. |
| **View and Maintain General Information** **QAS/Pitney Bowes?** | This use case begins when a claimant wishes to update their general information regarding name, address, phone number, and birth date. This use case ends when the claimant has successfully changed their general information, chooses to view other account information, or ends the session. If a new address is added, system will check for overpayment and activates collections if collection was inactive. |
| **View & Maintain Payment and Deduction Information** | This use case begins when a claimant or UI Staff wishes to view Claimant payment information. It describes the steps that the Claimant or UI Staff must go through to view payment information from previous requests, including deductions (earnings, eligibility, etc.), payment distribution (taxes, child support, etc.) and net payment amount. This use case ends when the claimant or UI Staff has successfully viewed payment information, chosen to view other account information, or ended the session. |
| **Manage Payment Method** | The Manage Payment Method use case is initiated when a claimant or Authorized UI Staff has accessed the Current Payment Method screen. This will allow the user to view and, if their security allows, update the Claimant's current payment method. This use case ends when the user has exited this functionality or has successfully updated the Claimant's payment method. |

75

DEL00406236

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Update Tax Withholding** | The Update Tax Withholding use case is initiated when a claimant or Authorized UI Staff have opted to access the Current Tax Withholding Status screen which allows the user to view and initiate an update to the Claimant's tax withholding status. This use case ends when the user has exited this functionality or has successfully updated the Claimant's tax withholding status. |
| **Customer Service Representative Interface/Views** | The purpose of this use case is to describe the functionality that will be available to internal UI Staff to view history of a claimant's account information. It is assumed that there are two types of account history information that need to be available to UI Staff. One type of information is a comprehensive transaction log, and the other is an individual history of categorical information, such as address. This use case is complete when UI Staff have viewed the history of an account. |
| **Claimant Views and Maintains Monetary Determinations** | The purpose of this use case is to describe the steps and functionality that exist to support claimants and UI Staff in viewing determination information for an account. This use case starts when any of the actors mentioned wish to view monetary determination information. The actors will need the ability to view determination information for an account at some level. This use case ends when determination information has been successfully retrieved and viewed. |
| **Employer Views and Maintains Monetary Determinations** | The purpose of this use case is to describe the steps and functionality that exist to support employers and UI Staff in viewing determination information for an account. This use case starts when any of the actors mentioned wish to view monetary determination information. The actors will need the ability to view determination information for an account at some level. This use case ends when determination information has been successfully retrieved and viewed. |
| **Claimant Views Non-Monetary Determinations** | The purpose of this use case is to describe the steps and functionality that exist to support claimants and UI Staff in viewing determination information for an account. This use case starts when any of the actors mentioned wish to view non-monetary determination information. The actors will need the ability to view determination information for an account at some level. This use case ends when determination information has been successfully retrieved and viewed. |
| **Employer Views Non-Monetary Determinations** | The purpose of this use case is to describe the steps and functionality that exist to support employers and UI Staff in viewing determination information for an account. This use case starts when any of the actors mentioned wish to view monetary determination information. The actors will need the ability to view determination information for an account at some level. This use case ends when determination information has been successfully retrieved and viewed |
| **Adjust an Account** | The purpose of this use case is to allow UI Staff to withdraw a claimant's account; or adjust the key data on the specific account. |
| **Employer Search** | The use case is designed to be an extension of the Tax Services Employer Search functionality. The scope is limited to add street address only. |
| **Claimant Search** | The use case is designed to aide UI Staff to search for individual claimants. The search functions will provide access to security-based claimant data. |

76

DEL00406237

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Modify Extension and DUA Program** | The use case is designed to update existing extension/DUA data. PID will participate in use case modification; Federal rules apply. |
| **Maintain Informational Lists** | The use case will allow users to update system lists. Some lists could include the following: State UI Addresses/Phone Numbers; Interpreters; Department Contacts for Appeals; etc. |
| **Modify Shared Work Plan** | The use case is designed to update existing shared work plans for employers. |
| **Maintain Claimant Address Information** | The use case provides claimants and UI staff the necessary functionality to update claimant address information. |
| **Manage Non-U.S. Citizen Certification** | The use case provides UI staff the ability to review available documentation and update the claimant's account. |
| **Audit Trail** | This use case provides the production of easy-to-follow audit trails, enabling program managers, internal control staff, and outside auditors to determine the "who/what/when/where" of any transaction taking place in the system. Will be determined during design. |

**Integration Services**

The Integration Services Sub-system describes several common functions that are utilized across Benefits functional areas. These common functions include Interactive Voice Recognition (IVR) applications, ICON Interface applications, Check Printing.

The following use cases documents have been identified for the Integration Services Sub-system:

**Integration Services: May apply to all groups and needs to be evaluated during design**

| Use Case or Supplemental Specification Document | Brief Use Case Description |
|---|---|
| **Document/Fax Management** | Use case scope needs to be defined. |
| **Health Coverage Tax Credit** | Health coverage tax credit management. |
| **Track Data Access** | The use case will track user views of SSA provided data. Will be determined during design. |
| **Record Management (Purge)** | The use case will organize all purge requirements for Revenue and Benefits System tables. |

77

DEL00406238

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case or Supplemental Specification Document | Brief Use Case Description |
|---|---|
| **BYE Account Status** | Benefit Year End Batch Process that updates certain flags and fields in the system. For example, after five weeks changes active to inactive and triggers a reactivate flag. |
| **Retirement Verification Batch Process** | Monthly batch process to detect those claimants that have turned 62 or full retirement age during the account. |
| **Print Checks** | This use case begins when the system receives data indicating that checks and/or statement of accounts need to be printed by the printing room. The recording of the warrant numbers and control of the checks are logged by the printing room and the insert room. The checks and/or statement of accounts are inserted into envelopes by an inserting machine. The envelopes are then sorted by zip code and delivered to the USPS. The use case ends when the checks and/or statements of account are mailed by the mailroom. |
| **Employer Request for Refunds** <br><br> **Revenue function** <br><br> **Verify this and Use Case in Revenue section.** | The use case begins when a credit on an Employer's account is identified and the Employer or Employer's agent requests a refund or UI Staff person requests a refund on behalf of the employer. The refund requests are requested through the System. The use case starts when the employer or the UI staff person selects the link on the system to request a refund. The use case ends when the System or UI Staff approves or denies the request, the Employer account and Event Log is updated, the requester (Agent or Employer) is notified of the action taken, and if approved, the refund check is generated and mailed to an Employer. Decided during design. |
| **ICON – IB6 Incoming** | This use case describes the interface for charges coming from other states on Interstate claims through the IB6 process. |
| **ICON – IB6 Outgoing** | This use case describes the interface for charges being sent to other states on Interstate claims through the IB 6 process. |
| **ICON - INSW** | This use case describes the creation and maintenance of user IDs, mailing lists, and ate characteristic information. |
| **ICON – IB13** | This use case describes the interface for Interstate memorandums. |
| **ICON – Handbook** | This use case describes the interface for the IB Handbook which lists information on claim filing in other states. This information includes each state's monetary determinations rules. |
| **ICON –Vessels View and Maintain** | This use case describes the viewing of the incoming interface for the central listing of vessels information and the process to maintain the MA central listing of vessels information for outgoing interface. |
| **ICON – WRIS Incoming/Outgoing** | This use case describes the wage record interface system. This process provides data to the hub for the Distributed Database Index, which is an index file stored at the hub with a list of each SSN from each state that has wages. |

78

DEL00406239

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case or Supplemental Specification Document | Brief Use Case Description |
|---|---|
| **IVR Integration - File a New Claim** | The purpose of this use case is to describe the steps the system must proceed through to create an account based on information submitted from an application. Applications are analyzed by the system to determine the program and account type, along with information necessary for determining benefit amounts and eligibility. The system will allow the claimant to create a password, which will be used to authenticate the claimant in future, interactions with the department's database. This use case is complete once an account has been established, along with any necessary issues for UI Staff to review. |
| **IVR Integration - Continued Claims** | This use case processes the claimant request for benefits. As part of this process, the system will collect claimant's earnings during the reporting term, collect claimant's availability information, ability information and verify some of the claimants' work search. The system will determine holds, deductions, timeliness of the request, if human intervention is needed. If appropriate, the system processes the check. |
| **IVR Integration - Re-open Claim** | The purpose of this use case is to document the steps and business rules for the Reactivate Account process. This use case begins when a claimant must reactivate his/her account after a predetermined amount of time has passed since their last request for payment. The claimant must confirm existing key information before reactivation, and then is required to provide information based on his/her response to a series of preliminary questions. The use case is complete when the claimant has submitted his/her account reactivation. |
| **IVR Integration - PIN Request** | This use case describes how a caller requests a PIN for the IVR. |
| **IVR Integration - Address Change** | This use case will support the claimants wish to update their general information. This information includes name, address, phone number, direct deposit, tax withholding and birth date. This use case ends when the claimant has successfully changed their general information, chooses to review other account information, or ends the session. |
| **IVR Integration - Claim Status** | This use case begins when a claimant chooses to access his/her account information. This category of information includes Weekly Unemployment Benefit Amount (WBA), Maximum Unemployment Benefit Amount (MBA), transactional history, current balance of their account, request a 1099G, check replacement. It describes the steps that the claimant must go through to access this information and complete these functions. This use case ends when the claimant has successfully accessed his/her account information, made request(s) of their account and/or ended the session. |
| **IVR Integration - Provide Office Hours and Locations** | This use case describes how the system will use a claimant's ZIP code information to provide information on the closest WorkForce Center. The claimant will be able to access the address, hours of operation, basic directions and phone number to the closest WorkForce Center. The claimant will also be given various services and resources available at that location. |

79

DEL00406240

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case or Supplemental Specification Document | Brief Use Case Description |
|---|---|
| **IVR Integration - Integrate IVR and QUEST Database** | This use case describes database history integration. |
| **IVR Integration - Workload Distribution** | This use case allows the authorized user to instruct the system to direct the workflow and distribute the workload. The system will sort calls not only by skill level groups of the customer contact center personnel, but also to specific individuals. The system will allow customer contact personnel to be put into skill groups of various sizes and varying availabilities. Each individual may be assigned language ability levels, a variety of skills and those skills will be changeable with proper authorization. The system may vary routing of calls by the one of these variables, or others (like time since last call, or availability). The system assesses if additional information is needed from a claimant and accordingly route the work/call. The result of this use case gives better control of the work flow and workload for a more efficient operation. |
| **IVR Integration - Language Selection** | The purpose of this flow is to allow claimants to choose the language of the IVR. The claimant will have the choice of English, Spanish, Somali, or Hmong. The claimant's selection will ask all of the questions and play all confirming statements in that specific language as recorded by state personnel. The system will always ask the claimant their language preference, but if the system recognizes the ANI (Automatic Number Identification) then the greeting and the language choice question will be played in the language chosen with the last call. The system will also recognize if the claimant needs to speak to a customer contact center that the agent has the appropriate language skill. |
| **IVR Integration - Speech to Text** | The result of this use case the claimant is able to have their statements recorded, and then the system could convert these voice files into printed text. The claimant statement would be responses to questionnaires, rebuttals, testimony or other request for information from the department. |

80

DEL00406241

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final
## Appeals and Hearings

The Appeals process in Massachusetts:
Any determination may result in an appeal. There are two levels of appeal: the lower authority is the DUA Appeals department; the higher authority is the Board of Review. After this, an appeal can be made to the District Court.
Workflow will be used to notify other departments once appeal is received and again when decision is entered into system.

### Appeal Processing

The purpose of this subsystem is to provide DUA with a comprehensive subsystem that supports the claimant and employer appeals needs of the UI department. The new claimant and employer appeals functionality will support creating case files that track appeals to completion and resolution, and then subsequently integrate with the necessary information for the claimant and process automatic updates to claimant and employer accounts. The following use cases have been identified for the Appeal Processing Sub-System:

### Appeal Processing:  Will be used by BOR as well

| Use Case | Brief Use Case Description |
| --- | --- |
| **File Appeal Request** BOR | The File Appeal use case documents the functionality necessary for a claimant, Employer, Agent or Staff (on behalf of a claimant or Employer) to file an appeal. This use case begins when the User selects the appropriate determination or document within the Claimant/Employer self-service and selects "File Appeal". The System will determine if other methods of account resolution are more beneficial for the User and present these options before creating an appeal level for the issue. This use case ends when the User chooses to resolve the issue through an alternative method or when the System creates an appeal level and generates appropriate correspondence. |
| **Prepare case for scheduling** | Cases are reviewed for a variety of criteria including complexity prior to scheduling. |
| **Schedule Appeal Hearing (Self-Service)** BOR | This use case begins after the appellant party completes their request to file an appeal.  Appeal requests received on paper (mail or fax) will be imaged and routed to staff workflow for scheduling. Scheduling an appeal determines the logistics of the appeal hearing. The use case ends when the system schedules the hearing and returns to the File Appeal process which will provide confirmation information and generate the necessary correspondence to the claimant, employer and/or other interested parties. |
| **Schedule or Reschedule Appeal Hearing (Staff)** BOR | This use case begins after workflow has been created to prompt staff to schedule or reschedule an appeal hearing. Staff scheduling an initial appeal hearing will be rare but will occur when an in person hearing is required or when a paper appeal request is received. Workflow will be created when appellants mail or fax in appeal requests and when interested parties request a reset of their appeal schedule either by mail, fax, IVR or Web. This use case also includes the functionality needed for Review Examiner or other staff to update the RE schedule of availability.   Dependent on design. |

81

DEL00406242

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Withdraw/Void Appeal** **BOR** | The Withdraw Appeal use case documents the functionality necessary for an Appellant or Staff on behalf of an Appellant to withdraw an appeal. This use case begins when the User selects the appropriate pending appeal issue within the Claimant/Employer self-service and selects "Withdraw Appeal". This use case ends when the System withdraws the appeal issue and generates the appropriate correspondence.  Merged with Process Appeal decision. |
| **Receive, Route & Mail Exhibits** **What about printing case folder material? BOR** | This use case documents the functionality necessary to receive, store, route and mail exhibits. This use case begins when new evidence/exhibits are received by mail or fax. Documents are scanned and become part of the appeal's electronic case file. Evidence that cannot be scanned (video tapes, policy manuals, etc) will be logged and referenced as part of the electronic case file. Copies of exhibits will be made available to all interested parties. Will be defined during design. |
| **Maintain Appeal Record** **BOR** | This use case documents the functionality necessary to allow staff to view and maintain Appeal specific details after an appeal has been filed and scheduled. Examples include adding witnesses, changing contact telephone numbers, etc.  Should have the ability to receive and process remands or remand to a lower authority. |
| **Conduct Appeal Hearing** **BOR: or review** | The conduct hearing functionality will allow the hearing process to be recorded via the telephone. This use case begins when the Review Examiner (RE) conducts the hearing as scheduled. The RE confirms the demographic information of the appellant and interested parties. This use case ends when the hearing is concluded and the recording has been stored. Digital recording options will be evaluated during design. |
| **Process Appeal Decision** **BOR** | This use case documents the functionality necessary for Staff to generate an appeal decision. Staff reviews the electronic case file. System tree logic will guide staff in processing the decision based on the appeal type. Based on the outcome of the decision the System will notify the following processes: Determine Multiple Days Denied, Benefits Paid Charge, Determine Potential Over/Underpayment, Revenue and Process Amended Monetary. This use case ends when the System issues correspondence to the appropriate parties. Will be determined during design. |
| **Modify Appeal Decision** **BOR** | This use case documents the functionality necessary for Staff to modify an appeal decision. This use case begins when Staff reviews a completed appeal decision and creates a level of one of the following: Modify – Corrected, Modify – Nullified, Modify – Amended, Modify – Exception Level, or Modify – End Indefinite Denial. After the Modify level is created System tree logic will guide Staff in processing the decision. Based on the outcome of the decision the System will notify the following processes: Determine Multiple Days Denied, Benefits Paid Charge, Determine Potential Over/Underpayment, Revenue and Process Amended Monetary. This use case ends when the System issues correspondence to the appropriate parties. |

82

DEL00406243

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final
**Program Integrity**

**Program Integrity**

The purpose of this subsystem is to provide conformance to federal quality assurance and benefit integrity requirements, assist in identification of fraudulent account situations, and to provide continuous quality improvement support. The following use cases have been identified for the Program Integrity Sub-System:

**Program Integrity Processing**

| Use Case | Brief Use Case Description |
|---|---|
| Update/entry-repayments | Consider during design along with other sub system payment processes. |
| Write-off of Overpayment | Consider during design along with other sub system collection processes. |
| Special processing of Appeals | Waiver, late appeals, tax intercept appeals<br>Consider during design along with other payment processes |
| Special processing of Overpayment | Bankruptcy, death notification will be defined during design.<br>Bounced checks, void check covered in payment processes |
| Integrated cross match system | May need more cross matches but also need an integrated system that produced a "hit" list with established priorities.  This implies the use of filters, checking of new information to old information etc.  This process will determine list of cases to be investigated and routed.<br>Contingent upon DW tool like SAS |
| Process New Hire Cross Match | This use case will identify claimant accounts that have been paid benefits the week of or after their date of hire as reported in the New Hires database. |
| Process Wage Detail Cross Match | The purpose of this use case is to identify potential overpayments that result from Claimants not reporting or under-reporting their earnings. This is accomplished by comparing earnings reported by employers within wage detail versus those reported (or not reported at all) by Claimants at the time of payment request. |
| Process Interstate (ICON) Cross Match | This use case involves the process of sending wage detail and account information to the FCCC to detect overpayments that result from a claimant receiving benefits in one state while working in another. |
| Process Workers' Comp Cross Match | The purpose of this use case is to identify overpayments (which can be fraud) that result from Claimant's not reporting that they have received or are receiving worker's compensation while collecting unemployment benefits. Other eligibility issues can arise such as: ability to work, actively seeking and/or availability to work. |
| Process Border Check Cross Match | The purpose of this use case is to identify potential overpayments to those individuals who live in "border" communities (those cities on the border with other states) to determine if the claimant has earnings in another state but is not reporting said earnings. |

83

DEL00406244

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Process Duplicate Address Cross Match** | The purpose of this use case is to identify individuals who are fraudulently receiving benefits from multiple accounts (formerly known as Eagle Pass). |
| **Process Quality Control Sample** | The scope of this use case seems to be handled within the Benefits Accuracy Measurement (BAM) SRS document. |
| **Fraud Investigation Routing** | Fraud use case scope is currently under review. The scope may simply create a workflow and/or issue type.<br><br>This Use Case must have routing to auditors (maybe based on cross-match hit list.) |

# Economic Research

**Economic Research**

The purpose of this subsystem is to provide Labor Market Information to the Federal Department of Labor, DUA Management and the constituents of the Commonwealth of Massachusetts. This module includes the production of UI federal operating reports and other activity summaries that can be validated against state and federal reporting requirements and can be recreated as needed to support internal quality and performance reviews and external audit engagements. The following use cases have been identified for the Economic Research Sub-System:

**Economic Research**

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 191 Statement of Expenditures and Financial Adjustments** | Is used by each State employment security agency (SESA) to report to the National Office (NO):<br><br>1. The quarterly summary of UCFE and UCX expenditures and adjustments, and<br><br>2. The total amount of benefits paid by the SESA to claimants of specific agencies.<br><br>Section B of the ETA 191 is the only source document used by the Office of Workforce Security to bill Federal and military agencies for the recovery of UCFE and UCX benefit payments. |
| **ES 202 - Quarterly Census of Employment and Wages (QCEW)** | The Covered Employment and Wages program, commonly called the ES-202 program. Using quarterly data submitted on magnetic media or electronically by the agencies, BLS summarizes employment and wage data for workers covered by State unemployment insurance (UI) laws and for civilian workers covered by the program of Unemployment Compensation for Federal Employees (UCFE). |

84

DEL00406245

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 203, Characteristics of the Insured Unemployed** | The ETA 203 report provides information, by State and for the Nation, about the characteristics of Unemployment Insurance claimants. This data is useful in describing the population of claimants and determining how that population changes over time and under various conditions. It can also be compared with characteristic figures of the total unemployed as published by the Bureau of Labor Statistics (BLS). |
| **ETA 204 - Experience Rating Report** | Data submitted annually on the ETA 204 enables Employment and Training Administration (ETA) to project revenues for the Unemployment Insurance (UI) program on a State by State basis and to measure the variations in assigned contribution rates which result from different experience rating systems. When used in conjunction with data from the ES 202, Employment Wages, and Contributions report, the ETA 204 data will assist in determining the effects of various factors (e.g., seasonality, stabilization, expansion, or contraction in employment and payroll, etc.) on the employment experience of various groups of employers. The data will also provide to States and the National Office an early signal for potential solvency problems, be useful in analyzing factors which give rise to the potential problems, and permit an evaluation of the effectiveness of the various approaches available to correct the problems detected. Moreover, the data are required as a basis for estimating State average tax rates for the rate year. Finally, the data are the basis for determining an experience rating index; the index will allow for the evaluation of the extent to which benefits in States are effectively charged, non-charged, and ineffectively charged. Comparisons in a single State over time will be possible. |
| **ETA 205, Preliminary Estimates of Average Employer Contribution Rates** | The Average Employer Tax Rate report collects annual information about the taxing efforts in States relative to both taxable and total wages and allows comparison between States. |
| **ETA 207, Non-monetary Determination Activities** | The data reported on the ETA 207 provides current information on the volume and nature of non-monetary determinations and denials under State, UCFE and UCX unemployment insurance programs. Agencies use the data to budget workloads, evaluate law changes, appraise disqualification processes and relate to benefit appeals. The National Office uses it to determine workload counts, to analyze the ratio of disqualifications to determinations, and to examine and evaluate the program effect of non-monetary activities. |
| **ETA 2112 UI Financial Transaction Summary** | Form ETA 2112 is a monthly summary of transactions in a State unemployment fund which includes the Clearing Account, Unemployment Trust Fund Account, and Benefit Payment Account. All payments by employers (and employees where applicable) into a State unemployment fund for contributions, payments in lieu of contributions, penalty and interest, or special assessments should be accounted for in the report. Form ETA 2112 provides a summary of data pertaining to State UI tax collections, regular benefits paid, Federal and State shares of extended benefits paid, third tier program benefits paid, and other transactions affecting the unemployment trust fund. |

85

Highly Confidential

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 218 Benefit Rights and Experience** | The number of eligible claimants with potential maximum duration, the average potential duration for all eligible claimants, and their distribution by number of full weeks of potential duration show the extent of protection, in terms of weeks of benefits, available to potential beneficiaries. |
| **ETA 227 Overpayment Detection and Recovery Activities** | Form ETA-227 provides information on determinations, overpayments, and recoveries of overpayments on intrastate and liable interstate claims under State unemployment compensation (UI) and under Federal unemployment insurance programs, i.e., programs providing unemployment compensation for Federal employees (UCFE) and ex-servicepersons (UCX), established under Chapter 85, Title 5, U.S. Code. |
| **ETA 5130 Benefit Appeals Report** | The ETA 5130 report is the basic source of information on the appeals case workload in each State under the regular programs of State unemployment insurance, unemployment compensation for Federal employees, and unemployment compensation for ex-service members (referred to as UI, UCFE, and UCX respectively). |
| **ETA 5159 Claims and Payment Activities** | The ETA 5159 report contains monthly information on claims activities and on the number and amount of payments under State unemployment insurance laws (State UI) and Federal unemployment insurance laws for Federal workers (UCFE) and for ex-service members (UCX). There are separate ETA 5159 reports labeled Regular, Extended Benefits (EB), and Short Time Compensation (STC). |
| **ETA 538 Advance Weekly Initial and Continued Claims Report** | This report provides for an advance national compilation and release of initial claims and weeks claimed data that, on a national basis, should conceptually be the same as the total of initial claims and weeks claimed data reported on the ETA 539, Weekly Claims and Extended Benefits Trigger Data. |
| **ETA 539 Weekly Claims and Extended Benefits Trigger Data** | This report serves as the State Administrator's initial notice to the Employment and Training Administration (ETA) National Office that a State extended benefit period will begin or end for a specified week. |
| **ETA 581 Contribution Operations** | The ETA 581 report provides information on volume of work and State agency performance in determining the taxable status of employers and the processing of wage items; in the collection of past due contributions and payments in lieu of contributions, and delinquent reports; and in field audit activity. The ETA 581 report for each calendar quarter is due in the Employment and Training Administration National Office on the 20th day of the second month following the quarter to which it relates, i.e., May 20, August 20, November 20, and February 20. This report will be transmitted electronically. |
| **ETA 586 Interstate Arrangement for Combining Employment and Wages** | This report will enable the Employment and Training Administration to measure the scope of wage-combining activities and to determine the effects of the program in terms of the number of claims filed, amount of benefits involved, and promptness of first payments and employment and wage transfers. |

86

DEL00406247

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 8401 Monthly Analysis of Benefit Payment Account** | The ETA 8401 is a record of benefit payment account transactions recorded in the books of each State. |
| **ETA 8403 Summary of Financial Transactions - Title IX Funds** | Provides a cumulative summary of expenditures of State unemployment funds pursuant to Section 903(c)(2) of the Social Security Act (SSA), the "Reed Act" as amended. |
| **ETA 8405 Monthly Analysis of Clearing Account** | The ETA 8405 report is a record of clearing account transactions recorded in the books of each State. |
| **ETA 8413 Income-Expense Analysis, UC Fund Benefit Payment** | The ETA 8413 is a monthly analysis of daily transactions in a State benefit payment account from the books of the bank on which benefit checks or warrants are issued. |
| **ETA 8414 Income-Expense Analysis, UC Fund Clearing Account** | This report is a monthly analysis of activity in a State clearing account from the books of the bank in which employer contributions and payments in lieu of contributions are deposited and transferred to the U.S. Treasury. |
| **ETA 9016 Alien Claims Activity Report** | The Immigration Reform and Control Act (IRCA) of 1986, Public Law 99-603, amended the Social Security Act by adding to Section 1137 - "Income and Eligibility Verification System". Section 1137 provisions require states to verify, through the Immigration and Naturalization Service (INS), the legal status of all aliens applying for benefits under certain federally assisted and federally funded programs, including Unemployment Compensation. To facilitate the required verification, INS developed the Systematic Alien Verification for Entitlement (SAVE) system. SAVE consists of automated and manual procedures by which states obtain information about an alien=s immigration status that will allow them to determine the alien=s eligibility for unemployment compensation. The information provided on the ETA 9016 Report is used by the Department of Labor to: C Assess the magnitude of alien claims and issues affecting eligibility; C Make decisions as to the appropriateness and value of state use of the SAVE system; and C Determine whether a state's administrative costs associated with SAVE are reasonable. |

87

DEL00406248

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 9048 Worker Profiling and Reemployment Services Activity** | The ETA 9048 report provides quarterly information on the Worker Profiling and Reemployment Service activities of claimants who are profiled to assess their likelihood of exhausting benefits. Worker profiling allows for the targeting of reemployment services to those most in need. The data on this report is used for evaluation and monitoring of the Worker Profiling and Reemployment Services system on a national level. It includes breakouts of those who reported to services and those who completed services to be able to track service utilization. The mandatory participation requirement of the profiling legislation does not pertain to education/training or to services provided under a State's Self Employment Assistance program. Data is captured in each of these categories to provide additional information about the range of services provided to profiled claimants. |
| **ETA 9049 Worker Profiling and Reemployment Services Outcomes** | The ETA 9049 report contains information on the outcomes of reemployment service activities of claimants who, through the Worker Profiling and Reemployment Services (WPRS) program, are identified as likely to exhaust their UI benefits, selected for referral to reemployment services and referred to such services. The report uses existing administrative data and allows evaluations such as comparison over time of the numbers and percentages of individuals selected through the Worker Profiling and Reemployment Services (WPRS) system and referred from the selection pool who subsequently become reemployed in covered employment within the same State, and what percent of their former wages the new jobs represent. |
| **ETA 9050 First Payment Time Lapse** | The ETA 9050 report contains monthly information on first payment time lapse. This report concerns the time it takes States to pay benefits to claimants for the first compensable week of unemployment. Similar time lapse data was formerly reported in Section C of the ETA 5159 report. That data addressed first payment time lapse for total unemployment only. This report contains monthly time lapse data for all first payments, i.e., total, partial and part-total. A separate section of this report is reserved for Workshare (Short-Time Compensation) first payments only. Workshare will be reported separately and is excluded from that part of the report for "ALL" first payments. |
| **ETA 9051 Continued Weeks Compensated Time Lapse** | The ETA 9051 report contains monthly information on continued weeks compensated time lapse. This report concerns the time it takes States to pay benefits to claimants for compensable weeks of unemployment other than the "first payment." Continued weeks compensated time lapse data was not formerly reported. This report contains monthly time lapse data for all continued weeks compensated, i.e., total, partial and part-total. A separate entry screen will be used for a breakout of partial and part-total continued weeks compensated. Workshare (Short-Time Compensation) continued weeks compensated will be reported on a third entry screen. Workshare continued weeks compensated are not reported in the total count of "All" continued weeks compensated. |

88

DEL00406249

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 9052 Non-monetary Determination Time Lapse, Detection Date** | The ETA 9052 report contains monthly information on the time it takes States to issue non-monetary determinations from the date the issues are first detected by the agency. Single-claimant and multi-claimant non-monetary determinations are included in the report. Non-monetary determinations made by organizational units such as Benefits Accuracy Measurement (BAM) and Benefit Payment Control (BPC) are also included in the report. Note: Overpayment notices on uncontested earnings detected by any method (e.g., cross match) should not be included. A separate section of this report is reserved for multi-claimant determinations only. |
| **ETA 9053 Non-monetary Issue Detection Time Lapse, Affected Week** | The ETA 9053 report contains monthly information on the time it takes States to detect an issue on a claim. The measure is days elapsed from the week ending date of the first affected week to the date on which the agency first detects an issue. Single-claimant and multi-claimant non-monetary determinations are included in the report. Non-monetary determinations made by organizational units such as Benefits Accuracy Measurement (BAM) and Benefit Payment Control (BPC) are also included in the report. BPC cross match determinations, however, are excluded, as are all monetary determinations, regardless of point of origin. A separate section of this report is reserved for multi-claimant determinations only. |
| **ETA 9054 Appeals Time Lapse** | The ETA 9054 report contains monthly information on the time it take States to issue lower authority and higher authority appeals decisions from the date the request for a lower authority hearing or a higher authority appeal is filed to the date on the decision. |
| **ETA 9055 Appeals Case Aging** | The ETA 9055 report contains monthly information on the inventory of lower authority and higher authority appeals which have been filed but not resolved. The universe of appeals included in this measure is all lower and higher authority appeals which are not resolved at the end of the month covered by the report. Case aging provides information about the number of days from the time an appeal is filed and the end of the month covered by the report. |
| **ETA 9056 Non-monetary Determination Quality Review** | The ETA 9056 report provides quarterly information on the quality of non-monetary determinations that State agencies issue to claimants and employers in the report period. Intrastate and Interstate single-claimant and multi-claimant separation and non-separation non-monetary determinations are included in the report. Non-monetary determinations made by organizational units such as Benefits Accuracy Measurement (BAM) and Benefit Payment Control (BPC) are also included in the report. Notices of overpayments on uncontested earnings detected by any method (e.g., cross match) are excluded from the report. |
| **ETA 9057 Lower Authority Appeals Quality Review** | The ETA 9057 report provides quarterly information on the quality of State agencies' single and two party lower authority appeals hearings and decisions in the report period. |

89

DEL00406250

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Management and Ad Hoc Reports** | This use case includes the production of financial and program activity reports that are timely, auditable, and credible (electronic reports that replace current manual reports must combine data from several sources and programs into summary reports that meet the needs and requirements of external audiences, e.g. the U.S. Department of Labor). This use case will provide the ability for management to track financial and programmatic activity, detect and document trends, and produce forecasts of key activities (e.g. monthly claims workload) and financial outlays and trust fund condition. In addition this use case includes the production of timely and consistent responses to regular and ad hoc requests for information about the operation of the UI program, the customers served, and the financial results (e.g. through use of an integrated database with user-driven reporting views). |
| **Labor Market Data Extracts** | This use case includes the set of standard Labor Market Information data extracts used by Massachusetts to publish LMI statistics for the constituents of the Commonwealth. |

# Application Infrastructure & System Administration

These tasks establish the overall application infrastructure and system administration components. It consists of design, development, and testing of the following components:

- Security Component
- Rules Component
- Interfaces Component
- Edit Checks Component
- System Logging Component
- System Management Component
- Code Table Maintenance Component
- Reports Component
- Correspondence Component
- Document Management and Workflow Component

Increment 1 is vital to setting the foundation for the QUEST project. The increment focuses on the underlying components used for developing benefits, tax, and future system functionality. BearingPoint will bring many of the standard application and database objects to the project. The importance of this Increment cannot be overemphasized; it serves as the foundation for subsequent tax and benefits development Increments. Experience has shown that ample time and attention devoted to developing a comprehensive, robust architecture and set of common objects will translate into less re-work, less maintenance and more code efficiencies in the future. The uFACTS solution framework, along with our tool-kit of .NET common objects, will help support these project tasks.

**Security Component**

BearingPoint recognizes the confidential nature of UI information: security must be designed into the system to comply with State and DUA security requirements and standards. We have, therefore, allocated a significant amount of time and resources to develop the Security Plan and application components.

90

DEL00406251

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

The system's security model will include: physical, application, and data level security. In collaboration with DUA resources, we will prepare a Security Model that will identify how security features will be implemented. Specifically:

- Products to be used
- Proposed levels of security
- Limitations of capabilities
- Required protocols
- Security tables format and content
- Recommended starting point for establishing security profiles

**Rules Component**

BearingPoint recognizes the need to change the business rules governing the UI System due to legislative changes or other driving factors. To accomplish these changes in a long-term cost effective way, we have allocated a significant amount of time and resources to develop the Rules management component.
The rules component will include:

- Rules Engine configuration
- Rules Engine integration with .NET application
- Rules definition
- Recommended starting point for establishing rules

**Interfaces Component**

In order to interface with various DUA and other systems, the Interface component will have to be robust and dependent. To accomplish this, we have allocated a significant amount of time and resources to develop the Interface component.
The interface component will include:

- Finalizing the technology to use for interfacing with other systems
- Finalizing the protocols for interfacing
- Finalizing the online and batch interfacing processes
- Creating the processes to support the interface process

**Edit Checks Component**

BearingPoint recognizes the need for the UI System to validate the user input effectively to maximize the data integrity. In order to accomplish a very high level of data integrity, the data entered must be validated in a very efficient and modular fashion. Modular and object oriented design will help significantly increase the organization of the software, thereby contributing directly to the data integrity by uniformly applying the business rules and edits.
The edit checks component will include:

- Software design to modularize edit checks and business rules
- Creation of non-business specific common edits
- Creation of placeholders for business specific common edits

91

Highly Confidential

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

- Creation of placeholders for business specific edits that are not common

**System Logging Component**

BearingPoint recognizes the need for the UI System to keep track of certain important system events that will track system activities by users. In order to accomplish this, the system logging component must be designed in such a fashion, that the important system activities are recorded by common code, thereby eliminating the need for individual Java classes and JSPs to focus on this.

The system logging component will include:

- Identification of important system logging events
- Software design to enable system logging
- Database design to enable system logging
- Creation of software to handle system logging

**System Management Component**

BearingPoint recognizes the need for the UI System to manage the system effectively based on the various system users and activities. For example, there may be a need to allow certain type of users to access the system for maintenance purposes, while the other types of users are locked out of the system.

The system management component will include:

- Identification of the various system open/close events
- Identification of the various system user types and their privileges
- Database design to enable system management
- Creation of software to handle system management functionality

**Code Table Maintenance Component**

The Code Table Maintenance component will provide system administrators the ability to modify systems codes defined in database tables within the system. This will ease system maintenance tasks and allow for greater flexibility in responding to changes in program and policy.

**Reports Component**

The UI System will produce and display various standard and ad-hoc reports to the system users. The reports in the system will be created using Crystal Reports software and will be published either as downloadable PDF (or other agreed-upon format) documents or viewable via Crystal Reports Viewer. The reports viewed by the Crystal Reports Viewer will be served by the Crystal Enterprise Server.

The Reports component will include:

- Finalization and creation of Report User Groups
- Integration of Crystal Enterprise with Java application
- Development and publication of sample reports in PDF or other agreed-upon format
- Development and publication of sample reports via Crystal Enterprise and Crystal Viewer

92

DEL00406253

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Correspondence Component**

BearingPoint recognizes the need for the UI System to send various types of correspondence to the various stakeholders of the system. Some of the common methods of correspondence include e-mails and printed letters. The correspondence component will have the functionality to generate and distribute various system related correspondence to the intended recipients.

The Correspondence component will include:

- Finalization of the various correspondence modes to be built in the system
- Building interfaces with other systems for correspondence purposes
- Building functionality to view previously sent correspondence

**Document Management & Workflow Component**

The FileNet document management and workflow components will be purchased and installed toward the end of the Overall Project Inception Phase, after the validation of the overall technical architecture is complete. (See Page 13-85 of BearingPoint's proposal)

During Increment 1 – Infrastructure, the UI TIP Team will integrate FileNet into a common development environment, so that its components can be used in Increments 2 and 3. During Increments 2 and 3, FileNet will be an integral component to both the self-service and core tax service components. DUA can expect the following document imaging/workflow functionality to be available in the first two years:

- Ability to define specific workflow scenarios and apply these scenarios to the UI TIP application
- Ability to automatically route correspondence to employers and applicants through workflow scenarios
- Ability to notify through email correspondence that follow up is required by either the employer or applicant
- Ability to index and scan employer related correspondence

93

DEL00406254

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final
# Appendix H: DOR Confidentiality Acknowledgement

## INTERDEPARTMENTAL MEMORANDUM

TO:        Distribution

FROM:    DWD

RE:        Confidentiality of the Department of Revenue's Information

DATE:    January 2, 2007

_____
_____

The attached Summary of the Laws is being provided to you because as part of your job duties you may have access to confidential tax, wage reporting, financial institution match, 14-day new hire and child support information, as well as "personal data" provided to the Department of Workforce Development by the Department of Revenue. The access and disclosure of this information is governed by the attached state and federal laws. Violation of the laws provide for specific sanctions including civil and criminal penalties, as well as dismissal from employment and disqualification from holding office in the Commonwealth for up to three years.

If you have any questions regarding this form, please contact Wayne Kallman at 617-626-5901.

_____
_____


### *ACKNOWLEDGMENT REGARDING THE CONFIDENTIALITY OF THE DEPARTMENT OF REVENUE'S INFORMATION*

I, _____, a full-time or part-time employee, contract employee, individual consultant, volunteer, trainee, student intern, member, director, officer, partner, agent or subcontractor of the Department of Workforce Development, hereby acknowledge that I have received a copy of the "Summary of the Massachusetts and Federal Laws Pertaining to Confidential Information of the Massachusetts Department of Revenue" which governs the access and disclosure of information to include, without limitation, tax information, wage reporting information, financial institution match information, 14-day new hire information and child support information, as well as "personal data" as defined in G.L. c. 66A (collectively, the "Information"). I also

94

                                                                        DEL00406255

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

acknowledge that it is my responsibility to read this Notice and to comply with the laws pertaining to the Information.

_____          _____
Signature                                          Date

_____

Name in print

**Distribution:  All persons with access to DOR confidential information.**


### SUMMARY OF MASSACHUSETTS AND FEDERAL LAWS PERTAINING TO CONFIDENTIALITY OF INFORMATION OF THE MASSACHUSETTS DEPARTMENT OF REVENUE

1) <u>Fair Information Practices Act (FIPA), G.L. c. 66A</u>:  Prohibits the unauthorized disclosure of "personal data," as defined in G.L. c. 66A.  Data subjects may make a claim for damages under the Massachusetts Tort Claims Act.  General Laws chapter 214, section 3B also provides for injunctive and other nonmonetary relief for violation of this statute.

2) <u>G.L. c. 62C, § 21</u>:  Prohibits unauthorized disclosure of tax information or returns as defined in 830 CMR 62C.21.1.  A return is defined very broadly in 830 CMR 62C.21.1 and includes information developed by the Department. Violation of this statute is punishable by a fine of not more than $1,000 and/or by imprisonment for not more than six months, and by disqualification from holding office in the Commonwealth for a period not exceeding three years.

3) <u>G.L. c. 62C, § 21B</u>:  Prohibits unauthorized willful inspection ("browsing") of tax information or returns as defined in 830 CMR 62C.21.1.  A return is defined very broadly in 830 CMR 62C.21.1 and includes information developed by the Department.  Violation of this statute is punishable by a fine of not more than $1,000 per return, document or taxpayer and/or by imprisonment for not more than one year, and by disqualification from holding office in the Commonwealth for a period not exceeding three years.  This section also provides that "browsing" by an employee shall be grounds for dismissal of the employee.

95

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

4) <u>G.L. c. 62E, § 8</u>:  Prohibits unauthorized disclosure of information obtained from the wage reporting and financial institution match system.  Violation of this statute is punishable by a fine of $100 per offense and by administrative discipline.

5) <u>G.L. c. 119A, § 5A</u>:  Prohibits unauthorized willful inspection ("browsing") or unauthorized disclosure of child support personal data, including data stored in a computer system or computer files. Any such inspection or disclosure is punishable by a fine of not more than $1,000 with respect to each person concerning whom information has been disclosed or inspected and/or by imprisonment for not more than one year, and by disqualification from holding office in the Commonwealth for a period not exceeding three years.  This section provides that unauthorized disclosure or "browsing" of child support data by an employee shall be grounds for dismissal of the employee.  This law also places additional restrictions on the disclosure of  location information about  a parent or child when the agency is provided with reasonable evidence of a risk of harm.

6) <u>I. R. C.  § 6103</u>:  Prohibits unauthorized disclosure of federal tax returns or return information  by  employees and former employees of state and IV-D agencies.

7) <u>I. R. C. § 7213</u>:  Makes any unauthorized disclosure of federal tax returns or return information a felony punishable by a fine of up to $5,000 and/or imprisonment for not more than five years, together with the costs of prosecution.

8) <u>I. R. C. § 7213A</u>:  Prohibits the unauthorized willful inspection ("browsing") of federal tax returns or return information and makes such inspection punishable by a fine of up to $1,000 and/or imprisonment for not more than one year, together with the costs of prosecution.

9) <u>I. R. C. § 7431</u>:  Permits a taxpayer to bring a civil action for damages in a federal district court against a person who unlawfully browsed or disclosed federal return or return information.

DOCS# 223762

96

DEL00406257

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

The undersigned hereby represent that they are duly authorized to execute this SOW on behalf of their respective organizations.

Division of Unemployment Assistance                BearingPoint

Edward T. Malmborg, Director                Kathy Karich, Regional Managing
                                            Director

Date:  May 21, 2007                Date: May 21, 2007

97

| | |
|---|---|
| **From:** | ded_nefreply@ded.uscourts.gov |
| **To:** | ded_ecf@ded.uscourts.gov |
| **Subject:** | [EXTERNAL] Activity in Case 1:23-cv-00325-WCB Deloitte Consulting LLP et al v. Sagitec Solutions LLC Letter |
| **Date:** | Friday, April 26, 2024 3:31:44 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### District of Delaware

### Notice of Electronic Filing

The following transaction was entered by Vrana, Robert on 4/26/2024 at 4:30 PM EDT and filed on 4/26/2024

**Case Name:** Deloitte Consulting LLP et al v. Sagitec Solutions LLC
**Case Number:** 1:23-cv-00325-WCB
**Filer:**
**Document Number:** 119

**Docket Text:**
**[SEALED] Letter to The Honorable William C. Bryson from Robert M. Vrana regarding Opening Discovery Dispute Letter - re [114] Oral Order,,. (Attachments: # (1) Exhibit 1, # (2) Exhibit 2, # (3) Exhibit 3, # (4) Exhibit 4, # (5) Exhibit 5, # (6) Exhibit 6, # (7) Exhibit 7, # (8) Exhibit 8)(Vrana, Robert)**


**1:23-cv-00325-WCB Notice has been electronically mailed to:**

Andrew Russell    arussell@shawkeller.com, cal@shawkeller.com

Anne Shea Gaza    agaza@ycst.com, corpcal@ycst.com, corporate@ycst.com

Brandon A. Carmack    bcarmack@robinskaplan.com, courtmail@robinskaplan.com

Christopher K. Larus    clarus@robinskaplan.com, npierick@robinskaplan.com

David A. Prange    dprange@robinskaplan.com, JSavina@robinskaplan.com

Demitri M. Dawson    ddawson@robinskaplan.com, swaters@robinskaplan.com

Gregg F. LoCascio    glocascio@kirkland.com, kenymanagingclerk@kirkland.com

John F. Hartmann     jhartmann@kirkland.com, ecf-bfb1bc342c02@ecf.pacerpro.com

John W. Shaw     jshaw@shawkeller.com, cal@shawkeller.com

Joshua L. Simmons     joshua.simmons@kirkland.com, erika.dillon@kirkland.com

Lindsey Michelle Gellar     lgellar@shawkeller.com, cal@shawkeller.com

Nick Teleky     nick.teleky@kirkland.com

Patrick Arnett     patrick.arnett@kirkland.com, gaya.holman@kirkland.com

Rajin S. Olson     rolson@robinskaplan.com, CourtMail@Robinskaplan.com

Rebecca Bact     rbact@robinskaplan.com, swaters@robinskaplan.com

Robert M. Vrana     rvrana@ycst.com, corpcal@ycst.com, corporate@ycst.com

**1:23-cv-00325-WCB Filer will deliver document by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=4/26/2024] [FileNumber=5530657-0
] [ce4aac817c1f41c325c5553d4a3d5beb5df2912a88cc40b023758168f5bba52d2f5
f7253304b19656db8d1b65882399781f536bf2a0bd8e888d369ecac8840ff]]
**Document description:**Exhibit 1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=4/26/2024] [FileNumber=5530657-1
] [c3d50070fc140ad38e1b5f215abf86ffb0e4ad2f29fe97f80d7ba60ec83698df90c
f4b8c0e81492a61263969ec11a7bd99e63a3d31104856fc9f67ad63c22677]]
**Document description:**Exhibit 2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=4/26/2024] [FileNumber=5530657-2
] [1fead9b9f281260706ffb0f67c31d353f107a1a8eb4b246120557cb4b745de248c0
5aa287a30b5fb3db63ba792cd428ef3fca622309f1a0069fea0ad4794dadb]]
**Document description:**Exhibit 3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=4/26/2024] [FileNumber=5530657-3
] [8f4120ea78b718159e2fe2af28b11923cd44782a9471638e434e97b039b8e6097b3
0ba391159faa98630a56c515b4742b668aaa2d8097cde20d89e6ff1e5f26f]]
**Document description:**Exhibit 4
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=4/26/2024] [FileNumber=5530657-4

] [82a8be18ee0daba3d7b0727749ad98b3df04421be7db7de3d7697ed06bd296f89c6
3c73d5359f00bd4a5d5af7fa0ba2c6ad48ce84721dbd8197b07bcdf1159ad]]

**Document description:**Exhibit 5
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=4/26/2024] [FileNumber=5530657-5
] [b0746cd367d4b057f70129e1132f8f55a2c45bb95234f8361c009d1845b6527801b
2a5801f7651b6df67ed4fd55802cb1fdbe5beceba2674f99f9206cc50eb28]]

**Document description:**Exhibit 6
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=4/26/2024] [FileNumber=5530657-6
] [ab982753e5b798df1f05413839c2672b176e6254e80f87cfd625fb17f50c26d2909
92449ef34ef639015b7679ee8dd6e2676e4d77c1723218fb8f1aaf6d1eb69]]

**Document description:**Exhibit 7
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=4/26/2024] [FileNumber=5530657-7
] [a8676dfdb48745e6650c27b9ea61016c29f1405286a892b9eb56f615e56460c5efd
7d4cb3d826e4b79117ac539de81daf01616796f159fa669c5477f82012c69]]

**Document description:**Exhibit 8
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=4/26/2024] [FileNumber=5530657-8
] [3e9050b027b717647cf23702f18fcfc2503b10505655868cb58f00b293bfc39c035
6f7fc35ba44af3ff3e75d981befe57d60ad15801e21dcfa005a37ed8d5d6b]]