IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DELOITTE CONSULTING LLP and DELOITTE DEVELOPMENT LLC, | ) ) ) | |
| Plaintiffs, | ) ) | **Redacted – Public Version** |
| v. | ) ) | C.A. No. 23-325-WCB |
| SAGITEC SOLUTIONS, LLC, | ) ) ) | ███████████████ |
| Defendant. | ) | |

## LETTER TO THE HONORABLE WILLIAM C. BRYSON
## FROM ANDREW E. RUSSELL

OF COUNSEL:
Joshua L. Simmons
Stephany S. Kim
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Gregg F. LoCascio
Patrick Arnett
Nicholas Teleky
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave NW
Washington, DC 20004
(202) 389-5000

John F. Hartmann
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Dated: August 6, 2024

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
*Attorneys for Plaintiffs Deloitte Consulting LLP*
*and Deloitte Development LLC*

Dear Judge Bryson:

Deloitte seeks an order requiring Sagitec to permit Deloitte to designate as confidential and highly confidential portions of the deposition testimony of and documents produced by two Deloitte clients, both nonparties to this litigation, pursuant to the terms of the Protective Order governing the parties' confidential information. D.I. 70 ¶1(c)-(d). These documents and depositions involved extensive discussions of confidential Deloitte information including, among other things, Deloitte's asserted trade secrets. Despite this, Sagitec has refused to treat these materials as confidential, claiming that the existing protective order does not permit Deloitte to designate Deloitte's own information as confidential simply because it was elicited from a non-party. Moreover, Sagitec argues that portions of these materials were disclosed to Sagitec as part of concurrent state public records requests and are thus public, in essence advancing a merits argument that the states were not required to keep them confidential and that Deloitte does not own the claimed trade secret materials—a subject for trial, not for a confidentiality dispute. Allowing Sagitec to disclose Deloitte's confidential information and trade secrets while the parties are litigating these issues would result in "irreparable harm . . . that would not be remedied by monetary damages." *Cf. Neo Gen Screening, Inc. v. TeleChem Intern., Inc.*, 69 F. App'x 550, 554 (3d Cir. 2003) (collecting sources). Sagitec has articulated no rationale for why this information requires disclosure now, revealing that Sagitec will not be prejudiced by the entry of a protective order allowing Deloitte to designate its materials as necessary. Thus, Deloitte asks this Court to permit it to designate confidential material elicited from these nonparties under the protective order governing the parties' materials.

**Background.** Deloitte designed and implemented its complex software solution, called uFACTS, to manage the unemployment insurance ("UI") benefits and taxes for individual state agencies running those programs for the state. Deloitte did so for the two nonparty state customers whose documents and testimony are at issue in this motion: Massachusetts and New Mexico. Deloitte licensed the uFACTS solution, including its source code, database schema, use cases, and other design and technical documentation, to those state agencies to permit the use and maintenance of the uFACTS solution in those states.

At the outset, and with an understanding that Sagitec might seek information from nonparties including Deloitte clients, Deloitte issued a series of document requests to Sagitec with continuing obligations, seeking all communications with Deloitte clients and all documents produced by nonparties to Sagitec pursuant to subpoena or other means. *See, e.g.*, Ex. 1 at 21, 27 (09/19/2023 Pl. First Set of RFPs at RFP 69, 106). In December 2023, Sagitec issued document subpoenas to both Massachusetts and New Mexico, seeking their copies of the uFACTS solution and documentation – information which Sagitec knew Deloitte considered to be proprietary. Ex. 2 at 14–37 (Def. Notice of 3d. Party Subpoenas for Massachusetts and New Mexico). Deloitte repeatedly requested that Sagitec keep Deloitte informed of any discussions with Deloitte clients who were subpoenaed.

Sagitec did not keep Deloitte so informed. Even though Sagitec issued its subpoena to New Mexico in December 2023, it did not inform Deloitte that there had been any response or discussion with New Mexico about the subpoena until March 2024. Sagitec similarly did not inform Deloitte that there had been any response or discussion about its subpoena to Massachusetts for months, and produced documents from Massachusetts in May 2024, shortly before the

deposition of the Massachusetts representative.  Both states produced documents pursuant to the subpoenas.  Sagitec then belatedly revealed, in March 2024 for New Mexico and May 2024 for Massachusetts, the text of its substantively identical public records requests and the state's responses thereto.  New Mexico's short response indicated that the subpoena-produced documents were also responsive to Sagitec's public records request.  Ex. 3 at 1 (SAGITEC-DEL_06920267) Massachusetts similarly indicated that some subpoena-produced documents were responsive to Sagitec's public records request, but when producing source code, noted that the source code should be considered highly confidential.  Ex. 4 at 1–2 (SAGITEC-DEL_07352835).

Sagitec then deposed representatives from New Mexico and Massachusetts on May 28 and May 31, 2024, respectively.  At those depositions, the representatives offered their factual lay opinions about which documents they thought were owned by Deloitte and the state's confidentiality obligations due to Deloitte.  Those nonparties, however, did not designate the challenged produced materials or their deposition testimony concerning Deloitte's trade secrets as confidential under the Stipulated Protective Order, D.I. 70.  Shortly thereafter, Deloitte notified Sagitec it was designating those materials as highly confidential.  Sagitec rejected Deloitte's request, arguing that there is "no procedural mechanism for Deloitte to designate testimony confidential . . . if it does not relate to a document produced by Deloitte."  Ex. 5 at 4 (06/04/2024 Email from R. Bact to P. Arnett).  Sagitec further argued that the majority of the documents regarded "public documents and public information" due to Sagitec's public record request, implicitly arguing that such documents were neither trade secrets nor owned by Deloitte, and thus could be produced under the public records laws of each state.  *Id*.  Deloitte disagrees, and as explained in more detail below, contends it is the owner of the trade secrets at issue, and thus seeks the Court's assistance to maintain the confidentiality of these documents while this issue is litigated.

**There Is Good Cause to Issue a Protective Order.**  Under Federal Rule 26(c)(1)(G), a court may enter a protective order for good cause to bar a person from revealing "a trade secret or other confidential research, development, or commercial information."  *See Jon Feingersh Photography, Inc. v. Pearson Education, Inc.*, 281 F.R.D. 234, 235–36 (E.D. Pa. 2012).  Good cause is established when it is demonstrated by showing that there will be a "clearly defined and serious injury."  *Id*. (citing *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir.1995)).

Sagitec refuses to recognize Deloitte's designation of documents and testimony concerning Deloitte's asserted trade secrets, thus subjecting the information to potential public disclosure during the pendency of this litigation.  Public disclosure of the produced documents and deposition testimony at issue "would result in irreparable harm . . . that would not be remedied by monetary damages."  *Neo Gen Screening, Inc. v. TeleChem Intern., Inc.*, 69 F. App'x 550, 554 (3d Cir. 2003).  At issue in this litigation is whether the very documents produced by the states constitute Deloitte-owned trade secrets and confidential material.  Not allowing Deloitte to designate these materials and related testimony with any level of confidentiality would risk irreversibly destroying the contended trade secret status of these documents even before discovery is complete.  Given the gravity of the potential harm, this Court has good cause to maintain these documents as confidential.  Indeed, as discussed below, Deloitte owns these trade secret materials.  Nevertheless, the Court need not prematurely rule on that question here, but instead may issue a protective order to maintain the *status quo* as the litigation continues.

**The uFACTS Licensing Agreements Evidence Deloitte's Ownership.**  Deloitte's uFACTS solution licensing scheme is designed to allow Deloitte to maintain ownership of its uFACTS solution so that Deloitte may, among other things, reuse and license its solution to other potential customers.  Deloitte's license with New Mexico provides that ███████████████████████████

███████████ Ex. 6 (DEL00869190 at '193). ███████████

████████████████████████████████████████████████████████████ *Id*.  Similarly, Deloitte's license with Massachusetts provides that Deloitte retains "all right, title, and interest in and to all Contractor Property" and that "Contractor Property contains or constitutes commercially valuable and proprietary trade secrets of [Deloitte] . . . ."  Ex 7 (MADUA00000212 at '224–225). "Contractor Property" is defined to include all "proprietary software, solutions, or other proprietary material . . . and derivative works created for DUA based on the [Deloitte] owned or licensed preexisting or proprietary software, solutions, or other proprietary material and information."  *Id*. at '224.  These provisions evidence Deloitte's ownership of the uFACTS material produced and discussed by each state.  Deloitte seeks to designate as confidential these proprietary materials which Deloitte contends it owns.

**Neither the Licensing Agreements Nor the Nonparty States Public Records Laws Permit Public Disclosure of Trade Secrets.**  Sagitec may argue that, to the extent the state nonparties indicated these documents would be produced pursuant to Sagitec's public records requests, the documents should not be held as confidential.  ***First***, Sagitec's position ignores that these materials are Deloitte's confidential materials which the states agreed to maintain as confidential in their licensing agreements with Deloitte.  Ex. 6 (DEL00869190 at '203) ███████████████

████████████████████████████████████████████████████ N.M. Stat. § 14-2-1(F) ("Every person has a right to inspect public records of this state except . . . trade secrets."); Ex. 7 (MADUA00000212 at '225) ("[Mass.] will take no affirmative steps to disclose such information to third parties, and, if required to do so under [Massachusetts Public Records Law], will promptly notify [Deloitte] of the imminent disclosure so that [Deloitte] can take steps to defend itself against such disclosure."); Mass. G.L. c. 4, § 7(26)(g) ("Public records" do not include "trade secret or commercial or financial information . . . .").  ***Second***, there is no evidence that these materials were ever previously disclosed to the public before Sagitec's simultaneous public records request and court-backed subpoena (which required production).  Thus, the confidentiality of these documents should be maintained while it is disputed whether those documents can be produced pursuant to a public records request in the first place.

**Sagitec Suffers No Prejudice by Issuing the Requested Protective Order.**  Sagitec has not articulated any reason that it would be prejudiced or harmed by maintaining these documents as either confidential or highly confidential during the pendency of this litigation.  Sagitec's counsel and others permitted under the Protective Order still would be able to view and use the documents in this litigation.  The issues of trade secret status and ownership would still be litigated according to the case schedule.  And certainly, Sagitec does not suffer harm by being unable to publicly disclose and thereby destroy the trade secret status of trade secrets belonging to others.  Thus, the contrasting irreparable harm to Deloitte gives this Court has an independent rationale to find good cause to issue the requested protective order allowing Deloitte to designate this material as confidential or highly confidential while these issues are litigated in this Court.

Respectfully Submitted,

*/s/ Andrew E. Russell*

Andrew E. Russell (No. 5382)


cc:    Clerk of Court (by CM/ECF)
       All Counsel of Record (by CM/ECF & Email)

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

DELOITTE CONSULTING LLP and
DELOITTE DEVELOPMENT LLC,

               Plaintiffs,

    v.

SAGITEC SOLUTIONS LLC,

               Defendant.

C.A. No. 23-325-WCB

**DEMAND FOR JURY TRIAL**

## DELOITTE'S FIRST SET OF REQUESTS FOR PRODUCTION (NO. 1–124) TO DEFENDANT SAGITEC SOLUTIONS LLC

Pursuant to Federal Rules of Civil Procedure Rules 26 and 34 and the Local Rules of the United States District Court for the District of Delaware (the "Local Rules"), Plaintiffs Deloitte Consulting LLP and Deloitte Development LLC, hereby request that Defendant Sagitec Solutions LLC produce for examination, inspection, and copying by Plaintiffs, their attorneys, or others acting on Deloitte's behalf, the Documents and Things set forth below within thirty (30) days of the service of these Requests, at the offices of Deloitte's attorneys, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or at such time and place as may be agreed upon by counsel. These requests are deemed to be continuing and impose upon Sagitec the obligations stated in Federal Rule 26.

## **DEFINITIONS**

Unless otherwise defined, all words and phrases used herein shall be accorded their usual meaning and shall be interpreted in their common, ordinary sense. These Requests incorporate the following Definitions, which shall apply throughout these Definitions, Instructions, and Requests wherever a defined term is used, without regard to its capitalization:

1.      "And" and "or" shall each be construed conjunctively and disjunctively, so as to give the broadest meaning possible.

2.      "Any" and "all" are interchangeable and shall each be construed to mean "each and every," so as to give the broadest meaning possible.

3.      "Client" or "Customer" means any past, present, or prospective customer to whom software or a solution has been marketed, offered, licensed, delivered, or sold, including without limitation any State government, government agency, or regional or multi-State consortium of such States or agencies.

4.      "Communication" means any exchange of information by any method of transmission, sending, or receipt of information of any kind by or through any means including without limitation speech, writings, Documents, language (machine, foreign, or otherwise) of any kind, computer electronics or electronic data, email, text message, instant message, sound, radio or video signals, telecommunication, telephone, teletype, facsimile, telegram, microfilm, microfiche, photographic film of all types or other media of any kind, and includes all Documents and ESI containing, summarizing, or memorializing any Communication.

5.      "Complaint" means the Complaint filed by Deloitte in this Litigation on March 23, 2023, and any amendments thereto.

6.      "Concerning," "concerns," "referring to," "regarding," "related to" and "relating to" mean discussing, describing, evidencing, constituting, reflecting, incorporating, effecting, including, pertaining to, relating to, or in any way connected with the subject matter of the Interrogatory and should be construed in the broadest possible sense.

7.      "Criminal Proceeding" means the case captioned *United States v. Minkkinen*, No. 2:22-cr-163, filed August 23, 2022, in the Southern District of West Virginia, and any related proceedings or appeals.

8.      "CTPF Litigation" means the case captioned *Sagitec Solutions LLC v. Chicago Teachers' Pension Fund*, No. 1:23-cv-01365, filed March 7, 2023, in the Northern District of Illinois, and any related proceedings or appeals.

9.      "Deloitte" or "Plaintiffs" refers to Deloitte Consulting LLP and Deloitte Development LLC and any of their former or current parents, subsidiaries, predecessors, successors, affiliated Entities, controlled Entities, joint ventures, related Entities, agents, attorneys, Employees, interns, representatives, assigns, directors, or officers, including without limitation BearingPoint, Inc.

10.     "Deloitte Agreement" means any agreement between Deloitte, on the one hand, and any Deloitte Customer or Deloitte Employee, on the other hand, including without limitation the confidentiality and intellectual property ownership agreements described in the Complaint.

11.     "Deloitte Employee" means any Employee of Deloitte's, including without limitation Deepak Ahuja, Rick Deshler, Julie Fett, Venkat Kakula, Harish Kumar Kanchanapally, Ranjith Kotcherlakota, Srinivas Kurra, Swamynathan Manikandan, Marcel Mascarenhas, David Minkkinen, Sindhu Nair, Bernt Peterson, Revathy Rajaraman, Praveen Rengaraj, Karthik Sadasivam, Sivaraman Sambasivam, Pankaj Sharma, Kathryn Sibbet, Patrik Svensson, Philip Tackett, Adam Taylor, Prabhu Tegur, Bala Venkat, and Regina Waldrep.

12.     "Deloitte Property" means any copyrighted works or trade secrets asserted in this Litigation, including without limitation the uFACTS Computer Program, the uFACTS Trade Secrets, and Documents that relate to or refer to uFACTS or bear indications that Deloitte authored, contributed to, created, developed, or possessed the Document prior to Sagitec's possession of it.

13.     "Document" and "Thing" shall each be given the fullest meaning under the Federal Rules of Civil Procedure.  Documents include all material of every kind, source, and

authorship in Your possession or known by You to exist, irrespective of whether the Document is one intended for or transmitted internally by You, or intended for or transmitted to any other Person.  Documents include ESI, writings, publications, printed matter, drawings, graphical materials, graphs, charts, photographs, audiovisual or sound recordings, images, and other data or data compilations that are stored in any medium whatsoever from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form, as well as any tangible Things.  The term also includes all appendices, schedules, exhibits, and other attachments, as well as related and relevant metadata for all ESI, including without limitation information about the Document's author, creation date, revision dates, tracked changes, and electronic comments.  A draft or non-identical copy of a Document is a separate Document within the meaning of this term.  Any Document with any part thereof bearing any annotations, comments, markings, notations, notes, "redlines," signatures or initials, stamps, or any textual or graphical information (whether handwritten, printed, or electronic) that is not part of the original electronic or physical copy is non-identical and therefore should be considered a separate Document.  A Document is in Your possession, custody, or control if You have either actual physical possession of a Document or constructive possession of the Document.  For the avoidance of doubt, the following are Documents: abstracts, advertisements, agreements, appointments, audits, booklets, books, brochures, calendars, calendar entries, charts, Communications (including without limitation those made via real-time collaboration tools, *e.g.*, Skype, Slack, Teams, and other chat or instant messaging platforms), correspondence, contracts, data, database contents, database schemas, diagrams, diaries, document management systems (*e.g.*, Confluence, Google Docs, Google Drive, or SharePoint), drawings, emails, email attachments, expense reports, files, films, graphics, graphs, Internet or Intranet media or postings (*e.g.*, forum posts, comments, and wiki entries), invoices, journals, ledgers, logs (*e.g.*, access,

- 4 -

call, change, error, event, server, telephone, and system logs), maps, meeting invitations and responses, memoranda, minutes, mockups, newspapers, notes, organizational charts, photographs, posters, presentations, printouts, project management artifacts (*e.g.*, Project or Visio files, Gantt charts, and Jira entries), recordings (including without limitation recorded meetings or presentations conducted via platforms such as Zoom or Blue Jeans), receipts, recitals, records, reports, research, resumes, schedules, server contents (*e.g.*, FTP, HTTP, NFS, SMB, or WebDAV); Source Code, spreadsheets, statements, storyboards, summaries (including without limitation those of conversations, data, interviews, negotiations, and financial or statistical information), tasks, text messages or their equivalent (*e.g.*, SMS, WhatsApp, and iMessage), time entries, to-do lists, voicemails, websites, whiteboards, working papers, and worksheets.  An excerpt or portion of any of the foregoing is a separate Document.

14.     "Employee" means any Person who acted or purported to act on behalf of another Person, including without limitation all past and present directors, officers, executives, principals, partners, agents, representatives, attorneys, accountants, independent contractors, advisors, and consultants of such other Person or Persons.

15.     "Entity" means any business, proprietorship, firm, corporation, company, partnership, group, association, trade or industry association, non-profit, or governmental body or agency.

16.     "Functionality" or "Functioning" means the technological and business processes that maintain, power, or otherwise enable a computer program or web-based service, including without limitation all underlying software, Source Code, databases, servers, and other technology.

17.     "Include" and "including" shall be construed to mean include or including "but not limited to" or "without limitation," such that any list preceded by "include" or "including" should be read as a list of non-limiting examples within a broader category.

18.     "Internal Investigation" means Sagitec's investigation with respect to the subject matter of the Criminal Proceeding, as reflected in the report filed as Docket No. 146-6 in the Criminal Proceeding and any prior drafts or subsequent revisions thereto.

19.     "Investigator Testimony" means the May 31, 2023, grand jury testimony of Jim Powers, filed in the Criminal Proceeding as Docket No. 277-1.

20.     "Minkkinen Hard Drive" means the hard drive retained by David Minkkinen containing software and use cases from the Massachusetts project among other data from his computer at Deloitte, as referenced on pages 16–17 of the Investigator Testimony.

21.     "Neosurance" means all versions of any software, including without limitation web-based and software-as-a-service solutions, that Sagitec has developed, tested, implemented, marketed, offered, licensed, delivered, or sold under the "Neosurance" name or that include or relate to Unemployment Insurance ("UI") tax, benefits, or appeals administration Functionality, including without limitation components or modules thereof, as embodied in client-facing applications, Source Code, design documentation, use cases, database schemas, requirements specifications, change orders, interface documentation, application programming interfaces, development frameworks, developer guides, business rules, algorithms, architectures, demos, mockups, user flows, product documentation, manuals, data sheets, and user guides.  For the avoidance of doubt, Neosurance means any software You offer or offered that includes UI or related Functionality, including without limitation Pandemic Unemployment Assistance ("PUA"), whether or not the software comprises a complete UI solution and whether the software is called "Neosurance" or any other name.

- 6 -

22.     "Person" means any natural person or Entity.

23.     "Sagitec," "Defendant," "You," and "Your" refer to Defendant Sagitec Solutions LLC, and any former or current parents, subsidiaries, predecessors, predecessors-in-interest, successors, affiliated Entities, controlled Entities, companies in which Sagitec owns stock or otherwise maintains an ownership interest, joint ventures, related Entities, agents, attorneys, Employees, interns, representatives, assigns, directors, or officers and all other Persons acting or purporting to act on their behalf, including without limitation any Deloitte Employee who also was an employee of Sagitec.

24.     "Source Code" means the human-readable programming language text that defines software, firmware, or electronic hardware description, including without limitation files containing code in any programming or scripting language, such as C, C++, C#, Java, JavaScript, Perl, PHP, Python, or Ruby; any markup or presentation language, such as HTML,  XML, or CSS; and any database language or commands, such as SQL.  Source Code also includes without limitation configuration files, include files, header files, make files, link files, log files, settings files, generated output files, and other human-readable text files used in the generation and/or building of software and/or hardware.

25.     "State" means any administrative division of the United States, including without limitation the 50 states, the District of Columbia, and inhabited territories.

26.     "Superseding Indictment" means the indictment filed in the Criminal Proceeding on May 31, 2023, as Docket No. 186.

27.     "This Case" or "This Litigation" refers to the above-captioned proceeding.

28.     "uFACTS Computer Program" means Deloitte's uFACTS software, including without limitation the versions registered with the U.S. Copyright Office as Registration Nos. TX 8-559-593, TX 8-559-594, and TX 8-559-595.

29.    "uFACTS Trade Secrets" means the uFACTS application software, design assets, and development framework described in the Complaint.

30.    The singular includes the plural and vice versa.

31.    The past tense includes the present tense and vice versa.

32.    Any pronoun shall be construed to refer to the masculine, feminine, or neutral gender as in each case is most appropriate.

## <u>GENERAL INSTRUCTIONS</u>

1.    These Requests are intended to cover all Documents in Your possession, custody or control, whether located at Your home or office, on a computer, server, cloud storage platform, or mobile device, or at any other place.  The production should include every Document known to You and every such Document that can be located or discovered by reasonably diligent efforts by You.  If any of the requested Documents cannot be disclosed or produced in full, produce the Documents to the extent possible, and state Your reasons for Your inability to produce the remainder, stating whatever information, knowledge, or belief You have concerning the unproduced portions.

2.    If any Document was, but is no longer, in Your possession, subject to Your control, or in existence, state whether it (i) is missing or lost; (ii) has been destroyed; (iii) has been transferred, voluntarily or involuntarily, to others (and if so, to whom); or (iv) has been disposed of in some other manner.  If You have reason to believe a responsive Document is in the possession of another Person, state (i) the basis for this belief; (ii) the Person believed to be in possession of the responsive Document; (iii) where You believe the responsive Document may be located; and (iv) other information as is sufficient to identify the Document for a subpoena *duces tecum*.

3.      If a Document that is responsive to a Request has been lost or destroyed, it should be identified as follows: (i) preparer; (ii) addressor (if different); (iii) addressee; (iv) each recipient and each Person to whom distributed or shown; (v) date prepared; (vi) date transmitted (if different); (vii) date received; (viii) description of contents and subject matter; (ix) date of destruction; (x) manner of destruction; (xi) name, title, and address of the Person who directed that the Document be destroyed and (if different) the Person who destroyed the Document; (xii) the reason for the Document's destruction; (xiii) the names of Persons having knowledge of the destruction; and (xiv) a full description of the efforts made to locate the Document.

4.      If any of the Documents requested below are claimed to be privileged or are otherwise withheld, You are requested to provide a privilege log which identifies: (i) the date of the Document; (ii) the identity of all Persons who sent, authored, signed or otherwise prepared the Document; (iii) the identity of all Persons designated as addressee or copyees; (iv) a description of the contents of the Document that, without revealing information itself privileged or protected, is sufficient to understand the subject matter of the Document and the basis of the claim or privilege or immunity; (v) the type or nature of the privilege asserted (*e.g.*, attorney-client privilege, or work product doctrine); and (vi) for redacted Documents only, the Bates numbers corresponding to the first and last page of any Document redacted.  To the extent e-mail is included and described on the privilege log, any e-mail chain (*i.e.*, a series of e-mails linked together by e-mail responses and forwarding) that is withheld or redacted on the grounds of privilege, immunity or any similar claim may be logged as a single entry and identified by the most recent (*i.e.*, top-most) e-mail.  You shall not be required to break up an e-mail chain and log each individual e-mail separately.  If, however, e-mail contained within a given chain exists separately, then You shall log that material in accordance with this Paragraph.  If an e-mail chain

- 9 -

contains one or more privileged e-mails requiring redaction, the e-mail chain may be logged as a single entry and identified by the most recent redacted e-mail.

5.      All Documents or other Things responsive to a Request shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond to the Request to which they are responsive.

6.      Any Document responsive to a Request should be produced in and with a file folder and other Document (*e.g.*, envelope or file cabinet marker) in or with which the Document was located when this Request was served.  All pages of any Document now stapled or fastened together should be produced stapled or fastened together.

7.      All electronic Documents shall be produced in accordance with the District of Delaware's Default Standard for Discovery, Including Discovery of ESI, as modified or supplemented by any ESI Order agreed to by the parties.

8.      If it is otherwise not possible to produce any Document called for by any Request, or if any part of any Request is objected to, the reasons for the objection should be stated with specificity as to all grounds and, for the convenience of the Court and the parties, each Request should be quoted in full immediately preceding the objection.

9.      These Requests shall be deemed continuing and require further and supplemental production by You as and whenever You acquire, make, or locate additional Documents between the time of the initial production and the time of final judgment in this Case.

## DOCUMENTS TO BE PRODUCED

**REQUEST FOR PRODUCTION NO. 1:**

All Deloitte Property.

**REQUEST FOR PRODUCTION NO. 2:**

All Documents comprising, discussing, evidencing, referring to, or related to Deloitte Property.

**REQUEST FOR PRODUCTION NO. 3:**

All Documents concerning Sagitec's study, examination, reference to, or analysis of Deloitte Property.

**REQUEST FOR PRODUCTION NO. 4:**

All Documents concerning Sagitec's use or copying of Deloitte Property.

**REQUEST FOR PRODUCTION NO. 5:**

All Documents concerning Sagitec's possession of Deloitte Property.

**REQUEST FOR PRODUCTION NO. 6:**

All Documents concerning Sagitec's storage of Deloitte Property, including without limitation storage and hosting on servers.

**REQUEST FOR PRODUCTION NO. 7:**

Documents sufficient to show the circumstances by which Sagitec came into possession of Deloitte Property.

**REQUEST FOR PRODUCTION NO. 8:**

Documents sufficient to show the repositories where Deloitte Property was stored.

- 11 -

**REQUEST FOR PRODUCTION NO. 9:**

Documents sufficient to identify the Persons who had access to Deloitte Property.

**REQUEST FOR PRODUCTION NO. 10:**

Documents sufficient to identify the Persons who had access to repositories where Deloitte Property was stored.

**REQUEST FOR PRODUCTION NO. 11:**

All Documents concerning Sagitec's access to Deloitte's uFACTS solution, including without limitation any Communications related to access to Deloitte's developer environments for any Deloitte Customers or any actual uFACTS implementations.

**REQUEST FOR PRODUCTION NO. 12:**

All Documents concerning Sagitec's access to State UI software developed or implemented by Deloitte.

**REQUEST FOR PRODUCTION NO. 13:**

Documents sufficient to show any code names or indirect references to Deloitte, Deloitte Property, or uFACTS.

**REQUEST FOR PRODUCTION NO. 14:**

All Documents concerning Sagitec's knowledge of the source of the Deloitte Property.

**REQUEST FOR PRODUCTION NO. 15:**

All Documents concerning Sagitec's knowledge of the ownership of the Deloitte Property.

**REQUEST FOR PRODUCTION NO. 16:**

All Documents concerning Sagitec's knowledge of whether the Deloitte Property was confidential.

**REQUEST FOR PRODUCTION NO. 17:**

All Documents concerning the Deloitte Employees' obligations relating to possession or use of the Deloitte Property by You or any other Person.

**REQUEST FOR PRODUCTION NO. 18:**

All Documents concerning Sagitec's knowledge of any Deloitte Agreements.

**REQUEST FOR PRODUCTION NO. 19:**

All Documents evidencing or relating to Your instructions regarding the possession, use, or destruction of Deloitte Property.

**REQUEST FOR PRODUCTION NO. 20:**

All Documents evidencing or relating to steps taken to search for, locate, collect, preserve, destroy, modify, de-identify, anonymize, or conceal Deloitte Property.

**REQUEST FOR PRODUCTION NO. 21:**

All Documents relating to Your efforts to investigate whether and to what extent Neosurance incorporated, benefitted from, or relied upon material and information originally developed by Deloitte, including without limitation the Deloitte Property.

**REQUEST FOR PRODUCTION NO. 22:**

All Documents concerning any clearance efforts for Neosurance, including without limitation efforts to confirm that Neosurance did not include Deloitte Property or proprietary technology and did not otherwise violate Deloitte's intellectual property rights.

- 13 -

**REQUEST FOR PRODUCTION NO. 23:**

All Documents concerning any clearance efforts used by Sagitec for any Sagitec product, including without limitation efforts to confirm that Sagitec products do not include third-party intellectual property or proprietary technology and did not otherwise violate third-party intellectual property rights.

**REQUEST FOR PRODUCTION NO. 24:**

All Documents relating to Sagitec's Internal Investigation, including without limitation all draft and final reports, exhibits and attachments to the foregoing, interview notes and summaries, discussions concerning the Internal Investigation and any interim findings or conclusions.

**REQUEST FOR PRODUCTION NO. 25:**

All Documents cited or referenced in any draft or final report related to Sagitec's Internal Investigation, and all Documents collected, searched, considered, or reviewed in preparation of any draft or final report.

**REQUEST FOR PRODUCTION NO. 26:**

All Communications between Sagitec and any Person who participated in or performed Sagitec's Internal Investigation.

**REQUEST FOR PRODUCTION NO. 27:**

All Documents retained by any Deloitte Employee from his or her work at Deloitte, whether stored on a personal or employer-issued or -controlled device, server, or cloud storage system.

- 14 -

**REQUEST FOR PRODUCTION NO. 28:**

Any devices provided by any Deloitte Employee to Sagitec, including without limitation the hard drive produced by David Minkkinen in connection with Sagitec's Internal Investigation.

**REQUEST FOR PRODUCTION NO. 29:**

All Documents preserved or collected from any devices produced by any Deloitte Employee to Sagitec, including without limitation the hard drive produced by David Minkkinen in connection with Sagitec's Internal Investigation.

**REQUEST FOR PRODUCTION NO. 30:**

A copy of the Minkkinen Hard Drive.

**REQUEST FOR PRODUCTION NO. 31:**

All Documents preserved or collected from the Minkkinen Hard Drive.

**REQUEST FOR PRODUCTION NO. 32:**

All Documents evidencing or relating to examples of Sagitec's use of any Deloitte Property, including without limitation the examples identified in the Superseding Indictment.

**REQUEST FOR PRODUCTION NO. 33:**

All Communications between Sagitec and any Deloitte Employee during the Deloitte Employee's employment with Deloitte, including without limitation the Communications referenced in paragraphs 13, 14, and 16–20 of the Superseding Indictment.

**REQUEST FOR PRODUCTION NO. 34:**

All Documents concerning the Internet link and login information for Deloitte's ongoing UI project in Massachusetts, which paragraph 14 of the Superseding Indictment indicates Sivaraman Sambasivam emailed to a Sagitec Employee on or about August 20, 2013.

- 15 -

**REQUEST FOR PRODUCTION NO. 35:**

All Documents that Sagitec accessed, downloaded, reviewed, transmitted, copied, modified, or used from the Internet link for Deloitte's ongoing UI project in Massachusetts.

**REQUEST FOR PRODUCTION NO. 36:**

All Documents stored or made available at any time at the SharePoint location "http://sagitecportal/Unemployment%20Insurance/uFACTS/."

**REQUEST FOR PRODUCTION NO. 37:**

All Documents concerning any SharePoint locations relating to uFACTS, including without limitation "http://sagitecportal/Unemployment%20Insurance/uFACTS/" and any subsidiary folders or pages.

**REQUEST FOR PRODUCTION NO. 38:**

All copies of any uFACTS Oracle database that Sivaraman Sambasivam or any other Deloitte Employee copied and later made available to Sagitec Employees.

**REQUEST FOR PRODUCTION NO. 39:**

All Documents concerning the uFACTS Oracle database referenced in paragraph 18 of the Superseding Indictment.

**REQUEST FOR PRODUCTION NO. 40:**

All Documents stored or made available at any time at the specified link hosted on a Sagitec server in India called "Pune Data" as referenced in paragraph 19 of the Superseding Indictment and on pages 32–34 of the Investigator Testimony, including without limitation the uFACTS code base and use cases from the Massachusetts project.

- 16 -

**REQUEST FOR PRODUCTION NO. 41:**

All Documents concerning the server containing uFACTS code base and use cases from the Massachusetts project as referenced in paragraph 19 of the Superseding Indictment.

**REQUEST FOR PRODUCTION NO. 42:**

Copies of each version of Neosurance, including without limitation its Source Code.

**REQUEST FOR PRODUCTION NO. 43:**

All Documents concerning all previous, current, and future versions of Neosurance, including without limitation the versions, if any, that existed before David Minkkinen or Sivaraman Sambasivam began employment with Sagitec.

**REQUEST FOR PRODUCTION NO. 44:**

All Documents concerning each version of Neosurance, including without limitation design documentation, use cases, database schemas, requirements specifications, change orders, interface documentation, application programming interfaces, development frameworks, developer guides, business rules, algorithms, architectures, demos, mockups, user flows, product documentation, manuals, data sheets, and user guides.

**REQUEST FOR PRODUCTION NO. 45:**

All Documents concerning changes to Neosurance from conception to the present.

**REQUEST FOR PRODUCTION NO. 46:**

All Documents concerning Sagitec's decision to create or offer UI solutions to States or other public sector Entities.

**REQUEST FOR PRODUCTION NO. 47:**

All Documents evidencing or relating to any investigations, discussions, deliberations, or decisions concerning the acquisition of any business that offered or developed UI solutions.

**REQUEST FOR PRODUCTION NO. 48:**

Documents sufficient to show all Persons involved in the conception, research, design, development, testing, launch, enhancement, maintenance, and operation of each version of Neosurance.

**REQUEST FOR PRODUCTION NO. 49:**

Documents sufficient to provide Deloitte's counsel with log-in credentials for Neosurance to access its user interface, including without limitation any demo, test, or sandbox versions.

**REQUEST FOR PRODUCTION NO. 50:**

Copies of each version of any non-public or Client-facing website You created related to Neosurance.

**REQUEST FOR PRODUCTION NO. 51:**

All Documents concerning the conception, research, design, development, testing, launch, enhancement, or maintenance of all versions of Neosurance, including without limitation those concerning the inspiration for creating Neosurance.

**REQUEST FOR PRODUCTION NO. 52:**

All Communications between Sagitec and any third party concerning the conception, research, design, development, testing, launch, enhancement, or maintenance of Neosurance.

**REQUEST FOR PRODUCTION NO. 53:**

Documents sufficient to show any code names, project names, or other indirect references to Neosurance or Sagitec's plan to develop Neosurance, including without limitation any alternative, interim, or provisional names for Neosurance.

**REQUEST FOR PRODUCTION NO. 54:**

Documents sufficient to show any code names, project names, or other indirect references to Neosurance's data dictionary or database schemas or Sagitec's plan to develop the same, including without limitation any alternative, interim, or provisional names for the Neosurance data dictionary or database schemas.

**REQUEST FOR PRODUCTION NO. 55:**

Documents sufficient to show the Persons involved in the marketing, sale, and distribution of each version of Neosurance.

**REQUEST FOR PRODUCTION NO. 56:**

Documents sufficient to identify all past and present actual or potential Customers of Neosurance.

**REQUEST FOR PRODUCTION NO. 57:**

All Documents concerning Customer inquiries referring or relating to Neosurance.

**REQUEST FOR PRODUCTION NO. 58:**

All Documents evidencing or relating to Sagitec's responses to Customer inquiries referring or relating to Neosurance.

**REQUEST FOR PRODUCTION NO. 59:**

All Documents concerning Customer inquiries referring or relating to UI, PUA, or related software.

**REQUEST FOR PRODUCTION NO. 60:**

All Documents regarding efforts to solicit or win contracts to implement products and services related to Neosurance, including without limitation all draft and submitted bids, requests for proposal, responses to requests for proposal, draft and executed contracts, and statements of work.

**REQUEST FOR PRODUCTION NO. 61:**

All agreements, contracts, or licenses concerning Neosurance.

**REQUEST FOR PRODUCTION NO. 62:**

All Documents concerning Sagitec's assistance to Customers relating or referring to Neosurance, including without limitation customer support manuals, frequently asked questions (FAQ), and customer support telephone or chat logs.

**REQUEST FOR PRODUCTION NO. 63:**

All Documents concerning Sagitec's marketing, sale, and distribution of Neosurance.

**REQUEST FOR PRODUCTION NO. 64:**

All Sagitec marketing material concerning Neosurance, including without limitation advertisements, drafts, and Communications concerning the same.

**REQUEST FOR PRODUCTION NO. 65:**

All Sagitec marketing or promotional material referencing Deloitte or Deloitte's products and services, including without limitation marketing material concerning uFACTS.

- 20 -

**REQUEST FOR PRODUCTION NO. 66:**

All Sagitec marketing or promotional material referencing the Deloitte Employees.

**REQUEST FOR PRODUCTION NO. 67:**

All Sagitec marketing or promotional material referencing the experience of Deloitte

Employees in implementing UI software for any State.

**REQUEST FOR PRODUCTION NO. 68:**

All Communications between Sagitec and potential or actual Customers concerning

Neosurance.

**REQUEST FOR PRODUCTION NO. 69:**

All Communications between Sagitec and potential or actual Customers concerning

Deloitte or Deloitte's products, including without limitation uFACTS.

**REQUEST FOR PRODUCTION NO. 70:**

All Documents reflecting efforts to compete with Deloitte's products and services,

including without limitation uFACTS.

**REQUEST FOR PRODUCTION NO. 71:**

All Documents concerning Deloitte.

**REQUEST FOR PRODUCTION NO. 72:**

All Documents concerning uFACTS.

**REQUEST FOR PRODUCTION NO. 73:**

All Communications from any Deloitte Employee's Sagitec email address to the same or

another Deloitte Employee's personal email address, or vice versa.

**REQUEST FOR PRODUCTION NO. 74:**

Documents sufficient to show the past and present organizational structure of Sagitec, including without limitation organizational charts.

**REQUEST FOR PRODUCTION NO. 75:**

Documents sufficient to establish Sagitec's corporate structure, including without limitation Documents that identify all of Sagitec's past and present affiliated Entities, including without limitation parents, subsidiaries, divisions, predecessors, predecessors-in-interest, successors, controlled Entities, companies in which Sagitec owns stock or otherwise maintains an ownership interest, joint ventures, and other related Entities.

**REQUEST FOR PRODUCTION NO. 76:**

Documents sufficient to establish Sagitec's ownership, membership, and management structure, including without limitation all past and present principals, partners, managers, and members of Sagitec, as well as the classification, manager/non-manager status, and role of each such individual.

**REQUEST FOR PRODUCTION NO. 77:**

Sagitec's articles of organization, operating agreement, charter, and any related or similar Documents.

**REQUEST FOR PRODUCTION NO. 78:**

All Documents concerning meetings of Sagitec's board of managers, board of directors, or similar decision-making body concerning Deloitte, Deloitte's products and services, uFACTS, the Deloitte Employees, or the Deloitte Property, including without limitation presentation slides and meeting minutes for any of the foregoing.

**REQUEST FOR PRODUCTION NO. 79:**

Sagitec's financial statements.

**REQUEST FOR PRODUCTION NO. 80:**

Documents sufficient to show Sagitec's yearly, quarterly, and monthly revenues, expenses, and gross and net profits.

**REQUEST FOR PRODUCTION NO. 81:**

Documents sufficient to show Sagitec's yearly, quarterly, and monthly earnings attributable to Neosurance, including without limitation revenues, expenses, and gross and net profits.

**REQUEST FOR PRODUCTION NO. 82:**

Documents sufficient to show Sagitec's yearly, quarterly, and monthly earnings attributable to any products or software sold or licensed to customers of Neosurance, including without limitation revenues, expenses, and gross and net profits.

**REQUEST FOR PRODUCTION NO. 83:**

Documents sufficient to show any payments made to any Person relating to Neosurance.

**REQUEST FOR PRODUCTION NO. 84:**

All Documents concerning Sagitec's projected future earnings concerning Neosurance.

**REQUEST FOR PRODUCTION NO. 85:**

All Communications to Sagitec's board of managers, board of directors, or similar decision making body, actual or potential investments in Sagitec, or Sagitec Customers concerning Neosurance, including without limitation concerning Sagitec's projected future earnings.

**REQUEST FOR PRODUCTION NO. 86:**

All Documents concerning the resources You invested in the conception, research, design, development, testing, launch, enhancement, or maintenance of Neosurance.

**REQUEST FOR PRODUCTION NO. 87:**

All Documents relating to the solicitation or hiring of any Deloitte Employee, including without limitation recruitment efforts, interview notes, internal deliberations, offer letters, employment contracts, and negotiations.

**REQUEST FOR PRODUCTION NO. 88:**

All Communications between Sagitec and David Minkkinen prior to the start of his employment with Sagitec.

**REQUEST FOR PRODUCTION NO. 89:**

All Communications between Sagitec and Sivaraman Sambasivam prior to the start of his employment with Sagitec.

**REQUEST FOR PRODUCTION NO. 90:**

Documents sufficient to show David Minkkinen's and Sambasivam's roles at Sagitec, including without limitation any prior, current, or future roles and any ownership or investments in Sagitec.

**REQUEST FOR PRODUCTION NO. 91:**

Documents sufficient to show the involvement of David Minkkinen or Sivaraman Sambasivam in the recruitment, solicitation, or hiring of any other Deloitte Employee.

**REQUEST FOR PRODUCTION NO. 92:**

All Documents concerning Sagitec's onboarding process for each of the Deloitte Employees, including without limitation all agreements, policies, trainings, interviews, checklists, instructions, and handbooks.

**REQUEST FOR PRODUCTION NO. 93:**

Documents sufficient to show any compensation You provided to a Deloitte Employee, including without limitation salary, bonus, equity (including without limitation any form of vested or unvested securities, shares, stock, options, or rights to purchase any of the foregoing), and any other monetary or non-monetary benefit.

**REQUEST FOR PRODUCTION NO. 94:**

All Documents concerning the performance of each Deloitte Employee, including without limitation any formal or informal reviews, complaints, counseling, action plans, performance improvement plans, remediation plans, awards, bonuses, garnishments, punishments, reprimands, warnings, or leaves of absence.

**REQUEST FOR PRODUCTION NO. 95:**

All Documents concerning the resignation or termination of any Deloitte Employee.

**REQUEST FOR PRODUCTION NO. 96:**

All Documents concerning the departure of any Deloitte Employees from Sagitec, including without limitation resignation or termination letters, exit interviews, checklists, certifications, and severance agreements.

- 25 -

**REQUEST FOR PRODUCTION NO. 97:**

All Communications between Sagitec and any Deloitte Employee after the conclusion of his or her employment with Sagitec.

**REQUEST FOR PRODUCTION NO. 98:**

All Documents concerning Sagitec's Employee policies, including without limitation any pertaining to assignment and ownership of inventions, works of authorship, or trade secrets; confidentiality; acceptable use; use of third-party confidential information; third-party intellectual property rights; and any codes of conduct or ethics.

**REQUEST FOR PRODUCTION NO. 99:**

All Documents concerning Your knowledge of Your knowledge or use of the copyrighted uFACTS Computer Program.

**REQUEST FOR PRODUCTION NO. 100:**

All Documents concerning Your knowledge of Your misappropriation of the uFACTS Trade Secrets.

**REQUEST FOR PRODUCTION NO. 101:**

All Documents concerning this Litigation, including without limitation Communications about the existence of this Litigation and the facts, allegations, defenses, and claims set forth in the Complaint.

**REQUEST FOR PRODUCTION NO. 102:**

All Documents concerning Communications between Sagitec and Deloitte, including without limitation Communications referring or relating to this Case, Deloitte, Deloitte Property, uFACTS, Neosurance, or the Criminal Proceeding.

**REQUEST FOR PRODUCTION NO. 103:**

All Documents Sagitec contends support or refute any claim or defense asserted in this Litigation.

**REQUEST FOR PRODUCTION NO. 104:**

All Documents relied upon by any expert witness or in any expert report served in this Case.

**REQUEST FOR PRODUCTION NO. 105:**

Documents sufficient to show the existence, nature, and extent of any insurance, indemnification, or similar agreement or arrangement to fund, contribute to, pay for, or provide reimbursement for any potential fees, costs, expenses, or liability incurred in connection with this Litigation.

**REQUEST FOR PRODUCTION NO. 106:**

All Documents produced to Sagitec by any third-party or non-party in this Litigation whether voluntarily, pursuant to a subpoena or court order, or otherwise.

**REQUEST FOR PRODUCTION NO. 107:**

All Documents concerning Your public statements or comments regarding this Litigation, Deloitte, uFACTS, or the Deloitte Property.

**REQUEST FOR PRODUCTION NO. 108:**

All Documents You considered or relied upon in responding to any Interrogatory, Request for Admission, or other discovery request in this Case, including without limitation any existing or supplemental request or response.

**REQUEST FOR PRODUCTION NO. 109:**

All Documents You considered or relied upon in the preparation of any Document or pleading You filed in this Case, including without limitation Your response to the Complaint in this Case.

**REQUEST FOR PRODUCTION NO. 110:**

All Documents that Sagitec may rely upon or introduce for any deposition, proceeding, brief, pleading, motion, memorandum, or hearing in this Case.

**REQUEST FOR PRODUCTION NO. 111:**

All Documents reviewed or prepared in connection with this Case by any Person who Sagitec anticipates, expects, or decides to call as a witness (including both fact and expert witnesses) at any hearing or at trial in this Case.

**REQUEST FOR PRODUCTION NO. 112:**

Documents sufficient to show Sagitec's Document retention policies, including without limitation the retention of physical Documents, Source Code, and ESI such as electronic Documents and emails.

**REQUEST FOR PRODUCTION NO. 113:**

Documents sufficient to show when, if at all, Sagitec began preserving Documents concerning this Litigation, Neosurance, Deloitte, uFACTS, or the Deloitte Property.

**REQUEST FOR PRODUCTION NO. 114:**

All Documents concerning the Criminal Proceeding, including without limitation Communications between Sagitec or its attorneys, Employees, and agents on the one hand, with the United States Department of Justice, counsel for David Minkkinen or Sivaraman

Sambasivam, or State or federal agents and Employees or Communications with Customers or potential Customers concerning or related to the Criminal Proceeding on the other hand.

**REQUEST FOR PRODUCTION NO. 115:**

All Documents produced to any party in the Criminal Proceeding, including without limitation all Documents produced to the Government, Sivaraman Sambasivam, or David Minkkinen.

**REQUEST FOR PRODUCTION NO. 116:**

All Documents concerning Communications between Sagitec and Customers; potential Customers; investors; potential investors; government regulators, agencies and agents; and government investigators, potential, current, or former partners, Employees, and agents concerning the Criminal Proceeding, including without limitation actual Communications, draft Communications, internal deliberations concerning the response to the same, and meetings and meeting minutes concerning the strategy for responding to the same.

**REQUEST FOR PRODUCTION NO. 117:**

All Documents concerning efforts to enforce Your intellectual property rights, including without limitation any demand letters or cease-and-desist letters.

**REQUEST FOR PRODUCTION NO. 118:**

All Documents concerning any enforcement activity by third parties referring or relating to Neosurance, including without limitation actual, anticipated, threatened, potential, or considered litigation, arbitration, or other adversarial proceedings and all demand letters or cease-and-desist letters.

**REQUEST FOR PRODUCTION NO. 119:**

All Communications with any State concerning allegations that Neosurance infringed,

violated, or relied on the intellectual property of Deloitte or any third party, including without

limitation all Communications between Sagitec and the State of Maryland Office of the Attorney

General regarding concerns that Sagitec's work relied on Source Code and related material

improperly obtained from Deloitte.

**REQUEST FOR PRODUCTION NO. 120:**

All Documents produced in the CTPF Litigation.

**REQUEST FOR PRODUCTION NO. 121:**

All Documents concerning Your allegations or admissions in the CTPF Litigation,

including without limitation Your allegations in the complaint (Docket No. 1) and Your answers

to CTPF's counterclaims (Docket No. 24).

**REQUEST FOR PRODUCTION NO. 122:**

All Documents concerning Your allegation that "David Minkkinen and Sivaraman

Sambasivam are Class B members and have no active management or other active role in

Sagitec's business operations" as set forth in paragraph 20 of the complaint in the CTPF

Litigation.

**REQUEST FOR PRODUCTION NO. 123:**

All Documents concerning Your allegation that "Neosurance™ … is a completely

different software solution that is not used in any way in Sagitec's Neospin™ software system"

as set forth in paragraph 29 of the complaint in the CTPF Litigation.

- 30 -

**REQUEST FOR PRODUCTION NO. 124:**

All Documents concerning Your allegations that "Mr. Minkkinen and Mr. Sambasivam are no longer involved in any management, supervisory or business function of Sagitec" and "are Class B members of Sagitec" and that "Sagitec's work [for CTPF] is not related to the federal government's investigation or the indictment against Messrs. Minkkinen and Sambasivam" and "relates to an entirely different product—Neospin™—which … is separate from and has nothing to do with Neosurance™" as set forth on page 2 of Your answers to CTPF's counterclaims in the CTPF Litigation.

Dated:  September 19, 2023

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com

/s/ Patrick Arnett

Patrick Arnett

OF COUNSEL:
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Gregg F. LoCascio
Patrick Arnett
Nick Teleky
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave NW
Washington, DC 20004
(202) 389-5000

John F. Hartmann
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

*Attorneys for Plaintiffs Deloitte Consulting LLP, and Deloitte Development LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2023, I caused a true and correct copy of the

foregoing Document to be served on the following counsel of record via electronic mail:

Anne Shea Gaza (No. 4093)
Robert Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
thartzell@ycst.com

Christopher K. Larus
David A. Prange
Rajin S. Olson
Brandon A. Carmack
ROBINS KAPLAN LLP
8000 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500
clarus@robinskaplan.com
dprange@robinskaplan.com
rolson@robinskaplan.com
bcarmack@robinskaplan.com

_/s/ Patrick Arnett_
Patrick Arnett

Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| DELOITTE COUNSULLING LLP and DELOITTE DEVELOPMENT LLC, | ) ) ) | |
| Plaintiffs, | ) ) ) | C.A. No. 23-325-WCB |
| v. | ) ) | |
| SAGITEC SOLUTIONS, LLC, | ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT SAGITEC SOLUTIONS, LLC'S
## NOTICE OF SUBPOENAS COMMANDING PRODUCTION OF DOCUMENTS

PLEASE TAKE NOTICE THAT, pursuant to Rule 45 of the Federal Rules of Civil

Procedure, Defendant Sagitec Solutions, LLC, will cause subpoenas to be served upon the

following entities, commanding each to produce the documents set forth in the subpoenas

attached hereto as Exhibit A within its possession, custody or control on January 22, 2024 at 5:00

p.m. at the locations listed on the attached subpoenas:

1. The Minnesota Department of Employment and Economic Development;

2. The Massachusetts Department of Workplace Development, Division of Unemployment

   Assistance;

3. The New Mexico Department of Workforce Solution; and

4. The Florida Agency for Workforce Innovation Unemployment Compensation.

OF COUNSEL:
Chris K. Larus
David A. Prange
Rajin S. Olson
Brandon A. Carmack
Demitri M. Dawson
ROBINS KAPLAN, LLP
800 LaSalle Avenue
Suite 2800
Minneapolis, MN  55402
(612) 349-8500

Rebecca Bact
ROBINS KAPLAN LLP
800 Boylston Street
Boston, MA 02199
(617) 859-2740


Dated: December 21, 2023

YOUNG CONAWAY STARGATT &
TAYLOR, LLP


_/s/ Robert M. Vrana_____
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com




*Attorneys for Defendant Sagitec Solutions, LLC*

# EXHIBIT A

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### DISTRICT OF DELAWARE ▾

| | |
|---|---|
| DELOITTE CONSULTING LLP and DELOITTE DEVELOPMENT LLC, | ) |
| *Plaintiff*s, | ) |
| v. | ) Civil Action No. 23-325-WCB |
| SAGITEC SOLUTIONS, LLC, | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Minnesota Department of Employment and Economic Development
Attn: Records Custodian, 332 Minnesota Street, Suite E200, Saint Paul, MN 55101

*(Name of person to whom this subpoena is directed)*

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

**Set forth on Schedule A attached.**

| Place: David A. Prange, Esq., Robins Kaplan LLP 800 LaSalle Avenue, Suite 2800 Minneapolis, MN 55402 | Date and Time: January 22, 2024 at 5:00 p.m. |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: December 21, 2023

| *CLERK OF COURT* | OR | |
|---|---|---|
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____ Sagitec Solutions, LLC _____, who issues or requests this subpoena, are:

Rebecca A. Bact, Esq., Robins Kaplan LLP, 800 Boylston Street, Suite 2500, Boston, MA 02199, rbact@robinskaplan.com
(617) 859-2740

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

### INSTRUCTIONS

1.      In order to fully comply with this Subpoena, you should produce all responsive documents that are in your possession, custody, or control, as they are kept in the ordinary course of business, including, where applicable, any index tabs, file dividers, labels, designations, or information as to the location of the documents.

2.      You should resolve any perceived ambiguity in favor of the most complete disclosure, and you should describe what you feel is ambiguous and why, responding in the alternative where possible. To the extent that it results in a more complete disclosure, the singular shall be construed to include the plural and vice versa, and the present tense shall be construed to include the past tense, and vice versa.

3.      Production is requested of documents in full, without abbreviation or expurgation. A copy of both side of the requested documents shall be produced, unless the reverse side of the documents is completely blank. Any computerized data shall be produced both on disk in its native format and in its printed form. If copies of the documents are produced, the copies must be identical to the original. For example, if a document contains multiple stapled, clipped, or otherwise collated pages, then the copy shall contain each attached page and be similarly collated. All documents shall be duplicated and attached to the copy in the exact manner and location as such items are appended to the original document.

4.      Your response shall not be deemed complete until documents and things are produced or a date certain is provided as to when the requested documents and things will be produced.

5.      If no documents are responsive to a particular request, You are to state that no responsive documents exist.

6. In the event You object to any request herein or any part thereof, You shall state with specificity the grounds of objection and respond to the fullest extent that such production is not subject to objection.

7. In the event You object to the production of any document or thing on the ground that it is protected from discovery under the attorney-client privilege or work product immunity or is otherwise not discoverable, You shall identify each such document or thing on a separate schedule to be produced to Sagitec, such identification to include at least the following::

    a. The basis on which the privilege is claimed;

    b. The title of the document;

    c. The nature of the document (e.g., interoffice memorandum, report, office procedure, etc.);

    d. The date of the document;

    e. The number of pages in such document;

    f. The names and positions of the author of the document and all other person participating in the preparation of the document;

    g. The name and position of each individual or other person to whom the document, or a copy thereof, was sent or otherwise disclosed;

    h. A description of any accompanying material transmitted with or attached to such document;

    i. The particular request(s) to which such document is responsive;

    j. Whether any business or non-legal matter is contained or discussed in such document; and

       k.      A summary statement of the subject matter of the document or

of the communication in sufficient detail to permit the Court to

rule on the propriety of the objection.

8.     In the event that any requested document has been lost or destroyed, that document shall be identified by indicating the date, the subject matter, number of pages, originator, and all persons to whom it was distributed. The date of loss or destruction, manner of loss or destruction, reasons for destruction, person(s) authorizing destruction, person(s) losing or destroying the document, and custodian(s) of the document at the time of the loss or destruction shall be identified.

## **DEFINITIONS**

1.     "Deloitte," or "Plaintiffs," means Deloitte Consulting LLP, Deloitte Development LLC, or any affiliated entities, including without limitation any parent, predecessors (including BearingPoint, Inc.), successor, wholly or partially owned subsidiaries, and other persons from whom Deloitte has the alleged legal right to obtain the information sought by this discovery.

2.     "Minnesota DEED" means the Minnesota Department of Employment and Economic Development.

3.     "Minnesota UITIP Project" means the project stemming from any contract or statement of work between Minnesota DEED and KMPG Consulting, BearingPoint Inc., or Deloitte related to the Unemployment Insurance Technology Initiative Project ("UITIP"). The UITIP project began in 2002 and was completed on or about June 30, 2008.

4.     "UI" refers to the phrase "unemployment insurance."

5.     "Software" means all software and code of any kind including executable code and source code as well as the contents of any directories or documents stored with source code

in the ordinary course of business, development files, header files, build files, build environment, macros, run-time libraries, management software, kernels, device drivers, interface, and any and all other types of software, whether stored in ROM or RAM, data files, or configuration files, and all other runtime files that affect the creation or execution of software present on a product when shipped. For avoidance of doubt, this includes source files, make files, intermediate output files, executable files, header files, resource files, library files, module definition files, map files, object files, linker files, browse info files, and debug files.

6.     "Software Design Document(s)" means documents used or generated to developing software, including software specifications and requirements at any level of detail, functional specifications, class specifications and guides, coding style guides, design documents, design and/or change documents for adding in features to existing code base or feature, implementation documents/guides, story boards, application guides, programmer reference guides, reference manuals, software architecture guides, verification and test plans, hierarchical summaries, simulation models for software or features, design review documents, code review documents, Agile development documents, as well as all notes created during software design.

7.     "Supporting" means tending to prove, establish, or corroborate.

8.     "Third Party" means and includes any person or entity, whether public or private and including State-related entities, other than Deloitte and Sagitec.

9.     The terms "and" and "or" will be understood as either conjunctive or disjunctive, whichever is more inclusive on context.

10.     The terms "any," "each," and "all" will be understood to include "each and every."

11.     The term "including" will be construed to mean "without any limitation."

12.     The terms "regarding," "relating to," and "related to" are to be given their broadest possible meaning, including but not limited to referring to, describing, evidencing, concerning, constituting, mentioning, containing, supporting, discussing, analyzing, pertaining to, being connected with, resulting from, reflecting upon, in whole or in part, directly or indirectly, the stated subject matter.

13.     The singular form of a noun or pronoun shall include the plural form of the noun or pronoun, and vice versa.

14.     The past tense shall include the present tense and the present tense shall include the past tense as to make the request inclusive rather than exclusive.

15.     "Identify" and "describe" in connection with a written document mean to furnish the name and date of the document, the date the document was created, modified, and/or sent, the number of pages in the document, the identity of the person who created, modified, and/or sent the document, the identity of all persons to whom the document was sent, and a brief description of the subject matter of the document. If the document has been produced in this litigation, to identify or describe such a document includes provision of the Bates number of the document.

16.     "Identify" and "describe" in connection with a person mean to state the person's full name, his or her home or business address, his or her present employer, and his or her employer and position at the time of the pertinent event. Once a person has been identified in accordance with this paragraph, that person may be identified only by name in subsequent discovery requests seeking an identification of that person.

17.     "Identify" and "describe" in connection with a company or business entity, including a corporation, association, partnership, or joint venture, mean to state the entity's full name, the address of the principal place of business of that entity, the entity's state of

incorporation, the location of any divisions, branches, or offices that were connected with or handled the subject matter referenced in the interrogatory, and the identity of the person acting or purporting to act on behalf of the business entity in connection with the subject matter of the interrogatory.

18.     "Identify" and "describe" in connection with an act, event, or course of conduct mean to provide the date and a complete description of the act, event, or course of conduct, and identify the person(s) who took part in the act, event, or course of conduct.

19.     "Document" and "documents" have the broadest meaning ascribed to them by Rule 34(a) of the Federal Rules of Civil Procedure and encompass any writing of any kind, including originals and non-identical copies (whether different from the original by reason of any notation made on such copies or otherwise). The terms "document" and "document(s)" include, without limitation, the following items, whether printed or reproduced by any process, or written or produced by hand or stored in computer memory, magnetic or hard disk, or other data storage medium, and whether or not claimed to be privileged, confidential, or otherwise excludable from discovery, including without limitation: copyrights, copyright applications, patents, patent applications, articles, publications, presentations, posters, slides, electronic presentations, notes, letters, correspondence, Communications, telegrams, memoranda, summaries or records of telephone conversations, summaries or records of personal conversations or meetings, diaries, reports, laboratory and research reports and notebooks, recorded experiments, charts, plans, drawings, diagrams, schematic diagrams, HDL, Verilog, source code or other computer code, illustrations, product descriptions, labels, product inserts, product analyses, requests for proposals, documents related to proposals or actual product improvements or changes, user manuals or guides, installation guides or manuals, technical descriptions or specifications,

product repair manuals or guides, photographs, video images, software flow charts or descriptions or specifications, product functional descriptions or specifications, minutes or records of meetings, summaries of interviews, reports, or investigations, opinions or reports of consultants, reports of patent searches, patent appraisals, opinions of counsel, agreements, reports or summaries of negotiations, brochures, pamphlets, advertisements, circulars, trade letters, press releases, drafts of documents, and all other material fixed in a tangible medium of whatever kind.

20. "Communication(s)" means the transmittal of information by any means, and includes any transfer of information, facts, ideas, opinions, inquiries, or thoughts by any means, written, oral, or otherwise, at any time or place under any circumstances. The definition is not limited to transfers between persons but also includes other transfers, such as records and memoranda to file; any written letter, memorandum, or other document which was sent by one or more individuals to another or others; any telephone call between one or more individuals and another or others, whether such call was by chance or prearranged, formal or informal; and any conversation or meeting between one or more individuals and another, whether such contact was by chance or prearranged, formal or informal.

## DOCUMENTS TO BE PRODUCED

1. All contracts and agreements pertaining to any project between Minnesota DEED and Deloitte related to UI Software, including but not limited to the Minnesota UITIP Project, including all exhibits, amendments, and other attachments thereto.

2. All documents and communications pertaining to contract negotiations between Minnesota DEED and Deloitte.

3. Documents sufficient to show ownership of any UI Software, other deliverable, or other intellectual property related to Minnesota UITIP Project, including documents sufficient to

show what UI Software, other deliverable, or other intellectual property was owned by Deloitte and what was owned by Minnesota DEED or other Minnesota entities.

4. All documents related to any claim of ownership made by Minnesota DEED or other Minnesota entity over any UI Software, other deliverable, or other intellectual property related to or resulting from the Minnesota UITIP Project.

5. Documents sufficient to show all funding sources for the Minnesota UITIP Project, including all state and federal funds and grants.

6. Documents sufficient to show all conditions and requirements for the Minnesota UITIP Project resulting from or pursuant to the funding received.

7. Documents sufficient to show all Software Design Documents, UI Software, and any other byproducts of software development for the Minnesota UITIP Project, including but not limited to data models, data definition languages, entity relationship diagrams, source code, and use cases.

8. A copy of the UI software delivered by Deloitte to Minnesota DEED as a result of the Minnesota UITIP Project.

9. All documents demonstrating any and all licenses to the UI Software or any other intellectual property resulting from the Minnesota UITIP Project, including but not limited to to any other state or federal entity, such as any state UI programs or the federal Department of Labor.

10. All communications between Minnesota DEED or other Minnesota entity and any licensee to the Minnesota UITIP Project UI software regarding the license or use of the UI Software or any other intellectual property resulting from the Minnesota UITIP Project.

11. Documents sufficient to show all disclosures of any product or byproduct of the Minnesota UITIP Project (including but not limited to Software, data models, data definition languages, entity relationship diagrams, source code, and use cases) with any Third Party, including but not limited to another state or any unemployment insurance vendor.

12. All documents pertaining to any confidentiality requirements or restriction on use of the UI Software or any other intellectual property resulting from the Minnesota UITIP Project put in place by Deloitte.

13. All documents pertaining to any claim by Deloitte that any material related to or resulting from the Minnesota UITIP Project was a trade secret belonging to Deloitte.

14. Documents sufficient to show all document retention policies covering documents, products, and byproducts of the Minnesota UITIP Project.

15. Documents sufficient to show any destruction or deletion of documents, products, and byproducts of the Minnesota UITIP Project, including internal communications or communications with Deloitte regarding the same.

16. Documents sufficient to show the time(s) of access, and identity of person(s) having access, to Software Design Documents, UI Software, and any other repository related to or byproducts of software development for the Minnesota UITIP Project, including but not limited to data models, data definition languages, entity relationship diagrams, source code, and use cases—including but not limited to server logs.

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

DISTRICT OF DELAWARE ▾

| | |
|---|---|
| DELOITTE CONSULTING LLP and DELOITTE DEVELOPMENT LLC, | ) |
| *Plaintiff*s, | ) |
| v. | ) Civil Action No. 23-325-WCB |
| SAGITEC SOLUTIONS, LLC, | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Massachusetts DUA Records Access Officer, 100 Cambridge Street, 4th Floor, Boston, MA  02114

*(Name of person to whom this subpoena is directed)*

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

**Set forth on Schedule A attached.**

| Place: Rebecca A. Bact, Esq., Robins Kaplan LLP 800 Boylston Street, Suite 2500, Boston, MA  02199 | Date and Time: January 22, 2024  at 5:00 p.m. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  December 21, 2023

| *CLERK OF COURT* | OR | |
|---|---|---|
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Sagitec Solutions, LLC _____, who issues or requests this subpoena, are:
Rebecca A. Bact, Esq., Robins Kaplan LLP, 800 Boylston Street, Suite 2500, Boston, MA  02199, rbact@robinskaplan.com
(617) 859-2740

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
  **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
  **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
  **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

## INSTRUCTIONS

1.      In order to fully comply with this Subpoena, you should produce all responsive

documents that are in your possession, custody, or control, as they are kept in the ordinary course

of business, including, where applicable, any index tabs, file dividers, labels, designations, or

information as to the location of the documents.

2.      You should resolve any perceived ambiguity in favor of the most complete

disclosure, and you should describe what you feel is ambiguous and why, responding in the

alternative where possible. To the extent that it results in a more complete disclosure, the singular

shall be construed to include the plural and vice versa, and the present tense shall be construed to

include the past tense, and vice versa.

3.      Production is requested of documents in full, without abbreviation or

expurgation. A copy of both side of the requested documents shall be produced, unless the

reverse side of the documents is completely blank. Any computerized data shall be produced

both on disk in its native format and in its printed form. If copies of the documents are produced,

the copies must be identical to the original. For example, if a document contains multiple stapled,

clipped, or otherwise collated pages, then the copy shall contain each attached page and be

similarly collated. All documents shall be duplicated and attached to the copy in the exact

manner and location as such items are appended to the original document.

4.      Your response shall not be deemed complete until documents and things are

produced or a date certain is provided as to when the requested documents and things will be

produced.

5.      If no documents are responsive to a particular request, You are to state that no

responsive documents exist.

6.      In the event You object to any request herein or any part thereof, You shall state with specificity the grounds of objection and respond to the fullest extent that such production is not subject to objection.

7.      In the event You object to the production of any document or thing on the ground that it is protected from discovery under the attorney-client privilege or work product immunity or is otherwise not discoverable, You shall identify each such document or thing on a separate schedule to be produced to Sagitec, such identification to include at least the following::

    a.      The basis on which the privilege is claimed;

    b.      The title of the document;

    c.      The nature of the document (e.g., interoffice memorandum, report, office procedure, etc.);

    d.      The date of the document;

    e.      The number of pages in such document;

    f.      The names and positions of the author of the document and all other person participating in the preparation of the document;

    g.      The name and position of each individual or other person to whom the document, or a copy thereof, was sent or otherwise disclosed;

    h.      A description of any accompanying material transmitted with or attached to such document;

    i.      The particular request(s) to which such document is responsive;

    j.      Whether any business or non-legal matter is contained or discussed in such document; and

    k.       A summary statement of the subject matter of the document or

of the communication in sufficient detail to permit the Court to

rule on the propriety of the objection.

8.     In the event that any requested document has been lost or destroyed, that

document shall be identified by indicating the date, the subject matter, number of pages,

originator, and all persons to whom it was distributed. The date of loss or destruction, manner of

loss or destruction, reasons for destruction, person(s) authorizing destruction, person(s) losing or

destroying the document, and custodian(s) of the document at the time of the loss or destruction

shall be identified.

## DEFINITIONS

1.     "Deloitte," or "Plaintiffs," means Deloitte Consulting LLP, Deloitte Development

LLC, or any affiliated entities, including without limitation any parent, predecessors (including

BearingPoint, Inc.), successor, wholly or partially owned subsidiaries, and other persons from

whom Deloitte has the alleged legal right to obtain the information sought by this discovery.

2.     "Massachusetts DUA" means the Massachusetts Department of Workplace

Development ("DWD"), Division of Unemployment Assistance ("DUA").

3.     "Massachusetts QUEST Project" means the project stemming from any contract

or statement of work between the Massachusetts DWD, DUA, and KMPG Consulting,

BearingPoint, Inc., or Deloitte related to the DUA Quality Unemployment System

Transformation ("QUEST") project. The Massachusetts QUEST Project began in 2007.

4.     "UI" refers to the phrase "unemployment insurance."

5.     "Software" means all software and code of any kind including executable code

and source code as well as the contents of any directories or documents stored with source code

in the ordinary course of business, development files, header files, build files, build environment, macros, run-time libraries, management software, kernels, device drivers, interface, and any and all other types of software, whether stored in ROM or RAM, data files, or configuration files, and all other runtime files that affect the creation or execution of software present on a product when shipped. For avoidance of doubt, this includes source files, make files, intermediate output files, executable files, header files, resource files, library files, module definition files, map files, object files, linker files, browse info files, and debug files.

6.      "Software Design Document(s)" means documents used or generated to developing software, including software specifications and requirements at any level of detail, functional specifications, class specifications and guides, coding style guides, design documents, design and/or change documents for adding in features to existing code base or feature, implementation documents/guides, story boards, application guides, programmer reference guides, reference manuals, software architecture guides, verification and test plans, hierarchical summaries, simulation models for software or features, design review documents, code review documents, Agile development documents, as well as all notes created during software design.

7.      "Supporting" means tending to prove, establish, or corroborate.

8.      "Third Party" means and includes any person or entity, whether public or private and including State-related entities, other than Deloitte and Sagitec.

9.      The terms "and" and "or" will be understood as either conjunctive or disjunctive, whichever is more inclusive on context.

10.      The terms "any," "each," and "all" will be understood to include "each and every."

11.      The term "including" will be construed to mean "without any limitation."

12.     The terms "regarding," "relating to," and "related to" are to be given their broadest possible meaning, including but not limited to referring to, describing, evidencing, concerning, constituting, mentioning, containing, supporting, discussing, analyzing, pertaining to, being connected with, resulting from, reflecting upon, in whole or in part, directly or indirectly, the stated subject matter.

13.     The singular form of a noun or pronoun shall include the plural form of the noun or pronoun, and vice versa.

14.     The past tense shall include the present tense and the present tense shall include the past tense as to make the request inclusive rather than exclusive.

15.     "Identify" and "describe" in connection with a written document mean to furnish the name and date of the document, the date the document was created, modified, and/or sent, the number of pages in the document, the identity of the person who created, modified, and/or sent the document, the identity of all persons to whom the document was sent, and a brief description of the subject matter of the document. If the document has been produced in this litigation, to identify or describe such a document includes provision of the Bates number of the document.

16.     "Identify" and "describe" in connection with a person mean to state the person's full name, his or her home or business address, his or her present employer, and his or her employer and position at the time of the pertinent event. Once a person has been identified in accordance with this paragraph, that person may be identified only by name in subsequent discovery requests seeking an identification of that person.

17.     "Identify" and "describe" in connection with a company or business entity, including a corporation, association, partnership, or joint venture, mean to state the entity's full name, the address of the principal place of business of that entity, the entity's state of

incorporation, the location of any divisions, branches, or offices that were connected with or handled the subject matter referenced in the interrogatory, and the identity of the person acting or purporting to act on behalf of the business entity in connection with the subject matter of the interrogatory.

18.     "Identify" and "describe" in connection with an act, event, or course of conduct mean to provide the date and a complete description of the act, event, or course of conduct, and identify the person(s) who took part in the act, event, or course of conduct.

19.     "Document" and "documents" have the broadest meaning ascribed to them by Rule 34(a) of the Federal Rules of Civil Procedure and encompass any writing of any kind, including originals and non-identical copies (whether different from the original by reason of any notation made on such copies or otherwise). The terms "document" and "document(s)" include, without limitation, the following items, whether printed or reproduced by any process, or written or produced by hand or stored in computer memory, magnetic or hard disk, or other data storage medium, and whether or not claimed to be privileged, confidential, or otherwise excludable from discovery, including without limitation: copyrights, copyright applications, patents, patent applications, articles, publications, presentations, posters, slides, electronic presentations, notes, letters, correspondence, Communications, telegrams, memoranda, summaries or records of telephone conversations, summaries or records of personal conversations or meetings, diaries, reports, laboratory and research reports and notebooks, recorded experiments, charts, plans, drawings, diagrams, schematic diagrams, HDL, Verilog, source code or other computer code, illustrations, product descriptions, labels, product inserts, product analyses, requests for proposals, documents related to proposals or actual product improvements or changes, user manuals or guides, installation guides or manuals, technical descriptions or specifications,

product repair manuals or guides, photographs, video images, software flow charts or descriptions or specifications, product functional descriptions or specifications, minutes or records of meetings, summaries of interviews, reports, or investigations, opinions or reports of consultants, reports of patent searches, patent appraisals, opinions of counsel, agreements, reports or summaries of negotiations, brochures, pamphlets, advertisements, circulars, trade letters, press releases, drafts of documents, and all other material fixed in a tangible medium of whatever kind.

20.     "Communication(s)" means the transmittal of information by any means, and includes any transfer of information, facts, ideas, opinions, inquiries, or thoughts by any means, written, oral, or otherwise, at any time or place under any circumstances. The definition is not limited to transfers between persons but also includes other transfers, such as records and memoranda to file; any written letter, memorandum, or other document which was sent by one or more individuals to another or others; any telephone call between one or more individuals and another or others, whether such call was by chance or prearranged, formal or informal; and any conversation or meeting between one or more individuals and another, whether such contact was by chance or prearranged, formal or informal.

## <u>DOCUMENTS TO BE PRODUCED</u>

1.  All contracts and agreements pertaining to any project between Massachusetts DUA and Deloitte related to UI Software, including but not limited to the Massachusetts QUEST Project, including all exhibits, amendments, and other attachments thereto.

2.  All documents and communications pertaining to contract negotiations between Massachusetts DUA and Deloitte.

3.  Documents sufficient to show ownership of any UI Software, other deliverable, or other intellectual property related to Massachusetts QUEST Project, including documents

sufficient to show what UI Software, other deliverable, or other intellectual property was owned by Deloitte and what was owned by Massachusetts DUA or other Massachusetts entities.

4.  All documents related to any claim of ownership made by Massachusetts DUA or other Massachusetts entity over any UI Software, other deliverable, or other intellectual property related to or resulting from the Massachusetts QUEST Project.

5.  Documents sufficient to show all funding sources for the Massachusetts QUEST Project, including all state and federal funds and grants.

6.  Documents sufficient to show all conditions and requirements for the Massachusetts QUEST Project resulting from or pursuant to the funding received.

7.  Documents sufficient to show all Software Design Documents, UI Software, and any other byproducts of software development for the Massachusetts QUEST Project, including but not limited to data models, data definition languages, entity relationship diagrams, source code, and use cases.

8.  A copy of the UI software delivered by Deloitte to Massachusetts DUA as a result of the Massachusetts QUEST Project.

9.  All documents demonstrating any and all licenses to the UI Software or any other intellectual property resulting from the Massachusetts QUEST Project, including but not limited to to any other state or federal entity, such as any state UI programs or the federal Department of Labor.

10. All communications between Massachusetts DUA or other Massachusetts entity and any licensee to the Massachusetts QUEST Project UI software regarding the license or use of the UI Software or any other intellectual property resulting from the Massachusetts QUEST Project.

11. Documents sufficient to show all disclosures of any product or byproduct of the Massachusetts QUEST Project (including but not limited to Software, data models, data definition languages, entity relationship diagrams, source code, and use cases) with any Third Party, including but not limited to another state or any unemployment insurance vendor.

12. All documents pertaining to any confidentiality requirements or restriction on use of the UI Software or any other intellectual property resulting from the Massachusetts QUEST Project put in place by Deloitte.

13. All documents pertaining to any claim by Deloitte that any material related to or resulting from the Massachusetts QUEST Project was a trade secret belonging to Deloitte.

14. Documents sufficient to show all document retention policies covering documents, products, and byproducts of the Massachusetts QUEST Project.

15. Documents sufficient to show any destruction or deletion of documents, products, and byproducts of the Massachusetts QUEST Project, including internal communications or communications with Deloitte regarding the same.

16. Documents sufficient to show the time(s) of access, and identity of person(s) having access, to Software Design Documents, UI Software, and any other repository related to or byproducts of software development for the Massachusetts QUEST Project, including but not limited to data models, data definition languages, entity relationship diagrams, source code, and use cases—including but not limited to server logs.

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### DISTRICT OF DELAWARE ▼

DELOITTE CONSULTING LLP and
DELOITTE DEVELOPMENT LLC,

*Plaintiff*s,

v.

SAGITEC SOLUTIONS, LLC,

*Defendant*

)
)
)
)
)
)
)

Civil Action No. 23-325-WCB

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: New Mexico Department of Workforce Solutions, 401 Broadway NE, Albuquerque, NM 87103

*(Name of person to whom this subpoena is directed)*

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

**Set forth on Schedule A attached.**

| Place: Martin Private Invest. P.O. Box 25903, Albuquerque, NM 87125 | Date and Time: January 22, 2024 at 5:00 p.m. |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: December 21, 2023

*CLERK OF COURT*

OR

_____
*Signature of Clerk or Deputy Clerk*

_____
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Sagitec Solutions, LLC
_____, who issues or requests this subpoena, are:
Rebecca A. Bact, Esq., Robins Kaplan LLP, 800 Boylston Street, Suite 2500, Boston, MA 02199, rbact@robinskaplan.com
(617) 859-2740

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $       0.00       .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                              *Server's signature*

                                    _____
                                              *Printed name and title*

                                    _____
                                              *Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
  **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
  **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
  **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

## INSTRUCTIONS

1.      In order to fully comply with this Subpoena, you should produce all responsive documents that are in your possession, custody, or control, as they are kept in the ordinary course of business, including, where applicable, any index tabs, file dividers, labels, designations, or information as to the location of the documents.

2.      You should resolve any perceived ambiguity in favor of the most complete disclosure, and you should describe what you feel is ambiguous and why, responding in the alternative where possible. To the extent that it results in a more complete disclosure, the singular shall be construed to include the plural and vice versa, and the present tense shall be construed to include the past tense, and vice versa.

3.      Production is requested of documents in full, without abbreviation or expurgation. A copy of both side of the requested documents shall be produced, unless the reverse side of the documents is completely blank. Any computerized data shall be produced both on disk in its native format and in its printed form. If copies of the documents are produced, the copies must be identical to the original. For example, if a document contains multiple stapled, clipped, or otherwise collated pages, then the copy shall contain each attached page and be similarly collated. All documents shall be duplicated and attached to the copy in the exact manner and location as such items are appended to the original document.

4.      Your response shall not be deemed complete until documents and things are produced or a date certain is provided as to when the requested documents and things will be produced.

5.      If no documents are responsive to a particular request, You are to state that no responsive documents exist.

6.      In the event You object to any request herein or any part thereof, You shall state with specificity the grounds of objection and respond to the fullest extent that such production is not subject to objection.

7.      In the event You object to the production of any document or thing on the ground that it is protected from discovery under the attorney-client privilege or work product immunity or is otherwise not discoverable, You shall identify each such document or thing on a separate schedule to be produced to Sagitec, such identification to include at least the following::

a.      The basis on which the privilege is claimed;

b.      The title of the document;

c.      The nature of the document (e.g., interoffice memorandum, report, office procedure, etc.);

d.      The date of the document;

e.      The number of pages in such document;

f.      The names and positions of the author of the document and all other person participating in the preparation of the document;

g.      The name and position of each individual or other person to whom the document, or a copy thereof, was sent or otherwise disclosed;

h.      A description of any accompanying material transmitted with or attached to such document;

i.      The particular request(s) to which such document is responsive;

j.      Whether any business or non-legal matter is contained or discussed in such document; and

          k.         A summary statement of the subject matter of the document or of the communication in sufficient detail to permit the Court to rule on the propriety of the objection.

8.      In the event that any requested document has been lost or destroyed, that document shall be identified by indicating the date, the subject matter, number of pages, originator, and all persons to whom it was distributed. The date of loss or destruction, manner of loss or destruction, reasons for destruction, person(s) authorizing destruction, person(s) losing or destroying the document, and custodian(s) of the document at the time of the loss or destruction shall be identified.

## DEFINITIONS

1.      "Deloitte," or "Plaintiffs," means Deloitte Consulting LLP, Deloitte Development LLC, or any affiliated entities, including without limitation any parent, predecessors (including BearingPoint, Inc.), successor, wholly or partially owned subsidiaries, and other persons from whom Deloitte has the alleged legal right to obtain the information sought by this discovery.

2.      "New Mexico DWS" means the New Mexico Department of Workforce Solutions ("DWS").

3.      "New Mexico UI Tax Modernization Project" means the project stemming from any contract or statement of work between the New Mexico DWS and KMPG Consulting, BearPoint, Inc., or Deloitte related to the New Mexico Unemployment Insurance ("UI") Modernization Project. The New Mexico UI Tax Modernization Project began in 2010.

4.      "UI" refers to the phrase "unemployment insurance."

5.      "Software" means all software and code of any kind including executable code and source code as well as the contents of any directories or documents stored with source code

in the ordinary course of business, development files, header files, build files, build environment, macros, run-time libraries, management software, kernels, device drivers, interface, and any and all other types of software, whether stored in ROM or RAM, data files, or configuration files, and all other runtime files that affect the creation or execution of software present on a product when shipped. For avoidance of doubt, this includes source files, make files, intermediate output files, executable files, header files, resource files, library files, module definition files, map files, object files, linker files, browse info files, and debug files.

6. "Software Design Document(s)" means documents used or generated to developing software, including software specifications and requirements at any level of detail, functional specifications, class specifications and guides, coding style guides, design documents, design and/or change documents for adding in features to existing code base or feature, implementation documents/guides, story boards, application guides, programmer reference guides, reference manuals, software architecture guides, verification and test plans, hierarchical summaries, simulation models for software or features, design review documents, code review documents, Agile development documents, as well as all notes created during software design.

7. "Supporting" means tending to prove, establish, or corroborate.

8. "Third Party" means and includes any person or entity, whether public or private and including State-related entities, other than Deloitte and Sagitec.

9. The terms "and" and "or" will be understood as either conjunctive or disjunctive, whichever is more inclusive on context.

10. The terms "any," "each," and "all" will be understood to include "each and every."

11. The term "including" will be construed to mean "without any limitation."

12.     The terms "regarding," "relating to," and "related to" are to be given their broadest possible meaning, including but not limited to referring to, describing, evidencing, concerning, constituting, mentioning, containing, supporting, discussing, analyzing, pertaining to, being connected with, resulting from, reflecting upon, in whole or in part, directly or indirectly, the stated subject matter.

13.     The singular form of a noun or pronoun shall include the plural form of the noun or pronoun, and vice versa.

14.     The past tense shall include the present tense and the present tense shall include the past tense as to make the request inclusive rather than exclusive.

15.     "Identify" and "describe" in connection with a written document mean to furnish the name and date of the document, the date the document was created, modified, and/or sent, the number of pages in the document, the identity of the person who created, modified, and/or sent the document, the identity of all persons to whom the document was sent, and a brief description of the subject matter of the document. If the document has been produced in this litigation, to identify or describe such a document includes provision of the Bates number of the document.

16.     "Identify" and "describe" in connection with a person mean to state the person's full name, his or her home or business address, his or her present employer, and his or her employer and position at the time of the pertinent event. Once a person has been identified in accordance with this paragraph, that person may be identified only by name in subsequent discovery requests seeking an identification of that person.

17.     "Identify" and "describe" in connection with a company or business entity, including a corporation, association, partnership, or joint venture, mean to state the entity's full name, the address of the principal place of business of that entity, the entity's state of

incorporation, the location of any divisions, branches, or offices that were connected with or handled the subject matter referenced in the interrogatory, and the identity of the person acting or purporting to act on behalf of the business entity in connection with the subject matter of the interrogatory.

18.    "Identify" and "describe" in connection with an act, event, or course of conduct mean to provide the date and a complete description of the act, event, or course of conduct, and identify the person(s) who took part in the act, event, or course of conduct.

19.    "Document" and "documents" have the broadest meaning ascribed to them by Rule 34(a) of the Federal Rules of Civil Procedure and encompass any writing of any kind, including originals and non-identical copies (whether different from the original by reason of any notation made on such copies or otherwise). The terms "document" and "document(s)" include, without limitation, the following items, whether printed or reproduced by any process, or written or produced by hand or stored in computer memory, magnetic or hard disk, or other data storage medium, and whether or not claimed to be privileged, confidential, or otherwise excludable from discovery, including without limitation: copyrights, copyright applications, patents, patent applications, articles, publications, presentations, posters, slides, electronic presentations, notes, letters, correspondence, Communications, telegrams, memoranda, summaries or records of telephone conversations, summaries or records of personal conversations or meetings, diaries, reports, laboratory and research reports and notebooks, recorded experiments, charts, plans, drawings, diagrams, schematic diagrams, HDL, Verilog, source code or other computer code, illustrations, product descriptions, labels, product inserts, product analyses, requests for proposals, documents related to proposals or actual product improvements or changes, user manuals or guides, installation guides or manuals, technical descriptions or specifications,

product repair manuals or guides, photographs, video images, software flow charts or descriptions or specifications, product functional descriptions or specifications, minutes or records of meetings, summaries of interviews, reports, or investigations, opinions or reports of consultants, reports of patent searches, patent appraisals, opinions of counsel, agreements, reports or summaries of negotiations, brochures, pamphlets, advertisements, circulars, trade letters, press releases, drafts of documents, and all other material fixed in a tangible medium of whatever kind.

20.     "Communication(s)" means the transmittal of information by any means, and includes any transfer of information, facts, ideas, opinions, inquiries, or thoughts by any means, written, oral, or otherwise, at any time or place under any circumstances. The definition is not limited to transfers between persons but also includes other transfers, such as records and memoranda to file; any written letter, memorandum, or other document which was sent by one or more individuals to another or others; any telephone call between one or more individuals and another or others, whether such call was by chance or prearranged, formal or informal; and any conversation or meeting between one or more individuals and another, whether such contact was by chance or prearranged, formal or informal.

## DOCUMENTS TO BE PRODUCED

1.  All contracts and agreements pertaining to any project between New Mexico DWS and Deloitte related to UI Software, including but not limited to the New Mexico UI Tax Modernization Project, including all exhibits, amendments, and other attachments thereto.

2.  All documents and communications pertaining to contract negotiations between New Mexico DWS and Deloitte.

3.  Documents sufficient to show ownership of any UI Software, other deliverable, or other intellectual property related to New Mexico UI Tax Modernization Project, including

documents sufficient to show what UI Software, other deliverable, or other intellectual property was owned by Deloitte and what was owned by New Mexico DWS or other New Mexico entities.

4. All documents related to any claim of ownership made by New Mexico DWS or other New Mexico entity over any UI Software, other deliverable, or other intellectual property related to or resulting from the New Mexico UI Tax Modernization Project.

5. Documents sufficient to show all funding sources for the New Mexico UI Tax Modernization Project, including all state and federal funds and grants.

6. Documents sufficient to show all conditions and requirements for the New Mexico UI Tax Modernization Project resulting from or pursuant to the funding received.

7. Documents sufficient to show all Software Design Documents, UI Software, and any other byproducts of software development for the New Mexico UI Tax Modernization Project, including but not limited to data models, data definition languages, entity relationship diagrams, source code, and use cases.

8. A copy of the UI software delivered by Deloitte to New Mexico DWS as a result of the New Mexico UI Tax Modernization Project.

9. All documents demonstrating any and all licenses to the UI Software or any other intellectual property resulting from the New Mexico UI Tax Modernization Project, including but not limited to to any other state or federal entity, such as any state UI programs or the federal Department of Labor.

10. All communications between New Mexico DWS or other New Mexico entity and any licensee to the New Mexico UI Tax Modernization Project UI software regarding the license or

use of the UI Software or any other intellectual property resulting from the New Mexico UI Tax Modernization Project.

11. Documents sufficient to show all disclosures of any product or byproduct of the New Mexico UI Tax Modernization Project (including but not limited to Software, data models, data definition languages, entity relationship diagrams, source code, and use cases) with any Third Party, including but not limited to another state or any unemployment insurance vendor.

12. All documents pertaining to any confidentiality requirements or restriction on use of the UI Software or any other intellectual property resulting from the New Mexico UI Tax Modernization Project put in place by Deloitte.

13. All documents pertaining to any claim by Deloitte that any material related to or resulting from the New Mexico UI Tax Modernization Project was a trade secret belonging to Deloitte.

14. Documents sufficient to show all document retention policies covering documents, products, and byproducts of the New Mexico UI Tax Modernization Project.

15. Documents sufficient to show any destruction or deletion of documents, products, and byproducts of the New Mexico UI Tax Modernization Project, including internal communications or communications with Deloitte regarding the same.

16. Documents sufficient to show the time(s) of access, and identity of person(s) having access, to Software Design Documents, UI Software, and any other repository related to or byproducts of software development for the New Mexico UI Tax Modernization Project, including but not limited to data models, data definition languages, entity relationship diagrams, source code, and use cases—including but not limited to server logs.

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

DISTRICT OF DELAWARE ▼

DELOITTE CONSULTING LLP and
DELOITTE DEVELOPMENT LLC,

*Plaintiff*s,

v.

SAGITEC SOLUTIONS, LLC,

*Defendant*

)
)
)
)
)
)
)

Civil Action No. 23-325-WCB

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Joanne Putnam, Florida Agency for Workforce Innovation
Unemployment Compensation, 107 E. Madison Street, Tallahassee, Fl 32399

*(Name of person to whom this subpoena is directed)*

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

**Set forth on Schedule A attached.**

| Place: | Date and Time: |
|---|---|
| KD Process<br>2957 Capital Park Drive, Suite 7, Tallahassee, FL 32399 | January 22, 2024 at 5:00 p.m. |

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: December 21, 2023

*CLERK OF COURT*

OR

_____
*Signature of Clerk or Deputy Clerk*

_____
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Sagitec Solutions, LLC _____, who issues or requests this subpoena, are:
Rebecca A. Bact, Esq., Robins Kaplan LLP, 800 Boylston Street, Suite 2500, Boston, MA 02199, rbact@robinskaplan.com
(617) 859-2740

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____.

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

## INSTRUCTIONS

1.      In order to fully comply with this Subpoena, you should produce all responsive documents that are in your possession, custody, or control, as they are kept in the ordinary course of business, including, where applicable, any index tabs, file dividers, labels, designations, or information as to the location of the documents.

2.      You should resolve any perceived ambiguity in favor of the most complete disclosure, and you should describe what you feel is ambiguous and why, responding in the alternative where possible. To the extent that it results in a more complete disclosure, the singular shall be construed to include the plural and vice versa, and the present tense shall be construed to include the past tense, and vice versa.

3.      Production is requested of documents in full, without abbreviation or expurgation. A copy of both side of the requested documents shall be produced, unless the reverse side of the documents is completely blank. Any computerized data shall be produced both on disk in its native format and in its printed form. If copies of the documents are produced, the copies must be identical to the original. For example, if a document contains multiple stapled, clipped, or otherwise collated pages, then the copy shall contain each attached page and be similarly collated. All documents shall be duplicated and attached to the copy in the exact manner and location as such items are appended to the original document.

4.      Your response shall not be deemed complete until documents and things are produced or a date certain is provided as to when the requested documents and things will be produced.

5.      If no documents are responsive to a particular request, You are to state that no responsive documents exist.

6.      In the event You object to any request herein or any part thereof, You shall state with specificity the grounds of objection and respond to the fullest extent that such production is not subject to objection.

7.      In the event You object to the production of any document or thing on the ground that it is protected from discovery under the attorney-client privilege or work product immunity or is otherwise not discoverable, You shall identify each such document or thing on a separate schedule to be produced to Sagitec, such identification to include at least the following::

a.      The basis on which the privilege is claimed;

b.      The title of the document;

c.      The nature of the document (e.g., interoffice memorandum, report, office procedure, etc.);

d.      The date of the document;

e.      The number of pages in such document;

f.      The names and positions of the author of the document and all other person participating in the preparation of the document;

g.      The name and position of each individual or other person to whom the document, or a copy thereof, was sent or otherwise disclosed;

h.      A description of any accompanying material transmitted with or attached to such document;

i.      The particular request(s) to which such document is responsive;

j.      Whether any business or non-legal matter is contained or discussed in such document; and

k.     A summary statement of the subject matter of the document or
of the communication in sufficient detail to permit the Court to
rule on the propriety of the objection.

8.     In the event that any requested document has been lost or destroyed, that
document shall be identified by indicating the date, the subject matter, number of pages,
originator, and all persons to whom it was distributed. The date of loss or destruction, manner of
loss or destruction, reasons for destruction, person(s) authorizing destruction, person(s) losing or
destroying the document, and custodian(s) of the document at the time of the loss or destruction
shall be identified.

## **DEFINITIONS**

1.     "Deloitte," or "Plaintiffs," means Deloitte Consulting LLP, Deloitte Development
LLC, or any affiliated entities, including without limitation any parent, predecessors (including
BearingPoint, Inc.), successor, wholly or partially owned subsidiaries, and other persons from
whom Deloitte has the alleged legal right to obtain the information sought by this discovery.

2.     "Florida AWI" means the Florida Agency for Workforce Innovation ("AWI").

3.     "Florida UC Solution Project" means the project stemming from any contract or
statement of work between the Florida AWI and KMPG Consulting, BearPoint, Inc., or Deloitte
related to the Unemployment Compensation Claims and Benefits Information System (the "UC
Solution"). The Florida AWI UC Solution Project began in 2011.

4.     "UI" refers to the phrase "unemployment insurance."

5.     "Software" means all software and code of any kind including executable code
and source code as well as the contents of any directories or documents stored with source code
in the ordinary course of business, development files, header files, build files, build environment,

macros, run-time libraries, management software, kernels, device drivers, interface, and any and all other types of software, whether stored in ROM or RAM, data files, or configuration files, and all other runtime files that affect the creation or execution of software present on a product when shipped. For avoidance of doubt, this includes source files, make files, intermediate output files, executable files, header files, resource files, library files, module definition files, map files, object files, linker files, browse info files, and debug files.

6.    "Software Design Document(s)" means documents used or generated to developing software, including software specifications and requirements at any level of detail, functional specifications, class specifications and guides, coding style guides, design documents, design and/or change documents for adding in features to existing code base or feature, implementation documents/guides, story boards, application guides, programmer reference guides, reference manuals, software architecture guides, verification and test plans, hierarchical summaries, simulation models for software or features, design review documents, code review documents, Agile development documents, as well as all notes created during software design.

7.    "Supporting" means tending to prove, establish, or corroborate.

8.    "Third Party" means and includes any person or entity, whether public or private and including State-related entities, other than Deloitte and Sagitec.

9.    The terms "and" and "or" will be understood as either conjunctive or disjunctive, whichever is more inclusive on context.

10.    The terms "any," "each," and "all" will be understood to include "each and every."

11.    The term "including" will be construed to mean "without any limitation."

12.     The terms "regarding," "relating to," and "related to" are to be given their broadest possible meaning, including but not limited to referring to, describing, evidencing, concerning, constituting, mentioning, containing, supporting, discussing, analyzing, pertaining to, being connected with, resulting from, reflecting upon, in whole or in part, directly or indirectly, the stated subject matter.

13.     The singular form of a noun or pronoun shall include the plural form of the noun or pronoun, and vice versa.

14.     The past tense shall include the present tense and the present tense shall include the past tense as to make the request inclusive rather than exclusive.

15.     "Identify" and "describe" in connection with a written document mean to furnish the name and date of the document, the date the document was created, modified, and/or sent, the number of pages in the document, the identity of the person who created, modified, and/or sent the document, the identity of all persons to whom the document was sent, and a brief description of the subject matter of the document. If the document has been produced in this litigation, to identify or describe such a document includes provision of the Bates number of the document.

16.     "Identify" and "describe" in connection with a person mean to state the person's full name, his or her home or business address, his or her present employer, and his or her employer and position at the time of the pertinent event. Once a person has been identified in accordance with this paragraph, that person may be identified only by name in subsequent discovery requests seeking an identification of that person.

17.     "Identify" and "describe" in connection with a company or business entity, including a corporation, association, partnership, or joint venture, mean to state the entity's full name, the address of the principal place of business of that entity, the entity's state of

incorporation, the location of any divisions, branches, or offices that were connected with or handled the subject matter referenced in the interrogatory, and the identity of the person acting or purporting to act on behalf of the business entity in connection with the subject matter of the interrogatory.

18.     "Identify" and "describe" in connection with an act, event, or course of conduct mean to provide the date and a complete description of the act, event, or course of conduct, and identify the person(s) who took part in the act, event, or course of conduct.

19.     "Document" and "documents" have the broadest meaning ascribed to them by Rule 34(a) of the Federal Rules of Civil Procedure and encompass any writing of any kind, including originals and non-identical copies (whether different from the original by reason of any notation made on such copies or otherwise). The terms "document" and "document(s)" include, without limitation, the following items, whether printed or reproduced by any process, or written or produced by hand or stored in computer memory, magnetic or hard disk, or other data storage medium, and whether or not claimed to be privileged, confidential, or otherwise excludable from discovery, including without limitation: copyrights, copyright applications, patents, patent applications, articles, publications, presentations, posters, slides, electronic presentations, notes, letters, correspondence, Communications, telegrams, memoranda, summaries or records of telephone conversations, summaries or records of personal conversations or meetings, diaries, reports, laboratory and research reports and notebooks, recorded experiments, charts, plans, drawings, diagrams, schematic diagrams, HDL, Verilog, source code or other computer code, illustrations, product descriptions, labels, product inserts, product analyses, requests for proposals, documents related to proposals or actual product improvements or changes, user manuals or guides, installation guides or manuals, technical descriptions or specifications,

product repair manuals or guides, photographs, video images, software flow charts or descriptions or specifications, product functional descriptions or specifications, minutes or records of meetings, summaries of interviews, reports, or investigations, opinions or reports of consultants, reports of patent searches, patent appraisals, opinions of counsel, agreements, reports or summaries of negotiations, brochures, pamphlets, advertisements, circulars, trade letters, press releases, drafts of documents, and all other material fixed in a tangible medium of whatever kind.

20.     "Communication(s)" means the transmittal of information by any means, and includes any transfer of information, facts, ideas, opinions, inquiries, or thoughts by any means, written, oral, or otherwise, at any time or place under any circumstances. The definition is not limited to transfers between persons but also includes other transfers, such as records and memoranda to file; any written letter, memorandum, or other document which was sent by one or more individuals to another or others; any telephone call between one or more individuals and another or others, whether such call was by chance or prearranged, formal or informal; and any conversation or meeting between one or more individuals and another, whether such contact was by chance or prearranged, formal or informal.

## <u>DOCUMENTS TO BE PRODUCED</u>

1.   All contracts and agreements pertaining to any project between Florida AWI and Deloitte related to UI Software, including but not limited to the Florida UC Solution Project, including all exhibits, amendments, and other attachments thereto.

2.   All documents and communications pertaining to contract negotiations between Florida AWI and Deloitte.

3.   Documents sufficient to show ownership of any UI Software, other deliverable, or other intellectual property related to Florida UC Solution Project, including documents sufficient

to show what UI Software, other deliverable, or other intellectual property was owned by Deloitte and what was owned by Florida AWI or other Florida entities.

4.   All documents related to any claim of ownership made by Florida AWI or other Florida entity over any UI Software, other deliverable, or other intellectual property related to or resulting from the Florida UC Solution Project.

5.   Documents sufficient to show all funding sources for the Florida UC Solution Project, including all state and federal funds and grants.

6.   Documents sufficient to show all conditions and requirements for the Florida UC Solution Project resulting from or pursuant to the funding received.

7.   Documents sufficient to show all Software Design Documents, UI Software, and any other byproducts of software development for the Florida UC Solution Project, including but not limited to data models, data definition languages, entity relationship diagrams, source code, and use cases.

8.   A copy of the UI software delivered by Deloitte to Florida AWI as a result of the Florida UC Solution Project.

9.   All documents demonstrating any and all licenses to the UI Software or any other intellectual property resulting from the Florida UC Solution Project, including but not limited to to any other state or federal entity, such as any state UI programs or the federal Department of Labor.

10. All communications between Florida AWI or other Florida entity and any licensee to the Florida UC Solution Project UI software regarding the license or use of the UI Software or any other intellectual property resulting from the Florida UC Solution Project.

11. Documents sufficient to show all disclosures of any product or byproduct of the Florida UC Solution Project (including but not limited to Software, data models, data definition languages, entity relationship diagrams, source code, and use cases) with any Third Party, including but not limited to another state or any unemployment insurance vendor.

12. All documents pertaining to any confidentiality requirements or restriction on use of the UI Software or any other intellectual property resulting from the Florida UC Solution Project put in place by Deloitte.

13. All documents pertaining to any claim by Deloitte that any material related to or resulting from the Florida UC Solution Project was a trade secret belonging to Deloitte.

14. Documents sufficient to show all document retention policies covering documents, products, and byproducts of the Florida UC Solution Project.

15. Documents sufficient to show any destruction or deletion of documents, products, and byproducts of the Florida UC Solution Project, including internal communications or communications with Deloitte regarding the same.

16. Documents sufficient to show the time(s) of access, and identity of person(s) having access, to Software Design Documents, UI Software, and any other repository related to or byproducts of software development for the Florida UC Solution Project, including but not limited to data models, data definition languages, entity relationship diagrams, source code, and use cases—including but not limited to server logs.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 21, 2023, a copy of the foregoing

document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Gregg F. LoCascio
Patrick Arnett
Nicholas Teleky
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave NW
Washington, DC 20004
(202) 389-5000

John F. Hartmann
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

*Deloitte-Sagitec@kirkland.com*

John W. Shaw
Andrew E. Russell
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
*jshaw@shawkeller.com*
*arussell@shawkeller.com*

*Attorneys for Plaintiffs Deloitte Consulting
LLP and Deloitte Development LLC*

 

 

*/s/ Robert M. Vrana*
YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Sagitec Solutions, LLC*

Exhibit 3

| | |
|---|---|
| **From:** | workforce, ipra, DWS <ipra.workforce@dws.nm.gov> |
| **To:** | Dawson, Demitri M. |
| **CC:** | Prange, David A.; Bact, Rebecca |
| **Sent:** | 3/7/2024 3:44:38 PM |
| **Subject:** | RE: [EXTERNAL] Public Records Request |
| **Attachments:** | 2024.01.09 Prange Public Records Request to New Mexico DWS.pdf; Subpoena to Produce Documents.pdf |

Good Afternoon,

Our department has produced requested Subpoena documents on January 25, 2024 I have attached the Subpoena to this email. All records produced are the public record and with those documents being sent it has complied with this IPRA request for documents. Please let me know if you have any questions regarding this matter.

Thank you

**From:** workforce, ipra, DWS <ipra.workforce@dws.nm.gov>
**Sent:** Wednesday, January 10, 2024 3:57 PM
**To:** Dawson, Demitri M. <DDawson@RobinsKaplan.com>
**Cc:** Prange, David A. <DPrange@RobinsKaplan.com>; Bact, Rebecca <RBact@RobinsKaplan.com>
**Subject:** RE: [EXTERNAL] Public Records Request

Good Afternoon,

New Mexico Department of Workforce Solutions (NMDWS) is in receipt of your request to inspect public records.  As required by NMSA 1978, §14-2-1, this serves as a response to your request for Inspection of Public Records Act ("IPRA") request to NMDWS received by this office on January 9, 2024.  Your IPRA request sought access to the following:

"Per your request for New Mexico Unemployment Insurance Tax Modernization Project between NMDWS and Deloitte Consulting LLP."

This office is currently reviewing and compiling the records and will need additional time to respond to your request.  We believe that your request is excessively burdensome or broad and this office anticipates that the entire record should be available by January 22, 2024.    Be advised that consistent with NMSA 1978, §14-2-9 Pursuant to New Mexico Department of Solutions Policy Issuance No. 39:  charges a per page copy fee of $1.00 for the first page, and .50 cents per page thereafter up to 100 copies, and .25 cents for all copies thereafter with the same file or request and a fee of $10.00 per USB Flash Drive.  <u>We will notify you of any copy cost and records will be sent upon receipt of payment.</u>

Thank you,
Records Custodian

<div style="border:2px solid black; display:inline-block; text-align:center;">

**NM DWS**
5/28/2024
**Ex. 2**
23-cv-325-WCB

</div>

**From:** Dawson, Demitri M. <DDawson@RobinsKaplan.com>
**Sent:** Tuesday, January 9, 2024 1:34 PM
**To:** workforce, ipra, DWS <ipra.workforce@dws.nm.gov>
**Cc:** Prange, David A. <DPrange@RobinsKaplan.com>; Bact, Rebecca <RBact@RobinsKaplan.com>
**Subject:** [EXTERNAL] Public Records Request

SAGITEC-DEL_06920267

CAUTION: This email originated outside of our organization. Exercise caution prior to clicking on links or opening attachments.

To Whom It May Concern,

Please see the attached correspondence from David Prange related to a Public Records Request.

Sincerely,

Demitri Dawson

Demitri Dawson
Associate
**Robins Kaplan LLP**
2800 LaSalle Plaza | 800 LaSalle Avenue | Minneapolis, MN 55402
Direct 612.349.8514 | RobinsKaplan.com
DDawson@RobinsKaplan.com

---

Information contained in this e-mail transmission may be privileged, confidential and covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521.

If you are not the intended recipient, do not read, distribute, or reproduce this transmission.

If you have received this e-mail transmission in error, please notify us immediately of the error by return email and please delete the message from your system.

Pursuant to requirements related to practice before the U. S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U. S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

Thank you in advance for your cooperation.

Robins Kaplan LLP
http://www.robinskaplan.com

---

SAGITEC-DEL_06920268

**ROBINS KAPLAN** LLP

800 LASALLE AVENUE     612 349 8500 TEL
SUITE 2800             612 339 4181 FAX
MINNEAPOLIS, MN  55402  ROBINSKAPLAN.COM

DAVID A. PRANGE
612 349 0131 TEL
DPRANGE@ROBINSKAPLAN.COM

January 9, 2024

*Sent Via Electronic Mail to*
*ipra.workforce@dws.nm.gov*

Records Custodian
New Mexico Department of Workforce Solutions
Office of General Counsel
P.O. Box 1928
Albuquerque, NM 87103

Dear Records Custodian:

I am writing to formally request copies of public records that relate to the New Mexico Unemployment Insurance Tax Modernization Project ("UI Tax Modernization Project"), a project which began in 2010 pursuant to contract documents between the New Mexico Department of Workforce Solutions ("DWS") and Deloitte Consulting LLP. To that end, I request the following public records:

**1. Documents related to the New Mexico UI Tax Modernization Project including:**

    **a. Documents sufficient to show any project proposal from Deloitte, any contract or agreement signed by Deloitte and New Mexico or any department thereof, any signed amendments, and any attachments, exhibits, schedules, or other documents including but not limited to use cases;**

    **b. Documents sufficient to show all software design documents including without limitation use cases;**

For purposes of this request, "software design document(s)" means documents used or generated to develop software, including software specifications and requirements at any level of detail, functional specifications, class specifications and guides, coding style guides, design documents, design and/or change documents for adding in features to existing code base or feature, implementation documents/guides, story boards, application guides, programmer reference guides, reference manuals, software architecture guides, verification and test plans, hierarchical summaries, simulation models for software or features, design review documents, code review documents, Agile development documents, as well as all notes created during software design.

SAGITEC-DEL_06920269

January 9, 2024
Page 2

      **c.  All unemployment insurance software ("UI software");**

For purposes of this request, "software" means all software and code of any kind including executable code and source code as well as the contents of any directories or documents stored with source code in the ordinary course of business, development files, header files, build files, build environment, macros, run-time libraries, management software, kernels, device drivers, interface, and any and all other types of software, whether stored in ROM or RAM, data files, or configuration files, and all other runtime files that affect the creation or execution of software present on a product when shipped. For avoidance of doubt, this includes source files, make files, intermediate output files, executable files, header files, resource files, library files, module definition files, map files, object files, linker files, browse info files, and debug files.

      **d.  Any other byproducts of software development for the New Mexico UI Tax Modernization Project, including but not limited to data models, data definition languages, entity relationship diagrams, source code, and use cases.**

2. **All deliverables resulting from the New Mexico UI Tax Modernization Project, including a copy of the UI software delivered by Deloitte to New Mexico DWS;**

3. **Billing records and/or invoices submitted by Deloitte to New Mexico DWS resulting from the New Mexico UI Tax Modernization Project sufficient to identify the Deloitte personnel involved in the project; and**

4. **Documents sufficient to show participants the New Mexico UI Tax Modernization Project employed by New Mexico DWS or other New Mexico entity.**

As you respond to this request, please let me know if you have any questions or need any further information. Please don't hesitate to contact me or my colleague Rebecca Bact at rbact@robinskaplan.com and we would be happy to discuss.

Thank you for your assistance.

                Sincerely,

                */s/ David A. Prange*
                David A. Prange
                Partner

SAGITEC-DEL_06920270

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
DISTRICT OF DELAWARE ▼

DELOITTE CONSULTING LLP and
DELOITTE DEVELOPMENT LLC,
*Plaintiffs,*
v.

SAGITEC SOLUTIONS, LLC,
*Defendant*

Civil Action No. 23-325-WCB

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:   New Mexico Department of Workforce Solutions, 401 Broadway NE, Albuquerque, NM 87103

*(Name of person to whom this subpoena is directed)*

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

**Set forth on Schedule A attached.**

| Place:   Martin Private Invest. | Date and Time: |
| P.O. Box 25903, Albuquerque, NM 87125 | January 22, 2024 at 5:00 p.m. |

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |

The following provisions of Fed. R. Civ. P. 45 are attached   Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   December 21, 2023

*CLERK OF COURT*

OR

*Signature of Clerk or Deputy Clerk*                                              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*
Sagitec Solutions, LLC
, who issues or requests this subpoena, are:
Rebecca A. Bact, Esq., Robins Kaplan LLP, 800 Boylston Street, Suite 2500, Boston, MA 02199, rbact@robinskaplan.com
(617) 859-2740

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

SAGITEC-DEL_06920271

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*

on *(date)*                        .

☐ I served the subpoena by delivering a copy to the named person as follows:

_____

_____                on *(date)*                     ; or

☐ I returned the subpoena unexecuted because:

_____.

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$                        .

My fees are $                     for travel and $                     for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date: _____              _____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

SAGITEC-DEL_06920272

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:

**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

SAGITEC-DEL_06920273

## SCHEDULE A

### INSTRUCTIONS

1.       In order to fully comply with this Subpoena, you should produce all responsive documents that are in your possession, custody, or control, as they are kept in the ordinary course of business, including, where applicable, any index tabs, file dividers, labels, designations, or information as to the location of the documents.

2.       You should resolve any perceived ambiguity in favor of the most complete disclosure, and you should describe what you feel is ambiguous and why, responding in the alternative where possible. To the extent that it results in a more complete disclosure, the singular shall be construed to include the plural and vice versa, and the present tense shall be construed to include the past tense, and vice versa.

3.       Production is requested of documents in full, without abbreviation or expurgation. A copy of both side of the requested documents shall be produced, unless the reverse side of the documents is completely blank. Any computerized data shall be produced both on disk in its native format and in its printed form. If copies of the documents are produced, the copies must be identical to the original. For example, if a document contains multiple stapled, clipped, or otherwise collated pages, then the copy shall contain each attached page and be similarly collated. All documents shall be duplicated and attached to the copy in the exact manner and location as such items are appended to the original document.

4.       Your response shall not be deemed complete until documents and things are produced or a date certain is provided as to when the requested documents and things will be produced.

5.       If no documents are responsive to a particular request, You are to state that no responsive documents exist.

6.      In the event You object to any request herein or any part thereof, You shall state with specificity the grounds of objection and respond to the fullest extent that such production is not subject to objection.

7.      In the event You object to the production of any document or thing on the ground that it is protected from discovery under the attorney-client privilege or work product immunity or is otherwise not discoverable, You shall identify each such document or thing on a separate schedule to be produced to Sagitec, such identification to include at least the following::

a.      The basis on which the privilege is claimed;

b.      The title of the document;

c.      The nature of the document (e.g., interoffice memorandum, report, office procedure, etc.);

d.      The date of the document;

e.      The number of pages in such document;

f.      The names and positions of the author of the document and all other person participating in the preparation of the document;

g.      The name and position of each individual or other person to whom the document, or a copy thereof, was sent or otherwise disclosed;

h.      A description of any accompanying material transmitted with or attached to such document;

i.      The particular request(s) to which such document is responsive;

j.      Whether any business or non-legal matter is contained or discussed in such document; and

          k.     A summary statement of the subject matter of the document or of the communication in sufficient detail to permit the Court to rule on the propriety of the objection.

8.     In the event that any requested document has been lost or destroyed, that document shall be identified by indicating the date, the subject matter, number of pages, originator, and all persons to whom it was distributed. The date of loss or destruction, manner of loss or destruction, reasons for destruction, person(s) authorizing destruction, person(s) losing or destroying the document, and custodian(s) of the document at the time of the loss or destruction shall be identified.

## DEFINITIONS

1.     "Deloitte," or "Plaintiffs," means Deloitte Consulting LLP, Deloitte Development LLC, or any affiliated entities, including without limitation any parent, predecessors (including BearingPoint, Inc.), successor, wholly or partially owned subsidiaries, and other persons from whom Deloitte has the alleged legal right to obtain the information sought by this discovery.

2.     "New Mexico DWS" means the New Mexico Department of Workforce Solutions ("DWS").

3.     "New Mexico UI Tax Modernization Project" means the project stemming from any contract or statement of work between the New Mexico DWS and KMPG Consulting, BearPoint, Inc., or Deloitte related to the New Mexico Unemployment Insurance ("UI") Modernization Project. The New Mexico UI Tax Modernization Project began in 2010.

4.     "UI" refers to the phrase "unemployment insurance."

5.     "Software" means all software and code of any kind including executable code and source code as well as the contents of any directories or documents stored with source code

SAGITEC-DEL_06920276

in the ordinary course of business, development files, header files, build files, build environment, macros, run-time libraries, management software, kernels, device drivers, interface, and any and all other types of software, whether stored in ROM or RAM, data files, or configuration files, and all other runtime files that affect the creation or execution of software present on a product when shipped. For avoidance of doubt, this includes source files, make files, intermediate output files, executable files, header files, resource files, library files, module definition files, map files, object files, linker files, browse info files, and debug files.

6. "Software Design Document(s)" means documents used or generated to developing software, including software specifications and requirements at any level of detail, functional specifications, class specifications and guides, coding style guides, design documents, design and/or change documents for adding in features to existing code base or feature, implementation documents/guides, story boards, application guides, programmer reference guides, reference manuals, software architecture guides, verification and test plans, hierarchical summaries, simulation models for software or features, design review documents, code review documents, Agile development documents, as well as all notes created during software design.

7. "Supporting" means tending to prove, establish, or corroborate.

8. "Third Party" means and includes any person or entity, whether public or private and including State-related entities, other than Deloitte and Sagitec.

9. The terms "and" and "or" will be understood as either conjunctive or disjunctive, whichever is more inclusive on context.

10. The terms "any," "each," and "all" will be understood to include "each and every."

11. The term "including" will be construed to mean "without any limitation."

SAGITEC-DEL_06920277

12.    The terms "regarding," "relating to," and "related to" are to be given their broadest possible meaning, including but not limited to referring to, describing, evidencing, concerning, constituting, mentioning, containing, supporting, discussing, analyzing, pertaining to, being connected with, resulting from, reflecting upon, in whole or in part, directly or indirectly, the stated subject matter.

13.    The singular form of a noun or pronoun shall include the plural form of the noun or pronoun, and vice versa.

14.    The past tense shall include the present tense and the present tense shall include the past tense as to make the request inclusive rather than exclusive.

15.    "Identify" and "describe" in connection with a written document mean to furnish the name and date of the document, the date the document was created, modified, and/or sent, the number of pages in the document, the identity of the person who created, modified, and/or sent the document, the identity of all persons to whom the document was sent, and a brief description of the subject matter of the document. If the document has been produced in this litigation, to identify or describe such a document includes provision of the Bates number of the document.

16.    "Identify" and "describe" in connection with a person mean to state the person's full name, his or her home or business address, his or her present employer, and his or her employer and position at the time of the pertinent event. Once a person has been identified in accordance with this paragraph, that person may be identified only by name in subsequent discovery requests seeking an identification of that person.

17.    "Identify" and "describe" in connection with a company or business entity, including a corporation, association, partnership, or joint venture, mean to state the entity's full name, the address of the principal place of business of that entity, the entity's state of

incorporation, the location of any divisions, branches, or offices that were connected with or handled the subject matter referenced in the interrogatory, and the identity of the person acting or purporting to act on behalf of the business entity in connection with the subject matter of the interrogatory.

18.    "Identify" and "describe" in connection with an act, event, or course of conduct mean to provide the date and a complete description of the act, event, or course of conduct, and identify the person(s) who took part in the act, event, or course of conduct.

19.    "Document" and "documents" have the broadest meaning ascribed to them by Rule 34(a) of the Federal Rules of Civil Procedure and encompass any writing of any kind, including originals and non-identical copies (whether different from the original by reason of any notation made on such copies or otherwise). The terms "document" and "document(s)" include, without limitation, the following items, whether printed or reproduced by any process, or written or produced by hand or stored in computer memory, magnetic or hard disk, or other data storage medium, and whether or not claimed to be privileged, confidential, or otherwise excludable from discovery, including without limitation: copyrights, copyright applications, patents, patent applications, articles, publications, presentations, posters, slides, electronic presentations, notes, letters, correspondence, Communications, telegrams, memoranda, summaries or records of telephone conversations, summaries or records of personal conversations or meetings, diaries, reports, laboratory and research reports and notebooks, recorded experiments, charts, plans, drawings, diagrams, schematic diagrams, HDL, Verilog, source code or other computer code, illustrations, product descriptions, labels, product inserts, product analyses, requests for proposals, documents related to proposals or actual product improvements or changes, user manuals or guides, installation guides or manuals, technical descriptions or specifications,

product repair manuals or guides, photographs, video images, software flow charts or descriptions or specifications, product functional descriptions or specifications, minutes or records of meetings, summaries of interviews, reports, or investigations, opinions or reports of consultants, reports of patent searches, patent appraisals, opinions of counsel, agreements, reports or summaries of negotiations, brochures, pamphlets, advertisements, circulars, trade letters, press releases, drafts of documents, and all other material fixed in a tangible medium of whatever kind.

 20. "Communication(s)" means the transmittal of information by any means, and includes any transfer of information, facts, ideas, opinions, inquiries, or thoughts by any means, written, oral, or otherwise, at any time or place under any circumstances. The definition is not limited to transfers between persons but also includes other transfers, such as records and memoranda to file; any written letter, memorandum, or other document which was sent by one or more individuals to another or others; any telephone call between one or more individuals and another or others, whether such call was by chance or prearranged, formal or informal; and any conversation or meeting between one or more individuals and another, whether such contact was by chance or prearranged, formal or informal.

## DOCUMENTS TO BE PRODUCED

 1. All contracts and agreements pertaining to any project between New Mexico DWS and Deloitte related to UI Software, including but not limited to the New Mexico UI Tax Modernization Project, including all exhibits, amendments, and other attachments thereto.

 2. All documents and communications pertaining to contract negotiations between New Mexico DWS and Deloitte.

 3. Documents sufficient to show ownership of any UI Software, other deliverable, or other intellectual property related to New Mexico UI Tax Modernization Project, including

documents sufficient to show what UI Software, other deliverable, or other intellectual property was owned by Deloitte and what was owned by New Mexico DWS or other New Mexico entities.

4.  All documents related to any claim of ownership made by New Mexico DWS or other New Mexico entity over any UI Software, other deliverable, or other intellectual property related to or resulting from the New Mexico UI Tax Modernization Project.

5.  Documents sufficient to show all funding sources for the New Mexico UI Tax Modernization Project, including all state and federal funds and grants.

6.  Documents sufficient to show all conditions and requirements for the New Mexico UI Tax Modernization Project resulting from or pursuant to the funding received.

7.  Documents sufficient to show all Software Design Documents, UI Software, and any other byproducts of software development for the New Mexico UI Tax Modernization Project, including but not limited to data models, data definition languages, entity relationship diagrams, source code, and use cases.

8.  A copy of the UI software delivered by Deloitte to New Mexico DWS as a result of the New Mexico UI Tax Modernization Project.

9.  All documents demonstrating any and all licenses to the UI Software or any other intellectual property resulting from the New Mexico UI Tax Modernization Project, including but not limited to to any other state or federal entity, such as any state UI programs or the federal Department of Labor.

10. All communications between New Mexico DWS or other New Mexico entity and any licensee to the New Mexico UI Tax Modernization Project UI software regarding the license or

SAGITEC-DEL_06920281

use of the UI Software or any other intellectual property resulting from the New Mexico UI Tax Modernization Project.

11. Documents sufficient to show all disclosures of any product or byproduct of the New Mexico UI Tax Modernization Project (including but not limited to Software, data models, data definition languages, entity relationship diagrams, source code, and use cases) with any Third Party, including but not limited to another state or any unemployment insurance vendor.

12. All documents pertaining to any confidentiality requirements or restriction on use of the UI Software or any other intellectual property resulting from the New Mexico UI Tax Modernization Project put in place by Deloitte.

13. All documents pertaining to any claim by Deloitte that any material related to or resulting from the New Mexico UI Tax Modernization Project was a trade secret belonging to Deloitte.

14. Documents sufficient to show all document retention policies covering documents, products, and byproducts of the New Mexico UI Tax Modernization Project.

15. Documents sufficient to show any destruction or deletion of documents, products, and byproducts of the New Mexico UI Tax Modernization Project, including internal communications or communications with Deloitte regarding the same.

16. Documents sufficient to show the time(s) of access, and identity of person(s) having access, to Software Design Documents, UI Software, and any other repository related to or byproducts of software development for the New Mexico UI Tax Modernization Project, including but not limited to data models, data definition languages, entity relationship diagrams, source code, and use cases—including but not limited to server logs.

Case 1:23-cv-00325-WCB    Document 180    Filed 08/13/24    Page 110 of 249 PageID #:
5735
Case 1:23-cv-00325-WCB   Document 70   Filed 10/27/23   Page 1 of 29 PageID #: 1679

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| DELOITTE CONSULTING LLP and | ) |
| DELOITTE DEVELOPMENT LLC, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) C.A. No. 23-325-WCB |
| | ) |
| SAGITEC SOLUTIONS, LLC, | ) |
| | ) |
| Defendant. | ) |

**STIPULATED PROTECTIVE ORDER**

Pursuant to Federal Rule of Civil Procedure 26(c), the Court enters the following Stipulated

Protective Order ("Order") limiting the disclosure and use of certain information.

IT IS HEREBY ORDERED THAT:

**1.    Definitions.**

(a)    "Action" means the above-captioned litigation.

(b)    "Confidential Information" means all non-public information, Documents,

interrogatory responses, responses to requests for admissions, deposition testimony and

transcripts, deposition exhibits, any other discovery materials, and any copies, notes, abstracts, or

summaries of the foregoing produced by a Producing Party in connection with this Action that

concerns or relates to the proprietary information used by the Producing Party in, or pertaining

to, its business that is not generally known, and which the Producing Party would not normally

reveal to third parties or would cause third parties to maintain in confidence. Confidential

Information includes, without limitation: agreements and contracts; current and future business,

product, or strategic plans; financial information; marketing documents; private personal

identifying information; trade secrets; or Documents or information that, if released publicly,

would cause embarrassment or be damaging to the reputation of the Producing Party. Any copies or reproductions, excerpts, summaries, or other Documents or media that paraphrase, excerpt, or contain Confidential Information shall be treated as Confidential Information pursuant to this Order. Material that is available to the public, or becomes available through no fault of the Producing Party, is not Confidential Information.

(c)     "Document" means documents, electronically stored information ("ESI"), items, and things as set forth in Federal Rule of Civil Procedure 34, the District of Delaware's Default Standard for Discovery, including Discovery of ESI, and writings, recordings, and photographs as defined in Federal Rule of Evidence 1001.

(d)     "Highly Confidential Information" means Confidential Information that is particularly sensitive, private, or competitively valuable, including without limitation Source Code, financial information, trade secrets, or other competitively sensitive information about future business, product, or strategic plans. Highly Confidential Information is included within the meaning of Confidential Information as used in this Order, and all provisions of this Order that apply to Confidential Information also shall apply to Highly Confidential Information.

(e)     "Parties" collectively means Deloitte Consulting LLP, Deloitte Development LLC, and Sagitec Solutions LLC. Each is individually a "Party."

(f)     "Producing Party" means a Party or non-Party to this Action who produces Documents in accordance with this Order (collectively, the "Producing Parties"). This Order is binding upon the Producing Parties in this Action, including their respective corporate parents, successors, and assigns, and their respective attorneys, agents, representatives, officers, employees, and others as set forth in this Order.

2

SAGITEC-DEL_06920284

Case 1:23-cv-00325-WCB    Document 180    Filed 08/13/24    Page 112 of 249 PageID #:
5737
Case 1:23-cv-00325-WCB   Document 70   Filed 10/27/23   Page 3 of 29 PageID #: 1681

(g)     "Receiving Party" means a Party or non-Party to this Action receiving Confidential Information under this Order.

(h)     "Review Period" means, for any particular deposition transcript, the period of time that begins upon receipt of the final deposition transcript, a copy of the final deposition transcript, or written notification that the final deposition transcript is available and that ends thirty (30) days thereafter.

(i)     "Source Code" means source code (*i.e.,* computer instructions and data definitions expressed in a human-readable form), as well as any and all programmer notes, annotations, files, and other comments of any type describing, explaining, and/or accompanying the code. Provisions regarding the inspection of Source Code are outlined in Section 6.

## 2.     Designating Material as Confidential Information or Highly Confidential Information.

Any Producing Party may designate any Confidential Information as "CONFIDENTIAL" or Highly Confidential Information as "HIGHLY CONFIDENTIAL" that it believes is entitled to such treatment under this Order. Such designation constitutes a representation that such information has been reviewed and that the Producing Party has a good faith basis for the designation. Documents, testimony, or information may be designated in the following ways:

(a)     Documents. Documents shall be designated by placing a legend with the applicable words "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" on each page of the Document. To the extent that it is not feasible to place a legend on each page of a Document, such Document shall be designated by placing in the Document file name the word "CONFIDENTIAL" or the words "HIGHLY CONFIDENTIAL." In addition, for any Confidential or Highly Confidential Document produced with a load file or similar metadata, the load file or metadata shall include the confidentiality designation.

3

Case 1:23-cv-00325-WCB   Document 180   Filed 08/13/24   Page 113 of 249 PageID #:
5738
Case 1:23-cv-00325-WCB   Document 70   Filed 10/27/23   Page 4 of 29 PageID #: 1682

(b)     Electronic Copies.  Whenever any electronic files bearing "CONFIDENTIAL" or
"HIGHLY CONFIDENTIAL" legends are converted into another file type, all such copies also
shall be marked "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL."  When electronically
stored Confidential Information is produced in a native format, the Producing Party shall place
the applicable confidentiality designation on the hard drive, DVD, CD, or other media on which
such electronically stored information is produced.

(c)     Interrogatory Responses and Responses to Requests for Admissions.  Counsel for
the Producing Party will place a statement in the answers or responses specifying that the
answers or responses, or specific parts thereof, are designated as either Confidential Information
or Highly Confidential Information.  Counsel for the Producing Party will place the applicable
"CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" legend on the front page of any set of
answers or responses containing Confidential Information, as well as in the header or footer of
any pages containing Confidential Information.

(d)     Depositions.  Counsel for the Producing Party or the deponent may designate
deposition transcripts (including exhibits) as containing Confidential Information by either
(i) identifying the transcript on the record as containing Confidential Information; or (ii) serving
on the Parties a written communication (including without limitation a written communication by
letter or electronic mail) making that identification before the close of the Review Period.  Prior
to the Review Period, all transcripts (including, but not limited to, rough and real-time
transcripts) and exhibits (collectively, the "Deposition Record") shall be treated as Highly
Confidential Information under this Order.  During the Review Period, the Deposition Record
shall be treated as Confidential Information under this Order, except that any portions of the
Deposition Record designated as containing Highly Confidential Information shall be treated as

4

Case 1:23-cv-00325-WCB   Document 180   Filed 08/13/24   Page 114 of 249 PageID #:
5739
Case 1:23-cv-00325-WCB   Document 70   Filed 10/27/23   Page 5 of 29 PageID #: 1683

Highly Confidential Information under this Order from the moment of designation. When any portion of the Deposition Record is designated prior to or during the Review Period as containing Highly Confidential Information, any persons, entities, or parties not authorized to access Highly Confidential Information under Section 4 shall no longer be granted access to that portion of the Deposition Record and shall destroy or return any copies of that portion of the Deposition Record in the person, entity, or party's possession or control. Notwithstanding the foregoing, the deponent may review the transcript at any time. A Party shall have the right to change any prior designations of the Deposition Record during the Review Period. At the close of the Review Period, all then-current designations made on the record or by written communication shall remain in force, subject to a Party's right to contest them as provided in Section 12. In addition, the applicable confidentiality designation shall be placed on the front of the original deposition transcript and on each page of the transcript. If all or part of a videotaped deposition is designated as Confidential Information, the DVD, filename, or other storage device shall also be labeled with the applicable confidentiality designation.

**3.    Disclosure of Confidential Information.**

Access to Confidential Information produced under the protection of this Order shall be limited to:

(a)    Attorneys employed by the law firms of record for the Parties in this Action, as well as such attorneys' respective paralegal, investigative, technical, administrative, secretarial, and clerical personnel, and any outside photocopying, document storage, data processing, or graphic production services employed or retained by them, who are engaged in assisting them in this Action ("Outside Counsel");

5

Case 1:23-cv-00325-WCB    Document 180    Filed 08/13/24    Page 115 of 249 PageID #:
5740
Case 1:23-cv-00325-WCB   Document 70   Filed 10/27/23   Page 6 of 29 PageID #: 1684

(b)     Up to three designated persons (limited to three total for Deloitte Consulting LLP and Deloitte Development LLC combined, and limited to three total for Sagitec Solutions, LLC), provided such personnel are not competitive decision makers, who are either—

     (i)     in-house attorneys employed by a Party, as well as their respective paralegal, investigative, technical, administrative, secretarial, and clerical personnel, only to the extent they are assisting or cooperating with Outside Counsel in the prosecution or defense of the claims advanced in this Action, or

     (ii)     non-attorney representatives employed by a Party

—to be disclosed by the Receiving Party to the Producing Party and identified by name, position, and a description of the person's role and obligations to the Receiving Party before that person may see Confidential Information, subject to objection under Section 5, and provided that Section 9 of this Order has been complied with;

(c)     Any outside expert, consultant, or investigator retained by a Party or by counsel for a Party for purposes of consulting or testifying in this Action (an "Expert") and their employees, subject to objection under Section 5, provided that (i) such Expert has no financial interest in or a business or personal relationship with any of the Parties (for avoidance of doubt, prior expert, consulting, or investigative services for the Party retaining the Expert or its counsel is not disqualifying); and (ii) Section 9 of this Order has been complied with;

(d)     Any person who authored, received, or otherwise has been provided access in the ordinary course outside this Action to the Confidential Information sought to be disclosed to that person;

6

(e)     This Court, the appellate court(s), the Court's personnel, jurors, alternate jurors, and qualified persons (including necessary clerical personnel) recording, taking, or transcribing testimony or argument at any deposition, hearing, trial, or appeal in this Action;

(f)     Any other person to whom the Producing Party agrees in writing or on the record in advance of the disclosure, provided that the person has complied or agrees in advance to comply with Section 9 of this Order, and any other person whom the Court directs should have access to the Confidential Information;

(g)     Mock jurors, to the extent permitted by Section 4(b), provided that Section 9 of this Order has been complied with; and

(h)     Any mediators or arbitrators retained to resolve this Action, provided that Section 9 of this Order has been complied with.

**4.     Disclosure of Highly Confidential Information.**

(a)     Access to Highly Confidential Information produced under the protection of this Order shall be limited to persons described in Sections 3(a) and 3(c)–3(h), and any person described in Section 3(b) if such person is responsible for managing this Action, but only to the extent reasonably necessary for litigation purposes and subject to the following limitations.

(b)     A Receiving Party may disclose arguments, descriptions, demonstratives, and other materials derived from or excerpting limited portions of another Party's Confidential Information or Highly Confidential Information to mock jurors pursuant to Section 3(g). A Receiving Party may not disclose, transmit, or allow possession of complete, as-produced Documents containing another Party's Confidential Information or Highly Confidential Information to mock jurors.

(c)     Unless otherwise ordered by the Court or agreed to in writing by the Producing Party, a Party that seeks to disclose to an Expert (as defined in Section 3(c) of this Order) any

7

SAGITEC-DEL_06920289

information or item that has been designated Highly Confidential Information by the Producing Party shall provide written notice to the Producing Party that (i) sets forth the full name of the Expert and the city and state of his or her primary residence, (ii) attaches a copy of the Expert's current resume, (iii) identifies the Expert's current employer(s), (iv) identifies each person or entity from whom the Expert has received compensation or funding for work in his or her areas of expertise or to whom the Expert has provided professional services, including in connection with a litigation, at any time during the preceding five years and the party to the litigation for whom such work was done, and (v) identifies (by name and number of the case, filing date, and location of court) any litigation in connection with which the Expert has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years. With regard to the information sought through part (5) of this disclosure, if the Expert believes any of this information is subject to a confidentiality obligation to a third party, then the Expert should provide whatever information the Expert believes can be disclosed without violating any confidentiality agreements. Notwithstanding anything to the contrary in this Section, employees of any Expert do not need to be disclosed. Subsequent disclosure is subject to the requirements of Section 5.

(d)     Highly Confidential Information shall not be given, shown, made available, communicated, or otherwise disclosed to any other person. Highly Confidential Information must remain at all times in the physical custody and control of the persons described in this Section.

**5.     Objections to Disclosure**

(a)     A Producing Party which receives notice that a Receiving Party plans to designate a recipient of the Producing Party's Confidential Information under Sections 3(b) and 3(c) shall have five (5) business days from the date of notice to object to disclosure to that person in

8

SAGITEC-DEL_06920290

writing in good faith. Any such objection must set forth the grounds upon which it is based and, to avoid ambiguity as to whether a challenge has been made, recite that the challenge is being made in accordance with this specific Section of the Protective Order.

(b)     The Receiving Party shall not disclose the Confidential Information to the designee prior to receiving the Producing Party's consent or to the expiration of the five (5) day notice period. In the absence of any objection at the end of the five (5) day period, the designee shall be deemed approved under this Agreement. If a timely written objection is made, the Parties must meet and confer (through direct voice to voice dialogue) to try to resolve the dispute by agreement within five (5) days of the written objection. If the Parties cannot reach agreement, the objecting Party must seek relief from the Court in accordance with the requirements for disputes relating to protective orders as stated in the Court's Scheduling Order (D.I. 51) ¶ 3(g) within ten (10) days from the date of the Receiving Party's notice. If relief is not sought from the Court within that time and after good faith efforts to meet and confer, the objection to disclosure shall be deemed withdrawn. The Receiving Party shall not disclose the Confidential Information to the designee until the objection is resolved or withdrawn.

6.     **Procedures for Source Code Inspection**

(a)     A Producing Party's Source Code made available for inspection shall be considered designated as "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY – SOURCE CODE," unless the Producing Party states otherwise in writing. Nothing in this Section, however, prevents the Producing Party from producing Source Code under a less restrictive confidentiality designation or in a different format. Unless the Producing Party states otherwise in writing, or unless the Parties otherwise agree in writing, Source Code shall be subject to the following restrictions and protections.

(b)     Source Code Inspection.

9

Case 1:23-cv-00325-WCB   Document 180   Filed 08/13/24   Page 119 of 249 PageID #:
5744
Case 1:23-cv-00325-WCB   Document 70   Filed 10/27/23   Page 10 of 29 PageID #: 1688

(i)     The Secure Room.  Source Code will be made available for inspection in a
secure room in computer searchable format on a stand-alone computer (that is, a
computer not connected to a network or the Internet) (the "Source Code Computer") on
mutually-agreeable business day(s) from 8:30 a.m. to 8:30 p.m. local time at an office of
a law firm of record for the Producing Party, or at some other location mutually agreed
upon in writing by the Producing Party and the Receiving Party (the "Secure Room").
Before being admitted into the Secure Room, an individual might be asked to provide a
photo identification card sanctioned by the government of a state of the United States or
by the national government of the individual's current citizenship.  The Producing Party
shall provide the Receiving Party with information explaining how to start, log on to, and
operate the Source Code Computer in order to access the Source Code.  The Producing
Party may configure the Source Code Computer to disable screenshots, screen sharing, or
other ability to transfer any data off the Source Code Computer, but shall either provide a
wired external USB mouse and keyboard to be used to facilitate review, or permit an
individual reviewer to bring a wired external USB mouse and/or keyboard to facilitate
review.

(ii)     The Producing Party shall load select software tools, agreed on by the
Parties, on the Source Code Computer to facilitate viewing, searching, and analyzing the
Source Code produced for inspection, on the platform produced, if such tools exist.
Specific tools may include without limitation: Eclipse, Notepad++, Source Navigator,
PowerGrep, ExamDiff Pro, Understand, Beyond Compare, CodeSuite, Sherlock, Git,
SVN, or similar programs.  If any requested tools require licenses, the Receiving Party
must provide appropriately licensed copies of the software tools to the Producing Party at

10

SAGITEC-DEL_06920292

Case 1:23-cv-00325-WCB   Document 180   Filed 08/13/24   Page 120 of 249 PageID #:
5745
Case 1:23-cv-00325-WCB   Document 70   Filed 10/27/23   Page 11 of 29 PageID #: 1689

least ten (10) days prior to the date on which the Receiving Party wishes to use such tools
so that the producing Party may install such tools on the Source Code Computer. If the
Parties are unable to agree on the additional requested software tools, the Receiving Party
may seek an Order from the Court after making a good faith effort to resolve the dispute.

(iii)    Notice.  When the Receiving Party wishes to review the Producing Party's
Source Code, the Receiving Party shall provide notice to the Producing Party at least
three (3) business days prior to the requested review date.  Such notice shall include the
estimated start time of the review, estimated duration of the review, and identification of
the individuals who will be reviewing the Producing Party's Source Code.  Such
individuals shall be limited to the persons described in Sections 3(a) and 3(c) and subject
to compliance with Section 4 unless otherwise agreed in writing by the Parties.  The
Producing Party shall make reasonable efforts to accommodate the Receiving Party's
request for access to the Source Code Computer upon shorter notice, and the Receiving
Party shall make reasonable efforts to provide as much advance notice for any subsequent
review sessions as possible.  The Receiving Party and the Producing Party shall cooperate
in accommodating each other's schedules when agreeing to the date(s) of inspection.  If a
Producing Party is asked to produce any Source Code that is owned by a third party and
subject to a claim of confidentiality or subject to any license restriction on its distribution
or release, the Party possessing the third party Source Code shall notify the third party
and Receiving Party within three (3) business days of the request to produce such code.
The third party will have an opportunity to object to such production and to seek a
protective order from the Court concerning the same within fifteen (15) days of being
notified of the anticipated production of such data.  If the third party does not object

11

SAGITEC-DEL_06920293

Case 1:23-cv-00325-WCB    Document 180    Filed 08/13/24    Page 121 of 249 PageID #:
5746
Case 1:23-cv-00325-WCB    Document 70    Filed 10/27/23    Page 12 of 29 PageID #: 1690

within this limit, any objections will be deemed waived. Until such time as a third party's objection is resolved by the Court, if an objection is made, or for the period in which an objection may be made, the Producing Party in possession of such third party source code shall not produce it for inspection.

(iv)    Restrictions on Note Taking. Except as otherwise provided by this Order or agreed by the parties in writing, no electronic copies may be made of any Source Code. Written notes relating to the Source Code may be taken only in spiral or permanently-bound notebooks and shall be designated as HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY – SOURCE CODE. The Source Code may not be copied into the notes. Notwithstanding this provision, file name and location (*i.e.*, directory path) may be copied into the notes. The Producing Party may visually monitor the activities of the Receiving Party's representatives during any review but only to ensure there is no unauthorized recording, copying, or transmission of the Source Code. The Producing Party may not monitor what code is being reviewed by the Receiving Party's representative(s). For the avoidance of doubt, no provision in this Section gives the Producing Party the right to inspect or review any notes and/or other work product of the Receiving Party, and nothing herein shall be construed to make such notes discoverable absent a waiver of attorney-client, work product, or other privilege.

(v)    A reviewer may not make phone calls during an inspection, except to other authorized reviewers. Other than devices used to make phone calls to other authorized reviewers, reviewers shall not use networked devices of any kind during a Source Code inspection. The reviewer may leave the room where the inspection is being conducted to use Internet-connected devices or make a private phone call.

12

(vi)     The Receiving Party shall not copy, modify, e-mail, message, upload, download, or otherwise electronically store, transmit, or tamper with any Source Code, including, but not limited to, through use of a camera or imaging device.

(c)     Requesting Paper Copies of Source Code. Notwithstanding the limitations in this Order, a Receiving Party is allowed to designate specific portions of the Source Code for later printing upon written notice to the producing party. Printing designations are restricted to what is reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition, hearings, mediations, arbitration, or trial. The Receiving Party will identify the Source Code file to be printed, the original file path, and the excerpt to be printed as identified by line numbers. A Receiving Party is not entitled to designate excessive portions of the Source Code to facilitate review of the Source Code away from the Secure Room; the Source Code is to be reviewed and analyzed using the Source Code Computer and printed only as necessary for the purposes outlined in this Section.

(d)     Delivery of Printouts. The Producing Party shall print the designated portions of the Source Code with a Bates number, original file path of the file, and line numbers, and label them "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY – SOURCE CODE." The Producing Party and the Receiving Party may also agree in writing that the Receiving Party may perform the printing and provide the printed pages to the Producing Party for reproduction and distribution. Within five (5) days of the Receiving Party's request, the Producing Party must either (i) deliver three (3) paper copy sets of the designated and printed pages to the office of one of the Receiving Party's Outside Counsel of Record (to be designated by the Receiving Party) or provide PDF copies (via encrypted file transfer or USB drive) to enable the Receiving Party to print up to three (3) paper copy sets of the designated pages; or (ii) object in writing that, under

13

SAGITEC-DEL_06920295

this Order, the designated portions are excessive or the Producing Party believes in good faith were not requested for a permitted purpose. Unless otherwise agreed in writing by the Parties or ordered by the Court, a Receiving Party may cumulatively possess printed copies of no more than 2,500 pages of a Producing Party's Source Code. For the avoidance of doubt, additional copies of the same printed pages of Source Code as permitted by this Order do not count towards the 2,500 page limit.

(e)     Objection to Printouts. In the event that the Producing Party timely objects that the printed portions were not requested for a permitted purpose or are excessive under this Section, the Producing Party and the Receiving Party shall first try to resolve the dispute in good faith including through a meet and confer within 5 days of the objection. If the dispute cannot be resolved, the Receiving Party may seek relief from the Court in accordance with the procedures for disputes relating to discovery matters and protective orders, as stated in the Court's Scheduling Order (D.I. 51) ¶ 3(g).

(f)     Logs. The Producing Party may maintain a log identifying: (i) the name of each person who accessed the Secure Room; (ii) the date and time of access; and (iii) the length of time of access. The Receiving Party shall maintain a log identifying the printed source code in its possession, including the location of such copies and the Outside Counsel or Expert responsible for maintaining the security of each copy according to the safeguards required by this Section. The Receiving Party must provide the Producing Party with the information from the Receiving Party's log by email on two (2) business days' notice, but no more than once per month absent a showing of good cause.

(g)     Maintenance of Printouts. If the Receiving Party's Outside Counsel of Record or Experts obtain permissible printouts or photocopies of Source Code under the provisions of this

14

Case 1:23-cv-00325-WCB   Document 180   Filed 08/13/24   Page 124 of 249 PageID #:
5749
Case 1:23-cv-00325-WCB   Document 70   Filed 10/27/23   Page 15 of 29 PageID #: 1693

Order, the Receiving Party shall ensure that such Outside Counsel of Record and Experts keep the printouts or photocopies in a locked storage container in a locked room or closet where they will not be accessible to persons other than those allowed access under this Protective Order. The Receiving Party is prohibited from having more than three (3) copies of Source Code printouts except as provided in this Section. Persons allowed to access the Source Code printouts under Sections 3(a) and 3(c) of this Protective Order may also temporarily keep the Source Code printouts in their physical possession while at: (i) Court for any proceedings(s) relating to the Source Code, for the dates associated with the proceeding(s); (ii) the sites where any deposition(s) relating to the Source Code are taken, for the dates associated with the deposition(s); and (iii) any reasonably secure intermediate location reasonably necessary for the Person to transport the printouts (*e.g.*, a locked hotel room prior to a Court proceeding or deposition). The Receiving Party shall exercise due care in limiting visual access to the Source Code printouts, maintaining the security of the printouts at these temporary locations, and securely transporting the printouts to and from these temporary locations.

(h)     Use of Paper Source Code. Any paper copies of Source Code may not be further copied, digitally imaged or otherwise duplicated except:

(i)     Outside Counsel of record for a Party may scan or make digital copies of printed Source Code in PDF or image format for the limited purpose of a trial, hearing, mediation, or arbitration, including demonstratives or exhibits, briefing exhibits, depositions, written discovery requests or responses, and expert reports and exhibits. Any such materials containing Source Code shall be clearly labeled as containing HIGHLY CONFIDENTIAL SOURCE CODE and treated as such under this Order. Digital copies of printed Source Code may not be converted into text using optical

15

Case 1:23-cv-00325-WCB   Document 180   Filed 08/13/24   Page 125 of 249 PageID #:
5750
Case 1:23-cv-00325-WCB   Document 70   Filed 10/27/23   Page 16 of 29 PageID #: 1694

character recognition (OCR) or other similar tools and shall not be used for any other

purpose other than that expressly stated herein. The Receiving Party shall use reasonable

measures to prevent unauthorized access to scans or digital copies of Source Code.

(ii)     Notwithstanding the foregoing, the use of Source Code in demonstratives,

exhibits, written discovery, and expert reports should be minimized by, for example,

describing or referring to the structure, function, or salient features of the Source Code

without including verbatim excerpts, or using only such excerpts that are reasonably

required by the circumstances.

(iii)     A Receiving Party intending to use printed Source Code at a deposition or

hearing shall identify to the Producing Party the specific printed pages that may be used

at least three (3) business days in advance, and the Producing Party may either prepare

additional copies for use at the deposition or hearing, authorize the Receiving Party to

make additional copies using the printed Source Code already in its custody, or, in the

case of a virtual deposition or hearing, authorize the display of Source Code in PDF or

image format via the remote deposition or hearing platform. The Producing Party may

direct that any unused additional copies that are not provided to the court reporter or

Court be destroyed after the deposition or hearing.

7.     **Use of Confidential Information.**

(a)     Confidential Information shall not be used by any person, other than the

Producing Party, for any purpose other than prosecuting, defending, or settling this Action. In no

event shall Confidential Information be used for any business, competitive, personal, private,

public, or other purpose, except as required by law.

(b)     Nothing in this Order shall bar or otherwise restrict an attorney from relying on

his or her examination of Confidential Information in rendering advice to his or her client with

16

respect to this matter. In rendering such advice or in otherwise communicating with his or her client, the attorney shall not disclose the content of any Confidential Information unless the client is permitted to receive such information pursuant to this Order.

(c)     Nothing in this Order shall prohibit a Party from disclosing its own Confidential Information to its own witnesses noticed or offered for deposition in this Action based on the disclosures or contentions of another Party. For example, a Party is permitted to disclose to its own witnesses its own Confidential Information, such as Source Code and other trade secret material, that it believes was copied or misappropriated by another Party. Likewise, a Party is permitted to disclose to its own witnesses Confidential Information that it produced to a Receiving Party that the Receiving Party contends was copied or misappropriated.

## 8.     Non-Application of Order.

The restrictions set forth in this Order shall not apply to Confidential Information that (a) was, is, or becomes public knowledge, unless in violation of this Order; or (b) was or is discovered independently by the Receiving Party. Additionally, the restrictions set forth in this Order do not apply to a Producing Party's use of its own Confidential Information.

## 9.     Notification of Confidentiality Order.

(a)     Confidential Information shall not be disclosed to persons described in Sections 3(b), 3(c), and 3(f)–(h) unless and until such persons are provided a copy of this Order and execute an Acknowledgment of Stipulated Protective Order ("Acknowledgment") in substantially the form attached hereto as **Exhibit A.**

(b)     Acknowledgements shall be maintained by the counsel who obtained them until the final resolution of this Action. Acknowledgments and the names of persons who signed them shall not be subject to discovery except upon agreement of the Parties or further order of the Court after application upon notice and good cause shown.

17

Case 1:23-cv-00325-WCB   Document 180   Filed 08/13/24   Page 127 of 249 PageID #:
Case 1:23-cv-00325-WCB   Document 70   Filed 10/27/23   Page 18 of 29 PageID #: 1696
5752

**10. Use of Confidential Information.**

(a)  In This Action.  No Party may file with the Court Confidential Information of any other Party except with the Producing Party's consent or when required for motions or other pending matters in the Action.  Any pleading or exhibit containing another Party's Confidential Information shall initially be filed under seal or with the Confidential Information redacted.

(b)  Other Proceedings.  By entering this Order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case.  Any person or Party subject to this Order who becomes subject to a motion to disclose another Party's information designated as confidential pursuant to this Order shall promptly notify that Party of the motion so that the Party may have an opportunity to appear and be heard on whether that information should be disclosed.

**11. Preservation of Rights and Privileges.**

(a)  Neither the acceptance by a Party of any Document, material, or information nor the failure of a Party to take action to enforce the terms of this Order shall constitute a concession or admission that the Document, material, or information contains Confidential Information or that that the Document, material, or information is admissible in or relevant to this Action.  A Party's compliance with the terms of this Order shall not operate as an admission that any particular Document is or is not confidential, privileged, or admissible in evidence at any trial or hearing in this Action or any other judicial or administrative proceeding.

(b)  Nothing in this Order shall constitute or be deemed or construed as a waiver of the right of a Party at any time (i) to seek a determination by the Court whether any particular Document, material, or information should be subject to the terms of this Order; (ii) to seek relief from any provision(s) of this Order, either generally or as to any particular Document or other

18

Case 1:23-cv-00325-WCB   Document 180   Filed 08/13/24   Page 128 of 249 PageID #:
5753
Case 1:23-cv-00325-WCB   Document 70   Filed 10/27/23   Page 19 of 29 PageID #: 1697

piece of Confidential Information, in whole or in part; (iii) to seek a higher level of protection than provided for by this Order if the Party believes that circumstances warrant that higher level of protection; (iv) to seek Documents or other information from any source; or (v) to object to any discovery request, including the right to assert that no discovery should be had of certain Documents, material, or information.

**12.     Challenging Confidentiality Designations.**

(a)      Timing of Challenges.  Unless a prompt challenge to a designating Party's confidentiality designation is necessary to avoid foreseeable substantial unfairness, unnecessary economic burdens, or a later significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

(b)      Meet and Confer.  A Party that elects to initiate a challenge to a designating Party's confidentiality designation must do so in good faith and must begin the process by conferring directly via telephone with counsel for the designating Party.  In conferring, the challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation.  A challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet-and-confer process first.

(c)      Judicial Intervention.  A Party that elects to press a challenge to a confidentiality designation after considering the justification offered by the designating Party may seek relief from the Court.  Until the Court rules on the challenge, all Parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation.

19

**13. Duration.**

Even after the termination of this Action, confidentiality obligations under this Order shall remain in effect for each piece of Confidential Information until the Producing Party agrees in writing otherwise or a Court order directs otherwise.

**14. Return/Destruction of Materials.**

(a) Within sixty (60) days after the final resolution of this Action, all Confidential Information, including all copies, abstracts, and summaries, either shall be destroyed or returned to counsel for the Producing Party, with the Receiving Party certifying to the destruction or return of such materials.

(b) Notwithstanding the foregoing, Outside Counsel of record in the Action may retain Confidential Information in copies of pleadings, motions, or other court-filed papers, in official transcripts and exhibits thereto, and in attorney work product, including counsels' email and document management systems. For the avoidance of doubt, Counsel shall continue to treat all such materials as Confidential Information pursuant to the requirements of this Order, and may not disclose such retained Confidential Information to persons other than those already permitted to receive Confidential Information under this Order.

**15. Inadvertent Disclosure.**

The inadvertent or unintentional disclosure by the Producing Party of Confidential Information, regardless of whether the information was so designated at the time of disclosure, shall not be deemed to be a waiver in whole or in part of the Producing Party's claim of confidentiality, either as to the specific information disclosed or as to any other information on the same or related subject matter. Upon learning of an inadvertent or unintentional disclosure of Confidential Information, the Producing Party shall designate such information as Confidential Information or Highly Confidential Information within thirty (30) days. The obligation to treat

20

Case 1:23-cv-00325-WCB    Document 180    Filed 08/13/24    Page 130 of 249 PageID #:
5755
Case 1:23-cv-00325-WCB    Document 70    Filed 10/27/23    Page 21 of 29 PageID #: 1699

such Confidential Information as provided for in this order shall run from the date of designation. Nothing contained within this Section prevents a Party from challenging such a designation of Documents or information pursuant to the procedures described in Section 12.

**16.    Privilege.**

(a)    Privilege Log.  Consistent with the Federal Rules of Civil Procedure, a party withholding or redacting any responsive Document on grounds of any privilege, immunity, work product protection, or similar basis shall provide to the Receiving Party a privilege log, subject to the exclusions identified in Section 16(c).  Privilege logs will be exchanged in Excel format.  The information contained in each Party's respective privilege log shall comply with the requirements set forth in Federal Rule of Civil Procedure 26(b)(5) and identify or provide: (i) the date of the Document; (ii) all persons who authored, prepared, signed, or sent the Document; (iii) all persons designated as addressees or recipients of the Document; (iv) a description of the contents of the document that, without revealing information itself privileged or protected, is sufficient to understand the subject matter of the document and the basis of the claim or privilege or immunity; (v) the type or nature of the privilege asserted (*e.g.*, attorney-client privilege, work product doctrine); and (vi) for redacted documents only, the Bates numbers corresponding to the first and last page of any document redacted.

(b)    Logging E-mails.  An e-mail thread (*e.g.*, a series of e-mails that are related as a series of e-mail replies and/or forwards) that is completely withheld may be logged as a single entry so long as the log entry complies with Section 16(a) and provides complete information for the entire e-mail thread. If a Producing Party produces one or more redacted e-mails from the same e-mail thread, each e-mail shall be separated logged and identified by production number.

21

SAGITEC-DEL_06920303

Case 1:23-cv-00325-WCB   Document 180   Filed 08/13/24   Page 131 of 249 PageID #:
5756
Case 1:23-cv-00325-WCB   Document 70   Filed 10/27/23   Page 22 of 29 PageID #: 1700

(c)     Exclusions from Logging. In addition to the categories identified in Sections
1.d(ii)–(iii) of the Default Standard, the following categories of documents do not need to be
included on a Producing Party's privilege log:

(i)     Any communications in connection with this Action exclusively between
a Party and its Outside Counsel, an agent of Outside Counsel other than the Party, or any
non-testifying experts, or, with respect to information protected by Federal Rule of Civil
Procedure 26(b)(4), testifying experts in connection with this Action;

(ii)    Any privileged materials or work product created in connection with this
Action by or specifically at the direction of a Party's Outside Counsel, an agent of
Outside Counsel other than the Party, any non-testifying experts, or, with respect to
information protected by Federal Rule of Civil Procedure 26(b)(4), testifying experts in
connection with this Action; and

(iii)   Documents relating to activities undertaken in compliance with the duty to
preserve information (including, but not limited to, litigation hold letters).

(d)     Redactions. The Producing Party will undertake reasonable efforts to make
limited, line-by-line redactions of privileged or work product information. For emails, metadata
(such as the subject line or attachment name) shall not be redacted unless the specific field
contains privileged or work product information.

(e)     Inadvertent Production and Waiver. The inadvertent production of any material
or information protected by any applicable privilege, protection, or immunity in this Action shall
not be deemed to waive, in whole or in part, any privilege or work product protection in this
Action or in any other federal or state proceeding unless the Producing Party failed to take
reasonable steps to prevent disclosure or, upon discovery of the inadvertent disclosure, fails to

22

Case 1:23-cv-00325-WCB   Document 180   Filed 08/13/24   Page 132 of 249 PageID #:
5757
Case 1:23-cv-00325-WCB   Document 70   Filed 10/27/23   Page 23 of 29 PageID #: 1701

promptly take reasonable steps to rectify the error, consistent with Federal Rule of Civil
Procedure 26(b)(5)(B) and this Order. The provisions of this Section explicitly are intended to
be, and are, an Order of the Court issued pursuant to Federal Rule of Evidence 502(d).

(f)      Claw-Back Process. Upon the written request of a Producing Party, the Receiving
Party shall promptly return or destroy (i) all copies of inadvertently produced Documents
identified by the Producing Party and (ii) any Documents derived from the inadvertently
produced Documents. If the Receiving Party intends to challenge any claim of privilege,
protection, or immunity based on the inadvertent production, it must notify the Producing Party
in writing within five (5) days after receiving a written request from the Producing Party seeking
the return or destruction of the inadvertently produced materials. If the Parties are unable to
resolve the disputed privilege claim, the Receiving Party shall seek relief from the Court. Until
the disputed privilege issue is resolved, the Receiving Party may retain the inadvertently
produced materials but may use such materials only for the purpose of litigating the privilege
claim.

## 17.   Subpoenas.

Any Party or person in possession of Confidential Information who receives a subpoena
or other process from any person or entity who is not a Party seeking production or other
disclosure of such Confidential Information, shall promptly and in any case within three (3)
business days give telephonic notice and written notice by overnight delivery or facsimile to
counsel for the Producing Party who designated the materials as Confidential Information,
identifying the materials sought and enclosing a copy of the subpoena or other process. The
Party or person receiving the subpoena also shall inform the person seeking the Confidential
Information that such information is subject to this Order. No production or other disclosure of
such information pursuant to the subpoena or other process shall occur before the last date on

23

Case 1:23-cv-00325-WCB   Document 180   Filed 08/13/24   Page 133 of 249 PageID #:
5758
Case 1:23-cv-00325-WCB   Document 70   Filed 10/27/23   Page 24 of 29 PageID #: 1702

which production may be made as specified in or required by the subpoena or other process. Nothing contained within this Section shall obligate any Party or person who receives a subpoena or other process seeking the production or disclosure of Confidential Information to resist such production or disclosure, or be construed as encouraging any Party or person not to comply with any court order, subpoena, or other process.

**18.    Application to Non-Parties.**

(a)    This Order shall apply to any non-Party who is obligated to provide discovery, by deposition, production of Documents, or otherwise, in this Action, if that non-Party requests the protection of this Order as to its Confidential Information and agrees to be bound by the provisions of this Order by executing an Acknowledgement in substantially the form attached hereto as **Exhibit A**. This Order also shall apply to non-Parties who are afforded access to Documents or information produced during discovery in this Action, whether by deposition, production of Documents, or otherwise. Such non-Parties shall execute an Acknowledgment in substantially the form attached hereto as **Exhibit A.**

(b)    Additionally, in the event a non-Party is compelled to provide discovery in this Action by a subpoena, a Party who believes in good faith that such subpoena may compel disclosure of Confidential Information in connection with which that Party holds a proprietary or other interest, shall promptly so notify the Party serving such subpoena. Such Party may thereupon designate Confidential Information in accordance with Section 2 of this Order. Specifically with respect to Documents produced in response to a subpoena as to which a Party has given notice under this Section, the Party receiving such Documents shall, upon receipt of said Documents, so advise the Party giving notice. The Party giving notice shall then have ten (10) days to inspect and to designate such Documents for protection in accordance with this

24

SAGITEC-DEL_06920306

Case 1:23-cv-00325-WCB   Document 180   Filed 08/13/24   Page 134 of 249 PageID #:
5759
Case 1:23-cv-00325-WCB   Document 70   Filed 10/27/23   Page 25 of 29 PageID #: 1703

Order. Pending such designation, the Documents produced shall be treated as Highly
Confidential Information.

**19.    Modification of the Order.**

This Order shall not foreclose a Party from moving this Court for an order that any
information, Documents, interrogatory answers, responses to requests for admissions, deposition
testimony and transcripts, deposition exhibits, any other discovery materials, and any copies,
notes, abstracts, or summaries of the foregoing, within the meaning of this Order are, in fact, not
Confidential Information or Highly Confidential Information or otherwise protectable under
Federal Rule of Civil Procedure 26(c). In addition, this Order shall not prevent a Party from
applying to the Court for relief therefrom, or from applying to the Court for further or additional
protective orders, or from agreeing to modification of this Order, subject to the approval of the
Court.

**20.    Reservation of Jurisdiction.**

Upon the final resolution of this Action, the provisions of this Order shall continue to be
binding. This Court expressly retains jurisdiction over any request for enforcement of the
provisions of this Order following the final resolution of this Action.

**21.    Parties Bound.**

This Order is binding on all Parties to this Action, on all non-Parties who have agreed to
be bound by this Order and on all others who have signed the Acknowledgment in substantially
the form attached hereto as **Exhibit A**, and shall remain in full force and effect until modified,
superseded, or terminated by consent of the Parties or by an order of the Court.

**22.    Time.**

All time periods set forth in this Order shall be calculated according to Federal Rule of
Civil Procedure 6, as in effect at the time of this Order's execution.

25

Case 1:23-cv-00325-WCB    Document 180    Filed 08/13/24    Page 135 of 249 PageID #:
5760
Case 1:23-cv-00325-WCB   Document 70   Filed 10/27/23   Page 26 of 29 PageID #: 1704

**23.    Execution in Counterparts.**

This agreement may be executed in counterparts. Facsimile and electronic signatures will be considered as valid signatures as of the date hereof, although counsel will retain the original signature pages in case they must be filed with the Court at some time in the future.

SAGITEC-DEL_06920308

Case 1:23-cv-00325-WCB    Document 180    Filed 08/13/24    Page 136 of 249 PageID #:
5761
Case 1:23-cv-00325-WCB    Document 70    Filed 10/27/23    Page 27 of 29 PageID #: 1705

SHAW KELLER LLP

*/s/ Andrew E. Russell*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com

OF COUNSEL:

Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Gregg F. LoCascio
Patrick Arnett
Nicholas Teleky
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave NW
Washington, DC 20004
(202) 389-5000

John F. Hartmann
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

*Attorneys for Plaintiffs Deloitte Consulting
LLP and Deloitte Development LLC*

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Robert M. Vrana*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

OF COUNSEL:
Christopher K. Larus
David A. Prange
Brandon A. Carmack
ROBINS KAPLAN, LLP
800 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500

*Attorneys for Sagitec Solutions, LLC*

Dated: October 24, 2023

SO ORDERED

SIGNED this 27th day of October, 2023.

_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

27

Case 1:23-cv-00325-WCB    Document 180    Filed 08/13/24    Page 137 of 249 PageID #:
5762
Case 1:23-cv-00325-WCB    Document 70    Filed 10/27/23    Page 28 of 29 PageID #: 1706

## EXHIBIT A

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DELOITTE CONSULTING LLP and<br>DELOITTE DEVELOPMENT LLC,<br><br>     Plaintiffs,<br><br>v.<br><br>SAGITEC SOLUTIONS, LLC,<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)  C.A. No. 23-325-WCB<br>)<br>)<br>)<br>) |

## ACKNOWLEDGEMENT OF STIPULATED PROTECTIVE ORDER

The undersigned has read the attached Stipulated Protective Order ("Order"), understands the terms of the Order, and agrees to be bound and fully abide by the terms of the Order. In particular:

(a)    The undersigned will hold in confidence, will not disclose to anyone other than those persons specifically authorized by the Order, and will not copy or use, except for the purposes of the above-captioned Action, any information designated as Confidential Information or Highly Confidential Information received in this Action.

(b)    The undersigned acknowledges that all Confidential Information or Highly Confidential information received and all Documents and things containing information designated as Confidential Information or Highly Confidential Information are to remain in the undersigned's personal custody until the undersigned's duties have been completed. The undersigned agrees to return or to destroy all such information and all notes containing any such information in accordance with the Order.

(c)    The undersigned is either:

SAGITEC-DEL_06920310

Case 1:23-cv-00325-WCB   Document 180   Filed 08/13/24   Page 138 of 249 PageID #:
5763
Case 1:23-cv-00325-WCB   Document 70   Filed 10/27/23   Page 29 of 29 PageID #: 1707

(i)     If designated under Sections 3(c) or 3(f)–(h) of the Order, not currently,

regularly, or expecting to be an employee of any Party to this Action; or

(ii)    If designated under Section 3(b) of the Order, currently employed by a

Party to the above-captioned Action, but does not hold a role for the Party that involves

any competitive decision making.

(d)     The undersigned agrees, should any of the foregoing applicable conditions change

during the course of this Action, to promptly notify counsel for the Party that requested this

acknowledgement to be signed.

(e)     The undersigned submits to the jurisdiction and venue of the Court and

understands that the Court may impose sanctions for any violation of the Order.

I declare under the penalty of perjury under the laws of the United States that the

foregoing is true and correct.

Dated: _____                _____

                                               Signature


                                               _____

                                               Name

| From: | ded_nefreply@ded.uscourts.gov |
|---|---|
| To: | ded_ecf@ded.uscourts.gov |
| Subject: | [EXTERNAL] Activity in Case 1:23-cv-00325-WCB Deloitte Consulting LLP et al v. Sagitec Solutions LLC SO ORDERED |
| Date: | Friday, October 27, 2023 7:39:07 AM |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### District of Delaware

### Notice of Electronic Filing

The following transaction was entered on 10/27/2023 at 8:37 AM EDT and filed on 10/27/2023
**Case Name:**      Deloitte Consulting LLP et al v. Sagitec Solutions LLC
**Case Number:**   1:23-cv-00325-WCB
**Filer:**
**Document Number:** 70

**Docket Text:**
**SO ORDERED, re [68] Proposed Stipulated Protective Order. Signed by Judge William C. Bryson on 10/27/2023. (twk)**

**1:23-cv-00325-WCB Notice has been electronically mailed to:**

John W. Shaw     jshaw@shawkeller.com, cal@shawkeller.com

Anne Shea Gaza     agaza@ycst.com, corpcal@ycst.com, corporate@ycst.com

Andrew Russell     arussell@shawkeller.com, cal@shawkeller.com

Christopher K. Larus     clarus@robinskaplan.com, npierick@robinskaplan.com

Robert M. Vrana     rvrana@ycst.com, corpcal@ycst.com, corporate@ycst.com

Joshua L. Simmons     joshua.simmons@kirkland.com, erika.dillon@kirkland.com

Gregg F. LoCascio     glocascio@kirkland.com, kenymanagingclerk@kirkland.com

David A. Prange     dprange@robinskaplan.com, JSavina@robinskaplan.com

SAGITEC-DEL_06920312

John F. Hartmann    jhartmann@kirkland.com, ecf-bfb1bc342c02@ecf.pacerpro.com

Rajin S. Olson    rolson@robinskaplan.com, CourtMail@Robinskaplan.com

Patrick Arnett    patrick.arnett@kirkland.com, gaya.holman@kirkland.com

Nick Teleky    nick.teleky@kirkland.com

Brandon A. Carmack    bcarmack@robinskaplan.com, mtacheny@robinskaplan.com

**1:23-cv-00325-WCB Filer will deliver document by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=10/27/2023] [FileNumber=5361498-0] [c47e92165faae3bcdab9403d5b312621b4c77913742f118a68acf594e19b8af5a5 5328ac2ed99055c53f4a28e92dc7ad7f1d867c03769761e252a35e3fa790d3]]

SAGITEC-DEL_06920313

# Exhibit 4



THE COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF LABOR AND WORKFORCE DEVELOPMENT
DEPARTMENT OF UNEMPLOYMENT ASSISTANCE

MAURA HEALEY
GOVERNOR

KIM DRISCOLL
LIEUTENANT GOVERNOR

LAUREN E. JONES
SECRETARY

KATIE DISHNICA
DIRECTOR

May 28, 2024

David A. Prange
800 Lasalle Avenue
Suite 2800
Minneapolis, MN 55402
*dprange@robinskaplan.com*

Dear Attorney Prange:

I am writing to respond to your public records request sent electronically to the
Massachusetts Department of Unemployment Assistance (DUA) on January 9, 2024.
Your request seeks:

"1. Documents related to the Massachusetts QUEST Project including:

a. Documents sufficient to show any project proposal from Deloitte, any
contract or agreement signed by Deloitte and Massachusetts or any
department thereof, any signed amendments, and any attachments,
exhibits, schedules, or other documents including but not limited to
use cases;

b. Documents sufficient to show all software design documents
including without limitation use cases

c. All unemployment insurance software ("UI software");

d. Any other byproducts of software development for the
Massachusetts QUEST Project, including but not limited to data
models, data definition languages, entity relationship diagrams,
source code, and use cases.

2. All deliverables resulting from the Massachusetts QUEST Project, including
a copy of the UI software delivered by Deloitte to Massachusetts DUA;

3. Billing records and/or invoices submitted by Deloitte to Massachusetts
DUA resulting from the Massachusetts QUEST Project sufficient to
identify the Deloitte personnel involved in the project; and

100 CAMBRIDGE STREET • SUITE 400 • BOSTON, MA 02114
www.mass.gov/dua

MA DUA
5/31/2024
Ex. 42
23-cv-325-WCB

SAGITEC-DEL_07352835

John Cronin
May 28, 2024

4. Documents sufficient to show participants [in] the Massachusetts QUEST Project employed by Massachusetts DUA or other Massachusetts entity."

Via secure upload to Robins Kaplan directly on April 25 and 26, and May 23, 2024, DUA has provided documents responsive to these requests, including:

- contractual statements of work and amendments thereto, entered into between Deloitte (formerly BearingPoint) and EOLWD/DUA;

- QUEST/UI Online system use cases; and

- various email correspondences and documents referencing, among other things, funding and requisitions for project payments and correspondences naming Commonwealth of Massachusetts and Deloitte/BearingPoint employees involved in the QUEST project.

Regarding the electronic materials that you have requested, DUA is in possession of, but is withholding from disclosure, the UI Online/QUEST system source code. Per the MA Secretary of State's Custodian of Records Management Bulletin SPR 03-96, "A custodian is not obligated to provide copies of a computer program. A computer program in and of itself is a tool used in the processing of data rather than a "record," and therefore is not subject to mandatory disclosure." As such, this material is not a public record and is exempt from disclosure under Massachusetts law.

We are not charging fees for this request.

If you wish to challenge any aspect of this response, you may appeal to the Supervisor of Public Records following the procedure set forth in 950 C.M.R. 32.08, a copy of which is available at http://www.mass.gov/courts/case-legal-res/law-lib/laws-by-source/cmr/. You may also file a civil action in accordance with G. L. c. 66, § 10A.

Sincerely,

/s/ John P. Cronin

John P. Cronin
Deputy Chief Counsel & Keeper of the Records

2

SAGITEC-DEL_07352836

# Exhibit 5

| | |
|---|---|
| **From:** | Olson, Rajin S. <ROlson@RobinsKaplan.com> |
| **Sent:** | Friday, July 19, 2024 4:42 PM |
| **To:** | Teleky, Nick; Bact, Rebecca; Prange, David A.; Carmack, Brandon A.; Larus, Christopher K.; Dawson, Demitri M.; *agaza@ycst.com; *RVrana@ycst.com; THARTZELL@ycst.com; RK-Sagitec |
| **Cc:** | #Deloitte Sagitec; *jshaw@shawkeller.com; Andrew Russell; Arnett, Patrick |
| **Subject:** | RE: Deloitte Consulting LLP et al. v. Sagitec Solutions LLC |

**This message is from an EXTERNAL SENDER**

Be cautious, particularly with links and attachments.

Nick,

We write to confirm a meet and confer for next week, as well as to correct your misstatements below regarding the Massachusetts DUA and New Mexico DWS transcripts and the public records requests propounded to those agencies.

First, we note that Deloitte has noted no basis to designate deposition testimony of a third party as confidential under the protective order (other than in circumstances related to an exhibit for which Deloitte is the Producing Party), despite Sagitec's repeated citations to the relevant Protective Order provisions. Dkt. 70, ¶ 1(h); ¶ 2(d). Similarly, we note that Deloitte has not stated a basis for its purported ability to designate materials that were obtained by Sagitec independently from this litigation's discovery process, and which are indeed not subject to the Protective Order. *See* Bact Email to Arnett, June 4, 2024 at 4:59PM ET; *see also* Dkt. 70 ¶ 8 (Protective Order does not apply to materials that have become public or are discovered by receiving party independently). Nor has Sagitec taken any steps to "irreversibly destroy the confidential nature" of any documents; instead, each state independently evaluated the requests Sagitec's counsel made, and each provided the materials at issue as public records—a status that each state determined with no input from Sagitec.

Sagitec has neither "hidden" its public records requests nor failed to timely disclose them. Sagitec's counsel made these requests separate and apart from the discovery process in this case —as any member of the public could have. We further dispute that Sagitec has at any time acted contrary to its duty to respond to Deloitte's requests for production, and in any event, Sagitec did timely produce the publicly available documents produced pursuant to these requests. As you know, Sagitec produced its request to the New Mexico DWS—and New Mexico's response—on March 20, 2024, well in advance of the New Mexico DWS deposition at the end of May. SAGITEC_DEL_06920264-SAGITEC_DEL_06920313. Sagitec did not receive a response from the Massachusetts DUA to its public records request until May 28, 2024, at which point it produced the request and the response the next day, May 29, 2024, absolutely as quickly as practicable. SAGITEC-DEL_07352833-SAGITEC-DEL_07352836. Further, Sagitec disclosed the existence of its request to Massachusetts as "nearly identical" to the already-produced New Mexico request on April 18, 2024, six weeks prior to the deposition of Massachusetts. *See* Bact Email to Arnett, April 18, 2024 at 11:07AM ET. Your assertion that Sagitec somehow obscured the nature of these productions is baseless. We timely provided you the correspondence provided by the state agencies and then sought testimony as to which documents were produced pursuant to the public records requests in the relevant depositions—at which Deloitte also had the opportunity to (and did) ask questions of the agency representatives. Since those depositions, and since Sagitec's emails of June 4, 2024 laying out the fact that Deloitte has no basis to designate the testimony and documents confidential pursuant to the Protective Order, Deloitte has taken no action.

As to the topic of producing internal communications between Sagitec's investigative counsel who took part in preparing Sagitec's Investigation Report, we are surprised that you are now raising this issue over two months after our last email on the subject; we had understood this issue to be closed. *See* Olson Email to Arnett, May 17, 2024 at 5:23PM ET. Nonetheless, we are willing to discuss. We do note, as stated in the May 17 email, that Deloitte did not identify Sagitec's investigative counsel as custodians, just as Sagitec did not identify Fish & Richardson, Deloitte's prelitigation outside counsel, as custodians. Sagitec complied with the terms of the parties' agreement and produced electronically stored documents from the identified custodians and search terms. Please be prepared at the meet and confer to identify any basis Deloitte has for expanding the scope of the parties' agreed custodian and search term protocol. Moreover, Sagitec disputes that RFP Nos. 24-26 reach communications among Sagitec's internal counsel.

Additionally, please be prepared to discuss (with Delaware counsel present) the following issues at the meet and confer:

- The impasse between the parties as to the financial documents requested by Sagitec pursuant to RFP Nos. 108, 109, 110, 112, 113, as most recently discussed in emails between counsel on July 15 and July 18; and
- Deloitte's deficient responses to Sagitec's Interrogatory Nos. 22-23 and RFP Nos. 118-119, most recently raised in correspondence between counsel on May 6. *See* Bact Email to Teleky, May 6, 2024 at 11:00AM ET; *see also* Prange Letter to Arnett, April 25, 2024.

We are available to meet and confer Tuesday or Wednesday at 9-11 AM ET. Please confirm when Deloitte would like to proceed.

Best regards,

Rajin

---

**From:** Teleky, Nick <nick.teleky@kirkland.com>
**Sent:** Friday, July 19, 2024 11:56 AM
**To:** Bact, Rebecca <RBact@RobinsKaplan.com>; Prange, David A. <DPrange@RobinsKaplan.com>; Carmack, Brandon A. <BCarmack@RobinsKaplan.com>; Larus, Christopher K. <CLarus@RobinsKaplan.com>; Olson, Rajin S. <ROlson@RobinsKaplan.com>; Dawson, Demitri M. <DDawson@RobinsKaplan.com>; *agaza@ycst.com <agaza@ycst.com>; *RVrana@ycst.com <RVrana@ycst.com>; THARTZELL@ycst.com; RK-Sagitec <RK-Sagitec@RobinsKaplan.com>
**Cc:** #Deloitte Sagitec <Deloitte-Sagitec@kirkland.com>; *jshaw@shawkeller.com <jshaw@shawkeller.com>; Andrew Russell <arussell@shawkeller.com>; Arnett, Patrick <patrick.arnett@kirkland.com>
**Subject:** [EXTERNAL] RE: Deloitte Consulting LLP et al. v. Sagitec Solutions LLC

Counsel,

We do not agree with your unilateral decision to consider the deposition transcripts and exhibits for the New Mexico DWS deposition or the Massachusetts DUA deposition not confidential under our Protective Order.  First, as to the date New Mexico's deposition transcript was made available, we were not notified that a final transcript was available until June 21, 2024.  Second, Sagitec's actions throughout this process, including hiding its public records requests despite a continuing duty to supplement its discovery responses to Deloitte's RFP Nos. 101, 106, and 116 under the Federal Rules of Civil Procedure, and obscuring which documents were produced pursuant to subpoenas and which were provided in response to Sagitec's untimely disclosed public records requests, have prejudiced Deloitte's ability to seek protection under the Protective Order.  Given your email, we intend to move for a protective order to maintain the confidentiality of these transcripts and documents.  Please provide your availability for a final meet and confer on this issue next Monday or Tuesday.  Please also be prepared to discuss Sagitec's apparent ongoing refusal to produce all documents and communications within Sagitec's possession, custody, or control related to Sagitec's Internal Investigation, including internal communications between Sagitec's investigative counsel who took part in preparing Sagitec's Investigation Report.  *See* 05/07/2024 Email from P. Arnett; 05/17/2024 Email from R. Olson.

To be clear, until the issue of confidentiality of the deposition transcripts or documents produced by any state agency is resolved by agreement or by the Court, Deloitte expects Sagitec to continue to treat as highly confidential all documents, exhibits, and testimony comprising or referring to information that Deloitte has previously designated as its trade secrets and/or confidential under the Protective Order.  It goes without saying that while the parties have an ongoing factual dispute regarding the confidentiality of the documents Sagitec sought from the states (and which Deloitte originally developed from its proprietary uFACTS solution), Sagitec is not entitled to unilaterally take steps to irreversibly destroy the confidential nature of such documents. *Cf. Neo Gen Screening, Inc. v. TeleChem Intern., Inc.,* 69 Fed. App'x 550, 554 (3d Cir. 2003) ("disclosure of trade secrets would result in irreparable harm… that would not be remedied by monetary damages") (collecting sources).  Deloitte reserves all rights in this regard.

Best regards,

**Nick Teleky**

**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Ave, N.W., Washington, D.C. 20004
**T** +1 202 389 3228 **M** +1 202 718 2475

He / Him / His
nick.teleky@kirkland.com

---

**From:** Bact, Rebecca <RBact@RobinsKaplan.com>
**Sent:** Thursday, July 18, 2024 7:49 PM
**To:** Arnett, Patrick <patrick.arnett@kirkland.com>; Prange, David A. <DPrange@RobinsKaplan.com>; Carmack, Brandon A. <BCarmack@RobinsKaplan.com>; Larus, Christopher K. <CLarus@RobinsKaplan.com>; Olson, Rajin S. <ROlson@RobinsKaplan.com>; Dawson, Demitri M. <DDawson@RobinsKaplan.com>; *agaza@ycst.com <agaza@ycst.com>; *RVrana@ycst.com <RVrana@ycst.com>; THARTZELL@ycst.com; RK-Sagitec <RK-Sagitec@RobinsKaplan.com>
**Cc:** #Deloitte Sagitec <Deloitte-Sagitec@kirkland.com>; *jshaw@shawkeller.com <jshaw@shawkeller.com>; Andrew Russell <arussell@shawkeller.com>
**Subject:** RE: Deloitte Consulting LLP et al. v. Sagitec Solutions LLC

Counsel,

We write to address the status of the transcripts for the depositions of the New Mexico DWS and the Massachusetts DUA. The parties were notified that final transcripts for those depositions became available on June 11, 2024 and June 17, 2024, respectively. The Protective Order lays out a 30 day review period during which the transcripts must be treated as highly confidential. Dkt. 70, ¶ 1(h); ¶ 2(d). We have received no confidentiality designations from either state agency/third-party deponent. Similarly, we have not received any response from you to our June 4, 2024 correspondence (below) explaining that there is no mechanism for Deloitte to designate testimony of a third party as confidential or highly confidential—other than where Deloitte was the producing party of a deposition exhibit, since only a "Producing Party or the deponent" can designate the testimony as having a confidentiality status. Dkt. 70, ¶ 2(d).

Because Deloitte was the "Producing Party" for Exhibit 12 to the New Mexico DWS deposition, a document Deloitte designated as confidential, we will treat the portions of the deposition transcript that discuss that document as confidential under the Protective Order.  Those sections are pages 79:4-23, 80:3-23, 82:1-86:8, 199:11-203:16, 204:20-205:1, and 207:16-25 of the New Mexico DWS transcript.

Likewise, because the Massachusetts DUA as Producing Party and deponent designated the QUEST source code as highly confidential, we will treat the portions of that deposition that discuss the contents of the QUEST source code as highly confidential. Those sections are pages 42:17-49:25 and 76:25-79:23 of the testimony by Ms. Amoakuh.

We do not consider any other sections as properly designated as confidential under the terms of the Protective Order, and we will proceed accordingly. Given Deloitte's decision not to respond to our email or take any action to modify the terms of the Protective Order, we understand that Deloitte does not dispute that its prior assertions that the entirety of these transcripts should be treated as confidential were improper. If Deloitte for any reason contends that its prior efforts to designate these transcripts under the terms of the Protective Order were effective, please notify me by close of business Friday, July 19, to schedule a meet and confer to address this issue.

Best regards,
Rebecca

Rebecca Bact


**ROBINS KAPLAN** LLP
Robins Kaplan LLP | 800 Boylston Street | Suite 2500 | Boston, MA  02199

p  617 859 2740 | f  617 267 8288 | Pronouns: she/her/hers
RBact@RobinsKaplan.com| RobinsKaplan.com

---

**From:** Bact, Rebecca
**Sent:** Tuesday, June 4, 2024 5:00 PM
**To:** Arnett, Patrick <patrick.arnett@kirkland.com>; Prange, David A. <DPrange@RobinsKaplan.com>; Carmack, Brandon A. <BCarmack@RobinsKaplan.com>; Larus, Christopher K. <CLarus@RobinsKaplan.com>; Olson, Rajin S. <ROlson@RobinsKaplan.com>; Dawson, Demitri M. <DDawson@RobinsKaplan.com>; *agaza@ycst.com <agaza@ycst.com>; *RVrana@ycst.com <RVrana@ycst.com>; THARTZELL@ycst.com; RK-Sagitec <RK-Sagitec@RobinsKaplan.com>
**Cc:** #Deloitte Sagitec <Deloitte-Sagitec@kirkland.com>; *jshaw@shawkeller.com <jshaw@shawkeller.com>; Andrew Russell <arussell@shawkeller.com>
**Subject:** RE: Deloitte Consulting LLP et al. v. Sagitec Solutions LLC

Patrick,

We now respond to Deloitte's attempt to designate both the MA DUA and NM DWS depositions as highly confidential.

We do not believe that Deloitte's designation of the totality of both depositions as highly confidential is proper as a matter of procedure or substance.  First, the Protective Order allows counsel for the "producing party or deponent" the opportunity to designate testimony confidential or highly confidential. Dkt. 70, ¶ 2(d). As to these third party depositions, there is no procedural mechanism for Deloitte to designate testimony confidential or highly confidential if it does not relate to a document produced by Deloitte.  There was only one exhibit in either deposition—the contract between Deloitte and New Mexico—that was produced by Deloitte. Second, the vast majority of both depositions did not contain confidential material and consisted rather of testimony regarding public documents and public information. Therefore, there is no substantive basis for Deloitte to designate the entirety of either transcript highly confidential. Notwithstanding this fact, Sagitec plans, in line with the Protective Order, to treat the transcripts as confidential during the review period, allowing the "deponent or producing party" make appropriate designations during that time.  *Id.*

Best,
Rebecca


Rebecca Bact
**ROBINS KAPLAN** LLP
Robins Kaplan LLP | 800 Boylston Street | Suite 2500 | Boston, MA  02199
p  617 859 2740 | f  617 267 8288 | Pronouns: she/her/hers
RBact@RobinsKaplan.com| RobinsKaplan.com

---

**From:** Arnett, Patrick <patrick.arnett@kirkland.com>
**Sent:** Monday, June 3, 2024 9:53 PM
**To:** Prange, David A. <DPrange@RobinsKaplan.com>; Carmack, Brandon A. <BCarmack@RobinsKaplan.com>; Larus, Christopher K. <CLarus@RobinsKaplan.com>; Olson, Rajin S. <ROlson@RobinsKaplan.com>; Bact, Rebecca <RBact@RobinsKaplan.com>; Dawson, Demitri M. <DDawson@RobinsKaplan.com>; *agaza@ycst.com <agaza@ycst.com>; *RVrana@ycst.com <RVrana@ycst.com>; THARTZELL@ycst.com; RK-Sagitec <RK-Sagitec@RobinsKaplan.com>
**Cc:** #Deloitte Sagitec <Deloitte-Sagitec@kirkland.com>; *jshaw@shawkeller.com <jshaw@shawkeller.com>; Andrew Russell <arussell@shawkeller.com>
**Subject:** [EXTERNAL] Deloitte Consulting LLP et al. v. Sagitec Solutions LLC

Counsel,

To follow up on issues that arose during last week's depositions of New Mexico DWS and Massachusetts DUA, Deloitte memorializes its designation of the respective deposition transcripts and exhibits as highly confidential.

In addition, Deloitte memorializes its designation as highly confidential of the portions of the non-party productions that include or were derived from Deloitte property, which includes the uFACTS solution.  In particular, Deloitte designates as highly confidential all source code, use cases, and other design assets produced by the states of Massachusetts, New Mexico, and Florida.  To the extent that Sagitec sought these documents through state records requests without timely notifying Deloitte such that Deloitte was prejudiced in its ability to prevent the disclosure of confidential information as contemplated by its agreements with any state agency, Deloitte reserves all rights to seek appropriate remedies.

Regards,

Patrick Arnett
he / him / his

KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave NW, Washington DC 20004
T +1 202 389 5160  M +1 646 352 3502
F +1 202 389 5200

patrick.arnett@kirkland.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

_____

Information contained in this e-mail transmission may be privileged, confidential and covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521.

If you are not the intended recipient, do not read, distribute, or reproduce this transmission.

If you have received this e-mail transmission in error, please notify us immediately of the error by return email and please delete the message from your system.

Pursuant to requirements related to practice before the U. S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U. S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

Thank you in advance for your cooperation.

Robins Kaplan LLP
http://www.robinskaplan.com
_____

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# Exhibit 6

**REDACTED IN ITS ENTIRETY**

Exhibit 7

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Statement of Work**
**Between**
**The Division of Unemployment Assistance**
**And**
**BearingPoint, Inc.**
**For the**
**DUA Quality Unemployment System Transformation**
**(QUEST) Project**

**May 18, 2007**





1

MADUA00000212

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final
**Table of Contents**

1. INTRODUCTION ........................................................................................... 4
2. OVERVIEW, EFFECTIVE DATE AND TERM ........................................... 4
3. SINGLE POINT OF CONTACT ................................................................... 5
4. SYSTEM SECURITY ................................................................................... 6
5. ACCEPTANCE OR REJECTION PROCESS ............................................... 6
6. PROJECT MANAGEMENT .......................................................................... 7
   6.1 Project Managers ..................................................................................... 7
      6.1.1 DUA Project Manager .................................................................... 7
      6.1.2 Vendor Project Manager ................................................................. 8
   6.2 Issue Resolution ...................................................................................... 9
   6.3 Changes in Scope of Work ...................................................................... 9
   6.4 Key Personnel .......................................................................................... 9
   6.5 Equipment, Work Space, Office Supplies ............................................. 10
   6.6 Related Project Knowledge ................................................................... 11
   6.7 IP Agreement for Vendor's Employees, Contractors and Agents .......... 11
   6.8 Project Responsibilities ......................................................................... 11
7. ADDITIONAL TERMS ............................................................................... 11
   7.1 Definitions ............................................................................................. 11
   7.2 Code Review .......................................................................................... 11
   7.3 Warranty ................................................................................................ 12
   7.4 Title and Intellectual Property Rights ................................................... 12
      7.4.1 Definition of Property ................................................................... 12
      7.4.2 Source of Property ........................................................................ 13
      7.4.3 Contractor Property and License ................................................... 13
      7.4.4 Commonwealth Property ............................................................... 15
      7.4.5 Clearance ...................................................................................... 16
   7.5 DUA's Responsibilities .......................................................................... 16
   7.6 Software Configuration Management Procedures .................................. 17
   7.7 Other Terms ........................................................................................... 17
8. PROJECT SCOPE AND MILESTONES ...................................................... 18
   8.1 Project Scope ......................................................................................... 18
   8.2 Task Descriptions ................................................................................... 18
   8.3 Milestones by Fiscal Year (FY2007 – FY2011) .................................... 22
9. DELIVERABLE SCHEDULE AND PAYMENT TERMS ........................... 23
   9.1 FY2007 (June 2007) .............................................................................. 24
   9.2 FY2008 (July 2007 to June 2008) ......................................................... 24
   9.3 FY2009 (July 2008 to June 2009) ......................................................... 25
   9.4 FY2010 (July 2009 to June 2010) ......................................................... 26
   9.5 FY2011 (July 2010 to June 2011) ......................................................... 28
   9.6 Total Cost, all Deliverables ................................................................... 29
   9.7 Statement of Work Assumptions and Conditions .................................. 29
   9.8 Project Tools .......................................................................................... 36




2

MADUA00000213

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

Appendix A: Deliverable Acceptance Criteria (Example) ............................................. 40
Appendix B: Deliverable Acceptance Form ................................................................... 41
Appendix C: CORI .......................................................................................................... 42
Appendix D: Information Technology Resource Policy ................................................. 43
Appendix E: Confidentiality Statement .......................................................................... 48
Appendix F: IP Agreement for Vendor's employees etc. ............................................... 49
Appendix G: Scope, Use Case Statements ..................................................................... 53
    Revenue Increment .................................................................................................... 53
    Benefits Increment .................................................................................................... 65
Appendix H: DOR Confidentiality Acknowledgement ................................................... 94





MADUA00000214

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# 1. INTRODUCTION

This document will serve as a statement of work (SOW) between the Department of Workforce Development (DWD), Division of Unemployment Assistance (DUA), and BearingPoint, Inc. ("BearingPoint") to apply to work on the DUA QUEST Project (QUEST). For the purposes of this Statement of Work, BearingPoint will function as the prime contractor. Any subcontractors identified by BearingPoint in their proposal to DUA are hereby accepted and approved by DUA. The entire agreement between the parties (the "Agreement") consists of the following documents in the following order of precedence:

The Standard Terms and Conditions

The Commonwealth's Standard Form Contract

RFR ITS23

BearingPoint's response to RFR ITS23

This SOW

RFQ DUA_QUEST_06-06 as amended plus Vendor Questions and Answers

BearingPoint's Response to RFQ DUA_QUEST_06-06

# 2. OVERVIEW, EFFECTIVE DATE AND TERM

The Vision of the DUA QUEST Project is to design and implement a comprehensive set of Unemployment Insurance (UI), UI Health Insurance processes and an Unemployment information system solution that when completed defines the standard of quality in state unemployment services.

1. Re-engineer the UI business model (subject to approval from Sponsors and Steering Committee).

2. Define the Business Requirements

3. Design and implement a software solution that represents the process model, business requirements and the needs of DUA.

4. Design appropriate technology architecture to support solution and business requirements

5. Develop an Implementation plan that minimizes any risk to the DUA business.

   a. System Performance and User Acceptance Testing

   b. Data Migration, (historical data)





4

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

   c.  Training Plan

   d.  Cutover Plan, (open claims, active accounts)

6. The DUA Project Manager will ensure that sufficient DUA process and technical expertise is created internal to DUA to provide design, development and implementation skills throughout the duration of the project and more importantly, these experts will remain in-house to maintain and adapt the completed QUEST solution to future demands.

Each Deliverable agreed to be provided under this SOW will be approved by the DUA Project Manager after review and acceptance by the DUA QUEST Project Team and Steering Committee pursuant to the acceptance process specified in section 5 of this SOW.

This SOW shall become effective on the date on which it is executed by both parties and shall terminate on July 31, 2011, unless terminated or expired earlier pursuant to the terms of this SOW. Notwithstanding the foregoing, sections 7.3, 7.4 and 9 shall survive the termination of this SOW.

The term of this SOW, subject to the terms, assumptions and conditions of this Agreement, shall be 50 months commencing on June 1, 2007 and ending on July 31, 2011.

# 3. SINGLE POINT OF CONTACT

BearingPoint and DUA will each assign a single point of project management contact with respect to this SOW. It is anticipated that the contact person will not change during the period the SOW is in force. In the event that a change is necessary, the party requesting the change will provide prompt written notice to the other. In the event a change occurs because of a non-emergency, two-week written notice is required. For a change resulting from an emergency, prompt notice is required.

BearingPoint's contact person is:

David Czelusniak
Senior Manager
2 Hampshire Street Suite 410
Foxboro, MA 02035
Phone: 508-216-2397
Email: david.czelusniak@bearingpoint.com

DUA's contact person is:

Robert Velten
Director DUA Technology
19 Staniford Street
Boston, MA 02114
Phone: 617-626-6599





5

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

Email: rvelten@detma.org

# 4. SYSTEM SECURITY

As part of its work effort, BearingPoint will be required to use Commonwealth data and IT resources in order to fulfill part of its specified tasks. For purposes of this work effort, "Commonwealth Data" shall mean data provided by DUA to BearingPoint, which will physically reside at a DUA location. In connection with such data that would be in BearingPoint's possession and custody for the purposes of the Project, BearingPoint will implement commercially reasonable safeguards necessary to:

- Prevent unauthorized access to Commonwealth Data from any public or private network

- Prevent unauthorized physical access to any information technology resources involved in the development effort and

- Prevent interception and manipulation of data during transmission to and from any servers.

BearingPoint will notify DUA immediately when it learns if any breaches to any system have occurred causing possible unauthorized access to, interception of and/or manipulation of Commonwealth Data.

# 5. ACCEPTANCE OR REJECTION PROCESS

BearingPoint will submit the required deliverables specified in this SOW to the DUA Project Manager for approval and acceptance. DUA will review work product for each of the deliverables and evaluate whether each deliverable has clearly met in all material respects the criteria established in this SOW and the relevant specifications.

BearingPoint and DUA will incorporate the use of Deliverable Expectations Documents (DED) in order to further define the contents and scope of each deliverable. The DED documents will include the purpose of each deliverable, the assumptions and constraints for each deliverable and the approach for each deliverable. DUA will develop acceptance criteria for each deliverable and achieve agreement with BearingPoint on the Acceptance Criteria. In the event the parties cannot agree on any DED or the Acceptance Criteria, the parties shall escalate the issue for resolution pursuant to clause 6.2 herein. DUA and the QUEST project will use the acceptance criteria documented by DUA, using the process described above, in order to determine if deliverables are complete and accepted. Once reviewed and favorably evaluated, the deliverables will be deemed acceptable.

Unless another acceptance period has been agreed to in a DED for a particular deliverable, within ten (10) business days of receipt of each deliverable, the DUA Project Manager will notify BearingPoint, in writing, of the acceptance or rejection of said deliverable using the acceptance criteria specified in this section or as specifically agreed pursuant to this SOW between the parties for the particular deliverable. A form signed by DUA shall indicate acceptance or rejection, (see the form attached in Appendix B). BearingPoint shall acknowledge receipt of the form in writing. Any rejection will





6

include a written description of the defects of the deliverable. Failure of DUA to accept or reject the deliverable within the specified period, or DUA's using the deliverable in its business environment, will constitute acceptance by DUA and the Commonwealth of the said deliverable. Deliverables accepted at any stage of the QUEST project shall be deemed accepted for any subsequent stages of QUEST.

Unless another specific period has been agreed to in a DED for a particular deliverable, BearingPoint upon receipt of a deliverable rejection will act within ten (10) business days to correct the specified defects and deliver an updated version of the deliverable to DUA. DUA will then have an additional 5 (five) business days from receipt of the updated deliverable to notify BearingPoint, in writing, of the acceptance or rejection of the updated deliverable. Any such rejections will include a description of the way in which the updated deliverable fails to correct the previously reported deficiency. No additional deficiencies will be raised through additional review. Rather, the additional DUA review is to confirm that previously reported deficiencies have been addressed. DUA and BearingPoint will each have the opportunity to negotiate an extended Acceptance/Rejection date or cure period, as applicable, if the work product or deliverable is of significant size to warrant it. Following any acceptance of a deliverable which requires additional work to be entirely compliant with the pertinent deliverable design specifications, and until the next delivery, BearingPoint will use reasonable efforts to provide a prompt correction or workaround.

# 6. PROJECT MANAGEMENT

## 6.1 Project Managers

### 6.1.1 DUA Project Manager

Project management of this engagement will be performed by DUA. DUA's project manager will:

- Work closely with BearingPoint's Project Manager to ensure successful completion of the project.

- Ensure that the DUA QUEST Project Team and BearingPoint are working together to complete project tasks and deliverables.

- Work with BearingPoint's Project Manager to develop the Project Management Plan and approve any/all plans.

- Agree with BearingPoint on all project artifacts to be created and maintained as part of the project.

- Review weekly status reports and conduct weekly meetings with BearingPoint and DUA QUEST Project Team, as necessary.

- Coordinate participation with assistance from DUA QUEST Project Team from DUA, DWD, other Agencies or software vendors as required during the engagement.





MADUA00000218

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

- Coordinate DUA's review of the deliverables and sign an acceptance form to signify acceptance for each accepted deliverable.

- Provide DUA dedicated project staff as follows, (dedicated staff will arrange for additional DUA staff participation as needed):

    o Benefits Team Leader: Jane Welch, (3 additional members)

    o Revenue Team Leader: Theresa DeMarco, (2 additional members)

    o Appeals/Hearings Team Lead: Mark Dobbins

    o Program Integrity Team Lead: Joan Pearson

    o QUEST Project Team Lead: Harriet Mermes, (BOR Team Lead)

    o QUEST Technical Team Lead: Ken Zimmerman, (5 additional members)

    4 .NET developers provided by DUA will be focused on the following:

    - System Interfaces, such as 1099/IRS, TPA downloadable files and legacy system interfaces

    - Reports such as ETA, economic research and other management reports

    - QUEST development tasks as assigned

    o Finance/Economic Research Team Lead: TBD

DUA's Project Manager reports to Ed Malmborg, DUA Director, who reports to Suzanne Bump, Secretary, Executive Office of Labor and Workforce Development.

Robert Velten, DUA Project Manager will work directly with BearingPoint's Project Manager. Ed Malmborg, Director DUA will sign this SOW and all amendments hereto on behalf of DUA.


## 6.1.2 Vendor Project Manager

The BearingPoint Project Manager will:

- Serve as an interface between the DUA Project Manager and all BearingPoint personnel participating in this engagement.

- Develop and maintain the Project Management Plan, in consultation with the DUA Project Manager.

- Facilitate regular communication with the DUA Project Manager, including weekly status reports/updates, and review the project performance against the project plan.

- Facilitate weekly project status meetings for the duration of the engagement.

- Update the project plan on a weekly basis and distribute plan with status at weekly meetings for the duration of the engagement.





8

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

- Develop plans to mitigate project issues or risks and obtain approval from the DUA Project Manager.

- Sign acceptance forms to acknowledge their receipt from DUA.

- Be responsible for the management and deployment of BearingPoint personnel.

Jonathan Slusarz, BearingPoint's Project Manager reports to David Minkkinen, Project Managing Director, who reports to Kathy Karich, Regional Managing Director, who reports to Catherine Pomanti, Executive Vice President and SLED Leader. Either Kathy Karich or Catherine Pomanti, being the authorized signatories named in BearingPoint's response to ITS23, will sign this SOW and all amendments thereto on behalf of BearingPoint.

## 6.2 Issue Resolution

The project managers from each organization bear the primary responsibility for ensuring issue resolution. If they determine that they are unable to resolve an issue, they are responsible for escalating the issue to Ed Malmborg, DUA Director and Kathy Karich, BearingPoint Regional Managing Director for resolution.

## 6.3 Changes in Scope of Work

The project manager who would like to request a change in scope, schedule or price for this engagement will provide the suggested change in writing to the other parties' project manager. The project managers will jointly determine whether the change impacts the schedule and/or cost. The parties can mutually agree to the change through a written amendment to this SOW but any scope, schedule or price change requires the approval of the Steering Committee. No change shall become effective unless agreed upon in writing by both parties. If either party's act or omission to perform its obligation(s) hereunder has an adverse effect on the performance of the project, including without limitation causing delays, the affected party shall notify the other party of such adverse effect in writing. If, in the opinion of the affected party, the adverse effect requires any change in the project's scope, schedule or pricing, such party should propose such change pursuant to this clause 6.3. If the project managers cannot agree on any change proposed pursuant to this clause 6.3 in a reasonable time (not to exceed 5 days), the issue shall be escalated for resolution pursuant to clause 6.2 above. It is anticipated that early in the project the parties will develop and mutually agree a Change Order Procedure that will be applicable for any changes in scope, schedule or price proposed pursuant to this SOW.

## 6.4 Key Personnel

BearingPoint agrees to provide the following personnel for the following amounts of time for the duration of this project:





9

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**TABLE 1**

**KEY PERSONNEL**

| Staff Members | Role | Time Commitment expressed as percentage of full time |
|---|---|---|
| Jonathan Slusarz | Project Manager | 100% |
| Joe Valorose | Benefits Leader | 100% during Benefits Increment |
| Harpreet Kaur | Revenue Leader | 100% during Revenue Increment |
| Marcellus Mascarenhas | Technical Team Leader | 100% |

BearingPoint will assign all of the foregoing key personnel to this engagement on the time basis set forth in Table 1. DUA requires that all key personnel remain on the project throughout the life of their specific project assignment, (exclusive of vacation, sick leave, training or administrative tasks). BearingPoint's key personnel on this project and under this SOW is defined as follows: 1) Project Manager; 2) Benefits Leader; 3) Revenue Leader; 4) Technical Team Leader. In the event that a change in the key personnel is necessary as a result of an emergency or other event, prompt written notice shall be provided by the BearingPoint Project Manager. In the event of a replacement of the key personnel due to circumstances beyond BearingPoint's reasonable control (including without limitation due to the key personnel's illness or incapacity, departure from BearingPoint, personal reasons or if the personnel's performance is in BearingPoint's opinion unsatisfactory), BearingPoint shall tender to the DUA Project Manager resume(s) of the proposed replacement within ten (10) business days of BearingPoint's knowledge of the key personnel's departure. BearingPoint is expected to provide replacement personnel with equal or better skill sets and experiences as the departing personnel.

Non-key personnel assigned by BearingPoint must meet with DUA approval, such approval will not be unreasonably withheld and will not interfere with BearingPoint's ability to deliver the project.

BearingPoint will be required to complete a "request" for Criminal Offender Record Information (Appendix C) for all staff participating in this engagement. Each member of the BearingPoint Team read and sign an Information Technology Resource Policy (Appendix D), the Confidentiality Statement (Appendix E), and the DOR Confidentiality Acknowledgement for wage records (Appendix H) as designated by DUA and attached as indicated. Failure to complete and/or sign these documents or if the CORI reveals matters that DUA deems inappropriate will disqualify the individual/s from participating in this engagement.

## *6.5 Equipment, Work Space, Office Supplies*

DUA will provide one office, workspace for up to 35 BearingPoint Project team members, standard office equipment, and standard network connectivity and access to DUA systems provided to state employees for BearingPoint team members working on-




10

site for activities defined in Project deliverables, as required by this SOW. DUA is providing a common Project workspace for all DUA and BearingPoint project team members. Two conference rooms (capacity 8-10) will be made available to the project team during the project and testing and training areas will be provided by DUA. DUA will provide administrative support to BearingPoint for scheduling meetings. BearingPoint will submit a list of employees who will need access to the building and to state systems as required for execution of this SOW.

## 6.6 Related Project Knowledge

In addition to the "Statewide Contract IT Specifications" and all other terms of ITS23, BearingPoint shall, prior to commencing any other work under this SOW, become familiar with the following documents: DUA QUEST Program Initiation Document and DUA QUEST BPR Vision Document.

## 6.7 IP Agreement for Vendor's Employees, Contractors and Agents

BearingPoint shall ensure that all BearingPoint personnel providing services under this SOW, regardless of whether they are BearingPoint's employees, contractors, or agents, shall, prior to rendering any services under this SOW, sign the "Intellectual Property Agreement for Vendor's Employees, Contractors and Agents," in a form attached as Appendix F hereof which is included as one of the ITS23 documents, and return signed copies of the same to the DUA Project Manager prior to the delivery of any services under this SOW.

## 6.8 Project Responsibilities

Due to the size and complexity of the QUEST Project, DUA and BearingPoint each have responsibilities to the project and each other to ensure that the project is delivered successfully. To the extent that either party can not meet their responsibilities for any reason, either party can invoke the procedures outlined in section 6.2 and/or 6.3 of this SOW.

# 7. ADDITIONAL TERMS

## 7.1 Definitions

The terms used in this SOW, unless defined herein, shall have the meaning ascribed to them in the other documents that constitute the Agreement between the parties as stated within section 1 of this document.

## 7.2 Code Review

BearingPoint shall comply with the code review policy as mutually agreed to in writing between the parties.




11

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

## 7.3 Warranty

BearingPoint's services shall be performed in a professional and workmanlike manner and in accordance with the detailed design specifications as agreed between the parties in writing (referred to herein also as "Rational Design Artifacts"). BearingPoint warrants that for a period of ninety (90) days following delivery ("Warranty Period") (1) the deliverables will substantially conform to the detailed design specifications as agreed between the parties in writing; (2) all media on which BearingPoint provides any software under this SOW shall be free from defects; (3) all code developed and delivered by BearingPoint, (exclusive of third party software purchased by DUA) under this SOW shall be free of Trojan horses, back doors, and other malicious code in the code developed by BearingPoint for this QUEST project; and (4) all software delivered by BearingPoint shall perform in all material respects in conformance with the detailed design specifications ('Rational Design Artifacts') agreed to in writing between the parties. Any material nonconformance that prevents the operation of a system component identified in Appendix G (a Use Case or collection of Use Cases), or prevents users from proceeding with the correct workflow which requires a workaround that is identified in writing during the Warranty Period (defined hereinafter as "Defect") will be repaired by BearingPoint at their expense. All other non-conformities will be addressed internally by DUA personnel or pursuant to a separate maintenance agreement that may be agreed between the parties. In no event shall BearingPoint be responsible for non-conformities caused by DUA or its personnel or contractors, or caused by third party products or services, including without limitation network or connection based non-conformities. It is DUA's responsibility to assess the cause and severity of an issue prior to invoking BearingPoint warranty. In the event BearingPoint concludes that an issue claimed by DUA under the preceding warranty is not covered by the BearingPoint warranty and DUA agrees with this conclusion, BearingPoint may charge DUA based on its standard rates for the time spent investigating or fixing the issue. THESE ARE THE EXPRESS WARRANTIES WITH RESPECT TO THE DELIVERABLES AND SOFTWARE UNDER THIS PROJECT. BEARINGPOINT DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. Any changes, repairs, modifications, adjustments or other fixes made by DUA, its personnel or contractors to the QUEST solution and not approved in writing by BearingPoint shall void BearingPoint warranty for the impacted portion of QUEST. If the parties cannot come to agreement, the issue will be escalated in accordance with section 6.2 of this SOW in order to determine if the issue is within or outside the warranty and where such item is outside of the warranty, DUA shall compensate BearingPoint as provided for above.

## 7.4 Title and Intellectual Property Rights

### 7.4.1 Definition of Property

The intellectual property required by BearingPoint to develop, and/or install and test QUEST (hereinafter the "Property") may consist of computer programs (in object and source code form), scripts, data, documentation, the audio, visual and audiovisual content




12

MADUA00000223

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

related to the layout and graphic presentation of the QUEST solution, text, photographs, video, pictures, animation, sound recordings, training materials, images, techniques, methods, algorithms, program images, text visible on the Internet, HTML code and images, illustrations, graphics, pages, storyboards, writings, drawings, sketches, models, samples, data, other technical or business information, and other works of authorship fixed in any tangible medium. The QUEST solution is an unemployment insurance information system involving intellectual property derived from three sources described below in clause 7.4.2 and with technical and functional specifications in accordance with this SOW ("QUEST").

## 7.4.2 Source of Property

This engagement will involve intellectual property derived from three different sources: (1) third party software and other products' (as specified in section 9.8 of this SOW to be licensed/obtained by DUA, including without limitation Microsoft, Oracle, IIS, Filenet) and any derivative works thereof ("Third Party Property"); (2) BearingPoint owned or licensed preexisting or proprietary software, solutions or other proprietary material and information (including without limitation ProvenCourse Methodology and uFACTS, but excluding Third Party Property and derivative works thereof.) and derivative works created for DUA based on the BearingPoint owned or licensed preexisting or proprietary software, solutions or other proprietary material and information (altogether herein "Contractor Property") and (3) software and material and information developed by BearingPoint in the course of developing the QUEST solution and specifically for the purposes of delivering QUEST to DUA under this SOW and other than Contractor Property or Third Party Property or derivative work thereof ("QUEST IP") . Ownership of the first category of intellectual property is addressed in separate agreements between the DUA and the third party contractors and resellers of such software.   The following paragraphs of the Statement of Work address ownership rights in the second and third categories of intellectual property.  For the purposes of this SOW, derivative works shall mean works defined as derivative works in 17 U.S.C.§ 101 and further defined as all Developments and Property associated with the migration of the uFACTS Solution Framework to a .NET architecture/application including but not limited to all core unemployment insurance functions but excluding specific Commonwealth of Massachusetts requirements that are developed originally and exclusively for DUA.

## 7.4.3 Contractor Property and License

BearingPoint will retain all right, title and interest in and to all Contractor Property. DUA acknowledges and agrees that its possession, installation or use of Contractor Property will not transfer to it any title or ownership to such Contractor Property. DUA further acknowledges and agrees that the uFACTS Unemployment Insurance Solution (which will be the basis for the QUEST solution), excluding the Third Party Property, is BearingPoint's proprietary technology and/or is licensed to BearingPoint such that the technology and its source code are considered a trade secret of BearingPoint or third party licensor.




13

DUA acknowledges that the Contractor Property contains or constitutes commercially valuable and proprietary trade secrets of the Contractor or other third parties, the development of which involved the expenditure of substantial time and money and the use of skilled development experts. DUA acknowledges that the Contractor Property is being disclosed to DUA to be used only as expressly permitted under the terms of this SOW and the license specified herein. DUA will take no affirmative steps to disclose such information to third parties, and, if required to do so under the Commonwealth's Public Records Law, M.G.L. c. 66, S 10, or by legal process, will promptly notify BearingPoint of the imminent disclosure so that BearingPoint can take steps to defend itself against such disclosure.

Except as expressly authorized in this clause 7.4 of the Statement of Work, DUA will not copy, modify, distribute or transfer by any means, display, sublicense, rent, reverse engineer, decompile or disassemble the Contractor Property.

Subject to the terms herein and upon the full and final payment for the deliverables containing the Contractor Property, BearingPoint grants to DUA and the Commonwealth a fully-paid, royalty-free, non-exclusive, non-transferable, worldwide, irrevocable, perpetual, license to use the Contractor Property by DUA with the deliverable provided to DUA by BearingPoint, and to make, or grant a limited sublicense to third party contractors to make, use, reproduce, distribute, modify, reverse engineer, decompile or disassemble or create derivative works based upon the Contractor Property solely for DUA's needs related to the QUEST solution, in any media now known or hereafter known, but only to the extent reasonably necessary for DUA's use and exploitation of the deliverables within the QUEST solution. The foregoing license expressly prohibits DUA or DUA's contractors to make, use, license, modify or create derivative works of the Contractor Property for reasons other than for the use in relation with the QUEST solution by DUA. In the event the Commonwealth does not provide funding for the work under this SOW, or does not fully fund the work hereunder at any stage, the license granted pursuant to this paragraph of 7.4.3 is hereby restricted so that no third party vendors or contractors of DUA will be authorized to make, use, license, the Contractor Property. In the event of agency reorganization within Commonwealth, the rights and obligations of DUA herein shall be applicable to DUA's successor agency.

Notwithstanding anything contained herein to the contrary, and notwithstanding DUA's use of the Contractor Property under the license created herein, BearingPoint shall have all the rights and incidents of ownership with respect to the Contractor Property, including the right to use such property for any purpose whatsoever and to grant licenses in the same to third parties.

During the term of the associated Statement of Work and immediately upon any expiration or termination thereof for any reason, BearingPoint will provide to DUA the most current copies of any Contractor Property to which DUA has rights pursuant to the foregoing, including any related documentation.





14

### 7.4.4 Commonwealth Property

In conformance with the Commonwealth's Standard Terms and Conditions, on the date on which DUA reimburses BearingPoint for a deliverable accepted by DUA under the terms of this Statement of Work, all of BearingPoint's right, title and interest in the QUEST IP developed originally and exclusively by BearingPoint under the terms of this Statement of Work for the purposes of DUA's QUEST project shall pass to and vest in the Commonwealth, including all copyright, patent, trade secret, trademark and other intellectual property rights created by BearingPoint in the QUEST IP, and any causes of action relating to or based upon such work (hereinafter the "Commonwealth Property"). Subject to clause 7.4.3., BearingPoint hereby assigns to the Commonwealth as of the date on which DUA reimburses BearingPoint for such deliverables, all intellectual property rights in the QUEST IP that it may now or hereafter possess in the Commonwealth Property related to such deliverable and all derivative works thereof. BearingPoint also agrees to execute all documents and take all actions that may be reasonably necessary to confirm such rights, including providing any code originally developed under this SOW and used exclusively to develop such Commonwealth Property for DUA and the documentation for such code. BearingPoint acknowledges that there are currently and that there may be future rights that the Commonwealth may otherwise become entitled to with respect to Commonwealth property that does not yet exist, as well as new uses, media, means and forms of exploitation, current or future technology yet to be developed, and that BearingPoint specifically intends the foregoing ownership or rights by the Commonwealth to include all such now known or unknown uses, media and forms of exploitation.

BearingPoint agrees to take such actions as may be reasonably requested by DUA to evidence the transfer of ownership of or license to intellectual property rights described in this section.

DUA expressly acknowledges that BearingPoint will continue to market and sell Contractor Property, including the uFACTS Framework and Solution and its derivative works to other clients. Nothing in this SOW shall be deemed to transfer or assign BearingPoint's rights in or concerning the uFACTS framework and solution, including without limitation BearingPoint's right to continue to use, modify, enhance, expand and create derivatives of the uFACTS framework or solution for itself or others. For the purposes of clarification, DUA acknowledges that nothing in this clause 7.4.4 or the SOW prevents BearingPoint from developing and using deliverables similar to the deliverables provided to DUA under this SOW for its own purposes or for third parties, as long as BearingPoint does not use or disclose DUA's confidential information or material. Any knowledge, principles or experience learned, obtained or remembered by BearingPoint in implementing QUEST for DUA can be used by BearingPoint and its personnel again for BearingPoint or others.





15

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

DUA and BearingPoint expressly acknowledge the rights, obligations and interest associated with the ownership and licensing of the intellectual property rights herein, including but not limited to this Section 7.4 and Appendix F, are material to both parties and reflect the parties' agreement and intent. The parties further acknowledge the clarifications to the intellectual property rights in this Statement of Work were negotiated and entered into with the expectation they are fully enforceable. Should any questions or issues arise relative to the clarifications; the parties agree to negotiate in good faith to resolve the questions or issues in a way that gives the greatest effect to the parties' agreement and intent. In the event any of the Contractor Property, as defined herein, is subsequently determined to be the Commonwealth Property then all such transferred Contractor Property shall be subject to the following: DUA hereby grants to BearingPoint permission to use the Commonwealth Property with a right to copy, reproduce, distribute, reverse engineer, decompile, disassemble, modify, license, sub-license, create and use all derivative works based upon the Commonwealth Property for itself or others, to the extent that no confidential information of DUA is disclosed to any third parties.

### 7.4.5 Clearance

BearingPoint will not be responsible for providing any third party hardware or software for the purposes of the QUEST solution implementation. All third party software and hardware for the QUEST solution will be purchased or licensed directly by DUA. DUA represents to BearingPoint that it has obtained or will obtain all rights, grants, assignments, conveyances, licenses, permissions and authorizations necessary or incidental to any materials owned by third parties supplied or specified by it for incorporation in the deliverables to be used or developed for DUA under the QUEST solution. With respect to any services performed on the QUEST solution's deliverables by BearingPoint subcontractors, BearingPoint represents to DUA that it has obtained or will obtain all rights, grants, assignments, conveyances, licenses, permissions and authorizations necessary or incidental to any materials owned by these subcontractors supplied or specified by it for incorporation in the deliverables to be developed for DUA under QUEST.

### *7.5 DUA's Responsibilities*

In addition to the tasks set forth in section 6.5 Equipment, Work Space, Office Supplies, DUA shall be responsible for the following:

DUA's Project Manager will procure all hardware and third party software for the QUEST software solution including development, test, production and Disaster Recovery hardware; required commercial off the shelf software including Microsoft O/S, IIS, Oracle and Filenet. A Microsoft Sharepoint Project Server will be provided to maintain project documentation and IBM Requisite Pro software will be provided with 25 virtual licenses to record and track "requirements".

**Changes to Source Systems** – DUA is responsible for any application modifications (if necessary) to existing DUA legacy systems.




16

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Hardware and Software –** DUA will provide the network and operating infrastructure necessary to support the QUEST System such as network connectivity, server back ups, appropriate fire walls, redundant equipment (e.g., Application Servers), etc. DUA will provide the Oracle database software and sufficient licenses to support the QUEST System. DUA will purchase, install and configure for use, all required hardware and software prior to the development of the QUEST System. DUA will pay for all hardware and software and its installation and configuration, (non-UI solution software) for all technical environments.

**Software Licensing -** DUA will provide third party software for the project as indicated in section 9.8 Project Tools.

**Network Operations –** DUA is responsible for network redundancy, performance and availability (e.g., redundant NICs, switches, capacity, etc.).

**Systems Management –** DUA will use its existing network management tools and processes for monitoring hardware performance, security threats, backup, disaster recovery, etc.

DUA shall cooperate with BearingPoint in its rendering of the Services, including, without limitation, making timely decisions, providing BearingPoint with timely access to appropriate data, information and personnel of DUA according to agreed upon Timeframes and Project Plans.

## *7.6 Software Configuration Management Procedures*

BearingPoint will ensure DUA that at a minimum the following are met:

The basic functions of Configuration Management:

- **Identification** - specifying and identifying all components of the final product.
- **Control** - the ability to agree and 'freeze' products and then to make changes only with the agreement of appropriate named authorities. Once a product has been approved, the motto is 'Nothing moves and nothing changes without authorization'.
- **Status accounting** - the recording and reporting of all current and historical data concerned with each product.
- **Verification** - a series of reviews and configuration audits to ensure that there is conformity between all projects products and the authorized state of products as registered in the Configuration Management records.
- **Source Safe will be used.**

This will be met by BearingPoint as part of the Fiscal Year 2008 Plan as identified in section 8.

## *7.7 Other Terms*

- In clarification of the Commonwealth Terms and Conditions (clause 4), prior to any termination or suspension of BearingPoint for breach pursuant to the Commonwealth Terms and Conditions (clause 4), DUA shall provide a written





17

MADUA00000228

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

notice of and a reasonable opportunity to BearingPoint (at least 15 business days) to remedy any material breach or BearingPoint's failure to perform or fulfill its material obligations.

- In the event of any termination of this SOW by DUA for reasons other than for the uncured material breach by BearingPoint pursuant to the preceding paragraph, DUA shall reimburse BearingPoint for fees and expenses associated with the services performed prior to the termination date, including any deliverables or services in progress, and for any reasonable fees, costs or expenses documented by BearingPoint as incurred due to such termination of the Contract by DUA.

# 8. PROJECT SCOPE AND MILESTONES

This section describes the tasks and deliverables that BearingPoint will provide to DUA and the tasks that BearingPoint will complete by the end of the engagement described in this SOW. Deliverables will be considered "complete" when all the acceptance criteria set forth in this SOW have been met or the prescribed review period for each deliverable or task has expired without written response from DUA. The task/deliverable numbers are referred to in subsequent sections throughout this SOW.

**DUA will use a Microsoft Sharepoint Collaboration site to maintain all documentation for the project. All project Team Members including BearingPoint will use this site to store and manage project documents and artifacts.** All written documents shall be delivered in electronic format, capable of being completely and accurately reproduced by computer software on a laser printer. All itemized and/or annotated lists shall be delivered in computer spreadsheets, capable of being imported to Microsoft Excel, PowerPoint or Word. All meetings shall be held in the Hurley Building QUEST Project Area unless agreed to otherwise by the Project Managers. Meetings must be scheduled in advance, with reasonable accommodation of attendees' schedules. All meeting results will be described in a follow-up report generated by the BearingPoint Project Manager and approved by the DUA Project Manager.

## *8.1 Project Scope*

The scope of the QUEST project is defined by the tasks and deliverables specified below and the Use Case Statements in Appendix G.

## *8.2 Task Descriptions*

The following task list describes the major tasks to be performed on the QUEST project. These tasks will be expanded upon to create a detailed project work plan that will be used to monitor progress throughout the project.





18

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Task Name | Task Description |
|---|---|
| Task 1. Project Management | Perform project management activities for the life of the project. |
| Task 1.1. Develop and Maintain Project Work Plan | Develop a detailed project plan that outlines tasks, resources, timeframes, milestones, and deliverables for the QUEST Project and update the project plan regularly to track progress and plan for future tasks. |
| Task 1.2. Execute FasTrack Tasks | Begin using the Capability Maturity Model Integration (CMMI) quality processes and process controls. CMMI defined processes are important tools for managing project risk and for managing quality in the application development process. |
| Task 1.3. Conduct Project Execution and Control | Manage the success of the QUEST project through experienced planning, careful tracking, and accurate reporting. |
| Task 1.4. Conduct Contract Closeout | Finalize the QUEST project and close out the contract. |
| Task 2. Project Initiation | Perform project initiation activities. |
| Task 2.1. Conduct Project Kickoff | Initiate the QUEST project and make the plans necessary for a successful project. |
| Task 2.2. Develop a Communications Strategy and Plan | Detail the guiding principles for project communication and outline all communications events and messages to be deployed during the life of the project. |
| Task 3. Project Inception | Perform overall requirements definition, business process design and technical architecture design.. |
| Task 3.1. Develop Business Requirements | Perform an overall functional decomposition for QUEST and assist DUA in deciding which major system component (benefits / revenue) will be developed and implemented as Increment 1 and which will be Increment 2.<br><br>Develop the requirements for all functions of the QUEST system using the uFACTS Solution Framework design artifacts and DUA's unique requirements and MA laws as a baseline. Track each requirement by business area, technical area, functional release, and stage of development. Document changes needed in the uFACTS Solution Framework. |
| Task 3.2. Design Business Processes | Develop the business processes for all functions of the QUEST system using the uFACTS Solution Framework, the existing Massachusetts process flows, and the project goals as input. Document changes needed in the uFACTS Solution Framework. |





19

MADUA00000230

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Task Name | Task Description |
|---|---|
| Task 3.3. Design the Technical Architecture | Design the technical architecture for the QUEST system and integrate it with the existing DUA infrastructure based on DUA's needs and the architecture requirements from the RFQ and proposal. This includes developing a final architecture diagram and confirming what hardware and software will be needed and in what quantity. The architecture will address design, development, and testing. |
| Task 3.4. Develop the Technical Infrastructure | Build the technical foundation for developing and implementing the UI system. |
| Task 3.5. Plan the Knowledge Transfer | Define a strategy to transfer knowledge to members of the QUEST project team for the respective functional releases, including knowledge of technical areas, project management, and business process reengineering, requirements, and training and testing leading practices. |
| Task 4. Increment 1 | Perform the design, development and implementation tasks for the Increment 1 functionality. |
| Task 4.1. Perform Increment 1 Inception Tasks | Review Increment 1 requirements and plan functions to be developed. |
| Task 4.1.1. Review Requirements and Process Flows | Review the process flows, usability requirements, data design, and requirements for Increment 1 functionality that was developed as part of the project inception task. |
| Task 4.1.2. Determine Functions Included in Increment 1 | Work collaboratively with DUA to identify the functions that will be part of Increment 1. |
| Task 4.2. Elaborate Increment 1 | Design Increment 1 functionality. |
| Task 4.2.1. Conduct JAD Sessions | Identify where the uFACTS Solution Framework design meets the needs of DUA and where additions, deletions, or changes need to occur. The JAD sessions are vital to providing DUA with a forum for validating that the QUEST system meets their needs and requirements. |





20

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Task Name | Task Description |
|---|---|
| Task 4.2.2. Design Use Cases | Move from requirements and process flows into detailed use case system modeling and design by further defining the business processes and modeling the web-server-based objects and batch business objects. These objects will be further defined during detail design. |
| Task 4.3. Construct Increment 1 | Build and test Increment 1 functionality. |
| Task 4.3.1. Develop System Functionality | Develop, unit test, and perform initial integration testing of the application components associated with the increment. Unit testing will be conducted in an informal manner and used to verify that transactions and business processes are working according to their design specifications. |
| Task 4.3.2. Test System Functionality | Thoroughly test Increment 1 functionality to help verify that the application is ready to be deployed. |
| Task 4.4. Transition to the New System | Transition Increment 1 functionality into production use. |
| Task 4.4.1. Test User Acceptance | Assist DUA in conducting user acceptance testing (UAT) of the QUEST system. The UAT team will use the UAT plan to test the application. During UAT, the project team will support the testers in the execution of their test plans and use the testing tools to provide additional verification of system performance. |
| Task 4.4.2. Convert QUEST Data | Convert necessary data and develop the bridging interfaces necessary to support the QUEST system. |
| Task 4.4.3. Create the Production Infrastructure | Create the production environment and integrate it with DUA production infrastructure. |
| Task 4.4.4. Develop a Contingency and Disaster Recovery Plan | Define and implement a contingency plan for protecting project assets. Identify disaster recovery procedures and locations based on DUA standards and uFACTS artifacts. |





MADUA00000232

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Task Name | Task Description |
|---|---|
| Task 4.4.5. Train Users | Develop and implement plans that address the specific needs of DUA end users and help effectively transition them to the new business processes. Conduct technical training and support end-user training for the implementation and use of the increment. |
| Task 4.4.6. Develop System Documentation | Build and deliver technical and user documentation to support system administration and training. System documentation comprises user manuals and the operations manual. |
| Task 4.4.7. Deploy Increment 1 | Implement an operational QUEST increment and deploy it to DUA and its users. |
| Task 5. Increment 2 | **NOTE: The tasks and sub-tasks for Increment 2 will be the same as those performed for Increment 1.  Along with the other project tasks, these will be identified in detail and tracked on the approved project plan.** |
| Task 6. Operations | Plan for and operate QUEST system in production. |
| Task 6.1. Establish Maintenance and Confirm Transition | Develop the maintenance procedures and system operations agreements. |
| Task 6.2. Operate and Support the System | Provide systems operations support including warranty support for a three-month period. |

## 8.3 Milestones by Fiscal Year (FY2007 – FY2011)

The table below lists the major project milestones by fiscal year.

| Fiscal Year | QUEST Milestone | Completion Date |
|---|---|---|
| FY 2008 | Functional Decomposition of QUEST functionality | July 2007 |





22

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Fiscal Year | QUEST Milestone | Completion Date |
|---|---|---|
| FY 2008 | Installation of uFACTS Solution Framework | August 2007 |
| FY 2008 | Completion of documented business process design (To be Process Model) and requirements definition | March 2008 |
| FY 2008 | Design appropriate technology architecture to support solution and business requirements | April 2008 |
| FY 2009 | Final detailed software design specification for Increment 1 core function: Benefits or Revenue. Decisions to be made on Appeal and Hearing, Program Integrity, and Economic Research. | September 2008 |
| FY 2009 | Final system construction for Increment 1 core function. | May 2009 |
| FY 2010 | System and User Acceptance Testing of Increment 1 core function | September 2009 |
| FY 2010 | Conversion/go-live of Increment 1 core function | October 2009 |
| FY 2010 | Final Detailed software design specification of Increment 2 core function: Benefits or Revenue | March 2010 |
| FY 2011 | Final system construction for Increment 2 core function. | November 2010 |
| FY 2011 | System and User Acceptance Testing of Increment 2 core function | March 2011 |
| FY 2011 | Conversion/go-live of Increment 2 core function | April 2011 |
| FY 2012 | Contract Close out | July 2011 |

# 9. DELIVERABLE SCHEDULE AND PAYMENT TERMS

BearingPoint agrees to invoice DUA for the deliverables or work completed per the requirements set forth in the Statement of Work. DUA will make payments to BearingPoint only after receiving an accurate invoice for deliverables completed and accepted pursuant to Section 5 of this SOW. Payment for specific tasks and deliverables shall be made in accordance with the tables in sections 9.1 through 9.6 below.

Payments will be made in accordance with the Commonwealth's bill paying policy.




23

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

## 9.1 FY2007 (June 2007)

| Deliverable | | Price |
|---|---|---|
| **Project Work Plan and Project Management Plan Deliverable** | Details the tasks to be performed and associated time frames in Microsoft Project. DUA and BearingPoint will jointly review, revise, detail, and submit the project plan associated with this work effort.  Also includes a communication plan and other project management procedures for the project team. | $800,000 |
| **Deliverable Expectation Documents.** | Contains a description of all deliverables to be produced on the project. Outlines, at a high level, the purpose, assumptions and constraints, and approach of each deliverable. This has proven to be a very successful tool in setting expectations for project deliverables. | $280,000 |
| **Sub-Total FY2007** | | **$1,080,000.00** |

## 9.2 FY2008 (July 2007 to June 2008)

| Deliverable | | Price |
|---|---|---|
| **Functional Design Definition Deliverable** | The Functional Design Definition Deliverable will contain a high-level decomposition of the functionality to be delivered for the entire QUEST system.  This deliverable will identify the high-level use case definitions, groupings of use cases into functional components and a mapping of DUA business objectives and use case functionality. | $600,000 |
| **Initial CMMI Plans Deliverable** | Contains the project-management plans required by CMMI, including the issue-management, change-management, software quality assurance (SQA), software quality management (SQM), and risk management plans. | $1,400,000 |
| **uFACTS Framework Installation Deliverable** | Certifies that the uFACTS framework is installed at the QUEST project site. The Rational environment will be set-up and design artifacts loaded before requirements and to-be process flows are customized for DUA. | $1,080,000 |
| **Requirements and Business Process Plan Deliverable** | Defines the requirements management and business process design discipline to be executed throughout the duration of the project. Finalizes the Rational artifacts that will be produced as part of requirements and business process flows. | $600,000 |





MADUA00000235

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Deliverable | | Price |
|---|---|---|
| **Requirements Definition Deliverable** | Contains the requirements for all system functions. DUA and BearingPoint will collaboratively develop this deliverable, using the results of the gap analysis between the requirements needed for QUEST and the uFACTS functionality. | $2,480,000 |
| **Business Process Design Deliverable** | Contains the process flows for all the new system's functions and other Rational artifacts. | $2,560,000 |
| **Technical Architecture Deliverable** | Details the components of the architecture, including version levels and configuration. Consists of network diagrams, server placement, access requirements, firewall ports and services needed, security requirements, backup requirements, and bandwidth requirements. | $400,000 |
| **Increment 1 Increment Plan Deliverable** | Defines the scope of functionality in Increment 1. The plan will address when Appeals and Hearing, Program Integrity, and Economic Research will be designed and developed. | $440,000 |
| **Increment 1 Knowledge Transfer Plan Deliverable** | Describes how we will manage the mentoring, coaching, and knowledge transfer to DUA team members throughout all Increment 1 project activities. | $200,000 |
| **Initial Increment 1 Detailed Design Deliverable** | Provides an initial set of design documents for an initial subset of components included in the first iteration of Increment 1. Includes use cases and activity diagrams. | $1,800,000 |
| **Sub-Total FY2008** | | **$11,560,000.00** |

## 9.3 FY2009 (July 2008 to June 2009)

| Deliverable | | Price |
|---|---|---|
| **Systems Configuration Plan Deliverable** | Defines the configuration management discipline to be executed throughout the duration of the project for the QUEST application. | $400,000 |
| **Final Increment 1 Detailed Design Deliverable** | Provides final design documentation for the components included in Increment 1. Includes a requirements-to-design traceability matrix to document that all requirements are captured in the design. | $1,400,000 |
| **Increment 1 Interface Integration Plan** | Describes the approach to develop the necessary Increment 1 system interfaces and integrate them into the QUEST system. | $240,000 |





25

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Deliverable | | Price |
|---|---|---|
| **Increment 1 Training Plan Deliverable** | Provides an overview of training methodology and approach. Identifies the Increment 1 training courses, number of sessions, and associated course objectives, including the training method for all training material to be developed (such as classroom, computer-based training [CBT], etc.). Addresses procedures for implementing and maintaining a training database. | $920,000 |
| **Increment 1 Conversion and Data Migration Plan Deliverable** | Includes the approach for designing and developing data conversion programs, testing the conversion process, and converting the data for the Increment 1 functionality. Elaborates how the integrity and confidentiality of the data will be protected throughout the conversion process. Include a crosswalk of each system data structure and the relevant conversion rules. Defines the approach to migrating historical data and cutover planning for open claims and active employer data. | $1,280,000 |
| **Increment 1 System Test Plan** | Outline the system performance testing, system testing, and UAT approach and acceptance criteria. | $560,000 |
| **Increment 1 Construction Deliverable** | Documents that Increment 1 system code components have been developed and unit tested. | $2,040,000 |
| **Increment 1 System Test Deliverable** | Documents that Increment 1 system code components have completed an initial round of system testing. Includes a traceability matrix between the test scripts and the use cases documenting that all application functionality was tested. | $1,800,000 |
| **Increment 1 Contingency and Disaster Recovery Plan Deliverable** | Plans for resolving risks and maintaining the current production capability if the Increment 1 implementation is delayed. Addresses strategies for business and system continuity in the case of implementation issues. Addresses disaster recovery procedures and physical locations. | $300,000 |
| **Sub-Total FY2009** | | **$8,940,000.00** |

## 9.4 FY2010 (July 2009 to June 2010)

| Deliverable | | Price |
|---|---|---|
| **Increment 1 Training Completion Letter** | States that technical training and user train-the-trainer training for Increment 1 has been completed. Includes training materials. | $400,000 |
| **Increment 1 UAT Completion Deliverable** | States that support for state-sponsored UAT procedures is complete. | $440,000 |





26

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Deliverable | | Price |
|---|---|---|
| **Increment 1 Conversion Completion Deliverable** | Documents that conversion of legacy data necessary to support the Increment 1 implementation is complete. | $1,080,000 |
| **Increment 1 System Documentation Deliverable** | Contains the maintenance manual, data dictionary, and help text. For some of the components, this deliverable may reference online material rather than paper copy. | $676,000 |
| **Increment 1 Maintenance Procedures Deliverable** | Describes the Increment 1 maintenance, operations, and support procedures. | $600,000 |
| **Increment 1 Implementation Completion Deliverable** | States that all implementation activities have been completed and Increment 1 functionality is operational. | $1,040,000 |
| **Increment 1 Transition Completion Letter Deliverable** | States that Increment 1 transition activities are complete.  The application and infrastructure components are in production. | $840,000 |
| **Increment 2 Increment Plan Deliverable** | Defines the scope of functionality in Increment 2. Contains the approach to integrating the Increment 2 functionality with the implemented Increment 1 functionality. | $440,000 |
| **Increment 2 Knowledge Transfer Plan Deliverable** | Describes how we will manage the mentoring, coaching, and knowledge transfer to DUA team members throughout all Increment 2 project activities. | $200,000 |
| **Initial Increment 2 Detailed Design Deliverable** | Provides an initial set of design documentation for an initial subset of components included in the first iteration of Increment 2. Includes use cases and activity diagrams. | $1,800,000 |
| **Final Increment 2 Detailed Design Deliverable** | Provides final design documentation for the components included in Increment 2. Includes a requirements-to-design traceability matrix to document that all requirements are captured in the design. | $1,400,000 |
| **Increment 2 Interface Integration Plan** | Describes the approach to develop the necessary Increment 2 system interfaces and integrate them into the QUEST system. | $240,000 |





27

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Deliverable | | Price |
|---|---|---|
| **Increment 2 Training Plan Deliverable** | Provides an overview of training methodology and approach. Identifies the Increment 2 training courses, number of sessions, and associated course objectives, including the training method for all training material to be developed (such as classroom, computer-based training [CBT], etc.). Addresses procedures for implementing and maintaining a training database. | $180,000 |
| **Increment 2 Conversion and Data Migration Plan Deliverable** | Includes the approach for designing and developing data conversion programs, testing the conversion process, and converting the data for the Increment 2 functionality. Elaborates how the integrity and confidentiality of the data will be protected throughout the conversion process. Include a crosswalk of each system data structure and the relevant conversion rules. Defines the approach to migrating historical data and cutover planning for open claims and active employer data. | $272,000 |
| **Sub-Total FY2010** | | **$9,608,000.00** |

## 9.5 FY2011 (July 2010 to June 2011)

| Deliverable | | Price |
|---|---|---|
| **Increment 2 System Test Plan** | Outline the system performance testing, system testing, and UAT approach and acceptance criteria for Increment 2. | $560,000 |
| **Increment 2 Construction Deliverable** | Documents that Increment 2 system code components have been developed and unit tested. | $1,800,000 |
| **Increment 2 System Test Deliverable** | Documents that Increment 2 system code components have completed an initial round of system testing. Includes a traceability matrix between the test scripts and the use cases documenting that all application functionality was tested. | $1,680,000 |
| **Increment 2 Contingency and Disaster Recovery Plan Deliverable** | Plan for resolving risks and maintaining the current production capability if the Increment 2 implementation is delayed. Addresses strategies for business and system continuity in the case of implementation issues. Addresses disaster recovery procedures and physical locations. | $300,000 |
| **Increment 2 Training Completion Letter** | States that technical training and user train-the-trainer training for Increment 2 has been completed. Includes training materials. | $400,000 |
| **Increment 2 UAT Completion Deliverable** | States that support for state-sponsored UAT procedures is complete. | $440,000 |





28

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Deliverable | | Price |
|---|---|---|
| **Increment 2 Conversion Completion Deliverable** | Documents that conversion of legacy data necessary to support the Increment 2 implementation is complete. | $1,080,000 |
| **Increment 2 System Documentation Deliverable** | Contains the maintenance manual, data dictionary, and help text. For some of the components, it may reference online material rather than paper copy. | $676,000 |
| **Increment 2 Maintenance Procedures Deliverable** | Describes the Increment 2 maintenance, operations, and support procedures. | $200,000 |
| **Increment 2 Implementation Completion Deliverable** | States that all implementation activities have been completed and Increment 2 functionality is operational. | $760,000 |
| **Increment 2 Transition Completion Letter Deliverable** | States that Increment 2 transition activities are complete. The application and infrastructure components are in production. | $640,000 |
| **Contract Closeout Deliverable** | Contains verification that issues have been addressed and formal deliverables accepted. It also contains lessons learned. | $276,000 |
| **Sub-Total FY2011** | | **$8,812,000.00** |

## 9.6 Total Cost, all Deliverables

| Total Deliverables | Total Price |
|---|---|
| **Total: FY2007 through FY2011** | **$40,000,000.00** |

## 9.7 Statement of Work Assumptions and Conditions

This Statement of Work was developed based on and is subject to the following factors, assumptions and conditions:

- **Scope** - This document serves to provide a common understanding of the DUA QUEST project scope; however, the final scope will be defined during the project in Joint Requirement Management (JRM) sessions and Joint Application Design (JAD) sessions, resulting in a final set of requirements and an approved design.





29

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

- **Sequencing Functions** - The combined DUA and BearingPoint project management team will collaborate on the decision regarding how to sequence the major QUEST functions (Revenue and Benefits). This decision will be made early in the project and the final project work plan will be revised based on the sequencing decision.

- **Project Work Plan** - The project work plan, included in this statement of work (SOW) assumes a May 2007 project start date. A more detailed final project work plan will be developed early in the project.

- **Methodology** – This Statement of Work assumes the use of BearingPoint's ProvenCourse methodology. BearingPoint believes the use of this methodology will help deliver an unemployment system that meets the requirements of this SOW while minimizing the risks of the project. BearingPoint and DUA will work together during the inception phase of the project to develop the final work plan for this SOW.

- **User Representative Authority** – BearingPoint's approach to system design and implementation is highly concentrated, visual, and relies heavily on focus group work sessions with the user representatives to validate business and technical requirements. The project work plan will assume and require that user representatives attending design sessions have full authority necessary to direct BearingPoint's analysts and make final decisions regarding the functionality of the system.

- **DUA Involvement on Project Team** – BearingPoint has not included any direct labor costs for DUA staff in the cost of any project deliverables. DUA will provide staff with an adequate level of experience and authority that can be fully integrated into the project team as an important part of the knowledge transfer process that will allow DUA to take full ownership of the project upon implementation. In the Engagement Definition task, BearingPoint and DUA will work together to define the participation requirements and expectations for the DUA staff. DUA's commitment of staff resources to this project is essential to the success of the project and to DUA's ability to operate the system after implementation. DUA staff assigned to the project will complete their detailed assignments as defined in the mutually agreed to work plan within the time frames identified.

- **Access to DUA Staff and Subject Matter Experts** –BearingPoint will have timely access to DUA subject matter experts to assist in identifying business rules, resolving business process discrepancies, and answering ad hoc questions. These subject matter experts will, in turn, solicit input from division managers on any areas where policy or procedure is undefined. The follow up on issues requiring DUA input and decision-making will be completed within the time frames identified in the work plan.

- **Prompt Deliverable Sign-off** – Approval and sign-off on all deliverables will occur promptly within ten (10) business days of submittal unless a different time period has been agreed to between the parties in the deliverable expectation document (DED) for a particular deliverable, in which case such period specified in the DED shall be used for acceptance pursuant to the DED and section 5 of this SOW. If formal sign-off has not occurred within the specified timeframe, the deliverable will be considered accepted. Refer to Section 5 of the SOW for general acceptance terms.

 

30

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

- **Schedule Adjustments** – BearingPoint has estimated the hours and costs required to complete this project on the basis of their understanding of QUEST scope, the information provided in the RFQ, and their previous system implementation experience. During any given phase of this project, some tasks may not take as long as estimated and other tasks may take longer than estimated. In these instances, BearingPoint and DUA will work together to adjust deliverable time schedules and dates to make the most efficient use of the time and budget allocated, including pursuant to section 6.3 of the SOW.

- **Requirements for Additional Hours/Budget** – If BearingPoint has problems meeting their responsibilities because of situations outside of their control or because of additional tasks or requirements identified during the project that were not originally estimated, they will assess and determine the impact to the project, and adjust the project schedule to remedy the situation if possible. However, BearingPoint and DUA may agree that the unexpected problems or scope requirements necessitate an increase in the scope of the project by approving a change order that adds budget and/or time to the project pursuant to section 6.3 of the SOW. Examples of problems outside of BearingPoint control include, without limitation:

  - Delays in delivery of the hardware and licensed software that is required prior to system implementation
  - Changes to legislation
  - Changes to validated business requirements
  - Turnover of key DUA staff
  - Low or infrequent DUA participation
  - Inadequate communication with or cooperation from DUA Sponsors, staff and external stakeholders, including untimely provision of required information, materials, staff or approvals
  - Late, incomplete, or inconsistent information from DUA Sponsors, or other external stakeholders
  - Lack of testing or training facilities or staff to complete their responsibilities
  - Changes to DUA Architecture Standards
  - Changes to Project Management/Reporting Requirements
  - Changes to Federal contracting requirements
  - Changes to Federal funding availability

- **System Training Requirements** – The following assumptions and conditions apply to DUA training requirements:

  - ***Training Participants' Baseline Knowledge and Skill Level*** – DUA training participants will enter the classroom with a thorough understanding of DUA business rules upon which the new System is based. Training participants will have a basic knowledge of PCs and operating system functions before attending system functionality training.




31

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

- o  ***End-User Training*** – The project team will address the training requirements in accordance with Section 6.2 of the RFQ and the answer to question #57C in the bidder's question and answer document. If DUA determines that there is a need for additional training, BearingPoint will work with DUA to identify the additional required training. In accordance with the requirements of the RFQ, the project will utilize a "train the trainer" approach combined with self-paced training for the overall end-user training approach.

- o  ***Technical Training*** – BearingPoint will provide technical and operations training for DUA technical and system administration staff. The details and number of sessions performed will be discussed and agreed between BearingPoint and DUA during the project and documented in the deliverable expectation document (DED) for technical training. DUA will assign system administration and technical resources with the requisite knowledge and skill to learn how to provide long-term support to the QUEST System. These staff will also work with the project team during the development and deployment of the QUEST System to allow for a more effective knowledge transfer.

- **DUA Acceptance Testing Requirements** – The following assumptions and conditions apply to DUA acceptance testing:

  - o  User Acceptance Testing (UAT) is the responsibility of DUA. DUA, with BearingPoint's assistance, will prepare the User Acceptance Test Plan, and DUA will execute that plan agreed between the parties. BearingPoint's Project team will create an acceptance test region and a test database structure. It is the responsibility of DUA to populate the acceptance test database. DUA may use test scenarios and test scripts that BearingPoint develops for the System Test as part of the Acceptance Test. BearingPoint and DUA will work together to define acceptance criteria and this criteria will be documented in the deliverable expectation document (DED) for user acceptance testing. DUA will not unreasonably withhold or delay acceptance of the system.

  - o  BearingPoint will review and comment on the User Acceptance Test plan. BearingPoint will provide technical assistance to DUA's acceptance test team in the maintenance of the acceptance test region. Where necessary, BearingPoint will assist DUA's acceptance test team in interpreting the results of the test. BearingPoint will discuss the findings with DUA and resolve agreed upon defects in a timely manner.

  - o  DUA will provide staffing to assist with and participate in the system, performance, parallel, and user acceptance testing of the application in the timeframes allocated in the final detailed work plan that is accepted by DUA.

  - o  There will be an acceptance testing period of 60-90 days for each of the QUEST System core functions. If acceptance testing extends beyond this duration due to reasons outside of BearingPoint's control, upon agreement BearingPoint will negotiate additional support for DUA acceptance testing activities.





32

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

- o Upon DUA acceptance of each QUEST system core function, DUA and BearingPoint will work together to implement the core function according to the approved project work plan. DUA will not unreasonably delay the implementation of a QUEST system core function after it has been accepted.

- **Performance Testing** – BearingPoint will develop a Performance Test Plan as a part of the overall System Test Plan. The Performance Test Plan will define the scope and duration of the performance testing activities as well as the mutually agreed upon acceptable performance criteria for the application. These criteria will be documented in the deliverable expectation document (DED) for The Performance Test Plan. BearingPoint will execute that plan to test the performance of the QUEST System in accordance with the criteria specified in the DED. The Mercury Interactive Suite of tools will be used for performance testing.

- **System Design Artifacts** – The system design, including all appropriate Rational Design artifacts, will be based on current Federal, state and local policies and procedures. Any requested modifications to these policies and procedures after the detailed design has been approved will be negotiated for determination of priority and contractual impact.

- **Data Conversion** – The budget proposed for data conversion under QUEST in BearingPoint's proposal is based on the information provided in the RFQ and the questions answered through the procurement process (specifically answer #57D). BearingPoint will provide services to convert the required data from the following 8 primary databases: UI Benefits, UI Hearings (Appeals), UI Trade Readjustment Allowances, Revenue (TAX), Wage Records, Revenue (Reimbursable Employer), Revenue (Universal Health Insurance – UHI) and AAA/WPA. BearingPoint will work collaboratively with DUA in order to determine which data elements from these 8 databases should be converted to the new system. If data from additional systems is required for QUEST or additional conversion support, such change will be agreed between the parties via a change order pursuant to section 6.3 of the SOW.

  DUA will perform any data purification processes necessary to cleanse the data and provide the data in the format BearingPoint requests. BearingPoint's approach to conversion requires the provision of "scrubbed" ASCII extract files from the existing production systems. DUA and BearingPoint agree that converting errors into the new System database should be avoided. Unnecessary and incomplete data will be identified and dealt with by DUA staff. Consequently, while BearingPoint will provide DUA with the specifications for these extract files, DUA is responsible for identifying and correcting such errors prior to conversion. Data conversion for production is assumed to be a one-time process. In order to perform the data mapping, BearingPoint resources will need access to knowledgeable technical staff that understand the legacy data sources and data structures. DUA will provide access to that staff and will assist in the mapping of legacy data.

- **Integration and Interface Design and Development** – The budget for integration and interfaces is based on the information provided in the RFQ Section 4.3. As a




33

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

result, BearingPoint will provide services to develop inbound/outbound interfaces for the following systems:

| | |
|---|---|
| o UIRR | o IRS |
| o CSC (SAVE) | o Railroad Retirement |
| o BOA/Sovereign | o Placement Accountable System |
| o MMARS | |
| o Intercept | o MOSES |
| o DOR | o SDDS |
| o Industrial Accident Board | o MSP |
| | o 202 System |
| o Mass Highway | o HR/Personnel |
| o State Police | o Secretary of State (incoming e-mail) |

BearingPoint will work collaboratively with DUA in order to determine the requirements for these interfaces in the Inception Phase of the project. Detailed specifications for these interfaces will be created in the Elaboration Phase of the project. In order to perform the mapping necessary to design system interfaces, BearingPoint resources will need access to knowledgeable technical staff that understands the legacy data sources and data structures. DUA will provide timely access to that staff. If additional interfaces are required for QUEST, BearingPoint will negotiate with DUA for the necessary additional interface design and development support.

- **Interfacing to Existing Employment System (MOSES)** – QUEST will be designed to capture certain re-employment data for purposes of interfacing with MOSES system. The planned QUEST solution supports these interface capabilities.

- **FileNet Integration Services -** BearingPoint's scope of services includes integrating the QUEST solution with FileNet's P8 document imaging platform. BearingPoint and DUA will work together in the project to determine any necessary upgrades to the FileNet software. FileNet upgrades will be the responsibility of DUA. BearingPoint is not responsible for any upgrades to the FileNet software under this SOW. Under this SOW, BearingPoint is responsible for providing integration services between QUEST and FileNet P8. DUA is responsible for obtaining any necessary FileNet software licenses and/or upgrades and in a timely manner enabling BearingPoint to perform the integration services hereunder.

- **Change Management Services -** DUA will manage Change Management and Communications activities on the project. BearingPoint will provide advice and reasonable assistance in these areas of the project. BearingPoint is not responsible for conducting any additional activities in this area of the project.

- **Disaster Recovery Services -** BearingPoint will provide design recommendations for disaster recovery as follows: technical design, hardware configuration, network




34

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

design and contingency planning. BearingPoint is not responsible for the implementation of or costs for a Disaster Recovery site.

- **MSP Program** – The MSP program is considered out of scope for the QUEST project.

- **IVR Integration Assumptions** – The following assumptions and conditions apply to IVR integration:

    o The current functional services offered through the Massachusetts DUA IVR will be maintained and implemented with the QUEST project. No functions will be added, nor reduced, through the IVR self service delivery channel.

    o The IVR will be integrated with the QUEST application, calling business rules developed in the QUEST application.

    o Any change to the Avaya physical architecture and hardware is out of scope for the QUEST project. BearingPoint is not responsible for any changes to the Avaya production environment needed to support the new QUEST system. DUA is responsible for upgrading the current Avaya IVR/Call center to a recent release in order to integrate the IVR functions with the QUEST Benefits functionality providing both a development and production capability for the QUEST project. BearingPoint will develop the useable API's within the QUEST system for the Avaya IVR CTI/PBX solution to use.

    o BearingPoint is not responsible for call routing outside of the IVR (e.g. how a call presents to the IVR, or bounces out to a staff member).

- **Hardware and Software Specifications** – Hardware, software and physical infrastructure specifications and pricing will be prepared by the DUA and BearingPoint project team during the first phase of the project. The QUEST hardware and network topology implementation will be a collaborative effort between DUA and BearingPoint in order to optimize system performance and minimize risk points in the topology.

- **Data Warehouse** – The creation of a data warehouse is not in BearingPoint's scope for the QUEST project.

- **Fail-Over Expectations** – Meeting the fail over expectations identified in the QUEST RFQ is a joint responsibility between BearingPoint and DUA. The expectations for system fail-over are met in as far as the uFACTS Solution Framework is concerned, as specified in BearingPoint's proposal in response to the RFQ. However, meeting these expectations for the overall QUEST solution goes beyond the core uFACTS Solution Framework. There are several other variables that will impact the QUEST solution's ability to meet these expectations, such as, the network infrastructure and operating system, the physical hardware being used, the Avaya (IVR/ACD) system, the FileNet and Crystal Reports software, as well as various other integral components to the overall QUEST solution. These components need to be implemented with the fail-over expectations in mind. Several of these





35

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

components are the responsibility of DUA, including without limitation the management and implementation of the network infrastructure and physical technical infrastructure. BearingPoint and DUA will work together to define an appropriate enterprise-wide solution to meet the fail-over expectations, given these variables.

- **System Response Time and Up Time Expectations** – The satisfaction of these expectations is a joint responsibility between BearingPoint and DUA. The system response time for the uFACTS Solution Framework is on average within the 3-8 second range specified in the RFQ, based on previous production implementations. Based on the business requirements defined by DUA, the QUEST system may need to perform additional calculations that may exceed this average response time for certain scenarios. BearingPoint and DUA will work together to identify these more resource-intensive scenarios and work to optimize them to the extent possible within the project scope. BearingPoint and DUA will also discuss and agree to system response time and system up time acceptance criteria which will be documented in the deliverable expectation document (DED) for production implementation. These criteria will include recognition of the execution of the nightly batch processes and database backup processes.

- **Requirements** – Unless a system or business requirement has been mutually agreed to between the parties and is specified as such in the SOW, a mutually agreed to DED, or an approved project deliverable, it is deemed aspirational only. Such aspirational or undocumented requirements are not the responsibility of BearingPoint and are not covered by the warranty provisions of this contract. For the purposes of clarification, system expectations and project success criteria in the RFQ are aspirational only and not considered agreed upon requirements.

## *9.8 Project Tools*

The project tools to be utilized during the project are listed below. BearingPoint is not responsible for providing any third party hardware or software for the purposes of QUEST. All third party software and hardware for QUEST will be purchased or licensed directly by DUA. The parties will coordinate throughout the project to ensure that licensing and purchasing of the third parties software and hardware does not adversely affect the project schedule.

| Project Phase | | | | |
|---|---|---|---|---|
| Activity / Technique | Tool | Provided By | Estimated Number of Licenses | Available For Use By |
| **Project Management Phase** | | | | |
| Project Methodology | BearingPoint ProvenCourse™ Methodology | BearingPoint | Unlimited | Project Start |





MADUA00000247

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Project Phase | | | | |
|---|---|---|---|---|
| **Activity / Technique** | **Tool** | **Provided By** | **Estimated Number of Licenses** | **Available For Use By** |
| Collaboration | Microsoft SharePoint (version 2007) | DUA | 75 | Project Start |
| Project Documentation | Microsoft Office (version 2007) | DUA | 41 | Project Start |
| Project Plans Management & Maintenance | Microsoft Project (version 2007) | DUA | 10 | Project Start |
| Quality Management | FasTrack Templates | BearingPoint | Unlimited | Project Start |
| **BPR and Inception Phase** | | | | |
| Requirements Management & Traceability | IBM Rational Suite (RequisitePro) version 7.0 | DUA | 20 Named , 10 Floating | July 2007 |
| Process Modeling | Microsoft Visio (version 2007) | DUA | 10 | Project Start |
| Base-line UI Requirements | BearingPoint uFACTS Solution Framework (excluding Third Party Property) | BearingPoint | Unlimited | July 2007 |
| Use Case Development | IBM Rational Suite (Rational Rose Modeler) version 7.0 | DUA | 20 Named and 5 Floating | July 2007 |
| Use Case Modeling | IBM Rational Suite (Rational Rose Modeler) version 7.0 | DUA | 20 Named and 5 Floating | July 2007 |
| Activity Diagramming | IBM Rational Suite (Rational Rose Modeler) version 7.0 | DUA | 20 Named and 5 Floating | July 2007 |
| Use Case Development | Dreamweaver 8 | DUA | 13 | July 2007 |
| **Elaboration Phase** | | | | |
| Base-line UI Use Cases | BearingPoint uFACTS Solution Framework (excluding Third Party Property) | BearingPoint | Unlimited | July 2007 |
| UML Analysis & Design Artifacts | IBM Rational Suite (Rational Rose Modeler) version 7.0 | DUA | 20 Named and 5 Floating | July 2007 |





37

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Project Phase | | | | |
|---|---|---|---|---|
| **Activity / Technique** | **Tool** | **Provided By** | **Estimated Number of Licenses** | **Available For Use By** |
| Architectural Diagrams | IBM Rational Suite (Rational Rose Modeler), Microsoft Visio, Microsoft Visual SourceSafe, Microsoft Office | DUA | N/A | July 2007 |
| Base-line UI Data Model | BearingPoint uFACTS Solution Framework (excluding Third Party Property) | BearingPoint | Unlimited | July 2007 |
| Database Modeling | Oracle Designer (version 10g) | DUA | 5 | July 2007 |
| **Construction Phase** | | | | |
| Base-line UI System Components | BearingPoint uFACTS Solution Framework (excluding Third Party Property) | BearingPoint | Unlimited | July 2007 |
| Code Generation & Unit/Integration Testing | Visual Studio Team System 2007 | DUA | 35 | July 2007 |
| System Testing & Regression Testing | Mercury Interactive Suite (specific products below all provided by DUA) | DUA | Licensing by product below | Dec 2007 |
| | Test Director for Quality Center 9.0 | | 15 users | |
| | Quick Test Pro | | 5 concurrent | |
| | Test Director Defect Manager | | 10 concurrent | |
| | LoadRunner 8.1 Controllers and Monitors | | Site license | |
| | LoadRunner Web Virtual User | | 500 licenses | |
| | Client Side Monitors | | Site license | |
| | Web Server Performance Monitors | | Site license | |
| | Web Application Server Performance Monitors | | Site license | |




38

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Project Phase | | | | |
|---|---|---|---|---|
| **Activity / Technique** | **Tool** | **Provided By** | **Estimated Number of Licenses** | **Available For Use By** |
| | Database Server Resource Monitors | | Site license | |
| Database Management, Development & Testing | Oracle Designer (version 10g) | DUA | 5 | July 2007 |
| Reporting | Crystal Reports Developer Edition XI | DUA | 10 | Oct 2007 |
| Reporting | Crystal Reports Server | DUA | 10 concurrent | March 2008 |
| Correspondence Generation | SoftArtisans OfficeWriter for .NET | DUA | None | Oct 2007 |
| Development Artifact Version & Change Control | Microsoft Visual Studio Team Foundation Server (Visual SourceSafe) | DUA | 35 | July 2007 |
| User Managed Rules Engine | ILOG Rules for .NET Rule Starter Pack Development | DUA | 10 | Oct 2007 |
| User Managed Rules Engine | ILOG Rules for .NET Rule  Prod and Test | DUA | 20CPU | March 2008 |
| Online Help generation | RoboHelp Office Professional for .NET (version 6) | DUA | 5 | March 2008 |
| Database  Manage and Query | Toad for Oracle Professional 9.0 | DUA | 60 | July 2007 |
| **Transition Phase** | | | | |
| Self-paced / Computer Based Training | Macromedia Captivate (version 2) | DUA | 5 | March 2008 |
| User Acceptance Testing | Mercury Interactive Suite | DUA | See above | Dec 2007 |





39

MADUA00000250

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Appendix A: Deliverable Acceptance Criteria (Example)





40

MADUA00000251

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Appendix B: Deliverable Acceptance Form

### DELIVERABLE ACCEPTANCE FORM
#### *DUA QUEST PROJECT*

| DELIVERABLE NAME AND NUMBER: | DESCRIPTION: |
|---|---|
| ACCEPTANCE CRITERIA: | |

Project Manager Acceptance

☐ Approved   ☐ Disapproved

Name _____   Signature _____   Date _____

Steering Committee review date, (if required):

Remarks:


Conditions to Acceptance

| Description | Resolution Date | Assigned to: |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |


Disapproved Deliverable

New Deliverable complete by date:

| Reason/Issue Description | Resolution Date | Assigned to: |
|---|---|---|
| | | |
| | | |





41



THE COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF WORKFORCE DEVELOPMENT

# Appendix C: CORI

DEVAL L. PATRICK
GOVERNOR

SUZANNE M. BUMP
DIRECTOR

TIMOTHY P. MURRAY
LT. GOVERNOR

Executive Office of Public Safety
Criminal History Systems Board
200 Arlington Street, Suite 2200
Chelsea, MA  02150

GMADET
G

Dear Sirs:

The Department has been certified by the Criminal History Systems Board for access to conviction and pending criminal case data concerning prospective, otherwise-qualified employees.  As an applicant for the position of _____ within the _____ department/career center, I understand that a criminal record check will be conducted for conviction and pending criminal case information only and that it will not necessarily disqualify me.  The information below is correct to the best of my knowledge.

### APPLICANT INFORMATION (PLEASE PRINT)

**LAST NAME**          **FIRST NAME**          **MIDDLE NAME**

**MAIDEN NAME or ALIAS (if applicable)**          **PLACE OF BIRTH**

**DATE OF BIRTH**     **SOCIAL SECURITY NUMBER**   **MOTHER'S MAIDEN NAME**

**ADDRESS:** _____

_____
_____

**APPLICANT'S SIGNATURE**                              **DATE**

---

The following information must be verified by the <u>hiring Manager</u> by reviewing a form of government issued photographic identification and attaching a copy of that identification.

**SEX:** _____    **HEIGHT:** ____ft. ____in.    **WEIGHT:** _____    **EYE COLOR:** _____

**STATE DRIVER'S LICENSE NUMBER:** _____

The above information was verified by: _____ from _____ on _____

   Date                                 Manager's Name              Unit/Office

---

Send <u>original</u> form, copy of ID AND resume to:    Internal Control & Security Department
                                                         19 Staniford Street, Boston, MA 02114
**REQUESTED BY:** _ Internal Control & Security Department _____
         19 Staniford Street, Boston, MA 02114 - Phone: (617) 626-6680

CHARLES F. HURLEY BUILDING · 19 STANIFORD STREET · BOSTON, MA 02114
*Division of Unemployment Assistance*

MADUA00000253

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Appendix D: Information Technology Resource Policy



## Information Technology Resources Policy
**Effective: July, 1998                    Last revision: December 2006**

This document formalizes the policy for employees of the Department of Workforce Development,
contractors and other authorized users (hereafter "users") on the use of information technology resources ("Agency ITRs"), including computers, printers and other peripherals, programs, data, local and wide area networks, the Internet, E-mail, facsimile machines, photocopiers, pagers, telephone and cellular phones, voicemail and two-way radios. Use of Agency ITRs by any users shall constitute acceptance of the terms of this policy and any such additional policies.

## 1. User Responsibilities

It is the responsibility of any user of Agency ITRs to read, understand, and follow this policy. In addition, users are expected to exercise reasonable judgment in interpreting this policy and in making decisions about the use of Agency ITRs. Any user with questions regarding the application or meaning of this policy should seek clarification from appropriate management. The Agency reserves the right to recoup any costs incurred for unauthorized use of ITR. Failure to observe this policy may subject users to disciplinary action, including termination of employment.

## 2. Acceptable Uses

The Department of Workforce Development firmly believe that Agency ITRs empower users and make their jobs more fulfilling by allowing them to deliver better services at lower costs. As such, users are encouraged to use Agency ITRs to the fullest extent in pursuit of the Agency's goals and objectives.

## 3. Unacceptable Uses of Agency ITRs

It is unacceptable for any user to use Agency ITRs:

o in furtherance of any illegal act, including violation of any criminal or civil laws or regulations, whether state or federal;
o for any political purpose;
o for any commercial purpose;
o to send threatening or harassing messages, whether sexual or otherwise;
o to access or share sexually explicit, obscene, or otherwise inappropriate materials;
o to infringe any intellectual property rights;




43

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

o to gain, or attempt to gain, unauthorized access to any computer or network;
o for any use that causes interference with or disruption of network users and resources, including propagation of computer viruses or other harmful programs;
o to intercept communications intended for other persons;
o to misrepresent either the Agency or a person's role at the Agency;
o to distribute chain letters;
o to access on-line gambling sites; or
o to libel or otherwise defame any person.

## 4. Data Confidentiality

In the course of performing their jobs, users may often have access to confidential or proprietary information, such as personal data about identifiable individuals or commercial information about business organizations. Under no circumstances is it permissible for users to acquire access to confidential data unless such access is required by their jobs. Under no circumstances may users disseminate any confidential information, unless such dissemination is required by their jobs.

## 5. Copyright Protection

Computer programs are valuable intellectual property. Software publishers can be very aggressive in protecting their property rights from infringement. In addition to software, legal protections can also exist for any information published on the Internet, such as the text and graphics on a web site. As such, it is important that users respect the rights of intellectual property owners. Users should exercise care and judgment when copying or distributing computer programs or information that could reasonably be expected to be copyrighted.

## 6. Computer Viruses

Users should exercise reasonable precautions in order to prevent the introduction of a computer virus into the local area or wide area networks. Virus scanning software should be used to check any software downloaded from the Internet or obtained from any questionable source. In addition, executable files (program files that end in ".exe") should not be stored on or run from network drives. Finally, it is a good practice to scan floppy disks periodically to see if they have been infected.

## 7. Network Security

Most desktop computers are connected to a local area network, which links computers within the Agency and, through the wide area network, to most other computers in state government. As such, it is critically important that users take particular care to avoid compromising the security of the network. Most importantly, users should never share their passwords with anyone else, and should promptly notify the DWD Information Security Office (part of the DWD Internal Control & Security Department) if they suspect their passwords have been compromised. In addition, users who will be leaving their PCs unattended for extended periods should either log off the network or have a password protected screensaver in operation. Finally, no user is allowed to access the



44

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

Internet or other external networks via modem unless they have received specific permission from DWD Information Security Office.

## 8. E-mail

When using e-mail, there are several points users should consider. First, because e-mail addresses identify the organization that sent the message (user@detma.org), users should consider e-mail messages to be the equivalent of letters sent on official letterhead. For the same reason, users should ensure that all e-mails are written in a professional and courteous tone. Finally, although many users regard e-mail as being like a telephone in offering a quick, informal way to communicate, users should remember that e-mails can be stored, copied, printed, or forwarded by recipients. As such, users
should not write anything in an e-mail message that they would not feel just as comfortable putting into a memorandum.

## 9. No Expectation of Privacy

Agency ITRs are the property of the Commonwealth of Massachusetts and are to be used in conformance with this policy. The Agency retains, when reasonable and in pursuit of legitimate needs for supervision, control, and the efficient and proper operation of the workplace, the right to inspect any user's computer, any data contained in it, and any data sent or received by that computer. Users should be aware that network administrators, in order to ensure proper network operations, routinely monitor network traffic. Use of Agency ITRs constitutes express consent for the Agency to monitor and/or inspect any data that users create or receive, any messages they send or receive, and any web sites that they access. The Agency does not intend to monitor the content of telephone conversations without prior notice. However, the usage of telephone communication is monitored for the performance of agency operations, maintenance, auditing, security, or investigative functions.

## 10. Remote Access

Some users will be authorized by the Agency for remote access to e-mail and other applications. Access is authorized for the same purposes as other Agency resources, i.e., business use. Managers should approve remote access only for those users which have a job-related need to access Agency resources remotely. Users authorized for remote access to e-mail and other applications are required to read, sign and comply with the terms and conditions explained in the Remote Access User Certification Agreement, which is Attachment B to this policy.

**All users of the Agency's Information Technology Resources are required to read and comply with this policy. Additionally, all users are required to sign (along with the responsible Department of Workforce Development manager) and submit Attachment A to this policy, the ITR Policy Acknowledgement Form.**





45

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Users requesting remote access are required to read, comply, sign (along with the responsible Department of Workforce Development manager) and submit the Remote Access User Certification Agreement, which is Attachment B to this policy.**

ATTACHMENT "A"

INFORMATION TECHNOLOGY RESOURCES POLICY

<u>ACKNOWLEDGMENT FORM FOR EMPLOYEES & NON-EMPLOYEES</u>

<u>Section 1: to be completed by employee or non-employee</u>

I hereby acknowledge receipt of the Policy concerning the use of Department of Workforce Development (DWD) Information Technology Resources. I understand that as:

Check One:  ☐ an employee        ☐ a non-employee

using ITR resources of the Commonwealth, it is my responsibility to read and comply with the requirements of this Policy.

_____    _____

**PRINT NAME**
**(non-employees)**                          **ORGANIZATION / COMPANY**

_____    _____/_____/_____

**SIGNATURE**                                **DATE**

<u>Section 2: to be completed by Manager responsible for employee or non-employee</u>

As the DWD's Manager responsible for the above named individual, I understand that it is my responsibility to monitor the above named individual's compliance with the ITR Policy and to notify the Internal Control and Security (ICS) Department of any violations. I also understand that I must notify ICS when the above named individual's services conclude so that his/her access is promptly terminated.

**PRINT NAME**

_____    _____/_____/_____

**SIGNATURE**                                **DATE**




46

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Please return completed original Acknowledgement form to:**

Department of Workforce Development
Internal Control and Security Department
19 Staniford Street, 4th Floor
Boston, MA 02114

Rev.  12/06




47

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

## Appendix E: Confidentiality Statement



Confidentiality
202006.pdf




48

*DUA QUEST Project*
*Division of Unemployment Assistance*
*BearingPoint SOW- Revision 4.0 Final*

# Appendix F: IP Agreement for Vendor's employees etc.

Intellectual Property Agreement for Contractor's Employees, Consultants and Agents Confidentiality, Assignment of Inventions and Representation of Non-Infringement Agreement; Other Representations

The undersigned hereby acknowledges that he or she is an employee or consultant to of the following contractor of the Commonwealth of Massachusetts:

Name of Contractor: _____ ("Contractor")

and desires to be assigned by the Contractor to perform services for the Commonwealth, and that the Contractor desires to assign you to perform services on one or more projects for the Commonwealth, but only under the condition that you sign this Agreement and agree to be bound by all of its terms and conditions.

NOW THEREFORE, in consideration of your assignment to work for the Commonwealth, the access you have to the confidential information of the Commonwealth, and for other good and valuable consideration, the parties agree as follows:

1. <u>Confidentiality of the Commonwealth's Materials.</u> You agree that both during your assignment at the Commonwealth and thereafter you will not use for your own benefit, divulge or disclose to anyone except to persons within the Commonwealth whose positions require them to know it, any information not already lawfully available to the public concerning the Commonwealth ("Confidential Information"), including but not limited to information regarding any web site of the Commonwealth, any e-commerce products or services, any web development strategy, any financial information or any information regarding users of or vendors to the Commonwealth's web sites. Confidential Information also includes, without limitation, any technical data, design, pattern, formula, computer program, source code, object code, algorithm, subroutine, manual, product specification, or plan for a new, revised or existing product or web site; any business, marketing, financial or sales information; and the present or future plans of the Commonwealth with respect to the development of its web sites and web services.

2. <u>All Developments the Property of the Commonwealth.</u>  All confidential, proprietary or other trade secret information and all other works of authorship, trademarks, trade names, discoveries, invention, processes, methods and improvements, conceived, developed, or otherwise made by you, alone or with





49

others, and in any way relating to the Commonwealth or any of its web development projects, whether or not patentable or subject to copyright protection and whether or not reduced to tangible form or reduced to practice during the period of your assignment with the Commonwealth ("Developments") shall be the sole property of the Contractor's customer, the Commonwealth. To the maximum extent permitted by law, you hereby waive all moral rights in any Developments. You agree to disclose all Developments promptly, fully and in writing to the Commonwealth promptly after development of the same, and at any time upon request. You agree to, and hereby do assign to the Commonwealth all your right, title and interest throughout the world in and to all Developments without any obligation on the part of the Commonwealth to pay royalties or any other consideration to you in respect of such Developments. You agree to assist the Contractors customer the Commonwealth, (without charge, but at no cost to you) to obtain and maintain for itself such rights.

3.  Return of the Commonwealth's Materials.  At the time of the termination of your assignment with the Commonwealth, you agree to return to the Commonwealth all Commonwealth materials, documents and property, in your possession or control, including without limitation, all materials relating to work done while assigned by the Contractor to projects for Commonwealth or relating to the processes and materials of the Commonwealth. You also agree to return to the Commonwealth all materials concerning past, present and future or potential products and/or services of the Commonwealth. You also agree to return to the Commonwealth all materials provided by persons doing business with the Commonwealth and all teaching materials provided by the Commonwealth.

4.  Representation of Non-Infringement.  You hereby represent and warrant that, to your best knowledge, no software, no web content and no other intellectual property that you develop during your assignment to and deliver to the Commonwealth, and no Developments made by you and assigned to the Commonwealth pursuant to Section 2 above, shall infringe a patent, copyright, trade secret or other proprietary or intellectual property right of any third party.

5.  No Conflicting Agreements.  You represent and warrant that you are not a party to any agreement or arrangement which would constitute a conflict of interest with the obligations undertaken hereunder or would prevent you from carrying out your obligations hereunder.  The existence of an Employment or similar agreement with BearingPoint or if you are an employee or consultant to a BearingPoint subcontractor on this project, then with that subcontractor by which you assign ownership of Intellectual Property rights to BearingPoint or the Subcontractor shall not constitute a conflict with this Agreement regarding Intellectual Property rights.

6.  Tax Payments.  You hereby represent and warrant that you have paid all due state and federal taxes, or, if your tax status is in dispute or in the process of





50

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

settlement, that you have responded as directed and within the required timeframes to all communications received from the state or federal government.

7.  <u>You acknowledge that you are not an employee of any Massachusetts state or municipal government agency, and are not entitled to any benefits, guarantees or other rights granted to state or municipal government agencies, including but not limited to group insurance, disability insurance, paid vacations, sick leave or other leave, retirements plans, health plans, or premium overtime pay.</u>  Should you be deemed to be entitled to receive any such benefits by operation of law or otherwise, you expressly waive any claim or entitlement to receiving such benefits from Massachusetts state or municipal government agencies.

8.  <u>Miscellaneous:</u>

(a)  The Commonwealth is a third party beneficiary of this Agreement with full rights to enforce its terms directly.

(b)  With respect to section 1 of this Agreement and for the purposes of this engagement, BearingPoint employees, independent consultants and subcontractors' employees and consultants are considered "persons within the Commonwealth".

(c)  This Agreement contains the entire agreement between the parties with respect to the subject matter hereof, superseding any previous oral or written agreements.

(d)  Your obligations under this Agreement shall survive the termination of your assignment with the Commonwealth regardless of the manner of or reasons for such termination.  Your obligations under this Agreement shall be binding upon and shall inure to the benefits of the heirs, assigns, executors, administrators and representatives of the parties.

(e)  You agree that the terms of this Agreement are reasonable and properly required for the adequate protection of our customer the Commonwealth's legitimate business interests.  You agree that in the event that any of the provisions of this Agreement are determined by a court of competent jurisdiction to be contrary to any applicable statute, law, rule, or policy or for any reason unenforceable as written, then such court may modify any of such provisions so as to permit enforcement thereof to the maximum extent permissible as thus modified.  Further, you agree that any finding by a court of competent jurisdiction that any provision of this Agreement is contrary to any applicable stature, law, or policy or for any reason unenforceable as written shall have no effect upon any other provisions and all other provisions shall remain in full force and effect.

 

51

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

(f) You agree that any breach of this Agreement will cause immediate and irreparable harm to the Contractor's customer the Commonwealth not compensable by monetary damages and that the Commonwealth will be entitled to obtain injunctive relief, in addition to all other relief, in any court of competent jurisdiction, to enforce the terms of this Agreement, without having to prove or show any actual damage to the Commonwealth.

(g) No failure to insist upon strict compliance with any of the terms, covenants, or conditions hereof, and no delay or omission in exercising any right under this Agreement, will operate as a waiver of such terms, covenants, conditions or rights. A waiver or consent given on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

(h) This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to the doctrine of conflicts of law. This Agreement is executed under seal.

The undersigned believes that this agreement imposes reasonable standards of conduct for all of the employees and the contractors on assignment at the Commonwealth, and that this agreement will serve to best protect the interests of all involved parties. If you agree with the terms set forth herein, please sign and return this Agreement.

Agreed and Accepted:

Name of Employee or Consultant: _____

Signature: _____

Date: _____

Name of Contractor: _____

Signature: _____

Name: _____

Title: _____

Date: _____




52

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Appendix G: Scope, Use Case Statements

## Revenue Increment

- Register Employer Account Subsystem
- Wage Detail and Tax Report Subsystem
- Payment Processing Subsystem
- Collections Subsystem
- Maintain Employer Account Subsystem
- Tax Rate Calculation Subsystem
- Benefit Paid Charge Subsystem
- Field Audit Subsystem
- Third Party Administrator Interface Subsystem

**Register Employer Account Subsystem**

BearingPoint will develop the functionality to register a new employer account; this includes calling the necessary functionality to compute an experience rate for liability determinations; determining reporting status; and triggering the appropriate correspondence. BearingPoint will develop the capability for Employers to self-register based on formally accepted DUA specific business requirements.

Major functions will be made available online. We will address functionality of employer registration, such as employer liability, employer entity types (i.e., LLC and Corporations), and reimbursing accounts; additionally, we will address third party administrator (agent) registration. Each account type, or process, will be managed through a slightly different – yet similar – process. The following use cases and business processes have been identified for this module:

**Register Employer Account Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| Initiate Existing Employer Self-Service Account | This use case is designed specifically for employer and third party administrator conversion and new system adoption. The process allows currently registered employers and agents to logon to the system, using an established security profile, and access their self-service account. The process displays current employer data, and request employers to complete or update missing data. Upon completion, the employer will have established a permanent username and password, updated their account data, and initiated their self-service system. |
| Create and Register Employer Account | This use case begins when a Registrant provides required registration information using the Employer Self Service portal; or, an authorized UI Staff assists a Registrant to register an Unemployment Insurance (UI) Employer Account. This use case ends when the Business Entity is assigned the appropriate dates of service and has established an Employer Profile. The use case calls several rate calculation use cases; validates an employer's data; and determines current and future liability, pending fees, and open reporting requirements. Includes getting a DUA ID number. Includes the initiation of appropriate Contributory or Reimbursable payment method. |

53

MADUA00000264

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Register Third Party Administrator / Employer Agent** | This use case begins when a new Employer Representative (Third Party Administrator or Agent) provides the necessary information to represent Massachusetts companies in Unemployment Insurance. The process creates an Agent Account and allows employers to select the agency for representation based on established roles (power of attorney). |
| **Reactivate Employer Account** | This use case begins when an Employer wishes to Reinstate their Employer Account after a period of termination. The System reinstates the Employer Account and calculates the experience rate including experience factors from the previously terminated account. This use case ends when the System updates the Employer Account and sends notification of the Reinstate Adjustment.  Includes Staff view. |

**Tax Rate Calculation Subsystem**

The Tax Rate Calculation subsystem holds the logic to manage employer tax rates; or the changes of those rates. The module manages the annual rate assignment to all employers, individual employer liability determinations, and modifications in rate due to mergers, acquisitions, or change in legal entity. The rate computation will factor in special conditions, such as Tax and Revenue executions and delinquencies that might impact the calculation. The following use cases have been identified for this module:

**Tax Rate Calculation Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Determine Employer Liability** | This use case begins after a business entity submits required information to register for an Unemployment Insurance Account. If data submitted during the registration portion of the process indicates potential liability, this process will determine if the entity has met its liability threshold and a liability determination will be made. This use case ends when the business entity receives notification of the liability determination. |
| **Assign Initial Premium Rate** | This use case begins once the Registrant has submitted the required information to register for an Unemployment Insurance Account and has met the liability threshold necessary to assign an initial premium rate. This use case ends when the business entity receives notification of the assigned initial premium rate.  Includes industry specific rate calculation. |
| **Process Succession-Merger Adjustment** | This use case begins when a Succession Adjustment is initiated on an employer account. This occurs when a business entity takes over all or part of an existing business entity in Massachusetts. An Employer or Authorized UI Staff initiates this type of adjustment while maintaining the Employer Account. This use case ends with the determination of the succession adjustment is approved or denied via the system workflow and rates are calculated. Includes mergers/consolidations. |
| **Process Change of Legal Entity Adjustment** | This use case begins when a business changes its legal entity type. The change can trigger a rate adjustment. This use case ends with the determination of the entity adjustment is approved or denied via the system workflow and rates are calculated. |

54

MADUA00000265

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Process Tax-Paying to Reimbursing / Reimbursing to Tax-Paying Adjustment** | This use case holds the rules to change an employer's reporting status from contributory to reimbursing. The use case assigns the appropriate rates, transfers the necessary experience, and modifies the employer's status. |
| **Calculate or Adjust Individual Employer Rates** | This use case is designed to re-calculate an individual employer's rate due to a change in business situation; assign a new rate based on UI staff decisions; or modify rates due to historic account changes. |
| **Voluntary Contributions Adjustment** | This use case begins when a contributing employer submits a voluntary contribution in order to buy down the premium rate assigned to their Employer Account. Once the amount of the buy down is decided and payment is confirmed, the system adjusts the rate for that employer account. This use case ends when the system updates the employer account with the voluntary contribution adjustment information and the Employer is issued the new premium rate confirmation. |
| **Calculate Annual Rate** | This use case is triggered by the trigger date that initiates the annual rate calculation. The system will calculate the annual rate for the next year for each active, liable, premium paying employer account. This approach allows the core function for calculating a rate to be available to other adjustments that require a rate re-calculation. A notification of the rate will be generated and sent. The flow ends with the Employer Account updated for the next year. The primary functional areas are: Generating certain rate calculation parameters, Accepting certain rate calculation parameters entered by authorized UI staff, Issuing the rate notification to the employer, Updating the Employer Profile. |
| Calculate Solvency Rate | Will be part of above Use Case or a stand-alone. |

**Maintain Employer Account Subsystem**

The system will support account maintenance via employer or agent self-service or staff use; this will allow users to control information such as demographics, contact information, security roles and power of attorney, and business change information. The following use cases have been identified for this module:

**Maintain Employer Account Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Change of Reporting Method Adjustment** | The Change of Reporting Method Adjustment use case begins when the authorized user requests a Change of Reporting Method. Authorized UI staff approves or denies the Change of Reporting Method request. The employer accounts are updated and, if appropriate, the rate is calculated and assigned. This use case ends when determination of Change of Reporting Method is sent. Includes Staff ability. |

55

MADUA00000266

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Assign Worker Status Determinations** | This use case begins when a request is made to review certain information provided by a firm and/or worker in order to properly classify a particular worker or class of workers. The use case ends when authorized UI staff issues a formal determination classifying the worker(s) in question as an employee or independent contractor. Includes Staff request (Benefits to Status/Field to Status/ Employer to Status by mail). |
| **View Employer Account Profile and History** | This use case begins when an authorized user enters the Employer Self Service Portal for viewing employer account information. The profile and history outlines major components (i.e., status, entity type, threshold dates, etc) within the employer's account; this includes history. This use case ends when the authorized user views the necessary information and exits the application. |
| **Maintain Third Party Administrator Roles (Power of Attorney)** | This use case outlines the process for employers to assign "Update and Submit" or "View Only" roles, based on system functions, to Third Party Administrators. The online Power of Attorney agreement allows an authorized agent to act on an employer's behalf and/or receive the employer's nonpublic information in certain defined situations. |
| **Maintain User (Employer) Roles** | This use case allows employers to manage individual staff responsibilities (roles) within the system. The roles can be defined by system function down to the reporting unit level. |
| **Suspend or cease Employer Account** | The use case outlines how an employer, agent, staff or system can suspend or cease an employer's account. |
| **Maintain Reporting Units** | This use case manages the location information for an employer's reporting units. Each reporting unit is assigned a number (cross-matched with wage reporting) and provided an address. The process allows employers to create new, update current, or close old reporting units. |
| **Maintain Owner Officer Information** | This use case manages owner/officer information and history; including percent of ownership, dates, and contact information. |
| **Maintain Third Party Administrator Mailing Address** | This use case manages the mailing addresses of third party administrators. The centralized address maintenance prevents one agent from holding multiple addresses for the same function. |
| **Maintain Employer Mailing Address** | This use case manages employer mailing addresses; this includes management of multiple addresses for the purposes of appropriate correspondence management. This includes all addresses as defined by DUA. |
| **Maintain Employer Name** | This use case allows employers to change their "doing business as" and "legal name". Legal documentation is required before a legal name change can take place in the system. |

56

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Administrate Employer and Third Party Administrator Searches** | This use case outlines the agent and staff functions of searching for employer accounts. The process also includes staff functionality for searching agent accounts. The agent – employer search only allows agents to search on employers with which they hold a power of attorney. |
| **View, Hold or Cancel Correspondence** | This use case provides the logic to view sent correspondence; hold created but not sent correspondence for later delivery; and, cancel correspondence.  This is a staff function. |
| **Administer Account Resolution** | This use case provides UI Staff the ability to review delinquent accounts via a report or on-line views, determine their true account status, and terminate or update the account as necessary. |

**Wage Detail and Tax Report Subsystem**

The QUEST system will accept employer and third party wage detail information from a variety of sources; however, electronic file transfer and manual submission of records will be the primary modes of submission. The Wage Detail and Tax Report subsystem provides for the collection of wage detail and tax reports; calculation of taxes (based on specific Massachusetts factors); adjusting wage records and tax reports; viewing wage record and submission history; and forecasting future tax liabilities. The sub module also assigns appropriate penalties and fees, and provides a report to track potential SUTA dumping activity. The following use cases have been identified for this module, and include the business processes directly related to the wage report:

**Wage Detail and Tax Report Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Submit Wage Detail Report** | This use case begins when an employer or employer representative receives a reminder to submit wage detail and uses Employer Self Service to prepare, review, verify, and submit, a wage detail report. The process also allows staff to submit wage records as necessary. This use case calls the "Process and Calculate Taxes Due" use case and integrates closely with the payments sub module and processes. The design incorporates FTP, file upload, manual, copy-from-previous, zero-wage, and estimate/exception wage reporting models. The use case will include, or require extension, the UHI and other fund collection and tax-report only functionality. This use case ends when the employer has submitted the quarterly (calendar quarter) wage information. |
| DOR Wage Detail | DUA is currently seeking to change the way Wage Detail is collected today.  Employers submit wages to DOR and DOR then provides a file back to DUA which we receive/hold in a separate Wage Record DB.  We are building a business case and are will attempt to reverse this process having employers submit wage detail directly to us. |

57

MADUA00000268

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Process and Calculate Taxes Due** | This use case begins when an employer, staff or employer representative has successfully entered, and the System has validated, a Wage Detail Report. The System must then calculate the taxable wages, necessary fees (i.e., healthcare assessment), and total amount due. This use case ends when the taxes due calculations are complete, and the data is displayed and/or applied to the employers account. |
| **Process Non-Submission Penalties** | This use case begins when an employer does not submit a wage detail on the necessary due date. The non-submission triggers a series of penalties and statements; these penalties are designed to motivate the employer to submit the required wage report. This use case ends when the delinquent employer submits the wage detail report; or, when the penalty(ies) is/are forwarded onto the Collections and Account Resolution for processing. |
| **Submit Wage Adjustments** | This use case begins when an Employer, Staff, or employer representative accesses the system to review and edit a previously submitted wage report. This use case ends when the System captures the wage adjustment information and re-calculates / updates the employer's tax liability. |
| **Transfer Wage Detail Adjustments** | The use case begins when a UI Staff identifies a need to shift previously reported wage detail records from one employer's account to another; this situation is usually the result of a succession between two businesses or a multi-business owner reporting wages in error. UI Staff move appropriate employee records/wages between employer accounts, and the System modifies the tax due to each employer. The use case ends when the wage detail is removed from an employer account and added to another employer account, the employer accounts are updated, and statements are sent. |
| **View Wage Detail History** | This use case begins when a user enters an employer's account, for the purposes of managing a UI Revenue Account, to view individual or a select quarter of wage records. This use case ends when the user views the necessary information. |
| **View Wage and Tax Report Submission History** | This use case begins when an employer, staff or employer representative enters the system to view the submission transactions, error reports, and results for each original or adjusted wage or tax reporting transaction. This use case ends when the user views the necessary information. |
| **Process SUTA Dumping Report** | This use case is managed within the general Tax Services Reporting module. The reports logic creates a list of employers who share common employees between quarters. SUTA dumping report needs more parameters other than similar employees between quarters:  Owners / officers' legal address business type etc.  Will be determined during design. |

**Payment Processing Subsystem**

The QUEST Tax and Revenue system will provide a standard interface to receive payment data from other systems, such as ACH Credit and ACH Debit. The payment process will also incorporate paper check processing and voucher creation. BearingPoint will use uFACTS to guide the design for managing employer, agent, Massachusetts's

58

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

state-agency, out-of-state and Federal payments. Payments received will be automatically allocated based on allocation or hierarchy rules provided by DUA.

The design will include error management from external systems (i.e., dishonored checks or incorrectly assigned ACH Credit payments), and reversal or adjustment of those transactions. QUEST will provide functionality to accept reversal and adjustment transactions via a file and to perform the appropriate accounting adjustments. Refund processing, fiscal reporting, and re-certification management are also included. The following use cases have been identified for this module, and encompass business processes related to funds processing:

**Payment Processing Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Employer Makes Payment** | This use case begins when an employer has identified a debt on the account and has opted to make a payment. The employer, in a single and secure transaction, submits a full or partial payment. This use case ends when receipt of payment has been confirmed. Includes processing paper check payments. |
| **Agent Makes Payment** | This use case begins when an employer representative has identified a debt on their client's accounts and has opted to make an individual or bulk payment. The employer representative, in a single and secure transaction, submits a full or partial payment on behalf of the employer(s). This use case ends when receipt of payment has been confirmed. |
| **Other State and Federal Government Makes Payment**<br>When? | This use case begins when another state or Federal Government submits a payment. The agency, in a single and secure transaction, submits a full or partial payment on behalf of the employer(s). This use case ends when receipt of payment has been confirmed.<br>Move to employer charge. |
| **Submit and Reconcile Payment** | This use case begins when a UI Staff identifies an electronic payment error; the situation occurs when an employer submits an ACH Credit file to the correct bank account but does not complete other components of the file correctly. The staff member maps the correct employer account to the completed payment, assigns the payment to the employer's account, and transfers the appropriate funds. |
| **Post and Deposit Payment**<br>Also PID | This use case begins when an employer payment has been accepted by the System. The system will deposit payments from employers to the financial institutions and post payments to the employer accounts. These payments include current and past due UI Tax and Fees, current and past due reimbursable charges, penalty and interest charges, collection costs, and fees. The use case ends when the payment is deposited into the UI Account.<br>Revenue requires electronic payments; PID may need credit cards/EFT. During design, we will address how payments are applied against what hierarchy. |
| **Process Dishonored Payment** | This use case begins with a notification from the banking institutions that a payment has been rejected. The rejected payment is "backed-out" of the employers account (following the reverse hierarchy) and assigns the necessary penalties and/or fees to the account. |

59

MADUA00000270

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Process Employer Requests for Refunds** | The use case begins when an employer identifies an account credit and wishes to reclaim the funds. The employer requests the funds through the System. The use case ends when the System submits the refund, updates the account, and notifies the employer of actions taken.  Thresholds and rules will be determined during design. |
| **Produce IRS Certification and Re-Certification File** | This use case begins when the IRS sends an annual FUTA Identification Data Tape to DUA. The FUTA Certification process is the method the IRS uses to verify with the Department that the credit for UI taxes claimed by employers on their annual Federal Tax and Revenue return was actually paid to the Massachusetts Unemployment Fund. The system creates the necessary re-certification file for submission to the IRS. The use case ends when the system returns a FUTA Certification data file to the IRS. |
| **Re-Certification of Tax Paid** | This use case begins when an employer or IRS agent or employer requests a certification of wages and taxes paid for a specific calendar quarter and year. The system allows employers, staff, or employer representatives to view Re-Certification information (940C) information online; appropriate correspondence can be submitted to the IRS if requested online. The use case ends when the employer either prints a copy of the certification report; or, the UI staff sends an electronic or paper copy to the employer/IRS agent. |
| **Staff Review Account Details** | This use case provides staff an opportunity to review employer and employer representative payments; this includes groups of payments (i.e., ACH Debit, Paper Checks, and ACH Credit) down to the individual payment level. |
| **Fiscal and Revenue Reporting** | Fiscal and Revenue reporting is housed in the base reporting infrastructure of uFACTS; however, there are critical base criteria that need inclusion in the payments process. The Fiscal and Revenue reporting component includes tracking of Benefits Paid Charges, Contributory Employer Payments, Receivables, Daily Balancing, Fund allocation, and Collected Debt.  Overpayments collections are included here. |
| **Processing accounts without DUA id number** | Processing and tracking payments of accounts that have not been assigned a DUA id number. We will examine the opportunity to modify this process with an improved process that does not allow payments without proper registration. |
| **Payment Deferral** | This use case describes deferring two-thirds or some other partial payment of quarterly payments to be paid in full by the third quarter. |

**Collections Subsystem**

The QUEST system will include functionality and specific subcomponents designed to support the collections business process. QUEST will support aging and tracking of receivables, and allow collections specialists to choose from a variety of collections mechanisms. Reporting and correspondence will be developed to support the system functionality. The following use cases have been identified for this module:

60

MADUA00000271

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Collections Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Collect Established Debt** | This use case begins when an employer account becomes past due. The main flow is only applied to established debt. An Overdue Account Statement is sent to the employer indicating the employer must pay the debt within a stated timeframe after which the debt, if it meets referral rules, will be referred to debt collection within DUA. The use case ends when the debt is resolved. |
| **Conduct Debtor Resolution Activities** | This use case identifies and executes steps that need to be taken to prepare owner/officer information for a Personal Liability Determination. Specifically, this will involve the System finding Owner/Officer records that are out of date or incomplete and routing them to UI Staff to be updated. |
| **Compromise of Penalty, Interest and Fees** | This use case begins when an Employer requests a compromise of penalty, interest or fees. This use case ends when the UI Staff has acted on the request, and the System notifies the employer of actions taken. |
| **Establish Payment Plan** | This use case describes the process of creating a payment plan. The use case progresses with UI Staff negotiating the terms of the proposed payment plan and gathering the require information for the proposed plan. It also covers the steps the System uses to monitor the plan status after it is put into place. |
| **Manually Hold Debt** | This use case manages individual debt items and prevents them from collection referral. The process also incorporates electronically recalling a debt from collections.  Includes lien and bankruptcy processing identified by reason codes for debt holds. |
| **Process Delinquent Debt** | This use case covers the flow of established, delinquent debt from the System. It begins when debt is established. The system will indicate when debt has reached the necessary conditions for processing debt (i.e., First Notice, Second Notice, and Payment Plan/Compromise). This use case also covers the activity of establishing interest or penalties on delinquent debts. |

**Benefits Paid Charge Subsystem**

The QUEST Tax and Revenue system will accept benefit paid charges and adjustments from benefits processing activity. The sub module tracks benefits paid charge transactions, and allows staff to manually adjust transactions, and creates a downloadable charge file for employers. Accounts for reimbursable employers are assigned the appropriate debits to their account. In many States, State Agency Accounts are treated specially. The following use cases have been identified for this module:

61

MADUA00000272

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Benefits Paid Charge Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Process Benefit Paid Charge and Non-Charge Data** **(This use case may need to be implemented with Benefits Increment.)** | This use case documents how to process the benefits paid and charge to employer accounts. It is the process effects of Benefits Paid/Charged on Benefit Account. Benefits Paid/Charged is not considered a separate "system", but rather one component of an integrated whole. |
| **Process Manual Benefits Paid Charge Adjustments** **(This use case may need to be implemented with Benefits Increment.)** | This use case begins when a UI Staff person wishes to adjust charges for an employer. It describes the steps needed to accomplish manual adjustments to the Benefits Charge transaction. A manual adjustment is an adjustment that is not accommodated by the automatic adjustment process; these adjustments are considered anomalies, but may be required to accommodate an employer's account. This use case ends when charges have been successfully adjusted. |
| **View Online Benefits Paid Charge Statement** | This use case begins when an employer wishes to view their charge statement of account, or charges in general. It describes the steps that an employer goes through to view their statement of account. The statement of account includes the employer charges from the last period and historically, along with any outstanding balance due, if a reimbursable employer. The use case ends after an employer has successfully viewed their charges. |
| **Create Employer Benefits Paid Charge Statement** | This use case describes the steps necessary for generating an employer charge statement. It begins when the system starts the process based on an automated batch scheduler. The charge statements can take a variety of forms, but each type must communicate the same content – employer charge activity for that period. The use case has slightly different requirements depending on the employer type, and the communication option that the employer has chosen; paper or electronic. The process ends when the employer charge statements have been generated. |
| **Create Employer Benefits Paid Charge Download File** | This use case describes the steps necessary for generating a delimited file of Benefits Paid Charge transactions. The file is created and displayed to be downloaded by employers online. |
| Employer Protest Charges | This is a placeholder for design concerns. This use case describes the employer's ability to protest benefit charges on a particular statement. There would be a connection from Appeals back to Accounts control to handle any adjustment. |

**Field Audit Subsystem**

The QUEST system will provide a set of data validation routines that automatically identify discrepancies between wage reports, Tax and Revenue reports and payments (integrity checks). Where possible, these routines will force employers to reconcile as

62

MADUA00000273

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

part of the wage submission process to eliminate any manual effort associated with reconciliation or data cleansing. However, we realize that the QUEST system must support the full range of balancing and reconciliation activities.

Additionally, the QUEST system will provide mechanisms to randomly and conditionally generate data for initiating, tracking, and executing field audits. This includes generating notices, notifying employers of scheduled activities, assigning resources, creating data extracts, and recording findings, as well as others. The following use cases have been identified for this module:

**Field Audit Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Generate Field Audit** | This use case describes the automated process of random selection, or targeted random selection, of employer accounts. The employer accounts are placed in a queue for field audit staff to process; based on pre-determined auditor factors (i.e., zip code or industry type). |
| **Administer Field Audit** | This use case begins when the System and/or Field Auditor selects an employer for an audit. The Use Case involves the activities necessary for required Federal Employer Audit Compliance. These audits may be triggered by a random selection process or by targeted criteria. This use case ends when an audit is complete, findings letter is submitted, and the audit is saved and approved by management. This excludes an offline process. Audits will be done via connection to QUEST system. |
| **Administer Field Audit Referrals** | This use case begins when a UI Field Auditor receives a referral or investigation request from another UI Staff member; or to respond to an employer request for assistance. The use case ends when the field auditor has addressed the referral/request, documented the actions, and updated the System as necessary. |
| **Review Field Audit** | This use case outlines the process necessary for management review of field audits; managing quality control. The process incorporates workflow functionality to return audits to staff once audit is complete or if quality is not met based on design. |

**Third Party Administrator Interface Subsystem**

The Third Party Administrator Interface subsystem provides a set of functionality that focuses on processing large volume, multi-employer records. The following use cases have been identified for this module in order to provide this functionality:

**Third Party Administrator Interface Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Process Agent FTP Wage Report File** | The design artifact outlines the file format and processing rules for submitting an agent file – containing multiple employer records. This includes error handling and file rejection rules. |
| **Create Agent FTP Wage Report Acknowledgement File** | The design artifact outlines the file format submitted to large agents upon processing a bulk agent file. The file provides validation of submission and error information. |

63

MADUA00000274

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Process Agent Role Assignment File** | The design artifact outlines the file format submitted by large agents to self-assign power-of-attorney in a bulk fashion. NOTE: The process is recommended for conversion purposes only. |
| **Process Agent FTP Benefits Paid Charge File** | The design artifact outlines the file format for providing Benefits Paid Charge transaction detail for agents on all their client accounts. |
| **Process Agent Employer Rate File** | The design artifact outlines the file format for providing agents rate information for their client accounts. |
| Process Other Bulk Filing | Will be determined if needed during design. |

**Unemployment Health Insurance (UHI)**

| Use Case | Brief Use Case Description |
|---|---|
| Match Revenue Processes | The system will be fully integrated and follow similar processes to Revenue collections. |

64

MADUA00000275

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

## Benefits Increment

BearingPoint will implement a Benefits module that aligns with the specific business requirements of Massachusetts Department of Unemployment Assistance. The module will include initial and continued claims, monetary and non-monetary determinations, adjudication, benefit payments and control, 1099 processing, fraud detection and recovery, as well as implementing and supporting various other programs and services such as Work Share, UHI, TRA, Child Support Recovery, and Trust Fund accounting. The tasks required to deliver this module will include:

- Design
- Construction
- Conversion
- Testing

BearingPoint will customize uFACTS' Benefits Services components to DUA's specific business and technical requirements. uFACTS will be modified based on subject matter experts and claimant focus group sessions. BearingPoint will also develop, based on formally accepted DUA project management requirements, the necessary interfaces to new and existing external and internal entities; exact interfaces or interface portions will be determined during detail design. Interface channels (i.e., s FTP, Online, and magnetic tape) will be examined for each interface. BearingPoint will deliver the following subsystems and assess the associated subsystem use cases for implementation:

- Initial Claim Subsystem
- Process Benefit Determination
- Benefit Payments
- View and Maintain Benefit Account
- Integrations Services
- Appeal Processing
- Program Integrity
- Economic Research
- Unemployment Health Insurance

**Initial Claim subsystem**

Initial Claim subsystem includes the necessary functionality for supporting claimants, employers and UI Staff throughout the initial claim application process. The design of this subsystem will include designing customer-facing functionality that allows claimants to apply for existing types of program benefits, including Standard Unemployment Insurance, Disaster Unemployment Assistance (DUA), Work Share, UHI, Extensions, and Trade Readjustment Allowance (TRA). The following use cases have been identified for the Initial Claim Subsystem:

65

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Initial Claim subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **View Preliminary Information** | This use case begins when a claimant selects "Apply for Unemployment Benefits Online" from the self-service website. The purpose of this use case is to provide cursory education on the following topic areas: When Should I File, Information Checklist, Who Qualifies for Benefits, How Benefits are Calculated, Web Page Viewing Tips, and System Security. This use case is complete when the claimant selects "Start the Unemployment Benefit Application" and then agrees to the data privacy authorization. |
| **Process Initial Questions** | The use case begins after the claimant selects "yes" to the data privacy authorization and submits. The system then displays the Initial Questions, which determine:<br>• If the potential claimant is able to apply for unemployment benefits.<br>• The type of application format presented to the claimant in order to obtain the appropriate data to establish a benefit account.<br>• The use case ends when the claimant has successfully answered the required initial questions. |
| **Authenticate Claimant** | This use case begins after the claimant has answered the initial questions. The claimant will enter personal information that will be sent to SSA and US CIS through an interface for verification. If a claimant's information is not validated by SSA or US CIS, he/she will have limited system access, and the system will place a non-monetary hold on his/her account. The claimant will then be directed to assign him/herself a password. This use case ends when the claimant has successfully chosen a password.  During the design we will determine which entities need to cross-referenced and how; real-time versus batch. |
| **Collect General Information** | This use case begins after the claimant has assigned him/herself a password. The purpose of this use case is to collect the claimant's demographic information for statistical and work search purposes. This use case ends when the claimant has answered all the required questions.  Capture profiling, dependency information and claimants preferred method of payment.  Will determine this during design. |
| **Collect Employment Information** | This use case begins after the claimant has answered the general questions. The purpose of this use case is to collect the claimant's Massachusetts, federal, military and/or combined wage employment information from the beginning of his/her base period date to the current date. The use case ends when the claimant's employment information has been successfully entered and validated by the system. |

66

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Activate DUA Option** | This use case begins after multiple off line preconditions steps are completed when an authorized Disaster Administrator has received notification from the Department of Labor that a Disaster has been declared in a Massachusetts County (ies). This Use case involves establishing the system framework that will be used to initiate the availability of benefits once a disaster has been declared. The administrator will define a new disaster record, or modify an existing record within the Disaster Benefits Framework. This creates a new disaster master record, to be stored in the framework that will then allow the system to accept and validate applications. Using the defined system framework criteria, the system could then compare, approve or deny eligibility for benefits for Disaster Unemployment Assistance. This use case ends when a DUA framework record has been successfully created or modified by an authorized administrator. |
| **Process DUA Application** | This use case begins when a claimant applies for DUA benefits. The claimant is required to submit specific information for making a determination of Disaster Unemployment Assistance (DUA) benefits. This use case ends when a claimant has completed all the necessary sections of the DUA application. |
| **Process RED Application** | Applies to Section 30/RED, similar to above. |
| **Activate Extension Option** | This use case begins when an authorized user wishes to define a new extension program within the Benefits Module. This creates a new extension option that can then be subsequently applied for by claimants when their account meets the necessary qualifying characteristics. This use case ends when an extension option has been successfully activated. |
| **Process Work Share Application** | The purpose of this use case is to describe the steps that an employer would need to perform to process an application to become a work share employer. An employer is required to meet several business requirements before their organization is considered by UI for work share eligibility. Once an employer has submitted all required information for the employer work share application, this use case is complete.  Includes workflow to staff for approval. |
| **Process Trade Readjustment Allowance** | This use case begins when an authorized TRA worker completes the applicable sections of the TRA application into the Benefits Module for consideration of TRA benefits. From this application, the Benefits module will determine if the claimant is eligible for any of the TRA programs. These include Alternative Trade Adjustment Assistance (ATAA), Trade Readjustment Allowance (TRA), and / or Health Coverage Tax Credit (HCTC). This use case ends when the authorized TRA Worker has completed all the necessary sections of the TRA application.  This use case needs to modified during design to include a "SHORT" version of UI claim/denial then work flowed to TRA |
| **Process Extension Application** | This use case begins when a claimant decides to apply for an extension of benefits. When a claimant decides to apply for an extension, several questions must be asked that pertain to the original account, plus the claimant's current circumstances. This use case ends when a claimant has completed all the necessary sections of the extension application. |

67

MADUA00000278

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Review, Edit, & Confirm** | This use case begins when the claimant has completed one or more sections of the application for benefits, and wishes to review his/her responses. This use case will describe the steps that the claimant goes through in the process of reviewing their registration questions and answers, and to edit those answers if necessary, as well as to submit the final confirmation of those answers. The use case ends after the claimant has either saved their application for later processing or submitted it after confirmation. |
| **Establish Claim** | The purpose of this use case is to describe the steps that the system must proceed through in order to create an account based on information submitted within an application. The system creates accounts when the claimant submits the application. Applications are analyzed by the system to determine the program and account type, along with all applicable information necessary for determining benefit amounts. This use case is complete once an account has been established, along with any necessary issues for UI Staff to review. |
| **Login Claimant** | This use case begins when a claimant has selected "Existing Account" from the "Getting Started with Massachusetts Unemployment Insurance Benefits". The claimant will then enter his/her ID (TBD) and password. If the claimant cannot remember his/her password, he/she will have an opportunity to reassign one. The use case ends when the claimant has logged into the system using the correct SSN and password. |
| **LADT** | This Use Case describes the functionality needed for UI to interface with the Interstate Statistical Data Exchange (commonly called the LADT) which in turn supports the exchange (incoming/ outgoing) of claims and related statistical data between States. The interface sends out initial and continued claims data for commuters and claimants that have Massachusetts Benefit Accounts but have residences out of Massachusetts. The interface receives and processes initial and continued claims data for commuters and claimants who have claims in other states but reside in Massachusetts. This Use Case details of the data to be exchanged, the record layout, and the process for exchanging the data. |

**Process Benefit Determination**

The purpose of this subsystem is to determine claimant eligibility for Regular and Special UI program benefits. The use cases in this subsystem will: Identify claimant monetary and non-monetary eligibility and issues; Calculate the Weekly Benefit Amount (WBA) and the Maximum Benefit Amount (MBA) specific to the claimant program type; and Issue a single or combined benefit determination to the employer or claimant. The following use cases have been identified for the Process Benefit Determination Subsystem:

68

MADUA00000279

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Process Benefit Determination**

| Use Case | Brief Use Case Description |
|---|---|
| Collect Eligibility Information | This use case begins when the claimant is requested to answer non-monetary eligibility information. Based upon the claimant's answers, the claimant will be required to provide additional fact-finding information, which is stored for review by UI staff. The use case ends when the claimant has completed entry of the eligibility information. |
| Collect Separation Information | This use case begins when the claimant is requested to enter separation Information. For each employer the claimant indicates the reason for separation. The claimant can select only one reason for separation for each employer. Based on the reason, claimants may be required to provide additional information (fact-finding) which is stored on the database for later review by UI staff. This use case ends when the claimant has completed entry of the required separation information. |
| Manage Non Monetary Issues | This use case was created in order to consolidate the documentation of all non-monetary issues that will be tracked by the system. The use case defines the list of issues and for each describes what processes/ use cases create the issue, how the issue will affect the claimant and how the issue will be routed to adjudication staff for processing. This use case ends when the issue has been routed to the appropriate workflow queue. |
| Gather Fact Finding | This use case begins when a non-monetary issue has been identified. The use case describes the fact-finding questionnaire that will be sent to the issues interested parties (claimants, employers, doctors, etc). The use case also describes the functionality for receiving fact-finding questionnaires. The use case ends when all questionnaires have been returned or when the time limit set for the return of the questionnaires has past. |
| Adjudication | This use case begins when UI staff selects a Non-Monetary issue from Workflow. UI staff reviews all information associated with the Non-Monetary issue and determines if the Non-Monetary issue is correct, if additional information is needed, or if another Non-Monetary issue has been identified. UI staff makes a determination by selecting the findings, conclusions and statute. UI staff determines if the Non-Monetary determination should be combined with other determinations. This use case ends when the system updates the claimant and employer accounts. The level of complexity will be reviewed during design. |
| Auto Adjudicate Non-Monetary | This use case begins when the issue identified by the system meets the user defined business rules for an auto adjudicated determination. System will make the determination and issue the correspondence to the employer or claimant as applicable. This use case ends when correspondence is issued and the system updates the claimant and/or employer account. The level of complexity will be reduced in design. |
| Modify Non Monetary Determination | This use case begins when UI Staff identify that a previous non-monetary determination should be modified. Once UI Staff has entered the data for modification, the system updates the system processes that are affected by the update and issues correspondence to the claimant and/or employer as necessary. This use case ends when correspondence is issued and the claimant and/or employer account is updated. |

69

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **View Non-Monetary** | This use case begins when a User accesses the "View Non-Monetary" functionality. The system will display the non-monetary determination and status. This use case ends when user exits this functionality. |
| **Calculate Pre-monetary (internal)** | This use case begins when authorized staff accesses the Pre-monetary Review screen. The user will enter an SSN and determine which base period the system should use to calculate a potential claimant's Weekly Benefit Amount and Maximum Benefit Amount. This use case ends once the system has retrieved and displayed the appropriate wage detail records and calculated and displayed both the Weekly Benefit Amount and Maximum Benefit Amount. |
| **Calculate Pre-monetary external** | This use case begins when the claimant wishes to receive a pre-monetary estimate of his/her unemployment benefits. The purpose of this use case is to provide the claimant with an estimate of his/her weekly benefit amount and maximum benefit amount based on the claimant's wage detail records. This use case ends after the claimant has viewed his/her pr-monetary estimate. |
| **Request and Receive Wages** | This use case begins after an initial application has been filed. If during the initial application the claimant indicated federal, military, and/or other state employment this use case processes the wage response(s) from ICON. If the claimant failed to indicate these types of employment upfront but later indicate missing wages this use case incorporates the functionality for staff invoked wage requests as well as the processing of wage responses. Finally, if a claimant indicates missing or incorrect MA wages this use case incorporates the functionality to modify MA wages. This use case ends once the wages (MA, other state, federal, and/or military) are received and handed over to the Calculate Monetary use case. |
| **Calculate Monetary** | This use case begins when the claimant has completed registration and has indicated they are requesting Regular or Special Program UI benefits. Special Programs include: Temporary Extended Unemployment Compensation (TEUC), state Extended Benefits (EB), Disaster Unemployment Assistance (DUA), and Shared Work. The purpose of this use case is to identify the employers that will be charged when a claimant receives benefits and to determine if the claimant has the wages necessary to be monetarily eligible to receive regular UI benefits or meets the monetary guidelines associated with Special Program UI benefits. This use case contains the business rules necessary to determine the claimants Regular or Special Program Weekly Unemployment Benefit Amount (WBA) and Maximum Unemployment Benefit Amount (MBA). Business rules will determine if a combined determination is issued to the claimant. This use case ends when the system calculates the claimants WBA and MBA and issues the necessary correspondence. Includes: Automatic calculations of monetary by Ma. Program; TRA/Red and/or workers comp., seasonal, school. Updates to payment records, overpayments. <br><br>Notification to claimant/employer of eligibility or payment charge <br><br>Appeal form must be sent to either claimant or employer |

70

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Process Amended Monetary** | This use case may be initiated based on the following: Claimant request for wage information has been returned through the ICON system or returned by a Massachusetts employer, claimant account updates (determination or appeal decision), employer correction to wage detail or the claimant has requested an alternate base period. This use case contains business rules that address Regular and Special Program re-determinations. The system will include internet based, and integrated voice response (IVR) service channels, for this option. Staff workflow would be created for monetary information received on paper. Upon receipt of the information the system re-calculates the claimants Regular or Special Program WBA and MBA and updates the benefit charge and wage detail processes. Business rules will determine if a combined determination is issued to the claimant. This use case ends when the claimant and employer account are updated to reflect the wage information and the necessary correspondence is issued to the claimant and employer. |
| **Process Effective Dated Monetary** | This use case begins when a claimant has submitted an application with employment identified by business rules as having a wage limitation. The system will use the wages in wage detail to calculate the MBA/WBA and based on the effective begin and end dates identified by the claimant will establish the effective date of the monetary and calculate the MBA/WBA. One the claimant has reached the end date of the limitation, the system releases the wages, issues the correspondence to the employer/claimant and updates the claimant account. |
| **Process Combined Wage Claim** | This use case begins when another state requests wages from MA by sending an IB4 request (either through the ICON interface or via mail). This use case describes the steps taken to determine whether there are wages that can be transferred from MA to the other state for the SSN being requested. The use case ends with the sending of an IB4 response to the other state which will either transfer wages or notify the other state that wages could not be transferred and why. This use case includes billing of other states for their share of combined wage claims, and reporting of that activity to state and federal agencies. In addition this use case incorporates Interfacing with electronic flows of funds from other systems (e.g. the payments from other states that are received in Massachusetts through the federal UTF financial transfer system) |

**Benefit Payments Subsystem**

The Benefit Payments subsystem incorporates functionality to determine continued weekly or bi-weekly eligibility as well as functionality to correlate payments with the proper program type. The Benefit Payment process also includes the calculation of payment based on monetary benefit entitlement, non-monetary holds, disqualifications and eligibility deductions, and deductions such as wages earned, child support and/or overpayment offsets, etc. The System will dispense payments and update the claimant benefit account to reflect payments and/or payment adjustments as well as the employer account benefits paid records. This subsystem also includes use cases related to the calculation, establishment, and recovery of overpayments. The following use cases have been identified for the Benefit Payments Subsystem:

71

MADUA00000282

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Benefit Payments Subsystem**

| Use Cases | Brief Use Case Description |
|---|---|
| **Collect Claimant Earnings Information** | This use case will collect all earnings that the claimant would have had during the request for payment period. The Claimant would have supplied all earnings from any wages, military income, and self employment income. The system would also ask the claimant if he/she had returned to work during the requested week's period. |
| **Collect Claimant Separation Information** | This use case gathers the fact-finding necessary to adjudicate separation issues. Will utilize questionnaires developed by the Determinations process. In addition, information can be gathered if a claimant indicates they have refused work, or identify an additional separation in the request payment. |
| **Collect Availability Information** | This use case gathers information regarding the claimant's ability and availability for work. If potential issues are identified related to the claimant's ability and availability, the claimant will be prompted to complete the appropriate questionnaire. |
| **Collect Other Source of Income Information** | This Use case begins when a claimant indicates within the Request for Payment Process that they have Other Income. The system routes the claimant to complete the necessary information regarding Other Income. |
| **Confirm Request Benefit for Payment** | This use case describes the functionality associated with the claimant's request for payment, including the data elements that appear, and which are editable. |
| **Determine Benefit Payment Distribution** | This use case describes the technical requirements needed to correctly distribute benefit payment monies to the proper entities (i.e., child support, state and federal taxes, etc.). |
| **Process DUA Request for Benefit Payment** | This use case describes the unique functionality and information captured when the claimant is applying for benefits under the Disaster Unemployment Assistance program. |
| **Generate Benefit Payment** | This use case begins when a claimant or UI Staff has successfully submitted a request for payment for a week, or if UI Staff makes an adjustment to a payment (PFRC) to be made. This use case ends when the all weeks requested to be paid have been processed. |
| **Initiate Cross Match Detection** | This use case begins when the System runs or UI staff initiates one of several cross match queries This use case ends when the requested cross match query is complete. |
| **Process Claimant Account Adjustments** | This use case begins when an adjustment to a processed Overpayment debt payment is required. This use case end when the Overpayment debt payment has been updated. |
| **Process Check Cancellations** | This use case documents requirements related to the processing of cancelled checks. |
| **Process Check Reconciliation** | This use case describes the process to reconcile outgoing checks with US Bank. |

72

MADUA00000283

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Cases | Brief Use Case Description |
|---|---|
| **View and Generate 1099-G** | This use case begins when a claimant or UI Staff wishes to view a 1099-G. The System will display the most recent year available for the claimant, and will allow a claimant or UI Staff to view and print previous years' data as well, in the proscribed 1099-G format. This use case also includes the necessary business rules for processing the annual 1099 job that generates the annual 1099-Gs. This use case ends when a user has successfully viewed a 1099-G. |
| **Process Overpayments** <br><br> Applies to PID | This use case begins when a regular or special program overpayment has been identified due to a monetary re-determination, account update, appeal decision, or discovered via one of the cross match queries. This use case ends when the system updates the account to accurately reflect the debt and the necessary correspondence is issued to the employer or claimant. |
| **Process Request for Benefit Payment** <br><br> Applies to PID | This use case begins when a claimant accesses the continued request option via IVR or the internet to process a weekly or bi-weekly request for Regular or Special Program benefit payment. This use case ends when the Claimant has successfully submitted their request for payment. Upon submission, the System deducts any overpayment offset or other deductions and calculates the benefit payment. |
| **Process Underpayments** | This use case begins when it has been determined that a claimant has been underpaid resulting from an appeal or adjudication. The system will issue the appropriate payment resulting from the underpayment. |
| **Process Shared Work Request for Benefit Payment** | This use case begins when a claimant requests partial Unemployment Insurance Benefits while continuing to work for a pre-approved employer of the Shared Work Program. This use case ends when the claimant receives payment. |
| **Process TRA Request for Benefit Payment** | This use cases describes the unique functionality and information captured when the claimant is applying for benefits under the Trade Adjustment Assistance Act. |
| **Validate Payment Calculation** | This use case begins when a claimant has successfully submitted his/her request for payment and received a confirmation notice This use case ends when the weeks requested have been validated and/or calculated |
| **Validate Work Search Verification** | This use case will validate the claimant's ongoing work search effort. |
| **Work Search Verification** | This use case will gather information regarding the claimant's ongoing search for employment. Claimants will be randomly identified and selected during the request for benefit payment. |
| **Process Claimant Payment Plan** <br><br> Applies to PID | This use case begins when a claimant requests a payment plan. This use case ends when the system updates the account to reflect the creation of an approved payment plan. |

73

MADUA00000284

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Cases | Brief Use Case Description |
|---|---|
| **Process Claimant Refund**<br><br>Applies to PID | This use case is initiated when UI has over-collected Claimant debt. This use case begins when either the System or UI Staff identifies a refund is due the Claimant. This use case ends when the check is cashed or cancelled. Credit balances should not automatically be refunded by the system. Hold and verify must be done. |
| **Process Debt Payment**<br><br>Applies to PID | This use case begins when the Claimant initiates a debt payment transaction. This use case ends when the System has been updated with debt payment information and has generated a payment confirmation number. This use case includes electronic access to Lockbox Transactions images for improved reporting capability. |
| **Process  Collections** | This use case begins when a debt has been determined uncollectible through available UI collection methods and ends when the debt has been assigned for additional collection actions |
| **Refer Debt for Revenue Recapture** | This use case begins when the system determines a claimant account debt meets business rule eligibility for referred to the State of Massachusetts Department of Revenue (DOR) for tax intercept. This use case ends when the debt is satisfied and tax intercept is no longer necessary. |
| **Process Online Underpayments** | The Use Case begins when manual intervention is required for the generation of an Underpayment. The use case ends when an Underpayment is created, and the determination has been updated. |
| **Process Online Overpayments**<br><br>Applies to PID | The Use Case begins when manual intervention is required for the generation of an overpayment. The use case ends when an overpayment is created, and the determination has been updated. |
| Employer Workshare | Employer will verify and enter work schedules.  Will be determined during design. |

**View and Maintain Benefit Claim**

This subsystem describes the ability of the claimant to maintain information about their claim, and for UI Staff to maintain information about a claimant. For the claimant, this includes the claimant's ability to maintain information including address, requesting a wage correction, viewing their payment and withholding history, requesting a check replacement, viewing and printing a 1099-G, and submitting any tax withholding and direct deposit information. A claimant will only have access to their account through the authentication of their identity using a UI-assigned user ID and self-assigned password. For a UI Staff person, the view and maintenance features will be enhanced from that functionality available only to claimants, and will include enhanced access to claimant and claim history, as well as appropriate internal maintenance functions, such as appeals and determinations. Employer access to claimant information will include viewing information directly related to unemployment charges and employer fact-finding, as well as applicable appeal updates. The following use cases have been identified for the View and Maintain Benefit Account Sub-System:

74

MADUA00000285

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**View and Maintain Benefit Claim**

| Use Case | Brief Use Case Description |
|---|---|
| **Resolve Authentication Issue** | This use case begins when a claimant attempts to access the UI System. This is a UCS to re-authenticate claimants who were not authenticated via SSA - possibly due to basic transposition of SSN. Allows staff to authenticate those claimants. Simple process and uses authentication process code. |
| **Determine Correct Path** | The purpose of this use case is to describe the steps that the system must take to determine the available options for the claimant, and the message(s) to display to the claimant. Both of these items (options and messages) are dependent on many factors related to the program and account status for the individual. This use case is complete once the System has successfully analyzed the program and account status, and determined the appropriate options and messages to display to the individual. |
| **Manage Password** | This use case begins when a claimant chooses to change their password. The System will allow the claimant to change their password to another value. The use case ends when the claimant's password has been successfully changed. |
| **Reactivate Account** | The purpose of this use case is to document the steps and business rules for the Reactivate Account process. A claimant must reactivate their account after a predetermined amount of time has passed since their last request for payment. The claimant must confirm existing key information before reactivation, and then is required to provide information based on their response to a series of preliminary questions. The use case is complete when the claimant has submitted their account reactivation. |
| **View and Maintain General Information** QAS/Pitney Bowes? | This use case begins when a claimant wishes to update their general information regarding name, address, phone number, and birth date. This use case ends when the claimant has successfully changed their general information, chooses to view other account information, or ends the session. If a new address is added, system will check for overpayment and activates collections if collection was inactive. |
| **View & Maintain Payment and Deduction Information** | This use case begins when a claimant or UI Staff wishes to view Claimant payment information. It describes the steps that the Claimant or UI Staff must go through to view payment information from previous requests, including deductions (earnings, eligibility, etc.), payment distribution (taxes, child support, etc.) and net payment amount. This use case ends when the claimant or UI Staff has successfully viewed payment information, chosen to view other account information, or ended the session. |
| **Manage Payment Method** | The Manage Payment Method use case is initiated when a claimant or Authorized UI Staff has accessed the Current Payment Method screen. This will allow the user to view and, if their security allows, update the Claimant's current payment method. This use case ends when the user has exited this functionality or has successfully updated the Claimant's payment method. |

75

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Update Tax Withholding** | The Update Tax Withholding use case is initiated when a claimant or Authorized UI Staff have opted to access the Current Tax Withholding Status screen which allows the user to view and initiate an update to the Claimant's tax withholding status. This use case ends when the user has exited this functionality or has successfully updated the Claimant's tax withholding status. |
| **Customer Service Representative Interface/Views** | The purpose of this use case is to describe the functionality that will be available to internal UI Staff to view history of a claimant's account information. It is assumed that there are two types of account history information that need to be available to UI Staff. One type of information is a comprehensive transaction log, and the other is an individual history of categorical information, such as address. This use case is complete when UI Staff have viewed the history of an account. |
| **Claimant Views and Maintains Monetary Determinations** | The purpose of this use case is to describe the steps and functionality that exist to support claimants and UI Staff in viewing determination information for an account. This use case starts when any of the actors mentioned wish to view monetary determination information. The actors will need the ability to view determination information for an account at some level. This use case ends when determination information has been successfully retrieved and viewed. |
| **Employer Views and Maintains Monetary Determinations** | The purpose of this use case is to describe the steps and functionality that exist to support employers and UI Staff in viewing determination information for an account. This use case starts when any of the actors mentioned wish to view monetary determination information. The actors will need the ability to view determination information for an account at some level. This use case ends when determination information has been successfully retrieved and viewed. |
| **Claimant Views Non-Monetary Determinations** | The purpose of this use case is to describe the steps and functionality that exist to support claimants and UI Staff in viewing determination information for an account. This use case starts when any of the actors mentioned wish to view non-monetary determination information. The actors will need the ability to view determination information for an account at some level. This use case ends when determination information has been successfully retrieved and viewed. |
| **Employer Views Non-Monetary Determinations** | The purpose of this use case is to describe the steps and functionality that exist to support employers and UI Staff in viewing determination information for an account. This use case starts when any of the actors mentioned wish to view monetary determination information. The actors will need the ability to view determination information for an account at some level. This use case ends when determination information has been successfully retrieved and viewed |
| **Adjust an Account** | The purpose of this use case is to allow UI Staff to withdraw a claimant's account; or adjust the key data on the specific account. |
| **Employer Search** | The use case is designed to be an extension of the Tax Services Employer Search functionality. The scope is limited to add street address only. |
| **Claimant Search** | The use case is designed to aide UI Staff to search for individual claimants. The search functions will provide access to security-based claimant data. |

76

MADUA00000287

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| Modify Extension and DUA Program | The use case is designed to update existing extension/DUA data.<br>PID will participate in use case modification; Federal rules apply. |
| Maintain Informational Lists | The use case will allow users to update system lists. Some lists could include the following: State UI Addresses/Phone Numbers; Interpreters; Department Contacts for Appeals; etc. |
| Modify Shared Work Plan | The use case is designed to update existing shared work plans for employers. |
| Maintain Claimant Address Information | The use case provides claimants and UI staff the necessary functionality to update claimant address information. |
| Manage Non-U.S. Citizen Certification | The use case provides UI staff the ability to review available documentation and update the claimant's account. |
| Audit Trail | This use case provides the production of easy-to-follow audit trails, enabling program managers, internal control staff, and outside auditors to determine the "who/what/when/where" of any transaction taking place in the system. Will be determined during design. |

**Integration Services**

The Integration Services Sub-system describes several common functions that are utilized across Benefits functional areas. These common functions include Interactive Voice Recognition (IVR) applications, ICON Interface applications, Check Printing.

The following use cases documents have been identified for the Integration Services Sub-system:

**Integration Services:  May apply to all groups and needs to be evaluated during design**

| Use Case or Supplemental Specification Document | Brief Use Case Description |
|---|---|
| Document/Fax Management | Use case scope needs to be defined. |
| Health Coverage Tax Credit | Health coverage tax credit management. |
| Track Data Access | The use case will track user views of SSA provided data.  Will be determined during design. |
| Record Management (Purge) | The use case will organize all purge requirements for Revenue and Benefits System tables. |

77

MADUA00000288

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case or Supplemental Specification Document | Brief Use Case Description |
|---|---|
| **BYE Account Status** | Benefit Year End Batch Process that updates certain flags and fields in the system. For example, after five weeks changes active to inactive and triggers a reactivate flag. |
| **Retirement Verification Batch Process** | Monthly batch process to detect those claimants that have turned 62 or full retirement age during the account. |
| **Print Checks** | This use case begins when the system receives data indicating that checks and/or statement of accounts need to be printed by the printing room. The recording of the warrant numbers and control of the checks are logged by the printing room and the insert room. The checks and/or statement of accounts are inserted into envelopes by an inserting machine. The envelopes are then sorted by zip code and delivered to the USPS. The use case ends when the checks and/or statements of account are mailed by the mailroom. |
| **Employer Request for Refunds** *Revenue function* *Verify this and Use Case in Revenue section.* | The use case begins when a credit on an Employer's account is identified and the Employer or Employer's agent requests a refund or UI Staff person requests a refund on behalf of the employer. The refund requests are requested through the System. The use case starts when the employer or the UI staff person selects the link on the system to request a refund. The use case ends when the System or UI Staff approves or denies the request, the Employer account and Event Log is updated, the requester (Agent or Employer) is notified of the action taken, and if approved, the refund check is generated and mailed to an Employer. Decided during design. |
| **ICON – IB6 Incoming** | This use case describes the interface for charges coming from other states on Interstate claims through the IB6 process. |
| **ICON – IB6 Outgoing** | This use case describes the interface for charges being sent to other states on Interstate claims through the IB 6 process. |
| **ICON - INSW** | This use case describes the creation and maintenance of user IDs, mailing lists, and ate characteristic information. |
| **ICON – IB13** | This use case describes the interface for Interstate memorandums. |
| **ICON – Handbook** | This use case describes the interface for the IB Handbook which lists information on claim filing in other states. This information includes each state's monetary determinations rules. |
| **ICON –Vessels View and Maintain** | This use case describes the viewing of the incoming interface for the central listing of vessels information and the process to maintain the MA central listing of vessels information for outgoing interface. |
| **ICON – WRIS Incoming/Outgoing** | This use case describes the wage record interface system. This process provides data to the hub for the Distributed Database Index, which is an index file stored at the hub with a list of each SSN from each state that has wages. |

78

MADUA00000289

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case or Supplemental Specification Document | Brief Use Case Description |
|---|---|
| **IVR Integration - File a New Claim** | The purpose of this use case is to describe the steps the system must proceed through to create an account based on information submitted from an application. Applications are analyzed by the system to determine the program and account type, along with information necessary for determining benefit amounts and eligibility. The system will allow the claimant to create a password, which will be used to authenticate the claimant in future, interactions with the department's database. This use case is complete once an account has been established, along with any necessary issues for UI Staff to review. |
| **IVR Integration - Continued Claims** | This use case processes the claimant request for benefits. As part of this process, the system will collect claimant's earnings during the reporting term, collect claimant's availability information, ability information and verify some of the claimants' work search. The system will determine holds, deductions, timeliness of the request, if human intervention is needed. If appropriate, the system processes the check. |
| **IVR Integration - Re-open Claim** | The purpose of this use case is to document the steps and business rules for the Reactivate Account process. This use case begins when a claimant must reactivate his/her account after a predetermined amount of time has passed since their last request for payment. The claimant must confirm existing key information before reactivation, and then is required to provide information based on his/her response to a series of preliminary questions. The use case is complete when the claimant has submitted his/her account reactivation. |
| **IVR Integration - PIN Request** | This use case describes how a caller requests a PIN for the IVR. |
| **IVR Integration - Address Change** | This use case will support the claimants wish to update their general information. This information includes name, address, phone number, direct deposit, tax withholding and birth date. This use case ends when the claimant has successfully changed their general information, chooses to review other account information, or ends the session. |
| **IVR Integration - Claim Status** | This use case begins when a claimant chooses to access his/her account information. This category of information includes Weekly Unemployment Benefit Amount (WBA), Maximum Unemployment Benefit Amount (MBA), transactional history, current balance of their account, request a 1099G, check replacement. It describes the steps that the claimant must go through to access this information and complete these functions. This use case ends when the claimant has successfully accessed his/her account information, made request(s) of their account and/or ended the session. |
| **IVR Integration - Provide Office Hours and Locations** | This use case describes how the system will use a claimant's ZIP code information to provide information on the closest WorkForce Center. The claimant will be able to access the address, hours of operation, basic directions and phone number to the closest WorkForce Center. The claimant will also be given various services and resources available at that location. |

79

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case or Supplemental Specification Document | Brief Use Case Description |
|---|---|
| **IVR Integration - Integrate IVR and QUEST Database** | This use case describes database history integration. |
| **IVR Integration - Workload Distribution** | This use case allows the authorized user to instruct the system to direct the workflow and distribute the workload. The system will sort calls not only by skill level groups of the customer contact center personnel, but also to specific individuals. The system will allow customer contact personnel to be put into skill groups of various sizes and varying availabilities. Each individual may be assigned language ability levels, a variety of skills and those skills will be changeable with proper authorization. The system may vary routing of calls by the one of these variables, or others (like time since last call, or availability). The system assesses if additional information is needed from a claimant and accordingly route the work/call. The result of this use case gives better control of the work flow and workload for a more efficient operation. |
| **IVR Integration - Language Selection** | The purpose of this flow is to allow claimants to choose the language of the IVR. The claimant will have the choice of English, Spanish, Somali, or Hmong. The claimant's selection will ask all of the questions and play all confirming statements in that specific language as recorded by state personnel. The system will always ask the claimant their language preference, but if the system recognizes the ANI (Automatic Number Identification) then the greeting and the language choice question will be played in the language chosen with the last call. The system will also recognize if the claimant needs to speak to a customer contact center that the agent has the appropriate language skill. |
| **IVR Integration - Speech to Text** | The result of this use case the claimant is able to have their statements recorded, and then the system could convert these voice files into printed text. The claimant statement would be responses to questionnaires, rebuttals, testimony or other request for information from the department. |

80

MADUA00000291

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final
## Appeals and Hearings

The Appeals process in Massachusetts:

Any determination may result in an appeal. There are two levels of appeal: the lower authority is the DUA Appeals department; the higher authority is the Board of Review. After this, an appeal can be made to the District Court.

Workflow will be used to notify other departments once appeal is received and again when decision is entered into system.

### Appeal Processing

The purpose of this subsystem is to provide DUA with a comprehensive subsystem that supports the claimant and employer appeals needs of the UI department. The new claimant and employer appeals functionality will support creating case files that track appeals to completion and resolution, and then subsequently integrate with the necessary information for the claimant and process automatic updates to claimant and employer accounts. The following use cases have been identified for the Appeal Processing Sub-System:

### Appeal Processing:  Will be used by BOR as well

| Use Case | Brief Use Case Description |
|---|---|
| **File Appeal Request** <br><br> BOR | The File Appeal use case documents the functionality necessary for a claimant, Employer, Agent or Staff (on behalf of a claimant or Employer) to file an appeal. This use case begins when the User selects the appropriate determination or document within the Claimant/Employer self-service and selects "File Appeal". The System will determine if other methods of account resolution are more beneficial for the User and present these options before creating an appeal level for the issue. This use case ends when the User chooses to resolve the issue through an alternative method or when the System creates an appeal level and generates appropriate correspondence. |
| Prepare case for scheduling | Cases are reviewed for a variety of criteria including complexity prior to scheduling. |
| **Schedule Appeal Hearing (Self-Service)** <br><br> BOR | This use case begins after the appellant party completes their request to file an appeal. Appeal requests received on paper (mail or fax) will be imaged and routed to staff workflow for scheduling. Scheduling an appeal determines the logistics of the appeal hearing. The use case ends when the system schedules the hearing and returns to the File Appeal process which will provide confirmation information and generate the necessary correspondence to the claimant, employer and/or other interested parties. |
| **Schedule or Reschedule Appeal Hearing (Staff)** <br><br> BOR | This use case begins after workflow has been created to prompt staff to schedule or reschedule an appeal hearing. Staff scheduling an initial appeal hearing will be rare but will occur when an in person hearing is required or when a paper appeal request is received. Workflow will be created when appellants mail or fax in appeal requests and when interested parties request a reset of their appeal schedule either by mail, fax, IVR or Web. This use case also includes the functionality needed for Review Examiner or other staff to update the RE schedule of availability.   Dependent on design. |

81

MADUA00000292

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Withdraw/Void Appeal** BOR | The Withdraw Appeal use case documents the functionality necessary for an Appellant or Staff on behalf of an Appellant to withdraw an appeal. This use case begins when the User selects the appropriate pending appeal issue within the Claimant/Employer self-service and selects "Withdraw Appeal". This use case ends when the System withdraws the appeal issue and generates the appropriate correspondence.  Merged with Process Appeal decision. |
| **Receive, Route & Mail Exhibits** What about printing case folder material? BOR | This use case documents the functionality necessary to receive, store, route and mail exhibits. This use case begins when new evidence/exhibits are received by mail or fax. Documents are scanned and become part of the appeal's electronic case file. Evidence that cannot be scanned (video tapes, policy manuals, etc) will be logged and referenced as part of the electronic case file. Copies of exhibits will be made available to all interested parties. Will be defined during design. |
| **Maintain Appeal Record** BOR | This use case documents the functionality necessary to allow staff to view and maintain Appeal specific details after an appeal has been filed and scheduled. Examples include adding witnesses, changing contact telephone numbers, etc.  Should have the ability to receive and process remands or remand to a lower authority. |
| **Conduct Appeal Hearing** BOR: or review | The conduct hearing functionality will allow the hearing process to be recorded via the telephone. This use case begins when the Review Examiner (RE) conducts the hearing as scheduled. The RE confirms the demographic information of the appellant and interested parties. This use case ends when the hearing is concluded and the recording has been stored. Digital recording options will be evaluated during design. |
| **Process Appeal Decision** BOR | This use case documents the functionality necessary for Staff to generate an appeal decision. Staff reviews the electronic case file. System tree logic will guide staff in processing the decision based on the appeal type. Based on the outcome of the decision the System will notify the following processes: Determine Multiple Days Denied, Benefits Paid Charge, Determine Potential Over/Underpayment, Revenue and Process Amended Monetary. This use case ends when the System issues correspondence to the appropriate parties. Will be determined during design. |
| **Modify Appeal Decision** BOR | This use case documents the functionality necessary for Staff to modify an appeal decision. This use case begins when Staff reviews a completed appeal decision and creates a level of one of the following: Modify – Corrected, Modify – Nullified, Modify – Amended, Modify – Exception Level, or Modify – End Indefinite Denial. After the Modify level is created System tree logic will guide Staff in processing the decision. Based on the outcome of the decision the System will notify the following processes: Determine Multiple Days Denied, Benefits Paid Charge, Determine Potential Over/Underpayment, Revenue and Process Amended Monetary. This use case ends when the System issues correspondence to the appropriate parties. |

82

MADUA00000293

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final
## Program Integrity

**Program Integrity**

The purpose of this subsystem is to provide conformance to federal quality assurance and benefit integrity requirements, assist in identification of fraudulent account situations, and to provide continuous quality improvement support. The following use cases have been identified for the Program Integrity Sub-System:

**Program Integrity Processing**

| Use Case | Brief Use Case Description |
|---|---|
| Update/entry-repayments | Consider during design along with other sub system payment processes. |
| Write-off of Overpayment | Consider during design along with other sub system collection processes. |
| Special processing of Appeals | Waiver, late appeals, tax intercept appeals<br>Consider during design along with other payment processes |
| Special processing of Overpayment | Bankruptcy, death notification will be defined during design.<br>Bounced checks, void check covered in payment processes |
| Integrated cross match system | May need more cross matches but also need an integrated system that produced a "hit" list with established priorities. This implies the use of filters, checking of new information to old information etc. This process will determine list of cases to be investigated and routed.<br>Contingent upon DW tool like SAS |
| **Process New Hire Cross Match** | This use case will identify claimant accounts that have been paid benefits the week of or after their date of hire as reported in the New Hires database. |
| **Process Wage Detail Cross Match** | The purpose of this use case is to identify potential overpayments that result from Claimants not reporting or under-reporting their earnings. This is accomplished by comparing earnings reported by employers within wage detail versus those reported (or not reported at all) by Claimants at the time of payment request. |
| **Process Interstate (ICON) Cross Match** | This use case involves the process of sending wage detail and account information to the FCCC to detect overpayments that result from a claimant receiving benefits in one state while working in another. |
| **Process Workers' Comp Cross Match** | The purpose of this use case is to identify overpayments (which can be fraud) that result from Claimant's not reporting that they have received or are receiving worker's compensation while collecting unemployment benefits. Other eligibility issues can arise such as: ability to work, actively seeking and/or availability to work. |
| **Process Border Check Cross Match** | The purpose of this use case is to identify potential overpayments to those individuals who live in "border" communities (those cities on the border with other states) to determine if the claimant has earnings in another state but is not reporting said earnings. |

83

MADUA00000294

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Process Duplicate Address Cross Match** | The purpose of this use case is to identify individuals who are fraudulently receiving benefits from multiple accounts (formerly known as Eagle Pass). |
| **Process Quality Control Sample** | The scope of this use case seems to be handled within the Benefits Accuracy Measurement (BAM) SRS document. |
| **Fraud Investigation** Routing | Fraud use case scope is currently under review. The scope may simply create a workflow and/or issue type. This Use Case must have routing to auditors (maybe based on cross-match hit list.) |

## Economic Research

**Economic Research**

The purpose of this subsystem is to provide Labor Market Information to the Federal Department of Labor, DUA Management and the constituents of the Commonwealth of Massachusetts. This module includes the production of UI federal operating reports and other activity summaries that can be validated against state and federal reporting requirements and can be recreated as needed to support internal quality and performance reviews and external audit engagements. The following use cases have been identified for the Economic Research Sub-System:

**Economic Research**

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 191 Statement of Expenditures and Financial Adjustments** | Is used by each State employment security agency (SESA) to report to the National Office (NO):<br>1. The quarterly summary of UCFE and UCX expenditures and adjustments, and<br>2. The total amount of benefits paid by the SESA to claimants of specific agencies.<br>Section B of the ETA 191 is the only source document used by the Office of Workforce Security to bill Federal and military agencies for the recovery of UCFE and UCX benefit payments. |
| **ES 202 - Quarterly Census of Employment and Wages (QCEW)** | The Covered Employment and Wages program, commonly called the ES-202 program. Using quarterly data submitted on magnetic media or electronically by the agencies, BLS summarizes employment and wage data for workers covered by State unemployment insurance (UI) laws and for civilian workers covered by the program of Unemployment Compensation for Federal Employees (UCFE). |

84

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 203, Characteristics of the Insured Unemployed** | The ETA 203 report provides information, by State and for the Nation, about the characteristics of Unemployment Insurance claimants. This data is useful in describing the population of claimants and determining how that population changes over time and under various conditions. It can also be compared with characteristic figures of the total unemployed as published by the Bureau of Labor Statistics (BLS). |
| **ETA 204 - Experience Rating Report** | Data submitted annually on the ETA 204 enables Employment and Training Administration (ETA) to project revenues for the Unemployment Insurance (UI) program on a State by State basis and to measure the variations in assigned contribution rates which result from different experience rating systems. When used in conjunction with data from the ES 202, Employment Wages, and Contributions report, the ETA 204 data will assist in determining the effects of various factors (e.g., seasonality, stabilization, expansion, or contraction in employment and payroll, etc.) on the employment experience of various groups of employers. The data will also provide to States and the National Office an early signal for potential solvency problems, be useful in analyzing factors which give rise to the potential problems, and permit an evaluation of the effectiveness of the various approaches available to correct the problems detected. Moreover, the data are required as a basis for estimating State average tax rates for the rate year. Finally, the data are the basis for determining an experience rating index; the index will allow for the evaluation of the extent to which benefits in States are effectively charged, non-charged, and ineffectively charged. Comparisons in a single State over time will be possible. |
| **ETA 205, Preliminary Estimates of Average Employer Contribution Rates** | The Average Employer Tax Rate report collects annual information about the taxing efforts in States relative to both taxable and total wages and allows comparison between States. |
| **ETA 207, Non-monetary Determination Activities** | The data reported on the ETA 207 provides current information on the volume and nature of non-monetary determinations and denials under State, UCFE and UCX unemployment insurance programs. Agencies use the data to budget workloads, evaluate law changes, appraise disqualification processes and relate to benefit appeals. The National Office uses it to determine workload counts, to analyze the ratio of disqualifications to determinations, and to examine and evaluate the program effect of non-monetary activities. |
| **ETA 2112 UI Financial Transaction Summary** | Form ETA 2112 is a monthly summary of transactions in a State unemployment fund which includes the Clearing Account, Unemployment Trust Fund Account, and Benefit Payment Account. All payments by employers (and employees where applicable) into a State unemployment fund for contributions, payments in lieu of contributions, penalty and interest, or special assessments should be accounted for in the report. Form ETA 2112 provides a summary of data pertaining to State UI tax collections, regular benefits paid, Federal and State shares of extended benefits paid, third tier program benefits paid, and other transactions affecting the unemployment trust fund. |

85

MADUA00000296

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 218 Benefit Rights and Experience** | The number of eligible claimants with potential maximum duration, the average potential duration for all eligible claimants, and their distribution by number of full weeks of potential duration show the extent of protection, in terms of weeks of benefits, available to potential beneficiaries. |
| **ETA 227 Overpayment Detection and Recovery Activities** | Form ETA-227 provides information on determinations, overpayments, and recoveries of overpayments on intrastate and liable interstate claims under State unemployment compensation (UI) and under Federal unemployment insurance programs, i.e., programs providing unemployment compensation for Federal employees (UCFE) and ex-servicepersons (UCX), established under Chapter 85, Title 5, U.S. Code. |
| **ETA 5130 Benefit Appeals Report** | The ETA 5130 report is the basic source of information on the appeals case workload in each State under the regular programs of State unemployment insurance, unemployment compensation for Federal employees, and unemployment compensation for ex-service members (referred to as UI, UCFE, and UCX respectively). |
| **ETA 5159 Claims and Payment Activities** | The ETA 5159 report contains monthly information on claims activities and on the number and amount of payments under State unemployment insurance laws (State UI) and Federal unemployment insurance laws for Federal workers (UCFE) and for ex-service members (UCX). There are separate ETA 5159 reports labeled Regular, Extended Benefits (EB), and Short Time Compensation (STC). |
| **ETA 538 Advance Weekly Initial and Continued Claims Report** | This report provides for an advance national compilation and release of initial claims and weeks claimed data that, on a national basis, should conceptually be the same as the total of initial claims and weeks claimed data reported on the ETA 539, Weekly Claims and Extended Benefits Trigger Data. |
| **ETA 539 Weekly Claims and Extended Benefits Trigger Data** | This report serves as the State Administrator's initial notice to the Employment and Training Administration (ETA) National Office that a State extended benefit period will begin or end for a specified week. |
| **ETA 581 Contribution Operations** | The ETA 581 report provides information on volume of work and State agency performance in determining the taxable status of employers and the processing of wage items; in the collection of past due contributions and payments in lieu of contributions, and delinquent reports; and in field audit activity. The ETA 581 report for each calendar quarter is due in the Employment and Training Administration National Office on the 20th day of the second month following the quarter to which it relates, i.e., May 20, August 20, November 20, and February 20. This report will be transmitted electronically. |
| **ETA 586 Interstate Arrangement for Combining Employment and Wages** | This report will enable the Employment and Training Administration to measure the scope of wage-combining activities and to determine the effects of the program in terms of the number of claims filed, amount of benefits involved, and promptness of first payments and employment and wage transfers. |

86

MADUA00000297

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 8401 Monthly Analysis of Benefit Payment Account** | The ETA 8401 is a record of benefit payment account transactions recorded in the books of each State. |
| **ETA 8403 Summary of Financial Transactions - Title IX Funds** | Provides a cumulative summary of expenditures of State unemployment funds pursuant to Section 903(c)(2) of the Social Security Act (SSA), the "Reed Act" as amended. |
| **ETA 8405 Monthly Analysis of Clearing Account** | The ETA 8405 report is a record of clearing account transactions recorded in the books of each State. |
| **ETA 8413 Income-Expense Analysis, UC Fund Benefit Payment** | The ETA 8413 is a monthly analysis of daily transactions in a State benefit payment account from the books of the bank on which benefit checks or warrants are issued. |
| **ETA 8414 Income-Expense Analysis, UC Fund Clearing Account** | This report is a monthly analysis of activity in a State clearing account from the books of the bank in which employer contributions and payments in lieu of contributions are deposited and transferred to the U.S. Treasury. |
| **ETA 9016 Alien Claims Activity Report** | The Immigration Reform and Control Act (IRCA) of 1986, Public Law 99-603, amended the Social Security Act by adding to Section 1137 - "Income and Eligibility Verification System". Section 1137 provisions require states to verify, through the Immigration and Naturalization Service (INS), the legal status of all aliens applying for benefits under certain federally assisted and federally funded programs, including Unemployment Compensation. To facilitate the required verification, INS developed the Systematic Alien Verification for Entitlement (SAVE) system. SAVE consists of automated and manual procedures by which states obtain information about an alien=s immigration status that will allow them to determine the alien=s eligibility for unemployment compensation. The information provided on the ETA 9016 Report is used by the Department of Labor to: C Assess the magnitude of alien claims and issues affecting eligibility; C Make decisions as to the appropriateness and value of state use of the SAVE system; and C Determine whether a state's administrative costs associated with SAVE are reasonable. |

87

MADUA00000298

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 9048 Worker Profiling and Reemployment Services Activity** | The ETA 9048 report provides quarterly information on the Worker Profiling and Reemployment Service activities of claimants who are profiled to assess their likelihood of exhausting benefits. Worker profiling allows for the targeting of reemployment services to those most in need. The data on this report is used for evaluation and monitoring of the Worker Profiling and Reemployment Services system on a national level. It includes breakouts of those who reported to services and those who completed services to be able to track service utilization. The mandatory participation requirement of the profiling legislation does not pertain to education/training or to services provided under a State's Self Employment Assistance program. Data is captured in each of these categories to provide additional information about the range of services provided to profiled claimants. |
| **ETA 9049 Worker Profiling and Reemployment Services Outcomes** | The ETA 9049 report contains information on the outcomes of reemployment service activities of claimants who, through the Worker Profiling and Reemployment Services (WPRS) program, are identified as likely to exhaust their UI benefits, selected for referral to reemployment services and referred to such services. The report uses existing administrative data and allows evaluations such as comparison over time of the numbers and percentages of individuals selected through the Worker Profiling and Reemployment Services (WPRS) system and referred from the selection pool who subsequently become reemployed in covered employment within the same State, and what percent of their former wages the new jobs represent. |
| **ETA 9050 First Payment Time Lapse** | The ETA 9050 report contains monthly information on first payment time lapse. This report concerns the time it takes States to pay benefits to claimants for the first compensable week of unemployment. Similar time lapse data was formerly reported in Section C of the ETA 5159 report. That data addressed first payment time lapse for total unemployment only. This report contains monthly time lapse data for all first payments, i.e., total, partial and part-total. A separate section of this report is reserved for Workshare (Short-Time Compensation) first payments only. Workshare will be reported separately and is excluded from that part of the report for "ALL" first payments. |
| **ETA 9051 Continued Weeks Compensated Time Lapse** | The ETA 9051 report contains monthly information on continued weeks compensated time lapse. This report concerns the time it takes States to pay benefits to claimants for compensable weeks of unemployment other than the "first payment." Continued weeks compensated time lapse data was not formerly reported. This report contains monthly time lapse data for all continued weeks compensated, i.e., total, partial and part-total. A separate entry screen will be used for a breakout of partial and part-total continued weeks compensated. Workshare (Short-Time Compensation) continued weeks compensated will be reported on a third entry screen. Workshare continued weeks compensated are not reported in the total count of "All" continued weeks compensated. |

88

MADUA00000299

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 9052 Non-monetary Determination Time Lapse, Detection Date** | The ETA 9052 report contains monthly information on the time it takes States to issue non-monetary determinations from the date the issues are first detected by the agency. Single-claimant and multi-claimant non-monetary determinations are included in the report. Non-monetary determinations made by organizational units such as Benefits Accuracy Measurement (BAM) and Benefit Payment Control (BPC) are also included in the report. Note: Overpayment notices on uncontested earnings detected by any method (e.g., cross match) should not be included. A separate section of this report is reserved for multi-claimant determinations only. |
| **ETA 9053 Non-monetary Issue Detection Time Lapse, Affected Week** | The ETA 9053 report contains monthly information on the time it takes States to detect an issue on a claim. The measure is days elapsed from the week ending date of the first affected week to the date on which the agency first detects an issue. Single-claimant and multi-claimant non-monetary determinations are included in the report. Non-monetary determinations made by organizational units such as Benefits Accuracy Measurement (BAM) and Benefit Payment Control (BPC) are also included in the report. BPC cross match determinations, however, are excluded, as are all monetary determinations, regardless of point of origin. A separate section of this report is reserved for multi-claimant determinations only. |
| **ETA 9054 Appeals Time Lapse** | The ETA 9054 report contains monthly information on the time it take States to issue lower authority and higher authority appeals decisions from the date the request for a lower authority hearing or a higher authority appeal is filed to the date on the decision. |
| **ETA 9055 Appeals Case Aging** | The ETA 9055 report contains monthly information on the inventory of lower authority and higher authority appeals which have been filed but not resolved. The universe of appeals included in this measure is all lower and higher authority appeals which are not resolved at the end of the month covered by the report. Case aging provides information about the number of days from the time an appeal is filed and the end of the month covered by the report. |
| **ETA 9056 Non-monetary Determination Quality Review** | The ETA 9056 report provides quarterly information on the quality of non-monetary determinations that State agencies issue to claimants and employers in the report period. Intrastate and Interstate single-claimant and multi-claimant separation and non-separation non-monetary determinations are included in the report. Non-monetary determinations made by organizational units such as Benefits Accuracy Measurement (BAM) and Benefit Payment Control (BPC) are also included in the report. Notices of overpayments on uncontested earnings detected by any method (e.g., cross match) are excluded from the report. |
| **ETA 9057 Lower Authority Appeals Quality Review** | The ETA 9057 report provides quarterly information on the quality of State agencies' single and two party lower authority appeals hearings and decisions in the report period. |

89

MADUA00000300

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Management and Ad Hoc Reports** | This use case includes the production of financial and program activity reports that are timely, auditable, and credible (electronic reports that replace current manual reports must combine data from several sources and programs into summary reports that meet the needs and requirements of external audiences, e.g. the U.S. Department of Labor). This use case will provide the ability for management to track financial and programmatic activity, detect and document trends, and produce forecasts of key activities (e.g. monthly claims workload) and financial outlays and trust fund condition. In addition this use case includes the production of timely and consistent responses to regular and ad hoc requests for information about the operation of the UI program, the customers served, and the financial results (e.g. through use of an integrated database with user-driven reporting views). |
| **Labor Market Data Extracts** | This use case includes the set of standard Labor Market Information data extracts used by Massachusetts to publish LMI statistics for the constituents of the Commonwealth. |

## Application Infrastructure & System Administration

These tasks establish the overall application infrastructure and system administration components. It consists of design, development, and testing of the following components:

- Security Component
- Rules Component
- Interfaces Component
- Edit Checks Component
- System Logging Component
- System Management Component
- Code Table Maintenance Component
- Reports Component
- Correspondence Component
- Document Management and Workflow Component

Increment 1 is vital to setting the foundation for the QUEST project. The increment focuses on the underlying components used for developing benefits, tax, and future system functionality. BearingPoint will bring many of the standard application and database objects to the project. The importance of this Increment cannot be overemphasized; it serves as the foundation for subsequent tax and benefits development Increments. Experience has shown that ample time and attention devoted to developing a comprehensive, robust architecture and set of common objects will translate into less re-work, less maintenance and more code efficiencies in the future. The uFACTS solution framework, along with our tool-kit of .NET common objects, will help support these project tasks.

### Security Component

BearingPoint recognizes the confidential nature of UI information: security must be designed into the system to comply with State and DUA security requirements and standards. We have, therefore, allocated a significant amount of time and resources to develop the Security Plan and application components.

90

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

The system's security model will include: physical, application, and data level security. In collaboration with DUA resources, we will prepare a Security Model that will identify how security features will be implemented. Specifically:

- Products to be used
- Proposed levels of security
- Limitations of capabilities
- Required protocols
- Security tables format and content
- Recommended starting point for establishing security profiles

**Rules Component**

BearingPoint recognizes the need to change the business rules governing the UI System due to legislative changes or other driving factors. To accomplish these changes in a long-term cost effective way, we have allocated a significant amount of time and resources to develop the Rules management component.
The rules component will include:

- Rules Engine configuration
- Rules Engine integration with .NET application
- Rules definition
- Recommended starting point for establishing rules

**Interfaces Component**

In order to interface with various DUA and other systems, the Interface component will have to be robust and dependent. To accomplish this, we have allocated a significant amount of time and resources to develop the Interface component.
The interface component will include:

- Finalizing the technology to use for interfacing with other systems
- Finalizing the protocols for interfacing
- Finalizing the online and batch interfacing processes
- Creating the processes to support the interface process

**Edit Checks Component**

BearingPoint recognizes the need for the UI System to validate the user input effectively to maximize the data integrity. In order to accomplish a very high level of data integrity, the data entered must be validated in a very efficient and modular fashion. Modular and object oriented design will help significantly increase the organization of the software, thereby contributing directly to the data integrity by uniformly applying the business rules and edits.
The edit checks component will include:

- Software design to modularize edit checks and business rules
- Creation of non-business specific common edits
- Creation of placeholders for business specific common edits

91

MADUA00000302

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

- Creation of placeholders for business specific edits that are not common

**System Logging Component**

BearingPoint recognizes the need for the UI System to keep track of certain important system events that will track system activities by users. In order to accomplish this, the system logging component must be designed in such a fashion, that the important system activities are recorded by common code, thereby eliminating the need for individual Java classes and JSPs to focus on this.

The system logging component will include:

- Identification of important system logging events
- Software design to enable system logging
- Database design to enable system logging
- Creation of software to handle system logging

**System Management Component**

BearingPoint recognizes the need for the UI System to manage the system effectively based on the various system users and activities. For example, there may be a need to allow certain type of users to access the system for maintenance purposes, while the other types of users are locked out of the system.

The system management component will include:

- Identification of the various system open/close events
- Identification of the various system user types and their privileges
- Database design to enable system management
- Creation of software to handle system management functionality

**Code Table Maintenance Component**

The Code Table Maintenance component will provide system administrators the ability to modify systems codes defined in database tables within the system. This will ease system maintenance tasks and allow for greater flexibility in responding to changes in program and policy.

**Reports Component**

The UI System will produce and display various standard and ad-hoc reports to the system users. The reports in the system will be created using Crystal Reports software and will be published either as downloadable PDF (or other agreed-upon format) documents or viewable via Crystal Reports Viewer. The reports viewed by the Crystal Reports Viewer will be served by the Crystal Enterprise Server.

The Reports component will include:

- Finalization and creation of Report User Groups
- Integration of Crystal Enterprise with Java application
- Development and publication of sample reports in PDF or other agreed-upon format
- Development and publication of sample reports via Crystal Enterprise and Crystal Viewer

MADUA00000303

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Correspondence Component**

BearingPoint recognizes the need for the UI System to send various types of correspondence to the various stakeholders of the system. Some of the common methods of correspondence include e-mails and printed letters. The correspondence component will have the functionality to generate and distribute various system related correspondence to the intended recipients.

The Correspondence component will include:

- Finalization of the various correspondence modes to be built in the system
- Building interfaces with other systems for correspondence purposes
- Building functionality to view previously sent correspondence

**Document Management & Workflow Component**

The FileNet document management and workflow components will be purchased and installed toward the end of the Overall Project Inception Phase, after the validation of the overall technical architecture is complete. (See Page 13-85 of BearingPoint's proposal)

During Increment 1 – Infrastructure, the UI TIP Team will integrate FileNet into a common development environment, so that its components can be used in Increments 2 and 3. During Increments 2 and 3, FileNet will be an integral component to both the self-service and core tax service components. DUA can expect the following document imaging/workflow functionality to be available in the first two years:

- Ability to define specific workflow scenarios and apply these scenarios to the UI TIP application
- Ability to automatically route correspondence to employers and applicants through workflow scenarios
- Ability to notify through email correspondence that follow up is required by either the employer or applicant
- Ability to index and scan employer related correspondence

93

MADUA00000304

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Appendix H: DOR Confidentiality Acknowledgement

## INTERDEPARTMENTAL MEMORANDUM

TO:          Distribution

FROM:        DWD

RE:          Confidentiality of the Department of Revenue's Information

DATE:        January 2, 2007

---

___

The attached Summary of the Laws is being provided to you because as part of your job duties you may have access to confidential tax, wage reporting, financial institution match, 14-day new hire and child support information, as well as "personal data" provided to the Department of Workforce Development by the Department of Revenue. The access and disclosure of this information is governed by the attached state and federal laws. Violation of the laws provide for specific sanctions including civil and criminal penalties, as well as dismissal from employment and disqualification from holding office in the Commonwealth for up to three years.

If you have any questions regarding this form, please contact Wayne Kallman at 617-626-5901.

---

_____

### ACKNOWLEDGMENT REGARDING THE CONFIDENTIALITY OF THE DEPARTMENT OF REVENUE'S INFORMATION

I, _____, a full-time or part-time employee, contract employee, individual consultant, volunteer, trainee, student intern, member, director, officer, partner, agent or subcontractor of the Department of Workforce Development, hereby acknowledge that I have received a copy of the "Summary of the Massachusetts and Federal Laws Pertaining to Confidential Information of the Massachusetts Department of Revenue" which governs the access and disclosure of information to include, without limitation, tax information, wage reporting information, financial institution match information, 14-day new hire information and child support information, as well as "personal data" as defined in G.L. c. 66A (collectively, the "Information"). I also

94

MADUA00000305

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

acknowledge that it is my responsibility to read this Notice and to comply with the laws pertaining to the Information.

_____          _____

Signature                                                          Date

_____

Name in print

**Distribution:  All persons with access to DOR confidential information.**


### SUMMARY OF MASSACHUSETTS AND FEDERAL LAWS PERTAINING TO CONFIDENTIALITY OF INFORMATION OF THE MASSACHUSETTS DEPARTMENT OF REVENUE

1) Fair Information Practices Act (FIPA), G.L. c. 66A:   Prohibits the unauthorized disclosure of "personal data," as defined in G.L. c. 66A.  Data subjects may make a claim for damages under the Massachusetts Tort Claims Act.  General Laws chapter 214, section 3B also provides for injunctive and other nonmonetary relief for violation of this statute.

2) G.L. c. 62C, § 21:   Prohibits unauthorized disclosure of tax information or returns as defined in 830 CMR 62C.21.1.  A return is defined very broadly in 830 CMR 62C.21.1 and includes information developed by the Department. Violation of this statute is punishable by a fine of not more than $1,000 and/or by imprisonment for not more than six months, and by disqualification from holding office in the Commonwealth for a period not exceeding three years.

3) G.L. c. 62C, § 21B:   Prohibits unauthorized willful inspection ("browsing") of tax information or returns as defined in 830 CMR 62C.21.1.  A return is defined very broadly in 830 CMR 62C.21.1 and includes information developed by the Department.  Violation of this statute is punishable by a fine of not more than $1,000 per return, document or taxpayer and/or by imprisonment for not more than one year, and by disqualification from holding office in the Commonwealth for a period not exceeding three years.  This section also provides that "browsing" by an employee shall be grounds for dismissal of the employee.

95

MADUA00000306

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

4) <u>G.L. c. 62E, § 8</u>:   Prohibits unauthorized disclosure of information obtained from the wage reporting and financial institution match system.   Violation of this statute is punishable by a fine of $100 per offense and by administrative discipline.

5) <u>G.L. c. 119A, § 5A</u>:   Prohibits unauthorized willful inspection ("browsing") or unauthorized disclosure of child support personal data, including data stored in a computer system or computer files.   Any such inspection or disclosure is punishable by a fine of not more than $1,000 with respect to each person concerning whom information has been disclosed or inspected and/or by imprisonment for not more than one year, and by disqualification from holding office in the Commonwealth for a period not exceeding three years.   This section provides that unauthorized disclosure or "browsing" of child support data by an employee shall be grounds for dismissal of the employee.   This law also places additional restrictions on the disclosure of  location information about  a parent or child when the agency is provided with reasonable evidence of a risk of harm.

6) <u>I. R. C.  § 6103</u>:   Prohibits unauthorized disclosure of federal tax returns or return information  by  employees and former employees of state and IV-D agencies.

7) <u>I. R. C. § 7213</u>:   Makes any unauthorized disclosure of federal tax returns or return information a felony punishable by a fine of up to $5,000 and/or imprisonment for not more than five years, together with the costs of prosecution.

8) <u>I. R. C. § 7213A</u>:  Prohibits the unauthorized willful inspection ("browsing") of federal tax returns or return information and makes such inspection punishable by a fine of up to $1,000 and/or imprisonment for not more than one year, together with the costs of prosecution.

9) <u>I. R. C. § 7431</u>:  Permits a taxpayer to bring a civil action for damages in a federal district court against a person who unlawfully browsed or disclosed federal return or return information.

DOCS# 223762

96

MADUA00000307

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

The undersigned hereby represent that they are duly authorized to execute this SOW on behalf of their respective organizations.

Division of Unemployment Assistance

_____
Edward T. Malmborg, Director

BearingPoint

_____
Kathy Karich, Regional Managing Director

_____
Date:  May 21, 2007

_____
Date: May 21, 2007

97

MADUA00000308