# EXHIBIT A

EFiled: Apr 07 2025 02:05PM EDT
Transaction ID 76013550
Case No. N25C-04-057 EMD CCLD

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SAGITEC SOLUTIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.:    -CCLD |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| DELOITTE CONSULTING LLP, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Sagitec Solutions, LLC ("Sagitec") for its Complaint against Defendant Deloitte Consulting LLP ("Deloitte") states and alleges as follows:

## NATURE OF THE ACTION

1.      Sagitec brings this action to halt Deloitte's ongoing campaign of disparagement and unfair competition.

2.      Sagitec, an innovator known for providing high-quality software solutions, finds itself under siege—not by the forces of fair competition, but by the calculated deceit and manipulation of a far larger rival. Deloitte, a global conglomerate with vast resources and market influence, has engaged in a campaign to disseminate false and defamatory misinformation about Sagitec in order to promote the sale of Deloitte's own products and services.

3.      According to Deloitte, "[t]he best leaders don't wait for the future to

33056892.1

arrive, they provoke it."[1] This case is about the lengths to which Deloitte went to "provoke" a competitive advantage when it found itself unable to compete fairly. Deloitte's campaign against Sagitec includes false and defamatory statements about Sagitec, false claims of trade secret rights in public materials that it does not own, and use of improper means to obtain access to Sagitec's confidential information.

4.      Deloitte is no stranger to claims of anti-competitive misconduct. In just the past five years, Deloitte and its affiliates have faced at least six lawsuits for misappropriating competitor trade secrets.[2] Most recently, the Multi-State Partnership for Prevention, LLC (MSPP) filed claims alleging Deloitte engaged in a conspiracy to steal MSPP's software-related trade secrets.[3] Other allegations leveled against Deloitte include inducement to violate confidentiality agreements.[4] Deloitte and its affiliates have also found themselves at the epicenter of multiple cases alleging fraudulent schemes for everything from fraud against the government, to

---

[1] *See* https://www2.deloitte.com/us/en/pages/operations/articles/provoke.html.

[2] *Multi-State Partnership for Prevention, LLC v. Deloitte Consulting, LLP et al*, 1:24CV09013, (S.D.N.Y. 2024); *Nulogy Corporation v. Menasha Packaging Company, LLC et al*, 1:21CV01164, (N.D. Ill. 2021) (includes Deloitte Consulting, LLP and Deloitte, LLP); *Definitive Logic Corporation v. Rodichok et al*, 1:21CV00195 (E.D. VA 2021) (includes Deloitte LLP); *Alfred Jackson v. Opus Fund Services USA LLC*, 2:20CV05774, (C. D. Cal. 2020); *Pauwels v. Bank of New York Mellon Corporation et al.*, 1:19CV02313 (S.D.N.Y. 2019); *Chen v. Rigsbee et al.*, 1:19-cv-00849-AJT-JFA (E.D.Va. 2019).

[3] *See Multi-State Partnership for Prevention, LLC v. Deloitte Consulting, LLP et al,* 1:24-CV-09013 (S.D.N.Y, filed Nov. 25, 2024).

[4] *See e.g.*, https://www.justice.gov/opa/pr/deloitte-touche-agrees-pay-1495-million-settle-claims-arising-its-audits-failed-mortgage; https://www.justice.gov/opa/pr/deloitte-consulting-llp-agrees-pay-11-million-alleged-false-claims-related-general-services;

the cover up of a billion-dollar Ponzi scheme.[5] Sagitec appears to be yet another target of Deloitte's widespread pattern of wrongful, anticompetitive conduct.

5.     Deloitte's ongoing misconduct in this case crosses far beyond the limits of fair competition, reflecting a deliberate strategy to secure an unfair economic advantage through deceit rather than the strength of its products and services. Deloitte's actions are calculated to undermine one of the few legitimate competitors in a concentrated market. Sagitec brings this action to hold Deloitte accountable and to recover the substantial damage caused by Deloitte's wrongful conduct.

## PARTIES

6.     Plaintiff Sagitec Solutions LLC is a limited liability company organized under the laws of the State of Nevada, with its principal place of business located in Saint Paul, Minnesota.

7.     Sagitec is a technology solutions company delivering innovative, industry-leading software and related services to public and private sector entities. Sagitec's offerings include software and related services that enable its customers to provide best-in-class administration of pension, unemployment insurance ("UI"), paid family leave, health care, and disability insurance benefits.

---

[5] https://qz.com/1662933/deloitte-and-others-pay-235-million-settlement-over-alleged-role-in-ponzi-scheme; https://greensboro.com/news/general_assignment/auditor-settles-fortress-re-suit/article_e28cf2fd-adc1-56c6-b24d-8ce41e933aed.html; https://www.sfltimes.com/uncategorized/deloitte-sued-for-7-6b-in-mortgage-fraud-case.

8.    Defendant Deloitte Consulting LLP ("Deloitte") is a limited liability partnership organized under the laws of the State of Delaware.

9.    Defendant Deloitte Consulting LLP is a subsidiary of the global conglomerate, Deloitte Touche Tohmatsu Limited ("DTTL"), which reported 2024 annual revenues of more than $67 Billion.

10.    Among its many products and services, Deloitte provides software and related services that enable its customers to provide administration of pension and UI benefits.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this suit pursuant to 10 *Del. C.* § 541 and Article IV, Section 7 of the Delaware Constitution.

12.    This Court has personal jurisdiction over Deloitte and venue is proper in this Court because Deloitte is a Delaware Limited Liability Partnership and has purposefully availed itself of the rights and benefits of Delaware law by engaging in systematic and continuous contacts with the State of Delaware.

13.    This action qualifies for assignment to the Complex Commercial Litigation Division of the Superior Court of the State of Delaware because the amount in controversy exceeds $1 million.

33056892.1

## FACTUAL BACKGROUND

**Sagitec And Its Innovative Software and Services:**

14.    Sagitec began business in 2004 with the release of its innovative Neospin™ pension administration software. Sagitec's Neospin™ software operates as a fully integrated, browser-based software system. Unlike other pension administration software on the market, Sagitec's Neospin™ pension administration software operates on Sagitec's proprietary software platform that includes, among other things, a full suite of design and run-time tools (the "Sagitec Framework").

15.    Deloitte directly competes with Sagitec in the pension administration software and related services market. Deloitte calls its pension administration software "DPAS," an acronym for Deloitte Pension Administration Solution. Unlike Sagitec's Neospin™ pension administration software, Deloitte's DPAS software does not operate on a proprietary platform.

16.    In the years following the successful launch of its Neospin™ software, Sagitec began exploring other software applications that could run on its established, proprietary Sagitec Framework. In 2013, Sagitec engaged personnel to develop a proprietary UI software application. In 2014, Sagitec released the first version of its Neosurance™ UI software application, a fully integrated, browser-based application providing functionality for UI benefits. Like its longstanding Neospin™ software,

33056892.1

Sagitec's Neosurance™ software was developed to operate on the proprietary Sagitec Framework.

17.    Deloitte claims that, in or about 2009, it acquired rights to the UI software offerings of BearingPoint North America called uFACTS. Although Deloitte has not consistently pursued public contracts for UI software, on information and belief, at various times since 2009, it has intermittently bid to provide uFACTS-branded software to various states and governmental entities.

**Development of Publicly Available Specification Documents and Use Cases:**

18.    Unlike pension programs administered by a wide variety of private or public entities, UI insurance programs are administered solely by states or other governmental entities; and each must administer its UI program to be consistent with government-specific laws, regulations, and eligibility guidelines.

19.    To ensure that UI software implementations administer UI programs consistent with applicable laws, regulations, and eligibility guidelines, governments contracting for such software generally issue detailed requests for proposal ("RFPs") that identify the work that must be performed by software vendors to provide and implement acceptable UI software. Any accepted proposal is then detailed by agreements and other documentation, including Terms and Conditions governing the acquisition of software and Statements of Work ("SOWs") setting forth detailed

business services to be provided in connection with implementation of the UI software.

20.    The RFPs, Terms and Conditions, and SOWs are publicly available from the issuing states upon request.

21.    UI programs are often funded by grants from the federal government. Where such federal funding is provided, federal laws and regulations such as the Reed Act and Federal Acquisition Regulations ("FAR") apply to define the scope and ownership of intellectual property rights in the resulting work, including the Government's right to make such materials publicly available.

**BearingPoint's Work for the Massachusetts Department of Unemployment Assistance:**

22.    In 2007, the Massachusetts Department of Unemployment Assistance ("DUA") contracted with BearingPoint for implementation of a Massachusetts-specific UI administration system called the "DUA Quality Unemployment System Transformation ("QUEST") Project." Pursuant to the QUEST Project, the Massachusetts DUA and Bearing Point entered into a detailed SOW setting forth services BearingPoint would perform as part of the QUEST Project, including BearingPoint's obligations to:

1.   Re-engineer the UI business model (subject to approval from [DUA] Sponsors and Steering Committee);

2.   Define the Business Requirements;

3.   Design and implement a software solution that represents the process model, business requirements, and the needs of the DUA;

4.   Design appropriate technology architecture to support solution and business requirements; and

5.   Develop an Implementation plan that minimizes any risk to the DUA's business.

23.    Under the SOW, each deliverable was approved by the DUA Project Manager after review and acceptance by the DUA QUEST Project team and Steering Committee.

24.    The SOW also defined the tasks BearingPoint was required to perform on the QUEST Project, including:

- Task 3.1.  Develop Business Requirements . . . Develop the requirements for all functions of the QUEST system using the uFACTS Solution Framework design artifacts and the DUA's unique requirements and Massachusetts laws as a baseline.

- Task 3.2.  Design Business Processes:  Develop the business processes for all functions of the QUEST system using the uFACTS Solution Framework, the existing Massachusetts process flows, and the project goals as input.

- Task 3.3.   Design the Technical Architecture:   Design the technical architecture for the QUEST system and integrate it with the existing

Massachusetts DUA infrastructure based on DUA's needs and the architecture requirements from the RFQ and proposal. This includes developing a final architecture diagram and confirming what hardware and software will be needed and in what quantity. The architecture will address design, development, and testing.

- Task 3.4. Develop the Technical Infrastructure: Build the technical foundation for developing and implementing the UI system.

- Task 4.2.2. Design Use Cases: Move from requirements and process flows into detailed use case system modeling and design by further defining the business processes and modeling the web-server-based objects and batch business objects. These objects will be further defined during detail design.

- Task 4.3.1. Develop System Functionality: Develop, unit test, and perform initial integration testing of the application components associated with the increment . . . to verify that transactions and business processes are working according to their design specifications.

25.    Consistent with these requirements, Appendix G of the SOW identified a long list of use cases to be developed by BearingPoint as part of the QUEST Project, including use cases for ICON interface applications.

26.    The contract documents governing BearingPoint's work on the QUEST Project clearly provide that each of the specification documents, use cases, and

software developed (including, but not limited, to software code, database schema, and interfaces) as part of the QUEST Project are owned by the Commonwealth of Massachusetts. For example, the Terms and Conditions which govern the QUEST Project expressly provide that "[t]he Commonwealth is entitled to ownership and possession of all deliverables purchased or developed with State funds."

27.    Section 7.4.4 of the SOW similarly provides that "[i]n conformance with the Commonwealth's Standard Terms and Conditions . . . all of BearingPoint's right, title and interest in the QUEST IP developed originally and exclusively by BearingPoint under the terms of the Statement of Work for the purposes of the DUA QUEST Project shall pass to and vest in the Commonwealth, including all copyright, patent, trade secret, trademark and other intellectual property rights created by BearingPoint in the QUEST IP.  Subject to clause 7.4.3., BearingPoint hereby assigns to the Commonwealth as of the date on which DUA reimburses BearingPoint for such deliverables, all intellectual property rights in the QUEST IP that it may now or hereafter possess in the Commonwealth Property related to such deliverable and all derivative works thereof."

28.    Consistent with BearingPoint's broad assignment of rights to material developed in connection with the QUEST Project, the Massachusetts DUA and Bearing Point further agreed that all BearingPoint employees, consultants, and

agents would execute a written "IP Agreement For Vendors employees, etc." that provided, *inter alia:*

> All Developments the Property of the Commonwealth: All confidential, proprietary or other trade secret information and all other works of authorship, trademarks, trade names, discoveries, invention, processes, methods and improvements, conceived, developed or otherwise made by you, alone or with others, and in any way relating to the Commonwealth or any of its web development projects . . . **shall be the sole property of the Contractor's customer, the Commonwealth.**

29.     Each of the contractual documents granting the Commonwealth of Massachusetts sole and exclusive ownership of all rights in the specification documents, use cases, and software developed as part of the QUEST Project were entered before Deloitte's acquisition of BearingPoint.

30.     On information and belief, Deloitte was aware of these contractual documents and the Commonwealth of Massachusetts' sole and exclusive ownership in the specification documents, use cases, and software developed as part of the QUEST Project before it acquired any purported rights from BearingPoint.

31.     Deloitte owns no rights in the specification documents, use cases, and software developed as part of the QUEST Project, including, but not limited to software code, logical and physical database(s), and interfaces.

32.     Consistent with its obligations to make the records of publicly funded projects publicly available, the Commonwealth of Massachusetts makes the

33056892.1

11

specification documents and use cases relating to the QUEST Project freely available to any person or entity who requests them.

33.    The specification documents and use cases relating to the QUEST Project are not maintained as secret by the Commonwealth of Massachusetts.

34.    The Commonwealth of Massachusetts does not take any efforts to maintain the specification documents and use cases relating to the QUEST Project as secret.

35.    The specification documents and use cases relating to the QUEST Project are not trade secrets.

**Deloitte Falsely Claims Sagitec Violated Deloitte's Trade Secret Rights In Deliverables Relating To The QUEST Project:**

36.    Although Deloitte owns no rights to any of the specification documents, use cases, or software, including, but not limited to, software code, logical and physical database(s), and interfaces that BearingPoint developed in connection with the QUEST Project; and although those same specification documents and use cases are freely available public records, Deloitte has falsely claimed to Sagitec's actual and prospective customers that it holds exclusive trade secret rights in all such materials.

37.    Deloitte has also falsely claimed that Sagitec violated Deloitte's alleged trade secret rights in specification documents, use cases, and software BearingPoint

developed in connection with the QUEST Project when Sagitec developed Neosurance™ UI software offerings.

38.    Deloitte has similarly falsely claimed to Sagitec's actual and prospective customers that it holds exclusive copyrights to software developed in connection with the QUEST Project.

39.    Specifically, after being approached by government investigators, Deloitte falsely claimed it owned deliverables relating to the QUEST Project that were in fact owned by the Commonwealth of Massachusetts. Deloitte further falsely claimed that it held trade secrets in all the deliverables, which included specification documents and use cases that were in fact public records available to any member of the public.  Deloitte further falsely claimed that it held valid copyrights to software developed in connection with the QUEST Project, and knowingly filed applications to register its alleged copyrights with the United States Copyright Office knowing that they contained false claims of authorship and ownership.

40.    Based on the knowingly false information Deloitte gave government investigators, two former Sagitec employees were indicted for criminal trade secret theft, among other criminal charges. During a hearing on the defendants' motion for a Bill of Particulars identifying the specific alleged trade secrets at issue, the government indicated it needed to consult with Deloitte regarding the specific alleged trade secrets at issue. After the court in that case ordered the government to

33056892.1

provide the requested Bill of Particulars, the government instead chose to drop the criminal trade secret theft charges in a superseding indictment.

41.    In an effort to gain unfair commercial advantage over Sagitec and to damage Sagitec's reputation in the marketplace, Deloitte repeated these same false and defamatory statements to Sagitec's actual and prospective customers.

42.    For example, on information and belief,

    a.    Deloitte personnel repeated these same false and defamatory statements during at least one NASWA industry conference attended by many of Sagitec's actual and potential customers.

    b.    Deloitte falsely repeated these assertions to a Kentucky lobbying group, and further asserted that Sagitec had lost a UI contract with the State of Kentucky because it stole Deloitte's IP.

43.    On information and belief, Deloitte continues to wrongfully assert to third parties, including Sagitec's actual customers and other governmental entities seeking proposals for new UI projects, these same false and defamatory claims.

44.    Deloitte has continued to make these same false and defamatory claims, even after, on information and belief, it was made aware in 2023 that specification documents and use cases relating to the QUEST Project were public records available from the Massachusetts DUA. Specifically, during the hearing on the defendants' motion for a Bill of Particulars mentioned above, counsel for the

criminal defendants indicated in open court that specification documents and use cases relating to the QUEST Project were public records available from the Massachusetts DUA.

45.    On information and belief, Deloitte personnel and outside counsel for Deloitte were monitoring the criminal proceedings, were in communication with government attorneys regarding the criminal proceedings, and reviewed the transcript for the hearing on the motion for a Bill of Particulars in 2023.

46.    On information and belief, during the NASWA Summit conference in Los Angeles on September 13-14, 2023, Deloitte personnel made false and defamatory statements to the Alabama Secretary of Labor and other state agency representatives regarding Sagitec's alleged theft of trade secrets – including allegedly wrongful use of use cases and other technical specification documents developed for the Massachusetts QUEST project – despite the fact that Deloitte was aware of the fact that the government had dropped criminal trade secret theft charges in a superseding indictment in May 2023, and despite the fact that Deloitte was well aware that the court in which the indictment had been filed had dismissed all remaining trade secret-related claims.

47.    On information and belief, in late 2024 Deloitte and its state lobbyist representatives made false and defamatory statements to representatives of the State of California Employment Development Department ("EDD") regarding Sagitec's

alleged theft of trade secrets, including falsely asserting that Sagitec had violated Deloitte's alleged trade secrets by using publicly available use cases and other technical specification documents developed for the Massachusetts QUEST project. In connection with these false and defamatory statements, Deloitte urged the State of California EDD to disqualify Sagitec as a bidder on a significant UI modernization project.

48.     On information and belief, Deloitte personnel repeated these same false and defamatory statements to representatives of SAIC, a leading Fortune 500 technology integrator, leading SAIC to decline to engage Sagitec as a partner on upcoming project bids.

49.     On information and belief, during or before the summer of 2024, a Deloitte client relationship executive in Texas made false and defamatory statements to the Executive Director of the Texas Workforce Commission including false and defamatory statements that Deloitte owned Sagitec's Neosurance™ code and that Deloitte and Sagitec's code were the same, and therefore Texas should contract with Deloitte instead of Sagitec.

50.     Deloitte's campaign of disinformation directed to Sagitec's actual or potential customers has tarnished Sagitec's professional reputation, cost Sagitec lost contracts amounting to hundreds of millions of dollars, and has otherwise stifled Sagitec's economic growth through unfair competition.

33056892.1

**Deloitte Makes Additional False and Defamatory Claims Relating To Sagitec's Neospin™ Pension Administration Software:**

51.    Not content to focus its false and defamatory claims to Sagitec's UI-related offerings, Deloitte made similar false and defamatory claims about Sagitec's wholly separate Neospin™ pension administration software.

52.    One of Sagitec's Neospin™ customers was the Chicago Teacher's Pension Fund ("CTPF"). On April 6, 2022, Sagitec and CTPF entered into a contract through which Sagitec agreed, among other things, to provide software for use in CTPF's pension administration system.

53.    In or about October 2022, one of Deloitte's Managing Directors named Tom Zacharias contacted Carlton Lenoir, Sagitec's primary contact at CTPF. During an October 7, 2022 telephone call between Mr. Zacharias and Mr. Lenoir, Deloitte falsely represented that:

      a. Sagitec had "stolen" pension administration software when it developed Neospin™ software; and

      b. Sagitec's Neospin™ pension administration software was just Deloitte's DPAS pension administration software "with a new name."

54.    Deloitte then used these false statements to entice CTPF to allow Deloitte to provide a demonstration of its competing DPAS pension administration software—despite knowing that CTPF had executed a long-term contract with Sagitec to provide pension administration software.

33056892.1

55.     Deloitte's statements regarding Sagitec's pension administration software were false, and Deloitte knew the statements were false when made.

56.     Sagitec did not steal any software to develop its Neospin™ pension administration software.

57.     Sagitec's Neospin™ software is substantially different from Deloitte's DPAS software. For example, unlike Deloitte's DPAS software, Sagitec's Neospin™ software was specifically developed to operate on Sagitec's proprietary platform.

58.     Deloitte's accusations regarding Sagitec's theft, copying, or other reliance on DPAS were false. Sagitec did not steal, reference, or otherwise use Deloitte's DPAS to develop Neospin™.

59.     Betraying its true intent, Deloitte has never alleged any such theft either in court or to Sagitec. On information and belief, Deloitte knew, at all times, that the accusations it made regarding Sagitec's theft of DPAS were false. Deloitte intended these false statements to convert CTPF's business away from Sagitec or to otherwise interfere with Sagitec's contractual relationship with CTPF.

60.     On information and belief, Deloitte's false and defamatory statements caused CTPF to wrongfully terminate its contractual relationship with Sagitec.

61.     On information and belief, Deloitte has continued spreading false information in the market regarding Sagitec's alleged theft of alleged Deloitte property to develop Sagitec's products and services.

33056892.1

62. Deloitte's false and defamatory misrepresentations, directed to Sagitec's actual or potential customers, has tarnished Sagitec's professional reputation, cost Sagitec lost contracts amounting to hundreds of millions of dollars, including the CTPF contract, and has otherwise stifled Sagitec's economic growth through unfair competition.

**Deloitte Engages In Its Own Campaign To Misappropriate Sagitec's Confidential Information:**

63. On around March 15, 2014, Sagitec responded to an RFP from the University of California ("UC") to provide pension administration software and related services. As part of this RFP, Sagitec provided UC detailed information relating to pricing tied to specific services such as cloud computer storage and hosting services.

64. Sagitec designated certain portions of its RFP response (including its pricing information) as confidential.

65. Sagitec won the RFP, and Sagitec entered into an agreement with UC to provide certain services to update UC's pension system, including platform maintenance, hosting, and licensing services.

66. Sagitec's contract with UC incorporated by reference certain licensing terms. These licensing terms restricted UC's use of "**Confidential Information**," which the parties' contract expressly defined to include "**Sagitec's . . . pricing information**." The parties each agreed "not to divulge any Confidential Information

33056892.1

19

or information derived therefrom to any third-party and . . . protect the confidentiality of the Confidential Information with the same degree of care it uses to protect the confidentiality of its own confidential information."

67.     On information and belief, Deloitte entered into an agreement with UC in January 2022, pursuant to which Deloitte agreed to provide certain analyses of the pension administration system that Sagitec hosted and supported. Pursuant to Deloitte's contract, UC agreed to provide Deloitte with detailed information regarding Sagitec's work relating to UC's pension administration system.

68.     When Sagitec learned of Deloitte's contract with UC, Sagitec expressed concern to UC that Deloitte could obtain access to Sagitec's confidential information and misuse it for competitive purposes. In response, UC representatives assured Sagitec that it would advise Deloitte of UC's obligations with respect to the treatment of Sagitec's confidential information, and that Deloitte would comply with those confidentiality obligations.

69.     On information and belief, UC informed Deloitte of its obligations with respect to the treatment of Sagitec's confidential information and required Deloitte to treat Sagitec's confidential information accordingly. Rather than acting in compliance with UC's confidentiality obligations owed to Sagitec, Deloitte used the access provided by UC to access whatever Sagitec confidential information it

wanted, including information with no relevance at all to Deloitte's contract with UC—for example, details of Sagitec's bid and pricing structure and design.

70.    Deloitte's work with UC did not encompass any assignment by which it would need to access documents containing Sagitec's confidential pricing information maintained by UC.  Nevertheless, Deloitte did so and provided a copy of that confidential pricing information to Deloitte personnel who did not work on the UC project, but instead were involved in Deloitte's UI business.

71.    On information and belief, Deloitte has used this ill-gotten confidential information to directly bid against Sagitec and has won contracts that Sagitec would have otherwise won utilizing this misappropriated data.

72.    On information and belief, Deloitte acted with the goal of improperly obtaining Sagitec's confidential information and causing UC to breach its contractual obligations owed to Sagitec.

73.    As a result of Deloitte's wrongful conduct, Deloitte wrongfully appropriated Sagitec's confidential information and caused UC to breach its confidentiality obligations owed to Sagitec.

## COUNT I
### (Defamation)

74.    Sagitec repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

75.    In an effort to promote the sale of Deloitte's products and services, Deloitte defamed Sagitec by publishing the following false statements to actual and/or prospective purchasers of Sagitec's products and services, asserting:

    a.  That Deloitte holds exclusive trade secret rights in the specification documents, use cases, and software, including, but not limited to, software code, logical and physical database(s) and interfaces that BearingPoint developed in connection with the QUEST Project, as set forth in Paragraph 36 above;

    b.  That Sagitec violated Deloitte's alleged trade secret rights in specification documents, use cases, and software BearingPoint developed in connection with the QUEST Project when Sagitec developed Neosurance™ UI software offerings, as set forth in Paragraph 37 above;

    c.  That Deloitte owned deliverables relating to the QUEST Project that were in fact owned by the Commonwealth of Massachusetts, as set forth in Paragraphs 38-39 and 41-43 above;

33056892.1

    d.  That Deloitte held trade secrets in all of the deliverables relating to the QUEST Project, which included specification documents and use cases that were in fact public records available to any member of the public, as set forth in Paragraphs 38-39 and 41-43 above;

    e.  That Sagitec had "stolen" pension administration software when it developed Neospin™ software, as set forth in Paragraph 53 above;

    f.  That Sagitec's Neospin™ pension administration software was just Deloitte's DPAS pension administration software "with a new name," as set forth in Paragraph 53 above.

76.    These statements were false for the reasons stated in Paragraphs 22-30, 44-45, and 56-59 above.

77.    These statements would tend to harm Sagitec's reputation in the community because they violated the innovative integrity of Sagitec's products and services, harmed Sagitec's reputation in the market, and exposed Sagitec to public contempt, ridicule, and degradation.

78.    These statements pertained to Sagitec because they were directed toward Sagitec's actions, products, and services to a targeted market that Sagitec serves.

79.    Deloitte has no applicable privilege or legal authorization to make these defamatory statements.

33056892.1

23

80.    As a result of the foregoing, Sagitec has been damaged by Deloitte's defamation in an amount to be determined at trial.

81.    In addition, Deloitte's defamation was malicious, oppressive, and done in reckless and conscious disregard of the rights and interests of Sagitec. Accordingly, Sagitec is entitled to punitive damages

## COUNT II
### (Defamation *Per Se*)

82.    Sagitec repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

83.    In an effort to promote the sale of Deloitte's products and services, Deloitte defamed Sagitec by publishing the following false statements to actual and/or prospective purchasers of Sagitec's products and services asserting:

  a.  That Deloitte holds exclusive trade secret rights in the specification documents, use cases, and software, including, but not limited to, software code, logical and physical database(s) and interfaces that BearingPoint developed in connection with the QUEST Project, as set forth in Paragraph 36 above;

  b.  That Sagitec violated Deloitte's alleged trade secret rights and copyrights in specification documents, use cases, and software BearingPoint developed in connection with the QUEST Project when

Sagitec developed Neosurance™ UI software offerings, as set forth in Paragraph 37 above;

c.  That Deloitte owned deliverables relating to the QUEST Project that were in fact owned by the Commonwealth of Massachusetts, as set forth in Paragraphs 38-39 and 41-43 above;

d.  That Deloitte held trade secrets in all of the deliverables relating to the QUEST Project, which included specification documents and use cases that were in fact public records available to any member of the public, as set forth in Paragraphs 38-39 and 41-43 above;

e.  That Sagitec had "stolen" pension administration software when it developed Neospin™ software, as set forth in Paragraph 53 above;

f.  That Sagitec's Neospin™ pension administration software was just Deloitte's DPAS pension administration software "with a new name," as set forth in Paragraph 53 above.

84.  These statements were false for the reasons alleged in Paragraphs 22-30, 44-45, and 56-59 above, which are incorporated herein by reference.

85.  These statements were defamatory *per se* because these statement concern Sagitec's business, trade, and professional conduct. Specifically, these statements concern Sagitec's product development, innovative integrity, and

33056892.1

25

assertions in the marketplace regarding the proprietary nature of Sagitec's products, relied on by public entities and their citizens all over the United States.

86.    Deloitte has no applicable privilege or legal authorization to make these defamatory statements.

87.    To the extent Deloitte's allegations concern Sagitec's business, trade, and professional conduct, Sagitec's harm to its reputation is presumed and Sagitec need not prove special damages.

88.    As a result of Deloitte's wrongful conduct, Sagitec suffered damages in an amount to be determined at trial.

89.    In addition, Deloitte's defamation *per se* was malicious, oppressive, and done in reckless and conscious disregard of the rights and interests of Sagitec. Accordingly, Sagitec is entitled to punitive damages.

## <u>COUNT III</u>
### (Tortious Interference with Contract - CTPF)

90.    Sagitec repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

91.    A contract existed between Sagitec and the CTPF providing for Sagitec's provision of pension administration software and services to the CTPF.

92.    Deloitte knew of the existence of Sagitec's contract with the CTPF.

93.    Deloitte intentionally procured the CTPF's breach of the contract with Sagitec by providing the CTPF false and inaccurate information regarding Sagitec's

33056892.1

alleged theft of pension software in connection with development of Sagitec's Neospin™ pension administration software as alleged above. This conduct caused the CTPF to wrongfully breach the contract.

94.    Deloitte's actions were not justified but were instead motivated by Deloitte's desire to harm Sagitec.

95.    As a result of Deloitte's wrongful conduct, Sagitec suffered damages in an amount to be determined at trial.

96.    In addition, Deloitte's tortious interference was malicious, oppressive, and done in reckless and conscious disregard of the rights and interests of Sagitec. Accordingly, Sagitec is entitled to punitive damages.

## <u>COUNT IV</u>
### (Tortious Interference with Contract - UC)

97.    Sagitec repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

98.    A contract existed between Sagitec and UC providing for Sagitec's provision of pension administration software and services to UC, and specifically obligating UC to maintain the confidentiality of Sagitec's pricing information.

99.    Deloitte knew of the existence of Sagitec's contract with UC and of UC's confidentiality obligations owed to Sagitec.

100.    Deloitte intentionally procured UC's breach of the contract with Sagitec by misusing its position as a UC contractor to access Sagitec's confidential pricing

33056892.1

information and to disseminate such information to others within Deloitte who had no legitimate reason to have access to such confidential information.

101.   Deloitte's actions were not justified, but were instead motivated by Deloitte's desire to harm Sagitec and obtain an unfair competitive advantage over Sagitec.

102.   As a result of Deloitte's wrongful conduct, Sagitec suffered damages in an amount to be determined at trial.

103.   In addition, Deloitte's tortious interference was malicious, oppressive, and done in reckless and conscious disregard of the rights and interests of Sagitec. Accordingly, Sagitec is entitled to punitive damages.

## <u>COUNT V</u>
### (Tortious Interference with Prospective Economic Advantage)

104.   Sagitec repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

105.   Sagitec maintained a reasonable probability of a business opportunity with at least the States of Ohio, Kentucky, and Texas, as well as numerous other state and local governmental units and quasi-governmental units seeking proposals for UI and/or pension administration products and services such as Arizona, California, Colorado, Delaware, Kansas, Massachusetts, Maine, Michigan, Tennessee, and Utah.

33056892.1

106.   On information and belief, Deloitte knew of the existence of Sagitec's reasonable expectation of a contract with these entities through various sources, including public RFP processes.

107.   On information and belief, Deloitte intentionally interfered, or knew that its acts were certain or substantially certain to interfere, with Sagitec's reasonable expectations of a contract with these entities by making the false and defamatory statements set forth above. Deloitte's interference was willful, wanton, and malicious.

108.   But for Deloitte's wrongful interference, Sagitec would have entered to into contracts with these entities.

109.   As a result of Deloitte's wrongful conduct, Sagitec suffered damages in an amount to be determined at trial.

110.   In addition, Deloitte's tortious interference was malicious, oppressive, and done in reckless and conscious disregard of the rights and interests of Sagitec. Accordingly, Sagitec is entitled to punitive damages.

## COUNT VI
### (Common Law Unjust Enrichment)

111.   Sagitec repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

112.   Deloitte has knowingly received a benefit to which it was not entitled through the conduct alleged herein.

33056892.1

113.   It would be unjust for Deloitte to retain the benefit that it received due to and in light of its conduct as alleged herein.

114.   Deloitte is liable to Sagitec in an amount to be proven at trial arising out of Deloitte's unjust enrichment.

## COUNT VII
### (Common Law Unfair Competition)

115.   Sagitec repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

116.   Deloitte's conduct set forth herein constitutes unfair competition in violation of Delaware common law.

117.   As a result of the foregoing, Sagitec has been damaged by Deloitte's wrongful conduct in an amount to be determined at trial.

118.   In addition, Deloitte's conduct was malicious, oppressive, and done in reckless and conscious disregard of the rights and interests of Sagitec. Accordingly, Sagitec is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Sagitec prays for relief against Defendant Deloitte Consulting LLP as follows:

A. Entering judgment in favor of Sagitec on each of the causes of action set forth above;

B. Awarding Sagitec general compensatory damages in an amount to be determined at trial;

33056892.1

C. Awarding Sagitec punitive damages;

D. Awarding Sagitec its reasonable attorneys' fees;

E. Awarding Sagitec its costs and expenses incurred in this action;

F. Awarding prejudgment and post-judgment interest; and

G. Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Sagitec demands a trial by jury of twelve on all issues so triable.

<table>
<tr><td>

OF COUNSEL:

Christopher K. Larus
William E. Manske
Rajin S. Olson
Thompson Hine LLP
800 Nicollet Avenue, Suite 2925
Minneapolis, MN 55402
(612) 605-5900
Christopher.Larus@ThompsonHine.com
William.Manske@ThompsonHine.com
Rajin.Olson@ThompsonHine.com




Dated: April 7, 2025

</td><td>

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ C. Barr Flinn*
C. Barr Flinn (No. 4092)
Anne Shea Gaza (No. 4093)
William E. Gamgort (No. 5011)
Rodney Square
1000 N. King Street
Wilmington, DE 19801
(302) 571-6600
bflinn@ycst.com
agaza@ycst.com
wgamgort@ycst.com

*Attorneys for Plaintiff*
*Sagitec Solutions, LLC*

</td></tr>
</table>