IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| DELOITTE CONSULTING LLP and DELOITTE DEVELOPMENT LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 23-325-WCB |
| v. | ) ) ) | **REDACTED VERSION**<br>**Filed: July 31, 2025** |
| SAGITEC SOLUTIONS, LLC, | ) ) ) | |
| Defendant. | ) | |

**DECLARATION OF CHRISTOPHER K. LAURUS**
**IN OPPOSITION TO DELOITTE'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT - VOLUME I**
**(Declaration; Exhibits 1 - 15)**

OF COUNSEL:

Christopher K. Larus
David A. Prange
Rajin S. Olson
Brandon A. Carmack
Demitri M. Dawson
ROBINS KAPLAN LLP
800 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500
clarus@robinskaplan.com
dprange@robinskaplan.com
rolson@robinskaplan.com
bcarmack@robinskaplan.com
ddawson@robinskaplan.com

Rebecca Bact
ROBINS KAPLAN LLP
800 Boylston Street
Boston, MA 02199
(617) 859-2740
rbact@robinskaplan.com

Dated: July 3, 2025

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Robert Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Defendant*
*Sagitec Solutions, LLC*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| DELOITTE CONSULTING LLP and DELOITTE DEVELOPMENT LLC, | ) ) ) ) ) |
| Plaintiffs, | ) C.A. No. 23-325-WCB ) |
| v. | ) HIGHLY CONFIDENTIAL ) |
| SAGITEC SOLUTIONS, LLC, | ) FILED UNDER SEAL ) |
| Defendant. | ) ) |

**DECLARATION OF CHRISTOPHER K. LARUS IN OPPOSITION TO
DELOITTE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, Christopher K. Larus, declare as follows:

1.     I am an attorney representing Defendant Sagitec Solutions, LLC ("Defendant" or "Sagitec") in the above-referenced matter. I submit this Declaration in Opposition to Plaintiffs Deloitte Consulting LLP and Deloitte Development LLC's (collectively, the "Plaintiffs") Motion for Partial Summary Judgment.

2.     Attached hereto as **Exhibit 1** is a true and correct copy of *Unemployment Insurance Fact Sheet*, U.S. Department of Labor, *available at* https://oui.doleta.gov/unemploy/docs/factsheet/UI_Program_FactSheet.pdf.

3.     Attached hereto as **Exhibit 2** is a true and correct copy of a document that Defendant produced to Plaintiffs in this case with bates numbers SAGITEC-DEL_00044113– 44217 ██████████████████████████████████████████████████████ ████████████████ which is designated "CONFIDENTIAL."

4.      Attached hereto as **Exhibit 3** is a true and correct screenshot capture of the National Association for State Workforce Agencies' ("NASWA") Interstate Connectivity Network ("ICON") system webpage, *available at* https://www.naswa.org/icon.

5.      Attached hereto as **Exhibit 4** is a true and correct screenshot capture of NASWA's State Information Data Exchange System ("SIDES") system webpage, *available at* https://www.naswa.org/uisides.

6.      Attached hereto as **Exhibit 5** is a true and correct copy of the 30(b)(6) transcript of the deposition of Benjamin Peirce, a corporate representative of NASWA, taken on February 28, 2025.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of a document that Defendant produced to Plaintiffs in this case with bates numbers SAGITEC-DEL_07114368–7114451, ████████████████████████████████████████████████████

████████ which is designated "CONFIDENTIAL."

8.      Attached hereto as **Exhibit 7** is a true and correct copy of a document that Defendant produced to Plaintiffs in this case with bates numbers SAGITEC-DEL_07114452–7114495, ████████████████████████████████████████████████████████

████ which is designated "CONFIDENTIAL."

9.      Attached hereto as **Exhibit 8** is a true and correct copy of a document that Defendant produced to Plaintiffs in this case with bates numbers SAGITEC-DEL_07114514–7114637, U.S. Department of Labor, Unemployment Insurance Program Letter No. 47-01 from Grace A. Kilbane to All State Employment Security Agencies re: Electronic Exchange of Wage and Separation Information for the Unemployment Compensation for Federal Employees (UCFE)

and the Unemployment Compensation for Ex-servicemembers (UCX) Programs, dated August 30, 2001, which is designated "CONFIDENTIAL."

10.      Attached hereto as **Exhibit 9** is a true and correct copy of a document that Defendant produced to Plaintiffs in this case with bates numbers SAGITEC-DEL_03120345–3120365, UI Reports Handbook No. 401, ETA 581 Contribution Operations, dated May 2000, which is designated "CONFIDENTIAL."

11.      Attached hereto as **Exhibit 10** is a true and correct copy of a document that Plaintiffs produced to Defendant in this case with bates numbers DEL00000086–93, UI Reports Handbook No. 401, ETA 2112 UI Financial Transaction Summary, dated May 2000, which is designated "HIGHLY CONFIDENTIAL."

12.      Attached hereto as **Exhibit 11** is a true and correct copy of a document that Plaintiffs produced to Defendant in this case with bates numbers DEL00000001–25, "uFACTS (Mass: Tax)" copyright application and certificate of registration, dated June 29, 2018, with Registration No. TX 8-559-594, which is designated "CONFIDENTIAL."

13.      Attached hereto as **Exhibit 12** is a true and correct copy of a document that Plaintiffs produced to Defendant in this case with bates numbers DEL00000026–51, "uFACTS (NM: Tax and Benefits)" copyright application and certificate of registration, dated June 29, 2018, with Registration No. TX 8-559-593, which is designated "CONFIDENTIAL."

14.      Attached hereto as **Exhibit 13** is a true and correct copy of a document that Plaintiffs produced to Defendant in this case with bates numbers DEL00000052–77, "uFACTS (Mass: Benefits)" copyright application and certificate of registration, dated June 29, 2018, with Registration No. TX 8-559-595, which is designated "CONFIDENTIAL."

15.    Attached hereto as **Exhibit 14** is a true and correct copy of a document that Plaintiffs Deloitte Consulting LLP and Deloitte Development LLC (collectively, the "Plaintiffs") produced to Defendant in this case with bates numbers DEL00067743–67839, Statement of Work between The Division of Unemployment Assistance and BearingPoint, Inc. for the DUA Quality Unemployment System Transformation (QUEST) Project, dated May 18, 2007, which is designated "HIGHLY CONFIDENTIAL."

16.    Attached hereto as **Exhibit 15** is a true and correct copy of source code-related material that Plaintiffs produced to Defendant in this case with bates numbers DEL-SC-000625–630, which is designated "HIGHLY CONFIDENTIAL – SOURCE CODE."

17.    Attached hereto as **Exhibit 16** is a true and correct copy of a document that Defendant produced to Plaintiffs in this case with bates numbers SAGITEC-DEL_02374683–2374743, Motion Hearing Transcript, *United States of America v. Minkkinen*, Criminal No. 2:22-cr-00163, Dkt. No. 171 (S.D.W.V. May 17, 2023).

18.    Attached hereto as **Exhibit 17** is a true and correct copy of a document that Defendant produced to Plaintiffs in this case with bates numbers SAGITEC-DEL_06920267–6920268, email string from DWS IPRA Workforce to Demitri Dawson ccs David Prange and Rebecca Bact, dated March 7, 2024, with subject line: RE: [EXTERNAL] Public Records Request.

19.    Attached hereto as **Exhibit 18** is a true and correct copy of a document that Defendant produced to Plaintiffs in this case with bates numbers SAGITEC-DEL_07352835–7352836, The Commonwealth of Massachusetts Executive Office of Labor and Workforce Development Department of Unemployment Assistance Letter to David Prange, dated May 28, 2024.

20.    Attached hereto as **Exhibit 19** is a true and correct copy of a document that Defendant produced to Plaintiffs in this case with bates numbers SAGITEC-DEL_07352837–7352841, The Commonwealth of Massachusetts Executive Office of Labor and Workforce Development Department of Unemployment Assistance Letter to David Prange, dated May 29, 2024.

21.    Attached hereto as **Exhibit 20** is a true and correct copy of an excerpt of Deloitte's Third Supplemental Responses and Objections to Sagitec Solutions LLC's Third Set of Interrogatories (Nos. 12-15), dated March 28, 2025, which is designated "HIGHLY CONFIDENTIAL."

22.    Attached hereto as **Exhibit 21** is a true and correct copy of the transcript of the deposition of Anil Gosu, taken on March 19, 2025, Volume II, which is designated "HIGHLY CONFIDENTIAL."

23.    Attached hereto as **Exhibit 22** is a true and correct copy of 4 Nimmer on Copyright § 13F.06 Factor Two: Nature of the Copyrighted Work.

24.    Attached hereto as **Exhibit 23** is a true and correct copy of the transcript of the deposition of Scott Malm, taken on February 19, 2025, Volume I, which is designated "HIGHLY CONFIDENTIAL."

25.    Attached hereto as **Exhibit 24** is a true and correct copy of a document that Plaintiffs produced to Defendant in this case with bates numbers DEL00353054–353069, ███████

████████████████████████████████████████████████████████████

which is designated "HIGHLY CONFIDENTIAL."

26.    Attached hereto as **Exhibit 25** is a true and correct copy of a document that Plaintiffs produced to Defendant in this case with bates numbers DEL00361917–361927, ████████

████████████████████, which is designated "CONFIDENTIAL."

27.     Attached hereto as **Exhibit 26** is a true and correct copy of the 30(b)(6) transcript of the deposition of Ranjith Kotcherlakota, Vol. I, taken on July 31, 2024, which is designated "CONFIDENTIAL."

28.     Attached hereto as **Exhibit 27** is a true and correct copy of the 30(b)(6) transcript of the deposition of Neil Adcox, taken on February 18, 2025, which is designated "CONFIDENTIAL."

29.     Attached hereto as **Exhibit 28** is a true and correct copy of the transcript of the deposition of Sindhu Nair, taken on July 30, 2024, which is designated "HIGHLY CONFIDENTIAL SOURCE CODE."

30.     Attached hereto as **Exhibit 29** is a true and correct copy of the transcript of the deposition of Pankaj Sharma, taken on August 8, 2024, which is designated "CONFIDENTIAL."

31.     Attached hereto as **Exhibit 30** is a true and correct copy of the transcript of the deposition of Chris Peretto, taken on June 4, 2024, which is designated "CONFIDENTIAL."

32.     Attached hereto as **Exhibit 31** is a true and correct copy of a document that Plaintiffs produced to Defendant in this case with bates numbers DEL00082789–82801, ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

which is designated "CONFIDENTIAL."

33.     Attached hereto as **Exhibit 32** is a true and correct copy of a document that Plaintiffs produced to Defendant in this case with bates numbers DEL00082802–82817, ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

which is designated "CONFIDENTIAL."

34.     Attached hereto as **Exhibit 33** is a true and correct copy of a document that Plaintiffs produced to Defendant in this case with bates numbers DEL00082831–82844, ██████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ which is designated "CONFIDENTIAL."

35.     Attached hereto as **Exhibit 34** is a true and correct copy of a document that Plaintiffs produced to Defendant in this case with bates numbers DEL01074553–1074612, ███████████████████████████████████████████████, which is designated "CONFIDENTIAL."

36.     Attached hereto as **Exhibit 35** is a true and correct copy of the transcript of the deposition of Annica Jin-Hendel, Vol. I, taken on February 28, 2025, which is designated "CONFIDENTIAL."

37.     Attached hereto as **Exhibit 36** is a true and correct copy of the transcript of the deposition of Christopher W. Madel, taken on March 20, 2025, which is designated "CONFIDENTIAL."

38.     Attached hereto as **Exhibit 37** is a true and correct copy of the transcript of the deposition of Piyush Jain, taken on August 2, 2024, which is designated "CONFIDENTIAL."

39.     Attached hereto as **Exhibit 38** is a true and correct copy of the 30(b)(6) transcript of the deposition of Derek John Deshler, taken on January 21, 2025, which is designated "ATTORNEYS EYES ONLY."

40.     Attached hereto as **Exhibit 39** is a true and correct copy of a document that Defendant produced to Plaintiffs in this case with bates numbers SAGITEC-DEL_07112227–7112231, ███████████████████████████████████████████████

██████████████████████████████████████████

██████, which is designated "CONFIDENTIAL."

41.     Attached hereto as **Exhibit 40** is a true and correct copy of a document that The Commonwealth of Massachusetts Division of Unemployment Assistance ("MADUA") produced to Defendant in this case with bates numbers MADUA00001257–1269, including email string from Michelle Amante to Cari Birkhauser, ccs Judith Cicatiello and John Glennon, dated August 24, 2011, with subject line: RE: Sharing with Florida.

42.     Attached hereto as **Exhibit 41** is a true and correct copy of a document that Plaintiffs produced to Defendant in this case with bates number DEL01053171, ██████████

██████████████████████████████████████████

██████████████████████████, which is designated "CONFIDENTIAL."

43.     Attached hereto as **Exhibit 42** is a true and correct copy of the 30(b)(6) transcript of the deposition of Massachusetts DUA through Houda Amoakuh, taken on May 31, 2024, which is designated "HIGHLY CONFIDENTIAL."

44.     Attached hereto as **Exhibit 43** is a true and correct copy of the transcript of the deposition of Sue Anne Athens, taken on May 28, 2024.

45.     Attached hereto as **Exhibit 44** is a true and correct copy of Deloitte's Responses and Objections to Sagitec Solutions LLC's First Set of Requests for Admission, dated April 1, 2024.

46.     Attached hereto as **Exhibit 45** is a true and correct copy of a document that Plaintiffs produced to Defendant in this case with bates numbers DEL00012382–12390,

██████████████████████████████████████████

███████████████████████████████████████████████████████████████████, which is

designated "HIGHLY CONFIDENTIAL."

    47.    Attached hereto as **Exhibit 46** is a true and correct copy of a document that

Plaintiffs produced to Defendant in this case with bates numbers DEL00012463–12476,

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████, which is

designated "HIGHLY CONFIDENTIAL."

    48.    Attached hereto as **Exhibit 47** is a true and correct copy of a document that

Plaintiffs produced to Defendant in this case with bates numbers DEL00027907–27917, ████

████████████████████████████████████████████████████████████████████████████

████████████████████████████, which is designated "HIGHLY CONFIDENTIAL."

    49.    Attached hereto as **Exhibit 48** is a true and correct copy of a document that

Plaintiffs produced to Defendant in this case with bates numbers DEL00037205–37280, ████

████████████████████████████████████████████████████████████████████████████

████████████ which is designated "HIGHLY CONFIDENTIAL."

    50.    Attached hereto as **Exhibit 49** is a true and correct copy of a document that

MADUA produced to Defendant in this case with bates numbers MADUA00012738–12745,

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

    51.    Attached hereto as **Exhibit 50** is a true and correct copy of a document that

MADUA produced to Defendant in this case with bates numbers MADUA00010628–10641,

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

9

52.     Attached hereto as **Exhibit 51** is a true and correct copy of a document that New Mexico Department of Workforce Solutions ("NMDWS") produced to Defendant in this case with bates numbers NMDWS_00010790–10800, ████████████████████████████

████████████████████████████████████████████████████████

53.     Attached hereto as **Exhibit 52** is a true and correct copy of a document that NMDWS produced to Defendant in this case with bates numbers NMDWS_00005920–6014, ███

████████████████████████████████████████████████████████

██████████

54.     Attached hereto as **Exhibit 53** is a true and correct copy of Deloitte's Notice of Deposition of Defendant Sagitec Solutions LLC pursuant to Federal Rule of Civil Procedure 30(b)(6), dated April 18, 2024, marked as Jain Deposition Exhibit 1.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed this 24th day of July, 2025 in Minneapolis, Minnesota.

>               */s/ Christopher K. Larus*
>               Christopher K. Larus
>
>               *Attorney for Defendant*
>               *Sagitec Solutions, LLC*

# Exhibit 1

# UNEMPLOYMENT INSURANCE

## WHAT IS UNEMPLOYMENT INSURANCE (UI)?

Unemployment Insurance is a joint state-federal program that provides cash benefits to eligible workers.  Each state administers a separate UI program, but all states follow the same guidelines established by federal law.

Unemployment insurance payments (benefits) are intended to provide temporary financial assistance to unemployed workers who are unemployed through no fault of their own. Each state sets its own additional requirements for eligibility, benefit amounts, and length of time benefits can be paid.

> **UI Benefits are Administered by States**
>
> To find information about your state's program, including eligibility, benefits, and application information, visit our Unemployment Insurance Service Locator.

Generally, benefits are based on a percentage of your earnings over a recent 52-week period, and each state sets a maximum amount. Benefits are subject to federal and most state income taxes and must be reported on your income tax return. You may choose to have the tax withheld from your payment.

## AM I ELIGIBLE?

Each state sets its own guidelines for eligibility for UI benefits, but you usually qualify if you:

- **Are unemployed through no fault of your own.** In most states, this means you have to have separated from your last job due to a lack of available work.
- **Meet work and wage requirements.** You must meet your state's requirements for wages earned or time worked during an established period of time referred to as a "base period." (In most states, this is usually the first four out of the last five completed calendar quarters prior to the time that your claim is filed.)
- **Meet any additional state requirements.** Find details of your own state's program by using our Unemployment Insurance Service Locator.

## HOW DO I APPLY?

To receive UI benefits, you need to file a claim with the UI program in the state where you worked.

- You should contact your state's UI program as soon as possible after becoming unemployed. Find your state's program by using our Unemployment Insurance Service Locator and check with them to see if you should file a claim in person, by telephone, or online.
- Generally, you should file your claim with the state where you worked. If you worked in a state other than the one where you now live or if you worked in multiple states, the state UI agency where you now live can provide information about how to file your claim with other states.
- When you file a claim, you will be asked for certain information, such as addresses and dates of your former employment. To make sure your claim is not delayed, be sure to give complete and correct information.
- It generally takes two to three weeks after you file your claim to receive your first benefit check. Some states require a one-week waiting period; in other words, you would receive your first payment for the second week of your unemployment claim.

# HOW DO I STAY ELIGIBLE?

Generally states require the following in order to maintain weekly eligibility:

- File weekly or biweekly claims, usually by mail or phone.
- Be able to work, available to work, and activly seek work each week you claim benefits.
- Report any earnings from work you had during the week(s). States have different rules for how much money you can earn while receiving benefits.
- Report any job offers or job offers you decline during the week.
- If requested, report to your local UI claims office or American Job Center on the scheduled day and time. Benefits may be denied for those who do not attend.
- Some states require registration for work with the State Employment Service, so it can assist you in finding employment.
- Meet any other state eligibility requirements.

You will find help in your job search at your local American Job Center. They have a variety of services free of charge. Staff there can:

- Refer you to job openings in your area, or in other areas if you plan to relocate.
- Help with resume writing, interview practice, and other job search activities.
- Refer you to training programs.
- Some Centers offer testing and counseling to help you explore new careers.
- If you believe you have special needs or considerations, such as physical needs or other considerations, which may prevent you from getting a job, they can refer you to other agencies for help with those needs.

# WHAT IF I AM DENIED?

Each state UI Program makes its own decisions about workers' eligibility for benefits. There are many reasons for denying benefit payments; some of the most common are:

- Voluntarily leaving work without good cause. Benefit payments can be paid if you quit under certain circumstances depending on your state's laws.
- Being discharged for misconduct connected with work. Misconduct is an intentional or controllable act or failure to take action, which shows a deliberate disregard of the employer's interests.
- Not being able or available for work. You must be able, ready and willing to accept a suitable job.
- Not actively seeking work.
- Refusing an offer of suitable work.
- Knowingly making false statements to obtain benefit payments.

If you are disqualified or denied benefits, you have the right to file an appeal. Your employer may also appeal a determination if he/she does not agree with the state's determination regarding your eligibility. You must file your appeal within an established time frame.

# HOW LONG WILL MY BENEFITS LAST?

In general, benefits are based on a percentage of an individual's earnings over a recent 52-week period - up to a State maximum amount.

▸ Benefits can be paid for a maximum of 26 weeks in most States.

▸ Additional weeks of benefits called Extended Benefits may be available during times of high unemployment (Some States also provide additional benefits for specific purposes).

▸ Benefits are subject to Federal income taxes and must be reported on the individual's Federal income tax return. Or the individual may elect to have the tax withheld by the State Unemployment Insurance agency.

You can visit the Comparison of State UI Laws at https://oui.doleta.gov/unemploy/statelaws.asp#Statelaw for additional information about the maximum weeks of entitlement and other state specific UI laws.

# Exhibit 2
# Redacted in Its Entirety

# Exhibit 3

Page 1
UI Interstate Connection Network (UI ICON) | National Association of State Workforce Agencies
https://www.naswa.org/icon
07-24-2025 09:59



MEMBERSHIP    LOGIN

National Association of State Workforce Agencies

ABOUT US    POLICY & ADVOCACY    SERVICES    MEETINGS    NEWS    RESOURCES

Home / UI Interstate Connection Network (UI ICON)

UI ICON    Resources    ICON Learning    Contact Us

# UI Interstate Connection Network (UI ICON)



The Unemployment Insurance Interstate Connection Network (ICON) is the system that allows State UI agencies to request and receive data for use in the filing and processing of combined wage claims, military and federal claims. The system provides for the exchange of data between State workforce agencies as well as federal partners.

ICON provides real time information to assist state UI staff in identifying if a claimant has a claim or wages in another state. It aids in the collection of overpayments by allowing states to request assistance with collection efforts through the Interstate Reciprocal Overpayment Recovery Arrangement (IRORA) process. The system also supports the state wage interchange system (SWIS) used to measure re-employment outcomes, as well as other communications with varying federal agencies.

### UI IB Subcommittee

NASWA's Unemployment Insurance (UI) Subcommittee work is vitally important to the UI Committee and to the NASWA leadership. The Interstate Benefits (IB) Subcommittee is the overseeing body for state UI agreements, interstate benefits processes/procedures, states' voice for the federal UI programs, and states' voice for the combined wage claim program. The mission of the IB system is to provide methods for the exchange of information among states and Canada to support Unemployment Compensation initial claims, benefit determinations, and workforce security objectives. *Note: To view UI IB Subcommittee information, a member login required.*

UI IB Subcommittee

--- NASWA Affiliates ---








# Exhibit 4



MEMBERSHIP    LOGIN

Home / SIDES

SIDES Home | About | SIDES Certified | Solutions | Participation | E-Response Help

## State Information Data Exchange System (SIDES)

SIDES E-Response is managed by the participating state. To register for usage or other questions, contact your respective state office.

[ View list of state offices ]    [ Access the SIDES Members Site ]



Introduction to SIDES



How to Connect



E- Response Registration



Current Events



### UI Simplified

SIDES stands for the State Information Data Exchange System. It's a software tool that empowers states, employers, Third Party Administrators (TPAs) and Professional Employer Organizations (PEOs) to quickly, accurately, and securely respond to unemployment insurance requests.

SIDES has six components, called exchanges, that makeup the full SIDES solution. Each exchange supports a specific step in the life cycle of an unemployment insurance claim.

[ Learn More ]

### The Value of SIDES

SIDES is available in two formats: SIDES E-Response for employers with a limited number of unemployment insurance claims, and SIDES Integration for employers, TPAs and PEOs who deal with a large volume of unemployment insurance claims. Both significantly improve the unemployment insurance information exchange process and offer the following benefits:



- Speeds up response time
- Reduces staff time, paperwork and postage costs
- Reduces follow-up time and phone-calls
- Allows attachment of supporting documentation

Page 2
SIDES | National Association of State Workforce Agencies
https://www.naswa.org/uisides
07-24-2025 10:00



- Eliminates late penalties
- Reduces tax rates, improper payments and overpayments



- Ensures accuracy on claimant eligibility decisions
- Ensures protection of sensitive employer and claimant data
- Includes data checks to ensure the exchange of complete and valid information
- Offers a nationally standardized electronic format
- Enhances integrity of the process

**Learn More About Sides**

SIDES Solutions Videos

—— NASWA Affiliates ——








# Exhibit 5

Page 1

<pre>
 1            IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF DELAWARE

 3

 4                             Case No. 23-cv-325-WCB

 5  _____

 6  DELOITTE CONSULTING LLP, and

 7  DELOITTE DEVELOPMENT LLC,

 8        Plaintiffs,

 9  v.

10  SAGITEC SOLUTIONS, LLC,

11        Defendant.

12  _____

13

14

15        VIDEOTAPED REMOTE ZOOM VIDEOCONFERENCE

16      DEPOSITION OF BENJAMIN PEIRCE - A CORPORATE

17       REPRESENTATIVE OF NATIONAL ASSOCIATION OF

18            STATE WORKFORCE AGENCIES (NASWA)

19          Taken on Friday, February 28, 2025

20            Scheduled for 12:30 p.m. CST

21

22

23

24  REPORTED BY:  DANA S. ANDERSON-LINNELL

25  Job No.:  MW 7210435
</pre>

**Page 2**

1 REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF BENJAMIN
2 PEIRCE, A CORPORATE REPRESENTATIVE OF NATIONAL
3 ASSOCIATION OF STATE WORKFORCE AGENCIES (NASWA),
4 taken on Friday, February 28, 2025, commencing at
5 12:38 p.m. CST, via a REMOTE ZOOM PROCEEDING, before
6 Dana S. Anderson-Linnell, a Stenographic Shorthand
7 Reporter and Notary Public of and for the State of
8 Minnesota.
9            ****************
10
11            APPEARANCES
12
13 On Behalf of the Defendant:
14 Rajin Singh Olson, Esquire
15 ROBINS KAPLAN LLP
16 800 LaSalle Avenue, Suite 2800
17 Minneapolis, MN 55402
18 Email: rolson@robinskaplan.com
19
20 (Appearances continued on next page.)
21
22
23
24
25

**Page 3**

1 APPEARANCES (continued):
2
3 On Behalf of the Plaintiffs:
4 Patrick K. Arnett, Esquire
5 KIRKLAND & ELLIS LLP
6 1301 Pennsylvania Avenue, N.W.
7 Washington, D.C. 20004
8 Email: patrick.arnett@kirkland.com
9
10 On Behalf of the Witness:
11 Julie Squire, Esquire
12 NATIONAL ASSOCIATION OF STATE
13 WORKFORCE AGENCIES (NASWA)
14 444 North Capitol Street, N.W., Suite 300
15 Washington, DC 20001
16 Email: jsquire@naswa.org
17
18 ALSO PRESENT: David Young, videographer
19
20 NOTE: The original transcript will be filed with the
21 Robins Kaplan Law Firm, pursuant to the applicable
22 Rules of Civil Procedure.
23
24
25

**Page 4**

1 INDEX                    PAGE
2
3 WITNESS: BENJAMIN PEIRCE
4 EXAMINATION BY:
5 Mr. Olson                  12
6 Mr. Arnett                 167
7
8 INSTRUCTIONS NOT TO ANSWER: (None.)
9
10 PRODUCTION REQUESTS: 130, 131
11
12 INDEX OF EXHIBITS MARKED:
13
14 Exhibit 1 - NASWA Dep. Ex. 01 - 2024.08.27
15 Document and Deposition Subpoena to NASWA
16 with Schedule A and Protective Order        25
17
18 Exhibit 2 - NASWA Dep. Ex. 02 - NASWA00000001    29
19
20 Exhibit 3 - NASWA Dep. Ex. 03 - NASWA00000003    62
21
22 Exhibit 4 - NASWA Dep. Ex. 04 - NASWA00000007    62
23
24 Exhibit 5 - NASWA Dep. Ex. 05 - NASWA00000011    62
25

**Page 5**

1 INDEX OF EXHIBITS (continued):          PAGE
2
3 Exhibit 6 - NASWA Dep. Ex. 06 - NASWA00000019    62
4
5 Exhibit 7 - NASWA Dep. Ex. 07 - NASWA00000028    62
6
7 Exhibit 8 - NASWA Dep. Ex. 08 - NASWA00000041    62
8
9 Exhibit 9 - NASWA Dep. Ex. 09 - NASWA00000049    62
10
11 Exhibit 10 - NASWA Dep. Ex. 10 - NASWA00000080   62
12
13 Exhibit 11 - NASWA Dep. Ex. 11 - NASWA00000206   62
14
15 Exhibit 12 - NASWA Dep. Ex. 12 - NASWA00000207   62
16
17 Exhibit 13 - NASWA Dep. Ex. 13 - NASWA00000262   62
18
19 Exhibit 14 - NASWA Dep. Ex. 14 - NASWA00000263   62
20
21 Exhibit 15 - NASWA Dep. Ex. 15 - NASWA00000313   62
22
23 Exhibit 16 - NASWA Dep. Ex. 16 - NASWA00000335   62
24
25

2 (Pages 2 - 5)

**Page 6**

1  INDEX OF EXHIBITS (continued):           PAGE
2
3  Exhibit 17 - NASWA Dep. Ex. 17 - NASWA00000349    62
4
5  Exhibit 18 - NASWA Dep. Ex. 18 - NASWA00000359    62
6
7  Exhibit 19 - NASWA Dep. Ex. 19 - NASWA00000378    62
8
9  Exhibit 20 - NASWA Dep. Ex. 20 - NASWA00000398    62
10
11 Exhibit 21 - NASWA Dep. Ex. 21 - NASWA00000441    62
12
13 Exhibit 22 - NASWA Dep. Ex. 22 - NASWA00000481    62
14
15 Exhibit 23 - NASWA Dep. Ex. 23 - NASWA00000487    62
16
17 Exhibit 24 - NASWA Dep. Ex. 24 - NASWA00000490    62
18
19 Exhibit 25 - NASWA Dep. Ex. 25 - NASWA00000557    62
20
21 Exhibit 26 - NASWA Dep. Ex. 26 - NASWA00000558    62
22
23 Exhibit 27 - NASWA Dep. Ex. 27 - NASWA00000559    62
24
25

**Page 7**

1  INDEX OF EXHIBITS (continued):           PAGE
2
3  Exhibit 28 - NASWA Dep. Ex. 28 - NASWA00000578    62
4
5  Exhibit 29 - NASWA Dep. Ex. 29 - NASWA00000584    62
6
7  Exhibit 30 - NASWA Dep. Ex. 30 - NASWA00000602    62
8
9  Exhibit 31 - NASWA Dep. Ex. 31 - NASWA00000608    62
10
11 Exhibit 32 - NASWA Dep. Ex. 32 - NASWA00000612    62
12
13 Exhibit 33 - NASWA Dep. Ex. 33 - NASWA00000614    62
14
15 Exhibit 34 - NASWA Dep. Ex. 34 - NASWA00000618    62
16
17 Exhibit 35 - NASWA Dep. Ex. 35 - NASWA00000642    62
18
19 Exhibit 36 - NASWA Dep. Ex. 36 - NASWA00000643    62
20
21 Exhibit 37 - NASWA Dep. Ex. 37 - NASWA00000654    62
22
23 Exhibit 38 - NASWA Dep. Ex. 38 - NASWA00000700    62
24
25

**Page 8**

1  INDEX OF EXHIBITS (continued):           PAGE
2
3  Exhibit 39 - NASWA Dep. Ex. 39 - NASWA00000728    144
4
5  Exhibit 40 - NASWA Dep. Ex. 40 -
6  SAGITEC-DEL_07359184                  56
7
8  Exhibit 41 - not marked              n/a
9
10 Exhibit 42 - not marked              n/a
11
12 Exhibit 43 -  NASWA Dep. Ex. 43 -
13 SAGITEC-DEL_07359187                 40
14
15 Exhibit 44 - Benjamin Peirce LinkedIn Profile    16
16
17 Exhibit 45 - NASWA Dep. Ex. 11 -
18 NASWA00000206.xsd                    78
19
20 Exhibit 46 - NASWA Dep. Ex. 13 -
21 NASWA00000262.txt                    n/a
22
23 Exhibit 47 - NASWA Dep. Ex. 25 -
24 NASWA00000557.xsd                    n/a
25

**Page 9**

1  INDEX OF EXHIBITS (continued):           PAGE
2
3  Exhibit 48 - NASWA Dep. Ex. 26 -
4  NASWA00000558.xsd                    n/a
5
6  Exhibit 49 - NASWA Dep. Ex. 35 -
7  NASWA00000642.xsd                    n/a
8
9  (Original exhibits attached to original transcript;
10 copies to counsel as requested.)
11
12 REPORTER'S NOTE:  All quotations from exhibits are
13 reflected in the manner in which they were read into
14 the record and do not necessarily indicate an exact
15 quote from the document.
16
17
18
19
20
21
22
23
24
25

3 (Pages 6 - 9)

Page 10

1    THE COURT REPORTER:  Do all counsel
2  stipulate that I may swear in the witness
3  remotely over the Zoom videoconference?
4    MR. OLSON:  Yes.
5    MR. ARNETT:  Yes, for Deloitte.
6    MS. SQUIRE:  Yes.
7    THE VIDEOGRAPHER:  Good afternoon.
8  We're going on the record at 12:38 p.m. on
9  February 28th, 2025.  Please note this
10  deposition is being conducted virtually.
11  Quality of recording depends on quality of
12  camera and Internet connection of participants.
13  What is seen from the witness and heard on the
14  screen is what will be recorded.  Audio and
15  video recording will continue to take place
16  unless all parties agree to go off the record.
17    This is Media Unit 1 of the
18  video-recorded deposition of Benjamin Peirce, a
19  corporate representative for NASWA.  This
20  deposition is being taken by counsel for
21  defendants in the matter of Deloitte
22  Development LLC, et al. versus Sagitec
23  Solutions filed in the United States District
24  Court for the District of Delaware, Case
25  Number 23-cv-325-WCB.

Page 11

1    My name is Dave Young.  I'm the
2  videographer.  Our court reporter today is
3  Dana Anderson.  We are both representing
4  Veritext Legal Solutions.  I am not related to
5  any party in this action, nor am I financially
6  interested in the outcome.
7    If there are any objections to this
8  proceeding, please state them at the time of
9  your appearance.  Will counsel now state their
10  appearances and affiliations for the record
11  beginning with the noticing attorney.
12    MR. OLSON:  This is Rajin Olson with
13  the law firm of Robins Kaplan LLP on behalf of
14  the defendant, Sagitec Solutions, LLC.
15    MR. ARNETT:  This is Patrick Arnett
16  with the law firm of Kirkland and Ellis LLP on
17  behalf of the plaintiffs, Deloitte Consulting
18  and Deloitte Development.
19    MS. SQUIRE:  Hello.  Julie Squire,
20  vice president of policy and general counsel
21  here with the limited scope of this deposition
22  representing the National Association of State
23  Workforce Agencies.
24    THE VIDEOGRAPHER:  And will the
25  court reporter please swear in the witness, and

Page 12

1  then we can proceed.
2    BENJAMIN PEIRCE,
3  called as a witness, being first duly sworn,
4    was examined and testified as follows:
5    EXAMINATION
6  BY MR. OLSON:
7  Q.    Good afternoon, Mr. Peirce.  As you
8  heard, I'm an attorney representing Sagitec in
9  this case.  I just want to confirm for the
10  record, Mr. Peirce, have you and I ever spoken
11  before?
12  A.    Not to my recollection, no.
13  Q.    And have you ever spoken with
14  Mr. Arnett, who is also on the Zoom?
15  A.    Also, no.
16  Q.    Okay.  Would you state your full name,
17  please?
18  A.    Benjamin Alan Peirce.
19  Q.    Where are you attending this deposition
20  from?
21  A.    I am in the Village of Oregon,
22  Wisconsin.
23  Q.    And are you in your home or your office?
24  A.    My office.
25  Q.    Have you been deposed before,

Page 13

1  Mr. Peirce?
2  A.    I have not.
3  Q.    Okay.  Well, I'll try to cover some
4  ground rules.  And maybe your counsel has
5  already gone over them with you.  But to start
6  with, I'll attempt to ask clear questions.  And
7  if you have any confusion about my questions,
8  if you have any doubts, or if you see any
9  ambiguities, I'll just ask that you please
10  clarify those for me so I can help you
11  understand the question, is that fair?
12  A.    Yes.
13  Q.    You may hear objections to my questions
14  from either your attorney or Deloitte's
15  attorney.  Do you understand that you must
16  still answer my questions anyway unless your
17  attorney instructs you not to answer?
18  A.    Yes.
19  Q.    And do you understand that you're
20  testifying today on behalf of the National
21  Association of State Workforce Agencies or
22  NASWA?
23  A.    Yes.
24  Q.    Do you understand that you're presumed
25  to have NASWA's knowledge regarding the topics

4 (Pages 10 - 13)

Page 14

1   that you've been designated on?
2   A.    No.
3   Q.    Mr. Peirce, I'll try to take a break
4   when needed.  And I'm hoping we won't need to
5   go for an extremely long time today, but if at
6   any point in time you'd like to take a break,
7   please just let me know.  The only thing I
8   would ask is if there is an outstanding
9   question pending, I would ask that you answer
10  the question before we break, is that fair?
11  A.    Yes.
12  Q.    We'll also need to try to not talk over
13  each other, and we'll need to try to make our
14  questions and answers verbal rather than
15  showing head nods or mm-hmms or uh-uhs.
16        Do you understand that?
17  A.    I do.
18  Q.    Is there any reason, Mr. Peirce, that
19  you cannot testify truthfully today?
20  A.    No.
21  Q.    There's no medication or any memory
22  problems or anything that would impact the
23  truth of your testimony today, correct?
24  A.    Correct.  There are not.
25  Q.    Before the subpoena to NASWA, had you

Page 15

1   heard about this lawsuit before between
2   Deloitte and Sagitec?
3   A.    Yes.
4   Q.    What had you heard about the lawsuit?
5   A.    Merely that it existed.
6   Q.    Did you hear anything about the
7   allegations in the lawsuit or what it was
8   about?
9   A.    No.
10  Q.    Other than your conversations with your
11  counsel, have you spoken to anyone about the
12  lawsuit?
13  A.    No.
14  Q.    Have you ever spoken to anyone at
15  Deloitte about the lawsuit?
16  A.    No.
17  Q.    Have you ever spoken to anyone at
18  Sagitec about the lawsuit?
19  A.    No.
20  Q.    Mr. Peirce, I'd like to briefly go over
21  your professional background.  And I'm going to
22  introduce one more exhibit, which is your
23  LinkedIn profile, I believe.  So give me one
24  moment to do that.  Okay.  So that has been
25  introduced, and I'm going to pull it up and

Page 16

1   share my screen here.  Mr. Peirce, are you able
2   to see this document?
3   A.    Hasn't rendered yet.  There it is.
4   Q.    Okay.  So we'll mark this document as
5   Exhibit 44 to the deposition of NASWA.
6         (Exhibit Number 44 marked for
7   identification.)
8   BY MR. OLSON:
9   Q.    And does this appear to be -- do you
10  recognize this as a copy of your LinkedIn
11  profile?
12  A.    (Views document.)  Yes.  I'm not sure
13  how it was extracted.  It doesn't look like it
14  does on the screen, but it does seem to be me.
15  Q.    I'll just tell you what I did was I went
16  to your LinkedIn profile and I hit a download
17  button.
18  A.    Okay.
19  Q.    Yeah.  I'll show you the second page as
20  well so you have a chance to see that.  Now,
21  before we dive into any specifics, does this
22  generally look accurate to you?
23  A.    Yes.
24  Q.    And is there anything that you want to
25  correct or change as you're looking at this

Page 17

1   right now?
2   A.    No.
3   Q.    Your LinkedIn indicates that you worked
4   for the State of Wisconsin for 25 years and
5   seven months from November 1992 to May 2018, is
6   that accurate?
7   A.    Yes.
8   Q.    And were you working for the Wisconsin
9   UI division the whole time?
10  A.    Yes.
11  Q.    In your last role with Wisconsin as the
12  deputy administrator of the Wisconsin UI
13  division, what were your responsibilities in
14  that role?
15  A.    In that role, all of the Unemployment
16  Insurance functions set forth in the
17  organizational structure, those individuals who
18  led those organizational units reported to me,
19  and I in turn reported to the administrator as
20  the sole deputy administrator.
21  Q.    During your time working for the
22  Wisconsin UI division, were there any UI
23  modernization projects?
24  A.    Yes.
25        MR. ARNETT:  Objection, vague.

5 (Pages 14 - 17)

Page 18

1  BY MR. OLSON:
2  Q.    What is UI modernization?
3  A.    UI modernization is a broad term that
4  encompasses many different types of activities,
5  but is generally considered to be oriented
6  around improving information technology used to
7  support Unemployment Insurance operations from
8  wherever a given state's current system may be
9  in terms of functionality, technology stack,
10  et cetera, and enhancing or improving or
11  otherwise modernizing the functionality of the
12  operation and the technology stack.
13  Q.    How many UI modernization projects were
14  there while you were working for Wisconsin, for
15  the State of Wisconsin?
16  A.    I'm not sure I can give you a precise
17  answer simply because of the nature of
18  modernization. It's an ongoing activity. But
19  I will say that I participated in a broad
20  modernization of the benefit system, and I was
21  present during a broad modernization of the tax
22  system, but I had less personal involvement in
23  the latter.
24  Q.    When was the UI -- when did the UI
25  modernization of the benefits system begin?

Page 19

1  A.    Approximately 2001. I may not be
2  precise on that.
3  Q.    Did Wisconsin hire a vendor or a
4  contractor to assist with that modernization?
5  A.    Yes. At that time, the vendors that
6  were hired were two. I don't have knowledge of
7  what contractual arrangements were between
8  them. I don't know if there was a primary and
9  a sub, but there were two vendors that were
10  hired.
11  Q.    Who were those two vendors?
12  A.    They were -- oh, goodness, I'm drawing a
13  blank as to their names. The technology stack
14  firm was called Curam, C-u-r-a-m. And I do not
15  remember the name of the integrator.
16  Q.    Was it KPMG?
17  A.    It was not.
18  Q.    Was it BearingPoint?
19  A.    No.
20  Q.    And it wasn't Deloitte?
21  A.    No, it was not.
22  Q.    You also mentioned a tax modernization
23  project. Do you recall when that began?
24  A.    I believe that was in 2000.
25  Q.    And do you recall which vendor assisted

Page 20

1  with that project, if any?
2  A.    I do. It was Accenture.
3  Q.    Was there an open RFP process for each
4  of those projects?
5        MR. ARNETT: Objection, vague.
6        THE WITNESS: I don't have firsthand
7  knowledge of either. I can say that I was not
8  involved in the procurement activities on
9  either of them.
10  BY MR. OLSON:
11  Q.    Mr. Peirce, have you heard of Deloitte's
12  uFACTs-branded UI solution?
13  A.    I have.
14  Q.    Did you see any demonstrations of uFACTS
15  while you worked for Wisconsin?
16  A.    I can't say with certainty.
17  Q.    Do you have any recollection of your
18  impressions of uFACTS during the time that you
19  worked for Wisconsin?
20  A.    I do not.
21  Q.    Have you heard of Sagitec's
22  Neosurance-branded UI solution?
23  A.    Yes.
24  Q.    Do you know if you saw any
25  demonstrations of Neosurance while you worked

Page 21

1  for Wisconsin?
2  A.    I don't think I did.
3  Q.    And do you recall any impressions that
4  you had about Neosurance while you worked for
5  Wisconsin --
6  A.    No --
7        MR. ARNETT: Objection, foundation.
8        THE COURT REPORTER: Can you repeat
9  your answer, Ben?
10        THE WITNESS: No, I do not.
11  BY MR. OLSON:
12  Q.    During the time that you worked for
13  Wisconsin, did you meet someone named David
14  Minkkinen?
15  A.    I do know David Minkkinen. I do not
16  recall when I met him.
17  Q.    What is the -- what is or was the nature
18  of your relationship with Mr. Minkkinen?
19  A.    I knew Mr. Minkkinen as someone who
20  participated in NASWA conferences in his roles
21  over the years as a vendor for the UI space.
22  Q.    When was the last time you spoke with
23  Mr. Minkkinen, approximately?
24  A.    It's been several years. I can't give
25  you a precise date.

6 (Pages 18 - 21)

Page 22

1 Q. Turning back to your LinkedIn here. In
2 June 2018, you joined NASWA as the director of
3 the UI ITSC, is that right?
4 A. Yes, it is.
5 Q. And that stands for the Unemployment
6 Insurance Information Technology Support
7 Center, right?
8 A. Yes.
9 Q. And I've seen this acronym before. Is
10 there a shorthand way that you pronounce it?
11 A. Yes. It's generally pronounced "ITSC."
12 Q. "ITSC." Okay. And you were in that
13 role until January 2021, right?
14 A. Yes.
15 Q. So why did you join NASWA?
16 A. I joined NASWA because, as the deputy
17 administrator at EWD in Wisconsin, I had
18 essentially reached the end of my career growth
19 opportunities within the state system. I
20 served long enough that I could retire
21 technically at age 55, but I could leave and be
22 considered a retiree and broaden and enhance my
23 career elsewhere. That's when I chose to apply
24 for a job at NASWA.
25 Q. What were your responsibilities as

Page 23

1 NASWA's director of ITSC?
2 A. The ITSC unit is a unit that has existed
3 under a variety of different host organizations
4 since the early 1990s. As the director, I was
5 hired to replace a retiring director who had
6 organizational span of management over that
7 organization's functions as contracted via the
8 State of Maryland from the Department of Labor.
9 Q. What's the relationship between the
10 Department of Labor and NASWA?
11 A. That's a very broad question. Can you
12 narrow it in any way?
13 Q. Yeah. I'm just trying to understand how
14 the Department of Labor and NASWA fit together
15 in this overarching UI space. Are you able to
16 provide any information on that?
17 A. Yes.
18    MS. SQUIRE: Objection as to
19 relevance and scope.
20    THE WITNESS: The U.S. Department of
21 Labor has agreements with NASWA to perform a
22 variety of different activities, one of which
23 is to house and run the Unemployment Insurance
24 Information Technology Support Center. There
25 are other agreements in place between the

Page 24

1 Department of Labor and NASWA sometimes using
2 an intermediary, sometimes not.
3 BY MR. OLSON:
4 Q. And then in January 2021, you began your
5 current role as vice president of technology
6 services and programs, is that right?
7 A. Yes, it is.
8 Q. And in that role, do you oversee the
9 direction of the Interstate Connection Network
10 or ICON?
11 A. Yes.
12 Q. What is ICON?
13 A. ICON is a system that has been around
14 since the early 1980s that is used by the
15 states and federal agencies to support multiple
16 set of use cases all related to the processing
17 of unemployment claims and other workforce
18 development activities as performed by the
19 states.
20 Q. You mentioned that ICON has been around
21 since the early '80s. Has it changed since
22 then?
23 A. Yes.
24    MR. ARNETT: Objection, vague.
25 BY MR. OLSON:

Page 25

1 Q. And generally speaking, how has the ICON
2 system changed since the '80s?
3 A. My knowledge, the early years of that
4 period are essentially based on lore rather
5 than fact. But as I understand it, the initial
6 scope was narrowed to support certain types of
7 interstate claim activity between multiple
8 states or between states and the federal
9 government. That functionality was increased
10 over the decades that followed. And at present
11 number, approximately 37 different types of
12 transactions.
13 Q. Who is the current director of ICON?
14 A. Judy Mattinson.
15 Q. And does she report to you directly?
16 A. Yes, she does.
17 Q. All right. Mr. Peirce, I'm going to
18 stop sharing my screen here, and I am going to
19 share a different document, which has been
20 premarked as Exhibit 1 to this deposition.
21    (Exhibit Number 1 marked for
22 identification.)
23 BY MR. OLSON:
24 Q. Okay. So we're marking as Exhibit 1 a
25 document with a title Subpoena to Testify at a

7 (Pages 22 - 25)

Page 26

1    Deposition in a Civil Action directed to NASWA.
2        Do you see that?
3    A.    (Views document.)  I do.
4    Q.    Do you recognize this document as the
5    document and deposition subpoena directed to
6    NASWA in this case?
7    A.    Yes.
8    Q.    And did you review this subpoena in
9    advance of the deposition?
10    A.    Yes.
11    Q.    I'm going to take us to pdf page 11 of
12    this document, which refers to, at the top,
13    Documents to be Produced.
14        Do you see that?
15    A.    I do.
16    Q.    And do you understand that subject to
17    NASWA's objections and further agreement with
18    Sagitec, that NASWA produce certain documents
19    in response to this subpoena?
20    A.    I do.
21    Q.    I'm going to go to the next page.
22        Do you see at the top where it says
23    Topics for Deposition?
24    A.    Yes.
25    Q.    Do you understand that you've been

Page 27

1    designated to provide testimony on behalf of
2    NASWA with respect to these topics subject to
3    NASWA's objections and further agreement with
4    Sagitec?
5    A.    Yes.
6    Q.    I'm going to stop sharing this document.
7        Mr. Peirce, did you prepare for today's
8    deposition?
9    A.    Yes, I did.
10    Q.    How did you prepare for today's
11    deposition?
12    A.    Reviewing materials, including the
13    document that you just shared, as well as the
14    exhibit file that I received earlier today.
15    Q.    And when you refer to the exhibit file
16    that you received earlier today, are you
17    referring to the exhibits that I provided your
18    counsel earlier?
19    A.    Yes.
20    Q.    Did you review any documents other than
21    the documents that you identified?
22    A.    Well, I'm not certain how to answer that
23    question. I'm interpreting your question as
24    how did I prepare for this deposition.
25    Q.    Yes.

Page 28

1    A.    If that's the case, then I would say no.
2    Q.    That's right.  I'm not -- apologies for
3    the poor question.  I was asking if -- as part
4    of your preparation for today's deposition if
5    you reviewed any documents other than the
6    documents that you've identified?
7    A.    I think the only gray area I'd like to
8    elaborate upon just for clarity's sake is that
9    the documents that I received this morning
10    included what appeared to be screenshots from
11    the NASWA website.  So I did go look at the
12    NASWA website to try to determine veracity.
13    Q.    And what did you determine when you
14    looked to the NASWA website?
15    A.    They appear to be similar.  I cannot
16    vouch for when those screenshots were taken,
17    but I have no reason to doubt their
18    authenticity, but I can't swear to their
19    authenticity.
20    Q.    Did you talk to anyone in preparation
21    for today's deposition?
22    A.    I spoke with Julie Squire.
23    Q.    And Julie Squire is your counsel on the
24    call?
25    A.    Yes.

Page 29

1    Q.    Other than speaking with Ms. Squire, did
2    you speak with anyone else in preparation for
3    today's deposition?
4    A.    No.
5    Q.    How long did you -- I don't want to get
6    into the contents of any of your communications
7    with Ms. Squire, but how long did you meet with
8    Ms. Squire in preparation for today's
9    deposition?
10    A.    Not sure that I can give you an accurate
11    account of the time because we conversed about
12    it several times over the last few weeks.
13    Q.    Do you recall approximately how many
14    times you conversed about it?
15    A.    I do not.  Low single digits, perhaps.
16    Q.    Would it be fair to say that you
17    prepared for fewer than ten hours in the
18    aggregate?
19    A.    Yes, I think that's fair.
20    Q.    I'm going to share another document that
21    we will mark as Exhibit 2 to the deposition.
22        (Exhibit Number 2 marked for
23    identification.)
24    BY MR. OLSON:
25    Q.    This is a document that is bearing a

8 (Pages 26 - 29)

Page 30

1  Bates label in the bottom right corner that
2  reads NASWA00000001.
3      Do you see that?
4  A.   (Views document.) I do.
5  Q.   And do you understand what a Bates label
6  is?
7  A.   No.
8  Q.   So I'll represent to you that that is a
9  number -- a label and a number that is added by
10  parties to a lawsuit when the documents are
11  produced in the case. So this Bates label did
12  not exist before, but it was added for the
13  purposes of identifying this document in the
14  case. And you may hear me refer to the Bates
15  label throughout today's deposition.
16      Do you understand that?
17  A.   I do.
18  Q.   Have you seen this document before?
19  A.   I've seen this document this morning as
20  part of the ZIP file that I downloaded.
21  Q.   And this is an email from your counsel,
22  Ms. Squire, to me, Rajin Olson, dated
23  January 30, 2025.
24      Do you see that?
25  A.   I do see that.

Page 31

1  Q.   And is it fair to say that this document
2  explains that documents responsive to the
3  subpoena were provided via secure upload?
4  A.   Yes.
5  Q.   This document includes several bulleted
6  notes towards the bottom half of the first
7  page.
8      Do you see that?
9  A.   I do.
10  Q.   Have you seen those notes before?
11  A.   Yes.
12  Q.   Do they appear accurate?
13  A.   Yes.
14  Q.   And, again, I don't want to get into any
15  conversations you may have had with your
16  lawyers, but did you personally prepare these
17  notes?
18  A.   No.
19  Q.   Do you know who did?
20  A.   I do not.
21  Q.   Let me go to the top of the next page
22  just to confirm, because there's some
23  additional information here. Does this
24  information also appear accurate to you?
25      MR. ARNETT: Objection, foundation.

Page 32

1      THE WITNESS: Yes.
2  BY MR. OLSON:
3  Q.   What process did NASWA follow to search
4  for and collect the documents described in this
5  email?
6      MR. ARNETT: Objection, form,
7  foundation.
8      THE WITNESS: The documents in this
9  email were gathered by working with the current
10  ICON team led by Judy Mattinson to determine
11  responsiveness to the subpoena, as earlier
12  described.
13  BY MR. OLSON:
14  Q.   Thank you, Mr. Peirce. I'm going to
15  stop sharing this document.
16      Does NASWA have -- are there members of
17  NASWA?
18  A.   Yes.
19      MR. ARNETT: Objection, vague.
20  BY MR. OLSON:
21  Q.   What types of organizations are members
22  of NASWA?
23  A.   The only types of organizations that are
24  members of NASWA are State Workforce Agencies.
25  Q.   And do I understand correctly that there

Page 33

1  are exactly 53 State Workforce Agencies?
2  A.   Yes.
3  Q.   Are there other types of participants in
4  NASWA who are not members?
5  A.   I think your terminology is vague. We
6  are organized as a member organization, member
7  association. However, we host many events and
8  gatherings throughout our program year, and
9  those events are open to a much larger audience
10  than our members only.
11  Q.   Does NASWA have affiliate organizations?
12  A.   Yes.
13  Q.   What are affiliates of NASWA?
14  A.   My knowledge of the affiliate program is
15  basic, but my understanding is that an
16  organization may opt to apply to become an
17  affiliate of NASWA that accrues them certain
18  benefits and pay us an affiliation fee on an
19  annual basis.
20  Q.   To your knowledge, is Sagitec an
21  affiliate of NASWA?
22  A.   I would have to verify that, but I
23  believe that is true.
24  Q.   Sagitec has sponsored NASWA conferences
25  before, right?

9 (Pages 30 - 33)

Page 34

1    A.    Yes.
2    Q.    And Deloitte is also an affiliate,
3    right?
4    A.    Again, with a caveat I would have to
5    double-check, but I believe that's true.
6    Q.    And Deloitte has also sponsored NASWA
7    conferences before, right?
8    A.    Yes.
9    Q.    We talked briefly earlier about ICON.
10   At a high level, how does the ICON system work?
11        MR. ARNETT:  Objection, vague.
12        THE WITNESS:  At a high level, the
13   ICON system is essentially a hub-and-spoke
14   technology system that uses a myriad of
15   technologies, some of which really do date to
16   the 1980s, and some of which are brand new, and
17   is used to communicate between one state and
18   another or through -- or one state and a
19   federal agency or one state to a supporting
20   federal entity for the purpose of supporting
21   the Unemployment Insurance claims.
22   BY MR. OLSON:
23   Q.    You mentioned a hub-and-spoke-type
24   system.  Can you explain what that is?
25   A.    Sure.  So, for example, if there needs

Page 35

1    to be a transaction between state A and
2    state B, the transmission of that request and
3    the transmission of its response did not go
4    directly from state A to state B, but rather
5    through the ICON Hub.
6    Q.    And who operates the ICON Hub?
7    A.    NASWA operates it but does utilize a
8    contractor for both the legacy and the
9    modernized components of the ICON system.
10   Q.    And how long has NASWA been responsible
11   for, with or without a contractor, operating
12   the hub?
13   A.    Since August --
14        MR. ARNETT:  Objection, form.
15        THE WITNESS:  Since August 3rd,
16   2018.
17   BY MR. OLSON:
18   Q.    Who was responsible for it before then?
19   A.    The State of Maryland.
20   Q.    Do you know when the State of Maryland
21   began its responsibility for operating the hub?
22   A.    I do not.
23   Q.    Do you know whether there was anyone
24   before the State of Maryland who was
25   responsible for operating the hub?

Page 36

1    A.    I do not.
2    Q.    Are you familiar with the phrase "ICON
3    interface"?
4    A.    Yes.
5    Q.    What's an ICON interface?
6    A.    Well, there are many.  As I mentioned
7    earlier, the legacy system consisted of 37
8    different types of transactions.  And so for
9    each transaction type there's a given specified
10   interface.  But I want to add a caveat to that,
11   which is that the interfaces also relied on
12   disparate technology as leveraged by states.
13   So there are multiple different transport
14   mechanisms that the ICON legacy hub supports.
15   Everything I just described is related to the
16   ICON legacy hub.  We haven't yet spoken about,
17   but there is also the ICON cloud system that
18   operates somewhat differently, is modernized
19   technology.
20   Q.    I appreciate you bringing that up,
21   because you've anticipated some other questions
22   I was going to ask later, but I'll just ask you
23   now.  What is the ICON cloud hub?
24   A.    So I think to answer that I better
25   explain the activity that NASWA has undertaken

Page 37

1    to modernize the ICON system as a whole.  So
2    the legacy ICON system consists of mainframe
3    processing with a variety of technologies
4    essentially arrayed around the mainframe for
5    the purposes of connectivity to various
6    parties.  As you're perhaps aware, mainframe
7    technologies have somewhat limited
8    functionality in terms of modern expectations
9    for information technology systems.  So in
10   2003, the Department of Labor and NASWA began
11   the process of modernizing the ICON Hub using
12   modernized technologies.  And that effort is
13   being undertaken by NASWA under a contract with
14   a different provider than the provider of the
15   legacy services.
16   Q.    I'm sorry.  I think I missed the year
17   even though you said it.  When did that
18   modernization effort begin?
19   A.    Well, the groundwork was all laid during
20   2023.  The official kickoff was at the
21   beginning of 2024.
22   Q.    Why is NASWA undergoing this
23   modernization effort?
24   A.    There are a variety of reasons that the
25   ICON system is due for modernization, one of

10 (Pages 34 - 37)

Page 38

1  which is that during the pandemic the ICON
2  system did struggle with usage due to the
3  exorbitant increase in traffic. And one of the
4  advantages of a modernized cloud-based
5  system -- there are many, but one of them is
6  scalability is much more easy and quicker to
7  initiate. In some cases it can be initiated
8  automatically. During the pandemic, for
9  example, NASWA's contractor literally had to
10 swap mainframes during the pandemic to increase
11 capacity.
12 Q.    Who was NASWA's contractor for this
13 project?
14 A.    Conduent.
15 Q.    And is that C-o-n-d-u-e-n-t?
16 A.    Yes, it is.
17 Q.    Does every State Workforce Agency need
18 to be able to interface with ICON?
19 A.    Yes.
20       MR. ARNETT: Objection, form.
21 BY MR. OLSON:
22 Q.    And just to confirm, Mr. Peirce, did you
23 say yes?
24 A.    Yes.
25 Q.    Why does every State Workforce Agency

Page 39

1  need to be able to interface with the ICON
2  system?
3  A.    The ICON system provides some
4  functionality that is mission critical for
5  every state's UI system, and there are no other
6  sources of that functionality other than ICON.
7  Q.    What functionality are you referring to
8  as mission critical?
9  A.    Well, a salient example for the present
10 day is that the filing of unemployment claims
11 by separated federal employees is supported
12 exclusively through the ICON system.
13 Q.    Do State Workforce Agencies need to be
14 able to interface with the ICON system in order
15 to request and receive data from the ICON
16 system?
17 A.    Yes.
18       MR. ARNETT: Objection, form.
19       THE WITNESS: Yes.
20 BY MR. OLSON:
21 Q.    Are you aware of any State Workforce
22 Agencies that do not have ICON connectivity?
23 A.    I am not.
24 Q.    Generally speaking, do you know how
25 State Workforce Agencies develop ICON

Page 40

1  interfaces?
2        MR. ARNETT: Objection, form, vague.
3        THE WITNESS: I don't think there's
4  a "generally speaking" answer to that because
5  State Workforce Agencies have myriad different
6  systems from which they need to communicate
7  with ICON. So what that means in the legacy
8  ICON world is that ICON supports many
9  technologies for data transport, some of which
10 are decades old and really no longer used to
11 any significant degree.
12 BY MR. OLSON:
13 Q.    I'm going to introduce another exhibit,
14 which will be marked Exhibit 43 to this
15 deposition.
16       (Exhibit Number 43 marked for
17 identification.)
18 BY MR. OLSON:
19 Q.    Give me one moment to share my screen.
20 All right. Are you able to see that document?
21 A.    (Views document.) Yes.
22 Q.    And do you see in the bottom right
23 corner there is a Bates label that reads
24 SAGITEC-DEL_07359187?
25 A.    Yes.

Page 41

1  Q.    And I'll represent to you that this is a
2  screenshot of a web page that we printed and
3  produced in this case. Do you recognize this
4  as a screenshot of a NASWA web page with URL,
5  and I'll zoom in here, NASWA.org/icon?
6  A.    Yes.
7  Q.    Have you seen this web page before?
8  A.    Yes.
9  Q.    And understanding that you've not done a
10 word-for-word comparison, does this generally
11 look accurate to you as of the date of May 28,
12 2024?
13       MR. ARNETT: Objection, form,
14 foundation.
15       THE WITNESS: I have no memory of
16 what it looked like in May of 2024. What I
17 will state is that it looks quite similar to
18 how the website looks today.
19 BY MR. OLSON:
20 Q.    And I'm going to zoom in here more in
21 the middle.
22       Do you see the heading UI Interstate
23 Connection Network (UI ICON)?
24 A.    Yes.
25 Q.    The first full paragraph in the first

11 (Pages 38 - 41)

Page 42

1　sentence says, "The Unemployment Insurance
2　Interstate Connection Network (ICON) is the
3　system that allows State UI agencies to request
4　and receive data for use in the filing and
5　processing of combined wage claims, military
6　and federal claims."
7　　　Did I read that correctly?
8　A.　You did.
9　Q.　And there are several other statements
10　here about what the ICON system provides and
11　supports and aids.
12　　　Do you see that?
13　A.　I do.
14　Q.　You mentioned before that NASWA took
15　over the operation of the ICON system in 2018,
16　is that right?
17　A.　Yes.
18　Q.　Why did NASWA take over the operation of
19　the ICON system in 2018?
20　A.　The information I have is -- I don't
21　want to say probably hearsay, but my
22　understanding is that the Department of Labor
23　approached NASWA to take it over because
24　Maryland was no longer willing or able perhaps
25　to continue its role.

Page 43

1　Q.　And are there physical servers for the
2　hub that you mentioned earlier for ICON?
3　　　MR. ARNETT:  Objection, vague.
4　　　THE WITNESS:  There are a
5　combination of physical mainframes and virtual
6　servers for the legacy ICON Hub.
7　BY MR. OLSON:
8　Q.　Where do those reside geographically?
9　A.　I don't know.
10　Q.　Are there requirements for requesting
11　data from the ICON network?
12　　　MR. ARNETT:  Objection, form,
13　foundation.
14　　　THE WITNESS:  I'm finding that
15　question vague.
16　BY MR. OLSON:
17　Q.　Are there particular data formats that
18　are required for requests to the ICON network?
19　A.　Yes.
20　　　MR. ARNETT:  Same objections.
21　BY MR. OLSON:
22　Q.　And I believe you said yes, right?
23　A.　I did.
24　Q.　Are you familiar with the phrase "data
25　schema"?

Page 44

1　A.　Yes.
2　Q.　Are there particular data schema that
3　are required for requests from the ICON
4　network?
5　　　MR. ARNETT:  Objection, form,
6　foundation.
7　　　THE WITNESS:  Yes, with an
8　explanation.  There are schemas for each
9　exchange, and there are schemas for both legacy
10　and modernized systems.
11　BY MR. OLSON:
12　Q.　Are you familiar with the term "element"
13　in the context of computer software?
14　A.　Yes.
15　　　MR. ARNETT:  Objection, form,
16　foundation.
17　BY MR. OLSON:
18　Q.　And are there particular element names
19　that are required for requesting data from the
20　ICON network?
21　　　MR. ARNETT:  Objection, form,
22　assumes facts.
23　　　THE WITNESS:  I suspect so, but I do
24　not have firsthand knowledge.
25　BY MR. OLSON:

Page 45

1　Q.　Likewise, are there particular data
2　formats and data schema required for receiving
3　data from the ICON network?
4　　　MR. ARNETT:  Objection, form,
5　foundation, assumes facts.
6　　　THE WITNESS:  Yes.
7　BY MR. OLSON:
8　Q.　And would the same be true for
9　particular element names?
10　　　MR. ARNETT:  Same objections.
11　　　THE WITNESS:  Same.  Yes, with the
12　explanation.
13　BY MR. OLSON:
14　Q.　Where do those requirements come from?
15　　　MR. ARNETT:  Objection, vague.
16　　　THE WITNESS:  I imagine, this is
17　speculative, that some of them were developed
18　in the mists of time many years or decades ago,
19　but I can say that those specifications are
20　maintained and made available to the states.
21　BY MR. OLSON:
22　Q.　Do state agencies need to follow those
23　requirements in order to interface correctly
24　with the ICON network?
25　　　MR. ARNETT:  Objection, form,

12 (Pages 42 - 45)

Page 46

1    foundation, assume facts.
2          THE WITNESS:  Yes.
3    BY MR. OLSON:
4    Q.    How do the state agencies know what
5    those requirements are?
6          MR. ARNETT:  Objection, vague,
7    foundation.
8          THE WITNESS:  The state agencies all
9    maintain relationships, for lack of a more
10   precise term, with ICON's operational team here
11   at NASWA and also have specific dedicated
12   access to artifacts using credentials.
13   BY MR. OLSON:
14   Q.    What do you mean when you say
15   "artifacts"?
16   A.    Documentation of the ICON system that
17   would not be freely available to the public is
18   made available to credentialed users from the
19   states.
20   Q.    And when you say "credentialed users
21   from the states," is that referring to at least
22   the 53 State Workforce Agencies we've talked
23   about earlier?
24   A.    Yes.  There could be one or more than
25   one potential user in a given state.

Page 47

1    Q.    Are affiliates given access to those
2    requirements?
3    A.    No.
4    Q.    Why not?
5    A.    I don't know.
6    Q.    Are State Workforce Agencies permitted
7    to share those artifacts with any vendors or
8    contractors they're working with?
9          MR. ARNETT:  Objection, form,
10   foundation, calls for a legal conclusion.
11         THE WITNESS:  I don't know whether
12   they're permitted to, but that is the de facto
13   situation.
14   BY MR. OLSON:
15   Q.    And to your knowledge, NASWA doesn't
16   have any objection to state agencies sharing
17   those artifacts with their vendors or
18   contractors, is that right?
19         MS. SQUIRE:  Objection --
20         THE WITNESS:  Yes.
21         MS. SQUIRE:  -- vague.
22   BY MR. OLSON:
23   Q.    Are you familiar with the concept of
24   business rules?
25   A.    Yes.

Page 48

1    Q.    In your experience, do State Workforce
2    Agencies have business rules pertaining to the
3    ICON interface?
4          MR. ARNETT:  Objection, vague.
5          THE WITNESS:  Not exactly.  The
6    business rules would be set forth by the
7    exchange rather than by the state.
8    BY MR. OLSON:
9    Q.    When you say "the exchange," what are
10   you referring to?
11   A.    Well, I mentioned earlier that in the
12   legacy system there were 37 different types of
13   data exchanges, and that is -- gets a little
14   bit fungible when we start talking about the
15   modernized system.  But essentially the
16   business rules are within the ICON system, not
17   within the endpoints, such as a state agency.
18   Q.    And so is it fair to say that every
19   state agency needs to follow the same business
20   rules?
21         MR. ARNETT:  Objection, form, vague.
22         THE WITNESS:  Yes.
23   BY MR. OLSON:
24   Q.    Do you know how those business rules
25   were created?

Page 49

1    A.    No.
2    Q.    To your knowledge, were those business
3    rules, at least in some form, already in
4    existence when NASWA took over managing the
5    ICON system in 2018?
6          MR. ARNETT:  Objection, form,
7    foundation.
8          THE WITNESS:  Yes.
9    BY MR. OLSON:
10   Q.    What -- you mentioned artifacts earlier.
11   What kinds of artifacts or documentation does
12   NASWA provide to its State Workforce members
13   regarding the ICON system?
14   A.    Well, I'm generally thinking along the
15   lines of the exhibits that you've already
16   discussed.
17   Q.    And we'll go through some of those, but
18   would that include guides, for example?
19         MR. ARNETT:  Objection, vague.
20         THE WITNESS:  Yes.
21   BY MR. OLSON:
22   Q.    And schema?
23         MR. ARNETT:  Same objection.
24         THE WITNESS:  Yes.
25   BY MR. OLSON:

13 (Pages 46 - 49)

Page 50

1   Q.    And .XSD files?
2         MR. ARNETT:  Same objection.
3         THE WITNESS:  Yes.
4   BY MR. OLSON:
5   Q.    What are .XSD files?
6   A.    .XSD files are XML schema files.
7   Q.    How are .XSD files used?
8         MR. ARNETT:  Objection, vague.
9         THE WITNESS:  I'm not a developer,
10  so my answer will be general.  My understanding
11  is that XSD files are used to validate the XML
12  file that actually carries the data for a given
13  transmission.
14  BY MR. OLSON:
15  Q.    Do you know if XSD files can be used to
16  auto-generate code?
17        MR. ARNETT:  Objection, form,
18  foundation.
19        THE WITNESS:  I do not know.
20  BY MR. OLSON:
21  Q.    Do you know what a .WSDL file is?
22  A.    I do not.
23  Q.    You mentioned that you're not a
24  developer, but do you know at a high level what
25  a source code file is?

Page 51

1   A.    I know the general term, yes.
2   Q.    Does NASWA provide source code files to
3   its State Workforce members pertaining to the
4   ICON interfaces?
5         MR. ARNETT:  Objection, form,
6   foundation.
7         THE WITNESS:  Yes.
8   BY MR. OLSON:
9   Q.    Does NASWA provide specifications to
10  State Workforce members regarding the ICON
11  system?
12        MR. ARNETT:  Objection, form, vague.
13        THE WITNESS:  Yes.
14  BY MR. OLSON:
15  Q.    Other than the resources that we've gone
16  over just now, can you think of any other
17  resources or documentation that NASWA provides
18  to its State Workforce members regarding the
19  ICON system?
20        MR. ARNETT:  Objection, vague.
21        THE WITNESS:  No.
22  BY MR. OLSON:
23  Q.    And I'm going to stop sharing.  I
24  probably should have stopped a while back.
25        To your knowledge, when NASWA took over

Page 52

1   the ICON program in 2018, did it receive copies
2   of resources that existed at the time?
3         MR. ARNETT:  Objection, form,
4   foundation.
5         THE WITNESS:  It's not precisely
6   that way.  The artifacts for the then-sole
7   vendor were maintained by that subcontractor,
8   and that subcontractor came to NASWA at the
9   same time that NASWA took over the system.  In
10  other words, I'm describing continuity there.
11  BY MR. OLSON:
12  Q.    And so the subcontractor stayed the same
13  even though NASWA took over Maryland's role
14  overseeing the ICON program.  Is that a fair
15  summary?
16  A.    Yes.
17  Q.    Who was the subcontractor at that time?
18  A.    Conduent.
19  Q.    And is that the same subcontractor that
20  has continued to maintain the system until
21  today?
22  A.    With one clarification, yes, they are
23  the same vendor that continues to maintain the
24  legacy system, not the modernized system.
25  Q.    And is there a different vendor for the

Page 53

1   modern cloud system?
2   A.    Yes.
3   Q.    Who is that vendor?
4   A.    UI Professional Services.
5   Q.    In collecting documents for this -- in
6   collecting documents in response to this
7   subpoena, did NASWA work with Conduent to
8   identify documents?
9   A.    Not to my knowledge.
10  Q.    How does NASWA make these artifacts
11  available to its State Workforce Agency
12  members?
13        MR. ARNETT:  Objection, vague.
14        THE WITNESS:  Some of the artifacts
15  are available through that credentialed service
16  that I described earlier that is hosted by the
17  vendor, Conduent, that's largely focusing on
18  the legacy system.  For the modernized system,
19  there's a different portal which uses different
20  credentials for states to get access to those
21  artifacts.
22  BY MR. OLSON:
23  Q.    Are there any restrictions on which
24  State Workforce Agencies can use those
25  artifacts?

14 (Pages 50 - 53)

Page 54

1    A.   I'm finding the question unclear.
2    Q.   Each of those 53 State Workforce
3    Agencies are free to use those resources
4    provided they use the credentialed login
5    service, correct?
6         MR. ARNETT:  Objection, form,
7    foundation.
8         THE WITNESS:  I'm struggling to come
9    up with a cogent answer because there is but
10   one use for each artifact, and it would only be
11   useful to those State Workforce Agencies.
12   BY MR. OLSON:
13   Q.   Right.  And I apologize if I'm being
14   unclear.  I guess what I'm getting at is:  To
15   your knowledge, there's nothing that's stopping
16   any individual State Workforce Agency from
17   making use of those artifacts, right?
18        MR. ARNETT:  Objection, form, calls
19   for speculation.
20        THE WITNESS:  No.
21   BY MR. OLSON:
22   Q.   Do you know who created the artifacts
23   that NASWA provides its members relating to the
24   ICON interface?
25        MR. ARNETT:  Objection, vague.

Page 55

1         THE WITNESS:  No.
2    BY MR. OLSON:
3    Q.   Do you know who owns the artifacts that
4    NASWA provides its members?
5         MR. ARNETT:  Objection, calls for a
6    legal conclusion.
7         THE WITNESS:  The position that
8    NASWA holds is that the Department of Labor
9    retains ownership of those artifacts.
10   BY MR. OLSON:
11   Q.   And to your knowledge, those artifacts
12   are not owned by Deloitte, correct?
13        MR. ARNETT:  Objection, vague, calls
14   for a legal conclusion.
15        THE WITNESS:  To my knowledge, NASWA
16   interprets the ownership of those artifacts as
17   remaining with the Department of Labor.
18   BY MR. OLSON:
19   Q.   Does NASWA update those artifacts over
20   time?
21        MR. ARNETT:  Objection, vague.
22        THE WITNESS:  Yes.
23   BY MR. OLSON:
24   Q.   What's the process for updating those
25   documents over time?

Page 56

1         MR. ARNETT:  Same objection.
2         THE WITNESS:  I don't know.
3    BY MR. OLSON:
4    Q.   Why does NASWA update those documents
5    over time?
6         MR. ARNETT:  Objection, form,
7    foundation.
8         THE WITNESS:  Speculating that as
9    changes are made to either the legacy or the
10   modernized system, those changes need to be
11   reflected in the documentation.
12   BY MR. OLSON:
13   Q.   All right.  I'm going to share one more
14   exhibit, and then I think we can take a short
15   break after that.  We will mark this as
16   Exhibit 40 to the deposition.
17        (Exhibit Number 40 marked for
18   identification.)
19   BY MR. OLSON:
20   Q.   And I have just introduced it in the
21   Exhibit Share system.  Okay.  Mr. Peirce, this
22   is another website screenshot that we took and
23   produced in this case.  And do you see in the
24   top left there is an URL that reads at the end
25   NASWA.org/icon/resources?

Page 57

1    A.   (Views document.)  Yes.
2    Q.   And then looking in the bottom right,
3    there is a Bates label that reads
4    SAGITEC-DELL07359184.
5         You see that as well, right?
6    A.   Yes.
7    Q.   And is this another website that you
8    reviewed and kind of generally compared with
9    the current version of the website?
10   A.   Yes.
11   Q.   And does this generally look accurate to
12   you?
13        MR. ARNETT:  Objection, foundation.
14        THE WITNESS:  Yes.
15   BY MR. OLSON:
16   Q.   We see several resources -- and I've
17   zoomed a bit, but we several resources
18   identified on this page, right?
19   A.   Yes.
20   Q.   The first resource listed here is
21   identified as USDOL ETA Advisories.  Is USDOL
22   the U.S. Department of Labor?
23   A.   Yes.
24   Q.   What is ETA?
25   A.   Employment and Training Administration.

Veritext Legal Solutions
www.veritext.com                                                                888-391-3376

Page 58

1    Q.    And is that a subset of the USDOL?
2    A.    Yes.
3    Q.    To the right there are -- I've gathered
4    that there are a lot of acronyms in the UI
5    industry, is that fair?
6    A.    Very much so.
7    Q.    And to the right there's several
8    additional acronyms.  The first one we see
9    refers to the Unemployment Insurance Program
10   Letters or UIPLs.
11        Do you see that?
12   A.    I do.
13   Q.    What are UIPLs?
14   A.    Unemployment Insurance Program Letters
15   are ways that the Department of Labor's
16   Employment and Training Administration directs
17   states to implement specific rules or
18   attributes or functions of the Unemployment
19   Insurance system.
20   Q.    And are states required to follow UIPLs?
21        MR. ARNETT:  Objection, form, calls
22   for speculation, calls for a legal conclusion.
23        THE WITNESS:  Yes.
24   BY MR. OLSON:
25   Q.    The next one we see is Training and

Page 59

1    Employment Guidance Letters or TEGLs.
2        Do you see that?
3    A.    I do.
4    Q.    What are TEGLs?
5    A.    There are two differences between a TEGL
6    and a UPEL.  And the first is that the training
7    and employment guidance letter or TEGL is a
8    broader scope or potentially could have a
9    broader scope than merely the Unemployment
10   Insurance program.  And the second is that this
11   represents guidance as opposed to direction.
12   Q.    And so is it fair to say that while
13   states are required to follow the UIPLs, they
14   are not necessarily required to follow the
15   TEGLs?
16        MR. ARNETT:  Objection, form, calls
17   for a legal conclusion.
18        THE WITNESS:  My understanding is
19   that it's a strong encouragement rather than a
20   requirement.
21   BY MR. OLSON:
22   Q.    The next one we see, and I think there
23   was an issue with the rendering of the
24   characters, but it looks like it's supposed to
25   say Training and Employment Notices, TENs.

Page 60

1        Do you see that?
2    A.    I do.
3    Q.    What are TENs?
4    A.    They're not dissimilar to the other
5    categories in the sense that they are
6    promulgated by the Department of Labor, but
7    they don't carry the weight that the other two
8    categories do.
9    Q.    I want to ask about the last resource
10   here listed here near the bottom, which is
11   Virtual Training Resources.
12        Do you see that?
13   A.    Yes.
14   Q.    At a high level, what Virtual Training
15   Resources does NASWA make available to its
16   State Workforce Agency members?
17        MR. ARNETT:  Objection, form,
18   assumes facts.
19        THE WITNESS:  At a high level,
20   NASWA's learning platform makes myriad
21   different curricula available to State
22   Workforce Agencies on a variety of topics.
23   BY MR. OLSON:
24   Q.    And does that include the 37 interfaces
25   that you mentioned earlier?

Page 61

1        MR. ARNETT:  Objection, vague.
2    BY MR. OLSON:
3    Q.    Or maybe I should say 37 applications.
4    A.    No.
5        MR. ARNETT:  Same objection.
6        THE WITNESS:  Generally, no.  I
7    believe that there are some ICON-specific
8    topics, but it is not the level of detail that
9    I believe that you're describing when you are
10   saying 37 systems.
11   BY MR. OLSON:
12   Q.    And just so we're on the same page about
13   terminology, would you prefer to refer to those
14   37 things as systems, applications, interfaces
15   or something else?
16        MR. ARNETT:  Objection, form.
17        THE WITNESS:  Something else.
18   BY MR. OLSON:
19   Q.    What term would you use?
20   A.    Transactions.
21   Q.    Transactions.  I'll do my best to stick
22   with that term going forward.
23        MR. OLSON:  Why don't we take a
24   short break and go off the record.
25        THE VIDEOGRAPHER:  We are going off

16 (Pages 58 - 61)

Page 62

1    the record.
2         Time now is 1:38.
3         (Off the record 1:38 to 1:46,
4    whereupon Exhibits 3 to 38 were marked for
5    identification.)
6         THE VIDEOGRAPHER:  We are back on
7    the record.  This is the start of Media
8    Number 2.
9         The time is 1:46.
10        Please proceed.
11        MR. OLSON:  Thank you.  My
12   apologies.
13   BY MR. OLSON:
14   Q.   Welcome back, Mr. Peirce.  During the
15   break, did you discuss the substance of your
16   testimony at all with your counsel?
17   A.   No, I did not.
18   Q.   Before the deposition we provided your
19   attorney with several premarked exhibits that
20   you had a chance to review, is that right?
21   A.   Yes.
22   Q.   And that includes exhibits that were
23   premarked 3 through 38, which are documents
24   bearing Bates labels NASWA0000003, I think
25   that's the right number of zeros, through

Page 63

1    NASWA00000771.
2         Do you understand that?
3    A.   I do understand that, but I think you
4    missed one.
5    Q.   I know there's an additional document
6    that we've already looked at, which was
7    Exhibit 2, which was the email between
8    Ms. Squire and myself.
9         Do you recall that?
10   A.   Yes.
11   Q.   And so I want to ask about the -- I'm
12   not asking about that exhibit.  I'm asking
13   about Exhibits 3 through 38 with the Bates
14   numbers that I mentioned.
15        Do you understand?
16   A.   I do.
17   Q.   Did you review those exhibits in advance
18   of the deposition?
19   A.   Yes.
20   Q.   And do you understand that those are
21   documents that were produced by NASWA in
22   response to the document subpoena that we
23   reviewed earlier, which was Exhibit 1?
24   A.   Yes.
25   Q.   Is it fair to say -- strike that.

Page 64

1         Based on your knowledge, experience and
2    review, do you recognize these exhibits as true
3    and correct copies of files maintained by NASWA
4    in the ordinary course of business?
5         MR. ARNETT:  Objection, form, calls
6    for legal conclusions.
7         THE WITNESS:  I did not note any
8    discrepancies between the items you described
9    and what NASWA had provided in January.
10   BY MR. OLSON:
11   Q.   So to your understanding, are they true
12   and correct copies of the files as maintained
13   by NASWA in the ordinary course of business?
14        MR. ARNETT:  Same objections.
15        THE WITNESS:  All I can say is I
16   noted no differences.
17   BY MR. OLSON:
18   Q.   All right.  Thank you, Mr. Peirce.  I'm
19   going to take us back to Exhibit 2, which we've
20   already reviewed.  Give me a moment to share my
21   screen.  Towards the bottom here we see again
22   several bullets.  Are these bullets referring
23   to what you called transactions earlier?
24        MR. ARNETT:  Objection, vague.
25        THE WITNESS:  Yes.

Page 65

1    BY MR. OLSON:
2    Q.   So IB1, for example, and IB4 and IB5,
3    those are all transactions?
4         MR. ARNETT:  Objection, vague.
5         THE WITNESS:  Yes.
6    BY MR. OLSON:
7    Q.   What does IB stand for?
8    A.   Interstate Benefits.
9    Q.   And are these transactions dictated by
10   any requirements from the Department of Labor?
11        MR. ARNETT:  Objection, compound,
12   calls for legal conclusions.
13        THE WITNESS:  Could you rephrase the
14   question?  The trouble I'm having is the
15   connection between the transaction type and
16   department requirements.  Is that what you're
17   getting at?
18   BY MR. OLSON:
19   Q.   Yeah, I guess I'm just trying to
20   understand where the requirements for these
21   transaction types come from.
22        MR. ARNETT:  Objection, form,
23   foundation, vague.
24        THE WITNESS:  In most of the cases
25   that you have on screen at this moment they are

17 (Pages 62 - 65)

Page 66

1 part of the legacy system that were defined
2 generations ago and refer to system
3 specifications rather than business
4 requirements set forth by the Department of
5 Labor.
6 BY MR. OLSON:
7 Q.    And when you refer to the transactions
8 that were defined generations ago, which
9 transactions are you referring to here?
10     MR. ARNETT:  Objection, vague,
11 compound.
12     THE WITNESS:  With the exception of
13 the two that have double asterisks, the rest of
14 are all legacy system transactions.  The two
15 that are double asterisks, which are IBIQ and
16 SID, both exist in the modernized system, but
17 they reflect the modern functionality of
18 transactions that used to exist in the legacy
19 system.
20 BY MR. OLSON:
21 Q.    And I see UIQ also has two asterisks.
22 Would that go in the same category as the other
23 two you just mentioned?
24     MR. ARNETT:  Objection, vague.
25     THE WITNESS:  Yes.  Thanks for

Page 67

1 pointing out that I missed that.
2 BY MR. OLSON:
3 Q.    And when you say these were -- that the
4 other transactions were defined generations
5 ago, do you have a sense of when they were
6 defined?
7     MR. ARNETT:  Objection, form,
8 foundation.
9     THE WITNESS:  No.
10 BY MR. OLSON:
11 Q.    Do you know if it was before 2010?
12     MR. ARNETT:  Same objections.
13     THE WITNESS:  Yes.  I recognize
14 these transactions as most of them having been
15 extant throughout the period of time that I've
16 worked in the Unemployment Insurance program.
17 BY MR. OLSON:
18 Q.    And that was beginning in 1992?
19 A.    That's correct.
20 Q.    What is the IB1 transaction?
21 A.    We're tripping perilously near the edge
22 of my business knowledge with that question,
23 and my understanding is that the IB1 originally
24 referred to a paper application for benefits
25 that were filed across state lines, and that

Page 68

1 the transaction that was built into the ICON
2 system, again, decades go, was to mimic the
3 functionality of what used to be occurring on
4 that paper IB1 form, which was the application
5 for benefits across state lines.
6 Q.    The first sentence here says, "This
7 application has been retired."
8     Do you know what that means?
9 A.    Yes.
10 Q.    And what does that mean?
11 A.    Means that it is no longer used because
12 in the modern era states can receive
13 unemployment claims from outside of their
14 physical borders.
15 Q.    When was the application retired, if you
16 know?
17 A.    I do not know.
18 Q.    Do you know if any states are still
19 using IB1?
20 A.    In terms of the application, it's not
21 available for use.
22 Q.    So then is it fair to say that IB1 is no
23 longer useful to State Workforce Agencies?
24 A.    When you're saying IB1, I'm interpreting
25 that to mean the IB1 application that

Page 69

1 previously was part of the ICON system as
2 opposed to the IB1 paper form.  If I am
3 interpreting that correctly, it is not only no
4 longer useful, it's not even existent.
5 Q.    So that makes sense to me.  Ido have a
6 terminology question because now I've heard you
7 say application as well.  So what is the
8 difference between, for example, an IB1
9 transaction and an IB1 application?
10 A.    I know of no difference between those
11 terms.
12 Q.    Okay.  So is it fair to understand that
13 if you use the term "application," it would
14 refer also to the transactions we've been
15 talking about?
16     MR. ARNETT:  Objection, vague.
17     THE WITNESS:  I think that's
18 generally true.
19 BY MR. OLSON:
20 Q.    And if at any point you're intending to
21 use the word "application" differently, would
22 you please let me know during today's
23 deposition?
24 A.    Certainly.
25 Q.    There's a sentence at the end of this

18 (Pages 66 - 69)

Page 70

1    IB1 bullet that says, "No documents to
2    provide."
3         Do you see that?
4    A.    Yes, I do.
5    Q.    Do you know why there are no documents
6    to provide for this application?
7    A.    I would be speculating, but that
8    speculation is because the application has been
9    retired.
10   Q.    Do you know if at one point there were
11   documents that would have been available for
12   this application?
13   A.    I do not know.
14   Q.    All right.  I want to run through the
15   rest of these just to understand generally what
16   they are, if you know.  And if you don't, you
17   can say that as well.  Generally, do you know
18   what IB4 is?
19   A.    Not particularly, no.
20   Q.    At a high level, do you know what IB5
21   is?
22   A.    No.
23   Q.    As you're looking down the list, because
24   I don't want to overcomplicate this, are there
25   any that you do recognize that you would be

Page 71

1    able to identify and give a high-level overview
2    of?
3    A.    Yes.
4    Q.    And which ones are those?
5    A.    They are IBIQ, SID, UIQ.  And that's
6    really it on this page.
7    Q.    What is IBIQ?
8    A.    IBIQ is a real-time query that a state
9    worker in a given state can use to query
10   whether there are records in other states
11   relating to a given Social Security number.
12   Q.    What do you mean when you say real time?
13   A.    The distinction between real time and
14   the alternative batch is that a real-time
15   transaction invokes by an operator when they
16   wish to have the information presented to them,
17   whereas a batch transaction typically occurs on
18   a regularly recurring frequency, but is not in
19   real time.
20   Q.    What is the SID application?
21   A.    A SID application is used to -- I'm
22   struggling to remember which of the two is
23   which.  SID is used to identify -- I'm sorry.
24   I am not positive that I can speak accurately
25   about the distinction between SID and IBIQ.  I

Page 72

1    don't want to misspeak.
2    Q.    What about UIQ, do you know what that is
3    at a high level?
4    A.    That, I believe, is the one that is the
5    query that allows the state to determine the
6    activity in a different state.
7    Q.    One other one I want to ask about here.
8    UCFE, do you know what that is?
9    A.    UCFE is an acronym that stands for
10   Unemployment Claims for Federal Employees.  So
11   in the usage you have on the screen it's
12   referring to the transactional system that
13   states would use to process UCFE claims, but
14   UCFE claims are a broader term than the
15   transactional system itself.
16   Q.    There's another term on here, which is
17   ICONnect with ICON capitalized, and then
18   n-e-c-t lowercase.  What does that refer to?
19   A.    That refers to the modernized system's
20   user console that's available for the states.
21   Q.    And what is the user console that you're
22   referring to?
23   A.    The agent -- the actor in a given state
24   who has credentials to utilize ICONnect can see
25   kind of global traffic within the modernized

Page 73

1    system that is related to their state's UI
2    programs that have been traveling through the
3    ICON modernized system.  That's functionality
4    that did not exist in the legacy system.
5    Q.    All right.  I want to take us to the
6    next page here of this same exhibit.  And you
7    see there are two asterisks again near the top
8    of this page?
9    A.    I do.
10   Q.    And then it says, "State wishing to use
11   containerized code for real-time applications
12   would need the following install guides,
13   depending on the technology in use.  State
14   wishing to create their own stateside
15   applications would use the documentation listed
16   above."
17        Do you see that?
18   A.    I do.
19   Q.    What does containerized code refer to?
20   A.    My understanding of the phrase
21   "containerized code" is that that is a modern
22   system to be able to deliver functional code
23   that can be installed in an environment without
24   having to fully integrate it into that
25   environment's architecture.

19 (Pages 70 - 73)

Page 74

1    Q.    Does NASWA provide containerized code to
2    State Workforce Agencies?
3    A.    Yes, for the items that were asterisked
4    on the prior page.
5    Q.    So it seems like in this -- in these two
6    sentences that I just read that NASWA was
7    referring to two different options to implement
8    these applications, is that fair?
9    A.    Yes.
10         MR. ARNETT:  Objection, vague.
11   BY MR. OLSON:
12   Q.    One option --
13   A.    Yes.
14   Q.    Sorry.  One option would be for
15   real-time applications, and the other would be
16   their own stateside applications, is that
17   right?
18   A.    No, that's not correct.
19   Q.    So where did I go wrong?  Please help
20   explain.
21   A.    Sure.  I mentioned earlier that we are
22   in the process of modernizing the ICON system
23   into a modern cloud-based architecture.  The
24   asterisked transactions on the prior page that
25   is leading us to this footnote, if you will,

Page 75

1    are the ones that have been modernized to date.
2    And the choice that the states have at present,
3    but not forever, will be to continue to use
4    their legacy connection to the legacy mainframe
5    ICON Hub or to connect directly to the
6    modernized system.  In the future when all of
7    the transactions have been modernized, there
8    will not be an option and states will only have
9    the ability to connect to the modernized
10   system.  The reason the option exists today is
11   that fundamentally ICON, which includes in this
12   usage both the legacy and the modernized
13   systems, needs to meet the states where they
14   are technologically.  To put a finer point on
15   that, NASWA, ICON could not demand that all
16   states flip over from using one connection
17   methodology to another connection methodology
18   with a hard cutover on a specific date.  It's
19   like herding cats.  So in the interim we are
20   providing multiple mechanisms for states to
21   connect to get the functionality that is
22   provided by those three systems, those three
23   transactions.
24   Q.    Does NASWA intend to expand the scope of
25   applications that are modernized?

Page 76

1         MR. ARNETT:  Objection, vague, calls
2    for speculation.
3         THE WITNESS:  NASWA's modernization
4    intention is to replace all of the
5    mainframe-based functionality with modernized
6    functionality in the new infrastructure.
7    BY MR. OLSON:
8    Q.    I understood you to say that NASWA does
9    not have a hard cutoff date, but does NASWA
10   have a target or aspirational date for when it
11   would like this modernization effort to be
12   complete?
13        MR. ARNETT:  Objection, vague, calls
14   for speculation.
15        THE WITNESS:  The modernization
16   effort is dependent on ongoing federal funding
17   for the purpose, and therefore NASWA has no
18   control over the availability of that funding.
19   Our initial project plan anticipated
20   approximately a five-year project, but that's
21   subject to the whims of appropriators.
22   BY MR. OLSON:
23   Q.    And likewise, does NASWA intend at some
24   point to stop supporting legacy hub
25   functionality?

Page 77

1         MR. ARNETT:  Objection, calls for
2    speculation.
3         THE WITNESS:  If modernization is
4    able to be completed, yes.
5    BY MR. OLSON:
6    Q.    I want to take us back to the first
7    page, Mr. Peirce.  And looking at this UIQ
8    bullet again.
9         Do you see that?
10   A.    I do.
11   Q.    And it looks like there are several
12   documents listed out after UIQ in this bullet,
13   is that right?
14   A.    Yes.
15   Q.    Let's look at those one by one.  First,
16   the UIQ Schema, do you know what that is?
17   A.    I believe that in this usage that
18   references the modernized schema for the
19   modernized version of UIQ.
20   BY MR. OLSON:
21   Q.    I'm going to stop sharing.  And I'm
22   going to show you first what has been marked as
23   Exhibit 11 to this deposition.  And do you see
24   that this is a single page which says Native
25   File Provided at the top?

20 (Pages 74 - 77)

Page 78

1    A.    (Views document.)  Yes.
2    Q.    Okay.  I'm going to show you the
3    corresponding native file now, which is
4    Exhibit 45 to this deposition.
5          (Exhibit Number 45 marked for
6    identification.)
7    BY MR. OLSON:
8    Q.    Are you able to see this file,
9    Mr. Peirce?
10   A.    (Views document.)  Yes.
11   Q.    And this is an XSD file, right?
12   A.    Yes.
13         MR. ARNETT:  Objection, foundation.
14         THE WITNESS:  Yes.
15   BY MR. OLSON:
16   Q.    And at the top it says UIQ Schema,
17   right?
18   A.    It does.
19   Q.    Is that the UIQ schema that was
20   referenced in Exhibit 2 that we were just
21   looking at?
22   A.    I believe so, yes.
23   Q.    Let me zoom in a little more.  So at a
24   high level and based on your review, what is
25   this file?

Page 79

1    A.    This file -- you asked me earlier what
2    an XSD file purpose is, and it's to validate an
3    XML file layout.  So this file provides an
4    English language understanding of what would be
5    transmitted to the modernized ICON system if a
6    transaction -- a UIQ transaction were
7    transmitted to the modernized system.  The
8    modernized system for UIQ went into production
9    in 2024.
10   Q.    And so in terms of your description of
11   this file, other than the name of the
12   transaction, would it be a similar description
13   or would you have a similar description for
14   other ICON schema files?
15         MR. ARNETT:  Objection, form,
16   foundation.
17         THE WITNESS:  The distinction I
18   would like to draw here is that modernized
19   transactions, those three that were asterisked,
20   will have corresponding documentation like
21   this.
22   BY MR. OLSON:
23   Q.    I see.  And so the ones that have not
24   been modernized would not necessarily have
25   corresponding documentation like this?

Page 80

1    A.    Correct.  They would have different
2    style of documentation, which is also in your
3    exhibit list.
4    Q.    Do you see in all capital letters where
5    it says PLEASE NOTE?
6    A.    Yes.
7    Q.    Thank you.  Sorry.  And below that you
8    see, "In an effort to facilitate testing and
9    implementation, valid element content is
10   discussed in greater detail below."
11         Do you see that?
12   A.    I do.
13   Q.    What does valid element content mean?
14   A.    My understanding is that for each of the
15   elements listed under the Element Name
16   category, valid means that it is following the
17   description described in the populated value
18   component of that essentially table.
19   Q.    Is it necessary to use the valid element
20   content for the UIQ application?
21         MR. ARNETT:  Objection, form.
22         THE WITNESS:  I would want to
23   reiterate, this document refers to the
24   modernized system for UIQ that went into
25   production in 2024.  This describes the data

Page 81

1    that that system needs to communicate
2    effectively.  I believe that the application
3    when it was built for the modernized usage,
4    UIQ, does have error handling in it.  So a
5    strict interpretation of your question is the
6    system may be able to handle transactions that
7    contain nonconformant data elements, but your
8    results may vary.  But, again, this is the
9    modernized system, which my understanding is
10   well after the period of time that you're
11   interested in.
12   BY MR. OLSON:
13   Q.    The next sentence says, "This
14   information along with the element descriptions
15   and definitions included within the schema
16   should provide the necessary information
17   required to define a UIQ Inquiry."
18         Do you see that?
19   A.    I do.
20   Q.    And for the modern implementation of UIQ
21   application that statement is correct, right?
22   A.    Yes.
23   Q.    We see several element names listed
24   here, right?
25   A.    Yes.

21 (Pages 78 - 81)

Page 82

1    Q.    Where do those element names come from?
2        MR. ARNETT: Objection, form, vague.
3        THE WITNESS: They are part of the
4    design of the transaction that needs to contain
5    those data elements to accurately provide the
6    response. I'm struggling with the question.
7    BY MR. OLSON:
8    Q.    And when you say they're part of --
9    well, I don't want to misquote you here, but
10   are these -- do you remember testifying earlier
11   that some of these applications were defined
12   generations ago?
13   A.    I do.
14   Q.    Were these element names defined
15   generations ago?
16   A.    Don't know.
17       MR. ARNETT: Objection, form,
18   foundation.
19       THE WITNESS: I don't know, with the
20   specificity to the document that is on the
21   screen, whether these elements are the same for
22   the modernized system that we're looking at
23   here versus the legacy system, and even if they
24   are the same, when they were defined in the
25   legacy system.

Page 83

1    BY MR. OLSON:
2    Q.    I want to scroll down here to a section
3    that begins with, "Changes made in this
4    revision..."
5        Do you see that?
6    A.    Yes.
7    Q.    And there are references to four
8    revisions with dates ranging from 2013 to 2018.
9        Do you see that?
10   A.    Yes.
11   Q.    And it looks like revision one is dated
12   March 26, 2013, is that right?
13   A.    Yes.
14   Q.    Do you know what the original date of
15   this schema was?
16       MR. ARNETT: Objection, foundation.
17       THE WITNESS: I don't.
18   BY MR. OLSON:
19   Q.    And I just want to make sure I
20   understand because I thought you testified that
21   this schema was for the modernized UIQ
22   application. Can you help me understand why
23   the modernized UIQ schema would have some
24   earlier dates in the revisions?
25   A.    I'm speculating. But you had asked a

Page 84

1    question a moment ago that I indicated that I
2    wasn't sure whether modernized specification --
3    the modernized schema and the legacy schema
4    matched. This seems to me to imply that they
5    do, and that the schema continues between the
6    old system and the new system. I do not
7    personally have that knowledge. That seems to
8    be an interpretation based on the revision
9    dates.
10   Q.    And would you expect any revisions to
11   the schema over time to be documented by NASWA
12   in this section?
13       MR. ARNETT: Objection, form,
14   foundation.
15       THE WITNESS: It would be documented
16   by the subcontractor.
17   BY MR. OLSON:
18   Q.    And it would be documented by the
19   subcontractor in this section?
20       MR. ARNETT: Objection, vague.
21       THE WITNESS: Presumably, yes.
22   BY MR. OLSON:
23   Q.    I'm going to scroll down a little more
24   here. Do you see a reference to a website that
25   ends in w3.org/2001/XML schema?

Page 85

1    A.    I do.
2    Q.    Do you know what that website is?
3    A.    No.
4    Q.    Below that there's another website that
5    ends in UI-ICON.org/ns/uiq. Do you know what
6    that website is?
7    A.    I know what the root website is.
8    UI-ICON.org is the website that we use to
9    prepare and share information regarding ICON.
10   That particular page, /ns/u iq, I am not
11   familiar.
12   Q.    Have you -- is UI-ICON.org the
13   credentialed website you testified about
14   earlier?
15       MR. ARNETT: Objection, vague.
16       THE WITNESS: I can't say so with
17   certainty.
18   BY MR. OLSON:
19   Q.    What -- have you personally gone to the
20   UI-ICON.org website?
21   A.    I believe I have. I did not do so in
22   preparation for this call.
23   Q.    Do you recall what information is made
24   available on the UI-ICON.org website?
25       MR. ARNETT: Objection, foundation,

22 (Pages 82 - 85)

Page 86

1  also vague.
2      THE WITNESS:  I don't.
3  BY MR. OLSON:
4  Q.    Okay.  Do you know whether it would
5  include the artifacts that you testified about
6  earlier?
7      MR. ARNETT:  Objection, foundation.
8      THE WITNESS:  I don't.
9  BY MR. OLSON:
10  Q.    Do you know who has access to this
11  website?
12      MR. ARNETT:  Objection, vague,
13  foundation, calls for speculation.
14      THE WITNESS:  I don't.
15  BY MR. OLSON:
16  Q.    Below that there's a phrase, "UIQ Top
17  Level Schema Method."  Do you know what that
18  is?
19  A.    Literally any line that starts with an
20  exclamation point is a comment.  So that's not
21  a line that would actually be machine read.  So
22  I believe that is a description of what
23  follows.
24  Q.    And the next line does not have an
25  exclamation point signifying that it's not a

Page 87

1  comment, right?
2  A.    Correct.
3  Q.    And that line refers to an element name,
4  "ICON_MessageTrain."
5      Do you see that?
6  A.    Yes.
7  Q.    Do you know what that element is?
8  A.    No.
9  Q.    Do you know who defined this element?
10  A.    No.
11      MR. ARNETT:  Objection, foundation.
12      THE WITNESS:  I do not.
13  BY MR. OLSON:
14  Q.    Do you know the source of the
15  information in this file?
16      MR. ARNETT:  Objection, vague,
17  foundation.
18      THE WITNESS:  I don't.
19  BY MR. OLSON:
20  Q.    You're not aware of this information
21  coming from Deloitte, is that right?
22      MR. ARNETT:  Same objections.
23      THE WITNESS:  I am not aware of the
24  source of this file.
25  BY MR. OLSON:

Page 88

1  Q.    Why does NASWA provide the schema to
2  state entities?
3      MR. ARNETT:  Objection, vague,
4  assumes facts.
5      THE WITNESS:  States would need this
6  information if they were to develop their own
7  program to interact with the ICON system
8  regarding the UIQ transaction.
9  BY MR. OLSON:
10  Q.    And to your knowledge, can states depart
11  from this schema and still properly request and
12  receive in the ICON Hub?
13      MR. ARNETT:  Objection, form, calls
14  for speculation.
15      THE WITNESS:  My speculation is that
16  no, they could not.
17  BY MR. OLSON:
18  Q.    And I understand you described it as
19  your speculation, but why do you believe that?
20  A.    I believe that because of my general
21  understanding of information technology.
22  Q.    To your knowledge, who owns any
23  intellectual property rights in this schema?
24      MR. ARNETT:  Objection, vague, calls
25  for a legal conclusion.

Page 89

1      THE WITNESS:  I believe that NASWA's
2  position is that the Department of Labor owns
3  everything you've just described.
4  BY MR. OLSON:
5  Q.    Which would be any intellectual property
6  rights in this schema, right?
7      MR. ARNETT:  Objection -- same
8  objections.
9      THE WITNESS:  Yes.
10  BY MR. OLSON:
11  Q.    And it is not NASWA's position that
12  Deloitte owns the intellectual rights in this
13  schema, correct?
14      MR. ARNETT:  Same objections.
15      THE WITNESS:  NASWA does not hold a
16  position on whether Deloitte owns this.
17  BY MR. OLSON:
18  Q.    Does NASWA intend for all state
19  workforce agencies to be able to use the
20  elements defined in this schema?
21  A.    Yes.
22  Q.    Does NASWA intend for all State
23  Workforce Agencies to be able to use the vendor
24  of their choice to implement the elements
25  defined in this schema?

23 (Pages 86 - 89)

Page 90

1      MR. ARNETT: Objection, vague.
2      THE WITNESS: Yes.
3  BY MR. OLSON:
4  Q.    Would you have any concerns about a
5  third-party vendor claiming they owned
6  intellectual rights in the elements defined
7  here?
8      MR. ARNETT: Objection, vague,
9  argumentative, misstates facts.
10     THE WITNESS: I don't have such an
11 opinion.
12 BY MR. OLSON:
13 Q.    If you were aware of a claim like that,
14 is that something you would want to talk with
15 your lawyer about?
16     MR. ARNETT: Objection -- same
17 objections and calls for speculation.
18     MS. SQUIRE: Objection.
19     THE WITNESS: I don't know that I
20 can answer such a hypothetical.
21 BY MR. OLSON:
22 Q.    If one state were prohibited from using
23 the ICON network, would that impact other
24 states?
25     MR. ARNETT: Objection, calls for

Page 91

1  speculation, vague.
2      THE WITNESS: Yes.
3  BY MR. OLSON:
4  Q.    How so?
5  A.    The ICON system fundamentally provides
6  functionality for multiple state claims as well
7  as claims that involve the federal government,
8  specifically federal employee and military
9  service member unemployment claims. So in your
10 scenario that you described, if state A could
11 not use the ICON system to communicate with
12 state B in your scenario, both states would be
13 at a disadvantage for processing one or more
14 claims filed with that scenario with those two
15 states involved.
16 Q.    Would you have any concerns about
17 someone attempting to stop a state from using
18 the elements defined here?
19     MR. ARNETT: Objection, vague, calls
20 for speculation, misstates facts.
21     THE WITNESS: Yes.
22 BY MR. OLSON:
23 Q.    Why would you have concerns about that?
24 A.    NASWA has been contracted to make the
25 system available to all 53 State Workforce

Page 92

1  Agency jurisdictions that run unemployment
2  programs.
3  Q.    Would there be any impact on -- let me
4  get aligned on terminology first. How do you
5  refer to the end user of an UI system? Would
6  that be claimants or something else?
7  A.    It would depend on the context.
8  Q.    I guess I'm just trying to talk -- I'm
9  trying to understand: If you have an
10 individual person in a state who is applying
11 for Unemployment Insurance, what terminology
12 would you use to describe that person in the
13 context of the ICON system?
14 A.    That individual would have the label of
15 claimant applied, and the claimant, him or
16 herself, does not directly interact with the
17 ICON system.
18 Q.    In the scenario we discussed where one
19 state might be prohibited from using the ICON
20 network, would that impact the claimants in
21 that state?
22     MR. ARNETT: Objection, calls for
23 speculation, assumes facts.
24     THE WITNESS: It would depend on the
25 circumstances of that claimant.

Page 93

1  BY MR. OLSON:
2  Q.    And for some claimants would it impact
3  them?
4      MR. ARNETT: Same objections.
5      THE WITNESS: Hypothetically, yes.
6  BY MR. OLSON:
7  Q.    Is that something that concerns you?
8      MR. ARNETT: Objection, vague, calls
9  for speculation, assumes facts.
10     THE WITNESS: I'm not highly
11 concerned because I don't believe the premise
12 is likely --
13 BY MR. OLSON:
14 Q.    Why do --
15 A.    -- or realistic.
16 Q.    Why do you not believe the premise is
17 likely or realistic?
18 A.    There is no precedent or mechanism by
19 which a state would be prohibited from using
20 the ICON system.
21 Q.    Mr. Peirce, let me just ask: Do you
22 have any knowledge of the relief that Deloitte
23 is seeking in this case?
24 A.    I do not.
25 Q.    Okay. I'm going to stop sharing this

24 (Pages 90 - 93)

Page 94

1    document and go to another document, which we
2    will mark -- or which has been marked as
3    Exhibit 10.
4        Do you see this document, Mr. Peirce?
5    A.    (Views document.)  Yes.
6    Q.    And do you recognize this as the UIQ
7    Schema Support Guide that was referred to in
8    Exhibit 2?
9    A.    Yes.
10    Q.    What is the UIQ Schema Support Guide
11    shown here?
12    A.    Again, I'm not an application developer,
13    but my understanding is that each of the rows
14    labeled Element reflects an element of the
15    transaction that would be occurring between the
16    ICON Hub and an endpoint, state or otherwise.
17    Q.    And just so the record is clear, do you
18    see in the bottom right there's a Bates label
19    that begins with NASWA and ends in 080?
20    A.    I do.
21    Q.    Does NASWA intend for State Workforce
22    Agencies to use this document?
23        MR. ARNETT:  Objection, vague, calls
24    for speculation.
25        THE WITNESS:  State Workforce

Page 95

1    Agencies who will be utilizing code that they
2    develop or developed by one of their
3    contractors would use this information, yes.
4    BY MR. OLSON:
5    Q.    And how would they use this information?
6    A.    To develop the technology to accurately
7    transmit their request and receive their
8    response.
9    Q.    And is that because this document
10    provides the information that they need in
11    order to accurately be able to transmit
12    requests and receive responses?
13        MR. ARNETT:  Objection, form,
14    foundation, calls for speculation.
15        THE WITNESS:  I'll put a finer point
16    on it.  It's the information they need to
17    accurately form the data request, to populate,
18    if you will, the data request.
19    BY MR. OLSON:
20    Q.    And what's the relationship between this
21    document and the UIQ schema we just looked at,
22    if any?
23        MR. ARNETT:  Objection, vague.
24        THE WITNESS:  Unclear to me.
25    BY MR. OLSON:

Page 96

1    Q.    I'm going to take us to the sixth page
2    of this document ending in Bates label 085.
3    Actually, I'm going to go back one page just so
4    we can see a header.  At the bottom of the page
5    ending in Bates label 84, do you see a heading
6    titled Overview?
7    A.    I do.
8    Q.    And on the next page near the top do you
9    see a sentence that says, "This document
10    reviews the format of UIQ-Specific Web Service
11    messages and describes the various UIQ
12    variables used in creating the XML"?
13    A.    Yes.
14    Q.    Is this format required for UIQ-specific
15    web service messages?
16        MR. ARNETT:  Objection, vague.
17        THE WITNESS:  It is with an
18    explanation.  Required means for it to function
19    correctly as opposed to a mandate.  And web
20    service means the modernized UIQ transaction,
21    not the legacy.
22    BY MR. OLSON:
23    Q.    Do you see the next heading says
24    Description of Row Headers?
25    A.    Yes.

Page 97

1    Q.    And THEN there are several subheadings
2    that I'm showing here, Diagram, Type,
3    Properties and Attributes.  To your knowledge,
4    is the information listed here correct and
5    accurate?
6        MR. ARNETT:  Objection, form,
7    foundation.
8        THE WITNESS:  I do not have
9    sufficient knowledge to answer that.
10    BY MR. OLSON:
11    Q.    You're not aware, looking at this now,
12    of any inaccuracies, right?
13        MR. ARNETT:  Objection, foundation.
14        THE WITNESS:  I'm not aware of any
15    inaccuracies.
16    BY MR. OLSON:
17    Q.    So you've talked a bit about the prior
18    UIQ implementation that would work with the
19    legacy hub and the modern UIQ implementation
20    that would work with the cloud hub or web
21    service messages.  Is that a fair summary of
22    your testimony?
23        MR. ARNETT:  Objection to the extent
24    it misstates his testimony and also compound.
25        THE WITNESS:  Yes.

25 (Pages 94 - 97)

Page 98

1   BY MR. OLSON:
2   Q.    I'm sorry.  I missed that, Mr. Peirce.
3   A.    Yes.
4   Q.    Okay.  And so as between those two
5   different implementations, has the core
6   functionality of the UIQ transaction changed?
7        MR. ARNETT:  Objection, vague,
8   compound.
9        THE WITNESS:  No.
10  BY MR. OLSON:
11  Q.    I'm going to stop sharing this screen or
12  this document.  And we will go to another
13  document, which was previously marked
14  Exhibit 4.  Actually, when we -- and maybe I
15  didn't paper that correctly.  When we came back
16  from the break, Mr. Peirce, do you recall that
17  we talked about the group of exhibits,
18  Exhibits 3 through 38?
19  A.    I do.
20       MR. OLSON:  And my apologies to the
21  court reporter if that was not clear at the
22  time, but I had intended to mark all of those
23  Exhibits 3 through 38 at that time.  And if
24  it's not clear on the record, then I will mark
25  them now.

Page 99

1   BY MR. OLSON:
2   Q.    I'm going to share my screen here.  I'm
3   showing you what was marked Exhibit 4 bearing a
4   Bates label of NASWA and ending in the
5   number 7.
6        Do you see that?
7   A.    (Views document.)  I do.
8   Q.    And this document is titled UI-ICON
9   Cloud Hub ICONnect UIQ Application.  Do you
10  recognize this document?
11  A.    Yes.
12  Q.    What is it?
13  A.    This document is documentation that is
14  made available to states who may wish to use
15  the modernized.  That's why it reads UI-ICON
16  Cloud Hub, UIQ application via the ICONnect
17  package.
18  Q.    And what is the relationship, if any,
19  between this document and the two other
20  documents we looked at that were Exhibits 10
21  and 11, which were the UIQ schema and the UIQ
22  Schema Support Guide?
23       MR. ARNETT:  Objection, compound,
24  vague.
25       THE WITNESS:  I would be

Page 100

1   speculating.  I do not know for certain.
2   BY MR. OLSON:
3   Q.    I'm going to take us to the last page
4   here and focus on the bottom here.  Do you see
5   this heading, Next Steps?
6   A.    Yes.
7   Q.    And then there's a description of
8   step-by-step instructions for both .NET/C# and
9   JAVA implementations, is that right?
10  A.    Yes.
11  Q.    Why does NASWA provide this information?
12       MR. ARNETT:  Objection, foundation,
13  calls for speculation.
14       THE WITNESS:  This documentation and
15  the code that would be shared by clicking on
16  those links is for the modernized ICON system,
17  the cloud system, and specifically for this
18  transaction.  And unlike the legacy system
19  where during essentially the interim of states
20  utilizing COBOL mainframes and the creation of
21  the modernized ICON cloud system, states
22  whether on their own or through a vendor needed
23  to be able to build their own client endpoint
24  in order to communicate with the legacy ICON
25  Hub.  That is no longer the case in the

Page 101

1   modernized system.  If you could think of this
2   very generally as going to either the .NET app
3   store and downloading the app or going to the
4   Java app store depending on whether you happen
5   to be carrying a .NET cell phone.  I'm drawing
6   an analogy here.  This is the difference
7   perhaps between going to get an application
8   that is both available for Android and for IOS
9   and downloading it from the app store.  So in
10  this case our state users may choose to use the
11  ICONnect software to act as their interaction
12  point with the modernized UIQ transaction.  And
13  if so, they may choose to download either of
14  the applications or both that we provide to
15  them.  This did not occur prior to the
16  modernization of this transaction in 2024.
17  BY MR. OLSON:
18  Q.    And so the applications -- or I should
19  say the supported applications that are
20  referred to here, to use your app store
21  analogy, are those applications that State
22  Workforce Agencies can download directly from
23  NASWA?
24       MR. ARNETT:  Objection, vague.
25       THE WITNESS:  Yes.

26 (Pages 98 - 101)

Page 102

1 BY MR. OLSON:
2 Q. I'm going to take us to another exhibit,
3 which I believe is the .NET Client
4 Implementation Guide referenced here, but you
5 can tell me if it is or not. And that is
6 Exhibit 27, which I am now showing you on the
7 screen, bearing Bates label NASWA ending in
8 559.
9     Do you see this document?
10 A. (Views document.) Yes.
11 Q. And do you understand this to be the
12 .NET Client Implementation Guide that was
13 referenced in the previous exhibit?
14 A. Yes.
15 Q. Generally speaking, what's included in
16 this document?
17     MR. ARNETT: Objection, vague,
18 foundation.
19     THE WITNESS: Generally speaking,
20 this document provides the instructions for
21 state staff to implement the NASWA-provided
22 modernized ICONnect client. This is not useful
23 for the legacy connection to the legacy ICON
24 Hub.
25 BY MR. OLSON:

Page 103

1 Q. To your knowledge, are there states that
2 have implemented use of the cloud hub as
3 opposed to the legacy hub?
4 A. Yes, in a general sense.
5 Q. Can you think of any specific states
6 that have implemented use of the cloud hub?
7 A. I do not have a list of the states that
8 are using the cloud hub.
9 Q. I'm going to take us two pages forward
10 to the Bates label ending in 561 and what is
11 identified in the corner as page 1 of 17.
12     Do you see that?
13 A. Yes.
14 Q. At the top there's a heading titled
15 Overview.
16     Do you see that?
17 A. Yes.
18 Q. And the first sentence says, "As with
19 any code library, you will implement the
20 ICONnect packages within your own application,"
21 right?
22 A. Yes.
23 Q. Do you know what the code library is
24 referred to here?
25 A. No.

Page 104

1 Q. Do you know what the ICONnect packages
2 are?
3     MR. ARNETT: Objection, foundation.
4     THE WITNESS: I would be
5 speculating.
6 BY MR. OLSON:
7 Q. You see the heading also on this page of
8 Creating the Project?
9 A. Yes.
10 Q. And the second sentence of this section
11 refers to, "This example project can also be
12 found in the examples/c#/client folder in the
13 provided ICONnect documentation package."
14     Do you see that?
15 A. Yes.
16 Q. What is that documentation package?
17     MR. ARNETT: Objection, foundation.
18     THE WITNESS: My general
19 understanding of the way this type of
20 application development works is that the
21 package consists of the various files of
22 various types that need to be installed in
23 order to run as executable code.
24 BY MR. OLSON:
25 Q. Do you know who has access to that

Page 105

1 documentation package?
2     MR. ARNETT: Objection, foundation,
3 calls for speculation.
4     THE WITNESS: State Workforce
5 Agencies.
6 BY MR. OLSON:
7 Q. Do you know if this package includes
8 sample code?
9     MR. ARNETT: Objection, foundation.
10     THE WITNESS: It does not include
11 sample code. It includes production code.
12 BY MR. OLSON:
13 Q. And what is production code?
14 A. In this situation, production code is
15 the ability for the user to install the
16 NASWA-developed application and run it within
17 their environment in the modernized ICON cloud.
18 This is not the use case that was used for the
19 legacy ICON Hub.
20 Q. I'm going to take us to page 5 of 17,
21 which ends in Bates label 565 in the corner.
22     Do you see that?
23 A. Yes.
24 Q. And there's a heading, Adding the
25 ICONnect Clients.

27 (Pages 102 - 105)

Page 106

1    Do you see that?
2    A.    Yes.
3    Q.    There's a reference to a Console
4    Application.  Do you know what that is?
5    A.    I don't.
6    Q.    There's also reference to ICONnect
7    clients.  Do you know what ICONnect clients
8    are?
9        MR. ARNETT:  Objection, foundation.
10       THE WITNESS:  The ICONnect client is
11   the family of software applications that we're
12   talking about here for the state endpoints to
13   utilize for the modernized ICON cloud.
14   BY MR. OLSON:
15   Q.    There's a reference here also to a file
16   that was "...generated for you by Visual
17   Studio."
18       Do you see that?
19   A.    I do.
20   Q.    How is the Program.cs file referred to
21   here generated for the user by Visual Studio?
22   A.    I don't know.
23       MR. ARNETT:  Objection, foundation.
24       THE WITNESS:  I don't know.
25   BY MR. OLSON:

Page 107

1    Q.    The next line here says, "Copy the code
2    below (Page 7) into Program.cs."
3        Do you see that?
4    A.    Yes.
5    Q.    And I'm going to take us to the next
6    page ending in Bates label 566.  Do you see
7    what you might recognize as source code and
8    comments here?
9    A.    Yes.
10   Q.    Does NASWA intend for the users of this
11   document to copy this code?
12       MR. ARNETT:  Objection, form,
13   foundation, calls for speculation.
14       THE WITNESS:  Yes.
15   BY MR. OLSON:
16   Q.    And any other code in the document,
17   right?
18       MR. ARNETT:  Objection -- same
19   objections.
20       THE WITNESS:  Yes.
21   BY MR. OLSON:
22   Q.    And from NASWA's perspective there's
23   nothing improper about State Workforce Agencies
24   copying the code in this document, right?
25       MR. ARNETT:  Same objections.

Page 108

1        THE WITNESS:  Correct.
2    BY MR. OLSON:
3    Q.    Who wrote this document, if you know?
4    A.    I don't.
5    Q.    Do you know who wrote the code in this
6    document?
7        MR. ARNETT:  Objection, foundation.
8        THE WITNESS:  This would be written
9    by our subcontractor, the UI professional
10   services team that I mentioned earlier.
11   BY MR. OLSON:
12   Q.    Does NASWA have a position on who owns
13   this code?
14       MR. ARNETT:  Objection, calls for a
15   legal conclusion.
16       THE WITNESS:  NASWA's position is
17   that this is owned by the Department of Labor.
18   BY MR. OLSON:
19   Q.    I'm going to stop sharing this document.
20       MR. OLSON:  We've been going about
21   an hour.  Why don't we take another short
22   break.
23       THE VIDEOGRAPHER:  We're going off
24   the record.
25       Time now is 2:45.

Page 109

1        (Off the record 2:45 to 2:52.)
2        THE VIDEOGRAPHER:  We are back on
3    the record.  This is the start of Media
4    Number 3.
5        The time is 2:52.
6    BY MR. OLSON:
7    Q.    Mr. Peirce, I want to take us back to
8    Exhibit 2 that we were looking at before, which
9    was the email between Ms. Squire and myself.
10   Are you able to see it on your screen again?
11   A.    Yes.
12   Q.    And I want to direct your attention to
13   the IB4 bullet.
14       Do you see that?
15   A.    I do.
16   Q.    And there is an IB4 Install Guide and an
17   IB4 Variable Description.
18       Do you see that?
19   A.    Yes.
20   Q.    What is the IB4 Install Guide?
21   A.    The IB4 Install Guide to my
22   understanding is the guide that is used for the
23   legacy hub if a state chooses to download the
24   legacy mainframe code.  There is only mainframe
25   code available for installation, not modernized

28 (Pages 106 - 109)

Page 110

1  job or .NET is my understanding for the
2  applications that are not double asterisked.
3  Q.    What do you mean when you say "mainframe
4  code"?
5  A.    Mainframe code consists of -- not unlike
6  we saw with modernized code, that there are a
7  variety of different files that are involved to
8  make mainframe code run.  You're probably
9  familiar with the term "COBOL."  COBOL is the
10  development application language, but there's
11  much more to mainframe code than developing a
12  program in COBOL.  You need Job Control
13  Language files to run them, you need database
14  structures and so on and so forth.  So when
15  we're talking about the installation guides for
16  the IB4, IB5, et cetera, that refers to legacy
17  implementation instructions that were available
18  if a state wished to install code on their
19  mainframe, mainframe only.
20  Q.    What is the IB4 Variable Description
21  document?
22  A.    It describes the variables that are used
23  in the IB4 legacy transaction.
24  Q.    Why does NASWA provide these materials
25  to State Workforce Agencies?

Page 111

1      MR. ARNETT:  Objection, vague,
2  assumes facts.
3      THE WITNESS:  So it's not the same
4  answer for each of the two things listed on a
5  given line like that.  The installation guide
6  is relevant for a state that may wish to
7  install the legacy mainframe application in
8  their mainframe potentially for use.  Many
9  states are still using mainframes.  In that
10  case they likely downloaded it decades ago,
11  perhaps have done updates, but the variable
12  descriptions are different.  The purpose of
13  those is to assist those states that are
14  modernized or have modernized away from their
15  mainframe but are still connecting to the
16  legacy ICON Hub as opposed to the modern ICON
17  cloud.  So in that use case a given state would
18  have to have developed either internally or by
19  their contractor modern language equivalents of
20  the mainframe functionality in order to connect
21  and transmit and receive responses from the
22  mainframe hub.
23  BY MR. OLSON:
24  Q.    So is it fair to say that states wishing
25  to accomplish that goal need the IB4 variable

Page 112

1  description to do so?
2      MR. ARNETT:  Objection, form, vague,
3  misstates testimony.
4      THE WITNESS:  Yes.
5  BY MR. OLSON:
6  Q.    Let's go to those documents one by one.
7  And we'll start with Exhibit 14 that was
8  previously introduced.  Are you able to see
9  this document on your screen?
10  A.    Yes.
11  Q.    And you see it's referred to as a
12  UI-ICON IB4 Processing Installation Guide?
13  A.    Yes.
14  Q.    And do you understand that to be the IB4
15  Install Guide that was referred to in
16  Exhibit 2?
17  A.    Yes.
18  Q.    And for the record, this document bears
19  the Bates label ending in 263 in the bottom
20  right corner.
21      Do you see that?
22  A.    Yes.
23  Q.    There is a reference to Release 2,
24  August 1990.  What does that date represent?
25  A.    That date should represent the date of

Page 113

1  this version of the specifications for that
2  mainframe package that I described a moment
3  ago.  1990 mainframe was essentially the only
4  game in town.
5  Q.    Below that there's a reference to
6  Document Version 2.3, July 2020.  What does
7  that date represent?
8  A.    That represents the current version of
9  this document, as also reflected in the
10  following line, for any updates that would have
11  occurred between the original release in 1990
12  and July of 2020.
13  Q.    Below that it says Current:
14  January 2025.  What does that date represent?
15  A.    I'm just taking a plain language reading
16  of that, which is to me that indicates that
17  this remains current at least as of a month
18  ago.
19  Q.    In the bottom left -- and I want to just
20  clarify one thing.  Way in the bottom left
21  you'll see language, "Highly Confidential."
22  And I'll represent to you that that was a
23  confidentiality designation that was applied to
24  this document for purposes of production in
25  this litigation.  What I want to ask about is

29 (Pages 110 - 113)

Page 114

1  the part that says "Sensitive Information,"
2  which was original to this document.  Do you
3  know why this was identified as sensitive
4  information?
5         MR. ARNETT:  Objection, foundation.
6         THE WITNESS:  I don't.
7  BY MR. OLSON:
8  Q.    Do you know whose information this
9  document is?
10        MR. ARNETT:  Objection, foundation,
11 calls for a legal conclusion.
12        THE WITNESS:  I'm not sure what the
13 antecedent of "whose" is.
14 BY MR. OLSON:
15 Q.    Is NASWA's position that this document
16 and the information in this document are owned
17 by the Department of Labor?
18        MR. ARNETT:  Same objections.
19        THE WITNESS:  Yes.
20 BY MR. OLSON:
21 Q.    I'm going to take us ahead one page to
22 the page ending in Bates label 264.  Do you see
23 a Change History listed here?
24 A.    Yes.
25 Q.    What's -- at a high level, what is shown

Page 115

1  in this table?
2         MR. ARNETT:  Objection, form, vague.
3         THE WITNESS:  This shows the
4  revision history of this document.
5  BY MR. OLSON:
6  Q.    And it shows that the initial document
7  was released in August 1990, is that right?
8  A.    That's my interpretation.
9  Q.    And then it was updated to version 2.0
10 in August 2008?
11 A.    Yes.
12 Q.    But is it fair to understand that -- I
13 guess, in view of this change history table
14 here, to which date would the core
15 functionality of the IB4 system trace back to,
16 if any, of the dates shown here?
17        MR. ARNETT:  Objection, form,
18 foundation.
19        THE WITNESS:  This table does not
20 describe the nature of the changes that
21 occurred between Version 1.0 and 2.0.  It looks
22 like the only changes after 2.0 are minor, but
23 I would be speculating on those.
24 BY MR. OLSON:
25 Q.    I'm going to take us ahead two pages to

Page 116

1  the page ending in Bates label 266 with page 1
2  at the bottom.  And you see there's an
3  Instruction at the top of this page?
4  A.    Yes.
5  Q.    The second paragraph directs the reader
6  of the document to contact someone named Martha
7  Stephens with any problems or questions, right?
8  A.    Yes.
9  Q.    Who is Martha Stephens?
10 A.    Martha Stephens is an employee of
11 Conduent.
12 Q.    And is she still the contact point for
13 any problems or questions?
14 A.    I'm making that presumption simply
15 because this document is still claimed to be
16 current.
17 Q.    I'm going to zoom in a little bit here
18 for us.  In the third paragraph it begins by
19 referring to -- well, I'll just read this first
20 sentence because it's short.  "The programs,
21 maps, and copybooks are provided as a complete
22 subsystem to handle IB4 processing."
23        Do you see that?
24 A.    I do.
25 Q.    What are the programs referenced in this

Page 117

1  sentence?
2         MR. ARNETT:  Objection, vague,
3  foundation.
4         THE WITNESS:  I don't know the
5  specific programs referred to in this sentence.
6  But generally speaking, programs, maps, and
7  copybooks are three types of elements that are
8  necessary to install and operate code in a
9  mainframe environment.  In this particular
10 case, although I can't cite what programs,
11 maps, and copybooks are being referred to, it
12 all refers to being implemented on a mainframe.
13 BY MR. OLSON:
14 Q.    There is a reference also to a complete
15 subsystem.  Do you know what that means?
16        MR. ARNETT:  Objection, foundation.
17        THE WITNESS:  It refers to the
18 complete body of work that would be necessary
19 to do this within that mainframe environment.
20 BY MR. OLSON:
21 Q.    Farther down in this paragraph there's a
22 reference to potentially "...replacing any
23 files, libraries, modules, tables, et cetera."
24        Do you see that?
25 A.    I do.

30 (Pages 114 - 117)

Page 118

1  Q.   Can you clarify under what circumstances
2  the files, libraries, modules or tables might
3  be replaced?
4         MR. ARNETT:  Objection, foundation,
5  calls for speculation.
6         THE WITNESS:  In mainframe
7  technologies there are sometimes shared
8  resources that may be utilized by different
9  programs.  And I suspect that this is providing
10 the reader with a common sense recommendation
11 that you save your work before you install
12 something new.
13 BY MR. OLSON:
14 Q.   Looking at the word "tables," are you
15 familiar with the concept of tables in an UI
16 system?
17 A.   Yes.
18        MR. ARNETT:  Objection, vague.
19        THE WITNESS:  Yes.
20 BY MR. OLSON:
21 Q.   And at a high level, what is your
22 understanding of tables in a UI system?
23 A.   Tables in the UI system is going to
24 refer very generically to data structures.
25 Q.   Does the ICON interface have any

Page 119

1  relationship to the data structures in an UI
2  system?
3         MR. ARNETT:  Objection, form, vague.
4         THE WITNESS:  I would need to you
5  define ICON interface.
6  BY MR. OLSON:
7  Q.   Sure.  Speaking of the 37 applications
8  or transactions that you've referred to, do
9  those 37 applications or transactions have any
10 bearing on the tables in an UI system?
11        MR. ARNETT:  Objection to form,
12 vague and compound.
13        THE WITNESS:  I think actually the
14 converse is more likely to be true, that --
15 and, again, this is all referring to mainframe
16 in this particular usage, that a mainframe
17 system for an unemployment program in a state
18 would have mainframe data tables that were
19 either developed internally or developed by a
20 vendor on the mainframe.  And any use of in
21 this example the IB4 subsystem would require
22 that the state conform either directly in their
23 tables or perhaps through a translation layer
24 to this specification in order to use this
25 mainframe code that was provided.

Page 120

1  BY MR. OLSON:
2  Q.   Got it.  I'm going to jump us ahead
3  several pages again to page ending in Bates
4  label 273 in the bottom right corner and page 8
5  at the bottom.  Do you see a header at the top
6  that says 4.5 Relevant Copybooks?
7  A.   Yes.
8  Q.   So I don't have anywhere near as much UI
9  background as you do, probably not none at all.
10 What are copybooks?
11        MR. ARNETT:  Objection, vague.
12        THE WITNESS:  The phrase "copybooks"
13 has nothing to do with the Unemployment
14 Insurance program.  It refers to concepts used
15 in mainframe applications.
16 BY MR. OLSON:
17 Q.   I don't have background in mainframe
18 applications either.  What are copybooks in the
19 context of mainframe applications, if you know?
20 A.   I only know in the most general sense in
21 that they represent files that need to be
22 included in the installation of mainframe
23 subsystems in order to operate correctly.
24 Q.   Is it fair to understand that in the
25 operation of a mainframe system these copybooks

Page 121

1  are required?
2         MR. ARNETT:  Objection, vague, form,
3  calls for speculation.
4         THE WITNESS:  I think you perhaps
5  are simplifying something there in the sense
6  that in order to run this code set in a state's
7  mainframe yes, they would need these copybooks.
8  But they wouldn't necessarily need these
9  copybooks to run their mainframe.  They would
10 need it to run this code set.
11 BY MR. OLSON:
12 Q.   Sure.  And that's what I had intended to
13 ask, so I appreciate you clarifying it in your
14 answer.
15        I want to jump ahead two more pages to
16 the page ending in Bates label 275 with page 10
17 at the bottom.  And do you see the heading
18 Sample JCL at the top?
19 A.   Yes.
20 Q.   What does JCL mean?
21 A.   Job Control Language.
22 Q.   There's also a reference to MVS States.
23 What does that mean?
24 A.   I don't know what the acronym means, but
25 my understanding is that MVS was a certain

31 (Pages 118 - 121)

Page 122

1  mainframe technology in use decades ago.
2  Q.    What is the series of lines here?
3         MR. ARNETT:  Objection, vague,
4  compound.
5         THE WITNESS:  I can't interpret what
6  this section of code does.  But essentially
7  generically this is Job Control Language code
8  that allows a mainframe to run other code.
9  BY MR. OLSON:
10  Q.    And is NASWA's position that this code
11  is owned by the Department of Labor?
12        MR. ARNETT:  Objection, calls for
13  speculation.
14        THE WITNESS:  NASWA's position on
15  this is this code has been around since the
16  1990s, and we have -- we have no stake in
17  ownership of it.
18  BY MR. OLSON:
19  Q.    When you say "we have no stake in
20  ownership of it," does that mean that NASWA
21  does not have a position of who, if anyone,
22  owns this code?
23        MR. ARNETT:  Objection, foundation,
24  calls for speculation, calls for a legal
25  conclusion.

Page 123

1         THE WITNESS:  I believe NASWA's
2  position would be that the Department of Labor
3  owns this.
4  BY MR. OLSON:
5  Q.    Would that be true for all the code in
6  this document?
7         MR. ARNETT:  Objection, vague,
8  foundation, compound.
9         THE WITNESS:  Yes.
10  BY MR. OLSON:
11  Q.    I'm going to take us ahead to page 23 at
12  the bottom, ending in Bates label 288 in the
13  bottom right corner.
14        Do you see that?
15  A.    Yes.
16  Q.    And there is a reference to CICS Table
17  Entries at the top.  What is CICS?
18  A.    CICS, I don't know what that stands for,
19  but essentially it acts as the user interface
20  between the mainframe code and a person sitting
21  at a keyboard.  So to put a finer point on it,
22  when an individual is interacting with
23  mainframe functionality, they're going to use
24  something like -- there are other options, but
25  in this option a CICS program to present a

Page 124

1  screen essentially to the user for them to
2  either run their query or do their data entry
3  or whatever they're there to do that then calls
4  those back-end programs that we talked about
5  earlier that were written in COBOL to do the
6  business functionality.
7  Q.    And then what is the acronym FCT shown
8  here, if you know?
9  A.    I don't know.
10  Q.    These table entries are also owned by
11  the Department of Labor, right?
12        MR. ARNETT:  Objection, calls for a
13  legal conclusion.
14        THE WITNESS:  I believe NASWA's
15  position is that they belong to the Department
16  of Labor.
17  BY MR. OLSON:
18  Q.    And would that be true for all the table
19  entries in this document?
20        MR. ARNETT:  Same objections, also
21  compound.
22        THE WITNESS:  Yes.
23  BY MR. OLSON:
24  Q.    I'm going to take us ahead to page 30 at
25  the bottom center, bearing Bates label 295 in

Page 125

1  the bottom right corner.
2         Do you see that?
3  A.    Yes.
4  Q.    And the heading at the top says Command
5  Level CICS Programs.  What does that mean?
6  A.    So let's parse that word by word.  So
7  we've already talked about CICS programs.  The
8  phrase "command level" refers to back when I
9  was a kid we had to use our computers by typing
10  a command line, no mouse, no click-ability.  So
11  we would type a command on the command line,
12  which in this usage would then run a program
13  that was written in CICS.
14  Q.    And what's shown in the table here,
15  again at a high level?
16  A.    My understanding of mainframe
17  architecture is limited.  My understanding is
18  that in the first example you have a program
19  that is identified as IN probably POSW06, which
20  would be invoked by a command line command, and
21  it would utilize the various files that are
22  listed in the columns to the right, the copy
23  members, map set, none in this case, the files
24  and, again, none under the return ID and the
25  ABEND code.  ABEND code means abnormal ending.

Page 126

1    Q.    All right. I'm going to take us ahead
2    now to page 46 of this document bearing Bates
3    label in the bottom right corner ending in 311
4    with the heading at the top Batch COBOL
5    Programs.
6         Do you see that?
7    A.    I do.
8    Q.    And you've mentioned COBOL before. What
9    is COBOL?
10   A.    COBOL is a programming language.
11   Q.    What are batch COBOL programs?
12   A.    So earlier you asked me to draw the
13   distinction between online or real-time
14   transactions and batch transactions. The same
15   distinction is drawn here. We talked a moment
16   ago about CICS programs, and I described them
17   as the way that the human would interact.
18   That's essentially a real-time transaction. A
19   human types something on the keyboard, hits
20   enter, something happens. A batch COBOL
21   program is invoked asynchronously typically at
22   night, but not always, and not with direct user
23   input, but rather from an input from either
24   another batch program or a scheduling system
25   that tells it to run at a certain time. So in

Page 127

1    mainframe batch processing what typically
2    occurs is that the batch process kicks off at a
3    given time and Job Control Language tells first
4    run this program, then run that program, then
5    run the other program. If that happens, maybe
6    you need to run the fourth program over here,
7    so on and so forth. But the general concept is
8    that's all happening in the background, again,
9    typically overnight so that the systems are
10   updated and ready for performance by humans in
11   the morning.
12   Q.    So just zooming out the lens briefly, is
13   it NASWA's position that everything in this
14   document is owned by the Department of Labor?
15        MR. ARNETT: Objection, compound,
16   calls for a legal conclusion.
17        THE WITNESS: Yes.
18   BY MR. OLSON:
19   Q.    And, is that true for all of the
20   installation guides that NASWA has produced?
21        MR. ARNETT: Objection, vague,
22   compound, calls for a legal conclusion.
23        THE WITNESS: I want to ask
24   interpretation of the word "produced" in your
25   question.

Page 128

1    BY MR. OLSON:
2    Q.    Yeah, I'm referring to the documents
3    that NASWA produced in this case which were
4    included in the ZIP file that you reviewed.
5    A.    Okay. So if you are -- I'm interpreting
6    that to mean that by the usage of the word
7    "produced," that means conferred to your firm
8    for use in this case as opposed to the
9    origination of those files.
10   Q.    Correct.
11   A.    If that's the case, then yes, that is
12   our position. NASWA did not originate many of
13   these files.
14   Q.    And of the files that NASWA produced to
15   our firm in this case, are there any files that
16   are not owned by the Department of Labor from
17   NASWA's perspective?
18        MR. ARNETT: Objection, compound,
19   calls for legal conclusions.
20        THE WITNESS: My pause is simply to
21   look over the list that I have in front of me.
22   I believe that NASWA's position would be that
23   each of the documents that were presented would
24   be the property of the Department of Labor.
25   BY MR. OLSON:

Page 129

1    Q.    You mentioned a list in front of you.
2    Is that a handwritten list?
3    A.    No.
4    Q.    Is it a copy of the email we've looked
5    at as Exhibit 2?
6    A.    No.
7    Q.    What are the notes that you have in
8    front of you?
9    A.    It's a printout of the directory that
10   includes all of the files in the ZIP file.
11   Q.    Do you have any other documents or notes
12   in front of you right now?
13   A.    I have many documents and notes in front
14   of me right now.
15   Q.    Setting aside whatever documents might
16   incidentally be in your working space, do you
17   have any documents or notes that you have in
18   front of you for purposes of today's
19   deposition?
20   A.    Yes.
21   Q.    And what are those documents or notes?
22   A.    There are many of them. For example, I
23   have a printout of the actual subpoena right
24   here.
25   Q.    Other than the printout of the subpoena

33 (Pages 126 - 129)

Page 130

1    and printouts of any documents that were in the
2    ZIP folder you received, are there any other
3    documents printed out in front of you right now
4    for purposes of your deposition?
5    A.    I have printed out in front of me the
6    file list from the original ZIP file that NASWA
7    provided and also the file list from -- I've
8    forgotten the name of the tool that you all
9    were using, but the tool that I had to log into
10   this morning.
11   Q.    Any other documents?
12   A.    I have hard copies of some emails that
13   some of which are internal.  Actually, I think
14   all of which are internal.
15   Q.    And do those emails relate to NASWA's
16   collection of document production in this case?
17   A.    Not exclusively.  For example, I have an
18   email here that was when I needed to find the
19   date that NASWA took the contract on, I didn't
20   have that knowledge ahead of time.  So I sent
21   an email to an individual that did, and that
22   individual provided me the answer, and I have
23   that in front of me for reference.
24   Q.    Okay.  So we can follow up with this
25   offline, but I think we'll ask your counsel to

Page 131

1    produce those notes to us just so we have a
2    complete record of the materials that were
3    available to you as part of your deposition
4    today.  But we can move on for now.
5          I want to take us back to Exhibit 2,
6    which we've been looking at throughout the
7    afternoon.  In looking at IB4 -- we just looked
8    at the IB4 Install Guide.  That's what we were
9    looking at, right?
10   A.    Yes.
11   Q.    I'm going to take us to the IB4 variable
12   description, which was previously introduced as
13   Exhibit 15 to this deposition.  Are you able to
14   see that document on your screen?
15   A.    Yes.
16   Q.    This is a document bearing Bates label
17   ending in 313 in the bottom right corner.
18         Do you see that?
19   A.    Yes.
20   Q.    This is, in fact, the IB4 variable
21   description referenced in the -- in Exhibit
22   Number 2 that we were just looking at, right?
23   A.    Yes.
24   Q.    Are you familiar with this document?
25   A.    Yes.

Page 132

1    Q.    And at a high level, what is this
2    document?
3    A.    My understanding of this document is
4    that this was created to facilitate states who
5    were moving away from mainframes in the
6    beginning of this millennium and needed to
7    generate their own functionality in order to
8    continue to communicate with the legacy
9    mainframe ICON hub.  And as such, the vendor at
10   that time, long before we took over in 2018,
11   made these documents available to states in
12   order to write modern language code, modern
13   platform code.
14   Q.    And which vendor are you referring to?
15   A.    Any vendor.
16   Q.    Sorry.  I just want to make sure I
17   understand.  I thought you testified that the
18   vendor at the time, long before you took over
19   in 2018, made these documents available to
20   states, which --
21   A.    Thank you for that clarification.  I
22   apologize.  My original statement was regarding
23   the subcontractor, then to Maryland, now to us,
24   Conduent, who has maintained the operation of
25   the legacy ICON system for many, many years.

Page 133

1    My confusion was when you asked me which
2    vendor, I was thinking of vendors that states
3    may leverage in order to generate modernized
4    systems.  And that's not what I was talking
5    about when I was talking about the then-ICON
6    subcontractor.  I'll try to use subcontractor
7    rather than vendor when I'm referring to that
8    group.
9    Q.    Thank you.  I appreciate that
10   clarification.  So when you said "any vendor"
11   earlier, what did you mean in terms of -- what
12   did you mean by that response as relating to
13   this document?
14         MR. ARNETT:  Objection, vague.
15         THE WITNESS:  Misunderstood your
16   question, and so I jumped to the terminology of
17   using the word "vendor" in the sense of that a
18   state UI agency may choose to develop their own
19   systems or may bid a contract out to vendors to
20   do such.  And in that case I was referring to
21   the latter.
22   BY MR. OLSON:
23   Q.    Let's go ahead one page here to the
24   Change History table on the page ending 314.
25         Do you see that?

34 (Pages 130 - 133)

Page 134

1   A.   I do.
2   Q.   So it's fair to understand here that
3   this document was first released in
4   February 2014?
5   A.   Yes.
6   Q.   And is it fair to understand that there
7   have been minimal changes over time?
8        MR. ARNETT:  Objection, foundation,
9   compound.
10       THE WITNESS:  Based on a plain
11  reading of the variable description change
12  summary, I think that seems reasonable, but I
13  do not have firsthand knowledge.
14  BY MR. OLSON:
15  Q.   But based on your interpretation of this
16  table sitting here today, that seems fair to
17  you?
18       MR. ARNETT:  Objection, foundation.
19       THE WITNESS:  Yes, simply because
20  many of the rows include the language "no
21  changes."
22  BY MR. OLSON:
23  Q.   Let's go ahead one more page to the
24  Bates label ending in 315, and at the center
25  bottom of this page Roman numeral III.  Do you

Page 135

1   see the heading at the top Appendix B:
2   Variable Descriptions for Copybook INCBSW16?
3   A.   Yes.
4   Q.   What does that refer to, if you know?
5   A.   I don't know what that copybook is, but
6   we talked about the concepts of copybooks a few
7   moments ago.
8   Q.   The first sentence -- and I'll zoom in a
9   little bit so we can see better.  The first
10  sentence here says, "This document is a
11  description of the various IB4 variables used
12  in creating the common carrier IB4 and IB4
13  records."
14       Do you see that?
15  A.   I do.
16  Q.   So is it fair to understand that NASWA
17  wants all State Workforce Agencies to have
18  access to these variables?
19       MR. ARNETT:  Objection, calls for
20  speculation, foundation as well.
21       THE WITNESS:  I don't think that
22  NASWA has a desire at all in this case.  I
23  think that this is simply that the information
24  here is necessary for the states to accurately
25  build their own or contract out the building of

Page 136

1   software to interact with the ICON system.
2   BY MR. OLSON:
3   Q.   So NASWA does, in fact, make these
4   variables available to State Workforce
5   Agencies, right?
6   A.   Yes.
7   Q.   Is every IB4 application required to use
8   these variables?
9        MR. ARNETT:  Objection, foundation,
10  calls for speculation.
11       THE WITNESS:  There is no mechanism
12  by which NASWA can require the usage.  But
13  functionally speaking, systems would not work
14  correctly if they did not comport to the
15  definitions that are set forth here.
16  BY MR. OLSON:
17  Q.   I appreciate that clarification.  When I
18  am asking about requirements today, I am asking
19  about functional requirements as opposed to
20  some sort of legal or policy-type requirement.
21  Does that make sense?
22  A.   Yes, it does.
23  Q.   And so with that understanding in mind,
24  are these variables functionally required for a
25  functioning IB4 interface?

Page 137

1        MR. ARNETT:  Objection to form.
2        THE WITNESS:  Yes.
3   BY MR. OLSON:
4   Q.   To your knowledge, can State Workforce
5   Agencies deviate from these variables and still
6   have a functioning IB4 interface?
7   A.   I'd be speculating.
8   Q.   You don't know one way or the other?
9   A.   I can't imagine it would work well.
10  Q.   And I think you testified earlier that
11  all of the documents produced in this case are
12  owned by the Department of Labor.  Do you
13  recall that testimony?
14  A.   I think I spoke that as a -- that's
15  NASWA's position regarding the documents.
16  Q.   Sure.  And does that mean that the
17  Department of Labor likewise owns the specific
18  variables in this document?
19       MR. ARNETT:  Objection, calls for a
20  legal conclusion, misstates prior testimony.
21       THE WITNESS:  I don't know the
22  distinction between specific variables in the
23  overall documentation.
24  BY MR. OLSON:
25  Q.   Has the core IB4 functionality described

35 (Pages 134 - 137)

1 in these two documents changed over time?
2      MR. ARNETT: Objection, vague,
3 compound, foundation.
4      THE WITNESS: I imagine that those
5 changes would have been -- if present, would
6 have been outlined in the version control table
7 that we saw at the beginning. I don't know the
8 nature of those particular changes. But I
9 think that there's circumstantial evidence that
10 they did change at least a couple of points in
11 the history of this particular exchange.
12 BY MR. OLSON:
13   Q.   Let's go back one page to the change
14 history in this document. Are you pointing at
15 anything in this table that you think shows a
16 substantial change in the core IB4
17 functionality?
18      MR. ARNETT: Objection, foundation.
19      THE WITNESS: I'm troubled by the
20 use of the word "substantial" simply because I
21 have no idea of the magnitude of the changes
22 that are reflected in the version 1.1, 1.2,
23 1.3, et cetera where there are references to
24 updates to the documentation.
25 BY MR. OLSON:

1   Q.   Does NASWA maintain earlier versions of
2 this document?
3   A.   No.
4   Q.   Does NASWA maintain earlier versions of
5 any of the documents that have been produced in
6 this case by NASWA?
7   A.   I'd be speculating.
8   Q.   Do you know whether NASWA maintains
9 earlier versions of any of the documents that
10 NASWA has produced in this case?
11   A.   I do not know.
12   Q.   Focusing on this one, I just want to
13 make sure I understand your testimony, do you
14 not know for this document, or are you certain
15 for this document that NASWA does not have
16 earlier versions of this document?
17   A.   I do not know for certain.
18   Q.   If you wanted to figure that out, who at
19 NASWA would you ask?
20   A.   I don't believe that I would get the
21 answer from NASWA. I think that the answer
22 would need to come from Conduent.
23   Q.   Do you know one way or the other whether
24 Conduent maintains earlier versions of this
25 document?

1   A.   I do not.
2   Q.   Do you know one way or the other whether
3 earlier versions of this document are available
4 from Conduent?
5   A.   I do not.
6   Q.   And would that be true for all the
7 documents that NASWA produced in this case?
8   A.   No.
9   Q.   So are there documents that NASWA has
10 produced in this case for which you know one
11 way or the other whether Conduent maintains
12 those documents?
13   A.   No.
14   Q.   Okay. I'm going to take us back to
15 Exhibit 2 again. And do you see the reference
16 to UCFE towards the bottom of this page?
17   A.   Yes.
18   Q.   And we see four documents listed here
19 starting with UCFE Install Guide.
20      Do you see that?
21   A.   Yes.
22   Q.   And functionally does that document
23 serve the same purpose as the IB4 Install Guide
24 does for the IB4 application?
25   A.   Yes.

1      MR. ARNETT: Objection, form,
2 foundation.
3      THE WITNESS: Sorry. Yes, that is
4 my understanding.
5 BY MR. OLSON:
6   Q.   And other than differences between the
7 applications or transactions, are you aware of
8 any differences between those install guides?
9      MR. ARNETT: Objection, vague.
10      THE WITNESS: If you're asking about
11 the purposes of those documents, then I would
12 say they serve the same purpose.
13 BY MR. OLSON:
14   Q.   Yes. And thank you for clarifying.
15 That is what I was asking about rather than,
16 you know, whether specific words are the exact
17 same from one document to the next.
18      What about the UCFE Non-Model Code
19 Guide, what is that?
20   A.   I am not sure what that means. That --
21 I would be speculating.
22   Q.   Does non-model code mean anything to
23 you?
24   A.   In the sense that model code means
25 something to me, I would be drawing inferences

Page 142

1  about what non-model code is.
2  Q.    What does model code mean to you?
3  A.    Model code means that in this situation,
4  it means that NASWA through its subcontractor
5  or Maryland prior through its subcontractor
6  would have provided functional code much like
7  we talked about a few moments ago when we were
8  going through the documents that showed various
9  programs and copybooks, batch ICS, so on and so
10 forth.  So that's why I'm confused about
11 non-model code because model code means:  Here,
12 try this out, use it as you see fit, but I
13 don't know what non-model code means.
14 Q.    We'll take a look at that document in a
15 moment, but I want to ask first:  What is the
16 revised request record layout?
17 A.    Parsing that word by word, record layout
18 is going to talk about the data that is
19 transmitted or returned needs to be formatted,
20 and the terminology for that formatting is in a
21 layout.  So a record has a layout in order to
22 be well formatted to be understood by a
23 machine.  The word "request" means the response
24 to the inquiry.  So we're talking about, as I
25 mentioned way at the beginning, a hub and spoke

Page 143

1  system where there's a request made, and then
2  the system generates a response.  This is
3  talking about the response to the request
4  apparently.  Excuse me.  Actually, I just
5  misspoke.  This says "revised request."  So
6  it's the request, not the response that has
7  apparently exchanged.  And, of course, the word
8  "revised" means that at some point that record
9  layout changed.
10 Q.    And then I think the next document in
11 the list here does refer to response.  What is
12 the Revised Response Record Layout?
13 A.    I think that kind of answers the rest of
14 the question, which is that at some point
15 apparently, according to this, on January 11th
16 of 2024, the ICON request record layout
17 changed, thus it's called revised.  And then
18 presumably because it changed, the response
19 record layout probably reflects corresponding
20 changes.
21 Q.    Let's take a look at what's been marked
22 as Exhibit 39 bearing Bates label ending in
23 728.
24       (Exhibit Number 39 marked for
25 identification.)

Page 144

1  BY MR. OLSON:
2  Q.    Mr. Peirce, do you recognize this
3  document?
4  A.    Yes.
5  Q.    And is this one of the documents that
6  you reviewed in advance of the deposition?
7  A.    Yes.
8  Q.    Do you understand that this document was
9  produced by NASWA in response to the document
10 subpoena that we reviewed earlier, which was
11 Exhibit 1?
12 A.    Yes.
13 Q.    And based on your knowledge, experience
14 and review, do you recognize this document as a
15 true and correct copy of a file maintained by
16 NASWA in the ordinary course of business?
17 A.    Yes.
18 Q.    Okay.  There is a reference on this
19 page -- well, let me state first, the document
20 is UI-ICON Unemployment Compensation For
21 Federal Employees (UCFE) Non-Model Code Guide.
22       Do you see that?
23 A.    I do.
24 Q.    It says Code Released August 2001 what
25 does that mean?

Page 145

1        MR. ARNETT:  Objection, foundation.
2        THE WITNESS:  I would be
3  speculating, but I believe that probably means
4  that whatever this non-model code, which I've
5  already mentioned I don't know what non-model
6  means, but within this document there is likely
7  reference to code that was originally released
8  in August of 2001.
9  BY MR. OLSON:
10 Q.    I'm going to take us forward to page
11 ending in Bates label 731 in the bottom
12 right-hand corner identified as page 1 where it
13 says Overview at the top.
14       Do you see that?
15 A.    Yes.
16 Q.    And then in the middle there is a
17 section titled Background, and we see an
18 acronym SESA.  What is that, if you know?
19 A.    I've forgotten what that stands for.  I
20 believe it -- I'm speculating, but I believe it
21 stands for State Employment Security Agency.
22 Q.    And do you know if that is an agency
23 operating under the Department of Labor?
24 A.    No.  It would be the state agencies.
25 Q.    I see.  What is a State Employment

37 (Pages 142 - 145)

Page 146

1  Security Agency?
2  A.   I believe this is an archaic term that
3  has been replaced by the term State Workforce
4  Agency that reflects, in this usage, the state
5  agency or department that runs the Unemployment
6  Insurance program in a given state.
7  Q.   There is also reference to a TC-ETA931
8  request.  Do you know what that is?
9  A.   Little confused by it.  The 931 request
10 without the prefix refers to the specified
11 request for federal employment information that
12 is generated by a state and sent to the federal
13 agency where the individual previously worked
14 to gather data about that person's employment
15 and earnings.  I do not know what the prefix
16 TC- means.
17 Q.   I want to take us forward several pages
18 to what is identified in the bottom right
19 corner as Bates label 736, and we see
20 Appendix A at the top.
21      Do you see that?
22 A.   Yes.
23 Q.   And if we go to the next page in
24 Appendix A ending in Bates label 737, we see at
25 the top TCA-ETA 931 Request for Wage and

Page 147

1  Separation Information SESA Layout.
2       Do you see that?
3  A.   I do.
4  Q.   At a high level what is shown in this
5  table?
6       MR. ARNETT:  Objection, vague.
7       THE WITNESS:  My understanding is
8  that this is essentially the record layout that
9  we talked about earlier for this particular
10 transaction.
11 BY MR. OLSON:
12 Q.   What are each of these fields?
13 A.   Do you mean what are the meaning of
14 those field names, or are you meaning
15 generically what are fields?
16 Q.   Yeah.  I mean more generically what does
17 a field name here represent?
18 A.   Part of the data element that would be
19 part of the file transmission.  So back in the
20 mainframe world when a transaction is initiated
21 it carries a payload.  In the old days that
22 payload was typically a long string, and this
23 would define the string that was made up of
24 individual elements.
25 Q.   The next column refers to FLD Type.  Is

Page 148

1  that field type?
2  A.   It is.
3  Q.   And what do the entries here mean, N or
4  A/N?
5  A.   I don't know.
6       MR. ARNETT:  Objection, form.
7       THE WITNESS:  I don't know.
8  BY MR. OLSON:
9  Q.   The next one says BEG COL.  Do you know
10 what that means?
11 A.   Beginning column.
12 Q.   And the next one here, FLD LGTH, is that
13 field length?
14 A.   It is.
15 Q.   The next one REQ/OPT, is that
16 required/optional?
17 A.   Yes.
18 Q.   And would the entries R or O in that
19 column corresponded with required or optional?
20 A.   Yes.
21 Q.   Do you have an understanding what it
22 means for a field to be required or optional
23 here?
24 A.   Yes.
25 Q.   And what does it mean?

Page 149

1  A.   Means for the payload of that
2  transaction that I described a minute ago,
3  which would be a long string of all of these
4  elements would be considered legitimate if the
5  required fields were completed but the optional
6  field could be omitted or somehow probably
7  likely be required to pass a null value or
8  something like that.
9  Q.   There's a statement here, "Record key is
10 fields 1 through 4."  What does that mean?
11 A.   In data structures, data needs to have a
12 reference to make sure that it can be uniquely
13 identified.  And in this case, that unique
14 identifier or record key is the string that's
15 consists of fields 1 through 4.
16 Q.   Going ahead here to page ending in
17 Bates 739 in the bottom right corner, we see
18 after the 35th row in this table a statement,
19 "Total Record 1000."  What does that mean?
20 A.   That means that the total width, if you
21 will, of that payload is 1,000 characters.
22 Q.   And there are several other tables in
23 this document.  I'm showing the next one on the
24 following page, 740.  Would the answers you
25 just gave about the structure of that table

38 (Pages 146 - 149)

Page 150

1  apply to the other tables in this document?
2         MR. ARNETT:  Object to form.
3         THE WITNESS:  Yes.
4  BY MR. OLSON:
5  Q.    I'm going to go ahead to the page ending
6  in Bates label 765.  Do you see where it says
7  Appendix B in the middle?
8  A.    Yes.
9  Q.    I'm going to go ahead one more page to
10  the Bates label ending in 766 with Variable
11  Description Table at the top.
12       Do you see that?
13  A.    I do.
14  Q.    What is the variable description table?
15       MR. ARNETT:  Objection, vague.
16       THE WITNESS:  It appears to be the
17  definitions of the variable names listed in the
18  first column.
19  BY MR. OLSON:
20  Q.    Do you know what PIC means at the header
21  of the second column?
22  A.    I'm speculating it's actually PLC and
23  may mean place within the record, but I am not
24  positive of that.
25  Q.    The next column refers to REQ/OPT.  Is

Page 151

1  that again required/optional?
2  A.    Yes.
3  Q.    And what's your understanding of the --
4  let me just ask this way:  What is the last
5  column titled Contents?
6  A.    Plain language description of what is
7  transmitted in that variable.
8  Q.    Where would these variables be used in a
9  UI system, if at all?
10       MR. ARNETT:  Objection, vague, calls
11  for speculation.
12       THE WITNESS:  These variables would
13  not be necessarily used in the state's UI
14  system explicitly, but rather would be
15  populated with data from the state's UI system
16  for the purpose of executing this transaction
17  via the ICON Hub.  Specifically, let's look at
18  the first one that has the description,
19  Receiver State Postal Code.  The variable name
20  is CC-Receiver-ID-State.  It's extremely
21  unlikely that a state's UI system would
22  architect their database to use that field name
23  when their state is their state.  And so what
24  they need to do is they need to populate the
25  transmission with the data that's relevant for

Page 152

1  the variable.  So to go back around to your
2  question, would these data elements be used in
3  a state's UI system, probably not directly, but
4  they need to coordinate with these variables in
5  order to have a functioning transaction.
6  BY MR. OLSON:
7  Q.    And so is it the case that a state would
8  need to have a corresponding variable or one or
9  more corresponding variables for the variables
10  shown here?
11       MR. ARNETT:  Objection, form,
12  foundation, calls for speculation.
13       THE WITNESS:  I'm going to use the
14  same variable as an example.  This is referring
15  to a transaction.  This transaction would be
16  sent to the hub for passage along to another
17  state.  So state A would be the sender, state B
18  would be the receiver.  State B would be -- the
19  postal code would be the value of this part of
20  the data payload in this transmission.  But
21  that wouldn't necessarily be explicitly stored
22  as a data element in the sender's database, but
23  rather known through the processing of the
24  underlying unemployment claim that generated
25  the need for the request.  I hope that helps.

Page 153

1  BY MR. OLSON:
2  Q.    It does.  Thank you.  And I appreciate
3  you bearing with me.  As I said before, I have
4  nowhere near the level of experience you do in
5  this field, so I appreciate you walking me
6  through this.
7       I'm going to take us ahead to Bates
8  label ending in page 769 with Appendix C at the
9  top.
10       Do you see that?
11  A.    I do.
12  Q.    And going ahead one more page to Bates
13  label ending in page 770, we see another table
14  that at least structurally appears similar to
15  the table that we saw in Appendix A, right?
16  A.    Yes.
17       MR. ARNETT:  Objection, vague.
18  BY MR. OLSON:
19  Q.    And is it fair to understand that your
20  testimony regarding the structure of the table
21  in Appendix A is also applicable to the tables
22  in Appendix C?
23       MR. ARNETT:  Object to form.
24       THE WITNESS:  Yes.  And I just
25  realized what the A/N means.

39 (Pages 150 - 153)

Page 154

1 BY MR. OLSON:
2 Q.    What does it mean?
3 A.    I believe it's likely to mean alphabetic
4 or numeric.
5 Q.    And so if it's A/N, would it be
6 alphanumeric where either letters or numbers
7 could be used?
8 A.    That's my interpretation, yes.
9 Q.    And N would be numeric where only
10 numbers could be used?
11 A.    Again, that's my interpretation.
12 Q.    Has the core functionality of the UCFE
13 application changed over time?
14        MR. ARNETT: Objection, vague,
15 foundation.
16        THE WITNESS: I'm sure that there
17 have been modifications to the system. But if
18 I am interpreting your literal question
19 correctly. The core functionality, I think you
20 used, is the word, if I'm interpreting that as
21 the reason that this exists, that the
22 unemployment compensation for federal employees
23 remains a requirement of the UI system and so
24 in that sense, no, the use case hasn't changed,
25 but the implementation details likely have.

Page 155

1 BY MR. OLSON:
2 Q.    And if we wanted to understand how the
3 implementation details had changed, what
4 documents would we look at to do so?
5 A.    Speculating. But when we looked at the
6 variety of different change logs for all of
7 these different documents that we've been
8 talking about, speculating that the way to do
9 what you're asking me to do would be to inspect
10 each version of those forms and then look for
11 the deltas.
12 Q.    Mr. Peirce, I have probably another 15
13 to 20 minutes, but we've gone for about an
14 hour. Would you like to take a break or do you
15 want to just keep going through?
16 A.    Let's go on through.
17 Q.    All right. We'll try to get you to your
18 weekend as soon as we can.
19        I'm going to pull up what was previously
20 marked as Exhibit 32. This document is bearing
21 in the bottom right corner Bates label ending
22 in 612 with the heading at the top Request
23 Record Layout?
24        Do you see that?
25 A.    I do.

Page 156

1 Q.    And do you recognize this as the revised
2 request record layout that was referenced in
3 Exhibit 2?
4 A.    Yes.
5 Q.    What is this document?
6 A.    It's not dissimilar to what we talked
7 about a moment ago in that it's providing the
8 specifications for the payload that would need
9 to be transmitted when a transaction is run,
10 and then on the return route the payload that
11 would be consumed by the original requesting
12 state.
13 Q.    Here we see again a column Field Type
14 with N and A/N. Would you have the same
15 understanding that this is referring to an
16 alphanumeric or numeric field type?
17 A.    I believe so.
18 Q.    And, again, Begin column, what does that
19 mean?
20 A.    That would mean, again, if you're
21 thinking of the payload as a long string of
22 characters, that means that this field starts
23 in column number, and then whatever the value
24 is in that column.
25 Q.    And then FLD LEN, is that field length?

Page 157

1 A.    It is.
2 Q.    So, for example, the field length for
3 the first row here is nine, right?
4 A.    Yes. As we know, Social Security
5 numbers are nine digits long.
6 Q.    Do you see that's why I picked that
7 example, to make it easy for us.
8 A.    Yes.
9 Q.    What's your understanding of the
10 relationship, if any, between this document and
11 a document that we were just looking at,
12 Exhibit 39?
13        MR. ARNETT: Objection, vague.
14        THE WITNESS: I do not understand
15 the relationship between the two.
16 BY MR. OLSON:
17 Q.    I'm going to go to one additional
18 document, which was previously marked as
19 Exhibit 33, in the bottom right-hand corner
20 bearing Bates label 614 with the heading at the
21 top Response Record Layout.
22        Do you see that?
23 A.    I do.
24 Q.    And is this the corresponding response
25 document that was referenced in Exhibit 2 that

Page 158

1  we looked at earlier?
2  A.    Yes.
3  Q.    And would your testimony regarding the
4  structure of this table be the same as the
5  testimony you gave regarding the previous
6  exhibit?
7          MR. ARNETT: Objection, form.
8          THE WITNESS: Yes.
9  BY MR. OLSON:
10  Q.    All right. I'm going to stop sharing
11  this document. And I'm actually going to take
12  us back to Exhibit Number 1 that we looked at
13  earlier. I'm going to share that now. Do you
14  see the topics for deposition listed here?
15  A.    Yes.
16  Q.    Do you see topic number 5 reads,
17  "Documents and communications, including but
18  not limited to source code, use cases, and
19  requirement specifications documents, from
20  State Workforce Agencies of Minnesota,
21  Massachusetts, New Mexico, or Florida that
22  NASWA has at any time made available to State
23  Workforce Agencies via the NASWA.org website or
24  otherwise"?
25          Do you see that?

Page 159

1  A.    I do.
2  Q.    And you are familiar with the term "use
3  case" in the context of UI, right?
4  A.    I'm familiar with the term "use case" in
5  the context of software development.
6  Q.    What is a use case in the context of
7  software development?
8  A.    Essentially it means that when an
9  application or code is designed, it's designed
10  to do something. Often it's designed to do
11  multiple things. And the way to break down the
12  needs at the design level of a piece of
13  software is to identify use cases.
14  Q.    And are you aware of use cases that
15  State Workforce agencies have for UI
16  modernization efforts?
17  A.    Generally, yes, for state modernization
18  efforts. At some point -- and there is
19  variation in this, but at some point in the
20  modernization effort, states will develop use
21  cases or some similar type of documentation of
22  how the modernized system is designed to
23  operate at a functional level, like the
24  outcomes necessary.
25  Q.    Generally speaking, do you know if a

Page 160

1  state's use cases are confidential?
2          MR. ARNETT: Objection, foundation,
3  calls for a legal conclusion.
4          THE WITNESS: I don't know that
5  there is a general answer to that. In some
6  cases use cases have been utilized as part of
7  the public procurement process. So in that
8  case they certainly would be available to
9  anyone who went to look. In other cases they
10  are not part of the RFP, and I don't know what
11  those state's positions are on the
12  confidentiality of them.
13  BY MR. OLSON:
14  Q.    Are you familiar with the term
15  "requirement specifications"?
16  A.    Yes.
17  Q.    What does that term mean to you?
18  A.    To some degree it's synonymous with use
19  cases with some nuance. So use cases generally
20  are going to refer to essentially the business
21  outcome that is necessary, calculate the amount
22  of a payment to an individual, for example,
23  whereas a requirement would include that but
24  also might include something that is very
25  specific like utilizing this type of

Page 161

1  architecture or so on and so forth. So I think
2  kind of at a philosophical level, if you will,
3  use cases would be a subset of requirements.
4  Q.    Looking back at this topic, to your
5  knowledge, has NASWA ever made use cases from
6  particular states available to its members?
7  A.    I'm not aware of that.
8  Q.    Have you ever heard of any repository
9  like this where different state's use cases
10  were available?
11          MR. ARNETT: Objection, vague,
12  assumes facts.
13          THE WITNESS: I would be
14  speculating. No, I do not.
15  BY MR. OLSON:
16  Q.    Yeah. And I'm not asking you to
17  speculate. I'm just curious if you recall ever
18  seeing an online repository of use cases from
19  specific states?
20  A.    Not that I recall, no.
21  Q.    I'm going to stop sharing this document.
22  And I believe I'm done sharing documents. Just
23  a few more questions.
24          Mr. Peirce, have you seen multiple UI
25  modernization efforts throughout your career?

41 (Pages 158 - 161)

Page 162

1    MR. ARNETT: Objection, vague.
2    THE WITNESS: Yes, I personally
3  participated when I worked in Wisconsin, and I
4  have a general awareness of what has occurred
5  in other states as well. I have not worked on
6  modernization efforts in any other states.
7  BY MR. OLSON:
8    Q.    And what is the source of your general
9  awareness of what's occurred in other states?
10    A.    NASWA served as a convener of its
11  members to states and in a variety of fora
12  provides opportunities for those states to
13  share their experiences in modernization, and
14  we help bring those messages to other states
15  who may be at a different part of the
16  modernization lifecycle.
17    Q.    Have you seen screenshots from various
18  UI modernization efforts?
19    MR. ARNETT: Objection, vague.
20    THE WITNESS: I don't have an
21  explicit recollection of a situation, but I
22  think it's likely because it's very, very
23  common for the system vendor community to do
24  demonstrations, whether static or otherwise, at
25  those convenings that I described a moment ago.

Page 163

1  So for example, if you were to come to our
2  NASWA annual conference, we call it a summit,
3  you'd enter a huge room with lots of technology
4  purveyors describing their products.
5  BY MR. OLSON:
6    Q.    Have you seen descriptions or
7  demonstrations from different vendors of UI
8  modernization solutions?
9    A.    Yes, I have.
10    MR. ARNETT: Objection, vague.
11    THE WITNESS: Yes, I have.
12  BY MR. OLSON:
13    Q.    Generally speaking, how much similarity
14  is there from one UI modernization system to
15  the next?
16    MR. ARNETT: Objection, vague, lacks
17  foundation.
18    THE WITNESS: There are a lot of
19  facets to that question. The similarities lie
20  in, you know, the general outcomes that all the
21  states need to have. I used an example a few
22  moments ago about being able to calculate the
23  payment amount. All the states need to be able
24  to accurately calculate the payment amount to
25  an individual. In terms of methods used to do

Page 164

1  that, math is set forth typically in state
2  statute. But in terms of the tool that is
3  designed to do that will vary widely depending
4  on not only the state's needs for how that will
5  be implemented, but also to some degree by the
6  products being offered in the marketplace.
7  BY MR. OLSON:
8    Q.    Is it fair to understand that generally
9  speaking UI modernization systems are trying to
10  achieve the same functional goals?
11    MR. ARNETT: Objection, form, vague.
12    THE WITNESS: If you distill it down
13  to the most simplistic level, any state's UI
14  program has the same types of activities that
15  need to be undertaken. But the way the states
16  choose to do that vary significantly, so it
17  kind of depends on how you interpret the
18  question.
19  BY MR. OLSON:
20    Q.    Mr. Peirce, do you have any personal
21  opinions about this lawsuit?
22    A.    No.
23    MR. ARNETT: Objection, vague.
24    THE WITNESS: No.
25  BY MR. OLSON:

Page 165

1    Q.    Do you have any personal opinions about
2  the merits of Deloitte's allegations?
3    MR. ARNETT: Objection to vague,
4  calls for a legal conclusion.
5    THE WITNESS: I don't even know what
6  their allegations are.
7  BY MR. OLSON:
8    Q.    We talked about David Minkkinen earlier.
9  Do you recall that?
10    A.    Yes.
11    Q.    Have you heard of a criminal proceeding
12  involving Mr. Minkkinen?
13    A.    Yes.
14    Q.    What is your understanding, if any, of
15  what that criminal proceeding is about?
16    A.    I don't know the outcome of the case. I
17  lost track of it long ago. But my
18  understanding is that there's an assertion by
19  prosecuting attorneys that Mr. Minkkinen
20  inappropriately used his experience and perhaps
21  artifacts from his prior employment with his
22  subsequent employment.
23    Q.    Have you ever discussed that criminal
24  proceeding with anyone from Deloitte?
25    A.    No.

42 (Pages 162 - 165)

Page 166

1    Q.    Has anyone from Deloitte ever told you
2    anything about the criminal proceeding?
3    A.    No.
4    Q.    Do you have any personal opinions on the
5    criminal proceeding?
6    A.    No.
7    Q.    Is it fair to say that NASWA generally
8    tries to treat all vendors or affiliates
9    equally?
10        MR. ARNETT:  Objection, vague.
11        THE WITNESS:  Yes.
12   BY MR. OLSON:
13   Q.    And NASWA does not have any bias in
14   favor of or against Sagitec, right?
15   A.    Correct.
16   Q.    And you personally do not have any bias
17   in favor of or against Sagitec, right?
18   A.    Correct.
19   Q.    NASWA does not have any bias in favor of
20   or against Deloitte, right?
21   A.    Correct.
22   Q.    And you personally do not have any bias
23   in favor of or against Deloitte, right?
24   A.    Correct.
25        MR. OLSON:  Thank you for your time

Page 167

1    today, Mr. Peirce.  I have no further questions
2    for you.  I'll pass the witness.
3        MR. ARNETT:  Yeah.  I'll just have a
4    few -- hopefully just a few follow-up
5    questions.
6        EXAMINATION
7    BY MR. ARNETT:
8    Q.    Hi, Mr. Peirce.  I'm an attorney
9    representing Deloitte, as I stated earlier.
10   Thanks for your time today.  I'm just going to
11   follow up on a few items that Mr. Olson went
12   over with you.  First off, am I correct that
13   you started at NASWA in 2018?
14   A.    Yes, that's correct.
15   Q.    Okay.  And can you just briefly explain
16   what the basis is for your knowledge of what
17   information related to ICON NASWA made
18   available to participants prior to your joining
19   NASWA in 2018?
20   A.    I want to make sure I'm understanding
21   the question correctly.  Are you talking about
22   present knowledge or knowledge prior to my
23   joining NASWA?
24   Q.    The knowledge underlying the testimony
25   you gave today about what NASWA made available,

Page 168

1    what's the basis for that information?
2    A.    So present knowledge then.  In that case
3    it's largely because for the last several years
4    my portfolio has included the ICON team.
5    Q.    Okay.  And by "ICON team," who are you
6    referring to?
7    A.    The individuals who are NASWA employees
8    who lead the ICON effort nationally, and by
9    extension, the subcontractors for both the
10   legacy system and the modernized system.
11   Q.    Turning to the modernized cloud hub, do
12   you recall testifying about that?
13   A.    Yes.
14   Q.    Okay.  And that was only -- let me ask
15   this:  Was that made operational in 2024?
16   A.    Yes.  I couldn't cite the specific date,
17   but yes.
18   Q.    Okay.  Were there any versions of the
19   modernized cloud hub made available for states
20   to use prior to 2024?
21        MR. OLSON:  Object to the form.
22        THE WITNESS:  No.
23   BY MR. ARNETT:
24   Q.    Do you know if Neosurance interfaces
25   with the modernized cloud hub?

Page 169

1        MR. OLSON:  Object to the form,
2    foundation.
3        THE WITNESS:  I don't know.
4    BY MR. ARNETT:
5    Q.    Turning to the legacy ICON Hub, do you
6    know whether or not Neosurance interfaces with
7    the legacy ICON Hub?
8        MR. OLSON:  Object to the form,
9    foundation, vague.
10        THE WITNESS:  I don't know.  But
11   given that they have an installed base, I'm
12   concluding that the system must, because all of
13   the states do interact with the ICON system.
14   BY MR. ARNETT:
15   Q.    And do you know one way or the other if
16   Sagitec used information provided by NASWA in
17   order to develop its interface with ICON?
18        MR. OLSON:  Object to the form,
19   foundation, vague.
20        THE WITNESS:  I do not know.
21   BY MR. ARNETT:
22   Q.    Okay.  Is it correct that each state or
23   their chosen vendor needs to develop their own
24   functionality to connect to the ICON Hub?
25        MR. OLSON:  Object to the form,

43 (Pages 166 - 169)

Page 170

1  foundation, vague.
2       THE WITNESS:  No.  I tried to
3  elaborate on this point throughout the
4  afternoon today.  If a state is still a
5  mainframe state using a legacy mainframe, they
6  could connect using mainframe code that was
7  provided by NASWA's predecessors and
8  subcontractors for decades.  Similarly, for the
9  three transactions that are in the main --
10 excuse me, that are in the modern cloud hub,
11 there is code that is provided that states
12 could use.  The reality is that most states
13 fall in the -- in between.
14 BY MR. ARNETT:
15 Q.    Okay.  So just to make sure I understand
16 correctly, setting aside states that choose to
17 use the mainframe code and setting aside states
18 that have upgraded to the modernized hub, the
19 remaining states would each need to implement
20 their own functionality to connect to the ICON
21 Hub, is that right?
22      MR. OLSON:  Object to the form,
23 misstates testimony, vague.
24      THE WITNESS:  Each state would need
25 to solve the same technical challenge of

Page 171

1  integrating between a modernized system and a
2  legacy mainframe, and they could do it in a
3  variety of ways.
4  BY MR. ARNETT:
5  Q.    And for some states at least one of
6  those ways is writing their own software to
7  connect to the ICON Hub, is that right?
8       MR. OLSON:  Object to the form,
9  vague.
10      THE WITNESS:  Generally, yes.  And
11 as I tried to demonstrate in my testimony, that
12 NASWA, its predecessors and subcontractors
13 provide sufficient information for states to do
14 just that.
15 BY MR. ARNETT:
16 Q.    But NASWA and its predecessors did not
17 provide individual states, setting aside the
18 mainframe code or the ICONnect hub software,
19 all of the source codes that those states would
20 need to implement a fully functional interface
21 of ICON, do they?
22      MR. OLSON:  Object to the form.
23      THE WITNESS:  That's correct.
24 Information is provided to facilitate that, but
25 not actual code.

Page 172

1  BY MR. ARNETT:
2  Q.    And does NASWA -- again, setting aside
3  the mainframe code and the modernized ICONnect
4  software, does NASWA provide states with any
5  database structures for implementing their back
6  ends?
7  A.    No.
8       MR. OLSON:  Object to the form.
9       Sorry.  Go ahead.
10      THE WITNESS:  No.
11 BY MR. ARNETT:
12 Q.    Prior to providing the ICONnect software
13 in approximately 2024, did NASWA ever provide
14 any software based on a .NET environment to
15 states?
16 A.    For any use cases or reflecting only on
17 ICON?
18 Q.    Related to -- let me reask a narrower
19 question then.  Prior to providing the ICONnect
20 software in approximately 2024, did NASWA ever
21 provide any .NET software to states related to
22 ICON?
23 A.    Not to my knowledge.
24 Q.    Okay.  And prior to the ICONnect
25 software in approximately 2024, did NASWA ever

Page 173

1  provide any software based on Java related to
2  ICON?
3  A.    Again, not to my knowledge.
4  Q.    Okay.
5       MR. ARNETT:  I don't have any other
6  questions for you, but reserve the right to ask
7  additional if Mr. Olson does.
8       MR. OLSON:  I have no questions for
9  you further, Mr. Peirce.  Thank you for your
10 time.
11      MR. ARNETT:  Thanks, Mr. Peirce.
12      THE WITNESS:  Certainly.
13      THE VIDEOGRAPHER:  This concludes
14 today's deposition.
15      The time now is 4:14 p.m.
16      (Deposition concluded at 4:14 p.m.)
17        ***************
18
19
20
21
22
23
24
25

44 (Pages 170 - 173)

## Page 174

1  REPORTER'S CERTIFICATE
2
   STATE OF MINNESOTA  )
3                      ) ss.
   COUNTY OF HENNEPIN  )
4
5      I hereby certify that I reported the remote
   deposition of BENJAMIN PEIRCE on Friday,
6  February 28, 2025, from Maple Grove, Minnesota,
   and that the witness was by me first duly sworn to
7  tell the whole truth;
8      That the testimony was transcribed by me
   and is a true record of the testimony of the
9  witness;
10     That the cost of the original has been
   charged to the party who noticed the deposition,
11 and that all parties who ordered copies have been
   charged at the same rate for such copies;
12
       That I am not a relative or employee or
13 attorney or counsel of any of the parties, or a
   relative or employee of such attorney or counsel;
14
       That I am not financially interested in the
15 action and have no contract with the parties,
   attorneys, or persons with an interest in the
16 action that affects or has a substantial tendency
   to affect my impartiality;
17
       That the right to read and sign the
18 deposition transcript by the witness was reserved.
19
       WITNESS MY HAND AND SEAL THIS 14th day of
20 March, 2025.
21
22
23
24 _Dana Anderson_
   Dana E. Anderson
   Notary Public, Hennepin County, MN
25 My commission expires 1/31/2030

## Page 175

1            Veritext Legal Solutions
                1100 Superior Ave
2                  Suite 1820
               Cleveland, Ohio 44114
3             Phone: 216-523-1313
4
   March 14, 2025
5
   To: Ms. Squire
6  Case Name: Deloitte Consulting LLP And Deloitte Development LLC v.
7  Sagitec Solutions LLC
   Veritext Reference Number: 7210435
8
9  Witness:  Benjamin Peirce , Corp. Rep.     Deposition Date:
   2/28/2025
10
11 Dear Madam:
12
   Enclosed please find a deposition transcript.  Please have the witness
13
   review the transcript and note any changes or corrections on the
14
   included errata sheet, indicating the page, line number, change, and
15
   the reason for the change.  Have the witness' signature notarized and
16
   forward the completed page(s) back to us at the Production address
17 shown
18 above, or email to production-midwest@veritext.com.
19
   If the errata is not returned within thirty days of your receipt of
20
   this letter, the reading and signing will be deemed waived.
21
22 Sincerely,
23 Production Department
24
25 NO NOTARY REQUIRED IN CA

## Page 176

1       DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 7210435
3    CASE NAME: Deloitte Consulting LLP And Deloitte Development
   LLC v. Sagitec Solutions LLC
     DATE OF DEPOSITION: 2/28/2025
4    WITNESS' NAME: Benjamin Peirce , Corp. Rep.
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7    I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____     _____
9  Date                 Benjamin Peirce , Corp. Rep.
10   Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
     They have read the transcript;
13   They signed the foregoing Sworn
        Statement; and
14   Their execution of this Statement is of
        their free act and deed.
15
   I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
   _____
18 Notary Public
19 _____
   Commission Expiration Date
20
21
22
23
24
25

## Page 177

1       DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 7210435
3    CASE NAME: Deloitte Consulting LLP And Deloitte Development
   LLC v. Sagitec Solutions LLC
     DATE OF DEPOSITION: 2/28/2025
4    WITNESS' NAME: Benjamin Peirce , Corp. Rep.
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7    I have listed on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9    I request that these changes be entered
   as part of the record of my testimony.
10
     I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____     _____
   Date                 Benjamin Peirce , Corp. Rep.
14
     Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17   They have read the transcript;
     They have listed all of their corrections
18     in the appended Errata Sheet;
     They signed the foregoing Sworn
19     Statement; and
     Their execution of this Statement is of
20     their free act and deed.
21 I have affixed my name and official seal
22 this _____ day of_____, 20____.
23 _____
   Notary Public
24
25 _____
   Commission Expiration Date

Page 178

1          ERRATA SHEET
           VERITEXT LEGAL SOLUTIONS MIDWEST
2          ASSIGNMENT NO: 7210435
3    PAGE/LINE(S) /      CHANGE       /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19
     _____      _____
20   Date          Benjamin Peirce , Corp. Rep.
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23   _____
          Notary Public
24
          _____
25        Commission Expiration Date

Veritext Legal Solutions
www.veritext.com                                                  888-391-3376

# Exhibits 6 and 7 Redacted in Their Entirety

# Exhibit 8

| **U. S. Department of Labor**<br>Employment and Training Administration<br>Washington, D.C. 20210 | **CLASSIFICATION**<br>OWS |
| --- | --- |
| | **CORRESPONDENCE SYMBOL**<br>OIS/DUIO |
| | **DATE**<br>August 30, 2001 |

DIRECTIVE:    UNEMPLOYMENT INSURANCE PROGRAM LETTER NO. 47-01

TO:         ALL STATE EMPLOYMENT SECURITY AGENCIES

FROM:     GRACE A. KILBANE
              Administrator
              Office of Workforce Security

SUBJECT:  Electronic Exchange of Wage and Separation Information for the Unemployment Compensation for Federal Employees (UCFE) and the Unemployment Compensation for Ex-servicemembers (UCX) Programs

1 . Purpose.  To transmit to the State Employment Security Agencies (SESAs) the system and procedural requirements for the electronic exchange of wage and separation information for the UCFE and UCX programs, and the Claims Control system for both programs.  To also advise SESAs that model code for the UCFE Interstate Connection (ICON) application is also being issued under separate cover by Lockheed Martin.

2.  Reference.  ET Handbook No. 384, Unemployment Compensation for Ex-Servicemembers; ET Handbook No. 391,  UCFE Instructions for State Agencies.

3 . Background.  To better integrate federal programs with states' claims processing systems, procedures for obtaining wage and separation information for both the UCX and UCFE programs have been automated to the extent possible.  For the UCFE program, Lockheed Martin has developed an ICON application that states will use to generate electronic and/or hardcopy requests to federal agencies, as appropriate, and to receive electronic responses.  For the UCX program, the electronic record of information from the DD Form 214/215 maintained by the Louisiana Claims Control Center (LCCC) has been changed to allow states, after necessary in-house programming, to electronically obtain UCX wage and separation information.  For the UCX and UCFE programs, the Claim Control File system maintained by the LCCC has been redesigned to support a more effective exchange of information and for integrity purposes.

| **RESCISSIONS**<br>None | **EXPIRATION DATE**<br>August 31, 2002 |
| --- | --- |

CONFIDENTIAL

SAGITEC-DEL_07114514

The attached Guide and Directory of Federal Agencies' Index has been developed by the Employment and Training Administration (ETA) with input and assistance from staff at the LCCC, Lockheed Martin and some of the pilot states that participated in testing the new applications and procedures. This Guide explains the revised UCFE and UCX claims processing and control file procedures.

The Frick Company, which represents approximately 30 federal agencies, is operational on the new UCFE system and is currently exchanging production data (wage and separation information) with the State of Georgia. The U.S. Postal Service (USPS) is expected to begin participating by the beginning of calendar year 2002. Discussions with four additional large federal agencies indicate their willingness to participate in the future. These agencies together with the USPS and the agencies represented by the Frick Company represent over 80 percent of the UCFE workload.

The Department has also been in discussion with the Department of Defense (DOD) concerning the new procedures for the UCX program and the need for prompt delivery of the Department's copy of each DD Forms 214 and 215 to the LCCC. Currently, a high percentage of the DD Forms 214 are not on file at the LCCC when individuals file initial UCX claims immediately upon discharge. The new system notifies the state when the DD Form 214 is not on file so that the state can use the claimant's copy to make a timely determination. The DOD has indicated that it is in the process of automating the DD Form 214, as well as the DD Form 215, in a manner that will allow the LCCC to obtain needed UCX information electronically in the future.

4.  UCFE Changes. The key UCFE procedural changes and automation improvements include the following:

a)  the development of an ICON UCFE application that supports the exchange of wage and separation information between the state agency and federal employers using electronic versions of the ETA 931, ETA 931A and ETA 934;

b)  a revision of the paper Forms ETA 931, ETA 931A and ETA 934 to represent the same data elements on the electronic forms;

c)  the inclusion of logic in the ICON UCFE application that determines when a hard copy form is necessary, thereby, eliminating the need for claims takers to handle the data entry of claims differently to generate electronic versus hard copy forms (not all federal agencies will be able to electronically exchange information);

d)  an automated Directory of Federal Agencies as a feature of the UCFE application; and

SAGITEC-DEL_07114515

- 3 -

e)  an address data entry capability to allow states to enter an address that is not in the electronic directory for use in mailing a form.  This address will not update the Directory.  It will instead cause Lockheed Martin to send a notice to the National Office for follow-up with the federal agency.  The address will only be added to the directory upon verification.

5.  UCX Changes.  The key UCX procedural changes include the following:

a)  the Department's copy of the DD Form 214, maintained at the LCCC, is now the official source of wage and separation information for use in establishing UCX entitlement and eligibility;

b)  the LCCC will calculate the claimant's UCX employment and wages and provide the information to state agencies; and

c)  the State is authorized to determine UCX eligibility under an affidavit process, using the claimant's copy four (4) of his/her DD Form 214, upon receipt of a notice from the LCCC that there is no DD Form 214 on file.   This procedure will eliminate any potential delay in the determination of UCX eligibility pending receipt of the Department's copy of the DD Form 214.

6.  UCFE/UCX Control File.  A primary feature of the new system at the LCCC is the change to the Claims Control System that serves both the UCFE and UCX programs. The key features of the new system are as follows:

a)  the Claims Control System has been changed to maintain a control record only when an intrastate or interstate benefit year is established that causes a wage assignment;

b)  there will be two types of control records, one that shows a benefit year on file in the state and one that shows a wage assignment only in a state; and

c)  the format of the new control record will contain sufficient information for use by states to determine if there is conflicting prior wage assignment or an existing benefit year.

7.  State Responsibilities.  It is each state agency's responsibility to take the actions necessary to implement these new UCFE and UCX procedures in the State.  In order for the system to operate optimally, it is necessary for the state agency to fully interface the new applications with its wage and benefit systems.  To that end, it will be necessary to designate both data processing staff to install and/or develop the

SAGITEC-DEL_07114516

- 4 -

necessary code to support the procedures, and program staff to develop internal operating procedures, train staff and monitor the testing of the new procedures.

Model code for the ICON UCFE application was being distributed by Lockheed Martin under separate cover during the week of August 13. IBM and non-IBM states will follow their normal implementation procedures that apply to all ICON applications. It will be helpful if the data processing staff handling the installation and interfacing of the UCFE application have familiarity with the ICON since this is an ICON application. No code is being provided for the UCX changes. States will have to individually develop software for the UCX changes based on the procedural descriptions and record formats that are provided in the attached Guide.

Implementation of the changes to the UCFE procedures requires the implementation of both the ICON UCFE application and the UCFE claims control feature with the LCCC. The new Claims Control System for UCFE claims is expected to be implemented before or simultaneously with the ICON UCFE application. Therefore, **it is suggested that states program and implement the new procedures for communicating with the LCCC first.**

The sooner that all states implement the new procedures for communicating requests for UCX wage and separation information and the new Claim Control System for UCFE and UCX, the shorter the transition period will be for receiving LCCC response records from the old "inquiry" Control System and the new Claims Control System.

8.  Action Required. SESAs are requested to:

    a.  provide copies of the attachments to appropriate personnel including data processing and UCFE/UCX program/operations staff;

    b.  develop a schedule for the programming, installation, and testing of the new UCFE and UCX electronic data exchange procedures; and

    c.  plan to be fully operational on the new UCFE and UCX systems no later than December 31, 2002.

9.  Inquiries. Please direct all program related inquiries to the appropriate Regional Office. Technical questions about the ICON UCFE application may be directed to Martha Hazelrigg (Lockheed Martin) at (407) 306-7228. Technical questions about the UCX or claim control records requirements may be directed to Rezzie Meyer (LCCC) at 1-800-535-8100.

10.  Attachments.

    I  -  STATE IMPLEMENTATION GUIDE - Changes to the UCFE and UCX Programs
    II  -  Directory of Federal Agencies - Index

Attachment to UIPL No. 47-01

# STATE IMPLEMENTATION GUIDE
# For
# UCFE and UCX Program Changes

**U.S. Department of Labor**
**August 2001**

CONFIDENTIAL

SAGITEC-DEL_07114518

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

## Table of Contents

|  |  | Page |
|---|---|---|
| Background................................................ | | i |
| Overview of Changes...................................... | | i |
| 1. | LCCC Claim Control Operation......................... | 1 |
| 2. | Transition from Old to New System.................... | 2 |
| 3. | State Agency Record Types for Communicating with LCCC.. | 4 |
| | a.   State Agency UCFE - UCX Request Record Layout...... | 5 |
| | b.   Required Fields for Each Record Type.............. | 7 |
| 4. | Requesting Information from the LCCC................. | 7 |
| 5. | Requesting UCX Wage and Separation Information and Match Against the Claim Control Records............... | 8 |
| 6. | Preparing a Claim Control Type 2 Record............. | 8 |
| 7. | Preparing a Type 3 Wage Assignment Only Record........ | 9 |
| 8. | Preparing a Type 4 Request Record, Cancellation of Type 2 Claim Control Record.......................... | 9 |
| 9. | Preparing a Type 5 Request Record, Cancellation of Wage Assignment Only Control Record.................... | 9 |
| 10. | Preparing a Type 6 Request Record, Cancellation UCX Pending Record...................................... | 9 |
| 11. | Transmitting Records to LCCC ........................ | 10 |
| | a.   Test Records Job Control Language................. | 10 |
| | b.   Production Records Job Control Language........... | 10 |
| 12. | Receiving Response Records from LCCC................. | 11 |
| 13. | LCCC Response Record Layout.......................... | 11 |
| 14. | Response to Request Record Type 1,, Initial Claim Request  ........................................... | 23 |
| | a.   Pending Records.................................. | 24 |
| | b.   Informational Messages ........................... | 24 |
| 15. | Amended UCX Responses................................ | 30 |
| 16. | Rejected Records - Error Messages.................... | 30 |
| 17. | Optional Print Program............................... | 31 |
| 18. | Using an Affidavit to Establish UCX Eligibility........ | 32 |
| 19. | UCFE Forms and Corresponding Electronic Record Formats. | 32 |
| 20. | UCFE - Generating Requests for Wage and Separation Information to Federal Agencies....................... | 32 |
| | a.   ICON UCFE Support System - Main Menu.............. | 34 |
| | b.   ETA-931, Data Entry Screen....................... | 34 |

TC - 1

SAGITEC-DEL_07114519

## STATE IMPLEMENTATION GUIDE
### UCFE AND UCX PROGRAM CHANGES

21. ETA-931, Request for Wage and Separation Information...  34
    a.  Form ETA-931, Request for Wage and Separation
        Information.. ..................................  35
        (1)  Front of Form ETA-931 ......................  35
        (2)  Reverse of Form ETA-931 ....................  36
        (3)  Number of copies ...........................  37
        (4)  Preparation of Form ETA-931 ................  37
    b.  TC-ETA-931, Request for Wage and Separation
        Information - Request Record Format...............  38
    c.  TC-ETA-931, Response Record Format.................  41
    d.  TC-ETA-931 Response Record View Screen............  54
22. State agency processing of TC-ETA-931 Response Record..  55
23. Use of Claimant's Affidavit............................  55
    a.  Form ETA-935, Claimant's Affidavit of Federal
        Civilian Service, Wages and Reason for Separation..  57
24. ETA-931A, Request for Separation Information -
    Additional Claim.......................................  58
    Data Entry Screen for ETA-931A....................  59

# Form ETA-931A, Request for Separation Information -

        Additional Claim..................................  59
    b.  TC-ETA-931A Request Record Format...............  61
    c.  TC-ETA-931A Response Record Format................  64
    d.  TC-ETA-931A Response Record View Screen...........  67
25. Requesting Additional Information From a Federal Agency  67
    a.  TC-ETA-934, Data Entry Screen....................  68
    b.  Form ETA-934, Request for Additional Information...  68
    c.  Completion of From ETA-934........................  69
    d.  TC-ETA-934, Request for Additional Information.....  69
        (1) TC-ETA-934, Request Record Format.............  70
        (2) TC-ETA-934, Response Record Format............  72
        (3) TC-ETA-931A Response Record View Screen.......  74
26. Directory of Federal Agencies.........................  74
    a.  Federal Agencies Address View Screen..............  75
27. Record Retention......................................  76

Appendix A - UCFE/UCX Questions and Answers
Appendix B - Examples of Responses from LCCC
Appendix C - Full Size Forms

CONFIDENTIAL                                    SAGITEC-DEL_07114520

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

# Background

For several years, State Employment Security Agencies (State agencies) have been taking advantage of technology advances to automate intrastate and interstate unemployment compensation processes to eliminate the use of paper forms and files and the use of the mail to exchange information.  The degree to which automation could be applied to UCFE and UCX activities has been limited by the programs' procedures for obtaining the wage and separation information necessary to the determination of claims. These UCFE and UCX procedures have resulted in the necessity to use manual procedures to collect and exchange information and have caused delays in the payment of benefits.

Over the past few years, the Department together with the Information Technology Support Center, the Louisiana Claims Control Center (LCCC), Lockheed Martin, the U.S. Postal Service, the Frick Company (as the representative of 30 Federal agencies) and the States of Alaska, Georgia, Louisiana, Maryland, Minnesota, New York and Virginia have worked to redesign and test new methods for electronically exchanging UCFE information between the Federal and State agencies and/or to exchange UCFE and UCX information between State agencies and the LCCC.  Additional UCFE and UCX procedural changes were initiated to take advantage of the use of technology and to ensure that the Federal UC programs are better accommodated in the State agencies' remote initial claims taking environment.

# Overview of Changes

An Interstate Connection(ICON)application has been developed by Lockheed Martin to support transmissions of State requests for UCFE wage and separation information and responses from Federal agencies.  The Directory of Federal Agencies has been automated as a feature of this UCFE application.

The LCCC operating system has been redesigned to support the use of the DD Form 214 and 215 information on file at the LCCC as the official source of UCX wage and separation information.  The LCCC will supply State agencies with UCX wage and separation information in an electronic record format.

i

CONFIDENTIAL

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

The UCFE/UCX Claim Control file feature of the LCCC operation has also been redesigned to maintain a Claim Control record <u>only</u> when an intrastate or interstate benefit year has been established that caused a wage assignment.  The format of the new Claims Control record will contain sufficient information for use by the State to determine if there is a prior wage assignment or conflict.

In addition to the change to the LCCC operation, a UCX affidavit procedure is being implemented which authorizes State agencies  to determine UCX eligibility using the claimant's copy 4 of a DD Form 214 as an affidavit upon receipt of a notice from the LCCC that there is no DD Form 214 on file.  Thus, determinations of UCX eligibility will no longer be delayed pending receipt of the Department's copy of the DD Form 214, provided the claimant has a copy 4 of his/her DD Form 214.

ii

SAGITEC-DEL_07114522

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

1.   <u>LCCC Claim Control Operation</u>.  The purpose of the LCCC
operation has been expanded from solely a fraud detection
operation to include serving as the official source of wage and
separation information for the UCX program.  To accomplish the two
purposes, the LCCC operating system and procedures have been
changed to: 1) maintain a record of all UCFE and UCX wage
assignments as the basic Claim Control file and 2) maintain all DD
Form 214/215 data necessary to compute quarterly wages and 3)
provide separation information and other pertinent eligibility
information in an electronically accessible file.

The changes at the LCCC, and authorizing States to use the
claimant's copy 4 of the DD Form 214 to determine UCX eligibility,
will help to accomplish administrative efficiencies and ensure
timely payments.  However, the overall  LCCC operation continues
to serve as a system of fraud detection.  Using the DD Form 214s
on file at the LCCC as the official source of wage and separation
information helps to ensure that determinations are based on
information provided by the DOD.  When there is no DD Form 214 on
file, the State agency will be so advised.  The LCCC will contact
the DOD for the DD Form 214 information and will send an amended
response to the requesting State agency upon receipt of the DD
Form 214 or other information from the DOD.  This procedure helps
to ensure the detection of any fraudulent claim(s) established
under the affidavit procedure.

The new Claim Control file will only contain Claim Control Records
representing an <u>actual</u> wage assignment when a benefit year has
been established.  Unlike past procedures for the "inquiry," the
LCCC will <u>not</u> maintain a copy of the request that is sent by the
State agency when a new claim is filed.  Therefore, **<u>States must
create and transmit these control records immediately (same day)
when a benefit year is established that assigns wages because
there is nothing on file to prevent the LCCC from providing UCX
wage information to another State until the LCCC receives the
Claim Control record</u>**.  Claim Control Records will be kept on file
for two years.  Incoming Claim Control records are matched against
the records in the Claims Control file to prevent duplicate use or
improper assignment.

The DD Form 214/215 file format has been redesigned to store nine
calendar quarters of information to have available information to
respond to current and backdated base period and alternate base
period requests.  Each initial UCX or UCFE request will be matched
against the Claim Control file, the DD Form 214 file, and the
pending files.  When a UCX request is processed and a DD Form 214

SAGITEC-DEL_07114523

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

is found <u>and</u> there is no Claim Control record on file that
prevents the release of the wages, the LCCC will respond to the
requesting State agency using the service dates, days lost, rank,
etc., the Schedule of Remuneration to calculate base period and
lag wages, as well as weeks and hours of work.  When no DD Form
214 is found, the LCCC will create a pending record and notify the
State agency "No Control Record or DD 214 on File.  Response
Pending."  A request for the DD Form 214 will be sent to the
appropriate Branch of Service by the LCCC when 21 days have
elapsed since the separation date.  When a response is received,
the LCCC will send an amended Response Record, containing
information from the DD Form 214 or other response document,
received from the Branch of Service, to the requesting State
agency.

Response records from the LCCC will contain alert messages and
flags that can be used by the State agency to electronically post
an issue to the benefit record when the type of separation or
other information from the DD Form 214 raises an identifiable
issue.  **The LCCC is not authorized to make determinations about
whether or not a claimant's military service is creditable or if
wages are usable.**  Therefore, the LCCC will provide wage and
separation information from any DD Form 214 on file without regard
to the length of service or the type of separation.  **It will be
the responsibility of the State agency to make the appropriate**
determination(s).

Response records will be sent to each State agency for each record
it sends to the LCCC as a confirmation that the record has been
processed.  For example, when there is a UCFE Type 1 request and
there is no Claim Control Record on file, the State agency will
receive a message stating "no Claim Control Record on file."  When
there is a Claim Control Record on file showing an existing
benefit year, or a last day of work/separation date that is within
the base period of the new claim, the response record will include
the information from the Claim Control Record.

2.  <u>**Transition From Old to New System**</u>.  Until all States are
operational on the new system and all "inquiries" under the old
procedures are at least two (2) years old, States will be
operating in a transition period.  During the transition period,
all States will continue to receive information from the "inquiry"
control file.  This means that those States that have implemented
the new system will still be required to receive response
information from the "inquiry" control file in the old manner.  A
State that is operating under the old system, will receive
information from the new system as a printout attached to its

CONFIDENTIAL                                          SAGITEC-DEL_07114524

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

response.  Examples of the types of responses that States can
expect are as follows:

    a.  <u>When the State Is Operating under the New System</u>, and:

       (1) there is **a match** against an inquiry in the old system,
the State will receive a listing in a job named PUXDLCCC which
will be sent to the DESTINATION,CLASS,FORM,etc., to which the old
system responses were sent.  The listing will contain the
following information:

```
                    UCX\UCFE LISTING PF PRIOR INQUIRIES
                             BY OTHER STATES


                                   EFFECTIVE        UCX        UCFE
SSN                    NAME          DATE        SEP DATE    SEP DATE
007002001 Mary E. Montgomery      20010708      20001007    00000000


        PGM TYPE: X      STATES WITH PRIOR INQUIRY: 33 45
```

       (2)  there is **NO match** against an inquiry in the old
system, the State will receive a listing in a job named PUXDLCCC
which will be sent to the DESTINATION,CLASS,FORM,etc., that the
old system responses were sent to. The listing will contain the
following acknowledgment that the match against the old system
occurred:

```
                    UCX\UCFE LISTING PF PRIOR INQUIRIES
                             BY OTHER STATES




                             NONE FOR TODAY
```

    b.  <u>When the State Is Operating under the Old Inquiry System,</u>
and:

       (1) there is a match against a pending record in the new

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

system, the State will receive a record as follows for each matching social security number at the end of its regular response records:

```
                    PENDING RECORD PRINT
       WAGES PENDING - BEING CLAIMED BY STATE WITH FIPS CODE --

SSN: 007002001                        OTHER SSN: 000000000
CLAIMANT NAME: Mary E. Montgomery
PROGRAM TYPE: UCX            EFFECTIVE DATE OF CLAIM: 2001/07/08

*****SEPARATION DATE*****              ******BASE PERIOD******
   UCX          UCFE                     BEG          END
2000/12/04    0000/00/00              2000/04/01    2001/03/31
SERVICE BRANCH: AIR FORCE STATE: 36 LOCAL OFFICE: 0516 RECORD TYPE: 1
TRANSMISSION DATE     LCCC RESPONSE DATE     PENDING NOTICE DATE
   2001/07/09           2001/07/09               2001/07/09
```

       (2)  there is a match against a record in the Claim Control File of the new system, the State will receive a record as follows for each matching social security number at the end of its regular response records:

```
                 CLAIM CONTROL RECORD PRINT
           WAGES CLAIMED BY STATE WITH FIPS CODE --

SSN: 007002001                        OTHER SSN: 000000000
CLAIMANT NAME: Mary E. Montgomery
BYE: 20020105              EFFECTIVE DATE OF CLAIM: 2001/01/07
PROGRAM TYPE: UCX

*****SEPARATION DATE*****              ******BASE PERIOD******
   UCX          UCFE                     BEG          END
2000/12/03    0000/00/00              1999/10/01    2000/09/30
TRANSFERRING STATE 1:00     TRANSFERRING STATE 2: 00   LOCAL OFFICE: 0516
TRANSMISSION DATE    LCCC PROCESS DATE    DELETE DD214    RECORD TYPE
   2001/01/12           2001/01/12                            2
```

3.  <u>State Agency Record Types for Communicating with the LCCC</u>. State agencies will use a single record format to generate six different types of records to the LCCC.  The six record types are:

   Type 1 - Initial Request for Wage and Separation Information;

   Type 2 - UCX or UCFE Claim Control Record;

   Type 3 - UCX or UCFE Wage Assignment Only Record;

   Type 4 - Cancellation of Claim Control Record;

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

Type 5 – Cancellation of Wage Assignment Only Control Record; and

Type 6 – Cancellation of UCX Pending Record.

With the exception of Record Type 6, all other record types are used for both UCX and UCFE records. Field 22 of the record format will carry the identifying code for the type of record (Record Type 1-6) being sent.

The Type 1 request replaces the "inquiry" and will be sent to the LCCC immediately (same day) when a new UCX or UCFE claim is filed. The Type 1 request for both programs will be used to match against the Claim Control file and the DD Form 214 file. The LCCC will not maintain a copy of the Type 1 request record. No Claim Control record will be on file until the State transmits a Claim Control record (Record Type 2 or 3) which means that a benefit year was established.

    a. State Agency UCFE – UCX Request Record Layout. The following request record layout is used for all record types by the State agency to send records to the LCCC.

| State Agency Request Record Layout | | | | | |
|---|---|---|---|---|---|
| FLD NBR | FIELD NAME | FIELD TYPE | BEGIN COLUMN | FIELD LENGTH | |
| 1 | Social Security No. | N | 1 | 9 | Enter claimant's Social Security Number |
| 2 | Claimant's Name - First | A/N | 10 | 12 | Enter claimant's first name. First position cannot be blank. Enter at least one alphabetic character. |
| 3 | Claimant's Name - Middle Initial | A/N | 22 | 1 | Enter claimant's middle initial, if any. |
| 4 | Claimant's Name - Last Name | A/N | 23 | 17 | Enter the claimant's last name. First position cannot be blank. Enter at least one alphabetic character. |
| 5 | Program Type | A/N | 40 | 1 | Enter valid program type: F = UCFE (Code as "F" when only UCFE employment or when UCFE and UI employment is shown in the base period) X = UCX (Code as "X" when only UCX employment or when UCX and UI employment is shown in the base period) J = JOINT (Code as "J" when both UCFE and UCX employment is shown in the base period) |
| 6 | Other Social Security Number | N | 41 | 9 | Enter other SSN that the claimant used since the beginning of the base period. |

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 7 | Effective Date of Claim | N | 50 | 8 | Enter the effective date of the claim. Format is: CCYYMMDD, i.e., 20001205. |
|---|---|---|---|---|---|
| 8 | Last Day of Work (UCX) | N | 58 | 8 | Enter the UCX Separation Date. Format is: CCYYMMDD, i.e., 20001205 |
| 9 | Last Day of Work (UCFE) | N | 66 | 8 | Enter UCFE Separation Date. Format is: CCYYMMDD, i.e., 20001205 |
| 10 | Base Period Beginning Date | N | 74 | 8 | Enter the beginning date of the base period for the claim. Format is: CCYYMMDD, i.e., 20001205 |
| 11 | Base Period Ending Date | N | 82 | 8 | Enter the ending date of the base period for the claim. Format is: CCYYMMDD, i.e., 20001205 |
| 12 | Benefit Year Ending Date | N | 90 | 8 | Enter the benefit year ending date for the claim. Format is: CCYYMMDD, i.e., 20001205. |
| 13 | State FIPS Code | N | 98 | 2 | Enter the two digit numerical FIPS Code of sending State. |
| 14 | Transferring State's FIPS Code - 1 | N | 100 | 2 | Enter the two digit numerical FIPS Code of the first State that transferred UCX or UCFE wages used on the claim. |
| 15 | Transferring State's FIPS Code - 2 | N | 102 | 2 | Enter the two digit numerical FIPS Code of the second State that transferred UCX or UCFE wages used on the claim. |
| 16 | Branch of Service | A/N | 104 | 2 | Enter the two digit code for the Branch of service. Leave Blank for Program Type "F". Valid entries for Program Types "X" or "J" are:<br>Army = 01<br>Navy = 02<br>Air Force = 03<br>Marines = 04<br>Coast Guard = 05<br>NOAA = 06 |
| 17 | Call Center/Local Office ID # | A/N | 106 | 4 | Enter four digit Call Center/Local office Number. Right justify, i.e., 0114. |
| 18 | Transmission/Transaction Date | A/N | 110 | 8 | Enter the date of the record transmission to LCCC. Should be system generated. Format is: CCYYMMDD, i.e., 20001205 |
| 19 | Amended Flag | A/N | 118 | 1 | For LCCC's use only. |
| 20 | Message Number | A/N | 119 | 2 | For LCCC's use only. |
| 21 | Filler | A/N | 121 | 39 | FILLER |

SAGITEC-DEL_07114528

**STATE IMPLEMENTATION GUIDE**
**UCFE AND UCX PROGRAM CHANGES**

| 22 | Record Type Code | A/N | 160 | 1 | Enter the one digit code for the type of record prepared for transmission. Valid entries are:<br>1 = Initial Claim Request<br>2 = Claims Control Record<br>3 = Wage Assignment Only Control Record<br>4 = Claims Control Record Cancellation<br>5 = Wage Assignment Only Control Record Cancellation<br>6 = Type 1 Request Cancellation (from the Pending File) |
|----|-------------------|-----|-----|---|---|
|    | **TOTAL RECORD** |     | 160 |   |   |

  b.  <u>Required Fields for Each Record Type</u>.  Below is a chart showing the fields that must be completed for each of the six record types.  The identified fields will be edited by the LCCC when processing the record.

| Fields | Record Types | | | | | |
|--------|:-:|:-:|:-:|:-:|:-:|:-:|
|        | **1** | **2** | **3** | **4** | **5** | **6** |
| SSN | X | X | X | X | X | X |
| First name | X | X | X | X | X | X |
| Middle initial | X | X | X | X | X | X |
| Last name | X | X | X | X | X | X |
| Program type | X | X | X | X | X | X |
| Other SSN | X | X | X | X | X | X |
| Effective date of claim | X | X |   | X |   | X |
| UCX separation date when Type = X | X | X | X |   |   | X |
| UCFE separation date when Type = F | X | X | X |   |   | X |
| Base period begin date | X | X |   |   |   | X |
| Base period end date | X | X |   |   |   | X |
| Benefit year end date |   | X |   | X |   |   |
| State FIPS code | X | X | X | X | X | X |
| Transferring State FIPS Code 1 |   | X |   |   |   |   |
| Transferring State FIPS Code 2 |   | X |   |   |   |   |
| Branch of Service (when Type X or J) | X |   |   |   |   | X |
| Local Office/Call Center |   |   |   |   |   |   |
| Amended Flag (LCCC Use only) |   |   |   |   |   |   |
| Message number (LCCC Use only) |   |   |   |   |   |   |
| Transaction Date | X | X | X | X | X | X |
| Record Type Code | X | X | X | X | X | X |

4.  <u>Requesting Information From the LCCC</u>.  The State's procedures for sending requests and receiving responses from the LCCC are the same for the UCX and UCFE programs.  Records sent to the LCCC for both programs will produce the same type of responses from the LCCC, including UCX wage and separation information responses. The State's information technology staff will have to accomplish the programming necessary to produce the appropriate request

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

records necessary for entering the appropriate information including the record type indicator in Field 22.

All records sent to the LCCC are considered request records. A single one-hundred sixty (160) character record will be use to transmit each of the record Types 1-6. It is the responsibility of the State agency to ensure the proper formatting and transmission of records to the LCCC.

5. **Requesting UCX Wage and Separation Information and a Match Against the Claim Control Records, Type 1.** At the time a new UCX or UCFE initial claim is filed and when assignable UCX or UCFE wages are in the lag period of the initial claim, the State agency will generate a Type 1 request record to the LCCC. Each Type 1 request, UCX and UCFE, is matched against the Claim Control file and against the DD 214 file. The Type 1 request serves as the request for UCX wage and separation information. When a DD Form 214 is on file, the LCCC will respond with wage and separation information from up to two (2) DD Forms 214. Because the electronic record format does not accommodate more than two (2) DD Forms 214, when there are more than two on file, the LCCC will advise the State agency and FAX a copy of each form to the State agency for its review and determination. When the UCFE request is matched against the DD Form 214 file, no pending record will be created if there is no DD Form 214 on file.

6. **Preparing a Type 2 Claims Control Record**. A Claims Control record notifies the LCCC that a benefit year has been established that used and assigned UCFE or UCX base period wages or assigned lag period wages. This record is maintained by the LCCC in the Claims Control file for two (2) years. A Type 2 record, identified as UCFE, UCX or Joint, is prepared and transmitted by the State at the time that a benefit year is established that used any UCX or UCFE wages in the determination of monetary entitlement.

The Type 2 Claims Control record must be created as soon as a benefit year is established and transmitted immediately (same day) because, prior to receipt of the Claim Control record, there is no Claim Control record on file at the LCCC to prevent the LCCC from responding to another State's request.

When preparing Type 2 records, program type "X" means that some UCX wages have been used in the monetary determination. Program type "F" means that some UCFE wages have been used in the monetary determination. Program type "J " means that both UCX and UCFE wages have been used in the monetary determination. This means that for purposes of this system, UI-UCFE or UI-UCX claims are

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

identified by the Federal program type of UCFE or UCX, as
appropriate.  The Claim Control record is generated by the State
agency that assigns wages to the State.  The paying State on a
combined wage claim (CWC) is responsible for assigning base period
wages used in the determination of the CWC claim.  When the UCFE
or UCX wages have been transferred from another State(s), the
paying State must identify the transferring State(s) on the Claim
Control record by FIPS Code(s).  The State agency should implement
a procedure that automatically creates the Claim Control record
when the State agency issues an eligible monetary determination.

7.   **Preparing a Type 3 Wage Assignment Only Record**.   A Type 3
record is prepared and transmitted to the LCCC when a UI benefit
year is established which causes the assignment of lag period UCX
or UCFE wages and when a benefit year is established by another
State which causes a wage assignment in your State, i.e., State
"A" transferred base period UCX wages to State "B" and State "B"
established a benefit year.  State "A" prepares a Type 3 control
to assign any lag period wages upon the receipt of a Report on
Determination of Combined Wage Claim, TC-IB5, that a benefit year
has been established by the paying State (State "B").

As a transferring State for a combined wage claim, the State
agency has to implement a procedure that assigns lag period wages
by creating a Type 3 "wage assignment only" Claims Control record
upon receipt of a Form IB5 showing a benefit year has been
established by the paying State.  The transferring State does not
send a Type 2 Claims Control record pertaining to the base period
wages that are reassigned to the paying State.

8.   **Preparing a Type 4 Request Record, Cancellation of Type 2
Claim Control Record**.  A Type 4 record cancels a previously
transmitted Type 2 record from the LCCC Claims Control file.  This
type 4 record is prepared and transmitted when a UCX, UCFE or
Joint (UCX-UCFE) benefit year is canceled for any reason.

9.   **Preparing a Type 5 Request Record, Cancellation of Type 3
Wage Assignment Only Control Record**.  A Type 5 record cancels a
previously transmitted Type 3 record from the LCCC Claims Control
file.  This type 5 record is prepared and transmitted when a
benefit year that caused an assignment is canceled.

10.   **Preparing a Type 6 Request Record, Cancellation of UCX
Pending Record**.  A Type 6 record cancels a pending record from
the DD Form 214 Response Pending file at the LCCC.  A Type 6
cancellation record is sent when a UCX claim is withdrawn or
canceled, or erroneous information, e.g., incorrect separation

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

date, on the Type 1 record caused an erroneous pending record to be created.  Upon receipt of a response record that contains an informational message number 2,6, or 28, (see messages - pages 27-32) the State agency should review the claim to determine if a Type 6 record is necessary.  The Type 6 record serves as notification to LCCC to discontinue contact with the military (DOD) concerning the missing DD Form 214.

**11.  Transmitting Records to LCCC.**  All record types should be transmitted to LCCC on a daily basis.

a.  Test Records - Job Control Language.  To send test records to LCCC, use the following Job Control Language with appropriate modifications as follows: 1) Replace "SS" with the State's alpha postal abbreviation; and 2) Replace "state name" with the name of the xmitting State.

```
//UIXFESSA  JOB (3777,XXXXXXXXX,XX,XXXX),'STATE NAME',
//          MSGLEVEL=(1,1),CLASS=G
//XFELIB JCLLIB ORDER=UI.XFE.PROCLIB
//PROCA EXEC XFESSAT
//STEP1.SYSUT1 DD *
your data, i.e., UCX/UCFE SESA TRANSMITTAL RECORDS
/*
//
```

**NOTE:** The 160-byte transmittal records will need to be xmitted in 2 80-byte records per SSN. The LCCC will reblock the two (2)80-byte records back to a single 160-byte record to process the data.

b.  Production Records - Job Control Language.  To send production records to the LCCC, use the following Job Control Language with appropriate modifications as follows: 1) Replace "SS" with the State's alpha postal abbreviation; and 2) Replace "state name" with the name of the xmitting State.

```
//UIXFESSA  JOB (3777,XXXXXXXXX,XX,XXXX),'STATE NAME',
//          MSGLEVEL=(1,1),CLASS=G
//XFELIB JCLLIB ORDER=UI.XFE.PROCLIB
//PROCA EXEC XFESSA
//STEP1.SYSUT1 DD *
your data, i.e., UCX/UCFE SESA TRANSMITTAL RECORDS
/*
//
```
**NOTE:** The 160-byte transmittal records will need to be transmitted in two (2) 80-byte records per SSN.  The LCCC will reblock the two (2) 80-byte records back to a single 160-byte record to process the data.

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

**12.** **R**eceiving **Response Records From LCCC**.  The LCCC will use a single 960 character record to respond to all State agency requests for both UCX and UCFE.  States will receive electronic responses, identified by the six different request record types.  The response records will be 960-bytes deblocked to twelve (12) 80-byte records by the LCCC for transmission to the State.  **The State will have to reblock to a single 960-byte response record to process.**  The response record type, identified in Field 121 will be a copy of the record type as shown on the request record in Field 22, except when the response is a copy of the Claim Control Record.  When the response includes information from a Claim Control record, record Type 2 will be shown in Field 121 to alert the State agency that the information in Fields 5-15 represents a copy of a Claims Control record that is on file.

Response records will contain flags and messages to alert the State when there is an existing benefit year, wages previously assigned, etc.  The message numbers and flags can be used by the State to post information to benefit files or to sort incoming records for review, as necessary.

**13.** **L**CCC **Response Record Layout**. The following response record layout is used for all record types by the LCCC to respond to all State request records.  **Please Note:** States will continue to receive response records from the "inquiry" file in the same manner that they have always received information from the LCCC.  States will not stop receiving the old type responses until the transition period ends.

| FLD NBR | FIELD NAME | FIELD TYPE | BEGIN COLUMN | FIELD LENGTH | |
|---------|-----------|------------|--------------|--------------|---|
| 1 | Social Security No. | N | 1 | 9 | Claimant's Social Security Number |
| 2 | Claimant's Name – First | A/N | 10 | 12 | Claimant's first name. |
| 3 | Claimant's Name – Middle Initial | A/N | 22 | 1 | Claimant's middle initial. |
| 4 | Claimant's Name – Last Name | A/N | 23 | 17 | Claimant's last name. |

SAGITEC-DEL_07114533

**STATE IMPLEMENTATION GUIDE**
**UCFE AND UCX PROGRAM CHANGES**

| 5 | Program Type | A/N | 40 | 1 | Program Type as shown on incoming request:<br>F = UCFE<br>X = UCX<br>J = Joint (UCFE/UCX) |
|---|---|---|---|---|---|
| 6 | Effective Date of Claim | N | 50 | 8 | Effective date of the initial claim.  Format is: CCYYMMDD, e.g. 20000702 = July 2, 2000. |
| 7 | Last Day of Work | N | 58 | 8 | UCX Separation Date . Format is: CCYYMMDD, e.g. 20000705 = July 5, 2000 |
| 8 | Last Day of Work | N | 66 | 8 | UCFE Separation Date. Format is: CCYYMMDD, e.g., 20000705 = July 5, 2000 |
| 9 | Other Social Security Number | N | 41 | 9 | Claimant's other Social Security Number as shown on incoming request. |
| 10 | Base Period Beginning Date | N | 74 | 8 | The beginning date of the base period of the claim. Format is: CCYYMMDD, e.g., 19990401 = April 1, 1999. |
| 11 | Base Period Ending Date | N | 82 | 8 | The ending date of the base period of the claim. Format is: CCYYMMDD , e.g., 20000331 = March 31, 2000. |
| 12 | Benefit Year Ending Date | N | 90 | 8 | The ending date of the benefit year for the claim. Format is: CCYYMMDD, e.g., 20010701 = July 1, 2001. |
| 13 | State FIPS Code | N | 98 | 2 | For "Record Types" 1, 3, 4, 5 or 6 (shown in Field 121), this is the FIPS Code of the State that sent the request record to the LCCC.<br><br>For "Record Type" 2 (shown in Field 121), this is the FIPS Code of the State that submitted the Claims Control Record to the LCCC. |
| 14 | Transferring State's FIPS Code | N | 100 | 2 | FIPS Code of first transferring State shown on Claims Control Record. |
| 15 | Transferring State's FIPS Code | N | 102 | 2 | FIPS Code of second transferring State shown on Claims Control Record. |

SAGITEC-DEL_07114534

# STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 16 | Branch of Service | N | 104 | 2 | Two digit code for the Branch of Service. Blank for Program Type "F".<br><br>Valid entries for Program Types "X" or "J" are:<br>Army      = 01<br>Navy      = 02<br>Air Force  = 03<br>Marines    = 04<br>Coast Guard = 05<br>NOAA      = 06 |
|----|----|----|----|----|----|
| 17 | Call Center/Local Office ID number | A/N | 106 | 4 | Call Center/Local Office Number. Right justified. |
| 18 | Transmission Date | A/N | 110 | 8 | Date that the State's request record was transmitted by State to the LCCC. Format is: CCYYMMDD. |
| 19 | Component | A/N | 118 | 30 | Identifies the Component of the Branch of Service as shown on the DD 214, e.g., Army Reserve. |
| 20 | LCCC Process Date | N | 148 | 8 | Date that the LCCC processed the State's request record. Format is: CCYYMMDD |
| 21 | 1st Quarter Date | N | 156 | 5 | Identification of the 1st quarter ending after the beginning date of the base period shown on the request record. Format is: CCYYQ, e.g., 20001 = 1st quarter of the year 2000. |
| 22 | 1st Qtr wages | N | 161 | 8 | Amount of wages for the quarter identified in field 21, right justified, e.g., 012345v67 = $12,345.67. (v = implied decimal) |
| 23 | 1st Qtr Number of Weeks worked | N | 169 | 2 | Number of weeks worked during the quarter identified in field 21, right justified, e.g., 06 = 6 weeks. |
| 24 | 1st Qtr Number of hours worked | N | 171 | 3 | Number of hours worked in the quarter identified in field 21, right justified, e.g., 040 = 40 hours. |

SAGITEC-DEL_07114535

# STATE IMPLEMENTATION GUIDE
# UCFE AND UCX PROGRAM CHANGES

| 25 | 1st Qtr Branch of Service | A/N | 174 | 2 | Identifier for Branch of Service for employment and wages during the quarter identified in Field 21. Code will be "99" if wages are from more than one Branch. |
|----|--------------------------|-----|-----|---|-----------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 26 | 2nd Quarter Date | N | 176 | 5 | Identification of the 2nd quarter ending after the beginning date of the base period shown on the request record. Format is: CCYYQ, e.g., 20002 = 2nd quarter of the year 2000. |
| 27 | 2nd Qtr wages | N | 181 | 8 | Amount of wages for the quarter identified in Field 26, right justified, e.g., 012345v67 = $12,345.67. |
| 28 | 2nd Qtr Number of Weeks worked | N | 189 | 2 | Number of weeks worked in the quarter identified in Field 26, right justified, e.g., 06 = 6 weeks. |
| 29 | 2nd Qtr Number of hours worked | N | 191 | 3 | Number of hours worked in the quarter identified in Field 26, right justified, e.g., 040 = 40 hours. |
| 30 | 2nd Qtr Branch of Service | A/N | 194 | 2 | Identifier for Branch of Service for employment and wages during the quarter identified in Field 26. Code will be "99" if wages are from more than one Branch. |
| 31 | 3rd Quarter Date | N | 196 | 5 | Identification of the 3rd quarter ending after the beginning date of the base period shown on the request record. Format is: CCYYQ, e.g., 20003 = 3rd quarter of the year 2000. |
| 32 | 3rd Qtr wages | N | 201 | 8 | Amount of wages for the quarter identified in Field 31, right justified, e.g., 012345v67 = $12,345.67. |
| 33 | 3rd Qtr Number of Weeks worked | N | 209 | 2 | Number of weeks worked during the quarter identified in Field 31, right justified, e.g., 06 = 6 weeks. |

SAGITEC-DEL_07114536

**STATE IMPLEMENTATION GUIDE**
**UCFE AND UCX PROGRAM CHANGES**

| 34 | 3rd Qtr Number of hours worked | N | 211 | 3 | Number of hours worked during the quarter identified in Field 31, right justified, e.g., 040 = 40 hours. |
|----|----|----|----|----|----|
| 35 | 3rd Qtr Branch of Service | A/N | 214 | 2 | Identifier for Branch of Service for employment and wages during quarter identified in Field 31. Code will be "99" if wages are from more than one Branch. |
| 36 | 4th Quarter Date | N | 216 | 5 | Identification of the 4th quarter ending after the beginning date of the base period shown on the request record. Format is: CCYYQ, e.g., 20004 = 4rd quarter of the year 2000. |
| 37 | 4th Qtr wages | N | 221 | 8 | Amount of wages for the quarter identified in Field 36, right justified, e.g., 012345v67 = $12,345.67. |
| 38 | 4th Qtr Number of Weeks worked | N | 229 | 2 | Number of weeks worked during the quarter identified in Field 36, right justified, e.g., 06 = 6 weeks. |
| 39 | 4th Qtr Number of hours worked | N | 231 | 3 | Number of hours worked during the quarter identified in Field 36, right justified, e.g., 040 = 40 hours. |
| 40 | 4th Qtr Branch of Service | A/N | 234 | 2 | Identifier for Branch of Service for employment and wages during quarter identified in Field 36. Code will be "99" if wages are from more than one Branch. |
| 41 | 5th Quarter Date | N | 236 | 5 | Identification of the 5th quarter ending after the beginning date of the base period shown on the request record. Format is: CCYYQ, e.g., 20011 = 1st quarter of the year 2001. |

CONFIDENTIAL

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 42 | 5th Qtr wages | N | 241 | 8 | Amount of wages for the quarter identified in Field 41, right justified, e.g., 012345v67 = $12,345.67. |
| 43 | 5th Qtr Number of Weeks worked | N | 249 | 2 | Number of weeks worked during the quarter identified in Field 41, right justified, e.g., 06 = 6 weeks. |
| 44 | 5th Qtr Number of hours worked | N | 251 | 3 | Number of hours worked during the quarter identified in Field 41, right justified, e.g., 040 = 40 hours. |
| 45 | 5th Qtr Branch of Service | A/N | 254 | 2 | Identifier for Branch of Service for employment and wages during the quarter identified in Field 41. Code will be "99" if wages are from more than one Branch. |
| 46 | 6th Quarter Date | N | 256 | 5 | Identification of the 6th quarter ending after the beginning date of the base period shown on the request record. Format is: CCYYQ, e.g., 20012 = 2nd quarter of the year 2001. |
| 47 | 6th Qtr wages | N | 261 | 8 | Amount of wages for the quarter identified in Field 46, right justified, e.g., 012345v67 = $12,345.67. |
| 48 | 6th Qtr Number of Weeks worked | N | 269 | 2 | Number of weeks worked during the quarter identified in Field 46, right justified, e.g., 06 = 6 weeks. |
| 49 | 6th Qtr Number of hours worked | N | 271 | 3 | Number of hours worked during the quarter identified in Field 46, right justified, e.g., 040 = 40 hours. |

SAGITEC-DEL_07114538

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 50 | 6th Qtr Branch of Service | N | 274 | 2 | Identifier for Branch of Service for employment and wages during the quarter identified in Field 46. Code will be "99" if wages are from more than one Branch. |
|---|---|---|---|---|---|
| 51 | 7th Quarter Date | N | 276 | 5 | Identification of the 7th quarter ending after the beginning date of the base period shown on the request record. Format is: CCYYQ, e.g., 20013 = 3rd quarter of the year 2001. |
| 52 | 7th Qtr wages | N | 281 | 8 | Amount of wages for the quarter identified in Field 51, right justified, e.g., 012345v67 = $12,345.67. |
| 53 | 7th Qtr Number of Weeks worked | N | 289 | 2 | Number of weeks worked in 7th quarter, right justified, e.g., 06 = 6 weeks. |
| 54 | 7th Qtr Number of hours worked | N | 291 | 3 | Number of hours worked in the 7th quarter, right justified, e.g., 040 = 40 hours. |
| 55 | 7th Qtr Branch of Service | A/N | 294 | 2 | Identifier for Branch of Service for wages during quarter identified in Field 51. Code will be "99" if wages are from more than one Branch. |
| 56 | 8th Quarter Date | N | 296 | 5 | Identification of the 8th quarter ending after the beginning date of the base period shown on the request record. Format is: CCYYQ, e.g., 20014 = 4th quarter of the year 2001. |
| 57 | 8th Qtr wages | N | 301 | 8 | Amount of wages for the quarter identified in Field 56, right justified, e.g., 012345v67 = $12,345.67. |
| 58 | 8th Qtr Number of Weeks worked | N | 309 | 2 | Number of weeks worked in 8th quarter, right justified, e.g., 06 = 6 weeks. |

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 59 | 8th Qtr Number of hours worked | N | 311 | 3 | Number of hours worked in the 8th quarter, right justified, e.g., 040 = 40 hours. |
|----|----------------------------------|-----|-----|-----|-----------------------------------|
| 60 | 8th Qtr Branch of Service | A/N | 314 | 2 | Identifier for Branch of Service for wages during quarter identified in Field 56. Code will be "99" if wages are from more than one Branch. |
| 61 | 9th Quarter Date | N | 316 | 5 | Identification of the 9th quarter ending after the beginning date of the base period shown on the request record. Format is: CCYYQ, e.g., 20021 = 1st qtr of the year 2002. |
| 62 | 9th Qtr wages | N | 321 | 8 | Amount of wages for the quarter identified in Field 61, right justified, e.g., 012345v67 = $12,345.67. |
| 63 | 9th Qtr Number of Weeks worked | N | 329 | 2 | Number of weeks worked in 9th quarter, right justified, e.g., 06 = 6 weeks. |
| 64 | 9th Qtr Number of hours worked | N | 331 | 3 | Number of hours worked in the 9th quarter, right justified, e.g., 040 = 40 hours. |
| 65 | 9th Qtr Branch of Service | A/N | 334 | 2 | Identifier for Branch of Service for wages during quarter identified in field 61. Code will be "99" if wages are from more than one Branch. |
| 66 | Warning Flag | A/N | 336 | 1 | X    =  Warning, potential issue<br>Blank =  No potential issue detected |
| 67 | 1st Full Term of Service Completed | N | 337 | 1 | Y = Yes<br>N = No<br>U = Unknown |
| 68 | Narrative Reason for Separation | N | 338 | 130 | This is the "narrative reason for separation" from the DD Form 214. |
| 69 | Service Entry Date | N | 468 | 8 | Date entered military service. |

SAGITEC-DEL_07114540

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

| 70 | Net Service | N | 476 | 6 | This is the number of years, number of months and number of days of net service, e.g., 031122 = 3 years, 11 months, 22 days. |
|----|-------------|---|-----|---|-----|
| 71 | Prior Active Service | N | 482 | 6 | This is the number of years, number of months and number of days of prior active service, e.g. 031122 = 3 years, 11 months, 22 days. |
| 72 | Character of Service | A/N | 488 | 2 | "HO"  =  Honorable<br>"UH"  =  General, Under Honorable Conditions<br>"DH"  =  Dishonorable<br>"BC"  =  Bad Conduct<br>"NA"  =  Uncharacterized or Blank<br>"UO"  =  Other than Honorable |
| 73 | Accrued Leave | N | 490 | 4 | The number of days of accrued leave for which the individual received Lump Sum Payment.  The format is 999v9 = 999.5 (v= implied decimal) to allow for partial days. |
| 74 | Separation/-Severance Pay | N | 494 | 8 | The amount of military severance/separation pay paid to the individual upon release.  The format is 012345v67 = 999,999.99 |
| 75 | Disability Pension Pay | N | 502 | 8 | The amount of Disability. The format is 012345v67 = 999,999.99 |
| 76 | U.S. National | A/N | 510 | 1 | Identifies individual as a US citizen/ National. Entries are:<br>Y  =  Yes<br>N  =  No<br>U  =  Unknown |
| 77 | Retirement | A/N | 511 | 1 | Identifies Retirement from Military Service . Entries are:<br>Y  =  Yes<br>N  =  No |

SAGITEC-DEL_07114541

# STATE IMPLEMENTATION GUIDE
# UCFE AND UCX PROGRAM CHANGES

| 78 | Pay Grade | A/N | 512 | 3 | Identifies military pay grade from the DD 214 that was used in calculating wages. |
|----|-----------|-----|-----|---|----------|
| 79 | Days Lost – Start 1st occurrence | N | 515 | 8 | Beginning date for first occurrence of days lost. Format is CCYYMMDD. |
| 80 | Days Lost – End 1st occurrence | N | 523 | 8 | Ending date for first occurrence of days lost. Format is CCYYMMDD. |
| 81 | Days Lost – Start 2nd occurrence | N | 531 | 8 | Beginning date for second occurrence of days lost. Format is CCYYMMDD. |
| 82 | Days Lost – End 2nd occurrence | N | 539 | 8 | Ending date for second occurrence of days lost. Format is CCYYMMDD. |
| 83 | Days Lost – Start 3rd occurrence | N | 547 | 8 | Beginning date for third occurrence of days lost. Format is CCYYMMDD. |
| 84 | Days Lost – End 3rd occurrence | N | 555 | 8 | Ending date for third occurrence of days lost. Format is CCYYMMDD |
| 85 | Days Lost – Start 4th occurrence | N | 563 | 8 | Beginning date for fourth occurrence of days lost. Format is CCYYMMDD |
| 86 | Days Lost – End 4th occurrence | N | 571 | 8 | Ending date for fourth occurrence of days lost. Format is CCYYMMDD |
| 87 | Microfilm ID | N | 579 | 12 | LCCC Microfilm ID number |
| 88 | Second DD-214 Separation Date | N | 591 | 8 | Separation Date from a second DD-214 with service period after the beginning date of the base period shown on the request. |
| 89 | Second DD-214 Component | A/N | 599 | 30 | Service Component from the DD-214 identified in field 88. |
| 90 | Second DD-214 Service Entry Date | N | 629 | 8 | Service Entry Date from the DD-214 identified in field 88. |
| 91 | Second DD-214 Net Service | N | 637 | 6 | Net Service from the DD-214 identified in field 88. |
| 92 | Second DD-214 Prior Active Service | N | 643 | 6 | Prior Active Service from the DD-214 identified in field 88. |

SAGITEC-DEL_07114542

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 93 | Second DD-214 Accrued Leave | N | 649 | 4 | Accrued Leave from the DD-214 identified in field 88. |
|---|---|---|---|---|---|
| 94 | Days Lost – Start 5th occurrence | N | 653 | 8 | Beginning date for fifth occurrence of days lost. Format is CCYYMMDD. |
| 95 | Days Lost – End 5th occurrence | N | 661 | 8 | Ending date for fifth occurrence of days lost. Format is CCYYMMDD. |
| 96 | Days Lost – Start 6th occurrence | N | 669 | 8 | Beginning date for sixth occurrence of days lost. Format is CCYYMMDD. |
| 97 | Days Lost – End 6th occurrence | N | 677 | 8 | Ending date for sixth occurrence of days lost. Format is CCYYMMDD. |
| 98 | Days Lost – Start 7th occurrence | N | 685 | 8 | Beginning date for seventh occurrence of days lost. Format is CCYYMMDD. |
| 99 | Days Lost – End 7th  occurrence | N | 693 | 8 | Ending date for seventh occurrence of days lost. Format is CCYYMMDD. |
| 100 | Days Lost – Start 8th occurrence | N | 701 | 8 | Beginning date for eight occurrence of days lost. Format is CCYYMMDD. |
| 101 | Days Lost – End 8th occurrence | N | 709 | 8 | Ending date for eight occurrence of days lost. Format is CCYYMMDD. |
| 102 | Second DD-214 Microfilm ID | N | 717 | 12 | LCCC Microfilm ID number |
| 103 | Message No. 1 | A/N | 729 | 3 | The number of the 1st message included in the response record. |
| 104 | Message No. 2 | A/N | 732 | 3 | The number of the 2nd message included in the response record. |
| 105 | Message No. 3 | A/N | 735 | 3 | The number of the 3rd message included in the response record. |
| 106 | Message No. 4 | A/N | 738 | 3 | The number of the 4th message included in the response record. |
| 107 | Message No. 5 | A/N | 741 | 3 | The number of the 5th message included in the response record. |

SAGITEC-DEL_07114543

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 108 | Message No. 6 | A/N | 744 | 3 | The number of the 6th message included in the response record. |
|---|---|---|---|---|---|
| 109 | Message No. 7 | A/N | 747 | 3 | The number of the 7th message included in the response record. |
| 110 | Message No. 8 | A/N | 750 | 3 | The number of the 8th message included in the response record. |
| 111 | Message No. 9 | A/N | 753 | 3 | The number of the 9th message included in the response record. |
| 112 | Message No. 10 | A/N | 756 | 3 | The number of the 10th message included in the response record. |
| 113 | Message No. 11 | A/N | 759 | 3 | The number of the 11th message included in the response record. |
| 114 | Message No. 12 | A/N | 762 | 3 | The number of the 12th message included in the response record. |
| 115 | Message Area | A/N | 765 | 70 | A text message will be provided in this field when there is information (i.e., names, dates, etc.) that has to be provided to the State. |
| 116 | Message Separation date | A/N | 835 | 8 | This separation date is provided for use with message number 028.  (See page 29) |
| 117 | Message Branch wages | A/N | 843 | 25 | Branch and wage information provided for use with message number 014.  (See page 27) |
| 118 | Edit/Process flag | A/N | 868 | 1 | This field identifies the point that an error or an informational message is generated. This flag is used in conjunction with the message number(s) shown in fields 103-114 to translate the message narrative.<br><br>'E' = Pre-Processing Edit error, record is rejected.<br>'P' = Message created during processing. |

SAGITEC-DEL_07114544

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

| 119 | Amended Response flag | A/N | 869 | 1 | Identifies amended responses:<br>'Y' = amends previous response.<br>'N' = initial response. |
|-----|----------------------|-----|-----|-----|-----|
| 120 | Filler | A/N | 870 | 90 | Blank |
| 121 | Record Code Type | N | 960 | 1 | This field contains the 'Record Type Code" from the input record.<br><br>**Exception**: When a control record is returned as part of the response, this code will identify the record type control record.  When this code is 2 or 3, it serves as a flag that information from a control record has been provided for review. |
| | TOTAL RECORD | | 960 | | |

**14.  <u>Response to Request Record Type 1, Initial Claim Request</u>.**  In response to a Type 1 UCX request, the State should expect to receive an electronic record from the new system, identified as a Type 1 response record in Field 121, which includes UCX wage and separation information.  However, when there is a Claim Control record on file in the new Claim Control file, the State will receive a Type 2 response that includes a copy of the Claim Control record in Fields 5-15, and depending on the Claim Control record information, may also include UCX wage and separation information.  During the transition period, which will last until all States are operational on the new system and the records in the "inquiry" control file are no longer applicable to new claims, the State must also be prepared to receive information from the "inquiry" control file in the same manner that it has received information in the past, when a record was found.

The response type and the message number dictates how the record should be handled by the State, e.g., when the response is a type 1 and contains message code number 030 ("Wages must be reduced by days lost on DD 214.  DD 214 being faxed"), the State may choose to sort this record to a file that will allow State staff to make the necessary wage adjustments before loading the wages to the State's wage file.

The response record contains 12 fields to display message numbers and one field to provide a narrative message.  Under some circumstances when specific information such as dates, other

names, breakout of wages for different Branches of Service, etc.,
need to be provided to the State, narrative will be included in
the response.  In all other cases, only a message number will be
provided.  The State will have to translate the number to the
narrative.  The message numbers and their meanings are provided
under item 14. b. of this document.

   a.  Pending Records.  A pending record is created when there is
no DD Form 214 on file that matches the separation date of the UCX
request.  When 21 days since the separation date have elapsed, the
LCCC will send a request to the DOD for the DD Form 214.  When a
response is received from the DOD, the State agency will receive
an amended response to its request.

   b.  **Informational Messages**.  The LCCC is <u>not</u> authorized to make
determinations regarding claimant eligibility.  Therefore, the
LCCC will transmit wage and separation information from the DD
Form 214 record unless there is a Claim Control record on file
containing the **same** separation date as the incoming request
record.  It is the State's responsibility to review the messages
and determine if its claim and use of wages is appropriate.
**Please note**:  Message # 032 is used as an additional alert to the
type of military discharge.  The specific type is identified in
"Character of Service," field 72, of the response record.
Information from field 72 must be used to determine if wages
provided are usable.

The following messages will be used to inform the State of
problems with the incoming request that are detected during
processing, to notify the State of potential issues, and to inform
the State of actions being taken by the LCCC with respect to the
incoming request.   When the State receives one of the following
messages, there will be an "p" in field 118 of the response
record, meaning that the record was sent to processing and the
message was generated during processing.

| Message # | Narrative | Examples of when the message is generated |
|---|---|---|
| 001 | Prior request. Response Pending. | A prior UCX request has been received and a pending record is on file. |
| 002 | No control record or DD 214 on file. Response Pending. | A UCX request has been received and a UCX pending record created. (State should use this notice to initiate affidavit using claimant's copy of DD Form 214.) |

                                          SAGITEC-DEL_07114546

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

| 003 | Pending record deleted. | Confirms the LCCC processing of request to delete a pending record. |
|-----|-------------------------|---------------------------------------------------------------------|
| 004 | No control record or DD 214 on file. | Confirms the LCCC processing of a UCFE Type 1 request. |
| 005 | No pending record on file to delete. | Notification that the State submitted a Type 6 request to cancel a pending record and no pending record was found on the LCCC file. |
| 006 | Control record on file.  No DD 214 on file. Response pending. | Generated when a Type 1 UCX request is processed, there is no DD Form 214 on file with a matching separation date and a pending record is created.  There is a Control Record on file with a benefit year in effect or a separation date that falls within the base period of the new claim.  A copy of the Control Record is included in the response. (If after a review of the Control Record information it is determined that the claim is inappropriate, send request record Type 6 to cancel the pending record.) |
| 007 | Wages previously assigned.  If subsequent DD 214 on file, wages sent. | Sent when the separation date on the incoming request matches the separation date on a claims Control Record to explain the source of the wage and separation information provided in the response.  The separation date shown in the response will be from the latest DD Form 214. |
| 008 | Narrative reason for separation exceeds 130 characters. | Self Explanatory.  When this message is generated, the LCCC will FAX the State agency a copy of the DD Form 214. |
| 009 | Control record on file. | Sent when the separation date on the incoming request matches the separation date on a claims Control Record or the separation date on the Control Record is greater than the base period begin date of the claim.  A copy of the Control Record is included in the response. |

SAGITEC-DEL_07114547

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

| 010 | No Control record on file. Wages sent from DD Form 214. | Sent when the request record is for UCFE and the secondary DD Form 214 file matching produced a DD Form 214 with a separation date subsequent to the beginning of the base period of the new claim and there is no UCX control record. |
|---|---|---|
| 011 | Name on request was_____ . | Sent when  there is claims control record on file under the social security number with a different name from the request.  The name on the request is being provided because the response record contains a copy of the Claims Control Record. |
| 012 | Control record on file. Prior claim filed since separation date. | Sent for UCX or UCFE requests when a claims control record shows a prior claim filed after the separation date shown on the request. |
| 013 | Control record on file for UCX claim. | Sent when a UCFE Type 1 record is received and there is a UCX Control Record on file with a separation date that is after the base period beginning date and/or with a benefit year ending date that is greater than the effective date of the new claim. |
| 014 | CCYYQ Branch Wages = Branch wages  = _____ . | Sent when there is more than one DD Form 214 on file with base period wages from different branches of service in the same quarter.  This is a breakout of the wages by branch of service for the quarter for benefit charging purposes. |

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 015 | Wages previously assigned. | Sent when there is a wage assignment Control Record on file with a matching separation date to that of a Type 1 the request record or a Control Record from the same State. (Control Records showing the same separation date can be filed by different States because of wage transfers.) |
|-----|-----|-----|
| 016 | Amended Response, wages sent from DD-214. | Sent when a DD Form 214 is received after the initial response or when a DD Form 214 is canceled and replaced with another DD Form 214. |
| 017 | Amended Response, DD-215 on file. | Sent when a DD Form 215 is received and there is a claim Control Record on file. |
| 018 | Amended Response. LCCC data entry correction. | Sent when the LCCC detects a data entry error to a critical data element that may affect the information previously provided. |
| 019 | Claims Control Record deleted. | Sent to confirm a deletion of a claims control record. |
| 020 | No Control record to be canceled. | Sent when a record Type 3 is received to delete a Type 2 record and there is no Type 2 record on file. |
| 021 | Invalid Control Card Sent | |
| 022 | Duplicate Claims Control Record Sent. | Self Explanatory. |
| 023 | Control Record Accepted. | Generated to confirm receipt of claims Control Record. |
| 024 | Wages Previously Assigned. Wages sent from DD Form 214. | Sent when the separation date on the request matches the separation date on a wage assignment Control Record and there is a subsequent DD Form 214 on file. |

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

| 025 | Claim Control Record on file. Wages sent from DD Form 214. | Sent when the separation date on the request matches the separation date on a Claim Control Record and there is a subsequent DD Form 214 on file. |
|---|---|---|
| 026 | Request Record Accepted. | Self Explanatory. |
| 027 | Separation date precedes base period begin date. | Sent when the separation date on the request record is before the beginning date of the base period for the claim. If there is a subsequent DD Form 214 on file with dates that fall within the base period of lag period, the information will be sent. |
| 028 | Req sep date MM/DD/YY is different from 214 sep date. Pdg rec created. | Sent when there is a DD Form 214 on file with a date of separation greater than the base period beginning date, but it does not match the date shown on the incoming request record.  The separation date from the request is provided because the separation date in field 7 of the response is from the Control Record. |
| 029 | More than 2 DD-214s on file. Copies of DD-214s being faxed. | Sent when more than 2 DD Forms 214 are on file.  UCX wage calculation system and response record format cannot handle more than 2 DD Forms 214. (Warning flag set) |
| 030 | Wages must be reduced by days lost on the DD-214.  DD-214 being faxed. | Generated when more than four occurrences of lost days appear on the DD Form 214.  Record format only accommodates four occurrences.  The wages provided have not been reduced by the days lost.  State will have to make wage reduction adjustment(s).  (Warning flag set) |
| 031 | First full term unknown.  DD-214 being faxed. | Generated when the LCCC is unable to determine if the 1st full term has been completed.  The State will have to make a determination upon review of DD Form 214 and using the claimant's affidavit/ certification, if necessary. (Warning flag set) |

SAGITEC-DEL_07114550

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 032 | Character of service not honorable. | Generated when character of service shown in Field 72 is anything other than "HO." (Warning flag set) |
|---|---|---|
| 033 | Used only one of the two SSNs to calculate. | Generated when two SSNs in request record and information is found for one SSN only.  (Warning flag set) |
| 034 | Unable to calculate wages.  DD Form 214 info provided. | Generated when there is a backdated claim with an effective date that is earlier than the effective date of the earliest military wage table (Schedule of Remuneration) on file. |
| 035 | Name on 214 rec is _____ . | Generated when there is a different name on the DD Form 214 record than is on the incoming request. (Warning flag set) |
| 036 | Name on 5616 rec is _____ . | Generated when there is a different name on the NOAA 5616 record than is on the incoming request. (Warning flag set) |
| 037 | 214 names _____ . _____ . | Generated when there are 2 names on the DD Form 214 records that are different from the name on the incoming request. (Warning flag set) |
| 038 | 5616 names _____ . _____ . | Generated when there are 2 names on the NOAA 56-16 records that are different from the name on the incoming request. (Warning flag set) |
| 039 | Amended Response, DD Form 214 deleted by Military. | Generated when the military deletes a DD Form 214 and there is no replacement DD Form 214 sent. |

SAGITEC-DEL_07114551

| 040 | Wages previously assigned, need Trans FIPS Identified on Control Rec. | Generated when there is a Type 3 Control Record from a different State with the same separation date on file. |
|---|---|---|
| 041 | Separation pay greater than 99999.99.  DD 214 being faxed. | Generated when the Separation Pay field is equal to 99999.  The LCCC can only accommodate 5 positions for this field. If the amount is more than 5 positions, this field will be filled with all 9s and the DD 214 will be faxed to the requesting State. |

**15.   Amended UCX Responses.**   The State agency will receive an amended response record any time the LCCC receives a new DD 214, or a DD Form 215 that changes critical information.   Amended responses will carry a record Type 1 even though the initial response may have been coded Type 2 or 3.   Information from the Claims Control file that may have caused the original response to be coded Type 2 or 3 will not be provided again.

**16.   Rejected Record - Error Messages.**   When the State receives one of the following error messages, there will be an "e" in Field 118 of the response record.   An "e" means that the record did not pass the initial edits and has been rejected prior to processing.

Using the 960 character response record format, Fields 1 thru 18 of the response record will be a copy of Fields 1 thru 18 of the request record submitted by the State.   Additional fields that will be completed are:   Field 103 (providing the error message number); Field 118 (providing an "edit/process flag" of  "e" for error); and Field 121 (copy of Field 20 from the incoming request record).

Following are the record rejection error message numbers and the narrative language.

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

| Message # | Narrative |
|-----------|-----------|
| 001 = | Record code type invalid |
| 002 = | Invalid Program type |
| 003 = | Invalid Social Security Number - not numeric |
| 004 = | Invalid Social Security Number not > zero |
| 005 = | Invalid Social Security Number first 3 digits not > zero |
| 006 = | Invalid Social Security Number middle 2 digits not > zero |
| 007 = | Invalid Social Security Number last 4 digits not > zero |
| 008 = | Invalid first name missing |
| 009 = | Invalid first name |
| 010 = | Invalid middle initial |
| 011 = | Invalid last name without first character |
| 012 = | Invalid last name missing |
| 013 = | Invalid last name |
| 014 = | Effective date of claim invalid |
| 015 = | Last day of work (UCX sep date) invalid |
| 016 = | Last day of work (UCFE sep date) invalid |
| 017 = | Base Period Begin date invalid |
| 018 = | Base Period Ending date invalid |
| 019 = | Benefit Year Ending date invalid |
| 020 = | State FIPS code invalid |
| 021 = | First transferring State FIPS code invalid |
| 022 = | Second transferring State FIPS code invalid |
| 023 = | Branch of service must be space for UCFE |
| 024 = | Branch of service invalid |
| 025 = | Transmission Date invalid |
| 026 = | Invalid other Social Security Number - Not numeric |
| 027 = | Invalid other SSN -First three digits not > zero. |
| 028 = | Invalid other SSN -Middle two digits not > zero |
| 029 = | Invalid other SSN -Last four digits not > zero |
| 030 = | State FIPS Code not Numeric |
| 031 = | First Transferring State FIPS Code Not Numeric |
| 032 = | Second Transferring State FIPS Code Not Numeric |
| 033 = | Invalid Program Type For Record Code |
| 034 = | State FIPS Code Not Your State Code |

17. **Optional Print Program.** A print program used during the
testing of the new system is available from the LCCC. If the
State is interested in obtaining this print program, contact
Rezzie Meyers at 1-800-535-8100. **Note:** The LCCC is not able to
provide States with on-going support pertaining to this print
program.

The print program will read the individual records in the response

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

file and print formatted readable records on a separate page for
each social security number.  The first records to print will be
rejected records.  These records will carry an "e" in Field 115
indicating that the record did not pass the initial edits and was
rejected prior to processing.  The second records to print will be
those with a "p" in Field 115 indicating that the record was
processed by the LCCC.  At the end of all records, a summary page
will be printed that contains the total number of rejected records
and the total number of processed records in the batch.

**18.  Using an Affidavit to Establish UCX Eligibility**.  When the
LCCC does not have a DD Form 214 on file, UCX benefits will no
longer be withheld pending its receipt.  States are now authorized
to use the claimant's copy 4 of a DD Form 214 as an affidavit upon
receipt of a notice from the LCCC that there is no DD Form 214 on
file.  The State should develop a system to electronically
generate a request to the claimant for a copy of the claimant's DD
Form 214 upon receipt of this notice.  Ideally, the State may
consider implementing this as a feature accessible from a screen
used to view response records, a PF key could be used to initiate
this request to the claimant after staff has reviewed the response
to insure that there has been no data entry error on the request
record separation date that caused an erroneous pending record to
be created.

**19.  UCFE Forms and Corresponding Electronic Record Formats**.  Each
State agency is required to reproduce the UCFE forms as designed,
except that if the State uses "weeks of employment" or "hours
worked" information, item 9B of the ETA 931 may be modified.

Any other proposed modification of the paper forms should be
submitted to the USDOL National Office through the appropriate
Employment and Training Administration Regional Office for review
and approval.  **NOTE**:  State agency modifications to the electronic
record formats are not permitted.

**20.  UCFE - Generating Requests for Wage and Separation
Information to Federal Agencies**.  An ICON UCFE Support System
application has been developed for States' use to generate
requests for Federal civilian wage and separation information.
This application supports the creation and delivery of hardcopy
and electronic versions of the ETA-931, Request for Wage and
Separation Information, the ETA-931A, Request for Separation
Information, and the ETA-934, Request for Additional Information.

Each request is data entered to the ICON UCFE Support System.  The
appropriate type of request, mail or electronic, will be generated

# STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

based on the delivery indicator for the Federal agency.  This
indicator is maintained in the Directory of Federal Agencies and
will be dynamically moved to Field number 17 of the TC-ETA-931 and
TC-ETA-931A, and Field number 15 of the TC-ETA-934.  The request
records will be generated as follows:

*   <u>Type 1, Delivery Indicator</u>.  A type "1" delivery indicator
    causes an electronic TC-ETA-931 to be transmitted to the
    employer requesting both wage and separation information.

*   <u>Type 2, Delivery Indicator</u>.  A type "2" delivery indicator
    causes an electronic request for wages to be sent to the
    federal agency for wage information and a copy of the
    request, including the name and address of the agency, to e
    written to a "flat" file for the State to use to complete a
    form ETA-931 for mailing to the federal agency to obtain
    separation information.

*   <u>Type 3, Delivery Indicator</u>.  A type "3" delivery indicator
    causes a request record, including the name and address of
    the federal agency, to be written to a "flat" file for the
    State to use to complete a form ETA-931 for mailing to the
    federal agency to obtain wage and separation information.
    Using the information from the "flat" file to address a
    preprinted form or to complete a computer printed form is a
    programming responsibility of the State.

An electronic record of each request entered ICON UCFE Support
System will be sent to the HUB.  Records with a '1' or '2'
delivery indicator will be forwarded (minus the information
carried in Fields 23-34) to the UCFE Server to await pickup by the
destination federal agency.  The information carried in Fields 23-
34 is used for maintenance of the Directory of Federal Agencies.
When there has been an entry to the address fields of the record,
field 34 will be dynamically marked.  Field 34 of all records will
be read by the HUB system and when marked will cause a record to
be will to an address maintenance file for appropriate action by
the National Office.  Refer to item 26 below for additional
information about the Directory of Federal Agencies.

Below is a copy of the Main Menu for the UCFE system for easy
reference.

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

a.  ICON UCFE Support System - Main Menu.

```
                           UCFE SUPPORT SYSTEM
                                MAIN MENU

       OPTION: _        SSN  ___ - __ -___     EFF DT: __ / __ / __

         (1)   ENTER 931               (REQUEST FOR WAGE AND SEPARATION INFO)
         (2)   ENTER 931A              (REQUEST FOR SEPARATION INFO ONLY)
         (3)   ENTER 934               (REQUEST FOR ADDITIONAL INFO)
         (4)   VIEW OUTGOING REQUESTS
         (5)   VIEW INCOMING RESPONSES
         (6)   VIEW FEDERAL ADDRESS DIRECTORY



       PRESS ENTER TO CONTINUE
       PRESS CLEAR TO EXIT
```

b.  ETA 931, ICON Data Entry Screen.  This data entry screen
is used to generate the ETA-931 in hardcopy or electronic form.

```
                         UCFE SUPPORT SYSTEM
             TC-ETA 931 REQUEST FOR WAGE AND SEPARATION INFORMATION

      OPTION: (1)           SSN: (2)              OFFICE: (3)
      CREATION DATE: (4)              DATE CLM TAKEN: __ / __ / __ (5)
                       EFF DT: 00 / 00 / 00 ( 6)

      NAME: FIRST: _____( 7) MI: _ (8  LAST: _____ (9)
      BASE PERIOD: EX? _ (10)  BEGINS: __ / __ / __ (11)
      WAGES ONLY: _ (12)
      FIC: ___(13)  DESTINATION: ____(14)

    ENTER=ADDRESS SCREEN  PF1=HELP  PF3=SEND  PF4=CANCEL  PF9=NEW CLAIM
    FE009 - ENTER DATA AND THEN PRESS THE ENTER KEY
```

21.  ETA-931, Request for Wage and Separation Information - UCFE.
The ETA-931 is used to obtain Federal civilian employment, wage,
and/or separation information from a Federal agency and is
available in a paper format and an electronic format.  The Form
ETA-931 is used to obtain Federal civilian wage and separation
information when the responding Federal agency is unable to
provide any wage or separation information in the electronic
format.  The electronic TC-ETA-931 is used when the responding
Federal agency is able to provide either the claimant's wage or
wage and separation information in the electronic format.

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

a. Form ETA 931

(1) Front of Form ETA 931

<table>
<tr><td colspan="2" align="center">(STATE AGENCY IDENTIFICATION)<br>**REQUEST FOR WAGE AND SEPARATION INFORMATION– UCFE**</td></tr>
<tr><td>1. State Agency Address:</td><td>2. Name of Federal Agency, 3 Digit Agency Code, and Address:</td></tr>
<tr><td colspan="2">3. Local Office/Call Center ID:    4. Date of Request:    5. Date claim taken:    6. Effective Date of Claim:</td></tr>
<tr><td>7. Name (Last, First , Middle Initial)</td><td>8. Social Security Number</td></tr>
</table>

Instructions: Complete and Return Within 4 Workdays

9. A. Did this person perform "Federal Civilian Service" as defined for UCFE purposes for your agency at any time during the base period shown in Item 10A below?    __Yes __No

B. Under what legal authority was the individual hired? _____

C. What funding Source was used for salary payments? _____

D. Were payroll deductions made for Federal and State taxes?    __Yes __No

E. Was Employee eligible for:

   (1) Annual and Sick leave?    ___Yes ___No    (2) Health and Life insurance?    __Yes __No

   (3) Civil Service or FERS retirement?    __Yes __No

F. Did the Federal agency provide direction and control?    __Yes __No

G. Duty Station: Enter State of the person's last employment with your agency (or if outside U.S., enter Country): _____

NOTE: If "NO" to D, E (1) through E (3) Explain on separate attachment.

<table>
<tr><td>10. Are base period wages provided electronically?<br>  ___Yes ___No. If 'yes', go to item 11. If 'no', report all wages from base period begin date to separation date.<br><br>A. Base period beginning date _____<br>B. Report wages for quarters ending after date in 'A' above.<br><br>Qtr. Ending  Year  Gross Wages<br>_____  ____  $_____<br>_____  ____  $_____<br>_____  ____  $_____<br>_____  ____  $_____<br>_____  ____  $_____<br>_____  ____  $_____<br>_____  ____  $_____<br>_____  ____  $_____<br>C. Report Hours<br>  No. of Duty Hours ___Workday<br>          ___Basic Workweek</td><td>11. Separation, Terminal Annual Leave, and Severance Pay Information<br>A. Did this person receive a lump sum payment(s) for terminal annual leave on or after the beginning date of base period shown in item 10A?    __Yes __No<br>If "Yes" or if currently entitled to such a payment, enter date below : Payment Date: __/__/    Days of Leave: _____<br>Period From: Date: __/__/ To: Date: __/__/<br>B. Date of Separation __/__/<br>C. Last day of active pay status __/__/<br>D. Reason for separation or nonpay status:_____<br>_____<br><br>E. Did this person receive or is he/she entitled to receive severance pay provided by Federal law or agency employee agreement?    ___Yes __No<br>If "Yes" complete the following information:<br>Total Entitlement: $_____ Weekly entitlement: $_____ Beginning date: __/__/<br>Ending Date: __/__/</td></tr>
<tr><td>Print Name _____</td><td>Title _____</td></tr>
<tr><td>Signature_____</td><td>Telephone Number (____)_____    Date____ /  /</td></tr>
<tr><td colspan="2">ETA-931(Revised 8/2001)</td></tr>
</table>

CONFIDENTIAL

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

(2)  Reverse of Form ETA-931.

---

**Important Notice**

If a completed Form ETA-931 is not received by the 12th calendar day from the 'date of request,' this agency may pay benefits to the claimant based on his/her affidavit as provided by Department of Labor's Regulation at 20 CFR 609.6(e)(2).  Any benefit payments made to the claimant will be charged to the Federal employing agency(ies) in accordance with Section 1023, PL 96-499, Omnibus Reconciliation Act of 1980(94 Stat. 2599).

COMPLETION INSTRUCTIONS TO FEDERAL AGENCY
(Also see Front of this Form)

As an alternative to completing this form, attaching a computer printout containing complete data of the data requested is acceptable if procedures and forms are cleared with the U.S. Department of Labor, Washington, DC 20210, and the State agency has completed items 1-7 and 10A and 10B, which identify the base period and the applicable calendar quarters for which information is requested.

Item 9A asks if the individual performed "Federal Civilian Service."  If the Federal agency response is "No," Item 9B through 9F are to be completed.  Item 9G will be answered when the individual performed "Federal Civilian Service."

The information is available on the SF-50 or payroll records.  Provide a separate attachment if necessary.

Item 10B and 9C.  Enter either gross wages, when paid, in Federal Civilian Service or "none" if no wages for that period.  Do not include as wages: (1) severance pay, (2) lump sum payment(s) for terminal annual leave, or (3) any other type of separation payment.  Enter hours, such as 8 and 40 for full-time employee.

Item 11A.  Self-explanatory.

Items 11B and 11C.  Enter dates requested.  The date in Item 11C includes annual and sick leave days if earlier than the date of separation (11B) or if employee is not separated.

Item 11D.  Obtain agency findings from SF 50: Item 5-B "Nature of Action" and Item 45, "Remarks", or if SF-50 not used, record equivalent information from other separation document(s) your agency used.  See Federal Personnel Manual (FPM) supplement 296-33 for standards on work connected "Resignation" cases, carefully review FPM requirements applicable since January 1,1982.  If payroll office records are incomplete or inadequate, or if information on SF-50 is not sufficient, check with personnel for additional information and add as part of separation information.  ATTACH COPIES OF DOCUMENTS IF APPROPRIATE.

Item 11E.  Self-explanatory.

Signature of Official.  Form is not complete unless it (or attached computer printout) is signed and dated; also enter signer's title and telephone number.

---

SAGITEC-DEL_07114558

# STATE IMPLEMENTATION GUIDE
# UCFE AND UCX PROGRAM CHANGES

(3) <u>Number of copies and distribution</u>. One copy of the Form ETA-931 is to be prepared and forwarded to the Federal agency on the date that the UCFE claim is taken.

(4) <u>Preparation of Form ETA-931</u>. The Form ETA-931 should be completed as follows:

(a)    <u>Item 1, State Agency Address</u>. Enter the address to which the response is to be returned.

(b)    <u>Item 2, Name of Federal Agency, 3 Digit Agency Code and Address</u>. Enter the Federal agency, the FIC code and mailing address.

(c)    <u>Item 3, Local Office/Call Center ID</u>. Enter the local office/call center identification number.

(d)    <u>Item 4, Date of request</u>. Enter the date the Form ETA-931 sent to the Federal agency.

(e)    <u>Item 5, Date claim taken</u>. Enter the date that the claim was taken. This should represent the date that application was received from the claimant.

(f)    <u>Item 6, Effective date of claim</u>. Enter the date of the first day that the claim is in effect. In most cases, it will be the Sunday preceding the date of filing.

(g)    <u>Item 7, Name</u>. Enter the claimant's full name plus maiden name in parentheses, if any (e.g., Elliott, Sara (Johnson)).

(h)    <u>Item 8, Social Security Number (SSN)</u>. Enter the claimant's SSN as provided by the claimant. Enter all of the SSN(s) shown in item 2 of the claimant's SF-50 or on any SSN(s) presented by the claimant, or obtained from any other official document, such as a W-2 Form, identifying the source of each number in parentheses, e.g., 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 (SF-50). Separate the number by dashes between the third and fourth digits and the fifth and sixth digits, e.g., 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).

(i)    <u>Items 10A and 10B</u>. Enter the beginning date of the base period in item 10A. In item 10B list each calendar quarter, for which wages are requested, from the base period begin date to the quarter in which the claim is effective. The request must list all quarters covering the base and lag periods

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

even those quarters beginning beyond the date that the claimant
provided as the separation date from the Federal agency.

States with laws that include weeks of employment in the formula
for determining monetary entitlement or requiring other wage or
employment information for a determination, are authorized to
adapt item 10B to meet their needs.

   b.  TC-ETA 931, Request for Wage and Separation Information.
The electronic ETA 931 is used to obtain wage or wage and
separation information from a Federal agency that is able to
provide the claimant's wage, or wage and separation, information
in the electronic format.  Below is the request record that will
be created for each ETA-931 entered to the ICON UCFE application.
This record, minus the information shown in Fields 23 – 34, will
be transmitted when the Federal agency is identified with a
"delivery indicator" of 1 or 2 in Field 17.  Information under
the "DESCRIPTION" column indicates the information that is to be
provided in the outgoing request record.  The information that is
required on this record that is not shown on the data entry
screen should be dynamically provided from other State records if
possible.

| TC-ETA 931, Request for Wage and Separation Information (STATE AGENCY REQUEST RECORD FORMAT) | | | | | | |
|---|---|---|---|---|---|---|
| FLD NBR | FIELD NAME | FIELD TYPE | BEGIN COLUMN | FIELD LENGTH | REQ/ OPT | |
| | Record Key is Fields 1 through 4 | | | | | |
| 1 | Social Security No. | N | 1 | 9 | R | Claimant's SSN. |
| 2 | Effective Date | N | 10 | 8 | R | The effective date of the claim.  Format is CCYYMMDD. |
| 3 | Sequence Identifier | N | 18 | 2 | R | Sequence of record supplied by the sending State.  Sequence will begin with 01.  Each new record for the same SSN and Effective Date will be incremented by +1. |
| 4 | Type of Request | N | 20 | 2 | R | Values:  01 = ETA 931 Request Record. |
| 5 | FIC of Responding Agency | N | | 3 | R | The Federal agency's three digit identifi-cation code. |

SAGITEC-DEL_07114560

# STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 6 | Destination Code of Responding Agency | N | 25 | 4 | R | The Federal agency component's four digit destination code. |
|---|---|---|---|---|---|---|
| 7 | Base Period Beginning Date | N | 29 | 8 | R | Beginning Date of the Base Period. Format is CCYYMMDD. |
| 8 | Requesting State's Postal Code | A/N | 37 | 2 | R | The sending state's alpha postal code. |
| 9 | Creation Date | N | 39 | 8 | R | Date the electronic request is created. Format is CCYYMMDD. |
| 10 | Creation Time | N | 47 | 6 | R | Time the electronic request is created. Format is HHMMSS. |
| 11 | Claim Date | N | 53 | 8 | R | Date the claim was taken. Format is CCYYMMDD. |
| 12 | First Name | A/N | 61 | 20 | R | The claimant's first name. |
| 13 | Middle Initial | A/N | 81 | 1 | O | The claimant's middle initial. |
| 14 | Last Name | A/N | 82 | 23 | R | The claimant's last name. |
| 15 | Base Period Override Indicator | A/N | 105 | 1 | R | Indicator identifying if the sending State has overridden the standard Base Period (BP). Blank = Standard BP 'X' = Standard BP has been overridden and alternate BP entered. |
| 16 | Local Office/ Call Center | A/N | 106 | 4 | R | Code identifying the Local Office or Call Center to which the claim is assigned in the Sending State or spaces. |
| 17 | Delivery Indicator | A/N | 110 | 1 | R | Indicator specifying the receiving Federal Agencies method of responding to requests. '1'= Electronic Wage and Separation Information. '2'= Electronic Wage and Paper Separation Information. '3'= Paper Wage and Separation Information. |

# STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 18 | Type of Response Requested | A/N | 111 | 1 | R | Indicator for the type of response requested. Values:<br>1 = Wages for the Quarter.<br>2 = Wages and number of weeks worked during each quarter<br>3 = Wages and number of hours worked during each quarter. |
|----|----------------------------|-----|-----|---|---|---|
| 19 | Date Exported | N | 112 | 8 | R | Date the request was exported. Format is CCYYMMDD. |
| 20 | Time Exported | N | 120 | 6 | R | Time the request was exported. Format is HHMMSS. |
| 21 | Response Received Indicator | A/N | 126 | 1 | O | This field will be set to 'X' when the response is received from the Federal Agency. |
| 22 | Wages Only Indicator | A/N | 127 | 1 | R | This field identifies a request for wages only when the state does not need separation information.<br><br>Valid entries:<br>X     = wages only<br>Blank = wages and separation information. |
| 23 | Filler | A/N | 128 | 73 | R | Spaces. |
| 24 | Agency Name | A/N | 201 | 50 | R | Name of the Federal Agency that is responsible for this claim |
| 25 | Agency Component | A/N | 251 | 50 | R | Component of the Federal Agency that is responsible for this claim. |
| 26 | Agency Address line 1 | A/N | 301 | 50 | R | First line of the Street or Postal Address for the Federal Agency. |
| 27 | Agency Address line 2 | A/N | 351 | 50 | R | Second line of the Street or Postal Address for the Federal Agency. |

SAGITEC-DEL_07114562

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 28 | Agency Address line 3 | A/N | 451 | 50 | R | Third line of the Street or Postal Address for the Federal Agency. |
|----|-----------------------|-----|-----|----|---|------------------------------------|
| 29 | Agency – City | A/N | 451 | 50 | R | City of the Postal Address. |
| 30 | Agency – State | A/N | 501 | 2 | R | Two digit alpha Postal Code for State. |
| 31 | Agency – Zip Code | A/N | 503 | 13 | R | Postal Zip Code. Format is: XXXXX-XXXX-XX. |
| 32 | Agency – Country | A/N | 516 | 26 | R | Country for location of Federal agency. |
| 33 | Filler | A/N | 542 | 1 | R | Space. |
| 34 | Address Change Indicator | A/N | 543 | 1 | O | Address Change Indicator . If this is a new address or the address is different from what is on the Directory of Federal Agencies file, this field will contain an 'X'. Otherwise, the field will contain a space. |
| 35 | Filler | A/N | 944 | 57 | R | Spaces. |
| | TOTAL RECORD | | | 1000 | | |

        c.  <u>TC-ETA-931 Response Record Format</u>.  Below is the record
format of the response that States will receive from the Federal
Agency.  The same record format will be used by Federal agencies
sending electronic wage information only and electronic wage and
separation information.

| TC-ETA-931 – Federal Agency Response Record Format | | | | | | |
|------------|------------|---------------|-----------------|------------------|-------------|---------------------------------|
| FLD NBR | Field Name | Field Type | Begin Column | Field Length | REQ/ OPT | Description |
| | Record Key is Fields 1 through 4 | | | | | |
| 1 | Social Security No. | N | 1 | 9 | R | Claimant's SSN. |
| 2 | Effective Date | N | 10 | 8 | R | The effective date of the claim.  Format is CCYYMMDD. |

SAGITEC-DEL_07114563

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 3 | Sequence Identifier | N | 18 | 2 | R | This sequence number identifies the original and subsequent responses to the request identified by sequence number in Field 85. The response numbering should be sequential beginning with 01 (up to 99) as follows: 01 = 1st response (original response to request) 02 = 2nd response (first amended response) 03 = 3rd response (second amended response) etc. |
|---|---|---|---|---|---|---|
| 4 | Type of response | N | 20 | 2 | R | Value:   04 = 931 Response Record. |
| 5 | Social Security No. | N | 22 | 9 | R | Claimant's Social Security Number from the incoming request. |
| 6 | Effective Date | N | 31 | 8 | R | The Effective Date of the claim from the incoming request. |
| 7 | Sequence Identifier | N | 39 | 2 | R | Sequence number of the request record supplied by the sending State on the incoming request in Field 3. |
| 8 | Type of Request | N | 41 | 2 | R | Value:   01 = 931 Request Information. This is supplied by the incoming request. |
| 9 | FIC of Responding Agency | N | 43 | 3 | R | The Federal Agency's three digit identification code from the incoming request. |
| 10 | Destination Code of Responding Agency | N | 46 | 4 | R | The Federal agency component's four digit destination code from the incoming request. |
| 11 | Base Period Beginning Date | N | 50 | 8 | R | Date of the Beginning of the Base Period identified by the requesting State (not modifiable). |
| 12 | Requesting State's Postal Code | A/N | 58 | 2 | R | The sending state's Postal Code from the incoming request |
| 13 | Creation Date | N | 60 | 8 | R | Date the electronic response is created. |
| 14 | Creation Time | N | 68 | 6 | R | Time the electronic response is created. |
| 15 | Claim Date | N | 75 | 8 | R | Date the claim was taken from the incoming request. |

SAGITEC-DEL_07114564

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 16 | First Name | A/N | 82 | 20 | R | The claimant's First Name from the incoming request. |
|----|-----------|-----|----|----|----|----------------------------------------------------|
| 17 | Middle Initial | A/N | 102 | 1 | O | The claimant's Middle initial from the incoming request. |
| 18 | Last Name | A/N | 103 | 23 | R | The claimant's Last name from the incoming request. |
| 19 | Base Period Override Indicator | A/N | 126 | 1 | R | Indicator from the incoming request identifying if the Sending State has overridden the standard Base Period (BP). Valid values are: Blank = Standard BP "X" = Standard BP Overridden. Alternate BP Entered. |
| 20 | Local Office/Call Center | A/N | 127 | 4 | R | Code from the incoming request identifying the Local Office or Call Center to which the claim is assigned in the Sending State. |
| 21 | Delivery Indicator | A/N | 131 | 1 | R | This field is taken from the incoming request. It is the indicator that specifies the type of request to send and the type of response to expect from the Federal Agency identified in fields 9 and 10. Valid values are: '1' = Electronic Wage and Separation Information '2' = Electronic Wage Information. Mail Separation Information. '3' = Mail Wage and Separation Information. |

# STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 22 | Type of Response Requested | A/N | 1322 | 1 | R | This field is taken from the incoming request and indicates what information the State is requesting. Values:<br>1 = Wages for each quarter<br>2 = Wages and the number of weeks worked during each quarter<br>3 = Wages and number of hours worked during each quarter. |
|---|---|---|---|---|---|---|
| 23 | Response Type sent | A/N | 1332 | 1 | R | Values:<br>1 = Wages for each quarter<br>2 = Wages and the number of weeks worked during each quarter<br>3 = Wages and number of hours worked during each quarter. |
| 24 | Performed Federal Civilian Service? | A/N | 134 | 1 | R | Values:<br>"Y" = Yes; "N" = No.<br>If "N" is entered in this field, fields 25 –31 must be completed. |
| 25 | Under what legal authority was individual hired? | A/N | 135 | 10 | O | If "N" in field 24, answer this question. |
| 26 | What funding source was used for salary payments? | A/N | 145 | 10 | O | If "N" in field 24, answer this question. |
| 27 | Were payroll deductions made for Federal and State taxes? | A/N | 155 | 1 | O | If "N" in field 24, answer this question. Values:<br>"Y" = Yes; "N" = No. |
| 28 | Was employee eligible for annual and sick leave? | A/N | 156 | 1 | O | If "N" in field 24, answer this question. Values:<br>"Y" = Yes; "N" = No. |

SAGITEC-DEL_07114566

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 29 | Was employee eligible for health and life insurance? | A/N | 157 | 1 | O | If "N" in field 24, answer this question. Values: "Y" = Yes; "N" = No. |
|----|----|----|----|----|----|----|
| 30 | Was employee eligible for Civil Service or FERS retirement? | A/N | 158 | 1 | O | If "N" in field 24, answer this question. Values: "Y" = Yes; "N" = No. |
| 31 | Did the Federal agency provide direction and control? | A/N | 159 | 1 | O | If "N" in field 24, answer this question. Values: "Y" = Yes; "N" = No. |
| 32 | Date of Separation/ Last Date in Active Pay Status | N | 160 | 8 | R | Enter the date of separation or the last day in active pay status if not separated.  Format is CCYYMMDD. |
| 33 | Reason for Separation/-Non-pay Status | N | 161 | 1 | R | Valid entries are:<br>1 =     Permanent Layoff<br>2 =     Temporary Layoff/Furlough<br>3 =     Quit<br>4 =     Discharged<br>5 =     Labor Dispute<br>6 =     Retirement<br>7 =     Other |
| 34 | Official Duty Station | N | 169 | 2 | R | Enter the 2-digit FIPS Code for the State, District of Columbia, Puerto Rico or Virgin Islands.  When the official duty station was outside of the US or the jurisdictions identified above, enter 99. |
| 35 | Severance Pay | N | 171 | 1 | R | Enter "Y" if the individual has received or will receive Severance pay after this separation. Enter "N" if the individual did not and will not receive severance pay after this separation. |
| 36 | Severance Pay – begin date | N | 188 | 9 | R | Enter the date on which severance pay began.  Format is CCYYMMDD. |

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 37 | Severance Pay – end date | I N | 180 | 8 | R | Enter the date on which severance pay ends. Format is CCYYMMDD. |
|----|----|----|----|----|----|----|
| 38 | Severance Payment amount | N | 189 | 9 | R | Enter the total dollar amount of severance pay. Format is 999999.99 (right justify. i.e. 012590.88). |
| 39 | Date of Severance Payment | N | 197 | 8 | R | Enter the date severance payment was issued. Format is CCYYMMDD. |
| 40 | Annual Leave | A/N | 205 | 1 | R | Enter "Y" if the individual has received or will receive a lump sum annual leave payment after the separation date.<br><br>Enter "N" if the individual did not and will not receive a lump sum annual leave payment after the separation date. |
| 41 | Annual Leave Amount | N N | 206 | 8 | R | Enter the total dollar amount of annual leave payment paid/due. Format is 999999.99 (right justify. i.e. 012590.88) |
| 42 | Number of Days of Annual Leave | N | 214 | 3 | 42 | Enter the number of days of annual leave paid/due. Format is 999 (right justify. i.e. 001). |
| 43 | Date of Annual Leave Payment | I N | 217 | 8 | 43 | Enter the date on which annual leave payment was issued. Format is CCYYMMDD. |
| 44 | Monthly Pension Payment amount | N | 225 | 8 | 44 | If value "6" is entered in field 33, enter the gross dollar amount of monthly pension payment. Format is 99999.99 (right justify. i.e. 02590.88) |
| 45 | Explanation of Reason for Separation/Non-pay Status | A/N | 233 | 400 | R | If value "3", "4" or "7" is entered in field 33, provide a detailed explanation. |

**STATE IMPLEMENTATION GUIDE**
**UCFE AND UCX PROGRAM CHANGES**

| 46 | Year – Quarter | N | 633 | 5 | 46 | Identify the 1st calendar quarter ending after the beginning date of the base period. Format is CCYYM.<br>Month Values:<br>Qtr ending  3/31 = 1<br>Qtr ending  6/30 = 2<br>Qtr ending  9/30 = 3<br>Qtr ending 12/31 = 4 |
|---|---|---|---|---|---|---|
| 47 | Base Period Wages – 1st Quarter | N | 638 | 8 | R | Enter the amount of wages during the 1st calendar quarter ending after the beginning date of the base period. Format is 99999.99. If no wages, enter zeros. |
| 48 | Weeks Worked – 1st Quarter | N | 646 | 2 | R | Enter the number of weeks during which work was performed in the 1st calendar quarter ending after the beginning date of the base period. The format is 99 (i.e. 05). If no weeks, enter zeros. |
| 49 | Hours Worked – 1st Quarter | N | 648 | 4 | R | Enter the number of hours work during the 1st calendar quarter ending after the beginning date of the base period. Format is 9999 (i.e. 0840). If no hours, enter zeros. |
| 50 | Year – Quarter | N | 652 | 5 | R | Identify the 2nd calendar quarter ending after the beginning date of the base period. Format is CCYYM.<br>Month Values:<br>Qtr ending  3/31 = 1<br>Qtr ending  6/30 = 2<br>Qtr ending  9/30 = 3<br>Qtr ending  12/31 = 4 |
| 51 | Base Period Wages – 2nd Quarter | N | 657 | 8 | R | Enter the amount of wages during the 2nd calendar quarter ending during base period. Format is 99999.99. If no wages, enter zeros. |

SAGITEC-DEL_07114569

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 52 | Weeks Worked – 2nd Quarter | N | 665 | 2 | R | Enter the number of weeks during which work was performed in the 2nd calendar quarter ending after the beginning date of the base period. Format is 99 (i.e. 05). If no weeks, enter zeros. |
| 53 | Hours Worked 2nd Quarter | N | 667 | 4 | R | Enter the number of hours work during the 2nd calendar quarter ending after the beginning date of the base period. Format is 9999 (i.e. 0840). If no hours, enter zeros. |
| 54 | Year – Quarter | N | 671 | 5 | 54 | Identify the 3rd calendar quarter ending after the beginning date of the base period. Format is CCYYM. Month Values: Qtr ending   3/31 = 1 Qtr ending   6/30 = 2 Qtr ending   9/30 = 3 Qtr ending  12/31 = 4 |
| 55 | Base Period Wages – 3rd Quarter | N | 676 | 8 | 55 | Enter the amount of wages during the 3rd calendar quarter ending during the base period. The format is 99999.99. If no wages, enter zeros. |
| 56 | Weeks Worked – 3rd Quarter | N | 684 | 2 | 56 | Enter the number of weeks during which work was performed in the 3rd calendar quarter ending after the beginning date of the base period. Format is 99 (i.e. 05). If no weeks, enter zeros. |
| 57 | Hours Worked – 3rd Quarter | N | 686 | 4 | R | Enter the number of hours work during the 3rd calendar quarter ending after the beginning date of the base period. Format is 9999 (i.e. 0840). If no hours, enter zeros. |

SAGITEC-DEL_07114570

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 58 | Year – Quarter | N | 690 | 5 | R | Identify the 4th calendar quarter ending after the beginning date of the base period.  Format is CCYYM.<br><br>Month Values:<br>Qtr ending   3/31 = 1<br>Qtr ending   6/30 = 2<br>Qtr ending   9/30 = 3<br>Qtr ending  12/31 = 4 |
|----|----------------|---|-----|---|---|------|
| 59 | Base Period Wages – 4th Quarter | N | 695 | 8 | R | Enter the amount of wages during the 4th calendar quarter ending during the base period.  Format is 99999.99.  If no wages, enter zeros. |
| 60 | Weeks Worked – 4th Quarter | N | 703 | 2 | 60 | Enter the number of weeks during which work was performed in the 4th calendar quarter ending after the beginning date of the base period.  Format is 99 (i.e. 05).  If no weeks, enter zeros. |
| 61 | Hours Worked – 4th Quarter | N | 705 | 4 | 61 | Enter the number of hours work during the 4th calendar quarter ending after the beginning date of the base period.  Format is 9999 (i.e. 0840).  If no hours, enter zeros. |
| 62 | Year – Quarter | N | 709 | 5 | R | Identify the 5th calendar quarter ending after the beginning date of the base period (i.e. the 1st lag quarter).  Format is CCYYM.<br><br>Month Values:<br>Qtr ending   3/31 = 1<br>Qtr ending   6/30 = 2<br>Qtr ending   9/30 = 3<br>Qtr ending  12/31 = 4 |
| 63 | Lag Period Wages – 1st Quarter | N | 714 | 8 | R | Enter the amount of wages during the 5th calendar quarter beginning after the base period end date (i.e. the 1st lag quarter).  Format is 99999.99.  If no wages, enter zeros. |

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 64 | Lag Period Weeks Worked – 1st Qtr | N | 722 | 2 | R | Enter the number of weeks during which work was performed in the 5th calendar quarter beginning after the ending date of the base period (i.e. the 1st lag quarter). Format is 99 (i.e. 05). If no weeks, enter zeros. |
|----|-----------------------------------|---|-----|---|---|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 65 | Lag Period Hours Worked – 1st Qtr | N | 724 | 4 | R | Enter the number of hours work during the 5th calendar quarter beginning after the ending date of the base period (i.e. the 1st lag quarter). Format is 9999 (i.e. 0840). If no hours, enter zeros. |
| 66 | Year – Quarter | N | 728 | 5 | 5 | Identify the 6th calendar quarter ending after the beginning date of the base period (i.e. the 2nd lag quarter). Format is CCYYM. Month Values: Qtr ending 3/31 = 1 Qtr ending 6/30 = 2 Qtr ending 9/30 = 3 Qtr ending 12/31 = 4 |
| 67 | Lag Period Wages – 2nd Quarter | N | 733 | 8 | R | Enter the amount of wages during the 6th calendar quarter beginning after the base period end date (i.e. the 2nd lag quarter). Format is 99999.99. If no wages, enter zeros. |
| 68 | Lag Period Weeks Worked – 2nd Qtr | N | 741 | 2 | R | Enter the number of weeks during which work was performed in the 6th calendar quarter beginning after the ending date of the base period (i.e. the 2nd lag quarter). Format is 99 (i.e. 05). If no weeks, enter zeros. |

SAGITEC-DEL_07114572

# STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 69 | Lag Period Hours Worked – 2nd Qtr | N | 743 | 4 | R | Enter the number of hours work during the 6th calendar quarter beginning after the ending date of the base period (i.e. the 2nd lag quarter). Format is 9999 (i.e. 0840). If no hours, enter zeros. |
|----|----|----|----|----|----|----|
| 70 | Year – Quarter | N | 747 | 5 | 70 | Identify the 7th calendar quarter ending after the beginning date of the base period (i.e. the 3rd lag quarter). Format is CCYYM.<br><br>Month Values:<br>Qtr ending   3/31 = 1<br>Qtr ending   6/30 = 2<br>Qtr ending   9/30 = 3<br>Qtr ending  12/31 = 4 |
| 71 | Lag Period Wages – 3rd Quarter | N | 752 | 8 | 71 | Enter the amount of wages during the 7th calendar quarter beginning after the base period end date (i.e. the 3rd lag quarter). Format is 99999.99. If no wages, enter zeros. |
| 72 | Lag Period Weeks Worked – 3rd Qtr | N | 760 | 2 | 72 | Enter the number of weeks during which work was performed in the 7th calendar quarter beginning after the ending date of the base period (i.e. the 3rd lag quarter). Format is 99 (i.e. 05). If no weeks, enter zeros. |
| 73 | Lag Period Hours Worked – 3rd Qtr | N | 762 | 4 | 73 | Enter the number of hours work during the 7th calendar quarter beginning after the ending date of the base period (i.e. the 3rd lag quarter). Format is 9999 (i.e. 0840). If no hours, enter zeros. |

SAGITEC-DEL_07114573

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

| 74 | Year – Quarter | I N | ˉ786ˉ | 5 | 74 | Identify the 8th calendar quarter ending after the beginning date of the base period (i.e. the 4th lag quarter). Format is CCYYM. Month Values: Qtr ending  3/31 = 1 Qtr ending  6/30 = 2 Qtr ending  9/30 = 3 Qtr ending 12/31 = 4 |
| 75 | Lag Period Wages – 4th Quarter | N | 771 | 8 | 75 | Enter the amount of wages during the 8th calendar quarter beginning after the base period end date (i.e. the 4th lag quarter).  Format is 99999.99. If no wages, enter zeros. |
| 76 | Lag Period Weeks Worked – 4th Qtr | N | 779 | 2 | 76 | Enter the number of weeks during which work was performed in the 8th calender quarter beginning after the ending date of the base period (i.e., the 4th lag quarter).  Format is 99(i.e., 05).  If no weeks, enter zeros. |
| 78 | Year – Quarter | N | 785 | 5 | 78 | Identify the 9th calendar quarter ending after the beginning date of the base period (i.e. the 5th lag quarter). Format is CCYYM. Month Values: Qtr ending  3/31 = 1 Qtr ending  6/30 = 2 Qtr ending  9/30 = 3 Qtr ending 12/31 = 4 |
| 79 | Lag Period Wages – 5th Quarter | N | 790 | 8 | 79 | Enter the amount of wages during the 9th calendar quarter beginning after the base period end date (i.e. the 5th lag quarter).  Format is 99999.99.  If no wages, enter zeros. |

 SAGITEC-DEL_07114574

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 80 | Lag Period Weeks Worked – 5th Qtr | N | 798 | 2 | 80 | Enter the number of weeks during which work was performed in the 9th calendar quarter beginning after the ending date of the base period (i.e. the 5th lag quarter). Format is 99 (i.e. 05). If no weeks, enter zeros. |
|---|---|---|---|---|---|---|
| 81 | Lag Period Hours Worked – 5th Qtr | N | 800 | 4 | 81 | Enter the number of hours work during the 9th calendar quarter beginning after the ending date of the base period (i.e. the 5th lag quarter). Format is 9999 (i.e. 0840). If no hours, enter zeros. |
| 82 | Date Imported | N | 804 | 8 | 82 | Date the response was imported from the Hub |
| 83 | Time Imported | N | 812 | 6 | 83 | Time the response was imported from the Hub |
| 84 | Amended Response Indicator | A/N | 818 | 1 | 84 | If this is an Amended Response, enter an 'X' in this field. |
| 85 | Request Sequence Number | A/N | 819 | 2 | 85 | This is the sequence number from Field 3 of the 931 request record to which the employer is responding. |
| 86 | Filler | A/N | 821 | 180 | 86 | Spaces. |
|  | Total Record |  |  | 1000 |  |  |

SAGITEC-DEL_07114575

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

d.  <u>TC-ETA931, Response Record View Screen</u>.

---

Approved
O.M.B. No. 1205-0179

### TC-ETA 931 EMPLOYER RESPONSE

SSN ___-__-_ (1)        SEQ: _ (2)        FIC: _ (3)        DEST: _ (4)        EFF DATE: __/__/____ (5)

NAME: FIRST_____ (6)    MI _ (7)    LAST_____ (8)

BASE PERIOD BEGINS: __/__/___ (9)    SEPARATION DT:__/__/__ (10)    REASON:_ (11)

OFFICIAL DUTY STATION: __ (12)    PERFORMED FEDERAL SERVICE:_ (13)

SEVERANCE PAY:                (14)    ANNUAL PAY:            (15)

YEAR/QTR:      __/_ (16)   __/_(20)   __/_(24)   __/_(28)   __/_(32)   __/_ (36)   __/_(40)

WAGES:         __.__ (17)   __.__ (21)   __.__(25)   __.__(29)   __.__(33)   __.__ (37)   __.__(41)

WKS WKD:      __ (18)   __ (22)   __ (26)   __ (30)   __ (34)   __ (38)   __ (42)

HRS WKD       ____(19)   ____ (23)   ____(27)   ____ (31)   ____(35)   ____(39)   ___(43)

---

(Sceen 2)                                    Approved
                                             O.M.B. No. 1205-0179

### TC-ETA 931 EMPLOYER RESPONSE

SSN ___-__-_(1)    SEQ: _ (2)    FIC: _(3)    DEST: _(4)    EFF DATE: __/__/___(5)

NAME: FIRST_____(6)    MI _(7)    LAST_____(8)

SEVERANCE PAY: BEGINS:__/__/_(44) ENDS:__/__/_(45) AMOUNT: __(46)_._ DATE PAID:__/__/_(47)

ANNUAL LEAVE: NUMBER OF DAYS ___ (48)    AMOUNT: ___._ (49)    DATE PAID:__/__/_ (50)

MONTHLY PENSION AMOUNT:____._ (51)    EXPLANATION OF SEPARATION:_____ (52)

_____

_____

_____

### FEDERAL SERVICE DETERMINATION:

LEGAL AUTHORITY FOR HIRE_____ (53) FUNDING SOURCE USED FOR SALARY:_____(54)

EMPLOYEE ELIGIBLE FOR: ANNUAL AND SICK LEAVE <u>(55)</u> HEALTH AND LIFE INSURANCE( <u>56</u>)

CIVIL SERVICE RETIREMENT OR FERS RETIREMENT__<u>(57)</u>

PAYROLL DEDUCTIONS MADE FOR STATE AND FEDERAL TAX _ (58)

FEDERAL AGENCY PROVIDED DIRECTION AND CONTROL _ (59)

---

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

**22. State Agency Processing of TC-ETA-931 Response Record.** The State agency has the same responsibilities upon the receipt of the TC-ETA-931 response record that it does upon the receipt of the completed paper Form ETA-931 from the Federal agency. The State agency should develop procedures to "flag" the claimant's record when the Federal agency's response in certain fields is critical to the claimant's eligibility, e.g., answering "no" where asked  did the claimant perform Federal civilian service, or entering the code of a potentially disqualifying code in the reason for separation.

a.  Federal Civilian Service.  Field number 24 contains the Federal agency's response to whether the claimant performed Federal civilian service.  If, there is a "N" marked in this field, field numbers 25-31 should contain additional information concerning the nature of the service that the claimant performed. The State will issue a determination based on the information provided or forward the agency's response to the USDOL for a coverage ruling, if necessary.

b.  Reason for Separation.  A code of 3, 4, or 7 in Field number 33 indicates a potential disqualifying separation.  A detailed explanation of the separation should be found in Field number 45.

**23. Use of a Claimant's Affidavit to Determine UCFE Eligibility.** The State agency is to use the Form ETA-935, Claimant's Affidavit of Federal Civilian Service, Wages, and Reason for Separation, to determine the claimant's monetary and non-monetary eligibility when no response is received from the Federal agency within the time frames provided below.  State agencies are not to send a "Second Request" ETA-931 to the Federal agency.

The time frames for using the affidavit are as follows:

Type 1, Delivery Indicator.  When the Federal agency is identified with type "1" delivery indicator in Field number 17 of the TC-ETA-931 and TC-ETA-931A, and Field number 15 of the TC-ETA-934, the State should use a completed Form ETA-935 to determine the claimant's eligibility after 7 days have elapsed from the date (ICON export date) that the TC-ETA-931 was sent to the Federal agency and no response has been received.

SAGITEC-DEL_07114577

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

Type 2, Delivery Indicator.  When the Federal agency is
identified with type "2" delivery indicator in Field number
17 of the TC-ETA-931 and TC-ETA-931A, and Field number 15 of
the TC-ETA-934, the State should use a completed Form ETA-
935 to determine the claimant's monetary eligibility after 7
days have elapsed from the date (ICON export date) that the
TC-ETA 931 was sent to the Federal agency and no response
has been received.  The Form ETA-935 should be used to
determine the claimant's non-monetary eligibility after 12
days have elapsed from the date that the ETA-931 was mailed
to the Federal agency for separation information and no
response has been received.

Type 3, Delivery Indicator.  When the Federal agency is
identified with type "3" delivery indicator in Field number
17 of the TC-ETA-931 and TC-ETA-931A, and Field number 15 of
the TC-ETA-934, the State should use a completed Form ETA-
935 to determine the claimant's monetary and non-monetary
eligibility after 12 days have elapsed from the date that
the ETA-931 was mailed to the Federal agency and no response
has been received.

The Form ETA-935 should identify the documentary evidence
submitted by the claimant to show he or she performed civilian
service for the Federal Government (e.g., SF-50, earnings and
leave statements, W-2, etc.).  If at the time the claimant
completes a Form ETA-935, he or she does not have documentary
evidence, the interviewer should advise the claimant to provide
such documents to the State agency at the earliest opportunity.

When a Form ETA-931, ETA-931A, or ETA-934 is received after a
determination has been made based on  the claimant's affidavit, a
redetermination should be issued, if appropriate, in accordance
with State law.  Information supplied by a Federal employer after
a determination has been made should be given the same
consideration and should have the same effect as material
information supplied by a State covered employer under similar
circumstances.

SAGITEC-DEL_07114578

**STATE IMPLEMENTATION GUIDE**
**UCFE AND UCX PROGRAM CHANGES**

a.  Form ETA-935, Claimant's Affidavit of Federal Civilian Service, Wages and Reason for Separation.

| | |
|---|---|
| (STATE AGENCY IDENTIFICATION) | |

**CLAIMANT'S AFFIDAVIT OF FEDERAL CIVILIAN SERVICE,**

**WAGES AND REASON FOR SEPARATION**

| 1. State Agency Address: | 2. Claimant's Name and mailing Address |
|---|---|
| | |

| 3. LO/Call Center ID: | 4. Date of Request: | 5. Eff. Date of Claim: | 6. Separation Date |
|---|---|---|---|

| 7. Federal Agency Name & Address: | 8. Social Security Number |
|---|---|

Instructions: Complete and Return Immediately

**9. Affidavit of Federal Wage and Separation Information/Documentary Evidence**

a. Enter the location of your Official Duty Station: (City, State)

b. Enter your wages with the above named employer below.  Show wages by quarter starting with the wages that you earned after (base period begin date) up to the date you separated from this employer.  Under Documentary Evidence, enter the source of the information provided and attach a copy.  If additional space is needed to explain reason for separation, attach your signed explanation.

| Quarter Ending | Year | Gross Wages | Documentary Evidence |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

c. Severance Pay.   Did you receive or are you entitled to receive severance pay provided by Federal law or agency employee agreement?  ___Yes __ No   If "Yes" complete the following information: Total Entitlement: $_____.    Severance Pay Period Beginning date: __/__/__ Ending Date __/__/__

d.  Pension: Are you entitled to receive a pension from any branch of the Federal Government? ___Yes ___No.   Enter Gross Monthly Pension $ _____

e.  Reason for Separation:

I, the claimant, understand that penalties are provided by law for an individual making false statements to obtain benefits and that determinations based on an affidavit are not final: that determinations are subject to correction upon receipt of wage and separation information from the Federal agency, that benefit payments made as a result of such determination may have to be adjusted on the basis of information from the Federal agency, and that any amount overpaid will have to be repaid or offset against future benefits. I, the claimant, swear or affirm, that the above statements, to the best of my knowledge, are true and correct.

| 10.   Signature of Claimant_____ Date ___/___/ _____ |
|---|
| ETA-935  (Revised 8/2001) |

b. <u>Number of Copies</u>. Sufficient copies of the Form ETA-935 are to be prepared for State agency use.

c. <u>Completion</u>. The Items on Form ETA-935 are self explanatory. Item 9B, "Documentary Evidence," should be completed in all cases. However, if the claimant omits the entry and has provided sufficient documentation, i.e., pay stubs, SF 50, earnings and leave statement to support the entries, the State should honor the affidavit.

d. <u>Federal Civilian Employees' Salary Rates</u>. When the State agency is calculating the claimant's gross wages based on the claimant's statement and an SF-50, refer to the most recent Unemployment Insurance Program Letter showing a list of Federal Annual Salary Rates. This will aid in determining the claimant's wages.

24. **<u>ETA-931A, Request for Separation Information Additional Claim</u>**. The ETA-931A is available in a paper format and an electronic format and is used to request separation information or the reason for non-pay status on an additional claim, when a claimant has established a benefit year and is filing an additional claim after an intervening period of employment in a Federal agency.

When the claimant has a disqualification in effect, the State agency should include its request for wages and/or weeks of employment subsequent to the disqualification, to determine if the claimant has met the requalification requirements.

Sending the electronic or paper version of the ETA-931A is initiated by data entry through the ICON UCFE application. When a form has to be mailed to the Federal agency, a record of the information data entered and the agency's name and address will be written to a file for use in completing the form. Additional information concerning the use of the data entry screen and record format is contained in the ICON UCFE Users Guide. Below is the ICON data entry screen.

 SAGITEC-DEL_07114580

### STATE IMPLEMENTATION GUIDE
### UCFE AND UCX PROGRAM CHANGES

    a.  <u>Data Entry Screen for ETA-931A</u>.

```
                     UCFE SUPPORT SYSTEM
          TC-ETA931A REQUEST FOR SEPARATION INFORMATION


    OPTION:  ___  (1)


    SSN: ____ ___ _____   (2)          OFFICE:  _____  (3)


    CREATION DATE:  / /  (4)
                            EFF DT: / /  (5)


    NAME: FIRST:  _____ ( 6) MI:  __(7) LAST:  _____ (8)


    FIC:  ___(9)  DESTINATION: _____  (10)

CLEAR=CANCEL ENTER=ADDRESS SCREEN PF1=HELP PF3=ADD PF4=CANCEL
FE009 - ENTER DATA AND THEN PRESS THE ENTER KEY
```

    b.  <u>Form ETA-931A, Request for Separation Information –
Additional Claim</u>.  The State should reproduce this form in the
format provided, except that, if the State's law does not
consider the receipt of a lump sum annual leave payment or
severance payment as wages or disqualifying income, the State
should print the item number and "Not Applicable" on the form,
i.e., "9. C. Not Applicable."

SAGITEC-DEL_07114581

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

---

(STATE AGENCY IDENTIFICATION)

## REQUEST FOR SEPARATION INFORMATION - ADDITIONAL CLAIM

| 1.  State Agency Address: | 2. Federal Agency Name, 3 Digit Agency Code, and Address: |
|---|---|
| 3. Local Office/Call Center : | 4.   Date of Request:   5.   Effective Date: |
| 6.  Claimant's Name (Last, First, Middle Initial) | 7.   Social Security Number |

Federal Agency Response - Complete and Return Within 4 Workdays

8.  Separation, Terminal Annual Leave and Severance Pay Information:

   A.  Date of Separation:    __/__/__   B. Last day of active pay status:   __/__/__

   C.  Reason for separation or non-pay status:_____
   _____
   _____

   D. Did this person receive a lump sum payment(s) for terminal annual leave on or after the beginning date of the base period shown? __Yes  __No.  If "Yes", or if currently entitled to such a payment, record date(s) below for each payment(s):    Payment Date: __/__/__   Days of Leave:  ____
                     Period from: __/__/ ___To:  __/__/_

   E. Did person receive or is he/she entitled to receive severance pay provided by Federal law or agency employee agreement?   __Yes __ No.  If "Yes", complete the following information: Total Entitlement: $_____
   Weekly entitlement $_____   Beginning Date: __/__/__ Ending Date __/__/__

9.  Signature of Official _____   Title: _____
    Print Name: _____Telephone: (   )_____Date __/__/ ___

ETA-931A (Revised 8/2001)

SAGITEC-DEL_07114582

**STATE IMPLEMENTATION GUIDE**
**UCFE AND UCX PROGRAM CHANGES**

(1)  Purpose and Use.  The Form ETA-931A is used by the State agency in connection with each additional claim when it is necessary for the State agency to obtain intervening Federal civilian employment and separation information.  This form is used in lieu of the regular "notice of claim filed" used in connection with State UC additional claims.

(2)  Preparation.  Item 1 thru 7 are to be completed by the agency.  The information required to complete these items will be provided as a file by the ICON UCFE system.  For the "Date of Request" entry, enter the date the Form ETA-931A is mailed.

A signed Privacy Act release statement is no longer required from a claimant to authorize the release of information requested. However, if State law requires all claimants to sign a Privacy Act release statement, then a UCFE claimant would also be required to sign the same statement.

c.  TC-ETA-931A, Request Record Format.  Data entering claimant information manually or electronically to the ICON UCFE data entry screen shown in item 24. a. above will result in the creation of the TC-ETA-931A request records shown below. Additional information concerning the use of the ICON UCFE application is contained in the ICON UCFE State Users Guide.  The field name and description identifies the information that is to be provided.

| ETA-931A, Request Record Format | | | | | | |
|---|---|---|---|---|---|---|
| (State Agency Request Record Format) | | | | | | |
| FLD NBR | FIELD NAME | FIELD TYPE | BEGIN COLUMN | FIELD LENGTH | REQ/ OPT | |
| | Record Key is Fields 1 through 4 | | | | | |
| 1 | Social Security No. | N | 1 | 9 | R | Claimant's SSN. |
| 2 | Effective Date | N | 0 | 8 | R | The effective date of the claim. Format is CCYYMMDD. |

SAGITEC-DEL_07114583

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 3 | Sequence Identifier | N | 8 | 2 | R | Sequence of record supplied by the sending State. Sequence will begin with 01. Each new record for the same SSN and Effective Date will be incremented by +1. |
|---|---|---|---|---|---|---|
| 4 | Type of Request | N | 20 | 2 | R | Values: 02 = 931A Request Record. |
| 5 | FIC of Responding Agency | N | 22 | 3 | R | The Federal agency's three digit identification code. |
| 6 | Destination Code of Responding Agency | N | 25 | 4 | R | The Federal agency component's four digit destination code. |
| 7 | Filler | N | 29 | 8 | R | Spaces. |
| 8 | Requesting State's Postal Code | A/N | 37 | 2 | R | The Sending State's postal code |
| 9 | Creation Date | N | 39 | 8 | R | Date the electronic request is created. Format is CCYYMMDD. |
| 10 | Creation Time | N | 47 | 6 | R | Time the electronic request is created. Format is HHMMSS. |
| 11 | Filler | N | 53 | 8 | R | Spaces. |
| 12 | First Name | A/N | 61 | 20 | R | The claimant's first name. |
| 13 | Middle Initial | A/N | 81 | 1 | O | The claimant's middle initial. |
| 14 | Last Name | A/N | 82 | 23 | R | The claimant's last name. |
| 15 | Filler | A/N | 105 | 1 | R | Space. |
| 16 | Local Office/ Call Center | A/N | 106 | 4 | R | Code identifying the Local Office or Call Center Number from the Sending State or spaces. |

SAGITEC-DEL_07114584

# STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 17 | Delivery Indicator | A/N | 110 | 1 | R | Indicator specifying the receiving Federal Agencies method of responding to requests. 1 = Send Electronic Request for Wage and Separation Information. 2 = Send Electronic Wage Request and Mail Request for Separation Information. 3 = Mail Request for Wage and Separation Information. |
|----|----|----|----|----|----|----|
| 18 | Type of Response Requested | A/N | 111 | 1 | R | Space. This field indicates how the requesting state would like to receive wages. Therefore, this field does not apply to a 931A request. |
| 19 | Date Exported | N | 112 | 8 | R | Date the request was exported. Format is CCYYMMDD. |
| 20 | Time Exported | N | 120 | 6 | R | Time the request was exported. Format is HHMMSS. |
| 21 | Response Received Indicator | A/N | 126 | 1 | O | This field will be set to 'X' when the response is received from the Federal Agency. |
| 22 | Filler | A/N | 127 | 74 | R | Spaces. |
| 23 | Agency Name | A/N | 210 | 50 | R | Name of the Federal agency |
| 24 | Agency Component | A/N | 51 | 50 | R | Name of the Federal Agency Component |
| 25 | Agency Address line 1 | A/N | 51 | 50 | R | First line of the Street or Postal Address for the Federal Agency. |
| 26 | Agency Address line 2 | A/N | 351 | 50 | R | Second line of the Street or Postal Address for the Federal Agency. |

SAGITEC-DEL_07114585

### STATE IMPLEMENTATION GUIDE
### UCFE AND UCX PROGRAM CHANGES

| 27 | Agency Address line 3 | A/N | 401 | 50 | R | Third line of the Street or Postal Address for the Federal Agency. |
|---|---|---|---|---|---|---|
| 28 | Agency City | A/N | 451 | 50 | R` | City of the Postal address. |
| 29 | Agency State | A/N | 501 | 2 | R | State Alpha Postal Code. |
| 30 | Agency Postal | A/N | 503 | 13 | R | Postal Zip Code. Format is: XXXXX-XXXX-XX. |
| 31 | Agency Country | A/N | 516 | 26 | R | Country Name or Abbreviation. |
| 32 | Filler | A/N | 542 | 1 | R | Space. |
| 33 | Address Change Indicator | A/N | 543 | 1 | O | Address Change Indicator . If this is a new address or the address is different from what is on the Directory of Federal Agencies file, this field will contain an 'X'. Otherwise, the field will contain a space. |
| 34 | Filler | A/N | 544 | 457 | R | Spaces. |
| | TOTAL RECORD | | | 1000 | | |

d. <u>TC-ETA-931A Response Record Format</u>. This is the response record that the state will receive from the federal agency and the description of information that should be received in each field.

## ETA-931A Response Record Format
( Fields 1 through 4 Response Record Format )

| FIELD NUMBER | FIELD NAME | FIELD TYPE | FIELD COLUMN | FIELD LENGTH | DESCRIPTION |
|---|---|---|---|---|---|
| | Record Key: Fields 1 through 4 | | | | |
| 1 | Social Security # . | N | 1 | 9 | Claimant's SSN |
| 2 | Effective date | N | 10 | 8 | The effective date of the claim |
| 3 | Sequence Identifier | N | 18 | 2 | This sequence number identifies the original and subsequent responses to the request identified by sequence number in Field 28. The response numbering should be sequential beginning with 01 (up to 99) as follows: 01 = 1st response (original response to |

# STATE IMPLEMENTATION GUIDE
# UCFE AND UCX PROGRAM CHANGES

| | | | | | request) |
|---|---|---|---|---|---|
| | | | | | 02 = 2nd response (first amended response) |
| | | | | | 03 = 3rd response (second amended response) etc. |
| 4 | Type of Response | N | 20 | 2 | Values: 05 = 931A response record. |
| 5 | Response Creation Date | N | 22 | 8 | Date the response was created by the Federal Agency. |
| 6 | FIC | N | 30 | 3 | Federal Identification Code of the Federal Agency sending the response. |
| 7 | Destination | N | 33 | 4 | Destination Identification Code of the Federal Agency sending the response. |
| 8 | Social Security No. | N | 37 | 9 | Claimant's SSN |
| 9 | Effective Date | N | 46 | 8 | The effective date of the claim |
| 10 | First Name | A/N | 54 | 20 | The claimant's first name |
| 11 | Middle Initial | A/N | 74 | 1 | The claimant's middle initial |
| 12 | Last Name | A/N | 75 | 23 | The claimant's last name |
| 13 | Date of Separation/ Last Date in active pay status | N | 98 | 8 | The date of separation or the last day in active pay status if not separated.  Format is CCYYMMDD. |
| 14 | Reason for Separation/ Non-pay Status | N | 106 | 1 | Valid values are: 1 = Permanent Layoff 2 = Temporary Layoff/Furlough 3 = Quit 4 = Discharged 5 = Labor Dispute 6 = Retirement 7 = Other |
| 15 | Severance Pay | A/N | 107 | 1 | "Y" - If the individual has received or will receive Severance pay after this separation.  "N" - If the individual did not and will not receive severance pay after this separation. |

SAGITEC-DEL_07114587

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 16 | Severance Pay - begin date | N | 108 | 8 | The date for which severance pay begins. |
|----|----|----|----|----|----|
| 17 | Severance Pay - end date | N | 116 | 8 | The date for which severance pay ends. Format is CCYYMMDD. |
| 18 | Severance Payment amount | N | 124 | 9 | The total dollar amount of severance pay. Format is 999999.99 (Right justify, i.e., 012590.88) |
| 19 | Annual Leave | A/N | 133 | 1 | "Y" - If the individual has received or will receive a lump sum annual leave payment after these separation date.

"N" - If the individual did not and will not receive a lump sum annual leave payment after these separation date. |
| 20 | Annual Leave Amount | N | 134 | 8 | The total dollar amount of annual leave payment paid/due.  Format is 999999.99 (Right justify, i.e., 012590.88) |
| 21 | Number of Days of Annual Leave | N | 142 | 3 | The number of days of annual leave paid/due. Format is 001 (right justified). |
| 22 | Date of Annual Leave Payment | N | 145 | 8 | The date on which annual leave payment issued. Format is CCYYMMDD. |
| 23 | Monthly Pension Payment Amount | N | 153 | 8 | If field 14 contains "6", enter the gross dollar amount of monthly pension payment.  Format is 99999.99 (Right just ify, i.e., 03 50 88) |
| 24 | Explanation of Reason for Separation/ Non-pay Status | A/N | 161 | 400 | Provide a detailed explanation in 400 characters or less. |
| 25 | Requesting State's Postal Code | N | 561 | 2 | Postal Code of the State that requested the information. |
| 26 | Filler | A/N | 563 | 1 | Space |
| 27 | Date of Separation Payment | N | 564 | 8 | The date on which separation payment was issued.  Format is CCYYMMDD. |
| 28 | Request Sequence Number | N | 72 | 2 | This is the sequence number from Field 3 of the 931A request record to which the employer is responding. |
| 29 | Filler | N | 574 | 230 | Spaces |
| 30 | Date Imported | N | 804 | 8 | Date the state imported the response from the |

SAGITEC-DEL_07114588

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

| | | | | | Hub. Federal agencies are to send zeros in this field. |
|---|---|---|---|---|---|
| 31 | Time Imported | N | 812 | 6 | Time the state imported the response from the Hub. Federal agencies are to send zeros in this field. |
| 32 | Filler | A/N | 818 | 183 | Spaces. |
| | TOTAL RECORD | | | 1000 | |

e. <u>TC-ETA-931A Response Record View Screen.</u>

```
                     TC-ETA 931A RESPONSE RECORD

SSN: 000 - 00 - 9247 (1)    SEQ. 011(2)    FIC:  410 (3)    DEST: 0001 (4)
EFF DATE 08 / 30 / 00 (5)

NAME: FIRST:  JEFF     6)  MI:    (7) LAST:  WOODL (8)

DATE OF SEPARATION:  00 / 00 / 0000 (9)    REASON FOR SEPARATION:  7 (10)

SEVERANCE PAY: Y (11) SEVERANCE BEG:10/27/2000 (12)END: 01/15/ 2001 (13)
            AMOUNT:  013000.00  (14) DATE PAID: 12/28/2000 (15)

 ANNUAL LEAVE:  N (16)  ANNUAL LEAVE   NUMBER OF DAYS:  000   (17)
            AMOUNT:  00000.00 (18) DATE PAID:  00/00/0000   (19)
            MONTHLY PENSION AMT:  00000.00   (20)

 EXPLANATION OF SEP:   (21) _____
 _____
 ____  _____
 ____  _____
 ____  _____

 PF4=END
```

**25.** **<u>Requesting Additional Information From a Federal Agency</u>.** The ETA-934 is used to obtain additional information or a clarification of information from a Federal agency and is available in a paper format and an electronic format. Sending the electronic or paper version of the ETA-934, is initiated by data entry through the ICON UCFE application to determine if an electronic or paper form should be generated. Additional information concerning the use of the data entry screen and record formats is contained in the ICON UCFE State Users Guide.

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

a.  <u>TC-ETA-934 Data Entry Screen</u>.

```
                          UCFE SUPPORT SYSTEM
              TC-ETA934 REQUEST FOR ADDITIONAL INFORMATION

   OPTION:  _ (1)

   SSN:     ___- __ - ___(2)            OFFICE:  ____(3)

   CREATION DATE:  __ / __ / __(4)     EFF DT:  __ / __ / __(5)

   NAME: FIRST:_____(6) MI:_ (7) LAST:_____(8)

   FIC:    __(9)        DESTINATION:    ___(10)

   MESSAGE: (11)

   _____
   _____
   _____
   _____

   CLEAR=CANCEL  ENTER=ADDRESS SCREEN    PF1=HELP   PF3=ADD   PF4=CANCEL
   FE009 - ENTER DATA AND THEN PRESS THE ENTER KEY
```

b.  <u>Form ETA-934, Request for Additional Information</u>.  The Form ETA-934 is used to obtain information when the responding Federal agency is unable to provide information in the electronic format.

**STATE IMPLEMENTATION GUIDE**
**UCFE AND UCX PROGRAM CHANGES**

```
┌────────────────────────────────────────────────────────────┐
│                  (STATE AGENCY IDENTIFICATION)               │
│             REQUEST FOR ADDITIONAL INFORMATION               │
├──────────────────────────────┬───────────────────────────────┤
│ 1. State Agency Address:     │ 2. Federal Agency Name, 3 Digit│
│                              │    Agency Code, and Address:   │
│                              │                                │
├──────────────────────────────┴───────────────────────────────┤
│ 3. Local Office/Call Center ID: 4. Date of Request: 5. Effective Date: 6. Separation Date: │
├──────────────────────────────┬───────────────────────────────┤
│ 7. Claimant's Name (Last,    │ 8. Social Security Number      │
│    First Middle Initial)     │                                │
├──────────────────────────────┴───────────────────────────────┤
│ 9. A.  State Agency Statement or Questions of Federal Agency: │
│                                                                │
│ 9. B.  Claimant's Statement:                                   │
│                                                                │
│ 10.    Federal Agency Response:                                │
│                                                                │
├────────────────────────────────────────────────────────────┤
│ 11. Signature of Official _____  Title: _____  │
│     Print Name: _____  Telephone:( __) ___ Date _/_/ __ │
├────────────────────────────────────────────────────────────┤
│ ETA -934 (Revised 8/2001)                                    │
└────────────────────────────────────────────────────────────┘
```

c.  Completion of Form ETA-934.  The items on the Form ETA-934 are self-explanatory.

d.  TC-ETA-934, Request for Additional Information.  The electronic TC-ETA-934 is used when the responding Federal agency is able to provide separation information in the electronic

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

format.  The field name and description indicates the information
that is to be entered into each field.

(1)  TC-ETA-934 Request Record Format.  This request
record will only be sent to Federal Agencies when the record
carries a delivery indicator of "1" in Field 15.

| FLD NBR | FIELD NAME | FIELD TYPE | BEGIN COLUMN | FIELD LENGTH | REQ OPT | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | Record Keys Fields 1 through 4 | | | | | |
| 1 | Social Security No. | N | 1 | 9 | R | Claimant's SSN. |
| 2 | Effective Date | N | 10 | 8 | R | The effective date of the claim. Format is CCYYMMDD. |
| 3 | Sequence Identifier | N | 18 | 2 | R | Sequence of record supplied by the sending State. Sequence will begin with 01.  Each new record for the same SSN and Effective Date will be incremented by +1. |
| 4 | Type of Request | N | 20 | 2 | R | Values:  03 = 934 Request Record. |
| 5 | FIC of Responding Agency | N | 22 | 3 | R | The Federal agency's three digit identification code. |
| 6 | Destination Code of Responding Agency | N | 25 | 4 | R | The Federal agency component's four digit destination code. |
| 7 | Requesting State's Postal Code | A/N | 29 | 2 | R | The sending states two digit alpha postal abbreviation. |
| 8 | Creation Date | N | 31 | 8 | R | Date the electronic request is created. Format is CCYYMMDD. |
| 9 | Creation Time | N | 39 | 6 | R | Time the electronic request is created. Format is HHMMSS. |
| 10 | First Name | A/N | 45 | 20 | R | The claimant's first name. |
| 11 | Middle Initial | A/N | 65 | 1 | O | The claimant's middle initial. |
| 12 | Last Name | A/N | 66 | 23 | R | The claimant's last name. |
| 13 | Local Office /Call Center | A/N | 89 | 4 | R | Code identifying the Local Office or Call Center to which the claim is assigned in the Sending State. Enter Spaces if LO/ Call Center ID unnecessary. |

**TC-ETA-934 Request Record**
(State Agency Request Record Format)

## STATE IMPLEMENTATION GUIDE
## UCFE AND UCX PROGRAM CHANGES

| 14 | Filler | A/N | 93 | 17 | R | Spaces. |
|---|---|---|---|---|---|---|
| 15 | Delivery Indicator | A/N | 110 | 1 | R | Indicator specifying the receiving Federal Agency's method of responding to requests. '1' = Electronic Wage and Separation Information. '2' = Electronic Wage Information, and Paper Separation Information. '3' = Paper Wage and Separation Information. |
| 16 | Type of Response Requested | A/N | 111 | 1 | R | Space. This field indicates how the requesting state would like to receive wages. Therefore, this field does not apply to a 934 request. |
| 17 | Date Exported | N | 112 | 8 | R | Date the request was exported. Format is CCYYMMDD. |
| 18 | Time Exported | N | 120 | 6 | R | Time the request was exported. Format is HHMMSS. |
| 19 | Response Received Indicator | A/N | 126 | 1 | O | This field will be set to 'X' when the response is received from the Federal Agency. |
| 20 | Filler | A/N | 127 | 2 | R | Spaces. |
| 21 | Message 1 | A/N | 129 | 67 | R | First line of message to the Federal Agency detailing the information desired. |
| 22 | Message 2 | A/N | 196 | 77 | R | Second line of message to the Federal Agency detailing the information desired. |
| 23 | Message 3 | A/N | 273 | 77 | R | Third line of message to the Federal Agency detailing the information desired. |
| 24 | Message 4 | A/N | 350 | 77 | R | Fourth line of message to the Federal Agency detailing the information desired. |
| 25 | Message 5 | A/N | 427 | 77 | R | Fifth line of message to the Federal Agency detailing the information desired. |
| 26 | Filler | A/N | 504 | 97 | R | Spaces. |

SAGITEC-DEL_07114593

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

| 27 | Agency Name | A/N | 601 | 50 | R | Name of the Federal Agency that is responsible for this claim. |
|----|-------------|-----|-----|----|----|-----------------------------------|
| 28 | Agency Component | A/N | 651 | 50 | R | Component of the Federal Agency that is responsible for this claim. |
| 29 | Agency Address line 1 | A/N | 701 | 50 | R | First line of the Street or Postal Address for the Federal Agency. |
| 30 | Agency Address line 2 | A/N | 751 | 50 | R | Second line of the Street or Postal address for the Federal Agency. |
| 31 | Agency Address line 3 | A/N | 801 | 50 | R | Third line of the Street or Postal Address for the Federal Agency. |
| 32 | Agency City | A/N | 8-51 | 50 | R | City or Providence of the Postal Address. |
| 33 | Agency State | A/N | 901 | 2 | R | State Postal Code. |
| 34 | Agency Postal | A/N | 903 | 13 | R | Postal Code or Zip Code of the Postal Office.  Format is: XXXXX-XXXX-XX. |
| 35 | Agency Country | A/N | 916 | 26 | R | Because many Federal agencies are located outside of the US, this field will contain the name of Country where the mailing address is located. |
| 36 | Filler | A/N | 942 | | R | Space. |
| 37 | Address Change Indicator | A/N | 943 | 1 | O | X   = New Address   Space = No change    This is dynamically marked if the State enters an address that is not in the Directory of Federal Agencies file. |
| 38 | Filler | A/N | 944 | 7 | R | Spaces. |
| | TOTAL RECORD | | | 1000 | | |

    (2)  <u>TC-ETA-934 Response Record Format</u>.  This response record is used by Federal Agencies that receive TC-ETA-934, Request for Additional Information.  This record will only be received from Federal agencies where the request record carried a delivery indicator of "1" in Field 15.

SAGITEC-DEL_07114594

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

| | TC-ETA-934 Response Record Format | | | | | |
|---|---|---|---|---|---|---|
| | (Federal Agency Response Record Format) | | | | | |
| FLD NBR | FIELD NAME | FIELD | BEGIN | FIELD | REQ | DESCRIPTION |
| | Record Key is Fields 1 through 4 | | | | | |
| 1 | Social Security No. | N | 1 | 9 | R | Claimant's SSN. |
| 2 | Effective Date | N | 10 | 8 | R | The effective date of the claim. Format is CCYYMMDD. |
| 3 | Sequence Identifier | N | 18 | 2 | R | This sequence number identifies the original and subsequent responses to the request identified by sequence number in Field 28. The response numbering should be sequential beginning with 01 ( up to 99) as follows: 01 = 1st response (original response to request) 02 = 2nd response (first amended response) 03 = 3rd response (second amended response) etc.) |
| 4 | Type of Response | N | 20 | 2 | R | Values: 06 = 934 Response Record. |
| 5 | Response Creation Date | N | 22 | 8 | R | Date the response was created by the Federal agency. Format is CCYYMMDD. |
| 6 | FIC | N | 30 | 3 | R | The Federal identification code of the Federal Agency sending the response. |
| 7 | Destination | N | 33 | 4 | R | The destination identification code of the Federal agency sending the response |
| 8 | Social Security No. | N | 37 | 9 | R | Claimant's SSN. |
| 9 | Effective Date | N | 46 | 8 | R | The effective date of the claim. Format is CCYYMMDD. |
| 10 | First Name | A/N | 54 | 20 | R | The claimant's first name. |
| 11 | Middle Initial | A/N | 74 | 1 | O | The claimant's middle initial. |
| 12 | Last Name | A/N | 75 | 23 | R | The claimant's last name. |

SAGITEC-DEL_07114595

**STATE IMPLEMENTATION GUIDE**
**UCFE AND UCX PROGRAM CHANGES**

| 13 | Response(s) to Question(s) asked | A/N | 98 | 640 | R | Federal agency's response to question asked on 934 request. The response will be 640 characters or less. |
|----|----|----|----|----|----|----|
| 14 | Requesting State's Postal Code | N | 738 | 2 | R | Postal Code of the state that requested the information. |
| 15 | Filler | N | 740 | 1 | R | Spaces. |
| 16 | Request Sequence Number | N | 741 | 2 | R | This is the sequence number from Field 3 of the 934 request record to which the employer is responding. |
| 17 | Filler | A/N | 743 | 61 | R | Spaces. |
| 18 | Date Imported | | | | | Date the state imported the response from the Hub. Federal Agencies are to send zeros in this field. |
| 19 | Time Imported | N | 812 | 6 | R | Time the state imported the response from the Hub. Federal Agencies are to send zeros in this field. |
| 20 | Filler | A/N | 818 | 183 | R | Spaces. |
| | TOTAL RECORD | | | 1000 | | |

      (3) <u>TC-ETA-934 Response Record View Screen</u>. Below is a copy of the ETA 934 response view screen for reference.

```
01/04/01                 TC-ETA934 Response Record

SSN:(1) 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 REQ SEQ:(2) 01 FIC:(3) 445 DEST:(4) 0012 EFF DT:(5) 07/02/00

NAME: FIRST: (6)   ROBERT    MI: (7)    C    LAST:(8)     WILSON


REQUEST
MESSAGE: (9)   PLEASE PROVIDE MORE INFORMATION CONCERNING CLAIMANT'S SEPARATION

_____

_____

RESPONSE MESSAGE: (10)  The claimant is currently separated as a result of a
warning or suspension. The Claimant has returned to work.

PF4 = END
```

**26.  <u>Directory of Federal Agencies</u>.**  The Directory of Federal Agencies identifies and provides a record of Federal Agencies and offices that employ civilian workers.  An automated directory has been included in the ICON UCFE Support System.  As a part of the UCFE application, the Directory serves two purposes.  First, it will be used as a table of addresses to reduce the data entry

requirements for sending mail requests for wage and separation information to Federal agencies.  Second, it will be accessible for use as a directory of contact personnel.

The Directory can only be updated by the ETA National office. However, since Federal agencies often provide new addresses directly to State agencies, the Directory's address screen has been designed to allow States to data enter corrections to existing addresses and to data enter new addresses.   The new/corrected address will not be written to the Directory, it will be used to mail the request being entered to the Federal agency and it will also be forwarded to the ETA National office for verification and posting to the Directory.

The Directory is arranged numerically in ascending order by Federal Identification Codes (FIC).  The agencies, called components, under each FIC are arranged alphabetically.  The different locations of offices for each component are arranged alphabetically by State and city.  Four digit destination codes have been assigned to each address to direct the delivery of the request.  Each code is critical to the writing of the correct address to the file that is created for use in addressing the forms for mailing.

The FIC and Destination Code must be data entered for each request.  Attachment II of this Unemployment Insurance Program Letter is a Directory of Federal Agencies Index which provides the destination codes for each address that is currently in the Directory.  When using the directory, if you do not know the destination code for an agency, enter the FIC code and destination code 0001.  You will then be able to scroll through the listing to locate an address or contact person.

There are two additional codes that are used in the Directory. Below is a copy of the address view screen for easy reference. The 'delivery indicator' code , item 15, is used to direct the sending of an electronic request or a mail request or both.  Code '1' means that the federal agency receives and responds to all request electronically.  Code '2' means that the federal agency receives and responds to the request for wage information electronically and to the request for separation or other employment information by mail.  Code '3' means that the federal agency receives requests and responds by mail only.  The 'other processing' code, item 16, is used to identify and direct the requests to the other federal agency or private company that processes requests for wage and separation information for the agency listed.

        a.  <u>Federal Agencies Address View Screen</u>.  Below is a copy a screen showing the federal address information that is contained in the Directory.

                                                                    SAGITEC-DEL_07114597

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAM CHANGES

```
          ICON PROJECT SYSTEM
       UCFE FEDERAL ADDRESS VIEW

    FIC: 002 (1)         DESTINATION: 0001 (2)

  NAME:  U.S. HOUSE OF REPRESENTATIVES (3)
  COMPONENT:                          (4)
  ADDRESS 1)  FINANCE OFFICE, ROOM 263        (5)
          2)  CANNON HOUSE OFFICE BUILDING    (6)
          3)                                  (7)
       CITY:  WASHINGTON (8)
      STATE:  DC (9)    POSTAL CODE: 20515 (10)
    COUNTRY: UNITED STATES (11)
  CONTACT: MERRI BALDWIN      (12)  OTHER PROCESSING:   (13)
  PHONE:(000) 000-0304 (14) EXT: 102 (15) DELIVERY IND:(16)


  LAST UPDATED:    / /  (17)
  PF4=CANCEL    PF7=BACK   PF8=FORWARD
```

**27.  Record Retention.**   The electronic and paper claims forms
contained in these instructions shall be maintained by the State
agency for 3 years after final action (including appeals or court
action) on the claim and shall be transferred to State agency
accountability under the conditions for the disposal of UCFE and
UCX records covered in Chapter XXII of ET Handbook No. 391 (1982
edition)and Chapter I, Page I-15, of ET Handbook No. 384 (1984
edition).

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAMS' CHANGES

# Appendix A - UCFE - UCX Questions and Answers

1.  <u>Question</u>.  Sometimes the response record from LCCC contains information under component 2. Does this have something to do with other SSN Field?

    <u>Answer</u>.  No.  When there is a second DD Form 214 on file, information from the DD Form 214 will be provided. The second DD Form 214 may be filed under the primary SSN or it may be filed under "other SSN."    If the name on the DD Form 214 is different from the name on the request, the response will include message Number 35 and a warning flag in Field 66.

2 .  <u>Question</u>.  What happens when the separation date on the UCX Type 1 request matches the separation date on a UCX control record?

    <u>Answer</u>.  A Type 2 response record will be sent that includes the information from the control record and a message.

2.  <u>Question</u>.  What happens when the separation date on the control record does not match the date on the request but it is greater than the base period begin date on the request record?

    <u>Answer</u>.  A response record will be sent that includes the information from the control record and the information from the DD Form 214 file if there is a match.  If there is no matching DD Form 214 on file, a pending record will be created and a corresponding message number indicating this will be included in the response.

3 .  <u>Question</u>.  How will the accrued leave lump sum payment be treated for calculation of UCX wages?

    <u>Answer</u>:  Accrued leave is assignable to the date of separation.  Therefore, wages for lump sum payment are added to wages for the quarter in which the separation date occurred.

5.  <u>Question</u>.  When there are two control records on file, which one will be included in the response to the requesting State?

    <u>Answer</u>.  The control record with the most recent effective date of claim will be the one included in the response record.

6.  <u>Question</u>.  When a Type 1 record is identified as program Type "F", how is it possible for the State to receive a response with UCX wage and separation information with message number 31 and 35?

A-1

SAGITEC-DEL_07114599

# Appendix A - UCFE - UCX Questions and Answers

Answer. All Type 1 requests are matched against the DD Form 214 file and UCX information is included in the response if there is a DD 214 on file with a separation date subsequent to the beginning date of the base period of the UCFE claim. The UCX wages are assignable if they belong to the UCFE claimant. However, the requesting State has to review the record to ensure that the UCX wages are properly assigned if the UCFE claim is an interstate claim. If for example, the match produced a message that the name on the DD Form 214 is different from the name on the UCFE request, it may be an incorrect SSN on the UCFE claim or the DD Form 214. The State will need to review for proper SSN and name.

4.  Question. When the SSN on the DD Form 214 matches the SSN included under "other SSN" on the Type 1 request, which SSN is to be used on the Type 2 record as the primary SSN?

    Answer. The control record is created using the claimant's correct SSN as the primary identifier of the record, with the other SSN in the other SSN field.

8.  Question. When a Type 1 UCX record includes a "other SSN" and there is no matching DD Form 214 on file, is a pending record created for both SSNs or just the primary one?

    Answer: Only one pending record is created. It will contain both the SSN and the "other SSN" in the record.

9.  Question. Are the wages added together when a Type 1 UCX record includes another SSN in "other SSN" field and there are matching DD Forms 214 on file for both SSNs?

    Answer. Yes. The wages will be calculated using both DD Form 214s and provided in a single response record.

10. Question. What happens when the separation date on a Type 1 UCX record and a Type 3 Claim Control record match?

    Answer. The State receives a Type 3 response with information from the Claim Control record included in Fields 5 thru 15, 18 and 19, and message # 015 "wages previously assigned." This type of response means that the wages have been assigned but should be available for transfer from the State of assignment for use on the new claim.

11. Question. What period of the individual's military service is covered by the wage assignment when the Claim Control record shows a separation date of June 12, 2001 for an individual that served 10 years of uninterrupted military service?

A-2

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAMS' CHANGES

# Appendix A - UCFE - UCX Questions and Answers

<u>Answer</u>. The entire 10 years is covered if there has been no prior benefit year established.

12. <u>Question</u>. What will the State receive from the LCCC if the separation date on a UCX Type 1 record and the separation date on a UCX or UCFE Claim Control record match?

<u>Answer</u>. The State will receive a Type 2 response with information from the Claim Control record and no information from the DD Form 214 with that separation date. The response record will show the information from the Claim Control record in Fields 5 thru 15, 18, and 19 with message # 009 "Control Record on file."

13. <u>Question</u>. If State A sends in a UCFE Type 2 record with a separation date of 6/15/99 and State B sends in a Type 3 record with the same separation date, will both of these records be accepted by LCCC?

<u>Answer</u>. Yes. These are different type control records and not considered duplicates. This situation will occur whenever a transferring State has lag period wages to assign.

14. <u>Question</u>. What will the State receive when it send in a UCFE Type 1 record and there is no control record on file?

<u>Answer</u>. The State will receive a UCFE Type 1 response record with message # 004 "No Control Record or DD 214 on file".

15. <u>Question</u>. How is the State agency notified when the Branch of Service code on the Type 1 request record is different from the DD Form 214?

<u>Answer</u>. The Branch of Service code is extracted from the DD Form 214 and included in the response record to identify the source of the wages for each quarter. If there are overlapping DD Form 214s, the Branch of Service identifier for the affected quarter will be shown as "99". In such cases, the response record will include message number 014 showing a breakout of the wages for each Branch.

16. <u>Question</u>. What happens when the separation date on the UCFE Type 1 record matches the separation date on a UCFE Claims Control record, but, there is a DD Form 214 on file with a separation date subsequent to the base period beginning date of the new claim?

<u>Answer</u>. When there is a DD Form 214 on file that has a separation date after the base period beginning date for the

A-3

SAGITEC-DEL_07114601

## Appendix A - UCFE - UCX Questions and Answers

new claim, wage and separation information from that DD Form 214 will be included in the response with message # 025 "Claim Control Record on file. Wages sent from subsequent DD 214."

17.  <u>Question</u>.  When a UCFE Type 1 record separation date matches the separation date on a UCX Claim Control record, what will the State receive?

<u>Answer</u>.  If the separation date precedes the effective date of the prior claim, the State should receive a Type 2 response record that includes a copy of the Claim Control information and message # 012 "Control Record on file. Prior claim filed since separation date."  This message notifies the State that the UCFE wages were assignable with the establishment of the UCX claim.  If the separation date is after the effective date of the prior claim, the State should receive a Type 2 response record that includes a copy of the Claim Control information and message # 013 "Control Record on file for UCX claim."

18.  <u>Question</u>.  What happens when the separation date on a UCFE Type 1 record matches the separation date on a Type 3 Claim Control record?

<u>Answer</u>.  The State will receive a Type 3 response record with the information from the Claim Control record included in Fields 5 thru 15 and message # 015 "wages previously assigned."  Receiving this response means that the wages are probably available for use on the claim, but they will need to be transferred from the State that posted the control record.

19.  <u>Question</u>.  When the State sends a Type 2 Claim Control record to the LCCC, will the State receive a response?

<u>Answer</u>.  Yes.  The State will receive a response record "Type 2" with message # 023 "Control Record Accepted."  This message number can be used to distinguish between a record receipt confirmation and a Type 2 response that includes information from a Claim Control record and is a response to a Type 1 request.  The answer is the same for a Type 3 response.

20.  <u>Question</u>.  What type of response will the State receive when the separation dates on a UCX Type 1 record and a DD Form 214 on file match and there is a UCX Claim Control record on file with a different separation date?

<u>Answer</u>.  The State will receive a Type 1 response record with information from any DD Form 214 with a service entry date greater than the separation date on the control record

A-4

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAMS' CHANGES

## Appendix A - UCFE - UCX Questions and Answers

when the benefit year ending date control record is less than the effective date of the new claim.  The State will receive a Type 2 response record, which include information from the control record and any DD Form 214 with a entry date greater than the separation date on the control record when the benefit year ending date on the control record is greater than the effective date of the new claim.

21.  <u>Question</u>.  Will the State receive a response record when a Type 4 record is sent?

22.  <u>Answer</u>.  Yes.  The processing of a Type 4 record will generate a Type 4 response which includes message # 019 "Control Record Deleted" confirming the deletion of the control record.  The process is the same for a Type 5 record.

A-5

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAMS' CHANGES

# Appendix B - Examples of Responses from the LCCC

1. Examples of responses that States will receive from the new System.

   a. Scenario. Type 1 UCX request processed and there is no DD Form 214 on file and no matching control record in new system. Pending Record created.

```
┌──────────────────────────────────────────────────────────────────────┐
│ 3/30/01              UCX/UCFE RESPONSE RECORD              Page 11      │
│                                                                        │
│ SSN: 000000000    Name: GARY      JGATHERS      OTHER SSN: 000000000   │
│                                                                        │
│ EFF. DATE:20010305      LDW UCX:20010224      LDW UCFE:00000000        │
│ BASE PER BEG:19991001    BASE PER END:20000930    BASE YEAR END:00000000│
│ ENTRY DATE:00000000    NET SERVICE 1:000000    PRIOR SERVICE 1:000000  │
│                                                                        │
│ STATE FIPS:13    TRANS FIPS-1:00    TRANS FIPS-2:00  LOCAL OFFICE:1500 │
│ BR SERVICE:01        COMPONENT:ARMY RA          CHAR SERV:             │
│ TRANS DATE:20010307    LCCC DATE:20010307    REC CODE:1                │
│                                                                        │
│ ACCRUED LEAVE:000.0  SEP PAY:000000.00  DISAB PEN:000000.00  PAY GRADE:│
│ US NATL:        RETIREMENT:      MICROFILM ID: 000000000000            │
│                                                                        │
│ DAYS LOST ST-1:00000000 DAYS LOST END-1:00000000                      │
│ DAYS LOST ST-2:00000000 DAYS LOST END-2:00000000                      │
│ DAYS LOST ST-3:00000000 DAYS LOST END-3:00000000                      │
│ DAYS LOST ST-4:00000000 DAYS LOST END-4:00000000                      │
│                                                                        │
│ Q1 DATE:00001 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00│
│ Q2 DATE:00002 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00│
│ Q3 DATE:00003 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00│
│ Q4 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00│
│ Q5 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00│
│ Q6 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00│
│ Q7 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00│
│ Q8 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00│
│ Q9 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00│
│                                                                        │
│ DAYS LOST ST-5:00000000 DAYS LOST END-5:00000000                      │
│ DAYS LOST ST-6:00000000 DAYS LOST END-6:00000000                      │
│ DAYS LOST ST-7:00000000 DAYS LOST END-7:00000000                      │
│ DAYS LOST ST-8:00000000 DAYS LOST END-8:00000000                      │
│                                                                        │
│ COMPONENT 2:                         ENTRY DATE 2:00000000            │
│ SEP DATE 2:00000000       NET SERVICE 2:000000  PRIOR SERVICE 2:000000 │
│ ACCRUED LEAVE 2:000.0     AMENDED RESPONSE:   MICROFILM ID:000000000000│
│                                                                        │
│ NARRATIVE:                                                             │
│                                                                        │
│ WARNING FLAG:    1ST FULL:      TYPE:X      EDIT/PROCESS:P             │
│ MSG:002 NO CONTROL RECORD OR DD 214 ON FILE.  RESPONSE PENDING         │
│ MSG:                                                                   │
│ MSG:                                                                   │
└──────────────────────────────────────────────────────────────────────┘
```

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAMS CHANGES

# Appendix B - Examples of Responses from the LCCC

    b. <u>Scenario</u>. Type 1 UCX request processed and there is a
DD Form 214 on file with different separation date. There is no
matching control record in new system. The response includes
information from the DD Form 214 that is on file and a pending
Record is created for the DD Form 214 with a separation date
which matches the date on the request record.

```
3/30/01                UCX/UCFE RESPONSE RECORD                 Page 11

SSN: 000000000   Name: ALLISON      CARTHONS       OTHER SSN: 000000000

EFF. DATE:20010306     LDW UCX:20010131      LDW UCFE:00000000
BASE PER BEG:19991001   BASE PER END:20000930    BASE YEAR END:00000000
ENTRY DATE:19810107     NET SERVICE 1:200024    PRIOR SERVICE 1:000000

STATE FIPS:13     TRANS FIPS-1:00     TRANS FIPS-2:00  LOCAL OFFICE:5500
BR SERVICE:01        COMPONENT:ARMY RA            CHAR SERV:HO
TRANS DATE:20010307    LCCC DATE:20010307    REC CODE:1

ACCRUED LEAVE:000.0  SEP PAY:000000.00  DISAB PEN:000000.00  PAY GRADE:E07
US NATL:U          RETIREMENT:Y       MICROFILM ID:200101020984

DAYS LOST ST-1:00000000 DAYS LOST END-1:00000000
DAYS LOST ST-2:00000000 DAYS LOST END-2:00000000
DAYS LOST ST-3:00000000 DAYS LOST END-3:00000000
DAYS LOST ST-4:00000000 DAYS LOST END-4:00000000

Q1 DATE:19994 Q1 WAGE:011171.70 Q1 WEEK:13  Q1 HOURS:720 Q1 BR SERV: 01
Q2 DATE:20001 Q1 WAGE:011171.70 Q1 WEEK:13  Q1 HOURS:720 Q1 BR SERV: 01
Q3 DATE:20002 Q1 WAGE:011171.70 Q1 WEEK:13  Q1 HOURS:720 Q1 BR SERV: 01
Q4 DATE:20003 Q1 WAGE:011171.70 Q1 WEEK:14  Q1 HOURS:720 Q1 BR SERV: 01
Q5 DATE:20004 Q1 WAGE:011171.70 Q1 WEEK:13  Q1 HOURS:720 Q1 BR SERV: 01
Q6 DATE:20011 Q1 WAGE:003723.90 Q1 WEEK:05  Q1 HOURS:240 Q1 BR SERV: 01
Q7 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00
Q8 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00
Q9 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00

DAYS LOST ST-5:00000000 DAYS LOST END-5:00000000
DAYS LOST ST-6:00000000 DAYS LOST END-6:00000000
DAYS LOST ST-7:00000000 DAYS LOST END-7:00000000
DAYS LOST ST-8:00000000 DAYS LOST END-8:00000000

COMPONENT 2:                        ENTRY DATE 2:00000000
SEP DATE 2:00000000      NET SERVICE 2:000000  PRIOR SERVICE 2:000000
ACCRUED LEAVE 2:000.0    AMENDED RESPONSE:    MICROFILM ID:000000000000

NARRATIVE: SUFFICIENT SERVICE FOR RETIREMENT
WARNING FLAG:    1ST FULL:y     TYPE:X      EDIT/PROCESS:P
MSG:028 REQ SEP DATE 10/16/00 DIFFERENT FROM DD214 SEP DATE. PDG RECORD CREATED.
```

SAGITEC-DEL_07114605

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAMS CHANGES

# Appendix B - Examples of Responses from the LCCC

c. <u>Scenario</u>. UCFE Type 1 request record processed and there is no match in the new control file or the DD Form 214 file.

```
3/30/01              UCX/UCFE RESPONSE RECORD                Page 11

SSN: 000000000   Name: DOROTHY   LJACKSON        OTHER SSN: 000000000

EFF. DATE:20010305      LDW UCX:00000000      LDW UCFE:20010224
BASE PER BEG:19991001   BASE PER END:20000930   BASE YEAR END:00000000
ENTRY DATE:00000000     NET SERVICE 1:000000   PRIOR SERVICE 1:000000

STATE FIPS:13     TRANS FIPS-1:00    TRANS FIPS-2:00  LOCAL OFFICE:3200
BR SERVICE:        COMPONENT:                  CHAR SERV:
TRANS DATE:20010329    LCCC DATE:20010329   REC CODE:1

ACCRUED LEAVE:000.0  SEP PAY:000000.00  DISAB PEN:000000.00  PAY GRADE:
US NATL:           RETIREMENT:       MICROFILM ID: 000000000000

DAYS LOST ST-1:00000000 DAYS LOST END-1:00000000
DAYS LOST ST-2:00000000 DAYS LOST END-2:00000000
DAYS LOST ST-3:00000000 DAYS LOST END-3:00000000
DAYS LOST ST-4:00000000 DAYS LOST END-4:00000000

Q1 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00
Q2 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00
Q3 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00
Q4 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00
Q5 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00
Q6 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00
Q7 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00
Q8 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00
Q9 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00

DAYS LOST ST-5:00000000 DAYS LOST END-5:00000000
DAYS LOST ST-6:00000000 DAYS LOST END-6:00000000
DAYS LOST ST-7:00000000 DAYS LOST END-7:00000000
DAYS LOST ST-8:00000000 DAYS LOST END-8:00000000

COMPONENT 2:                        ENTRY DATE 2:00000000
SEP DATE 2:00000000      NET SERVICE 2:000000  PRIOR SERVICE 2:000000
ACCRUED LEAVE 2:000.0    AMENDED RESPONSE:     MICROFILM ID:000000000000

NARRATIVE:

WARNING FLAG:   1ST FULL:      TYPE:X     EDIT/PROCESS:P
MSG:004 NO CONTROL RECORD OR DD 214 ON FILE.
MSG:
MSG:
```

SAGITEC-DEL_07114606

# Appendix B - Examples of Responses from the LCCC

d. <u>Scenario</u>. UCX Type 1 request processed.  DD Form 214 on file
with different name.  Warning flag set on response record.

```
3/30/01                UCX/UCFE RESPONSE RECORD                    Page

SSN: 000000000    Name: MARK      PURVIS        OTHER SSN: 000000000

EFF. DATE:20010328      LDW UCX:20010215       LDW UCFE:00000000
BASE PER BEG:19991001    BASE PER END:20000930    BASE YEAR END:00000000
ENTRY DATE:19970815      NET SERVICE 1:030600    PRIOR SERVICE 1:000207

STATE FIPS:13      TRANS FIPS-1:00    TRANS FIPS-2:00  LOCAL OFFICE:5500
BR SERVICE:04      COMPONENT:USMCR C1                  CHAR SERV:HO
TRANS DATE:20010328    LCCC DATE:20010328    REC CODE:1

ACCRUED LEAVE:000.0  SEP PAY:000000.00  DISAB PEN:000000.00  PAY GRADE:002
US NATL:U            RETIREMENT:N       MICROFILM ID:200102280675

DAYS LOST ST-1:00000000 DAYS LOST END-1:00000000
DAYS LOST ST-2:00000000 DAYS LOST END-2:00000000
DAYS LOST ST-3:00000000 DAYS LOST END-3:00000000
DAYS LOST ST-4:00000000 DAYS LOST END-4:00000000

Q1 DATE:19994 Q1 WAGE:011502.00 Q1 WEEK:13  Q1 HOURS:720 Q1 BR SERV: 04
Q2 DATE:20001 Q1 WAGE:011502.00 Q1 WEEK:13  Q1 HOURS:720 Q1 BR SERV: 04
Q3 DATE:20002 Q1 WAGE:011502.00 Q1 WEEK:13  Q1 HOURS:720 Q1 BR SERV: 04
Q4 DATE:20003 Q1 WAGE:011502.00 Q1 WEEK:14  Q1 HOURS:720 Q1 BR SERV: 04
Q5 DATE:20004 Q1 WAGE:011502.00 Q1 WEEK:13  Q1 HOURS:720 Q1 BR SERV: 04
Q6 DATE:20011 Q1 WAGE:005751.00 Q1 WEEK:07  Q1 HOURS:360 Q1 BR SERV: 04
Q7 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00
Q8 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00
Q9 DATE:00000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00

DAYS LOST ST-5:00000000 DAYS LOST END-5:00000000
DAYS LOST ST-6:00000000 DAYS LOST END-6:00000000
DAYS LOST ST-7:00000000 DAYS LOST END-7:00000000
DAYS LOST ST-8:00000000 DAYS LOST END-8:00000000

COMPONENT 2:                              ENTRY DATE 2:00000000
SEP DATE 2:00000000      NET SERVICE 2:000000   PRIOR SERVICE 2:000000
ACCRUED LEAVE 2:000.0    AMENDED RESPONSE:      MICROFILM ID:000000000000

NARRATIVE: SUFFICIENT SERVICE FOR RETIREMENT

WARNING FLAG:X  1ST FULL:U     TYPE:X      EDIT/PROCESS:P

MSG:035 NAME ON 214 REC IS CHRISTOPHER AEMERSON
MSG:031 FIRST FULL TERM UNKNOWN.  DD-14 BEING FAXED.
```

# Appendix B - Examples of Responses from the LCCC

e.  Scenario.  UCX Type 1 record processed.  DD Form 214 with
different name and separation date is on file. Pending record
created.  After reviewing this response record, the State will
need to cancel the pending record because all of the matching
problems were created by data entry errors.

```
3/30/01                UCX/UCFE RESPONSE RECORD                 Page 11

SSN: 000000000   Name: DEDRIC     COLEMAN          OTHER SSN: 000000000

EFF. DATE 20010325     LDW UCX: 2000802      LDW UCFE: 00000000
BASE PER BEG: 19991001    BASE PER END: 2000930    BASE YEAR END: 00000000
ENTRY DATE: 20010121     NET SERVICE 1: 000612    PRIOR SERVICE 1: 000000

STATE FIPS:22     TRANS FIPS-1:00    TRANS FIPS-2:00  LOCAL OFFICE:0870
BR SERVICE:01      COMPONENT:ARMY RA              CHAR SERV:HO
TRANS DATE:20010328    LCCC DATE:20010328    REC CODE:1

ACCRUED LEAVE:016.5  SEP PAY:000000.00 DISAB PEN:000000.00  PAY GRADE:E01
US NATL:U          RETIREMENT:N    MICROFILM IDD: 200009051777

DAYS LOST ST-1:00000000 DAYS LOST END-1:00000000
DAYS LOST ST-2:00000000 DAYS LOST END-2:00000000
DAYS LOST ST-3:00000000 DAYS LOST END-3:00000000
DAYS LOST ST-4:00000000 DAYS LOST END-4:00000000

Q1 DATE:20001 Q1 WAGE:004069.10 Q1 WEEK:10  Q1 HOURS:560 Q1 BR SERV: 01
Q2 DATE:20002 Q1 WAGE:005231.70 Q1 WEEK:13  Q1 HOURS:720 Q1 BR SERV: 01
Q3 DATE:20003 Q1 WAGE:002819.30 Q1 WEEK:06  Q1 HOURS:256 Q1 BR SERV: 01
Q4 DATE:20000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00
Q5 DATE:20000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00
Q6 DATE:20000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00
Q7 DATE:20000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00
Q8 DATE:20000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00
Q9 DATE:20000 Q1 WAGE:000000.00 Q1 WEEK:00  Q1 HOURS:000 Q1 BR SERV: 00

DAYS LOST ST-5:00000000 DAYS LOST END-5:00000000
DAYS LOST ST-6:00000000 DAYS LOST END-6:00000000
DAYS LOST ST-7:00000000 DAYS LOST END-7:00000000
DAYS LOST ST-8:00000000 DAYS LOST END-8:00000000

COMPONENT 2:                          ENTRY DATE 2:00000000
SEP DATE 2:00000000        NET SERVICE 2:000000   PRIOR SERVICE 2:000000
ACCRUED LEAVE 2:000.0      AMENDED RESPONSE:      MICROFILM ID:000000000000

NARRATIVE: FAILURE TO MEET PROCUREMENT MEDICAL FITNESS STANDARDS

WARNING FLAG:X   1ST FULL:N      TYPE:X      EDIT/PROCESS:P
MSG:028 REQ SEP DATE 08/03/00 DIFFERENT FROM DD214 SEP DATE. PDG REC CREATED
MSG:035 NAME ON 214 REC IS DEDRICK RCOLEMAN
```

STATE IMPLEMENTATION GUIDE
UCFE AND UCX PROGRAMS' CHANGES

## Appendix B - Examples of Responses from the LCCC

2. <u>Examples of Responses that States will receive from the "Inquiry" Control File</u>. States sending request records using the new system and procedures will receive the following type responses from the old "Inquiry" file.


   a. <u>Situation</u>. There is a UCX request and there is a match with a record in the "Inquiry" File.

The response will contain identifying claimant and program type information from the incoming request and the FIPS Code(s) of the State(s) that previously inquired as follows:

| 02/09/01 | UCX/UCFE Listing of Prior Inquiries | | | Page 1 |
|---|---|---|---|---|
| | By Other States | | | |
| | | Effective | UCX SEP | UCFE SEP |
| **SSN** | **NAME** | DATE | DATE | DATE |
| 000110000 | Robert Gillham | 20010209 | 20001115 | 00000000 |
| | **PGM TYPE:** X   **STATES WITH PRIOR INQUIRY:** 51 29 | | | |


   b. <u>Situation</u>:  There are UCX OR UCFE requests from a State and there are no matches with records in the "Inquiry" File.

The response will be as follows:

| 02/09/01 | UCX/UCFE Listing of Prior Inquiries | Page 1 |
|---|---|---|
| | By Other States | |
| | NONE FOR TODAY | |

SAGITEC-DEL_07114609

Appendix C

FULL SIZE FORMS FOLLOW

CONFIDENTIAL

SAGITEC-DEL_07114610

(STATE AGENCY IDENTIFICATION)

# REQUEST FOR WAGE AND SEPARATION INFORMATION--UCFE

| 1. State Agency Address: | 2. Name of Federal Agency, 3 Digit Agency Code, and Address: |
|---|---|

| 3. Local Office/Call Center ID: | 4. Date of Request: | 5. Date claim taken: | 6. Effective Date of Claim: |
|---|---|---|---|

| 7. Name (Last, First , Middle Initial) | 8. Social Security Number |
|---|---|

**Instructions:   Complete and Return Within 4 Workdays**

9. A. Did this person perform "Federal Civilian Service" as defined for UCFE purposes for your agency at any time during the base period shown in Item 10A below?     __Yes __No

B. Under what legal authority was the individual hired?_____

C. What funding Source was used for salary payments? _____

D. Were payroll deductions made for Federal and State taxes?     __Yes __No

* E. Was Employee eligible for:

(1) Annual and Sick leave?     ___Yes __No     (2) Health and Life insurance?     __Yes __ No

(3) Civil Service or FERS retirement?     __Yes __ No

F.  Did the Federal agency provide direction and control?     __Yes __No

G. Duty Station: Enter State of the person's last employment with your agency (or if outside U.S., enter Country):_____

* NOTE:  If "NO" to D, E (1) through E (3) Explain on separate attachment.

10.   Are base period wages provided electronically?  ___Yes ___No. If 'yes', go to item 11.  If 'no', report all wages from base period begin date to separation date.

A.  Base period beginning date_____

B.  Report  wages for quarters ending after date in 'A' above.

| Qtr. Ending | Year | Gross Wages |
|---|---|---|
| _____ | ____ | $_____ |
| _____ | ____ | $_____ |
| _____ | ____ | $_____ |
| _____ | ____ | $_____ |
| _____ | ____ | $_____ |
| _____ | ____ | $_____ |
| _____ | ____ | $_____ |
| _____ | ____ | $_____ |
| _____ | ____ | $_____ |

C.  Report Hours

No. of Duty Hours ____ Workday ____

____ Basic Workweek

11. Separation, Terminal Annual Leave, and Severance Pay Information

A. Did this person receive a lump sum payment(s) for terminal annual leave on or after the beginning date of base period shown in item 10A?     ___Yes ___No

If "Yes" or if currently entitled to such a payment, enter date below:  Payment Date: __/__/__

Days of Leave: ___

Period  From: Date: __/__/__ To: Date:__/__/__

B. Date of Separation__/__/__

C. Last day of active pay status __/__/__

D. Reason for separation or nonpay status:_____

_____

E. Did this person receive or is he/she entitled to receive severance pay provided by Federal law or agency employee agreement?     ___Yes  No

If "Yes" complete the following information:

Total Entitlement: $_____ Weekly

entitlement: $_____  Beginning date: __/__/__

Ending Date: __/__/__

| Print Name_____ | Title _____ |
|---|---|
| Signature_____ | Telephone Number (___) _____ Date __/__/__ |

**ETA-931 (Revised 8/2001)**

C - 2

## Important Notice

If a completed Form ETA-931 is not received by the 12th calendar day from the 'date of request,' this agency may pay benefits to the claimant based on his/her affidavit as provided by Department of Labor's Regulation at 20 CFR 609.6(e)(2). Any benefit payments made to the claimant will be charged to the Federal employing agency(ies) in accordance with Section 1023, PL 96-499, Omnibus Reconciliation Act of 1980(94 Stat. 2599).

### COMPLETION INSTRUCTIONS TO FEDERAL AGENCY
#### (Also see Front of this Form)

As an alternative to completing this form, attaching a computer printout containing complete data of the data requested is acceptable if procedures and forms are cleared with the U.S. Department of Labor, Washington, DC 20210, and the State agency has completed items 1-7 and 10A and 10B, which identify the base period and the applicable calendar quarters for which information is requested.

Item 9A asks if the individual performed "Federal Civilian Service." If the Federal agency response is "No," Items 9B through 9F are to be completed. Item 9G will be answered when the individual performed "Federal Civilian Service."

The information is available on the SF-50 or payroll records. Provide a separate attachment if necessary.

Item 10B and 9C. Enter either gross wages, when paid, in Federal Civilian Service or "none" if no wages for that period. Do not include as wages: (1) severance pay, (2) lump sum payment(s) for terminal annual leave, or (3) any other type of separation payment. Enter hours, such as 8 and 40 for full-time employee.

Item 11A. Self-explanatory.

Items 11B and 11C. Enter dates requested. The date in Item 11C includes annual and sick leave days if earlier than the date of separation (11B) or if employee is not separated.

Item 11D. Obtain agency findings from SF 50: Item 5-B "Nature of Action" and Item 45, "Remarks", or if SF-50 not used, record equivalent information from other separation document(s) your agency used. See Federal Personnel Manual (FPM) supplement 296-33 for standards on work connected "Resignation" cases, carefully review FPM requirements applicable since January 1,1982. If payroll office records are incomplete or inadequate, or if information on SF-50 is not sufficient, check with personnel for additional information and add as part of separation information. ATTACH COPIES OF DOCUMENTS IF APPROPRIATE.

Item 11E. Self-explanatory.

Signature of Official. Form is not complete unless it (or attached computer printout) is signed and dated; also enter signer's title and telephone number.

ETA-931 (Revised 6/2001)

C - 3

SAGITEC-DEL_07114612

(STATE AGENCY IDENTIFICATION)

# REQUEST FOR SEPARATION INFORMATION – ADDITIONAL CLAIM

| 1.  State Agency Address: | 2.  Federal Agency Name, 3 Digit Agency Code, and Address: |
|---|---|
| **3. Local Office/Call Center:** | **4.  Date of Request:    5.  Effective Date:** |
| 6.  Claimant's Name (Last, First, Middle Initial) | 7.  Social Security Number |

Federal Agency Response – Complete and Return Within 4 Workdays

8.  Separation, Terminal Annual Leave and Severance Pay Information:

   A.  Date of Separation:    __/__/__    I. Last day of active pay status:   __/__/__

   B.  Reason for separation or non-pay status:  _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

   C. Did this person receive a lump sum payment(s) for terminal annual leave on or after the beginning date of the base period shown? __Yes   __No.  If  "Yes", or if currently entitled to such a payment, record date(s) below for each payment(s):
     Payment Date: __/__/__    Days of Leave:   __Period from:   __/__  ___To:   __/__/__

   D. Did person receive or is he/she entitled to receive severance pay provided by Federal law or agency  employee agreement?  __Yes __ No.   If "Yes", complete the following information:
             Total Entitlement: $_____    Weekly entitlement $_____
             Beginning Date: __/__/__    Ending Date __/__/__

9.  Signature of Official _____ Title: _____

   Print Name: _____ Telephone: (   )_____Date __/ /___

ETA-931A (Revised 8/2001)

C – 4

CONFIDENTIAL

SAGITEC-DEL_07114613

(STATE AGENCY IDENTIFICATION)

# REQUEST FOR ADDITIONAL INFORMATION

| 1. State Agency Address: | 2. Federal Agency Name, 3 Digit Agency Code, and Address: |
|---|---|

3. Local Office/Call Center ID: 4. Date of Request: 5. Effective Date: 6. Separation Date:

| 7. Claimant's Name (Last, First Middle Initial) | 8. Social Security Number |
|---|---|

9. A.   State Agency Statement or Questions of Federal Agency:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

9. B.   Claimant's Statement:
_____
_____
_____
_____
_____
_____

10.    Federal Agency Response:
_____
_____
_____
_____
_____
_____
_____
_____

11. Signature of Official _____ Title: _____

    Print Name: _____  Telephone:( ___ ) ____ Date __/__/__

ETA-934 (Revised 8/2001)

C - 5

CONFIDENTIAL

SAGITEC-DEL_07114614

(STATE AGENCY IDENTIFICATION)

# CLAIMANT'S AFFIDAVIT OF FEDERAL CIVILIAN SERVICE, WAGES AND REASON FOR SEPARATION

1. State Agency Address:

2. Claimant's Name and mailing Address

3. LO/Call Center ID: 4. Date of Request: 5. Eff. Date of Claim:  6. Separation Date

7. Federal Agency Name & Address:

8. Social Security Number

Instruction - Complete and Return Immediately

9. Affidavit of Federal Wage and Separation Information/Documentary Evidence

a. Enter the location of your Official duty Station (City, State)

b. Enter your wages with the above named employer below.  Show wages by quarter starting with the wages that you earned after (base period begin date) up to the date you separated from this employer.  Under Documentary Evidence, enter the source of the information provided and attach a copy.  If additional space is needed to explain reason for separation, attach your signed explanation.

| Quarter Ending | Year | Gross Wages | Documentary Evidence |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

c. Severance Pay.  Did you receive or are you entitled to receive severance pay provided by Federal law or agency employee agreement?  ___ Yes  ___ No  If "Yes" complete the following information: Total Entitlement: $_____.  Severance Pay Period Beginning date: __/__/__  Ending Date  __/__/__

d.  Pension: Are you entitled to receive a pension from any branch of the Federal Government?  ___ Yes  ___ No.  Enter fos Monthly Pension $_____

e. Reason for Separation:

f.  I, the claimant, understand that penalties are provided by law for an individual making false statements to obtain benefits and that determinations based on an affidavit are not final: that determinations are subject to correction upon receipt of wage and separation information from the Federal agency, that benefit payments made as a result of such determination may have to be adjusted on the basis of information from the Federal agency, and that any amount overpaid will have to be repaid or offset against future benefits. I, the claimant, swear or affirm, that the above statements, to the best of my knowledge, are true and correct.

10.  Signature of Claimant_____  Date __/__/__

ETA-935 (Revised 8/2001)

C - 6

CONFIDENTIAL

SAGITEC-DEL_07114615

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

| 001 | 0001 | U.S. Senate | 3 |
| 002 | 0001 | U.S. House of Representatives | 3 |
| 003 | 0001 | Commission on Security & Cooperation in Europe | 3 |
| 006 | 0001 | U.S. Capitol Police | 3 |
| 010 | 0001 | Architect of the Capitol | 3 |
| 012 | 0001 | Copyright Royalty Tribunal | 3 |
| 015 | 0001 | U.S. Botanical Gardens | 3 |
| 020 | 0001 | General Accounting Office | 3 |
| 025 | 0001 | U.S. Government Printing Office | 3 |
| 030 | 0001 | Library of Congress | 3 |
| 031 | 0001 | Library of Congress/OIG | 1 |
| 032 | 0001 | Office of Compliance | 3 |
| 035 | 0001 | United States Tax Court | 3 |
| 040 | 0001 | Congressional Budget Office | 3 |
| 045 | 0001 | Office of Technology Assessment | 3 |
| 111 | 0001 | Supreme Court of the United States | 3 |
|  | 0002 | Supreme Court- Office of the Marshall | 3 |
| 112 | 0001 | Administrative Office of the U.S. Courts | 3 |
|  | 0002 | Federal Courts | 3 |
|  | 0003 | Federal Judicial Center | 3 |
|  | 0004 | Judicial Panel on Multi-District Litigation | 3 |
|  | 0005 | United States Sentencing Commission | 3 |
| 113 | 0001 | U.S. Court of Veterans Appeals | 3 |
| 205 | 0001 | White House Office | 3 |
| 207 | 0001 | Office of the Vice President | 3 |
| 210 | 0001 | Office of Management and Budget | 3 |
| 215 | 0001 | Office of Administration | 3 |
| 220 | 0001 | Council of Economic Advisers | 3 |
| 221 | 0001 | Council on Environmental Quality | 3 |
| 222 | 0001 | Council on Wage and Price Stability | 3 |
| 223 | 0001 | Executive Mansion & Grounds | 3 |
| 224 | 0001 | Executive Residence At the White House | 3 |
| 225 | 0001 | Office of Policy Development | 3 |
| 230 | 0001 | National Security Council | 3 |
| 233 | 0001 | Office of Federal Procurement Policy | 3 |
| 235 | 0001 | Office of Science & Technology Policy | 3 |
| 238 | 0001 | Office of U.S. Trade Representative | 3 |
| 239 | 0001 | U.S. Office of Special Counsel | 3 |
| 250 | 0001 | Regulatory Information Service Center | 3 |
| 301 | 0001 | Architectural and Transportation Barriers Compliance Board | 3 |
| 302 | 0001 | Arctic Research Commission | 3 |
| 303 | 0001 | Barry Goldwater Scholarship & Excellence Foundation | 3 |
| 308 | 0001 | Corporation For National & Community Services | 3 |

Index - 1

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

| 310 | 0001 | Defense Nuclear Facilities Safety Board | | 3 |
|-----|------|------------------------------------------|---|---|
| 312 | 0001 | James Madison Foundation | | 1 |
| 321 | 0001 | National Council on Disabilities | | 3 |
| 323 | 0001 | Nuclear Waste Technical Review Board | | 3 |
| 324 | 0001 | Medicare Payment Advisory Commission | | 3 |
| 326 | 0001 | U.S. Institute of Peace | | 3 |
| 338 | 0001 | Thrift Depositor Protection Oversight Board | | 3 |
| 405 | 0001 | Department of State | | 3 |
| 406 | 0001 | International Broadcasting Bureau | | 3 |
| 410 | | Department of Treasury | | |
| | 0001 | Bureau of Alcohol, Tobacco, and Firearms | – Treasury | 1 |
| | 0002 | Bureau of Engraving/Printing | – Treasury | 1 |
| | 0003 | Bureau of the Public Debt | – Treasury | 1 |
| | 0004 | Comptroller of The Currency | – Treasury | 1 |
| | 0005 | Customs Service | – Treasury | 1 |
| | 0006 | Departmental Offices | – Treasury | 1 |
| | 0007 | Federal Law Enforcement Training Center | – Treasury | 1 |
| | 0008 | Financial Management Systems | – Treasury | 1 |
| | 0009 | Internal Revenue Service | – Treasury | 1 |
| | 0010 | Office of The Inspector General | – Treasury | 1 |
| | 0011 | Savings Bonds Division | – Treasury | 1 |
| | 0012 | Secret Service | – Treasury | 1 |
| | 0013 | United States Mint | – Treasury | 1 |
| 421 | | Department of Defense | | |
| | 0001 | Arms Control & Disarmament Agency, Wash, DC | – DOD | 3 |
| | 0002 | Commissary Agency, Fort Meade, MD | – DOD | 3 |
| | 0003 | Commissary Agency, Alexandria, VA | – DOD | 3 |
| | 0004 | Contract Audit Agency, POI 9718, Ft Belvoir, VA | – DOD | 3 |
| | 0005 | Contract Audit Agency, POI 3195, Ft Belvoir, VA | – DOD | 3 |
| | 0006 | Contract Audit Agency, Smyrna, GA | – DOD | 3 |
| | 0007 | Contract Audit Agency, Lexington, MA | – DOD | 3 |
| | 0008 | Contract Audit Agency, Irving, TX | – DOD | 3 |
| | 0009 | Contract Audit Agency, La Mirada, CA | – DOD | 3 |
| | 0010 | Contract Audit Agency, Philadelphia, PA | – DOD | 3 |
| | 0011 | Contract Management, District West | – DOD | 3 |
| | 0012 | DPMDFC5/BPT, Randolph AFB, TX | – DOD | 3 |
| | 0013 | Education Activity, Arlington, VA | – DOD | 3 |
| | 0014 | Finance & Accounting Service, Arlington, VA | – DOD | 3 |
| | 0015 | Finance & Accounting Service, Denver, CO | – DOD | 3 |
| | 0016 | Finance & Accounting Service, Indianapolis, IN | – DOD | 3 |
| | 0017 | Finance & Accounting Service, Cleveland, OH | – DOD | 3 |
| | 0018 | Finance & Accounting Service, Columbus, OH | – DOD | 3 |
| | 0019 | Finance & Accounting Service, Kansas City, MO | – DOD | 3 |
| | 0020 | Finance & Accounting Service, Norfolk, VA | – DOD | 3 |

CONFIDENTIAL

SAGITEC-DEL_07114617

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

```
0021  HQ Human Resource Directorate, Ft Belvoir, VA   - DOD    3
0022  Information Systems Agency, Arlington, VA        - DOD    3
0023  Information Systems Agency, Reston, VA           - DOD    3
0024  Information Systems Agency (Pentagon), Wash, DC  - DOD    3
0025  Intelligence Agency, Washington, DC              - DOD    3
0026  Investigative Service, Baltimore, MD             - DOD    3
0027  Investigative Service, Chicago, IL               - DOD    3
0028  Investigative Service, Smyrna, GA                - DOD    3
0029  Investigative Service, Boston, MA                - DOD    3
0030  Investigative Service, Cherry Hill, NJ           - DOD    3
0031  Investigative Service, Long Beach, CA            - DOD    3
0032  Joint Field Support Center, Ft Meade, MD         - DOD    3
0033  Joint Staff (Pentagon), Washington, DC           - DOD    3
0034  Logistics Agency, Stockton, CA                   - DOD    3
0035  Logistics Agency, Columbus, OH                   - DOD    3
0036  Logistics Agency, (Ind. Supply) Phila, PA        - DOD    3
0037  Logistics Agency, Memphis, TN                    - DOD    3
0038  Logistics Agency HRO, Ft Belvoir, VA             - DOD    3
0039  Logistics Agency, Richmond, VA                   - DOD    3
0040  Natl Imagery & Mapping Agency, Bethesda, MD      - DOD    3
0041  Natl Imagery & Mapping Agency, St Louis, MO      - DOD    3
0042  Natl Imagery & Mapping Agency, Ft Belvior, VA    - DOD    3
0043  Natl Imagery & Mapping Agency, Reston, VA        - DOD    3
0044  Natl Security Agency, Ft Meade, VA               - DOD    3
0045  On-Site Inspection Agency, Washington, DC        - DOD    3
0046  OPLOC - Pensacola Code P, Pensacola, FL          - DOD    3
0047  OPLOC - Charleston Code P, Charleston, SC        - DOD    3
0048  Reutilization & Marketing Service                - DOD    3
0049  Special Weapons Agency, Alexandria, VA           - DOD    3
0050  Supply Center, Philadelphia, PA                  - DOD    3
0051  Uniformed Services University, Bethesda, MD      - DOD    3
0052  Washington Hdqtrs Service, Arlington, VA         - DOD    3
422   Department of the Army
0001  6th Infantry Division (Light), USAG-Alaska CPO   - Army   3
0002  7th Army Training Command/CPO (Germany)          - Army   3
0003  20th Support Group, CPO, EANC-CP, Unit 15494     - Army   3
0004  24th Infantry Div. (MECH) & Fort Stewart, GA     - Army   3
0005  26th Area Support Group, Heidelberg, Germany     - Army   3
0006  29th Area Support Group, Unit 429, APO, AE       - Army   3
0007  34th Support Command Group, Unit 15333 (Korea)   - Army   3
0008  98th Area Support Group-Wuerzburg, Germany       - Army   3
0009  104th Area Support Group, Unit 20193, APO, AE    - Army   3
0010  Armament Munitions & Chem Command, Rock Isl, IL  - Army   3
0011  Armor Center, CPO, Fort Knox, KY                 - Army   3
```

Index - 3

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

| | | | |
|---|---|---|---|
| 0012 | Aviation Center, CPO, Ft. Rucker, AL | – Army | 3 |
| 0013 | Aviation & Missile Command, Redstone, AL | – Army | 3 |
| 0014 | Central Rheinland Pfalz, Baumhholder, Germany | – Army | 3 |
| 0015 | Chemical & Military Police, Ft. McClellan, AL | – Army | 3 |
| 0016 | Chief of Engineers, Washington, DC | – Army | 3 |
| 0017 | Civilian Personnel Office, Fort Campbell, KY | – Army | 3 |
| 0018 | Civ. Per. Ctr, NE, Aberdeen Proving Ground, MD | – Army | 3 |
| 0019 | Cmdr-Netherlands 54th Area Support Group | – Army | 3 |
| 0020 | Combined Arms Command, CPO, Ft. Levenworth, KS | – Army | 3 |
| 0021 | Commander Anniston Army Depot, Anniston, AL | – Army | 3 |
| 0022 | Commander US Army Yuma Proving Ground, Yuma, AZ | – Army | 3 |
| 0023 | Corps of Engineers, CEHR-ZA, Washington, DC | – Army | 3 |
| 0024 | Corps of Engineers, No. Cent. Div., Chicago, IL | – Army | 3 |
| 0025 | Corps of Engineers, St. Paul, MN | – Army | 3 |
| 0026 | CPO Center, So. Central, Redstone Arsenal, AL | – Army | 3 |
| 0027 | CPO Center, Pacific, Fort Richardson, AK | – Army | 3 |
| 0028 | CPO Center, Southeast, Fort Benning, GA | – Army | 3 |
| 0029 | CPO Center, North Central, Rock Isl Arsenal, IL | – Army | 3 |
| 0030 | CPO Center, Southwest, Fort Riley, KS | – Army | 3 |
| 0031 | CPO Center, Camp Henry Hdqtrs, Korea | – Army | 3 |
| 0032 | Defense Fin. & Acct Service, Indianapolis, IN | – Army | 3 |
| 0033 | Defense Language Inst, Pres. of Monterey, CA | – Army | 3 |
| 0034 | Directorate of Civ. Personnel, Ft Devens, MA | – Army | 3 |
| 0035 | Directorate of Civ. Per. Ft Leonard Wood, MO | – Army | 3 |
| 0036 | DLIFLC & POM, ATZP-CPR, Pres. of Monterey, CA | – Army | 3 |
| 0037 | Engineer District, Mobile, AL | – Army | 3 |
| 0038 | Engineer District, HRO, Little Rock, AR | – Army | 3 |
| 0039 | Engineer District, Anchorage, AK | – Army | 3 |
| 0040 | Engineer District, Jacksonville, FL | – Army | 3 |
| 0041 | Engineer District, Savannah, GA | – Army | 3 |
| 0042 | Engineer District, Rock Island, IL | – Army | 3 |
| 0043 | Engineer District, Kansas, City, KS | – Army | 3 |
| 0044 | Engineer District, Louisville, KY | – Army | 3 |
| 0045 | Engineer District, New Orleans, LA | – Army | 3 |
| 0046 | Engineer District, Baltimore, MD | – Army | 3 |
| 0047 | Engineer District, HRO, Detroit, MI | – Army | 3 |
| 0048 | Engineer District, HRO, St. Louis, MO | – Army | 3 |
| 0049 | Engineer Division, Huntsville, AL | – Army | 3 |
| 0050 | Engineer Div., So.Pacific, Sacramento, CA | – Army | 3 |
| 0051 | Engineer Div. So. Atlantic, Atlanta, GA | – Army | 3 |
| 0052 | Engineer Division, Concord, MA | – Army | 3 |
| 0053 | Fitzsimons Army Medical Center, Aurora, CO | – Army | 3 |
| 0054 | Forces Command, CPO, Ft McPherson, GA | – Army | 3 |
| 0055 | Ft. Carson 4th Infantry Div., Ft. Carson, CO | – Army | 3 |

Index - 4

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

| | | | |
|---|---|---|---|
| 0056 | Garrison, Dir of CP, Ft McPherson, GA | – Army | 3 |
| 0057 | Garrison - Panama, Unit 7150, APO, AA | – Army | 3 |
| 0058 | Garrison, CPO, Ft Detrick, Frederick, MD | – Army | 3 |
| 0059 | HQ USAREUR & 7th Army, Unit 29351, APO, AE | – Army | 3 |
| 0060 | HQ U.S. Army - Pacific, Fort Shafter, HI | – Army | 3 |
| 0061 | HQ 17th Area Support Group, Camp Zama, Japan | – Army | 3 |
| 0062 | HQ USAREUR & 7TH ARMY, Chieves Belgium | – Army | 3 |
| 0063 | HQ USAREUR, CPO, Unit 29150, APO, AE | – Army | 3 |
| 0064 | HQ 1st Infantry Div. (MECH) & Fort Riley, KS | – Army | 3 |
| 0065 | HQ Army Military Dist of Wash, Jacksonville, FL | – Army | 3 |
| 0066 | HQ Army Military Dist of Wash, Washington, DC, | – Army | 3 |
| 0067 | HQ Army Research Lab, HR Mgmt Div., Adelphi, MD | – Army | 3 |
| 0068 | HQ Army Reserve Command, CPO, Atlanta, GA | – Army | 3 |
| 0069 | HQ U.S. Army Garrison, Ft. Meade, MD | – Army | 3 |
| 0070 | Infantry Ctr, Dir of CP, Ft Benning, GA) | – Army | 3 |
| 0071 | Intelligence Ctr, CPO, Ft Huachuca, AZ | – Army | 3 |
| 0072 | Jefferson Proving Ground, Madison, IN | – Army | 3 |
| 0073 | Joint Readiness Training Center, Fort Polk, LA | – Army | 3 |
| 0074 | Lexington Bluegrass Army Depot, Richmond, KY | – Army | 3 |
| 0075 | MTMC Western Area, Oakland, CA | – Army | 3 |
| 0076 | Natick Research Dev. & Eng. Center, Natick, MA | – Army | 3 |
| 0077 | NTC & Ft. Irwin, Attn: AFZJ-CP, Ft. Irwin, CA | – Army | 3 |
| 0078 | Office of the Secy of the Army, Washington, DC | – Army | 3 |
| 0079 | OPM SANG-Riyadh Saudi Arabia, #61304, APO, AE | – Army | 3 |
| 0080 | Pine Bluff Arsenal - Pine Bluff, AR | – Army | 3 |
| 0081 | Reserve, Personnel Ctr., St. Louis,, MO | – Army | 3 |
| 0082 | Rock Island Arsenal, CPO - Rock Island, IL | – Army | 3 |
| 0083 | Savannah Army Depot - Activity, Savannah, IL | – Army | 3 |
| 0084 | Sierra Army Depot, SDSSI-CP, Herlong, CA | – Army | 3 |
| 0085 | Signal School, CPO, (ATZH-CP) Ft. Gordon, GA | – Army | 3 |
| 0086 | Stuttgart/6th Area Support Group, APO, AE | – Army | 3 |
| 0087 | Support Activity - Aberdeen Proving Ground, MD | – Army | 3 |
| 0088 | Tank Automotive, Command CPO, Warren, MI | – Army | 3 |
| 0089 | Vicinza Civ. Per. Support Center, APO, AE | – Army | 3 |
| 0090 | Walter Reed Army Med. Ctr(HSHL-CP) Wash., DC | – Army | 3 |
| 423 | Department of the Navy | | |
| 0001 | Camp Lejeune Satelite Off-HRO-Camp Lejeune, NC | – Navy | 3 |
| 0002 | CHRO East Albany Sat Off, Albany, GA | – Navy | 3 |
| 0003 | Commander(Code 164) HRO, NUWCDIV, WA | – Navy | 3 |
| 0004 | Costal Systems Station, PC-80, Panama City, FL | – Navy | 3 |
| 0005 | European Reg. (OCPM-EURR)-PSC 8022, FPO, AE | – Navy | 3 |
| 0006 | Fleet and Industrial S.C (3231), San Diego, CA | – Navy | 3 |
| 0007 | Fleet and Industrial S.C (4221), San Diego, CA | – Navy | 3 |
| 0008 | Fleet and Industrial Supply Ctr, Norfolk, VA | – Navy | 3 |

CONFIDENTIAL

SAGITEC-DEL_07114620

# Directory of Federal Agencies - **Index**

| | | | |
|---|---|---|---|
| 0009 | Great Lakes Ser. Ctr. HRO, Great Lakes, IL | – Navy | 3 |
| 0010 | HRO Groton, Code 00G18, UC Div. Groton, CT | – Navy | 3 |
| 0011 | Human Resources Ser Ctr NW, Silverdale, WA | – Navy | 3 |
| 0012 | Human Resources SE, (2179), Stennis Space, MS | – Navy | 3 |
| 0013 | Human Resources SE, (2417), Stennis Space, MS | – Navy | 3 |
| 0014 | IIQs III Armored Corps & FH CPO, FT Hood, TX | – Navy | 3 |
| 0015 | Lemore NAS 2800, San Diego, CA | – Navy | 3 |
| 0016 | Marine Corps (MPC-37), Washington, DC | – Navy | 3 |
| 0017 | Marine Corps Base, HRO, (Okinawa) FPO, AP | – Navy | 3 |
| 0018 | Marine Corps Air Station, HRO 35404, FPO, AP | – Navy | 3 |
| 0019 | Marine Corps-DC/S-Man & Res-(MPL 30)- Wash, DC | – Navy | 3 |
| 0020 | Marine Corps Civ. HRO-W, Twentynine Palms, CA | – Navy | 3 |
| 0021 | Marine Corps Civ. (HQ) HRB, Washington, DC | – Navy | 3 |
| 0022 | Military Sealift Command, Virginia BH, VA | – Navy | 3 |
| 0023 | MCCHRO, West, POI 2023, Barstow, CA | – Navy | 3 |
| 0024 | Monterey Post Grad School, SW, San Diego, CA | – Navy | 3 |
| 0025 | NAVACTS, HRO, PSC 455, FPO, AP | – Navy | 3 |
| 0026 | NAVAIRWARCENWPNSDIV., China Lake, CA | – Navy | 3 |
| 0027 | NAVSEA 07, Vallejo, CA | – Navy | 3 |
| 0028 | NAVSEASYSCMD, Yorktown, VA | – Navy | 3 |
| 0029 | NAVSTA HRO, New Orleans, LA | – Navy | 3 |
| 0030 | NAWC Training Systems Division, Orlando, FL | – Navy | 3 |
| 0031 | NAWCAD, HRO, Patuxent River, MD | – Navy | 3 |
| 0032 | NAWCAD Code 731400B150-1, Lakehurst, NJ | – Navy | 3 |
| 0033 | NCCOSC RDTE Div. Code 122, San Diego, CA | – Navy | 3 |
| 0034 | Naval Academy, HRO, Annapolis, MD | – Navy | 3 |
| 0035 | Naval Activities-United Kingdom-PSC 802, FPO, AE | – Navy | 3 |
| 0036 | Naval Air Station -N. Isl (3231) San Diego, CA | – Navy | 3 |
| 0037 | Naval Air Station, Joint Res. Base-Ft Worth, TX | – Navy | 3 |
| 0038 | Naval Air Station, HRO, Jacksonville, FL | – Navy | 3 |
| 0039 | Naval Air Warfare Ctr, COG, Patuxent River, MD | – Navy | 3 |
| 0040 | Naval Aviation Depot, CHRO-E, Cherry Point, NC | – Navy | 3 |
| 0041 | Naval Const Batt Ctr- Pt Hueneme, San Diego, CA | – Navy | 3 |
| 0042 | Naval Inventory Control Point, Philadelphia, PA | – Navy | 3 |
| 0043 | Naval Hospital, POI 3231, San Diego, CA | – Navy | 3 |
| 0044 | Naval Hospital, POI 4221, San Diego, CA | – Navy | 3 |
| 0045 | Naval Intelligence Civ Per Off, Washington, DC | – Navy | 3 |
| 0046 | Naval Ordnance Ctr- Seal Beach, San Diego, CA | – Navy | 3 |
| 0047 | Naval Research Laboratory, Washington, DC | – Navy | 3 |
| 0048 | Naval Sea Systems Command, HRO, Arlington, VA | – Navy | 3 |
| 0049 | Naval Shipyard, Long Beach, CA | – Navy | 3 |
| 0050 | Naval Station, HRO, PSC 819, FPO, AE | – Navy | 3 |
| 0051 | Naval Station Roosevelt Rds- PSC 1008, FPO, AA | – Navy | 3 |
| 0052 | Naval Submarine Base-Bangor, Silverdale, CA | – Navy | 3 |

Index - 6

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

```
     0053  Naval Support Activity, HRO, PSC 817, FPO, AE    - Navy      3
     0054  Naval Surface Warfare Ctr (3231) San Diego, CA   - Navy      3
     0055  Naval Surface Warfare Ctr., Crane, IN            - Navy      3
     0056  Naval Surface Warfare Ctr-HRO, Bethesda, MD      - Navy      3
     0057  Naval Surface Warfare Ctr-HRO, Indian Head, MD   - Navy      3
     0058  Naval Surface Warfare Ctr-P50, Dahlgren, VA      - Navy      3
     0059  Naval Undersea Warfare Ctr Div, Newport, RI      - Navy      3
     0060  Navy Ship Parts Control Ctr, Mechanicsburg, PA   - Navy      3
     0061  Norfolk Naval Base, HRO, Norfolk, Va             - Navy      3
     0062  Norfolk Naval Shipyard, Portsmouth, VA           - Navy      3
     0063  Office of Civ. Personnel Mgmt -Arlington, VA     - Navy      3
     0064  OPCM - Pacific Region-Code 51, Honolulu, HI      - Navy      3
     0065  Pearl Harbor Naval Shipyard HRO, Pearl Harbor, HI- Navy      3
     0066  Portsmouth Naval Shipyard-HRO, Indian Head, MD   - Navy      3
     0067  Public Works Ctr, N. Isl    San Diego, CA        - Navy      3
     0068  Public Works Ctr, N. Isl(Coronado) San Diego, CA- Navy       3
     0069  Public Works Ctr, HRO Code 42A, Honolulu, HI     - Navy      3
     0070  Puget Sound Naval Shipyard, Bremerton, WA        - Navy      3
     0071  S/HRO, Arlington Annex, Washington, DC           - Navy      3
     0072  Secretariat/HQ - HRO,  Arlington, VA             - Navy      3
     0073  SPAWAR, POI 3231, HRO, San Diego, CA             - Navy      3
     0074  SPAWAR, POI 4219, HRO, San Diego, CA             - Navy      3
     0075  Stennis Space Ctr, SE HR Ctr., Mississippi       - Navy      3
     0076  U. S. Naval Base - HRO, FPO, AE                  - Navy      3
424        Department of the Air Force (Appropriated Funds)
     0001  11 MSS/DPC/CPO, Bolling AFB, Washington, DC      - Air Force 3
     0002  Academy/MAJCOM Dir. HQ, Colorado Springs, CO     - Air Force 3
     0003  Civilian Personnel Office, Grissom AFB, IN       - Air Force 3
     0004  Civilian Personnel Office, Andrews AFB, MD       - Air Force 3
     0005  Civilian Personnel Office, Kirkland AFB, NM      - Air Force 3
     0006  Combat Command/CPO/24MSS, Howard AFB APO, AA     - Air Force 3
     0007  Combat Command/CPO/65MSS, Lajes Fld Unt APO, AE  - Air Force 3
     0008  Combat Command/CPO/355MSS, Davis-Monthan AFB, AZ- Air Force 3
     0009  Combat Command/CPO/9MSS, Beale AFB, CA           - Air Force 3
     0010  Combat Command/CPO/6MSS/DPC/ACC, MacDill AFB, FL- Air Force 3
     0011  Combat Command/CPO/347MSS, Moody AFB, GA         - Air Force 3
     0012  Combat Command/CPO/366MSS, Mountain Home AFB, ID- Air Force 3
     0013  Combat Command/CPO/2MSS, Barksdale AFB, LA       - Air Force 3
     0014  Combat Command/CPO/509MSS, Whiteman AFB, MO      - Air Force 3
     0015  Combat Command/CPO/55MSS, Offutt AFB, NE         - Air Force 3
     0016  Combat Command/CPO/554MSS, Nellis AFB, NV        - Air Force 3
     0017  Combat Command/CPO/27MSS, Cannon AFB, NM         - Air Force 3
     0018  Combat Command/CPO/49MSS/MSC, Holloman AFB, NM   - Air Force 3
     0019  Combat Command/CPO/23MSS, Pope AFB, NC           - Air Force 3
```

Index - 7

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

0020  Combat Command/CPO/4MSS, Seymour Johnson AFB, NC- Air Force 3
0021  Combat Command/CPO/5MSS/DPC/ACC, Minot AFB, ND  - Air Force 3
0022  Combat Command/CPO/28MSS, Ellsworth AFB, SD     - Air Force 3
0023  Combat Command/CPO/20MSS/DPC/ACC, Shaw AFB, SC  - Air Force 3
0024  Educ & Training Command, 42MSS, Maxwell AFB, AL - Air Force 3
0025  Educ & Training Command, 56MSS, Luke AFB, AZ    - Air Force 3
0026  Educ & Trg Command, 314MSS, Little Rock AFB, AR - Air Force 3
0027  Educ & Training Command, 325MSS, Tyndall AFB, FL- Air Force 3
0028  Educ & Training Command, 14MSS, Columbus AFB, MS- Air Force 3
0029  Educ & Training Command, 81MSS, Keesler AFB, MS - Air Force 3
0030  Educ & Training Command, 97MSS, Altus AFB, OK   - Air Force 3
0031  Educ & Training Command, 71MSS, Vance AFB, OK   - Air Force 3
0032  Europe/CPO, 31 MSS/MSC(USAFE) Aviano, APO, AE   - Air Force 3
0033  Europe/CPO, 425 ABS/DPC(USAFE) Izmir, APO, AE   - Air Force 3
0034  Europe/CPO, 3 AF/DPC(USAFE) Mildenhall, APO, AE - Air Force 3
0035  Europe/CPO, 86 MSS/DPC, Ramstein AB GE, APO, AE - Air Force 3
0036  Europe/CPO, 39 MSS/MSC, Incirlik AB, TU, APO, AE- Air Force 3
0037  Europe/CPO, 52 MSS, Spangdahlem AB, GE, APO, AE - Air Force 3
0038  Headquarters USAF/DPC, Pentagon, Wash, DC       - Air Force 3
0039  MAJCOM Directors/HQ USA/FE/DPC, APO, AE         - Air Force 3
0040  MAJCOM Directors/HQ AFSPC/DPC, Peterson AFB, CO - Air Force 3
0041  MAJCOM Directors/HQ 11 SPTW/DPC, Washington, DC - Air Force 3
0042  MAJCOM Directors HQ AFRES/DPC, Robins AFB, GA   - Air Force 3
0043  MAJCOM Directors HQ PACAF, Hickam AFB, HI       - Air Force 3
0044  MAJCOM Directors, HQ AMC/DPC, Scott AFB, IL     - Air Force 3
0045  MAJCOM Dir/HQ AFMC/DPC, Wright Patterson AFB, OH- Air Force 3
0046  Materiel Command/CPO/95MSS, Edwards AFB, CA     - Air Force 3
0047  Materiel Command/CPO/61MSS, Los Angeles AFB, CA - Air Force 3
0048  Materiel Command/CPO/77SPTG, McClellan AFB, CA  - Air Force 3
0049  Materiel Command/CPO/96MSS, Eglin AFB, FL       - Air Force 3
0050  Materiel Command/CPO/78SPTG, Robins AFB, GA     - Air Force 3
0051  Materiel Command/CPO/66SPTG, Hanscom AFB, MA    - Air Force 3
0052  Materiel Command/88SPTG-Wright-Patterson AFB, OH- Air Force 3
0053  Materiel Command/CPO/OC-ALC, Tinker AFB, OK     - Air Force 3
0054  Materiel Command/CPO/656ABS, Arnold AS, TN      - Air Force 3
0055  Materiel Command/CPO/CASC/DPC, Battlecreek, MI  - Air Force 3
0056  Mobility Command/CPO/22MSS, McConnell AFB, KS   - Air Force 3
0057  Mobility Command/CPO/89MSS, Andrews AFB, MD     - Air Force 3
0058  Mobility Command/CPO/437MSS, Charleston AFB, SC - Air Force 3
0059  Mobility Command/CPO/305MSS, McGuire AFB, NJ    - Air Force 3
0060  Mobility Command/CPO319MSS, Grand Forks AFB, ND - Air Force 3
0061  Mobility Command/CPO/375MSS/DPC, Scott AFB, IL  - Air Force 3
0062  Mobility Command/CPO/60MSS/DPC, Travis AFB, CA  - Air Force 3
0063  Mobility Command/CPO/436MSS/DPC, Dover AFB, DE  - Air Force 3

Index - 8

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

```
        0064  National Guard(5USC)/CPO/102MSS/DPC, Milford, MA- Air Force 3
        0065  National Guard(5USC)CPO/127FW-Selfridge ANGB, MI- Air Force 3
        0066  Onizuka, Air Station 750MSS, Sunnyvale, CA    - Air Force 3
        0067  Pacific/CPO/354MSS/MSC, Eielson AFB, AK       - Air Force 3
        0068  Pacific/CPO/3MSS/DPC, Elmendorf AFB, AK       - Air Force 3
        0069  Pacific/CPO/18MSS/DPC, Kadena,AB JA, APO, AP  - Air Force 3
        0070  Pacific/CPO/374MSS/DPC, Yokota AB JA, APO, AP - Air Force 3
        0071  Pacific/CPO/8MSS/MSCK, Kunsan AB KOR, APO, AP - Air Force 3
        0072  Pacific/CPO/36MSS/MSC, Andersen AFB GU, APO, AP - Air Force 3
        0073  Pacific/CPO/51MSS/MSC, Osan AB KOR, APO, AP   - Air Force 3
        0074  Pacific/CPO/15MSS.DPC, Hickam AFB, HI         - Air Force 3
        0075  Pacific/CPO/432MSS/MSC, Misawa AB JA, APO,AP  - Air Force 3
        0076  PALACE COMPASS-SCOTT/AMCCPO/DPCC, Scott AFB, IL - Air Force 3
        0077  Reserve Command/CPO/452SPTG/DPC, March AFB, CA - Air Force 3
        0078  Reserve/CPO/482SPTG/DPC/AFRES, Homestead AFB, FL- Air Force 3
        0079  Reserve/CPO/94SUG/DPC/AFRES, Dobbins ARB, GA  - Air Force 3
        0080  Reserve/911SPTG-Pittsburgh IAP-ARS Coraopolis PA- Air Force 3
        0081  Reserve/CPO/939SPTG/DPC/AFRES, Portland IAP, OR - Air Force 3
        0082  Reserve/CPO/913Sptg/DPC, Willow Grove ARS, PA - Air Force 3
        0083  Reserve/CPO/439SPTG/DPC, Westover AFB, MA     - Air Force 3
        0084  Reserve/CPO/926SPTG/DPC, New Orleans, LA      - Air Force 3
        0085  Reserve/CPO/934SPTG/DPC, St Paul, MN          - Air Force 3
        0086  Reserve/910SPTG, Yngstwn-Warren Aprt, Vienna, OH- Air Force 3
        0087  Reserve/CPO/914SPTG, Niagra Falls IAP-ARS, NY - Air Force 3
        0088  Space Command/CPO/341MSS/DPC, Malmstrom AFB, MT - Air Force 3
        0089  Space Command/CPO/21MSS, Peterson AFB, CO     - Air Force 3
        0090  Space Command/CPF/45MSS/DPC, Patrick AFB, FL  - Air Force 3
425     0001  Army-Central Payroll Office/NAF, Texarkana, TX - Army      3
427           Department of the Air Force (Non-Appropriated Funds)
        0001  Bergstrom Air Reserve Station/924FG, Austin, TX - Air Force 3
        0002  Combat Command/NAF/7MSS/MSC, Dyess AFB, TX    - Air Force 3
        0003  Combat Command/NAF/1MSS/DPC, Langley AFB, VA  - Air Force 3
        0004  Combat Command/CPO/NAF/92MSS, Fairchild AFB, WA - Air Force 3
        0005  Educ & Trg Command/NAF17MSS, Goodfellow AFB, TX - Air Force 3
        0006  Educ & Trg Command/NAF/37MSS, Lackland AFB, TX - Air Force 3
        0007  Educ & Trg Command/NAF/47MSS, Laughlin AFB, TX - Air Force 3
        0008  Educ & Trg Command/NAF/12MSS,  Randolph AFB, TX - Air Force 3
        0009  Educ & Trg Command/NAF/82MSS, Sheppard AFB, TX - Air Force 3
        0010  Hdqtrs USAF AFCPMC/DR/NAF, Randolph AFB, TX   - Air Force 3
        0011  Hdqtrs AFPC/DPCM/NAF, Randolph AFB, TX)       - Air Force 3
        0012  Intelligence Command/NAF/HQ AIA, San Antonio, TX- Air Force 3
        0013  Mobility Command/NAF/62MSS/MSC, McChord AFB, WA - Air Force 3
        0014  MAJCOM Directors/NAF/HQ AETC, Randolph AFB, TX - Air Force 3
        0015  MAJCOM Directors/NAF, Langley AFB, VA         - Air Force 3
```

Index - 9

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

|     |      |                                                      |              |   |
|-----|------|------------------------------------------------------|--------------|---|
|     | 0016 | Materiel Command/NAF/HSC/DPC, Brooks AFB, TX          | - Air Force  | 3 |
|     | 0017 | Materiel Command/76SPTG/DPC, Kelly AFB, TX            | - Air Force  | 3 |
|     | 0018 | Materiel Command/75SPTG/DPC, Hill AFB, UT            | - Air Force  | 3 |
|     | 0019 | Reserve/NAF301SPTG, Ft Worth, TX                     | - Air Force  | 3 |
|     | 0020 | Reserve/CPO/NAF440SPTG, Milwaukee, WI                | - Air Force  | 3 |
|     | 0021 | Space Command/NAF/90MSS, Fran E. Warren AFB, WY      | - Air Force  | 3 |
| 429 | 0001 | Army & Air Exchange Service (Dallas, TX)             | - Army       | 3 |
| 430 |      | Department of Justice                                |              |   |
|     | 0001 | Alternative Dispute Resolution                       | Justice      | 1 |
|     | 0002 | Antitrust Division                                   | Justice      | 1 |
|     | 0003 | Associate Attorney General                           | Justice      | 1 |
|     | 0004 | Attorney General                                     | Justice      | 1 |
|     | 0005 | Civil Division                                       | Justice      | 1 |
|     | 0006 | Civil Rights Division                                | Justice      | 1 |
|     | 0007 | Community Oriented Policing Services                 | Justice      | 1 |
|     | 0008 | Community Relations Service                          | Justice      | 1 |
|     | 0009 | Court Services & Offender Supervision for DC         | Justice      | 1 |
|     | 0010 | Criminal Division                                    | Justice      | 1 |
|     | 0011 | Drug Enforcement Administration                      | Justice      | 1 |
|     | 0012 | Executive Office For Immigration Review              | Justice      | 1 |
|     | 0013 | Environment and Natural Resources Division           | Justice      | 1 |
|     | 0014 | Federal Prison System                                | Justice      | 1 |
|     | 0015 | Foreign Claims Settlement Commission                 | Justice      | 1 |
|     | 0016 | Immigration and Naturalization Service               | Justice      | 1 |
|     | 0017 | Independent Counsel RE: Madison                      | Justice      | 1 |
|     | 0018 | Information and Privacy                              | Justice      | 1 |
|     | 0019 | Intelligence Policy and Review                       | Justice      | 1 |
|     | 0020 | Intergovernmental Affairs                            | Justice      | 1 |
|     | 0021 | Inspector General                                    | Justice      | 1 |
|     | 0022 | Justice Programs                                     | Justice      | 1 |
|     | 0023 | Legal Counsel                                        | Justice      | 1 |
|     | 0024 | Legislative Affairs                                  | Justice      | 1 |
|     | 0025 | Management Division                                  | Justice      | 1 |
|     | 0026 | Marshals Service                                     | Justice      | 1 |
|     | 0027 | National Drug Intelligence Center                    | Justice      | 1 |
|     | 0028 | Office of Professional Responsibility                | Justice      | 1 |
|     | 0029 | Pardon Attorney                                      | Justice      | 1 |
|     | 0030 | Parole Commission                                    | Justice      | 1 |
|     | 0031 | Policy Development                                   | Justice      | 1 |
|     | 0032 | President's Crime Prevention Council                 | Justice      | 1 |
|     | 0033 | Professional Responsibility Advisory Office          | Justice      | 1 |
|     | 0034 | Public Affairs                                       | Justice      | 1 |
|     | 0035 | Solicitor General                                    | Justice      | 1 |
|     | 0036 | Special Counsel                                      | Justice      | 1 |

CONFIDENTIAL                                                   SAGITEC-DEL_07114625

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

|  | 0037 | Tax Division | Justice | 1 |
|---|---|---|---|---|
|  | 0038 | Trustee Program | Justice | 1 |
|  | 0039 | U.S. Trustees | Justice | 1 |
|  | 0040 | United States Attorneys | Justice | 1 |
|  | 0041 | USNCB - Interpol | Justice | 1 |
| 431 | 0001 | Federal Bureau of Investigation | Justice | 3 |
| 432 | 0001 | Drug Enforcement Agency | Justice | 3 |
| 440 |  | Department of the Interior |  |  |
|  | 0001 | Bureau of Indian Affairs | Interior | 1 |
|  | 0002 | Bureau of Land Management | Interior | 1 |
|  | 0003 | Bureau of Mines | Interior | 1 |
|  | 0004 | Bureau of Reclamation | Interior | 1 |
|  | 0005 | Minerals Management Services | Interior | 1 |
|  | 0006 | National Park Service | Interior | 1 |
|  | 0007 | Office of The Secretary | Interior | 1 |
|  | 0008 | Office of The Solicitor | Interior | 1 |
|  | 0009 | Office of Surface Mining | Interior | 1 |
|  | 0010 | U.S. Fish & Wildlife Service | Interior | 1 |
|  | 0011 | U.S. Geological Survey | Interior | 1 |
| 445 |  | Department of Agriculture |  |  |
|  | 0001 | Agricultural Marketing Service | Agriculture | 1 |
|  | 0002 | Agricultural Research Service | Agriculture | 1 |
|  | 0003 | Animal And Plant Health Inspection Service | Agriculture | 1 |
|  | 0004 | Cooperative State Research Service | Agriculture | 1 |
|  | 0005 | Economic Analysis Staff | Agriculture | 1 |
|  | 0006 | Economics Management Staff | Agriculture | 1 |
|  | 0007 | Economic Research Service | Agriculture | 1 |
|  | 0008 | Farmers Home Administration | Agriculture | 1 |
|  | 0009 | Federal Crop Insurance Corporation | Agriculture | 1 |
|  | 0010 | Federal Grain Inspection Service | Agriculture | 1 |
|  | 0011 | Food and Nutrition Service | Agriculture | 1 |
|  | 0012 | Food Safety and Inspection Service | Agriculture | 1 |
|  | 0013 | Forest Service | Agriculture | 1 |
|  | 0014 | Natural Resources Conservation Service | Agriculture | 1 |
|  | 0015 | National Agricultural Statistical Service | Agriculture | 1 |
|  | 0016 | Office of Energy | Agriculture | 1 |
|  | 0017 | Office of Finance and Management | Agriculture | 1 |
|  | 0018 | Office of Personnel | Agriculture | 1 |
|  | 0019 | Office of Operations | Agriculture | 1 |
|  | 0020 | Packers and Stockyards Administration | Agriculture | 1 |
|  | 0021 | Soil Conservation Service | Agriculture | 1 |
|  | 0022 | World Agricultural Outlook Board | Agriculture | 1 |
| 450 |  | Department of Commerce |  |  |
|  | 0001 | Bureau of the Census | Commerce | 1 |

Index - 11

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

|      | 0002 | Bureau of Economic Analysis | Commerce | 1 |
|------|------|------------------------------|----------|---|
|      | 0003 | Bureau of Export Administration | Commerce | 1 |
|      | 0004 | Economic Development Administration | Commerce | 1 |
|      | 0005 | Economics and Statistics Administration | Commerce | 1 |
|      | 0006 | International Trade Administration | Commerce | 1 |
|      | 0007 | Minority Business Development Agency | Commerce | 1 |
|      | 0008 | Natl Institute of Standards and Technology | Commerce | 1 |
|      | 0009 | National Oceanic & Atmospheric Admin. | Commerce | 1 |
|      | 0010 | National Technical Information Service | Commerce | 1 |
|      | 0011 | National Telecommunications & Info. Admin. | Commerce | 1 |
|      | 0012 | Patent and Trademark Office | Commerce | 1 |
|      | 0013 | Office of the Inspector General | Commerce | 1 |
|      | 0014 | Office of the Secretary | Commerce | 1 |
|      | 0015 | Technology Administration | Commerce | 1 |
|      | 0016 | Travel & Tourism Administration | Commerce | 1 |
| 455  |      | U.S. Department of Labor |  |  |
|      | 0001 | Atlanta (GA)Region | Labor | 3 |
|      | 0002 | Boston (MA) Region | Labor | 3 |
|      | 0003 | Chicago (IL) Region | Labor | 3 |
|      | 0004 | Dallas (TX) Region | Labor | 3 |
|      | 0005 | Philadelphia (PA) Region | Labor | 3 |
|      | 0006 | San Francisco (CA) Region | Labor | 3 |
|      | 0007 | Washington (DC) National Office | Labor | 3 |
| 460  |      | Department of Health and Human Services (DHHS) |  |  |
|      | 0001 | ACF/OA/OHRM, L'Enfant Promenade, SW, Washington, DC | HHS | 3 |
|      | 0002 | AHCPR (Rockville, MD) | HHS | 3 |
|      | 0003 | Center for Disease Control/HRMO, Atlanta, GA | HHS | 3 |
|      | 0004 | Food & Drug Admin, OHRMS, San Francisco, CA | HHS | 3 |
|      | 0005 | Food & Drug Administration, HQ, Rockville, MD | HHS | 3 |
|      | 0006 | Food & Drug Admin, NY Pers. Office, New York, NY | HHS | 3 |
|      | 0007 | Gillis W. Long Hansen Disease, Carville, LA | HHS | 3 |
|      | 0008 | HCFA, Baltimore, MD | HHS | 3 |
|      | 0009 | HRSA, Fishers Lane, Rockville, MD | HHS | 3 |
|      | 0010 | Indian Health Services, Anchorage, AK | HHS | 3 |
|      | 0011 | Indian Health, Personnel Office, Window Rock, AR | HHS | 3 |
|      | 0012 | Indian Health Services, OHR, Phoenix, AZ | HHS | 3 |
|      | 0013 | Indian Health Services, Tucson, AZ | HHS | 3 |
|      | 0014 | Indian Health Services, Albuquerque, NM | HHS | 3 |
|      | 0015 | Indian Health Services, Oklahoma City, OK | HHS | 3 |
|      | 0016 | Indian Health Service/PHS, Portland, OR | HHS | 3 |
|      | 0017 | Indian Health Services, Billings, MT | HHS | 3 |
|      | 0018 | Indian Health Services, Aberdeen, SD | HHS | 3 |
|      | 0019 | National Institute of Health/CIT, Bethesda, MD | HHS | 3 |
|      | 0020 | National Institute of Health2/NCI, Bethesda, MD | HHS | 3 |

CONFIDENTIAL

SAGITEC-DEL_07114627

# Directory of Federal Agencies - **Index**

|     |      |                                                      |                |   |
|-----|------|------------------------------------------------------|----------------|---|
|     | 0021 | National Institute of Health2/NHLBI, Bethesda, MD    | HHS            | 3 |
|     | 0022 | National Institute of Health/NIMH, Bethesda, MD      | HHS            | 3 |
|     | 0023 | National Institute of Health/NIDDK/OHRM, Bethesda, MD | HHS           | 3 |
|     | 0024 | National Institute of Health/NICHDHRMB, Bethesda, MD | HHS            | 3 |
|     | 0025 | NCHS, 6525 Belcrest Road, Hyattsville, MD            | HHS            | 3 |
|     | 0026 | NIAID/OHRM, Rockville, MD                            | HHS            | 3 |
|     | 0027 | NIEHS/EC-II, Research Triangle Park, NC             | HHS            | 3 |
|     | 0028 | NIOSH/CDC, Cincinnati, OH                            | HHS            | 3 |
|     | 0029 | NIOSH/Spokane Research Laboratory, Spokane, WA       | HHS            | 3 |
|     | 0030 | NLM, Bethesda, MD                                   | HHS            | 3 |
|     | 0031 | OD, MSC 2215, 31 Center Drive, Bethesda, MD          | HHS            | 3 |
|     | 0033 | OHRMS/Central RO, Chicago Personnel Operation        |                | 3 |
|     | 0034 | PHS, CA Area Office, Bell Street, Sacramento, CA     | HHS            | 3 |
|     | 0035 | POD/OS, 330 C St. SW, Washington, DC                 | HHS            | 3 |
|     | 0036 | PSC, Fisher Lane, Rockville, MD                      | HHS            | 3 |
|     | 0037 | SAMHSA/DPM/POB, Fisher Lane, Rockville, MD           | HHS            | 3 |
| 465 | 0001 | Dept of Housing and Urban Development, Chicago, IL   |                | 3 |
| 466 | 0001 | Department of Housing and Urban Development/OIG      |                | 1 |
| 470 |      | Department of Transportation                         |                |   |
|     | 0001 | Federal Aviation Administration                     | Transportation | 1 |
|     | 0002 | Federal Highways Administration                     | Transportation | 1 |
|     | 0003 | Federal Railroad Administration                     | Transportation | 1 |
|     | 0004 | Inspector General                                   | Transportation | 1 |
|     | 0005 | Maritime Administration                             | Transportation | 1 |
|     | 0006 | Natl Highway Transportation Safety Admin.           | Transportation | 1 |
|     | 0007 | Office of the Secretary                             | Transportation | 1 |
|     | 0008 | Research-Special Programs Administration            | Transportation | 1 |
|     | 0009 | Transportation System Center                        | Transportation | 1 |
|     | 0010 | U.S. Coast Guard                                    | Transportation | 1 |
|     | 0011 | Urban Mass Transportation Safety Admin.             | Transportation | 1 |
| 475 | 0001 | Department of Energy                                |                | 3 |
|     | 0002 | African Development Foundation                       |                | 1 |
| 480 | 0001 | Department of Education                             |                | 1 |
| 502 | 0001 | Action                                              |                | 3 |
| 503 | 0001 | Administrative Conference of the U.S.               |                | 3 |
| 505 | 0001 | Advisory Committee on Federal Pay                   |                | 3 |
| 506 | 0001 | U.S. Agency for International Development            |                | 3 |
| 507 | 0001 | Advisory Council on Historic Preservation           |                | 3 |
| 508 | 0001 | Alaska National Gas Transportation                 |                | 3 |
| 509 | 0001 | Appalachian Regional Commission                     |                | 3 |
| 510 | 0001 | American Battle Monuments Commission                |                | 3 |
| 511 | 0001 | Board For International Broadcasting                 |                | 3 |
| 512 | 0001 | U.S. Arms Control & Disarmament Agency              |                | 3 |
| 520 | 0001 | Federal Reserve System                              |                | 3 |

CONFIDENTIAL

SAGITEC-DEL_07114628

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

| | | | |
|---|---|---|---|
| 531 | 0001 | Commission For the Purchase of Products From the Handicap | 3 |
| 532 | 0001 | Delaware River Basin Commission | 3 |
| 535 | 0001 | Office of Personnel Management | 3 |
| 538 | 0001 | Commission on Fine Arts | 3 |
| 539 | 0001 | U.S. Commission on Civil Rights | 3 |
| 540 | 0001 | Office of Government Ethics | 3 |
| 541 | 0001 | U.S. Consumer Product Safety Commission | 3 |
| 543 | 0001 | Commodity Futures Trading Commission | 3 |
| 545 | 0001 | Advisory Commission On Intergovernmental Relations | 3 |
| 552 | 0001 | Environmental Protection Agency | 1 |
| 554 | 0001 | Equal Employment Opportunity Commission | 3 |
| 555 | 0001 | Export-Import Bank | 3 |
| 557 | 0001 | Farm Credit Administration | 3 |
| 558 | 0001 | Farm Credit System Assistance Board | 3 |
| 570 | 0001 | Federal Communications Commission | 3 |
| 572 | 0001 | Federal Election Commission | 3 |
| 574 | 0001 | Federal Emergency Management Agency | 1 |
| 575 | 0001 | Federal Deposit Insurance Corporation | 1 |
| 576 | 0001 | Office of Thrift Supervision | 3 |
| 577 | 0001 | Federal Labor Relations Authority | 1 |
| 578 | 0001 | Federal Maritime Commission | 3 |
| 579 | 0001 | Federal Housing Finance Board | 3 |
| 580 | 0001 | Federal Mediation and Conciliation Service | 3 |
| 583 | 0001 | Federal Mine, Safety & Health Rev. Commission | 3 |
| 584 | 0001 | Federal Retirement Thrift Investment Board | 3 |
| 590 | 0001 | Federal Trade Commission | 1 |
| 592 | 0001 | Foreign Claims Settlement Commission | 3 |
| 600 | 0001 | General Services Administration | 1 |
| 601 | 0001 | Harry S. Truman Scholarship | 1 |
| 602 | 0001 | Japan-U.S. Friendship Commission | 1 |
| 603 | 0001 | U.S. Chemical Safety and Hazard Investigation Board | 1 |
| 618 | 0001 | Institute of Museum Services | 3 |
| 619 | 0001 | JFK Center For The Performing Arts | 3 |
| 620 | 0001 | U.S. Information Agency | 3 |
| 621 | 0001 | Inter-American Foundation | 1 |
| 622 | 0001 | International Boundary and Water Comm | 3 |
| 623 | 0001 | International Trade Commission | 1 |
| 625 | 0001 | Interstate Commerce Commission | 1 |
| | 0002 | Surface Transportation Board (Interstate Commerce) | 3 |
| | 0003 | St. Lawrence Seaway Dev. Corp. (Interstate Commerce) | 3 |
| 626 | 0001 | Interagency Council On the Homeless | 3 |
| 627 | 0001 | Marine Mammal Commission | 3 |
| 628 | 0001 | U.S. Merit Systems Protection Board | 3 |
| 631 | 0001 | National Aeronautics & Space Administration | 3 |

CONFIDENTIAL                                                  SAGITEC-DEL_07114629

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

| 633 | 0001 | National Archives & Records Administration | 1 |
|-----|------|--------------------------------------------|---|
| 634 | 0001 | National Credit Union Administration | 3 |
| 635 | 0001 | National Commission for Employment Policy | 3 |
| 640 | 0001 | National Capital Planning Commission | 3 |
| 642 | 0001 | National Gallery Of Arts | 3 |
| 645 | 0001 | National Labor Relations Board | 3 |
| 646 | 0001 | National Endowment For the Arts | 3 |
| 647 | 0001 | National Endowment For the Humanities | 3 |
| 650 | 0001 | National Mediation Board | 3 |
| 652 | 0001 | National Railroad Adjustment Board | 3 |
| 655 | 0001 | National Science Foundation | 3 |
| 656 | 0001 | National Transportation Policy Study Commission | 3 |
| 657 | 0001 | Navajo & Hopi Indian Relocation Commission | 3 |
| 659 | 0001 | Nuclear Regulatory Commission | 3 |
| 660 | 0001 | National Transportation Safety Board | 3 |
| 661 | 0001 | NUC Safety Oversight Committee | 3 |
| 663 | 0001 | Occupational Safety & Health Review Commission | 3 |
| 664 | 0001 | Overseas Private Investment Corp. | 1 |
| 665 | 0001 | Panama Canal Commission | 3 |
| 667 | 0001 | Pension Benefit Guaranty Corporation | 3 |
| 668 | 0001 | Postal Rate Commission | 3 |
| 670 | 0001 | Railroad Retirement Board | 3 |
| 677 | 0001 | Peace Corps | 3 |
| 678 | 0001 | Pennsylvania Avenue Development Corporation | 3 |
| 680 | 0001 | President's Commission on Ethical Problems | 3 |
| 682 | 0001 | President's Commission on Pension Policy | 3 |
| 683 | 0001 | Railroad Accounting Principles Board | 3 |
| 687 | 0001 | Social Security Administration | 1 |
| 690 | 0001 | U.S. Securities and Exchange Commission | 1 |
| 695 | 0001 | Selective Service System | 1 |
| 697 | 0001 | Susquehanna River Basin Commission | 3 |
| 700 | 0001 | Small Business Administration | 1 |
| 701 | 0001 | United States Holocaust Memorial Museum | 3 |
| 705 | 0001 | Smithsonian Institution | 3 |
| 710 | 0001 | Soldiers' and Airmen's Home | 3 |
| 730 | 0001 | Tennessee Valley Authority | 3 |
| 732 | 0001 | U.S. Postal Service, St Paul, MN | 1 |
|     | 0002 | U.S. Postal Service, Washington, DC | 1 |
| 735 |      | Department of Veterans Affairs | |
|     | 0001 | Health Care Center (756), El Paso, TX | 3 |
|     | 0002 | Medical Center (619), Montgomery, AL | 3 |
|     | 0003 | Medical Center (644), Phoenix, AZ | 3 |
|     | 0004 | Medical Center (649), Prescott, AZ | 3 |
|     | 0005 | Medical Center (564), Fayetteville, AR | 3 |

CONFIDENTIAL

SAGITEC-DEL_07114630

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

0006   Medical Center (598), W. 7th Street, Little Rock, AR        3
0007   Medical Center (570), East Clinton Avenue, Fresno, CA       3
0008   Medical Center (599), Concord, CA                           3
0009   Medical Center (605), Loma Linda, CA                        3
0010   Medical Center (600), E. 7th Street, Long Beach, CA         3
0011   Medical Center (691), Wilshire Blvd., Los Angeles , CA      3
0012   Medical Center (640), Miranda Avenue, Palo Alto, CA         3
0013   Medical Center (664), La Jolla Village Dr., San Diego, CA   3
0014   Medical Center (662), Clement Street, San Francisco, CA     3
0015   Medical Center (665), Plummer Street, Sepulveda, CA         3
0016   Medical Center (339), Denver, CO                            3
0017   Medical Center (554), Clemont Street, Denver, CO            3
0018   Medical Center (567), Fort Lyon, CO                         3
0019   Medical Center (575), Grand Junction, CO                    3
0020   Medical Center (627), Willard Avenue, Newington, CT         3
0021   Medical Center (689), Campbell Avenue, West Haven, CT       3
0022   Medical Center (688), Irving Street, N.W, Washington, DC    3
0023   Medical Center (573), Archer Road, Gainesville, FL          3
0024   Medical Center (594), Lake City, FL                         3
0025   Medical Center (546), Northwest 16th Street, Miami, FL      3
0026   Medical Center (673), Bruce B. Downs Blvd., Tampa, FL       3
0027   Medical Center (548), N. Military Dr., W. Palm Beach, FL    3
0028   Medical Center (557), 1826 Veteran's Blvd., Dublin, GA      3
0029   Medical Center (531), West Fort Street, Boise, ID           3
0030   Medical Center (535), East Huron Street, Chicago, IL        3
0031   Medical Center (537), So. Damen Avenue, Chicago, IL         3
0032   Medical Center (556), Green Bay Road North, Chicago, IL     3
0033   Medical Center (550), Danville, IL                          3
0034   Medical Center (578), Hines, IL                             3
0035   Medical Center (609), West Main Street, Marion, IL          3
0036   Medical Center (569), Fort Wayne,IN                         3
0037   Medical Center (583), West 10th Street, Indianapolis, IN    3
0038   Medical Center (610), Marion, IN                            3
0039   Medical Center (555), 30th & Euclid Avenue, Des Moines, IA  3
0040   Medical Center (584), Highway 6 West, Iowa City, IA         3
0041   Medical Center (592), W. Pleasant Street,  Knoxville, IA    3
0042   Medical Center (696), Leavenworth, KS                       3
0043   Medical Center (677), Gaple Blvd, Topeka, KS                3
0044   Medical Center (596), Lexington, KY                         3
0045   Medical Center (603), Zorn Avenue, Louisville, KY           3
0046   Medical Center (629), Perdido Street, New Orleans, LA       3
0047   Medical Center (66 ), East Stoner Avenue, Shreveport, LA    3
0048   Medical Center (566), Fort Howard, MD                       3
0049   Medical Center (641), Perry Point, MD                       3

Index – 16

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

```
0050  Medical Center (325), Belmont Street Brockton, MA          3
0051  Medical Center (631), Northampton, MA                      3
0052  Medical Center (553), John R (Street), Detroit, MI         3
0053  Medical Center (585), Iron Mountain, MI                    3
0054  Medical Center (655), Weiss Street, Saginaw, MI            3
0055  Medical Center (618), Veterans Drive, Minneapolis, MN      3
0056  Medical Center (656), 8th Street North, St. Cloud, MN      3
0057  Medical Center (586), East Woodrow Wilson Dr, Jackson, MS  3
0058  Medical Center (543), Hospital Drive Columbia, MO          3
0059  Medical Center (589), Linwood Boulevard, Kansas City, MO   3
0060  Medical Center (647), Poplar Bluff, MO                     3
0061  Medical Center (657), Jefferson Barracks, St. Louis, MO    3
0062  Medical Center (617), Miles City, MT                       3
0063  Medical Center (574), Grand Island, NE                     3
0064  Medical Center (597), South 70th Street, Lincoln, NE       3
0065  Medical Center (636), Woolworth Avenue, Omaha, NE          3
0066  Medical Center (593), Vegas Drive, Las Vegas, NV           3
0067  Medical Center (654), Locust Street, Reno, NV              3
0068  Medical Center (608), Smyth Road, Manchester, NH           3
0069  Medical Center (561), East Orange, NJ                      3
0070  Medical Center (604), Knollcroft Road, Lyons, NJ           3
0071  Medical Center (526), West Kingsbridge Road, Bronx, NY     3
0072  Medical Center (527), Poly Place, Brooklyn, NY             3
0073  Medical Center (528), Bailey Avenue, Buffalo, NY           3
0074  Medical Center (532), Fort Hill Avenue,  Canandaigua, NY   3
0075  Medical Center (533), Castlepoint, NY                      3
0076  Medical Center (620), P.O. Box 100, Rt 9A , Montrose, NY   3
0077  Medical Center (630), East 23rd Street, New York, NY       3
0078  Medical Center (632), Northport, NY                        3
0079  Medical Center (670), Irving Ave & Univ. Pl., Syracuse, NY 3
0080  Medical Center (637), Asheville, NC                        3
0081  Medical Center (558), Fulton Street, Durham, NC            3
0082  Medical Center (565), Ramsey Street, Fayetteville, NC      3
0083  Medical Center (659), Brenner Avenue, Salisbury, NC        3
0084  Medical Center (538), Chillicothe, OH                      3
0085  Medical Center (539), Vine Street, Cincinnati, OH          3
0086  Medical Center (541), East Blvd, Cleveland, OH             3
0087  Medical Center (552), West Third Street, Dayton, OH        3
0088  Medical Center (623), Honor Heights Drive, Muskogee, OK    3
0089  Medical Center (635), NE 13th Street, Oklahoma City, OK    3
0090  Medical Center (648), P.O. Box 1034, Portland, OR          3
0091  Medical Center (653), Roseburg, OR                         3
0092  Medical Center (692), Crater Lake Highway, White City, OR  3
0093  Medical Center (529), Butler, PA                           3
```

Index - 17

Attachment II to UIPL 47-01

# Directory of Federal Agencies – **Index**

| | | |
|---|---|---|
| 0094 | Medical Center (542), Coatesville, PA | 3 |
| 0095 | Medical Center (562), East 38th Street, Erie, PA | 3 |
| 0096 | Medical Center (595), Lebanon, PA | 3 |
| 0097 | Medical Center (642), Univ. & Woodland Aves., Phila. PA | 3 |
| 0098 | Medical Center (646), Highland/Univ. Drive, Pittsburgh, PA | 3 |
| 0099 | Medical Center (693), East End Blvd, Wilkes-Barre, PA | 3 |
| 0100 | Medical Center (677), San Juan, PR | 3 |
| 0101 | Medical Center (650), Providence, RI | 3 |
| 0102 | Medical Center (534), Bee Street, Charleston, SC | 3 |
| 0103 | Medical Center (544), Garners Road, Columbia, SC | 3 |
| 0104 | Medical Center (558), Comanche Road, Fort Meade, SD | 3 |
| 0105 | Medical Center (579), Hot Springs, SD | 3 |
| 0106 | Medical Center (614), Jefferson Avenue, Memphis, TN | 3 |
| 0107 | Medical Center (621), (Johnson City) Mountain Home, TN | 3 |
| 0108 | Medical Center (622), Lebanon Road, Murfreesboro, TN | 3 |
| 0109 | Medical Center (626), 24th Avenue South, Nashville, TN | 3 |
| 0110 | Medical Center (549), South Lancaster Road, Dallas, TX | 3 |
| 0111 | Medical Center (580), Holcombe Blvd Houston, TX | 3 |
| 0112 | Medical Center (591), Memorial Blvd. Kerrville, TX | 3 |
| 0113 | Medical Center (611), Marlin, TX | 3 |
| 0114 | Medical Center (671), Merton Miriter Blvd San Antonio, TX | 3 |
| 0115 | Medical Center (674), South 1st Street, Temple, TX | 3 |
| 0116 | Medical Center (685), Memorial Drive, Waco, TX | 3 |
| 0117 | Medical Center (660), Foothill Blvd, Salt Lake City, UT | 3 |
| 0118 | Medical Center (590), Hampton, VA | 3 |
| 0119 | Medical Center (652), Broad Rock Road, Richmond, VA | 3 |
| 0120 | Medical Center (658), Salem, VA | 3 |
| 0121 | Medical Center (663), South Columbia Way, Seattle, WA | 3 |
| 0122 | Medical Center (668), Spokane, WA | 3 |
| 0123 | Medical Center (687), Wainwright Drive, Walla Walla, WA | 3 |
| 0124 | Medical Center (540), Clarksburg, WV | 3 |
| 0125 | Medical Center (581), Spring Valley Drive, Huntington, WV | 3 |
| 0126 | Medical Center (613), Martinsburg, WV | 3 |
| 0127 | Medical Center (607), Overlook Terrace, Madison, WI | 3 |
| 0128 | Medical Center (G95), West National Avenue, Milwaukee, WI | 3 |
| 0129 | Medical Center (676), Torriah, WI | 3 |
| 0130 | Medical Center (666), Sheridan, WY | 3 |
| 0131 | Northern CA Systems of Clinics (612), Pleasant Hill, CA | 3 |
| 0132 | Outpatient Clinic (752), East Tenipic, Los Angeles, CA | 3 |
| 0133 | Outpatient Clinic (677), San Juan, PR | 3 |
| 0134 | Outpatient Clinic (750), Causeway Street, Boston, MA | 3 |
| 0135 | Outpatient Clinic (757), Taylor Avenue, Columbus, OH | 3 |
| 0136 | Regional Office (322), Perry Hill Road, Montgomery, AL | 3 |
| 0137 | Regional Office (343), N. Central Avenue, Phoenix, AZ | 3 |

Index – 18

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

| | | |
|---|---|---|
| 0138 | Regional Office (350), North Little Rock, AR | 3 |
| 0139 | Regional Office (344), 11000 Wilshire Blvd, LA, CA | 3 |
| 0140 | Regional Office (343), 1301 Clay Street, Oakland, CA | 3 |
| 0141 | Regional Office (359), 1301 Clay Street, Oakland, CA | 3 |
| 0142 | Regional Office (339), P.O.  Box 25126, Denver, CO | 3 |
| 0143 | Regional Office (308), Main Street, Hartford, CT | 3 |
| 0144 | Regional Office (317), P.O. Box 1437, St. Petersburg, FL | 3 |
| 0145 | Regional Office          Peachtree Street, NE, Atlanta, GA | 3 |
| 0146 | Regional Office (480), P.O. Box 50188, Honolulu, HI | 3 |
| 0147 | Regional Office (347), West Franklin Street, Boise, ID | 3 |
| 0148 | Regional Office (329), PO Box 91336, Chicago, IL | 3 |
| 0149 | Regional Office (326), N. Penn. St., Indianapolis, IN | 3 |
| 0150 | Regional Office (333), Walnut Street, Des Moines, IA | 3 |
| 0151 | Regional Office (327), S. Third Street, Louisville, KY | 3 |
| 0152 | Regional Office (321), Loyola Avenue, New Orleans, LA | 3 |
| 0153 | Regional Office (313), 31 Hopkins Plaza, Baltimore, MD | 3 |
| 0154 | Regional Office (301), Govt Center, Boston, MA | 3 |
| 0155 | Regional Office (329), Michigan Avenue, Detroit, MI | 3 |
| 0156 | Regional Office          (Fort Snelling) St. Paul, MN | 3 |
| 0157 | Regional Office (323), West Capitol Street, Jackson, MS | 3 |
| 0158 | Regional Office (131), N. Market Street, St. Louis, MO | 3 |
| 0159 | Regional Office (334), South 48th Street, Lincoln, NE | 3 |
| 0160 | Regional Office (054), Terminal Way, Reno, NV | 3 |
| 0161 | Regional Office (373), Chestnut, Manchester, NH | 3 |
| 0162 | Regional Office (309), Washington Place, Newark, NJ | 3 |
| 0163 | Regional Office (340), Gold Avenue, S.W., Albuquerque, NM | 3 |
| 0164 | Regional Office (307), West Huron Street, Buffalo, NY | 3 |
| 0165 | Regional Office (306), Houston Street, New York, NY | 3 |
| 0166 | Regional Office (319), N. Main St., Winston-Salem, NC | 3 |
| 0167 | Regional Office (325), East Ninth Street, Cleveland, OH | 3 |
| 0168 | Regional Office (351), South Main Street, Muskogee, OK` | 3 |
| 0169 | Regional Office          S.W. Third Avenue, Portland, OR | 3 |
| 0170 | Regional Office (310), Wissahickon Ave., Philadelphia, PA | 3 |
| 0171 | Regional Office (311), Liberty Avenue, Pittsburgh, PA | 3 |
| 0172 | Regional Office (355), GPO Box 364867, San Juan, PR | 3 |
| 0173 | Regional Office          Westminister Mall, Providence, RI | 3 |
| 0174 | Regional Office (311), Assembly Street, Columbia, SC | 3 |
| 0175 | Regional Office (320), Ninth Avenue, South, Nashville, TN | 3 |
| 0176 | Regional Office (349), N. Valley Mills Drive, Waco, TX | 3 |
| 0177 | Regional Office (341), S. State St., Salt Lake City, UT | 3 |
| 0178 | Regional Office (314), Franklin Road S.W., Roanoke, VA | 3 |
| 0179 | Regional Office (346), 2nd Avenue, Seattle, WA | 3 |
| 0180 | Regional Office (315), 4th Avenue, Huntington, WV | 3 |
| 0181 | Regional Office          P.O. Box 6, Milwaukee, WI | 3 |

Index - 19

SAGITEC-DEL_07114634

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

| 801 | 0001 | Department of Army/NAF/DFAS/IN/UCX | | 3 |
|---|---|---|---|---|
| 802 | 0001 | Department of Navy/NAF | | 3 |
| 803 | 0001 | Department of Air Force/NAF/HQ AFPC/DPPTU | | 3 |
| 804 | 0001 | U.S. Marine Corps/NAF/DFAS-KC | | 3 |
| 805 | 0001 | U.S. Coast Guard/NAF/Coast Guard Pers. Command | | 3 |
| 806 | 0001 | National Oceanic and Atmospheric Administration | | 1 |
| 807 | 0001 | Navy Exchange Service | Navy | 3 |
| 808 | | DEPARTMENT OF NAVY/NAF - MORALE, WELFARE, & RECREATION | | |
| | 0001 | Administrative Unit, S.W Asia Bahrain, FPO, AE | Navy | 3 |
| | 0002 | Administrative Unit, Scotia, NY | Navy | 3 |
| | 0003 | Air Engineering Station, Lakehurst, NJ | Navy | 3 |
| | 0004 | Air Facility, Atsugi Japan, FPO, AP | Navy | 3 |
| | 0005 | Air Facility, Building 318, Code 60, El Centro, CA | Navy | 3 |
| | 0006 | Air Station, Sigonella, Italy, FPO, AE | Navy | 3 |
| | 0007 | Air Station, (Keflavik) FPO, AP | Navy | 3 |
| | 0008 | Air Station, ADAK, PSC 486 Box 1219, FPO, AP | Navy | 3 |
| | 0009 | Air Station, N. Island, PO Box 357083, San Diego, CA | Navy | 3 |
| | 0010 | Air Station, Cecil Field, FL | Navy | 3 |
| | 0011 | Air Station, Jacksonville, FL | Navy | 3 |
| | 0012 | Air Station, Key West, FL | Navy | 3 |
| | 0013 | Air Station, Milton, FL | Navy | 3 |
| | 0014 | Air Station, (Atlanta) Marietta, GA | Navy | 3 |
| | 0015 | Air Station, Brunswick, ME | Navy | 3 |
| | 0016 | Air Station-Patuxent, Annapolis, MD | Navy | 3 |
| | 0017 | Air Station, Meridian, MS | Navy | 3 |
| | 0018 | Air Station, Fallon, NV | Navy | 3 |
| | 0019 | Air Station/Joint Reserve, Willow Grove, PA | Navy | 3 |
| | 0020 | Air Station, Corpus Christi, TX | Navy | 3 |
| | 0021 | Air Station, Fort Worth, TX | Navy | 3 |
| | 0022 | Air Station, Kingville, TX | Navy | 3 |
| | 0023 | Air Station, Oceana, Virginia Beach, VA | Navy | 3 |
| | 0024 | Air Weapons Station, Building 21, China Lake, CA | Navy | 3 |
| | 0025 | Air Weapons Station, 521 9th Street, Point Mugu, CA | Navy | 3 |
| | 0026 | Air Weapons Station, P.O. Box 6169, Ridgecrest, CA | Navy | 3 |
| | 0027 | Amphibious Base, Little Creek, Norfolk, VA | Navy | 3 |
| | 0028 | Antarctic Support Unit, Christchurch, FPO, AP | Navy | 3 |
| | 0029 | Armed Forces Staff College, Norfolk, VA | Navy | 3 |
| | 0030 | Coastal Systems Station, Panama City, FL | Navy | 3 |
| | 0031 | Communications Station, Stockton, CA | Navy | 3 |
| | 0032 | Computers & Tele Area Station (Guam), FPO, AP | Navy | 3 |
| | 0033 | Computers & Tele Command, MA Ave, Washington, DC | Navy | 3 |
| | 0034 | Computers & Tele Station, Cutler, ME | Navy | 3 |
| | 0035 | Construction Battalion Center, Port Hueneme, CA | Navy | 3 |
| | 0036 | Construction Battalion Center, Gulfport, MS | Navy | 3 |

CONFIDENTIAL

SAGITEC-DEL_07114635

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

| | | | |
|---|---|---|---|
| 0037 | Education and Training, Pensacola, FL | Navy | 3 |
| 0038 | Education and Training, Newport, RI | Navy | 3 |
| 0039 | Fleet Activities, China, FPO, AP | Navy | 3 |
| 0040 | Fleet Activities, Okinawa, Japan, FPO, AP | Navy | 3 |
| 0041 | Fleet Activities, Sasebo, FPO, AP | Navy | 3 |
| 0042 | Fleet Activities, Yokosuka, FPO, AP | Navy | 3 |
| 0043 | Fleet & Industrial Supply, Exec. Way, Oakland, CA | Navy | 3 |
| 0044 | Fleet & Industrial Supply, Williamsburg, VA | Navy | 3 |
| 0045 | Hospital,(Guam), FPO, AP | Navy | 3 |
| 0046 | Inventory Control Point, Mechanicsburg, PA | Navy | 3 |
| 0047 | Joint Maritime Facility, St, Mawgan, FPO, AE | Navy | 3 |
| 0048 | Joint Military Affairs Group, Korea, FPO, AP | Navy | 3 |
| 0049 | Joint Services Activity, New Sanno, FPO, AP | Navy | 3 |
| 0050 | Marine Corp Barracks, 8th & I Sts. Washington, DC | Navy | 3 |
| 0051 | Medical Center, Code BEA Building 26, San Diego, CA | Navy | 3 |
| 0052 | Medical Center, Bethesda, MD | Navy | 3 |
| 0053 | Medical Center, Portsmouth, VA | Navy | 3 |
| 0054 | MWR Department, Comnavact UK, FPO, AE | Navy | 3 |
| 0055 | MWR Department, NSA, Gaeta, FPO, AE | Navy | 3 |
| 0056 | MWR Department, Naval Forces Korea, FPO, AP | Navy | 3 |
| 0057 | MWR Department, US Forces Marianas, FPO, AP | Navy | 3 |
| 0058 | MWR Department, Building 950 Code 90, Lemoore, CA | Navy | 3 |
| 0059 | MWR Department, Regulus Ave, Virginia Beach, VA | Navy | 3 |
| 0060 | NCTAMS EASTPAC, Wahiawa, HI | Navy | 3 |
| 0061 | Naval District Washington, Anacostia, Washington, DC | Navy | 3 |
| 0062 | Naval Forces Europe, FPO, AE | Navy | 3 |
| 0063 | Naval Magazine Lualualei, Waianae, HI | Navy | 3 |
| 0064 | Naval Station, Roosevelt Roads, FPO, AA | Navy | 3 |
| 0065 | Naval Station, Guantanamo Bay, Cuba, FPO, AE | Navy | 3 |
| 0066 | Naval Station, Rota Spain, FPO, AP | Navy | 3 |
| 0067 | Naval Station, Recreation Way, San Diego, CA | Navy | 3 |
| 0068 | Naval Station, Mayport, FL | Navy | 3 |
| 0069 | Naval Station, Pearl Harbor, HI | Navy | 3 |
| 0070 | Naval Station, Annapolis, MD | Navy | 3 |
| 0071 | Naval Station, Pascagoula, MS | Navy | 3 |
| 0072 | Naval Station, Ingleside, TX | Navy | 3 |
| 0073 | Naval Station, Norfolk, VA | Navy | 3 |
| 0074 | Office of Naval Intelligence, Suitland Rd, Wash, DC | Navy | 3 |
| 0075 | Ordnance Test Unit, Cape Canaveral, FL | Navy | 3 |
| 0076 | Pacific Missile Range Facility, Kekaha, HI | Navy | 3 |
| 0077 | Recreation Center, Solomons, MD | Navy | 3 |
| 0078 | Regional Contracting Center, FPO, AP | Navy | 3 |
| 0079 | Research Lab/Rec Club, Overlook Ave, Washington, DC | Navy | 3 |
| 0080 | Security Group Activity, Edzell, FPO, AE | Navy | 3 |

Index - 21

SAGITEC-DEL_07114636

Attachment II to UIPL 47-01

# Directory of Federal Agencies - **Index**

|      | 0081 | Security Group Activity, Sabana Seca, FPO, AP | Navy | 3 |
|      | 0082 | Security Group Activity, Winter Harbor, ME | Navy | 3 |
|      | 0083 | Security Group Activity, Chesapeake, Va | Navy | 3 |
|      | 0084 | Security Group Activity, Suger Grove, WV | Navy | 3 |
|      | 0085 | Security Station, Nebraska Ave, Washington, DC | Navy | 3 |
|      | 0086 | Shipyard, Portsmouth, NH | Navy | 3 |
|      | 0087 | Shipyard, (Norfolk) Portsmouth, VA | Navy | 3 |
|      | 0088 | Submarine Base (New London) Groton, CT | Navy | 3 |
|      | 0089 | Submarine Base, Kings Bay, GA | Navy | 3 |
|      | 0090 | Supply Corps School, Athens, GA | Navy | 3 |
|      | 0091 | Support Activity, Souda Bay, Crete, Greece, FPO, AP | Navy | 3 |
|      | 0092 | Support Activity, Code 45 NSAMB, Monterey, CA | Navy | 3 |
|      | 0093 | Support Activity, Naples Italy, FPO, AE | Navy | 3 |
|      | 0094 | Support Activity, New Orleans, LA | Navy | 3 |
|      | 0095 | Support Activity, (Memphis), Millington, TN | Navy | 3 |
|      | 0096 | Support Facility, Diego Garcia, FPO, AE | Navy | 3 |
|      | 0097 | Support Facility, Kami Seya, Japan, FPO, AP | Navy | 3 |
|      | 0098 | Support Facility, Pascagoula, MS | Navy | 3 |
|      | 0099 | Support Office, La Maddalena Italy, FPO, AE | Navy | 3 |
|      | 0100 | Surface Warfare Ctr, Crane, IN | Navy | 3 |
|      | 0101 | Surface Warfare, Indian Head, MD | Navy | 3 |
|      | 0102 | Surface Warfare, Dahlgren, VA | Navy | 3 |
|      | 0103 | Tech Training Center, Pensacola, FL | Navy | 3 |
|      | 0104 | Training Center, Great Lakes, IL | Navy | 3 |
|      | 0105 | Undersea Warfare Center, Keyport, WA | Navy | 3 |
|      | 0106 | Weapons Station, 10 Delta Street, Concord, CA | Navy | 3 |
|      | 0107 | Weapons Station, 800 Seal Beach Blvd, Seal Beach, CA | Navy | 3 |
|      | 0108 | Weapons Station Earle, Colts Neck, NJ | Navy | 3 |
|      | 0109 | Weapons Station, (Charleston) Goose Creek, SC | Navy | 3 |
|      | 0110 | Weapons Station, Lackey, VA | Navy | 3 |
|      | 0111 | Weapons Station, Yorktown, VA | Navy | 3 |
| 809 | 0001 | U.S. Marine Corps |  | 3 |
| 811 | 0001 | U. S. Coast Guard - Non-Appropriated Fund |  | 3 |
| 902 | 0001 | Central Intelligence Agency |  | 3 |
| 910 | 0001 | Bureau of Census |  | 1 |
| 911 | 0001 | Presidio Trust |  | 1 |

1/  Delivery Indicator:  1 = Electronic Request for Wage and Separation
                             Information
                         2 = Electronic Request for Wage Information and Mail
                             Request for Separation Information
                         3 = Mail Request for Wage ands Separation Information

Index - 22

# Exhibit 9

# UI REPORTS HANDBOOK NO. 401

## ETA 581 Contribution Operations

# CONTENTS

**A.  Facsimile of Form ETA 581** . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-3
**B.  Purpose** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-4
**C.  Due Date and Transmittal** . . . . . . . . . . . . . . . . . . . . . . . II-2-4
**D.  General Reporting Instructions** . . . . . . . . . . . . . . . . . . . . II-2-4
**E.  Definitions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-4

   1.   Report Quarter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-4
   2.   Active Employer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-4
   3.   Inactive Employer . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-4
   4.   Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-5
   5.   Contributory Employer . . . . . . . . . . . . . . . . . . . . . . . . . II-2-5
   6.   Reimbursing Employer . . . . . . . . . . . . . . . . . . . . . . . . . II-2-5
   7.   Delinquency Cutoff Date . . . . . . . . . . . . . . . . . . . . . . . . II-2-5
   8.   Wage Item . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-5
   9.   Due Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-5
  10.   Secured Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-5
  11.   Resolved Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-5
  12.   Status Determination . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-6
  13.   Newly Established Account . . . . . . . . . . . . . . . . . . . . . . II-2-6
  14.   Successor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-6
  15.   Terminated Employer . . . . . . . . . . . . . . . . . . . . . . . . . II-2-6
  16.   Receivables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-6
  17.   Estimate - Contributions Due . . . . . . . . . . . . . . . . . . . . . II-2-6
  18.   Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-6
  19.   Final Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-7
  20.   Liquidated Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-7
  21.   Declared Uncollectible . . . . . . . . . . . . . . . . . . . . . . . . . II-2-7
  22.   Aging of Receivables . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-7
  23.   Audit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-7
  24.   Large Employer Audit . . . . . . . . . . . . . . . . . . . . . . . . . II-2-8
  25.   Change Audit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-8

**F.  Item by Item Instructions** . . . . . . . . . . . . . . . . . . . . . . . II-2-8

   1.   Employer Count . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-8
   2.   Delinquency Cutoff Date, Wage Items . . . . . . . . . . . . . . . II-2-8
   3.   Employer Reports for Preceding Quarters - Contributory
       Employers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-9
   4.   Employer Reports for Preceding Quarters - Reimbursing
       Employers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-10
   5.   Outstanding Quarters and Estimated Contributions Due . . . . . II-2-11
   6.   Status Determinations . . . . . . . . . . . . . . . . . . . . . . . . II-2-12
   7.   Receivables - Contributory Employers . . . . . . . . . . . . . . . II-2-13
   8.   Age of Receivables - Contributory Employers . . . . . . . . . . . II-2-15

CONFIDENTIAL

SAGITEC-DEL_03120345

# UI REPORTS HANDBOOK NO. 401

## ETA 581 Contribution Operations

9.   Receivables - Reimbursing Employers . . . . . . . . . . . . . . . . . . . II-2-16
10.  Age of Receivables - Reimbursing Employers . . . . . . . . . . . . II-2-17
11.  Audit Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-18
12.  Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2-20

CONFIDENTIAL　　　　SAGITEC-DEL_03120346

# UI REPORTS HANDBOOK NO. 401

## ETA 581 Contribution Operations

## A. Facsimile of Form ETA 581

### ETA 581 - CONTRIBUTION OPERATIONS

Report For Quarter Ended:      Region Code:      State:

| Ln | End of Quarter Employers | | | 4. Delinquency Cutoff Date | 5. Total Wage Items Received |
|---|---|---|---|---|---|
| | 1. Contrib. | 2. Reimbur. | 3. Total | | |
| 101 | | | | | |

**EMPLOYER REPORTS FOR PRECEDING QUARTERS**

| 201 | Contributory Employers | | | Reimbursing Employers | | |
|---|---|---|---|---|---|---|
| | 6. Timely | 7. Secured | 8. Resolved | 9. Timely | 10. Secured | 11. Resolved |
| | | | | | | |
| | 12. No. Outstanding Qtrs. Prior to Report Quarter | | 13. Total Estimated Contributions Due | | | |
| | | | | | | |

**STATUS DETERMINATIONS**

| 301 | Newly Established Employers | | | Successor Employers | | | 20. Inactive Terminations |
|---|---|---|---|---|---|---|---|
| | 14. Number | 15. Time Lapse <= 90 | 16. Time Lapse <= 180 | 17. Number | 18. Time Lapse <= 90 | 19. Time Lapse <= 180 | |
| | | | | | | | |

**CONTRIBUTORY EMPLOYER RECEIVABLES**

| 401 | 21. Total Beg. Period | 22. Determ Receivable | 23. Liquidated | 24. Declared Uncollected | 25. Removed End Period | 26. Total End Period | 27. Employers Owing |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 402 | Age of Receivables | | | | | |
|---|---|---|---|---|---|---|
| | 28. 6 Months or Less | 29. 9 Months | 30. 12 Months | 31. 15 Months | 32. Over 15 Months | |
| | | | | | | |

**REIMBURSING EMPLOYER RECEIVABLES**

| 403 | 33. Total Beg. Period | 34. Determ Receivable | 35. Liquidated | 36. Declared Uncollected | 37. Removed End Period | 38. Total End Period | 39. Employers Owing |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 404 | Age of Receivables | | | | | |
|---|---|---|---|---|---|---|
| | 40. 6 Months or Less | 41. 9 Months | 42. 12 Months | 43. 15 Months | 44. Over 15 Months | |
| | | | | | | |

**AUDIT ACTIVITY**

| 501 | Number of Audits | | | 48 Calendar Quarters Audited | Total Wages Audited | | 51. Hours Spent Auditing | 52. Number Employees Misclassified as Ind.Contr. |
|---|---|---|---|---|---|---|---|---|
| | 45. Large Employers | 46. Change Audits | 47. Total Audits | | 49. Pre-Audit | 50. Post-Audit | | |
| | | | | | | | | |

| 502 | Amount Underreported | | | Amount Overreported | | |
|---|---|---|---|---|---|---|
| | 53. Total Wages | 54. Taxable Wages | 55. Contributions | 56. Total Wages | 57. Taxable Wages | 58. Contributions |
| | | | | | | |

CONFIDENTIAL

SAGITEC-DEL_03120347

## UI REPORTS HANDBOOK NO. 401

| ETA 581 Contribution Operations |
|---|

### B. Purpose

The ETA 581 report provides information on volume of work and State agency performance in determining the taxable status of employers and the processing of wage items; in the collection of past due contributions and payments in lieu of contributions, and delinquent reports; and in field audit activity.  The data provide measures of the effectiveness of the tax program.

### C.   Due Date and Transmittal

The ETA 581 report for each calendar quarter is due in the Employment and Training Administration National Office on the 20th day of the second month following the quarter to which it relates, i.e., May 20, August 20, November 20, and February 20. This report will be transmitted electronically.

### D.   General Reporting Instructions

<u>Checking the Report</u>.   Entries should be made for all items.   If no activity corresponding to the items occurred during the report period, a zero should be entered.  A report containing missing data can not be sent to the National Office but can be stored on the State's system.  Edit checks can be found in Handbook 402, Unemployment Insurance Required Reports User's Manual, Appendix C.  In addition, the sum of items 40 through 44 should equal item 38.

### E.   Definitions

1.   <u>Report Quarter</u>.  A calendar quarter (3 months) referenced on ETA reports covering a State's activities and transactions occurring within <u>or</u> existing as of the end of the quarter specified.

2.   <u>Active Employer</u>.   An "employer" (single or multi-unit) under the State unemployment compensation law, currently registered and required to file reports, during one or more of eight consecutive calendar quarters which includes the quarter being reported.

3.   <u>Inactive Employer</u>.  An employer who does not qualify for termination of coverage by reason of no longer meeting the State's definition of "EMPLOYER" but:

   a.   has notified the agency it is no longer paying wages and has been granted permission to suspend filing of quarterly reports, or

   b.   has been administratively granted permission to suspend filing quarterly reports by reason of no longer paying wages, or

CONFIDENTIAL                                                                    SAGITEC-DEL_03120348

# UI REPORTS HANDBOOK NO. 401

## ETA 581 Contribution Operations

c.   without notification to the agency or prior to administrative action by the agency, has filed quarterly reports in eight consecutive quarters showing no wages paid.  The effective date is the last day of the eighth quarter for which "no wages" reports were filed.

4.   <u>Contributions</u>.  The amount of State unemployment taxes, including voluntary payments, paid or payable into a State unemployment fund by an employer based on the taxable wages paid to an employee.

5.   <u>Contributory Employer</u>.   An employer who is required by the State unemployment compensation law to pay contributions into the State unemployment fund.  Employers of certain classes who are not required to pay contributions but elect to do so, and employers with a 0.0% contribution rate are included in the definition of "contributory employer".

6.   <u>Reimbursing Employer</u>.   Certain nonprofit organizations, State or local government and political subdivisions which elect or are required to pay into the State unemployment fund a sum in lieu of contributions as provided in the State unemployment compensation law (usually an amount equal to unemployment benefits drawn against such an employer account).

7.   <u>Delinquency Cutoff Date</u>.  The date on which employers who have not submitted contribution and wage reports for a specific quarter are notified of such by the mailing of first delinquency notices.

8.   <u>Wage Item</u>.  A statement of wages for which, as the result of regular processing, a separate record is kept in a wage record file by employee name or Social Security Account Number.

9.   <u>Due Date (Contribution Report)</u>.   The date after which the State can impose penalty and/or interest, whichever is first applicable.

10.   <u>Secured Report</u>.  A contribution report which <u>has</u> been received.  A report is <u>not</u> considered secured even if a final assessment or a ruling of non-liability has been made.

11.   <u>Resolved Report</u>.  A contribution report which <u>has</u> been received or resolved by a final assessment of tax that is legally due and collectible or by a determination of non-liability.

12.   <u>Status Determination</u>.   Any recorded administrative action that establishes, modifies, changes, inactivates or terminates an employing unit's liability as an employer under the State unemployment compensation law.

CONFIDENTIAL

SAGITEC-DEL_03120349

## UI REPORTS HANDBOOK NO. 401

### ETA 581 Contribution Operations

13. <u>Newly Established Account</u>.  An account for an employing unit which is determined, for the first time, as meeting the definition of "EMPLOYER" in the State unemployment compensation law or a previously terminated employing unit which again is determined as meeting the definition of employer.

14. <u>Successor</u>.  An employing unit which has acquired the organization, trade, or business, in whole or in part, of another employer, and is declared subject as a successor as of the day on which it meets the requirements of the State unemployment compensation law for successorship.

15. <u>Terminated Employer</u>.  An employer, who may or may not have previously been granted permission to suspend filing quarterly reports (made inactive), but has requested and been granted termination of coverage or has administratively been granted termination of coverage by reason of not meeting the definition of "EMPLOYER" in the State unemployment compensation law.

16. <u>Receivables</u>.

    a. <u>Contributory employers</u>:  past due contributions (State unemployment taxes), not including penalty and interest, which were due and payable with the employer's contribution report.  Receivables include assessments and final assessments which are legally collectible and enforceable.

    b. <u>Reimbursing employers</u>:  past due amounts for reimbursable benefit payments that were charged and billed to reimbursing employers.

17. <u>Estimate - Contributions Due</u>.  A calculation of contributions due for which a quarterly report has not yet been received.  Estimates are usually based on past experience of an employer's account, and may be a "best reasonable calculation".  An estimate may or may not be legally collectible and enforceable under the State unemployment compensation law.  Estimates for purposes of item 13 are not receivables for purposes of lines 401 and 402.

18. <u>Assessment</u>.  A liability established administratively for contributions due, usually based on an estimate and charged to an employer account with the expectation that it will be paid by the employer.  For purposes of lines 401 and 402, an assessment is a receivable only if it is legally collectible and enforceable.  It is no longer an estimate for statistical purposes of item 13.

19. <u>Final Assessment</u>.  The same as assessment but requires completion of some due process (e.g., employer notification and expiration of an appeal period) to be legally collectible under the State unemployment compensation law.

CONFIDENTIAL

SAGITEC-DEL_03120350

**UI REPORTS HANDBOOK NO. 401**

---

**ETA 581 Contribution Operations**

---

20.  <u>Liquidated Amount</u>.  An amount received or an adjustment which cancels a previously established receivable.

21.  <u>Declared Uncollectible (Write off)</u>.  A receivable amount for which all reasonable collection efforts have been exhausted and which has been officially written off and/or authorized for removal from the active accounts receivable file and transferred to suspense (no further action to be taken).

22.  <u>Aging of Receivables</u>.  The process of identifying and classifying receivable amounts according to the length of time such amounts have remained unpaid, e.g., 6 months or less, 9 months, 12 months, 15 months, over 15 months.

23.  <u>Audit</u>.  A systematic examination of an employer's books and records, using generally accepted auditing standards and procedures, covering a specified period of time during which the employer is liable for reporting under the law or, is found to be liable as a result of the examination.  An audit must:

   a.   Include an opening interview;

   b.   Cover a minimum of four calendar quarters (except as specified in <u>ES Manual</u>, Part V, Section 3675);

   c.   Verify the business entity as a sole proprietor, partnership, corporation, joint venture, or other;

   d.   Document records examined and evidence obtained in tests used to verify payroll procedure, accuracy and completeness;

   e.   Document records available and examined and the evidence obtained in the search for misclassified workers and payments;

   f.   Conclude with a close-out conference with the employer or designated representative or include an explanation if not conducted; and

   g.   Include a written report stating the auditor's final determination and all facts contributing to or supporting that final determination.

24.  <u>Large Employer Audit</u>.  An audit of an employing unit:

   a.   Reporting wages paid to 100 or more individuals during the current or preceding calendar year, or

---

CONFIDENTIAL                                                           SAGITEC-DEL_03120351

# UI REPORTS HANDBOOK NO. 401

<div style="border:1px solid">

## ETA 581 Contribution Operations

</div>

    b.    Reporting at least $1,000,000 in taxable payroll for the calendar year preceding the first quarter being audited.

25.   <u>Change Audit</u>.  An audit resulting in the discovery of wages or taxes not previously reported or reported incorrectly by the employer.  <u>Note</u>:  Delinquent employer reports obtained at the same time an audit is conducted, but are not related to any quarter covered by the audit, must not be considered in determining if the audit is a change audit.

F.   <u>Item by Item Instructions</u>

1.   <u>Employer Count</u>.  Items 1, 2, and 3 relate to the count of active employers only. Do not include inactive or terminated employers.

   <u>Note</u>:  To obtain an accurate count of the number of employers at the end of the quarter, a computer program (or other reliable tool) which identifies and counts employers who meet the definitions of active contributory employer (item 1) and active reimbursing employer (item 2) must be used.

    a.   <u>Item 1. Contributory</u>.  Enter the number of active contributory employers subject to the State unemployment compensation law at the end of the report quarter.  Include employers with a 0.0% contribution rate and employers from certain classes which are not required to pay contributions but have elected to do so.

    b.   <u>Item 2. Reimbursing</u>.  Enter the number of active reimbursing employers subject to the State unemployment compensation law at the end of the report quarter.

    c.   <u>Item 3. Total</u>.  Enter the total number of active employers (sum of items 1 and 2) subject to the State unemployment compensation law at the end of the report quarter.

2.   <u>Delinquency Cutoff Date and Wage Items Received</u>

    a.   <u>Item 4. Delinquency Cutoff Date</u>.  Enter the date on which employers, who have not submitted contribution and wage reports for the quarter preceding the report quarter, were identified and notified of such by the mailing of first delinquency notices.

    b.   <u>Item 5. Total Number of Wage Items Received</u>.  Enter the number of wage items received and processed during the quarter.

CONFIDENTIAL                                                  SAGITEC-DEL_03120352

## UI REPORTS HANDBOOK NO. 401

### ETA 581 Contribution Operations

Count "Wage Items" after initial data entry or before or during the quarterly update of the Wage Record Master File. The quarterly count should be made consistently at the same point every quarter.

If a wage record is incomplete, e.g., some elements are omitted, count only those records containing a dollar amount <u>and</u> another element which positively identifies the worker either by name or Social Security Number; or by employer name or account number. A wage item is counted only once. Corrected wage items are counted only if they were <u>not</u> previously included.

The percent of change in the number of wage items from the preceding quarter should be computed. If the percent of change (either increase or decrease) exceeds the criteria below, data should be checked further and explained under "Comments".

| <u>Number of Wage Items</u> | <u>Percent Change</u> |
|---|---|
| 5,000,000 or more | 7% |
| 3,000,000 - 4,999,999 | 10% |
| Less than 3,000,000 | 20% |

3. <u>Employer Reports for Preceding Quarters - Contributory Employers</u>

   a. <u>Item 6. Filing Timely</u>. Enter the number of contributory employers who, as of the due date, had submitted contribution reports for the quarter preceding the report quarter.

   b. <u>Item 7. Secured</u>. Enter the number of contributory employers who, as of the last day of the report quarter, had submitted contribution reports for the preceding quarter. This number includes <u>all</u> employers whose reports were actually secured (report in hand). Employers whose report delinquencies were resolved by the issuance of an assessment or estimate as well as employers found to be no longer liable are not counted as secured reports, and therefore, are not counted in this item. This count includes the number of reports filed timely in item 6.

   c. <u>Item 8. Resolved</u>. Enter the number of contributory employers who, as of the last day of the report quarter, had resolved reports for the second quarter preceding the report quarter. Employers whose report delinquencies were cleared by the issuance of an assessment or estimate as well as employers found to be no longer liable are counted as resolved reports, and therefore, are counted in this item.

   <u>Example - For items 6, 7, and 8:</u>

---

CONFIDENTIAL                                    SAGITEC-DEL_03120353

## UI REPORTS HANDBOOK NO. 401

| ETA 581 Contribution Operations |
|---|

For the report quarter ending June 30, 1999;

Timely - Enter in item 6, the number of contributory employers who as of the due date had submitted contribution reports for the quarter ending March 31, 1999,

Secured -  Enter in item 7, the number of contributory employers who, as June 30, 1999, had submitted contribution reports for the quarter ending March 31, 1999.  Do not include employers to whom assessments have been issued, or for whom determinations of non-liability have been made.

Resolved - Enter in item 8, the number of contributory employers who as of June 30, 1999, had resolved reports for the quarter ending December 31, 1998.  Include employers to whom assessments have been issued, or for whom determinations of non-liability have been made.

4.   Employer Reports for Preceding Quarters - Reimbursing Employers

a.   Item 9. Filing Timely.  Enter the number of reimbursing employers who, as of the due date, had submitted required reports for the quarter preceding the report quarter.

b.   Item 10. Secured.  Enter the number of reimbursing employers who, as of the last day of the report quarter, had submitted required reports for the immediately preceding quarter.  Do not include those employers whose delinquency was resolved because they were found to be no longer liable.

c.   Item 11. Resolved.  Enter the number of reimbursing employers who, as of the last day of the report quarter, had submitted required reports for the second quarter preceding the report quarter.  Include those employers whose delinquency was resolved because they were found to be no longer liable.

CONFIDENTIAL                                                                                          SAGITEC-DEL_03120354

# UI REPORTS HANDBOOK NO. 401

## ETA 581 Contribution Operations

Example - For items 9, 10, and 11:

For the report quarter ending June 30, 1999;

Timely - Enter in item 9, the number of reimbursing employers who, as of the due date, had submitted required reports for the quarter ending March 31, 1999,

Secured - Enter in item 10, the number of reimbursing employers who, as June 30, 1999, had submitted required reports for the quarter ending March 31, 1999. Do not include employers for whom determinations of non-liability have been made,

Resolved - Enter in item 11, the number of reimbursing employers who, as of June 30, 1999, had resolved reports for the quarter ending December 31, 1998. Include employers for whom determinations of non-liability have been made.

5.   Outstanding Quarters, Estimated Contributions Due and Wage Items

   a.   Item 12. Number of Outstanding Quarters Prior to Report Quarter. Enter the total number of quarters represented by contribution reports outstanding for all quarters prior to the report quarter. Item 12 must include quarters attributable to all delinquent contribution reports for the immediately preceding quarter, regardless of whether or not the employer has been issued an assessment. Do not include reports due from reimbursing employers.

   b.   Item 13. Total Estimated Contributions Due. Enter an estimate of the total amount of contributions due attributable to the number of outstanding quarters in item 12.

   The estimate of contributions due should be based on:

   (1)   the amount of taxable wages for the same quarter in the preceding year adjusted to the employer's contribution rate for the quarter being estimated, or

   (2)   a method which results in a "best reasonable calculation".

   The estimate for item 13 should not include intentionally inflated amounts which are assigned to employers for enforcement purposes or any assessments based on outstanding reports in item 12 for which a receivable has been established and is included on line 401. Item 13

CONFIDENTIAL                                                           SAGITEC-DEL_03120355

## UI REPORTS HANDBOOK NO. 401

### ETA 581 Contribution Operations

should represent the "truest picture" of the actual amount of contributions due.

<u>Note</u>:  Item 13 is related only to item 12 and is not to be included in any other items or calculations on this report.

6.  <u>Status Determinations - Status Determinations Made During Report Quarter</u>

a.  <u>Item 14. Number, Newly Established Employers</u>.  Enter the number of status determinations made during the report quarter which resulted in the establishment of a new account, except do not include those determinations which resulted in the establishment of a new account for a successor employer.  Include status determinations which re-established accounts for previously inactivated and/or terminated employers.

b.  <u>Item 15. Time Lapse - 90 Days or Less, Newly Established Employers</u>.  Enter the number of status determinations in item 14 that were made in 90 days or less from the end of the quarter in which liability occurred.  Count the number of calendar days from the end of the quarter in which liability occurred to the date that the status information was officially entered into the State's system.  For previously inactivated and/or terminated employers, count the number of days from the end of the quarter in which liability re-occurred.  If the status information is entered before the end of the quarter in which liability occurred or re-occurred, the determination is automatically counted in the 90 days or less time lapse category.

c.  <u>Item 16. Time Lapse - 180 Days or Less, Newly Established Employers</u>.  Enter the number of status determinations in item 14 that were made in 180 days or less from the end of the quarter in which liability occurred.  Count the number of calendar days from the end of the quarter in which liability occurred to the date that the status information was officially entered into the State's system.  For previously inactivated and/or terminated employers, count the number of days from the end of the quarter in which liability re-occurred.  This count includes the number of status determinations reported for the 90 days or less time lapse in item 15.

d.  <u>Item 17. Number, Successor Employers</u>.  Enter the number of status determinations made during the report quarter in which the State's legal definition of successorship was met and the employer was, thus, classified as a successor.  Include full and partial successorships.  Include status determinations which resulted in the establishment of new accounts for successor employers, as well as those employers who already had an

CONFIDENTIAL

SAGITEC-DEL_03120356

# UI REPORTS HANDBOOK NO. 401

## ETA 581 Contribution Operations

existing account and acquired all or a part of the business of another employer with an existing account.

Example:
Employer B, who previously has not been a subject employer, acquires and continues the business of Employer A. Employer B is determined to be a successor and is counted in item 17 as a successor rather than in item 14 as a newly established account.

Employer X, who is registered as an active subject employer, acquires and continues the business of Employer Y. Employer X is determined to be the successor to Employer Y and should also be counted in item 17.

e. <u>Item 18. Time Lapse - 90 Days or Less, Successor Employers</u>. Enter the number of status determinations in item 17 that were made in 90 days or less from the end of the quarter in which liability as a successor occurred. Count the number of calendar days from the end of the quarter in which liability occurred to the date that the status information was officially entered into the State's system. If the status information is entered before the end of the quarter in which liability occurred, the determination is automatically counted in the 90 days or less time lapse category.

f. <u>Item 19. Time Lapse - 180 Days or Less, Successor Employers</u>. Enter the number of status determinations in item 17 that were made in 180 days or less from the end of the quarter in which liability as a successor occurred. Count the number of calendar days from the end of the quarter in which liability occurred to the date that the status information was officially entered into the State's system. This count includes the number of status determinations reported for the 90 days or less time lapse in item 18.

g. <u>Item 20. Inactivations/Terminations</u>. Enter the number of employers that were made inactive or for whom coverage was terminated during the quarter. Do not include terminated employers who were first made inactive and were previously included in the count for this item at that time.

7. <u>Receivables - Contributory Employers</u>. Line 401 shows accounting control activities during the report quarter in regard to receivables due from contributory employers. Line 401 covers (as of the last day of the report quarter) all <u>known</u> receivables due for all calendar quarters prior to the report quarter.

a. <u>Item 21. Total Receivables at the Beginning of Period</u>. Enter the total amount of known past due contributions at the beginning of the period. This amount should be equal to item 26 on the previous report.

CONFIDENTIAL                                                    SAGITEC-DEL_03120357

# UI REPORTS HANDBOOK NO. 401

## ETA 581 Contribution Operations

b. <u>Item 22. Amount Determined Receivable During Report Period</u>. Enter the amount of contributions determined to be past due during the report quarter based on contribution reports received without full payment of taxes, audit findings, adjustments, legally enforceable estimates and assessments and final assessments. Include all such receivables even though they are paid later in the quarter, otherwise liquidated or declared uncollectible. Do not include estimates and assessments which are not legally collectible or enforceable. Do not include interest and penalties.

c. <u>Item 23. Receivables Liquidated During Report Period</u>. Enter amounts which were liquidated during the report quarter, other than by being declared uncollectible, which reduced the amounts in items 21 and 22. Do not include timely contributions received during the report quarter.

d. <u>Item 24. Receivables Declared Uncollectible During Report Period</u>. Enter amounts reported in items 21 and 22 that were declared uncollectible and/or transferred to suspense status during the report quarter. Do not include amounts previously reported in item 25 (receivables removed from active file at end of report period) if such amounts were later declared uncollectible.

e. <u>Item 25. Receivables Removed from Active File at End of Report Period</u>. Enter amounts included in item 21 (total receivables at beginning of period) that were reported in item 32 (over 15 months - age category) for the two immediately preceding ETA 581 report periods, but because of State policy, have not been declared uncollectible.

<u>Example</u>: A receivable amount of $500 attributable to the quarter ending June 30, 1997 was included in total receivables at the end of report period (item 26) and, for the first time, reported in the "over 15 months" age category (item 32) on the ETA 581 report for the quarter ending December 31, 1998. The $500 was not collected or declared uncollectible during the quarter ending March 31, 1999, and, therefore, was included in total receivables at the end of report period (item 26) and the "over 15 months" age category (item 32) for a second report quarter. Since item 26 (total receivables at the end of report period) on the report for the quarter ending March 31, 1999, is the same as item 21 (total receivables at beginning of report period) on the report for the quarter ending March 31, 1999, the $500 was included in item 21 on the report for the quarter ending June 30, 1999. The $500 was not collected or declared uncollectible during the quarter ending June 30, 1999, and had already been reported in the "over 15 months" age category (item 32) on reports for quarters ending December 31, 1997 and March 31, 1999. Therefore, on the report for the

CONFIDENTIAL

SAGITEC-DEL_03120358

# UI REPORTS HANDBOOK NO. 401

## ETA 581 Contribution Operations

quarter ending June 30, 1999, the $500 is reported in item 25, receivables removed at end of report period.

f.    <u>Item 26. Total Receivables at End of Report Period</u>.  Enter the total amount of past due contributions as of the last day of the period.  This amount should equal the result of the addition of items 21 and 22 minus items 23, 24, and 25.

g.    <u>Item 27. Number of Employers Owing Receivables</u>.  Enter the number of employers who owe the amount reported in item 26.

8.    <u>Age of Receivables - Contributory Employers</u>.  Line 402 separates total receivables in item 26 by amount and age.  The age of receivable amounts should be calculated from the end of the quarter for which contributions are due, i.e.: March 31, June 30, September 30, December 31, not the date on which the amount was established as past due.  Negative amounts cannot be entered in the age categories on this line.

a.    <u>Item 28. 6 Months or Less. (2 quarters or less)</u>  Enter that part of the amount in item 26 which, as of the end of the report quarter, was past due for 2 report quarters or less.  <u>Example</u>:  On the report for  quarter ending June 30, 1999, enter in item 28 amounts that were past due for quarters ending March 31, 1999 and December 31, 1998.

b.    <u>Item 29. 9 Months. (3 quarters)</u>  Enter that part of the amount in item 26 which, as of the end of the report quarter, was past due for 3 report quarters.  <u>Example</u>:  On the report for the quarter ending  June 30, 1999, enter in item 29, amounts that were past due for the quarter ending September 30, 1998.

c.    <u>Item 30. 12 Months. (4 quarters)</u>  Enter that part of the amount in item 26 which, as of the end of the report quarter, was past due for 4 report quarters.  <u>Example</u>:  On the report for the quarter ending  June 30, 1999, enter in item 30, amounts that were past due for the quarter ending June 30, 1998.

d.    <u>Item 31. 15 Months. (5 quarters)</u>  Enter that part of the amount in item 26 which, as of the end of the report quarter, was past due for 5 report quarters.  <u>Example</u>:  On the report for the quarter ending  June 30, 1999, enter in item 31, amounts that were past due for the quarter ending March 31, 1998.

e.    <u>Item 32. Over 15 Months. (6 quarters or more)</u>  Enter that part of the amount in item 26 which, as of the end of the report quarter, was past due

CONFIDENTIAL

SAGITEC-DEL_03120359

## UI REPORTS HANDBOOK NO. 401

### ETA 581 Contribution Operations

for more than 15 months; i.e., 6 or more report quarters. <u>Example</u>: On the report for the quarter ending   June 30, 1999, enter in item 32, amounts that were past due for the quarter ending December 31, 1997, and all prior quarters.

<u>Note</u>:   The sum of amounts in items 28 through 32 must equal total receivables in item 26.

9.   <u>Receivables - Reimbursing Employers</u>.   Line 403 shows accounting control activities during the report quarter for past due payments in lieu of contributions. Line 403 covers (as of the last day of the report quarter) all known past due payments in lieu of contributions for all calendar quarters prior to the report quarter.

    a.   <u>Item 33. Total Receivables at the Beginning of Period.</u>  Enter the total amount of payments in lieu of contributions known to be past due at the beginning of the period.   This figure should be equal to item 38 of the previous report.

    b.   <u>Item 34. Amount Determined Receivable During Report Period</u>.  Enter the amount of payments in lieu of contributions determined as past due during the report quarter based on current billings to reimbursing employers which are unpaid.  Do not report amounts already included in item 33.

    c.   <u>Item 35. Receivables Liquidated During Report Period</u>.  Enter the amount liquidated during the report quarter which reduced amounts in items 33 and 34 (other than by being declared uncollectible).  Do not include timely payments in lieu of contributions received during the report quarter.

    d.   <u>Item 36. Receivables Declared Uncollectible During Report Period</u>.  Enter amounts reported in items 33 and 34 that were declared uncollectible and transferred to suspense status during the report quarter.  Do not include amounts previously reported in item 37 (receivables removed from active file at end of report period) if such amounts were later declared uncollectible.

    e.   <u>Item 37. Receivables Removed from Active File at End of Report Period</u>. Enter amounts included in item 33 (total receivables at beginning of period) that were reported in item 44 (over 15 months - age category) for the two immediately preceding ETA 581 report periods, but because of State policy, have not been declared uncollectible.

    <u>Example</u>:  An amount of $600, which was determined receivable during the quarter ending June 30, 1997, was included in total receivables at the end

CONFIDENTIAL

SAGITEC-DEL_03120360

# UI REPORTS HANDBOOK NO. 401

| ETA 581 Contribution Operations |
|---|

of report period (item 38) and, for the first time, reported in the "over 15 months" age category (item 44) on the ETA 581 report for the quarter ending December 31, 1998. The $600 was not collected or declared uncollectible during the quarter ending March 31, 1999, and, therefore, was included in total receivables at the end of report period (item 38) and the "over 15 months" age category (item 44) for a second report quarter. Since item 38 (total receivables at the end of report period) on the report for the quarter ending March 31, 1999, is the same as item 33 (total receivables at beginning of report period) on the report for the quarter ending June 30, 1999, the $600 was included in item 33 on the report for the quarter ending June 30, 1999. The $600 was not collected or declared uncollectible during the quarter ending June 30, 1999, and it had already been reported in the "over 15 months" age category (item 44) on reports for quarters ending December 31, 1998 and March 31, 1999. Therefore, on the report for the quarter ending June 30, 1999, the $600 is reported in item 37, receivables removed at end of report period.

f.    Item 38. Total Receivables at End of Report Period. Enter the total amount of payments in lieu of contributions that were past due as of the last day of the report quarter. This figure should be the result of the addition of items 33 and 34 minus items 35, 36, and 37.

g.    Item 39. Number of Employers Owing Receivables. Enter the number of employers who owe the amount reported in item 38.

10.    Age of Receivables - Reimbursing Employers. Line 404 separates total receivables in item 38 by amount and age. The age of receivable amounts for reimbursing employers should be calculated from the date payment was due, not the date on which the amount was determined to be past due. Negative amounts cannot be entered in the age categories on this line.

a.    Item 40. 6 Months or Less. Enter that part of the amount in item 38 which, as of the end of the report quarter, was past due for 6 months or less.

b.    Item 41. 9 Months. Enter that part of the amount in item 38 which, as of the end of the report quarter, was past due for 9 months or less but more than 6 months.

c.    Item 42. 12 Months. Enter that part of the amount in item 38 which, as of the end of the report quarter, was past due for 12 months or less but more than 9 months.

CONFIDENTIAL                                          SAGITEC-DEL_03120361

# UI REPORTS HANDBOOK NO. 401

### ETA 581 Contribution Operations

    d.    <u>Item 43. 15 Months</u>.  Enter that part of the amount in item 38 which, as of the end of the report quarter, was past due for 15 months or less but more than 12 months.

    e.    <u>Item 44. Over 15 Months</u>.  Enter that part of the amount in item 38 which, as of the end of the quarter, was past due for more than 15 months.

    <u>Note</u>:  The sum of amounts in items 40 through 44 must equal total receivables in item 38.

11.    <u>Audit Activity</u>.  Lines 501 and 502 show transactions resulting from activities which meet the definition of "audit" as specified in Section E. 23. of these instructions and the requirements of the Field Audit Function in <u>ES Manual</u>, Part V, Sections 3670-3693. With the exception of item 49, <u>total wages audited: pre-audit</u>, do not include in amounts underreported or overreported, any wages or contributions that were reported by an employer before an audit assignment or that were obtained without resorting to an audit.  Wages and contributions attributed to a delinquent employer report which were obtained through a field assignment other than an audit, or were obtained at the same time an audit was conducted but were not within the scope of the audit, should not be reported on line 502 but should be included in items 22 and/or 23 (contributions), as appropriate.

    a.    <u>Item 45. Large Employer Audits</u>.  Enter the total number of completed large employer audits.  Item 45 can not be greater than item 47.

    b.    <u>Item 46. Change Audits</u>.  Enter the number of audits in item 46 that were change audits.  Item 46 can not be greater than item 47.

    c.    <u>Item 47. Total Audits</u>.  Enter the total number of audits completed during the report quarter.

    d.    <u>Item 48. Calendar Quarters Audited</u>.  Enter the total number of quarters audited as the result of audits reported in item 47.  Count only quarters actually audited.  Do not include quarters in which adjustments were made without auditing.

    e.    <u>Item 49. Total Wages Audited:  Pre-Audit</u>.  Enter the amount of pre-audit total wages originally reported by employers for quarters audited in item 48. Estimates and/or assessments processed to an employer's account in lieu of actual reports <u>should</u> be included in this amount.

CONFIDENTIAL                                                     SAGITEC-DEL_03120362

## UI REPORTS HANDBOOK NO. 401

| ETA 581 Contribution Operations |
|---|

f.   <u>Item 50. Total Wages Audited:  Post Audit</u>.  Enter the amount of total wages recorded in audit summaries as the result of auditing quarters in item 48.

g.   <u>Item 51. Hours Spent in Auditing</u>.  Enter the total number of hours (rounded to the nearest full hour) spent conducting the audits reported in item 47. Do not include time spent traveling to and from audit sites.

h.   <u>Item 52. Number of Employees Misclassified as Independent Contractors</u>. Enter the total number of employees discovered through audits in item 47 that were previously misclassified by the employer as independent contractors.  Count only employees discovered in quarters that were actually audited as reported in item 48.

Employees who were improperly misclassified in categories other than independent contractor can not be counted in item 52.  <u>Example</u>: Under the State law, newspaper carriers age 18 years old or younger are classified as "excluded employees" for UI purposes.  In an audit of the City Times Newspaper Co., it was discovered that all newspaper carriers, including 30 carriers over 18 years old, were being classified as "excluded employees". The 30 carriers can not be counted in item 52 because they were improperly classified as "excluded employees" not "independent contractors".

i.   <u>Item 53. Underreported Total Wages</u>.   Enter the total amount of underreported gross wages discovered as a result of quarters audited in item 48.  Do not include amounts resulting from adjustments for quarters that were not actually audited.

j.   <u>Item 54. Underreported Taxable Wages</u>.   Enter the total amount of underreported taxable wages discovered as a result of quarters audited in item 48.  Do not include amounts resulting from adjustments for quarters that were not actually audited.

k.   <u>Item 55. Underreported Contributions</u>.   Enter the total amount of underreported contributions discovered as a result of quarters audited in item 48.  Do not include penalty and interest.  Do not include amounts resulting from adjustments for quarters that were not actually audited.

l.   <u>Item 56. Overreported Total Wages</u>.   Enter the total amount of overreported gross wages discovered as a result of quarters audited in item 48.  Do not include amounts resulting from adjustments for quarters that were not actually audited.

CONFIDENTIAL                                                                                                          SAGITEC-DEL_03120363

# UI REPORTS HANDBOOK NO. 401

| ETA 581 Contribution Operations |
| --- |

m.   Item 57. Overreported Taxable Wages.   Enter the total amount of overreported taxable wages discovered as a result of quarters audited in item 48.  Do not include amounts resulting from adjustments for quarters that were not actually audited.

n.   Item 58. Overreported Contributions.   Enter the total amount of overreported contributions discovered as a result of quarters audited in item 48.  Do not include amounts resulting from adjustments for quarters that were not actually audited.

Note:  Amounts reported in items 53 through 58 must represent total amounts discovered as underreported and overreported for all audits without regard to the net effect for each individual audit.

Example:  The following audit differences were discovered in Audit A:

|  | Underreported | Overreported | Net |
| --- | --- | --- | --- |
| Total Wages | $850,000 | $1,000,000 | $150,000/over |
| Taxable Wages | 500,000 | 50,000 | 450,000/under |
| Contributions | 25,000 | 10,000 | 15,000/under |

To report audit differences from audit A on ETA 581, $850,000 should be included in item 53, $500,000 in item 54, $25,000 in item 55, $1,000,000 in item 56, $50,000 in item 57 and $10,000 in item 58.  The net differences for audit A are not to be included on the ETA 581.

12.   Comments.  Four lines are available on the electronic submittal system for comments.  Comments are appropriate under the following circumstances:

a.   Administrative Factors Affecting Data Reported.   Describe any administrative factors, such as rules and regulations, which may affect the information reported in such a way that it lacks comparability with data submitted on prior reports or on current reports submitted by the State agency.

b.   Legal Factors Affecting Data Reported.  Describe any legal factors, such as new laws or amendments to the State unemployment compensation law, which may affect the information reported in such a way that it lacks comparability with data submitted on prior reports or on current reports submitted by other State agencies.

c.   Economic Factors Affecting Data Reported.   Describe any economic factors which substantially affect the data reported by increasing or

CONFIDENTIAL                                                                                   SAGITEC-DEL_03120364

## UI REPORTS HANDBOOK NO. 401

### ETA 581 Contribution Operations

reducing the number of status determinations, subject employers, field audits, and amount of receivables in such a way that the conditions will be reflected in any of the tabulations prepared.

CONFIDENTIAL                                                                    SAGITEC-DEL_03120365

# Exhibit 10

Click Here for HTML Version

**UI REPORTS HANDBOOK NO. 401**

---

**ETA 2112 UI Financial Transaction Summary**

---

## Contents

**A.**  **Facsimile of Form ETA 2112** . . . . . . . . . . . . . . . . . . . . . . . . . . . II-1-2

**B.**  **Purpose** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-1-3

**C.**  **Due Date and Transmittal** . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-1-3

**D.**  **General Reporting Instructions** . . . . . . . . . . . . . . . . . . . . . . . . II-1-3

**E.**  **Item by Item Instructions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-1-3

    1.  Balance Brought Forward . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-1-3

    2.  Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-1-4

    3.  Disbursements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-1-6

    4.  Balance at the Close of the Month . . . . . . . . . . . . . . . . . . . . II-1-8

    5.  Withholding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-1-8

HIGHLY CONFIDENTIAL

DEL00000086

UI REPORTS HANDBOOK NO. 401

## ETA 2112 UI Financial Transaction Summary

### A.  Facsimile of Form

| ETA 2112, UI Financial Transaction Summary, Unemployment Fund | | | U.S. Department of labor<br>Employment and Training Administration | | |
|---|---|---|---|---|---|
| A. REPORT PERIOD ENDED (Month, Day, Year) | | | B. STATE | OMB Approval No. 1205-0154<br>Expiration Date: 01/03/03 | |

| ITEM<br><br>A | LN NO<br><br>B | NET TOTALS (Sum of cols. D, E, & F)<br><br>C | CLEARING ACCOUNT<br><br>D | UNEMPLOYMENT TRUST FUND ACCOUNT<br><br>E | BENEFIT PAYMENT ACCOUNT<br><br>F |
|---|---|---|---|---|---|
| BALANCE BROUGHT FORWARD | 01 | | | | |
| **DEPOSITS** | | | | | |
| Total Deposits (Lines 11-26) | 10 | | | | |
| Net UI Contributions | 11 | | | | |
| Penalty/Interest | 12 | | | | |
| U.S. Treasury Interest Credits | 13 | | | | |
| Title IX Funds(Reed Act amortization) | 14 | | | | |
| Title IX Funds (Reed Act Distribution) | 15 | | | | |
| Intra-Account Transfer | 16 | | | | |
| From Other States--Interstate Benefits | 17 | | | | |
| FECA Advances/Reimbursements - UCX | 18 | | | | |
| Reimbursable Benefit Payments — Loc.Govt. & Other Pol. Subdivisions | 19 | | | | |
| Reimbursable Benefit Payments — State Govt. including State Hospitals and State institutions of Higher Ed. | 20 | | | | |
| Reimbursable Benefit Payments — From Other Sources (Explain in Comments) | 21 | | | | |
| Federal Share Extended Benefits | 22 | | | | |
| Federal Emergency Compensation | 23 | | | | |
| FECA Advances/Reimbursements-- UCFE | 24 | | | | |
| From Other Sources (Explain in Comments) | 25 | | | | |
| From Other Sources (Explain in Comments) | 26 | | | | |
| **DISBURSEMENTS** | | | | | |
| Total Disbursements | 30 | | | | |
| Net UI Benefits | 31 | | | | |
| Net State Share Extended Benefits | 32 | | | | |
| Reimbursable Benefit Payments — Loc.Govt. & Other Pol. Subdivisions | 33 | | | | |
| Reimbursable Benefit Payments — State Govt. including State Hospitals and State institutions of Higher Education | 34 | | | | |
| Reimbursable Benefit Payments — From Other Sources (Explain in Comments) | 35 | | | | |
| FECA Net Benefit payments--UCX | 36 | | | | |
| Net Fed. Benefits — Federal Share--Regular | 37 | | | | |
| Net Fed. Benefits — Federal Share--Extended | 38 | | | | |
| Federal Emergency Compensation | 39 | | | | |
| To Other States--Interstate Benefits | 40 | | | | |
| Title IX Funds--withdrawn (Reed Act) | 41 | | | | |
| To Special Funds (Explain in Comments) | 42 | | | | |
| FECA Net Benefit Payments--UCFE | 43 | | | | |
| Intra- Account Transfer | 44 | | | | |
| Other (Explain in Comments) | 45 | | | | |
| BALANCE AT CLOSE OF MONTH (Line 01 plus line 10 minus line 30) | 46 | | | | |
| **OTHER INFORMATION** | | | | | |
| Withholding | 50 | | | | |

| COMMENTS |
|---|
| |

CERTIFICATION: I HEREBY CERTIFY THAT THE REPORT AND THE SUPPORTING SCHEDULES ATTACHED HERETO REPRESENTS A TRUE SUMMARY OF ALL FINANCIAL TRANSACTIONS MADE IN THE ACCOUNTS OF THE UNEMPLOYMENT FUND DURING THE ABOVE MONTH

| TYPED NAME AND TITLE | SIGNATURE | DATE SIGNED |
|---|---|---|
| | | |

Public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to the Office of Information Management, Department of Labor, Rm N-1301, 200 Constitution Avenue, N.W., Washington, D.C. 20210; and to the Office of Management and Budget, Paperwork Reduction Project (1205-0154), Washington, D.D. 20503

HIGHLY CONFIDENTIAL

DEL00000087

**UI REPORTS HANDBOOK NO. 401**

---

| ETA 2112 UI Financial Transaction Summary |
| --- |

## B.   Purpose

Form ETA 2112 is a monthly summary of transactions in a State unemployment fund which includes the Clearing Account, Unemployment Trust Fund Account, and Benefit Payment Account. All payments by employers (and employees where applicable) into a State unemployment fund for contributions, payments in lieu of contributions, penalty and interest, or special assessments should be accounted for in the report. Funds received from the Federal Employees Compensation Account (FECA) and the Extended Unemployment Compensation Account (EUCA) as advances or reimbursements for Federal benefit obligations paid through the benefit payment account, should be identified and reported in appropriate line items. All funds received in - passed through - or paid out of the State unemployment fund should be reflected on the ETA 2112. Form ETA 2112 provides a summary of data pertaining to State UI tax collections, regular benefits paid, Federal and State shares of extended benefits paid, third tier program benefits paid, and other transactions affecting the unemployment trust fund. In addition, it reflects specific areas where adjustments are indicated to determine the adequacy of resources available for regular unemployment benefit payments. Data from this form is also used with data from other statistical reports to study trends in financial aspects of the UI program and as a basis for solvency studies.

## C.   Due Date and Transmittal

This report is due the 1st day of the second month following the month of reference and will be transmitted electronically.

## D.   General Reporting Instructions

The data used in preparing the ETA 2112 must be obtained from the books of the State employment security agency. A properly completed ETA 2112 will accurately show the net result of all transactions in the three accounts comprising the State unemployment fund as they appear in the agency's records.

Edit checks can be found in Handbook 402, Unemployment Insurance Required Reports User's Manual, Appendix C.

## E.   Item by Item Instructions

1.   <u>Line 1.  Balance Brought Forward</u>.  Enter in the appropriate column the balance at the beginning of the month. The amounts will be those reported as Balance at the Close of the Month, line 46, on the previous month's report.

---

HIGHLY CONFIDENTIAL                                                                                   DEL00000088

**UI REPORTS HANDBOOK NO. 401**

---

| ETA 2112 UI Financial Transaction Summary |
|---|

2.   <u>Deposits</u>.

   a.   <u>Line 10.   Total Deposits</u>.   Enter the sum of lines 11 through 26 for each column.

   b.   <u>Line 11.   Net UI Contributions</u>.   Enter in columns C and D, the net contribution collections for the month.   Net contribution collections are the amount of total remittances deposited for the month including employee contributions used for unemployment compensation (ETA 8405 - total of column III) less the amounts for refunds to employers, dishonored checks, and amounts received during the month for reimbursable benefit payments, penalty and interest, and Title IX (Reed Act) Funds.

   c.   <u>Line 12.   Penalty/Interest</u>.   Enter in columns C and D the net collections of penalty, interest, and fines deposited during the month.

   d.   <u>Line 13.   U.S. Treasury Interest Credits</u>.   Enter in columns C and E the amount of interest earned on the State's account in the Unemployment Trust Fund and credited by the U.S. Treasury.   Enter this amount on the report for the first month following the end of the quarter to which the interest relates.   For example, interest for the October-December quarter should be reflected on the January report.

   e.   <u>Line 14.   Title IX Funds (Reed Act Amortization)</u>.   Enter in columns C and D the amount of Reed Act expenditures recovered during the month through amortization with Title III grant funds or other means, to be redeposited in the Unemployment Trust Fund.

   f.   <u>Line 15.   Title IX Funds (Reed Act Distribution)</u>.   Enter in columns C and E the amount received through a standard Reed Act distribution (from the ESAA to the State account in the UTF) or under a special distribution such as under the Balanced Budget Act.

   g.   <u>Line 16.   Intra-Account Transfer</u>.   Enter in column E the amount transferred during the month to the Unemployment Trust Fund from the Clearing Account.   Enter in column F the amount transferred during the month from the Unemployment Trust Fund to the Benefit Payment Account.   Enter in column C the sum of the entries made in columns E and F.   These entries should correspond with the entries made on line 44 of Disbursements.

   h.   <u>Line 17.   From Other States-Interstate Benefits</u>.   Enter in columns C and F the total amount received from other States as reimbursement of benefits paid under combined wage plans.

---

HIGHLY CONFIDENTIAL                                                                                                    DEL00000089

**UI REPORTS HANDBOOK NO. 401**

| ETA 2112 UI Financial Transaction Summary |
|---|

    i.      <u>Line 18.  FECA Advances/Reimbursements-UCX</u>.  Enter in columns C, and F amounts received as advances or reimbursements from FECA for benefit payments made under applicable Federal provisions to Ex-service Members (UCX).

    j.      <u>Line 19.  Reimbursable Benefit Payments (Local Government and Other Political Subdivisions)</u>.  Enter in columns C and D the amount received as reimbursement for benefit payments made to former employees of local governments and political subdivisions.

    k.      <u>Line 20.  Reimbursable Benefit Payments (State Government Including State Hospitals and State Institutions of Higher Learning)</u>.  Enter in columns C and D the amount received as reimbursement for benefit payments made to former employees of State governments, including State hospitals and State institutions of higher education.

    l.      <u>Line 21.  Reimbursable Benefit Payments (Nonprofit Organizations)</u>.  Enter in columns C and D the amount received as reimbursement for benefit payments made to former employees of reimbursing nonprofit organizations.

    m.      <u>Line 22.  Federal Share Extended Benefits</u>.  Enter in columns C and E Federal funds received as advances or reimbursements for the 50 percent Federal share of extended benefit payments under PL 91-373.

    n.      <u>Line 23.  Federal Emergency Compensation.</u>  Enter in columns C and E Federal funds received as advances or reimbursements for emergency compensation.

    o.      <u>Line 24.  FECA Advances/Reimbursements - UCFE</u>.  Enter in columns C and E amounts which have been received as advances or reimbursements from FECA for payment of benefits to Federal civilians (including Postal employees).

    p.      <u>Lines 25-26.  From Other Sources</u>.  Enter in columns D, E, and F, as applicable, receipts from other sources (i.e., Title XII loans, reimbursements from EUCA and recovery of FSB overpayments).  Enter in column D, penalties, fines, and/or interest collected resulting from the recovery of UCFE/UCX overpayments.  Enter in column C the sum of such transactions.  Identify the source and indicate the amount received from each in the "Comments" section.

3.    <u>Disbursements</u>.

HIGHLY CONFIDENTIAL                                                         DEL00000090

UI REPORTS HANDBOOK NO. 401

---

### ETA 2112 UI Financial Transaction Summary

---

a.    <u>Line 30.  Total Disbursements</u>.  Enter the sum of lines 31 through 45, inclusive, for each column.

b.    <u>Line 31.  Net UI Benefits</u>.  Enter in column C and F the amount of regular unemployment benefits paid to claimants during the month, including the net State portion of benefits paid former Federal employees, and ex-Service personnel.  Include benefit checks issued and cash benefits paid to all regular claimants eligible under State law.  In computing the net amount of regular unemployment benefits paid, reduce the total benefits paid by the amount of benefit refunds received from claimants during the month, also, adjustment for credit or recharge of checks by banks, or for cancellation or reissuance of benefit checks previously issued.

c.    <u>Line 32.  Net State Share-Extended Benefits</u>.  Enter in columns C and F the net State share of extended benefits paid.  This represents (plus or minus adjustments) 50 percent of any sharable extended benefits including combined wage claims, 50 percent of sharable regular benefits, and 50 percent of EB attributable to the State portion of joint UI/UCFE/UCX extended payments.  Include EB payments attributable to former employees of State and local governments for which the employer is not liable for reimbursement to the State unemployment fund.  On combined wage claims, an adjustment will be made on charges to transferring States to omit the Federal share of amounts attributed to transferred wages.

d.    <u>Line 33.  Net Reimbursable Benefit Payments (Local Government and Other Political Subdivisions)</u>.  Enter in columns C, E, and F the net amount of benefits paid which were attributable to local governments and political subdivisions subject to reimbursement.  In computing the net amount, include any extended benefits for which the employer is liable for reimbursement to the State unemployment fund.

e.    <u>Line 34.  Net Reimbursable Benefit Payments (State Government Including State Hospitals and State Institutions of Higher Education)</u>.  Enter in columns C, E, and F the net amount of benefits paid former employees of State government including State hospitals and State institutions of higher learning subject to reimbursement.  In computing the net amount, include any extended benefits paid for which the employer is liable for reimbursement to the State unemployment fund.

f.    <u>Line 35.  Net Reimbursable Benefit Payments (Nonprofit Organizations)</u>.  Enter in columns C, E and F the net amount of benefits paid former employees of reimbursing nonprofit organizations.  In computing the net amount, do not include the 50 percent Federal share of any extended

---

HIGHLY CONFIDENTIAL                                                                 DEL00000091

**UI REPORTS HANDBOOK NO. 401**

---

**ETA 2112 UI Financial Transaction Summary**

---

benefits paid. The 50 percent Federal sharable portion should be included in line 38.

g.  Line 36. FECA Net Federal Benefits - UCX. Enter in columns C and F the net Federal portion of unemployment compensation paid to former members of the armed services from funds in the benefit payment account. The total payments should be adjusted for refunds deposited during the month, credits and recharges, and cancellations and reissuances.

h.  Line 37. Net Federal Benefits (Federal Share Regular Benefits). Enter in columns C and F the net Federal share of regular compensation paid, including combined wage claims and benefit payments subject to reimbursement by nonprofit employers. This applies to those States whose regular duration of benefits exceeds 26 weeks.

i.  Line 38. Net Federal Benefits (Federal Share Extended Benefits). Enter in columns C and F the net Federal share of extended compensation paid, including combined wage claims and payments subject to reimbursement by nonprofit employers. States without a noncompensable waiting week for regular benefits should not include the first week of the Federal share of extended benefit payments on this line. The first week of the Federal share of extended benefits should be reported on line 45, columns C and F. Do not include any other transactions on this line.

j.  Line 39. Federal Emergency Compensation. Enter in column C and F the net Federal Emergency Compensation, paid for which the Federal government is liable. Examples are benefits authorized and financed by Congress during extended periods of high unemployment rates, such as the former TC, SUA, FSB, FSC and EUC programs. Identify the payment by program and amount in the "Comments" section.

k.  Line 40. To Other States-Interstate Benefits. Enter in columns C, E and F the amount transferred to other States as reimbursement for benefits paid under combined wage plans.

l.  Line 41. Title IX Funds - Withdrawn (Reed Act). Enter in columns C and E the total amount of Title IX funds withdrawn from the UTF pursuant to Section 903(c)(2) of the Social Security Act, as amended, and/or under special legislation such as under the Balanced Budget Act.

m.  Line 42. To Special Funds. Enter in columns C and D the amount transferred from the clearing account to special administration or contingent funds established under State law, and explain in the "Comments" section.

---

HIGHLY CONFIDENTIAL                                            DEL00000092

# UI REPORTS HANDBOOK NO. 401

| ETA 2112 UI Financial Transaction Summary |
|---|

n.   Line 43.  FECA Net Benefit Payments-UCFE.  Enter in columns C and F net benefit payments made during the month to former Federal civilian (including Postal) employees with funds from the FEC account.

o.   Line 44.  Intra-Account Transfer.     Enter in column D the amount transferred during the month to the Unemployment Trust Fund from the Clearing Account.  Enter in column E the amount transferred during the month from the Unemployment Trust Fund to the Benefit Payment Account.  Enter in column C the sum of the entries made in columns D and E.  These entries should correspond with the entries made on line 15 in the "Deposits" section.

p.   Line 45.  Other (Explain).  Enter in columns D, E, and F, as applicable, amounts disbursed for other purposes not included in lines 31 through 44 and explain in the "Comments" section (i.e., repayments of Title XII loans, return of outstanding Extended and Federal Supplemental Benefits balances to EUCA, CETA/PSE and non-reimbursable Federal share of extended benefits).  Enter in column E, transfers to FECA of penalties, fines, and/or interest collected resulting from the recovery of overpayments of UCFE/UCX claims.

Transfers of amounts collected as principal, penalties, fines, and/or interest resulting from the recovery of UCFE/UCX overpayments from the State's accounts in the Unemployment Trust Fund to FECA should be executed through the Treasury UTF Accounting System.  The Department of Labor, ETA should be notified of any of those transfers.

Column C is the sum of columns D, E, and F.

4.   Line 46.  Balance at the Close of the Month.  Enter in the appropriate column the balance at the close of the month.  The amount to be entered for each column will be the sum of item 1 plus item 10 minus item 30.  The amount entered in column D should agree with the clearing account balance at the end of the month as reported on form ETA 8405.  The amount entered in column F should agree with the benefit payment account balance at the end of the month as reported on form ETA 8401.

5.   Line 50.  Withholding. Enter in columns C, E and F the amount  withheld from benefits sent to the IRS for Federal income tax liabilities.

HIGHLY CONFIDENTIAL

DEL00000093

# Exhibits 11 through 13 Redacted in Their Entirety

# Exhibit 14

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Statement of Work**
**Between**
**The Division of Unemployment Assistance**
**And**
**BearingPoint, Inc.**
**For the**
**DUA Quality Unemployment System Transformation**
**(QUEST) Project**

**May 18, 2007**





1

HIGHLY CONFIDENTIAL

DEL00067743

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final
**Table of Contents**

1. INTRODUCTION ............................................................................................... 4
2. OVERVIEW, EFFECTIVE DATE AND TERM........................................... 4
3. SINGLE POINT OF CONTACT ................................................................... 5
4. SYSTEM SECURITY ...................................................................................... 6
5. ACCEPTANCE OR REJECTION PROCESS ............................................ 6
6. PROJECT MANAGEMENT ........................................................................... 7
   6.1 Project Managers ...................................................................................... 7
      6.1.1 DUA Project Manager ..................................................................... 7
      6.1.2 Vendor Project Manager ................................................................. 8
   6.2 Issue Resolution ....................................................................................... 9
   6.3 Changes in Scope of Work ..................................................................... 9
   6.4 Key Personnel ........................................................................................... 9
   6.5 Equipment, Work Space, Office Supplies ......................................... 10
   6.6 Related Project Knowledge .................................................................. 11
   6.7 IP Agreement for Vendor's Employees, Contractors and Agents ......................... 11
   6.8 Project Responsibilities ........................................................................ 11
7. ADDITIONAL TERMS .................................................................................. 11
   7.1 Definitions................................................................................................ 11
   7.2 Code Review ............................................................................................ 11
   7.3 Warranty ................................................................................................... 12
   7.4 Title and Intellectual Property Rights ................................................ 12
      7.4.1 Definition of Property ................................................................... 12
      7.4.2 Source of Property ......................................................................... 13
      7.4.3 Contractor Property and License .............................................. 13
      7.4.4 Commonwealth Property ............................................................. 15
      7.4.5 Clearance.......................................................................................... 16
   7.5 DUA's Responsibilities .......................................................................... 16
   7.6 Software Configuration Management Procedures ............................ 17
   7.7 Other Terms ............................................................................................. 17
8. PROJECT SCOPE AND MILESTONES..................................................... 18
   8.1 Project Scope ........................................................................................... 18
   8.2 Task Descriptions .................................................................................... 18
   8.3 Milestones by Fiscal Year (FY2007 – FY2011)................................. 22
9. DELIVERABLE SCHEDULE AND PAYMENT TERMS......................... 23
   9.1 FY2007 (June 2007) ............................................................................... 24
   9.2 FY2008 (July 2007 to June 2008)........................................................ 24
   9.3 FY2009 (July 2008 to June 2009)........................................................ 25
   9.4 FY2010 (July 2009 to June 2010)........................................................ 26
   9.5 FY2011 (July 2010 to June 2011)........................................................ 28
   9.6 Total Cost, all Deliverables.................................................................. 29
   9.7 Statement of Work Assumptions and Conditions............................. 29
   9.8 Project Tools ............................................................................................ 36

 

2

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

Appendix A: Deliverable Acceptance Criteria (Example) ................................................. 40
Appendix B: Deliverable Acceptance Form....................................................................... 41
Appendix C: CORI ............................................................................................................. 42
Appendix D: Information Technology Resource Policy .................................................... 43
Appendix E: Confidentiality Statement............................................................................. 48
Appendix F: IP Agreement for Vendor's employees etc................................................... 49
Appendix G: Scope, Use Case Statements ........................................................................ 53
    Revenue Increment .................................................................................................. 53
    Benefits Increment ................................................................................................... 65
Appendix H: DOR Confidentiality Acknowledgement..................................................... 94





3

DEL00067745

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# 1. INTRODUCTION

This document will serve as a statement of work (SOW) between the Department of Workforce Development (DWD), Division of Unemployment Assistance (DUA), and BearingPoint, Inc. ("BearingPoint") to apply to work on the DUA QUEST Project (QUEST). For the purposes of this Statement of Work, BearingPoint will function as the prime contractor. Any subcontractors identified by BearingPoint in their proposal to DUA are hereby accepted and approved by DUA. The entire agreement between the parties (the "Agreement") consists of the following documents in the following order of precedence:

The Standard Terms and Conditions

The Commonwealth's Standard Form Contract

RFR ITS23

BearingPoint's response to RFR ITS23

This SOW

RFQ DUA_QUEST_06-06 as amended plus Vendor Questions and Answers

BearingPoint's Response to RFQ DUA_QUEST_06-06

# 2. OVERVIEW, EFFECTIVE DATE AND TERM

The Vision of the DUA QUEST Project is to design and implement a comprehensive set of Unemployment Insurance (UI), UI Health Insurance processes and an Unemployment information system solution that when completed defines the standard of quality in state unemployment services.

1. Re-engineer the UI business model (subject to approval from Sponsors and Steering Committee).

2. Define the Business Requirements

3. Design and implement a software solution that represents the process model, business requirements and the needs of DUA.

4. Design appropriate technology architecture to support solution and business requirements

5. Develop an Implementation plan that minimizes any risk to the DUA business.

   a. System Performance and User Acceptance Testing

   b. Data Migration, (historical data)




4

HIGHLY CONFIDENTIAL

DEL00067746

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

    c. Training Plan

    d. Cutover Plan, (open claims, active accounts)

6. The DUA Project Manager will ensure that sufficient DUA process and technical expertise is created internal to DUA to provide design, development and implementation skills throughout the duration of the project and more importantly, these experts will remain in-house to maintain and adapt the completed QUEST solution to future demands.

Each Deliverable agreed to be provided under this SOW will be approved by the DUA Project Manager after review and acceptance by the DUA QUEST Project Team and Steering Committee pursuant to the acceptance process specified in section 5 of this SOW.

This SOW shall become effective on the date on which it is executed by both parties and shall terminate on July 31, 2011, unless terminated or expired earlier pursuant to the terms of this SOW. Notwithstanding the foregoing, sections 7.3, 7.4 and 9 shall survive the termination of this SOW.

The term of this SOW, subject to the terms, assumptions and conditions of this Agreement, shall be 50 months commencing on June 1, 2007 and ending on July 31, 2011.

# 3. SINGLE POINT OF CONTACT

BearingPoint and DUA will each assign a single point of project management contact with respect to this SOW. It is anticipated that the contact person will not change during the period the SOW is in force. In the event that a change is necessary, the party requesting the change will provide prompt written notice to the other. In the event a change occurs because of a non-emergency, two-week written notice is required. For a change resulting from an emergency, prompt notice is required.

 BearingPoint's contact person is:

David Czelusniak
Senior Manager
2 Hampshire Street Suite 410
Foxboro, MA 02035
Phone: 508-216-2397
Email: david.czelusniak@bearingpoint.com

DUA's contact person is:

Robert Velten
Director DUA Technology
19 Staniford Street
Boston, MA 02114
Phone: 617-626-6599





5

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

Email: rvelten@detma.org

# 4. SYSTEM SECURITY

As part of its work effort, BearingPoint will be required to use Commonwealth data and IT resources in order to fulfill part of its specified tasks. For purposes of this work effort, "Commonwealth Data" shall mean data provided by DUA to BearingPoint, which will physically reside at a DUA location. In connection with such data that would be in BearingPoint's possession and custody for the purposes of the Project, BearingPoint will implement commercially reasonable safeguards necessary to:

- Prevent unauthorized access to Commonwealth Data from any public or private network

- Prevent unauthorized physical access to any information technology resources involved in the development effort and

- Prevent interception and manipulation of data during transmission to and from any servers.

BearingPoint will notify DUA immediately when it learns if any breaches to any system have occurred causing possible unauthorized access to, interception of and/or manipulation of Commonwealth Data.

# 5. ACCEPTANCE OR REJECTION PROCESS

BearingPoint will submit the required deliverables specified in this SOW to the DUA Project Manager for approval and acceptance. DUA will review work product for each of the deliverables and evaluate whether each deliverable has clearly met in all material respects the criteria established in this SOW and the relevant specifications.

BearingPoint and DUA will incorporate the use of Deliverable Expectations Documents (DED) in order to further define the contents and scope of each deliverable. The DED documents will include the purpose of each deliverable, the assumptions and constraints for each deliverable and the approach for each deliverable. DUA will develop acceptance criteria for each deliverable and achieve agreement with BearingPoint on the Acceptance Criteria. In the event the parties cannot agree on any DED or the Acceptance Criteria, the parties shall escalate the issue for resolution pursuant to clause 6.2 herein. DUA and the QUEST project will use the acceptance criteria documented by DUA, using the process described above, in order to determine if deliverables are complete and accepted. Once reviewed and favorably evaluated, the deliverables will be deemed acceptable.

Unless another acceptance period has been agreed to in a DED for a particular deliverable, within ten (10) business days of receipt of each deliverable, the DUA Project Manager will notify BearingPoint, in writing, of the acceptance or rejection of said deliverable using the acceptance criteria specified in this section or as specifically agreed pursuant to this SOW between the parties for the particular deliverable. A form signed by DUA shall indicate acceptance or rejection, (see the form attached in Appendix B). BearingPoint shall acknowledge receipt of the form in writing. Any rejection will





6

include a written description of the defects of the deliverable. Failure of DUA to accept or reject the deliverable within the specified period, or DUA's using the deliverable in its business environment, will constitute acceptance by DUA and the Commonwealth of the said deliverable. Deliverables accepted at any stage of the QUEST project shall be deemed accepted for any subsequent stages of QUEST.

Unless another specific period has been agreed to in a DED for a particular deliverable, BearingPoint upon receipt of a deliverable rejection will act within ten (10) business days to correct the specified defects and deliver an updated version of the deliverable to DUA. DUA will then have an additional 5 (five) business days from receipt of the updated deliverable to notify BearingPoint, in writing, of the acceptance or rejection of the updated deliverable. Any such rejections will include a description of the way in which the updated deliverable fails to correct the previously reported deficiency. No additional deficiencies will be raised through additional review. Rather, the additional DUA review is to confirm that previously reported deficiencies have been addressed. DUA and BearingPoint will each have the opportunity to negotiate an extended Acceptance/Rejection date or cure period, as applicable, if the work product or deliverable is of significant size to warrant it. Following any acceptance of a deliverable which requires additional work to be entirely compliant with the pertinent deliverable design specifications, and until the next delivery, BearingPoint will use reasonable efforts to provide a prompt correction or workaround.

# 6. PROJECT MANAGEMENT

## *6.1 Project Managers*

### 6.1.1 DUA Project Manager

Project management of this engagement will be performed by DUA. DUA's project manager will:

- Work closely with BearingPoint's Project Manager to ensure successful completion of the project.
- Ensure that the DUA QUEST Project Team and BearingPoint are working together to complete project tasks and deliverables.
- Work with BearingPoint's Project Manager to develop the Project Management Plan and approve any/all plans.
- Agree with BearingPoint on all project artifacts to be created and maintained as part of the project.
- Review weekly status reports and conduct weekly meetings with BearingPoint and DUA QUEST Project Team, as necessary.
- Coordinate participation with assistance from DUA QUEST Project Team from DUA, DWD, other Agencies or software vendors as required during the engagement.

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

- Coordinate DUA's review of the deliverables and sign an acceptance form to signify acceptance for each accepted deliverable.

- Provide DUA dedicated project staff as follows, (dedicated staff will arrange for additional DUA staff participation as needed):

  o Benefits Team Leader: Jane Welch, (3 additional members)

  o Revenue Team Leader: Theresa DeMarco, (2 additional members)

  o Appeals/Hearings Team Lead: Mark Dobbins

  o Program Integrity Team Lead: Joan Pearson

  o QUEST Project Team Lead: Harriet Mermes, (BOR Team Lead)

  o QUEST Technical Team Lead: Ken Zimmerman, (5 additional members)

    4 .NET developers provided by DUA will be focused on the following:

    ▪ System Interfaces, such as 1099/IRS, TPA downloadable files and legacy system interfaces

    ▪ Reports such as ETA, economic research and other management reports

    ▪ QUEST development tasks as assigned

  o Finance/Economic Research Team Lead: TBD

DUA's Project Manager reports to Ed Malmborg, DUA Director, who reports to Suzanne Bump, Secretary, Executive Office of Labor and Workforce Development.

Robert Velten, DUA Project Manager will work directly with BearingPoint's Project Manager. Ed Malmborg, Director DUA will sign this SOW and all amendments hereto on behalf of DUA.

## 6.1.2 Vendor Project Manager

The BearingPoint Project Manager will:

- Serve as an interface between the DUA Project Manager and all BearingPoint personnel participating in this engagement.

- Develop and maintain the Project Management Plan, in consultation with the DUA Project Manager.

- Facilitate regular communication with the DUA Project Manager, including weekly status reports/updates, and review the project performance against the project plan.

- Facilitate weekly project status meetings for the duration of the engagement.

- Update the project plan on a weekly basis and distribute plan with status at weekly meetings for the duration of the engagement.




8

HIGHLY CONFIDENTIAL

- Develop plans to mitigate project issues or risks and obtain approval from the DUA Project Manager.

- Sign acceptance forms to acknowledge their receipt from DUA.

- Be responsible for the management and deployment of BearingPoint personnel.

  Jonathan Slusarz, BearingPoint's Project Manager reports to David Minkkinen, Project Managing Director, who reports to Kathy Karich, Regional Managing Director, who reports to Catherine Pomanti, Executive Vice President and SLED Leader. Either Kathy Karich or Catherine Pomanti, being the authorized signatories named in BearingPoint's response to ITS23, will sign this SOW and all amendments thereto on behalf of BearingPoint.

## 6.2 Issue Resolution

The project managers from each organization bear the primary responsibility for ensuring issue resolution. If they determine that they are unable to resolve an issue, they are responsible for escalating the issue to Ed Malmborg, DUA Director and Kathy Karich, BearingPoint Regional Managing Director for resolution.

## 6.3 Changes in Scope of Work

The project manager who would like to request a change in scope, schedule or price for this engagement will provide the suggested change in writing to the other parties' project manager. The project managers will jointly determine whether the change impacts the schedule and/or cost. The parties can mutually agree to the change through a written amendment to this SOW but any scope, schedule or price change requires the approval of the Steering Committee. No change shall become effective unless agreed upon in writing by both parties. If either party's act or omission to perform its obligation(s) hereunder has an adverse effect on the performance of the project, including without limitation causing delays, the affected party shall notify the other party of such adverse effect in writing. If, in the opinion of the affected party, the adverse effect requires any change in the project's scope, schedule or pricing, such party should propose such change pursuant to this clause 6.3. If the project managers cannot agree on any change proposed pursuant to this clause 6.3 in a reasonable time (not to exceed 5 days), the issue shall be escalated for resolution pursuant to clause 6.2 above. It is anticipated that early in the project the parties will develop and mutually agree a Change Order Procedure that will be applicable for any changes in scope, schedule or price proposed pursuant to this SOW.

## 6.4 Key Personnel

BearingPoint agrees to provide the following personnel for the following amounts of time for the duration of this project:





9

HIGHLY CONFIDENTIAL

DEL00067751

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final
**TABLE 1**
**KEY PERSONNEL**

| Staff Members | Role | Time Commitment expressed as percentage of full time |
|---|---|---|
| Jonathan Slusarz | Project Manager | 100% |
| Joe Valorose | Benefits Leader | 100% during Benefits Increment |
| Harpreet Kaur | Revenue Leader | 100% during Revenue Increment |
| Marcellus Mascarenhas | Technical Team Leader | 100% |

BearingPoint will assign all of the foregoing key personnel to this engagement on the time basis set forth in Table 1. DUA requires that all key personnel remain on the project throughout the life of their specific project assignment, (exclusive of vacation, sick leave, training or administrative tasks). BearingPoint's key personnel on this project and under this SOW is defined as follows: 1) Project Manager; 2) Benefits Leader; 3) Revenue Leader; 4) Technical Team Leader. In the event that a change in the key personnel is necessary as a result of an emergency or other event, prompt written notice shall be provided by the BearingPoint Project Manager. In the event of a replacement of the key personnel due to circumstances beyond BearingPoint's reasonable control (including without limitation due to the key personnel's illness or incapacity, departure from BearingPoint, personal reasons or if the personnel's performance is in BearingPoint's opinion unsatisfactory), BearingPoint shall tender to the DUA Project Manager resume(s) of the proposed replacement within ten (10) business days of BearingPoint's knowledge of the key personnel's departure. BearingPoint is expected to provide replacement personnel with equal or better skill sets and experiences as the departing personnel.

Non-key personnel assigned by BearingPoint must meet with DUA approval, such approval will not be unreasonably withheld and will not interfere with BearingPoint's ability to deliver the project.

BearingPoint will be required to complete a "request" for Criminal Offender Record Information (Appendix C) for all staff participating in this engagement. Each member of the BearingPoint Team read and sign an Information Technology Resource Policy (Appendix D), the Confidentiality Statement (Appendix E), and the DOR Confidentiality Acknowledgement for wage records (Appendix H) as designated by DUA and attached as indicated. Failure to complete and/or sign these documents or if the CORI reveals matters that DUA deems inappropriate will disqualify the individual/s from participating in this engagement.

## 6.5 Equipment, Work Space, Office Supplies

DUA will provide one office, workspace for up to 35 BearingPoint Project team members, standard office equipment, and standard network connectivity and access to DUA systems provided to state employees for BearingPoint team members working on-





10

DEL00067752

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

site for activities defined in Project deliverables, as required by this SOW. DUA is providing a common Project workspace for all DUA and BearingPoint project team members. Two conference rooms (capacity 8-10) will be made available to the project team during the project and testing and training areas will be provided by DUA. DUA will provide administrative support to BearingPoint for scheduling meetings. BearingPoint will submit a list of employees who will need access to the building and to state systems as required for execution of this SOW.

## 6.6 Related Project Knowledge

In addition to the "Statewide Contract IT Specifications" and all other terms of ITS23, BearingPoint shall, prior to commencing any other work under this SOW, become familiar with the following documents: DUA QUEST Program Initiation Document and DUA QUEST BPR Vision Document.

## 6.7 IP Agreement for Vendor's Employees, Contractors and Agents

BearingPoint shall ensure that all BearingPoint personnel providing services under this SOW, regardless of whether they are BearingPoint's employees, contractors, or agents, shall, prior to rendering any services under this SOW, sign the "Intellectual Property Agreement for Vendor's Employees, Contractors and Agents," in a form attached as Appendix F hereof which is included as one of the ITS23 documents, and return signed copies of the same to the DUA Project Manager prior to the delivery of any services under this SOW.

## 6.8 Project Responsibilities

Due to the size and complexity of the QUEST Project, DUA and BearingPoint each have responsibilities to the project and each other to ensure that the project is delivered successfully. To the extent that either party can not meet their responsibilities for any reason, either party can invoke the procedures outlined in section 6.2 and/or 6.3 of this SOW.

# 7. ADDITIONAL TERMS

## 7.1 Definitions

The terms used in this SOW, unless defined herein, shall have the meaning ascribed to them in the other documents that constitute the Agreement between the parties as stated within section 1 of this document.

## 7.2 Code Review

BearingPoint shall comply with the code review policy as mutually agreed to in writing between the parties.





11

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

## 7.3 Warranty

BearingPoint's services shall be performed in a professional and workmanlike manner and in accordance with the detailed design specifications as agreed between the parties in writing (referred to herein also as "Rational Design Artifacts"). BearingPoint warrants that for a period of ninety (90) days following delivery ("Warranty Period") (1) the deliverables will substantially conform to the detailed design specifications as agreed between the parties in writing; (2) all media on which BearingPoint provides any software under this SOW shall be free from defects; (3) all code developed and delivered by BearingPoint, (exclusive of third party software purchased by DUA) under this SOW shall be free of Trojan horses, back doors, and other malicious code in the code developed by BearingPoint for this QUEST project; and (4) all software delivered by BearingPoint shall perform in all material respects in conformance with the detailed design specifications ('Rational Design Artifacts') agreed to in writing between the parties.    Any material nonconformance that prevents the operation of a system component identified in Appendix G (a Use Case or collection of Use Cases), or prevents users from proceeding with the correct workflow which requires a workaround that is identified in writing during the Warranty Period (defined hereinafter as "Defect") will be repaired by BearingPoint at their expense.    All other non-conformities will be addressed internally by DUA personnel or pursuant to a separate maintenance agreement that may be agreed between the parties. In no event shall BearingPoint be responsible for non-conformities caused by DUA or its personnel or contractors, or caused by third party products or services, including without limitation network or connection based non-conformities. It is DUA's responsibility to assess the cause and severity of an issue prior to invoking BearingPoint warranty.    In the event BearingPoint concludes that an issue claimed by DUA under the preceding warranty is not covered by the BearingPoint warranty and DUA agrees with this conclusion, BearingPoint may charge DUA based on its standard rates for the time spent investigating or fixing the issue.    THESE ARE THE EXPRESS WARRANTIES WITH RESPECT TO THE DELIVERABLES AND SOFTWARE UNDER THIS PROJECT. BEARINGPOINT DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. Any changes, repairs, modifications, adjustments or other fixes made by DUA, its personnel or contractors to the QUEST solution and not approved in writing by BearingPoint shall void BearingPoint warranty for the impacted portion of QUEST. If the parties cannot come to agreement, the issue will be escalated in accordance with section 6.2 of this SOW in order to determine if the issue is within or outside the warranty and where such item is outside of the warranty, DUA shall compensate BearingPoint as provided for above.

## 7.4 Title and Intellectual Property Rights

### 7.4.1 Definition of Property

The intellectual property required by BearingPoint to develop, and/or install and test QUEST (hereinafter the "Property") may consist of computer programs (in object and source code form), scripts, data, documentation, the audio, visual and audiovisual content




12

HIGHLY CONFIDENTIAL

related to the layout and graphic presentation of the QUEST solution, text, photographs, video, pictures, animation, sound recordings, training materials, images, techniques, methods, algorithms, program images, text visible on the Internet, HTML code and images, illustrations, graphics, pages, storyboards, writings, drawings, sketches, models, samples, data, other technical or business information, and other works of authorship fixed in any tangible medium. The QUEST solution is an unemployment insurance information system involving intellectual property derived from three sources described below in clause 7.4.2 and with technical and functional specifications in accordance with this SOW ("QUEST").

## 7.4.2 Source of Property

This engagement will involve intellectual property derived from three different sources: (1) third party software and other products' (as specified in section 9.8 of this SOW to be licensed/obtained by DUA, including without limitation Microsoft, Oracle, IIS, Filenet) and any derivative works thereof ("Third Party Property"); (2) BearingPoint owned or licensed preexisting or proprietary software, solutions or other proprietary material and information (including without limitation ProvenCourse Methodology and uFACTS, but excluding Third Party Property and derivative works thereof.) and derivative works created for DUA based on the BearingPoint owned or licensed preexisting or proprietary software, solutions or other proprietary material and information (altogether herein "Contractor Property") and (3) software and material and information developed by BearingPoint in the course of developing the QUEST solution and specifically for the purposes of delivering QUEST to DUA under this SOW and other than Contractor Property or Third Party Property or derivative work thereof ("QUEST IP") . Ownership of the first category of intellectual property is addressed in separate agreements between the DUA and the third party contractors and resellers of such software.  The following paragraphs of the Statement of Work address ownership rights in the second and third categories of intellectual property. For the purposes of this SOW, derivative works shall mean works defined as derivative works in 17 U.S.C.§ 101 and further defined as all Developments and Property associated with the migration of the uFACTS Solution Framework to a .NET architecture/application including but not limited to all core unemployment insurance functions but excluding specific Commonwealth of Massachusetts requirements that are developed originally and exclusively for DUA.

## 7.4.3 Contractor Property and License

BearingPoint will retain all right, title and interest in and to all Contractor Property. DUA acknowledges and agrees that its possession, installation or use of Contractor Property will not transfer to it any title or ownership to such Contractor Property. DUA further acknowledges and agrees that the uFACTS Unemployment Insurance Solution (which will be the basis for the QUEST solution), excluding the Third Party Property, is BearingPoint's proprietary technology and/or is licensed to BearingPoint such that the technology and its source code are considered a trade secret of BearingPoint or third party licensor.





13

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

DUA acknowledges that the Contractor Property contains or constitutes commercially valuable and proprietary trade secrets of the Contractor or other third parties, the development of which involved the expenditure of substantial time and money and the use of skilled development experts. DUA acknowledges that the Contractor Property is being disclosed to DUA to be used only as expressly permitted under the terms of this SOW and the license specified herein. DUA will take no affirmative steps to disclose such information to third parties, and, if required to do so under the Commonwealth's Public Records Law, M.G.L. c. 66, S 10, or by legal process, will promptly notify BearingPoint of the imminent disclosure so that BearingPoint can take steps to defend itself against such disclosure.

Except as expressly authorized in this clause 7.4 of the Statement of Work, DUA will not copy, modify, distribute or transfer by any means, display, sublicense, rent, reverse engineer, decompile or disassemble the Contractor Property.

Subject to the terms herein and upon the full and final payment for the deliverables containing the Contractor Property, BearingPoint grants to DUA and the Commonwealth a fully-paid, royalty-free, non-exclusive, non-transferable, worldwide, irrevocable, perpetual, license to use the Contractor Property by DUA with the deliverable provided to DUA by BearingPoint, and to make, or grant a limited sublicense to third party contractors to make, use, reproduce, distribute, modify, reverse engineer, decompile or disassemble or create derivative works based upon the Contractor Property solely for DUA's needs related to the QUEST solution, in any media now known or hereafter known, but only to the extent reasonably necessary for DUA's use and exploitation of the deliverables within the QUEST solution. The foregoing license expressly prohibits DUA or DUA's contractors to make, use, license, modify or create derivative works of the Contractor Property for reasons other than for the use in relation with the QUEST solution by DUA. In the event the Commonwealth does not provide funding for the work under this SOW, or does not fully fund the work hereunder at any stage, the license granted pursuant to this paragraph of 7.4.3 is hereby restricted so that no third party vendors or contractors of DUA will be authorized to make, use, license, the Contractor Property. In the event of agency reorganization within Commonwealth, the rights and obligations of DUA herein shall be applicable to DUA's successor agency.

Notwithstanding anything contained herein to the contrary, and notwithstanding DUA's use of the Contractor Property under the license created herein, BearingPoint shall have all the rights and incidents of ownership with respect to the Contractor Property, including the right to use such property for any purpose whatsoever and to grant licenses in the same to third parties.

During the term of the associated Statement of Work and immediately upon any expiration or termination thereof for any reason, BearingPoint will provide to DUA the most current copies of any Contractor Property to which DUA has rights pursuant to the foregoing, including any related documentation.





14

*DUA QUEST Project*
*Division of Unemployment Assistance*
*BearingPoint SOW- Revision 4.0 Final*

### 7.4.4 Commonwealth Property

In conformance with the Commonwealth's Standard Terms and Conditions, on the date on which DUA reimburses BearingPoint for a deliverable accepted by DUA under the terms of this Statement of Work, all of BearingPoint's right, title and interest in the QUEST IP developed originally and exclusively by BearingPoint under the terms of this Statement of Work for the purposes of DUA's QUEST project shall pass to and vest in the Commonwealth, including all copyright, patent, trade secret, trademark and other intellectual property rights created by BearingPoint in the QUEST IP, and any causes of action relating to or based upon such work (hereinafter the "Commonwealth Property"). Subject to clause 7.4.3., BearingPoint hereby assigns to the Commonwealth as of the date on which DUA reimburses BearingPoint for such deliverables, all intellectual property rights in the QUEST IP that it may now or hereafter possess in the Commonwealth Property related to such deliverable and all derivative works thereof. BearingPoint also agrees to execute all documents and take all actions that may be reasonably necessary to confirm such rights, including providing any code originally developed under this SOW and used exclusively to develop such Commonwealth Property for DUA and the documentation for such code. BearingPoint acknowledges that there are currently and that there may be future rights that the Commonwealth may otherwise become entitled to with respect to Commonwealth property that does not yet exist, as well as new uses, media, means and forms of exploitation, current or future technology yet to be developed, and that BearingPoint specifically intends the foregoing ownership or rights by the Commonwealth to include all such now known or unknown uses, media and forms of exploitation.

BearingPoint agrees to take such actions as may be reasonably requested by DUA to evidence the transfer of ownership of or license to intellectual property rights described in this section.

DUA expressly acknowledges that BearingPoint will continue to market and sell Contractor Property, including the uFACTS Framework and Solution and its derivative works to other clients. Nothing in this SOW shall be deemed to transfer or assign BearingPoint's rights in or concerning the uFACTS framework and solution, including without limitation BearingPoint's right to continue to use, modify, enhance, expand and create derivatives of the uFACTS framework or solution for itself or others. For the purposes of clarification, DUA acknowledges that nothing in this clause 7.4.4 or the SOW prevents BearingPoint from developing and using deliverables similar to the deliverables provided to DUA under this SOW for its own purposes or for third parties, as long as BearingPoint does not use or disclose DUA's confidential information or material. Any knowledge, principles or experience learned, obtained or remembered by BearingPoint in implementing QUEST for DUA can be used by BearingPoint and its personnel again for BearingPoint or others.





15

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

DUA and BearingPoint expressly acknowledge the rights, obligations and interest associated with the ownership and licensing of the intellectual property rights herein, including but not limited to this Section 7.4 and Appendix F, are material to both parties and reflect the parties' agreement and intent. The parties further acknowledge the clarifications to the intellectual property rights in this Statement of Work were negotiated and entered into with the expectation they are fully enforceable. Should any questions or issues arise relative to the clarifications, the parties agree to negotiate in good faith to resolve the questions or issues in a way that gives the greatest effect to the parties' agreement and intent. In the event any of the Contractor Property, as defined herein, is subsequently determined to be the Commonwealth Property then all such transferred Contractor Property shall be subject to the following: DUA hereby grants to BearingPoint permission to use the Commonwealth Property with a right to copy, reproduce, distribute, reverse engineer, decompile, disassemble, modify, license, sub-license, create and use all derivative works based upon the Commonwealth Property for itself or others, to the extent that no confidential information of DUA is disclosed to any third parties.

### 7.4.5 Clearance

BearingPoint will not be responsible for providing any third party hardware or software for the purposes of the QUEST solution implementation. All third party software and hardware for the QUEST solution will be purchased or licensed directly by DUA. DUA represents to BearingPoint that it has obtained or will obtain all rights, grants, assignments, conveyances, licenses, permissions and authorizations necessary or incidental to any materials owned by third parties supplied or specified by it for incorporation in the deliverables to be used or developed for DUA under the QUEST solution. With respect to any services performed on the QUEST solution's deliverables by BearingPoint subcontractors, BearingPoint represents to DUA that it has obtained or will obtain all rights, grants, assignments, conveyances, licenses, permissions and authorizations necessary or incidental to any materials owned by these subcontractors supplied or specified by it for incorporation in the deliverables to be developed for DUA under QUEST.

## 7.5 DUA's Responsibilities

In addition to the tasks set forth in section 6.5 Equipment, Work Space, Office Supplies, DUA shall be responsible for the following:

DUA's Project Manager will procure all hardware and third party software for the QUEST software solution including development, test, production and Disaster Recovery hardware; required commercial off the shelf software including Microsoft O/S, IIS, Oracle and Filenet. A Microsoft Sharepoint Project Server will be provided to maintain project documentation and IBM Requisite Pro software will be provided with 25 virtual licenses to record and track "requirements".

**Changes to Source Systems** – DUA is responsible for any application modifications (if necessary) to existing DUA legacy systems.




16

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Hardware and Software** – DUA will provide the network and operating infrastructure necessary to support the QUEST System such as network connectivity, server back ups, appropriate fire walls, redundant equipment (e.g., Application Servers), etc. DUA will provide the Oracle database software and sufficient licenses to support the QUEST System. DUA will purchase, install and configure for use, all required hardware and software prior to the development of the QUEST System. DUA will pay for all hardware and software and its installation and configuration, (non-UI solution software) for all technical environments.

**Software Licensing -** DUA will provide third party software for the project as indicated in section 9.8 Project Tools.

**Network Operations** – DUA is responsible for network redundancy, performance and availability (e.g., redundant NICs, switches, capacity, etc.).

**Systems Management** – DUA will use its existing network management tools and processes for monitoring hardware performance, security threats, backup, disaster recovery, etc.

DUA shall cooperate with BearingPoint in its rendering of the Services, including, without limitation, making timely decisions, providing BearingPoint with timely access to appropriate data, information and personnel of DUA according to agreed upon Timeframes and Project Plans.

## 7.6 Software Configuration Management Procedures

BearingPoint will ensure DUA that at a minimum the following are met:

The basic functions of Configuration Management:

- **Identification** - specifying and identifying all components of the final product.
- **Control** - the ability to agree and 'freeze' products and then to make changes only with the agreement of appropriate named authorities. Once a product has been approved, the motto is 'Nothing moves and nothing changes without authorization'.
- **Status accounting** - the recording and reporting of all current and historical data concerned with each product.
- **Verification** - a series of reviews and configuration audits to ensure that there is conformity between all projects products and the authorized state of products as registered in the Configuration Management records.
- **Source Safe will be used.**

This will be met by BearingPoint as part of the Fiscal Year 2008 Plan as identified in section 8.

## 7.7 Other Terms

- In clarification of the Commonwealth Terms and Conditions (clause 4), prior to any termination or suspension of BearingPoint for breach pursuant to the Commonwealth Terms and Conditions (clause 4), DUA shall provide a written





17

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

notice of and a reasonable opportunity to BearingPoint (at least 15 business days) to remedy any material breach or BearingPoint's failure to perform or fulfill its material obligations.

- In the event of any termination of this SOW by DUA for reasons other than for the uncured material breach by BearingPoint pursuant to the preceding paragraph, DUA shall reimburse BearingPoint for fees and expenses associated with the services performed prior to the termination date, including any deliverables or services in progress, and for any reasonable fees, costs or expenses documented by BearingPoint as incurred due to such termination of the Contract by DUA.

# 8. PROJECT SCOPE AND MILESTONES

This section describes the tasks and deliverables that BearingPoint will provide to DUA and the tasks that BearingPoint will complete by the end of the engagement described in this SOW. Deliverables will be considered "complete" when all the acceptance criteria set forth in this SOW have been met or the prescribed review period for each deliverable or task has expired without written response from DUA. The task/deliverable numbers are referred to in subsequent sections throughout this SOW.

**DUA will use a Microsoft Sharepoint Collaboration site to maintain all documentation for the project. All project Team Members including BearingPoint will use this site to store and manage project documents and artifacts.** All written documents shall be delivered in electronic format, capable of being completely and accurately reproduced by computer software on a laser printer. All itemized and/or annotated lists shall be delivered in computer spreadsheets, capable of being imported to Microsoft Excel, PowerPoint or Word. All meetings shall be held in the Hurley Building QUEST Project Area unless agreed to otherwise by the Project Managers. Meetings must be scheduled in advance, with reasonable accommodation of attendees' schedules. All meeting results will be described in a follow-up report generated by the BearingPoint Project Manager and approved by the DUA Project Manager.

## 8.1 Project Scope

The scope of the QUEST project is defined by the tasks and deliverables specified below and the Use Case Statements in Appendix G.

## 8.2 Task Descriptions

The following task list describes the major tasks to be performed on the QUEST project. These tasks will be expanded upon to create a detailed project work plan that will be used to monitor progress throughout the project.





18

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Task Name | Task Description |
|---|---|
| Task 1. Project Management | Perform project management activities for the life of the project. |
| Task 1.1. Develop and Maintain Project Work Plan | Develop a detailed project plan that outlines tasks, resources, timeframes, milestones, and deliverables for the QUEST Project and update the project plan regularly to track progress and plan for future tasks. |
| Task 1.2. Execute FasTrack Tasks | Begin using the Capability Maturity Model Integration (CMMI) quality processes and process controls. CMMI defined processes are important tools for managing project risk and for managing quality in the application development process. |
| Task 1.3. Conduct Project Execution and Control | Manage the success of the QUEST project through experienced planning, careful tracking, and accurate reporting. |
| Task 1.4. Conduct Contract Closeout | Finalize the QUEST project and close out the contract. |
| Task 2. Project Initiation | Perform project initiation activities. |
| Task 2.1. Conduct Project Kickoff | Initiate the QUEST project and make the plans necessary for a successful project. |
| Task 2.2. Develop a Communications Strategy and Plan | Detail the guiding principles for project communication and outline all communications events and messages to be deployed during the life of the project. |
| Task 3. Project Inception | Perform overall requirements definition, business process design and technical architecture design.. |
| Task 3.1. Develop Business Requirements | Perform an overall functional decomposition for QUEST and assist DUA in deciding which major system component (benefits / revenue) will be developed and implemented as Increment 1 and which will be Increment 2.<br><br>Develop the requirements for all functions of the QUEST system using the uFACTS Solution Framework design artifacts and DUA's unique requirements and MA laws as a baseline. Track each requirement by business area, technical area, functional release, and stage of development. Document changes needed in the uFACTS Solution Framework. |
| Task 3.2. Design Business Processes | Develop the business processes for all functions of the QUEST system using the uFACTS Solution Framework, the existing Massachusetts process flows, and the project goals as input. Document changes needed in the uFACTS Solution Framework. |





19

DEL00067761

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Task Name | Task Description |
|---|---|
| Task 3.3. Design the Technical Architecture | Design the technical architecture for the QUEST system and integrate it with the existing DUA infrastructure based on DUA's needs and the architecture requirements from the RFQ and proposal. This includes developing a final architecture diagram and confirming what hardware and software will be needed and in what quantity. The architecture will address design, development, and testing. |
| Task 3.4. Develop the Technical Infrastructure | Build the technical foundation for developing and implementing the UI system. |
| Task 3.5. Plan the Knowledge Transfer | Define a strategy to transfer knowledge to members of the QUEST project team for the respective functional releases, including knowledge of technical areas, project management, and business process reengineering, requirements, and training and testing leading practices. |
| Task 4. Increment 1 | Perform the design, development and implementation tasks for the Increment 1 functionality. |
| Task 4.1. Perform Increment 1 Inception Tasks | Review Increment 1 requirements and plan functions to be developed. |
| Task 4.1.1. Review Requirements and Process Flows | Review the process flows, usability requirements, data design, and requirements for Increment 1 functionality that was developed as part of the project inception task. |
| Task 4.1.2. Determine Functions Included in Increment 1 | Work collaboratively with DUA to identify the functions that will be part of Increment 1. |
| Task 4.2. Elaborate Increment 1 | Design Increment 1 functionality. |
| Task 4.2.1. Conduct JAD Sessions | Identify where the uFACTS Solution Framework design meets the needs of DUA and where additions, deletions, or changes need to occur. The JAD sessions are vital to providing DUA with a forum for validating that the QUEST system meets their needs and requirements. |





20

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Task Name | Task Description |
|---|---|
| Task 4.2.2. Design Use Cases | Move from requirements and process flows into detailed use case system modeling and design by further defining the business processes and modeling the web-server-based objects and batch business objects. These objects will be further defined during detail design. |
| Task 4.3. Construct Increment 1 | Build and test Increment 1 functionality. |
| Task 4.3.1. Develop System Functionality | Develop, unit test, and perform initial integration testing of the application components associated with the increment. Unit testing will be conducted in an informal manner and used to verify that transactions and business processes are working according to their design specifications. |
| Task 4.3.2. Test System Functionality | Thoroughly test Increment 1 functionality to help verify that the application is ready to be deployed. |
| Task 4.4. Transition to the New System | Transition Increment 1 functionality into production use. |
| Task 4.4.1. Test User Acceptance | Assist DUA in conducting user acceptance testing (UAT) of the QUEST system. The UAT team will use the UAT plan to test the application. During UAT, the project team will support the testers in the execution of their test plans and use the testing tools to provide additional verification of system performance. |
| Task 4.4.2. Convert QUEST Data | Convert necessary data and develop the bridging interfaces necessary to support the QUEST system. |
| Task 4.4.3. Create the Production Infrastructure | Create the production environment and integrate it with DUA production infrastructure. |
| Task 4.4.4. Develop a Contingency and Disaster Recovery Plan | Define and implement a contingency plan for protecting project assets. Identify disaster recovery procedures and locations based on DUA standards and uFACTS artifacts. |




21

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Task Name | Task Description |
|---|---|
| Task 4.4.5. Train Users | Develop and implement plans that address the specific needs of DUA end users and help effectively transition them to the new business processes. Conduct technical training and support end-user training for the implementation and use of the increment. |
| Task 4.4.6. Develop System Documentation | Build and deliver technical and user documentation to support system administration and training. System documentation comprises user manuals and the operations manual. |
| Task 4.4.7. Deploy Increment 1 | Implement an operational QUEST increment and deploy it to DUA and its users. |
| Task 5. Increment 2 | **NOTE: The tasks and sub-tasks for Increment 2 will be the same as those performed for Increment 1. Along with the other project tasks, these will be identified in detail and tracked on the approved project plan.** |
| Task 6. Operations | Plan for and operate QUEST system in production. |
| Task 6.1. Establish Maintenance and Confirm Transition | Develop the maintenance procedures and system operations agreements. |
| Task 6.2. Operate and Support the System | Provide systems operations support including warranty support for a three-month period. |

## 8.3 Milestones by Fiscal Year (FY2007 – FY2011)

The table below lists the major project milestones by fiscal year.

| Fiscal Year | QUEST Milestone | Completion Date |
|---|---|---|
| FY 2008 | Functional Decomposition of QUEST functionality | July 2007 |





22

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Fiscal Year | QUEST Milestone | Completion Date |
|---|---|---|
| FY 2008 | Installation of uFACTS Solution Framework | August 2007 |
| FY 2008 | Completion of documented business process design (To be Process Model) and requirements definition | March 2008 |
| FY 2008 | Design appropriate technology architecture to support solution and business requirements | April 2008 |
| FY 2009 | Final detailed software design specification for Increment 1 core function: Benefits or Revenue. Decisions to be made on Appeal and Hearing, Program Integrity, and Economic Research. | September 2008 |
| FY 2009 | Final system construction for Increment 1 core function. | May 2009 |
| FY 2010 | System and User Acceptance Testing of Increment 1 core function | September 2009 |
| FY 2010 | Conversion/go-live of Increment 1 core function | October 2009 |
| FY 2010 | Final Detailed software design specification of Increment 2 core function: Benefits or Revenue | March 2010 |
| FY 2011 | Final system construction for Increment 2 core function. | November 2010 |
| FY 2011 | System and User Acceptance Testing of Increment 2 core function | March 2011 |
| FY 2011 | Conversion/go-live of Increment 2 core function | April 2011 |
| FY 2012 | Contract Close out | July 2011 |

# 9. DELIVERABLE SCHEDULE AND PAYMENT TERMS

BearingPoint agrees to invoice DUA for the deliverables or work completed per the requirements set forth in the Statement of Work. DUA will make payments to BearingPoint only after receiving an accurate invoice for deliverables completed and accepted pursuant to Section 5 of this SOW. Payment for specific tasks and deliverables shall be made in accordance with the tables in sections 9.1 through 9.6 below.

Payments will be made in accordance with the Commonwealth's bill paying policy.




23

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

## 9.1 FY2007 (June 2007)

| Deliverable | | Price |
|---|---|---|
| **Project Work Plan and Project Management Plan Deliverable** | Details the tasks to be performed and associated time frames in Microsoft Project. DUA and BearingPoint will jointly review, revise, detail, and submit the project plan associated with this work effort. Also includes a communication plan and other project management procedures for the project team. | $800,000 |
| **Deliverable Expectation Documents.** | Contains a description of all deliverables to be produced on the project. Outlines, at a high level, the purpose, assumptions and constraints, and approach of each deliverable. This has proven to be a very successful tool in setting expectations for project deliverables. | $280,000 |
| **Sub-Total FY2007** | | **$1,080,000.00** |

## 9.2 FY2008 (July 2007 to June 2008)

| Deliverable | | Price |
|---|---|---|
| **Functional Design Definition Deliverable** | The Functional Design Definition Deliverable will contain a high-level decomposition of the functionality to be delivered for the entire QUEST system. This deliverable will identify the high-level use case definitions, groupings of use cases into functional components and a mapping of DUA business objectives and use case functionality. | $600,000 |
| **Initial CMMI Plans Deliverable** | Contains the project-management plans required by CMMI, including the issue-management, change-management, software quality assurance (SQA), software quality management (SQM), and risk management plans. | $1,400,000 |
| **uFACTS Framework Installation Deliverable** | Certifies that the uFACTS framework is installed at the QUEST project site. The Rational environment will be set-up and design artifacts loaded before requirements and to-be process flows are customized for DUA. | $1,080,000 |
| **Requirements and Business Process Plan Deliverable** | Defines the requirements management and business process design discipline to be executed throughout the duration of the project. Finalizes the Rational artifacts that will be produced as part of requirements and business process flows. | $600,000 |





24

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Deliverable | | Price |
|---|---|---|
| **Requirements Definition Deliverable** | Contains the requirements for all system functions. DUA and BearingPoint will collaboratively develop this deliverable, using the results of the gap analysis between the requirements needed for QUEST and the uFACTS functionality. | $2,480,000 |
| **Business Process Design Deliverable** | Contains the process flows for all the new system's functions and other Rational artifacts. | $2,560,000 |
| **Technical Architecture Deliverable** | Details the components of the architecture, including version levels and configuration. Consists of network diagrams, server placement, access requirements, firewall ports and services needed, security requirements, backup requirements, and bandwidth requirements. | $400,000 |
| **Increment 1 Increment Plan Deliverable** | Defines the scope of functionality in Increment 1. The plan will address when Appeals and Hearing, Program Integrity, and Economic Research will be designed and developed. | $440,000 |
| **Increment 1 Knowledge Transfer Plan Deliverable** | Describes how we will manage the mentoring, coaching, and knowledge transfer to DUA team members throughout all Increment 1 project activities. | $200,000 |
| **Initial Increment 1 Detailed Design Deliverable** | Provides an initial set of design documents for an initial subset of components included in the first iteration of Increment 1. Includes use cases and activity diagrams. | $1,800,000 |
| **Sub-Total FY2008** | | **$11,560,000.00** |

## 9.3 FY2009 (July 2008 to June 2009)

| Deliverable | | Price |
|---|---|---|
| **Systems Configuration Plan Deliverable** | Defines the configuration management discipline to be executed throughout the duration of the project for the QUEST application. | $400,000 |
| **Final Increment 1 Detailed Design Deliverable** | Provides final design documentation for the components included in Increment 1. Includes a requirements-to-design traceability matrix to document that all requirements are captured in the design. | $1,400,000 |
| **Increment 1 Interface Integration Plan** | Describes the approach to develop the necessary Increment 1 system interfaces and integrate them into the QUEST system. | $240,000 |





25

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Deliverable | | Price |
|---|---|---|
| **Increment 1 Training Plan Deliverable** | Provides an overview of training methodology and approach. Identifies the Increment 1 training courses, number of sessions, and associated course objectives, including the training method for all training material to be developed (such as classroom, computer-based training [CBT], etc.). Addresses procedures for implementing and maintaining a training database. | $920,000 |
| **Increment 1 Conversion and Data Migration Plan Deliverable** | Includes the approach for designing and developing data conversion programs, testing the conversion process, and converting the data for the Increment 1 functionality. Elaborates how the integrity and confidentiality of the data will be protected throughout the conversion process. Include a crosswalk of each system data structure and the relevant conversion rules. Defines the approach to migrating historical data and cutover planning for open claims and active employer data. | $1,280,000 |
| **Increment 1 System Test Plan** | Outline the system performance testing, system testing, and UAT approach and acceptance criteria. | $560,000 |
| **Increment 1 Construction Deliverable** | Documents that Increment 1 system code components have been developed and unit tested. | $2,040,000 |
| **Increment 1 System Test Deliverable** | Documents that Increment 1 system code components have completed an initial round of system testing. Includes a traceability matrix between the test scripts and the use cases documenting that all application functionality was tested. | $1,800,000 |
| **Increment 1 Contingency and Disaster Recovery Plan Deliverable** | Plans for resolving risks and maintaining the current production capability if the Increment 1 implementation is delayed. Addresses strategies for business and system continuity in the case of implementation issues. Addresses disaster recovery procedures and physical locations. | $300,000 |
| **Sub-Total FY2009** | | **$8,940,000.00** |

## 9.4 FY2010 (July 2009 to June 2010)

| Deliverable | | Price |
|---|---|---|
| **Increment 1 Training Completion Letter** | States that technical training and user train-the-trainer training for Increment 1 has been completed. Includes training materials. | $400,000 |
| **Increment 1 UAT Completion Deliverable** | States that support for state-sponsored UAT procedures is complete. | $440,000 |





26

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Deliverable | | Price |
|---|---|---|
| **Increment 1 Conversion Completion Deliverable** | Documents that conversion of legacy data necessary to support the Increment 1 implementation is complete. | $1,080,000 |
| **Increment 1 System Documentation Deliverable** | Contains the maintenance manual, data dictionary, and help text. For some of the components, this deliverable may reference online material rather than paper copy. | $676,000 |
| **Increment 1 Maintenance Procedures Deliverable** | Describes the Increment 1 maintenance, operations, and support procedures. | $600,000 |
| **Increment 1 Implementation Completion Deliverable** | States that all implementation activities have been completed and Increment 1 functionality is operational. | $1,040,000 |
| **Increment 1 Transition Completion Letter Deliverable** | States that Increment 1 transition activities are complete. The application and infrastructure components are in production. | $840,000 |
| **Increment 2 Increment Plan Deliverable** | Defines the scope of functionality in Increment 2. Contains the approach to integrating the Increment 2 functionality with the implemented Increment 1 functionality. | $440,000 |
| **Increment 2 Knowledge Transfer Plan Deliverable** | Describes how we will manage the mentoring, coaching, and knowledge transfer to DUA team members throughout all Increment 2 project activities. | $200,000 |
| **Initial Increment 2 Detailed Design Deliverable** | Provides an initial set of design documentation for an initial subset of components included in the first iteration of Increment 2. Includes use cases and activity diagrams. | $1,800,000 |
| **Final Increment 2 Detailed Design Deliverable** | Provides final design documentation for the components included in Increment 2. Includes a requirements-to-design traceability matrix to document that all requirements are captured in the design. | $1,400,000 |
| **Increment 2 Interface Integration Plan** | Describes the approach to develop the necessary Increment 2 system interfaces and integrate them into the QUEST system. | $240,000 |




27

HIGHLY CONFIDENTIAL

DEL00067769

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Deliverable | | Price |
|---|---|---|
| **Increment 2 Training Plan Deliverable** | Provides an overview of training methodology and approach. Identifies the Increment 2 training courses, number of sessions, and associated course objectives, including the training method for all training material to be developed (such as classroom, computer-based training [CBT], etc.). Addresses procedures for implementing and maintaining a training database. | $180,000 |
| **Increment 2 Conversion and Data Migration Plan Deliverable** | Includes the approach for designing and developing data conversion programs, testing the conversion process, and converting the data for the Increment 2 functionality. Elaborates how the integrity and confidentiality of the data will be protected throughout the conversion process. Include a crosswalk of each system data structure and the relevant conversion rules. Defines the approach to migrating historical data and cutover planning for open claims and active employer data. | $272,000 |
| **Sub-Total FY2010** | | **$9,608,000.00** |

## 9.5 FY2011 (July 2010 to June 2011)

| Deliverable | | Price |
|---|---|---|
| **Increment 2 System Test Plan** | Outline the system performance testing, system testing, and UAT approach and acceptance criteria for Increment 2. | $560,000 |
| **Increment 2 Construction Deliverable** | Documents that Increment 2 system code components have been developed and unit tested. | $1,800,000 |
| **Increment 2 System Test Deliverable** | Documents that Increment 2 system code components have completed an initial round of system testing. Includes a traceability matrix between the test scripts and the use cases documenting that all application functionality was tested. | $1,680,000 |
| **Increment 2 Contingency and Disaster Recovery Plan Deliverable** | Plan for resolving risks and maintaining the current production capability if the Increment 2 implementation is delayed. Addresses strategies for business and system continuity in the case of implementation issues. Addresses disaster recovery procedures and physical locations. | $300,000 |
| **Increment 2 Training Completion Letter** | States that technical training and user train-the-trainer training for Increment 2 has been completed. Includes training materials. | $400,000 |
| **Increment 2 UAT Completion Deliverable** | States that support for state-sponsored UAT procedures is complete. | $440,000 |




28

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Deliverable | | Price |
|---|---|---|
| **Increment 2 Conversion Completion Deliverable** | Documents that conversion of legacy data necessary to support the Increment 2 implementation is complete. | $1,080,000 |
| **Increment 2 System Documentation Deliverable** | Contains the maintenance manual, data dictionary, and help text. For some of the components, it may reference online material rather than paper copy. | $676,000 |
| **Increment 2 Maintenance Procedures Deliverable** | Describes the Increment 2 maintenance, operations, and support procedures. | $200,000 |
| **Increment 2 Implementation Completion Deliverable** | States that all implementation activities have been completed and Increment 2 functionality is operational. | $760,000 |
| **Increment 2 Transition Completion Letter Deliverable** | States that Increment 2 transition activities are complete.  The application and infrastructure components are in production. | $640,000 |
| **Contract Closeout Deliverable** | Contains verification that issues have been addressed and formal deliverables accepted. It also contains lessons learned. | $276,000 |
| **Sub-Total FY2011** | | **$8,812,000.00** |

## 9.6 Total Cost, all Deliverables

| Total Deliverables | Total Price |
|---|---|
| **Total:  FY2007 through FY2011** | **$40,000,000.00** |

## 9.7 Statement of Work Assumptions and Conditions

This Statement of Work was developed based on and is subject to the following factors, assumptions and conditions:

- **Scope** - This document serves to provide a common understanding of the DUA QUEST project scope; however, the final scope will be defined during the project in Joint Requirement Management (JRM) sessions and Joint Application Design (JAD) sessions, resulting in a final set of requirements and an approved design.





29

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

- **Sequencing Functions** - The combined DUA and BearingPoint project management team will collaborate on the decision regarding how to sequence the major QUEST functions (Revenue and Benefits). This decision will be made early in the project and the final project work plan will be revised based on the sequencing decision.

- **Project Work Plan** - The project work plan, included in this statement of work (SOW) assumes a May 2007 project start date. A more detailed final project work plan will be developed early in the project.

- **Methodology** – This Statement of Work assumes the use of BearingPoint's ProvenCourse methodology. BearingPoint believes the use of this methodology will help deliver an unemployment system that meets the requirements of this SOW while minimizing the risks of the project. BearingPoint and DUA will work together during the inception phase of the project to develop the final work plan for this SOW.

- **User Representative Authority** – BearingPoint's approach to system design and implementation is highly concentrated, visual, and relies heavily on focus group work sessions with the user representatives to validate business and technical requirements. The project work plan will assume and require that user representatives attending design sessions have full authority necessary to direct BearingPoint's analysts and make final decisions regarding the functionality of the system.

- **DUA Involvement on Project Team** – BearingPoint has not included any direct labor costs for DUA staff in the cost of any project deliverables. DUA will provide staff with an adequate level of experience and authority that can be fully integrated into the project team as an important part of the knowledge transfer process that will allow DUA to take full ownership of the project upon implementation. In the Engagement Definition task, BearingPoint and DUA will work together to define the participation requirements and expectations for the DUA staff. DUA's commitment of staff resources to this project is essential to the success of the project and to DUA's ability to operate the system after implementation. DUA staff assigned to the project will complete their detailed assignments as defined in the mutually agreed to work plan within the time frames identified.

- **Access to DUA Staff and Subject Matter Experts** –BearingPoint will have timely access to DUA subject matter experts to assist in identifying business rules, resolving business process discrepancies, and answering ad hoc questions. These subject matter experts will, in turn, solicit input from division managers on any areas where policy or procedure is undefined. The follow up on issues requiring DUA input and decision-making will be completed within the time frames identified in the work plan.

- **Prompt Deliverable Sign-off** – Approval and sign-off on all deliverables will occur promptly within ten (10) business days of submittal unless a different time period has been agreed to between the parties in the deliverable expectation document (DED) for a particular deliverable, in which case such period specified in the DED shall be used for acceptance pursuant to the DED and section 5 of this SOW. If formal sign-off has not occurred within the specified timeframe, the deliverable will be considered accepted. Refer to Section 5 of the SOW for general acceptance terms.




30

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

- **Schedule Adjustments** – BearingPoint has estimated the hours and costs required to complete this project on the basis of their understanding of QUEST scope, the information provided in the RFQ, and their previous system implementation experience. During any given phase of this project, some tasks may not take as long as estimated and other tasks may take longer than estimated. In these instances, BearingPoint and DUA will work together to adjust deliverable time schedules and dates to make the most efficient use of the time and budget allocated, including pursuant to section 6.3 of the SOW.

- **Requirements for Additional Hours/Budget** – If BearingPoint has problems meeting their responsibilities because of situations outside of their control or because of additional tasks or requirements identified during the project that were not originally estimated, they will assess and determine the impact to the project, and adjust the project schedule to remedy the situation if possible. However, BearingPoint and DUA may agree that the unexpected problems or scope requirements necessitate an increase in the scope of the project by approving a change order that adds budget and/or time to the project pursuant to section 6.3 of the SOW. Examples of problems outside of BearingPoint control include, without limitation:

  o Delays in delivery of the hardware and licensed software that is required prior to system implementation
  o Changes to legislation
  o Changes to validated business requirements
  o Turnover of key DUA staff
  o Low or infrequent DUA participation
  o Inadequate communication with or cooperation from DUA Sponsors, staff and external stakeholders, including untimely provision of required information, materials, staff or approvals
  o Late, incomplete, or inconsistent information from DUA Sponsors, or other external stakeholders
  o Lack of testing or training facilities or staff to complete their responsibilities
  o Changes to DUA Architecture Standards
  o Changes to Project Management/Reporting Requirements
  o Changes to Federal contracting requirements
  o Changes to Federal funding availability

- **System Training Requirements** – The following assumptions and conditions apply to DUA training requirements:

  o ***Training Participants' Baseline Knowledge and Skill Level*** – DUA training participants will enter the classroom with a thorough understanding of DUA business rules upon which the new System is based. Training participants will have a basic knowledge of PCs and operating system functions before attending system functionality training.





31

DEL00067773

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

○ ***End-User Training*** – The project team will address the training requirements in accordance with Section 6.2 of the RFQ and the answer to question #57C in the bidder's question and answer document. If DUA determines that there is a need for additional training, BearingPoint will work with DUA to identify the additional required training. In accordance with the requirements of the RFQ, the project will utilize a "train the trainer" approach combined with self-paced training for the overall end-user training approach.

○ ***Technical Training*** – BearingPoint will provide technical and operations training for DUA technical and system administration staff. The details and number of sessions performed will be discussed and agreed between BearingPoint and DUA during the project and documented in the deliverable expectation document (DED) for technical training. DUA will assign system administration and technical resources with the requisite knowledge and skill to learn how to provide long-term support to the QUEST System. These staff will also work with the project team during the development and deployment of the QUEST System to allow for a more effective knowledge transfer.

- **DUA Acceptance Testing Requirements** – The following assumptions and conditions apply to DUA acceptance testing:

  ○ User Acceptance Testing (UAT) is the responsibility of DUA. DUA, with BearingPoint's assistance, will prepare the User Acceptance Test Plan, and DUA will execute that plan agreed between the parties. BearingPoint's Project team will create an acceptance test region and a test database structure. It is the responsibility of DUA to populate the acceptance test database. DUA may use test scenarios and test scripts that BearingPoint develops for the System Test as part of the Acceptance Test. BearingPoint and DUA will work together to define acceptance criteria and this criteria will be documented in the deliverable expectation document (DED) for user acceptance testing. DUA will not unreasonably withhold or delay acceptance of the system.

  ○ BearingPoint will review and comment on the User Acceptance Test plan. BearingPoint will provide technical assistance to DUA's acceptance test team in the maintenance of the acceptance test region. Where necessary, BearingPoint will assist DUA's acceptance test team in interpreting the results of the test. BearingPoint will discuss the findings with DUA and resolve agreed upon defects in a timely manner.

  ○ DUA will provide staffing to assist with and participate in the system, performance, parallel, and user acceptance testing of the application in the timeframes allocated in the final detailed work plan that is accepted by DUA.

  ○ There will be an acceptance testing period of 60-90 days for each of the QUEST System core functions. If acceptance testing extends beyond this duration due to reasons outside of BearingPoint's control, upon agreement BearingPoint will negotiate additional support for DUA acceptance testing activities.





32

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

- o  Upon DUA acceptance of each QUEST system core function, DUA and BearingPoint will work together to implement the core function according to the approved project work plan. DUA will not unreasonably delay the implementation of a QUEST system core function after it has been accepted.

- **Performance Testing** – BearingPoint will develop a Performance Test Plan as a part of the overall System Test Plan. The Performance Test Plan will define the scope and duration of the performance testing activities as well as the mutually agreed upon acceptable performance criteria for the application. These criteria will be documented in the deliverable expectation document (DED) for The Performance Test Plan. BearingPoint will execute that plan to test the performance of the QUEST System in accordance with the criteria specified in the DED. The Mercury Interactive Suite of tools will be used for performance testing.

- **System Design Artifacts** – The system design, including all appropriate Rational Design artifacts, will be based on current Federal, state and local policies and procedures. Any requested modifications to these policies and procedures after the detailed design has been approved will be negotiated for determination of priority and contractual impact.

- **Data Conversion** – The budget proposed for data conversion under QUEST in BearingPoint's proposal is based on the information provided in the RFQ and the questions answered through the procurement process (specifically answer #57D). BearingPoint will provide services to convert the required data from the following 8 primary databases: UI Benefits, UI Hearings (Appeals), UI Trade Readjustment Allowances, Revenue (TAX), Wage Records, Revenue (Reimbursable Employer), Revenue (Universal Health Insurance – UHI) and AAA/WPA. BearingPoint will work collaboratively with DUA in order to determine which data elements from these 8 databases should be converted to the new system. If data from additional systems is required for QUEST or additional conversion support, such change will be agreed between the parties via a change order pursuant to section 6.3 of the SOW.

  DUA will perform any data purification processes necessary to cleanse the data and provide the data in the format BearingPoint requests. BearingPoint's approach to conversion requires the provision of "scrubbed" ASCII extract files from the existing production systems. DUA and BearingPoint agree that converting errors into the new System database should be avoided. Unnecessary and incomplete data will be identified and dealt with by DUA staff. Consequently, while BearingPoint will provide DUA with the specifications for these extract files, DUA is responsible for identifying and correcting such errors prior to conversion. Data conversion for production is assumed to be a one-time process. In order to perform the data mapping, BearingPoint resources will need access to knowledgeable technical staff that understand the legacy data sources and data structures. DUA will provide access to that staff and will assist in the mapping of legacy data.

- **Integration and Interface Design and Development** – The budget for integration and interfaces is based on the information provided in the RFQ Section 4.3. As a





33

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

result, BearingPoint will provide services to develop inbound/outbound interfaces for the following systems:

| | |
|---|---|
| o UIRR | o IRS |
| o CSC (SAVE) | o Railroad Retirement |
| o BOA/Sovereign | o Placement Accountable System |
| o MMARS | |
| o Intercept | o MOSES |
| o DOR | o SDDS |
| o Industrial Accident Board | o MSP |
| | o 202 System |
| o Mass Highway | o HR/Personnel |
| o State Police | o Secretary of State (incoming e-mail) |

BearingPoint will work collaboratively with DUA in order to determine the requirements for these interfaces in the Inception Phase of the project. Detailed specifications for these interfaces will be created in the Elaboration Phase of the project. In order to perform the mapping necessary to design system interfaces, BearingPoint resources will need access to knowledgeable technical staff that understands the legacy data sources and data structures. DUA will provide timely access to that staff. If additional interfaces are required for QUEST, BearingPoint will negotiate with DUA for the necessary additional interface design and development support.

- **Interfacing to Existing Employment System (MOSES)** – QUEST will be designed to capture certain re-employment data for purposes of interfacing with MOSES system. The planned QUEST solution supports these interface capabilities.

- **FileNet Integration Services** - BearingPoint's scope of services includes integrating the QUEST solution with FileNet's P8 document imaging platform. BearingPoint and DUA will work together in the project to determine any necessary upgrades to the FileNet software. FileNet upgrades will be the responsibility of DUA. BearingPoint is not responsible for any upgrades to the FileNet software under this SOW. Under this SOW, BearingPoint is responsible for providing integration services between QUEST and FileNet P8. DUA is responsible for obtaining any necessary FileNet software licenses and/or upgrades and in a timely manner enabling BearingPoint to perform the integration services hereunder.

- **Change Management Services** - DUA will manage Change Management and Communications activities on the project. BearingPoint will provide advice and reasonable assistance in these areas of the project. BearingPoint is not responsible for conducting any additional activities in this area of the project.

- **Disaster Recovery Services** - BearingPoint will provide design recommendations for disaster recovery as follows: technical design, hardware configuration, network





34

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

design and contingency planning. BearingPoint is not responsible for the
implementation of or costs for a Disaster Recovery site.

- **MSP Program** – The MSP program is considered out of scope for the QUEST project.

- **IVR Integration Assumptions** – The following assumptions and conditions apply to IVR integration:

  o The current functional services offered through the Massachusetts DUA IVR will be maintained and implemented with the QUEST project. No functions will be added, nor reduced, through the IVR self service delivery channel.

  o The IVR will be integrated with the QUEST application, calling business rules developed in the QUEST application.

  o Any change to the Avaya physical architecture and hardware is out of scope for the QUEST project. BearingPoint is not responsible for any changes to the Avaya production environment needed to support the new QUEST system. DUA is responsible for upgrading the current Avaya IVR/Call center to a recent release in order to integrate the IVR functions with the QUEST Benefits functionality providing both a development and production capability for the QUEST project. BearingPoint will develop the useable API's within the QUEST system for the Avaya IVR CTI/PBX solution to use.

  o BearingPoint is not responsible for call routing outside of the IVR (e.g. how a call presents to the IVR, or bounces out to a staff member).

- **Hardware and Software Specifications** – Hardware, software and physical infrastructure specifications and pricing will be prepared by the DUA and BearingPoint project team during the first phase of the project. The QUEST hardware and network topology implementation will be a collaborative effort between DUA and BearingPoint in order to optimize system performance and minimize risk points in the topology.

- **Data Warehouse** – The creation of a data warehouse is not in BearingPoint's scope for the QUEST project.

- **Fail-Over Expectations** – Meeting the fail over expectations identified in the QUEST RFQ is a joint responsibility between BearingPoint and DUA. The expectations for system fail-over are met in as far as the uFACTS Solution Framework is concerned, as specified in BearingPoint's proposal in response to the RFQ. However, meeting these expectations for the overall QUEST solution goes beyond the core uFACTS Solution Framework. There are several other variables that will impact the QUEST solution's ability to meet these expectations, such as, the network infrastructure and operating system, the physical hardware being used, the Avaya (IVR/ACD) system, the FileNet and Crystal Reports software, as well as various other integral components to the overall QUEST solution. These components need to be implemented with the fail-over expectations in mind. Several of these





35

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

components are the responsibility of DUA, including without limitation the management and implementation of the network infrastructure and physical technical infrastructure. BearingPoint and DUA will work together to define an appropriate enterprise-wide solution to meet the fail-over expectations, given these variables.

- **System Response Time and Up Time Expectations** – The satisfaction of these expectations is a joint responsibility between BearingPoint and DUA. The system response time for the uFACTS Solution Framework is on average within the 3-8 second range specified in the RFQ, based on previous production implementations. Based on the business requirements defined by DUA, the QUEST system may need to perform additional calculations that may exceed this average response time for certain scenarios. BearingPoint and DUA will work together to identify these more resource-intensive scenarios and work to optimize them to the extent possible within the project scope. BearingPoint and DUA will also discuss and agree to system response time and system up time acceptance criteria which will be documented in the deliverable expectation document (DED) for production implementation. These criteria will include recognition of the execution of the nightly batch processes and database backup processes.

- **Requirements** – Unless a system or business requirement has been mutually agreed to between the parties and is specified as such in the SOW, a mutually agreed to DED, or an approved project deliverable, it is deemed aspirational only. Such aspirational or undocumented requirements are not the responsibility of BearingPoint and are not covered by the warranty provisions of this contract. For the purposes of clarification, system expectations and project success criteria in the RFQ are aspirational only and not considered agreed upon requirements.

## *9.8 Project Tools*

The project tools to be utilized during the project are listed below. BearingPoint is not responsible for providing any third party hardware or software for the purposes of QUEST. All third party software and hardware for QUEST will be purchased or licensed directly by DUA. The parties will coordinate throughout the project to ensure that licensing and purchasing of the third parties software and hardware does not adversely affect the project schedule.

| Project Phase | | | | |
|---|---|---|---|---|
| **Activity / Technique** | **Tool** | **Provided By** | **Estimated Number of Licenses** | **Available For Use By** |
| **Project Management Phase** | | | | |
| Project Methodology | BearingPoint ProvenCourse™ Methodology | BearingPoint | Unlimited | Project Start |





36

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Project Phase | | | | |
|---|---|---|---|---|
| **Activity / Technique** | **Tool** | **Provided By** | **Estimated Number of Licenses** | **Available For Use By** |
| Collaboration | Microsoft SharePoint (version 2007) | DUA | 75 | Project Start |
| Project Documentation | Microsoft Office (version 2007) | DUA | 41 | Project Start |
| Project Plans Management & Maintenance | Microsoft Project (version 2007) | DUA | 10 | Project Start |
| Quality Management | FasTrack Templates | BearingPoint | Unlimited | Project Start |
| **BPR and Inception Phase** | | | | |
| Requirements Management & Traceability | IBM Rational Suite (RequisitePro) version 7.0 | DUA | 20 Named , 10 Floating | July 2007 |
| Process Modeling | Microsoft Visio (version 2007) | DUA | 10 | Project Start |
| Base-line UI Requirements | BearingPoint uFACTS Solution Framework (excluding Third Party Property) | BearingPoint | Unlimited | July 2007 |
| Use Case Development | IBM Rational Suite (Rational Rose Modeler) version 7.0 | DUA | 20 Named and 5 Floating | July 2007 |
| Use Case Modeling | IBM Rational Suite (Rational Rose Modeler) version 7.0 | DUA | 20 Named and 5 Floating | July 2007 |
| Activity Diagramming | IBM Rational Suite (Rational Rose Modeler) version 7.0 | DUA | 20 Named and 5 Floating | July 2007 |
| Use Case Development | Dreamweaver 8 | DUA | 13 | July 2007 |
| **Elaboration Phase** | | | | |
| Base-line UI Use Cases | BearingPoint uFACTS Solution Framework (excluding Third Party Property) | BearingPoint | Unlimited | July 2007 |
| UML Analysis & Design Artifacts | IBM Rational Suite (Rational Rose Modeler) version 7.0 | DUA | 20 Named and 5 Floating | July 2007 |





37

HIGHLY CONFIDENTIAL

DEL00067779

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Project Phase | | | | |
|---|---|---|---|---|
| **Activity / Technique** | **Tool** | **Provided By** | **Estimated Number of Licenses** | **Available For Use By** |
| Architectural Diagrams | IBM Rational Suite (Rational Rose Modeler), Microsoft Visio, Microsoft Visual SourceSafe, Microsoft Office | DUA | N/A | July 2007 |
| Base-line UI Data Model | BearingPoint uFACTS Solution Framework (excluding Third Party Property) | BearingPoint | Unlimited | July 2007 |
| Database Modeling | Oracle Designer (version 10g) | DUA | 5 | July 2007 |
| **Construction Phase** | | | | |
| Base-line UI System Components | BearingPoint uFACTS Solution Framework (excluding Third Party Property) | BearingPoint | Unlimited | July 2007 |
| Code Generation & Unit/Integration Testing | Visual Studio Team System 2007 | DUA | 35 | July 2007 |
| System Testing & Regression Testing | Mercury Interactive Suite (specific products below all provided by DUA) | DUA | Licensing by product below | Dec 2007 |
| | Test Director for Quality Center 9.0 | | 15 users | |
| | Quick Test Pro | | 5 concurrent | |
| | Test Director Defect Manager | | 10 concurrent | |
| | LoadRunner 8.1 Controllers and Monitors | | Site license | |
| | LoadRunner Web Virtual User | | 500 licenses | |
| | Client Side Monitors | | Site license | |
| | Web Server Performance Monitors | | Site license | |
| | Web Application Server Performance Monitors | | Site license | |





38

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Project Phase | | | | |
|---|---|---|---|---|
| **Activity / Technique** | **Tool** | **Provided By** | **Estimated Number of Licenses** | **Available For Use By** |
| | Database Server Resource Monitors | | Site license | |
| Database Management, Development & Testing | Oracle Designer (version 10g) | DUA | 5 | July 2007 |
| Reporting | Crystal Reports Developer Edition XI | DUA | 10 | Oct 2007 |
| Reporting | Crystal Reports Server | DUA | 10 concurrent | March 2008 |
| Correspondence Generation | SoftArtisans OfficeWriter for .NET | DUA | None | Oct 2007 |
| Development Artifact Version & Change Control | Microsoft Visual Studio Team Foundation Server (Visual SourceSafe) | DUA | 35 | July 2007 |
| User Managed Rules Engine | ILOG Rules for .NET Rule Starter Pack Development | DUA | 10 | Oct 2007 |
| User Managed Rules Engine | ILOG Rules for .NET Rule  Prod and Test | DUA | 20CPU | March 2008 |
| Online Help generation | RoboHelp Office Professional for .NET (version 6) | DUA | 5 | March 2008 |
| Database  Manage and Query | Toad for Oracle Professional 9.0 | DUA | 60 | July 2007 |
| **Transition Phase** | | | | |
| Self-paced / Computer Based Training | Macromedia Captivate (version 2) | DUA | 5 | March 2008 |
| User Acceptance Testing | Mercury Interactive Suite | DUA | See above | Dec 2007 |




39

HIGHLY CONFIDENTIAL

# Appendix A: Deliverable Acceptance Criteria (Example)




40

HIGHLY CONFIDENTIAL

DEL00067782

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Appendix B: Deliverable Acceptance Form

## DELIVERABLE ACCEPTANCE FORM
### *DUA QUEST PROJECT*

| DELIVERABLE NAME AND NUMBER: | DESCRIPTION: |
|---|---|
| ACCEPTANCE CRITERIA: | |

Project Manager Acceptance

☐ Approved    ☐ Disapproved

Name _____    Signature _____    Date _____

Steering Committee review date, (if required):

Remarks:

Conditions to Acceptance

| Description | Resolution Date | Assigned to: |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

Disapproved Deliverable

New Deliverable complete by date:

| Reason/Issue Description | Resolution Date | Assigned to: |
|---|---|---|
| | | |
| | | |




41

HIGHLY CONFIDENTIAL



THE COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF WORKFORCE DEVELOPMENT

# Appendix C: CORI

DEVAL L. PATRICK
GOVERNOR

TIMOTHY P. MURRAY
LT. GOVERNOR

SUZANNE M. BUMP
DIRECTOR

Executive Office of Public Safety
Criminal History Systems Board
200 Arlington Street, Suite 2200
Chelsea, MA  02150

GMADET
G

Dear Sirs:

The Department has been certified by the Criminal History Systems Board for access to conviction and pending criminal case data concerning prospective, otherwise-qualified employees.  As an applicant for the position of _____ within the _____ department/career center, I understand that a criminal record check will be conducted for conviction and pending criminal case information only and that it will not necessarily disqualify me.  The information below is correct to the best of my knowledge.

### APPLICANT INFORMATION (PLEASE PRINT)

_____     _____

**LAST NAME**          **FIRST NAME**          **MIDDLE NAME**

_____          _____

**MAIDEN NAME or ALIAS (if applicable)**          **PLACE OF BIRTH**

_____     _____     _____

**DATE OF BIRTH**     **SOCIAL SECURITY NUMBER**     **MOTHER'S MAIDEN NAME**

**ADDRESS:** _____

_____
_____

_____     _____

**APPLICANT'S SIGNATURE**          **DATE**

---

The following information must be verified by the <u>hiring Manager</u> by reviewing a form of government issued photographic identification and attaching a copy of that identification.

**SEX:** _____     **HEIGHT:** ____ft. ____in.     **WEIGHT:** _____     **EYE COLOR:** _____

**STATE DRIVER'S LICENSE NUMBER:** _____

The above information was verified by: _____ from _____ on _____

          Manager's Name          Unit/Office
     Date

**Send <u>original</u> form, copy of ID AND resume to:**     Internal Control & Security Department
          19 Staniford Street, Boston, MA 02114

**REQUESTED BY:** _ Internal Control & Security Department _____
          19 Staniford Street, Boston, MA 02114 - Phone: (617) 626-6680

CHARLES F. HURLEY BUILDING • 19 STANIFORD STREET • BOSTON, MA 02114
Division of Unemployment Assistance

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Appendix D: Information Technology Resource Policy

*Massachusetts Department of*
# Workforce
*Development*

## Information Technology Resources Policy
**Effective: July, 1998**          **Last revision: December 2006**

This document formalizes the policy for employees of the Department of Workforce Development,
contractors and other authorized users (hereafter "users") on the use of information technology resources ("Agency ITRs"), including computers, printers and other peripherals, programs, data, local and wide area networks, the Internet, E-mail, facsimile machines, photocopiers, pagers, telephone and cellular phones, voicemail and two-way radios. Use of Agency ITRs by any users shall constitute acceptance of the terms of this policy and any such additional policies.

### 1. User Responsibilities

It is the responsibility of any user of Agency ITRs to read, understand, and follow this policy. In addition, users are expected to exercise reasonable judgment in interpreting this policy and in making decisions about the use of Agency ITRs. Any user with questions regarding the application or meaning of this policy should seek clarification from appropriate management. The Agency reserves the right to recoup any costs incurred for unauthorized use of ITR. Failure to observe this policy may subject users to disciplinary action, including termination of employment.

### 2. Acceptable Uses

The Department of Workforce Development firmly believe that Agency ITRs empower users and make their jobs more fulfilling by allowing them to deliver better services at lower costs. As such, users are encouraged to use Agency ITRs to the fullest extent in pursuit of the Agency's goals and objectives.

### 3. Unacceptable Uses of Agency ITRs

It is unacceptable for any user to use Agency ITRs:

o in furtherance of any illegal act, including violation of any criminal or civil laws or regulations, whether state or federal;
o for any political purpose;
o for any commercial purpose;
o to send threatening or harassing messages, whether sexual or otherwise;
o to access or share sexually explicit, obscene, or otherwise inappropriate materials;
o to infringe any intellectual property rights;




43

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

o to gain, or attempt to gain, unauthorized access to any computer or network;
o for any use that causes interference with or disruption of network users and resources, including propagation of computer viruses or other harmful programs;
o to intercept communications intended for other persons;
o to misrepresent either the Agency or a person's role at the Agency;
o to distribute chain letters;
o to access on-line gambling sites; or
o to libel or otherwise defame any person.

## 4. Data Confidentiality

In the course of performing their jobs, users may often have access to confidential or proprietary information, such as personal data about identifiable individuals or commercial information about business organizations. Under no circumstances is it permissible for users to acquire access to confidential data unless such access is required by their jobs. Under no circumstances may users disseminate any confidential information, unless such dissemination is required by their jobs.

## 5. Copyright Protection

Computer programs are valuable intellectual property. Software publishers can be very aggressive in protecting their property rights from infringement. In addition to software, legal protections can also exist for any information published on the Internet, such as the text and graphics on a web site. As such, it is important that users respect the rights of intellectual property owners. Users should exercise care and judgment when copying or distributing computer programs or information that could reasonably be expected to be copyrighted.

## 6. Computer Viruses

Users should exercise reasonable precautions in order to prevent the introduction of a computer virus into the local area or wide area networks. Virus scanning software should be used to check any software downloaded from the Internet or obtained from any questionable source. In addition, executable files (program files that end in ".exe") should not be stored on or run from network drives. Finally, it is a good practice to scan floppy disks periodically to see if they have been infected.

## 7. Network Security

Most desktop computers are connected to a local area network, which links computers within the Agency and, through the wide area network, to most other computers in state government. As such, it is critically important that users take particular care to avoid compromising the security of the network. Most importantly, users should never share their passwords with anyone else, and should promptly notify the DWD Information Security Office (part of the DWD Internal Control & Security Department) if they suspect their passwords have been compromised. In addition, users who will be leaving their PCs unattended for extended periods should either log off the network or have a password protected screensaver in operation. Finally, no user is allowed to access the

44

Internet or other external networks via modem unless they have received specific permission from DWD Information Security Office.

## 8. E-mail

When using e-mail, there are several points users should consider. First, because e-mail addresses identify the organization that sent the message (user@detma.org), users should consider e-mail messages to be the equivalent of letters sent on official letterhead. For the same reason, users should ensure that all e-mails are written in a professional and courteous tone. Finally, although many users regard e-mail as being like a telephone in offering a quick, informal way to communicate, users should remember that e-mails can be stored, copied, printed, or forwarded by recipients. As such, users
should not write anything in an e-mail message that they would not feel just as comfortable putting into a memorandum.

## 9. No Expectation of Privacy

Agency ITRs are the property of the Commonwealth of Massachusetts and are to be used in conformance with this policy. The Agency retains, when reasonable and in pursuit of legitimate needs for supervision, control, and the efficient and proper operation of the workplace, the right to inspect any user's computer, any data contained in it, and any data sent or received by that computer. Users should be aware that network administrators, in order to ensure proper network operations, routinely monitor network traffic. Use of Agency ITRs constitutes express consent for the Agency to monitor and/or inspect any data that users create or receive, any messages they send or receive, and any web sites that they access. The Agency does not intend to monitor the content of telephone conversations without prior notice. However, the usage of telephone communication is monitored for the performance of agency operations, maintenance, auditing, security, or investigative functions.

## 10. Remote Access

Some users will be authorized by the Agency for remote access to e-mail and other applications. Access is authorized for the same purposes as other Agency resources, i.e., business use. Managers should approve remote access only for those users which have a job-related need to access Agency resources remotely. Users authorized for remote access to e-mail and other applications are required to read, sign and comply with the terms and conditions explained in the Remote Access User Certification Agreement, which is Attachment B to this policy.

**All users of the Agency's Information Technology Resources are required to read and comply with this policy.  Additionally, all users are required to sign (along with the responsible Department of Workforce Development manager) and submit Attachment A to this policy, the ITR Policy Acknowledgement Form.**





45

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Users requesting remote access are required to read, comply, sign (along with the responsible Department of Workforce Development manager) and submit the Remote Access User Certification Agreement, which is Attachment B to this policy.**

ATTACHMENT "A"

INFORMATION TECHNOLOGY RESOURCES POLICY

<u>ACKNOWLEDGMENT FORM FOR EMPLOYEES & NON-EMPLOYEES</u>

<u>Section 1: to be completed by employee or non-employee</u>

I hereby acknowledge receipt of the Policy concerning the use of Department of Workforce Development (DWD) Information Technology Resources. I understand that as:

Check One:    ☐ an employee        ☐ a non-employee

using ITR resources of the Commonwealth, it is my responsibility to read and comply with the requirements of this Policy.

_____    _____

**PRINT NAME**                      **ORGANIZATION / COMPANY**
**(non-employees)**

_____    _____/_____/_____

**SIGNATURE**                       **DATE**

<u>Section 2: to be completed by Manager responsible for employee or non-employee</u>

As the DWD's Manager responsible for the above named individual, I understand that it is my responsibility to monitor the above named individual's compliance with the ITR Policy and to notify the Internal Control and Security (ICS) Department of any violations. I also understand that I must notify ICS when the above named individual's services conclude so that his/her access is promptly terminated.

**PRINT NAME**

_____    _____/_____/_____

**SIGNATURE**                       **DATE**

   

46

HIGHLY CONFIDENTIAL                      DEL00067788

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Please return completed original Acknowledgement form to:**

Department of Workforce Development
Internal Control and Security Department
19 Staniford Street, 4th Floor
Boston, MA 02114

Rev.  12/06




47

HIGHLY CONFIDENTIAL

DEL00067789

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

## Appendix E: Confidentiality Statement



Confidentiality
202006.pdf





48

HIGHLY CONFIDENTIAL

DEL00067790

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Appendix F: IP Agreement for Vendor's employees etc.

Intellectual Property Agreement for Contractor's Employees, Consultants and Agents Confidentiality, Assignment of Inventions and Representation of Non-Infringement Agreement; Other Representations

The undersigned hereby acknowledges that he or she is an employee or consultant to of the following contractor of the Commonwealth of Massachusetts:

Name of Contractor: _____ ("Contractor")

and desires to be assigned by the Contractor to perform services for the Commonwealth, and that the Contractor desires to assign you to perform services on one or more projects for the Commonwealth, but only under the condition that you sign this Agreement and agree to be bound by all of its terms and conditions.

NOW THEREFORE, in consideration of your assignment to work for the Commonwealth, the access you have to the confidential information of the Commonwealth, and for other good and valuable consideration, the parties agree as follows:

1. <u>Confidentiality of the Commonwealth's Materials.</u> You agree that both during your assignment at the Commonwealth and thereafter you will not use for your own benefit, divulge or disclose to anyone except to persons within the Commonwealth whose positions require them to know it, any information not already lawfully available to the public concerning the Commonwealth ("Confidential Information"), including but not limited to information regarding any web site of the Commonwealth, any e-commerce products or services, any web development strategy, any financial information or any information regarding users of or vendors to the Commonwealth's web sites. Confidential Information also includes, without limitation, any technical data, design, pattern, formula, computer program, source code, object code, algorithm, subroutine, manual, product specification, or plan for a new, revised or existing product or web site; any business, marketing, financial or sales information; and the present or future plans of the Commonwealth with respect to the development of its web sites and web services.

2. <u>All Developments the Property of the Commonwealth.</u> All confidential, proprietary or other trade secret information and all other works of authorship, trademarks, trade names, discoveries, invention, processes, methods and improvements, conceived, developed, or otherwise made by you, alone or with





49

others, and in any way relating to the Commonwealth or any of its web development projects, whether or not patentable or subject to copyright protection and whether or not reduced to tangible form or reduced to practice during the period of your assignment with the Commonwealth ("Developments") shall be the sole property of the Contractor's customer, the Commonwealth. To the maximum extent permitted by law, you hereby waive all moral rights in any Developments. You agree to disclose all Developments promptly, fully and in writing to the Commonwealth promptly after development of the same, and at any time upon request. You agree to, and hereby do assign to the Commonwealth all your right, title and interest throughout the world in and to all Developments without any obligation on the part of the Commonwealth to pay royalties or any other consideration to you in respect of such Developments. You agree to assist the Contractors customer the Commonwealth, (without charge, but at no cost to you) to obtain and maintain for itself such rights.

3. <u>Return of the Commonwealth's Materials</u>. At the time of the termination of your assignment with the Commonwealth, you agree to return to the Commonwealth all Commonwealth materials, documents and property, in your possession or control, including without limitation, all materials relating to work done while assigned by the Contractor to projects for Commonwealth or relating to the processes and materials of the Commonwealth. You also agree to return to the Commonwealth all materials concerning past, present and future or potential products and/or services of the Commonwealth. You also agree to return to the Commonwealth all materials provided by persons doing business with the Commonwealth and all teaching materials provided by the Commonwealth.

4. <u>Representation of Non-Infringement</u>. You hereby represent and warrant that, to your best knowledge, no software, no web content and no other intellectual property that you develop during your assignment to and deliver to the Commonwealth, and no Developments made by you and assigned to the Commonwealth pursuant to Section 2 above, shall infringe a patent, copyright, trade secret or other proprietary or intellectual property right of any third party.

5. <u>No Conflicting Agreements</u>. You represent and warrant that you are not a party to any agreement or arrangement which would constitute a conflict of interest with the obligations undertaken hereunder or would prevent you from carrying out your obligations hereunder. The existence of an Employment or similar agreement with BearingPoint or if you are an employee or consultant to a BearingPoint subcontractor on this project, then with that subcontractor by which you assign ownership of Intellectual Property rights to BearingPoint or the Subcontractor shall not constitute a conflict with this Agreement regarding Intellectual Property rights.

6. <u>Tax Payments.</u> You hereby represent and warrant that you have paid all due state and federal taxes, or, if your tax status is in dispute or in the process of





50

DEL00067792

settlement, that you have responded as directed and within the required timeframes to all communications received from the state or federal government.

7.  <u>You acknowledge that you are not an employee of any Massachusetts state or municipal government agency, and are not entitled to any benefits, guarantees or other rights granted to state or municipal government agencies, including but not limited to group insurance, disability insurance, paid vacations, sick leave or other leave, retirements plans, health plans, or premium overtime pay.</u>  Should you be deemed to be entitled to receive any such benefits by operation of law or otherwise, you expressly waive any claim or entitlement to receiving such benefits from Massachusetts state or municipal government agencies.

8.  <u>Miscellaneous:</u>

(a)  The Commonwealth is a third party beneficiary of this Agreement with full rights to enforce its terms directly.

(b)  With respect to section 1 of this Agreement and for the purposes of this engagement, BearingPoint employees, independent consultants and subcontractors' employees and consultants are considered "persons within the Commonwealth".

(c)  This Agreement contains the entire agreement between the parties with respect to the subject matter hereof, superseding any previous oral or written agreements.

(d)  Your obligations under this Agreement shall survive the termination of your assignment with the Commonwealth regardless of the manner of or reasons for such termination.  Your obligations under this Agreement shall be binding upon and shall inure to the benefits of the heirs, assigns, executors, administrators and representatives of the parties.

(e)  You agree that the terms of this Agreement are reasonable and properly required for the adequate protection of our customer the Commonwealth's legitimate business interests.  You agree that in the event that any of the provisions of this Agreement are determined by a court of competent jurisdiction to be contrary to any applicable statute, law, rule, or policy or for any reason unenforceable as written, then such court may modify any of such provisions so as to permit enforcement thereof to the maximum extent permissible as thus modified. Further, you agree that any finding by a court of competent jurisdiction that any provision of this Agreement is contrary to any applicable stature, law, or policy or for any reason unenforceable as written shall have no effect upon any other provisions and all other provisions shall remain in full force and effect.




51

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

(f) You agree that any breach of this Agreement will cause immediate and irreparable harm to the Contractor's customer the Commonwealth not compensable by monetary damages and that the Commonwealth will be entitled to obtain injunctive relief, in addition to all other relief, in any court of competent jurisdiction, to enforce the terms of this Agreement, without having to prove or show any actual damage to the Commonwealth.

(g) No failure to insist upon strict compliance with any of the terms, covenants, or conditions hereof, and no delay or omission in exercising any right under this Agreement, will operate as a waiver of such terms, covenants, conditions or rights. A waiver or consent given on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

(h) This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to the doctrine of conflicts of law. This Agreement is executed under seal.

The undersigned believes that this agreement imposes reasonable standards of conduct for all of the employees and the contractors on assignment at the Commonwealth, and that this agreement will serve to best protect the interests of all involved parties. If you agree with the terms set forth herein, please sign and return this Agreement.


Agreed and Accepted:

Name of Employee or Consultant: _____

Signature: _____

Date: _____

Name of Contractor: _____

Signature: _____

Name: _____

Title: _____

Date: _____





52

DEL00067794

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Appendix G: Scope, Use Case Statements

## Revenue Increment

- Register Employer Account Subsystem
- Wage Detail and Tax Report Subsystem
- Payment Processing Subsystem
- Collections Subsystem
- Maintain Employer Account Subsystem
- Tax Rate Calculation Subsystem
- Benefit Paid Charge Subsystem
- Field Audit Subsystem
- Third Party Administrator Interface Subsystem

**Register Employer Account Subsystem**

BearingPoint will develop the functionality to register a new employer account; this includes calling the necessary functionality to compute an experience rate for liability determinations; determining reporting status; and triggering the appropriate correspondence. BearingPoint will develop the capability for Employers to self-register based on formally accepted DUA specific business requirements.

Major functions will be made available online. We will address functionality of employer registration, such as employer liability, employer entity types (i.e., LLC and Corporations), and reimbursing accounts; additionally, we will address third party administrator (agent) registration. Each account type, or process, will be managed through a slightly different – yet similar – process. The following use cases and business processes have been identified for this module:

**Register Employer Account Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Initiate Existing Employer Self-Service Account** | This use case is designed specifically for employer and third party administrator conversion and new system adoption. The process allows currently registered employers and agents to logon to the system, using an established security profile, and access their self-service account. The process displays current employer data, and request employers to complete or update missing data. Upon completion, the employer will have established a permanent username and password, updated their account data, and initiated their self-service system. |
| **Create and Register Employer Account** | This use case begins when a Registrant provides required registration information using the Employer Self Service portal; or, an authorized UI Staff assists a Registrant to register an Unemployment Insurance (UI) Employer Account. This use case ends when the Business Entity is assigned the appropriate dates of service and has established an Employer Profile. The use case calls several rate calculation use cases; validates an employer's data; and determines current and future liability, pending fees, and open reporting requirements. Includes getting a DUA ID number. Includes the initiation of appropriate Contributory or Reimbursable payment method. |

53

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Register Third Party Administrator / Employer Agent** | This use case begins when a new Employer Representative (Third Party Administrator or Agent) provides the necessary information to represent Massachusetts companies in Unemployment Insurance. The process creates an Agent Account and allows employers to select the agency for representation based on established roles (power of attorney). |
| **Reactivate Employer Account** | This use case begins when an Employer wishes to Reinstate their Employer Account after a period of termination. The System reinstates the Employer Account and calculates the experience rate including experience factors from the previously terminated account. This use case ends when the System updates the Employer Account and sends notification of the Reinstate Adjustment. Includes Staff view. |

**Tax Rate Calculation Subsystem**

The Tax Rate Calculation subsystem holds the logic to manage employer tax rates; or the changes of those rates. The module manages the annual rate assignment to all employers, individual employer liability determinations, and modifications in rate due to mergers, acquisitions, or change in legal entity. The rate computation will factor in special conditions, such as Tax and Revenue executions and delinquencies that might impact the calculation. The following use cases have been identified for this module:

**Tax Rate Calculation Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Determine Employer Liability** | This use case begins after a business entity submits required information to register for an Unemployment Insurance Account. If data submitted during the registration portion of the process indicates potential liability, this process will determine if the entity has met its liability threshold and a liability determination will be made. This use case ends when the business entity receives notification of the liability determination. |
| **Assign Initial Premium Rate** | This use case begins once the Registrant has submitted the required information to register for an Unemployment Insurance Account and has met the liability threshold necessary to assign an initial premium rate. This use case ends when the business entity receives notification of the assigned initial premium rate. Includes industry specific rate calculation. |
| **Process Succession- Merger Adjustment** | This use case begins when a Succession Adjustment is initiated on an employer account. This occurs when a business entity takes over all or part of an existing business entity in Massachusetts. An Employer or Authorized UI Staff initiates this type of adjustment while maintaining the Employer Account. This use case ends with the determination of the succession adjustment is approved or denied via the system workflow and rates are calculated. Includes mergers/consolidations. |
| **Process Change of Legal Entity Adjustment** | This use case begins when a business changes its legal entity type. The change can trigger a rate adjustment. This use case ends with the determination of the entity adjustment is approved or denied via the system workflow and rates are calculated. |

54

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Process Tax-Paying to Reimbursing / Reimbursing to Tax-Paying Adjustment** | This use case holds the rules to change an employer's reporting status from contributory to reimbursing. The use case assigns the appropriate rates, transfers the necessary experience, and modifies the employer's status. |
| **Calculate or Adjust Individual Employer Rates** | This use case is designed to re-calculate an individual employer's rate due to a change in business situation; assign a new rate based on UI staff decisions; or modify rates due to historic account changes. |
| **Voluntary Contributions Adjustment** | This use case begins when a contributing employer submits a voluntary contribution in order to buy down the premium rate assigned to their Employer Account. Once the amount of the buy down is decided and payment is confirmed, the system adjusts the rate for that employer account. This use case ends when the system updates the employer account with the voluntary contribution adjustment information and the Employer is issued the new premium rate confirmation. |
| **Calculate Annual Rate** | This use case is triggered by the trigger date that initiates the annual rate calculation. The system will calculate the annual rate for the next year for each active, liable, premium paying employer account. This approach allows the core function for calculating a rate to be available to other adjustments that require a rate re-calculation. A notification of the rate will be generated and sent. The flow ends with the Employer Account updated for the next year. The primary functional areas are: Generating certain rate calculation parameters, Accepting certain rate calculation parameters entered by authorized UI staff, Issuing the rate notification to the employer, Updating the Employer Profile. |
| **Calculate Solvency Rate** | Will be part of above Use Case or a stand-alone. |

**Maintain Employer Account Subsystem**

The system will support account maintenance via employer or agent self-service or staff use; this will allow users to control information such as demographics, contact information, security roles and power of attorney, and business change information. The following use cases have been identified for this module:

**Maintain Employer Account Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Change of Reporting Method Adjustment** | The Change of Reporting Method Adjustment use case begins when the authorized user requests a Change of Reporting Method. Authorized UI staff approves or denies the Change of Reporting Method request. The employer accounts are updated and, if appropriate, the rate is calculated and assigned. This use case ends when determination of Change of Reporting Method is sent. Includes Staff ability. |

55

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Assign Worker Status Determinations** | This use case begins when a request is made to review certain information provided by a firm and/or worker in order to properly classify a particular worker or class of workers. The use case ends when authorized UI staff issues a formal determination classifying the worker(s) in question as an employee or independent contractor. Includes Staff request (Benefits to Status/Field to Status/ Employer to Status by mail). |
| **View Employer Account Profile and History** | This use case begins when an authorized user enters the Employer Self Service Portal for viewing employer account information. The profile and history outlines major components (i.e., status, entity type, threshold dates, etc) within the employer's account; this includes history. This use case ends when the authorized user views the necessary information and exits the application. |
| **Maintain Third Party Administrator Roles (Power of Attorney)** | This use case outlines the process for employers to assign "Update and Submit" or "View Only" roles, based on system functions, to Third Party Administrators. The online Power of Attorney agreement allows an authorized agent to act on an employer's behalf and/or receive the employer's nonpublic information in certain defined situations. |
| **Maintain User (Employer) Roles** | This use case allows employers to manage individual staff responsibilities (roles) within the system. The roles can be defined by system function down to the reporting unit level. |
| **Suspend or cease Employer Account** | The use case outlines how an employer, agent, staff or system can suspend or cease an employer's account. |
| **Maintain Reporting Units** | This use case manages the location information for an employer's reporting units. Each reporting unit is assigned a number (cross-matched with wage reporting) and provided an address. The process allows employers to create new, update current, or close old reporting units. |
| **Maintain Owner Officer Information** | This use case manages owner/officer information and history; including percent of ownership, dates, and contact information. |
| **Maintain Third Party Administrator Mailing Address** | This use case manages the mailing addresses of third party administrators. The centralized address maintenance prevents one agent from holding multiple addresses for the same function. |
| **Maintain Employer Mailing Address** | This use case manages employer mailing addresses; this includes management of multiple addresses for the purposes of appropriate correspondence management. This includes all addresses as defined by DUA. |
| **Maintain Employer Name** | This use case allows employers to change their "doing business as" and "legal name".   Legal documentation is required before a legal name change can take place in the system. |

56

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Administrate Employer and Third Party Administrator Searches** | This use case outlines the agent and staff functions of searching for employer accounts. The process also includes staff functionality for searching agent accounts. The agent – employer search only allows agents to search on employers with which they hold a power of attorney. |
| **View, Hold or Cancel Correspondence** | This use case provides the logic to view sent correspondence; hold created but not sent correspondence for later delivery; and, cancel correspondence.  This is a staff function. |
| **Administer Account Resolution** | This use case provides UI Staff the ability to review delinquent accounts via a report or on-line views, determine their true account status, and terminate or update the account as necessary. |

**Wage Detail and Tax Report Subsystem**

The QUEST system will accept employer and third party wage detail information from a variety of sources; however, electronic file transfer and manual submission of records will be the primary modes of submission. The Wage Detail and Tax Report subsystem provides for the collection of wage detail and tax reports; calculation of taxes (based on specific Massachusetts factors); adjusting wage records and tax reports; viewing wage record and submission history; and forecasting future tax liabilities. The sub module also assigns appropriate penalties and fees, and provides a report to track potential SUTA dumping activity. The following use cases have been identified for this module, and include the business processes directly related to the wage report:

**Wage Detail and Tax Report Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Submit Wage Detail Report** | This use case begins when an employer or employer representative receives a reminder to submit wage detail and uses Employer Self Service to prepare, review, verify, and submit, a wage detail report. The process also allows staff to submit wage records as necessary. This use case calls the "Process and Calculate Taxes Due" use case and integrates closely with the payments sub module and processes. The design incorporates FTP, file upload, manual, copy-from-previous, zero-wage, and estimate/exception wage reporting models. The use case will include, or require extension, the UHI and other fund collection and tax-report only functionality. This use case ends when the employer has submitted the quarterly (calendar quarter) wage information. |
| **DOR Wage Detail** | DUA is currently seeking to change the way Wage Detail is collected today.  Employers submit wages to DOR and DOR then provides a file back to DUA which we receive/hold in a separate Wage Record DB.  We are building a business case and are will attempt to reverse this process having employers submit wage detail directly to us. |

57

HIGHLY CONFIDENTIAL                                                                      DEL00067799

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Process and Calculate Taxes Due** | This use case begins when an employer, staff or employer representative has successfully entered, and the System has validated, a Wage Detail Report. The System must then calculate the taxable wages, necessary fees (i.e., healthcare assessment), and total amount due. This use case ends when the taxes due calculations are complete, and the data is displayed and/or applied to the employers account. |
| **Process Non-Submission Penalties** | This use case begins when an employer does not submit a wage detail on the necessary due date. The non-submission triggers a series of penalties and statements; these penalties are designed to motivate the employer to submit the required wage report. This use case ends when the delinquent employer submits the wage detail report; or, when the penalty(ies) is/are forwarded onto the Collections and Account Resolution for processing. |
| **Submit Wage Adjustments** | This use case begins when an Employer, Staff, or employer representative accesses the system to review and edit a previously submitted wage report. This use case ends when the System captures the wage adjustment information and re-calculates / updates the employer's tax liability. |
| **Transfer Wage Detail Adjustments** | The use case begins when a UI Staff identifies a need to shift previously reported wage detail records from one employer's account to another; this situation is usually the result of a succession between two businesses or a multi-business owner reporting wages in error. UI Staff move appropriate employee records/wages between employer accounts, and the System modifies the tax due to each employer. The use case ends when the wage detail is removed from an employer account and added to another employer account, the employer accounts are updated, and statements are sent. |
| **View Wage Detail History** | This use case begins when a user enters an employer's account, for the purposes of managing a UI Revenue Account, to view individual or a select quarter of wage records. This use case ends when the user views the necessary information. |
| **View Wage and Tax Report Submission History** | This use case begins when an employer, staff or employer representative enters the system to view the submission transactions, error reports, and results for each original or adjusted wage or tax reporting transaction. This use case ends when the user views the necessary information. |
| **Process SUTA Dumping Report** | This use case is managed within the general Tax Services Reporting module. The reports logic creates a list of employers who share common employees between quarters. SUTA dumping report needs more parameters other than similar employees between quarters: Owners / officers' legal address business type etc.  Will be determined during design. |

**Payment Processing Subsystem**

The QUEST Tax and Revenue system will provide a standard interface to receive payment data from other systems, such as ACH Credit and ACH Debit. The payment process will also incorporate paper check processing and voucher creation. BearingPoint will use uFACTS to guide the design for managing employer, agent, Massachusetts's

58

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

state-agency, out-of-state and Federal payments. Payments received will be automatically allocated based on allocation or hierarchy rules provided by DUA.

The design will include error management from external systems (i.e., dishonored checks or incorrectly assigned ACH Credit payments), and reversal or adjustment of those transactions. QUEST will provide functionality to accept reversal and adjustment transactions via a file and to perform the appropriate accounting adjustments. Refund processing, fiscal reporting, and re-certification management are also included. The following use cases have been identified for this module, and encompass business processes related to funds processing:

**Payment Processing Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Employer Makes Payment** | This use case begins when an employer has identified a debt on the account and has opted to make a payment. The employer, in a single and secure transaction, submits a full or partial payment. This use case ends when receipt of payment has been confirmed.  Includes processing paper check payments. |
| **Agent Makes Payment** | This use case begins when an employer representative has identified a debt on their client's accounts and has opted to make an individual or bulk payment. The employer representative, in a single and secure transaction, submits a full or partial payment on behalf of the employer(s). This use case ends when receipt of payment has been confirmed. |
| **Other State and Federal Government Makes Payment**<br><br>**When?** | This use case begins when another state or Federal Government submits a payment. The agency, in a single and secure transaction, submits a full or partial payment on behalf of the employer(s). This use case ends when receipt of payment has been confirmed.<br><br>Move to employer charge. |
| **Submit and Reconcile Payment** | This use case begins when a UI Staff identifies an electronic payment error; the situation occurs when an employer submits an ACH Credit file to the correct bank account but does not complete other components of the file correctly. The staff member maps the correct employer account to the completed payment, assigns the payment to the employer's account, and transfers the appropriate funds. |
| **Post and Deposit Payment**<br><br>**Also PID** | This use case begins when an employer payment has been accepted by the System. The system will deposit payments from employers to the financial institutions and post payments to the employer accounts. These payments include current and past due UI Tax and Fees, current and past due reimbursable charges, penalty and interest charges, collection costs, and fees. The use case ends when the payment is deposited into the UI Account.<br><br>Revenue requires electronic payments; PID may need credit cards/EFT. During design, we will address how payments are applied against what hierarchy. |
| **Process Dishonored Payment** | This use case begins with a notification from the banking institutions that a payment has been rejected. The rejected payment is "backed-out" of the employers account (following the reverse hierarchy) and assigns the necessary penalties and/or fees to the account. |

59

DEL00067801

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Process Employer Requests for Refunds** | The use case begins when an employer identifies an account credit and wishes to reclaim the funds. The employer requests the funds through the System. The use case ends when the System submits the refund, updates the account, and notifies the employer of actions taken. Thresholds and rules will be determined during design. |
| **Produce IRS Certification and Re-Certification File** | This use case begins when the IRS sends an annual FUTA Identification Data Tape to DUA. The FUTA Certification process is the method the IRS uses to verify with the Department that the credit for UI taxes claimed by employers on their annual Federal Tax and Revenue return was actually paid to the Massachusetts Unemployment Fund. The system creates the necessary re-certification file for submission to the IRS. The use case ends when the system returns a FUTA Certification data file to the IRS. |
| **Re-Certification of Tax Paid** | This use case begins when an employer or IRS agent or employer requests a certification of wages and taxes paid for a specific calendar quarter and year. The system allows employers, staff, or employer representatives to view Re-Certification information (940C) information online; appropriate correspondence can be submitted to the IRS if requested online. The use case ends when the employer either prints a copy of the certification report; or, the UI staff sends an electronic or paper copy to the employer/IRS agent. |
| **Staff Review Account Details** | This use case provides staff an opportunity to review employer and employer representative payments; this includes groups of payments (i.e., ACH Debit, Paper Checks, and ACH Credit) down to the individual payment level. |
| **Fiscal and Revenue Reporting** | Fiscal and Revenue reporting is housed in the base reporting infrastructure of uFACTS; however, there are critical base criteria that need inclusion in the payments process. The Fiscal and Revenue reporting component includes tracking of Benefits Paid Charges, Contributory Employer Payments, Receivables, Daily Balancing, Fund allocation, and Collected Debt. Overpayments collections are included here. |
| **Processing accounts without DUA id number** | Processing and tracking payments of accounts that have not been assigned a DUA id number.<br><br>We will examine the opportunity to modify this process with an improved process that does not allow payments without proper registration. |
| **Payment Deferral** | This use case describes deferring two-thirds or some other partial payment of quarterly payments to be paid in full by the third quarter. |

**Collections Subsystem**

The QUEST system will include functionality and specific subcomponents designed to support the collections business process. QUEST will support aging and tracking of receivables, and allow collections specialists to choose from a variety of collections mechanisms. Reporting and correspondence will be developed to support the system functionality. The following use cases have been identified for this module:

60

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Collections Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Collect Established Debt** | This use case begins when an employer account becomes past due. The main flow is only applied to established debt. An Overdue Account Statement is sent to the employer indicating the employer must pay the debt within a stated timeframe after which the debt, if it meets referral rules, will be referred to debt collection within DUA. The use case ends when the debt is resolved. |
| **Conduct Debtor Resolution Activities** | This use case identifies and executes steps that need to be taken to prepare owner/officer information for a Personal Liability Determination. Specifically, this will involve the System finding Owner/Officer records that are out of date or incomplete and routing them to UI Staff to be updated. |
| **Compromise of Penalty, Interest and Fees** | This use case begins when an Employer requests a compromise of penalty, interest or fees. This use case ends when the UI Staff has acted on the request, and the System notifies the employer of actions taken. |
| **Establish Payment Plan** | This use case describes the process of creating a payment plan. The use case progresses with UI Staff negotiating the terms of the proposed payment plan and gathering the require information for the proposed plan. It also covers the steps the System uses to monitor the plan status after it is put into place. |
| **Manually Hold Debt** | This use case manages individual debt items and prevents them from collection referral. The process also incorporates electronically recalling a debt from collections.  Includes lien and bankruptcy processing identified by reason codes for debt holds. |
| **Process Delinquent Debt** | This use case covers the flow of established, delinquent debt from the System. It begins when debt is established. The system will indicate when debt has reached the necessary conditions for processing debt (i.e., First Notice, Second Notice, and Payment Plan/Compromise). This use case also covers the activity of establishing interest or penalties on delinquent debts. |

**Benefits Paid Charge Subsystem**

The QUEST Tax and Revenue system will accept benefit paid charges and adjustments from benefits processing activity. The sub module tracks benefits paid charge transactions, and allows staff to manually adjust transactions, and creates a downloadable charge file for employers. Accounts for reimbursable employers are assigned the appropriate debits to their account. In many States, State Agency Accounts are treated specially. The following use cases have been identified for this module:

61

DEL00067803

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Benefits Paid Charge Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Process Benefit Paid Charge and Non-Charge Data** **(This use case may need to be implemented with Benefits Increment.)** | This use case documents how to process the benefits paid and charge to employer accounts. It is the process effects of Benefits Paid/Charged on Benefit Account. Benefits Paid/Charged is not considered a separate "system", but rather one component of an integrated whole. |
| **Process Manual Benefits Paid Charge Adjustments** **(This use case may need to be implemented with Benefits Increment.)** | This use case begins when a UI Staff person wishes to adjust charges for an employer. It describes the steps needed to accomplish manual adjustments to the Benefits Charge transaction. A manual adjustment is an adjustment that is not accommodated by the automatic adjustment process; these adjustments are considered anomalies, but may be required to accommodate an employer's account. This use case ends when charges have been successfully adjusted. |
| **View Online Benefits Paid Charge Statement** | This use case begins when an employer wishes to view their charge statement of account, or charges in general. It describes the steps that an employer goes through to view their statement of account. The statement of account includes the employer charges from the last period and historically, along with any outstanding balance due, if a reimbursable employer. The use case ends after an employer has successfully viewed their charges. |
| **Create Employer Benefits Paid Charge Statement** | This use case describes the steps necessary for generating an employer charge statement. It begins when the system starts the process based on an automated batch scheduler. The charge statements can take a variety of forms, but each type must communicate the same content – employer charge activity for that period. The use case has slightly different requirements depending on the employer type, and the communication option that the employer has chosen; paper or electronic. The process ends when the employer charge statements have been generated. |
| **Create Employer Benefits Paid Charge Download File** | This use case describes the steps necessary for generating a delimited file of Benefits Paid Charge transactions. The file is created and displayed to be downloaded by employers online. |
| **Employer Protest Charges** | This is a placeholder for design concerns.  This use case describes the employer's ability to protest benefit charges on a particular statement. There would be a connection from Appeals back to Accounts control to handle any adjustment. |

**Field Audit Subsystem**

The QUEST system will provide a set of data validation routines that automatically identify discrepancies between wage reports, Tax and Revenue reports and payments (integrity checks). Where possible, these routines will force employers to reconcile as

62

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

part of the wage submission process to eliminate any manual effort associated with reconciliation or data cleansing. However, we realize that the QUEST system must support the full range of balancing and reconciliation activities.

Additionally, the QUEST system will provide mechanisms to randomly and conditionally generate data for initiating, tracking, and executing field audits. This includes generating notices, notifying employers of scheduled activities, assigning resources, creating data extracts, and recording findings, as well as others. The following use cases have been identified for this module:

**Field Audit Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Generate Field Audit** | This use case describes the automated process of random selection, or targeted random selection, of employer accounts. The employer accounts are placed in a queue for field audit staff to process; based on pre-determined auditor factors (i.e., zip code or industry type). |
| **Administer Field Audit** | This use case begins when the System and/or Field Auditor selects an employer for an audit. The Use Case involves the activities necessary for required Federal Employer Audit Compliance. These audits may be triggered by a random selection process or by targeted criteria. This use case ends when an audit is complete, findings letter is submitted, and the audit is saved and approved by management. This excludes an offline process. Audits will be done via connection to QUEST system. |
| **Administer Field Audit Referrals** | This use case begins when a UI Field Auditor receives a referral or investigation request from another UI Staff member; or to respond to an employer request for assistance. The use case ends when the field auditor has addressed the referral/request, documented the actions, and updated the System as necessary. |
| **Review Field Audit** | This use case outlines the process necessary for management review of field audits; managing quality control. The process incorporates workflow functionality to return audits to staff once audit is complete or if quality is not met based on design. |

**Third Party Administrator Interface Subsystem**

The Third Party Administrator Interface subsystem provides a set of functionality that focuses on processing large volume, multi-employer records. The following use cases have been identified for this module in order to provide this functionality:

**Third Party Administrator Interface Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Process Agent FTP Wage Report File** | The design artifact outlines the file format and processing rules for submitting an agent file – containing multiple employer records. This includes error handling and file rejection rules. |
| **Create Agent FTP Wage Report Acknowledgement File** | The design artifact outlines the file format submitted to large agents upon processing a bulk agent file. The file provides validation of submission and error information. |

63

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Process Agent Role Assignment File** | The design artifact outlines the file format submitted by large agents to self-assign power-of-attorney in a bulk fashion. NOTE: The process is recommended for conversion purposes only. |
| **Process Agent FTP Benefits Paid Charge File** | The design artifact outlines the file format for providing Benefits Paid Charge transaction detail for agents on all their client accounts. |
| **Process Agent Employer Rate File** | The design artifact outlines the file format for providing agents rate information for their client accounts. |
| **Process Other Bulk Filing** | Will be determined if needed during design. |

**Unemployment Health Insurance (UHI)**

| Use Case | Brief Use Case Description |
|---|---|
| **Match Revenue Processes** | The system will be fully integrated and follow similar processes to Revenue collections. |

64

HIGHLY CONFIDENTIAL                                                                                                 DEL00067806

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Benefits Increment

BearingPoint will implement a Benefits module that aligns with the specific business requirements of Massachusetts Department of Unemployment Assistance. The module will include initial and continued claims, monetary and non-monetary determinations, adjudication, benefit payments and control, 1099 processing, fraud detection and recovery, as well as implementing and supporting various other programs and services such as Work Share, UHI, TRA, Child Support Recovery, and Trust Fund accounting. The tasks required to deliver this module will include:

- Design
- Construction
- Conversion
- Testing

BearingPoint will customize uFACTS' Benefits Services components to DUA's specific business and technical requirements. uFACTS will be modified based on subject matter experts and claimant focus group sessions. BearingPoint will also develop, based on formally accepted DUA project management requirements, the necessary interfaces to new and existing external and internal entities; exact interfaces or interface portions will be determined during detail design. Interface channels (i.e., s FTP, Online, and magnetic tape) will be examined for each interface. BearingPoint will deliver the following subsystems and assess the associated subsystem use cases for implementation:

- Initial Claim Subsystem
- Process Benefit Determination
- Benefit Payments
- View and Maintain Benefit Account
- Integrations Services
- Appeal Processing
- Program Integrity
- Economic Research
- Unemployment Health Insurance

### Initial Claim subsystem

Initial Claim subsystem includes the necessary functionality for supporting claimants, employers and UI Staff throughout the initial claim application process. The design of this subsystem will include designing customer-facing functionality that allows claimants to apply for existing types of program benefits, including Standard Unemployment Insurance, Disaster Unemployment Assistance (DUA), Work Share, UHI, Extensions, and Trade Readjustment Allowance (TRA). The following use cases have been identified for the Initial Claim Subsystem:

65

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Initial Claim subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **View Preliminary Information** | This use case begins when a claimant selects "Apply for Unemployment Benefits Online" from the self-service website. The purpose of this use case is to provide cursory education on the following topic areas: When Should I File, Information Checklist, Who Qualifies for Benefits, How Benefits are Calculated, Web Page Viewing Tips, and System Security. This use case is complete when the claimant selects "Start the Unemployment Benefit Application" and then agrees to the data privacy authorization. |
| **Process Initial Questions** | The use case begins after the claimant selects "yes" to the data privacy authorization and submits. The system then displays the Initial Questions, which determine:<br>• If the potential claimant is able to apply for unemployment benefits.<br>• The type of application format presented to the claimant in order to obtain the appropriate data to establish a benefit account.<br>• The use case ends when the claimant has successfully answered the required initial questions. |
| **Authenticate Claimant** | This use case begins after the claimant has answered the initial questions. The claimant will enter personal information that will be sent to SSA and US CIS through an interface for verification. If a claimant's information is not validated by SSA or US CIS, he/she will have limited system access, and the system will place a non-monetary hold on his/her account. The claimant will then be directed to assign him/herself a password. This use case ends when the claimant has successfully chosen a password.  During the design we will determine which entities need to cross-referenced and how; real-time versus batch. |
| **Collect General Information** | This use case begins after the claimant has assigned him/herself a password. The purpose of this use case is to collect the claimant's demographic information for statistical and work search purposes. This use case ends when the claimant has answered all the required questions.  Capture profiling, dependency information and claimants preferred method of payment.  Will determine this during design. |
| **Collect Employment Information** | This use case begins after the claimant has answered the general questions. The purpose of this use case is to collect the claimant's Massachusetts, federal, military and/or combined wage employment information from the beginning of his/her base period date to the current date. The use case ends when the claimant's employment information has been successfully entered and validated by the system. |

66

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Activate DUA Option** | This use case begins after multiple off line preconditions steps are completed when an authorized Disaster Administrator has received notification from the Department of Labor that a Disaster has been declared in a Massachusetts County (ies). This Use case involves establishing the system framework that will be used to initiate the availability of benefits once a disaster has been declared. The administrator will define a new disaster record, or modify an existing record within the Disaster Benefits Framework. This creates a new disaster master record, to be stored in the framework that will then allow the system to accept and validate applications. Using the defined system framework criteria, the system could then compare, approve or deny eligibility for benefits for Disaster Unemployment Assistance. This use case ends when a DUA framework record has been successfully created or modified by an authorized administrator. |
| **Process DUA Application** | This use case begins when a claimant applies for DUA benefits. The claimant is required to submit specific information for making a determination of Disaster Unemployment Assistance (DUA) benefits. This use case ends when a claimant has completed all the necessary sections of the DUA application. |
| **Process RED Application** | Applies to Section 30/RED, similar to above. |
| **Activate Extension Option** | This use case begins when an authorized user wishes to define a new extension program within the Benefits Module. This creates a new extension option that can then be subsequently applied for by claimants when their account meets the necessary qualifying characteristics. This use case ends when an extension option has been successfully activated. |
| **Process Work Share Application** | The purpose of this use case is to describe the steps that an employer would need to perform to process an application to become a work share employer. An employer is required to meet several business requirements before their organization is considered by UI for work share eligibility. Once an employer has submitted all required information for the employer work share application, this use case is complete.  Includes workflow to staff for approval. |
| **Process Trade Readjustment Allowance** | This use case begins when an authorized TRA worker completes the applicable sections of the TRA application into the Benefits Module for consideration of TRA benefits. From this application, the Benefits module will determine if the claimant is eligible for any of the TRA programs. These include Alternative Trade Adjustment Assistance (ATAA), Trade Readjustment Allowance (TRA), and / or Health Coverage Tax Credit (HCTC). This use case ends when the authorized TRA Worker has completed all the necessary sections of the TRA application.  This use case needs to modified during design to include a "SHORT" version of UI claim/denial then work flowed to TRA |
| **Process Extension Application** | This use case begins when a claimant decides to apply for an extension of benefits. When a claimant decides to apply for an extension, several questions must be asked that pertain to the original account, plus the claimant's current circumstances. This use case ends when a claimant has completed all the necessary sections of the extension application. |

67

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Review, Edit, & Confirm** | This use case begins when the claimant has completed one or more sections of the application for benefits, and wishes to review his/her responses. This use case will describe the steps that the claimant goes through in the process of reviewing their registration questions and answers, and to edit those answers if necessary, as well as to submit the final confirmation of those answers. The use case ends after the claimant has either saved their application for later processing or submitted it after confirmation. |
| **Establish Claim** | The purpose of this use case is to describe the steps that the system must proceed through in order to create an account based on information submitted within an application. The system creates accounts when the claimant submits the application. Applications are analyzed by the system to determine the program and account type, along with all applicable information necessary for determining benefit amounts. This use case is complete once an account has been established, along with any necessary issues for UI Staff to review. |
| **Login Claimant** | This use case begins when a claimant has selected "Existing Account" from the "Getting Started with Massachusetts Unemployment Insurance Benefits". The claimant will then enter his/her ID (TBD) and password. If the claimant cannot remember his/her password, he/she will have an opportunity to reassign one. The use case ends when the claimant has logged into the system using the correct SSN and password. |
| **LADT** | This Use Case describes the functionality needed for UI to interface with the Interstate Statistical Data Exchange (commonly called the LADT) which in turn supports the exchange (incoming/ outgoing) of claims and related statistical data between States. The interface sends out initial and continued claims data for commuters and claimants that have Massachusetts Benefit Accounts but have residences out of Massachusetts. The interface receives and processes initial and continued claims data for commuters and claimants who have claims in other states but reside in Massachusetts. This Use Case details of the data to be exchanged, the record layout, and the process for exchanging the data. |

**Process Benefit Determination**

The purpose of this subsystem is to determine claimant eligibility for Regular and Special UI program benefits. The use cases in this subsystem will: Identify claimant monetary and non-monetary eligibility and issues; Calculate the Weekly Benefit Amount (WBA) and the Maximum Benefit Amount (MBA) specific to the claimant program type; and Issue a single or combined benefit determination to the employer or claimant. The following use cases have been identified for the Process Benefit Determination Subsystem:

68

HIGHLY CONFIDENTIAL

DEL00067810

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Process Benefit Determination**

| Use Case | Brief Use Case Description |
|---|---|
| **Collect Eligibility Information** | This use case begins when the claimant is requested to answer non-monetary eligibility information. Based upon the claimant's answers, the claimant will be required to provide additional fact-finding information, which is stored for review by UI staff. The use case ends when the claimant has completed entry of the eligibility information. |
| **Collect Separation Information** | This use case begins when the claimant is requested to enter separation Information. For each employer the claimant indicates the reason for separation. The claimant can select only one reason for separation for each employer. Based on the reason, claimants may be required to provide additional information (fact-finding) which is stored on the database for later review by UI staff. This use case ends when the claimant has completed entry of the required separation information. |
| **Manage Non Monetary Issues** | This use case was created in order to consolidate the documentation of all non-monetary issues that will be tracked by the system. The use case defines the list of issues and for each describes what processes/ use cases create the issue, how the issue will affect the claimant and how the issue will be routed to adjudication staff for processing. This use case ends when the issue has been routed to the appropriate workflow queue. |
| **Gather Fact Finding** | This use case begins when a non-monetary issue has been identified. The use case describes the fact-finding questionnaire that will be sent to the issues interested parties (claimants, employers, doctors, etc). The use case also describes the functionality for receiving fact-finding questionnaires. The use case ends when all questionnaires have been returned or when the time limit set for the return of the questionnaires has past. |
| **Adjudication** | This use case begins when UI staff selects a Non-Monetary issue from Workflow. UI staff reviews all information associated with the Non-Monetary issue and determines if the Non-Monetary issue is correct, if additional information is needed, or if another Non-Monetary issue has been identified. UI staff makes a determination by selecting the findings, conclusions and statute. UI staff determines if the Non-Monetary determination should be combined with other determinations. This use case ends when the system updates the claimant and employer accounts.  The level of complexity will be reviewed during design. |
| **Auto Adjudicate Non-Monetary** | This use case begins when the issue identified by the system meets the user defined business rules for an auto adjudicated determination. System will make the determination and issue the correspondence to the employer or claimant as applicable. This use case ends when correspondence is issued and the system updates the claimant and/or employer account.  The level of complexity will be reduced in design. |
| **Modify Non Monetary Determination** | This use case begins when UI Staff identify that a previous non-monetary determination should be modified. Once UI Staff has entered the data for modification, the system updates the system processes that are affected by the update and issues correspondence to the claimant and/or employer as necessary. This use case ends when correspondence is issued and the claimant and/or employer account is updated. |

69

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **View Non-Monetary** | This use case begins when a User accesses the "View Non-Monetary" functionality. The system will display the non-monetary determination and status. This use case ends when user exits this functionality. |
| **Calculate Pre-monetary (internal)** | This use case begins when authorized staff accesses the Pre-monetary Review screen. The user will enter an SSN and determine which base period the system should use to calculate a potential claimant's Weekly Benefit Amount and Maximum Benefit Amount. This use case ends once the system has retrieved and displayed the appropriate wage detail records and calculated and displayed both the Weekly Benefit Amount and Maximum Benefit Amount. |
| **Calculate Pre-monetary external** | This use case begins when the claimant wishes to receive a pre-monetary estimate of his/her unemployment benefits. The purpose of this use case is to provide the claimant with an estimate of his/her weekly benefit amount and maximum benefit amount based on the claimant's wage detail records. This use case ends after the claimant has viewed his/her pr-monetary estimate. |
| **Request and Receive Wages** | This use case begins after an initial application has been filed. If during the initial application the claimant indicated federal, military, and/or other state employment this use case processes the wage response(s) from ICON. If the claimant failed to indicate these types of employment upfront but later indicate missing wages this use case incorporates the functionality for staff invoked wage requests as well as the processing of wage responses. Finally, if a claimant indicates missing or incorrect MA wages this use case incorporates the functionality to modify MA wages. This use case ends once the wages (MA, other state, federal, and/or military) are received and handed over to the Calculate Monetary use case. |
| **Calculate Monetary** | This use case begins when the claimant has completed registration and has indicated they are requesting Regular or Special Program UI benefits. Special Programs include: Temporary Extended Unemployment Compensation (TEUC), state Extended Benefits (EB), Disaster Unemployment Assistance (DUA), and Shared Work. The purpose of this use case is to identify the employers that will be charged when a claimant receives benefits and to determine if the claimant has the wages necessary to be monetarily eligible to receive regular UI benefits or meets the monetary guidelines associated with Special Program UI benefits. This use case contains the business rules necessary to determine the claimants Regular or Special Program Weekly Unemployment Benefit Amount (WBA) and Maximum Unemployment Benefit Amount (MBA). Business rules will determine if a combined determination is issued to the claimant. This use case ends when the system calculates the claimants WBA and MBA and issues the necessary correspondence. Includes: Automatic calculations of monetary by Ma. Program; TRA/Red and/or workers comp., seasonal, school.  Updates to payment records, overpayments.<br><br>Notification to claimant/employer of eligibility or payment charge<br><br>Appeal form must be sent to either claimant or employer |

70

HIGHLY CONFIDENTIAL

DEL00067812

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Process Amended Monetary** | This use case may be initiated based on the following: Claimant request for wage information has been returned through the ICON system or returned by a Massachusetts employer, claimant account updates (determination or appeal decision), employer correction to wage detail or the claimant has requested an alternate base period. This use case contains business rules that address Regular and Special Program re-determinations. The system will include internet based, and integrated voice response (IVR) service channels, for this option. Staff workflow would be created for monetary information received on paper. Upon receipt of the information the system re-calculates the claimants Regular or Special Program WBA and MBA and updates the benefit charge and wage detail processes. Business rules will determine if a combined determination is issued to the claimant. This use case ends when the claimant and employer account are updated to reflect the wage information and the necessary correspondence is issued to the claimant and employer. |
| **Process Effective Dated Monetary** | This use case begins when a claimant has submitted an application with employment identified by business rules as having a wage limitation. The system will use the wages in wage detail to calculate the MBA/WBA and based on the effective begin and end dates identified by the claimant will establish the effective date of the monetary and calculate the MBA/WBA. One the claimant has reached the end date of the limitation, the system releases the wages, issues the correspondence to the employer/claimant and updates the claimant account. |
| **Process Combined Wage Claim** | This use case begins when another state requests wages from MA by sending an IB4 request (either through the ICON interface or via mail). This use case describes the steps taken to determine whether there are wages that can be transferred from MA to the other state for the SSN being requested. The use case ends with the sending of an IB4 response to the other state which will either transfer wages or notify the other state that wages could not be transferred and why. This use case includes billing of other states for their share of combined wage claims, and reporting of that activity to state and federal agencies. In addition this use case incorporates Interfacing with electronic flows of funds from other systems (e.g. the payments from other states that are received in Massachusetts through the federal UTF financial transfer system) |

**Benefit Payments Subsystem**

The Benefit Payments subsystem incorporates functionality to determine continued weekly or bi-weekly eligibility as well as functionality to correlate payments with the proper program type. The Benefit Payment process also includes the calculation of payment based on monetary benefit entitlement, non-monetary holds, disqualifications and eligibility deductions, and deductions such as wages earned, child support and/or overpayment offsets, etc. The System will dispense payments and update the claimant benefit account to reflect payments and/or payment adjustments as well as the employer account benefits paid records. This subsystem also includes use cases related to the calculation, establishment, and recovery of overpayments. The following use cases have been identified for the Benefit Payments Subsystem:

71

DEL00067813

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Benefit Payments Subsystem**

| Use Cases | Brief Use Case Description |
|---|---|
| **Collect Claimant Earnings Information** | This use case will collect all earnings that the claimant would have had during the request for payment period. The Claimant would have supplied all earnings from any wages, military income, and self employment income. The system would also ask the claimant if he/she had returned to work during the requested week's period. |
| **Collect Claimant Separation Information** | This use case gathers the fact-finding necessary to adjudicate separation issues. Will utilize questionnaires developed by the Determinations process. In addition, information can be gathered if a claimant indicates they have refused work, or identify an additional separation in the request payment. |
| **Collect Availability Information** | This use case gathers information regarding the claimant's ability and availability for work. If potential issues are identified related to the claimant's ability and availability, the claimant will be prompted to complete the appropriate questionnaire. |
| **Collect Other Source of Income Information** | This Use case begins when a claimant indicates within the Request for Payment Process that they have Other Income. The system routes the claimant to complete the necessary information regarding Other Income. |
| **Confirm Request Benefit for Payment** | This use case describes the functionality associated with the claimant's request for payment, including the data elements that appear, and which are editable. |
| **Determine Benefit Payment Distribution** | This use case describes the technical requirements needed to correctly distribute benefit payment monies to the proper entities (i.e., child support, state and federal taxes, etc.). |
| **Process DUA Request for Benefit Payment** | This use case describes the unique functionality and information captured when the claimant is applying for benefits under the Disaster Unemployment Assistance program. |
| **Generate Benefit Payment** | This use case begins when a claimant or UI Staff has successfully submitted a request for payment for a week, or if UI Staff makes an adjustment to a payment (PFRC) to be made. This use case ends when the all weeks requested to be paid have been processed. |
| **Initiate Cross Match Detection** | This use case begins when the System runs or UI staff initiates one of several cross match queries This use case ends when the requested cross match query is complete. |
| **Process Claimant Account Adjustments** | This use case begins when an adjustment to a processed Overpayment debt payment is required. This use case end when the Overpayment debt payment has been updated. |
| **Process Check Cancellations** | This use case documents requirements related to the processing of cancelled checks. |
| **Process Check Reconciliation** | This use case describes the process to reconcile outgoing checks with US Bank. |

72

DEL00067814

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Cases | Brief Use Case Description |
|---|---|
| **View and Generate 1099-G** | This use case begins when a claimant or UI Staff wishes to view a 1099-G. The System will display the most recent year available for the claimant, and will allow a claimant or UI Staff to view and print previous years' data as well, in the proscribed 1099-G format. This use case also includes the necessary business rules for processing the annual 1099 job that generates the annual 1099-Gs. This use case ends when a user has successfully viewed a 1099-G. |
| **Process Overpayments** **Applies to PID** | This use case begins when a regular or special program overpayment has been identified due to a monetary re-determination, account update, appeal decision, or discovered via one of the cross match queries. This use case ends when the system updates the account to accurately reflect the debt and the necessary correspondence is issued to the employer or claimant. |
| **Process Request for Benefit Payment** **Applies to PID** | This use case begins when a claimant accesses the continued request option via IVR or the internet to process a weekly or bi-weekly request for Regular or Special Program benefit payment. This use case ends when the Claimant has successfully submitted their request for payment. Upon submission, the System deducts any overpayment offset or other deductions and calculates the benefit payment. |
| **Process Underpayments** | This use case begins when it has been determined that a claimant has been underpaid resulting from an appeal or adjudication. The system will issue the appropriate payment resulting from the underpayment. |
| **Process Shared Work Request for Benefit Payment** | This use case begins when a claimant requests partial Unemployment Insurance Benefits while continuing to work for a pre-approved employer of the Shared Work Program. This use case ends when the claimant receives payment. |
| **Process TRA Request for Benefit Payment** | This use cases describes the unique functionality and information captured when the claimant is applying for benefits under the Trade Adjustment Assistance Act. |
| **Validate Payment Calculation** | This use case begins when a claimant has successfully submitted his/her request for payment and received a confirmation notice This use case ends when the weeks requested have been validated and/or calculated |
| **Validate Work Search Verification** | This use case will validate the claimant's ongoing work search effort. |
| **Work Search Verification** | This use case will gather information regarding the claimant's ongoing search for employment. Claimants will be randomly identified and selected during the request for benefit payment. |
| **Process Claimant Payment Plan** **Applies to PID** | This use case begins when a claimant requests a payment plan. This use case ends when the system updates the account to reflect the creation of an approved payment plan. |

73

HIGHLY CONFIDENTIAL

DEL00067815

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Cases | Brief Use Case Description |
|---|---|
| **Process Claimant Refund**<br><br>**Applies to PID** | This use case is initiated when UI has over-collected Claimant debt. This use case begins when either the System or UI Staff identifies a refund is due the Claimant. This use case ends when the check is cashed or cancelled.  Credit balances should not automatically be refunded by the system.  Hold and verify must be done. |
| **Process Debt Payment**<br><br>**Applies to PID** | This use case begins when the Claimant initiates a debt payment transaction. This use case ends when the System has been updated with debt payment information and has generated a payment confirmation number. This use case includes electronic access to Lockbox Transactions images for improved reporting capability. |
| **Process  Collections** | This use case begins when a debt has been determined uncollectible through available UI collection methods and ends when the debt has been assigned for additional collection actions |
| **Refer Debt for Revenue Recapture** | This use case begins when the system determines a claimant account debt meets business rule eligibility for referred to the State of Massachusetts Department of Revenue (DOR) for tax intercept. This use case ends when the debt is satisfied and tax intercept is no longer necessary. |
| **Process Online Underpayments** | The Use Case begins when manual intervention is required for the generation of an Underpayment. The use case ends when an Underpayment is created, and the determination has been updated. |
| **Process Online Overpayments**<br><br>**Applies to PID** | The Use Case begins when manual intervention is required for the generation of an overpayment. The use case ends when an overpayment is created, and the determination has been updated. |
| **Employer Workshare** | Employer will verify and enter work schedules.  Will be determined during design. |

**View and Maintain Benefit Claim**

This subsystem describes the ability of the claimant to maintain information about their claim, and for UI Staff to maintain information about a claimant. For the claimant, this includes the claimant's ability to maintain information including address, requesting a wage correction, viewing their payment and withholding history, requesting a check replacement, viewing and printing a 1099-G, and submitting any tax withholding and direct deposit information. A claimant will only have access to their account through the authentication of their identity using a UI-assigned user ID and self-assigned password. For a UI Staff person, the view and maintenance features will be enhanced from that functionality available only to claimants, and will include enhanced access to claimant and claim history, as well as appropriate internal maintenance functions, such as appeals and determinations. Employer access to claimant information will include viewing information directly related to unemployment charges and employer fact-finding, as well as applicable appeal updates. The following use cases have been identified for the View and Maintain Benefit Account Sub-System:

74

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**View and Maintain Benefit Claim**

| Use Case | Brief Use Case Description |
|---|---|
| **Resolve Authentication Issue** | This use case begins when a claimant attempts to access the UI System. This is a UCS to re-authenticate claimants who were not authenticated via SSA - possibly due to basic transposition of SSN. Allows staff to authenticate those claimants. Simple process and uses authentication process code. |
| **Determine Correct Path** | The purpose of this use case is to describe the steps that the system must take to determine the available options for the claimant, and the message(s) to display to the claimant. Both of these items (options and messages) are dependent on many factors related to the program and account status for the individual. This use case is complete once the System has successfully analyzed the program and account status, and determined the appropriate options and messages to display to the individual. |
| **Manage Password** | This use case begins when a claimant chooses to change their password. The System will allow the claimant to change their password to another value. The use case ends when the claimant's password has been successfully changed. |
| **Reactivate Account** | The purpose of this use case is to document the steps and business rules for the Reactivate Account process. A claimant must reactivate their account after a predetermined amount of time has passed since their last request for payment. The claimant must confirm existing key information before reactivation, and then is required to provide information based on their response to a series of preliminary questions. The use case is complete when the claimant has submitted their account reactivation. |
| **View and Maintain General Information** <br> **QAS/Pitney Bowes?** | This use case begins when a claimant wishes to update their general information regarding name, address, phone number, and birth date. This use case ends when the claimant has successfully changed their general information, chooses to view other account information, or ends the session. <br><br> If a new address is added, system will check for overpayment and activates collections if collection was inactive. |
| **View & Maintain Payment and Deduction Information** | This use case begins when a claimant or UI Staff wishes to view Claimant payment information. It describes the steps that the Claimant or UI Staff must go through to view payment information from previous requests, including deductions (earnings, eligibility, etc.), payment distribution (taxes, child support, etc.) and net payment amount. This use case ends when the claimant or UI Staff has successfully viewed payment information, chosen to view other account information, or ended the session. |
| **Manage Payment Method** | The Manage Payment Method use case is initiated when a claimant or Authorized UI Staff has accessed the Current Payment Method screen. This will allow the user to view and, if their security allows, update the Claimant's current payment method. This use case ends when the user has exited this functionality or has successfully updated the Claimant's payment method. |

75

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Update Tax Withholding** | The Update Tax Withholding use case is initiated when a claimant or Authorized UI Staff have opted to access the Current Tax Withholding Status screen which allows the user to view and initiate an update to the Claimant's tax withholding status. This use case ends when the user has exited this functionality or has successfully updated the Claimant's tax withholding status. |
| **Customer Service Representative Interface/Views** | The purpose of this use case is to describe the functionality that will be available to internal UI Staff to view history of a claimant's account information. It is assumed that there are two types of account history information that need to be available to UI Staff. One type of information is a comprehensive transaction log, and the other is an individual history of categorical information, such as address. This use case is complete when UI Staff have viewed the history of an account. |
| **Claimant Views and Maintains Monetary Determinations** | The purpose of this use case is to describe the steps and functionality that exist to support claimants and UI Staff in viewing determination information for an account. This use case starts when any of the actors mentioned wish to view monetary determination information. The actors will need the ability to view determination information for an account at some level. This use case ends when determination information has been successfully retrieved and viewed. |
| **Employer Views and Maintains Monetary Determinations** | The purpose of this use case is to describe the steps and functionality that exist to support employers and UI Staff in viewing determination information for an account. This use case starts when any of the actors mentioned wish to view monetary determination information. The actors will need the ability to view determination information for an account at some level. This use case ends when determination information has been successfully retrieved and viewed. |
| **Claimant Views Non-Monetary Determinations** | The purpose of this use case is to describe the steps and functionality that exist to support claimants and UI Staff in viewing determination information for an account. This use case starts when any of the actors mentioned wish to view non-monetary determination information. The actors will need the ability to view determination information for an account at some level. This use case ends when determination information has been successfully retrieved and viewed. |
| **Employer Views Non-Monetary Determinations** | The purpose of this use case is to describe the steps and functionality that exist to support employers and UI Staff in viewing determination information for an account. This use case starts when any of the actors mentioned wish to view monetary determination information. The actors will need the ability to view determination information for an account at some level. This use case ends when determination information has been successfully retrieved and viewed |
| **Adjust an Account** | The purpose of this use case is to allow UI Staff to withdraw a claimant's account; or adjust the key data on the specific account. |
| **Employer Search** | The use case is designed to be an extension of the Tax Services Employer Search functionality. The scope is limited to add street address only. |
| **Claimant Search** | The use case is designed to aide UI Staff to search for individual claimants. The search functions will provide access to security-based claimant data. |

76

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Modify Extension and DUA Program** | The use case is designed to update existing extension/DUA data. PID will participate in use case modification; Federal rules apply. |
| **Maintain Informational Lists** | The use case will allow users to update system lists. Some lists could include the following: State UI Addresses/Phone Numbers; Interpreters; Department Contacts for Appeals; etc. |
| **Modify Shared Work Plan** | The use case is designed to update existing shared work plans for employers. |
| **Maintain Claimant Address Information** | The use case provides claimants and UI staff the necessary functionality to update claimant address information. |
| **Manage Non-U.S. Citizen Certification** | The use case provides UI staff the ability to review available documentation and update the claimant's account. |
| **Audit Trail** | This use case provides the production of easy-to-follow audit trails, enabling program managers, internal control staff, and outside auditors to determine the "who/what/when/where" of any transaction taking place in the system. Will be determined during design. |

**Integration Services**

The Integration Services Sub-system describes several common functions that are utilized across Benefits functional areas. These common functions include Interactive Voice Recognition (IVR) applications, ICON Interface applications, Check Printing.

The following use cases documents have been identified for the Integration Services Sub-system:

**Integration Services: May apply to all groups and needs to be evaluated during design**

| Use Case or Supplemental Specification Document | Brief Use Case Description |
|---|---|
| **Document/Fax Management** | Use case scope needs to be defined. |
| **Health Coverage Tax Credit** | Health coverage tax credit management. |
| **Track Data Access** | The use case will track user views of SSA provided data. Will be determined during design. |
| **Record Management (Purge)** | The use case will organize all purge requirements for Revenue and Benefits System tables. |

77

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case or Supplemental Specification Document | Brief Use Case Description |
|---|---|
| **BYE Account Status** | Benefit Year End Batch Process that updates certain flags and fields in the system. For example, after five weeks changes active to inactive and triggers a reactivate flag. |
| **Retirement Verification Batch Process** | Monthly batch process to detect those claimants that have turned 62 or full retirement age during the account. |
| **Print Checks** | This use case begins when the system receives data indicating that checks and/or statement of accounts need to be printed by the printing room. The recording of the warrant numbers and control of the checks are logged by the printing room and the insert room. The checks and/or statement of accounts are inserted into envelopes by an inserting machine. The envelopes are then sorted by zip code and delivered to the USPS. The use case ends when the checks and/or statements of account are mailed by the mailroom. |
| **Employer Request for Refunds**<br><br>**Revenue function**<br><br>**Verify this and Use Case in Revenue section.** | The use case begins when a credit on an Employer's account is identified and the Employer or Employer's agent requests a refund or UI Staff person requests a refund on behalf of the employer. The refund requests are requested through the System. The use case starts when the employer or the UI staff person selects the link on the system to request a refund. The use case ends when the System or UI Staff approves or denies the request, the Employer account and Event Log is updated, the requester (Agent or Employer) is notified of the action taken, and if approved, the refund check is generated and mailed to an Employer. Decided during design. |
| **ICON – IB6 Incoming** | This use case describes the interface for charges coming from other states on Interstate claims through the IB6 process. |
| **ICON – IB6 Outgoing** | This use case describes the interface for charges being sent to other states on Interstate claims through the IB 6 process. |
| **ICON - INSW** | This use case describes the creation and maintenance of user IDs, mailing lists, and ate characteristic information. |
| **ICON – IB13** | This use case describes the interface for Interstate memorandums. |
| **ICON – Handbook** | This use case describes the interface for the IB Handbook which lists information on claim filing in other states. This information includes each state's monetary determinations rules. |
| **ICON –Vessels View and Maintain** | This use case describes the viewing of the incoming interface for the central listing of vessels information and the process to maintain the MA central listing of vessels information for outgoing interface. |
| **ICON – WRIS Incoming/Outgoing** | This use case describes the wage record interface system. This process provides data to the hub for the Distributed Database Index, which is an index file stored at the hub with a list of each SSN from each state that has wages. |

78

DEL00067820

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case or Supplemental Specification Document | Brief Use Case Description |
|---|---|
| **IVR Integration - File a New Claim** | The purpose of this use case is to describe the steps the system must proceed through to create an account based on information submitted from an application. Applications are analyzed by the system to determine the program and account type, along with information necessary for determining benefit amounts and eligibility. The system will allow the claimant to create a password, which will be used to authenticate the claimant in future, interactions with the department's database. This use case is complete once an account has been established, along with any necessary issues for UI Staff to review. |
| **IVR Integration - Continued Claims** | This use case processes the claimant request for benefits. As part of this process, the system will collect claimant's earnings during the reporting term, collect claimant's availability information, ability information and verify some of the claimants' work search. The system will determine holds, deductions, timeliness of the request, if human intervention is needed. If appropriate, the system processes the check. |
| **IVR Integration - Re-open Claim** | The purpose of this use case is to document the steps and business rules for the Reactivate Account process. This use case begins when a claimant must reactivate his/her account after a predetermined amount of time has passed since their last request for payment. The claimant must confirm existing key information before reactivation, and then is required to provide information based on his/her response to a series of preliminary questions. The use case is complete when the claimant has submitted his/her account reactivation. |
| **IVR Integration - PIN Request** | This use case describes how a caller requests a PIN for the IVR. |
| **IVR Integration - Address Change** | This use case will support the claimants wish to update their general information. This information includes name, address, phone number, direct deposit, tax withholding and birth date. This use case ends when the claimant has successfully changed their general information, chooses to review other account information, or ends the session. |
| **IVR Integration - Claim Status** | This use case begins when a claimant chooses to access his/her account information. This category of information includes Weekly Unemployment Benefit Amount (WBA), Maximum Unemployment Benefit Amount (MBA), transactional history, current balance of their account, request a 1099G, check replacement. It describes the steps that the claimant must go through to access this information and complete these functions. This use case ends when the claimant has successfully accessed his/her account information, made request(s) of their account and/or ended the session. |
| **IVR Integration - Provide Office Hours and Locations** | This use case describes how the system will use a claimant's ZIP code information to provide information on the closest WorkForce Center. The claimant will be able to access the address, hours of operation, basic directions and phone number to the closest WorkForce Center. The claimant will also be given various services and resources available at that location. |

79

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case or Supplemental Specification Document | Brief Use Case Description |
|---|---|
| **IVR Integration - Integrate IVR and QUEST Database** | This use case describes database history integration. |
| **IVR Integration - Workload Distribution** | This use case allows the authorized user to instruct the system to direct the workflow and distribute the workload. The system will sort calls not only by skill level groups of the customer contact center personnel, but also to specific individuals. The system will allow customer contact personnel to be put into skill groups of various sizes and varying availabilities. Each individual may be assigned language ability levels, a variety of skills and those skills will be changeable with proper authorization. The system may vary routing of calls by the one of these variables, or others (like time since last call, or availability). The system assesses if additional information is needed from a claimant and accordingly route the work/call. The result of this use case gives better control of the work flow and workload for a more efficient operation. |
| **IVR Integration - Language Selection** | The purpose of this flow is to allow claimants to choose the language of the IVR. The claimant will have the choice of English, Spanish, Somali, or Hmong. The claimant's selection will ask all of the questions and play all confirming statements in that specific language as recorded by state personnel. The system will always ask the claimant their language preference, but if the system recognizes the ANI (Automatic Number Identification) then the greeting and the language choice question will be played in the language chosen with the last call. The system will also recognize if the claimant needs to speak to a customer contact center that the agent has the appropriate language skill. |
| **IVR Integration - Speech to Text** | The result of this use case the claimant is able to have their statements recorded, and then the system could convert these voice files into printed text. The claimant statement would be responses to questionnaires, rebuttals, testimony or other request for information from the department. |

80

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final
## Appeals and Hearings

The Appeals process in Massachusetts:
Any determination may result in an appeal. There are two levels of appeal: the lower authority is the DUA Appeals department; the higher authority is the Board of Review. After this, an appeal can be made to the District Court.
Workflow will be used to notify other departments once appeal is received and again when decision is entered into system.

**Appeal Processing**

The purpose of this subsystem is to provide DUA with a comprehensive subsystem that supports the claimant and employer appeals needs of the UI department. The new claimant and employer appeals functionality will support creating case files that track appeals to completion and resolution, and then subsequently integrate with the necessary information for the claimant and process automatic updates to claimant and employer accounts. The following use cases have been identified for the Appeal Processing Sub-System:

**Appeal Processing: Will be used by BOR as well**

| Use Case | Brief Use Case Description |
| --- | --- |
| **File Appeal Request** BOR | The File Appeal use case documents the functionality necessary for a claimant, Employer, Agent or Staff (on behalf of a claimant or Employer) to file an appeal. This use case begins when the User selects the appropriate determination or document within the Claimant/Employer self-service and selects "File Appeal". The System will determine if other methods of account resolution are more beneficial for the User and present these options before creating an appeal level for the issue. This use case ends when the User chooses to resolve the issue through an alternative method or when the System creates an appeal level and generates appropriate correspondence. |
| **Prepare case for scheduling** | Cases are reviewed for a variety of criteria including complexity prior to scheduling. |
| **Schedule Appeal Hearing (Self-Service)** BOR | This use case begins after the appellant party completes their request to file an appeal. Appeal requests received on paper (mail or fax) will be imaged and routed to staff workflow for scheduling. Scheduling an appeal determines the logistics of the appeal hearing. The use case ends when the system schedules the hearing and returns to the File Appeal process which will provide confirmation information and generate the necessary correspondence to the claimant, employer and/or other interested parties. |
| **Schedule or Reschedule Appeal Hearing (Staff)** BOR | This use case begins after workflow has been created to prompt staff to schedule or reschedule an appeal hearing. Staff scheduling an initial appeal hearing will be rare but will occur when an in person hearing is required or when a paper appeal request is received. Workflow will be created when appellants mail or fax in appeal requests and when interested parties request a reset of their appeal schedule either by mail, fax, IVR or Web. This use case also includes the functionality needed for Review Examiner or other staff to update the RE schedule of availability.  Dependent on design. |

81

DEL00067823

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Withdraw/Void Appeal** <br> **BOR** | The Withdraw Appeal use case documents the functionality necessary for an Appellant or Staff on behalf of an Appellant to withdraw an appeal. This use case begins when the User selects the appropriate pending appeal issue within the Claimant/Employer self-service and selects "Withdraw Appeal". This use case ends when the System withdraws the appeal issue and generates the appropriate correspondence.  Merged with Process Appeal decision. |
| **Receive, Route & Mail Exhibits** <br> **What about printing case folder material? BOR** | This use case documents the functionality necessary to receive, store, route and mail exhibits. This use case begins when new evidence/exhibits are received by mail or fax. Documents are scanned and become part of the appeal's electronic case file. Evidence that cannot be scanned (video tapes, policy manuals, etc) will be logged and referenced as part of the electronic case file. Copies of exhibits will be made available to all interested parties. Will be defined during design. |
| **Maintain Appeal Record** <br> **BOR** | This use case documents the functionality necessary to allow staff to view and maintain Appeal specific details after an appeal has been filed and scheduled. Examples include adding witnesses, changing contact telephone numbers, etc.  Should have the ability to receive and process remands or remand to a lower authority. |
| **Conduct Appeal Hearing** <br> **BOR: or review** | The conduct hearing functionality will allow the hearing process to be recorded via the telephone. This use case begins when the Review Examiner (RE) conducts the hearing as scheduled. The RE confirms the demographic information of the appellant and interested parties. This use case ends when the hearing is concluded and the recording has been stored. <br> Digital recording options will be evaluated during design. |
| **Process Appeal Decision** <br> **BOR** | This use case documents the functionality necessary for Staff to generate an appeal decision. Staff reviews the electronic case file. System tree logic will guide staff in processing the decision based on the appeal type. Based on the outcome of the decision the System will notify the following processes: Determine Multiple Days Denied, Benefits Paid Charge, Determine Potential Over/Underpayment, Revenue and Process Amended Monetary. This use case ends when the System issues correspondence to the appropriate parties. <br> Will be determined during design. |
| **Modify Appeal Decision** <br> **BOR** | This use case documents the functionality necessary for Staff to modify an appeal decision. This use case begins when Staff reviews a completed appeal decision and creates a level of one of the following: Modify – Corrected, Modify – Nullified, Modify – Amended, Modify – Exception Level, or Modify – End Indefinite Denial. After the Modify level is created System tree logic will guide Staff in processing the decision. Based on the outcome of the decision the System will notify the following processes: Determine Multiple Days Denied, Benefits Paid Charge, Determine Potential Over/Underpayment, Revenue and Process Amended Monetary. This use case ends when the System issues correspondence to the appropriate parties. |

82

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final
**Program Integrity**

**Program Integrity**

The purpose of this subsystem is to provide conformance to federal quality assurance and benefit integrity requirements, assist in identification of fraudulent account situations, and to provide continuous quality improvement support. The following use cases have been identified for the Program Integrity Sub-System:

**Program Integrity Processing**

| Use Case | Brief Use Case Description |
|---|---|
| **Update/entry-repayments** | Consider during design along with other sub system payment processes. |
| **Write-off of Overpayment** | Consider during design along with other sub system collection processes. |
| **Special processing of Appeals** | Waiver, late appeals, tax intercept appeals<br>Consider during design along with other payment processes |
| **Special processing of Overpayment** | Bankruptcy, death notification will be defined during design.<br>Bounced checks, void check covered in payment processes |
| **Integrated cross match system** | May need more cross matches but also need an integrated system that produced a "hit" list with established priorities.  This implies the use of filters, checking of new information to old information etc.  This process will determine list of cases to be investigated and routed.<br>Contingent upon DW tool like SAS |
| **Process New Hire Cross Match** | This use case will identify claimant accounts that have been paid benefits the week of or after their date of hire as reported in the New Hires database. |
| **Process Wage Detail Cross Match** | The purpose of this use case is to identify potential overpayments that result from Claimants not reporting or under-reporting their earnings. This is accomplished by comparing earnings reported by employers within wage detail versus those reported (or not reported at all) by Claimants at the time of payment request. |
| **Process Interstate (ICON) Cross Match** | This use case involves the process of sending wage detail and account information to the FCCC to detect overpayments that result from a claimant receiving benefits in one state while working in another. |
| **Process Workers' Comp Cross Match** | The purpose of this use case is to identify overpayments (which can be fraud) that result from Claimant's not reporting that they have received or are receiving worker's compensation while collecting unemployment benefits. Other eligibility issues can arise such as: ability to work, actively seeking and/or availability to work. |
| **Process Border Check Cross Match** | The purpose of this use case is to identify potential overpayments to those individuals who live in "border" communities (those cities on the border with other states) to determine if the claimant has earnings in another state but is not reporting said earnings. |

83

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Process Duplicate Address Cross Match** | The purpose of this use case is to identify individuals who are fraudulently receiving benefits from multiple accounts (formerly known as Eagle Pass). |
| **Process Quality Control Sample** | The scope of this use case seems to be handled within the Benefits Accuracy Measurement (BAM) SRS document. |
| **Fraud Investigation Routing** | Fraud use case scope is currently under review. The scope may simply create a workflow and/or issue type.<br><br>This Use Case must have routing to auditors (maybe based on cross-match hit list.) |

# Economic Research

**Economic Research**

The purpose of this subsystem is to provide Labor Market Information to the Federal Department of Labor, DUA Management and the constituents of the Commonwealth of Massachusetts. This module includes the production of UI federal operating reports and other activity summaries that can be validated against state and federal reporting requirements and can be recreated as needed to support internal quality and performance reviews and external audit engagements. The following use cases have been identified for the Economic Research Sub-System:

**Economic Research**

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 191 Statement of Expenditures and Financial Adjustments** | Is used by each State employment security agency (SESA) to report to the National Office (NO):<br><br>1. The quarterly summary of UCFE and UCX expenditures and adjustments, and<br><br>2. The total amount of benefits paid by the SESA to claimants of specific agencies.<br><br>Section B of the ETA 191 is the only source document used by the Office of Workforce Security to bill Federal and military agencies for the recovery of UCFE and UCX benefit payments. |
| **ES 202 - Quarterly Census of Employment and Wages (QCEW)** | The Covered Employment and Wages program, commonly called the ES-202 program. Using quarterly data submitted on magnetic media or electronically by the agencies, BLS summarizes employment and wage data for workers covered by State unemployment insurance (UI) laws and for civilian workers covered by the program of Unemployment Compensation for Federal Employees (UCFE). |

84

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 203, Characteristics of the Insured Unemployed** | The ETA 203 report provides information, by State and for the Nation, about the characteristics of Unemployment Insurance claimants. This data is useful in describing the population of claimants and determining how that population changes over time and under various conditions. It can also be compared with characteristic figures of the total unemployed as published by the Bureau of Labor Statistics (BLS). |
| **ETA 204 - Experience Rating Report** | Data submitted annually on the ETA 204 enables Employment and Training Administration (ETA) to project revenues for the Unemployment Insurance (UI) program on a State by State basis and to measure the variations in assigned contribution rates which result from different experience rating systems. When used in conjunction with data from the ES 202, Employment Wages, and Contributions report, the ETA 204 data will assist in determining the effects of various factors (e.g., seasonality, stabilization, expansion, or contraction in employment and payroll, etc.) on the employment experience of various groups of employers. The data will also provide to States and the National Office an early signal for potential solvency problems, be useful in analyzing factors which give rise to the potential problems, and permit an evaluation of the effectiveness of the various approaches available to correct the problems detected. Moreover, the data are required as a basis for estimating State average tax rates for the rate year. Finally, the data are the basis for determining an experience rating index; the index will allow for the evaluation of the extent to which benefits in States are effectively charged, non-charged, and ineffectively charged. Comparisons in a single State over time will be possible. |
| **ETA 205, Preliminary Estimates of Average Employer Contribution Rates** | The Average Employer Tax Rate report collects annual information about the taxing efforts in States relative to both taxable and total wages and allows comparison between States. |
| **ETA 207, Non-monetary Determination Activities** | The data reported on the ETA 207 provides current information on the volume and nature of non-monetary determinations and denials under State, UCFE and UCX unemployment insurance programs. Agencies use the data to budget workloads, evaluate law changes, appraise disqualification processes and relate to benefit appeals. The National Office uses it to determine workload counts, to analyze the ratio of disqualifications to determinations, and to examine and evaluate the program effect of non-monetary activities. |
| **ETA 2112 UI Financial Transaction Summary** | Form ETA 2112 is a monthly summary of transactions in a State unemployment fund which includes the Clearing Account, Unemployment Trust Fund Account, and Benefit Payment Account. All payments by employers (and employees where applicable) into a State unemployment fund for contributions, payments in lieu of contributions, penalty and interest, or special assessments should be accounted for in the report. Form ETA 2112 provides a summary of data pertaining to State UI tax collections, regular benefits paid, Federal and State shares of extended benefits paid, third tier program benefits paid, and other transactions affecting the unemployment trust fund. |

85

HIGHLY CONFIDENTIAL DEL00067827

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 218 Benefit Rights and Experience** | The number of eligible claimants with potential maximum duration, the average potential duration for all eligible claimants, and their distribution by number of full weeks of potential duration show the extent of protection, in terms of weeks of benefits, available to potential beneficiaries. |
| **ETA 227 Overpayment Detection and Recovery Activities** | Form ETA-227 provides information on determinations, overpayments, and recoveries of overpayments on intrastate and liable interstate claims under State unemployment compensation (UI) and under Federal unemployment insurance programs, i.e., programs providing unemployment compensation for Federal employees (UCFE) and ex-servicepersons (UCX), established under Chapter 85, Title 5, U.S. Code. |
| **ETA 5130 Benefit Appeals Report** | The ETA 5130 report is the basic source of information on the appeals case workload in each State under the regular programs of State unemployment insurance, unemployment compensation for Federal employees, and unemployment compensation for ex-service members (referred to as UI, UCFE, and UCX respectively). |
| **ETA 5159 Claims and Payment Activities** | The ETA 5159 report contains monthly information on claims activities and on the number and amount of payments under State unemployment insurance laws (State UI) and Federal unemployment insurance laws for Federal workers (UCFE) and for ex-service members (UCX). There are separate ETA 5159 reports labeled Regular, Extended Benefits (EB), and Short Time Compensation (STC). |
| **ETA 538 Advance Weekly Initial and Continued Claims Report** | This report provides for an advance national compilation and release of initial claims and weeks claimed data that, on a national basis, should conceptually be the same as the total of initial claims and weeks claimed data reported on the ETA 539, Weekly Claims and Extended Benefits Trigger Data. |
| **ETA 539 Weekly Claims and Extended Benefits Trigger Data** | This report serves as the State Administrator's initial notice to the Employment and Training Administration (ETA) National Office that a State extended benefit period will begin or end for a specified week. |
| **ETA 581 Contribution Operations** | The ETA 581 report provides information on volume of work and State agency performance in determining the taxable status of employers and the processing of wage items; in the collection of past due contributions and payments in lieu of contributions, and delinquent reports; and in field audit activity. The ETA 581 report for each calendar quarter is due in the Employment and Training Administration National Office on the 20th day of the second month following the quarter to which it relates, i.e., May 20, August 20, November 20, and February 20. This report will be transmitted electronically. |
| **ETA 586 Interstate Arrangement for Combining Employment and Wages** | This report will enable the Employment and Training Administration to measure the scope of wage-combining activities and to determine the effects of the program in terms of the number of claims filed, amount of benefits involved, and promptness of first payments and employment and wage transfers. |

86

HIGHLY CONFIDENTIAL                                      DEL00067828

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 8401 Monthly Analysis of Benefit Payment Account** | The ETA 8401 is a record of benefit payment account transactions recorded in the books of each State. |
| **ETA 8403 Summary of Financial Transactions - Title IX Funds** | Provides a cumulative summary of expenditures of State unemployment funds pursuant to Section 903(c)(2) of the Social Security Act (SSA), the "Reed Act" as amended. |
| **ETA 8405 Monthly Analysis of Clearing Account** | The ETA 8405 report is a record of clearing account transactions recorded in the books of each State. |
| **ETA 8413 Income-Expense Analysis, UC Fund Benefit Payment** | The ETA 8413 is a monthly analysis of daily transactions in a State benefit payment account from the books of the bank on which benefit checks or warrants are issued. |
| **ETA 8414 Income-Expense Analysis, UC Fund Clearing Account** | This report is a monthly analysis of activity in a State clearing account from the books of the bank in which employer contributions and payments in lieu of contributions are deposited and transferred to the U.S. Treasury. |
| **ETA 9016 Alien Claims Activity Report** | The Immigration Reform and Control Act (IRCA) of 1986, Public Law 99-603, amended the Social Security Act by adding to Section 1137 - "Income and Eligibility Verification System". Section 1137 provisions require states to verify, through the Immigration and Naturalization Service (INS), the legal status of all aliens applying for benefits under certain federally assisted and federally funded programs, including Unemployment Compensation. To facilitate the required verification, INS developed the Systematic Alien Verification for Entitlement (SAVE) system. SAVE consists of automated and manual procedures by which states obtain information about an alien=s immigration status that will allow them to determine the alien=s eligibility for unemployment compensation. The information provided on the ETA 9016 Report is used by the Department of Labor to: C Assess the magnitude of alien claims and issues affecting eligibility; C Make decisions as to the appropriateness and value of state use of the SAVE system; and C Determine whether a state's administrative costs associated with SAVE are reasonable. |

87

HIGHLY CONFIDENTIAL

DEL00067829

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 9048 Worker Profiling and Reemployment Services Activity** | The ETA 9048 report provides quarterly information on the Worker Profiling and Reemployment Service activities of claimants who are profiled to assess their likelihood of exhausting benefits. Worker profiling allows for the targeting of reemployment services to those most in need. The data on this report is used for evaluation and monitoring of the Worker Profiling and Reemployment Services system on a national level. It includes breakouts of those who reported to services and those who completed services to be able to track service utilization. The mandatory participation requirement of the profiling legislation does not pertain to education/training or to services provided under a State's Self Employment Assistance program. Data is captured in each of these categories to provide additional information about the range of services provided to profiled claimants. |
| **ETA 9049 Worker Profiling and Reemployment Services Outcomes** | The ETA 9049 report contains information on the outcomes of reemployment service activities of claimants who, through the Worker Profiling and Reemployment Services (WPRS) program, are identified as likely to exhaust their UI benefits, selected for referral to reemployment services and referred to such services. The report uses existing administrative data and allows evaluations such as comparison over time of the numbers and percentages of individuals selected through the Worker Profiling and Reemployment Services (WPRS) system and referred from the selection pool who subsequently become reemployed in covered employment within the same State, and what percent of their former wages the new jobs represent. |
| **ETA 9050 First Payment Time Lapse** | The ETA 9050 report contains monthly information on first payment time lapse. This report concerns the time it takes States to pay benefits to claimants for the first compensable week of unemployment. Similar time lapse data was formerly reported in Section C of the ETA 5159 report. That data addressed first payment time lapse for total unemployment only. This report contains monthly time lapse data for all first payments, i.e., total, partial and part-total. A separate section of this report is reserved for Workshare (Short-Time Compensation) first payments only. Workshare will be reported separately and is excluded from that part of the report for "ALL" first payments. |
| **ETA 9051 Continued Weeks Compensated Time Lapse** | The ETA 9051 report contains monthly information on continued weeks compensated time lapse. This report concerns the time it takes States to pay benefits to claimants for compensable weeks of unemployment other than the "first payment." Continued weeks compensated time lapse data was not formerly reported. This report contains monthly time lapse data for all continued weeks compensated, i.e., total, partial and part-total. A separate entry screen will be used for a breakout of partial and part-total continued weeks compensated. Workshare (Short-Time Compensation) continued weeks compensated will be reported on a third entry screen. Workshare continued weeks compensated are not reported in the total count of "All" continued weeks compensated. |

88

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 9052 Non-monetary Determination Time Lapse, Detection Date** | The ETA 9052 report contains monthly information on the time it takes States to issue non-monetary determinations from the date the issues are first detected by the agency. Single-claimant and multi-claimant non-monetary determinations are included in the report. Non-monetary determinations made by organizational units such as Benefits Accuracy Measurement (BAM) and Benefit Payment Control (BPC) are also included in the report. Note: Overpayment notices on uncontested earnings detected by any method (e.g., cross match) should not be included. A separate section of this report is reserved for multi-claimant determinations only. |
| **ETA 9053 Non-monetary Issue Detection Time Lapse, Affected Week** | The ETA 9053 report contains monthly information on the time it takes States to detect an issue on a claim. The measure is days elapsed from the week ending date of the first affected week to the date on which the agency first detects an issue. Single-claimant and multi-claimant non-monetary determinations are included in the report. Non-monetary determinations made by organizational units such as Benefits Accuracy Measurement (BAM) and Benefit Payment Control (BPC) are also included in the report. BPC cross match determinations, however, are excluded, as are all monetary determinations, regardless of point of origin. A separate section of this report is reserved for multi-claimant determinations only. |
| **ETA 9054 Appeals Time Lapse** | The ETA 9054 report contains monthly information on the time it take States to issue lower authority and higher authority appeals decisions from the date the request for a lower authority hearing or a higher authority appeal is filed to the date on the decision. |
| **ETA 9055 Appeals Case Aging** | The ETA 9055 report contains monthly information on the inventory of lower authority and higher authority appeals which have been filed but not resolved. The universe of appeals included in this measure is all lower and higher authority appeals which are not resolved at the end of the month covered by the report. Case aging provides information about the number of days from the time an appeal is filed and the end of the month covered by the report. |
| **ETA 9056 Non-monetary Determination Quality Review** | The ETA 9056 report provides quarterly information on the quality of non-monetary determinations that State agencies issue to claimants and employers in the report period. Intrastate and Interstate single-claimant and multi-claimant separation and non-separation non-monetary determinations are included in the report. Non-monetary determinations made by organizational units such as Benefits Accuracy Measurement (BAM) and Benefit Payment Control (BPC) are also included in the report. Notices of overpayments on uncontested earnings detected by any method (e.g., cross match) are excluded from the report. |
| **ETA 9057 Lower Authority Appeals Quality Review** | The ETA 9057 report provides quarterly information on the quality of State agencies' single and two party lower authority appeals hearings and decisions in the report period. |

89

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

| Use Case | Brief Use Case Description |
|---|---|
| **Management and Ad Hoc Reports** | This use case includes the production of financial and program activity reports that are timely, auditable, and credible (electronic reports that replace current manual reports must combine data from several sources and programs into summary reports that meet the needs and requirements of external audiences, e.g. the U.S. Department of Labor). This use case will provide the ability for management to track financial and programmatic activity, detect and document trends, and produce forecasts of key activities (e.g. monthly claims workload) and financial outlays and trust fund condition. In addition this use case includes the production of timely and consistent responses to regular and ad hoc requests for information about the operation of the UI program, the customers served, and the financial results (e.g. through use of an integrated database with user-driven reporting views). |
| **Labor Market Data Extracts** | This use case includes the set of standard Labor Market Information data extracts used by Massachusetts to publish LMI statistics for the constituents of the Commonwealth. |

# Application Infrastructure & System Administration

These tasks establish the overall application infrastructure and system administration components. It consists of design, development, and testing of the following components:

- Security Component
- Rules Component
- Interfaces Component
- Edit Checks Component
- System Logging Component
- System Management Component
- Code Table Maintenance Component
- Reports Component
- Correspondence Component
- Document Management and Workflow Component

Increment 1 is vital to setting the foundation for the QUEST project. The increment focuses on the underlying components used for developing benefits, tax, and future system functionality. BearingPoint will bring many of the standard application and database objects to the project. The importance of this Increment cannot be overemphasized; it serves as the foundation for subsequent tax and benefits development Increments. Experience has shown that ample time and attention devoted to developing a comprehensive, robust architecture and set of common objects will translate into less re-work, less maintenance and more code efficiencies in the future. The uFACTS solution framework, along with our tool-kit of .NET common objects, will help support these project tasks.

**Security Component**

BearingPoint recognizes the confidential nature of UI information: security must be designed into the system to comply with State and DUA security requirements and standards. We have, therefore, allocated a significant amount of time and resources to develop the Security Plan and application components.

90

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

The system's security model will include: physical, application, and data level security. In collaboration with DUA resources, we will prepare a Security Model that will identify how security features will be implemented. Specifically:

- Products to be used
- Proposed levels of security
- Limitations of capabilities
- Required protocols
- Security tables format and content
- Recommended starting point for establishing security profiles

**Rules Component**

BearingPoint recognizes the need to change the business rules governing the UI System due to legislative changes or other driving factors. To accomplish these changes in a long-term cost effective way, we have allocated a significant amount of time and resources to develop the Rules management component.
The rules component will include:

- Rules Engine configuration
- Rules Engine integration with .NET application
- Rules definition
- Recommended starting point for establishing rules

**Interfaces Component**

In order to interface with various DUA and other systems, the Interface component will have to be robust and dependent. To accomplish this, we have allocated a significant amount of time and resources to develop the Interface component.
The interface component will include:

- Finalizing the technology to use for interfacing with other systems
- Finalizing the protocols for interfacing
- Finalizing the online and batch interfacing processes
- Creating the processes to support the interface process

**Edit Checks Component**

BearingPoint recognizes the need for the UI System to validate the user input effectively to maximize the data integrity. In order to accomplish a very high level of data integrity, the data entered must be validated in a very efficient and modular fashion. Modular and object oriented design will help significantly increase the organization of the software, thereby contributing directly to the data integrity by uniformly applying the business rules and edits.
The edit checks component will include:

- Software design to modularize edit checks and business rules
- Creation of non-business specific common edits
- Creation of placeholders for business specific common edits

91

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

- Creation of placeholders for business specific edits that are not common

**System Logging Component**

BearingPoint recognizes the need for the UI System to keep track of certain important system events that will track system activities by users. In order to accomplish this, the system logging component must be designed in such a fashion, that the important system activities are recorded by common code, thereby eliminating the need for individual Java classes and JSPs to focus on this.

The system logging component will include:

- Identification of important system logging events
- Software design to enable system logging
- Database design to enable system logging
- Creation of software to handle system logging

**System Management Component**

BearingPoint recognizes the need for the UI System to manage the system effectively based on the various system users and activities. For example, there may be a need to allow certain type of users to access the system for maintenance purposes, while the other types of users are locked out of the system.

The system management component will include:

- Identification of the various system open/close events
- Identification of the various system user types and their privileges
- Database design to enable system management
- Creation of software to handle system management functionality

**Code Table Maintenance Component**

The Code Table Maintenance component will provide system administrators the ability to modify systems codes defined in database tables within the system. This will ease system maintenance tasks and allow for greater flexibility in responding to changes in program and policy.

**Reports Component**

The UI System will produce and display various standard and ad-hoc reports to the system users. The reports in the system will be created using Crystal Reports software and will be published either as downloadable PDF (or other agreed-upon format) documents or viewable via Crystal Reports Viewer. The reports viewed by the Crystal Reports Viewer will be served by the Crystal Enterprise Server.

The Reports component will include:

- Finalization and creation of Report User Groups
- Integration of Crystal Enterprise with Java application
- Development and publication of sample reports in PDF or other agreed-upon format
- Development and publication of sample reports via Crystal Enterprise and Crystal Viewer

92

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Correspondence Component**

BearingPoint recognizes the need for the UI System to send various types of correspondence to the various stakeholders of the system. Some of the common methods of correspondence include e-mails and printed letters. The correspondence component will have the functionality to generate and distribute various system related correspondence to the intended recipients.

The Correspondence component will include:

- Finalization of the various correspondence modes to be built in the system
- Building interfaces with other systems for correspondence purposes
- Building functionality to view previously sent correspondence

**Document Management & Workflow Component**

The FileNet document management and workflow components will be purchased and installed toward the end of the Overall Project Inception Phase, after the validation of the overall technical architecture is complete. (See Page 13-85 of BearingPoint's proposal)

During Increment 1 – Infrastructure, the UI TIP Team will integrate FileNet into a common development environment, so that its components can be used in Increments 2 and 3. During Increments 2 and 3, FileNet will be an integral component to both the self-service and core tax service components. DUA can expect the following document imaging/workflow functionality to be available in the first two years:

- Ability to define specific workflow scenarios and apply these scenarios to the UI TIP application
- Ability to automatically route correspondence to employers and applicants through workflow scenarios
- Ability to notify through email correspondence that follow up is required by either the employer or applicant
- Ability to index and scan employer related correspondence

93

HIGHLY CONFIDENTIAL

DEL00067835

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final
# Appendix H: DOR Confidentiality Acknowledgement

## INTERDEPARTMENTAL MEMORANDUM

TO:      Distribution

FROM:    DWD

RE:      Confidentiality of the Department of Revenue's Information

DATE:    January 2, 2007

---

The attached Summary of the Laws is being provided to you because as part of your job duties you may have access to confidential tax, wage reporting, financial institution match, 14-day new hire and child support information, as well as "personal data" provided to the Department of Workforce Development by the Department of Revenue. The access and disclosure of this information is governed by the attached state and federal laws. Violation of the laws provide for specific sanctions including civil and criminal penalties, as well as dismissal from employment and disqualification from holding office in the Commonwealth for up to three years.

If you have any questions regarding this form, please contact Wayne Kallman at 617-626-5901.

---

### ACKNOWLEDGMENT REGARDING THE CONFIDENTIALITY OF THE DEPARTMENT OF REVENUE'S INFORMATION

I, _____, a full-time or part-time employee, contract employee, individual consultant, volunteer, trainee, student intern, member, director, officer, partner, agent or subcontractor of the Department of Workforce Development, hereby acknowledge that I have received a copy of the "Summary of the Massachusetts and Federal Laws Pertaining to Confidential Information of the Massachusetts Department of Revenue" which governs the access and disclosure of information to include, without limitation, tax information, wage reporting information, financial institution match information, 14-day new hire information and child support information, as well as "personal data" as defined in G.L. c. 66A (collectively, the "Information"). I also

94

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

acknowledge that it is my responsibility to read this Notice and to comply with the laws pertaining to the Information.

_____          _____
Signature                                                          Date

_____

Name in print

**Distribution:  All persons with access to DOR confidential information.**

### SUMMARY OF MASSACHUSETTS AND FEDERAL LAWS PERTAINING TO CONFIDENTIALITY OF INFORMATION OF THE MASSACHUSETTS DEPARTMENT OF REVENUE

1) Fair Information Practices Act (FIPA), G.L. c. 66A:  Prohibits the unauthorized disclosure of "personal data," as defined in G.L. c. 66A.  Data subjects may make a claim for damages under the Massachusetts Tort Claims Act.  General Laws chapter 214, section 3B also provides for injunctive and other nonmonetary relief for violation of this statute.

2) G.L. c. 62C, § 21:  Prohibits unauthorized disclosure of tax information or returns as defined in 830 CMR 62C.21.1.  A return is defined very broadly in 830 CMR 62C.21.1 and includes information developed by the Department. Violation of this statute is punishable by a fine of not more than $1,000 and/or by imprisonment for not more than six months, and by disqualification from holding office in the Commonwealth for a period not exceeding three years.

3) G.L. c. 62C, § 21B:  Prohibits unauthorized willful inspection ("browsing") of tax information or returns as defined in 830 CMR 62C.21.1.  A return is defined very broadly in 830 CMR 62C.21.1 and includes information developed by the Department.  Violation of this statute is punishable by a fine of not more than $1,000 per return, document or taxpayer and/or by imprisonment for not more than one year, and by disqualification from holding office in the Commonwealth for a period not exceeding three years.  This section also provides that "browsing" by an employee shall be grounds for dismissal of the employee.

95

HIGHLY CONFIDENTIAL

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

4) <u>G.L. c. 62E, § 8</u>:   Prohibits unauthorized disclosure of information obtained from the wage reporting and financial institution match system.   Violation of this statute is punishable by a fine of $100 per offense and by administrative discipline.

5) <u>G.L. c. 119A, § 5A</u>:   Prohibits unauthorized willful inspection ("browsing") or unauthorized disclosure of child support personal data, including data stored in a computer system or computer files. Any such inspection or disclosure is punishable by a fine of not more than $1,000 with respect to each person concerning whom information has been disclosed or inspected and/or by imprisonment for not more than one year, and by disqualification from holding office in the Commonwealth for a period not exceeding three years. This section provides that unauthorized disclosure or "browsing" of child support data by an employee shall be grounds for dismissal of the employee. This law also places additional restrictions on the disclosure of  location information about  a parent or child when the agency is provided with reasonable evidence of a risk of harm.

6) <u>I. R. C.  § 6103</u>:   Prohibits unauthorized disclosure of federal tax returns or return information  by  employees and former employees of state and IV-D agencies.

7)  <u>I. R. C. § 7213</u>:   Makes any unauthorized disclosure of federal tax returns or return information a felony punishable by a fine of up to $5,000 and/or imprisonment for not more than five years, together with the costs of prosecution.

8) <u>I. R. C. § 7213A</u>:   Prohibits the unauthorized willful inspection ("browsing") of federal tax returns or return information and makes such inspection punishable by a fine of up to $1,000 and/or imprisonment for not more than one year, together with the costs of prosecution.

9) <u>I. R. C. § 7431</u>:   Permits a taxpayer to bring a civil action for damages in a federal district court against a person who unlawfully browsed or disclosed federal return or return information.

DOCS# 223762

96

HIGHLY CONFIDENTIAL

The undersigned hereby represent that they are duly authorized to execute this SOW on behalf of their respective organizations.


Division of Unemployment Assistance          BearingPoint

_____             _____
Edward T. Malmborg, Director                 Kathy Karich, Regional Managing
                                             Director

_____             _____
Date: May 21, 2007                           Date: May 21, 2007

97

HIGHLY CONFIDENTIAL                                  DEL00067839

# Exhibit 15
# Redacted in Its Entirety

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on July 24, 2025, a copy of the foregoing document

was served on the counsel listed below in the manner indicated:

**<u>BY EMAIL</u>**

| | |
|---|---|
| Joshua L. Simmons | John W. Shaw |
| Dana DeVlieger | Andrew E. Russell |
| KIRKLAND & ELLIS LLP | SHAW KELLER LLP |
| 601 Lexington Avenue | I.M. Pei Building |
| New York, NY 10022 | 1105 North Market Street, 12th Floor |
| | Wilmington, DE 19801 |
| Gregg F. LoCascio | *jshaw@shawkeller.com* |
| Patrick Arnett | *arussell@shawkeller.com* |
| Nicholas Teleky | |
| KIRKLAND & ELLIS LLP | *Attorneys for Plaintiffs Deloitte Consulting* |
| 1301 Pennsylvania Ave NW | *LLPand Deloitte Development LLC* |
| Washington, DC 20004 | |

John F. Hartmann
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654

Ariel Deitchman
KIRKLAN & ELLIS LLP
Three Brickell City Centre
98 S.E. 7th Street, Suite 700
Miami, FL 33131

Miranda D. Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116

*Deloitte-Sagitec@kirkland.com*

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street

Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Sagitec Solutions, LLC*