IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DELOITTE CONSULTING LLP and DELOITTE DEVELOPMENT LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SAGITEC SOLUTIONS, LLC,<br><br>Defendant. | C.A. No. 23-325-WCB<br><br>**REDACTED VERSION**<br>**Filed: July 31, 2025** |

## DECLARATION OF CHRISTOPHER K. LAURUS
## IN OPPOSITION TO DELOITTE'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT - VOLUME II
### (Exhibits 16 - 30)

OF COUNSEL:

Christopher K. Larus
David A. Prange
Rajin S. Olson
Brandon A. Carmack
Demitri M. Dawson
ROBINS KAPLAN LLP
800 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500
clarus@robinskaplan.com
dprange@robinskaplan.com
rolson@robinskaplan.com
bcarmack@robinskaplan.com
ddawson@robinskaplan.com

Rebecca Bact
ROBINS KAPLAN LLP
800 Boylston Street
Boston, MA 02199
(617) 859-2740
rbact@robinskaplan.com

Dated: July 3, 2025

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Robert Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Defendant*
*Sagitec Solutions, LLC*

# Exhibit 16

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                                        :
UNITED STATES OF AMERICA,               :
                                        :
               Plaintiff,               : Civil Action Number:
     -vs-                               : 2:22-cr-163
                                        :
DAVID GERALD MINKKINEN AND              :
SIVARAMAN SAMBASIVAM,                   :
                                        :
               Defendants.              :
_____x:
```

**MOTIONS HEARING**
**BEFORE THE HONORABLE OMAR J. ABOULHOSN**
**UNITED STATES MAGISTRATE JUDGE**
**MAY 11, 2023**

**APPEARANCES:**
**For the Government:**          **ANDREW R. COGAR**
                                 **UNITED STATES ATTORNEY'S OFFICE**
                                 Northern District of West Virginia
                                 Suite 300
                                 320 West Pike Street
                                 Clarksburg, WV 26301

                                 **JONATHAN TYLER STORAGE**
                                 **UNITED STATES ATTORNEY'S OFFICE**
                                 Southern District of West Virginia
                                 Suite 4000
                                 300 Virginia Street, East
                                 Charleston, WV 25301

        Proceedings recorded by mechanical stenography,
transcript produced by computer.

AMANDA J. PICKENS, CCR, RPR
Federal Official Court Reporter
300 Virginia Street, East
Charleston, WV 25301

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL
SAGITEC-DEL_02374683

```
1   CONTINUED APPEARANCES:
    For the Defendants:      MICHAEL EDWARD NOGAY
2                           SELLITTI NOGAY & NOGAY
                            Post Office Box 3095
3                           Weirton, WV 26062

4                           STEPHEN S. STALLINGS
                            LAW OFFICES OF STEPHEN S. STALLINGS
5                           Suite 3600
                            310 Grant Street
6                           Pittsburgh, PA 15219

7                           RABEA JAMAL ZAYED
                            DORSEY & WHITNEY
8                           Suite 1500
                            50 South Sixth Street
9                           Minneapolis, MN 55402

10                          ERICA F. ANDREWS
                            DORSEY & WHITNEY
11                          Suite 900
                            1401 New York Avenue, NW
12                          Washington, DC 20005

13                          SUSAN M. ROBINSON
                            THOMAS COMBS & SPANN
14                          Post Office Box 3824
                            Charleston, WV 25338-3824
15
                            ROBERT G. McCOID
16                          McCOID LAW OFFICES
                            Post Office Box 1
17                          Wheeling, WV 26003

18
    Also Present:  Jim Powers, case agent
19

20

21

22

23

24

25
```

CONFIDENTIAL                                        SAGITEC-DEL_02374684

Case 2:22-cv-00153 WCB Document 171 Filed 05/17/23 Page 5 of 61 PageID #:
21053

1         (The following proceedings were held before the

2    Honorable Omar J. Aboulhosn, United States Magistrate Judge,

3    in the case of *United States of America v. David Gerald*

4    *Minkkinen and Sivaraman Sambasivam,* on May 11, 2023, at

5    Charleston, West Virginia, beginning at 1:29 p.m.)

6         THE COURT:  Good afternoon.  The matter the Court

7    has on the docket this afternoon are a couple of motions in

8    the matter of United States of America versus David

9    Minkkinen and Sivaraman Sambasivam.  I apologize I'm

10    butchering those names.  I do apologize for that.

11       Would counsel please note your appearance for the

12    record?

13         MR. COGAR:  Andrew Cogar and Jonathan Storage for

14    the United States.

15         THE COURT:  Thank you.

16         MR. STALLINGS:  Stephen Stallings and Michael

17    Nogay for Mr. Minkkinen.

18         MS. ROBINSON:  Susan Robinson and Mr. Zayed -

19    R.J. - for the defendant, Mr. Sambasivam.

20         THE COURT:  Okay.  Counsel, we're here on a couple

21    different motions.  I believe one motion is the defendants'

22    motion for a bill of particulars, and then the motion to

23    compel that's been filed by the defendants as well.

24       I have reviewed the pleadings, the exhibits.  I have

25    looked through those extensively.  I've got some notes of

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374685

```
 1      some things to discuss with you.  Let me just have the
 2      defendant proceed with your argument, and I'll interrupt as
 3      I need to.
 4              MR. ZAYED:  May it please the Court, Counsel,
 5      investigative powers.
 6          Good afternoon.  R.J. Zayed on behalf of the defendants
 7      -- Siva Sambasivam.  Basically, the issue on the bill of
 8      particulars, Your Honor, is how am I going to try this case?
 9      That's the problem, is that I do not know what the trade
10      secret is.  Even -- the Government, to its credit, has
11      produced massive amounts of materials.  For example -- and I
12      -- I -- we specifically asked the Government, what are your
13      trade secrets?
14          Well, they say, the Massachusetts uFACTS project source
15      code.  Okay.  That source code, Your Honor, has 7.1 million
16      lines of code.  If you include the comments, we're now up to
17      9.7 million lines of code.  And the problem with that, this
18      code has a lot of third-party software embedded in it.  Like
19      five or six different companies have their material in it.
20          So the question that I have for the Government -- okay.
21      In this 7.1 million lines, please identify those portions
22      that were not developed by somebody else, that are not
23      generally known, that are not readily ascertainable by
24      proper means, and who give you an economic advantage by the
25      fact that they're secrets.  At a minimum -- because when we
```

CONFIDENTIAL

SAGITEC-DEL_02374686

```
 1    ask a jury to decide the case, that's the issue that they're
 2    going to need to decide.  And so fundamentally, there is no
 3    way we can try a 7.1 million dol- -- 7.1 million lines of
 4    code case to a jury.
 5            THE COURT:  Counsel, not to cut you short.  At
 6    least preliminarily, you won that argument.  I want to hear
 7    what the Government has to say about that in a moment.
 8            MR. ZAYED:  Very -- thank you, Your Honor.
 9            THE COURT:  I have some very serious questions for
10    the Government on that very issue that we'll discuss.  So
11    the other part of your motion for bill of particulars is
12    requesting information about venue.
13            MR. ZAYED:  Yes, Your Honor.
14            THE COURT:  Go to that.
15            MR. ZAYED:  Okay.  The issue here, Your Honor, is
16    under trade secret law -- in the case we provided you from
17    the 11th Circuit -- venue requires for purposes
18    misappropriation of trade secrets, two things.  One, where
19    were these trade secrets located when they were
20    misappropriated?  Two, where did the defendant use them?
21    And those two drive the venue argument.
22            THE COURT:  What about -- something about the
23    files were located in West Virginia?
24            MR. ZAYED:  That's -- we'll get to that.
25    Basically, very quickly, Your Honor, Sagitec, the company
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL                                    SAGITEC-DEL_02374687

1    put things on Cloud.  It's called the Microsoft Azure

2    Infrastructure Cloud.  This Cloud had only two servers.  The

3    location of their servers was Virginia and Iowa.  There was

4    nothing in West Virginia.

5        Now, when they open the Cloud -- when you signed in and

6    you had access to it, the material was on the Cloud.  So

7    everybody worked off the Cloud.

8            THE COURT:  Meaning one of those two servers?

9            MR. ZAYED:  Yes.  One of those two servers.

10   That's where it resided.

11       Now, to the extent any portion made it to West

12   Virginia, it was not because of the defendant.  It was the

13   Government who downloaded the stuff into West Virginia.

14   There was no act by the defendant in here that was done in

15   West Virginia.

16       So the question I have, you claim constructive

17   possession.  Okay.  Give me the evidence that you purport to

18   have that shows that constructive possession.  Because if

19   you cannot, venue isn't proper as to the trade secret count.

20   And that's -- unless Your Honor has a --

21       Two final points, and I can sit down, Your Honor.  The

22   other two trade secrets are the Massachusetts uFACTS project

23   design documentation, which is use cases and data tables,

24   and the New Mexico uFACTS project design documents which are

25   use cases.  That is 77,000 pages worth of documents.  That's

CONFIDENTIAL                                    SAGITEC-DEL_02374688

```
 1    3,200 separate use cases.

 2              THE COURT:  When you say use cases, what's that

 3    mean?

 4              MR. ZAYED:  Basically a use case is business

 5    rules.  For example, a simple use case.  How do you apply

 6    for unemployment insurance.  And then you have all these

 7    screenshots, name, address, date of birth --

 8              THE COURT:  I understand.

 9              MR. ZAYED:  -- et cetera, et cetera.  How do you

10    adjudicate something?  How do you appeal something?

11              THE COURT:  Okay.  You may continue.

12              MR. ZAYED:  Okay.  So that's basically, Your Honor

13    -- of those 3,200 use cases, many of them are driven by the

14    Social Security Act, by the unemployment insurance

15    framework, by the Department of Labor and state

16    requirements.  We want to use this for this purpose.

17         We want -- for example -- one example -- and this case

18    was a use case.  If there's an employer, and the employer

19    has four different businesses, we only want them to log in

20    once and then pick which business it is, so they go through

21    the insurance claims.  That's a very simple type of use case

22    and stuff like that.

23         So the question comes in here -- okay -- if use cases

24    are being driven by somebody applying for unemployment

25    insurance, analyze them for unemployment insurance, doing
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374689

1    the requisite analysis, processing it and then making a

2    decision and then appealing it, whatever, that's standard

3    stuff that's generally known really.  So the question to you

4    is, where is the secret sauce?  Where do I find it?  In

5    these 3,200 cases that you have given me in discovery, where

6    do I find the stuff that you call a trade secret?  Because

7    the issue I have, Your Honor -- we get to trial, and then

8    the Government will pull out a use case, Number 2,199, and

9    say aha.  I got you.

10          I am entitled not to be unfairly surprised at trial,

11   and I'm entitled under double jeopardy to object finality on

12   this case.

13          THE COURT:  Thank you, Counsel.

14       Mr. Cogar, I'll allow you to stay at counsel table

15   because, I'll be honest with you, I'm probably going to ask

16   defense counsel to answer you while you're doing your

17   argument.  Because I think a conversation style is a bit

18   easier for me to do here.  So -- so you don't have to come

19   up to the podium.

20       So, Mr. Cogar, as you can tell, I cut short the

21   defendant's argument because I'm having some trouble

22   understanding why the Government won't identify with

23   particularity what is the trade secret that you're claiming

24   they took.  And I read your response.  And you respond that

25   it's essentially the entire 7.1 million lines of code.  And

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374690

```
 1    I find that hard to believe.

 2             MR. COGAR:  Judge, it's a software program.

 3             THE COURT:  I appreciate that.

 4             MR. COGAR:  It's not a -- it's not -- it's

 5    misleading to suggest that it's just simply 7.1 million

 6    lines of code.  Any software program is going to have a

 7    substantial amount of lines of code.  The question is, what

 8    is -- what is the trade secret itself?

 9             THE COURT:  That's right.

10             MR. COGAR:  And to that, we have to I think start

11    with the statutory definition of trade secret.

12             THE COURT:  Well, all the cases you cite to me

13    don't reference that statute.  It references other states

14    and other entities, codes.  For example, you rely -- if I'm

15    not mistaken -- correct me if I'm wrong.  And I don't mind

16    to be wrong.  But I believe you cited some case law -- let

17    me see here, Trandes -- the Trandes case.  Was that you or

18    was that the defendant?

19             MR. COGAR:  Yes, Your Honor.  I did.

20             THE COURT:  That was you, right?

21             MR. COGAR:  Uh-huh.

22             THE COURT:  Yeah.  And that -- and you cite that

23    for some proposition that -- well, this says that the entire

24    code can be considered a trade secret.  Except they use the

25    definition of trade secrets of -- the State of -- let me see
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL                                                      SAGITEC-DEL_02374691

```
 1    what state -- Maryland.  They didn't use the federal code
 2    definition of trade secret.  I mean, how can you present to
 3    the Court a federal case that defines trade secrets using
 4    the State of Maryland's definition of trade secrets and
 5    somehow offer that to me that that's somehow the answer to
 6    your -- to the response to this?  I mean, I find that
 7    troublesome that the case you rely upon doesn't even cite
 8    federal code for the definition of trade secrets.
 9               MR. COGAR:  Right.  Well, so two points on that,
10    Judge.  First of all, the statutes that I relied on in the
11    Trandes case and the Decision Insights case are state codes
12    that are based on the Uniform Trade Secret Act, which is
13    also what the federal code is based on.
14        If you actually drill down and look at the definitions
15    of the trade secrets in those codes, they are virtually and
16    materially identical to the federal definition.  Secondly,
17    federal courts all over the country have affirmed the
18    reliance on state Uniform Trade Secret Act cases to help
19    inform the interpretation of the Defendant Trade Secrets
20    Act, the Economic Espionage Act, which is before this Court.
21    So it's completely proper, Judge, to rely on those cases.
22               THE COURT:  It's a civil case for starters.  It's
23    not a criminal --
24               MR. COGAR:  True.  But, Judge, in fairness, that's
25    all that's cited by the defense as well for all of it.
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374692

```
 1              THE COURT:  No doubt --

 2              MR. COGAR:  And so --

 3              THE COURT:  -- their case is your case.  You're

 4    right.

 5              MR. COGAR:  So it's fair to use those cases as an

 6    interpretive guide.

 7              THE COURT:  I guess the part that I have a

 8    question with -- and it's really parts on both of your

 9    arguments, is that I typed in, in Westlaw, bill of

10    particulars, trade secrets.  And I looked only in federal

11    criminal cases.  And I had four or five cases pop up on the

12    very issue of whether bill of particulars are warranted in

13    trade secret cases.  And I would say more than half of them

14    granted the bill of particulars because of the -- of how

15    vague -- what the trade secret is that's being protected.

16    And the defendants have a right to know before they go to

17    trial what the specific trade secret is that you're claiming

18    they violated.

19              MR. COGAR:  Uh-huh.

20              THE COURT:  But not a single party -- not the

21    defendant, not the United States, cited a single criminal

22    case in which a bill of particulars was issued by a court.

23    I'm quite surprised, to be honest with you, that neither

24    side, as I recall, cited anything about that.  From my

25    reading, I didn't see that.  I saw a lot of civil cases, but
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374693

1    no particular -- bill of particular cases.

2          But nonetheless, I really -- as I sit here right now, I

3    don't know what the -- I don't know what the trade secret is

4    that these gentlemen are trying to defend themselves on from

5    the Government prosecuting them and seeking to take away

6    their liberty.  I think that's serious.

7          MR. COGAR:  If I may, Judge.  I think -- I think

8    they do.  They just submitted expert reports in the past two

9    weeks indicating -- from Mr. Sambasivam's experts retained

10   that did analyses of the Massachusetts software code and did

11   analyses of the use cases from New Mexico and Massachusetts.

12   So they were capable of analyzing those things.

13         THE COURT:  Counsel, that really looks at it

14   backwards, doesn't it?  The Government has the burden.  They

15   don't have to put on any evidence whatsoever.

16         MR. COGAR:  I agree, Judge.  But we're --

17         THE COURT:  So what I'm saying is -- I'm sitting

18   here from my perspective as the judge, and I still don't

19   know what it is you claim the trade secret is that they have

20   violated.  I mean, it's a simple question.  Tell me.  What

21   is it?

22         MR. COGAR:  It's what we've said, Judge.  It's the

23   Massachusetts source code, which we've identified and

24   specifically disclosed.

25         THE COURT:  The entire source code?

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL                                        SAGITEC-DEL_02374694

```
1              MR. COGAR:  The entire source code.

2              THE COURT:  They argue that the source code was

3    made available by Deloitte to Massachusetts without any

4    restrictions whatsoever.

5              MR. COGAR:  And that's the defense that they can

6    offer at trial.  What's before us is not a motion for

7    summary judgement.  It's a motion for a bill of particulars.

8              THE COURT:  I understand that, Counsel.  But is

9    that in fact the case, that Deloitte offered the entire

10   source code, the Massachusetts uFACTS system without any

11   restrictions whatsoever?

12             MR. COGAR:  No.  We don't agree with that.  And

13   that's a contractual interpretation question that will also

14   be focused on at trial.

15             THE COURT:  Okay.  But would you agree that if

16   that in fact is the facts, that that would then make it not

17   susceptible to a trade secret?

18             MR. COGAR:  No.  I wouldn't agree.  Because as far

19   as a conspiracy charge in particular, which is the charge

20   that focuses on Massachusetts code, in addition to the New

21   Mexico and Massachusetts design documentation, the

22   Government doesn't have to prove that the trade secret

23   existed.  It's only if the Government can prove that the

24   defendants believed that the trade secret -- there was a

25   trade secret.
```

CONFIDENTIAL

SAGITEC-DEL_02374695

THE COURT:  Okay.  I understand that about the
conspiracy part.  But you've charged them specifically with
the trade secrets substantive offense, right, not just the
conspiracy?

MR. COGAR:  That's correct, Judge.  But we're not
-- but we're not -- just to be clear, we're not arguing with
respect to Count 2 that the defendants possess or
constructively possess or aided and abetted the possession
of the New Mexico code -- or excuse me -- the Massachusetts
code in West Virginia.  That relates more to the New Mexico
design documentation for Count 2.

THE COURT:  Okay.  Okay.  Continue on with your
response.  I mean, I -- I'm still -- I don't want to beat a
dead horse, but I'm still tripped up as to what it is -- how
are they supposed to defend themselves with such a broad
allegation?

MR. COGAR:  I understand, Judge.  Judge, we
wouldn't view it as broad.  We would view it differently.
And I understand there's just a -- you know, a difference
here of perspective.  But at the end of the day, lots of
other courts besides the Fourth Circuit have said that
identification of the source code -- including federal court
--

    I don't know if you noticed or saw the attachment of
the exhibit of the Wisconsin District Court where they

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374696

```
1     identified and -- the district judge there in the jury
2     instructions in that case identified the source code --
3     didn't identify specific lines of code or parts of the code
4     -- identified the source code as the trade secret that was
5     at issue in that case that was alleged to have been
6     misappropriated by the defense in a federal case.
7                 THE COURT:  Was that a criminal case?
8                 MR. COGAR:  Yes, sir.
9                 THE COURT:  And you cited that as part of your
10    brief?
11                MR. COGAR:  I did, Your Honor.  It is on page 11.
12    It's the United States versus Sinovel Wind Group Company
13    case.  It's from the Western District of Wisconsin.  And I
14    attached that exhibit -- as an exhibit to our response.
15        But in addition to that, Judge -- I mean, there's other
16    courts as well that we cited in our brief which indicate --
17    which agree that the -- a complete source code for a
18    computer program can qualify as a trade secret.  In fact,
19    even in the cases -- as we explained in our opposition
20    brief, even in the cases the defendants cite, they don't
21    necessarily stand for the opposite conclusion.  Those were
22    on motions for summary judgment where the courts were
23    evaluating evidence to determine in fact if there was
24    evidence sufficient to establish that there was trade
25    secrets --
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374697

THE COURT: Defense counsel mentioned that parts of this source code were contributed by others other than Deloitte. Is that the facts?

MR. COGAR: Judge, without seeing it in front of me, I couldn't -- I couldn't comment effectively on it.

THE COURT: I mean, isn't that the exact same argument they would have; without seeing it in front of me, I can't comment on the exact source of that? I mean, because -- that's what they're trying to say, that we don't know which part of this source code is Deloitte's trade secret that we allege to have violated because a lot of this is from other entities.

Would you agree that there's at least other entities -- trade secret -- or -- forget trade secrets -- source code -- plus that belonged to other entities or were placed there by other entities that would not be trade secret?

MR. COGAR: I wouldn't agree that there's source code that belongs to other entities in the source code. I believe that it's -- as a unified whole, it's Deloitte's source code.

THE COURT: Well, let me ask defense counsel. This is where I want to have a conversation.

MR. COGAR: Sure.

THE COURT: Counsel, explain to me again. You said that there was lots of other --

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374698

```
 1              MR. ZAYED:  Yes, Your Honor.
 2              THE COURT:  -- entities' information in that
 3    source code that would not be a trade secret; is that
 4    correct?
 5              MR. ZAYED:  That's correct, Your Honor.  The way
 6    the source code was built was that Deloitte could only build
 7    portions of it.
 8              THE COURT:  Would you agree with that, Counsel?
 9              MR. COGAR:  I'm not sure what he means by that,
10    Judge.
11              MR. ZAYED:  They had to use other third-party
12    software.  And it's stated in the contract -- the
13    Massachusetts contract -- it says, look, there's three
14    components of IP here.  Component one, third-party software,
15    you've got to tell us how you're getting license on.
16    Component two is stuff that you, Deloitte, might have
17    brought in.  And component three, whatever you build,
18    Deloitte, belongs to me Massachusetts.  I own it outright.
19    It's mine.  Those are three components in the contract.
20         The source code itself has inputs, outputs, a database
21    management, procedures, security, protocols that were not
22    developed by Deloitte at all.
23         And so for counsel for the Government to stand before
24    the Court and say this whole thing is a trade secret -- just
25    because the Government says this is a trade secret does not
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374699

```
1    make it so.

2          And I would just like the Court -- the Trandes case,

3    which is cited by the Government, actually supports our

4    position.  And specifically, if you look at Trandes, Your

5    Honor, 996 F.2d at 661 -- 62, the Court there held that the

6    plaintiff-appellee failed to describe two of its three

7    alleged misappropriated trade secrets with sufficient detail

8    to establish each element of the existence of the trade

9    secret.  The plaintiff in Trandes had asserted that the

10   alleged misappropriated trade secrets were the specific

11   engineering formulas and methods of calculation embodied in

12   the software.

13         That's more than what we have been told here.  And the

14   structured organization of the software, that is more than

15   what he told us here.  And as well as the executable object

16   code of the software.  But did not provide any details as to

17   what those formulas were or how the software was structured

18   or organized.  The Fourth Circuit acknowledged that these

19   could constitute trade secrets, but the plaintiff relied on

20   conclusory allegations in generalized averments so they

21   could not sustain even a prima facie case of

22   misappropriation.  Without such details, no reasonable jury

23   could have concluded that they were unique and not generally

24   known in the industry as required to prove a trade secret."

25              THE COURT:  Counsel, he makes a good point there.
```

CONFIDENTIAL

SAGITEC-DEL_02374700

```
 1    From my layman's perspective, I don't know how I can't agree

 2    with that.  We're putting these men's -- these men on trial,

 3    trying to take away their freedom.  And it's not clear what

 4    part of this is really a trade secret and what part isn't.

 5    And I know you say, well, the whole thing is.  But I have to

 6    be honest with you, it's falling on deaf ears over here.

 7              MR. COGAR:  Judge, but that's what the cases say,

 8    that a compilation trade secret can have -- every component

 9    of a compilation trade secret can be publicly available --

10    every component.  And -- but the combination of them

11    together, is a uniform, unitary trade secret.

12         And in speaking to the Trandes case -- just to be

13    clear, what Mr. Zayed was quoting did not relate to the

14    software code.  That related to other trade secret claims

15    that were made in that case, not the software code.  The

16    software code under Trandes could be -- it was -- what the

17    Court found, that it could be a trade secret.

18         And the Decision Insights case, which the Government

19    also cited for the Court, reaffirmed that idea, and said

20    that the source code can be a trade secret.

21         In Trandes itself, it says right after -- about three

22    paragraphs -- two paragraphs after the cite -- what

23    Mr. Zayed quoted said, "The source -- the source code can

24    and does qualify as a trade secret."  No qualifications

25    there.  No caveats.  The source code.  The entire source
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374701

1    code.

2        And then the *Decision Insights* case, again, reaffirms

3    that idea that the source code as a solitary whole can

4    constitute a trade secret.  And that providing the source

5    code in discovery sufficiently identifies that thing as a

6    trade secret for purposes of allegation, which is what we've

7    done in this case.

8        So the defendants want to restrict what we claim --

9    they want to deconstruct what we claim was stolen.  And they

10    can't do that either.  We're allowed to allege that the

11    software code is a trade secret.  And we have the burden to

12    prove that.  We're not talking about proof here.  We're

13    talking about allegations for purposes of the motion for

14    bill of particulars.  And if we fail to make our burden,

15    then so be it.  But as it stands, the case law supports the

16    Government alleging that source code can be trade secrets.

17        THE COURT:  Well, that gets you past the motion to

18    dismiss, but I'm not sure that -- I mean, it's kind of like

19    the issue on venue.  You basically say, well, that's already

20    been decided by Judge Alboulhosn and Judge Berger, so that

21    -- they're just rehashing all the arguments.  But that's not

22    the case.  We ruled that they can't have an evidentiary

23    hearing on venue because you've pled venue in your

24    indictment.  That's a whole different argument than saying

25    they're not entitled to some evidence as to how you get

CONFIDENTIAL

SAGITEC-DEL_02374702

```
 1    venue in the -- where's your evidence of venue in the
 2    Southern District of West Virginia.
 3             MR. COGAR:  Judge, that is not what's before the
 4    Court for a motion for a bill of particulars.
 5             THE COURT:  It is.  Because they have a right to
 6    be able to -- because as you alleged in your response to the
 7    motion to dismiss, is that venue isn't -- is a jury issue,
 8    right?
 9             MR. COGAR:  That's correct.
10             THE COURT:  You've got to put on evidence to a
11    jury --
12             MR. COGAR:  Correct.
13             THE COURT:  -- that establishes that venue is in
14    West Virginia in the Southern District, correct?
15             MR. COGAR:  Yes, Your Honor.
16             THE COURT:  Okay.  Are you telling me they're not
17    entitled to the evidence that you have to suggest why venue
18    is proper here?
19             MR. COGAR:  We've given them that evidence, Judge.
20             THE COURT:  What have you given them?  Tell me
21    what makes venue proper in the Southern District.
22             MR. COGAR:  Judge --
23             THE COURT:  Just flat out tell me.  I want to know
24    if you've told them -- tell me directly what it is you've
25    told them about why venue is proper in the Southern
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374703

1    District.

2            MR. COGAR:  Judge, let's go back to the

3    indictment.

4            THE COURT:  I'm not asking about the indictment.

5    I realize you pled venue in the indictment.

6            MR. COGAR:  I'd note -- I'm sorry, Judge.  Don't

7    misunderstand.  I'm just -- I want to use that as a guide.

8            THE COURT:  Okay.  All right.  I'm sorry.  I

9    jumped the gun.

10           MR. COGAR:  So the indictment alleges that the

11   defendants constructively possessed trade secret materials

12   that were found in WorkForce West Virginia servers.  Okay?

13           THE COURT:  Who --

14           MR. COGAR:  There's evidence.  There's interviews

15   from WorkForce West Virginia employees.  There's other

16   documentary evidence reflecting that there was evidence of

17   Deloitte trade secrets materials -- at least what we allege

18   to be trade secret materials -- that were possessed by

19   WorkForce West Virginia employees in Charleston, West

20   Virginia.

21           THE COURT:  Who put them there?

22           MR. COGAR:  What?  Excuse me?

23           THE COURT:  Who put them there?

24           MR. COGAR:  Who put them there?  Sagitec did.

25           THE COURT:  What evidence do you have that either

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

SAGITEC-DEL_02374704

```
 1    of these two defendants put that information there?  I mean,
 2    don't you have to say these defendants -- not that Sagitec
 3    put it on a West Virginia computer, but that these two
 4    defendants did that?  They don't get guilty -- they can't be
 5    found guilty or found to have proper venue in West Virginia,
 6    therefore guilty -- assume you prove everything else, and
 7    the only issue was venue.  You've got to specify how these
 8    two defendants have venue in the Southern District of West
 9    Virginia.
10            MR. COGAR:  Right.  And that's what trial is for,
11    Judge.
12            THE COURT:  Counsel, you know -- are they supposed
13    to be tried by surprise?
14            MR. COGAR:  No, Judge.  And they're not going to
15    be.
16            THE COURT:  Okay.  So when are you going to tell
17    them how venue is proper in West Virginia for these two
18    defendants?  What evidence you have of venue, if these
19    defendants put something on a computer in West Virginia?
20            MR. COGAR:  Judge, I have to go back to the fact
21    that the bill of particulars is not supposed to supply -- is
22    not as a discovery device.  The case law --
23            THE COURT:  No.  It's supposed to at least give
24    them something -- I mean -- go ahead.  I'm sorry.
25        Defense, tell me what the bill of particulars --
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374705

```
 1            MR. COGAR:  It's not a discovery device.  We're
 2    not required to spell out every detail of what we're going
 3    to prove at trial.  I mean, just -- we're not.
 4        May I have a moment, Your Honor?
 5            THE COURT:  Absolutely.
 6            MR. COGAR:  But in any event, the point here is,
 7    is that they want to preview our trial evidence to the bill
 8    of particulars.  And that's not the purpose of the bill of
 9    particulars.
10            THE COURT:  I'll be honest with you, I haven't
11    read that.  That's not the way I read your pleadings.  And I
12    know I'm harping on you a little bit, Counsel.  And I don't
13    mean to be.  But I'll be honest with you, I'm frustrated
14    that as we stand here right now -- you just told me that
15    Sagitec put the stuff on the West Virginia computers.
16            MR. COGAR:  Well, Judge -- so here's the thing.  I
17    -- it would take the rest of the afternoon to explain kind
18    of what we're going to present -- summarize what we're going
19    to present at trial.  I mean, we have hundreds of emails
20    reflecting that the defendants in this case had transmitted
21    a variety of different types of Deloitte trade secret
22    materials and electrical property, that two people who were
23    working on a West Virginia project, and that those materials
24    were found on West Virginia servers.
25            THE COURT:  I appreciate that.
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374706

```
1                 MR. COGAR:  Excuse me?

2                 THE COURT:  I appreciate that.  I don't dispute

3       that at all.  I don't know how that -- I mean, I can believe

4       all of that that you just told me as absolute gospel.  But I

5       don't know how that applies to the bill of particulars that

6       the defendants are asking for about -- show me something

7       that ties us to the venue in West Virginia that they

8       specifically did that.

9                 MR. COGAR:  Well --

10                THE COURT:  And -- don't you have to do that at

11      trial to convict them?

12                MR. COGAR:  So I don't have to show -- it's a

13      conspiracy.  So more than one -- there's more than one

14      conspirator.

15                THE COURT:  Okay.

16                MR. COGAR:  And there's also at least one

17      unindicted co-conspirator who's no longer alive.  And so I

18      don't have to show that they physically placed the --

19      anything on --

20                THE COURT:  Okay.

21                MR. COGAR:  -- the servers in West Virginia.

22                THE COURT:  But you have to show that someone

23      involved in the conspiracy did.

24                MR. COGAR:  Correct.

25                THE COURT:  And that they were involved in the
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374707

```
1     conspiracy.
2               MR. COGAR:  Correct.
3               THE COURT:  Have you done that?
4               MR. COGAR:  I've -- we've provided all the
5     evidence of it.  I mean, again, the Government's not
6     required --
7               THE COURT:  Seven thousand plus pages of it,
8     right?
9               MR. COGAR:  Judge, the material evidence that
10    relates to that, just to be fair -- I mean, I understand the
11    discovery is voluminous.  But there's different chunks of
12    the evidence that are much more manageable.  And the
13    investigative file from the Commission on Special
14    Investigations has interviews -- a lot of interviews.
15         But, you know, if you just took their part of the file,
16    that would be reflective of a lot of the things that we're
17    talking about in the conspiracy.  There's emails by both
18    defendants -- again, things that I provided them before the
19    indictment that were indicative of these things as well.
20         And so, Judge, I'm just struggling with kind of -- with
21    what is being asked by the defendants and what can be done
22    through a bill of particulars.  It relates to allegations,
23    not proof.  The allegations reflect the reason why.  But,
24    you know -- we focus on the fact that the Court can I guess
25    -- the venue is properly pled is because --
```

CONFIDENTIAL

SAGITEC-DEL_02374708

THE COURT:  What we said -- what we said was -- I don't know that we said -- we said it was properly pled for purposes of the motion to dismiss.  You know, the case law was pretty clear on that.  But I don't -- you still have a burden of proof on that.  And they still have a right to be -- to know what the Government's evidence is on that.  And I'm not -- I just can't believe that as we stand here right now, you can't tell me that.

MR. COGAR:  Judge, I can, but I wasn't prepared to go through the Court and outline all the different types of evidence that we plan to prove at trial that relates to venue.  I mean, this is substantive evidence that we're going to present at trial.

And the one -- you know, I'll go to the second point -- all right -- the second overt act that's charge.  And that is, on September 14th, 2017, Mr. Minkkinen sent an email to the investigative agents that was designed to conceal, misrepresent the ongoing possession and transmission and use of Deloitte trade secrets.  That email was sent to both Mr. Powers in West Virginia and the other case agent in Virginia.  So the transmission to Charleston, West Virginia, was -- that's another thing that checks a box on venue in the Southern District.

THE COURT:  But you know the person that transferred it to the Southern District of West Virginia,

CONFIDENTIAL

SAGITEC-DEL_02374709

```
 1    right?
 2              MR. COGAR:  Excuse me?  I'm sorry.
 3              THE COURT:  You said it was to the servers in the
 4    Southern District of West Virginia, right?  It was saved to
 5    the Southern District of West Virginia server?  Is that --
 6              MR. COGAR:  The email was transmitted to
 7    Charleston, West Virginia.
 8              THE COURT:  Email?
 9              MR. COGAR:  Yes.
10              THE COURT:  Okay.  Is that the email that you're
11    saying that provides the venue?
12              MR. COGAR:  That is one basis of venue.  That --
13    any of the overt acts that are alleged, each one
14    individually could satisfy or establish venue in the
15    Southern District.
16              THE COURT:  Okay.  So when defense counsel argues
17    that the servers are up in the Cloud or in two locations in
18    Virginia and Iowa, and that you claim there's a -- this
19    trade secret was housed in a computer in West Virginia; is
20    that right?
21              MR. COGAR:  Well, so to maybe put a little bit
22    more flesh on that.  There was information downloaded from
23    those servers to West Virginia -- to Charleston by WorkForce
24    West Virginia employees.
25              THE COURT:  Okay.  That does not give you the
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374710

```
 1    venue that you need unless those WorkForce West Virginia
 2    employees were somehow in conspiracy with the defendants,
 3    right?
 4          MR. COGAR:  No, Judge.  Because that would be --
 5    we would argue that -- insofar as that was the dynamics of
 6    how that occurred, we would argue that that was foreseeable,
 7    and that -- because the project was with West Virginia, and
 8    it was designed to be developed in West Virginia.
 9          THE COURT:  So if any of those WorkForce employees
10    were not part of the conspiracy, but because of the course
11    of their employment, they downloaded something off of the
12    servers onto their computer, you're claiming that gives you
13    the venue necessary to convict these defendants in the
14    Southern District of West Virginia?  At least in part,
15    that's one of the ways you get venue?
16          MR. COGAR:  It could be.  I mean, there's -- we
17    have a number of alternate theories.  The defense actually
18    also visited Charleston on a few occasions.
19          THE COURT:  Okay.  But -- okay.  Let me ask -- let
20    me do it this way.  Let's say that I was inclined to grant a
21    bill of particulars in this case -- and I realize you
22    vehemently disagree with me on that.  But the defendants
23    have asked 17 areas of inquiry.  If I was going to rule
24    against you in the issue of bill of particulars, which of
25    those 17 -- four or five of them would you want me to grant
```

Amanda J. Pickens, RPR, CCR (304) 347-3188

CONFIDENTIAL

SAGITEC-DEL_02374711

```
 1   versus others that you wouldn't want me to grant?
 2        And I know that's a weird way of asking a question, but
 3   I'm just curious, you know, if you had -- if you were going
 4   to lose this issue, which ones would you rather lose?  And
 5   I'm not saying you are.  Please don't take me as that.  I'm
 6   going to turn around and ask the same type of questions to
 7   the defendants.  If I was going to rule against them, which
 8   ones would they not want me to rule against them.
 9        MR. COGAR:  Well, I mean, there's some questions
10   that are impractical, if not impossible, to answer because
11   of the volume of things.  Like, (10), for example,
12   "Specification of the dates on which the defendants
13   allegedly copied, downloaded, obtained, and transmitted
14   numerous Deloitte files, including trade secret information
15   such as uFACTS source code, data" --
16        MADAM COURT REPORTER:  Can you -- I'm sorry.  Can
17   you slow down when you're reading?
18        MR. COGAR:  I'm sorry.
19        Number (10) asks -- the "Specification of all dates
20   which the defendants allegedly copied, downloaded, obtained,
21   transmitted Deloitte files, including trade secret
22   information."  I mean, that would be -- I mean -- an
23   enormous undertaking to identify every date on which that
24   happened.
25        And, again, like we have -- and two, Judge, just so you
```

CONFIDENTIAL

SAGITEC-DEL_02374712

```
 1     know, we've agreed to exchange exhibits in advance.  We've
 2     tried to cull some "hot docs" as well to make defense job a
 3     bit easier in terms of understanding what we're focusing on
 4     in terms of evidentiary presentation.
 5               THE COURT:  What about Number (16)?
 6               MR. COGAR:  Judge, we're ultimately going to
 7     provide the defendants with the grand jury testimony of the
 8     case agent in the case.
 9               THE COURT:  Have you not done so yet?
10               MR. COGAR:  No.  The plaintiff's disclosures
11     haven't been due.
12               THE COURT:  But when are they due?
13               MR. COGAR:  I believe in about a month.
14               THE COURT:  But I mean -- I guess my question --
15     that's a deadline for you.  Why wait until the deadline?
16     Why not do it earlier?
17               MR. COGAR:  We can do so, Judge.
18               THE COURT:  So back to my question on Number (16).
19     Why not the "Identification by Bates number the specific
20     trade secrets that were presented to the grand jury to
21     procure the indictment"?
22               MR. COGAR:  It was explained narratively in the
23     grand jury presentation.
24               THE COURT:  Okay.  You're agreeable to turn that
25     over to them now?
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374713

```
1                MR. COGAR:  We can do that.

2                THE COURT:  Okay.  By your acquiescence, I'm going

3    to order that to be done by the end of business tomorrow.

4    Okay?

5                MR. COGAR:  Okay.

6                THE COURT:  Okay.  And let me ask defense, does

7    that help in any way?

8                MR. ZAYED:  That helps, Your Honor.  But not --

9    it's not complete relief.

10               THE COURT:  I understand that's not complete

11   relief.  But I'm just wondering if that -- because I look at

12   this 17-item list, and I'm going -- you're asking for way

13   too much.  If I thought I was going to grant a bill of

14   particulars, I'm not going to grant a bill of particulars in

15   all 17 topics in here.

16               MR. ZAYED:  Well, that's fair, Your Honor.  But if

17   you look at (4), "Identification of the specific lines of

18   source code within the Massachusetts uFACTS source code that

19   constitute a trade secret."

20        As an initial matter, Your Honor --

21               THE COURT:  So that's one you would want me to

22   grant?

23               MR. ZAYED:  Yes.  As an initial matter, Your

24   Honor, we can supplement -- we would like to supplement this

25   hearing with the expert reports so Your Honor has them, as
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

```
 1    well as a -- the contract from Massachusetts, which has page

 2    after page after page of third-party software embedded in

 3    the Massachusetts source code.  So we would like to submit

 4    that to Your Honor.

 5         But what we want is -- okay.  Given that there's so

 6    much third-party stuff, given that the State (sic) is making

 7    demands of what they want, given that the federal government

 8    has an overlay -- you have this massive thing.  Exactly

 9    where is your trade secret, Government?  Where?  Where in

10    this?

11         The Government -- Ray said, well, you had an expert.

12    You know what our expert did, Your Honor?  Our expert,

13    without knowing what a trade secret is, said, okay, I'll do

14    it generally.  I'll compare their 7 million lines of code to

15    Sagitec's 7 million lines of code.  He did that.  And he

16    come back, there's no plagiarism.  They didn't take

17    anything.  Codes are not similar.  That's his testimony.

18         So then the question I have, is that enough to satisfy

19    the Government to go away?  No.  Because what the

20    Government's going to say, well, the Sagitec source code is

21    based on the Massachusetts source code.  So then I said,

22    what in the Massachusetts source code is a trade secret that

23    entitles you to that?  He has to tell me what the trade

24    secret is for me to put a defense.  So I think --

25              THE COURT:  Would you agree with that, Mr. Cogar?
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374715

```
 1              MR. COGAR:  Agree with what?

 2              THE COURT:  What he just said.  That you have to

 3   tell him what part of the Massachusetts source code is a

 4   trade secret.

 5              MR. COGAR:  No, we wouldn't agree with that,

 6   Judge.  I mean, again, I was just relying on the volumes of

 7   case law that indicate otherwise.  That --

 8              THE COURT:  Would you agree that there's volumes

 9   of case law that indicate otherwise, that you do have to

10   disclose?

11              MR. COGAR:  No, I would not agree with that,

12   Judge.  There's -- he cited one case that roughly supports

13   that point, and that was a summary judgment case in which --

14   at the district court level, and a published decision in

15   California in which the Court said that they couldn't find

16   identification of trade secrets because there was no witness

17   that testified that the entire source code was a trade

18   secret.  So that doesn't really have much bearing on whether

19   or not the entire source code here can be alleged to be a

20   secret -- a trade secret.  Excuse me.

21              THE COURT:  I mean, what I can't understand is how

22   you guys can be so diametrically opposed on this.  How you

23   can say, we've given them everything that they're entitled

24   to -- that they should have, and they should be able to tell

25   what's the -- and they're going, we have absolutely no clue
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374716

```
 1    what to defend ourselves on.
 2         I mean, come on.  There's got to be somewhere that you
 3    guys can come to an agreement on and say, okay, we'll give
 4    you this information or we'll accept this information, and
 5    we can proceed on with this matter.
 6         I mean, I will be honest with you.  I'm frustrated.  I
 7    still sit here, and I don't understand what the trade secret
 8    is.  I think I, as the judge, should at least be able to
 9    ascertain a little bit of that.  I mean -- and I know this
10    is not the same as a drug case, for example, when the
11    Government says, hey, they have this many ounces of this
12    drug and they possess it with intent to deliver.  I mean,
13    it's pretty clear what the defendant has to defend against.
14    Here, it's about as murky as can be.
15              MR. COGAR:  Judge, may I suggest then this?  If
16    the Court would give us some time -- I don't know how long
17    it would take.  And I can revisit with Deloitte directly,
18    some of the things that we found, some of the source code
19    that we found in the case that was transmitted and --
20              THE COURT:  Why do you have to consult with
21    Deloitte?  Why --
22              MR. COGAR:  Because they're the owner of the trade
23    secret, Judge.
24              THE COURT:  Forget them.  They're not a party to
25    this action.  The United States of America is prosecuting
```

CONFIDENTIAL

SAGITEC-DEL_02374717

```
 1    two individuals on a criminal charge.  The United States of
 2    America shouldn't have to consult with anybody else right
 3    now to be able to determine what the source code is to
 4    discuss with these defendants.  I don't understand.
 5              MR. COGAR:  Well, if I could hopefully elaborate?
 6              THE COURT:  Sure.
 7              MR. COGAR:  So I'm trying to creatively think
 8    through some kind of a middle road to give the defendants a
 9    -- more of a narrower view to circumscribe just some of the
10    issues that we're talking about.  And so what I'm
11    contemplating is -- because, again, Deloitte is the owner of
12    the trade secret.  Deloitte is the alleged victim here.  And
13    they have rights too.  And so --
14              THE COURT:  I'm going to push back on that,
15    Counsel.  The Government has brought a criminal case in
16    which you're trying to take the liberty of two people from
17    them, and you're telling me that the Government can't
18    proceed unless it gets permission from Deloitte?
19              MR. COGAR:  Judge, that's not what I'm saying.
20    I'm saying I'm trying to work through and -- thinking out
21    loud, trying to work through a middle way so that we could
22    -- we can satisfy the Court's concern and the defense
23    concerns about focusing in on specific aspects of the code.
24    I can't do that on my own.  I can't just pluck out different
25    lines of code because I'm not an expert.  I have to consult
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374718

```
 1      with the trade secret owner to work through that.
 2           It's just a natural part of the process.  It's not to
 3      say that -- I'm not -- I'm not shafting my responsibilities
 4      as a prosecutor in the case.  I'm -- to the contrary, I'm
 5      trying to handle this in an appropriate way that balances
 6      the interest of the victim -- the punitive victim in the
 7      case, while also trying to help narrow the issues for trial
 8      for the defendant.
 9           THE COURT:  And I appreciate that, Counsel.  And I
10      don't -- I'm not trying to beat up on you.  I'm genuinely
11      asking questions because I'm perplexed.  But it sounds to me
12      like you said, I need to talk to these other people because
13      I don't know what the trade secrets are exactly.  They do.
14           MR. COGAR:  That's not it at all.  We're -- we are
15      arguing that the source code is a trade secret, and we have
16      -- as I've tried to explain, there's a lot of authority to
17      support that.  And what I'm saying, I can't -- I can't go
18      through line by line and specifically -- and nor do the
19      cases require us frankly.  But I can't go through line by
20      line and say, okay, here's a trade secret.  Here's a trade
21      secret.  I need to prioritize.  I need to call out if we're
22      going to do that with Deloitte.  There's no other way for me
23      to do --
24           THE COURT:  What kind of time do you need to do
25      that?
```

Amanda J. Pickens, RPR, CCR (304) 347-3188

CONFIDENTIAL

SAGITEC-DEL_02374719

| 1 | MR. COGAR: I would say at least a couple of |
| 2 | weeks. |

1          MR. COGAR:  I would say at least a couple of

2     weeks.

3          THE COURT:  That's too long.  I mean, this case --

4     when's it set for trial?

5          MR. COGAR:  July 10th.

6          THE COURT:  Yeah.  It's too long.  And I need to

7     get something out -- because by the time we do this process

8     -- and if you all can't agree, and I have to issue an order,

9     parties are going to have an opportunity to appeal that to

10    Judge Berger.  And then that -- that time would start

11    crowding into the July hearing.  I'm going to say complete

12    that by next week -- by next Friday.  That's a week -- eight

13    days.

14          MR. COGAR:  We'll do our best, Judge.  I want --

15    but I want to reserve my rights to maintain that the entire

16    source code is --

17          THE COURT:  You have made that -- all I'm

18    suggesting is that you all communicate and try to come up

19    with a solution to this matter rather than me having to

20    issue an order.  Because I'll be honest with you, I'm

21    probably going to grant a bill of particulars of some kind,

22    as I sit here.  Now, I'm not granting all 17.  I made that

23    pretty clear.

24          I was trying to see where -- you know, what you would

25    -- say, okay, I can do -- and I was going to see what they

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

```
 1    said they have to have, trying to cull it down to a workable

 2    amount.  But, you know, I think they're entitled to some

 3    more information on venue as well as to the proof on venue

 4    that you have of these defendants.

 5          So what do you think about that approach, Counsel?

 6          MR. ZAYED:  Your Honor, we're always welcome to a

 7    discussion.  The fear that we have is -- with an open-ended

 8    source code, it's like saying, Your Honor, I have a black

 9    box.  This black box is a trade secret.  And that's my

10    position.  And I don't have to tell them, oh, here's the

11    black box and everything in it.

12          So now I'm supposed to open this black box, go through

13    the 7 million lines and figure out where is this trade

14    secret.  They are required to tell me.  And then if they

15    came in and said, hey, R.J., what we're claiming is a trade

16    secret is the sequence that we do this step, this step, this

17    step, this step, this step, that gives us --

18          THE COURT:  Let me see if I can put this in

19    something that might be easier for -- it makes it easier for

20    me to understand.  Let's say we're talking about stuffing

21    for turkey.  You know, turkey stuffing.  You're saying that

22    the turkey stuffing box that I buy at Kroger is the trade

23    secret.  And they're saying, no, not everything in that

24    turkey box is a trade secret.  But Pillsbury may have their

25    own ingredients they put in it.  And, you know, Dunkin' has
```

Amanda J. Pickens, RPR, CCR (304) 347-3188

CONFIDENTIAL

SAGITEC-DEL_02374721

```
 1    its own -- I don't think they make turkey stuffing -- but
 2    I'm just coming up with names.  Dunkin' has their own
 3    version of it.  And if you're saying, well, Dunkin's stolen
 4    our version, then you've got to tell us what ingredients
 5    were the secret part of that formula.  And you're telling me
 6    it's the whole box of stuffing, and you don't have to tell
 7    me the individual items that were stolen by them to make
 8    their version of it.  And to be honest with you, my head
 9    says that you do have to tell me that.
10             MR. COGAR:  Well, Judge, I would -- to use another
11    trade secret analogy --
12             THE COURT:  Okay.
13             MR. COGAR:  One of most famous trade secrets is
14    Coca-Cola --
15             THE COURT:  Okay.
16             MR. COGAR:  -- the formula for Coca-Cola.
17             THE COURT:  Sure.
18             MR. COGAR:  So if someone stole that -- okay --
19    and then used it in some way to develop their own thing, we
20    wouldn't have to prove -- okay -- that it's this amount of
21    sugar water that makes it a trade secret or this flavoring.
22    It's the formula itself.  It's the collective whole.  And
23    that's the trade secret.  It is in itself a compilation
24    trade secret.  It's the formula.  If you take any part of
25    that formula out, it doesn't taste like Coke.
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374722

```
 1          And so -- and the same way with source code, we would

 2    argue, that if you take a line of code out, the program is

 3    not going to work right.  It's a simple whole.  There's no

 4    -- and I understand the argument about, okay, there's a lot

 5    there.  But that's -- there's no arbitrary restriction in

 6    the trade secret definition about volume.  Okay?  But that's

 7    our position when it comes to the source code.

 8          THE COURT:  Using your example though, if

 9    Coca-Cola said, hey, Massachusetts, here's our Coca-Cola

10    formula, you can use it however you want to, whenever you

11    want to, to whoever you want to, would you agree that

12    there's no longer a trade secret there anymore?

13          MR. COGAR:  Well --

14          THE COURT:  You can give it away to everybody.

15          MR. COGAR:  -- if they give it to private parties

16    and Coca-Cola knew that and didn't do anything about it,

17    then, yes, that would -- that would vitiate -- essentially

18    vitiate trade secret.  That's not what we have in this case.

19    That will be the argument we'll have at trial.

20          THE COURT:  Interesting.

21          MR. ZAYED:  Your Honor, if I may respond to the

22    Coca-Cola --

23          THE COURT:  Sure.  You didn't like my turkey --

24          MR. ZAYED:  No.  I like -- your turkey stuffing is

25    just as good.
```

CONFIDENTIAL    SAGITEC-DEL_02374723

|    |                                                                        |
|----|------------------------------------------------------------------------|
| 1  | THE COURT:  I understand.                                               |
| 2  | MR. ZAYED:  Well, let's use the turkey stuffing.                        |
| 3  | THE COURT:  Okay.                                                       |
| 4  | MR. ZAYED:  His claim is that I stole your turkey                       |
| 5  | stuffing, right?  Because I'm making turkey stuffing.  First            |
| 6  | of all, everybody in this room can make turkey stuffing.                |
| 7  | There's not -- this is not a unique rocket fuel formula.                |
| 8  | It's turkey stuffing, right?  So if I stole your turkey                 |
| 9  | stuffing, he has to show that my turkey stuffing is the same            |
| 10 | as your turkey stuffing.  And more importantly, he has to               |
| 11 | show that his turkey stuffing is so unique that nobody else             |
| 12 | knows about how he makes his turkey stuffing.  It's not                 |
| 13 | generally known, not really ascertainable by proper means.             |
| 14 | And his secret sauce -- and that's -- maybe it's an herb.              |
| 15 | Maybe it's chicken fat.  Maybe it's --                                  |
| 16 | THE COURT:  Whatever.                                                   |
| 17 | MR. ZAYED:  -- garbanzo beans -- whatever.  But                         |
| 18 | then he has to show that what I have is your turkey                     |
| 19 | stuffing.  That's the problem.  Unemployment insurance, 50              |
| 20 | states have it.  And what they're required to do -- 50                  |
| 21 | states have to do generally the same doggone thing.  And so             |
| 22 | the question becomes here, your turkey -- when you say I                |
| 23 | have turkey stuffing.  My turkey stuffing is a trade secret.            |
| 24 | You have it.                                                            |
| 25 | First of all, he has to show that I do have the same                    |

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL                                                      SAGITEC-DEL_02374724

```
1    ingredients.  Then he has to show that his ingredients are a
2    trade secret.  And he has failed to tell me what ingredients
3    or what calibration of ingredients make it a trade secret.
4    And I'm entitled to have that before we go to trial.
5              THE COURT:  Anything further, Counsel?
6              MR. COGAR:  No, Judge.  I think we're getting kind
7    of deep in the weeds in terms of evidence.  But, no, nothing
8    further.
9              THE COURT:  Well, I appreciate that.  But I still
10   sit here, and I still don't know what the Government's
11   evidence is against these defendants that they violate --
12   that they misappropriated trade secrets.  And I thought by
13   the end of this hearing, you would say, well, we've showed
14   them this.  We've showed them that.  And we've given them
15   this information.  And that's generally where we're at.  May
16   not be, you know, dialed in straight on top of it, but it's
17   pretty close to it.  So far, you're still telling me, it's
18   out here instead of somewhere here.
19             MR. COGAR:  Well, Judge -- I mean --
20             THE COURT:  And you're saying I don't have to tell
21   them anything else but here.  I don't have to give them the
22   ball this big.  It can be as big as this.  And I realize I'm
23   speaking in generalities, but ...
24             MR. COGAR:  Yeah.  Well, there's a lot that you're
25   addressing.  And I mean, I'm kind of at a loss as to where
```

CONFIDENTIAL

SAGITEC-DEL_02374725

```
 1    to start.  What we've addressed like -- what we identify as

 2    a trade secret versus how we're going to prove the trade

 3    secret versus venue.  I mean, the -- I understand -- I

 4    understand where the Court's coming from.  It's not been my

 5    object today to not answer the Court's questions.  I just --

 6          THE COURT:  No.  I don't think it has.  I mean,

 7    but -- I mean, it's just part of the -- the nature of the

 8    beast that we're involved in at this point.  But I am kind

 9    of dismayed that you haven't given me more to help ease my

10    concerns that these defendants are going to be surprised at

11    trial unless they have more information.  That's not the

12    Government's goal, is to surprise the defendants at trial.

13          MR. COGAR:  Absolutely not.

14          THE COURT:  So -- but as I sit here today, I think

15    they're going to be surprised at trial as to what -- they

16    don't really know how to defend this case.  And I know you

17    say otherwise.  But I'll be honest with you, I'm sitting

18    here going, I have no clue how they're going to do that.  I

19    mean -- counsel, I hope you take that for what it's worth.

20    I'm sitting here -- and I realize I'm not the trial judge.

21    But I'm sitting here as the judge going, I don't know how

22    they're going to defend this.

23          MR. COGAR:  Judge, if I may, just by way of

24    illustration -- and this is just by way of illustration.

25    There's email traffic between Mr. Sambasivam and another
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374726

```
 1    individual that works at Sagitec where they say the

 2    Massachusetts code is available for download here.  Okay?

 3    And Mr. Sambasivam knows this.  He's on this email chain.

 4    And then there's other emails reflecting that -- okay --

 5    we're going to move it to these servers in India.  Right?

 6    And so that's the kind of thing that we're dealing with.

 7    The whole -- the entire thing was downloaded -- the entire

 8    thing.  And that's the kind of evidence that we have as one

 9    example.  It's not, you know, piecemeal.  You know, this is

10    what's distinguishable here.

11        So I mean, I don't know what the Court really -- what

12    would satisfy the Court's concerns.  I'm happy to do what I

13    can to do that.  But all I can tell you is that the evidence

14    we've provided -- obviously it's voluminous evidence.  But

15    it's not -- it's manageable in many respects for the most

16    material things.  And to the extent that there was questions

17    about, you know, different aspects of the evidence, there's

18    -- those questions are answerable.  And I -- we've answered

19    some of them already either through the course of litigation

20    or through direct contact with defense counsel or through

21    pre-indictment disclosures.

22        So I really have a hard time believing that they're

23    going to be surprised at trial with the trial evidence.  I

24    really do.  And it's -- we're not going to be presenting,

25    Judge, on the PowerPoint screen a list of code.  We're not
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374727

```
 1    going to do that.  We're not going to do that.
 2         That -- so, you know, I don't know if that helps the
 3    Court.  But I want -- I don't want to belabor it.  I don't
 4    want to, you know, raise the eye of the Court anymore.
 5         But we believe based on our disclosures that started a
 6    year and a half before this case was indicted and through to
 7    this day, we've explained a lot about what this case is
 8    about, given them a lot of notice about what our theory of
 9    the case is and the general idea of how we're going to prove
10    it.
11              THE COURT:  Okay.  Thank you, Counsel.
12         Anything further, Counsel?
13              MR. ZAYED:  Very briefly, Your Honor.  The
14    Massachusetts code is owned by Massachusetts; lock, stock
15    and barrel.  Massachusetts could do whatever it wants.  It
16    received federal funding.
17              THE COURT:  Is that correct, Mr. Cogar?
18              MR. COGAR:  So --
19              THE COURT:  Yes or no?
20              MR. COGAR:  Yes and no.  It depends on what
21    aspects we're talking about.  Again, it's a contractual
22    interpretation question that we're going to litigate at
23    trial, there's no doubt about it.  And what I'm talking
24    about when I reference the code, the -- that was -- some of
25    that was transmitted before -- two Sagitec -- two Sagitec
```

CONFIDENTIAL

SAGITEC-DEL_02374728

```
 1    employees before Mr. Sambasivam had left Deloitte's

 2    employment.  And there was no authorization to do that.  And

 3    so -- but when it comes to ownership --

 4              THE COURT:  Say that again now.  The -- when they

 5    were still employed by Deloitte?

 6              MR. COGAR:  Yes, Your Honor.

 7              THE COURT:  They gave this to Massachusetts?

 8              MR. COGAR:  To Sagitec.

 9              THE COURT:  To Sagitec?

10              MR. COGAR:  Yes.

11              THE COURT:  Okay.

12              MR. COGAR:  But, again, this is getting -- I want

13    to -- I don't want to go down this road because this is

14    getting into evidence.  And we could go -- we could -- no

15    use in trying the case right now.

16         But bottom line is, Judge, that when it comes to this

17    Massachusetts piece, it's a contractual interpretation

18    question that we have different views on.

19              THE COURT:  Okay.  Thank you.

20         Last word?

21              MR. ZAYED:  The Massachusetts stuff, Your Honor,

22    is public.  We subpoenaed Massachusetts.  Massachusetts told

23    us that had we done FOIA, they would have given us this --

24    public information.  Public information.  So I asked the

25    Government, if that's public, where's your trade secret?
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374729

Case 2:22-cv-00253-WCB Document 317 Filed 05/17/25 Page 50 of 98 PageID #:

1      Tell me, what am I missing?  They haven't told me.

2              THE COURT:  Okay.  So I'm going to give the

3      parties a week to meet and confer on -- the benefit of

4      having these 17 items is, at least there's a finite list of

5      things that they say they would like for the Court to rule

6      upon.  I'm not saying -- I've clearly said they're not

7      getting all 17.  I don't think anywhere close to 17.

8              But maybe you all can get together and say we agree

9      upon this venue.  And that resolves the issue between the

10     two of you.  Or maybe it resolves most of it.  And if it --

11     whatever you all can agree upon, then you say, this is --

12     this is the set of requests we can agree upon.  We can't

13     agree on this.  We agree we don't -- we're not entitled to

14     this.  These are the ones we still have questions on.  And

15     then at least that would narrow the issue down for the Court

16     to decide whether I need to rule -- whether I need to grant

17     a bill of particulars or not.

18             Is that fair for you all to be able to try and do in a

19     week?

20             MR. COGAR:  Judge, I appreciate where the Court's

21     coming from.  But this is exactly what the Government's

22     concern was, that this is -- this is -- these read like

23     interrogatories.

24             THE COURT:  Counsel, I can rule upon it.  And I'll

25     be glad to rule upon it.

CONFIDENTIAL

SAGITEC-DEL_02374730

```
 1            MR. COGAR:  Yeah.  I mean --

 2            THE COURT:  So let me just rule upon it.  Okay?

 3    If you -- if you can't agree to sit down and -- because I've

 4    told you, I think they're entitled to a bill of particulars

 5    to some issues.  I'm going to grant a bill of particulars on

 6    some of this information.  You don't want to have a part of

 7    that process to see if you can't agree to avoid the Court

 8    having to do that.  I'm fine with it.  So I'll make a

 9    ruling.

10            MR. COGAR:  Judge, we will make a good faith

11    effort to work something out, but -- my concerns

12    notwithstanding.  But I share -- I've shared with the Court

13    my concerns.

14            THE COURT:  And I appreciate that.  I was trying

15    to find a way out to allow you all to maybe negate the need

16    for a bill of particulars, to satisfy some of the issues

17    that are listed down here.  I thought that would be a

18    benefit to you.  You're saying that that's a problem for the

19    Government.  Then I don't think I have any other choice but

20    to rule the way I'm going to rule.  And it's going to take

21    me some time to do so.  But I'll get it done -- before the

22    end of the month is my goal.

23        Okay.  Now, if you all happen to meet and confer and

24    you come up with a resolution in this matter beforehand, let

25    me know.  Otherwise, an order will be entered by me, and you
```

CONFIDENTIAL

SAGITEC-DEL_02374731

1    all can do with it what you may with regard to Judge Berger.

2    Okay?

3        Is there anything else that I failed to cover that you

4    wanted me to?

5            MR. ZAYED:  Not on behalf of Mr. Siva Sambasivam,

6    Your Honor.

7            THE COURT:  Anything else on behalf -- and I

8    apologize.  I didn't mean to leave you out of the

9    conversation.

10           MR. STALLINGS:  No, Your Honor.  We worked ahead

11   together -- together ahead of this hearing so that Mr. Zayed

12   could take the lead on that particular motion.

13       I have a few points on the motion to compel if Your

14   Honor would like to hear it?

15           THE COURT:  Yes.  I've got -- yes.  We need to

16   take care of that.

17           MR. STALLINGS:  They are -- if I may stay at the

18   table?

19           THE COURT:  Sure.

20           MR. STALLINGS:  Your Honor, the two motions are

21   intertwined on the issues that underline them.  So if the

22   Government identifies a response to either meet and confer

23   or an order on a bill of particulars -- the answers to those

24   17 are some subset of those 17, that will satisfy what we're

25   seeking in most of the motion to compel.

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

```
1          I do want to address the use cases briefly.  And it --
2     again, it can come under the context of the bill of
3     particulars or our motion to compel because they're a little
4     different than the source code.  And I'm not going to rehash
5     the arguments on source code at all.
6               THE COURT:  Right.
7               MR. STALLINGS:  Use cases I think were well
8     explained by counsel for Mr. Sambasivam.  And I don't want
9     to go over that again.  Here's another example though that
10    kind of highlights the issue I want to raise with the Court.
11         So if somebody logs in to an unemployment system and
12    they have an expired password, there's a process for that.
13    Right?  Boom.  And that's a very narrow kind of use case.
14         That applies in probably all 50 states' systems.
15    Right?  And it looks virtually the same in all systems.  Not
16    only that, use cases themselves are almost always made
17    public at some point by the state.  In other words, they're
18    public materials.  So out of these thousands of use cases
19    that are identified as a general category, there's no
20    question -- I think the Government would admit that a great
21    majority, maybe all of them, are actually public documents.
22         Now, maybe there's some that aren't that they contend
23    remain protected trade secrets of Deloitte.  But they need
24    to identify those.  And the way I think about it is -- in
25    two months when we go to trial, presumably Mr. Cogar is
```

CONFIDENTIAL                                      SAGITEC-DEL_02374733

```
 1      going to introduce an exhibit.  Right?  And that exhibit is

 2      going to be a use case that he claims is a trade secret.

 3      Well, he should tell us that now and produce it now or

 4      identify it now.

 5           What are the use cases that they claim are actually

 6      trade secrets?  That's a little different than the source

 7      code issue.  Obviously, it's the same overall concept.  But

 8      I believe that needs to be part of this as well.

 9           The last point I want to raise is just in response to

10      something Mr. Cogar brought up about litigating at trial the

11      issue of the contract interpretation of the Massachusetts

12      agreements.  I've thought about this problem quite a bit

13      because the Government clearly has a different view of what

14      those contracts say than what the defendants do.  But I

15      can't imagine submitting that issue to the jury.

16           In a civil case -- in a civil trade secret case, we

17      file motions for summary judgment.  That's not available to

18      us.  My thought was -- and perhaps we want to think about

19      how to accelerate the timetable on this litigation -- that

20      maybe jury instructions are the right way to do it.

21           Because in our view, those contracts are pretty clear,

22      and this source code he's identified under those contracts

23      cannot be protected IP.  But that should be a legal issue,

24      if it is one of contract interpretation, for the Court to

25      resolve before we get to the jury.
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374734

```
1        So I don't know if that should be in the context of
2   jury instructions or not.  But we on our side of the V have
3   been trying to think about a way to raise it with the Court
4   so it can be resolved before we go to the jury because, as
5   Mr. Cogar indicated, it's pretty essential to resolving
6   these issues.  That's all I have, Your Honor.
7              THE COURT:  So you're suggesting that the Court
8   move up the jury instruction deadline?
9              MR. STALLINGS:  I think that would be helpful.  I
10  think it would resolve at least that issue and some others
11  in advance of trial in a way.  We think it's almost
12  dispositive, if not completely dispositive, at least on
13  source code type issues.
14             THE COURT:  Okay.  That's interesting.  I'll take
15  that into consideration.  That may be above my pay grade.
16  May have to punt that to Judge Berger.  But that's something
17  the Court can look at.
18             MR. STALLINGS:  Thank you, Your Honor.
19             THE COURT:  Mr. Cogar, what do you say about that,
20  about the whole argument on the motion to compel with regard
21  to the use --
22             MR. COGAR:  For these cases?  I mean, we view it
23  -- it won't surprise the Court -- similarly.
24             THE COURT:  Similar -- I mean, are you this far
25  apart again?
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL                                          SAGITEC-DEL_02374735

```
 1              MR. COGAR:  I think so.  Yeah.  When it comes to,
 2     you know, the use cases -- just like the source code is a --
 3     we view it in a collective way, as a compilation, that
 4     layout, the design of the software.  Like Mr. Zayed said,
 5     it's -- those are business rules.  They're like -- they're
 6     blueprints that are used by programmers to then create the
 7     source code.  So the source code and the use cases in many
 8     respects go hand in glove.
 9          And so consequently, we view them by way of trade
10     secret protection, very similarly as well.  Again, given the
11     Court's perspective, we can go back to the drawing board on
12     that and see how we can limit or focus in on specific sets
13     of these --
14              THE COURT:  What do you think about his suggestion
15     on the jury instructions?
16              MR. COGAR:  Well, I'm not sure exactly what
17     Mr. Stallings had in mind.  But I will say that -- I mean,
18     when it comes to contractual interpretations, juries take up
19     those kind of things in cases.
20              THE COURT:  Right.  They do that after they get
21     the instructions of the Court.
22              MR. COGAR:  Right.  Right.
23              THE COURT:  I would assume you have a pretty good
24     idea of what your instructions should be at this point?
25              MR. COGAR:  Yes.  We do, by and large.
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

```
 1          THE COURT:  So why not have both sides share that

 2   information now?

 3          MR. COGAR:  Well, we can -- when it comes to the

 4   jury -- or excuse me -- the contractual interpretation of

 5   things, I'm curious as to what direction we're going to go

 6   on that front.  But in any event, yeah, we can -- I think

 7   that because of the other things that are going on

 8   concurrently, I wouldn't want to move up the jury

 9   instruction deadline substantially because -- I think even

10   still, it's something that we can --

11          THE COURT:  It's not to say that you couldn't

12   amend or add.  But I mean, if you went ahead and identified

13   your jury instructions, they went ahead and identified their

14   jury instructions, and go ahead and trade those.  You can

15   label them, number them however you want to do that right

16   now.  Doesn't say you can't change it when it gets closer to

17   trial.

18          But, you know -- and maybe it helps on the first issue

19   we were talking about -- on the trade secrets issue.

20   Because I believe you're going to have a definition of that

21   that you can give to the jury that -- so they can determine

22   how to weigh that information they've heard.  I mean, maybe

23   that helps in a lot of ways.  Is that something that the

24   parties can do in a week or so?  Or is that too soon.

25          MR. COGAR:  I think given the other issues that
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374737

```
1     we're dealing with with respect to the source code in these

2     cases, that's probably too ambitious to address that.  I

3     would definitely want more time, Judge.

4              THE COURT:  I appreciate that.  I'm just trying to

5     figure out if that doesn't help resolve the second motion

6     before I have to issue an opinion on it.

7              MR. COGAR:  No.  I understand where the Court's

8     coming from.  I'm not sure -- I'm not sure it would resolve

9     it frankly, would be my expectation.  I see it -- I

10    understand the connection, and I understand where the Court

11    is going with -- on that as well.  But I do think it's -- it

12    is a bit separate.

13             THE COURT:  Counsel?

14             MR. STALLINGS:  Just logistically, Your Honor,

15    right now the jury instructions I believe are due June 19th.

16    Whereas, our motion in limines are due June 2nd.

17         For my part at least, having the jury instructions at

18    least exchanged before the motions in limine would be pretty

19    valuable to limiting and being more efficient in the motions

20    in limine.  So we would be agreeable for our part to having

21    an exchange of jury instructions by the end of this month,

22    May 29th.  That gives Mr. Cogar, you know, over two weeks

23    from today.  And we certainly are amenable to that, or do an

24    informal exchange if he's agreeable to it.  But for our

25    part, that makes sense.
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL                                                            SAGITEC-DEL_02374738

```
1              THE COURT:  Mr. Cogar?

2              MR. COGAR:  That's fine, Judge.  We may lean

3    toward an informal exchange at that time.  But I think

4    that's doable.

5              THE COURT:  Okay.  Okay.  So I'm not going to -- I

6    don't want to step into Judge Berger's realm on changing

7    that date.  But the Court's going to note that the parties

8    have agreed to informally exchange those by May 29th.  And

9    we'll hold you to that.  I'm not -- we've got the deadline

10   for Judge Berger -- because you all may make some changes to

11   those before you issue them to Judge Berger.  But I do

12   expect you all to informally exchange your jury instructions

13   by May 29th.  Okay?

14             MR. STALLINGS:  And last point, Your Honor --

15   housekeeping matter.  I think this was mentioned before, but

16   to confirm for my part as well.  It's our understanding that

17   we have the Court's leave to supplement the record with our

18   expert opinions and the document mentioned from

19   Massachusetts?

20             THE COURT:  Okay.  How voluminous is that?  Is

21   that a --

22             MR. STALLINGS:  I actually have them right here,

23   Your Honor.  Ours is 28 pages from Professor Shamos at CMU.

24   The Government's -- the substantive aspect -- I mean, the

25   codefendant's is 59 pages, the substantive aspect.  And the
```

CONFIDENTIAL

SAGITEC-DEL_02374739

```
1    Government's is like -- I think 11 or -- yeah.  Like, you
2    know, 11 pages.  Most of the thickness are CVs and
3    attachments and things like that.  But the substantive
4    reports are fairly condensed for a case like this, I would
5    suggest.
6         And just for what it's worth -- and I'm not trying to
7    toot our own expert's horn -- but Professor Shamos from CMU,
8    our expert, who's nationally recognized of course and
9    testifies in thousands of IP cases, says exactly what Your
10   Honor said at the beginning of this hearing, which is -- you
11   know, in this entire record, they just haven't -- so I think
12   he goes right to some of the issues you're looking at, Your
13   Honor.  And he will be helpful to guide what a use case is
14   and things of that nature.
15             THE COURT:  Okay.  So how do you want to submit
16   that to the Court?
17             MR. STALLINGS:  We could file a supplement
18   tomorrow morning, just attaching it as a supplement to the
19   record on the motion for bill of particulars and motion to
20   compel.
21             THE COURT:  Okay.  Is that okay with --
22             MR. ZAYED:  Yes, Your Honor.  And in fact, the
23   contract that I was referring to with the third party is
24   already an exhibit in our filings.  It's Exhibit G.
25             THE COURT:  Okay.  So it's already in here?
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

```
 1              MR. ZAYED:  Yes.

 2              MR. COGAR:  Judge, if I may?  We object -- we

 3    object specifically to the submission of Dr. Shamos's

 4    report.  We've only had that report less than two weeks.  He

 5    -- it reads like an amicus brief, not an expert report.  And

 6    it doesn't even address -- you know, there's a comment by

 7    Mr. Stallings about his view of the trade secret

 8    identification.  In his analysis of that, he doesn't

 9    actually even look at what we claim to be the trade secret.

10              THE COURT:  Well, why don't you tell him what the

11    trade secret is, and we wouldn't have an issue.

12              MR. COGAR:  Again, we have.  That's where -- we're

13    not having a meeting of the minds there.

14              THE COURT:  We are not, Counsel.  And it's -- are

15    you -- you're really objecting to the Court receiving their

16    expert opinion's report because somehow it's going to poison

17    my mind in my decision-making?

18              MR. COGAR:  Well, Judge, we don't have -- we don't

19    have adequate -- we don't have adequate time to respond to

20    it.  They're asking the Court to consider an expert report

21    that for -- motion in limine, motions -- for *Daubert* motions

22    are due at the end of the month.  It's just -- I -- it's

23    unheard of that an expert report be submitted for purposes

24    of the motion for a bill of particulars.  So it's just --

25    procedurally, we have problems with it.  And also it's -- it
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL                                                                    SAGITEC-DEL_02374741

```
 1    puts us at a disadvantage in how we can address it.
 2              THE COURT:  Well, I'm not going to tell them they
 3    can't give the Court that information.  If they want to
 4    submit supplemental information for the Court to consider,
 5    they're more than welcome to.  Okay?
 6        Counsel?
 7              MR. ZAYED:  Yes.  Briefly, Your Honor.  We would
 8    submit those with your permission under seal because
 9    ostensibly, they contain Deloitte information or victims'
10    information, so -- or we can submit them to you --
11              THE COURT:  Why don't you do it in-camera?  Send
12    it to my law clerk.
13              MR. ZAYED:  Okay.  Very well, Your Honor.
14              THE COURT:  Okay.
15              MR. ZAYED:  And just one point that the Government
16    makes is that -- why are these expert reports part of the
17    issue?  Because they go directly to the bill of particulars.
18    I have the two source codes compared by our expert.
19              THE COURT:  Whatever you submit to me, I want
20    Mr. Cogar to have --
21              MR. ZAYED:  Yes.  Absolutely.  Yeah.  He already
22    has it.
23              THE COURT:  In the same email -- I appreciate it.
24    In the same email that you're submitting it to my law clerk,
25    I want you to make sure the Government's included in that as
```

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

CONFIDENTIAL

SAGITEC-DEL_02374742

1    well.

2              MR. ZAYED:  Very well, Your Honor.

3              THE COURT:  Anything further at this point?

4              MR. COGAR:  No, Your Honor.  Thank you.

5              MR. ZAYED:  No, Your Honor.  Thank you.

6              THE COURT:  Okay.  Thank you all very much.  We

7    will be in recess on this matter.

8         (Proceedings concluded at 2:46 p.m., May 11th, 2023.)

9

10   CERTIFICATION:

11        I, Amanda J. Pickens, Federal Official Court Reporter,

12   certify that the foregoing is a true and correct transcript

13   from the record of proceedings in the above-entitled matters

14   as reported on May 11th, 2023.

15        s/Amanda J. Pickens, CCR, RPR

16

17   _____    May 17th, 2023

18   Amanda J. Pickens, CCR, RPR
     Federal Official Court Reporter
19

20

21

22

23

24

25

*Amanda J. Pickens, RPR, CCR (304) 347-3188*

# Exhibit 17

| | |
|---|---|
| **From:** | workforce, ipra, DWS <ipra.workforce@dws.nm.gov> |
| **To:** | Dawson, Demitri M. |
| **CC:** | Prange, David A.; Bact, Rebecca |
| **Sent:** | 3/7/2024 3:44:38 PM |
| **Subject:** | RE: [EXTERNAL] Public Records Request |
| **Attachments:** | 2024.01.09 Prange Public Records Request to New Mexico DWS.pdf; Subpoena to Produce Documents.pdf |

Good Afternoon,

Our department has produced requested Subpoena documents on January 25, 2024 I have attached the Subpoena to this email. All records produced are the public record and with those documents being sent it has complied with this IPRA request for documents. Please let me know if you have any questions regarding this matter.

Thank you

**From:** workforce, ipra, DWS <ipra.workforce@dws.nm.gov>
**Sent:** Wednesday, January 10, 2024 3:57 PM
**To:** Dawson, Demitri M. <DDawson@RobinsKaplan.com>
**Cc:** Prange, David A. <DPrange@RobinsKaplan.com>; Bact, Rebecca <RBact@RobinsKaplan.com>
**Subject:** RE: [EXTERNAL] Public Records Request

Good Afternoon,

New Mexico Department of Workforce Solutions (NMDWS) is in receipt of your request to inspect public records.  As required by NMSA 1978, §14-2-1, this serves as a response to your request for Inspection of Public Records Act ("IPRA") request to NMDWS received by this office on January 9, 2024.  Your IPRA request sought access to the following:

"Per your request for New Mexico Unemployment Insurance Tax Modernization Project between NMDWS and Deloitte Consulting LLP."

This office is currently reviewing and compiling the records and will need additional time to respond to your request.  We believe that your request is excessively burdensome or broad and this office anticipates that the entire record should be available by January 22, 2024.    Be advised that consistent with NMSA 1978, §14-2-9 Pursuant to New Mexico Department of Solutions Policy Issuance No. 39:  charges a per page copy fee of $1.00 for the first page, and .50 cents per page thereafter up to 100 copies, and .25 cents for all copies thereafter with the same file or request and a fee of $10.00 per USB Flash Drive.  <u>We will notify you of any copy cost and records will be sent upon receipt of payment.</u>

Thank you,
Records Custodian

**From:** Dawson, Demitri M. <DDawson@RobinsKaplan.com>
**Sent:** Tuesday, January 9, 2024 1:34 PM
**To:** workforce, ipra, DWS <ipra.workforce@dws.nm.gov>
**Cc:** Prange, David A. <DPrange@RobinsKaplan.com>; Bact, Rebecca <RBact@RobinsKaplan.com>
**Subject:** [EXTERNAL] Public Records Request

SAGITEC-DEL_06920267

> CAUTION: This email originated outside of our organization. Exercise caution prior to clicking on links or opening attachments.

To Whom It May Concern,

Please see the attached correspondence from David Prange related to a Public Records Request.

Sincerely,

Demitri Dawson

Demitri Dawson
Associate
**Robins Kaplan LLP**
2800 LaSalle Plaza | 800 LaSalle Avenue | Minneapolis, MN 55402
Direct 612.349.8514 | RobinsKaplan.com
DDawson@RobinsKaplan.com

---

Information contained in this e-mail transmission may be privileged, confidential and covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521.

If you are not the intended recipient, do not read, distribute, or reproduce this transmission.

If you have received this e-mail transmission in error, please notify us immediately of the error by return email and please delete the message from your system.

Pursuant to requirements related to practice before the U. S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U. S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

Thank you in advance for your cooperation.

Robins Kaplan LLP
http://www.robinskaplan.com

---

# Exhibit 18



THE COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF LABOR AND WORKFORCE DEVELOPMENT
DEPARTMENT OF UNEMPLOYMENT ASSISTANCE

MAURA HEALEY
GOVERNOR

KIM DRISCOLL
LIEUTENANT GOVERNOR

LAUREN E. JONES
SECRETARY

KATIE DISHNICA
DIRECTOR

May 28, 2024

David A. Prange
800 Lasalle Avenue
Suite 2800
Minneapolis, MN 55402
*dprange@robinskaplan.com*

Dear Attorney Prange:

I am writing to respond to your public records request sent electronically to the
Massachusetts Department of Unemployment Assistance (DUA) on January 9, 2024.
Your request seeks:

"1. Documents related to the Massachusetts QUEST Project including:

 a. Documents sufficient to show any project proposal from Deloitte, any
 contract or agreement signed by Deloitte and Massachusetts or any
 department thereof, any signed amendments, and any attachments,
 exhibits, schedules, or other documents including but not limited to
 use cases;

 b. Documents sufficient to show all software design documents
 including without limitation use cases

 c. All unemployment insurance software ("UI software");

 d. Any other byproducts of software development for the
 Massachusetts QUEST Project, including but not limited to data
 models, data definition languages, entity relationship diagrams,
 source code, and use cases.

2. All deliverables resulting from the Massachusetts QUEST Project, including
a copy of the UI software delivered by Deloitte to Massachusetts DUA;

3. Billing records and/or invoices submitted by Deloitte to Massachusetts
DUA resulting from the Massachusetts QUEST Project sufficient to
identify the Deloitte personnel involved in the project; and

SAGITEC-DEL_07352835

John Cronin
May 28, 2024

4. Documents sufficient to show participants [in] the Massachusetts QUEST Project
employed by Massachusetts DUA or other Massachusetts entity."

Via secure upload to Robins Kaplan directly on April 25 and 26, and May 23, 2024,
DUA has provided documents responsive to these requests, including:

- contractual statements of work and amendments thereto, entered into between
  Deloitte (formerly BearingPoint) and EOLWD/DUA;

- QUEST/UI Online system use cases; and

- various email correspondences and documents referencing, among other
  things, funding and requisitions for project payments and correspondences
  naming Commonwealth of Massachusetts and Deloitte/BearingPoint
  employees involved in the QUEST project.

Regarding the electronic materials that you have requested, DUA is in possession of, but
is withholding from disclosure, the UI Online/QUEST system source code.  Per the MA
Secretary of State's Custodian of Records Management Bulletin SPR 03-96, "A custodian
is not obligated to provide copies of a computer program. A computer program in and of
itself is a tool used in the processing of data rather than a "record," and therefore is not
subject to mandatory disclosure." As such, this material is not a public record and is
exempt from disclosure under Massachusetts law.

We are not charging fees for this request.

If you wish to challenge any aspect of this response, you may appeal to the Supervisor of
Public Records following the procedure set forth in 950 C.M.R. 32.08, a copy of which is
available at http://www.mass.gov/courts/case-legal-res/law-lib/laws-by-source/cmr/. You
may also file a civil action in accordance with G. L. c. 66, § 10A.

Sincerely,

/s/ John P. Cronin

John P. Cronin
Deputy Chief Counsel & Keeper of
the Records

2

SAGITEC-DEL_07352836

# Exhibit 19



THE COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF LABOR AND WORKFORCE DEVELOPMENT
DEPARTMENT OF UNEMPLOYMENT ASSISTANCE

MAURA HEALEY
GOVERNOR

KIM DRISCOLL
LIEUTENANT GOVERNOR

LAUREN E. JONES
SECRETARY

KATIE DISHNICA
DIRECTOR

May 29, 2024

David A. Prange
800 Lasalle Avenue
Suite 2800
Minneapolis, MN 55402
*dprange@robinskaplan.com*

Dear Attorney Prange:

I am writing to respond to your subpoena for records sent electronically to the Massachusetts Department of Unemployment Assistance (DUA) on December 21, 2023. Please see below our formal responses to the following requests, for which responsive documentation was variously provided via secure upload to Robins Kaplan directly on April 25 and 26, and May 23, 2024.

1. All contracts and agreements pertaining to any project between Massachusetts DUA and Deloitte related to UI Software, including but not limited to the Massachusetts QUEST Project, including all exhibits, amendments, and other attachments thereto.

> **RESPONSE: Please see: the "Statement of Work Between the Division of Unemployment Assistance and BearingPoint, Inc. For the DUA Quality Unemployment System Transformation (QUEST) Project," dated May 18, 2007, and the numerous amendments thereto; the RFQ DUA Quest 06-06 and amendments thereto; and the IT Services RFR and related documentation, all provided via upload on April 25, 2024.**

2. All documents and communications pertaining to contract negotiations between Massachusetts DUA and Deloitte.

> **RESPONSE: Please see Document 3 in the documentary disclosure of April 25, 2024, an email from former DUA Director Judith Cicatiello.**

100 CAMBRIDGE STREET · SUITE 400 · BOSTON, MA 02114
www.mass.gov/dua

SAGITEC-DEL_07352837

John Cronin
May 29, 2024

3. Documents sufficient to show ownership of any UI Software, other deliverable, or other intellectual property related to Massachusetts QUEST Project, including documents sufficient to show what UI Software, other deliverable, or other intellectual property was owned by Deloitte and what was owned by Massachusetts DUA or other Massachusetts entities.

> **RESPONSE: Please see Section 7.4 and Appendix F of the "Statement of Work Between the Division of Unemployment Assistance and BearingPoint, Inc. For the DUA Quality Unemployment System Transformation (QUEST) Project," dated May 18, 2007. Please also see Document 1 in the documentary disclosure of April 25, 2024, an email from former DUA Director of Revenue Michelle Amante.**

4. All documents related to any claim of ownership made by Massachusetts DUA or other Massachusetts entity over any UI Software, other deliverable, or other intellectual property related to or resulting from the Massachusetts QUEST Project.

> **RESPONSE: Please see Section 7.4 and Appendix F of the "Statement of Work Between the Division of Unemployment Assistance and BearingPoint, Inc. For the DUA Quality Unemployment System Transformation (QUEST) Project," dated May 18, 2007. Please also see Document 1 in the documentary disclosure of April 26, 2024, an email from former DUA Director of Revenue Michelle Amante.**

5. Documents sufficient to show all funding sources for the Massachusetts QUEST Project, including all state and federal funds and grants.

> **RESPONSE: Please see Documents 2 and 3 in the documentary disclosure of April 26, 2024, consisting of an email from former DUA Director of Technology Robert Velten and an Information Technology Division Commonwealth IT Investment Brief for Fiscal Year 2010. Please also see Documents 1-10 in the documentary disclosure of May 23, 2024, consisting of emails regarding the effect of the change of entities from BearingPoint to Deloitte related to state funding and a Change in Contractor Identity Form.**

2

SAGITEC-DEL_07352838

John Cronin
May 29, 2024

6. Documents sufficient to show all conditions and requirements for the Massachusetts QUEST Project resulting from or pursuant to the funding received.

> **RESPONSE: Please see: the "Statement of Work Between the Division of Unemployment Assistance and BearingPoint, Inc. For the DUA Quality Unemployment System Transformation (QUEST) Project," dated May 18, 2007, and the numerous amendments thereto; the RFQ DUA Quest 06-06 and amendments thereto; and the IT Services RFR and related documentation, all provided via upload on April 25, 2024. Please also see Documents 6 in the documentary disclosure of April 26, 2024, "Program Initiation Document for The DUA QUEST Quality UnEmployment System Transformation Project." See also Documents 21-26, 28-30 in the documentary disclosure of May 23, 2024, inclusive of emails regarding invoices for project services.**

7. Documents sufficient to show all Software Design Documents, UI Software, and any other byproducts of software development for the Massachusetts QUEST Project, including but not limited to data models, data definition languages, entity relationship diagrams, source code, and use cases.

> **RESPONSE: Please see the QUEST/UI Online system source code, provided via direct upload on April 26, 2024 and the QUEST/UI Online use cases, provide via direct upload on May 23, 2024. Please also see Please also see Documents 1-10 in the documentary disclosure of May 23, 2024, consisting of emails regarding the effect of the change of entities from BearingPoint to Deloitte related to state funding and a Change in Contractor Identity Form. Please also see Documents 11, 12-13, 16-20, 27, 32, 34-41, 44-57, inclusive of various email communications and draft and finalized documents created in the process of collaboration between DUA and BearingPoint/Deloitte on aspects of the QUEST/UI Online system.**
>
> **DUA has provided the QUEST/UI Online system source code subject to limitations on its further disclosure as "Highly Confidential Information," under Paragraph I.(d) of the Stipulated Protective Order.**

8. A copy of the UI software delivered by Deloitte to Massachusetts DUA as a result of the Massachusetts QUEST Project.

> **RESPONSE: Please see the QUEST/UI Online system source code, provided via direct upload on April 26, 2024.**

3

SAGITEC-DEL_07352839

John Cronin
May 29, 2024

9. All documents demonstrating any and all licenses to the UI Software or any other intellectual property resulting from the Massachusetts QUEST Project, including but not limited to any other state or federal entity, such as any state UI programs or the federal Department of Labor.

**RESPONSE: No responsive documents located.**

10. All communications between Massachusetts DUA or other Massachusetts entity and any licensee to the Massachusetts QUEST Project UI software regarding the license or use of the UI Software or any other intellectual property resulting from the Massachusetts QUEST Project.

**RESPONSE: No responsive documents located.**

11. Documents sufficient to show all disclosures of any product or byproduct of the Massachusetts QUEST Project (including but not limited to Software, data models, data definition languages, entity relationship diagrams, source code, and use cases) with any Third Party, including but not limited to another state or any unemployment insurance vendor.

**RESPONSE: Please see Document 1 in the documentary disclosure of April 26, 2024, an email from former DUA Director of Revenue Michelle Amante.**

12. All documents pertaining to any confidentiality requirements or restriction on use of the UI Software or any other intellectual property resulting from the Massachusetts QUEST Project put in place by Deloitte.

**RESPONSE: Please see Document 3 in the documentary disclosure of April 25, 2024, consisting of a letter from Deloitte to Seshubabu Konatham, dated May 23, 2014.**

13. All documents pertaining to any claim by Deloitte that any material related to or resulting from the Massachusetts QUEST Project was a trade secret belonging to Deloitte.

**RESPONSE: Please see Document 3 in the documentary disclosure of April 25, 2024, consisting of a letter from Deloitte to Seshubabu Konatham, dated May 23, 2014.**

14. Documents sufficient to show all document retention policies covering documents, products, and byproducts of the Massachusetts QUEST Project.

**RESPONSE: No responsive documents located.**

4

SAGITEC-DEL_07352840

John Cronin
May 29, 2024

15. Documents sufficient to show any destruction or deletion of documents, products, and byproducts of the Massachusetts QUEST Project, including internal communications or communications with Deloitte regarding the same.

**RESPONSE: No responsive documents located.**

16. Documents sufficient to show the time(s) of access, and identity of person(s) having access, to Software Design Documents, UI Software, and any other repository related to or byproducts of software development for the Massachusetts QUEST Project, including but not limited to data models, data definition languages, entity relationship diagrams, source code, and use cases—including but not limited to server logs.

**RESPONSE: Please see Documents 1, 4 and 5 in the documentary disclosure of April 26, 2024, consisting of emails regarding system access for Deloitte team employees. Please also see Documents 14, 15, 31, 33, 42 and 43 in the documentary disclosure of May 23, 2024, consisting of emails regarding system access.**

Sincerely,

/s/ John P. Cronin

John P. Cronin
Deputy Chief Counsel & Keeper of
the Records

5

SAGITEC-DEL_07352841

# Exhibits 20 and 21 Redacted in Their Entirety

# Exhibit 22

*4 Nimmer on Copyright § 13F.06*

*Nimmer on Copyright*    >    *CHAPTER 13F Defenses*    >    *PART I FAIR USE*

## § 13F.06 Factor Two: Nature of the Copyrighted Work[*]

The second factor listed in Section 107 is "the nature of the copyrighted work."[1] Obviously, the mere fact that the copied portions are themselves copyrightable cannot incline this factor against fair use.[2] After all, "a work will always be found 'original' for copyrightability purposes before the fair use analysis is applied. The second statutory fair use factor, then, refers to the 'nature' of the work beyond this initial inquiry."[3] Further scrutiny therefore focuses on the degree of creativity inherent to the work[4] and to the implications that may follow when the work has not been disseminated.[5]

### [A] Creativity

Under factor two, the more creative a work, the more protection it merits from copying;[6] correlatively, the more informational or functional is plaintiff's work, the broader should be the scope of the fair use defense.[7] Chart 7 depicts the fundamental contrast:

### Chart 7: Proximity to the Core of Intended Copyright Protection

---

[*] Part I of this chapter (§§ 13F.02–13F.17) is co-authored by BJ Ard.

[1] *17 U.S.C. § 107(2)*.

[2] *Cambridge Univ. Press v. Patton, 769 F.3d 1232, 1268 n.25 (11th Cir. 2014) (Treatise quoted)*.

[3] *Compaq Computer Corp. v. Ergonome Inc., 387 F.3d 403, 410 (5th Cir. 2004)*, cert. denied, **544 U.S. 962 (2005)**. After the district court concluded that plaintiff's work was copyrightable, *137 F. Supp. 2d 768, 775–76 & n.3 (S.D. Tex. 2001)*, the Fifth Circuit affirmed the jury's later verdict that defendant's use was fair. Disclosure should be made that this writer served as co-counsel on behalf of Compaq.

[4] See *§ 13F.06[A]* infra.

[5] See *§ 13F.06[B]* infra.

[6] Nonetheless, one pair of commentators remarks on pressure in exactly the opposite direction. The prevailing focus in fair use analysis is on how transformative a usage is, including a transformation in purpose rather than content. See *§ 13F.05[B][2]* supra. From there, it follows that

it is more difficult to oppose a fair use defense in cases of technological uses with regard to "highly expressive" works than purely "functional" works. This is because *if* the work is expressive, *then* a technological use thereof is normally unrelated to the purpose for which it was created.

Maurizio Borghi & Stavroula Karapapa, *Copyright and Mass Digitization* 27 (2013) (emphasis original).

[7] *Google LLC v. Oracle Am., Inc., 141 S. Ct. 1183, 1215 (2021)* (Thomas, J., dissenting) (Treatise quoted); *Leadsinger, Inc. v. BMG Music Publ'g, 512 F.3d 522, 531 (9th Cir. 2007) (Treatise quoted)*; *Stern v. Does, 978 F. Supp. 2d 1031, 1046 (C.D. Cal. 2012) (Treatise quoted)*, aff'd mem., *512 Fed. Appx. 701 (9th Cir. 2013)*, cert. denied, **571 U.S. 953 (2013)**; *Cambridge Univ. Press v. Becker, 863 F. Supp. 2d 1190, 1225 (N.D. Ga. 2012) (Treatise quoted)*, rev'd on other grounds sub nom., *Cambridge Univ. Press v. Patton, 769 F.3d 1232 (11th Cir. 2014)*; *Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F.2d 1148 (9th Cir. 1986) (Treatise cited)*.

4 Nimmer on Copyright § 13F.06



This contrast stems from "recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied."[8] Notwithstanding that general pronouncement, as an historical matter, the second factor has largely receded into insignificance[9] in the greater fair use calculus.[10]

Although regression analysis from reported fair use cases bears out the asserted insignificance historically of factor two on the overall outcome of the defense,[11] that stance later faced an inflection point. Specifically,

---

[8] *Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 586, 114 S. Ct. 1164, 127 L. Ed. 2d 500 (1994) (Treatise cited)*; *Monster Commc'ns, Inc. v. Turner Broad. Sys., Inc., 935 F. Supp. 490, 494 (S.D.N.Y. 1996) (Treatise cited)*.

[9] *Kienitz v. Sconnie Nation LLC, 965 F. Supp. 2d 1042, 1052 (W.D. Wis. 2013) (Treatise quoted)*, *aff'd, 766 F.3d 756 (7th Cir. 2014)*, *cert. denied*, **575 U.S. 913 (2015)**; *FMC Corp. v. Control Solutions, Inc., 369 F. Supp. 2d 539, 579 (E.D. Pa. 2005) (Treatise quoted)*.

[10] In the case that articulated the language just quoted, the copied work's creative nature scarcely moved the Court against fair use. *Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 586, 114 S. Ct. 1164, 127 L. Ed. 2d 500 (Treatise cited)*. *Accord Belmore v. City Pages, Inc., 880 F. Supp. 673, 678 (D. Minn. 1995)*. By contrast, when the work is nonfiction and hence farther from "the core of intended copyright protection," courts still barely hesitate in denying the fair use defense. See **Robinson v. Random House, Inc., 877 F. Supp. 830, 841 (S.D.N.Y. 1995)**.

[11] See Barton Beebe, *An Empirical Study of U.S. Copyright Fair Use Opinions, 1978–2005*, *156 U. Pa. L. Rev. 549, 610 (2008)* (analyzing decisions through 2005); Clark D. Asay, Arielle Sloan & Dean Sobczak, *Is Transformative Use Eating the World?*, *61 B.C. L. Rev. 905, 942–43 (2020)* (documenting same trend through 2017).

4 Nimmer on Copyright § 13F.06

the Supreme Court placed new-found emphasis on factor two in *Google LLC v. Oracle America*.[12] The discussion below explicates the new dynamics that this 2021 opinion introduced into the field.[13]

## [1] Factual Works.

Copyright protection is narrower, and the corresponding application of the fair use defense greater, in the case of factual works than in the case of works of fiction or fantasy.[14] Correlatively,[15] with respect to "a work more of diligence than of originality or inventiveness" such as a catalog, index or other compilation, there is a "greater license" to use portions under the doctrine of fair use than would be the case "if a creative work had been involved."[16] Thus, "[i]f a work is more appropriately characterized as entertainment, it is less likely that a claim of fair use will be accepted."[17] As the Supreme Court recognized in *Sony*, "copying a news broadcast may have a stronger claim to fair use than copying a motion picture."[18]

Problems arise applying this standard, inasmuch as the line separating information from entertainment can be evanescent[19]—even apart from self-styled works of "infotainment." One court considered a television talk show "more informational than entertaining in nature."[20] A homily may be factual to believers, but still treated by secular courts as a work of imagination.[21] Although architectural works would appear plainly functional, courts have held them to lie on the creative side of the ledger[22]—thus casting further doubt on the utility of this factor. Some courts have also entertained or accepted the argument that photography is to

---

[12] *141 S. Ct. 1183 (2021)*. For a general discussion of this case, see *§ 13F.03[C][5]* supra.

[13] See *§ 13F.06[A][2]* infra.

[14] *Google LLC v. Oracle Am., Inc., 141 S. Ct. 1183, 1197 (2021) (Treatise quoted)*; *Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 594, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985)* (Brennan, J., dissenting) (Treatise cited); *Abend v. MCA, Inc., 863 F.2d 1465, 1481 (9th Cir. 1988) (Treatise quoted)*, aff'd sub nom. *Stewart v. Abend, 495 U.S. 207, 237, 110 S. Ct. 1750, 109 L. Ed. 2d 184 (1990) (Treatise quoted)*; *Consumers Union of U.S., Inc. v. General Signal Corp., 724 F.2d 1044, 1049 (2d Cir. 1983) (Treatise cited)*, cert. denied, **469 U.S. 823 (1984)**.

[15] *TCA Television Corp. v. McCollum, 839 F.3d 168, 180 n.11 (2d Cir. 2016) (Treatise quoted)*, cert. denied, **581 U.S. 994 (2017)**.

[16] *N.Y. Times Co. v. Roxbury Data Interface, Inc., 434 F. Supp. 217, 221 (D.N.J. 1977)*.

[17] *Universal City Studios, Inc. v. Sony Corp. of Am., 659 F.2d 963, 972 (9th Cir. 1981) (Treatise cited)*. The Ninth Circuit further stated that "the scope of fair use is greater when informational type works, as opposed to more creative products are involved." *Id.* The Supreme Court later reversed on other grounds. *464 U.S. 417, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984)*. See *§ 13F.03[C][1]* supra.

[18] *464 U.S. at 456*. One case construed this statement to apply to the fourth factor, see *§ 13F.08* infra, rather than to the nature of the copyrighted work. See *L.A. News Serv. v. Tullo, 973 F.2d 791, 798 (9th Cir. 1992)*. The Ninth Circuit then applied it under that factor in favor of a copyright owner who refused to license its news work. See *L.A. News Serv. v. KCAL-TV Channel 9, 108 F.3d 1119, 1120, 1123 (9th Cir.)*, cert. denied, **522 U.S. 823 (1997)**. Properly construed, that refusal actually favors fair use. See *§ 13F.08[B][1]* infra.

[19] One case had difficulty in characterizing the religious writings of L. Ron Hubbard; on balance, the court concluded that they "are more properly viewed as factual or informational." *New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp., 904 F.2d 152, 157 (2d Cir.)*, cert. denied, **498 U.S. 921 (1990)**.

[20] *NAGE/Int'l Bhd. of Police Officers v. BUCI TV, Inc., 118 F. Supp. 2d 126, 129 (D. Mass. 2000)*.

[21] See *Soc'y of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of Denver, Colo., 685 F. Supp. 2d 217, 227 (D. Mass. 2010)*, aff'd, *689 F.3d 29, 62 (1st Cir. 2012)*, cert. denied, **568 U.S. 1167 (2013)**.

[22] See *Thomas M. Gilbert Architects, P.C. v. Accent Builders & Devs., LLC, 629 F. Supp. 2d 526, 534 (E.D. Va. 2008)*, aff'd mem., *377 Fed. Appx. 303 (4th Cir 2010)*.

4 Nimmer on Copyright § 13F.06

some extent factual,[23] particularly where defendant claims to have copied the subject's facial features rather than the expressive contributions of the photographer.[24]

One court contrasted factual works intended to promote the progress of science, such as scholarly articles, with such items as an extortion note.[25] Another court stated that, although a "court may consider, among other things, whether the work was creative, imaginative, and original," it may also consider "whether it represented a substantial investment of time and labor made in anticipation of a financial return."[26] In light of the Supreme Court's subsequent rejection of any copyright subsistence for the product of "industrious compilation,"[27] it is questionable whether that ruling survives.[28]

It is sometimes necessary, in calibrating the fair use defense, to advert to defendant's usage simultaneously with the nature of plaintiff's work.[29] For example, even though a creative song measures high under this second factor, if the purpose of defendant's use is parody under the first factor, then the weight of this factor is minimal—moving the Supreme Court to postulate that this second factor is "[n]ever likely to help much in separating the fair use sheep from the infringing goats in a parody case, since parodies almost invariably copy publicly known, expressive works."[30] Chart 8 illustrates the relationship whereby the purpose and character of the use (☞A), especially a transformative purpose (☞H) like parody, may diminish the significance of a work's creative nature (☞M):

**Chart 8: Implications of Transformative Use for Factor Two**

---

[23] See Kienitz v. Sconnie Nation LLC, *aff'd*, _766 F.3d 756 (7th Cir. 2014)_, *cert. denied*, **575 U.S. 913 (2015)** (opining, albeit in context of factor three, that copying was consistent with fair use because it primarily featured "the outline of [the subject's] face, which can't be copyrighted"); _Núñez v. Caribbean Int'l News Corp., 235 F.3d 18, 23 (1st Cir. 2000)_ (suggesting photographs "could be categorized as either factual or creative"); _Fitzgerald v. CBS Broad., Inc., 491 F. Supp. 2d 177, 188 (D. Mass. 2007)_ ("the photographs are factual works, and therefore this factor weighs … in favor of fair use").

[24] See _Otto v. Hearst Commc'ns, Inc., 345 F. Supp. 3d 412, 430 (S.D.N.Y. 2018)_ (deeming photograph "more factual than creative" where photographer "did not direct or pose the subjects of the photo, nor control the lighting or the background"). On the factor four significance of the distinction between copying facts and expression, see _§ 13F.08[C][2]_ infra.

[25] See **Am. Geophysical Union v. Texaco, Inc., 802 F. Supp. 1, 16 (S.D.N.Y. 1992)**, *aff'd*, _60 F.3d 913 (2d Cir. 1994)_, *cert. dismissed*, **516 U.S. 1005 (1995)**. The court nonetheless treated the scholarly articles as factual and hence favoring defendant, although plaintiff prevailed based on other factors.

[26] _MCA, Inc. v. Wilson, 677 F.2d 180 (2d Cir. 1981)_.

[27] See _Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991)_.

[28] See _§ 3.04[B][1]_ supra.

[29] _Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc., 907 F. Supp. 1361, 1379 (N.D. Cal. 1995) (Treatise quoted)_. See _§ 13F.05_ supra.

[30] _Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 586, 114 S. Ct. 1164, 127 L. Ed. 2d 500 (1994)_. See _§ 13F.10[B][2][b]_ infra.

☞A  **Factor One:**

**Purpose of Δ's Use**

☞H
**Transformative Use**



May Diminish

☞M

**Creative**

☞B  **Factor Two:**

**Nature of π's Work**

When plaintiff's and defendant's usages overlap, this comparison may work in plaintiff's favor. Speaking to factor two, the legislative history notes that "text books and other materials prepared primarily for the school markets would be less susceptible to reproduction for classroom use than material prepared for general public distribution."[31] In the same vein, *Financial Information, Inc. v. Moody's Investors Service, Inc.* acknowledged that fair use usually is given broader scope with respect to factual works.[32] Nonetheless, citing the equitable nature of the fair use doctrine, the Second Circuit refused to allow fair use copying of one factual work by a rival factual work, although it would give broad latitude to "a songwriter or playwright to copy from a compilation of information regarding municipal bond redemptions in order, say, to enhance the verisimilitude of his art."[33] Though consonant with the purpose-driven analysis of the later-emerging transformative use paradigm,[34] if applied categorically, this exception threatens to swallow the general rule tilting towards a broad fair use construction in the copying of factual works, given that the vast majority[35] of copying of factual works presumably occurs in the context of other factual works.[36]

**[2] Functional Works.**

---

[31] S. Rep., p.64. See *Triangle Publ'ns, Inc. v. Knight-Ridder Newspapers, Inc., 626 F.2d 1171 (5th Cir. 1980)*. The point of general public distribution bleeds into the other distinction operative in this realm. See *§ 13F.06[B] infra*.

[32] *751 F.2d 501, 509 (2d Cir. 1984)*.

[33] *Id. at 509*. That allowance would appear of dubious value—query whether a songwriter who wishes to include "information regarding municipal bond redemptions" in a ditty benefit at all from quoting actual material, as opposed to invented statistics.

[34] See *§ 13F.10[C][1] infra*.

[35] One is hard pressed to cite any actual case that unfolded in the context of a songwriter copying bond statistics—or anything remotely approaching that paradigm.

[36] See *West Publ'g Co. v. Mead Data Cent., Inc., 616 F. Supp. 1571, 1580 (D. Minn. 1985)*, citing *Moody's*, aff'd, *799 F.2d 1219 (8th Cir. 1986)*; *Marshall & Swift v. BS & A Software, 871 F. Supp. 952, 963 n.13 (W.D. Mich. 1994)*.

4 Nimmer on Copyright § 13F.06

Factor two analysis typically focuses on the divide between the creative and the factual rather than that between the creative and the functional or utilitarian.[37] Even though cases have articulated both distinctions,[38] discussion of utilitarian features in fair use analysis is rare, outside a handful of cases dealing with reverse engineering of software.[39] This trend emerged not because functionality is unimportant in software copyright litigation—far from it—but instead because defendants conventionally assert that a work's functional features undermine the work's copyrightability[40] such that imitation of these features does not constitute appropriation of protectable expression.[41] Their frequent success on that basis has pretermitted consideration of the analytically subsequent issue of fair use.

The Supreme Court's 2021 decision in *Google LLC v. Oracle America, Inc.* forged a notable exception to that trend.[42] Defendant Google stood accused of copyright infringement for appropriating some 11,500 lines of "declaring code" from the Sun Java Application Programming Interface ("API").[43] Google prevailed in the first round of district court proceedings on the basis that "the particular elements replicated by Google" were uncopyrightable.[44] Although resisting the implication that APIs are always uncopyrightable, Judge Alsup concluded that the specific lines of code in this case lay outside copyright protection.[45] That result emerged inasmuch as their "precise and necessary form" was required to achieve particular functionality.[46] The district court likewise held the structure, sequence, and organization of the code unprotected because the command structure it establishes is also functional in nature.[47]

When the case reached the Supreme Court,[48] the majority could have simply carried forward the district court's reasoning.[49] But it would seem that too few justices were convinced of Google's position to rule in its

---

[37] On the former distinction, see *§ 13F.06[A][1] supra*. On the latter, see *Sega Enters. v. Accolade, Inc., 977 F.2d 1510, 1524 (9th Cir. 1993)* ("Works of fiction receive greater protection than works that have strong factual elements, such as historical or biographical works, or works that have strong functional elements, such as accounting textbooks.") (citations omitted); *Sony Computer Entm't, Inc. v. Connectix Corp., 203 F.3d 596, 603 (9th Cir. 2000)* (according "a lower degree of protection" for a software "contain[ing] unprotected functional elements").

[38] Factor two "generally favors fair use when a copyrighted work is more 'informational or functional' than 'creative.' " *Google LLC v. Oracle America, Inc., 141 S. Ct. 1183, 1215 (2021), 1215* (Thomas, J., dissenting) (Treatise quoted). The Supreme Court majority likewise accepted that proposition as uncontroversial. *Id. at 1197–98 (Treatise quoted).*

[39] The cases just cited are illustrative. See *Sega, 977 F.2d at 1524*; *Connectix, 203 F.3d at 603*. On reverse engineering as fair use, see *§ 13F.14[C] infra*.

[40] See *§ 2A.06[A] supra*.

[41] See *§ 13.03[F] supra*.

[42] *141 S. Ct. 1183 (2021)*. See *§ 13F.03[C][5][d] supra*.

[43] *141 S. Ct. at 1191–92*. See *§ 13F.03[C][5][b] supra*,

[44] *Oracle Am., Inc. v. Google Inc., 872 F. Supp. 2d 974, 1002 (N.D. Cal. 2012)*. For further explication of the extensive procedural history and the difference between the "declaring code" copied and more conventional "implementing code," see *§ 13F.03[C][5][a]–[b] supra*.

[45] See *872 F. Supp. 2d at 1002*.

[46] *Id. at 979, 998*.

[47] *Id. at 998–1001*.

[48] In the interim, the Federal Circuit reversed the district court's copyrightability decision, see *Oracle Am., Inc. v. Google Inc., 750 F.3d 1339 (Fed. Cir. 2014)*, and its subsequent fair use opinion, see *Oracle Am., Inc. v. Google Inc., 886 F.3d 1179, 1193 (Fed. Cir. 2018)*. The Supreme Court, in turn, reversed the court of appeals.

favor on that basis.[50] Justice Breyer instead brought the functionality arguments to bear under factor two of the fair use doctrine.

Whereas prior fair use decisions had treated factor two as the least significant of the four,[51] *Google v. Oracle* brought it roaring to primary status. The majority's fair use analysis broke new ground by commencing with factor two,[52] holding that this factor "points in the direction of fair use" because the portions of the API copied lie far from "the core of copyright."[53] If this conclusion stemmed from the mere observation that the code was functional in nature, then it would seem that the same conclusion would follow in *all* cases involving computer code—as the dissent noted, "code is predominantly functional."[54]

Rather than endorsing this broad proposition, the majority opinion emphasized the importance of factor two in this case because of the unique features of declaring code beyond mere functionality. Oracle's declaring code differed from other kinds of code, the decision explained, because of its relation to aspects of the program over which plaintiff could not (or did not) assert copyright protection. Specifically, that code is "inextricably bound" with (1) "a general system, the division of computing tasks, that no one claims is the proper subject of copyright," (2) "the idea of organizing tasks into what we have called cabinets, drawers, and files, an idea that is also not copyrightable," (3) "the use of specific methods known to programmers, known here as method calls … that Oracle does not here contest," and (4) "implementing code, which is copyrightable but was not copied."[55] In drawing these distinctions, the Court implicitly channeled the limiting principles codified at Section 102(b):[56] Google's factor-two argument was strong not just because the work from which it copied was functional, but also because many of the specific elements it stood accused of copying either embodied or were "inextricably bound"[57] with the sorts of ideas and systems excluded categorically from copyright protection.

Beyond its particulars, *Google v. Oracle* carries notable implications for copyright's limiting doctrines. By leading with factor two, the Court signaled the importance of calibrating fair use analysis to the protectability of the precise material copied. Particularly telling was the majority's focus, in its analysis under factor two, on the distinctions between declaring code and implementing code—in marked contrast to its subsequent insistence, for purposes of factor three, that both sets of code formed part of one unified work.[58] The contrast reveals that what mattered for factor two was not the nature and protectability of the work as a

---

[49] In fact, this writer joined in urging the Court to dispose of the case on the basis that the district court correctly determined that APIs constituted non-protectable methods of operation. See Brief of Professors Peter S. Menell, David Nimmer, and Shyamkrishna Balganesh as *Amici Curiae* in Support of Petitioner, Google LLC v. Oracle Am., Inc., (No. 18-956).

[50] The discussion above has examined the way oral argument unfolded to reach that conclusion. See *§ 13F.03[C][5][c]* Ns. 255–258 *supra*.

[51] See *§ 13F.06[A]* N. 11 *supra*.

[52] All previous Supreme Court opinions had proceeded mechanically through the statute, starting with factor one.

[53] *141 S. Ct. at 1202* (majority).

[54] *141 S. Ct. at 1215* (Thomas, J., dissenting). The fact that software is functional may, of course, be relevant to factor two analysis in the typical software case, but that observation may carry little weight, see *§ 13F.06[A]* N. 10 *supra*, in the absence of the additional factors emphasized here by the Court, see *141 S. Ct. at 1201–02* (majority).

[55] *Id. at 1201*.

[56] See *§ 2A.06* *supra*.

[57] *141 S. Ct at 1201* (using that phrase three times).

[58] See *§§ 13F.07[A][1]*, *13F.14[D][1] infra*.

whole, but rather the nature and protectability of those portions copied.[59] Chart 9 illustrates the Court's implicit views on which unit of analysis is relevant for factor two (☞B), in contrast to factor three (☞C):

**Chart 9: Relative Points of Comparison For Factors Two and Three**



The opinion stopped short of addressing how the principles underlying other limiting doctrines—such as merger and scenes a faire[60]—might also shape analysis under factor two. Although these limiting principles arise primarily as challenges to copyrightability[61] and substantial similarity,[62] they too speak to the protectability of specific elements of the work.[63] The logic of the majority's opinion thus leaves the door open for their invocation in factor two analysis.[64] It remains to be seen whether subsequent cases will develop those avenues.

**[B] Unpublished Works**

Unpublished works present special considerations for fair use. Chart 10 incorporates this precept, whereby a work's published status (☞N) favors defendant and a work's unpublished status (☞O) favors plaintiff:

**Chart 10: Factor Two Analysis**

---

[59] *Compare* _141 S. Ct. at 1201–02_ *with* _id. at 1205_.

[60] See _§ 13.03[B][3]–[4]_ *supra*.

[61] See _§ 2A.10_ *supra*.

[62] See _§ 13.03_ *supra*.

[63] Even assuming the Sun Java API were copyrightable and conceding that Google copied it as a factual matter, it does not follow that Google would be an infringer but for the defense of fair use. Rather, Oracle would first need to establish that Google had appropriated protectable expression. Successive filtration of non-protectable elements in accordance with these limiting principles thus rises to the fore. See _§ 13.03[F]_ *supra*.

[64] In earlier proceedings, the Federal Circuit ruled it premature to consider merger and scenes a faire in connection with the preliminary question of copyrightability rather than in connection with the infringement analysis. _750 F.3d at 1358_ (applying Ninth Circuit precedent). Notwithstanding that objection, it remains eminently appropriate to consider them in connection with fair use, an issue that conceptually arises subsequent to both copyrightability and the *prima facie* case for infringement. Consideration of these limiting principles further comports with fair use doctrine's openness to a plurality of considerations. See _§ 13F.09_ *infra*.



At adoption of the current Act, the prevailing view on this issue was that the unpublished status of a work deliberately withheld by the author gave rise to a nearly "categorical presumption"[65] against fair use.[66] Nonetheless, Congress later rejected this bright line rule—its 1992 amendment makes clear that, although a work's unpublished status may still weigh against fair use, it must not count as dispositive.[67]

Greater ambivalence surrounds the implications of a work's quasi-unpublished status when the work is merely out of print.[68] Courts have also reached disparate results as to the legitimacy of using an unpublished work when the author has disclaimed any intent of publication.[69]

### [1] Works Held Confidentially.

A work's confidential status aligns factor two against fair use. Like any other factor or subfactor, however, confidentiality is not a categorical bar against fair use. The case law is informed by the Senate Report, which states:

> The applicability of the fair use doctrine to unpublished works is narrowly limited since, although the work is unavailable, this is the result of a deliberate choice on the part of the copyright owner. Under ordinary circumstances the copyright owner's right of first publication would outweigh any needs of reproduction for classroom purposes.[70]

The scope of the fair use doctrine is thus supposed to be[71] considerably narrower with respect to unpublished works that are held confidential by their copyright owners.[72] Note that "confidential" differs

---

[65] *Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 595, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985)* (Brennan, J., dissenting).

[66] See *§ 13F.06[B][1] infra.*

[67] See *§ 13F.06[B][2] infra.*

[68] See *§ 13F.06[B][4] infra.*

[69] See *§ 13F.06[B][3] infra.*

[70] S. Rep., p.64.

[71] Nonetheless, according to one statistical survey, "the fact that the plaintiffs work was unpublished appears to have exerted no significant effect on the outcome of the fair use test, but the fact that the plaintiff's work was published appears to have exerted a

4 Nimmer on Copyright § 13F.06

subtly from "unpublished."[73] If the author does not exercise "deliberate choice" to keep the work out of the public eye, the fact the author has not formally published or commercialized it carries less weight.[74] Conversely, given that an element of copyright publication is authorization from the proprietor,[75] a work can be effectively disseminated to the world (which would therefore be colloquially labeled "published")[76] but still sought to be held confidential by its owner.[77]

Building on the Senate's language quoted above, *Harper & Row, Publishers, Inc. v. Nation Enterprises*[78] called the unpublished status of a work "a critical element of its 'nature.' "[79] The Supreme Court there promulgated the rule that "[u]nder ordinary circumstances,[80] the author's right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use."[81] The dissent complained that this standard introduced an unwarranted "categorical presumption against prepublication fair use."[82] If that categorical presumption existed, it would limit fair use analysis to this second factor in the case of unpublished works—the "nature of the copyrighted work" as unpublished would *ipso facto* preclude fair use. In fact, however, the Court's presumption was less than categorical.[83] For the rule was expressly limited to

---

strong effect on the outcome of the test in favor of a finding of fair use." Barton Beebe, *An Empirical Study of U.S. Copyright Fair Use Opinions, 1978–2005*, *156 U. Pa. L. Rev. 549, 613 (2008)*.

[72] *Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 564, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985) (Treatise cited)*. See *Ass'n of Am. Medical Colls. v. Mikaelian, 571 F. Supp. 144 (E.D. Pa. 1983)*, aff'd, **734 F.2d 3 (3d Cir. 1984)**. One commentator traces the heightened protection for unpublished works to copyright's protection of authors' privacy interests. See Stephen B. Thau, *Copyright, Privacy, and Fair Use*, *24 Hofstra L. Rev. 179, 202–05 (1995)*. Another delineates "privative" copyright claims of this sort from the conventional economic claims that dominate modern discussions of copyright law. See Shyamkrishna Balganesh, *Privative Copyright*, *73 Vanderbilt L. Rev. 1, 10–16 (2020)*.

[73] *Nation* extended this protection even to a soon-to-be-published manuscript, *471 U.S. at 554*, as to which the author continued to desire prepublication confidentiality, *id. at 564*. See also *id. at 597* (Brennan, J., dissenting) (Treatise quoted). For more on this distinction, see *§ 13F.06[B][3] infra*.

[74] *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P., 756 F.3d 73, 88 (2d Cir. 2014) (Treatise cited)*; *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith, 382 F. Supp. 3d 312, 327 & n.9 (S.D.N.Y. 2019) (Treatise cited)*, rev'd in part, vacated in part, *11 F.4th 26 (2d Cir. 2021)*, aff'd, *143 S. Ct. 1258 (2023)*. See *Kienitz v. Sconnie Nation LLC, 965 F. Supp. 2d 1042, 1053 (W.D. Wis. 2013)*, aff'd, *766 F.3d 756 (7th Cir. 2014)*, cert. denied, **575 U.S. 913 (2015)** (although mayor's official portrait was not published in any book, that photo appeared in city website and on his Facebook page). Insufficiently adverting to this distinction is *CSM Investors, Inc. v. Everest Dev., Ltd., 840 F. Supp. 1304, 1313 (D. Minn. 1994)*.

[75] See *§§ 4.03[B]*, *7.03 supra*.

[76] One court ruled that unauthorized posting to the Internet of a film depicting plaintiffs engaged in sex did not constitute authorized publication that would incline this factor against fair use. See *Michaels v. Internet Entm't Grp., Inc., 5 F. Supp. 2d 823, 835 (C.D. Cal. 1998)*.

[77] See *Chi. Bd. of Educ. v. Substance, Inc., 354 F.3d 624, 627 (7th Cir. 2003)*, cert. denied, **543 U.S. 816 (2004)** (standardized, nationwide test registered with Copyright Office as "secure test" is still unpublished, weighing this factor against fair use); *Coll. Entrance Examination Bd. v. Pataki, 889 F. Supp. 554, 569 (N.D.N.Y. 1995)* (same); *Coll. Entrance Examination Bd. v. Cuomo, 788 F. Supp. 134, 141 (N.D.N.Y. 1992)* (same).

[78] *471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985)*. See *§ 13F.03[C][2] supra*.

[79] *471 U.S. at 564*.

[80] Note the origin of this prepositional phrase in the Senate Report, quoted in the text accompanying N. 70 *supra*.

[81] *471 U.S. at 555*. It has been argued that Congress cannot constitutionally divest authors of their rights in unpublished manuscripts. Additional Views of Senator Hatch in S. Rep. No. 102–141, at 9–13 (1991). See *§ 8C.02 supra*.

[82] *471 U.S. at 595* (Brennan, J., dissenting).

"ordinary circumstances"; elsewhere, the opinion concluded that the unpublished nature of a work is "a key, *though not necessarily determinative factor* tending to negate a defense of fair use."[84] The Court was silent, however, on what sort of "extraordinary circumstances" could overcome the presumption.

The *Nation* dissent's fear—that the case would create a "categorical presumption against prepublication fair use"[85]—soon thereafter reached fruition. In a line of cases punctuated by lively (at times, rebarbative) disagreement, the Second Circuit proceeded to adopt just that sort of presumption. *Salinger v. Random House, Inc.*[86] initiated this line by reversing the denial of a preliminary injunction.[87] Author J.D. Salinger sought to restrain publication of a forthcoming biography about him based on the fact that the biographer had quoted from Salinger's unpublished letters; Judge Leval denied the request, holding the biographer's usage to be likely fair.[88] On appeal, a lean Second Circuit panel,[89] although conceding that *Nation* allowed fair use to be applied to unpublished works, nonetheless concluded that, particularly in the case of unpublished letters, the likelihood of finding fair use is remote.[90]

The next case concerning unpublished works arose in the context of a biography of L. Ron Hubbard.[91] Judge Leval, again sitting at trial, reached a complex decision, finding fair use in certain instances and infringement in others.[92] In affirming, the majority of the Second Circuit panel noted that this second fair use factor had yet to be applied in favor of any defendant in the case of an unpublished work.[93] The Chief

---

[83] A categorical presumption against prepublication fair use cannot harmonize with the statutory scheme. Section 106(3) of the Copyright Act confers the right of first publication. See *§ 8.11 supra*. Section 106 makes that right "[subject to sectio[n] 107." Section 107 in turn allows fair use "[n]otwithstanding the provisions of section 106." Therefore, the right of first publication under Section 106 by its terms is limited by the right of fair use under Section 107; accordingly, there can be no categorical presumption against fair use for the Section 106 right of first publication. See *471 U.S. at 595 n.19* (Brennan, J., dissenting).

[84] *471 U.S. at 555* (emphasis added) (Treatise cited). See *id. at 551 (Treatise cited)*.

[85] A categorical rule would amount to a moral right analogous to the French *droit de divulgation.* See *§ 8D.05[A] supra.* See also *§ 13F.06[B][3] infra.*

[86] *811 F.2d 90, 95–97 (2d Cir. 1987)*, *cert. denied*, **484 U.S. 890 (1988)**.

[87] See *§ 2.01[B][1]* N. 6 *supra.*

[88] Questions of prior restraint under the *First Amendment* are also implicated here. See *§ 14.06[C][1][c] infra.*

[89] Following the death of a panel member, only two judges issued the opinion in this expedited appeal.

[90] Some months after *Salinger,* Judge Leval issued a preliminary injunction to restrain publication of a forthcoming biography of a different famous figure, Igor Stravinsky. See *Craft v. Kobler, 667 F. Supp. 120 (S.D.N.Y. 1987).* Given that *Salinger* dealt with unpublished works, Judge Leval found the Second Circuit's opinion to have "little bearing on th[e] dispute" in *Craft* over published works. *Id. at 129.*

[91] Subsequently, another case arose concerning a different L. Ron Hubbard biography, in which all the subject quotations were taken from published works. The Second Circuit in that later case held the use fair, reversing the district court's finding of liability. *New Era Publ'ns Int'l, ApS v. Carol Pub. Grp., 904 F.2d 152, 155 (2d Cir.)*, *cert. denied*, **498 U.S. 921 (1990)**.

[92] See *New Era Publ'ns Int'l, ApS v. Henry Holt & Co., 695 F. Supp. 1493, 1524 (S.D.N.Y. 1988)* ("As to the book overall, were it not for the ruling of the Court of Appeals in *Salinger,* I would conclude that fair use had been adequately demonstrated.")

[93] *873 F.2d 576, 583 (2d Cir. 1989).* The majority went out of its way to criticize Judge Leval's findings—in particular seeing no need for his distinction regarding the second factor between use to "enliven" the text and to "communicate significant points" about it. *Id.* ("we disagree with a great deal of what is said in the [district court] opinion"). The concurrence took the majority to task for its criticism, which was *dictum* given the affirmance on other grounds. *Id. at 585* (Oakes, Chief Judge, concurring).

4 Nimmer on Copyright § 13F.06

Judge of the Second Circuit disagreed that every reproduction of an unpublished segment should be deemed infringing.[94] In addition, he expressed doubt about the wisdom of his circuit's decision in *Salinger*.[95]

At that high water mark, it appeared that the American book publishing industry—headquartered in New York, seat of the Second Circuit[96]—would need to rigorously exclude all unpublished snippets[97] from biographies.[98] But the tide subsequently began to recede. In *Wright v. Warner Books, Inc.,* the Second Circuit reiterated that "[u]npublished works are the favorite sons of factor two" and ruled that this particular factor accordingly weighed heavily in favor of plaintiff.[99] Nonetheless, in a departure from prior jurisprudence, it affirmed summary judgment in favor of defendant.[100] The Second Circuit judge who tried the case, and all three Second Circuit judges on the appellate panel, agreed that sparing use of creative expression from author Richard Wright's unpublished letters and journals constituted fair use.[101]

### [2] 1992 Amendment.

Congress responded to the foregoing line of cases by amending Section 107. That 1992 legislation constitutes the only statutory amendment to the fair use doctrine since its legislative recognition in 1976.[102] It adds to the end of the statutory provision[103] the following qualification:

---

[94] *Id. at 585*. See Pierre N. Leval, *Fair Use or Foul*, 36 J. Copr. Soc'y 167, 168 (1989). For a scathing criticism of the Second Circuit's reasoning, see Lynn I. Miller, *Fair Use, Biographies, and Unpublished Works: Life After H.R. 4412*, 40 J. Copr. Soc'y 349, 389 (1993).

[95] *873 F.2d at 585, 593* ("we are bound to follow [*Salinger*] absent en banc review"). The entire Second Circuit was riven over the issue, with five out of twelve active judges voting to rehear the matter *en banc*. *New Era Publ'ns Int'l, ApS v. Henry Holt & Co., 884 F.2d 659 (2d Cir. 1989)*, *cert. denied*, **493 U.S. 1094 (1990)** (denying petition for *en banc* review). The conflict spilled over into the scholarly commentary, with Judges Oakes, Leval, Miner and Newman debating the wisdom of Second Circuit fair use rulings in various articles (which are cited in *New Era Publ'ns Int'l, ApS v. Carol Pub. Grp., 904 F.2d 152, 155 (2d Cir.)*, *cert. denied*, **498 U.S. 921 (1990))**. Judges Oakes, Leval, and Miner were among the witnesses who testified before Congress concerning the 1992 amendment discussed below. H.R. Rep. No. 102–286, at 2 (1992). See *§ 13F.06[B][2] infra*.

[96] S. Rep. No. 102–141, at 3 (1991); 138 Cong. Rec. S17358 (daily ed. Oct. 7, 1992) (statement of Sens. Simon, Leahy, Kennedy, Grassley, Metzenbaum, and Kohl) ("pall … over the publishing world"). "We think it no exaggeration to say that if the trend were to continue, it could severely damage the ability of journalists and scholars to use unpublished primary material." *Id.*

[97] One commentator lamented the possibility that a monstrosity of the following order might be required, simply to convey an author's unpublished *aperçu* that "audience is all":

[She observed that] the role of the audience is an encompassing factor in any rhetorical situation. Moreover, the clipped style of the sentence suggests her conciseness and economy. Her prose passage also gives a hint of her affection for alliteration.

Karen Burke LeFevre, *The Tell-Tale "Heart": Determining "Fair Use" of Unpublished Texts*, 55 Law & Contemp. Probs. 153, 165 (1992).

[98]

Evidence was presented at our hearings that reasonable attorneys because of the specter of the second circuit decisions are routinely advising publishers from relying on a fair use defense when they are dealing with unpublished works. As a result, the public is being denied access to the raw materials that are the life blood of these authors.

138 Cong. Rec. H7991 (daily ed. Aug. 11, 1992) (statement of Rep. Moorhead). See S. Rep. No. 102-141, at 4.

[99] *953 F.2d 731, 737 (2d Cir. 1991)*. *Wright* represented an insufficient retreat in the opinion of one commentator. Miller, 40 J. Copr. Soc'y at 368–69. But, as we will see in the next subsection, Congress felt differently.

[100] The concurring judge would have even further de-emphasized the fact that unpublished works were at issue. *Id. at 743* (Van Graafeiland, J., concurring).

[101] *Wright v. Warner Books, Inc., 748 F. Supp. 105 (S.D.N.Y. 1990)*, *aff'd*, *953 F.2d 731 (2d Cir. 1991)*. See *Norse v. Henry Holt & Co., 847 F. Supp. 142, 147 (N.D. Cal. 1994)* (following *Wright*).

4 Nimmer on Copyright § 13F.06

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.[104]

A few words of explication from the legislative history are in order. The phrase "shall not itself" is "designed to ensure that the courts do not erect a *per se* rule barring any fair use of unpublished works."[105] The reference to "all the above factors" refers to the four factors explicitly set forth in the statute,[106] and other "factors in addition to those set forth in the statute"[107] that courts, in their discretion, may wish to consider.[108]

The motivation for this amendment inhered in "concerns by some biographers, historians, and publishers that their ability to use unpublished primary source materials such as copyrighted letters and diaries have been limited"[109] by the Second Circuit decisions regarding the Salinger and Hubbard biographies noted above.[110] The legislative history further asserts that "the *Wright* opinion[111] properly balanced all the fair use factors"[112] and added that "the *Wright* opinion did not reach the outer limits of what might be regarded as fair use."[113]

But Congress wished to go further.

For example, in some circumstances, it would be a fair use to copy an author's unpublished expression where necessary to report fairly and accurately a fact set forth in the author's writings. Additionally, as Judge Leval has written: "Often, it is the words used by [a] public figure (or the particular manner of expression) that are the facts calling for comment."[114]

The legislature therefore stated its intent to "disavow certain troublesome language in the *Salinger* opinion … that unpublished works 'normally enjoy complete protection against copying any protected expression.' "[115] In particular, the Supreme Court had previously held that "the scope of fair use is narrower with respect to unpublished works."[116] Congress rejected *Salinger*'s interpretation of "scope" as meaning

---

[102] Note that this amendment took effect upon enactment—four days before the effective date of the Audio Home Recording Act of 1992. See *Chap. 8B* supra.

[103] For the text of a predecessor bill, see S. Rep. No. 102-141, at 8 (1991).

[104] Act of Oct. 24, 1992, ***Pub. L. No. 102-492, 106 Stat. 3145***.

[105] H.R. Rep. No. 102-286, at 9 (1992).

[106] See *§§ 13F.05* supra, *13F.07*–*13F.08 infra*.

[107] See *§ 13F.09[B]* infra.

[108] H.R. Rep. No. 102-286, at 9.

[109] *Id.* at 9.

[110] *Id.* at 4. See *§ 13F.06[B][1]* supra.

[111] That case "was wending its way through the Second Circuit" during deliberation of the amendment. H.R. Rep. No. 102-286, at 7. See *§ 13F.06[B][1]* supra.

[112] H.R. Rep. No. 102-286, at 8.

[113] *Id.* at 8 (noting that *Wright* arose in posture of defense summary judgment). One commentator calls the amendment's potential expansion of fair use beyond *Wright* the "key" statement in the legislative history. Lynn I. Miller, *Fair Use, Biographies, and Unpublished Words: Life After H.R. 4412*, 40 J. Copr. Soc'y. 349, 395 (1993).

[114] H.R. Rep. No. 102-286, at 8.

[115] H.R. Rep. No. 102-286, at 8.

[116] *Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 564, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985)*.

that "the circumstances in which copying will be found to be fair use will be fewer in number for unpublished works than for published works."[117] Instead, Congress opted for the alternative construction of scope,[118] rejected in *Salinger,* that "the amount of copyrighted material that may be copied as fair use is a lesser quantity for unpublished works than for published works."[119]

The amendment thus reaffirms the holding in *Nation*[120]—in particular, that the unpublished nature of a work for purposes of this second fair use factor is a "key, though not necessarily determinative factor tending to negate a defense of fair use"[121]—unencumbered by the later Second Circuit glosses, canvassed above, that apparently imported a bright line rule against fair use of unpublished excerpts.[122] The effect has been salutary, saving the law from recrudescence of the unfortunate bright line rule initiated by *Salinger*[123] at the same time still allowing individual instances of copying unpublished works to be considered unfair (as one case ruled with respect to secure test[124] questions).[125]

### [3] Cross-Overs with Divulgation Right and Its Disavowal.

We have seen above various species of moral rights, including the right to engage in initial dissemination of a copyrighted work, parallel to the French *droit de divulgation.*[126] When the second factor devolved into a

---

[117] *Salinger v. Random House, Inc., 811 F.2d 90, 97 (2d Cir. 1987).*

[118] *Religious Tech. Ctr. v. Netcom On-Line Comm. Servs., Inc., 923 F. Supp. 1231, 1246 (N.D. Cal. 1995) (Treatise cited).*

[119] H.R. Rep. No. 102-286, at 8.

[120]

[I]t is not the Committee's intention to alter the weight currently given by the courts to the unpublished nature of a work under the second fair use factor. The general principles regarding fair use of unpublished works set forth by the Supreme Court in Harper & Row, Publishers, Inc. v. Nation Enterprises still apply.

H.R. Rep. No. 102-286, at 9. See 138 Cong. Rec. H7991 (daily ed. Aug. 11, 1992) (statement of Rep. Hughes); S. Rep. No. 102-141, at 5–6 (1991) ("we intend to roll back the virtual per se rule of *Salinger* and *New Era,* but we do not mean to depart from *Harper & Row*").

[121] *471 U.S. at 555.* See generally Kenneth D. Crews, *Fair Use of Unpublished Works: Burdens of Proof and the Integrity of Copyright,* *31 Ariz. St. L.J. 1 (1999).*

[122] See *§ 13F.06[B][1]* supra.

The purpose of [the amendment] is to clarify the intent of Congress that there be no per se rule barring claims of fair use of published [sic] works. Instead, consistent with Congress's codification of fair use in the 1976 Copyright Act, the courts are to determine the affirmative defense of fair use of unpublished works on a case-by-case basis, after consideration of all the factors set forth in Section 107 … as well as any other factors a court may find relevant.

H.R. Rep. No. 102-286, at 1.

[123] See *§ 13F.06[B][1]* supra. The amendment has been called "an unqualified success" and singled out as one of the most outstanding amendments ever to the Copyright Act. David Nimmer, *Codifying Copyright Comprehensibly,* *51 UCLA L. Rev. 1233, 1346 (2004).*

[124] See *§ 7.17[E][4]* supra.

[125] See *Educ. Testing Serv. v. Simon, 95 F. Supp. 2d 1081, 1090 (C.D. Cal. 1999).* The case cited legislative history in which several senators stated that the amendment "applies to uses of letters, diaries and other unpublished copyrighted works" but that it does not "broaden the fair use of unpublished computer programs [or secure tests]." 138 Cong. Rec. S17358 (daily ed. Oct. 7, 1992) (statement of Sens. Simon, Leahy, Kennedy, Grassley, Metzenbaum, and Kohl). See S. Rep. No. 102-141, at 6.

[126] See *§ 8D.06[A]* supra.

4 Nimmer on Copyright § 13F.06

categorical presumption, the copyright owner's rights effectively enjoyed a categorical "first publication right."[127] Given the intervening amendment rejecting an iron-clad presumption here, the domains are best considered separate.[128]

What then is the significance for fair use when a copyright owner disavows any intent to disseminate or otherwise commercialize the work? This declaration pulls in two directions. On the one hand, it diminishes the expected market impact under factor four. One case concluded that there was no violation of the "first publication right" inasmuch as the copyright owner *never* intended to publish the subject materials.[129] Another court concluded that a plagiarism detection service for unpublished high school papers "did not have the '*intended purpose*' or 'incidental effect' of supplanting plaintiff's rights to first publication."[130] These cases highlight, once again, the intersection of factors two and four.[131] Use of an unpublished work bound for publication is disfavored because that use threatens to supplant plaintiff's anticipated market; on the other hand, disavowal of intent to publish in the context of factor two implies disavowal of the potential market in the context of factor four and may thereby strengthen the case for fair use. Chart 11 illustrates that distinction:

**Chart 11: Implications of Unpublished Status for Factor Four**



We will resume examination of plaintiff's decisions with respect to market entry (and disavowal) in the context of factor four below.[132]

---

[127] See § 13F.06[B][1] *supra*.

[128] In other words, the proprietor may posses a substantive right to first publication, but the current matter concerns a defense to the copyright owner's rights. See § 13F.06[B][2] *supra*.

[129] See *Online Policy Grp. v. Diebold, Inc., 337 F. Supp. 2d 1195, 1203 n.13 (N.D. Cal. 2004).*

[130] A.V. *ex rel.* Vanderhye v. iParadigms, *LLC, 562 F.3d 630, 641 (4th Cir. 2009)* (emphasis original), quoting *Harper & Row Publishers v. Nation Enters, 471 U.S. 539, 562, 205 S. Ct. 2218, 85 L. Ed. 2d 588 (1985).*

[131] See § 13F.08 *infra*. See also § 13F.11 *infra*.

[132] See § 13F.08[B] *infra*.

4 Nimmer on Copyright § 13F.06

On the other hand, however, this disclaimer of intent to publish the work may signal a separate set of noneconomic harms.[133] An author might suffer a harm to her dignitary interests from the publication of private correspondence;[134] in the language of incentives, a lack of protection against the involuntary publication of some kinds of writings might discourage the author from creating them in the first place.[135] Although concerns of this nature seem to undergird the courts' historical reluctance to allow fair use with respect to unpublished materials,[136] caselaw has not provided a definitive answer regarding the weight these concerns should carry in fair use analysis.[137]

### [4] Out-of-Print Works.

Out-of-print works form a category of published works that have lapsed into quasi-unpublished status—under limited circumstances, unavailability in this guise may actually *support* fair use rather than militate against it. As the Senate Report states,

> another key, though not necessarily determinative, factor in fair use is whether or not the work is available to the potential user. If the work is "out of print" and unavailable for purchase through normal channels, the user may have more justification for reproducing it than in the ordinary case, but the existence of organizations licensed to provide photocopies of out-of-print works at reasonable cost is a factor to be considered.[138]

That statement is deliberately double-edged. On the one hand, it favors a broad fair use application to out-of-print works. Yet, its qualification in light of licensing organizations[139] has, not surprisingly, led some courts to reach the opposite conclusion.[140] As one court aptly notes, "plaintiffs in this case convincingly argue that damage to out-of-print works may in fact be greater since permissions fees may be the only income for authors."[141]

Solicitude for the use of out-of-print works is further qualified by the Senate Report's discussion of works becoming "unavailable" from "the result of a deliberate choice on the part of the copyright owner."[142] The

---

[133] See *§ 13F.06[B][1]* N. 72 *supra*.

[134] See Shyamkrishna Balganesh, *Privative Copyright*, *73 Vanderbilt L. Rev. 1, 12 (2020)*.

[135] "Just as licensing of derivatives is an important economic incentive to the creation of originals, so too will the right *not* to license derivatives sometimes act as an incentive to the creation of originals." *Salinger v. Colting, 641 F. Supp. 2d 250, 268 (S.D.N.Y. 2009)* (emphasis original), *vacated on other grounds*, *607 F.3d 68 (2d Cir. 2010)*.

[136] Balganesh, *73 Vanderbilt L. Rev. at 51–59*.

[137] *Id.* at 63–65 (proposing framework for analysis). See *§ 13F.08[C][1]* infra (confronting questions of reputational harm in factor four context).

[138] S. Rep., p.64. See *Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985)*; *Triangle Publ'ns, Inc. v. Knight-Ridder Newspapers, Inc., 626 F.2d 1171 (5th Cir. 1980)*.

[139] See *§§ 13F.08[B][1]*, *13F.13[B][4] infra* (discussing Copyright Clearance Center's significance for fair use).

[140]

The fact that the Rosenberg letters have been out of print for 20 years does not necessarily mean that they have no future market which can be injured. The market for republication or for sale of motion picture rights might be affected by the infringing work.

*Meeropol v. Nizer, 560 F.2d 1061 (2d Cir. 1977) (Treatise cited)*. See *Craft v. Kobler, 667 F. Supp. 120, 129 (S.D.N.Y. 1987)*.

[141] *Basic Books, Inc. v. Kinko's Graphics Corp., 758 F. Supp. 1522, 1533 (S.D.N.Y. 1991)*.

[142] S. Rep., p.64. For the full quotation in context, see *§ 13F.06[B][1] supra*.

Report's implicit position seems to be that factor two might favor fair use in those circumstances when proprietors suffer their published works to go out of print due to circumstances beyond their control. But circumstances can arise in which a work attains that status not from dearth of sales, but instead from the copyright owner's conscious choice. At times, it might arise out of a change of heart, in which the copyright owner desires to suppress that which it previously promulgated.[143] At other times, a decision to withdraw a work may serve as "a valuable marketing tool—taking advantage of timing and pent-up market demand."[144] Under those circumstances, this factor weighs against fair use.[145]

In any case, the fact that a work goes out of print cannot mean that its copyright is vitiated. Consideration of the full context, including market impact under factor four, remains vital.[146] Among other pertinent facts, works out of print are published in new editions when market demand grows sufficient. That demand may never arise if competitors may freely copy the out-of-print work.[147] Determining the import of a work's out-of-print status thus requires attending to the consequences for factor four, where the implication flowing from a work that falls out of print for lack of interest contrasts with that which arises when plaintiff withholds the work from reissue deliberately. Chart 12 illustrates those contrasts:

**Chart 12: Closer Scrutiny of Published, In-Print, and Out-of-Print Works**



Presenting a final wrinkle, some works are destined by their very nature to go out of print—serial magazines being a prime example. Even in the magazine realm itself, distinctions apply—the legislative history notes that works of limited circulation, such as newsletters, may be less susceptible to fair use copying than are mass-circulation periodicals or scientific journals.[148] One court commented that this factor

---

[143] See _Worldwide Church of God v. Phila. Church of God, Inc., 227 F.3d 1110, 1123 (9th Cir. 2000)_ (Brunetti, J., dissenting), _cert. denied_, **532 U.S. 958 (2001)**. In this context, it is _apropos_ to note the moral right of retraction. See _§ 8D.05[B]_ supra.

[144] _Peter Letterese & Assocs. v. World Inst. of Scientology Enters., 533 F.3d 1287, 1314 (11th Cir. 2008)_.

[145] _Id. at 1314_ (considering second factor neutral as to factual work deliberately withheld from market for strategic purposes).

[146] See _§ 13F.08_ infra.

[147] _Meeropol v. Nizer, 560 F.2d 1061 (2d Cir. 1977) (Treatise cited)_; _Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Coop. Prods., Inc., 479 F. Supp. 351 (N.D. Ga. 1979) (Treatise quoted)_ (fact that plaintiffs had previously attempted stage version, which had proven unsuccessful, did not justify defendant mounting its own stage version).

could therefore justly be argued to favor defendant in the case of an old magazine, but concluded that it had slight weight in any event under the facts of that case,[149] given that the usage in question was transformative.[150]

Cumulatively, the caveats flagged in Charts 11 and 12 culminate in the refined Chart 13, which traces the distinctions that arise between unpublished works where publication is contemplated (☞AA) and those where it is disavowed (☞AB), and also those that arise between in-print works (☞AC), works that have gone out of print due to waning interest (☞AE), and those withheld from print deliberately (☞AF):

**Chart 13: Factor Two Analysis, with Caveats**



Nimmer on Copyright
Copyright 2025, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

**End of Document**

---

[148] H. Rep., p.73. See *Wainwright Sec., Inc. v. Wall Street Transcript Corp., 558 F.2d 91 (2d Cir. 1977)*.

[149] See *Warren Publ'g Co. v. Spurlock, 645 F. Supp. 2d 402, 423 (E.D. Pa. 2009)*. Addressing a 1958 magazine entitled *Famous Monsters of Filmland*, the court bent over in plaintiff's favor to hold the factor against fair use, before ultimately granting the fair use defense as a whole. *Id. at 428*.

[150] See *§ 13F.05[B][2]* supra.

# Exhibits 23 through 30 Redacted in Their Entirety

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 24, 2025, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Joshua L. Simmons
Dana DeVlieger
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

Gregg F. LoCascio
Patrick Arnett
Nicholas Teleky
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave NW
Washington, DC 20004

John F. Hartmann
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654

Ariel Deitchman
KIRKLAN & ELLIS LLP
Three Brickell City Centre
98 S.E. 7th Street, Suite 700
Miami, FL 33131

Miranda D. Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116

*Deloitte-Sagitec@kirkland.com*

John W. Shaw
Andrew E. Russell
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
*jshaw@shawkeller.com*
*arussell@shawkeller.com*

*Attorneys for Plaintiffs Deloitte Consulting LLPand Deloitte Development LLC*

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street

Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Sagitec Solutions, LLC*