IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DELOITTE CONSULTING LLP and DELOITTE DEVELOPMENT LLC, )<br><br>Plaintiffs, )<br><br>v. )<br><br>SAGITEC SOLUTIONS, LLC, )<br><br>Defendant. ) | C.A. No. 23-325-WCB<br><br>**REDACTED VERSION**<br>**Filed: July 31, 2025** |

## DECLARATION OF CHRISTOPHER K. LAURUS
## IN OPPOSITION TO DELOITTE'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT - VOLUME III
### (Exhibits 31 - 53)

OF COUNSEL:

Christopher K. Larus
David A. Prange
Rajin S. Olson
Brandon A. Carmack
Demitri M. Dawson
ROBINS KAPLAN LLP
800 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500
clarus@robinskaplan.com
dprange@robinskaplan.com
rolson@robinskaplan.com
bcarmack@robinskaplan.com
ddawson@robinskaplan.com

Rebecca Bact
ROBINS KAPLAN LLP
800 Boylston Street
Boston, MA 02199
(617) 859-2740
rbact@robinskaplan.com

Dated: July 3, 2025

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Robert Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Defendant*
*Sagitec Solutions, LLC*

# Exhibits 31 through 39 Redacted in Their Entirety

# Exhibit 40

Deloitte - 4-25-24

Table of Contents

1 #57372.1

2 #60909.1

3 #158118.1

MADUA00001257

**From:** "Amante, Michelle \(DWD\)" <MAmante@detma.org>

**To:** "Birkhauser, Cari \(DWD\)" <CBirkhauser@detma.org>

**Cc:** "Cicatiello, Judith \(DWD\)" <JCicatiello@detma.org>, "Glennon, John \(EOL\)" <john.glennon@state.ma.us>

**Subject:** RE: Sharing with Florida

**Date:** Wed, 24 Aug 2011 14:53:30 +0000

**Importance:** Normal

---

This morning I sent the Employer Acct Maintenance UCs. It shouldn't be a problem because we own the revenue system now and all relevant documentation. I also sent the UCs to the Deloitte contact so that they would have a copy of the Employer use cases (because they apparently couldn't get the information from their own team).

**Michelle Amante**
Director of Revenue
Department of Unemployment Assistance
Telephone: (617) 626-6618
-----Original Message-----
**From:** Birkhauser, Cari (DWD)
**Sent:** Wednesday, August 24, 2011 10:43 AM
**To:** Graham, Patricia (DWD); Freeman-Roche, Nancy (DWD); Corey, Ann (DWD); Amante, Michelle (DWD); Long, Yean-Ai (DWD)
**Cc:** Cicatiello, Judith (DWD); Glennon, John (EOL)
**Subject:** FW: Sharing with Florida

Hi let's not send anything along without checking as a team, there maybe legal implications.
Thanks,
Cari

---

**From:** Glennon, John (EOL) [mailto:john.glennon@massmail.state.ma.us]
**Sent:** Wednesday, August 24, 2011 9:29 AM
**To:** Birkhauser, Cari (DWD)
**Cc:** Cicatiello, Judith (DWD)
**Subject:** Sharing with Florida

Hi Cari –

Per our discussion, before we share anything with Florida, let's make sure it doesn't violate any section of the Intellectual Property Rights section of the SOW. I have extracted that section below, and believe we should have our counsel review it prior to sharing any project artifacts.

John

## 7.4 Title and Intellectual Property Rights

### 7.4.1 Definition of Property
The intellectual property required by BearingPoint to develop, and/or install and test QUEST (hereinafter the "Property") may consist of computer programs (in object and source code form), scripts, data, documentation, the audio, visual and audiovisual content related to the layout and graphic presentation of the QUEST solution, text, photographs,

MADUA00001258

video, pictures, animation, sound recordings, training materials, images, techniques, methods, algorithms, program images, text visible on the Internet, HTML code and images, illustrations, graphics, pages, storyboards, writings, drawings, sketches, models, samples, data, other technical or business information, and other works of authorship fixed in any tangible medium. The QUEST solution is an unemployment insurance information system involving intellectual property derived from three sources described below in clause 7.4.2 and with technical and functional specifications in accordance with this SOW ("QUEST").

## 7.4.2 Source of Property

This engagement will involve intellectual property derived from three different sources: (1) third party software and other products' (as specified in section 9.8 of this SOW to be licensedlobtained by DUA, including without limitation Microsoft, Oracle, IIS, Filenet) and any derivative works thereof ("Third Party Property"); (2) BearingPoint owned or licensed preexisting or proprietary software, solutions or other proprietary material and information (including without limitation Provencourse Methodology and uFACTS, but excluding Third Party Property and derivative works thereof.) and derivative works created for DUA based on the BearingPoint owned or licensed preexisting or proprietary software, solutions or other proprietary material and information (altogether herein "Contractor Property") and (3) software and material and information developed by BearingPoint in the course of developing the QUEST solution and specifically for the purposes of delivering QUEST to DUA under this SOW and other than Contractor Property or Third Party Property or derivative work thereof ("QUEST IP") . Ownership of the first category of intellectual property is addressed in separate agreements between the DUA and the third party contractors and resellers of such software. The following paragraphs of the Statement of Work address ownership rights in the second and third categories of intellectual property. For the purposes of this SOW, derivative works shall mean works defined as derivative works in 17 U.S.C.5 101 and further defined as all Developments and Property associated with the migration of the uFACTS Solution Framework to a .NET architecture/application including but not limited to all core unemployment insurance functions but excluding specific Commonwealth of Massachusetts requirements that are developed originally and exclusively for DUA.

## 7.4.3 Contractor Property and License

BearingPoint will retain all right, title and interest in and to all Contractor Property. DUA acknowledges and agrees that its possession, installation or use of Contractor Property will not transfer to it any title or ownership to such Contractor Property. DUA further acknowledges and agrees that the uFACTS Unemployment Insurance Solution (which will be the basis for the QUEST solution), excluding the Third Party Property, is Bearingpoint's proprietary technology andlor is licensed to BearingPoint such that the technology and its source code are considered a trade secret of BearingPoint or third party licensor.

DUA acknowledges that the Contractor Property contains or constitutes commercially valuable and proprietary trade secrets of the Contractor or other third parties, the development of which involved the expenditure of substantial time and money and the use of skilled development experts. DUA acknowledges that the Contractor Property is being disclosed to DUA to be used only as expressly permitted under the terms of this SOW and the license specified herein. DUA will take no affirmative steps to disclose such information to third parties, and, if required to do so under the Commonwealth's Public Records Law, M.G.L. c. 66, S 10, or by legal process, will promptly notify BearingPoint of the imminent disclosure so that BearingPoint can take steps to defend itself against such disclosure.

MADUA00001259

Except as expressly authorized in this clause 7.4 of the Statement of Work, DUA will not copy, modify, distribute or transfer by any means, display, sublicense, rent, reverse engineer, decompile or disassemble the Contractor Property.

Subject to the terms herein and upon the full and final payment for the deliverables containing the Contractor Property, BearingPoint grants to DUA and the Commonwealth a fully-paid, royalty-free, non-exclusive, non-transferable, worldwide, irrevocable, perpetual, license to use the Contractor Property by DUA with the deliverable provided to DUA by BearingPoint, and to make, or grant a limited sublicense to third party contractors to make, use, reproduce, distribute, modify, reverse engineer, decompile or disassemble or create derivative works based upon the Contractor Property solely for DUA's needs related to the QUEST solution, in any media now known or hereafter known, but only to the extent reasonably necessary for DUA's use and exploitation of the deliverables within the QUEST solution. The foregoing license expressly prohibits DUA or DUA's contractors to make, use, license, modify or create derivative works of the Contractor Property for reasons other than for the use in relation with the QUEST solution by DUA. In the event the Commonwealth does not provide funding for the work under this SOW, or does not fully fund the work hereunder at any stage, the license granted pursuant to this paragraph of 7.4.3 is hereby restricted so that no third party vendors or contractors of DUA will be authorized to make, use, license, the Contractor Property. In the event of agency reorganization within Commonwealth, the rights and obligations of DUA herein shall be applicable to DUA's successor agency.

Notwithstanding anything contained herein to the contrary, and notwithstanding DUA's use of the Contractor Property under the license created herein, BearingPoint shall have all the rights and incidents of ownership with respect to the Contractor Property, including the right to use such property for any purpose whatsoever and to grant licenses in the same to third parties.

During the term of the associated Statement of Work and immediately upon any expiration or termination thereof for any reason, BearingPoint will provide to DUA the most current copies of any Contractor Property to which DUA has rights pursuant to the foregoing, including any related documentation.

## 7.4.4 Commonwealth Property

In conformance with the Commonwealth's Standard Terms and Conditions, on the date on which DUA reimburses BearingPoint for a deliverable accepted by DUA under the terms of this Statement of Work, all of BearingPoint's right, title and interest in the QUEST IP developed originally and exclusively by BearingPoint under the terms of this Statement of Work for the purposes of DUA's QUEST project shall pass to and vest in the Commonwealth, including all copyright, patent, trade secret, trademark and other intellectual property rights created by BearingPoint in the QUEST IP, and any causes of action relating to or based upon such work (hereinafter the "Commonwealth Property"). Subject to clause 7.4.3., BearingPoint hereby assigns to the Commonwealth as of the date on which DUA reimburses BearingPoint for such deliverables, all intellectual property rights in the QUEST IP that it may now or hereafter possess in the Commonwealth Property related to such deliverable and all derivative works thereof. BearingPoint also agrees to execute all documents and take all actions that may be reasonably necessary to confirm such rights, including providing any code originally developed under this SOW and used exclusively to develop such Commonwealth Property for DUA and the documentation for such code. BearingPoint acknowledges that there are currently and that there may be future rights that the Commonwealth may otherwise become entitled to with respect to Commonwealth property that does not yet exist, as well as new uses, media, means and forms of exploitation, current or future technology yet to be developed, and that BearingPoint specifically intends the foregoing ownership or rights by the Commonwealth to include all such now known or unknown uses, media and forms of exploitation.

MADUA00001260

BearingPoint agrees to take such actions as may be reasonably requested by DUA to evidence the transfer of ownership of or license to intellectual property rights described in this section.

DUA expressly acknowledges that BearingPoint will continue to market and sell Contractor Property, including the uFACTS Framework and Solution and its derivative works to other clients. Nothing in this SOW shall be deemed to transfer or assign BearingPoint's rights in or concerning the uFACTS framework and solution, including without limitation BearingPoint's right to continue to use, modify, enhance, expand and create derivatives of the uFACTS framework or solution for itself or others. For the purposes of clarification, DUA acknowledges that nothing in this clause 7.4.4 or the SOW prevents BearingPoint from developing and using deliverables similar to the deliverables provided to DUA under this SOW for its own purposes or for third parties, as long as BearingPoint does not use or disclose DUA's confidential information or material. Any knowledge, principles or experience learned, obtained or remembered by BearingPoint in implementing QUEST for DUA can be used by BearingPoint and its personnel again for BearingPoint or others.

DUA and BearingPoint expressly acknowledge the rights, obligations and interest associated with the ownership and licensing of the intellectual property rights herein, including but not limited to this Section.7.4 and Appendix F, are material to both parties and reflect the parties' agreement and intent. The parties further acknowledge the clarifications to the intellectual property rights in this Statement of Work were negotiated and entered into with the expectation they are fully enforceable. Should any questions or issues arise relative to the clarifications; the parties agree to negotiate in good faith to resolve the questions or issues in a way that gives the greatest effect to the parties' agreement and intent. In the event any of the Contractor Property, as defined herein, is subsequently determined to be the Commonwealth Property then all such transferred Contractor Property shall be subject to the following: DUA hereby grants to BearingPoint permission to use the Commonwealth Property with a right to copy, reproduce, distribute, reverse engineer, decompile, disassemble, modify, license, sub-license, create and use all derivative works based upon the Commonwealth Property for itself or others, to the extent that no confidential information of DUA is disclosed to any third parties.

This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is strictly prohibited and may be the subject of legal action. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you

**From:** "Cicatiello, Judith \(DWD\)" <JCicatiello@detma.org>

**To:** "Kottcamp, Rena \(DWD\)" <RKottcamp@detma.org>

**Subject:** FW: QUEST Scope reductions during contract negotiations

**Date:** Thu, 18 Mar 2010 12:28:19 +0000

**Importance:** Normal

---

Here you go. I agree and have made recommendations accordingly......

Judi L. Cicatiello, Director
Department of Workforce Development
Division of Unemployment Assistance
19 Staniford Street, 3rd floor
Boston, MA 02114
Tel. (617) 626-6619
Fax (617) 727-0315
jcicatiello@detma.org

This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is strictly prohibited and may be the subject of legal action. If you are not the intended recipient please contact the sender by reply e-mail and destroy all copies of the original message.        Thank you.

-----Original Message-----
**From:** Minkkinen, David (US - Minneapolis) [mailto:dminkkinen@deloitte.com]
**Sent:** Wednesday, March 17, 2010 4:18 PM
**To:** Cicatiello, Judith (DWD); Judith.Cicatiello@state.ma.us
**Cc:** Slusarz, Jonathan (US - Boston); Kaur, Harpreet (US - Philadelphia); Amante, Michelle (US - Minneapolis)
**Subject:** RE: QUEST Scope reductions during contract negotiations

The individuals that are still here:

Bob Ganong (Legal Review and Counsel)
Barbara McDonough
Harriet Mermes
Dennis Thompson
Theresa DeMarco (helped review and draft the statement of work)
Jane Welch (helped review and draft the statement of work)
Joan Pearson (helped review and draft the statement of work)

No longer here:

Bob Velten
Ed Malmborg


**David Minkkinen**
Principal
Deloitte Consulting LLP
50 S 6th St. Ste. 2800, Minneapolis, MN 55402
Cell: 612-759-7738
dminkkinen@deloitte.com | www.deloitte.com

Please consider the environment before printing

---

**From:** Cicatiello, Judith (DWD) [mailto:JCicatiello@detma.org]
**Sent:** Wednesday, March 17, 2010 1:01 PM
**To:** Minkkinen, David (US - Minneapolis); Judith.Cicatiello@state.ma.us

MADUA00001262

**Cc:** Slusarz, Jonathan (US - Boston); Kaur, Harpreet (US - Philadelphia); Amante, Michelle (US - Minneapolis)
**Subject:** RE: QUEST Scope reductions during contract negotiations

David:

Thank you. This is very helpful. Do any of you know who was on the DUA/EOLWD contract negotiation team?

Judi L. Cicatiello, Director
Department of Workforce Development
Division of Unemployment Assistance
19 Staniford Street, 3rd floor
Boston, MA 02114
Tel. (617) 626-6619
Fax (617) 727-0315
jcicatiello@detma.org

This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is strictly prohibited and may be the subject of legal action. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.          Thank you.

-----Original Message-----
**From:** Minkkinen, David (US - Minneapolis) [mailto:dminkkinen@deloitte.com]
**Sent:** Tuesday, March 16, 2010 10:15 PM
**To:** Judith.Cicatiello@state.ma.us
**Cc:** Slusarz, Jonathan (US - Boston); Kaur, Harpreet (US - Philadelphia); Amante, Michelle (US - Minneapolis)
**Subject:** QUEST Scope reductions during contract negotiations

Judi,

Attached is the document that highlights our agreement with DUA regarding QUEST scope reductions during contract negotiations. As I indicated, we originally bid $46 million and the contract was awarded to us based on that bid price. During contract negotiations, we worked with DUA to reduce the budget from $46 million to $40 million due to the fact they only had $41.5 million in bonding money. This document provides the details regarding the $6 million in scope reductions.

As you will see, Deloitte ended up taking responsibility for many of these items.

I hope this provides you some additional perspective on the history here.

**David Minkkinen**
Principal
Deloitte Consulting LLP
50 S 6th St. Ste. 2800, Minneapolis, MN 55402
Cell: 612-759-7738
dminkkinen@deloitte.com | www.deloitte.com

Please consider the environment before printing

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message.

Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited. [v.E.1]

MADUA00001263

# Deloitte.

Deloitte Consulting LLP
2500 One PPG Place
Pittsburgh, PA 15222-5401
USA

Tel: +1 412 338 7200
Fax: +1 412 338 7380
www.deloitte.com

May 23, 2014

Seshubabu Konatham
401 Engamore Lane
Apt. 101
Norwood, MA 02062

Mr. Konatham:

Because of recent circumstances, we would like to remind you of the terms of your work order for Shakti Solutions ("Shakti") with Deloitte Consulting dated August 25, 2013 ("Work Order") (attached hereto as Attachment A).  The Work Order requires you to complete a non-disclosure agreement, which was executed on April 12, 2012 ("NDA") (attached hereto as Attachment B).  Specifically, we wish to call your attention to Paragraph 3 of the NDA, which provides as follows:

"You agree that during your engagement to perform services hereunder and, to the extent permissible under applicable state law, for two years thereafter, you will not provide to any Deloitte Consulting client for whom Deloitte Consulting has contracted your services or any such client, or solicit or offer to provide to any such client or any contractor of any such client, any software, services, or other products related to your services hereunder without the advance written consent of Deloitte Consulting."

Additionally, your Work Order provides that the terms of the Subcontract Agreement (#DT-0324) between Shakti and Deloitte Consulting dated as of December 23, 2002 (the "Subcontract") are incorporated by reference.  In particular, there are non-compete sections of the Subcontract, which prevent Shakti from providing to the relevant client or any contractor of such client any software, services, or other products related to the relevant client contract without Deloitte Consulting's consent. In particular, Section 3(b) of the Subcontract provides as follows:

"Subcontractor will not interfere with or impede the contractual relationship between any Client and Deloitte Consulting or suggest or cause any Client to modify, cancel, or fail to renew or extend any Contract with Deloitte Consulting.  During the term of this Agreement and for two years thereafter, Subcontractor will not provide to any Client or contractor of any Client, or solicit or offer to provide to any Client or contractor of any Client, any software, services, or other products related to a Contract without the advance written consent of Deloitte Consulting…"

Member of
Deloitte Touche Tohmatsu Limited

MADUA00001264

# Deloitte

**Deloitte Consulting LLP**
2500 One PPG Place
Pittsburgh, PA 15222-5401
USA

Tel: +1 412 338 7200
Fax: +1 412 338 7380
www.deloitte.com

Further action may be taken if it is determined that you have been or become non-compliant with the Work Order and/or the Subcontract.  Should you wish to discuss this matter, please contact Kelly Blair, CWS Manager, at (412) 402-5184.

Sincerely,

Bert Maier
Director
Deloitte Consulting LLP

Member of
Deloitte Touche Tohmatsu Limited

MADUA00001265

# Deloitte.

Deloitte Consulting LLP
2500 One PPG Place
Pittsburgh, PA 15222-5401
USA

Tel: +1 412 338 7200
Fax: +1 412 338 7380
www.deloitte.com

Attachment A

# Deloitte.

**EXHIBIT A**

Form of Work Order

**MA-Commonwealth of Massachusetts-QUEST**

This Work Order incorporates the terms and conditions of the Subcontractor Agreement between Deloitte Consulting LLP ("Deloitte Consulting") and _Shakti Group Inc._ ("Subcontractor") dated 12/23/2002 (Contract # DT-0324). In the event that this Work Order conflicts with any provision of the Subcontractor Agreement, the terms of this Work Order will control. Until a new Work Order is executed, the previous Work Order remains in effect.

**1. List of Subcontractor Personnel Assigned to Perform Services/Billing Rate**
Services will be provided by Subcontractor on behalf of Deloitte Consulting for the Client engagement referenced above.

| Name | Role | Individual's Actual Start Date | Individual's Work Order Start Date | Rate (Deloitte Accounting Period) | Overtime Rate (Hourly) |
|------|------|------|------|------|------|
| Konatham, Seshubabu | Developer | 3/27/2012 | 8/25/2013 | | N/A |

**2. Overtime**
The DC Accounting Period rate specified in this work order applies to all hours worked by the Subcontractor personnel, except as noted below in "Other Terms."

**3. Invoicing**
As per Section 4 of the Subcontractor Agreement, invoices will be generated by Deloitte Consulting's on line web portal at [http://subcontracting.deloitte.com] (the "Portal"). For Services performed under this Work Order, Subcontractor will generate an invoice for each Deloitte Consulting accounting period, the dates of which are displayed in the Portal. In order to generate the invoice, Subcontractor will input the information requested by the Portal relating to the Services, including, for example, a detailed statement of hours worked by each of Subcontractor's personnel assigned to perform the Services and information related to expenses incurred in connection with the Services. After the necessary information is inputted into the Portal and the timesheet is approved by both the Deloitte Consulting project manager and Subcontractor, the Portal will generate an invoice that will be electronically submitted to Deloitte Consulting. Each approved invoice will be paid no later than 52 days after Deloitte Consulting's receipt thereof, notwithstanding anything to the contrary in the Subcontractor Agreement. All payments made hereunder will be made by electronic method only, which includes, but is not limited to, Automated Clearing House (ACH) and Domestic Money Transfer (DMF). For all invoices, Subcontractor will be charged a Portal user fee equal to (1.5%) of the fees due to Subcontractor under such invoice, which such fee the Portal will automatically deduct from the total amount to be invoiced to Deloitte Consulting.

**4. Electronic Execution**

The parties hereby acknowledge and agree that this Work Order may also be executed by the parties' authorized representatives by means of logging into the Portal via use of a unique Portal ID and password and electronically checking the relevant "approve" box on the Portal (by clicking the appropriate button electronically) for this Work Order and that such checking of such approval box represents present intent to authenticate by an authorized representative of such party and shall constitute acceptance of the terms of this Work Order by such party.

Member of
Deloitte Touche Tohmatsu Limited

MADUA00001266

# Deloitte.

Deloitte Consulting LLP
2500 One PPG Place
Pittsburgh, PA 15222-5401
USA

Tel: +1 412 338 7200
Fax: +1 412 338 7380
www.deloitte.com

**5. Other Terms**
a)      Reasonable out-of-pocket expenses approved in writing in advance by Deloitte Consulting project management and incurred by Subcontractor in performing the Services will be billed separately and will be subject to reimbursement in accordance with the applicable expense policies in force on the project. Subcontractor must be able to produce expense receipts upon request.
b)      Subcontractor will only be paid fees for time spent performing the Services.  Sick, vacation, or other time off will not be paid. The Portal will automatically calculate the amount due to Subcontractor for actual time spent performing the Services (eliminating sick, vacation, or other time off) after the timesheet for that DC Accounting Period is completed. The Portal will derive a daily rate and then will multiply this daily rate by the number of billable days for that specific period.
c)      Two week guarantee:  If a Subcontractor personnel does not meet the expectations of Deloitte Consulting project management within the first two weeks (10 business days) of their assignment, s/he will be removed from the project immediately upon Deloitte Consulting's request and Subcontractor will not bill Deloitte Consulting, and Deloitte Consulting will not be responsible for paying, for any fees or expenses related to this assignment.
d)      Subcontractor agrees to provide Deloitte Consulting with the Deloitte Consulting Non-Disclosure Agreement (Exhibit B) signed by the Subcontractor resource assigned to perform the Services hereunder by sending the signed agreement within 5 business days of Subcontractor's approval of the Work Order. The signed agreement can be faxed to 412.402.2880 or emailed to subcontracting@deloitte.com.
e)      Description of Services: Converts a design into a complete information system. Includes acquiring and installing systems environment; creating and testing databases; preparing test case procedures; preparing test files; coding, compiling, and refining programs.
f)      Project Location: 19 Staniford Street, Boston, MA  02114

Approved By:

Greer, Scott

**Deloitte Consulting LLP**

9/27/2013 1:10:00 PM

Ram Srinivasan

**Shakti Group Inc.**

9/27/2013 2:56:00 PM

2

Member of
Deloitte Touche Tohmatsu Limited

MADUA00001267

# Deloitte.

**Deloitte Consulting LLP**
2500 One PPG Place
Pittsburgh, PA 15222-5401
USA

Tel: +1 412 338 7200
Fax: +1 412 338 7380
www.deloitte.com

Attachment B

## Deloitte Consulting

Deloitte Consulting LLP

### EXHIBIT B

### AGREEMENT REGARDING NON-DISCLOSURE OF INFORMATION; OWNERSHIP OF WORK PRODUCT; NON-COMPETE

You will be performing services for Deloitte Consulting LLP ("Deloitte Consulting") in connection with either an engagement for a client of Deloitte Consulting ("Client") or an internal project of Deloitte Consulting. For the purposes of these terms, "Deloitte Consulting" shall mean Deloitte Consulting LLP and its subsidiaries, successors and assigns.

1. In performing these services, you will have access to proprietary and confidential information of Deloitte Consulting and/or the Client and, in order to permit Deloitte Consulting to provide you with such access, you agree that:

   (a) Any information delivered or disclosed by Deloitte Consulting, the Client, or others acting on its or their behalf, to you incidental to or in connection with performance of the services, whether such delivery or disclosure occurred before or after execution of this Agreement (collectively, the "Confidential Information"), shall be and remain the property of Deloitte Consulting or the Client. Such Confidential Information includes without limitation any information concerning Deloitte Consulting's or the Client's business, plans, operations, products, methods, procedures, customers, services, equipment, systems, and facilities and proprietary information, regardless of the form or method of communication.

   (b) Confidential Information shall be used by you only to the extent necessary for performance of the services and may be duplicated for or disclosed to only those persons within your organization having a need to know for purposes of performance of your services. You shall not disclose the Confidential Information to any third party and shall accord to all Confidential Information such protection as is necessary to prevent any other use, duplication, or disclosure, which protection shall be no less than a reasonable degree of care. Upon completion of performance or termination of the services, you shall deliver to Deloitte Consulting or its authorized representative all items embodying Confidential Information then in your possession or shall certify that all such items have been destroyed.

   (c) The restrictions set forth above shall apply, notwithstanding the completion or the termination of your services, until such time as you can establish that such information is known to the general public provided such knowledge is not due to your acts or omissions.

2. With respect to the work product prepared by you during the course of your services, you agree that:

   (a) Deloitte Consulting shall own all work product produced by you hereunder, including, without limitation, deliverables, computer programs (source code and object code), programming aids and tools, documentation, reports, data, designs, concepts, know-how, and other information, whether copyrightable or patentable or not (collectively, "Work Product"). Such work product shall be deemed to be "works made for hire." To the extent that any of the Work Product may not, by operation of law, be "works made for hire," you hereby assign to Deloitte Consulting all ownership rights, including, without limitation, intellectual property rights, in such Work Product. Deloitte Consulting shall have the right to obtain and hold copyrights, patent rights, registrations and similar protection which may be available for such work product. You agree to give Deloitte Consulting such assistance as may be reasonably required to perfect such rights.

   (b) To the extent that any of your preexisting materials are contained in the Work Product, you hereby grant to Deloitte Consulting an irrevocable, worldwide, perpetual, royalty-free license to such preexisting materials. Such license includes, without limitation, the right to use, execute, reproduce, display, perform, distribute (internally and externally) copies of, and prepare derivative works based upon, such

Member of
Deloitte Touche Tohmatsu Limited

MADUA00001268

# Deloitte.

**Deloitte Consulting LLP**
2500 One PPG Place
Pittsburgh, PA 15222-5401
USA

Tel: +1 412 338 7200
Fax: +1 412 338 7380
www.deloitte.com

preexisting materials and derivative works thereof. You acknowledge and agree that Deloitte Consulting may transfer such rights to others without your approval.

(c) Except for preexisting materials, you have no rights or license to use, publish, reproduce, prepare derivative works based upon, distribute, perform or display any Work Product.

(d) You warrant and represent (i) that the Work Product shall be your original work and will not infringe upon or violate any patent, copyright, trade secret, contractual or any other proprietary right of others; (ii) that there exist no known rights, claims, causes of action or other legal rights or impediments; and (iii) that Deloitte Consulting's rights in such Work Product, as hereinbefore set forth, shall be free and clear of any encumbrances, liens, claims, judgments, causes of action or other legal rights or impediments.

(e) Your and Deloitte Consulting's rights and obligations in respect of all Work Product shall survive the completion or the termination of your services.

3. You agree that during your engagement to perform services hereunder and, to the extent permissible under applicable state law, for two years thereafter, you will not provide to any Deloitte Consulting client for whom Deloitte Consulting has contracted your services or any contractor of any such client, or solicit or offer to provide to any such client or any contractor of any such client, any software, services, or other products related to your services hereunder without the advance written consent of Deloitte Consulting.

I acknowledge that I have read, that I understand, and that I agree to the foregoing.

Name:        Seshubabu Konatham

Signature:   _____

Date:        04 | 12 | 12

Subcontractor:   Shakti Group Inc.

Client:      Commonwealth of Massachusetts

2

Member of
Deloitte Touche Tohmatsu Limited

MADUA00001269

# Exhibits 41 through 43 Redacted in Their Entirety

# Exhibit 44

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| DELOITTE CONSULTING LLP and<br>DELOITTE DEVELOPMENT LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SAGITEC SOLUTIONS, LLC,<br><br>Defendant. | C.A. No. 23-325-WCB<br><br>**DEMAND FOR JURY TRIAL** |

**DELOITTE'S RESPONSES AND OBJECTIONS TO SAGITEC**
**SOLUTIONS LLC'S FIRST SET OF REQUESTS FOR ADMISSION**

Pursuant to Federal Rules of Civil Procedure 26 and 36 and the Local Rules of the United States District Court for the District of Delaware (the "Local Rules" and each a "Local Rule"), Plaintiffs Deloitte Consulting LLP and Deloitte Development LLC (collectively "Deloitte"), hereby respond to Defendant Sagitec Solutions, LLC's ("Sagitec" or "Defendant") First Set of Requests for Admission, served on March 1, 2024 (the "Requests" and each individually, a "Request") in the above-captioned action ("Action") as follows:

**GENERAL OBJECTIONS**

1.    Deloitte objects to the Requests to the extent that they purport to impose obligations beyond those set forth in the Federal Rules of Civil Procedure, the Local Rules, or other applicable law.

2.    Deloitte objects to the Requests to the extent that they seek proprietary or confidential business information, trade secrets, or other sensitive information. To the extent that a response to any Request requires the disclosure of any non-privileged proprietary or confidential information, trade secrets, or other sensitive information, Deloitte will provide such information subject to the provisions in the Protective Order ordered by the Court in this case.

D.I. 70 ("Protective Order").  By responding to the Requests, Deloitte does not waive, intends to preserve, and is preserving all of its rights to assert that any and all such information is confidential.  Information furnished by Deloitte shall be used only in connection with this Action and shall not be disclosed, in whole or in part, to any person or entity apart from the parties and their representatives in this Action, and only as permitted by the Protective Order.

3.      Deloitte objects to the Requests to the extent that they seek information that is subject to the attorney-client privilege, the work-product privilege, or any other applicable privilege or protection under federal or state law.  Deloitte does not waive, intends to preserve, and is preserving any such privilege with respect to any information protected by such privilege.

4.      Deloitte objects to the Requests and Sagitec's definitions to the extent they purport to alter the plain meaning and/or scope of any specific Request, on the grounds that such alteration renders the Request vague, ambiguous, unduly broad, and/or uncertain by failing to adequately define terms or by using terms the meaning of which are not readily available or decipherable.  The responses provided to the Requests are based on Deloitte's interpretation of the language used in the Requests.

5.      Deloitte objects to the Requests to the extent that they seek information that is outside of Deloitte's possession, custody, or control.  For the purposes of responding to the Requests, Deloitte will provide responses based on the information that is reasonably within its possession, custody, or control.

6.      Deloitte objects to any factual characterizations or implications within these Requests.  By responding, Deloitte does not accept or admit any of Sagitec's factual characterizations or implications.

7.      Deloitte objects to the Requests to the extent that they unfairly seek to restrict the facts upon which Deloitte may rely at trial.  Discovery has not been completed and Deloitte is

not necessarily in possession of all the facts and documents upon which Deloitte intends to rely. The responses submitted herewith are tendered to Sagitec with the reservation that responses are submitted without limiting the evidence on which Deloitte may rely to support the contentions they may assert at the trial on this Action and to rebut or impeach the contentions, assertions, and evidence that Sagitec may present.

8.      Deloitte reserves the right to modify and/or supplement its objections and responses to the Requests to conform to the results of continuing discovery and factual investigation in this matter.  These responses also are subject to correction for omissions or errors.

9.      In providing responses to the Requests, Deloitte does not in any way waive or intend to waive, but rather is preserving and intends to preserve:

(i)      All objections as to competency, authenticity, relevancy, materiality and admissibility;

(ii)     All rights to object on any grounds to the use in any subsequent proceedings of any of the responses or information contained herein, including but not limited to the right to object at the trial of this or any other action;

(iii)    All objections as to vagueness and ambiguity; and

(iv)     All rights to object on any grounds to any further Requests.

10.     Deloitte objects to the Requests as premature to the extent that they ask or require Deloitte to provide information that is the subject of expert disclosures under Federal Rule of Civil Procedure 26(a)(2) before the deadlines for expert discovery set by the Scheduling Order. D.I. 51 ("Scheduling Order").

11.     Deloitte objects to the Requests to the extent that they are premature in that they ask or require Deloitte to analyze or formulate admissions on matters for which Deloitte's

- 3 -

investigation and discovery have not yet been completed.  The responses provided below are based on the investigation conducted to date and are without prejudice to any later supplementation, amendment, or modification.

12.    Deloitte objects to the Requests to the extent that they seek information that is or will be in the possession of Sagitec by referring to documents, taking depositions, or other means of obtaining discovery in this Action that are more convenient, efficient, practical, and less burdensome.

13.    Deloitte objects to the Requests as overly broad and unduly burdensome, to the extent that the terms "Deloitte," "Plaintiffs," "You," and "Your" include "any affiliated entities" and "other persons from whom Deloitte has the alleged legal right to obtain the information sought by this discovery."  For purposes of responding to the Requests, Deloitte will construe the terms "Deloitte," "Plaintiffs," "You," and "Your" to mean Deloitte Consulting LLP, Deloitte Development LLC, and BearingPoint, Inc., as limited to its North American public services business that was acquired by Deloitte in 2009.

14.    Deloitte objects to the Requests as overly broad and unduly burdensome to the extent that the terms "Defendant" and "Sagitec" include "its affiliates, representatives, and agents."  For purposes of responding to the Requests, Deloitte will construe the terms "Defendant" and "Sagitec" to mean Sagitec Solutions LLC.

15.    Deloitte objects to the Requests as vague and ambiguous to the extent that the term "Asserted Trade Secret Material" replaces a term from the Complaint.  For purposes of responding to the Requests, Deloitte will construe the term "Asserted Trade Secret Material" as having the definition of the term "uFACTS Trade Secrets" used in Deloitte's Complaint, which includes the uFACTS Application, uFACTS Design, and uFACTS Framework.

16.     Deloitte objects to the Requests as overly broad and unduly burdensome to the extent that the term "Software Design Document(s)" is broadly defined to mean "documents used or generated to developing [*sic*] software, including software specifications and requirements at any level of detail, functional specifications, class specifications and guides, coding style guides, design documents, design and/or change documents for adding in features to existing code base or feature, implementation documents/guides, story boards, application guides, programmer reference guides, reference manuals, software architecture guides, verification and test plans, hierarchical summaries, simulation models for software or features, design review documents, code review documents, Agile development documents, as well as all notes created during software design."  For purposes of responding to the Requests, Deloitte will construe the term "Software Design Document(s)" to mean requirement specifications, reference guides and manuals, and architecture design documents that describe the implementation, structure, architecture, and development process for the software described in the particular Request.

17.     Deloitte objects to the Requests as vague and ambiguous to the extent that the term "Content" replaces a term from the Complaint.  For purposes of responding to the Requests, Deloitte will construe the term "Content" as having the definition of the term "uFACTS Computer Program" used in Deloitte's Complaint, which "includes source code, libraries, configurations, settings, logic, routines, scripts, and database schemas (as embodied in data dictionaries)."

18.     Deloitte objects to the Requests as vague and ambiguous to the extent that the term "Deposit" is defined to include anything other than the deposits submitted to the Copyright Office for Registration Nos. TX 8-559-593, TX 8-559-594, and TX 8-559-595.  For purposes of responding to the Requests, Deloitte will construe the term "Deposit" as only materials that were

submitted to the Copyright Office as part of the application to register the uFACTS Computer Program that resulted in Registration Nos. TX 8-559-593, TX 8-559-594, and TX 8-559-595.

19.     Deloitte objects to the Requests as vague and ambiguous to the extent that the term "Preexisting Material" replaces and conflates terms used on the face of the certificates of registration for Registration Nos. TX 8-559-593, TX 8-559-594, and/or TX 8-559-595.  For purposes of responding to the Requests, Deloitte will construe the term "Preexisting Material" to mean "licensed code" or "prior published code and licensed code" as those terms are used in each Certificate of Registration.

20.     Deloitte objects to the Requests as vague and ambiguous to the extent that the term "RFP" includes requests other than requests for proposals.  For purposes of responding to the Requests, Deloitte will construe the term "RFP" to mean requests for proposals.

21.     Deloitte objects to the Requests as overly broad and unduly burdensome to the extent that each of Sagitec's three definitions for the terms "Identify" and "Describe" would call for information that is not relevant to any claim or defense or is otherwise not necessary to provide a response to the Requests.  Deloitte will provide such descriptions in response to appropriate Requests as necessary.

22.     Deloitte objects to the Requests as overly broad and unduly burdensome to the extent they do not specify timeframes and are, thus, unlimited as to time.

23.     Deloitte incorporates the foregoing General Objections into each and every one of its responses to the Requests as set forth below.

## RESPONSES AND OBJECTIONS TO REQUESTS FOR PRODUCTION

## REQUEST FOR ADMISSION NO. 1:

Admit Deloitte is not seeking its lost profits as a measure of damages for any alleged trade secret misappropriation by Sagitec.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

Deloitte incorporates by reference the above-stated General Objections as if fully set forth herein.  Deloitte objects to this Request as overly broad, unduly burdensome, vague, and ambiguous at least because the phrase "lost profits" and "measure of damages" are unclear and undefined.  Deloitte objects to this Request to the extent that it prematurely seeks information that will be part of expert discovery, and will provide such information pursuant to the Scheduling Order ordered by the Court in this case.  D.I. 51.  Deloitte objects to this Request as requiring Deloitte to admit or deny opinions and conclusions of law.  *See* Fed. R. Civ. P. 36(a); *Medigus Ltd. v. Endochoice, Inc.*, No. CV 15-505-LPS-CJB, 2016 WL 5791409, at *3–4 (D. Del. July 19, 2016) (holding that plaintiff does not need to respond to RFAs that improperly seek legal conclusions).

Subject to, as limited by, and without waiving the foregoing objections, Deloitte denies this Request.


**REQUEST FOR ADMISSION NO. 2:**

Admit Deloitte is not seeking its lost profits as a measure of damages for any alleged copyright infringement by Sagitec.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Deloitte incorporates by reference the above-stated General Objections as if fully set forth herein.  Deloitte objects to this Request as overly broad, unduly burdensome, vague, and ambiguous at least because the phrase "lost profits" and "measure of damages" are unclear and undefined.  Deloitte objects to this Request to the extent that it prematurely seeks information that will be part of expert discovery, and will provide such information pursuant to the Scheduling Order ordered by the Court in this case.  D.I. 51.  Deloitte objects to this Request as requiring Deloitte to admit or deny opinions and conclusions of law.  *See* Fed. R. Civ. P. 36(a); *Medigus Ltd. v. Endochoice, Inc.*, No. CV 15-505-LPS-CJB, 2016 WL 5791409, at *3–4 (D.

- 7 -

Del. July 19, 2016) (holding that plaintiff does not need to respond to RFAs that improperly seek legal conclusions).

Subject to, as limited by, and without waiving the foregoing objections, Deloitte denies this Request.

## REQUEST FOR ADMISSION NO. 3:

Admit Deloitte is not seeking its lost profits as a measure of damages for any claim of unfair competition by Sagitec.

## RESPONSE TO REQUEST FOR ADMISSION NO. 3:

Deloitte incorporates by reference the above-stated General Objections as if fully set forth herein. Deloitte objects to this Request as overly broad, unduly burdensome, vague, and ambiguous at least because the phrase "lost profits" and "measure of damages" are unclear and undefined. Deloitte objects to this Request to the extent that it prematurely seeks information that will be part of expert discovery, and will provide such information pursuant to the Scheduling Order ordered by the Court in this case. D.I. 51. Deloitte objects to this Request as requiring Deloitte to admit or deny opinions and conclusions of law. *See* Fed. R. Civ. P. 36(a); *Medigus Ltd. v. Endochoice, Inc.*, No. CV 15-505-LPS-CJB, 2016 WL 5791409, at *3–4 (D. Del. July 19, 2016) (holding that plaintiff does not need to respond to RFAs that improperly seek legal conclusions).

Subject to, as limited by, and without waiving the foregoing objections, Deloitte denies this Request.

## REQUEST FOR ADMISSION NO. 4:

Admit Deloitte is not seeking its lost profits as a measure of damages for any claim of unjust enrichment by Sagitec.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Deloitte incorporates by reference the above-stated General Objections as if fully set forth herein.  Deloitte objects to this Request as overly broad, unduly burdensome, vague, and ambiguous at least because the phrase "lost profits" and "measure of damages" are unclear and undefined.  Deloitte objects to this Request to the extent that it prematurely seeks information that will be part of expert discovery, and will provide such information pursuant to the Scheduling Order ordered by the Court in this case.  D.I. 51.  Deloitte objects to this Request as requiring Deloitte to admit or deny opinions and conclusions of law.  *See* Fed. R. Civ. P. 36(a); *Medigus Ltd. v. Endochoice, Inc.*, No. CV 15-505-LPS-CJB, 2016 WL 5791409, at *3–4 (D. Del. July 19, 2016) (holding that plaintiff does not need to respond to RFAs that improperly seek legal conclusions).

Subject to, as limited by, and without waiving the foregoing objections, Deloitte denies this Request.

**REQUEST FOR ADMISSION NO. 5:**

Admit that Deloitte makes no claim of Literal Copying in This Litigation.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Deloitte incorporates by reference the above-stated General Objections as if fully set forth herein.  Deloitte objects to this Request as requiring Deloitte to admit or deny opinions and conclusions of law.  *See* Fed. R. Civ. P. 36(a); *Medigus Ltd. v. Endochoice, Inc.*, No. CV 15-505-LPS-CJB, 2016 WL 5791409, at *3–4 (D. Del. July 19, 2016) (holding that plaintiff does not need to respond to RFAs that improperly seek legal conclusions).

Subject to, as limited by, and without waiving the foregoing objections, Deloitte denies this Request.

**REQUEST FOR ADMISSION NO. 6:**

Admit that Deloitte did not submit any bid or response to an RFP for the 2014 District of Columbia Employer Self-Service Portal Project.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Deloitte incorporates by reference the above-stated General Objections as if fully set forth herein.  Deloitte objects to this Request as overly broad, unduly burdensome, vague, and ambiguous at least because the phrase "bid or response" is unclear and undefined.  Deloitte objects to this Request as vague and ambiguous because the phrase "2014 District of Columbia Employer Self-Service Portal Project" is unclear.

Subject to, as limited by, and without waiving the foregoing objections, Deloitte admits that Deloitte did not submit an RFP response in connection with the District of Columbia Employer Self-Service Portal Project in or about 2014.

**REQUEST FOR ADMISSION NO. 7:**

Admit that Deloitte did not submit any bid or response to an RFP for the 2015 Maryland and West Virginia Consortium Unemployment Insurance Tax and Benefits Project.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Deloitte incorporates by reference the above-stated General Objections as if fully set forth herein.  Deloitte objects to this Request as overly broad, unduly burdensome, vague, and ambiguous at least because the phrase "bid or response" is unclear and undefined.  Deloitte objects to this Request as vague and ambiguous because the phrase "2015 Maryland and West Virginia Consortium Unemployment Insurance Tax and Benefits Project" is unclear.

Subject to, as limited by, and without waiving the foregoing objections, Deloitte admits that Deloitte did not submit an RFP response in connection with the Maryland and West Virginia Consortium Unemployment Insurance Tax and Benefits Project in or about 2015.

**REQUEST FOR ADMISSION NO. 8:**

Admit that Deloitte did not submit any bid or response to an RFP for the 2016 South Carolina Unemployment Insurance Tax Project.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Deloitte incorporates by reference the above-stated General Objections as if fully set forth herein. Deloitte objects to this Request as overly broad, unduly burdensome, vague, and ambiguous at least because the phrase "bid or response" is unclear and undefined. Deloitte objects to this Request as vague and ambiguous because the phrase "2016 South Carolina Unemployment Insurance Tax Project" is unclear.

Subject to, as limited by, and without waiving the foregoing objections, Deloitte admits that Deloitte did not submit an RFP response in connection with the South Carolina Unemployment Insurance Tax Project in or about 2016.

**REQUEST FOR ADMISSION NO. 9:**

Admit that Deloitte did not submit any bid or response to an RFP for the 2016 District of Columbia Unemployment Insurance Tax Project.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Deloitte incorporates by reference the above-stated General Objections as if fully set forth herein. Deloitte objects to this Request as overly broad, unduly burdensome, vague, and ambiguous at least because the phrase "bid or response" is unclear and undefined. Deloitte objects to this Request as vague and ambiguous because the phrase "2016 District of Columbia Unemployment Insurance Tax Project" is unclear.

Subject to, as limited by, and without waiving the foregoing objections, Deloitte denies this Request.

**REQUEST FOR ADMISSION NO. 10:**

Admit that Deloitte did not submit any bid or response to an RFP for the 2016 Ohio Unemployment Insurance Tax and Benefits Project.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Deloitte incorporates by reference the above-stated General Objections as if fully set forth herein. Deloitte objects to this Request as overly broad, unduly burdensome, vague, and ambiguous at least because the phrase "bid or response" is unclear and undefined. Deloitte objects to this Request as vague and ambiguous because the phrase "2016 Ohio Unemployment Insurance Tax and Benefits Project" is unclear.

Subject to, as limited by, and without waiving the foregoing objections, Deloitte admits that Deloitte did not submit an RFP response in connection with the Ohio Unemployment Insurance Tax and Benefits Project in or about 2016.

**REQUEST FOR ADMISSION NO. 11:**

Admit that Deloitte did not submit any bid or response to an RFP for the 2020 Maryland Pandemic Unemployment Insurance Project.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

Deloitte incorporates by reference the above-stated General Objections as if fully set forth herein. Deloitte objects to this Request as overly broad, unduly burdensome, vague, and ambiguous at least because the phrase "bid or response" is unclear and undefined. Deloitte objects to this Request as overly broad, unduly burdensome, vague, and ambiguous to the extent there was no published RFP or open bidding process for the Maryland Pandemic Unemployment Insurance Project in or about 2020. Deloitte objects to this Request as vague and ambiguous because the phrase "2020 Maryland Pandemic Unemployment Insurance Project" is unclear.

Subject to, as limited by, and without waiving the foregoing objections, Deloitte admits that Deloitte did not submit an RFP response in connection with the Maryland Pandemic

Unemployment Insurance Project in or about 2020, and also states that there would have been no opportunity to submit an RFP response in connection with such project because it was offered to Sagitec as a sole-source contract.

**REQUEST FOR ADMISSION NO. 12:**

Admit that Deloitte did not submit any bid or response to an RFP for the 2020 Delaware Pandemic Unemployment Insurance Project.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

Deloitte incorporates by reference the above-stated General Objections as if fully set forth herein. Deloitte objects to this Request as overly broad, unduly burdensome, vague, and ambiguous at least because the phrase "bid or response" is unclear and undefined. Deloitte objects to this Request as overly broad, unduly burdensome, vague, and ambiguous to the extent there was no published RFP or public bidding process for the Delaware Pandemic Unemployment Insurance Project in or about 2020. Deloitte objects to this Request as vague and ambiguous because the phrase "2020 Delaware Pandemic Unemployment Insurance Project" is unclear.

Subject to, as limited by, and without waiving the foregoing objections, Deloitte admits that Deloitte did not submit an RFP response in connection with the Delaware Pandemic Unemployment Insurance Project in or about 2020, and states that there would have been no opportunity to submit an RFP response in connection with such project because it was offered to Sagitec as a sole-source contract.

**REQUEST FOR ADMISSION NO. 13:**

Admit that Deloitte did not submit any bid or response to an RFP for the 2021 Texas Unemployment Insurance Tax and Benefits Project.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

Deloitte incorporates by reference the above-stated General Objections as if fully set forth herein.  Deloitte objects to this Request as overly broad, unduly burdensome, vague, and ambiguous at least because the phrase "bid or response" is unclear and undefined.  Deloitte objects to this Request as vague and ambiguous because the phrase "2021 Texas Unemployment Insurance Tax and Benefits Project" is unclear.

Subject to, as limited by, and without waiving the foregoing objections, Deloitte admits that Deloitte did not submit an RFP response in connection with the Texas Unemployment Insurance Tax and Benefits Project in or about 2021, and states that Deloitte submitted an RFI response to the Texas Workforce Commission in connection with a potential unemployment insurance modernization project.  *See* DEL00337634.

**REQUEST FOR ADMISSION NO. 14:**

Admit that Deloitte did not submit any bid or response to an RFP for the 2022 North Carolina Unemployment Insurance Tax Project.

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

Deloitte incorporates by reference the above-stated General Objections as if fully set forth herein.  Deloitte objects to this Request as overly broad, unduly burdensome, vague, and ambiguous at least because the phrase "bid or response" is unclear and undefined.  Deloitte objects to this Request as overly broad, unduly burdensome, vague, and ambiguous to the extent there was published RFP or public bidding process for the North Carolina Unemployment Insurance Tax Project in or about 2022.  Deloitte objects to this Request as vague and ambiguous because the phrase "2022 North Carolina Unemployment Insurance Tax Project" is unclear.

Subject to, as limited by, and without waiving the foregoing objections, Deloitte admits that Deloitte did not submit an RFP response in connection with the North Carolina Unemployment Insurance Tax Project in or about 2022, and states that there would have been no

opportunity to submit an RFP response in connection with such project because it was offered to Sagitec as a sole-source contract.

**REQUEST FOR ADMISSION NO. 15:**

Admit that none of the documents You cited in Appendix A to your supplemental response to Sagitec's Interrogatory No. 1, except for DEL00037282, was labeled "confidential" on their face before This Litigation.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

Deloitte incorporates by reference the above-stated General Objections as if fully set forth herein. Deloitte objects to this Request as overly broad, unduly burdensome, vague, and ambiguous at least because the phrase "on their face" is unclear and undefined. Deloitte further objects to this Request as irrelevant to the parties' claims and defenses in this Action.

Subject to, as limited by, and without waiving the foregoing objections, Deloitte admits that the documents identified in Appendix A are not marked "confidential" within the document themselves, but states that the documents are labeled both as originating from Deloitte and as part of the uFACTS Solution, which is labeled "confidential," "highly confidential," and/or "trade secret" throughout the various agreements and contracts applicable to each uFACTS project. *E.g.,* DEL00067743 at '755–57; DEL00407140 at '141; DEL00625494 at '497, '507; DEL00066263 at '272–75; DEL00066174 at '175–76; DEL00067567 at '595–96; DEL00066092 – DEL00066176.

**REQUEST FOR ADMISSION NO. 16:**

Admit that none of the documents You cited in Appendix B to your supplemental response to Sagitec's Interrogatory No. 1 was labeled "confidential" on the document before This Litigation.

- 15 -

**RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

Deloitte incorporates by reference the above-stated General Objections as if fully set forth herein.  Deloitte further objects to this Request as irrelevant to the parties' claims and defenses in this Action.

Subject to, as limited by, and without waiving the foregoing objections, Deloitte admits that the documents identified in Appendix B are not marked "confidential" within the document themselves, but states that the documents are labeled both as originating from Deloitte and as part of the uFACTS Solution, which is labeled "confidential," "highly confidential," and/or "trade secret" throughout the various agreements and contracts applicable to each uFACTS project.  *E.g.,* DEL00067743 at '755–57; DEL00407140 at '141; DEL00625494 at '497, '507; DEL00066263 at '272–75; DEL00066174 at '175–76; DEL00067567 at '595–96; DEL00066092 – DEL00066176.

**REQUEST FOR ADMISSION NO. 17:**

Admit that none of the documents You cited by Bates number in the body of your supplemental response to Sagitec's Interrogatory No. 1 (i.e., excluding Appendices A and B) was labeled "confidential" on the document before This Litigation.

**RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

Deloitte incorporates by reference the above-stated General Objections as if fully set forth herein.  Deloitte further objects to this Request as irrelevant to the parties' claims and defenses in this Action.

Subject to, as limited by, and without waiving the foregoing objections, Deloitte admits that the documents identified in Deloitte's supplemental response to Sagitec's Interrogatory No. 1 are not marked "confidential" within the document themselves, but states that the documents are labeled both as originating from Deloitte and as part of the uFACTS Solution, which is labeled "confidential" or "highly confidential" throughout the various agreements and contracts

for each uFACTS project. *E.g.,* DEL00067743 at '755–57; DEL00407140 at '141;

DEL00625494 at '497, '507; DEL00066263 at '272–75; DEL00066174 at '175–76;

DEL00067567 at '595–96; DEL00066092 – DEL00066176.

Dated:  April 1, 2024

/s/ Patrick Arnett

Patrick Arnett

Andrew E. Russell (No. 5382)
John W. Shaw (No. 3362)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com

*Attorneys for Plaintiffs Deloitte Consulting LLP, and Deloitte Development LLC*

OF COUNSEL:

Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Gregg F. LoCascio
Patrick Arnett
Nick Teleky
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave NW
Washington, DC 20004
(202) 389-5000

John F. Hartmann
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 1, 2024, I caused a true and correct copy of the foregoing

Document to be served on the following counsel of record via electronic mail:


Anne Shea Gaza (No. 4093)
Robert Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
thartzell@ycst.com

Christopher K. Larus
David A. Prange
Rajin S. Olson
Brandon A. Carmack
ROBINS KAPLAN LLP
8000 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500
clarus@robinskaplan.com
dprange@robinskaplan.com
rolson@robinskaplan.com
bcarmack@robinskaplan.com



*/s/ Patrick Arnett*
Patrick Arnett

# Exhibits 45 through 52 Redacted in Their Entirety

# Exhibit 53

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DELOITTE CONSULTING LLP and
DELOITTE DEVELOPMENT LLC,

        Plaintiffs,

    v.

SAGITEC SOLUTIONS LLC,

        Defendant.

C.A. No. 23-325-WCB

**DEMAND FOR JURY TRIAL**

## DELOITTE'S NOTICE OF DEPOSITION OF DEFENDANT SAGITEC SOLUTIONS LLC PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(B)(6)

PLEASE TAKE NOTICE that commencing on a date and at a location to be agreed upon by the parties, and following a good faith conference concerning the matters for examination, Plaintiffs Deloitte Consulting LLP and Deloitte Development LLC ("Plaintiffs" or "Deloitte"), will take the deposition of the corporate designee(s) of Defendant Sagitec Solutions LLC ("Defendant" or "Sagitec") by oral examination, pursuant to Federal Rule of Civil Procedure 30(b)(6). Sagitec must designate one or more persons as Sagitec's representative(s) to testify on its behalf as to each of the topics identified in **Attachment A**.

The deposition will take place before a Notary Public or other officer authorized by law to administer oaths and will continue from day to day until completed, with such adjournments as to time and place as may be necessary. The deposition testimony shall be recorded by both audiovisual and stenographic means.



EXHIBIT
Ex. 1

Dated:  April 18, 2024

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com

/s/ Patrick Arnett
Patrick Arnett

OF COUNSEL:
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Gregg F. LoCascio
Patrick Arnett
Nick Teleky
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave NW
Washington, DC 20004
(202) 389-5000

John F. Hartmann
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

*Attorneys for Plaintiffs Deloitte Consulting LLP, and Deloitte Development LLC*

## ATTACHMENT A

### DEFINITIONS

Unless otherwise defined, all words and phrases used herein shall be accorded their usual meaning and shall be interpreted in their common, ordinary sense. These Requests incorporate the following Definitions, which shall apply throughout these Definitions, Instructions, and Requests wherever a defined term is used, without regard to its capitalization:

1.    "And" and "or" shall each be construed conjunctively and disjunctively, so as to give the broadest meaning possible.

2.    "Any" and "all" are interchangeable and shall each be construed to mean "each and every," so as to give the broadest meaning possible.

3.    "Client" or "Customer" means any past, present, or prospective customer to whom software or a solution has been marketed, offered, licensed, delivered, or sold, including without limitation any State government, government agency, or regional or multi-State consortium of such States or agencies.

4.    "Communication" means any exchange of information by any method of transmission, sending, or receipt of information of any kind by or through any means including without limitation speech, writings, Documents, language (machine, foreign, or otherwise) of any kind, computer electronics or electronic data, email, text message, instant message, sound, radio or video signals, telecommunication, telephone, teletype, facsimile, telegram, microfilm, microfiche, photographic film of all types or other media of any kind, and includes all Documents and ESI containing, summarizing, or memorializing any Communication.

5.    "Complaint" means the Complaint filed by Deloitte in this Litigation on March 23, 2023, and any amendments thereto.

6.     "Concerning," "concerns," "referring to," "regarding," "related to" and "relating to" mean discussing, describing, evidencing, constituting, reflecting, incorporating, effecting, including, pertaining to, relating to, or in any way connected with the subject matter of the Topic and should be construed in the broadest possible sense.

7.     "Criminal Proceeding" means the case captioned *United States v. Minkkinen*, No. 2:22-cr-163, filed August 23, 2022, in the Southern District of West Virginia, and any related proceedings or appeals.

8.     "Deloitte" or "Plaintiffs" refers to Deloitte Consulting LLP and Deloitte Development LLC and any of their former or current parents, subsidiaries, predecessors, successors, affiliated Entities, controlled Entities, joint ventures, related Entities, agents, attorneys, Employees, interns, representatives, assigns, directors, or officers, including without limitation BearingPoint, Inc.

9.     "Deloitte Agreement" means any agreement between Deloitte, on the one hand, and any Deloitte Customer or Deloitte Employee, on the other hand, including without limitation the confidentiality and intellectual property ownership agreements described in the Complaint.

10.    "Deloitte Employee" means any Employee of Deloitte's, including without limitation Deepak Ahuja, Rick Deshler, Julie Fett, Venkat Kakula, Harish Kumar Kanchanapally, Ranjith Kotcherlakota, Srinivas Kurra, Swamynathan Manikandan, Marcel Mascarenhas, David Minkkinen, Sindhu Nair, Bernt Peterson, Revathy Rajaraman, Praveen Rengaraj, Karthik Sadasivam, Sivaraman Sambasivam, Pankaj Sharma, Kathryn Sibbet, Patrik Svensson, Philip Tackett, Adam Taylor, Prabhu Tegur, Bala Venkat, and Regina Waldrep.

11.    "Deloitte Property" means any copyrighted works or trade secrets asserted in this Litigation, including without limitation the uFACTS Computer Program, the uFACTS Trade Secrets, and Documents that relate to or refer to uFACTS or bear indications that Deloitte

- 4 -

authored, contributed to, created, developed, or possessed the Document prior to Sagitec's possession of it.

12. "Document" and "Thing" shall each be given the fullest meaning under the Federal Rules of Civil Procedure. Documents include all material of every kind, source, and authorship in Your possession or known by You to exist, irrespective of whether the Document is one intended for or transmitted internally by You, or intended for or transmitted to any other Person. Documents include ESI, writings, publications, printed matter, drawings, graphical materials, graphs, charts, photographs, audiovisual or sound recordings, images, and other data or data compilations that are stored in any medium whatsoever from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form, as well as any tangible Things. The term also includes all appendices, schedules, exhibits, and other attachments, as well as related and relevant metadata for all ESI, including without limitation information about the Document's author, creation date, revision dates, tracked changes, and electronic comments. A draft or non-identical copy of a Document is a separate Document within the meaning of this term. Any Document with any part thereof bearing any annotations, comments, markings, notations, notes, "redlines," signatures or initials, stamps, or any textual or graphical information (whether handwritten, printed, or electronic) that is not part of the original electronic or physical copy is non-identical and therefore should be considered a separate Document. A Document is in Your possession, custody, or control if You have either actual physical possession of a Document or constructive possession of the Document. For the avoidance of doubt, the following are Documents: abstracts, advertisements, agreements, appointments, audits, booklets, books, brochures, calendars, calendar entries, charts, Communications (including without limitation those made via real-time collaboration tools, *e.g.,* Skype, Slack, Teams, and other chat or instant messaging platforms), correspondence, contracts,

- 5 -

data, database contents, database schemas, diagrams, diaries, document management systems (*e.g.*, Confluence, Google Docs, Google Drive, or SharePoint), drawings, emails, email attachments, expense reports, files, films, graphics, graphs, Internet or Intranet media or postings (*e.g.*, forum posts, comments, and wiki entries), invoices, journals, ledgers, logs (*e.g.*, access, call, change, error, event, server, telephone, and system logs), maps, meeting invitations and responses, memoranda, minutes, mockups, newspapers, notes, organizational charts, photographs, posters, presentations, printouts, project management artifacts (*e.g.*, Project or Visio files, Gantt charts, and Jira entries), recordings (including without limitation recorded meetings or presentations conducted via platforms such as Zoom or Blue Jeans), receipts, recitals, records, reports, research, resumes, schedules, server contents (*e.g.*, FTP, HTTP, NFS, SMB, or WebDAV); Source Code, spreadsheets, statements, storyboards, summaries (including without limitation those of conversations, data, interviews, negotiations, and financial or statistical information), tasks, text messages or their equivalent (*e.g.*, SMS, WhatsApp, and iMessage), time entries, to-do lists, voicemails, websites, whiteboards, working papers, and worksheets. An excerpt or portion of any of the foregoing is a separate Document.

13. "Employee" means any Person who acted or purported to act on behalf of another Person, including without limitation all past and present directors, officers, executives, principals, partners, agents, representatives, attorneys, accountants, independent contractors, advisors, and consultants of such other Person or Persons.

14. "Entity" means any business, proprietorship, firm, corporation, company, partnership, group, association, trade or industry association, non-profit, or governmental body or agency.

15. "Functionality" or "Functioning" means the technological and business processes that maintain, power, or otherwise enable a computer program or web-based service, including

without limitation all underlying software, Source Code, databases, servers, and other technology.

16.    "Include" and "including" shall be construed to mean include or including "but not limited to" or "without limitation," such that any list preceded by "include" or "including" should be read as a list of non-limiting examples within a broader category.

17.    "Internal Investigation" means Sagitec's investigation with respect to the subject matter of the Criminal Proceeding, as reflected in the report filed as Docket No. 146-6 in the Criminal Proceeding and any prior drafts or subsequent revisions thereto.

18.    "Investigator Testimony" means the May 31, 2023, grand jury testimony of Jim Powers, filed in the Criminal Proceeding as Docket No. 277-1.

19.    "Minkkinen Hard Drive" means the hard drive retained by David Minkkinen containing software and use cases from the Massachusetts project among other data from his computer at Deloitte, as referenced on pages 16–17 of the Investigator Testimony.

20.    "Neosurance" means all versions of any software, including without limitation web-based and software-as-a-service solutions, that Sagitec has developed, tested, implemented, marketed, offered, licensed, delivered, or sold under the "Neosurance" name or that include or relate to Unemployment Insurance ("UI") tax, benefits, or appeals administration Functionality, including without limitation components or modules thereof, as embodied in client-facing applications, Source Code, design documentation, use cases, database schemas, requirements specifications, change orders, interface documentation, application programming interfaces, development frameworks, developer guides, business rules, algorithms, architectures, demos, mockups, user flows, product documentation, manuals, data sheets, and user guides. For the avoidance of doubt, Neosurance means any software You offer or offered that includes UI or related Functionality, including without limitation Pandemic Unemployment Assistance

- 7 -

("PUA"), whether or not the software comprises a complete UI solution and whether the software is called "Neosurance" or any other name.

21.    "Person" means any natural person or Entity.

22.    "Sagitec," "Defendant," "You," and "Your" refer to Defendant Sagitec Solutions LLC, and any former or current parents, subsidiaries, predecessors, predecessors-in-interest, successors, affiliated Entities, controlled Entities, companies in which Sagitec owns stock or otherwise maintains an ownership interest, joint ventures, related Entities, agents, attorneys, Employees, interns, representatives, assigns, directors, or officers and all other Persons acting or purporting to act on their behalf, including without limitation any Deloitte Employee who also was an employee of Sagitec.

23.    "Sagitec Server Location" means any server which Sagitec owns, manages, or otherwise controls, including without limitation Sagitec SharePoint sites and servers, Sagitec servers hosted in foreign countries, and server locations found at any URL or location referenced in any Deloitte Interrogatory or Request for Production (including without limitation those identified in Deloitte Request for Production Nos. 36, 37, 40, 41, and 127–154).

24.    "Source Code" means the human-readable programming language text that defines software, firmware, or electronic hardware description, including without limitation files containing code in any programming or scripting language, such as C, C++, C#, Java, JavaScript, Perl, PHP, Python, or Ruby; any markup or presentation language, such as HTML, XML, or CSS; and any database language or commands, such as SQL.  Source Code also includes without limitation configuration files, include files, header files, make files, link files, log files, settings files, generated output files, and other human-readable text files used in the generation and/or building of software and/or hardware.

- 8 -

25. "State" means any administrative division of the United States, including without limitation the 50 states, the District of Columbia, and inhabited territories.

26. "This Case" or "This Litigation" refers to the above-captioned proceeding.

27. "uFACTS Computer Program" means Deloitte's uFACTS software, including without limitation the versions registered with the U.S. Copyright Office as Registration Nos. TX 8-559-593, TX 8-559-594, and TX 8-559-595.

28. "uFACTS Trade Secrets" means the uFACTS application software, design assets, and development framework described in the Complaint.

29. The singular includes the plural and vice versa.

30. The past tense includes the present tense and vice versa.

31. Any pronoun shall be construed to refer to the masculine, feminine, or neutral gender as in each case is most appropriate.

## TOPICS

1.      The process through which Neosurance was designed, created, developed, implemented, enhanced, and tested, including without limitation the identities of all Persons involved and any use of Deloitte Property to do so.

2.      The Sagitec Entities responsible for or involved in the conception, research, creation, design, development, testing, launch, enhancement, maintenance, and distribution of any and all versions of Neosurance, and their corporate relationship.

3.      The Functionality of Neosurance, including without limitation any differences in Functionality between each version Sagitec developed for each of Sagitec's Clients.

4.      Technical Documents concerning Neosurance, including without limitation Source Code for Neosurance.

5.      The design, development, creation, implementation, enhancement, and testing of Neosurance's data model, including as embodied in data dictionaries, schemas, database tables, or entity relationship diagrams.

6.      The use or copying of any uFACTS Source Code in the development or implementation of Neosurance.

7.      The use or copying of the uFACTS data model in the development or implementation of Neosurance.

8.      The creation of use cases and requirements specifications for Neosurance, including the source of any and all information contained within each use case or requirements specification.

9.      The use or copying of any uFACTS design assets, including use cases and requirements specifications, in the development, implementation, marketing, or sale of Neosurance.

10.    The means by which Sagitec obtained Deloitte Property, including without limitation the uFACTS Computer Program and uFACTS Trade Secrets.

11.    The Minkkinen Hard Drive, including any use or possession by Sagitec of its contents and any efforts by Sagitec or others acting at its direction to locate, collect and preserve its contents.

12.    The current disposition of any Deloitte Property formerly within Sagitec's possession, custody, or control at any time, including without limitation any Deloitte Property that was destroyed or interfered with by Sagitec's officers, directors, or employees.

13.    Copies of Deloitte Property in Sagitec's possession, custody, or control, including without limitation the uFACTS Computer Program and uFACTS Trade Secrets, source code, object code, compile code or classes, or portions thereof.

14.    Each Sagitec Server Location, including any Deloitte Property stored therein at any time and the reasons any Sagitec Server Location and/or Deloitte Property contained therein are no longer available.

15.    Sagitec's use, study, analysis, reliance, or copying of any Deloitte Property, in whole or in part, including without limitation the uFACTS Computer Program or uFACTS Trade Secrets, in the conception, research, creation, design, development, testing, launch, enhancement, or maintenance of Neosurance, including Sagitec's reason, purpose, motivation, or decision for doing so, the means by which Sagitec obtained such Deloitte Property, and Sagitec's knowledge thereof.

16.    Sagitec's process of marketing and selling Neosurance to potential or actual customers, including without limitations all bids, offers, proposals, quotes, or responses to requests for information, requests for offers, requests for proposals, and requests for quotes.

- 11 -

17.    All contracts between Sagitec and any of its customers regarding Neosurance, including without limitation statements of work, addenda, and change orders.

18.    Documents given to actual or potential Sagitec customers concerning Deloitte Property, including any Documents based on or containing Deloitte Property.

19.    Sagitec's efforts to compete with Deloitte in the market for unemployment insurance software solutions, including without limitation Sagitec's pursuit of actual or potential customers of Deloitte.

20.    Sagitec's revenues, expenses, and profits (both gross and net), including without limitation those attributable to, associated with, or concerning Neosurance.

21.    All funds invested by Sagitec in the conception, research, design, development, testing, launch, enhancement, or maintenance of Neosurance.

22.    Any payments between Sagitec and any other Person, including other Sagitec Entities, relating to the creation, design, development, testing, launch, enhancement, or maintenance of any and all versions of Neosurance.

23.    The value of any Deloitte Property that Sagitec used or relied upon to create, design, develop, test, launch, enhance, or maintain Neosurance.

24.    Sagitec's projected future earnings relating to Neosurance, including without limitation earnings, revenues, expenses, and gross and net profits attributable to, associated with, or concerning Neosurance.

25.    The market for Neosurance, uFACTS, and unemployment insurance software solutions.

26.    Sagitec's recruitment or hiring of Deloitte Employees.

27.    Sagitec's knowledge of Deloitte Agreements.

- 12 -

28.    Sagitec's knowledge of or investigation into its possession, copying, or use of Deloitte Property, including without limitation the uFACTS Computer Program and uFACTS Trade Secrets.

29.    Sagitec's clearance efforts for Neosurance, including without limitation efforts to confirm that Neosurance did not include proprietary material belonging to any Person other than Sagitec or violate the intellectual property rights of any Person.

30.    Sagitec's efforts or considerations, if any, to modify any aspect of Neosurance to remove, revise, or conceal Deloitte Property, material based on uFACTS, or any other material originating from Deloitte.

31.    Communications between Sagitec and any Person concerning the conception, research, design, development, testing, launch, enhancement, or maintenance of Neosurance, including without limitation any Communications in which Sagitec or any other Person indicated that Sagitec was or was not in possession of, using, copying, or relying on Deloitte Property, including without limitation the uFACTS Computer Program or the uFACTS Trade Secrets, and including without limitation any Communications in which Sagitec or any other Person expressed a view as to whether or not such possession, use, copying, or reliance was authorized or permissible.

32.    Sagitec's Internal Investigation.

33.    The factual basis for Sagitec's affirmative defenses.

34.    The purpose and character of Neosurance.

35.    Sagitec's competition with Deloitte in the market for UI software solutions.

36.    Any and all information that Sagitec contends dictated, informed, or impacted the design of uFACTS, the uFACTS Computer Program, or the uFACTS Trade Secrets, or other Deloitte Property Sagitec used or relied upon.

- 13 -

37.     Any and all aspects of uFACTS, the uFACTS Computer Program, or the uFACTS

Trade Secrets that Sagitec contends are elements taken from the public domain.

38.     Any and all aspects of the uFACTS Computer Program that Sagitec contends are

not copyrightable, including any and all aspects that Sagitec contends are standard or stock or

constitute *scenes a faire*.

39.     Any copying of the uFACTS Computer Program that Sagitec contends constitutes

fair use.

40.     Any and all aspects of the uFACTS Trade Secrets that Sagitec contends are not

protectable, including without limitation because Sagitec contends that such aspects do not

derive independent economic value from not being generally known to or readily ascertainable

by proper means by others or that such aspects were not subject to reasonable efforts to maintain

their secrecy.

41.     Any and all aspects of the uFACTS Computer Program or uFACTS Trade Secrets

that Sagitec contends are not owned by Deloitte.

42.     Any and all aspects of the uFACTS Computer Program or uFACTS Trade Secrets

that Sagitec contends it did not acquire or use.

43.     Sagitec's agreements relating to Neosurance, including any provisions concerning

Sagitec's ownership or other intellectual property rights in Neosurance.

44.     Meetings of Sagitec's board of directors, board of managers, or equivalent

corporate governing bodies, including without limitation any minutes thereof, regarding Deloitte,

Deloitte Property, uFACTS, the uFACTS Computer Program, the uFACTS Trade Secrets, the

Criminal Proceeding, or Neosurance.

- 14 -

  
45.     Public statements or comments made by Sagitec regarding Deloitte, Deloitte Property, uFACTS, the uFACTS Computer Program, the uFACTS Trade Secrets, the Criminal Proceeding, or Neosurance.

46.     Communications between Sagitec and potential or actual customers referring or relating to Deloitte, uFACTS, Deloitte Property, the uFACTS Computer Program, or the uFACTS Trade Secrets.

47.     Sagitec's communications concerning this Litigation, both internally and with other Persons.

48.     The topics, subjects, witnesses, and Documents relied on by Sagitec in responding to Deloitte's discovery requests.

49.     The topics, subjects, witnesses, and Documents relied on by Sagitec to file its Answer, including without limitation each of Sagitec's responses and allegations in its Answer, the factual basis for each of Sagitec's admissions and denials, and the assertions in Sagitec's Counterclaims.

50.     The topics, subjects, witnesses, Documents, and damages referenced in Sagitec's Initial Disclosures.

51.     Sagitec's Document retention policies, including without limitation the retention of emails or other electronic or physical Documents.

52.     When, if at all, Sagitec began preserving Documents concerning this Litigation, Deloitte, Deloitte Property, uFACTS, and Neosurance.

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2024, I caused a true and correct copy of the foregoing

Document to be served on the following counsel of record via electronic mail:

Anne Shea Gaza (No. 4093)
Robert Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
thartzell@ycst.com

Christopher K. Larus
David A. Prange
Rajin S. Olson
Brandon A. Carmack
ROBINS KAPLAN LLP
8000 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500
clarus@robinskaplan.com
dprange@robinskaplan.com
rolson@robinskaplan.com
bcarmack@robinskaplan.com

/s/ Patrick Arnett
Patrick Arnett

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 24, 2025, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Joshua L. Simmons
Dana DeVlieger
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

Gregg F. LoCascio
Patrick Arnett
Nicholas Teleky
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave NW
Washington, DC 20004

John F. Hartmann
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654

Ariel Deitchman
KIRKLAN & ELLIS LLP
Three Brickell City Centre
98 S.E. 7th Street, Suite 700
Miami, FL 33131

Miranda D. Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116

*Deloitte-Sagitec@kirkland.com*

John W. Shaw
Andrew E. Russell
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
*jshaw@shawkeller.com*
*arussell@shawkeller.com*

*Attorneys for Plaintiffs Deloitte Consulting LLPand Deloitte Development LLC*

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street

Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Sagitec Solutions, LLC*