## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DELOITTE CONSULTING LLP and DELOITTE DEVELOPMENT LLC, <br><br> Plaintiffs, <br><br> v. <br><br> SAGITEC SOLUTIONS LLC, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

**Redacted - Public Version**

C.A. No. 23-325-WCB

███████████████

████████████

### DECLARATION OF MIRANDA D. MEANS IN SUPPORT OF
### PLAINTIFFS' MOTION FOR SANCTIONS

I, Miranda D. Means, hereby declare as follows:

1.  I am over eighteen (18) years old, and I am competent to attest to and have personal knowledge of the facts in this declaration.

2.  I am an attorney at Kirkland & Ellis LLP, counsel of record in the above captioned case for Plaintiffs Deloitte Consulting LLP and Deloitte Development LLC ("Plaintiffs"). I am a member in good standing to practice law in the states of Massachusetts and New York, and I am admitted *pro hac vice* to practice in this District for the above-captioned case.

3.  I submit this Declaration in support of Plaintiffs' Motion for Sanctions. ("Motion" or "Mot."). The statements set forth in this declaration are based on my personal knowledge and my review of the contemporaneous documents referenced and attached hereto.

4.  Attached hereto as **Exhibit 1** is a true and correct copy of Deloitte's Second Set of Requests for Production to Sagitec, dated February 9, 2024.

5.      Attached hereto as **Exhibit 2** is a true and correct copy of excerpts of Sagitec's Third Supplemental Responses and Objections to Deloitte's First Set of Interrogatories, dated February 28, 2025.

6.      Attached hereto as **Exhibit 3** is a true and correct copy of excerpts of Sagitec's Supplemental Responses and Objections to Deloitte's Second Set of Interrogatories, dated May 31, 2024.

7.      Attached hereto as **Exhibit 4** is a true and correct copy of excerpts of the deposition of Ranjith Kotcherlakota, dated July 31, 2024.

8.      Attached hereto as **Exhibit 5** is a true and correct copy of excerpts of the deposition of Christopher Madel, dated March 20, 2025.

9.      Attached hereto as **Exhibit 6** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00018352.

10.     Attached hereto as **Exhibit 7** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00019441.

11.     Attached hereto as **Exhibit 8** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00044299.

12.     Attached hereto as **Exhibit 9** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00043800.

13.     Attached hereto as **Exhibit 10** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00052544.

14.     Attached hereto as **Exhibit 11** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00059340.

15.     Attached hereto as **Exhibit 12** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00059346.

16.     Attached hereto as **Exhibit 13** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00059523.

17.     Attached hereto as **Exhibit 14** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00059524.

18.     Attached hereto as **Exhibit 15** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00059637.

19.     Attached hereto as **Exhibit 16** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00059673.

20.     Attached hereto as **Exhibit 17** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00060093.

21.     Attached hereto as **Exhibit 18** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00060100.

22.     Attached hereto as **Exhibit 19** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00060107.

23.     Attached hereto as **Exhibit 20** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_02588547.

24.     Attached hereto as **Exhibit 21** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00016939.

25.     Attached hereto as **Exhibit 22** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00017691.

26.    Attached hereto as **Exhibit 23** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00001427.

27.    Attached hereto as **Exhibit 24** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00012826.

28.    Attached hereto as **Exhibit 25** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_02343546.

29.    Attached hereto as **Exhibit 26** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_02343024.

30.    Attached hereto as **Exhibit 27** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00045247.

31.    Attached hereto as **Exhibit 28** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_02588560.

32.    Attached hereto as **Exhibit 29** is a true and correct copy of a document bearing beginning Bates number FISH_0000130.

33.    Attached hereto as **Exhibit 30** is a true and correct copy of the Superseding Indictment in *US v. Minkkinen* (22-cr-00163), dated May 31, 2023.

34.    Attached hereto as **Exhibit 31** is a true and correct copy of a document beginning Bates number SAGITEC-DEL_00017900.

I declare under penalty of perjury that the foregoing is are true and correct.

Executed on the 24th day of July, 2025.

*/s/ Miranda D. Means*
Miranda D. Means

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| DELOITTE CONSULTING LLP and<br>DELOITTE DEVELOPMENT LLC,<br><br>        Plaintiffs,<br><br>   v.<br><br>SAGITEC SOLUTIONS LLC,<br><br>        Defendant. | C.A. No. 23-325-WCB<br><br>**DEMAND FOR JURY TRIAL** |

## DELOITTE'S SECOND SET OF REQUESTS FOR PRODUCTION (NO. 125–155) TO DEFENDANT SAGITEC SOLUTIONS LLC

Pursuant to Federal Rules of Civil Procedure Rules 26 and 34 and the Local Rules of the United States District Court for the District of Delaware (the "Local Rules"), Plaintiffs Deloitte Consulting LLP and Deloitte Development LLC, hereby request that Defendant Sagitec Solutions LLC produce for examination, inspection, and copying by Plaintiffs, their attorneys, or others acting on Deloitte's behalf, the Documents and Things set forth below within thirty (30) days of the service of these Requests, at the offices of Deloitte's attorneys, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or at such time and place as may be agreed upon by counsel. These requests are deemed to be continuing and impose upon Sagitec the obligations stated in Federal Rule 26.

## DEFINITIONS

Unless otherwise defined, all words and phrases used herein shall be accorded their usual meaning and shall be interpreted in their common, ordinary sense. These Requests incorporate the following Definitions, which shall apply throughout these Definitions, Instructions, and Requests wherever a defined term is used, without regard to its capitalization:

1.      "And" and "or" shall each be construed conjunctively and disjunctively, so as to give the broadest meaning possible.

2.      "Any" and "all" are interchangeable and shall each be construed to mean "each and every," so as to give the broadest meaning possible.

3.      "Client" or "Customer" means any past, present, or prospective customer to whom software or a solution has been marketed, offered, licensed, delivered, or sold, including without limitation any State government, government agency, or regional or multi-State consortium of such States or agencies.

4.      "Communication" means any exchange of information by any method of transmission, sending, or receipt of information of any kind by or through any means including without limitation speech, writings, Documents, language (machine, foreign, or otherwise) of any kind, computer electronics or electronic data, email, text message, instant message, sound, radio or video signals, telecommunication, telephone, teletype, facsimile, telegram, microfilm, microfiche, photographic film of all types or other media of any kind, and includes all Documents and ESI containing, summarizing, or memorializing any Communication.

5.      "Complaint" means the Complaint filed by Deloitte in this Litigation on March 23, 2023, and any amendments thereto.

6.      "Concerning," "concerns," "referring to," "regarding," "related to" and "relating to" mean discussing, describing, evidencing, constituting, reflecting, incorporating, effecting, including, pertaining to, relating to, or in any way connected with the subject matter of the Interrogatory and should be construed in the broadest possible sense.

7.      "Criminal Proceeding" means the case captioned *United States v. Minkkinen*, No. 2:22-cr-163, filed August 23, 2022, in the Southern District of West Virginia, and any related proceedings or appeals.

8.      "CTPF Litigation" means the case captioned *Sagitec Solutions LLC v. Chicago Teachers' Pension Fund*, No. 1:23-cv-01365, filed March 7, 2023, in the Northern District of Illinois, and any related proceedings or appeals.

9.      "Deloitte" or "Plaintiffs" refers to Deloitte Consulting LLP and Deloitte Development LLC and any of their former or current parents, subsidiaries, predecessors, successors, affiliated Entities, controlled Entities, joint ventures, related Entities, agents, attorneys, Employees, interns, representatives, assigns, directors, or officers, including without limitation BearingPoint, Inc.

10.      "Deloitte Agreement" means any agreement between Deloitte, on the one hand, and any Deloitte Customer or Deloitte Employee, on the other hand, including without limitation the confidentiality and intellectual property ownership agreements described in the Complaint.

11.      "Deloitte Employee" means any Employee of Deloitte's, including without limitation Deepak Ahuja, Rick Deshler, Julie Fett, Venkat Kakula, Harish Kumar Kanchanapally, Ranjith Kotcherlakota, Srinivas Kurra, Swamynathan Manikandan, Marcel Mascarenhas, David Minkkinen, Sindhu Nair, Bernt Peterson, Revathy Rajaraman, Praveen Rengaraj, Karthik Sadasivam, Sivaraman Sambasivam, Pankaj Sharma, Kathryn Sibbet, Patrik Svensson, Philip Tackett, Adam Taylor, Prabhu Tegur, Bala Venkat, and Regina Waldrep.

12.      "Deloitte Property" means any copyrighted works or trade secrets asserted in this Litigation, including without limitation the uFACTS Computer Program, the uFACTS Trade Secrets, and Documents that relate to or refer to uFACTS or bear indications that Deloitte authored, contributed to, created, developed, or possessed the Document prior to Sagitec's possession of it.

13.      "Document" and "Thing" shall each be given the fullest meaning under the Federal Rules of Civil Procedure.  Documents include all material of every kind, source, and

authorship in Your possession or known by You to exist, irrespective of whether the Document is one intended for or transmitted internally by You, or intended for or transmitted to any other Person. Documents include ESI, writings, publications, printed matter, drawings, graphical materials, graphs, charts, photographs, audiovisual or sound recordings, images, and other data or data compilations that are stored in any medium whatsoever from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form, as well as any tangible Things. The term also includes all appendices, schedules, exhibits, and other attachments, as well as related and relevant metadata for all ESI, including without limitation information about the Document's author, creation date, revision dates, tracked changes, and electronic comments. A draft or non-identical copy of a Document is a separate Document within the meaning of this term. Any Document with any part thereof bearing any annotations, comments, markings, notations, notes, "redlines," signatures or initials, stamps, or any textual or graphical information (whether handwritten, printed, or electronic) that is not part of the original electronic or physical copy is non-identical and therefore should be considered a separate Document. A Document is in Your possession, custody, or control if You have either actual physical possession of a Document or constructive possession of the Document. For the avoidance of doubt, the following are Documents: abstracts, advertisements, agreements, appointments, audits, booklets, books, brochures, calendars, calendar entries, charts, Communications (including without limitation those made via real-time collaboration tools, *e.g.*, Skype, Slack, Teams, and other chat or instant messaging platforms), correspondence, contracts, data, database contents, database schemas, diagrams, diaries, document management systems (*e.g.*, Confluence, Google Docs, Google Drive, or SharePoint), drawings, emails, email attachments, expense reports, files, films, graphics, graphs, Internet or Intranet media or postings (*e.g.*, forum posts, comments, and wiki entries), invoices, journals, ledgers, logs (*e.g.*, access,

- 4 -

call, change, error, event, server, telephone, and system logs), maps, meeting invitations and responses, memoranda, minutes, mockups, newspapers, notes, organizational charts, photographs, posters, presentations, printouts, project management artifacts (*e.g.*, Project or Visio files, Gantt charts, and Jira entries), recordings (including without limitation recorded meetings or presentations conducted via platforms such as Zoom or Blue Jeans), receipts, recitals, records, reports, research, resumes, schedules, server contents (*e.g.*, FTP, HTTP, NFS, SMB, or WebDAV); Source Code, spreadsheets, statements, storyboards, summaries (including without limitation those of conversations, data, interviews, negotiations, and financial or statistical information), tasks, text messages or their equivalent (*e.g.*, SMS, WhatsApp, and iMessage), time entries, to-do lists, voicemails, websites, whiteboards, working papers, and worksheets.  An excerpt or portion of any of the foregoing is a separate Document.

14.    "Employee" means any Person who acted or purported to act on behalf of another Person, including without limitation all past and present directors, officers, executives, principals, partners, agents, representatives, attorneys, accountants, independent contractors, advisors, and consultants of such other Person or Persons.

15.    "Entity" means any business, proprietorship, firm, corporation, company, partnership, group, association, trade or industry association, non-profit, or governmental body or agency.

16.    "Functionality" or "Functioning" means the technological and business processes that maintain, power, or otherwise enable a computer program or web-based service, including without limitation all underlying software, Source Code, databases, servers, and other technology.

17.     "Include" and "including" shall be construed to mean include or including "but not limited to" or "without limitation," such that any list preceded by "include" or "including" should be read as a list of non-limiting examples within a broader category.

18.     "Internal Investigation" means Sagitec's investigation with respect to the subject matter of the Criminal Proceeding, as reflected in the report filed as Docket No. 146-6 in the Criminal Proceeding and any prior drafts or subsequent revisions thereto.

19.     "Investigator Testimony" means the May 31, 2023, grand jury testimony of Jim Powers, filed in the Criminal Proceeding as Docket No. 277-1.

20.     "Minkkinen Hard Drive" means the hard drive retained by David Minkkinen containing software and use cases from the Massachusetts project among other data from his computer at Deloitte, as referenced on pages 16–17 of the Investigator Testimony.

21.     "Neosurance" means all versions of any software, including without limitation web-based and software-as-a-service solutions, that Sagitec has developed, tested, implemented, marketed, offered, licensed, delivered, or sold under the "Neosurance" name or that include or relate to Unemployment Insurance ("UI") tax, benefits, or appeals administration Functionality, including without limitation components or modules thereof, as embodied in client-facing applications, Source Code, design documentation, use cases, database schemas, requirements specifications, change orders, interface documentation, application programming interfaces, development frameworks, developer guides, business rules, algorithms, architectures, demos, mockups, user flows, product documentation, manuals, data sheets, and user guides.  For the avoidance of doubt, Neosurance means any software You offer or offered that includes UI or related Functionality, including without limitation Pandemic Unemployment Assistance ("PUA"), whether or not the software comprises a complete UI solution and whether the software is called "Neosurance" or any other name.

- 6 -

22.    "Person" means any natural person or Entity.

23.    "Sagitec," "Defendant," "You," and "Your" refer to Defendant Sagitec Solutions LLC, and any former or current parents, subsidiaries, predecessors, predecessors-in-interest, successors, affiliated Entities, controlled Entities, companies in which Sagitec owns stock or otherwise maintains an ownership interest, joint ventures, related Entities, agents, attorneys, Employees, interns, representatives, assigns, directors, or officers and all other Persons acting or purporting to act on their behalf, including without limitation any Deloitte Employee who also was an employee of Sagitec.

24.    "Source Code" means the human-readable programming language text that defines software, firmware, or electronic hardware description, including without limitation files containing code in any programming or scripting language, such as C, C++, C#, Java, JavaScript, Perl, PHP, Python, or Ruby; any markup or presentation language, such as HTML,  XML, or CSS; and any database language or commands, such as SQL.  Source Code also includes without limitation configuration files, include files, header files, make files, link files, log files, settings files, generated output files, and other human-readable text files used in the generation and/or building of software and/or hardware.

25.    "State" means any administrative division of the United States, including without limitation the 50 states, the District of Columbia, and inhabited territories.

26.    "Superseding Indictment" means the indictment filed in the Criminal Proceeding on May 31, 2023, as Docket No. 186.

27.    "This Case" or "This Litigation" refers to the above-captioned proceeding.

28.    "uFACTS Computer Program" means Deloitte's uFACTS software, including without limitation the versions registered with the U.S. Copyright Office as Registration Nos. TX 8-559-593, TX 8-559-594, and TX 8-559-595.

29.     "uFACTS Trade Secrets" means the uFACTS application software, design assets, and development framework described in the Complaint.

30.     The singular includes the plural and vice versa.

31.     The past tense includes the present tense and vice versa.

32.     Any pronoun shall be construed to refer to the masculine, feminine, or neutral gender as in each case is most appropriate.

## <u>GENERAL INSTRUCTIONS</u>

1.     These Requests are intended to cover all Documents in Your possession, custody or control, whether located at Your home or office, on a computer, server, cloud storage platform, or mobile device, or at any other place.  The production should include every Document known to You and every such Document that can be located or discovered by reasonably diligent efforts by You.  If any of the requested Documents cannot be disclosed or produced in full, produce the Documents to the extent possible, and state Your reasons for Your inability to produce the remainder, stating whatever information, knowledge, or belief You have concerning the unproduced portions.

2.     If any Document was, but is no longer, in Your possession, subject to Your control, or in existence, state whether it (i) is missing or lost; (ii) has been destroyed; (iii) has been transferred, voluntarily or involuntarily, to others (and if so, to whom); or (iv) has been disposed of in some other manner.  If You have reason to believe a responsive Document is in the possession of another Person, state (i) the basis for this belief; (ii) the Person believed to be in possession of the responsive Document; (iii) where You believe the responsive Document may be located; and (iv) other information as is sufficient to identify the Document for a subpoena *duces tecum*.

3.      If a Document that is responsive to a Request has been lost or destroyed, it should be identified as follows: (i) preparer; (ii) addressor (if different); (iii) addressee; (iv) each recipient and each Person to whom distributed or shown; (v) date prepared; (vi) date transmitted (if different); (vii) date received; (viii) description of contents and subject matter; (ix) date of destruction; (x) manner of destruction; (xi) name, title, and address of the Person who directed that the Document be destroyed and (if different) the Person who destroyed the Document; (xii) the reason for the Document's destruction; (xiii) the names of Persons having knowledge of the destruction; and (xiv) a full description of the efforts made to locate the Document.

4.      If any of the Documents requested below are claimed to be privileged or are otherwise withheld, You are requested to provide a privilege log which identifies: (i) the date of the Document; (ii) the identity of all Persons who sent, authored, signed or otherwise prepared the Document; (iii) the identity of all Persons designated as addressee or copyees; (iv) a description of the contents of the Document that, without revealing information itself privileged or protected, is sufficient to understand the subject matter of the Document and the basis of the claim or privilege or immunity; (v) the type or nature of the privilege asserted (*e.g.*, attorney-client privilege, or work product doctrine); and (vi) for redacted Documents only, the Bates numbers corresponding to the first and last page of any Document redacted.  To the extent e-mail is included and described on the privilege log, any e-mail chain (*i.e.*, a series of e-mails linked together by e-mail responses and forwarding) that is withheld or redacted on the grounds of privilege, immunity or any similar claim may be logged as a single entry and identified by the most recent (*i.e.*, top-most) e-mail.  You shall not be required to break up an e-mail chain and log each individual e-mail separately.  If, however, e-mail contained within a given chain exists separately, then You shall log that material in accordance with this Paragraph.  If an e-mail chain

- 9 -

contains one or more privileged e-mails requiring redaction, the e-mail chain may be logged as a single entry and identified by the most recent redacted e-mail.

5.      All Documents or other Things responsive to a Request shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond to the Request to which they are responsive.

6.      Any Document responsive to a Request should be produced in and with a file folder and other Document (*e.g.*, envelope or file cabinet marker) in or with which the Document was located when this Request was served.  All pages of any Document now stapled or fastened together should be produced stapled or fastened together.

7.      All electronic Documents shall be produced in accordance with the District of Delaware's Default Standard for Discovery, Including Discovery of ESI, as modified or supplemented by any ESI Order agreed to by the parties.

8.      If it is otherwise not possible to produce any Document called for by any Request, or if any part of any Request is objected to, the reasons for the objection should be stated with specificity as to all grounds and, for the convenience of the Court and the parties, each Request should be quoted in full immediately preceding the objection.

9.      These Requests shall be deemed continuing and require further and supplemental production by You as and whenever You acquire, make, or locate additional Documents between the time of the initial production and the time of final judgment in this Case.

## DOCUMENTS TO BE PRODUCED

**REQUEST FOR PRODUCTION NO. 125:**

All Documents sent to or received from any third party retained by Sagitec or others acting at its direction to perform forensic preservation, including without limitation CFS, in connection with the Sagitec Internal Investigation.

**REQUEST FOR PRODUCTION NO. 126:**

All Documents reviewed, considered, or cited as part of the Internal Investigation that contained the term "Deloitte."

**REQUEST FOR PRODUCTION NO. 127:**

All Documents found at, stored within, or linked from, at any time, the "shared service space" at "\\ic-file-01\insurance" referenced in SAGITEC-DEL_00052502.

**REQUEST FOR PRODUCTION NO. 128:**

All Documents found at, stored within, or linked from, at any time, the "shared server space" at "\\ic-file-01\insurance" in the folder called "Bernt.Peterson_view_2" referenced in SAGITEC-DEL_00052502.

**REQUEST FOR PRODUCTION NO. 129:**

All Documents referencing the "shared server space" referenced in SAGITEC-DEL_00052502, including the URL "\\ic-file-01\insurance."

**REQUEST FOR PRODUCTION NO. 130:**

All Documents found at, stored within, or linked from, at any time, the URLs and/or server locations referenced in SAGITEC-DEL_00019441.

**REQUEST FOR PRODUCTION NO. 131:**

All Documents found at, stored within, or linked from, at any time, the URL and/or server location linked to in SAGITEC-DEL_00019441 as "Key Use cases Set1-Continued Claim" at the URL "http:/corporate.corp.sagitec.com/Sagitec%20InfoWeb%20Portal/ Unemployment%20Insurance/uFACTS/Forms/AllItems.aspx?RootFolder=%2FSagitec%20 InfoWeb%20Portal%2FUnemployment%20Insurance%2FuFACTS%2FUse%20Cases%2F Key%20Use%20Cases%20%2D%20FL%2F07%2DIter%5F1%2FContinued%20Claims&Folder CTID=0x012000661BD23962B7BB4FAE5E742BF29AA43F&View=%7BB74897B1%2DD05 4%2D4950%2DB3E4%2DCEF179068B43%7D".

**REQUEST FOR PRODUCTION NO. 132:**

All Documents found at, stored within, or linked from, at any time, the URL and/or server location linked to in SAGITEC-DEL_00019441 as "Key Use cases Set 2" at the URL "http://corporate.corp.sagitec.com/Sagitec%20InfoWeb%20Portal/Unemployment%20Insurance/ uFACTS/Forms/AllItems.aspx?RootFolder=%2FSagitec%20InfoWeb%20Portal%2FUnemploy ment%20Insurance%2FuFACTS%2FUse%20Cases%2FKey%20Use%20Cases&FolderCTID=0 x012000661BD23962B7BB4FAE5E742BF29AA43F&View=%7BB74897B1%2DD054%2D49 50%2DB3E4%2DCEF179068B43%7D".

**REQUEST FOR PRODUCTION NO. 133:**

All Documents found at, stored within, or linked from, at any time, the URLs and/or server locations referenced in SAGITEC-DEL_00019441 under the text "Below are some of the relevant use cases from Set 2," including without limitation the linked documents "Process Continued Claim Request.UCS," "Collect Other Source of Income.UCS," "Collect Claimant

Earnings Information.UCS," "Collect Able and Available Information.UCS," and "Process and Issue Benefit Payment.UCS."

**REQUEST FOR PRODUCTION NO. 134:**

All Documents found at, stored within, or linked from, at any time, the directory URL and/or server location "http://corporate.corp.sagitec.com/Sagitec%20InfoWeb%20Portal/ Unemployment%20Insurance/", referenced in SAGITEC-DEL_0001944, including without limitation all Documents found within any subfolders of that location.

**REQUEST FOR PRODUCTION NO. 135:**

All Documents found at, stored within, or linked from, at any time, the directory URL and/or server location "http://corporate.corp.sagitec.com/Sagitec%20InfoWeb%20Portal/ Unemployment%20Insurance/uFACTS/", referenced in SAGITEC-DEL_0001944, including without limitation all Documents found within any subfolders of that location.

**REQUEST FOR PRODUCTION NO. 136:**

All Documents found at, stored within, or linked from, at any time, the directory URL and/or server location "http://corporate.corp.sagitec.com/Sagitec%20InfoWeb%20Portal/ Unemployment%20Insurance/uFACTS/Use%20Cases/", referenced in SAGITEC-DEL_0001944, including without limitation all Documents found within any subfolders of that location.

**REQUEST FOR PRODUCTION NO. 137:**

All Documents found at, stored within, or linked from, at any time, the directory URL and/or server location "http://corporate.corp.sagitec.com/Sagitec%20InfoWeb%20Portal/ Unemployment%20Insurance/uFACTS/Use%20Cases/Key%20Use%20Cases/", referenced in

SAGITEC-DEL_0001944, including without limitation all Documents found within any subfolders of that location.

**REQUEST FOR PRODUCTION NO. 138:**

All Documents referencing the URLs and/or server locations linked to or referenced in SAGITEC-DEL_0001944, including without limitation those specifically enumerated in Deloitte's Requests for Production Nos. 130–137.

**REQUEST FOR PRODUCTION NO. 139:**

The "UFACTS oracle database" referenced in SAGITEC-DEL_00012778.

**REQUEST FOR PRODUCTION NO. 140:**

The "data models" linked to, found at, or stored within, at any time, the URL and/or server location "\\Pune-data-01\sis\old app data models," referenced in SAGITEC-DEL_00012778.

**REQUEST FOR PRODUCTION NO. 141:**

All Documents found at, stored within, or linked from, at any time, the URL and/or server location "\\Pune-data-01\sis\old app data models," referenced in SAGITEC-DEL_00012778.

**REQUEST FOR PRODUCTION NO. 142:**

All Documents referencing the "UFACTS oracle database" referenced in SAGITEC-DEL_00012778.

**REQUEST FOR PRODUCTION NO. 143:**

All Documents referencing the URL and/or server location "\\Pune-data-01\sis\old app data models" referenced in SAGITEC-DEL_00012778.

- 14 -

**REQUEST FOR PRODUCTION NO. 144:**

The "questionnaire related code" found in the "Questionnaire" folder of

"uFACTS.ControlLibrary" referenced in SAGITEC-DEL_00017989.

**REQUEST FOR PRODUCTION NO. 145:**

All Documents found at, stored within, or linked from, at any time, the "Questionnaire"

folder of "uFACTS.ControlLibrary" referenced in SAGITEC-DEL_00017989.

**REQUEST FOR PRODUCTION NO. 146:**

All Documents found at, stored within, or linked from, at any time, the "Correspondence"

folder, including without limitation the referenced "code related to XML/XSLT transformation,"

referenced in SAGITEC-DEL_00017989.

**REQUEST FOR PRODUCTION NO. 147:**

The "uFACTS code" referenced in SAGITEC-DEL_00017989 in the sentence

"Pushawart and all the developers have the uFACTS code."

**REQUEST FOR PRODUCTION NO. 148:**

The "code tables" referenced in SAGITEC-DEL_00015639 in the sentence "Below are

the code tables that need to be migrated from the Oracle database to SIS."

**REQUEST FOR PRODUCTION NO. 149:**

The "script" referenced in SAGITEC-DEL_00015639 in the sentence "Hope you can

modify the script you have to bring the data to SIS."

**REQUEST FOR PRODUCTION NO. 150:**

All Documents found at, stored within, or linked from, at any time, the "uFACTS MA

code repository" referenced in SAGITEC-DEL_00015638.

**REQUEST FOR PRODUCTION NO. 151:**

The "uFACTS code base" referenced in SAGITEC-DEL_00012906 in the sentence "[t]he uFACTS code base should be available with Chaitanya and he can point you to the location where it is available."

**REQUEST FOR PRODUCTION NO. 152:**

The "uFACTS code" for "developing Auto Coder and DHS interfaces" referenced in SAGITEC-DEL_00019042,

**REQUEST FOR PRODUCTION NO. 153:**

The "key uFACTS use cases" referenced in SAGITEC-DEL_00017396, including without limitation those found at the SharePoint site with the URL "http://sagitecportal/ Unemployment%20Insurance/uFACTS/Forms/AllItems.aspx?Rootfolder=%2f Unemployment%20Insurance%2fuFACTS%2fUse%20Cases&FolderCTID=& View=%7bDF13EE52%2dF4E5%2dF4E5%2d4B7A%2d8DE2%2dC9C5FDAD4B73%7d."

**REQUEST FOR PRODUCTION NO. 154:**

All Documents found at, stored within, or linked from, at any time, the SharePoint site found at the URL and/or server location "http://sagitecportal/Unemployment%20Insurance/ uFACTS/" referenced in SAGITEC-DEL_00017396, including without limitation all Documents found within subfolders of that location.

**REQUEST FOR PRODUCTION NO. 155:**

All Documents concerning the modification or deletion of Documents on Sagitec devices and servers that relate to uFACTS or Deloitte Property, including without limitation the Sagitec SharePoint and server locations referenced in any Deloitte Request for Production.

Dated:  February 9, 2024

|  |  |
|---|---|
| | _/s/ Patrick Arnett_ |
| John W. Shaw (No. 3362) | Patrick Arnett |
| Andrew E. Russell (No. 5382) | |
| SHAW KELLER LLP | OF COUNSEL: |
| I.M. Pei Building | Joshua L. Simmons |
| 1105 North Market Street, 12th Floor | KIRKLAND & ELLIS LLP |
| Wilmington, DE 19801 | 601 Lexington Avenue |
| (302) 298-0700 | New York, NY 10022 |
| jshaw@shawkeller.com | (212) 446-4800 |
| arussell@shawkeller.com | |

Gregg F. LoCascio
Patrick Arnett
Nick Teleky
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave NW
Washington, DC 20004
(202) 389-5000

John F. Hartmann
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

_Attorneys for Plaintiffs Deloitte Consulting LLP,_
_and Deloitte Development LLC_

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2024, I caused a true and correct copy of the foregoing

Document to be served on the following counsel of record via electronic mail:

Anne Shea Gaza (No. 4093)
Robert Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
thartzell@ycst.com

Christopher K. Larus
David A. Prange
Rajin S. Olson
Brandon A. Carmack
ROBINS KAPLAN LLP
8000 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500
clarus@robinskaplan.com
dprange@robinskaplan.com
rolson@robinskaplan.com
bcarmack@robinskaplan.com

                                        */s/ Patrick Arnett*
                                        Patrick Arnett

# EXHIBIT 2

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 3

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 4

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 5

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 6

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 7

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 8

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 9

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 10

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 11



August 23, 2016

Jessica Carter, Assistant Attorney General
500 North Calvert Street – Suite 406
Baltimore, Maryland 21202-3659

Dear Ms. Carter,

We received your letter dated July 25, 2016 regarding our contract with State of Maryland, Department of Labor, Licensing and Regulations, Unemployment Insurance Technology Modernization Project.

In the letter, you had indicated that an individual who had some involvement in the project has raised concerns regarding Sagitec and its work on the contract. In general, the allegations were that (1) Sagitec does not possess the source code for the Neosurance framework that is being used for the contract work because Sagitec improperly obtained the framework from another company, and (2) the work on the contract is primarily being performed by programmers located in India and that is contrary to contract requirements.

We ask that the Department accept Sagitec's assurance that Sagitec has not provided the Department any software improperly obtained from another company. This is consistent with Sagitec's business ethics and practices. It is also consistent with the terms of the Contract, which include representations and warranties regarding both Sagitec's ownership of the subject software, as well as the freedom of that software from the infringement of third party intellectual property rights.

However, in addition to responding to those concerns on Sagitec's behalf, I'm obliged to raise an additional concern about this matter. Simply put, statements made in the Attachment damage Sagitec's reputation. Certainly the allegation that Sagitec has in any way misappropriated another party's property is defamatory. There are also other statements in the attachment that damage Sagitec's reputation.

The continued dissemination of this type of information is not in the interests of either the Department or Sagitec. Sagitec would appreciate the opportunity to work with the Department to expeditiously resolve these misunderstandings.

CONFIDENTIAL

SS0009492
SAGITEC-DEL_00059340



In the attachment, we provide a detailed response to each of your concerns as you requested.

Regards,

Senior Partner | Sagitec Solutions, LLC.

| 612-759-7738 | david.minkkinen@sagitec.com

---

CONFIDENTIAL

SS0009492
SAGITEC-DEL_00059341



The following provides Sagitec's detailed response to these concerns and allegations:

**Concern #1:** Sagitec does not possess the source code for the Neosurance framework that is being used for the contract work because Sagitec improperly obtained the framework from another company.

**Sagitec Response to Concern #1:** The Sagitec Framework has been in existence for the last 12 years and is successfully implemented in 23 State Government agencies across the country. Sagitec has a dedicated team of resources in our product infrastructure group that maintain and enhance the Sagitec Framework to keep pace with changes in technology. We use this technical framework to create all of our line of business solutions including Retirement and Unemployment Insurance. The Neosurance solution is the business application that was designed and developed by the Sagitec Unemployment Practice over the past three years. This solution was designed and developed using the Sagitec Framework and Sagitec's design and development tools including: Sagitec Analyst Studio, Sagitec Design Studio, Sagitec Modeling Studio and Sagitec Test Studio. The MW Consortium (MWC) Technical staff has access to the Source Control Software (Team Foundation Server) in the MWC Project Technical Infrastructure. This provides MWC with access to the source code for the Neosurance solution.

In addition, Sagitec has successfully conducted several fit-gap sessions to assess the fit/gaps of the Neosurance solution with MWC requirements. Sagitec and MWC have successfully completed the solution configurations required address solution gaps for the first two iterations of the MWC UI Tax and Benefits system. After completing the solution configurations to address these gaps, the solution was deployed in the Iteration User Acceptance Testing (IUAT) Environment for MWC to perform IUAT. The IUAT process has been successfully executed for the T01, T02, B01 and B02 iterations of the project. Without source code, Sagitec would not have been able to address the MWC solution gaps identified during the fit-gap sessions.

The allegation that Sagitec does not possess the source code for the Neosurance Solution and Sagitec Framework is false.

**Concern #2:** The work on the contract is primarily being performed by programmers located in India and that is contrary to contract requirements.

**Sagitec Response to Concern #2:** Sagitec has a project team of approximately 40 staff on site at the project site in Baltimore. These resources are dedicated to complete the services/deliverables specified in the contract between MWC and Sagitec. These resources are supported by our product teams located in Minnesota and India. The product team supports our Sagitec Framework, Sagitec Design and Development tools, Neosurance Solution, NeoMobile Solution and our NeoFraud Solution. The product team's focus is on product development activities and technology upgrades pertaining to our base solution. The product team supports all of our on-site project teams to deliver solutions that meet our client requirements. In many cases, this requires upgrades to our base solution and technology framework. Our work for the MW Consortium project is performed by these joint teams. This approach was disclosed in our proposal and MWC project leadership is aware of Sagitec's overall project approach.

---

CONFIDENTIAL

SS0009492
SAGITEC-DEL_00059342



**Sagitec's response to the Quoted and/or Paraphrased Allegations:**

1. There are many references to the State of Massachusetts in the documentation used and provided by Sagitec. There is no rational explanation for this unless the documentation was copied from the Massachusetts project. Sagitec has never done any work for the State Workforce Agency (SWA) in Massachusetts. However, Deloitte has done quite a bit of work over the last several years for the Massachusetts SWA. The people at Sagitec have admitted that many of the used to work for Deloitte. The Director at Sagitec for data conversion, Srinivas Kurra, was the manager for data conversion for the Massachusetts project while he was employed by Deloitte. Srinivas left Deloitte and started working for Sagitec only one and a half years ago. References to Massachusetts have been removed. However, SharePoint's version control tools should reveal the older versions with the references to Massachusetts.

   **Sagitec's Response:** Sagitec has several employees who worked in the Unemployment Insurance Industry as either consultants or employees of State Workforce or Labor Agencies. Several of our team members worked for other companies including KPMG Consulting, BearingPoint and Deloitte. This experience was highlighted in our key personnel resumes in our proposal. Our team brings our knowledge and experience from our past UI Tax and Benefits modernization experience to the MWC. During the course of the MWC project, our team has consistently discussed about how some of our clients from our individual past experiences have done certain business processes or how some of us have implemented certain technical design concepts. This is a strength Sagitec brings to the project. In some of our documentation, there may be references to our experience from other states as we use these examples to discuss potential implementation options at the MWC states. For example, our base solution and its documentation may contain references to our work at Washington DC or other states that Sagitec is currently providing services. The documentation used on the MWC project was created by our product team/on-site project team and subsequently customized to reflect MWC-specific requirements.

2. The column mapping documentation has a lot of columns that Sagitec has declared that will not be used. Since this is Sagitec's first foray into Unemployment Insurance (UI) it doesn't make any sense for these columns to be present unless the entire design was copied verbatim from some other company's work.

   **Sagitec's Response:** Sagitec's base solution design incorporates design principles our team brings from other UI tax and benefits implementations. As a result our database and the application design includes database columns that are included in our base solution design that may not be used by the MWC States or other clients. For example, we have application and database design concepts incorporated into our base solution from our recent Washington DC UI tax implementation. Some of these features may not be used by the MWC States. However, the presence of such information in our database design does not mean that the design of the database was copied from another source. The database design for the Neosurance Solution was completed in 2013 using experienced UI practitioners that averaged over 15 years of experience in UI Tax and Benefits modernization. In addition, the MWC implementation is not Sagitec's first project in the Unemployment Insurance market.

---

CONFIDENTIAL



3.  It appears to be impossible for Sagitec to change the framework of their system. There are serious deficiencies with the database design such as the use of Massive Unified Code Key table and an almost complete lack of junction tables. Both the technical people and business people have refused to alter their database design despite repeated requests to do so. Even a brief perusal of a college text book on database design or a Google search above databases on the internet will reveal that the Sagitec database is poorly designed. Sagitec refuses to change the database because they can't do it. It's not really their framework.

**Sagitec's Response:** Sagitec has provided responses to the concerns raised by the MWC technical team regarding the database design utilized in Neosurance and the Sagitec Framework. In general, our database design utilizes third normal form design with the exception of a few tables that utilize second normal form. Utilization of second normal form is limited to very few instances where the data is stored temporarily. The MWC technical staff has reviewed Sagitec's responses to the concerns raised and subsequently approved the Database design deliverables for the T01, B01, T02 and B02 iterations. The unified code key table design is used by our code tables as part of the Sagitec Framework that is used by all Sagitec clients. We have successfully implemented this design for 23 State and Local Government clients. Sagitec has stated to MWC technical team that any tables starting with SGS_, SGW_ are part of Sagitec Framework used by all of our clients and are not subject to change by the project team. Sagitec makes changes to the database (tables starting with SGT_) and Neosurance base solution code to address the solution gaps identified during the MWC fit-gap sessions.

4.  When Sagitec is asked for changes, there are excuses such as "It's a product" or "It's per system design" or "It's too complex", etc. All of the explanations are extremely vague and sometimes preposterous. The business users were told a label on a button was part of the framework, which is rubbish. There is a possibility that the business users are told these excuses because the Sagitec employees are technically incompetent but some of the changes are extremely simple. Once again, the more likely explanation is that it is impossible for Sagitec to answer the questions or make the changes because they do not have access to the source code of their own framework. Sagitec may have illegally appropriated an executable version of Deloitte's framework but couldn't obtain a source code version of Deloitte's framework. Without access to the source code, it is impossible for Sagitec to make changes to it.

**Sagitec's Response:** Sagitec's project approach and timeline is based on a product configuration/fit-gap approach. Sagitec is executing the project in accordance with the proposed project approach. There are certain instances where the changes requested by the MWC team are not consistent with this approach. In those situations our team has responded to these requests by stating that certain aspects of the base product are not subject to change due to the proposed approach. This explanation has been provided to the MWC project leadership team and has been accepted as a reasonable explanation for our position. If an alternative approach was used, such as a custom-build approach, any change could be incorporated into the solution. However, in a product configuration/fit-gap approach, changes should be limited to what is needed to address the requirements, solution gaps and the approved detailed design specifications. Sagitec has been able

CONFIDENTIAL

SS0009492
SAGITEC-DEL_00059344



to address MWC's solution gaps expeditiously through configuration and customization of the Neosurance source code.

The fact that Sagitec is able to incorporate changes to the solution to address the solution gaps clearly demonstrates that Sagitec has access to the Sagitec Framework and Neosurance base solution source code.

5.  The Application Program Interface (API) is basically non-existent.  The API is a key piece of documentation that is used by developers to maintain, debug and improve software applications.  Without this software it is literally impossible for a programmer who is not a Sagitec employee to interact with the framework.  Any portion of the API that interacts with Microsoft products is well documented but all of the portions of the API that are part of the Neosurance framework have a few notes such as "This method works with the Employer Agent" and nothing else.  There are supposed to be more in-depth descriptions.  These descriptions are automatically inserted within the API documentation when it is created by the computed but these descriptions are missing.  There are three possibilities.  The first is that the Sagitec developers are incredibly lazy but every time the lack of API documentation is mentioned, there is never an acceptable response from Sagitec.  The second possibility is that if that if the API documentation was completed, it would be obvious that was created by Deloitte.  The third possibility is that Sagitec has an executable version of the framework, not a source code version, and therefore can't make changes to the source code that would be incorporated into the API documentation.

**Sagitec's Response:**  The project has an API documentation deliverable for each project iteration.  The API documentation is entered in the source code by the developers and the summarized API Documentation is produced by extracting this information from the source code using these tools.  MWC provided feedback to Sagitec's initial API documentation deliverable for the B01 and T01 iterations indicating that the API documentation lacked detail for certain methods.  Sagitec reviewed those comments and subsequently addressed these issues by entering the appropriate level of detail into the Neosurance source code and resubmitting the revised API documentation.  As a result, MWC approved the API documentation for the B01, T01, B02 and T02 iterations.  The API documentation delivered to MWC was derived from the Neosurance Solution and the Sagitec Framework source code and not from any other source.

CONFIDENTIAL

SS0009492
SAGITEC-DEL_00059345

# EXHIBIT 12

# STATE OF MARYLAND
## OFFICE OF THE ATTORNEY GENERAL

**BRIAN E. FROSH**
Attorney General

**ELIZABETH F. HARRIS**
Chief Deputy Attorney General

**THIRU VIGNARAJAH**
Deputy Attorney General



**JESSICA V. CARTER**
Division Director

**SUSAN M. CHERRY**
Chief of Litigation, O & P

### DEPARTMENT OF LABOR, LICENSING AND REGULATION
500 N. Calvert Street - Suite 406
Baltimore, Maryland 21202-3659
(410) 230-6108 - FAX: (410) 333-6503

July 25, 2016

David Minkkinen
Partner
Sagitec Solutions
422 County Road D East
Little Canada, MN 55117

Re:    Unemployment Insurance Information Technology Modernization Project
Contract between State of Maryland, Department of Labor, Licensing and
Regulation and Sagitec Solutions

Dear Mr. Minkkinen:

This letter follows up on your recent discussion with Deputy Secretary David McGlone regarding the above-referenced contract between Sagitec and the Department of Labor, Licensing and Regulation. An individual who has some involvement on the project has raised concerns regarding Sagitec and its work on the contract. In summary, the general allegations are that (1) Sagitec does not possess the source code for the Neosurance framework that is being used for the contract work because Sagitec improperly obtained the framework from another company, and (2) the work on the contract is being performed primarily by programmers located in India and that this is contrary to the contract requirements. More specific information regarding the first general allegation can be found in the attachment to this letter.

On behalf of the Department, I request that Sagitec provide a written response to these allegations providing as much detail as possible. If you have concerns about the confidentiality of the information, please contact me in advance of providing the information to discuss these concerns. I can be reached at 410-230-6112 or jessica.carter1@maryland.gov. Thank you for your cooperation in this matter.

Sincerely,

Jessica V. Carter
Assistant Attorney General

Enclosure
cc: David McGlone, Deputy Secretary, Dept. of Labor, Licensing and Regulation

CONFIDENTIAL

SS0009498
SAGITEC-DEL_00059346

**SAGITEC-DEL_00059346**

*Attachment – Quoted and/or Paraphrased Allegations*

1.       There are many references to the State of Massachusetts in the documentation used and provided by Sagitec.  There is no rational explanation for this unless the documentation was copied from the Massachusetts project. Sagitec has never done any work for the State Workforce Agency (SWA) in Massachusetts.  However, Deloitte has done quite a bit of work over the last several years for the Massachusetts SWA. The people at Sagitec have admitted that many of them used to work for Deloitte. The Director at Sagitec for data conversion, Srinivas Kurra, was the manager for data conversion for the Massachusetts project while he was employed by Deloitte.  Srinivas left Deloitte and started working for Sagitec only one and a half years ago. References to Massachusetts have been removed.     However, Sharepoint's version control tools should reveal the older versions with the references to Massachusetts.

2.       The column mapping documentation has a lot of columns that Sagitec has declared that will not be used. Since this is Sagitec's first foray into Unemployment Insurance (UI) it doesn't make any sense for all these columns to be present unless the entire design was copied verbatim from some other company's work.

3.       It appears to be impossible for Sagitec to change the framework of their system. There are serious deficiencies with the data base design such as the use of a Massive Unified Code Key table and an almost complete lack of junction tables.  Both the technical people and business people have refused to alter their database design despite repeated requests to do so. Even a brief perusal of a college text book on database design or a Google search about data bases on the internet will reveal that the Sagitec database is poorly designed.    Sagitec refuses to change the data base because they can't do it.  It's not really their framework.

4.       When Sagitec is asked for changes, there are excuses such as "It's a product" or "It's per system design" or "It's too complex", etc.  All of the explanations are extremely vague and sometimes preposterous.  The business users were told a label on a button was part of the framework, which is rubbish.   There is a possibility that the business users are told these excuses because the Sagitec employees are technically incompetent but some of the changes are extremely simple. Once again, the more likely explanation is that it is impossible for Sagitec to answer the questions or make the changes because they do not have access to the source code of their own framework.  Sagitec may have illegally appropriated an executable version of Deloitte's framework but couldn't obtain a source code version of Deloitte's framework.  Without access to the source code, it's impossible for Sagitec to make changes to it.

5.       The Application Program Interface (API) is basically non-existent. The API is a key piece of documentation that is used by developers to maintain, debug, and improve software applications. Without this software it is literally impossible for a programmer who is not a Sagitec employee to interact with the framework.  Any portion of the API that interacts with Microsoft products is well documented but all of the portions of the API that are part of the Neosurance framework have a few notes such as "This method works with the Employer Agent" and nothing else. There are supposed to be more in-depth descriptions.  These descriptions are automatically inserted within the API documentation when it is created by the computer but these descriptions are missing. There are three possibilities.  The first is that the Sagitec developers are incredibly lazy but every time the lack of API documentation is mentioned, there is never an acceptable response from Sagitec. The second possibility is that if the API documentation was completed, it would be obvious that it was created by Deloitte. The third possibility is that Sagitec has an executable version of the framework, not a source code version, and therefore can't make changes to the source code that would be incorporated into the API documentation.

# EXHIBIT 13

# Deloitte.

Jaclyn C. Fink
Assistant General Counsel
Office of General Counsel

**Deloitte LLP**
555 Mission Street
San Francisco, CA 94105
USA

Tel:  (415) 783-5691
Fax:  (877) 779-9536

jafink@deloitte.com
www.deloitte.com

**VIA UPS OVERNIGHT DELIVERY**

October 3, 2016

Piyush Jain
Chief Executive Officer
Sagitec Solutions LLC
422 County Road D East
Saint Paul, MN 55117

      Re:    Deloitte's Unemployment Insurance Intellectual Property

Dear Mr. Jain:

    I am an attorney in the Office of General Counsel of Deloitte LLP and write with respect to possible use by Sagitec Solutions LLC of Deloitte's unemployment insurance intellectual property, including the uFACTS Unemployment Insurance Solution and related documentation. This intellectual property is the property of Deloitte Consulting LLP, a subsidiary of Deloitte LLP.

    We have been notified by a third party that Sagitec may be using Deloitte's unemployment insurance intellectual property in its client engagements.  Deloitte LLP and its subsidiaries have not given permission to Sagitec to use our unemployment insurance intellectual property, and your unauthorized use would constitute an infringement of our intellectual property rights.

    We hereby demand that Sagitec (1) immediately cease and desist from using all Deloitte unemployment insurance intellectual property; (2) immediately destroy or return all Deloitte unemployment insurance intellectual property; and (3) certify in writing within five (5) business days that Sagitec has complied and will continue to comply with the terms set forth herein.

    We appreciate your attention to this matter.

        Sincerely yours,

        Jaclyn C. Fink
        Assistant General Counsel –Chief IP Strategist

CC:   David Minkkinen, Partner, Sagitec Solutions LLC

CONFIDENTIAL

SS0009675
SAGITEC-DEL_00059523

# EXHIBIT 14

**Timothy Keller**
T Keller PLLC
7901 Telegraph Road
Bloomington, MN 55348
tim@tkeller.legal
612·860·1258

**VIA EMAIL**

October 7, 2016

Jaclyn C. Fink
Assistant General Counsel
Office of General Counsel
Deloitte LLP
555 Mission Street
San Francisco, CA 94105

Re:    Sagitec Solutions, LLC

Dear Ms. Fink:

I represent Sagitec Solutions, LLC.  This letter is in response to your October 3, 2016 letter to Mr. Piyush Jain, the Chief Executive Officer of Sagitec.

The assertions in your letter are baseless, and Deloitte has no right or reason to make any of the demands made in your letter.  Sagitec does not use, and is not in possession of the Deloitte Ufacts Unemployment Insurance Solution, any related documentation, or any Deloitte intellectual property of any kind.

However, your letter raises another issue that must be addressed.  Specifically, information about the intellectual property Sagitec uses "in its client engagements" seems likely to include Sagitec intellectual property.  Deloitte should not possess any such information or intellectual property, induce others to disclose that information or intellectual property, or interfere with Sagitec's relationships with its clients and prospective clients.  Please make certain that it does not.

CONFIDENTIAL

SS0009676
SAGITEC-DEL_00059524

Jaclyn C. Fink
October 7, 2016

Please contact me with any further questions or concerns about this matter.

Very truly yours

Timothy Keller

C:     Piyush Jain

# EXHIBIT 15



**T Keller PLLC**
7901 Telegraph Road
Bloomington, MN 55438
Office: 952.217.4596 | Cell: 612.860.1258
tim@tkeller.legal | tkeller.legal

**VIA EMAIL**

September 27, 2018

Kristen McCallion
Principal
Fish & Richardson P.C.

Subject:  Sagitec Solutions, LLC /Deloitte LLC

I am writing to update you on the status of the review of the allegations in your September 12, 2018 letter. .  Based upon our preliminary review, we have no reason to deviate from the conclusion stated in our October 7, 2016, letter addressed to Jaclyn Fink that Sagitec Solutions LLC does not possess any Deloitte LLP intellectual property.

We will, however, continue to review the allegations. To assist that process, we  ask that you identify more precisely the technology that your client claims has been misappropriated.

Your letter refers to the uFACTS solution framework.  The framework technology incorporated in Sagitec's Neosurance product was developed well before any individual who subsequently joined Sagitec had left Deloitte.   Is it possible that the intellectual property in question is something other than the framework technology you reference?

Your letter does not reference any specific Deloitte technology; nor do Deloitte's copyright registrations establish infringement.  Please provide the specific facts upon which you have based your allegations.

In addition, please identify the source of any facts that you identify.  You allege that "Sagitec used and continues to use Deloitte's source code and trade secrets."  What information do you rely upon in making that assertion?

Further, you assert that Sagitec's technology is based on or incorporates Deloitte technology.  Have you had access to the Sagitec technology so that you can make a detailed comparison to the Deloitte products?  Please confirm if your client is in possession of Sagitec technology, or if your client has accessed Sagitec technology in the past.  If your client does not possess and has not accessed Sagitec technology, please explain how your client reached the conclusion that the technology is based on or incorporates Deloitte technology.  If that conclusion is based on an opinion or information provided by a third party, please identify that third party and provide a detailed summary of that opinion or information.

CONFIDENTIAL

In conclusion, please be assured that Sagitec wishes to bring this matter to a conclusion satisfactory to both parties.

Very truly yours

Timothy Keller

C:      David Minkkinen
        Piyush Jain

CONFIDENTIAL

# EXHIBIT 16

| | |
|---|---|
| **From:** | Timothy Keller <tim@tkeller.legal> |
| **Sent:** | Monday, July 1, 2019 2:44 PM |
| **To:** | Jain, Piyush; Minkkinen, David |
| **Subject:** | FW: Deloitte - Sagitec Matter |
| **Attachments:** | Deloitte-Sagitec Tolling Agreement.7.1.19.docx |

This just in.  I haven't looked at yet.

Tim

**Timothy Keller**
Principal

 **KELLER**
TECHNOLOGY LAW

**T Keller PLLC**
7901 Telegraph Road, Bloomington, MN 55438
Office: 952.217.4596 | Cell: 612.860.1258
tim@tkeller.legal | tkeller.legal

**From:** Kristen McCallion <McCallion@fr.com>
**Sent:** Monday, July 1, 2019 1:53 PM
**To:** Timothy Keller <tim@tkeller.legal>
**Subject:** RE: Deloitte - Sagitec Matter

Dear Tim,

We have not touched base in a while, but Deloitte remains interested in resolving this matter with your client.  It therefore seeks Sagitec's agreement to toll claims that Deloitte and Sagitec may have between them in relation to this matter, and as more specifically explained in our letter of September 12, 2018 and in calls and correspondence following that letter.

In light of this, we ask that you please review the attached tolling agreement and advise whether Sagitec will sign it.

Thank you and regards,
Kristen

**Kristen McCallion ::** Principal **::** Fish & Richardson P.C.
Chair **::** Copyright Practice Group

212 641 2261 direct **::** mccallion@fr.com
fr.com **::** FishTMCopyrightblog.com **::** Bio **::** LinkedIn

SS0009846
SAGITEC-DEL_00059673

**From:** Timothy Keller <tim@tkeller.legal>
**Sent:** Thursday, November 29, 2018 9:01 AM
**To:** Kristen McCallion <McCallion@fr.com>
**Subject:** Deloitte - Sagitec Matter

I am sorry that we did not have an opportunity to talk directly.  I think we could have had a productive discussion, but this summary provides the essential points.

Sagitec will not agree to your client's demands for a code review and an affidavit.  Sagitec has already stated that there has been no infringement or misappropriation of IP.  These further efforts are not supported by any of your allegations.

None of the information you have provided to date supports an inference that Sagitec possesses Deloitte technology.  For example, the marketing statement you reference in the Washington State bid does not make any reference to the substance of either party's technology.  In addition, this marketing statement was made by Microsoft in a proposal for a paid family leave solution where Sagitec was a subcontractor.  The paid family leave program did not exist in 2013 and does not have any relationship to uFACTS or the Deloitte technology you reference in your letter. Also, Sagitec disputes the assertion that the Deloitte logo appeared in any Sagitec client presentation.  Finally, the assertions made about the District of Columbia project are based on incorrect assumptions about that project that could be clarified in a discussion with your client.  In summary. these examples do not support the level of effort you are requesting in your demand.

Nonetheless, Sagitec does remain open to a discussion with your client. We believe that is the best and most efficient way to resolve your client's concerns.  For example, we believe that a discussion of the District of Columbia project would quickly resolve that concern.   That discussion could be face-to-face or by teleconference.  Another alternative would be a brief teleconference that is followed by a face-to-face meeting.

With the foregoing in mind, please ask your client to reconsider Sagitec's offer of a discussion.

Thanks.

Tim

**Timothy Keller**
Principal



**T Keller PLLC**
7901 Telegraph Road, Bloomington, MN 55438
Office: 952.217.4596 | Cell: 612.860.1258
tim@tkeller.legal | tkeller.legal

********************************************************************************************************
*****************************
This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized use or disclosure is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# EXHIBIT 17

Message

| | |
|---|---|
| **From:** | Minkkinen, David [/O=SAGITEC/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MINKKINEN, DAVID484] |
| **Sent:** | 8/15/2016 2:28:18 PM |
| **To:** | Timothy Keller [tim@tkeller.legal] |
| **Subject:** | RE: DLLR letter |
| **Attachments:** | DLLR Response Letter 8-10-2016.docx |

Please use this updated version.  I made a few updates.

**David Minkkinen**
Partner
**Sagitec Solutions**
422 County Road D East, Little Canada, MN 55117
Cell: 612-759-7738
david.minkkinen@sagitec.com | www.sagitec.com

---

**From:** Timothy Keller [mailto:tim@tkeller.legal]
**Sent:** Monday, August 15, 2016 2:28 PM
**To:** Minkkinen, David
**Subject:** RE: DLLR letter

I'll take a look later this afternoon.

Thanks.

Tim

**Timothy Keller**
T Keller PLLC
Office: 952·217·4596
Cell: 612·860·1258
tim@tkeller.legal

---

**From:** Minkkinen, David [mailto:David.Minkkinen@sagitec.com]
**Sent:** Monday, August 15, 2016 2:09 PM
**To:** Timothy Keller <tim@tkeller.legal>
**Subject:** DLLR letter

Tim,

Can you review the attached response?  The MWC leadership received an email from a "challenging" employee from West Virginia and they wanted an official response from us on record.

They do not agree with these assertions and are not concerned.

I will call you to give you context.

Please edit our response with revision marks on

**David Minkkinen**
Partner
Sagitec Solutions

SS0010266
SAGITEC-DEL_00060093

422 County Road D East, Little Canada, MN 55117
Cell: 612-759-7738
david.minkkinen@sagitec.com | www.sagitec.com

CONFIDENTIAL

# EXHIBIT 18

| Message | |
|---|---|
| **From:** | Minkkinen, David [/O=SAGITEC/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MINKKINEN, DAVID484] |
| **Sent:** | 8/15/2016 4:19:13 PM |
| **To:** | Timothy Keller [tim@tkeller.legal] |
| **CC:** | Jain, Piyush [/O=SAGITEC/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Jain, Piyush]; Deshler, Rick [/O=SAGITEC/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Deshler, Rick] |
| **Subject:** | RE: DLLR letter - Attorney Client Privileged. |

We are not going to hold off on our response.  I have personally discussed this with the assistant secretary.  They do not have any concerns.  This is one employee on West Virginia.

They wanted a response on record.  Please review as I requested.  I will talk to Piyush separately.

Sent via the Samsung Galaxy S7 active, an AT&T 4G LTE smartphone

-------- Original message --------
From: Timothy Keller <tim@tkeller.legal>
Date: 8/15/16 5:13 PM (GMT-05:00)
To: "Minkkinen, David" <David.Minkkinen@sagitec.com>
Cc: "Jain, Piyush" <piyush.jain@sagitec.com>, "Deshler, Rick" <rick.deshler@sagitec.com>
Subject: RE: DLLR letter - Attorney Client Privileged.

I took a first read through this.  The allegations are certainly serious. They might be the first step in legal action by Maryland.  Even if that is not the case though, how we respond might affect other issues in the future – including how we prepare proposals for other transactions.

I've talked briefly with Piyush about this, and he agreed that we need to take a step back and evaluate our response in a more strategic light.  For that reason he wants to hold off sending a response until we get a chance to do make that evaluation.

I'll continue reviewing this in greater detail in the meantime.

Thanks.

Tim

**Timothy Keller**
T Keller PLLC
Office: 952·217·4596
Cell: 612·860·1258
tim@tkeller.legal

---

**From:** Minkkinen, David [mailto:David.Minkkinen@sagitec.com]
**Sent:** Monday, August 15, 2016 2:28 PM
**To:** Timothy Keller <tim@tkeller.legal>
**Subject:** RE: DLLR letter

SS0010273
SAGITEC-DEL_00060100

Please use this updated version.  I made a few updates.

**David Minkkinen**
Partner
Sagitec Solutions
422 County Road D East, Little Canada, MN 55117
Cell: 612-759-7738
david.minkkinen@sagitec.com | www.sagitec.com

---

**From:** Timothy Keller [mailto:tim@tkeller.legal]
**Sent:** Monday, August 15, 2016 2:28 PM
**To:** Minkkinen, David
**Subject:** RE: DLLR letter

I'll take a look later this afternoon.

Thanks.

Tim

**Timothy Keller**
T Keller PLLC
Office: 952·217·4596
Cell: 612·860·1258
tim@tkeller.legal

---

**From:** Minkkinen, David [mailto:David.Minkkinen@sagitec.com]
**Sent:** Monday, August 15, 2016 2:09 PM
**To:** Timothy Keller <tim@tkeller.legal>
**Subject:** DLLR letter

Tim,

Can you review the attached response?  The MWC leadership received an email from a "challenging" employee from West Virginia and they wanted an official response from us on record.

They do not agree with these assertions and are not concerned.

I will call you to give you context.

Please edit our response with revision marks on

**David Minkkinen**
Partner
Sagitec Solutions
422 County Road D East, Little Canada, MN 55117
Cell: 612-759-7738
david.minkkinen@sagitec.com | www.sagitec.com

CONFIDENTIAL

# EXHIBIT 19

| Message | |
|---|---|
| **From:** | Minkkinen, David [/O=SAGITEC/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MINKKINEN, DAVID484] |
| **Sent:** | 8/16/2016 9:57:18 PM |
| **To:** | Timothy Keller [tim@tkeller.legal] |
| **CC:** | Deshler, Rick [/O=SAGITEC/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Deshler, Rick]; Jain, Piyush [/O=SAGITEC/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Jain, Piyush] |
| **Subject:** | RE: Maryland Letter |

Yes you are correct.  This is not what I expected and is not consistent with what we discussed.

Sent via the Samsung Galaxy S7 active, an AT&T 4G LTE smartphone

-------- Original message --------
From: Timothy Keller <tim@tkeller.legal>
Date: 8/16/16 9:48 PM (GMT-06:00)
To: "Minkkinen, David" <David.Minkkinen@sagitec.com>
Cc: "Deshler, Rick" <rick.deshler@sagitec.com>, "Jain, Piyush" <piyush.jain@sagitec.com>
Subject: Maryland Letter

The draft is attached.  This one is harder than it looks, and as is often the case, my perspective evolved as I wrote.  In the end, I kept to the less is more approach.  However, I've built this in a way that more detail can be added; either in the form of examples in the body of the letter or as an attachment as we discussed.

I know it's not what you expected, but it's my recommendation.  Of course it's subject to everyone's comments and requirements.  Certainly I will need input on the tone.  Maybe you, Rick and I can get on a short call tomorrow.

In any event, I think we should take advantage of Ms. Carter's offer to talk before we send the final letter.  In know you are the one with the best understanding of the people and the situation.  However, as I understand it, she's new to this and it might be good to feel her out a little before we take the next step.

Thanks.

Tim

**Timothy Keller**
T Keller PLLC
Office: 952·217·4596
Cell: 612·860·1258
tim@tkeller.legal

CONFIDENTIAL

# EXHIBIT 20



January 15, 2017

Jessica Carter, Assistant Attorney General
500 North Calvert Street – Suite 406
Baltimore, Maryland 21202-3659

Dear Ms. Carter,

This letter is in response to your letter of December 7, 2016.  You requested additional information related to matters discussed in a meeting held on November 10, 2016 between Sagitec and representatives of the MW Consortium, including Project Steering Committee members.

As stated in our letter dated August 23, 2016 and restated at the November 10, 2016 meeting, we ask that the Department accept our assurance that Sagitec has not provided the Department any software improperly obtained from another company.  This is consistent with Sagitec's business ethics and practices.  It is also consistent with the terms of the Contract, which include representations and warranties regarding both Sagitec's ownership of the subject software, as well as the freedom of that software from the infringement of third party intellectual property rights.

In the attachment, we provide a detailed response to each of your concerns as you requested.  The responses include confidential information and we request that this information is protected from public disclosure.

In addition, we have provided a great deal of information in this response, in previous correspondence and in meetings with you.  Gathering the requested information and preparing those responses has been time consuming, but we think it has been important to address your concerns as best we reasonably can.  We believe the effort we have made and the information we've provided should be sufficient, and we would like to focus our attention and energy on the project.

We respectfully ask that you agree and that you consider this matter closed.

Regards,

Senior Partner | Sagitec Solutions, LLC.

| 612-759-7738 | david.minkkinen@sagitec.com

---

CONFIDENTIAL                                                                                   SAGITEC-DEL_02588547



The following provides Sagitec's detailed response to the questions you raised:

1.  We understand that the solution underlying Sagitec's proposal has multiple layers as depicted in your diagram below.



a.  When did Sagitec develop the "Sagitec Framework" for Enterprise Framework Services (gray box above), and when was it first commercially marketed?

**Sagitec Response:**  Sagitec developed the "Sagitec Framework" for Enterprise Framework Services (gray box above) beginning in April 2004 and has since enhanced the Framework with new versions.  It was commercially marketed in September 2004 to the Kansas Public Employees Retirement System and has been in use by nearly two dozen clients, beginning with the first implementation in 2005.  Please see the following press release regarding this implementation:

http://www.prweb.com/releases/2005/12/prweb317829.htm

Since 2004, we have upgraded the Framework in parallel with Microsoft's .NET platform, incorporating new features into our products and solutions.  Our product roadmap is strategically defined every two years to ensure our customers have access to updated products that integrate newer technology trends and business functionality. The following diagram demonstrates our current product roadmap that highlights the evolution of Sagitec's software products through 2017. Sagitec is in the process of updating the product roadmap beyond 2017.

---

CONFIDENTIAL                                                                SAGITEC-DEL_02588548



**Sagitec's Current Product Road Map**

Sagitec continues to enhance its framework and product offerings for the benefit of the MW consortium. The following tables highlight the upgrades and evolution of our products and solutions over the past 12 years, illustrating our ongoing commitment to and investment in our solutions and products.

| Evolution of the Sagitec Framework™ from 2004 to 2009 | | | |
|---|---|---|---|
| **Area of Evolution** | **Framework 1.0 (2004)** | **Framework 2.0 (2005)** | **Framework 3.0 (2009)** |
| Enterprise Architecture | First release based on .NET 1.1; N-tier architecture; XML-based representation | Implemented generics, master pages and multi-threaded batch services | Implemented asynchronous messaging; Introduced NeoFlow based on Windows Workflow Foundation (WWF) |
| Enterprise Integration | SQL server database. | Implemented DB2/400 database; LDAP authentication, ECM integration adaptors; Financial (GL) integration adaptors | Implemented multi-factor authentication framework (RSA/PassMark/Entrust); MSMQ integration |

---

**Sagitec Solutions, LLC | 422 County Road D East, Saint Paul, MN 55117 | (612) 284-7130**
**www.sagitec.com**

SAGITEC-DEL_02588549



| Evolution of the Sagitec Framework™ from 2004 to 2009 | | | |
|---|---|---|---|
| **Area of Evolution** | **Framework 1.0 (2004)** | **Framework 2.0 (2005)** | **Framework 3.0 (2009)** |
| Security & Control | Deployed role-based security; fine grained security at control level | Data-based security; Rule-based security; Fine grained auditing at field level | Implemented Exception management framework; Fine-grained user activity logging |
| Usability | 100% browser based; Based on ASP.NET Web forms | Allow user preferences; Updated Web controls; Smart Navigation | Implemented AJAX controls; Seamless Workflow-driven processes; CSS styling |
| Business/ System Management | Manage reference values, messages, security, etc.; Batch Process Monitor | Enhanced Batch Monitor across servers; Integrated exception management | Implemented Workload monitoring |
| SDLC Management | Deployed Studio for designing Web Forms and Business Rules (Validations) | Support for designing Correspondence, Reports, and interface file layout | Support for Workflow Diagram design; Studio support for Prototype; Automated migration using Cruise Control; Automated code review using Code-Gym |

The Sagitec Framework™ Evolution from 2004 to 2009

| Sagitec Framework™ Evolution from 2010 through 2015 | | | |
|---|---|---|---|
| **Area of Evolution** | **Framework V4.0 (2010)** | **Framework V4.0 (2011)** | **Framework V4.5 (2014)** |
| Enterprise Architecture | Implemented parallel computing extensions; Enriched asynchronous messaging; 64-Bit version; Multi-processor computing; Updated Workflow Engine | Implemented "on the fly" ADA compliance; OpenXML; architecture for multilingual support | Migration to MVVM architecture; Migration to Web API from WCF; Upgraded Rule Engine performance with DLR |
| Enterprise Integration | Added SharePoint integration adaptor; Upgraded ECM adaptors; | First deployment on Oracle | |
| Security & Control | Added encryption at database, file, and document level | Implemented Full audit; Full tracing; Performance monitoring; Addressed sans top 25 security vulnerability | |

**Sagitec Solutions, LLC | 422 County Road D East, Saint Paul, MN 55117 | (612) 284-7130**
**www.sagitec.com**



| Sagitec Framework™ Evolution from 2010 through 2015 | | | |
|---|---|---|---|
| **Area of Evolution** | **Framework V4.0 (2010)** | **Framework V4.0 (2011)** | **Framework V4.5 (2014)** |
| Usability | Implemented JQuery UC controls | Implemented Spell checking; Accordion panels; Enhanced user preferences; Enhanced experience such as cascading dropdown, automated grid formatting, etc. | Implemented Kendo UC controls; Enhanced charting controls; CSS3 styling; Advanced HTML 5.0 features; Native Mobile Application Support |
| Business/ System Management | Performance and control reports | Dashboard; Calendaring/Scheduling | Added Decision Tables and Logical Rules to Rules Engine; Implemented Process Modeling and Execution using BPMN 2.0 Standards |
| SDLC Management | Launched NeoCertify for Unit testing, Regression testing, Build Verification testing Enhanced support for file design and correspondence design | Enhanced Sagitec Test Studio™ for Performance testing Automated System Test case documentation Updated Studio with WPF controls and provided run time view during design | Deployed the Sagitec Analyst Studio™ for modeling and testing business rules independent of the solution Deployed the Sagitec Modeling Studio™ to model business processes and automate execution |

*The Sagitec Framework™ Evolution from 2010 to 2015*

This aforementioned information was disclosed in our proposal.

b. When did Sagitec develop the "Sagitec Framework" for Enterprise Application Management Services (blue box above), and when was it first commercially marketed?

**Sagitec Response:** Sagitec developed the Sagitec Framework in April 2004 and has since enhanced it with major upgrades. It was first commercially marketed in September 2004 and has been operating in production environments since September 2005.

c. When did Sagitec develop the "Sagitec Framework" for Neosurance Solution – Benefit Services (orange box above), and when was it first commercially marketed?

**Sagitec Response:** Sagitec developed our Neosurance Solution – Benefit Services (orange box above) beginning in August 2013 and has since been enhancing the Neosurance Solution with new features and functions. The Neosurance solution was developed using the Sagitec Framework and Sagitec design and development tools. No other software can work on top of the Sagitec Framework unless it has been developed using Sagitec's design and development tools. Neosurance was first commercially marketed in 2013 and implemented in production in October 2014.

---

*Sagitec Solutions, LLC | 422 County Road D East, Saint Paul, MN 55117 | (612) 284-7130*
*www.sagitec.com*



d.  Is Sagitec in possession of all source code for all of the above components?

**Sagitec Response:**  Yes.  Sagitec possesses and owns the source code for all of the above software components.

e.  Who were the lead developers for each component?

**Sagitec Response:**  Sagitec assigns teams to maintain and enhance each of these software components.  We do not assign lead developers to design and develop these software platforms.  Please see below the teams assigned to the software components outlined above:

- Enterprise Framework Services – Sagitec's Framework Team
- Enterprise Application Management Services – Sagitec's Framework Team
- Neosurance Solution – Benefit Services – Sagitec's Neosurance Product Team

Sagitec is a matrix organization and the resources assigned to these teams change frequently.

2.  To the extent that pre-existing Sagitec frameworks or other code are being customized for the MW Consortium, who are the key developers?

**Sagitec Response:**  Sagitec Enterprise Framework Services or Enterprise Application Management Services are the core building blocks of our solution offering and are used by all of our clients in the UI and Public Pension domain.  Therefore, these components are maintained only by the Sagitec Framework team.  If any changes are required to these two components of the framework to support a function required for the MW consortium, the Sagitec Framework team evaluates these needs and incorporates them into these two components by ensuring the change does not adversely affect any of our existing clients.

Modifications to the Neosurance Solution Benefit Services are made by either the product team or the project team depending on the nature of the change.  Sagitec evaluates each change that is needed for the MW Consortium and determines if this change has to be made at the product level in order to roll this feature on to all of our clients.  If it is determined to be a change that will be made at the product level, the change is made by our product team to the base solution which is then made available to the MW consortium and other project teams.  If the change is not planned to be incorporated into the base solution, then the change is made by the project team.

3.  Of the individuals identified in response to Question #2, which of these were formerly employed by Deloitte, and what dates were they employed by Deloitte?  What was the scope of their responsibilities at Deloitte?

**Sagitec Response:**  Sagitec did not recruit developers from Deloitte to work on our solutions and products.  The type of resources who left Deloitte and subsequently joined Sagitec included technical architects, project management, development management, data conversion analysts and UI subject matter experts.  Each of these resources was hired based on their experience and

CONFIDENTIAL



expertise in implementing unemployment insurance solutions.  The table below outlines the 13 individuals that were formerly employed by Deloitte:

| Name | Dates of Employment | Responsibilities |
|---|---|---|
| David Minkkinen | May 2009 – June 2013 | UI Practice Leader |
| Sivaraman Sambasivam | May 2009 – September 2013 | Project Management (Director) |
| Pankaj Sharma | May 2009 – December 2013 | Technical Architect |
| Bernt Peterson | May 2009 – December 2013 | Functional team manager |
| Sindhu Nair | May 2009 – September 2015 | Technical Architect |
| Srinivas Kurra | May 2009 – December 2014 | Data Conversion Lead |
| Revathy Rajaraman | May 2009 – February 2015 | Development Manager |
| Praveen Rengaraj | May 2009 – June 2014 | Functional team lead |
| Karthik Sadasivam | May 2009 – November 2012 | Technical Architect |
| Prabhu Tegur | May 2009 – February 2015 | Development Manager |
| Deepa Sundaram | June 2012 – December 2015 | Subcontractor to Deloitte – Data Conversion Analyst |
| Venkat Kakula | May 2009 – December 2015 | Development Manager |
| Marcel Mascarenhas | May 2009 – October 2014 | Technical Architect |

4. Did any of those individuals have access to Deloitte source code used in Unemployment Insurance (UI) systems while employed at Deloitte?  If so, describe their level of access.

   **Sagitec Response:**  Development management resources identified in the table above would have had access to portions of Deloitte source code used in Unemployment (UI) systems while employed at Deloitte.

5. Did any of those individuals retain any software, source code, data tables, data structures, data dictionaries, documentation, deliverables, or other works of authorship authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client after leaving Deloitte's employment?  If so, who and what?

   **Sagitec Response:**  To our knowledge, none of those individuals retained any software, source code, or any other tangible artifacts authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client after leaving Deloitte's employment.

6. Did Sagitec or Sagitec personnel ever obtain copies of any software, source code, data tables, data structures, data dictionaries, documentation, deliverable or other works of authorship authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client?  If so, who, what, when and how?

   **Sagitec Response:**  Sagitec has not obtained copies of any software, source code, or any other tangible software artifacts authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client.

CONFIDENTIAL



7.  Have Sagitec or Sagitec personnel ever incorporated any software, source code, data tables, data structures, data dictionaries, documentation, deliverable or other works of authorship authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client into anything delivered to the MW Consortium?  If so, who, what, when and how?

    **Sagitec Response:**  Sagitec has not incorporated any software, source code, or any other tangible software artifacts authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client into anything delivered to the MW Consortium.

8.  How is the Sagitec Framework/Neosurance Solution code similar to and/or different from the solution that was provided by Deloitte UI solutions to its clients, including the system developed for Massachusetts?

    **Sagitec Response:**  Based on our knowledge, the Sagitec Framework/Neosurance Solution software code is completely different from the solution that was provided by Deloitte UI solutions to its clients, including the system developed for Massachusetts.  The following tables outline the significant differences between the two solutions.

    Sagitec Framework components – Enterprise Framework Services (gray box above) and Enterprise Application Management Services (blue box above) have been in existence since 2004 and implemented at 25 State and Local governments over the last 12 years.  The Sagitec Framework is consistently enhanced/upgraded by our product team to integrate technology advancements in the industry.  To the best of our knowledge, the following table highlights the technology used by the Sagitec Framework components and the equivalent offering from the Deloitte Framework:

| Component | Sagitec Solution Offering | Deloitte Solution Offering |
|---|---|---|
| Database | SQL Server | Oracle or DB2 |
| Source Code | .Net 5.0 | .Net 3.5 |
| HTML | HTML 5.0 | HTML 2.0 |
| XML based processing for online screens | Yes | No |

    Furthermore, Sagitec's Framework provides multiple integrated features that offer the following services which are not included in Deloitte's solution framework:

| Component | Sagitec Solution Offering | Deloitte Solution Offering |
|---|---|---|
| Workflow Engine | Sagitec's proprietary workflow engine | 3rd party workflow engine such as FileNet BPM |
| Batch Scheduler | Sagitec's proprietary batch schedule | 3rd party batch schedule such as Argent or UC7 |
| Rules Engine | Sagitec's proprietary Rules Engine | None |
| Correspondence Generation Engine | Sagitec's proprietary correspondence engine | 3rd party correspondence generation tools such as Pitney Bowes or HP Extreme. |

CONFIDENTIAL

SAGITEC-DEL_02588554



The Neosurance Solution code is developed by the Sagitec product team to execute using Sagitec Framework components – Enterprise Framework Services (gray box above) and Enterprise Application Management Services (blue box above) using the proprietary Sagitec design and development tools. The differences between Sagitec and Deloitte's design and development tools are outlined in the table below:

| Component | Sagitec Solution Offering | Deloitte Solution Offering |
|---|---|---|
| Screen development | Sagitec Design Studio | Deloitte's proprietary tool |
| Interface File processing development | Sagitec Design Studio | Microsoft Visual Studio |
| Rules Engine | Sagitec Analyst Studio | None |
| Workflow | Sagitec Modeling Studio | FileNet BPM |
| Correspondence Development | Sagitec Design Studio | 3rd party correspondence generation tools such as Pitney Bowes or HP Extreme. |

9.  With what other Federal, State, local government entities has the Sagitec Framework or the Neosurance Framework (or any of their components) been utilized or adapted? Describe Sagitec's activities with that government entity, including the dates that the Sagitec Framework or the Neosurance Solution (or components) project was utilized or adapted.

    **Sagitec Response:** Sagitec's Framework has been utilized or adapted by the following Federal, State, local government entities. Following are the names, Sagitec's activities and the dates during which the Sagitec Framework has been utilized or adapted:

| Entity | Sagitec's Activity Description | Date |
|---|---|---|
| 21 State and Local Pension Administration agencies.<br><br>A confidential list of clients can be provided upon request. | Implementation of Sagitec Framework and Neospin Solution (Pension Solution) | 2004 - 2016 |
| Washington DC Department of Employment Services (DOES) | Implementation of Sagitec Framework and Neosurance Solution (UI Solution) | Implemented in October 2014 |
| South Carolina Department of Employment and Workforce (SCDEW) | Implementation of Sagitec Framework and Neosurance Solution (UI Solution) | Planned for implementation in August 2017 |

10. Of those individuals identified in response to Question #2 above, which of those worked on Sagitec activities with government entities identified in response to question #9?

    **Sagitec Response:** Members of the Sagitec Framework team, Neosurance Product Team and Sagitec Project Team assigned to the specific project.

---

CONFIDENTIAL                                                                  SAGITEC-DEL_02588555



11. Has Sagitec bid on or been awarded a contract for any other UI modernization project? If so, please describe these projects, including the dates of these projects, and identify any of these projects Sagitec is currently working.

   **Sagitec Response:** Sagitec has bid and been awarded the following contracts for UI Modernization Projects:

| Entity | Sagitec's Activity Description | Date |
|---|---|---|
| Washington DC Department of Employment Services (DOES) | Implementation of employer tax services to maintain their accounts, file wages, make payments and perform UI Tax business processes. Operation and Maintenance Services. | March 2014 – current date. The Sagitec Framework and the Neosurance Solution was implemented in October 2014. Most recent contract extension is through September 2018. |
| South Carolina Department of Employment and Workforce (SCDEW) | Modernization of SCDEW UI Tax System.  Operation and Maintenance and Infrastructure as a Service provider. | May 2016 – current date; The Contract is through August 2023. Implementation is planned for August 2017. |

   Sagitec submitted bids on the following UI Modernization RFPs and the outcome of these RFPs are listed in the table below:

| Entity | RFP Goal | Outcome |
|---|---|---|
| Tennessee | UI Benefits Modernization | Not Awarded to Sagitec – awarded to another vendor |
| Washington State | UI Benefits Modernization | Not Awarded to Sagitec – awarded to another vendor |
| Pennsylvania | UI Benefits Modernization | Proposal evaluation in progress |

12. Of those individuals identified in response to Question #2 above, which of whose worked on the other UI modernization projects identified in response to Question #11?

   **Sagitec Response:**  Members of the Sagitec Framework team, Neosurance Product Team and Sagitec Project Team assigned to the specific project.

---

CONFIDENTIAL                                                                 SAGITEC-DEL_02588556



13. Documentation for the MW Consortium project data-mapping sessions, as well as the project's ER diagram, referenced the Massachusetts One-Stop Employment System (MOSES). Additionally, some of the code tables included pre-populated Massachusetts- specific county codes. Please explain why these anomalies, which have since been removed, occurred. From where and why did they originate?

   **Sagitec Response:** The Neosurance Solution includes generic tables for workforce integration due to the fact each state client requires integration with a different workforce system. As a result, these tables are not included in our base solution because the integration is specific to each state. In terms of the MOSES reference, Sagitec hired a new data conversion resource that previously worked on the Massachusetts UI implementation. During the table mapping exercise, this resource inadvertently referred to the workforce tables as MOSES due to their previous experience in Massachusetts. The workforce tables that will be included in the MWC solution will be specific to the MAC integration in West Virginia and the Geographic Solution's integration in Maryland. This integration will include a customized set of tables that will integrate with the different workforce systems in each state. In addition, the Neosurance Solution includes system code parameter tables. These tables are used to identify system parameters that are unique to a specific state. Due to the fact we have multiple implementations and we have provided Neosurance demonstrations to over 30 states, these system code parameter tables could include references to other states. During product configuration sessions, these system parameters will be configured to reflect Maryland and West Virginia business rules.

14. Are there prior versions and/or predecessors of the Sagitec Neosurance Solutions or Sagitec Framework that are built on the same technologies and/or platform on which the MOSES system was developed?

   **Sagitec Response:** No. The MOSES system was a custom developed workforce system used specifically for the Commonwealth of Massachusetts. This system was developed over 15 years ago and used legacy COBOL/mainframe technology.

15. What support can you provide for your statement in the November 10 meeting that a replication of Deloitte's source code in the Sagitec system would be "technically impossible."

   **Sagitec Response:** As discussed in our response to question #8, the technologies used by the Sagitec solution and the Deloitte solution are significantly different. The design and development process used by Sagitec and Deloitte use different tools, processes and techniques. Due to these significant differences, the replication of Deloitte's source code in Sagitec's product and solutions is technically impossible.

---

CONFIDENTIAL                                                                                    SAGITEC-DEL_02588557



16. Please address the concern that Sagitec has been unable to make certain changes in its system requested by West Virginia during development, which suggested that Sagitec might not have access to all original source code.  In particular, the concern focused on Sagitec's unwillingness to modify its database design, such as the use of any Massive Unified Code Key table and a lack of junction tables.

   **Sagitec Response:**  Sagitec has provided responses to the concerns raised by MWC technical team regarding the database design utilized in Neosurance and Sagitec frameworks in our previous responses to these concerns.

   In summary, our database design utilizes third normal form design with the exception of few tables that utilize second normal form.  Utilization of second normal form is limited to very few instances where the data is stored temporarily.  MWC technical staff have reviewed our responses to the concerns raised and subsequently approved the Database design deliverables for the T01, B01, T02 and B02 iterations.  The unified code key table design used by our code tables is a part of the Sagitec Framework used by all of our clients from both our Retirement Solution Practice and Unemployment Insurance Practice for the last 12 years.  Sagitec has stated to MWC technical team that any tables starting with SGS_, SGW_ are part of Sagitec framework used by all of our clients and are not subject to change by the project team.  Sagitec makes changes to the database (tables starting with SGT_) and application code to address the gaps identified during the fit-gap session.

17. Is Sagitec aware of any allegations or questions raised by Deloitte or other third parties (other than those raised by the MW Consortium itself) about the possibility of misappropriation by Sagitec of Deloitte's intellectual property?

   **Sagitec Response:**  No.

18. Has Deloitte made any allegations that any partner, employee or other representative of Sagitec has violated his or he non-compete agreement with Deloitte?

   **Sagitec Response:**  No.

19. At the time Sagitec was formed, was there any discussion or controversy with representatives of Deloitte over Sagitec's use of any Deloitte framework or intellectual property or any knowledge in the possession of former Deloitte employees?  If so, what and when?

   **Sagitec Response:**  No.

20. Following DLLR's letter of July 25, 2016, or the "cease and desist" letter to Sagitec from Deloitte dated October 3, 2016, did Sagitec perform any internal inquiry or investigation into the allegations, and, if so, what if any actions were taken as a result?

   **Sagitec Response:**  Sagitec performed an internal audit of the source code to ascertain if there were any references to Deloitte intellectual property in our products.  This audit confirmed that there were no references to Deloitte intellectual property.

---

CONFIDENTIAL

SAGITEC-DEL_02588558



21. Are there any further steps that Sagitec can take to assure the Consortium members that concerns about possible misappropriation have no basis in fact, such as, for example, a third party source code review?

>   **Sagitec Response:**  We do not believe there are any additional steps to be taken by Sagitec.

>   We would not agree to expose Sagitec proprietary information to a third-party in a code review. In addition, we would not agree to assume the expense of such a review.  More importantly, we cannot agree to disclose to any third-party any of the confidential information that we have provided in response to your inquiries.  We also cannot agree to the disclosure of even the fact that you have made these inquiries.

>   Sagitec has a reasonable concern that the disclosure of this matter, and any information disclosed in this matter, could cause damage to Sagitec's business reputation.  Involving third-parties would increase that risk.

>   We are also concerned about our employees.  Our employees have a right to be concerned about their professional reputations.  There is no reason to think any Sagitec employee has done anything wrong, and it is unreasonable to suggest otherwise.

>   Finally, it is our understanding that one individual's ongoing and baseless allegations are the root cause of this matter.  We would appreciate your help in addressing that problem.  We believe that resolving it is the best way to bring this matter to a conclusion.

>   We do not believe there are any additional steps to be taken by Sagitec.

22. In Attachment N to the RFP, Sagitec responded that, at the time of Bid/Proposal Submission, it had no plans to perform any services required under the Contract outside the United States.  Please explain whether, since the commencement of the Contract, Sagitec is or has been providing services required under the Contract outside the United States and, if so, what services.

>   **Sagitec Response:**  Sagitec has a project team of approximately 40-45 staff on site at Baltimore who work on the MW consortium project.  In addition, Sagitec has a product team of 10 staff at our headquarters in Minnesota who work on the Neosurance product and support the various projects including the MW Consortium Project.  Our work for the MW Consortium project is performed by these teams.  Sagitec does have a Framework product team based out of our offices in India.  This was disclosed in our proposal.  However, our product teams in India specifically works on product development activities, Sagitec design and development tools and Sagitec Framework upgrades pertaining to our base solution.

23. Please state whether members of your product team in India are employed by Sagitec Solutions, LLC, by an affiliate of Sagitec Solutions, LLC, or by some other entity.  If by anyone other than Sagitec Solutions, LLC itself, please identify each such entity and the role of its personnel in the development of the UI solution for the MW Consortium.

>   **Sagitec Response:**  Members of our product team in India are employed by Sagitec Solutions Pvt. Limited., which is Sagitec Solutions LLC's fully owned India operations entity.  Sagitec Solutions Private Limited is a captive unit that provides services only to Sagitec Solutions, LLC.

CONFIDENTIAL

# EXHIBIT 21

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 22

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 23

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 24

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 25

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 26

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 27

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 28



**BRIAN E. FROSH**
*Attorney General*

**STATE OF MARYLAND**
**OFFICE OF THE ATTORNEY GENERAL**

**ELIZABETH F. HARRIS**
*Chief Deputy Attorney General*

**DONNA HILL STATON**
*Deputy Attorney General*

**CAROLYN QUATTROCKI**
*Deputy Attorney General*

FACSIMILE NO.

WRITER'S DIRECT DIAL NO.
410-230-6112

January 25, 2017

*By First Class Mail and E-mail*

Mr. David Minkkinen
Partner
Sagitec Solutions
422 County Road D East
Little Canada, MN 55117

Re:    MW UI Modernization Project – Contract with Sagitec Solutions

Dear Mr. Minkkinen:

Thank you for your letter of January 15, 2017 and the thoroughness of your response to our follow-up questions. We have reviewed it internally, from a legal and technical perspective, and are comfortable with your response. We consider this matter closed, assuming no new concerns are raised. We also recognize the sensitive, confidential nature of your response and this inquiry and will maintain confidentiality as permitted by law. Please let me know if you have any questions.

Very truly yours,

Jessica V. Carter
Principal Counsel

CONFIDENTIAL

SAGITEC-DEL_02588560

# EXHIBIT 29

**From:** Timothy Keller [tim@tkeller.legal]
**Sent:** 10/9/2019 7:38:32 PM
**To:** Kristen McCallion [McCallion@fr.com]
**Subject:** Deloitte - Sagitec Matter

I reviewed our correspondence in the effort to identify the principal misunderstandings that have led to your client's concern. The key misunderstanding appears to be your client's belief that the subject Sagitec product was developed in an unusually shorter period of time. We believe that misunderstanding results from a mistaken assumption about the nature of the Sagitec product. The subject Sagitec product consists of more than the business solution developed for its target market. In fact, the subject product was built to work with a Sagitec-owned domain neutral software technical platform or framework. That domain neutral software technical platform or framework which is the engine that operates the subject Sagitec product pre-existed the subject Sagitec product and has been implemented in over 20 client locations since 2004.

We also believe that a big part of the misunderstanding is the speed in which Sagitec implemented an Unemployment Insurance Employer Portal for a Washington D.C. client. This first Unemployment Insurance Employer Portal implementation occurring in October 2014 included a very limited set of business functions only. The portal was primarily a web front-end portal with limited functionality, which utilized the existing legacy backend UI system for transaction processing. This portal solution also leveraged Sagitec's domain neutral software technical platform which has been in use by our other clients since 2004.

I am hopeful that this information will correct any misperception in this regard, and will put this matter behind us.

Thank you.

Tim

**Timothy Keller**
Principal

---



**T Keller PLLC**
7901 Telegraph Road, Bloomington, MN 55438
Office: 952.217.4596 | Cell: 612.860.1258
tim@tkeller.legal | tkeller.legal

Confidential

# EXHIBIT 30



UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON GRAND JURY 2021
MAY 31, 2023 SESSION

UNITED STATES OF AMERICA

v.                                          CRIMINAL NO. 2:22-cr-00163
                                            18 U.S.C. § 1832(a)(5)
                                            18 U.S.C. § 1349
                                            18 U.S.C. § 1343
DAVID GERALD MINKKINEN and                  18 U.S.C. § 1001(a)(2)
SIVARAMAN SAMBASIVAM                        18 U.S.C. § 2

S U P E R S E D I N G
I N D I C T M E N T

The Grand Jury charges that:

**INTRODUCTION**

At all times relevant to this indictment:

1.      Deloitte was an international company that provided various financial and advisory
services, including unemployment claims management services. Deloitte owned and marketed a
proprietary web-based software platform named Unemployment Framework for Automated Claim
& Tax Services ("uFACTS") to process unemployment insurance claims for state agencies. The
uFACTS source code, database, data tables, use cases, software designs, business rules, schema,
logic, artifacts, and architecture constituted Deloitte intellectual property.

2.      As of July 2013, the states of Minnesota, New Mexico, and Massachusetts, had
implemented uFACTS.

3.      Sagitec Solutions, LLC ("Sagitec") was a global "technology solutions" company
founded in 2004 and headquartered in Saint Paul, Minnesota. Sagitec provided a variety of
information technology products to private and public institutions.

1

4.  In or about July 2013, Sagitec launched its Unemployment Insurance ("UI") practice.

5.  Between in or about June 2013, to in or about December 2015, at least eleven Deloitte employees left Deloitte to work for Sagitec, including defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM**. Defendant **DAVID GERALD MINKKINEN** joined Sagitec in or about July 2013 as a senior partner at Sagitec to oversee its UI practice and defendant **SIVARAMAN SAMBASIVAM** joined Sagitec in or about September 2013 as a senior partner at Sagitec to oversee client service delivery for its UI practice.

6.  Before joining Sagitec, defendant **DAVID GERALD MINKKINEN** was the UI Practice Leader at Deloitte from in or about May 2009 to in or about June 2013, and defendant **SIVARAMAN SAMBASIVAM** was employed by Deloitte from April 2009 until September 2013, serving as the lead system architect for the uFACTS Solution Framework.

7.  Deloitte's employment contracts with defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM**, and with other former Deloitte employees, established that any information, materials, and records prepared by or for Deloitte or used in connection with Deloitte's operations were the proprietary property of Deloitte and must remain confidential. In each of their contracts, defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM** both promised that they would not disclose any Deloitte proprietary property to third parties, nor would they remove or retain such property after leaving Deloitte's employment.

8.  On or about June 20, 2013, before leaving his employment at Deloitte, defendant **DAVID GERALD MINKKINEN** received by email a Deloitte Partner/Principal resignation checklist, which contained sections entitled "Your Obligation to Return Computer and Software

2

Equipment" and "Your Obligation to Return Client Work Papers Belonging to the Deloitte U.S. Firms and Their Clients." The checklist stated that "[y]ou should not copy client or Deloitte information off your equipment." The checklist also directed that the partner/principal must "[r]eturn all records checked out in your name in the Deloitte Records Management System (DRMS) to Central Files," and that "[a]ll work in progress files (not checked out to you in DRMS) should be returned to Deloitte in accordance with directions you receive from your leadership."

9.     From on or about July 16, 2013, to on or about July 19, 2013, defendant **DAVID GERALD MINKKINEN** and Deloitte employees exchanged emails wherein defendant **DAVID GERALD MINKKINEN** requested files from his Deloitte computer, to include "Outlook PST files, Outlook contacts, Outlook notes, and Outlook calendar." In these emails, defendant **DAVID GERALD MINKKINEN** stated that he understood the admonishment that the files "should only be personal information" and asserted that he "did not request any proprietary information."

*Description of Deloitte Intellectual Property and Examples of Misappropriation*

10.     As described herein, defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM** copied, downloaded, obtained, and transmitted numerous Deloitte files, including highly proprietary information such as uFACTS source code, data, and use cases, without authorization and in violation of their Deloitte employment contracts. These files were subsequently used by numerous Sagitec employees to design, develop, and market Sagitec's UI software, known as "Neosurance." The events described in paragraphs 11 through 20, 22 through 25, 30 and 31 below are representative examples of this activity.

11.     On or about July 18, 2013, defendant **DAVID GERALD MINKKINEN** sent an email to a Sagitec employee, attaching a 37-page executive summary from a Deloitte response to a UI request for proposal ("RFP").

3

12.     On or about July 29, 2013, defendant **DAVID GERALD MINKKINEN** emailed a Deloitte marketing brochure to Sagitec employees, stating that "I took one of our existing collateral pieces and customized."

13.     On or about August 16, 2013, defendant **DAVID GERALD MINKKINEN** sent emails to defendant **SIVARAMAN SAMBASIVAM,** who was still employed by Deloitte, and a Sagitec employee, attaching Deloitte PowerPoint presentations with the file names "WI UI Fraud Analytics Findings 20130617 v5.pptx" and "MN UI Fraud Detection - June Meeting with Jim - v7.pptx" and stating that those documents were final deliverables for Wisconsin and Minnesota.

14.     On or about August 19, 2013, while still employed at Deloitte, defendant **SIVARAMAN SAMBASIVAM** emailed an internet link and login information to a Sagitec employee for Deloitte's ongoing UI project in Massachusetts.

15.     On or about August 20, 2013, defendant **DAVID GERALD MINKKINEN** provided a collection of uFACTS program design documents known as "use cases" from Deloitte's UI project in Massachusetts to a Sagitec employee to facilitate the development of the Neosurance product.

16.     On or about August 20, 2013, a Sagitec employee sent an email with the subject "uFACTS artifacts" to defendant **DAVID GERALD MINKKINEN**, defendant **SIVARAMAN SAMBASIVAM**, who was still employed at Deloitte, and another Sagitec employee, stating that he "added the captivate videos that [they] discussed today morning and uFACTS ERD/DDL's to the below SharePoint site. Going forward, [he'll] keep adding additional artifacts to this site[:] http://sagitecportal/Unemployment%20Insurance/uFACTS/Forms/AllItems.aspx." "ERD" meant an "Entity Relationship Diagram," which was a graphical representation of relationships among concepts or events within an information technology (IT) system that assists in defining business

4

processes. "DDL" means "Data Definition Language," which was used in software to describe data and its relationships in a database.

17.     On or about August 22, 2013, a Sagitec employee sent an email to defendant **SIVARAMAN SAMBASIVAM** with the subject line "uFACTS tables needed for development" and an attached spreadsheet. The Sagitec employee wrote, "Attached is the spreadsheet that has all the uFACTS tables that were contained in the DDL's you sent earlier."

18.     On or about August 26, 2013, defendant **SIVARAMAN SAMBASIVAM**, while still employed at Deloitte, copied the uFACTS Oracle database and later made it available to Sagitec employees to facilitate the development of Neosurance.

19.     On August 29, 2013, a Sagitec employee sent an email with the subject line "ufACTS code base and all use cases" to two other Sagitec employees and defendant **SIVARAMAN SAMBASIVAM**, who was still employed with Deloitte. The email stated that "[t]he uFACTS code base from Massachusetts project and all use cases are available at" a specified link located hosted on a Sagitec server in India. Later that day, defendant **SIVARAMAN SAMBASIVAM** responded in the email dialogue, stating "[p]lease talk to Deepak before you copy this to other locations."

20.     On September 2, 2013, a Sagitec employee sent an email to defendant **SIVARAMAN SAMBASIVAM**, inquiring about "uFACTS data." In a response later that day, defendant **SIVARAMAN SAMBASIVAM**, while still employed with Deloitte, wrote that "[w]e might have to import the data into a database instance from MN and then [another Sagitec employee] can extract to load into tables with new scheme there."

21.    Defendant **SIVARAMAN SAMBASIVAM** ended his employment with Deloitte on or about September 20, 2013, and officially started his employment with Sagitec as a senior partner on or about September 23, 2013.

22.    On October 15, 2013, defendant **DAVID GERALD MINKKINEN** emailed defendant **SIVARAMAN SAMBASIVAM** a 227-page document prominently labeled "CONFIDENTIAL" on the cover page and "Deloitte Consulting LLP / Confidential – Trade Secret" at the footer on the introductory pages. The document, entitled "uFACTS Solution Framework," contained a comprehensive explanation of the uFACTS software platform's functionality. In the email, defendant **DAVID GERALD MINKKINEN** also wrote "Siva – you could also use this for benefit charges, and other enhancements we need."

23.    On February 5, 2014, in an email chat dialogue, defendant **DAVID GERALD MINKKINEN** directed a Sagitec employee to "check how uFACTS coded" a particular software function.

24.    On October 29, 2014, a Sagitec employee sent an email to other Sagitec employees, copying defendant **DAVID GERALD MINKKINEN** and defendant **SIVARAMAN SAMBASIVAM**, with the subject line "Collection use cases from ufacts." The email stated, "Has all the use cases from MA and uFACTS, Correspondence specs, reports, etc. that I could find." Attached to the email was a file named "Collection -use cases.rar," which contained more than 600 pages of use cases from Deloitte's project in Massachusetts. Defendant **DAVID GERALD MINKKINEN** responded to the email, asking two Sagitec employees to "analyze this and determine what is feasible for the demonstration."

25.    On April 13, 2015, defendant **DAVID GERALD MINKKINEN** sent an email to defendant **SIVARAMAN SAMBASIVAM** with the subject "WYCAN pricing," which attached

a spreadsheet entitled "Deloitte Consulting Project Pricing Model" that Deloitte used to determine whether and how to bid on unemployment insurance projects.

*The Maryland-West Virginia Consortium Unemployment Insurance Project*

26.    In or about 2015, and based on its proposal, Sagitec was awarded a contract to design, develop, and implement a replacement software system to process UI benefit claims, taxes, and appeals in the states of Maryland and West Virginia. The project was funded by federal grants from the United States Department of Labor.

27.    The Maryland-West Virginia Consortium ("Consortium") contract with Sagitec provided, in pertinent part, that Sagitec "represent[ed], warrant[ed], and covenant[ed]" that its "Work Product, the Software, and the System shall not infringe or otherwise violate any intellectual property or other proprietary rights of a third party." On or about August 27, 2015, **DAVID GERALD MINKKINEN** signed the contract on behalf of Sagitec, and served as the primary point of contact for the project. The Consortium contract indicated that Sagitec would be paid between $49,195,338 and $70,631,145 for its services. To date, more than $100 million has been expended on the project.

28.    Workforce West Virginia ("Workforce WV") was a state government agency funded through the United States Department of Labor that oversaw the state unemployment insurance program and a network of workforce development services. Workforce WV was the state's implementing agency for Sagitec's UI product and thus worked with Sagitec and other subcontractors to develop and install the new UI software platform. Workforce WV employees worked on the UI project in offices in Charleston, Kanawha County, West Virginia; Clarksburg, Harrison County, West Virginia; and Morgantown, Monongalia County, West Virginia, among other locations in West Virginia, where they often remotely collaborated with Sagitec employees

in Maryland and elsewhere.

29.     Defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM** continued to possess, distribute, and use Deloitte intellectual property without authorization after Sagitec began work on the Consortium project in October 2015.

30.     On or about June 10, 2016, defendant **SIVARAMAN SAMBASIVAM** emailed a file entitled "SIDES.zip" to defendant **DAVID GERALD MINKKINEN** and other Sagitec employees, writing "The attached file has a bunch of documents. Please review them and use them as needed." The SIDES.zip file exclusively contained documents and files produced for Deloitte's UI projects in Massachusetts and New Mexico.

31.     On or about July 23, 2016, defendant **SIVARAMAN SAMBASIVAM** emailed a file entitled "Performance Testing.zip" to a Sagitec employee, writing that "the set of documents I am sending now should give a very good start for finalizing the scenarios for both batch and online with the expected performance numbers." The Performance Testing.zip exclusively contained files from Deloitte's UI project in Massachusetts.

*Maryland's Investigation of Sagitec's Product*

32.     Starting in 2016, multiple Workforce WV employees working in Charleston, Kanawha County, West Virginia, noticed suspicious references to Massachusetts, New Mexico, and Deloitte in Sagitec project materials. In May 2016, a Workforce WV employee made contact with an agent with the West Virginia Commission on Special Investigations, alleging possible wrongdoing by Sagitec, to include the misappropriation of Deloitte intellectual property.

33.     On or about July 25, 2016, after learning about the Workforce WV employee whistleblower complaint relating to the alleged theft of Deloitte intellectual property, a Maryland Assistant Attorney General ("MD AAG") sent a letter to defendant **DAVID GERALD**

**MINKKINEN**, which relayed the whistleblower's concerns at the time. In part, the attachment to the letter specifically expressed the concern that "[t]here are many references to the State of Massachusetts in the documentation used and provided by Sagitec."

34. Defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM** both contributed to drafting a response to the July 25, 2016 letter from the MD AAG. In the August 23, 2016 responsive letter signed by defendant **DAVID GERALD MINKKINEN**, the defendants did not divulge their extensive and then-recent use of Deloitte intellectual property from its Massachusetts project. Instead, the defendants provided a misleading response that "[i]n some of our documentation, there may be references to our experience from other states as we use these examples to discuss potential implementation options at the MWC states [Maryland and West Virginia]."

35. On or about December 7, 2016, the MD AAG sent a follow-up letter to defendant **DAVID GERALD MINKKINEN**, which attached a document with twenty-three (23) additional questions relating to Sagitec's "ownership of the framework being used to develop the Consortium project." In part, these questions asked whether former Deloitte employees who were now employed at Sagitec, including defendant **DAVID GERALD MINKKINEN** and defendant **SIVARAMAN SAMBASIVAM**, "retain[ed]" or "obtain[ed]" "any software, source code, data tables, data structures, data dictionaries, documentation, deliverables, or other works of authorship authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client," or "incorporated" any of those items "into anything delivered to the MW Consortium."

36. Defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM** both contributed to drafting a response to the December 7, 2016 letter from MD AAG Carter. On or about January 15, 2017, defendant **DAVID GERALD MINKKINEN** sent an

9

email to MD AAG Carter with an attached responsive letter signed by defendant **DAVID GERALD MINKKINEN**, wherein both defendants falsely denied that they or any other Sagitec personnel ever "retain[ed]" or "obtain[ed]" "any software, source code, data tables, data structures, data dictionaries, documentation, deliverables, or other works of authorship authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client," or "incorporated" any of those items "into anything delivered to the MW Consortium." The materially false assurances in the defendants' responsive letter caused the Maryland Office of the Attorney General to close its inquiry as of January 25, 2017.

37.     After the closure of the Maryland investigation, on or about April 12, 2017, defendant **DAVID GERALD MINKKINEN** sent an email with the subject "SLIM" to defendant **SIVARAMAN SAMBASIVAM** and other Sagitec employees, attaching a file named "QUEST_Pre_Implementation_Assessment_10_13_09_Final.doc," which was produced by Deloitte for its Massachusetts UI project. In the email, defendant **DAVID GERALD MINKKINEN** stated, "I want to raise the priority of completing the SLIM analysis. . . . I am attaching the report we created for MA. I would like a similar report created for both projects."

*Deloitte Allegations of Intellectual Property Theft*

38.     On or about October 3, 2016, legal counsel for Deloitte notified Sagitec by letter that Deloitte had reason to believe that Sagitec had misappropriated and was improperly using Deloitte intellectual property associated with its unemployment insurance product. In an October 7, 2016 response letter signed by Sagitec counsel, Sagitec denied those claims as "baseless."

39.     On or about November 10, 2016, defendant **DAVID GERALD MINKKINEN** met with officials from Maryland's Department of Labor, Licensing, and Regulation in Baltimore, Maryland. Officials with Workforce WV participated in the meeting by telephone in Charleston,

Kanawha County, West Virginia. The purpose of the meeting was to discuss the allegations relating to Sagitec's source code development for the Consortium, especially in light of Deloitte's cease and desist letter and an inquiry by an investigator in West Virginia. During the meeting, defendant **DAVID GERALD MINKKINEN** made false and misleading assurances to the state officials attending in person and by telephone, stating, among other things, that no source code was taken from Deloitte's Massachusetts project.

40.     After learning of the criminal investigation in the matter, defendant **DAVID GERALD MINKKINEN** sent an email on or about September 14, 2017, to investigators in Charleston, Kanawha County, West Virginia and Virginia, seeking to quell the investigation and directing agents to "refrain from contacting" certain Sagitec employees. Attached to the email were the defendants' August 23, 2016 and January 15, 2017 responsive letters to MD AAG Carter signed by defendant **DAVID GERALD MINKKINEN**, reasserting their material misrepresentation and continuing to falsely deny any possession or misappropriation of Deloitte intellectual property.

41.     Defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM** subsequently continued to falsely deny ever possessing or using Deloitte intellectual property. Deloitte sent a follow-up letter dated September 12, 2018, demanding that Sagitec cease and desist from using Deloitte intellectual property. Defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM** assisted with drafting a response, which again falsely stated that they and the other former Deloitte employees who were now Sagitec employees "did not obtain Deloitte proprietary materials including work product, source code, methodologies, tools, and documentation for the purposes of developing the Neosurance solution." On or about September 27, 2018, Sagitec counsel, relying on representations made by the

defendants, emailed Deloitte a responsive letter falsely stating that Sagitec "does not possess any

Deloitte LLP intellectual property."

## COUNT ONE

42.     Paragraphs one through forty-one are incorporated herein by reference as if repeated and re-alleged in full.

43.     From in or about July 2013 to in or about June 2021, at or near Charleston, Kanawha County, West Virginia, within the Southern District of West Virginia, and elsewhere, defendant **DAVID GERALD MINKKINEN** and defendant **SIVARAMAN SAMBASIVAM**, together with persons known and unknown to the Grand Jury, with intent to convert a trade secret that was related to a product and service used in and intended for use in interstate and foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending and knowing that the offense will injure any owner of that trade secret, did knowingly and willfully conspire and agree to steal trade secret information belonging to Deloitte, that is:

a.     stole, and without authorization appropriated, took, carried away, and concealed, and by fraud, artifice, and deception obtained such information;

b.     without authorization copied, duplicated, sketched, drew, photographed, downloaded, uploaded, altered, destroyed, photocopied, replicated, transmitted, delivered, sent, mailed, communicated, and conveyed such information; and

c.     received and possessed such information, knowing the same to have been stolen and appropriated, obtained, and converted without authorization.

44.     Defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM** knew and firmly believed that Deloitte considered the uFACTS source code, database, use cases, software designs, schema, logic, artifacts, and architecture to be trade secret information.

45.     Defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM** knew and firmly believed that Deloitte took reasonable steps to maintain the secrecy of its trade secret information, along with other associated confidential and proprietary information.

46.     In addition, defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM** knew and firmly believed that the Deloitte trade secret information and the Deloitte confidential and proprietary information derived independent economic value from not being generally known to, and not being readily ascertainable through proper means by, the public.

47.     In furtherance of the conspiracy, and to accomplish its objectives, defendant **DAVID GERALD MINKKINEN**, defendant **SIVARAMAN SAMBASIVAM**, together with persons both known and unknown to the Grand Jury, committed the following overt acts, among others, in the Southern District of West Virginia and elsewhere:

a.      From approximately January 2016 until at least on or about April 8, 2019, caused the transmission of material containing and derived from Deloitte trade secret information to computers and servers located in Charleston, Kanawha County, West Virginia, belonging to Workforce WV.

b.      From approximately January 2016 until at least on or about April 8, 2019, uploaded and conveyed material containing and derived from Deloitte trade secret information to a Microsoft SharePoint server, knowing and intending that the material would be accessed and downloaded to computers and servers located in Charleston, Kanawha County, West Virginia, belonging to Workforce WV.

c.      On or about September 14, 2017, defendant **DAVID GERALD MINKKINEN** sent an email to investigating agents that was designed to conceal and misrepresent the

ongoing possession, transmission, and use of Deloitte trade secret information by defendant **DAVID GERALD MINKKINEN,** defendant **SIVARAMAN SAMBASIVAM**, Sagitec, and other persons both known and unknown to the Grand Jury.

d.      On or about October 1, 2020, in a recorded interview with an investigating agent in Charleston, Kanawha County, West Virginia, defendant **DAVID GERALD MINKKINEN** made material misrepresentations about Sagitec's acquisition, possession, and use of Deloitte trade secret information.

e.      On or about March 12, 2021, in a recorded interview with an investigating agent in Charleston, Kanawha County, West Virginia, defendant **SIVARAMAN SAMBASIVAM** made material misrepresentations about Sagitec's acquisition, possession, and use of Deloitte trade secret information.

In violation of Title 18, United States Code, Section 1832(a)(5).

## COUNT TWO

48. Paragraphs one through forty-one and fifty-seven through sixty-one are incorporated herein by reference as if repeated and re-alleged in full.

49. From in or about July 2013 to in or about June 2021, at or near Charleston, Kanawha County, West Virginia, within the Southern District of West Virginia, and elsewhere, defendant **DAVID GERALD MINKKINEN** and defendant **SIVARAMAN SAMBASIVAM** knowingly conspired and agreed together and with other persons both known and unknown to the Grand Jury, to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communications in interstate commerce, any writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice in violation of 18 U.S.C. § 1343.

### *Object of the Conspiracy*

50. The object of the conspiracy was for defendants DAVID GERALD MINKKINEN and SIVARAMAN SAMBASIVAM and others, without the knowledge or permission of the Maryland-West Virginia Consortium, Workforce WV, and Deloitte, to use Deloitte intellectual property to facilitate and expedite the development and deliverability of Sagitec's competing Neosurance software for its Unemployment Insurance (UI) practice; to misrepresent and conceal to the Maryland-West Virginia Consortium, Workforce WV, and others, to include Deloitte and other state and federal agencies, that the UI solution offered, developed for and delivered to the Maryland-West Virginia Consortium and Workforce WV contained, consisted of, incorporated and infringed Deloitte intellectual property; and based on the defendants' misrepresentation and omissions, to enable Sagitec to receive and retain funds received for the development and

16

implementation of Sagitec's UI solution using its Neosurance software in Maryland and West Virginia.

*Manner and Means of the Conspiracy*

51.     Defendant **DAVID GERALD MINKKINEN**, defendant **SIVARAMAN SAMBASIVAM**, together with persons known and unknown to the Grand Jury, obtained and distributed Deloitte intellectual property by means of wire communications in interstate commerce to Sagitec employees without Deloitte's authorization and in violation of their employment contracts with Deloitte.

52.     Defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM** used and encouraged other Sagitec employees by means of wire communications in interstate commerce to use Deloitte intellectual property to develop and market Sagitec's competing Neosurance product.

53.     Defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM** made and caused others to make material misrepresentations by means of wire communications in interstate commerce to Deloitte and state and federal government agencies about both defendants' possession and use, as well as Sagitec's possession and use of Deloitte intellectual property.

54.     In furtherance of the conspiracy, defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM** made material misrepresentations about their respective possession and use and Sagitec's possession and use of Deloitte intellectual property by means of wire communications in interstate commerce, including their interviews with an investigator in Charleston, Kanawha County, West Virginia on or about October 1, 2020 and March 12, 2021, respectively.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS THREE THROUGH FIVE

55.     Paragraphs one through forty-one are incorporated herein by reference as if repeated and re-alleged in full.

56.     From in or about July 2013 to in or about June 2021, at or near Charleston, Kanawha County, West Virginia, within the Southern District of West Virginia, and elsewhere, defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM,** aided and abetted by each other, devised and intended to devise a scheme and artifice to defraud the Maryland-West Virginia Consortium and Deloitte to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

*The Scheme to Defraud*

It was part of the scheme to defraud that:

57.     Defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM** obtained, transmitted, and used various forms of Deloitte intellectual property without authorization, including proprietary documents and data associated with uFACTS.

58.     Defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM** knowingly facilitated and approved the use of Deloitte intellectual property to design, develop, and market Sagitec's UI software product.

59.     In Sagitec's contract with the Consortium, defendant **DAVID GERALD MINKKINEN** falsely affirmed that Sagitec's UI software product would not infringe third party intellectual property rights.

60.     Defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM** thereafter repeatedly concealed and misrepresented Sagitec's possession and use of Deloitte intellectual property.

19

61.    On or about the dates below, for the purpose of executing, and attempting to execute, the scheme to defraud the Maryland-West Virginia Consortium and Deloitte, and for obtaining money and property by false and fraudulent pretenses, defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM**, aided and abetted by each other, transmitted and caused to be transmitted by means of wire communication in interstate commerce the writings, signs, signals, pictures and sounds described below for each count, each transmission constituting a separate count:

| COUNT | DATE | DESCRIPTION OF WIRE |
|-------|------|---------------------|
| Three | September 14, 2017 | Email transmitted by **DAVID GERALD MINKKINEN** from Minnesota to investigators in West Virginia and Virginia |
| Four | October 1, 2020 | Telephonic communication by **DAVID GERALD MINKKINEN** from Minnesota to West Virginia |
| Five | March 12, 2021 | Videoconference interview conducted via the internet between **SIVARAMAN SAMBASIVAM** in Minnesota and investigator in West Virginia |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT SIX

62.     Paragraphs one through forty-one are incorporated herein by reference as if repeated and re-alleged in full.

63.     On or about September 14, 2017, defendant **DAVID GERALD MINKKINEN** sent an unsolicited email to agents of the West Virginia Commission on Special Investigations and United States Department of Labor, Office of Inspector General. In the email, defendant **DAVID GERALD MINKKINEN** claimed, among other things, that "an individual in West Virginia" "made certain unfounded claims regarding Sagitec's software and services," which "were thoroughly vetted with MW consortium project leadership and the Maryland Attorney General."

64.     Defendant **DAVID GERALD MINKKINEN** attached three documents to the September 14, 2017 email: two letters addressed to the Maryland Office of the Attorney General ("OAG") dated August 23, 2016, and January 15, 2017, which were responses to inquiries by the Maryland OAG about alleged misappropriation of Deloitte intellectual property by Sagitec, and a January 25, 2017 letter from the Maryland OAG, which indicated that the inquiry was "closed" based on the information provided by defendant **DAVID GERALD MINKKINEN**.

65.     On or about September 14, 2017, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **DAVID GERALD MINKKINEN** willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by stating in an email attachment dated August 23, 2016 that "[c]ertainly the allegation that Sagitec has in any way misappropriated another party's property is defamatory." The statement and representation was false because, as defendant **DAVID GERALD MINKKINEN** then and there knew, Sagitec had, in fact, misappropriated Deloitte intellectual property.

21

In violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT SEVEN

66.     Paragraphs one through forty-one and sixty-three and sixty-four are incorporated herein by reference as if repeated and re-alleged in full.

67.     On or about September 14, 2017, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **DAVID GERALD MINKKINEN** willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by stating in an email attachment dated January 15, 2017, that former Deloitte employees at Sagitec, including defendant **DAVID GERALD MINKKINEN**, had not "retained any software, source code, or any other tangible artifacts authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client after leaving Deloitte's employment." The statement and representation was false because, as defendant **DAVID GERALD MINKKINEN** then and there knew, he and other former Deloitte employees working for Sagitec had, in fact, retained copies of the Deloitte uFACTS source code and numerous other and software-related data authored by Deloitte.

In violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT EIGHT

68.     Paragraphs one through forty-one and sixty-three and sixty-four are incorporated herein by reference as if repeated and re-alleged in full

69.     On or about September 14, 2017, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **DAVID GERALD MINKKINEN** willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by stating in an email attachment dated January 15, 2017, that Sagitec had not "obtained copies of any software, source code, or any other tangible software artifacts authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client after leaving Deloitte's employment." The statement and representation was false because, as defendant **DAVID GERALD MINKKINEN** then and there knew, Sagitec had, in fact, obtained copies of the Deloitte uFACTS source code and numerous other software-related data authored by Deloitte.

In violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT NINE

70.     Paragraphs one through forty-one are incorporated herein by reference as if repeated and re-alleged in full.

71.     On or about October 1, 2020, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **DAVID GERALD MINKKINEN**, during a recorded interview with a agents of the West Virginia Commission on Special Investigations and United States Department of Labor, Office of Inspector General, willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, that is: when asked whether he brought anything from Deloitte when he came to Sagitec, defendant **DAVID GERALD MINKKINEN** responded "No, and . . . that's entirely false." This representation was false because, as defendant **DAVID GERALD MINKKINEN** then and there knew, he in fact took Deloitte intellectual property with him when he started his employment at Sagitec.

In violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT TEN

72.     Paragraphs one through forty-one are incorporated herein by reference as if repeated and re-alleged in full.

73.     On or about October 1, 2020, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **DAVID GERALD MINKKINEN**, during a recorded interview with agents of the West Virginia Commission on Special Investigations and United States Department of Labor, Office of Inspector General, willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by stating that "I can assure you both that there was nothing of Deloitte technology that was used in [Sagitec's] solution, period." This representation was false because, as defendant **DAVID GERALD MINKKINEN** then and there knew, Deloitte technology, including software code and data tables, was used to develop Sagitec's Neosurance product.

In violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT ELEVEN

74.     Paragraphs one through forty-one are incorporated herein by reference as if repeated and re-alleged in full.

75.     On or about October 1, 2020, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **DAVID GERALD MINKKINEN**, during a recorded interview with agents of the West Virginia Commission on Special Investigations and United States Department of Labor, Office of Inspector General, willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, that is, when asked if he left Deloitte with Deloitte use cases or similar material, defendant **DAVID GERALD MINKKINEN** responded that "No, no, and it wouldn't even be useful. Like if I took the [Deloitte] use case from New Mexico it wouldn't even be useful . . ., because they're, like I said, 30 percent different state by state. . . . [I]t wouldn't even make sense." These statements were false because, as defendant **DAVID GERALD MINKKINEN** then and there knew, he took use cases from a Deloitte project in Massachusetts, transmitted them to Sagitec employees, and knew that they were used to develop Sagitec's Neosurance product.

In violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT TWELVE

76.     Paragraphs one through forty-one are incorporated herein by reference as if repeated and re-alleged in full.

77.     On or about October 1, 2020, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **DAVID GERALD MINKKINEN**, during a recorded interview with agents of the West Virginia Commission on Special Investigations and United States Department of Labor, Office of Inspector General, willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by stating that "If somebody was using the [Deloitte] use case from another state I'm not aware of it . . . ." This statement was false because, as defendant **DAVID GERALD MINKKINEN** then and there knew, he took use cases from a Deloitte project in Massachusetts, transmitted them to Sagitec employees, and knew that they were used to develop Sagitec's Neosurance product.

In violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT THIRTEEN

78.    Paragraphs one through forty-one are incorporated herein by reference as if repeated and re-alleged in full.

79.    On or about March 12, 2021, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **SIVARAMAN SAMBASIVAM**, during a recorded interview with agents of the West Virginia Commission on Special Investigations and United States Department of Labor, Office of Inspector General, willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, that is: When asked if he was "aware of whether any [former Deloitte employees who joined Sagitec] took Deloitte intellectual property when they left Deloitte," defendant **SIVARAMAN SAMBASIVAM** stated that "[I]t's hard for me to say whether they took it or not. . . . David [Minkkinen] has had some material, that I know of, some proposal material I've seen. I don't know if that's considered as intellectual property or not, but I've seen that." This statement was false because, as defendant **SIVARAMAN SAMBASIVAM** then and there knew, David Minkkinen obtained uFACTS source code and use cases from Deloitte's Massachusetts project, which defendant **SIVARAMAN SAMBASIVAM** fully understood to be Deloitte intellectual property.

In violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT FOURTEEN

80.     Paragraphs one through forty-one are incorporated herein by reference as if repeated and re-alleged in full.

81.     On or about March 12, 2021, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **SIVARAMAN SAMBASIVAM**, during a recorded interview with agents of the West Virginia Commission on Special Investigations and United States Department of Labor, Office of Inspector General, willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, that is: When asked if he took Deloitte "materials," defendant **SIVARAMAN SAMBASIVAM** stated that "No, I did not." This statement was false because, as defendant **SIVARAMAN SAMBASIVAM** then and there knew, he took a uFACTS Oracle database, data tables from Deloitte's Massachusetts project, and other Deloitte documents and files.

In violation of Title 18, United States Code, Section 1001(a)(2).

UNITED STATES OF AMERICA
WILLIAM S. THOMPSON
United States Attorney

By: _____
Jonathan T. Storage
Assistant United States Attorney

_____
Candina S. Heath, Senior Counsel
Department of Justice
Computer Crime and Intellectual Property Section

# EXHIBIT 31

**REDACTED IN ITS ENTIRETY**