# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| DELOITTE CONSULTING LLP and DELOITTE DEVELOPMENT LLC, | ) ) ) ) | **Redacted - Public Version** |
| Plaintiffs, | ) ) | C.A. No. 23-325-WCB |
| v. | ) ) | ███████████████████████ |
| SAGITEC SOLUTIONS LLC, | ) ) | |
| Defendant. | ) ) ) ) | |

## DECLARATION OF MIRANDA D. MEANS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO SAGITEC SOLUTIONS LLC'S <u>MOTION FOR SUMMARY JUDGMENT</u>

I, Miranda D. Means, hereby declare as follows:

1.      I am over eighteen (18) years old, and I am competent to attest to and have personal knowledge of the facts in this declaration.

2.      I am an attorney at Kirkland & Ellis LLP, counsel of record in the above captioned case for Plaintiffs Deloitte Consulting LLP and Deloitte Development LLC ("Plaintiffs"). I am a member in good standing to practice law in the states of Massachusetts and New York, and I am admitted *pro hac vice* to practice in this District for the above-captioned case.

3.      I submit this Declaration in support of Plaintiffs' Opposition to Sagitec Solutions LLC's Motion for Summary Judgment. ("Opposition" or "Opp."). The statements set forth in this declaration are based on my personal knowledge and my review of the contemporaneous documents referenced and attached hereto.

4.      Attached hereto as **Exhibit 26** is a true and correct copy of excerpts of the deposition of Annica Jin-Hendel, dated February 28, 2025.

5.      Attached hereto as **Exhibit 27** is a true and correct copy of excerpts of the deposition of Jonathan L. Krein, dated June 13, 2025.

6.      Attached hereto as **Exhibit 28** is a true and correct copy of excerpts of the deposition of Monty Myers, dated June 27, 2025.

7.      Attached hereto as **Exhibit 29** is a true and correct copy of  the Expert Report of Thomas W. Britven, dated May 2, 2025

8.      Attached hereto as **Exhibit 30** is a true and correct copy of excerpts of Sagitec's Second Supplemented Objections and Responses to Deloitte's Third Set of Interrogatories, dated February 28, 2025.

9.      Attached hereto as **Exhibit 31** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00000168.

10.     Attached hereto as **Exhibit 32** is a true and correct copy of excerpts of Deloitte's First Supplemental Responses and Objections to Sagitec's Fourth Set of Interrogatories, dated March 28, 2025.

11.     Attached hereto as **Exhibit 33** is a true and correct copy of excerpts of Deloitte's Sixth Supplemental Responses and Objections to Sagitec's First Set of Interrogatories, dated March 28, 2025.

12.     Attached hereto as **Exhibit 34** is a true and correct copy of a document bearing beginning Bates number DEL00067840.

13.     Attached hereto as **Exhibit 35** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00000172.

14.     Attached hereto as **Exhibit 36** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00043800.

15.     Attached hereto as **Exhibit 37** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00045247.

16.     Attached hereto as **Exhibit 38** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_07112297.

17.     Attached hereto as **Exhibit 39** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00059523.

18.     Attached hereto as **Exhibit 40** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00059524.

19.     Attached hereto as **Exhibit 41** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00059637.

20.     Attached hereto as **Exhibit 42** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_00059673

21.     Attached hereto as **Exhibit 43** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_02374277

22.     Attached hereto as **Exhibit 44** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_02588547

23.     Attached hereto as **Exhibit 45** is a true and correct copy of a document bearing beginning Bates number SAGITEC-DEL_02974302.

24.     Attached hereto as **Exhibit 46** is a true and correct copy of excerpts of the deposition of Anil Gosu, dated February 12, 2025.

25.    Attached hereto as **Exhibit 47** is a true and correct copy of excerpts of the

deposition of Rena Kottcamp, dated May 31, 2024.

I declare under penalty of perjury that the foregoing is are true and correct.

Executed on the 24th day of July, 2025.

_/s/ Miranda D. Means_
Miranda D. Means

# EXHIBIT 26

# FILED UNDER SEAL

# EXHIBIT 27

# FILED UNDER SEAL

# EXHIBIT 28

# FILED UNDER SEAL

# EXHIBIT 29

# FILED UNDER SEAL

# EXHIBIT 30

# FILED UNDER SEAL

# EXHIBIT 31

## FILED UNDER SEAL

# EXHIBIT 32

# FILED UNDER SEAL

# EXHIBIT 33

## FILED UNDER SEAL

# EXHIBIT 34

GSD/PD 003-B (Rev. 01/09)



## STATE OF NEW MEXICO
## GENERAL SERVICES DEPARTMENT

**Contract**

---

**Awarded Vendor**
**0000006483**
**Deloitte Consulting LLC**
**215 Lincoln Ave. Ste. 205**
**Santa Fe, NM 87501**

Telephone No. <u>505-989-9791</u>

---

Contract: <u>00-631-00-05505</u>

Payment Terms: <u>See Contract</u>

F.O.B.: <u>See Contract</u>

Delivery: <u>See Contract</u>

---

**Ship To:**
**New Mexico Department of Workforce Solutions**
**401 Broadway NE**
**Albuquerque, NM 87103**

**Invoice:**
**New Mexico Department of Workforce Solutions**
**P.O. Box 1928**
**Albuquerque, NM 87103**

For questions regarding this contract please contact:
**Andrea Chavez 505-841-8487**

---

Procurement Specialist: <u>Gerrie Becker</u>

Telephone No.: <u>505-476-3121</u>

**Commodity: UI Tax System**

**Term: January 14, 2010 thru January 31, 2013**

**This Contract is made subject to the "terms and conditions" shown on the reverse side of this page, and as indicated in this Contract.**

Accepted for the State of New Mexico

New Mexico State Purchasing Agent

Date: 01/13/10

Purchasing Division, 1100 St. Francis Drive, PO Box 6850, Santa Fe, NM 87502-6850 (505) 827-0472

HIGHLY CONFIDENTIAL

DEL00067840

**State of New Mexico**
**New Mexico Department of Workforce Solutions**
Information Technology
Agreement
Contract No.10-631-9999-05505

THIS Information Technology Agreement ("Agreement") is made by and between the State of New Mexico, New Mexico Department of Workforce Solutions hereinafter referred to as the "Procuring Agency" and Deloitte Consulting LLP, hereinafter referred to as the "Contractor" and collectively referred to as the "Parties".

WHEREAS, PURSUANT TO THE Procurement Code, NMSA 1978 13-1-28 *et. seq*; and Procurement Code Regulations, NMAC 1.4.1 *et. seq*; the Contractor has held itself out as an having experience and knowledge in implementing the Scope of Work as contained herein and the Procuring Agency has selected the Contractor as the offeror most advantageous to the State of New Mexico; and

WHEREAS, the Request For Proposals Number 00-631-00-05505 including the answers to questions and amendments, the documents referenced in the Procurement Library and the Contractor's response to such document(s), the Contractor's best and final offer as well as the Contractor's oral presentation/demonstration handouts/exhibits and the approved Project Management Plan are incorporated herein by reference; and

## ARTICLE 1 – DEFINITIONS

A. "Acceptance" shall mean the approval, pursuant to Section 4 hereof, of a Deliverable by an executive level representative ("Executive Level Representative") of the Procuring Agency.

B. "Change Request" shall mean the document utilized to request changes or revisions in the Scope of Work.

C. "Chief Information Officer ("CIO")" shall mean the Secretary/CIO of the Department of Information Technology for the State of New Mexico or designated representative.

D. "Contract Manager" shall mean a qualified person from the Procuring Agency responsible for the administration of this Agreement. Under the terms of this Agreement, the Contract Manager shall be John Salazar, NMDWS Chief Information Officer or designated representative.

E. "Commercial off the Shelf" (COTS) shall mean a collection of commercial third party computer source and/or object code that with modifications defined by Contract which shall meet the system requirements and specifications set forth in the Contract. The Procuring Agency shall have the right to use the modified software in accordance with the licensing provisions of this Agreement.

F. "Deliverable" shall mean any verifiable outcome, result, service or product that must be delivered, developed, performed or produced by the Contractor, in each case as identified as a deliverable by the Scope of Work.

G. "DoIT" shall mean the Department of Information Technology.

H. "DFA" shall mean the Department of Finance and Administration; "DFA/CRB" shall mean the Department of Finance and Administration, Contracts Review Bureau.

I. "Escrow" shall mean a legal document (such as the software source code) delivered by the contractor into the hands of a third party, to be held by that party until the performance of a condition is accepted; in the event contractor fails to perform, the grantee agency receives the legal document, in this case, source code.

J. "Enhancement" means any modification or addition that, when made or added to the program, materially changes its or their utility, efficiency, functional capability, or application, but does not constitute solely an Error Correction. After conferring with Procuring Agency, an Enhancement may be identified as minor or major

HIGHLY CONFIDENTIAL
DEL00067841

K.  "Executive Level Representative" shall mean the Cabinet Secretary or Deputy Secretary(ies) empowered with the authority to represent and make decisions on behalf of the Procuring Agency.

L.  "Funded Contract Amount" shall mean the total amount of dollars the State has encumbered to pay for the contract, which shall not in any event exceed the Contract price.

M.  "Know How" shall mean all technical information, data and knowledge that is necessary to enable the Procuring Agency to use any Deliverables developed under this Agreement, including, but not limited to, all documents, computer storage devices, drawings, flow charts, plans, proposals, records, notes, memoranda, manuals and other tangible items.

N.  "Intellectual Property" shall mean any and all designs, documentation, inventions (whether or not patentable or reduced to practice), materials, plans, marks (including brand names, product names, logos, and slogans), methods, procedures, processes, proprietary information, protocols, specifications, techniques, tools, works of authorship, and other forms of technology and intellectual property, in each case to the extent embedded in or part of a Deliverable.

O.  "Independent Verification and Validation ("IV&V")" shall mean the process of evaluating a project and the project's product to determine compliance with specified requirements and the process of determining whether the products of a given development phase fulfill the requirements established during the previous stage, both of which are performed by an entity independent of the Procuring Agency.

P.  "Payment Invoice" shall mean a detailed, certified and written request for payment of services rendered from the Contractor to the Procuring Agency. Payment Invoice(s) must contain the fixed price Deliverable cost to the state and identify the Deliverable for which the invoice is submitted.

Q.  "Performance Bond" shall mean a surety bond which guarantees that the contractor will fully perform the contract and guarantees against breach of contract.

R.  "Project" shall mean a temporary process undertaken to solve a well-defined goal or objective with clearly defined start and end times, a set of clearly defined tasks, and a budget. The project terminates once the project scope is achieved and project approval is given by the Executive Level Representative and verified by the agency CIO to the DoIT. If applicable, under the terms of this Agreement the Project is the Unemployment Insurance Tax System Replacement Project.

S.  "Product" shall mean software source or object code, system technical documentation, user documentation, training materials or other items of tangible personal property developed by or delivered from the Contractor to the Procuring Agency under the terms and conditions of this Agreement.

T.  "Project Manager" shall mean a qualified person from the Procuring Agency responsible for all aspects of the Project or the administration of this Agreement.

U.  "Project Office" shall mean a Contractor supplied facility located in the vicinity of Albuquerque, New Mexico that is fully equipped with computer equipment, telephone, network access, facsimile, copy machine, a small meeting room and suitable office space for the in-state portion of the Contractor's project team plus up to five members of the Procuring Agency's personnel.

V.  "Quality Assurance" shall mean a deliverable inspection process as set forth in Section 4 hereof.

W.  "Software Framework" shall mean a collection of computer source code that, with modifications defined by Procuring Agency, shall meet the system requirements and specifications set forth in the Contract.

X.  "State Purchasing Agent (SPA)" - shall mean the State Purchasing Agent for the State of New Mexico or designated representative.

HIGHLY CONFIDENTIAL

DEL00067842

Y.   "State Purchasing Division (SPD)"- shall mean the State Purchasing Division of the General Services Department for the State of New Mexico

## ARTICLE 2 – SCOPE OF WORK

A.      Scope of Work.  The Contractor shall perform the work as outlined in Exhibit A, attached hereto and incorporated herein by reference.  Contractor may perform the services or any portion thereof from any location within the United States.

B.      Performance Measures.  Contractor shall substantially perform the Performance Measures set forth in Exhibit A.  In the event the Contractor fails to perform substantially in accordance with the Contract, the Procuring Agency shall provide written notice to the Contractor of the default and specify a reasonable period of time, but not less than thirty (30) days, in which the Contractor shall advise the Procuring Agency of specific steps it will take to achieve these results and the proposed timetable for implementation.  Nothing in this Section shall be construed to prevent the Procuring Agency from exercising its rights pursuant to Article 6 should Contractor fail to respond to Procuring Agency within such reasonable period..

C.      Schedule.  The due dates, as set forth in Exhibit A, shall not be altered or waived by the Procuring Agency without prior written approval, through the Change Management process, as defined in Article 14.

D.   Ownership and Licensing.

Contractor will own all intellectual property rights in or related to all Deliverables that are developed and delivered by Contractor for use under this Agreement.  However, upon full payment therefore in accordance with this Agreement, Procuring Agency will have the unlimited right and license to use, the copy of the Deliverables provided by Contractor to Procuring Agency hereunder.  Such copy, will be in both object code and source code form, and the related right and license to use will consist of Procuring Agency being able to load, execute, display, store, modify, and copy for Procuring Agency's purposes.  This non-exclusive, perpetual, royalty-free license granted herein also includes the right for Procuring Agency to share the code with other State of New Mexico agencies it deems appropriate.

Contractor will retain all rights, title and interest in and to all know-how, intellectual property, software, methodologies, processes, technologies, algorithms, development tools or forms, templates or output used in performing the services which are based on trade secrets or proprietary information of Contractor or are otherwise owned or licensed by Contractor, and all improvements thereto that are developed or created by or on behalf of Contractor in the course of performing the services (collectively, "Contractor Materials").  Contractor Materials include the uFACTS solution framework (including all related source and object code).  Contractor, upon full payment by the Procuring Agency, grants the Procuring Agency a limited license to use and copy the Contractor Materials provided hereunder solely for the State of New Mexico's internal business purposes in connection with the Deliverables.

To the extent that Contractor uses any third party software or documentation (other than COTS) and such  software or documentation becomes embedded in a Deliverable , Contractor will obtain for Procuring Agency a perpetual, royalty-free, transferable within State of New Mexico Government, non-exclusive, license to use such software or documentation as part of the Deliverable solely for the Procuring Agency's internal use, or such other license as Contractor

HIGHLY CONFIDENTIAL

and Procuring Agency agree to in writing. Nothing in this Agreement will require Contractor or Procuring Agency to violate the proprietary rights of any third party in any software or otherwise.

To the extent that Contractor uses third party commercial-off-the-shelf software products (COTS) either: (i) Contractor shall assign such licenses to the Procuring Agency upon the acceptance of the system, or (ii) Procuring Agency shall be responsible for licensing the software products directly with the applicable third party supplier, using supplier's standard terms and conditions. Such assignment is subject to all of the commercial license terms and conditions imposed by the manufacturers with respect thereto, a copy of each such license terms having been provided to the Procuring Agency. The Procuring Agency shall look solely to the third party manufacturer with respect to exercise of the Procuring Agency's rights under the applicable license or support agreement with each such third party hardware or software manufacturer once the licenses are in possession of the Procuring Agency.

Upon full payment by the Procuring Agency, Contractor agrees to deliver the applicable source code to the Procuring Agency as set forth in Exhibit A. The source code shall be in magnetic form on media specified by the Contract.

## ARTICLE 3 - COMPENSATION

A.    <u>Compensation Schedule</u>. The Procuring Agency shall pay to the Contractor based upon fixed prices for each Deliverable, per the schedule outlined in Exhibit A, less retainage as identified in Paragraph D. The costs associated with each Deliverable assume the Procuring Agency's resources, including their agents or external agencies, provide the required project support within the agreed-to schedule. Failure to provide such required project support may result in schedule delays. Any Deliverable scope or schedule change shall require a change order/amendment pursuant to Article 14 if there is any adverse impact.

B.    <u>Payment</u>. The total compensation under this Agreement shall not exceed **$17,164,722.00** excluding New Mexico gross receipts tax, subject to potential increases based on change requests that have been approved in writing by the Procuring Agency.

C.    <u>Taxes</u>.

The Contractor shall be reimbursed by the Procuring Agency for applicable New Mexico gross receipts taxes, excluding interest or penalties assessed on the Contractor by any authority. The payment of taxes for any money received under this Agreement shall be the Contractor's sole responsibility and should be reported under the Contractor's Federal and State tax identification number(s).

Contractor and any and all subcontractors shall pay all Federal, state and local taxes applicable to its operation and any persons employed by the Contractor. Contractor shall require all subcontractors to hold the Procuring Agency harmless from any responsibility for taxes, damages and interest, if applicable, contributions required under Federal and/or state and local laws and regulations and any other costs, including transaction privilege taxes, unemployment compensation insurance, Social Security and Worker's Compensation.

D.    <u>Retainage</u>. Prior to acceptance of the System, the Procuring Agency shall retain a percentage of the fixed-price Deliverable cost, not to exceed 10 (ten) percent for each Deliverable that is the subject of this Agreement as security for full performance under the terms of this

HIGHLY CONFIDENTIAL

Agreement. All amounts retained shall be released to the Contractor upon final System Acceptance. Such retainage shall not apply to purchases of computer hardware or to third party software.

E.      Performance Bond. Contractor shall execute and deliver to Procuring Agency, contemporaneously with the execution of this Agreement, a performance bond in the amount of $3,000,000 (Three Million Dollars) in the name of the Procuring Agency. The bond shall be in effect for the duration of this Agreement and any renewals thereof. The required bond shall be conditioned upon and for the full performance and Acceptance of each and every Deliverable of the Contractor arising under this Agreement. The Procuring Agency's right to recover from the bond shall include all costs and damages associated with the transfer of services provided under this Agreement to another contractor or to the State of New Mexico as a result of Contractor's failure to perform.

## ARTICLE 4 – ACCEPTANCE

A.      Submission. The procedures for submission of deliverables for acceptance are set forth in detail in Exhibit B to this Agreement. If there is a disagreement between the language of Exhibit B and the Agreement, the language in the Agreement takes precedence. Upon completion of each agreed upon Deliverables as set forth in Article 2 and Exhibit A, Contractor shall submit a Payment Invoice with the Deliverable, or description of the Deliverable, to the Contract Manager. Each Payment Invoice shall be for the fixed Deliverable price, any adjustments agreed to in a written amendment to the contract signed by the parties, plus the then-applicable New Mexico gross receipts tax as set forth in Article 2 and Exhibit A, less retainage if applicable.

B.      Acceptance. In accord with Section 13-1-158 NMSA 1978; the Executive Level Representative shall determine if the Deliverable provided substantially meets specifications. No payment shall be made for any Deliverable until the individual Deliverable that is the subject of the Payment Invoice has been accepted, in writing, by the Executive Level Representative. In order to accept the Deliverable, the Executive Level Representative will assess the Deliverable for the purpose of determining that the Deliverable substantially complies with the requirements for the specific Deliverable Contract.

If the Deliverable is deemed Acceptable under Quality Assurance by the Executive Level Representative or designee, the Executive Level Representative will notify the Contractor of Acceptance, in writing, within fifteen (15) days from the date the Executive Level Representative receives the Deliverable(s) and accompanying Payment Invoice (unless another period of time is set forth in the Agreement). The Procuring Agency shall not unreasonably withhold approval of any Deliverable.

C.      Rejection. Unless the Executive Level Representative gives notice of rejection within the time period stated in the Agreement or the fifteen (15) day Acceptance period for deliverables with no acceptance period stated in the Agreement, the Deliverable will be deemed to have been accepted. If the Deliverable is determined unacceptable under Quality Assurance, fifteen (15) days from the date the Executive Level Representative receives the Deliverable(s) and accompanying Payment Invoice, the Executive Level Representative will send a consolidated set of comments indicating issues, unacceptable items, and/or requested revisions accompanying the rejection. Upon rejection and receipt of comments, the Contractor will have fifteen (15) days to resubmit the Deliverable to the Executive Level Representative with all appropriate corrections or modifications made and/or addressed. The Executive Level Representative will review the corrections submitted by the Contractor and again determine whether the Deliverable(s) is

HIGHLY CONFIDENTIAL

Acceptable under Quality Assurance and provide a written determination within fifteen (15) days of receipt of the revised or amended Deliverable. If the Deliverable is once again determined to be unacceptable under Quality Assurance and thus rejected, the Contractor will be required to provide a remediation plan that shall include a timeline for corrective action acceptable to the Procuring Agency. The Contractor shall also be subject to all damages and remedies attributable to the late delivery of the Deliverable under the terms of this Agreement and available at law or equity. In the event that a Deliverable must be resubmitted more than three times for Acceptance due to its failure to meet Contract requirements, and the Procuring Agency has fully satisfied its obligations under the Agreement, the Contractor shall be deemed as in breach of this Agreement.

D.      To the extent that any Deliverables are or have been approved by the Executive Level Representative pursuant to the terms hereof at any stage of the Contractor's performance hereunder, the Contractor shall be entitled to rely on such approval, and the accepted Deliverable shall govern. Deliverables placed into production by the Procuring Agency shall be considered accepted.

## ARTICLE 5 – TERM

THIS AGREEMENT SHALL NEITHER BE EFFECTIVE NOR BINDING UNTIL APPROVED BY THE DoIT AND THE STATE PURCHASING AGENT. This Agreement shall terminate on **January 31, 2013**, unless terminated pursuant to Article 6. This Agreement may be extended for one (1), one-year optional renewals or a portion thereof at the option of the Procuring Agency. No contract term, including extensions and renewals, shall exceed four years, except as set forth in Section 13-1-150 NMSA 1978.

## ARTICLE 6 – TERMINATION

This Agreement may be terminated as follows:

A.      General. By the either Party upon written notice to be delivered to the other party not less than sixty (60) business days prior to the intended date of termination.

B.      Appropriations. By the Procuring Agency, if required by changes in State or federal law, or because of court order, or because of insufficient appropriations made available by the United States Congress and/or the New Mexico State Legislature for the performance of this Agreement. The Procuring Agency's decision as to whether sufficient appropriations are available shall be accepted by the Contractor and shall be final. If the Procuring Agency terminates this Agreement pursuant to this subsection, the Procuring Agency shall provide the Contractor written notice of such termination at least thirty (30) days prior to the effective date of the termination.

C.      Obligations and Waiver. By termination pursuant to this Article, neither party may nullify obligations already incurred for performance or failure to perform prior to the date of termination. THIS ARTICLE IS NOT EXCLUSIVE AND DOES NOT CONSTITUTE A WAIVER OF ANY OTHER LEGAL RIGHTS AND REMEDIES AFFORDED THE PROCURING AGENCY AND THE STATE OF NEW MEXICO CAUSED BY THE CONTRACTOR'S DEFAULT OR BREACH OF THIS AGREEMENT.

## ARTICLE 7 – TERMINATION MANAGEMENT

A.      Contractor. In the event this Agreement is terminated for any reason, or upon expiration, and in addition to all other rights to property set forth in this Agreement, the Contractor shall:

HIGHLY CONFIDENTIAL

1.) Transfer, deliver, and/or make readily available to the Procuring Agency property which is owned by the Procuring Agency or in which the Procuring Agency has been granted ongoing rights to use, including Deliverables and Intellectual Property

2.) Incur no further financial obligations for materials, services, or facilities under the Agreement without prior written approval of the Procuring Agency;

3.) Terminate all purchase orders or procurements for materials, services or facilities to be paid for by the Procuring Agency under this Agreement and cease all work, except as the Procuring Agency may direct, for orderly completion and transition;

4.) Take such action as the Procuring Agency may reasonably direct, for the protection and preservation of all Procuring Agency property and records related to and required by this Agreement;

5.) Agree that the Procuring Agency is not liable for any costs arising out of termination and that the Procuring Agency is liable only for costs of Deliverables Accepted prior to the termination of the Agreement and costs of partially completed Deliverables for which the Procuring Agency wants;

6.) Cooperate fully in the closeout or transition of any activities to permit continuity in the administration of Procuring Agency programs. The Contractor will not be required to perform any additional work requested by the Procuring Agency that is not set out in this termination plan, unless the parties enter into an Amendment to the Agreement;

7.) Should this Agreement terminate due to the Contractor's default, the State may pursue any right or remedy available against Contractor; and,

8.) In the event this Agreement is terminated for any reason, or upon its expiration, the Contractor shall assist and cooperate with the Procuring Agency in the orderly and timely transfer of files, computer software, documentation, system turnover plan, Intellectual Property and other materials, whether provided by the Procuring Agency or created by the Contractor under this Agreement, to the Procuring Agency, including but not limited to, user manuals with complete documentation, functional technical descriptions of each program and data flow diagrams. At the request of the Project Manager, the Contractor shall provide to the Procuring Agency a copy of the most recent versions of all files, software, Intellectual Property and documentation for which full payment has been rendered, whether provided by the Procuring Agency or created by the Contractor under this Agreement.

B.     Procuring Agency.  In the event this Agreement is terminated for any reason, or upon expiration, and in addition to all other rights to property set forth in this Agreement, the Procuring Agency shall 1) upon full payment therefore, retain ownership, or receive a license to the software pursuant to Article 2 of this Agreement, of all Deliverables created pursuant to this Agreement; and 2) Pay the Contractor all amounts due for services Accepted prior to the effective date of such termination or expiration.

## ARTICLE 8 – INDEMNIFICATION

A.     General.  The Contractor shall defend, indemnify and hold harmless the Procuring Agency, the State of New Mexico and its employees from all third party actions, proceedings, claims, and demands, and related costs, damages, reasonable attorneys' fees and other liabilities and expenses, in each case for bodily injury or damage to tangible personal property to the extent caused by the negligent act or failure to act of the Contractor, its officers, employees, servants, subcontractors or agents, or if caused by the actions of any client of the Contractor supporting this Contract and resulting in bodily injury or damage to tangible property during the time when the Contractor or any officer, agent, employee, servant or subcontractor thereof has or is performing

HIGHLY CONFIDENTIAL

services pursuant to this Agreement. In the event that any action, suit or proceeding related to the services performed by the Contractor or any officer, agent, employee, servant or subcontractor under this Agreement is brought against the Contractor, the Contractor shall, as soon as practicable, but no later than two (2) days after it receives notice thereof, notify, by certified mail, the legal counsel of the Procuring Agency, the Risk Management Division of the New Mexico General Services Department, and the DoIT.

B.      The indemnification obligation under this Agreement shall not be limited by the existence of any insurance policy or by any limitation on the amount or type of damages, compensation or benefits payable by or for Contractor or any subcontractor, and shall survive the termination of this Agreement. Money due or to become due to the Contractor under this Agreement may be retained by the Procuring Agency, as necessary, to satisfy any third party claim for which the Procuring Agency is entitled to indemnification under this provision.

C.      The Procuring Agency shall provide the Contractor with prompt notice of any such claim for indemnification and the Contractor may control the defense of such claim provided that the Contractor shall not, absent the Procuring Agency's prior written consent, agree to any settlement that prejudices the Procuring Agency or otherwise acknowledge any fault or liability on the part of the State of New Mexico. The Procuring Agency, to the extent it desires, may also participate in Contractor's defense.

### ARTICLE 9 – INTELLECTUAL PROPERTY
### See Article 2 (D) – Ownership and Licensing

### ARTICLE 10 – INTELLECTUAL PROPERTY INDEMNIFICATION

A.      Intellectual Property Indemnification. The Contractor shall defend, at its own expense, the Procuring Agency, the State of New Mexico and/or any other State of New Mexico body against any third party claim that any product or service provided under this Agreement infringes any patent, copyright or trademark, and shall pay all costs, damages and attorney's fees that may be awarded as a result of such claim. The foregoing indemnity shall not apply to the extent such infringement results from or is based on (i) any modifications to the product or service by the Procuring Agency that were not made at the direction of the Contractor, (ii) the Contractor's compliance with specifications provided by the Procuring Agency, and (iii) any use by the Procuring Agency of the product or service other than in the manner for which they were intended. In addition, if any third party obtains a judgment against the Procuring Agency based upon Contractor's trade secret infringement relating to any product or services provided under this Agreement, the Contractor agrees to reimburse the Procuring Agency for all costs, attorneys' fees and the amount of the judgment. To qualify for such defense and/or payment, the Procuring Agency shall:

> 1.) Give the Contractor written notice, within forty-eight (48) hours, of its notification of any claim;
> 2.) Allow the Contractor to control the defense and settlement of the claim to the extent set out in Article 8 of this Agreement; and
> 3.) Cooperate with the Contractor, in a reasonable manner, to facilitate the defense or settlement of the claim.

B.      Procuring Agency Rights. If any product or service becomes, or in the Contractor's opinion is likely to become, the subject of a claim of infringement, the Contractor shall, at its sole expense:

HIGHLY CONFIDENTIAL

1.) Provide the Procuring Agency the right to continue using the product or service and fully indemnify the Procuring Agency against all claims that may arise out of the Procuring Agency's use of the product or service;

2.) Replace or modify the product or service so that it becomes non-infringing; or

3.) Accept the return of the product or service and refund an amount equal to the value of the returned product or service, less the unpaid portion of the purchase price and any other amounts, which are due to the Contractor. The Contractor's obligation will be void as to any product or service modified or misused by the Procuring Agency to the extent such modification or misuse is the cause of the claim.

## ARTICLE 11 - WARRANTIES

A.    General Services Warranty. The Contractor hereby expressly warrants the services shall be performed in good faith and in a professional manner. This warranty encompasses correction of services that are in breach of this warranty. The warranties contained herein shall not apply to the extent that information provided by the Procuring Agency directly related to the Deliverables is materially erroneous, inaccurate or incomplete.

B.    Software Warranty. For twelve months following Acceptance of the System, the Contractor warrants that the software Deliverables provided under this Agreement shall substantially comply with the terms of this Agreement, Contractor's official published specification(s) and technical specifications of this Agreement. The Contractor further warrants that the system configuration, integration of all system components as defined by Contractor and custom application program code ("System") provided under this Agreement will substantially meet the applicable specifications for minimum of twelve (12) months after Acceptance by the Executive Level Representative and implementation by the Procuring Agency. If the software deliverables/System fails to meet the applicable specifications during the warranty period, the Contractor will correct the deficiencies, at no additional cost to the Procuring Agency, so that the software meets the applicable specifications. For any such failure, the Procuring Agency will provide Contractor in writing, notice of the failure, description of the operation, adequate documentation and evidence to reproduce the failure, to the extent available, and, when necessary, demonstrate the failure to Contractor so that the cause of the failure may be traced and corrected. Contractor will make such warranty repairs within a reasonable period or as may be agreed to.

C.    Contractor assigns to the Procuring Agency all third software manufacturers' warranties relating to any third party software provided under the Contract. Such assignment is subject to all of the commercial license terms and conditions imposed by the manufacturers with respect thereto. Notwithstanding anything herein to the contrary, the Procuring Agency shall look solely to the third party manufacturer with respect to exercise of its rights under the applicable license or support agreement with each such third party software manufacturer upon acceptance of the System (including, without limitation, any warranty obligations). However, during the System Warranty period, at the Procuring Agency's request, the Contractor shall use reasonable efforts to provide the manufacturer with reasonably requested information, monitor the manufacturer's status on resolving the warranty or support issue, and, at the Procuring Agency's direction, test the updated package with the System on behalf of the Procuring Agency.

D.    The Contractor has no obligation to make warranty repairs attributable to the Procuring Agency's misuse or modification of the System; the quality or integrity of data from other automated or manual systems with which the System interfaces (this limitation does not apply to

HIGHLY CONFIDENTIAL

DEL00067849

the Solution being able to access and/or read the data provided it is otherwise of sufficient integrity); hardware, systems software, telecommunications equipment that does not meet the agreed upon written specifications or requirements (including sizing) or software not a part of the System which is inadequate to allow proper operation of the System or which is not operating in accordance with the manufacturer's specifications; or operation or utilization of the System in a manner not contemplated by the Contract.

## ARTICLE 12 – CONTRACTOR PERSONNEL

A.    Key Personnel. Contractor's key personnel shall not be diverted from this Agreement without the prior written approval of the Procuring Agency. Key personnel are those individuals considered by the Procuring Agency to be mandatory to the work to be performed under this Agreement. Key personnel shall be:

Scott Malm, Project Director
Dennis Wenzel, Project Manager
Harpreet Kaur, Business Architecture Lead
Brahma Mishra, Business Analyst
Bernt Peterson, Business Analyst
Josh Kunin-Goldsmith, Training Lead
Partha Mukhopadhyay, Quality/Testing Lead
Mrinal Shaw, Lead System Architect

B.    Personnel Changes. Replacement of any personnel shall be made with personnel of equal ability, experience, and qualification and shall be approved by the Procuring Agency. For all Key personnel, the Procuring Agency reserves the right to require submission of their resumes prior to approval. If any Contractor's Key personnel assigned to the Project leave the project, Contractor shall, within ten (10) business days of the reduction, replace with personnel with equal ability, experience, and qualifications, subject to Procuring Agency approval which shall not be unreasonably withheld. The Procuring Agency, in its sole discretion, may approve additional time beyond the ten (10) business days for replacement of personnel. The Contractor shall include status reports of its efforts and progress in finding replacements and the effect of the absence of the personnel on the progress of the project. The Contractor shall also make interim arrangements to assure that the project progress is not affected by the loss of personnel. The Procuring Agency reserves the right to require a change in Contractor's Key personnel if the assigned Key personnel are not meeting the Procuring Agency's expectations.

## ARTICLE 13 – STATUS OF CONTRACTOR

A.    Independent Contractor. The Contractor and its agents and employees are independent contractors performing professional services for the Agency and are not employees of the State of New Mexico. The Contractor and its agents and employees shall not accrue leave, retirement, insurance, bonding, use of state vehicles, or any other benefits afforded to employees of the State of New Mexico as a result of this Agreement. The Contractor acknowledges that all sums received hereunder are personally reportable by it for income tax purposes as self-employment or business income and are reportable for self-employment tax.

B.    Subject of Proceedings. Contractor warrants that neither the Contractor nor any officer, stockholder, director or employee of the Contractor, is presently subject to any litigation or

HIGHLY CONFIDENTIAL

administrative proceeding before any court or administrative body which would have an adverse effect on the Contractor's ability to perform under this Agreement; nor, to the best knowledge of the Contractor, is any such litigation or proceeding presently threatened against it or any of its officers, stockholders, directors or employees. If any such proceeding is initiated or threatened during the term of this Agreement, the Contractor shall immediately disclose such fact to the Procuring Agency.

## ARTICLE 14 - CHANGE MANAGEMENT

A.      Changes. Contractor may only make changes or revisions within the Scope of Work as defined by Article 2 and Exhibit A (statement of work) after receipt of written approval by the Executive Level Representative. Such change may only be made to Tasks or Sub-Task as defined in the Exhibit A (statement of work). Under no circumstance shall such change affect the following unless mutually agreed to in writing by the Parties through an Amendment to this Agreement;

    1) Deliverable requirements;
    2) Compensation due under the terms of this Agreement; or
    3) Due Date of any Deliverable, as outlined in Exhibit A (statement of work).

B.      Change Request Process. In the event that circumstances warrant a change to accomplish the Scope of Work as described above, a Change Request shall be submitted that meets the following criteria: 1) The Project Manager or Contractor shall draft a written Change Request for Executive Level Representative review and approval to include: the name of the person requesting the change, a summary of the required change, the start date for the change, the reason and necessity for change, the urgency level for the change, the elements to be altered, the impact of the change, the staffing plan associated with the change, the impact on the schedule for implementing the change, the cost impact, the risk assessment and a recommended approach to the change, and 2) The Executive Level Representative shall provide a written decision on the Change Request to the Contractor within a maximum of ten (10) working days of receipt of the Change Request. All decisions made by the Executive Level Representative are final. Change requests, once approved, become a part of the contract and become binding as a part of the original contract. Contractor shall not be required to implement any Change unless the parties have entered into an Amendment to the Agreement.

## ARTICLE 15 – INDEPENDENT VERIFICATION AND VALIDATION

If Independent Validation and Verification ("IV&V") services are used or required to be used for the Project associated with this Agreement, the Contractor hereby agrees to cooperate with the IV&V vendor. Such cooperation shall include, but is not limited to: 1) Providing project documentation; 2) Allowing the IV&V vendor to sit in on project meetings; and 3) Supplying the IV&V vendor with any other material within the scope of work for this contract as directed by the Project Manager.

## ARTICLE 16 – DEFAULT/BREACH

The Procuring Agency will provide written notice to the Contractor of any default and/or breach by the Contractor of this Agreement. The Contractor will have 30 days to cure or receive approval from the Procuring Agency (which will not be unreasonably withheld) of a plan to cure the default/breach within thirty (30) days. If the default/breach is not cured, or on a plan to cure,

HIGHLY CONFIDENTIAL

within thirty days the Procuring Agency and the State of New Mexico may procure the goods or services from another source and hold the Contractor responsible for any resulting reasonable and verifiable direct costs. The State of New Mexico may also seek all other remedies under the terms of this Agreement and under law or equity.

## ARTICLE 17 – EQUITABLE REMEDIES

Contractor acknowledges that its failure to comply with any confidentiality provision of this Agreement will cause the Procuring Agency irrevocable harm and that a remedy at law for such a failure would be an inadequate remedy for the Procuring Agency, and the Contractor consents to the Procuring Agency's seeking from a court of competent jurisdiction, injunction, or any other equitable relief in order to enforce such compliance. Procuring Agency's rights to seek equitable relief pursuant to this Agreement shall be in addition to, and not in lieu of, any other remedy that Procuring Agency may have under applicable law, including, but not limited to, monetary damages.

## ARTICLE 18 – LIMITATION OF LIABILITY

Contractor shall not be liable, irrespective of the form of action or theory of liability (whether in contract, tort or otherwise), for damages in excess of the Funded Contract Amount under this Agreement. This limitation of liability shall not apply to: (1) damages finally judicially determined to directly result from Contractor's bad faith or willful misconduct; (2) indemnification claims arising from bodily injury to third persons or damage to tangible personal property; (3) Article 10 indemnification; and 4) damages for reasonable and verifiable contract replacement costs to finalize the Solution, which damages shall not exceed the Funded Amount of the Contract plus five million dollars ($5,000,000), less any amounts spent under the Agreement with respect to third party product.

Neither party shall be liable to the other party hereunder for loss of goodwill or profits or for any consequential or indirect damages in connection with this Agreement.

In circumstances where all or any portion of this provision is finally judicially determined to be unavailable, the aggregate liability of each party shall not exceed an amount which is proportional to the relative fault that their conduct bears to all other conduct giving rise to such liability.

Contractor shall be liable for damages arising out of bodily injury to persons and/or damage to real or tangible personal property before or after Acceptance, delivery, installation and use of the equipment, and during the warranty period either at the Contractor's site or the Procuring Agency's place of business, provided that the injury or damage was caused by the negligence of the Contractor or defect of the equipment or installation. Contractor shall not be liable for damages arising out of, or caused by, alterations to the equipment (other than alterations performed or caused by Contractor's officers, employees or agents) made by the Procuring Agency or for losses occasioned by the Procuring Agency's fault or negligence.

## ARTICLE 19 – ASSIGNMENT

The Contractor shall not assign or transfer any interest in this Agreement or assign any claims for money due or to become due under this Agreement without the prior written approval of this Agreement's approval authorities.

HIGHLY CONFIDENTIAL

## ARTICLE 20 – SUBCONTRACTING

The Contractor shall not subcontract any portion of this Agreement without the prior written approval of the Procuring Agency. No such subcontracting shall relieve the Contractor from its obligations and liabilities under this Agreement, nor shall any subcontracting relieve an consent from the Procuring Agency. The following named subcontractors have been approved by the Procuring Agency.

Revenue Solutions, Inc
CSG
POD, Inc

## ARTICLE 21 – RELEASE

The Contractor's acceptance of final payment of the amount due under this Agreement shall operate as a release of the Procuring Agency, its officers and employees and the State of New Mexico from all liabilities, claims and obligations whatsoever arising from or under this Agreement. The Contractor agrees not to purport to bind the State of New Mexico unless the Contractor has express written authority to do so, and then only within the strict limits of that authority.

## ARTICLE 22 – CONFIDENTIALITY

All confidential information as defined in applicable state and federal law shall not be disclosed to any individual or organization unless done (i) in accordance with applicable law; or (ii) with the written consent of the applicant/recipient; or (iii) as required by order of competent jurisdiction. Each party will notify the other party promptly of any information as to any unauthorized possession, use, or knowledge of or attempt to use the other party's confidential information. Each party will assist the other party in the investigation of confidentiality violations and in the prevention of future occurrences. Any confidential information provided to the Contractor by the Procuring Agency or, developed by the Contractor based on confidential information provided by the Procuring Agency in the performance of this Agreement shall be kept confidential and shall not be made available to any individual or organization by the Contractor without the prior written approval of the Procuring Agency. Upon termination of this Agreement, Contractor shall deliver all confidential material of the Procuring Agency in its possession to the Procuring Agency within thirty (30) business days of such termination. Contractor may retain copies of such information to the extent required to support any audit obligations.

To the extent that confidential information provided by the Contractor to the Procuring Agency is exempt from New Mexico state laws pertaining to open records, the Procuring Agency shall safeguard the Contractor's exempted confidential information, identified by the Contractor as confidential, to which it has access in connection with the products and/or services provided under this Agreement, and shall use the same means as it uses to protect its own confidential information to prevent the disclosure and to use such confidential information solely in connection with this Agreement.

HIGHLY CONFIDENTIAL

DEL00067853

## ARTICLE 23 – CONFLICT OF INTEREST

The Contractor warrants that, to its knowledge, it presently has no interest and shall not acquire any interest, direct or indirect, which would conflict in any manner or degree with the performance or services required under the Agreement. The Contractor certifies that the requirements of the Governmental Conduct Act, Sections 10-16-1 through 10-16-18, NMSA 1978, regarding contracting with a public officer, state employee or former state employee have been followed.

## ARTICLE 24 - RECORDS AND AUDIT

The Contractor shall maintain detailed records that indicate the date, time, nature and cost of services to the Procuring Agency rendered during this Agreement's term and effect and retain them for a period of three (3) years from the date of final payment under this Agreement. The records shall be subject to inspection by the Procuring Agency, DoIT, SPA, and DFA. The Procuring Agency shall have the right to audit billings both before and after payment. Payment for services under this Agreement shall not foreclose the right of the Procuring Agency to recover excessive or illegal payments.

## ARTICLE 25 - AMENDMENT

This Agreement shall not be altered, changed, or amended except by an instrument in writing executed by the Parties hereto. No amendment shall be effective or binding unless approved by all of the approval authorities.

## ARTICLE 26 – NEW MEXICO EMPLOYEES HEALTH COVERAGE

A.      If Contractor has, or grows to, six (6) or more employees who work, or who are expected to work, an average of at least 20 hours per week over a six (6) month period during the term of the contract, Contractor certifies, by signing this agreement, to:

(1) have in place, and agree to maintain for the term of the contract, health insurance for those employees and offer that health insurance to those employees no later than July 1, 2008 if the expected annual value in the aggregate of any and all contracts between Contractor and the State exceed one million dollars or;

(2) have in place, and agree to maintain for the term of the contract, health insurance for those employees and offer that health insurance to those employees no later than July 1, 2009 if the expected annual value in the aggregate of any and all contracts between Contractor and the State exceed $500,000 dollars or;

(3) have in place, and agree to maintain for the term of the contract, health insurance for those employees and offer that health insurance to those employees no later than July 1, 2010 if the expected annual value in the aggregate of any and all contracts between Contractor and the State exceed $250,000 dollars.

B.      Contractor agrees to maintain a record of the number of employees who have (a) accepted health insurance; (b) declined health insurance due to other health insurance coverage already in place; or (c) declined health insurance for other reasons. These records are subject to review and audit by a representative of the state.

HIGHLY CONFIDENTIAL

C.    Contractor agrees to advise all employees working on this project that are residents of, or working in, New Mexico of the availability of State publicly financed health care coverage programs by providing each employee with, as a minimum, the following web site link to additional information: http://insurenewmexico.state.nm.us/.

D.    For Indefinite Quantity, Indefinite Delivery contracts (price agreements without specific limitations on quantity and providing for an indeterminate number of orders to be placed against it); Contractor agrees these requirements shall apply the first day of the second month after the offeror reports combined sales (from state and, if applicable, from local public bodies if from a state price agreement) of $250,000, $500,000 or $1,000,000, depending on the dollar value threshold in effect at that time.

## ARTICLE 27 - MERGER, SCOPE, ORDER OF PRECEDENCE

A.    Severable. The provisions of this Agreement are severable, and if for any reason, a clause, sentence or paragraph of this Agreement is determined to be invalid by a court or agency or commission having jurisdiction over the subject matter hereof, such invalidity shall not affect other provisions of this Agreement, which can be given effect without the invalid provision.

B.    Merger/Scope. This Agreement incorporates any and all agreements, covenants and understandings between the Parties concerning the subject matter hereof, and all such agreements, covenants and understanding have been merged into this Agreement. No prior agreement or understanding, verbal or otherwise, of the Parties or their agents or assignees shall be valid or enforceable unless embodied in this Agreement.

C.    Order. This Agreement incorporates by reference the Contractor's proposal in response to RFP # 00-631-00-05505 including the best and final offer as well as the presentation/demonstration handouts and exhibits. In addition, the Request For Proposals Number 00-631-00-05505 including the answers to questions and amendments, the and the documents referenced in the Procurement Library are also incorporated by reference. In the event of any conflict among the documents and materials, the following order of precedence shall apply:

> 1). The terms and conditions of this Agreement;
> 2). The Contractor's proposal including the best and final offer; and
> 3). The request for proposals including supporting documents.

## ARTICLE 28 – NOTICES

All deliveries, notices, requests, demands or other communications provided for or required by this Agreement shall be in writing and shall be deemed to have been given when sent by registered or certified mail (return receipt requested), when sent by overnight carrier, or upon telephone confirmation by Contractor to the sender of receipt of a facsimile communication that is followed by a mailed hard copy from the sender.  Notices shall be addressed as follows:

For PROCURING AGENCY
New Mexico Department of Workforce Solutions
DWS Legal Counsel/Contract Office
Attention: Contract Administrator
401 Broadway NE
P.O. Box 1928

HIGHLY CONFIDENTIAL

Albuquerque, NM 87102

CC TO: UI Tax Project Contract Manager
New Mexico Department of Workforce Solutions
401 Broadway, NE
P.O. Box 1928
Albuquerque, New Mexico 87102

FOR STATE PURCHASING
State Purchasing Agent
Joseph M. Montoya State Building, Room 2016
1100 St. Francis Drive
Santa Fe, New Mexico 87505
Mailing Address:
P.O. Drawer 6850
Santa Fe, NM 87502-6850

For CONTRACTOR
Deloitte Consulting, LLP
215 Lincoln Avenue, Suite 205
Santa Fe, NM 87501-1940

Any change to the Notice individual or the address, shall be effective only in writing.

## ARTICLE 29- GENERAL PROVISIONS

A.    Civil and Criminal Penalties. The Procurement Code, Sections 13-1-28 through 13-1-199 NMSA 1978, imposes civil and criminal penalties for its violation. In addition, the New Mexico criminal statutes impose felony penalties for illegal bribes, gratuities and kickbacks.

B.    Equal Opportunity Compliance. The Contractor agrees to abide by all federal and state laws and rules and regulations, and executive orders of the Governor of the State of New Mexico, pertaining to equal employment opportunity. In accordance with all such laws of the State of New Mexico, the Contractor agrees to assure that no person in the United States shall, on the grounds of race, religion, color, national origin, ancestry, sex, age, physical or mental handicap, serious medical condition, spousal affiliation, sexual orientation or gender identity, be excluded from employment with or participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity performed under this Agreement. If Contractor is found not to be in compliance with these requirements during the life of this Agreement, Contractor agrees to take appropriate steps to correct these deficiencies.

C.    Workers Compensation. The Contractor agrees to comply with state laws and rules applicable to workers compensation benefits for its employees. If the Contractor fails to comply with the Workers Compensation Act and applicable rules when required to do so, this Agreement may be terminated by the Procuring Agency.

D.    Applicable Law. The laws of the State of New Mexico shall govern this Agreement. Venue shall be proper only in a New Mexico court of competent jurisdiction in the county where the Procuring Agency's main office is located. By execution of this Agreement, Contractor acknowledges and agrees to the jurisdiction of the courts of the State of New Mexico over any and all such lawsuits.

HIGHLY CONFIDENTIAL

E.    Waiver.  A party's failure to require strict performance of any provision of this Agreement shall not waive or diminish that party's right thereafter to demand strict compliance with that or any other provision. No waiver by a party of any of its rights under this Agreement shall be effective unless expressed and in writing, and no effective waiver by a party of any of its rights shall be effective to waive any other rights.

F.    Headings.  Any and all headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.  Numbered or lettered provisions, sections and subsections contained herein, refer only to provisions, sections and subsections of this Agreement unless otherwise expressly stated.

## ARTICLE 30 - SURVIVAL

The Articles entitled Intellectual Property, Intellectual Property Ownership, Confidentiality, Limitation of Liability and Warranties shall survive the expiration or termination of this Agreement.  Software License and Software Escrow agreements and other unexpired agreements entered into in conjunction with this Agreement shall survive the expiration or termination of this Agreement.

## ARTICLE 31 – TIME

Calculation of Time.  Any time period herein calculated by reference to "days" means calendar days; provided, however, that if the last day for a given act falls on a Saturday, Sunday, or a holiday as observed by the State of New Mexico, the day for such act shall be the first day following that is not a Saturday, Sunday, or such observed holiday.

## ARTICLE 32 – FORCE MAJEURE

Neither party shall be liable in damages or have any right to terminate this Agreement for any delay or default in performing hereunder if such delay or default is caused by conditions beyond its control including, but not limited to Acts of God, Government restrictions (including the denial or cancellation of any export or other necessary license), wars, insurrections and/or any other cause beyond the reasonable control of the party who performance is affected.

## ARTICLE 33 – PROJECT OFFICE

Contractor agrees to establish and maintain a Project Office for the duration of the initial Agreement term. The Procuring Agency will supply a data communication link with suitable bandwidth from the Procuring Agency's UI Tax System processing site to the Contactor's Project Office. The Procuring Agency will supply its personnel working in the Project Office with suitable computer equipment. The Contractor agrees to establish a fully functioning Project Office by the date specified by the Project Manager.

## ARTICLE 34 – CONTRACT MANAGER

The Procuring Agency shall appoint a Contract Manager for this Agreement who shall be the official contact between the Contractor and the Procuring Agency in all matters concerning this Agreement. All events, problems concerns or requests affecting this Agreement must be reported by the Contractor to the Contract Manager in a timely manner. Invoices shall be delivered to the Contract Manager as well as requested changes to the Scope of Work, staffing or the use of

HIGHLY CONFIDENTIAL

subcontractors. The Executive Level Representative's approval and acceptance of all Contractor installed software and services rendered is required prior to payment.

## ARTICLE 35 – REPORTING REQUIREMENTS

Reporting Requirements

A.      If any part of this Agreement is funded pursuant to the American Recovery and Reinvestment Act ("ARRA"), Contractor agrees to abide by the reporting requirements of that Act, as amended. Receipt of funds pursuant to ARRA is expressly contingent upon Contractor's agreement that it will fully comply with the reporting requirements specified by the Act. These reporting requirements shall include, but not necessarily be limited to, the following, as applicable:

      1.      Contractor shall report information required by the Federal Funding Accountability and Transparency Act of 2006 (P.L. 109-282), as that law may be amended or renumbered.

      2.      The name of the entity receiving the award.

      3.      The amount of the award.

      4.      Information on the award including transaction type, funding agency, the North American Industry Classification System code or Catalog of Federal Domestic Assistance number (where applicable), program source, and an award title descriptive of the purpose of each funding action.

      5.      The location of the entity receiving the award and the primary location of the performance under the award, including the city, State, congressional district, and country.

      6.      A unique identifier of the entity receiving the award and of the parent entity of the recipient, should the entity be owned by another entity.

      7.      Any other relevant information specified by the Office of Management and Budget.

B.      Contractor will acquire or update their DUNS number and register with the Central Contractor Registration, if applicable.

C.      Contractor shall report information responsive to ARRA Section 1512 as identified in that Section, and as that Section may be amended or renumbered, and in Federal Office of Management and Budget ("OMB") memoranda and supplements addressing Section 1512 reporting, as amended or renumbered. Reported information will include:

      1.      Data elements specific to vendor reporting.

          a.      Award Number – Prime Recipient Vendor

          b.      Subaward Number – Sub-recipient Vendor

          c.      Vendor DUNS Number

          d.      Vendor HQ Zip Code + 4

          e.      Vendor Name

          f.      Product and Service Description

          g.      Payment Amount

      2.      Data elements for which the prime recipient or sub-recipient is responsible, but which are generated by the vendor, including, but not limited to: project status, jobs creation, and number of jobs.

      3.      Data on number of jobs will comply with OMB Memorandum M-09-21 description of a mathematical formula to calculate Full Time Equivalence (FTE) for jobs created and retained, at page 35, and as that memorandum may be amended, supplemented, or replaced by OMB.

HIGHLY CONFIDENTIAL

DEL00067858

4.      If applicable, pursuant to ARRA Division B, Title VII, or pursuant to OMB Guidelines, memoranda or other directives, Contractor will report the names and compensation of the five most highly compensated officers of the Contractor.

5.      Contractor shall report any other information specified by the funding federal agency for ARRA-funded projects in addition to the reporting requirements specified in Section 1512 and OMB Memoranda.

6.      At the direction of the Agency, Contractor will use any automated data system identified by Agency to report ARRA funds, jobs created or retained, or any other ARRA-mandated reporting requirements.

7.      Contractor will meet all reporting deadlines established by the Agency to ensure compliance with ARRA-mandated reporting deadlines as well as any deadlines specified by the Agency for the reporting of data that the Agency requires in order to comply with Agency's ARRA reporting requirements.

8.      In the event that additional data reporting is imposed on the Agency by federal law or by an appropriate federal agency subsequent to the execution of this Agreement, Contractor agrees to fully comply with any and all additional reporting requirements as directed by the Agency.

D.      Contractor shall also be fully responsible for complying with any reporting requirements which apply to any subcontracts awarded pursuant to this Agreement and in accordance with Section 8 of this Agreement regarding subcontracting, such reporting to comply with ARRA and/or the Federal Funding Accountability and Transparency Act (P.L. 109-282), as those laws may be amended or renumbered. Contractor shall be responsible for ensuring that all required subcontractor reporting is completed in a timely and accurate manner.

1.      The data elements required for compliance shall include, but not necessarily be limited to, the following, as applicable:

    a.      Specific data elements identified by OMB for vendor reporting.

    b.      Any other information specified by OMB or the funding federal agency, if applicable.

    c.      The number of jobs created and retained by the project or activity, with a narrative description of the types of jobs. Data on number of jobs will comply with OMB M-09-21 description of a mathematical formula to calculate Full Time Equivalence (FTE), as that memorandum may be amended or supplemented by OMB.

2.      At the direction of the Agency, subcontractor will use any automated data system identified by the Agency to track ARRA funds, jobs created or retained, or any other ARRA mandated reporting requirements.

3.      ARRA Funds may be used in conjunction with other funds to perform the Scope of Work under this Agreement, but tracking and reporting must be done separately to meet the reporting requirements of ARRA and the OMB Guidance.

4.      Contractor agrees that it will include in any subcontract agreement subject to these requirements, an affirmative obligation upon any subcontractor to collect, maintain and timely provide any and all information subject to the reporting requirements specified herein and a specific authorization for the release of this information directly to the Agency upon the Agency's request.

## ARTICLE 36 – ADDITIONAL AUDIT REQUIREMENTS

A.      If any part of this Agreement is funded pursuant to the ARRA, Contractor agrees to abide by the following:

DEL00067859

1.    Allow access by any appropriate Federal entity, including an inspector general appointed under section 3 or 8G of the Inspector General Act of 1978 (5 U.S.C. App.) to examine any records of the Contractor and any subcontractor pursuant to this original Agreement that pertain to, and involve transactions relating to, this Agreement or any subcontract pursuant to this Agreement; and

2.    To allow any appropriate inspector general appointed under section 3 or 8G of the Inspector General Act of 1978 to interview any officer or employee of the Contractor or any subcontractor pursuant to this original Agreement regarding such transactions.

3.    Nothing in this Section shall be interpreted to limit or restrict in any way any existing authority of an inspector general.

B.    If any part of this Agreement is funded pursuant to the ARRA, Contractor agrees to abide by the following:

1.    Allow access by the Government Accountability Office Comptroller General and his representatives to examine any records of the Contractor or any of Contractor's subcontractors, or any State or local agency administering such contract, that directly pertain to, and involve transactions relating to, the contract or subcontract; and

2.    Allow the Comptroller General and his representatives to interview any officer or employee of the Contractor or any of Contractor's subcontractors, or of any State or local government agency administering the contract, regarding such transactions.

3.    Nothing in this section shall be interpreted to limit or restrict in any way any existing authority of the Comptroller General.

C.    If any part of this Agreement is funded pursuant to ARRA, Contractor agrees to maintain documentation and records that support all information submitted to the Agency for Federal Reporting purposes.

D.    Contractor agrees that it will include in any subcontract agreement an affirmative obligation upon any subcontractor to comply with and submit to all of the additional audit requirements specified herein.

## ARTICLE 37 – ADDITIONAL ARRA REQUIREMENTS

A.    The Agency and Contractor hereby acknowledge that any funding provided pursuant to ARRA is one-time funding which shall be limited to the specific purposes and deliverables specified herein.

B.    Whistleblower Protections of Employees Under ARRA

1.    Contractor will comply with Section 1553 of the ARRA regarding Whistleblower protections, as that section may be amended or renumbered.

2.    Any employer, including Contractor, receiving funds pursuant to ARRA shall post notice of the rights and remedies provided under this section. The notice of rights shall be the same as or equivalent to the example notice set forth in Attachment.

3.    Contractor agrees that it will include in any subcontract agreement an affirmative obligation upon any subcontractor to comply with the whistleblower protection provisions specified herein.

C.    Buy American Provisions

1.    If applicable, Contractor will comply with Division A, Section 1605 of ARRA regarding Buy American Provisions, regarding use of American iron, steel, and manufactured goods, as that section may be amended or renumbered.

HIGHLY CONFIDENTIAL

DEL00067860

2.     If applicable, Contractor is responsible for advising any subcontractor of this requirement.

D.     Wage Rate Requirements

1.     If applicable, Contractor will comply with Division A, Section 1606 of ARRA regarding wage rate requirements, as that section may be amended or renumbered.

2.     If applicable, Contractor will comply with Division B, Section 1601 of ARRA regarding application of certain labor standards to projects financed with certain tax-favored bonds.

3.     If applicable, Contractor is responsible for advising any subcontractor of this requirement.

## ARTICLE 38 – MANDATORY WASTE, FRAUD OR ABUSE REPORTING

If any part of this Agreement is funded pursuant to the American Recovery and Reinvestment Act ("ARRA"), Contractor shall:

A.     Promptly refer to an appropriate inspector general any credible evidence that a principal, employee, agent, contractor, subcontractor, or other person has submitted a false claim under the False Claims Act or has committed a criminal or civil violation of laws pertaining to fraud, conflict of interest, bribery, gratuity, or similar misconduct involving such ARRA funds.

B.     Promptly report to the Agency and NMORR any credible evidence that a principal, employee, agent, contractor, subcontractor, or other person has committed fraud, waste, or abuse of ARRA funds.

C.     Contractor agrees that it will include in any subcontract agreement an affirmative obligation upon any subcontractor to comply with the mandatory waste, fraud or abuse reporting requirements specified herein.

## ARTICLE 39 – NON-COMPLIANCE WITH ARRA REPORTING REQUIREMENTS

Failure of Contractor or any subcontractor to Contractor to comply with the reporting requirements, through material omission, knowingly reporting false data, or failure to comply with reporting deadlines, may result in withholding of payment and/or termination of this Agreement.

## ARTICLE 40 – CITED DOCUMENTS

Cited documents may be viewed in their entirety at United States Government websites, and it is Contractor's responsibility to fully understand Contractor's duties and responsibilities for reporting and disclosure requirements when receiving ARRA funds pursuant to this or any other agreement under which ARRA funds are disbursed.

| | |
|---|---|
| American Recovery and Reinvestment Act of 2009 | ARRA |
| Federal Funding Accountability and Transparency Act of 2006 (P.L. 109-282 | FFATA |
| OMB M-09-21, Implementing Guidance for the Reports on Use of Funds Pursuant to the Recovery Act of 2009.<br>OMB M-09-21 Supp 1: List of Programs Subject to Recipient Reporting | M-09-21 Memorandum<br>M-09-21 Supplement 1<br>M-09-21 Supplement 2 |

HIGHLY CONFIDENTIAL

DEL00067861

| | |
|---|---|
| OMB M-09-21 Supp 2: Recipient Reporting Data Model | |
| OMB M-09-19, Guidance on Data Submission under the Federal Funding Accountability and Transparency Act (FFATA) | M-09-19 |
| OMB M-09-15, Updated Implementing Guidance for the Recovery Act of 2009 | M-09-15 |

## ARTICLE 41 – DEBARMENT AND SUSPENSION AND OTHER RESPONSIBILITY MATTERS

A.      Contractor certifies by signing this Agreement, that Contractor and Contractor's principals, if applicable, to the best of Contractor's knowledge and belief: (1) are not debarred, suspended, proposed for debarment, or declared ineligible for the award of contracts by any Federal department or agency; (2) have not, within a three-year period preceding the effective date of this Agreement, been convicted of or had a civil judgment rendered against them for: commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, state, or local) contract or subcontract; violation of Federal or state antitrust statutes relating to the submission of offers; or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, or receiving stolen property; (3) have not been indicted for, or otherwise criminally or civilly charged by a governmental entity (Federal, state or local) with commission of any of the offenses enumerated above in this Paragraph; and, (4) have not, within a three-year period preceding the effective date of this Agreement, had one or more public Agreements or transactions (Federal, State or local) terminated for cause or default. If applicable, Contractor certifies that it and its principals have not been excluded from participation from Medicare, Medicaid or other federal health care programs pursuant to Title XI of the Social Security Act, 42 U.S.C. § 1320a.

B.      Contractor's certification in Paragraph A is a material representation of fact upon which the Agency relied when this Agreement was entered into by the parties. Contractor shall provide immediate written notice to the Agency if, at any time during the term of this Agreement, Contractor learns that Contractor's certification in Paragraph A was erroneous on the effective date of this Agreement or has become erroneous by reason of new or changed circumstances. If it is later determined that Contractor's certification in Paragraph A was erroneous on the effective date of this Agreement or has become erroneous by reason of new or changed circumstances, in addition to other remedies available to the Agency, the Agency may terminate the Agreement.

C.      Contractor shall require each proposed first-tier sub-Contractor whose subcontract will equal or exceed $25,000, to disclose to the Agency whether as of the time of award of the subcontract, the sub-Contractor, or its principals, is or is not debarred, suspended, or proposed for debarment by any Federal department or agency. Contractor shall make such disclosures available to the Agency. If the sub-Contractor, or its principals, is debarred, suspended, or proposed for debarment by any Federal department or agency, the Agency may refuse to approve the use of the sub-Contractor.

HIGHLY CONFIDENTIAL

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date of the signature by the required approval authorities below.

By: _____ Date: ___1-8-10___
Ken Ortiz,
Secretary of Department of Workforce Solutions

By: _____ Date: ___1-8-10___
Mike Phelan,
Principal, Deloitte Consulting LLP

By: _____ for Date: ___1-8-10___
John Salazar
Chief Information Officer for Department of Workforce Solutions

Approved for legal sufficiency:

By: _____ Date: ___1-8-10___
Clyde DeMersseman
Department of Workforce Solutions General Counsel

The records of the Taxation and Revenue Department reflect that the Contractor is registered with the Taxation and Revenue Department of the State of New Mexico to pay gross receipts and compensating taxes:

CRS ID Number: 02-358179604

By: _____ Date: ___1/8/10___

Taxation & Revenue Department

Approved as to information technology contractual specifications and compliance with the Department of Information Technology Act, Laws 2007, Chapter 290; and any and all Executive Orders relating to Information Technology issued by the Governor of the State of New Mexico:

By: _____ Date: ___1-11-10___
Marlin Mackey, Secretary
Department of Information Technology

HIGHLY CONFIDENTIAL

DEL00067863

This Agreement has been approved by the SPA:

By: ~~[signature]~~ _for_   Date: _1/12/10_

Purchasing Agent for the State of New Mexico

HIGHLY CONFIDENTIAL

DEL00067864

# EXHIBIT 35

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 36

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 37

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 38

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 39

# Deloitte.

Jaclyn C. Fink
Assistant General Counsel
Office of General Counsel

**Deloitte LLP**
555 Mission Street
San Francisco, CA 94105
USA

Tel:  (415) 783-5691
Fax:  (877) 779-9536

jafink@deloitte.com
www.deloitte.com

**VIA UPS OVERNIGHT DELIVERY**

October 3, 2016

Piyush Jain
Chief Executive Officer
Sagitec Solutions LLC
422 County Road D East
Saint Paul, MN 55117

Re:    Deloitte's Unemployment Insurance Intellectual Property

Dear Mr. Jain:

I am an attorney in the Office of General Counsel of Deloitte LLP and write with respect to possible use by Sagitec Solutions LLC of Deloitte's unemployment insurance intellectual property, including the uFACTS Unemployment Insurance Solution and related documentation. This intellectual property is the property of Deloitte Consulting LLP, a subsidiary of Deloitte LLP.

We have been notified by a third party that Sagitec may be using Deloitte's unemployment insurance intellectual property in its client engagements.  Deloitte LLP and its subsidiaries have not given permission to Sagitec to use our unemployment insurance intellectual property, and your unauthorized use would constitute an infringement of our intellectual property rights.

We hereby demand that Sagitec (1) immediately cease and desist from using all Deloitte unemployment insurance intellectual property; (2) immediately destroy or return all Deloitte unemployment insurance intellectual property; and (3) certify in writing within five (5) business days that Sagitec has complied and will continue to comply with the terms set forth herein.

We appreciate your attention to this matter.

Sincerely yours,

Jaclyn C. Fink
Assistant General Counsel –Chief IP Strategist

CC:    David Minkkinen, Partner, Sagitec Solutions LLC

CONFIDENTIAL

# EXHIBIT 40

**Timothy Keller**
T Keller PLLC
7901 Telegraph Road
Bloomington, MN 55348
tim@tkeller.legal
612·860·1258

**VIA EMAIL**

October 7, 2016

Jaclyn C. Fink
Assistant General Counsel
Office of General Counsel
Deloitte LLP
555 Mission Street
San Francisco, CA 94105

Re:    Sagitec Solutions, LLC

Dear Ms. Fink:

I represent Sagitec Solutions, LLC.  This letter is in response to your October 3, 2016 letter to Mr. Piyush Jain, the Chief Executive Officer of Sagitec.

The assertions in your letter are baseless, and Deloitte has no right or reason to make any of the demands made in your letter.  Sagitec does not use, and is not in possession of the Deloitte Ufacts Unemployment Insurance Solution, any related documentation, or any Deloitte intellectual property of any kind.

However, your letter raises another issue that must be addressed.  Specifically, information about the intellectual property Sagitec uses "in its client engagements" seems likely to include Sagitec intellectual property.  Deloitte should not possess any such information or intellectual property, induce others to disclose that information or intellectual property, or interfere with Sagitec's relationships with its clients and prospective clients.  Please make certain that it does not.

CONFIDENTIAL

SS0009676
SAGITEC-DEL_00059524

Jaclyn C. Fink
October 7, 2016


Please contact me with any further questions or concerns about this matter.


     Very truly yours


     Timothy Keller


C:     Piyush Jain

CONFIDENTIAL

# EXHIBIT 41



**T Keller PLLC**
7901 Telegraph Road
Bloomington, MN 55438
Office: 952.217.4596 | Cell: 612.860.1258
tim@tkeller.legal | tkeller.legal

**VIA EMAIL**

September 27, 2018

Kristen McCallion
Principal
Fish & Richardson P.C.

Subject:  Sagitec Solutions, LLC /Deloitte LLC

I am writing to update you on the status of the review of the allegations in your September 12, 2018 letter. .  Based upon our preliminary review, we have no reason to deviate from the conclusion stated in our October 7, 2016, letter addressed to Jaclyn Fink that Sagitec Solutions LLC does not possess any Deloitte LLP intellectual property.

We will, however, continue to review the allegations. To assist that process, we  ask that you identify more precisely the technology that your client claims has been misappropriated.

Your letter refers to the uFACTS solution framework.  The framework technology incorporated in Sagitec's Neosurance product was developed well before any individual who subsequently joined Sagitec had left Deloitte.   Is it possible that the intellectual property in question is something other than the framework technology you reference?

Your letter does not reference any specific Deloitte technology; nor do Deloitte's copyright registrations establish infringement.  Please provide the specific facts upon which you have based your allegations.

In addition, please identify the source of any facts that you identify.  You allege that "Sagitec used and continues to use Deloitte's source code and trade secrets."  What information do you rely upon in making that assertion?

Further, you assert that Sagitec's technology is based on or incorporates Deloitte technology.  Have you had access to the Sagitec technology so that you can make a detailed comparison to the Deloitte products?  Please confirm if your client is in possession of Sagitec technology, or if your client has accessed Sagitec technology in the past.  If your client does not possess and has not accessed Sagitec technology, please explain how your client reached the conclusion that the technology is based on or incorporates Deloitte technology.  If that conclusion is based on an opinion or information provided by a third party, please identify that third party and provide a detailed summary of that opinion or information.

In conclusion, please be assured that Sagitec wishes to bring this matter to a conclusion satisfactory to both parties.

Very truly yours

Timothy Keller

C:     David Minkkinen
       Piyush Jain

SS0009810
SAGITEC-DEL_00059638

# EXHIBIT 42

| | |
|---|---|
| **From:** | Timothy Keller <tim@tkeller.legal> |
| **Sent:** | Monday, July 1, 2019 2:44 PM |
| **To:** | Jain, Piyush; Minkkinen, David |
| **Subject:** | FW: Deloitte - Sagitec Matter |
| **Attachments:** | Deloitte-Sagitec Tolling Agreement.7.1.19.docx |

This just in.  I haven't looked at yet.

Tim

**Timothy Keller**
Principal

 **KELLER**
TECHNOLOGY LAW

**T Keller PLLC**
7901 Telegraph Road, Bloomington, MN 55438
Office: 952.217.4596 | Cell: 612.860.1258
tim@tkeller.legal | tkeller.legal

**From:** Kristen McCallion <McCallion@fr.com>
**Sent:** Monday, July 1, 2019 1:53 PM
**To:** Timothy Keller <tim@tkeller.legal>
**Subject:** RE: Deloitte - Sagitec Matter

Dear Tim,

We have not touched base in a while, but Deloitte remains interested in resolving this matter with your client.  It therefore seeks Sagitec's agreement to toll claims that Deloitte and Sagitec may have between them in relation to this matter, and as more specifically explained in our letter of September 12, 2018 and in calls and correspondence following that letter.

In light of this, we ask that you please review the attached tolling agreement and advise whether Sagitec will sign it.

Thank you and regards,
Kristen

**Kristen McCallion ::** Principal **::** Fish & Richardson P.C.
Chair **::** Copyright Practice Group

212 641 2261 direct **::** mccallion@fr.com
fr.com **::** FishTMCopyrightblog.com **::** Bio **::** LinkedIn

CONFIDENTIAL

**From:** Timothy Keller <tim@tkeller.legal>
**Sent:** Thursday, November 29, 2018 9:01 AM
**To:** Kristen McCallion <McCallion@fr.com>
**Subject:** Deloitte - Sagitec Matter

I am sorry that we did not have an opportunity to talk directly. I think we could have had a productive discussion, but this summary provides the essential points.

Sagitec will not agree to your client's demands for a code review and an affidavit. Sagitec has already stated that there has been no infringement or misappropriation of IP. These further efforts are not supported by any of your allegations.

None of the information you have provided to date supports an inference that Sagitec possesses Deloitte technology. For example, the marketing statement you reference in the Washington State bid does not make any reference to the substance of either party's technology. In addition, this marketing statement was made by Microsoft in a proposal for a paid family leave solution where Sagitec was a subcontractor. The paid family leave program did not exist in 2013 and does not have any relationship to uFACTS or the Deloitte technology you reference in your letter. Also, Sagitec disputes the assertion that the Deloitte logo appeared in any Sagitec client presentation. Finally, the assertions made about the District of Columbia project are based on incorrect assumptions about that project that could be clarified in a discussion with your client. In summary. these examples do not support the level of effort you are requesting in your demand.

Nonetheless, Sagitec does remain open to a discussion with your client. We believe that is the best and most efficient way to resolve your client's concerns. For example, we believe that a discussion of the District of Columbia project would quickly resolve that concern. That discussion could be face-to-face or by teleconference. Another alternative would be a brief teleconference that is followed by a face-to-face meeting.

With the foregoing in mind, please ask your client to reconsider Sagitec's offer of a discussion.

Thanks.

Tim

**Timothy Keller**
Principal



**T Keller PLLC**
7901 Telegraph Road, Bloomington, MN 55438
Office: 952.217.4596 | Cell: 612.860.1258
tim@tkeller.legal | tkeller.legal

**************************************************************************************************
************************
This email message is for the sole use of the intended recipient(s) and may contain confidential
and privileged information. Any unauthorized use or disclosure is prohibited. If you are not the
intended recipient, please contact the sender by reply email and destroy all copies of the original
message.

*********************************************************************************************************
**************************

CONFIDENTIAL

# EXHIBIT 43

# EXHIBIT 1

SAGITEC-DEL_02374277

**West Virginia Legislature**
**Commission on Special Investigations**



**Memorandum of Contact**

**In RE:** Work Force WV – US DOL Grant

**Case No.:** U831-16

**Date of Event:** May 17, 2016

**Participants:** Greg Keene, Programmer/Analyst, WorkForce WV, 112 California Avenue, Charleston, WV
Cellular #:
Jim Powers, Deputy Director, CSI

**Subject:** Information re WorkForce WV Software Vendor Sagitec

On Tuesday, May 17, 2016, at 1:00 PM, CSI Deputy Director JAMES POWERS received a call from GREG KEENE, as styled above. **KEENE is a cooperating individual, known by POWERS to be reliable. KEENE requested that he not be contacted by any means other than his cellular number above.**

KEENE expressed concerns regarding possible fraud involved with a current grant from the US Department of Labor to WV Workforce. After speaking with KEENE, POWERS explained to KEENE that owing to other investigative demands it might be some time before an interview could be arranged. POWERS then forwarded via email the following information to CSI Director CHARLES BEDWELL and S/A STEVE WILBURN, US Department of Labor

*I got a call today from a CI with Workforce WV who has been reliable (if a little paranoid) in the past. The quick and dirty is as follows:*

*US Dept. of Labor has funded an approx. $80 million consortium grant for joint software development for the states of MD and WV*

*The developer is Sagitec*

*The project management company is CSG*

*The CI is involved in the WV side of the equation. He says there are major problems with the software, and the WV people are unable to get straight answers from the Sagitec people. He is unsure whether this is incompetence, corruption or both. He says there seems to be a lack of concern in MD, but that he does sense a degree of concern with CSG when he speaks to their rep.*

Page **1** of **2**

DOJ_00369074

CONFIDENTIAL

SAGITEC-DEL_02374278

*The Sagitec folks are largely Indian, with many being former employees of DeLoitte. CI has seen numerous references to Massachusetts. He begins to wonder if the Sagitec people stole part of the software they are selling from Deloitte, the State of Mass., or both. It is his understanding this is a $38 million project which will take another two years to complete.*

*He says mgmt. will be strongly opposed to blowing up the project, because the US DOL is no longer funding this type project, specifically because of all the trouble they have had with similar projects in the past.*

*I told the CI keep as close tabs on this as he can. I am up to my eyeballs with other issues here.*

*Wanted to share this with you before it left my mind… jp*

Upon reviewing the email and discussing the matter further with POWERS, Director BEDWELL assigned CSI Senior Investigator STEVE STATON to contact KEENE and arrange an interview.

CRB:lmw
2016-05-17

Page **2** of **2**

DOJ_00369075

CONFIDENTIAL                                                                    SAGITEC-DEL_02374279

# EXHIBIT 2

CONFIDENTIAL

SAGITEC-DEL_02374280

**West Virginia Legislature
Commission on Special Investigations**



**Memorandum of Contact**

**In RE:**          Work Force WV – US DOL Grant

**Case No.:**      U831-16

**Date of Event:**  June 17, 2016

**Participants:**   Greg Keene, Programmer/Analyst, WorkForce WV, 112 California
                    Avenue, Charleston, WV
                    Cellular #:
                    Jim Powers, Deputy Director, CSI

**Subject:**        Thumb Drive re WorkForce WV Software Vendor Sagitec

On Friday, June 17, 2016, KEENE provided to POWERS three files on a thumb
drive. These files appear as attachments # 1, 2, & 3 to this memorandum. Attachments
# 1 and 2 are letters to ELIZABETH CARENBAUER, one of the KEENE's superiors at
WorkForce WV. These two documents provide an outline of KEENE's suspicions and
should be read closely. The two resulted from a meeting on June 10, 2016, when
KEENE formally reported his concerns with the Sagitec project to his superiors. KEENE
subsequently identified the participants at this meeting as:

VALERIE COMER
BETH CARENBAUER
DAVE ADKINS (KENNE's boss)
JEFF GREEN
JEREMY PARSONS (KEENE's subordinate)
MARK MCNEELY (KEENE's subordinate)

At this meeting, KEENE was directed to put his concerns on paper, and to
provide them to CARENBAUER. He was specifically directed not to e-mail what he
wrote. KEENE's subordinates were instructed to do the same, but he has not seen
what they submitted.

Jim Powers, Investigator, CSI              Charles R. Bedwell, Director, CSI

JSP:lmw
2016-06-17
E-Attachments

DOJ_00369076

CONFIDENTIAL                                                          SAGITEC-DEL_02374281

# EXHIBIT 3

CONFIDENTIAL

SAGITEC-DEL_02374282

**West Virginia Legislature**
**Commission on Special Investigations**



**Memorandum of Interview**

**In RE:** Work Force WV – US DOL Grant

**Case No.:** U831-16

**Date of Event:** June 23, 2016

**Participants:** Greg Keene, Programmer/Analyst, WorkForce WV, 112 California
Avenue, Charleston, WV
Cellular #: ▮▮▮▮▮▮
James Powers, Deputy Director, CSI
Steven Staton, Senior Investigator, CSI
Stephen Wilburn, US Dept. of Labor

**Subject:** Interview re WorkForce WV Software Vendor Sagitec

On Thursday, June 23, 2016, at 10:00 AM, the above named Investigators met
with KEENE at the CSI offices. KEENE was also introduced to Director BEDWELL on
this date. At the onset of the meeting, KEENE provided a second thumb drive, along
with several paper documents which were subsequently scanned by the Undersigned.
It is noted there is likely duplication within these documents. Attachments # 4 through
15 are from the second thumb drive. Attachments # 16 through 22 are scanned paper
documents.

During the course of the interview, KEENE provided the following additional
information. According to KEENE, approximately three years ago, the States of
Vermont, Maryland and West Virginia formed a consortium to upgrade each State's
unemployment compensation computer system. An RFP was written, however there
were no bids received from the RFP. At that time, the State of Vermont dropped out of
the consortium.

A new RFP was written, KEENE believes by ROBERT FRENATT of Diamond
Technologies, Wilmington, Delaware, MELISSA GANLEY, State of Maryland, and
PRAHALAD PATELLE, State of Maryland. This RFP was a joint venture with the States
of West Virginia and Maryland. Three bids were received, with Sagitec winning the bid.
The project was to be paid with a Federal Department of Labor $80M grant. Sagitec bid
$38M.

CSG Government Solutions (CSG) was hired as the Project Management for the
West Virginia – Maryland consortium. CSG is paid from the grant.

CSG hired business analysts to create "use cases" to test the new system for the
State of West Virginia. According to KEENE, the "use cases" are not being used by

Page 1 of 2

CONFIDENTIAL

DOJ_00369077

SAGITEC-DEL_02374283

Sagitec. Sagitec is making us up their own use cases. KEENE stated this is a bad idea.

Maryland is considered the lead on the project, however KEENE is not sure how payments to CSG and/or Sagitec are made. He didn't know if Maryland makes all payments or West Virginia and Maryland both make payments.

The Lead Manager for the entire project is MELISSA GANLEY, State of Maryland. The West Virginia Lead is DANI ASSEFF, located at Plaza East, Charleston, WV. TERESA SMITH was the former Lead Manager for the State of West Virginia, however she left in July 2015. KEENE stated the current Lead Manager is unqualified to do the job.

The two lead technical people for the consortium are both State of Maryland employees: PRAHALAD PATELLE is the Chief Information Officer for the State of Maryland; and SHANWAZ (LNU).

According to KEENE, all work done by Sagitec has to be done in the continental US. However, he has reservations that the work is actually being done in the US due to conversations he has had with SRINIVAS KURRA. His reservations are outlined in a memo he created dated June 11, 2016 (copy provided to CSI). KEENE also said the lead person with CSG (KARTHIK VENKATESAN) read in the contract the work had to be done in the continental US. A copy of his business card is electronically attached.

KEENE stated that Sagitec is working on Milestone #3 now. When Milestone #3 is completed, Sagitec gets 30% of the $38M. KEENE stated Milestone #3 has seven parts to it and they are now working on part 3 of the seven parts. He stated Milestone #3 should be completed by the end of December 2016.

KEENE stated Sagitec is in over their heads and in his opinion cannot adequately do the job. KEENE stated he asked Sagitec for a data flow chart but they provided him a work flow chart, which is not what they needed.

Jim Powers
Deputy Director, CSI

Charles R. Bedwell
Director, CSI

JSP:lmw
2016-06-23

Page **2** of **2**

DOJ_00369078

CONFIDENTIAL

SAGITEC-DEL_02374284

# EXHIBIT 4

CONFIDENTIAL

SAGITEC-DEL_02374285

**West Virginia Legislature**
**Commission on Special Investigations**



**Memorandum of Interview**

**In RE:** Work Force WV – US DOL Grant

**Case No.:** U831-16

**Date of Event:** August 5, 2016

**Participants:** Annica Jin-Hendel, Assistant General Counsel, Deloitte LLP, New York, NY
Telephone:
Jaclyn Fink, Chief Intellectual Property Strategist General Counsel, Deloitte LLP, San Francisco, CA
Telephone:
Scott Malm, Private Sector Workforce & Employment Leader, Deloitte LLP, Minneapolis, MN
Telephone:
Greg Keene, Programmer/Analyst, WorkForce WV, 112 California Avenue, Charleston, WV
Cellular #:
Steve Staton, Senior Investigator, CSI
Jim Powers, Deputy Director, CSI

**Subject:** Conference Call re WorkForce WV Software Vendor Sagitec

On Friday, July 15, 2016, the Undersigned forwarded information provided by CI GREG KEENE regarding Sagitec and the software product provided to date under its contract with the WV/MD Consortium (hereafter the Consortium) to ANNICA JIN-HENDEL, as styled above. Ms. JIN-HENDEL had at this point identified herself as the individual assigned to look into this matter on behalf of Deloitte LLP. (This in response to an initial telephone call to LINDA BEYER, Associate General Counsel with Deloitte LLP on July 12, 2016.) Ms. JIN-HENDEL was provided everything available, as provided the Undersigned by the CI, short of revealing the CI's identity.

On Friday, August 5, 2016, at 4:30 PM, a conference call was held involving all the above named individuals. The call lasted from approximately 4:30 PM until approximately 5:30 PM. It is noted the conference call was scheduled for this date and time because Ms. JIN-HENDEL was to begin two weeks' vacation the following morning.

It is also noted that when the call was arranged, the Undersigned suggested the participation of AUSA ANDREW COGAR. Ms. JIN-HENDEL was very resistant to this,

Page **1** of 3

DOJ_00369079

CONFIDENTIAL                                                                 SAGITEC-DEL_02374286

stating she could not agree to AUSA COGAR's participation without first securing the permission of her superior at Deloitte. Given this, the Undersigned agreed to move forward without AUSA COGAR's participation.

Given the complexity of the matter and other factors, the Undersigned made an audio recording of the conference call. This recording was made with the full knowledge and consent of Senior Investigator STATON, and the CI. It was not disclosed to the representatives of Deloitte. The decision to record the call was made by the Undersigned without any knowledge or input on the part of AUSA COGAR.

The full detail of the conversation which took place can be reviewed by listening to the recording which will be maintained as part of the CSI case file. The following are points considered worthy of note, some of which consist of the impression/opinion of the Undersigned:

1) At the onset of the call it was again emphasized that the CI would be in serious jeopardy if his superiors at Workforce WV became aware of his cooperation. An understanding of this was acknowledged by those from Deloitte.
2) As the call progressed, it became clear that only one of the three Deloitte representatives has a real, in-depth understanding of the software solution developed for the State of Massachusetts by Deloitte, this being SCOTT MALM.
3) MALM indicated that the situation/circumstances are suspicious, but the information in hand at this point is not sufficient to prove theft of intellectual property by Sagitec.
4) There were many questions posed to the CI as to how in-depth his access to the Sagitec software under development is, and whether he is able to access/produce more detailed information. The CI made it clear, among other things, that not only does he not have access to the source code for the software being developed, but Sagitec has stated more than once they will not at any point turn over the source code for the product being produced.
5) There was discussion of the numerous references to the State of Massachusetts within the data tables the CI has access to, and during this discussion it became clear that: a) JIN-HENDEL had provided the background documents sent earlier only to Ms. FINK, not to SCOTT MALM; and b) Ms. FINK never bothered to open or examine any of these documents until half-way through this conference call.
6) While looking at one of the documents, FINK acknowledged seeing references to both the State of Massachusetts and the State of Minnesota. At this point, MALM acknowledged that Deloitte developed a software solution of this type for the State of Minnesota also.

Toward the end of the call, the Investigators began to sense the representatives from Deloitte might be operating under the mistaken impression the Investigators were considering some type civil action against Sagitec. Given this, the Investigators made it clear that if indeed Sagitec has committed a crime, the solution sought will be criminal.

Page **2** of **3**

DOJ_00369080

CONFIDENTIAL

SAGITEC-DEL_02374287

Ultimately it was decided the parties from Deloitte would scrutinize the material already provided more closely, and the Investigators would work with the CI toward any additional detail/information which might be obtained here.


JSP:lmw
2016-08-05

Page **3** of **3**

DOJ_00369081

CONFIDENTIAL                                                                          SAGITEC-DEL_02374288

EXHIBIT 5

CONFIDENTIAL

SAGITEC-DEL_02374289

**West Virginia Legislature**
**Commission on Special Investigations**



**Memorandum of Interview**

---

**In RE:** Highways (US Attorney's Task Force)

**Case No.:** 2173-16

**Date of Event:** October 5, 2016

**Participants:** Jessica V. Carter, Assistant Attorney General, Principal Counsel, Department of Labor, Licensing and Regulation, 500 N. Calvert Street, Suite 406, Baltimore, MD 21202
Telephone:
Dana Reed, Maryland Attorney General's Office
Steve Staton, Senior Investigator, CSI
Jim Powers, Deputy Director, CSI

**Subject:** Conference Call re WorkForce WV Software Vendor Sagitec

On Wednesday, September 14, 2016, the Undersigned received the e-mail at Att. 001 from GREG KEENE. It was noted within this communication that a new individual, DAYNE FREEMAN, had been placed in a position over the MD/WV Consortium project. Given the absence of any progress on this investigation, a decision was made to reach out to Ms. FREEMAN.

The Undersigned moved forward in this attempt on Tuesday, October 4, 2016, via the attached electronic mail message which was transmitted to DAYNE FREEMAN (Att. 002). A subsequent automated response indicated Ms. FREEMAN was out of town on business.

At 1:39 PM, the same date, the Undersigned received an e-mail response from JESSICA CARTER (Att. 003), indicating she was responding on behalf of Ms. FREEMAN. A conference call was subsequently set up for the following day at 3:00 PM, with CARTER calling the Undersigned.

In preparing for this telephone call, Investigators STATON and POWERS were cognizant of GREG KEENE's e-mail of September 15, 2016 (Att. 004), which reads in part as follows:

*Scott Adkins told me that my letter from June 10, 2016, of which I gave you a copy, was given to the upper management in the Maryland Workforce agency. They then gave it to the Maryland State Attorney General. The Attorney General then went to Sagitec with the letter.*

Page 1 of 3

DOJ_00490694

CONFIDENTIAL                                                                 SAGITEC-DEL_02374290

*Sagitec then gave a response, I don't know what, that satisfied the Attorney General. Sagitec then wrote a 6 page letter to our upper management here in Charleston complaining that my letter was "defamatory". I have not been permitted to read this letter. Scott Adkins told me that the letter does not mention me by name. I suspect that the letter does allude to me though. I wouldn't be surprised if my being removed from Consortium work is at least partly punishment for this letter.*

(KEENE's June letter appears at Att. 005.)

At 3:00 PM, Wednesday, October 5, 2016, the following individuals participated in a telephone conference call: JESSICA CARTER and DANA REED from the Maryland Attorney General's office, Investigator STATON and Investigator POWERS. CARTER did not offer to introduce Ms. REED other than to state she is an attorney with the AG's office, and is not assigned to the Department of Labor as CARTER is.

After a brief amount of conversation, CARTER asked if the Investigators are associated with the WV Attorney General's office. It was quickly established this is not the case, and that the WV Attorney General has no criminal jurisdiction in matters of this type. Investigator POWERS further acknowledged he had reached out discretely to an individual with the WV Attorney General's office in order to obtain a copy of the Sagitec contract, and/or the MD/WV Consortium agreement, with the result being a response the WV Attorney General's office had never seen either.

In light of the information provided by GREG KEENE, the Undersigned asked if CARTER and/or REED had seen GREG KEENE's June 2016 letter to CARENBAUER. (Note: KEENE's name was never mentioned to the Maryland officials.) The Undersigned pointed out that if the two had reviewed the letter, the Undersigned would not repeat the content of same in describing the concerns which were the cause for reaching out to Ms. FREEMAN.

CARTER deferred to REED on this question, and REED stated she could not respond without first consulting her client.

Given this, the Undersigned then proceeded with a summary description of the concerns raised by KEENE. The fear of retaliation against KEENE by management at Workforce WV was emphasized, along with the Investigators' inability to seek out basic documents because of this issue. CARTER and REED agreed to provide relevant documents, within the limits of what constituted "public record". The Undersigned specifically asked for: 1) any grant or similar agreement between the Consortium and the US Department of Labor (governing the project funding); 2) any signed contract or agreement governing the Consortium; 3) any signed contract with Sagitec; and 4) a copy of Sagitec's official proposal.

The Undersigned reiterated the two basic concerns which were shared on a previous occasion with representatives of DeLoitte. First that there appear to be major problems with the software being developed which raises the question of whether the Consortium is paying for a product which will ultimately fail. Second, that circumstances seem to raise the real possibility one or more individuals with Sagitec may have pirated

Page 2 of 3

CONFIDENTIAL SAGITEC-DEL_02374291

part or all of the software source code from their former employer Deloitte. In discussing this it was emphasized the WV Investigators are not accusing Sagitec of anything, rather, they are asserting the facts and circumstances are troubling and need to be laid to rest one way or the other.

In the interest of full disclosure, the Undersigned did recount the Investigators' telephone call with representatives of DeLoitte. They also made CARTER and REED aware of having reached out to AUSA ANDREW COGAR and S/A STEVE WILBURN, US Department of Labor. CARTER and REED asked for and were provided contact information for all these individuals.

Beyond agreeing to provide copies of relevant documents, and stating they understood the nature of the concerns being raised, CARTER and REED provided no information other than to say they would take the matter up with their client. They made no mention of having hired SLI to look into this matter or of representatives of SLI coming to West Virginia recently (Att.'s 005 & 006).

Immediately subsequent to the telephone call, the Investigators spoke by telephone with AUSA ANDREW COGAR and briefed him on the above information.

Att.'s 006 & 007 are e-mails which were received on October 5th and 6th from GREG KEENE. (KEENE is not aware of the above described telephone call.) It is noted that while representatives of SLI were in Charleston and did conduct interviews, they did not speak with KEENE or either of his subordinates. It is unknown who decided which Workforce WV employees would be interviewed. Additionally, the details related by KEENE about the Sagitec letter he was shown, appear inconsistent with what he was previously led to believe about the matter.

Jim Powers
Deputy Director, CSI

Charles R. Bedwell
Director, CSI

JSP:lmw
2016-10-05
E-Attachments

Page 3 of 3

DOJ_00490696

CONFIDENTIAL

SAGITEC-DEL_02374292

# EXHIBIT 6

CONFIDENTIAL

SAGITEC-DEL_02374293

| | |
|---|---|
| **From:** | Jin-Hendel, Annica (US - New York) <"/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=ce2610ea65994db19cd1d43952a98cc2-Jin, Annica"> |
| **To:** | Jim Powers |
| **CC:** | Fink, Jaclyn (US - San Francisco) |
| **Sent:** | 11/4/2016 12:32:34 PM |
| **Subject:** | |

Hi Jim,

We are happy to be on a call. Next week isn't good, but would you like to schedule a call for the week of 11/14?

Best,

Annica

**Annica Jin-Hendel**
Deloitte LLP
Tel/Direct: +1 212 492 3857
www.deloitte.com

**From:** Jim Powers [mailto:jim.powers@wvcsi.gov]
**Sent:** Wednesday, November 2, 2016 4:38 PM
**To:** Jin-Hendel, Annica (US - New York) <annjin@deloitte.com>
**Cc:** Steve Staton <steven.staton@wvcsi.gov>; Andy.Cogar@usdoj.gov
**Subject:** Sagitec

Annica,

Steve and I just got off the telephone with AUSA Andy Cogar. We think another conversation between your team and ours would be very helpful at this point. This will allow the opportunity for you to speak directly with AUSA Cogar as to what additional information would be helpful to him at this point, and to discuss the specifics of the best way to move forward.

For us, next Monday afternoon would be best. Thursday would also work for us.

.....................jim

> **James S. Powers**
> Commission on Special Investigations
> Deputy Director
>
> (304) 347-4126 Work
> (304) 347-4120 Work
> jim.powers@wvcsi.gov
> 301 Eagle Mountain Road
> Room 218
> Charleston, WV 25311-1061



CONFIDENTIAL/RESTRICTED DISCOVERY MATERIALS

DT00000365

CONFIDENTIAL

SAGITEC-DEL_02374294

# EXHIBIT 7

CONFIDENTIAL

SAGITEC-DEL_02374295

**West Virginia Legislature**
**Commission on Special Investigations**



**Memorandum of Interview**

**In RE:** Work Force WV – US DOL Grant

**Case No.:** 2173-16

**Date of Event:** November 3, 2016

**Participants:** Annica Jin-Hendel, Assistant General Counsel, Deloitte LLP, New York, NY
Telephone:
Jaclyn Fink, Chief Intellectual Property Strategist General Counsel, Deloitte LLP, San Francisco, CA
Telephone:
Scott Malm, Private Sector Workforce & Employment Leader, Deloitte LLP, Minneapolis, MN
Telephone:
Steve Staton, Senior Investigator, CSI
Jim Powers, Deputy Director, CSI

**Subject:** Conference Call re WorkForce WV Software Vendor Sagitec

On Monday, October 31, 2016, the Undersigned received an e-mail message from ANNICA JIN-HENDEL inquiring if the Investigators were available for a conference call. This call was scheduled for Wednesday, November 2, 2016 at 3:00 PM.

The call took place as scheduled, with the above named individuals present and participating in the call. It is noted this was essentially the first meaningful communication from Deloitte since the initial conference call on August 5, 2016, and that the call involved the same group of participants, absent the CI, who was present for the first call.

Ms. JIN-HENDEL asked if there had been any developments since the last conference call. The Undersigned responded by providing information summarized as follows:

1) That an attempt had been made in early October to reach out to the State of Maryland, which resulted in a conference call with two attorneys from the Maryland Attorney General's office (JESSICA CARTER and one other) on October 5, 2016.
2) That at the onset of this call the Undersigned stated it was his impression CARTER had been provided a copy of the original letter from the CI in West Virginia, dating to June of this year and raising concerns about the project.

Page **1** of **4**

DOJ_00369086

CONFIDENTIAL

SAGITEC-DEL_02374296

3) That CARTER and the second attorney (DANA REED) declined to respond as to whether they had seen the letter without first speaking to their client.

4) That the Investigators had provided CARTER and REED the same general information about concerns regarding Sagitec and the Maryland/West Virginia (hereafter MD/WV) Consortium Project as had been provided to Deloitte two months earlier.

5) That the Investigators had been transparent with the Maryland attorneys, disclosing that they had previously reached out to Deloitte, as well the United States Attorney's office, and providing the names and telephone numbers of the individuals contacted.

6) That the Maryland attorneys seem to be holding the Investigators at "arm's length" for some unidentified reason, and that the only real information they had provided was copies of RFP and contract documents for the MD/WV project which fall within the public domain. It was noted these documents include relatively extensive redactions.

Aside from the above, the Undersigned also informed those on the call from Deloitte that additional evidence had been provided by the CI indicating that contrary to the contract terms, there is project development work occurring at a Sagitec office in India.

The Investigators then asked questions of the Deloitte group, with the responses from Deloitte coming almost exclusively from SCOTT MALM, who is clearly the one of the three most knowledgeable of Deloitte's unemployment insurance (hereafter UI) software product.

1) Deloitte was asked if they submitted a proposal for the MD/WV project. MALM stated they did not.

2) Deloitte was next asked if the Maryland attorneys had reached out to them. They stated there has been no contact from the Maryland attorneys.

3) The Undersigned pointed out the Investigators are clear that the Massachusetts and Minnesota UI software projects are Deloitte product, and asked if similar projects in New Mexico and Montana were Deloitte projects/product as well. MALM stated they were.

The Undersigned then pointed out that based upon the content of the Sagitec proposal to the MD/WV Consortium, it appears Sagitec is taking credit for project work by Deloitte in the above states, but phrasing same as the expertise of Sagitec's "project team", with this team consisting of a group of former Deloitte personnel who left Deloitte for Sagitec in the fall and winter of 2013.

The Undersigned further pointed out that a review of Sagitec's listing of actual projects completed reveals that virtually all their completed work consists of software projects for various retirement systems, and that the only UI software project cited in the proposal which is truly theirs is one for the District of Columbia, which occurred after the key players left Deloitte.

Page **2** of **4**

DOJ_00369087

CONFIDENTIAL

SAGITEC-DEL_02374297

MALM stated the above is correct, and the District of Columbia project is Sagitec's only real venture into the UI software realm to date. During this conversation MALM made it clear he is in possession of a copy of Sagitec's proposal for the MD/WV project, and is fully aware of their claims with respect to what is in reality Deloitte's product and projects.

Given this, the Undersigned asked MALM to explain the licensing arrangements with the various states where Deloitte has completed UI software development projects, and whether any of their product was "public domain" such that the personnel who left Deloitte for Sagitec could have (legally) taken a copy of Deloitte's work product with them.

MALM stated without hesitation that none of the UI software product Deloitte has developed for various states falls within the public domain. He stated Deloitte has been very careful to protect its ownership rights in the work product in question, and its agreements with the various states are such that the states have no ownership rights in the software developed for them. Deloitte grants the state/customer a license to use the software in perpetuity, but does not grant the states any right to share the software product with others.

MALM stated that since the initial conversation on August 5th, he has examined the material obtained from the CI closely, and it is clear the Sagitec product being developed for the MD/WV Consortium is based upon a foundation of software development work and product developed by Deloitte for the other states, which is the intellectual property of Deloitte. He stated it is clear the MD/WV project began with a copy of Deloitte's product, and while new data fields have been added, there has been no attempt to hide the fact the starting point is a copy of Deloitte's work. (*The preceding is the Undersigned's layman's explanation of the considerably more technical explanation articulated by SCOTT MALM.*)

Having reached this point in the conversation, Ms. JIN-HENDEL turned to next steps, and suggested the need to compare Deloitte's product with the Sagitec product. She made mention of potentially reaching out to the attorney's in Maryland to establish some type of non-disclosure agreement.

After a short conversation between the Investigators, off the telephone, it was suggested the matter was now at an apparently critical point, and that the Investigators felt the need to solicit AUSA ANDREW COGAR's advice before proceeding any further. When asked, JIN-HENDEL stated Deloitte is agreeable to bringing the US Attorney into the situation now that Deloitte has reached the conclusions outlined above. It was agreed the Investigators would reach out to Deloitte as soon as they had been able to confer with AUSA COGAR.

Shortly after the call concluded, Investigator's STATON and POWERS spoke by telephone with AUSA COGAR, and reviewed the above information with him. It was agreed the next best step would be to essentially repeat the conference call of this date with AUSA COGAR participating as well, which would place him in a posture of discussing evidentiary needs, etc., directly with the attorneys from Deloitte.

Page **3** of **4**

DOJ_00369088

CONFIDENTIAL

SAGITEC-DEL_02374298

The Undersigned transmitted an e-mail message to Ms. JIN-HENDEL later this same date requesting a conference call to occur the coming week, with all the same parties participating, but with AUSA COGAR participating as well.

JSP:lmw
2016-11-03

DOJ_00369089

CONFIDENTIAL                                                                    SAGITEC-DEL_02374299

# EXHIBIT 8

CONFIDENTIAL

SAGITEC-DEL_02374300

August 5, 2016

| | |
|---|---|
| Powers: | [00:01] And then I'll shut up and let you all talk. I don't know how much you've told Scott, but I just want to re-emphasize that our friend from WorkForce has come forth with significant risk to himself and this information needs to be treated with discretion because he will be in a very precarious position if the people he works for discover that he has volunteered this information and is helping us. |
| Annica: | [00:39] Yes, understood. |
| Malm: | [00:40] Sure. |
| Powers: | [00:41] Okay. |
| Malm: | [00:42] Understood. |
| Powers: | [00:42] The other thing that I would mention in terms of good communication today. Our friend here is just getting over a really bad case of bronchitis and his ears are stopped up. So don't talk too fast, and try to enunciate, and if we miss a word or two here we'll just holler and stop ya, okay? |
| Annica: | [01:12] Sure, sure. |
| Powers: | [01:13] Alright. You all can have at it. |
| Malm: | [01:17] Perfect. Could we possibly just do some quick introductions too because I'm not sure who is in the call, and I understand the need for anonymity, but could the folks that are on the call identify themselves if they're comfortable doing so? |
| Powers: | [01:33] I'm Jim Powers, and other than our friend from WorkForce West Virginia, the only other person in the room or on the call on our side is Steve Staton. We are both investigators with the West Virginia Commission on Special Investigations, which is part of the legislature and our primary focus is contract fraud and staff to state funds. |
| Malm: | [01:59] I understand. So you're part of a legislative commissioners staff for the legislative commission, is that right? |
| Powers: | [02:04] We are investigators for the commission. |
| Malm: | [02:08] Got it. Okay. Thank you, that's helpful and by way of introduction this is Scott Malm. I lead our WorkForce & Employment Market Offering for Deloitte, so I've worked in this space for a number of years. So, thanks for your time guys. I just wanted to make sure we knew who each other was and I introduced myself. |

SAGITEC-DEL_02374301

Greg:       [14:22] We weren't allowed to make an approval of the design, but I'll give you an example. If an employer has more than one business, say he owns a convenience store and a pizza restaurant, he has to have two logon IDs to get onto the employer portal, and we've repeatedly asked, arrange it so that they can have only one logon ID and that's all that would be required. This is a simple change, but they refuse to do it.

Fink:       [15:04] I mean what is their rationale?

Greg:       [15:07] They don't give a rationale.

Malm:       [15:13] Yeah, I didn't even know if that's material to our concerns, just for our benefit here. You know, maybe, I think that's clearly an issue with project governance, and then how that leads to changing of the solution that they did. I think our interest, for purposes of Mike **[UNINTELLIGIBLE]** here in Deloitte is whether or not in fact they are using either design documentation or and/or code assets that are of Deloitte IP, so, you know, I just wanted to make sure we have a very, very clear picture. It is very important for us to understand what exactly has been observed so far versus speculated on it. It sounds like so far we, you know, the evidence is the design mapping, or the data mapping documents, right? That's the limit of it so far. There's no other artifacts that you have been exposed to or you're aware of that would indicate the possible presence of Deloitte IP, is that correct?

Greg:       [16:17] That's correct. All I've seen is documentation, mentioning Massachusetts, and I don't think I'm going to be exposed to any sort of proof, a smoking gun if you would, anytime in the near future. I admit that I'm speculating some, but the references to Massachusetts are very odd and the people at Sagitec have never given an explanation for it.

Malm:       [16:53] Yeah and you can see like column, column header names that were like MA in them or something like that, it's just obviously Massachusetts.

Greg:       [17:01] Yes.

Malm:       [17:02] So is that the nature of it? Okay. Okay. Okay. You had said there was some other colleagues though that had seen some evidence of this as well, beyond yourself, or are we still talking about the same data mapping document?

Greg:       [17:16] We've discussed, beyond what I know, no, they haven't seen anything that I haven't seen, but they've come to the same conclusion, and we've discussed this in the office, but everybody tells me, Gregie, oops…

Malm:       [17:39] Gregie.

6

|  | to do that, but that's probably, from a forensic standpoint, that's probably where I would look next. |
|---|---|
| Greg: | [27:29] I don't know what I can produce that would help you compare it to the Massachusetts system. Is there something I should look for? |
| Malm: | [27:41] You couldn't. No you couldn't. I think what you, you know, have to look to is the actual database itself, right, rather than just design, database design documentation, you'd have to look to the actual generated database sitting in Oracle or SQL, or wherever it's sitting, and, you know, look to see whether or not there were similar column headings, right. Whether or not that same sort of Massachusetts references that you appear, that you see in the data mapping document would exist in the actual installed database. You know, with respect to the code, you know, one would always have to look at, do a comparison of sorts, right, to be able to see whether or not there was commonality in the footprint of the code, and that isn't something that you could do on your own honestly. |
| Greg: | [28:38] Well Sagitec has flat-out said they will not supply us with source-code, ever, other than the portions that are for specialized functions for West Virginia. |
| Malm: | [28:57] Mhm. |
| Greg: | [28:59] Would it help if I produced an entity relationship diagram? |
| Malm: | [29:05] I think that would be an indication, right, of the table design that might contain references that could only be Massachusetts, right. That would be a much, much clearer, that would be one additional step towards saying there could be some commonality here. You know, seeing an actual generated database with its intended tables, you know, in an environment that they created would be another indication that there may be some issue there, but I don't know if you have access to look at the database or not? |
| Greg: | [29:43] I do. |
| Malm: | [29:46] I'm sorry. I would say, you know, from my perspective, you know, is if I was looking into who had access to it I'd probably be looking to see whether or not those same Massachusetts fields actually existed in the database that they're representing as being their database. |
| Powers: | [30:16] Would it make any difference as far as what's discernable at this point if you and our guy were sitting at the same computer together? |
| Malm: | [30:35] You know, I probably I wouldn't, I mean obviously…I probably wouldn't be the guy actually with the skills to be able to sort of, I mean, I probably could. I could see it if we were looking at, you know, references |

10

|  | to Mass. It would be obvious. I'll rely on my legal counsel who's on the phone to indicate whether or not that **[UNINTELLIGIBLE]** to enter into right now at this point any way. I wouldn't answer that question without their advice. So, Annica, I'm not sure if you have an opinion on that or not? |
|---|---|
| Annica: | [31:10] Yeah, I think we got to talk about that, and talk that through. |
| Malm: | [31:14] Yeah. Yeah. |
| Fink: | [31:16] I mean cause, you know, if it's not our's and it is Sagitec's then we don't have a right to see Sagitec's things. |
| Malm: | [31:26] Right. Right. |
| Greg: | [31:30] Well, then how would we do a comparison? |
| Malm: | [31:34] Yeah. It'd be pretty tough. |
| Fink: | [31:38] Yeah, no. We would need to do a couple more steps before then and see sort of whether the information you've seen in the sort of data mappings actually made it into the database and all, preferably made it into the code as well, and, you know, at that point then I think that, you know, there's enough. |
| Malm: | [32:04] **[UNINTELLIGIBLE]**. Yeah. |
| Fink: | [32:08] There's enough **[UNINTELLIGIBLE]** there to see that there's a problem. |
| Malm: | [32:10] Yeah. |
| Powers: | [32:13] Do you understand what we need to do next because this is a little over my head here? |
| Greg: | [32:19] Well, I can produce an ERD, and I have a spreadsheet, actually several spreadsheets that were used for data mapping, but like you said, if it's strictly Sagitec's, you know, you shouldn't be looking at it, but at this point I don't know what else to do. |
| Fink: | [32:49] I mean, I think the point is, you know, where is referring to the Massachusetts, you know, you guys need to get comfortable that, you know, that's suggesting that they didn't create it themselves. |
| Malm: | [33:04] Right. |
| Greg: | [33:05] So you think we should do some sort of… |

11

CONFIDENTIAL

SAGITEC-DEL_02374304

| Greg: | [39:41] I don't know anything about the Minnesota references. I don't know if your company did any work for Minnesota? |
|---|---|
| Malm: | [39:52] Yeah, we built their system too. |
| Greg: | [39:53] Oh. |
| Malm: | [39:59] And I think maybe we can take it offline for me to look at it a little bit more closer. I haven't seen any of this documentation, so I maybe can shed a little bit more light on it, and we can take that offline and get a look at it. |
| Fink: | [40:12] Yeah. Perfect. Yeah. |
| Malm: | [40:15] I think kinda coming back to, you know, so far I think we've seen some evidence, you know, I think we've seen there's some evidence here that there may be reason to look further into this. You know, I think that where at a consensus from an employee stand point here and it is that we probably feel more comfortable if we had a better sense that it was actually installed either code and or database tables that were reflecting these types of references as opposed to just a data mapping document. Not to say that there isn't. See how that isn't a little bit alarm…that that isn't alarming. It's something to look into, but I think, you know, for us, and please correct me if I'm wrong on this, I think for us to sort of to have cause for action we might need to see something a little bit more. Is that fair to say? |
| Annica: | [41:07] Yeah at this point we still just don't have enough proof here. |
| Malm: | [41:10] Yep. |
| Powers: | [41:14] Well in, and understand I'm, we're not necessarily sitting here waiting for you to say we're gonna jump on these peoples' feet. |
| Annica: | [41:27] No, no, and that's actually a question for you. What your next steps are going to be if you…? |
| Powers: | [41:32] We're at a point where we're hopeful these people don't know yet that we suspect there's a problem, and we wanna pursue this in the best way we can determine, and, you know, if that's something covert that we can do by gathering information that you all can make heads or tails of, great. If we've gotta go some other route to do it, you know, we can get with an U.S. attorney and do that. But everything changes, you know, assuming these people are not just incompetent, assuming they're dishonest, once you get overt with them everything changes and it's a different ballgame. |
| Malm: | [42:26] Right. Yeah. |

14

CONFIDENTIAL

SAGITEC-DEL_02374305

| | |
|---|---|
| Fink: | [42:32] Yes, understood. |
| Malm: | [42:33] It is. Question for our team partner. You know, how comfortable are we accepting some additional information on this should these guys be able to discover it, and are there any guidelines that we need to follow to sort of, you know, both protect us and Sagitec's interest quite frankly that we don't get more that we should? You know. |
| Fink: | [42:56] Yeah. |
| Malm: | [42:56] I mean does it come back to kind of just limiting the information conveyed to sort of point indications that there has been, there might have been some diversions to IP. Like what additional references to Mass. that type of things. Is that the guidance we would give them? |
| Powers: | [43:11] Let me, let me throw a question out here, and I may be completely out in left field because intellectual property is not our specialty. Do we need to be looking at trying to get copies of the Massachusetts product and what Sagitec is trying to sell here and having some independent third party with no interest in this compare the two? |
| Annica: | [43:48] I mean I think that's something that, you know, either your lawyers need to provide advice to you on how you want to proceed with that. |
| Powers: | [44:00] Well, I'm just saying do you perceive that is a practical solution if it's in the realm of something that can be done? |
| Malm: | [44:13] I mean, I think, you know, from practically speaking a direct comparison is probably the best way to determine whether or not there's been any diversion of that IP or to what extent, right. I mean I don't personally believe that the entire codebase was copied and it's been handed over with a new Sagitec label on top of it. I don't think, you know, we're talking about that because I've said I've seen but I've sat there demonstrating it, you know, "their own new solution" on this. I think what's more likely is that we see, you know, designs, design documentation, maybe a database structure, or perhaps some code components that, you know, could have been diverted. I think that's a much more likely a scenario. I mean clearly the best way to discover that would be a comparison, but, you know, as we've indicated, you know, I think the best approach would be for you to consult legal counsel on, you know, your best interests in approaching that, but I would say that would be the best way to determine that story. |
| Greg: | [45:16] **[UNINTELLIGIBLE]**. |
| Powers: | [45:20] Okay. You do understand we're not considering any civil options here? |

15

CONFIDENTIAL

SAGITEC-DEL_02374306

| Malm: | [45:30] Yeah, you know, what, I'm not even familiar with what the law with, you know, how they would say that, I mean. |
|---|---|
| Powers: | [45:36] Okay. |
| Malm: | [45:36] You are gonna have to determine how wanna proceed with it but. |
| Powers: | [45:39] No, I just didn't want you all to be under the illusion that we were, that we had any thoughts of seeking a civil remedy. We don't. That's not what we do. |
| Malm: | [45:53] No. Got it. |
| Powers: | [45:58] Well, we don't have to solve anything here today. Do you want, Scott do you wanna look through what we, the information we forwarded and discuss this further when Annica gets back from vacation? |
| Malm: | [46:17] Yeah. Yeah, I'll work with Annica and Jaclyn to review the information you guys have forwarded and, you know, maybe we'll provide you some additional guidance on any material that might be helpful and, you know, in such a way that we're not compromising Sagitec either. Because we want to be **[UNINTELLIGIBLE]** in how we treat this as well. You know, there's kinda a presumptive innocence in our business in my mind and I would hate to be infringing upon any of their knowledge as well, or their IP in the course of trying to discover whether or not ours is violated. So, you know, I'll consult with Jaclyn and Annica on whether or not we can provide you some additional guidance for what could be useful. I think you heard me say what kind of approach that I would probably look next would be to look for evidence of an installed physical database that had these same Massachusetts references, an ERD certainly could be helpful, but, like I wouldn't want to be in receipt of something that could compromise their IP either, so, you know, some partial reference would probably be much better in that case. And Annica and Jaclyn please interrupt me if I'm getting ahead of myself on this. |
| Annica: | [47:32] Oh no, you're, this is…you're right. |
| Fink: | [47:34] You're on point. |
| Malm: | [47:35] Okay. |
| Powers: | [47:36] We're not wanting to put you in a position you shouldn't be in. I just, we're looking for solutions here. |
| Malm: | [47:45] Absolutely. And, you know, if you guys think you see something, and you want to just talk about it first, I think that might be the better approach, and we could probably provide some guidance. Do you know how to convey that to us to examine it without, you know, |

16

SAGITEC-DEL_02374307

# EXHIBIT 9

CONFIDENTIAL

SAGITEC-DEL_02374308

| From: | Greg <gskeene1@hotmail.com> |
|---|---|
| Sent: | Thursday, September 15, 2016 10:27 AM |
| To: | Jim Powers <jim.powers@wvcsi.gov>; Steve Staton <steven.staton@wvcsi.gov> |
| Subject: | Re: Calculation of interest owed by employers |

I hope you are enjoying your vacation Jim.

I would like to mention something I forgot before I forget it again.

Scott Adkins told me that my letter from June 10, 2016, of which I gave you a copy, was given to the upper management in the Maryland Workforce agency.
They then gave it to the Maryland State Attorney General.
The Attorney General then went to Sagitec with the letter.
Sagitec then gave a response, I don't know what, that satisfied the Attorney General.
Sagitec then wrote a 6 page letter to our upper management here in Charleston complaining that my letter was "defamatory". I have not been permitted to read this letter. Scott Adkins told me that the letter does not mention me by name. I suspect that the letter does allude to me though.
I wouldn't be surprised if my being removed from Consortium work is at least partly punishment for this letter.

Greg

---

**From:** Jim Powers <jim.powers@wvcsi.gov>
**Sent:** 14 September 2016 13:53
**To:** Greg
**Subject:** Re: Calculation of interest owed by employers

I'm out of town on vacation this week.

Sounds like things may be falling apart for Sagitec if Ms. Freeman is as sharp as she sounds.

Sent from my iPhone

On Sep 14, 2016, at 8:34 AM, Greg <gskeene1@hotmail.com> wrote:

> There were some big changes yesterday at work concerning the Consortium.
>
> The headline news is that I was removed (sort of) from doing any Consortium work. The people at Sagitec complained about me, saying I was "unprofessional" but without citing any examples. It's bullshit. All of our meetings are on BlueJeans and those meetings are all recorded. It's pretty easy to listen to recordings. My own boss has done it. So there is a medium in which my behaviour is documented but none of it was used. It's all very vague and nebulous. Sagitec also said that I was slowing down the project without being specific about what I was doing. This was told to me by Scott Adkins (our agency lawyer) and Beth Carenbauer. I was NOT given a reprimand, not even a verbal one. Of course, none of this is in writing. I have been told to not talk to Sagitec employees or to send them any emails.

DOJ_00490706

CONFIDENTIAL                                                              SAGITEC-DEL_02374309

I am still allowed to work with Workforce employees on the Consortium. Nothing was mentioned about CSG employees so I am still talking to them and they know what has happened.

I think the reason Sagitec has complained about me is because I have been asking them some very uncomfortable questions about how their computer application that they are developing "works". They rarely seem to know the answers. Everything is broken. There is no good way to track progress, testing has been failing miserably, data mapping of core functionality can't be done, etc. Basically, I have told the emperor that he doesn't have any clothes on.

The state government in Maryland hired a very high level person named Dayne Freeman. I will forward her biography in another email. Her name is pronounced Day Na. Most women spell this name Dana. She is NOT buying the happy talk being disseminated by the Consortium upper management. Dayne has declared the project to be in the RED for the last month. The only other two color choices are YELLOW and GREEN.

Also, the Maryland state government has hired a company called SLI to do IV&V (Independent Verification & Validation). They are coming to Charleston next week and they will probably ask our upper management some hard questions.

I will probably learn some more by the end of the week.

Greg

**From:** Jim Powers <jim.powers@wvcsi.gov>
**Sent:** 24 August 2016 18:31
**To:** Greg
**Subject:** RE: Calculation of interest owed by employers

Greg,

I hope you do not construe my silence for a lack of interest. I have posed a couple of additional questions to the attorneys at Deloitte (about who the Massachusetts and Minnesota software actually belongs to). Additionally, waiting for the lead attorney in New York to return from her vacation.

I will admit that we are also somewhat stymied on this end as to next steps, which will not result in the slaying of the messenger, but we are not giving up.

---

Totally unrelated to the above................
I spoke with a couple of my friends at the Legislative Automated Services Division yesterday. They are in dire need of a programmer who is fluent in C sharp if you know of anyone who is interested/qualified.

Hang in there.........................jim

DOJ_00490707

CONFIDENTIAL

SAGITEC-DEL_02374310

# EXHIBIT 10

CONFIDENTIAL

SAGITEC-DEL_02374311

| From: | Greg <gskeene1@hotmail.com> |
|---|---|
| Sent: | Wednesday, September 14, 2016 8:34 AM |
| To: | Jim Powers <jim.powers@wvcsi.gov> |
| Subject: | Re: Calculation of interest owed by employers |

There were some big changes yesterday at work concerning the Consortium.

The headline news is that I was removed (sort of) from doing any Consortium work. The people at Sagitec complained about me, saying I was "unprofessional" but without citing any examples. It's bullshit. All of our meetings are on BlueJeans and those meetings are all recorded. It's pretty easy to listen to recordings. My own boss has done it. So there is a medium in which my behaviour is documented but none of it was used. It's all very vague and nebulous. Sagitec also said that I was slowing down the project without being specific about what I was doing. This was told to me by Scott Adkins (our agency lawyer) and Beth Carenbauer. I was NOT given a reprimand, not even a verbal one. Of course, none of this is in writing. I have been told to not talk to Sagitec employees or to send them any emails.

I am still allowed to work with Workforce employees on the Consortium. Nothing was mentioned about CSG employees so I am still talking to them and they know what has happened.

I think the reason Sagitec has complained about me is because I have been asking them some very uncomfortable questions about how their computer application that they are developing "works". They rarely seem to know the answers. Everything is broken. There is no good way to track progress, testing has been failing miserably, data mapping of core functionality can't be done, etc. Basically, I have told the emperor that he doesn't have any clothes on.

The state government in Maryland hired a very high level person named Dayne Freeman. I will forward her biography in another email. Her name is pronounced Day Na. Most women spell this name Dana. She is NOT buying the happy talk being disseminated by the Consortium upper management. Dayne has declared the project to be in the RED for the last month. The only other two color choices are YELLOW and GREEN.

Also, the Maryland state government has hired a company called SLI to do IV&V (Independent Verification & Validation). They are coming to Charleston next week and they will probably ask our upper management some hard questions.

I will probably learn some more by the end of the week.

Greg

---

**From:** Jim Powers <jim.powers@wvcsi.gov>
**Sent:** 24 August 2016 18:31
**To:** Greg
**Subject:** RE: Calculation of interest owed by employers

Greg,

DOJ_00490697

CONFIDENTIAL                                                                 SAGITEC-DEL_02374312

I hope you do not construe my silence for a lack of interest. I have posed a couple of additional questions to the attorneys at Deloitte (about who the Massachusetts and Minnesota software actually belongs to). Additionally, waiting for the lead attorney in New York to return from her vacation.

I will admit that we are also somewhat stymied on this end as to next steps, which will not result in the slaying of the messenger, but we are not giving up.

---

Totally unrelated to the above…………….
I spoke with a couple of my friends at the Legislative Automated Services Division yesterday. They are in dire need of a programmer who is fluent in C sharp if you know of anyone who is interested/qualified.

Hang in there……………………jim

DOJ_00490698

CONFIDENTIAL                                                         SAGITEC-DEL_02374313

# EXHIBIT 11

CONFIDENTIAL

SAGITEC-DEL_02374314

**West Virginia Legislature**
**Commission on Special Investigations**



**Memorandum of Contact**

**In RE:** Work Force WV – US DOL Grant

**Case No.:** 2173-16

**Date of Event:** November 7, 2016

**Participants:** Greg Keene, Programmer/Analyst, WorkForce WV, 112 California Avenue, Charleston, WV
Jim Powers, Deputy Director, CSI

**Subject:** E-Mail Communication with Greg Keene

On Thursday, November 3, 2016, at noon, Investigators STATON and POWERS spoke by telephone with GREG KEENE, hereafter the CI. The primary purpose of this conversation pertained to where the software package being used/developed by Sagitec is physically situated (see MOI of 11/03/16).

On Friday, November 4, 2016, as a result of reviewing additional documents submitted by Sagitec, the Undersigned transmitted the below inquiry to the CI. (The documents attached to the below message appear at Att. 001.)

> *Greg…see attachment…is this describing what you were talking to Steve and I about Thursday? If so, is "A" the one you think is in India? Are "B" and "C" in the U.S…?*

On Saturday, November 5, 2016, the CI transmitted a series of electronic mail messages, two of which included attached documents. All are summarized below.

Message # 1
Consists of an attachment only, announcing the forthcoming retirement of ELIZABETH CARENBAUER, who has been to date the senior official over the Sagitec project for the State of West Virginia (see Att. 002).

Message # 2
Is a response to the questions posed by the Undersigned. ("Karthik" is KARTHIK VENKATESAN of CSG Government Solutions.)

> *I asked Karthik for a bit of clarification.*

Page **1** of **3**

DOJ_00369092

CONFIDENTIAL

*All the environments, including A, B, and C, are on the Microsoft Azure Cloud. This includes the Contractor's source 1. b. iii. and the Sandbox 1. b. All of the data is on the Cloud and the application is on the Cloud too. The Cloud is here in the states. Each environment has it own copy of the database and the application. There are more environments than are listed here. I will send you another email that lists them.*

*All of these environments have to be accessed remotely. According to Karthik, the data centers are in Iowa and Virginia. Anyone who is accessing these environments is supposed to be within the U.S. Whenever someone checks out source code from the source code library they are installing it on their client (personal computer). This is normal behaviour for any developer. The problem is that the Sagitec developers are in India.*

*About the Sandbox; the states were supposed to have access to the Sandbox from the very start of the project but we have yet to be granted access. Either the Sandbox environment doesn't exist or Sagitec is trying to hide something from us. I think it's the latter. If we had access to the Sandbox we would be able to see the source code, which would probably reveal something. Our upper management has not pressed Sagitec for access. Sagitec has basically stonewalled any requests for access, citing technical difficulties. The upper management seems to be content with Sagitec's response. Not having access to the Sandbox is something that I would think is a contract violation.*

## Message # 3
Is a further response to the questions posed by the Undersigned.

*I asked Karthik for clarification.*

*All of the environments are on the Microsoft Azure Cloud here in the states. This includes A, B, and C. Karthik told me that both the data and the application are on the cloud and that it looks like the data centers are in Iowa and Virginia. Everyone who accesses the data or the application is doing so remotely, even the people in India.*

*Something about the Sandbox environment; it either doesn't exist or Sagitec doesn't want us to have access to it. If we had access we could see the source code, which may be very revealing. It looks like nobody in the Maryland or West Virginia agencies has access to it yet. We were supposed to have access at the start of the project. Our upper management in MD and WV have not pushed for access. Sagitec has stonewalled all requests and our management has been content with Sagitec excuses, whatever they are. I would consider our not having access to the Sandbox environment to be a violation of the contract.*

*Greg*

DOJ_00369093

CONFIDENTIAL

SAGITEC-DEL_02374316

Message # 4
This is the final response and includes two attachments which are best read electronically owing to the detail in same (Att. 003 & 004). The response includes a message from KARTHIK VENKATESAN to the CI.

*A warning here. These documents are pretty technical and I don't understand them completely myself. I'm a programmer and not a system architect so I'm a bit out of my league here.*

**From:** Keene, Greg S <Greg.S.Keene@wv.gov>
**Sent:** 05 November 2016 00:08
**To:** 'gskeene1@hotmail.com'
**Subject:** FW: TFS and Azure details

Greg Keene
Management Information Systems
Programmer/Analyst IV
112 California Avenue
Charleston, WV 25305
Telephone: 304-558-4046 Ext. 2171
Fax: 304-558-1850

**From:** Venkatesan, Karthik [mailto:kvenkatesan@csgdelivers.com]
**Sent:** Friday, November 04, 2016 8:05 PM
**To:** Keene, Greg S <Greg.S.Keene@wv.gov>
**Subject:** TFS and Azure details

*Hi Greg,*

*The TFS server is a common server for both MD and WV and its located in the following VM: MWC-TFS-01.*

*The two data centers are Virginia and Iowa.*

*Please see attached document if you need further details.*

*Regards,*
*Karthik*


JSP:lmw
2016-11-07
E-attachments

Page **3** of **3**

DOJ_00369094

CONFIDENTIAL                                                            SAGITEC-DEL_02374317

# EXHIBIT 12

CONFIDENTIAL

SAGITEC-DEL_02374318

**West Virginia Legislature**
**Commission on Special Investigations**

**Memorandum of Conversation**

**In RE:** Work Force WV – US DOL Grant

**Case No.:** 2173-16

**Date of Event:** November 3, 2016

**Participants:** Greg Keene, Programmer/Analyst, WorkForce WV, 112 California Avenue, Charleston, WV
Cellular #
Steve Staton, Senior Investigator
Jim Powers, Deputy Director, CSI

**Subject:** Telephone Message Conversation with Greg Keene

On Thursday, November 3, 2016, at noon, Investigators STATON and POWERS spoke by telephone with GREG KEENE, hereafter the CI. The CI provided the following in response to inquiries from the Investigators.

With respect to the recent reassignment of MELISSA GANLEY, the lead project person with the State of Maryland, it is the CI's perception she was removed from the project for incompetence.

With respect to RAY GARDNER, the lead person with CSG, the CI says that GARDNER was overheard making disparaging comments about Sagitec, and that Sagitec likely sought his removal because of perceiving him as a threat. The CI thinks it likely GARDNER will be fired as soon as he passes his project knowledge on to his replacement.

KARTHIK VENKATSEAN is a subordinate of GARDNER with CSG, and is a primary source of information to the CI. KARTHIK is also fearful of being terminated or reassigned in the near future.

With respect to the issue of where the software package being used/developed by Sagitec is physically situated, the CI offered the following:

1) The West Virginia data which is part of the system is physically housed in West Virginia by the WV Office of Technology. According

Page 1 of 2

DOJ_00369090

CONFIDENTIAL

SAGITEC-DEL_02374319

to plan, it will be housed by Microsoft in the foreseeable future. One concern of the CI is that he knows for a certainty Sagitec personnel are accessing West Virginia data from India, which is contrary to the security parameters within the Sagitec contract and in his opinion represents a serious threat of a data breach.

2) The CI believes Sagitec personnel in India are actually the ones developing the application software which is the product or software solution being developed for the Consortium. The CI describes this version of the Sagitec software as the "development" version, and says it is not accessible to Consortium personnel in Maryland or West Virginia. It is his belief this software may be housed at the Sagitec facility in India, but he does not know this to be a fact.

3) As various components of the software package are completed and ready for testing, they are moved into what the CI refers to as the "customer" or "public" version of the software. Again, he does not know where this version of the software is housed, but is relatively sure it is not in West Virginia. He said it could conceivably be somewhere in Maryland, somewhere with CSG, or possibly at Sagitec's corporate headquarters in Minnesota.

4) The CI was asked his opinion of how the software would have been transported if indeed a copy was stolen from Deloitte when their employees left for Sagitec. He opined it would likely have been copied onto CD ROM(s) or a thumb drive.

The CI agreed to make an attempt to ascertain where the two versions of the software actually reside, but was cautioned against doing anything which would jeopardize his position with Workforce WV.


JSP:lmw
2016-11-03a


Page **2** of **2**

DOJ_00369091

CONFIDENTIAL

SAGITEC-DEL_02374320

# EXHIBIT 13

CONFIDENTIAL

SAGITEC-DEL_02374321



**West Virginia Legislature**
**Commission on Special Investigations**

**Memorandum of Interview**

**In RE:** Work Force WV – US DOL Grant

**Case No.:** 2173-16

**Date of Event:** May 3, 2017

**Participants:** S/A Scott E. Fell, DHS/ICE/Homeland Security Investigations, 3000
Sidney Street, Suite 300, Pittsburgh, PA 15203
Tel: █████████
Cell: █████████
Jim Powers, Deputy Director, CSI

**Subject:** Immigration Status Inquiry on Sagitec Staff Members

On April 12, 2017, the Undersigned transmitted a request to S/A SCOTT FELL,
as styled above, via electronic mail. The purpose of the request was to check the
immigration status of several Sagitec employees who are part of the MD/WV
Consortium Project (Att. 001).

S/A FELL's response was received via encrypted e-mail on May 3, 2017 (Att.
002). The actual decrypted data appears within Att. 003, and speaks for itself.

One subject, BERNT PETERSON, remains unidentified at this point. It "appears"
the individual identified as MARCELLUS MASCARENHAS by S/A FELL is likely the
Sagitec employee of that name. This is based upon: a) his former residence address in
Minnesota; b) his current residence address in Maryland; and c) the fact he was
formerly employed by KPMG.

Lexis-Nexus data for MASCARENHAS appears at Att. 004.

Jim Powers
Deputy Director, CSI

Charles R. Bedwell
Director, CSI

JSP:lmw
2017-05-03
E-Attachments

Page 1 of 1

DOJ_00369112

# EXHIBIT 14

SAGITEC-DEL_02374323

**West Virginia Legislature**
**Commission on Special Investigations**



**Memorandum of Interview**

**In RE:** Work Force WV – US DOL Grant

**Case No.:** 2173-16

**Date of Event:** April 13, 2017

**Participants:** Gay Gilbert, US Department of Labor
Jim Garner, US Department of Labor
Kebharu Smith, US Department of Justice
S/A Joe Harilla, US Department of Labor

**Subject:** Interview re Sagitec Investigation

Find attached a memorandum of interview authored by S/A JOE HARILLA. The interview involved the above-named subjects and was conducted at the US Department of Labor in Washington D.C., on April 13, 2017.

Find attached also my comments to other investigative team members concerning the information provided by GILBERT and GARNER.

Jim Powers
Deputy Director, CSI

Charles R. Bedwell
Director, CSI

JSP:lmw
2017-04-13
E-Attachments

Page 1 of 1

CONFIDENTIAL

DOJ_00369103

SAGITEC-DEL_02374324

| Report of Interview | U.S. Department of Labor<br>Office of Inspector General<br>Office of Investigations |  |
|---|---|---|
| Page  1  of  2 | OIG Form 103 (OI – 1/98) | |

| Investigation on: | Sagitech | At: | Washington, DC | File: | C173100722-J |
|---|---|---|---|---|---|

By: Special Agent Joseph Harrilla                                       Date Prepared: April 14, 2017

On April 13, 2017, Special Agent (SA) Joseph Harrilla, U.S. Department of Labor (DOL), Office of Inspector General (OIG), and Kebharu Smith, Senior Trail Attorney, U.S. Department of Justice, Computer Crime and Intellectual Property Section, interviewed Gay GILBERT in a conference room at the USDOL Building, located at 200 Constitution Avenue, N.W., Washington, DC, 20005. Jim GARNER was also available and provided the information as noted.

GILBERT and GARNER were advised that the purpose of the requested meeting was for the reporting agent to gain insight of the grants awarded by USDOL, Employment and Training Administration (ETA), Office of Unemployment Insurance (OUI). Particularly OUI grants awarded in recent years for Program Integrity and Information Technology Consortium Projects. GILBERT and GARNER provided the following information:

1. GILBERT, (202) 693-3029, is the Administrator and GARNER, (202) 693-2957, is the Deputy Administrator for OUI.

2. Overall, the unemployment insurance (UI) program is jointly funded by the states and USDOL. The states fund the individuals' UI benefits and USDOL funds the administrative costs associated with the program.

3. Base funding from USDOL is discretionary based on projected work load. For example, when the economy is doing poorly and the unemployment rate is higher, USDOL has more funds to provide to the states. Similarly, as the economy improves and the unemployment rate drops, so does the funding amount.

4. One of the issues with the UI program is the antiquated IT infrastructure. The states have been struggling because there are no funds targeted specifically to address this problem. In order to save money and efforts, several states formed six different consortiums to address this issue.

5. The states, who are part of the National Association of State Workforce Agencies (NASWA), decided which consortium they would belong to and which state would be designated as the lead state. States may decide to form a consortium with other states that have similar laws and organizational structures.

6. The Information Technology Support Center (ITSC) is part of the NASWA that provides support and promotes information sharing and the dissemination of effective practices among the state workforce agencies. USDOL provides the funding for ITSC to operate. The state of Maryland is part of the ITSC steering committee.

7. In 2011, Maryland (MD), West Virginia (WV) and Vermont (VT) formed a consortium. MD was the leader of the consortium. VT dropped out of the consortium because it felt that MD had too much influence. VT dropped out before a vendor was selected.

CONFIDENTIAL                                                                 SAGITEC-DEL 02374325

8. MD has a complicated and rigorous process when selecting a vendor. The first request for proposals (RFP) by MD on behalf of the consortium did not result in any successful bids. After the second RFP, Sagitech was selected as the vendor.

9. In 2013, approximately $82 million was obligated to the consortium for the project. OUI is responsible for monitoring the progress of the vendor and consortium to make sure certain milestones are met. They make sure all requirements of the grant are being met and everything is running effectively. OUI has quarterly meetings with the members of the consortium and OUI receives quarterly narrative and financials.

10. GILBERT has the impression that the consortium has a good relationship with Sagitech. At one point there was an issue with the quality of the program. After some quality testing, the program improved. GILBERT did not think this was an unusual problem given the size of the project.

11. In February 2017, OUI had a meeting with officials from MD and WV concerning the project. This was not a regularly scheduled meeting. The meeting was requested because WV recently had a change of leadership due to a new governor being in office. WV was concerned, which is normal for a smaller state, that they did not have the capacity or personnel to run a large multi-year project. This is a six (6) year project that is scheduled for completion in September 2019.

12. GILBERT stated that meeting minutes concerning the above meeting or quarterly meetings are not maintained.

13. This consortium grant does not require that only US companies or employees are used, although some individual states may have such a requirement. GILBERT noted that TCS is an India based company that provides services to some state workforce agencies.

14. Deliotte has developed software for individual states, but not for any consortium. Deliotte has done work for Florida, New Mexico and Massachusetts. GILBERT noted that Deliotte's products have not been very successful and are expensive.

15. Sagitech has been actively advertising their software to other members of the NASWA. It is not known if any other states are using Sagitech's software.

16. GARNER agreed to provide the reporting agent with records concerning the WV/MD Consortium Agreement, to include financial reports, progress reports, RFP, and contracts.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL

## Jim Powers

| | |
|---|---|
| **From:** | Jim Powers |
| **Sent:** | Tuesday, April 25, 2017 8:29 AM |
| **To:** | 'Harrilla, Joseph - OIG'; Smith, Kebharu (CRM) (Kebharu.Smith2@usdoj.gov); Andy Cogar (andy.cogar@usdoj.gov); Steve Staton |
| **Subject:** | RE: Sagitech - DOL Interview |

Good morning.............

A couple of observations re the content of Joe's memo............

1) Gay Gilbert's description of the substance of the February meeting with Consortium members is not particularly consistent with what the CI was told by his superiors.

2) Interesting that Gilbert did not speak to the success or failure of the other Consortium's. We have been led to believe (by the CI) that all the others failed.

3) Interesting that she did not mention any contact or inquiries by WV investigators reaching out to the Consortium staff in MD. Possibilities:

   a) The folks in MD did not share this information with Ms. Gilbert, or
   b) Ms. Gilbert did not see fit to share that information with Joe & Kebarhu.........??

.......................jim

**From:** Harrilla, Joseph - OIG [mailto:harrilla.joseph@oig.dol.gov]
**Sent:** Tuesday, April 25, 2017 6:15 AM
**To:** Smith, Kebharu (CRM) (Kebharu.Smith2@usdoj.gov) <Kebharu.Smith2@usdoj.gov>; Jim Powers <jim.powers@wvcsi.gov>; Andy Cogar (andy.cogar@usdoj.gov) <andy.cogar@usdoj.gov>
**Subject:** Sagitech - DOL Interview

See Attached. Let me know if you have any questions.

Kebharu – Are you still planning of traveling to MN in May?

Thanks,

Joe

1

DOJ_00369106

CONFIDENTIAL

SAGITEC-DEL_02374327

**Joseph Harrilla**
**Special Agent**
U.S. Department of Labor - OIG
Office of Investigations
Labor Racketeering & Fraud
(540) 892-8454 – Cell
(540) 857-2655 - Fax

**WARNING: This email and any attachments may contain legally privileged or sensitive information. The information is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution, or reproduction, or taking any action in reliance on the contents of this transmission, is strictly prohibited. If you received this transmission in error, please notify the sender and delete the message and any attachments.**

2

CONFIDENTIAL

# EXHIBIT 15

CONFIDENTIAL

SAGITEC-DEL_02374329

**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**

Page   1   of   2

OIG Form 103 (OI – 1/98)

| Investigation on: | Sagitech | At: | Washington, DC | File: | C173100722-J |
|---|---|---|---|---|---|

By: Special Agent Joseph Harrilla

Date Prepared: April 14, 2017

On April 13, 2017, Special Agent (SA) Joseph Harrilla, U.S. Department of Labor (DOL), Office of Inspector General (OIG), and Kebharu Smith, Senior Trail Attorney, U.S. Department of Justice, Computer Crime and Intellectual Property Section, interviewed Gay GILBERT in a conference room at the USDOL Building, located at 200 Constitution Avenue, N.W., Washington, DC, 20005. Jim GARNER was also available and provided the information as noted.

GILBERT and GARNER were advised that the purpose of the requested meeting was for the reporting agent to gain insight of the grants awarded by USDOL, Employment and Training Administration (ETA), Office of Unemployment Insurance (OUI). Particularly OUI grants awarded in recent years for Program Integrity and Information Technology Consortium Projects. GILBERT and GARNER provided the following information:

1. GILBERT, (202) 693-3029, is the Administrator and GARNER, (202) 693-2957, is the Deputy Administrator for OUI.

2. Overall, the unemployment insurance (UI) program is jointly funded by the states and USDOL. The states fund the individuals' UI benefits and USDOL funds the administrative costs associated with the program.

3. Base funding from USDOL is discretionary based on projected work load. For example, when the economy is doing poorly and the unemployment rate is higher, USDOL has more funds to provide to the states. Similarly, as the economy improves and the unemployment rate drops, so does the funding amount.

4. One of the issues with the UI program is the antiquated IT infrastructure. The states have been struggling because there are no funds targeted specifically to address this problem. In order to save money and efforts, several states formed six different consortiums to address this issue.

5. The states, who are part of the National Association of State Workforce Agencies (NASWA), decided which consortium they would belong to and which state would be designated as the lead state. States may decide to form a consortium with other states that have similar laws and organizational structures.

6. The Information Technology Support Center (ITSC) is part of the NASWA that provides support and promotes information sharing and the dissemination of effective practices among the state workforce agencies. USDOL provides the funding for ITSC to operate. The state of Maryland is part of the ITSC steering committee.

7. In 2011, Maryland (MD), West Virginia (WV) and Vermont (VT) formed a consortium. MD was the leader of the consortium. VT dropped out of the consortium because it felt that MD had too much influence. VT dropped out before a vendor was selected.

DOJ_00386587

CONFIDENTIAL

8. MD has a complicated and rigorous process when selecting a vendor. The first request for proposals (RFP) by MD on behalf of the consortium did not result in any successful bids. After the second RFP, Sagitech was selected as the vendor.

9. In 2013, approximately $82 million was obligated to the consortium for the project. OUI is responsible for monitoring the progress of the vendor and consortium to make sure certain milestones are met. They make sure all requirements of the grant are being met and everything is running effectively. OUI has quarterly meetings with the members of the consortium and OUI receives quarterly narrative and financials.

10. GILBERT has the impression that the consortium has a good relationship with Sagitech. At one point there was an issue with the quality of the program. After some quality testing, the program improved. GILBERT did not think this was an unusual problem given the size of the project.

11. In February 2017, OUI had a meeting with officials from MD and WV concerning the project. This was not a regularly scheduled meeting. The meeting was requested because WV recently had a change of leadership due to a new governor being in office. WV was concerned, which is normal for a smaller state, that they did not have the capacity or personnel to run a large multi-year project. This is a six (6) year project that is scheduled for completion in September 2019.

12. GILBERT stated that meeting minutes concerning the above meeting or quarterly meetings are not maintained.

13. This consortium grant does not require that only US companies or employees are used, although some individual states may have such a requirement. GILBERT noted that TCS is an India based company that provides services to some state workforce agencies.

14. Deliotte has developed software for individual states, but not for any consortium. Deliotte has done work for Florida, New Mexico and Massachusetts. GILBERT noted that Deliotte's products have not been very successful and are expensive.

15. Sagitech has been actively advertising their software to other members of the NASWA. It is not known if any other states are using Sagitech's software.

16. GARNER agreed to provide the reporting agent with records concerning the WV/MD Consortium Agreement, to include financial reports, progress reports, RFP, and contracts.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

DOJ_00386588

CONFIDENTIAL                                                                                    SAGITEC-DEL_02374331

# EXHIBIT 16

SAGITEC-DEL_02374332

**West Virginia Legislature**
**Commission on Special Investigations**



**Memorandum of Interview**

**In RE:** WorkForce WV – US DOL Grant

**Case No.:** 2173-16

**Date of Event:** April 17, 2017

**Participants:** Greg Keene, Programmer/Analyst, WorkForce WV, 112 California
Avenue, Charleston, WV
Steve Staton, Senior Investigator
Jim Powers, Deputy Director, CSI

**Subject:** Interview re Reprimand, and Gathering of Additional Information

On Saturday, April 15, 2017, the Undersigned received a call from GREG
KEENE (hereafter the CI) advising that he had received a letter of reprimand from JEFF
GREEN, one of his superiors at WorkForce West Virginia. Given that the Undersigned
and the CI had agreed some days prior to meet on the following Monday morning at the
CSI offices for a follow-up interview, the Undersigned asked that the CI e-mail a copy of
the reprimand document for review and take no further action in the interim.

The following documents, as provided by the CI, are attached:

Att. 001 – Letter of reprimand, e-mail message to MIKE NICHOLS, and
Employee Performance Appraisal Form.
Att. 002 – Follow-up e-mail from the CI to JEFFREY GREEN.

For purposes of clarity, it is noted that MIKE NICHOLS, to whom the offending e-
mail is directed, is not the CI's supervisor, but is a "technical person" on the Consortium
project. The CI's direct supervisor is DAVE ADKINS. Both MIKE NICHOLS and DAVE
ADKINS answer to JEFF GREEN. NICHOLS told the CI he sat on the letter about a
week before passing it on to GREEN. According to the CI, GREEN passed the matter
on to WorkForce WV attorney SCOTT ADKINS, who in turned passed it on to the
Executive Director, RUSSELL FRYE.

JEREMY PARSONS and MARK MCNEELY, who received copies of the subject
e-mail are the CI's subordinates. KARTHIK VENKATESAN is an employee of CSG, a
third-party contractor on the project, whom the CI trusts and communicates with.

On Monday, April 17, 2017, at approximately 9:30 AM, the CI met with
Investigators STATON and POWERS at the CSI offices on Eagle Mountain Road. The
CI asked the Investigators their opinion as to the letter of reprimand he had received, to

Page 1 of 4

DOJ_00491249

CONFIDENTIAL                                                    SAGITEC-DEL_02374333

which the Investigators responded that in their view he is likely guilty of insubordination as charged in the letter of reprimand. Other issues discussed in this regard are summarized as follows:

1) The CI pointed out that he does not understand why the reprimand was issued by JEFF GREEN, rather than his immediate supervisor DAVE ADKINS.

2) The Investigators made it clear to the CI that they cannot provide him any advice as to whether he should file a grievance (appeal) regarding the reprimand.

3) The Investigators did make it clear to the CI that while he may be frustrated with the status of the Consortium project, he must guard against his frustration manifesting itself in this fashion.

4) With respect to the follow-up e-mail authored by the CI (Att. 002), it was noted that while seeking clarification of his supervisors' expectations is certainly his right, that such communications should be pursued, civilly, tactfully, and within his chain-of-command.

5) The Investigators encouraged the CI to never act in such a manner as to jeopardize his career, pointing out that he must remain patient while the Investigator's do their job in seeking the facts regarding the Consortium matter.

Unrelated to the above, the following was also discussed with the CI on this date:

1) Sagitec has only had one employee who was physically present in West Virginia, PRABHU TEGUR. This individual's presence here was a result of MIKE NICHOLS having asked for assistance. While NICHOLS had someone from CSG in mind, Sagitec sent their employee instead. The CI said this individual never really did anything while he was here, and he believes this individual is gone for good at this point.

2) SLI has no one physically present in West Virginia, although SLI staff members do come in occasionally. The CI believes SLI did issue some type report after interviewing various WorkForce WV employees about the project, but he does not have access to it. The following are SLI personnel involved in the Consortium project:

DORSETT, LILLIAN – believed to be located in Denver, and characterized as the senior member of the SLI team.
WALLACE, TOM – believed to be located in Austin.
NAIRN or NARIN, GEORGE
GOINS, KRISTOPHER – relatively new to the SLI team, and believed to be located in Phoenix

The CI explained that SLI was hired by the Consortium to perform independent validation and verification, and has been involved with the project from the beginning. The above names are typically attached to e-mails about the project,

Page **2** of **4**

CONFIDENTIAL

and these individuals also typically monitor Blue Jeans sessions about the project, although according to the CI they listen/observe only.

3) CSG does not have anyone located in West Virginia, although CSG employee CORY RUSSELL does come to West Virginia occasionally.

4) Diamond Technologies, another third-party contractor, does have a staff of business analysts physically present in West Virginia.

RAGUBE, DAISY – see previous memo to file.
WATSON, LORETTA JOYCE – resides in Winfield, West Virginia, and is a retired employee of WorkForce WV.
PATEL, BHAVIK B. – approximately 30 y.o.a., resides in Philadelphia, Pennsylvania. According to the CI, PATEL does not get along with Sagitec, and because of this is now in fear of his job.
BHATTI, SHAHARYAR – characterized by the CI as being lazy and doing little if any work.
CORLEY, ANNETTE L. – a Caucasian female approximately 40 to 45 years of age.

The CI explained that of the above individuals the females work on the "benefits" side of the system, while the males work on the "tax" side, which is the part of the system the CI is involved with.

5) The CI was asked if any testing of the system occurs at WorkForce field offices or if field office staff are asked for any input on the new system. He stated that field personnel are involved in some system testing, but to the best of his knowledge, they always travel to Charleston to do this.

6) The CI was asked if there is any additional information on the system or its functionality which he can gain access to which might shed light on the nature of the software being developed. He stated there is not at present, but there may be in the foreseeable future once the "sandbox" testing area currently under development is in place.

7) At present the CI does not have access to even the data screens for the new system, because of WorkForce management having exiled him from the project. The CI's subordinates, MARK MCNEELY and JEREMY PARSONS, do have access to the system, which they accomplish by logging into it remotely "in the Cloud". The CI is unsure whether the system can be accessed from remote locations outside the WorkForce offices.

8) The CI volunteered that JEREMY PARSONS is particularly disillusioned about the Consortium project, likening his actions to "poking at an ant hill". The Investigators strongly suggested this is a bad idea and should stop.

DOJ_00491251

CONFIDENTIAL

SAGITEC-DEL_02374335

At the conclusion of the interview, the Investigators again urged the CI to keep his head down, be respectful of his superiors, and give them (the Investigators) the time to do their job.

Jim Powers
Deputy Director, CSI

Charles R. Bedwell
Director, CSI

JSP:lmw
2017-04-17
E-attachments

DOJ_00491252

CONFIDENTIAL SAGITEC-DEL_02374336

# EXHIBIT 17

CONFIDENTIAL

SAGITEC-DEL_02374337

Case 1:23-cv-00325-WCB    Document 326    Filed 03/31/25    Page 117 of 178 PageID #:
21566
Case 2:22-cr-00163    Document 150-2    Filed 02/27/23    Page 62 of 104    PageID #:



**WorkForce**
WEST VIRGINIA

Jim Justice, *Governor*
H. Wood Thrasher, *Commerce Cabinet Secretary*
Russell L. Fry, *Acting Executive Director*

April 13, 2017

Gregory Keene

████████████████

Charleston, WV 25312

**Via Hand Delivery**

Dear Mr. Keene:

This letter is a formal written reprimand and confirms in writing our discussion of April 13, 2017 concerning your unacceptable conduct, where 1) you encouraged, in writing (an email authored by you dated March 31, 2017 at 10:02 AM), that a co-worker circumvents the chain of command to the point of officially representing WFWV, beyond their authority, making a commitment on behalf of WorkForce West Virginia, the Executive Director and/or his designees; and 2) for including a person outside of WorkForce West Virginia in said email, an internally deliberative communication (attachment A), and to establish my expectations which I have outlined in this Corrective Action Plan to be commenced immediately. Further, you are hereby warned of additional disciplinary action if the conduct does not improve. I have developed this corrective measure to assist you in bringing your work as a Programmer/Analyst IV to an acceptable standard as defined in your enclosed Employee Performance Appraisal.

During the past several months, I have shared with you expectations about your participation level and communications regarding consortium activities. While I want to emphasize that you have generally complied with directives, this incident demonstrates your inability or unwillingness to conform to expected standards of work. I believe it is necessary to initiate this Corrective Action Plan to cause you to understand that not only is this conduct unacceptable, but also that we are at a point where such conduct cannot be tolerated. Any further incidents of misconduct may result in more severe disciplinary action up to and including dismissal. Acceptable conduct at work is an essential element of your position and the employment relationship.

So you may understand why I believe your conduct to be unsatisfactory and how this prevents or hinders this agency from meeting its objectives, I offer the following representative occurrence that demonstrates your failure to meet the agency's work expectations:

1) On March 31, 2017, at 10:02AM, You sent an email to 3 coworkers and an individual outside WorkForce West Virginia, an internally deliberative communication, to encourage, in writing that a co-worker circumvent the chain of command to the point of officially representing WFWV, beyond their authority, making a commitment on behalf of WorkForce West Virginia, the Executive Director and/or his designees.

The above incident reflects your failure to adhere to WorkForce Administrative Directive 6400.01, which specifically deals with Employee Conduct reads in part:

112 California Avenue • Charleston, WV 25305

An agency of the Department of Commerce
*An equal opportunity employer/program and auxiliary aids are available upon request to individuals with disabilities.*

**www.workforcewv.org**

A proud partner of the **American Job Center** network

DOJ_00491254

CONFIDENTIAL

SAGITEC-DEL_02374338

> *Employees are expected to adhere to reasonable and legal directives of their supervisor. The refusal of an employee to perform any lawful directive by his or her supervisor is insubordination and cause for disciplinary action. Insubordination encompasses more than an explicit order and subsequent refusal or intentional failure to carry it out. It also involves a flagrant or willful disregard for implied directions of an employer. Choosing to perform other work or refusing or failing to perform work as assigned or as directed by a supervisor may be considered insubordination and inappropriate conduct.*

To assist you in meeting a standard of conduct consistent with my expectations, I am establishing a thirty (30) calendar day improvement period, beginning April 13, 2017 through May 6, 2017 to allow you to bring your faltering conduct to acceptable standards. Your supervisor will closely monitor all aspects of your work performance and will meet with you periodically during this time to discuss your progress and provide you with direction and feedback; however, I believe it is important for you to understand that your supervisor will not perform your work for you and will not make decisions for you. So there is no misunderstanding concerning your current responsibilities, I have reduced to writing my expectations of you in your position as a Programmer/Analyst IV:

1. Do not circumvent, or encourage others to circumvent, the chain of command to the point of officially representing WFWV, the Executive Director and/or his designees, beyond their authority.
2. Do not include non-MIS or non-WFWV person(s) in internally deliberative communications.

I would like to confirm my receptiveness to any reasonable suggestion as to how I might assist you during this improvement period. I sincerely hope you will correct your inappropriate conduct. Please be advised that this letter is intended to serve as a formal warning in that regard. I assure you it is my intention to maintain the integrity of our standard of performance and conduct which provides WorkForce West Virginia and its employees with a means to ensure its efficient and effective operation. Accordingly, I must inform you that you are expected to fulfill your responsibilities as a dependable and conscientious employee. Continued conduct that either circumvents the chain of command, encourages a co-worker to circumvent the chain of command, or includes persons external to WorkForce West Virginia in internal deliberations will be viewed as unwillingness, rather than inability, to comply with reasonable expectations, and could result in further disciplinary action, up to and including dismissal.

The State of West Virginia and its agencies have reason to expect their employees to observe a standard of conduct that will not reflect discredit on the abilities and integrity of their employees, or create suspicion with reference to their employees' capability in discharging their duties and responsibilities. I believe the nature of your conduct in this incident is sufficient to cause me to conclude that you did not meet a reasonable standard of conduct as an employee of WorkForce West Virginia, thus warranting this written reprimand.

If your misconduct is the result of medical and/or personal problems, I suggest you may want to contact the physician, practitioner, or counseling service of your choice. Whether or not you choose to do so is your decision. I am, however, obligated to ensure that you observe established rules and appropriate

CONFIDENTIAL

SAGITEC-DEL_02374339

Gregory Keate
Page | 3

Case 1:23-cv-00325-WCB   Document 326   Filed 03/31/25   Page 64 of 104 PageID #:
21568
Case 2:22-cr-00163   Document 150-2   Filed 02/27/23   Page 119 of 178 PageID #:

conduct. You may also obtain information on the State of West Virginia's Employee Referral Program by contacting the Division of Personnel at (304) 558-3950, extension 57209, or by visiting the web site at www.personnel.wv.gov/SiteCollectionDocuments/Miscellaneous%20Documents/EmpReferral.pdf.

You may respond to me, in person and/or in writing, concerning the contents of this letter, provided you do so within eight (8) calendar days of its date. For any appeal rights you may have, please refer to W. VA. CODE §6C-2-1 *et seq*., the West Virginia Public Employees Grievance Procedure. If you choose to exercise your grievance rights, you must submit your grievance, on the prescribed form, within fifteen (15) working days of the effective date of this action, to Russell Fry, Acting Executive Director, WorkForce West Virginia, 112 California Avenue, Sixth Floor, Charleston, WV 25305. As provided in the statute, you may proceed to Level Three of the Procedure upon the agreement of the chief administrator, or when dismissed, suspended without pay, or demoted or reclassified resulting in a loss of compensation or benefits. You must provide copies of your grievance to the Public Employees Grievance Board at 1596 Kanawha Boulevard, East, Charleston, West Virginia, 25311; agency copy; and the Director of the Division of Personnel, Building 6, Room B-416, State Capitol Complex, Charleston, West Virginia, 25305. Details regarding the grievance procedure, as well as grievance forms, are available at the Board's web site at www.pegb.wv.gov or you may telephone the Board at (304) 558-3361 or toll-free at (866) 747-6743.

Please sign one copy of this letter indicating your receipt of this written warning, and return to me. Your signature does not indicate agreement or disagreement with the contents; it only verifies that you received this letter. A copy will be placed in your confidential agency Personnel File.

I look forward to your success with the corrective action plan.

Sincerely,

Jeff Green
Executive Deputy Director

Enclosure

c:  Agency Personnel File
    West Virginia Division of Personnel

I have received a copy and am aware of the contents of the foregoing letter

Employee Signature                    Date  4/13/2017

DOJ_00491256
3

CONFIDENTIAL                                                SAGITEC-DEL_02374340

Case 1:23-cv-00325-WCB  Document 326  Filed 04/27/23  Page 65 of 120  PageID #:
Case 2:22-cr-00163  Document 156-2  Filed 03/31/25  Page 65 of 120  PageID #:
21569

## Green, Jeffrey A

| | |
|---|---|
| **From:** | Nichols, Michael B |
| **Sent:** | Friday, March 31, 2017 11:55 AM |
| **To:** | Green, Jeffrey A |
| **Subject:** | FW: |

Jeff, please see below.

**From:** Keene, Greg S
**Sent:** Friday, March 31, 2017 11:53 AM
**To:** Nichols, Michael B <Michael.B.Nichols@wv.gov>
**Subject:** FW:

Sorry, I sent it to everyone but you.

Greg Keene
Management Information Systems
Programmer/Analyst IV
1321 Plaza East Suite 106
Charleston, WV 25301
Telephone: 304-558-4046 Ext. 3102
Fax: 304-558-0301

**From:** Keene, Greg S [mailto:greg.s.keene@wv.gov]
**Sent:** Friday, March 31, 2017 10:02 AM
**To:** Keene, Greg S <Greg.S.Keene@wv.gov>
**Cc:** Parsons, Jeremy R <Jeremy.R.Parsons@wv.gov>; McNeely, Mark A <Mark.A.McNeely@wv.gov>; Venkatesan, Karthik <kvenkatesan@csgdelivers.com>
**Subject:**

Mike,

I think you need to write an email to Prahalad, Pramod, Sagitec, etc. saying that WV opposes the exit criteria changes. I don't think you should delay any longer. This needs to be done today and preferably before noon.

I think you should do it on behalf of WV and not as your personal opinion and that you should not ask Jeff or Dani for permission. If you do it on the agency's behalf you are assuming authority that you don't have but no one will dare to over rule you, especially in writing. No one above you will do it because it could put them in legal jeopardy later. The most likely outcome is that Prahalad will call Dani and ask her about it. She will probably say that she doesn't agree with you but the important thing is that there will be an email from you stating that WV is against it and it will be the final, official word.

Dani might ask you to write another email that is a retraction but I suggest you politely but firmly refuse. Just tell her she can write an email to Prahalad and overrule you but she won't do that.

1

CONFIDENTIAL

SAGITEC-DEL_02374341

Case 1:23-cv-00325-WCB    Document 326    Filed 03/31/25    Page 66 of 120 PageID #:
Case 2:22-cr-00163    Document 150-2    Filed 04/27/23    Page 66 of 174 PageID #:
21570

I think that if you unilaterally do this Jeff will support you.

Doing this is what Jeremy calls "being a bad prince". I can't say that this is completely without risk for you but I think it's a risk worth taking. The worst that can happen is that a few people will be miffed at you.

I wrote a sample email below. I suggest you discuss it with Jeremy, Mark, and Karthik.

Don't take too long deciding what to write. Sometimes urgency of action is more important than perfection of preparation.


Prahalad,

West Virginia's response to the proposed changes to the IUAT exit criteria is that we are opposed to it. Our opinion is that the changes will result in a lower quality product from Sagitec. We don't see any reason to change the current IUAT exit criteria.


Sent from my Verizon 4G LTE smartphone

2

DOJ_00491258

CONFIDENTIAL                                                                 SAGITEC-DEL_02374342

Case 1:23-cv-00325-WCB Document 326 Filed 07/31/25 Page 6 Page 122 of 178 PageID #:
Case 2:22-cr-00163 Document 156-2 Filed 04/27/23 Page 6 of 20 PageID #:
21571



**West Virginia**
**Division of Personnel**

**EMPLOYEE PERFORMANCE APPRAISAL**
**FORM EPA-2**

Use this form for interim or mid-point review, probationary employee, or special situations

| EMPLOYEE INFORMATION | | | | | |
|---|---|---|---|---|---|
| **Employee Name:** Keene, Gregory | | | **Social Security Number:** (last 4 digits – to be completed by the employee) | | |
| **Position Title:** Programmer/Analyst IV | | | **Supervisor's Name and Title:** David Adkins IS Manager 2 | | |
| **Department:** Commerce | | | | | |
| **Agency:** WorkForce WV | | | | | |
| **Division (and Section):** | | | | | |
| **Rating Period:** 03/2017 to 09/2017 | **Type of Rating** ☐ Interim ☐ Probationary ☑ Special | | | **Time in Present Position** (in months) | 45 |

**PROGRESS EVALUATION (Clearly mark the area which most adequately describes the level of work performance achieved to this time): Below is an assessment of your progress and degree of achievement toward meeting the established performance expectations that are state in your Employee Performance Appraisal Form. These expectations were discussed with you at the beginning of this rating period.**

☐ **GOOD; MEETS EXPECTATIONS** — Performance results show consistent achievement toward meeting the established performance expectations.

☑ **FAIR, BUT NEEDS IMPROVEMENT** — Performance results show inconsistent achievement of job and position objectives; performance improvement needed.

☐ **DOES NOT MEET EXPECTATIONS** — Performance results show deficiencies which seriously interfere with the attainment of job and performance expectations.

**PERFORMANCE DEVELOPMENT NEEDS: Describe specific areas that need improvement, keeping in mind established performance expectations, critical success factors, and performance elements.**

1. Do not circumvent, or encourage others to circumvent, the chain of command to the point of officially representing WFWV, the Executive Director and/or his designees, beyond their authority.
2. Do not include non-MIS or non-WFWV person(s) in internally deliberative communications.

**GENERAL COMMENTS:**

**ACKNOWLEDGEMENT:**

Supervisor's Signature      Date 4/13/2017      Employee's Signature      Date 4/13/2017

February 15, 2013

DOJ_00491259

CONFIDENTIAL      SAGITEC-DEL_02374343

# EXHIBIT 18

SAGITEC-DEL_02374344

## West Virginia Legislature
## Commission on Special Investigations



### Memorandum of Interview

**In RE:** Work Force WV – US DOL Grant

**Case No.:** 2173-16

**Date of Event:** May 12, 2017

**Participants:** Greg Keene, Programmer/Analyst, WorkForce WV, 112 California Avenue, Charleston, WV

Jim Powers, Deputy Director, CSI

**Subject:** Information Received from Greg Keene

On Friday, May 12, 2017, the Undersigned received a telephone call from GREG KEENE during which the following information was provided:

1) CONNIE KIRK is above KEENE within the management structure at WorkForce WV. Prior to the retirement of BETH CARENBAUER circa December 2016, CONNIE KIRK answered to CARENBAUER. CARENBAUER in turn answered to RUSSELL FRYE, Executive Director of WorkForce WV. When CARENBAUER retired, JEFF GREEN became CONNIE KIRK's supervisor, and now answers to FRYE. KEENE recently learned from GREEN that up until CARENBAUER's departure she had been lying to FRYE about the status/progress of the Consortium project. Additionally, she had been directing CONNIE KIRK to lie as well. Upon CARENBAUER's departure, KIRK told her new supervisor, GREEN, the truth. GREEN in turn informed FRYE, who is furious, but can do nothing since CARENBAUER is now beyond his reach.

2) KEENE recently became aware the State of Maryland is using a software testing team on the Consortium project. The members of this team are State employees who are not assigned to the Maryland workforce agency. They reportedly do nothing but test computer/software systems on a fulltime basis. KEENE recently was privy to a conversation with MARY STEGMAIER (sp?), who is a member of this unit, during which she expressed shock at what she was seeing during the testing.

> Note: This subject should be considered for interview at the appropriate point in time.

3) West Virginia is on the verge of authorizing Sagitec to transfer its client database information into the new system. The only holdup is a requirement that Sagitec execute a document agreeing to the terms and conditions they must comply with

Page 1 of 2

DOJ_00369113

CONFIDENTIAL

SAGITEC-DEL_02374345

regarding data security. For some unknown reason Sagitec has been delaying the execution of this document.

4) KEENE received a request recently from CATHY PHILLIPS, another WorkForce WV employee, asking that he provide her with the agency's current data retention rules (i.e., how long data is retained before being purged). When KEENE attempted to ascertain why she wanted the information, his supervisor, JEFF GREEN, intervened and told him to stop asking questions. KEENE believes this information request relates to an ongoing civil action in West Virginia between several internet service providers, and has nothing to do with the Sagitec matter.

Jim Powers
Deputy Director, CSI

Charles R. Bedwell
Director, CSI

JSP:lmw
2017-05-12

DOJ_00369114

CONFIDENTIAL                                                    SAGITEC-DEL_02374346

# EXHIBIT 19

CONFIDENTIAL

SAGITEC-DEL_02374347

**West Virginia Legislature**
**Commission on Special Investigations**



**Memorandum of Interview**

**In RE:**        Work Force WV – US DOL Grant

**Case No.:**     2173-16

**Date of Event:**   May 18, 2017

**Participants:**   Greg Keene, Programmer/Analyst, WorkForce WV, 112 California
              Avenue, Charleston, WV
              Jim Powers, Deputy Director, CSI

**Subject:**      Information Received from Greg Keene

   On Thursday, May 18, 2017, at approximately 4:17 PM, the Undersigned
received a telephone call from GREG KEENE during which the following information
was provided:

1) This past Monday, JEFF GREEN, KEENE's supervisor, had a meeting with the
   IT staff he supervises. During this meeting GREEN announced the US
   Department of Labor will be providing supplemental funding in the near term to
   be used for salary costs, travel expenses and the like for the West Virginia and
   Maryland staff personnel, and for CSG personnel. There is no additional funding
   for Sagitec. During this same meeting, GREEN opined the US Department of
   Labor may allow an additional 6 to 12 months for completion of the Consortium
   project.

2) GREEN also offered the observation that the Maryland staff involved in the
   Consortium project are angry at Management in West Virginia, and characterized
   the project as *"…running on fumes…"*

3) KEENE learned recently that PRAHALAD PATEEL has been pushing the
   programmers on the project staff in Maryland to do things which they are
   opposed to. CINDY LEO (see attached), a supervisor over the programmers
   who answers to PATEEL, is reported to have told PATEEL he would have to
   issue the directive in writing before her staff would comply. Thus far, PATEEL
   has failed to issue a written directive, and whatever it is he wants done has not
   occurred.

Page **1** of **2**

DOJ_00369115

CONFIDENTIAL                                    SAGITEC-DEL_02374348

4) DAYNE FREEMAN recently chewed out CINDY LEO for taking some action which had been directed by her supervisor PATEEL. As KEENE understands it the action taken was something involving the Maryland mainframe.


JSP:lmw
2017-05-18
E-Attachment

DOJ_00369116

CONFIDENTIAL                                   SAGITEC-DEL_02374349

# EXHIBIT 20

CONFIDENTIAL

SAGITEC-DEL_02374350

**West Virginia Legislature**
**Commission on Special Investigations**



**Memorandum of Interview**

**In RE:**        Work Force WV – US DOL Grant

**Case No.:**     2173-16

**Date of Event:**  May 22, 2017

**Participants:**  Greg Keene, Programmer/Analyst, WorkForce WV, 112 California
Avenue, Charleston, WV
Jim Powers, Deputy Director, CSI

**Subject:**      Information Received from Greg Keene

On Monday, May 22, 2017, at approximately 9:00 AM, the Undersigned received a telephone call from GREG KEENE. KEENE stated he spoke by telephone with KARTHIK VENKATESAN of CSG Government Solutions on Friday evening, May 19, 2017. During this conversation VENKATESAN informed KEENE the Testing Manager with CSG, PRAMOD MUSILANNAGARI, was removed from the Consortium project the previous Tuesday, May 16, 2017.

KEENE stated that early on both he and VENKATESAN perceived MUSILANNAGARI to be too easy on Sagitec, failing to clearly document the many shortcomings and failings of the software they are developing. Over the last two to three months, however, it has been their perception MUSILANNAGARI has become significantly more strict, publishing lists of problems critical of the software.

KEENE said MUSILANNAGARI's removal is reminiscent of the removal of RAY GARDNER, formerly the lead with CSG on the Consortium project. (See memo dated November 3, 2016.)

Limited information for MUSILANNAGARI and GARDNER is attached.

Jim Powers
Deputy Director, CSI

Charles R. Bedwell
Director, CSI

JSP:lmw
2017-05-22
E-attachments

Page 1 of 1

DOJ_00369117

CONFIDENTIAL                                                    SAGITEC-DEL_02374351

# EXHIBIT 21

CONFIDENTIAL

SAGITEC-DEL_02374352

**West Virginia Legislature**
**Commission on Special Investigations**



**Memorandum of Interview**

**In RE:** Work Force WV – US DOL Grant

**Case No.:** 2173-16

**Date of Event:** May 26, 2017

**Participants:** Greg Keene, Programmer/Analyst, WorkForce WV, 112 California Avenue, Charleston, WV
Jim Powers, Deputy Director, CSI

**Subject:** Information Received from Greg Keene

On Friday, May 26, 2017, at approximately 6:02 PM, the Undersigned received a telephone call from GREG KEENE. KEENE stated he had just learned from KARTHIK VENKATESAN of CSG Government Solutions that DAYNE FREEMAN, Assistant Secretary for the Maryland Division of Unemployment Insurance, and her subordinate PRAHALAD PATEL are traveling to Sagitec Corporate Headquarters in Wisconsin on Wednesday, May 31st for a meeting with Sagitec officials. As best VENKATESAN and KEENE can determine, no one else from Maryland or West Virginia is attending, and it appears West Virginia officials are not aware of the meeting.

Unrelated to the above, the Undersigned had asked KEENE for information which would assist in developing current identifying information for RAY GARDNER, an employee of CSG who was removed from the Consortium project. GARDNER is reported to reside in Leesburg, Virginia. Based upon this information, it is believed the attached information is likely him.

Jim Powers
Deputy Director, CSI

Charles R. Bedwell
Director, CSI

JSP:lmw
2017-05-26
E-Attachment

Page 1 of 1

DOJ_00369118

CONFIDENTIAL

SAGITEC-DEL_02374353

# EXHIBIT 22

CONFIDENTIAL

SAGITEC-DEL_02374354

**West Virginia Legislature**
**Commission on Special Investigations**



**Memorandum of Contact**

**In RE:** Work Force WV – US DOL Grant

**Case No.:** 2173-17

**Date of Event:** June 16, 2017

**Participants:** Greg Keene, Programmer/Analyst, WorkForce WV, 112 California Avenue, Charleston, WV
Jim Powers, Deputy Director, CSI

**Subject:** Information Received from Greg Keene

On Friday, June 16, 2017, at approximately 5:00 PM, the Undersigned received a cellular telephone call from GREG KEENE, as styled above. KEENE stated as follows:

1. He has spoken with CSG employee KARTHIK VENKATESAN and learned that in spite of repeated requests Sagitec has refused to allow him access to the Audit Logs associated with the data transfer process which is ongoing at the present time. More specifically, Sagitec is transferring data from the West Virginia employer and employee databases, and VENKATESAN is unable to monitor the Audit Logs for this transfer which is contrary to the provisions of the Consortium contract. The data being transferred includes extensive personal data for West Virginia employee claimants.

2. VENKATESAN does not know the situation with the Maryland employee/employer data, as he is assigned strictly to West Virginia.

3. VENKATESAN has appealed to KEENE's superior MIKE NICHOLS about the situation but has received zero support in correcting the situation.

4. VENKATESAN's superiors at CSG have encouraged him to make an on-site visit to Workforce WV, and he will be flying to Charleston on Monday, June 19th to spend the week. KEENE says it seems clear no one in West Virginia wanted VENKATESAN to come, and no one in West Virginia bothered to inform him June 20th is a State holiday, which means no one will be at work.

Page 1 of 2

DOJ_00369126

CONFIDENTIAL

SAGITEC-DEL_02374355

KEENE intends to spend the day June 20th with VENKATESAN.

Jim Powers
Deputy Director, CSI

Charles R. Bedwell
Director, CSI

JSP:lmw
2017-06-16

DOJ_00369127

CONFIDENTIAL

SAGITEC-DEL_02374356

# EXHIBIT 23

SAGITEC-DEL_02374357

**West Virginia Legislature**
**Commission on Special Investigations**



**Memorandum of Interview**

**In RE:** WorkForce WV – US DOL Grant

**Case No.:** 2173-16

**Date of Event:** June 27, 2017

**Participants:** Greg Keene, Programmer/Analyst, WorkForce WV, 112 California Avenue, Charleston, WV
Jim Powers, Deputy Director, CSI

**Subject:** Information Received from Greg Keene

During a telephone call on June 23, 2017, the CI stated that of the Sagitec personnel he has been exposed to or has knowledge of, RAHUL MAZUMDAR appears to be the most uncomfortable with the current state of the Consortium project. CI believes this individual would not lie unless given a direct order to by his superiors.

Identifying information is attached.

Jim Powers
Deputy Director, CSI

Charles R. Bedwell
Director, CSI

JSP:lmw
2017-06-27
E-Attachments

Page 1 of 1

DOJ_00369135

CONFIDENTIAL

SAGITEC-DEL_02374358

# EXHIBIT 24

SAGITEC-DEL_02374359

**West Virginia Legislature**
**Commission on Special Investigations**



**Memorandum of Interview**

**In RE:** Work Force WV – US DOL Grant

**Case No.:** 2173-17

**Date of Event:** July 6, 2017

**Participants:** Greg Keene, Programmer/Analyst, WorkForce WV, 112 California Avenue, Charleston, WV
Jim Powers, Deputy Director, CSI

**Subject:** Information Received from Greg Keene

On Thursday, July 6, 2017, at 12:15 PM, the Undersigned spoke by telephone with GREG KEENE.

KEENE was asked if he is aware of a provision in the MD/WV Consortium contract which required Sagitec Solutions, LLC to place a copy of its UI software product in escrow at the onset of the Consortium Project. He stated he is not familiar with this provision nor is he aware of any software held in escrow.

KEENE was also asked if Sagitec has yet turned any completed software product over to either Maryland or West Virginia. (The above escrow provision states the software must remain in escrow until the source code is turned over to the Consortium.) If any completed software has been turned over, KEENE is not aware of it.

KEENE said on the previous Thursday his subordinates (MARK MCNEELY and JEREMY PARSONS) were party to a conversation with CSG staff in Maryland, which did not include any representatives from Sagitec. The substance of the conversation concerned problems which have been encountered when error testing the adjudication module within the Sagitec software product. This part of the software generates correspondence to claimants who are appealing denial of benefits. This correspondence should include references to the appropriate section(s) of either Maryland or West Virginia statute which are being cited as a basis for the ruling being communicated. During the testing, it has been discovered the Sagitec product is instead citing provisions of Pennsylvania statute. The CI is not aware who may or may not have worked on the system used in Pennsylvania.

In the RFP submitted by Sagitec in pursuit of the MD/WV Consortium project, there is no mention of Sagitec having performed any work on the UI system in Pennsylvania.

Page 1 of 2

CONFIDENTIAL

DOJ_00369138

SAGITEC-DEL_02374360

Subsequent to this conversation, the Undersigned found the attached January 9, 2014 news article from the Los Angeles Times. Page 3 of the article makes reference to Deloitte having worked on the UI systems in both Massachusetts and Pennsylvania.

Jim Powers
Deputy Director, CSI

Charles R. Bedwell
Director, CSI

JSP:lmw
2017-07-06
E-Attachment

Page **2** of **2**

DOJ_00369139

CONFIDENTIAL

SAGITEC-DEL_02374361

# EXHIBIT 25

SAGITEC-DEL_02374362

**West Virginia Legislature**
**Commission on Special Investigations**



**Memorandum of Conversation**

**In RE:** Work Force WV – US DOL Grant

**Case No.:** 2173-16

**Date of Event:** August 9, 2017

**Participants:** Greg Keene, Programmer/Analyst, WorkForce WV, 112 California Avenue, Charleston, WV
Jim Powers, Deputy Director, CSI

**Subject:** Information Received from Greg Keene

During a telephone call on August 9, 2017, the CI provided the following information:

1) PRAHALAD PATEL, who is overall lead on the Consortium Project for the State of Maryland, left Monday on a trip to India for what was described as some type of emergency. The nature of the emergency is unknown. This information came to the CI from KARTHIK VENKATESAN of CSG Consulting.

2) JEFF GREEN told the CI he met with RAY MARIOTTI (upper management) of CSG Consulting the week of July 17th, while the CI was absent on vacation. According to GREEN, MARIOTTI told him the conduct of Sagitec Solutions LLC is not just outside industry standards, but is unprecedented both in terms of how bad the work product is and in terms of outright fraud. MARIOTTI is reported to have added that the States of Maryland and West Virginia are being taken for a ride. It is considered possible MARIOTTI may also have had this conversation with RUSSELL FRYE, Director of WorkForce WV.

3) The CI also recently asked GREEN (his superior) if a particular iteration of the Sagitec software had been paid for. GREEN responded that he does not know and does not want to know, because he wants to maintain plausible deniability.

JSP:lmw
2017-08-09

Page **1** of **1**

DOJ_00369147

# EXHIBIT 26

SAGITEC-DEL_02374364

Case 2:23-cv-00032 Document 160-23 Filed 07/31/25 Page 144 of 178 PageID #: 21593



**Memorandum of Interview**

**In RE:** Work Force WV – US DOL Grant

**Case No.:** 2173-16

**Date of Event:** September 18, 2017

**Participants:** Greg Keene, Programmer/Analyst, WorkForce WV, 112 California Avenue, Charleston, WV
Steve Staton, Senior Investigator, CSI
Jim Powers, Deputy Director, CSI

**Subject:** Information Received from Greg Keene

On Thursday, September 7, 2017, at 3:36 PM, the Undersigned spoke with the CI by telephone. At this time, he provided the following information:

1) In July of this year, RAY MARIOTTI of CSG Government Solutions met with RUSSELL FRYE, Director of WorkForce WV, while on a visit to West Virginia. During this meeting, FRYE is reported to have stated to MARIOTTI *"...West Virginia doesn't want to rock the boat..."* (this in reference to the Consortium project). This information was provided to the CI by KARTHIK VENKATESAN of CSG.

2) Sagitec has been paid for all data and image conversion associated with the Consortium project, however, the data conversion is ongoing at present, and the image conversion has not yet begun.

On Monday, September 18, 2017, at 9:00 AM, Senior Investigator STATON and the Undersigned met with the CI at the CSI offices. At this time, the CI provided a thumb drive containing files which the Undersigned copied for inclusion with this memorandum. The CI provided the following information during this meeting.

1) The attached files include material pertaining to the ECM (Enterprise Content Management) Implementation Plan for West Virginia, as submitted to WorkForce WV by Sagitec recently. Also included is one file pertaining to the ECM Migration Design for West Virginia.

Page 1 of 3

DOJ_00369154

CONFIDENTIAL                                                        SAGITEC-DEL_02374365

2) MIKE NICHOLS asked the CI to document (write-up) his thoughts on the documents such that he (NICHOLS) could then submit them to WorkForce WV Management.[1]

3) With respect to this, the CI observed that it was obvious to those at WorkForce WV who read the documents that at least some of the content within them was plagiarized, likely from sources on the internet.

4) The CI examined one of the documents and discovered that indeed entire paragraphs were copied directly from internet sources (see *UIM ECM Implementation – WV commented*). These internet source documents typically bear a Copyright by IBM Corporation. Notwithstanding this, there is no attribution to IBM in the Sagitec documents and the Sagitec documents bear a Sagitec Copyright.

5) During the past week, Sagitec asked WorkForce WV, specifically MIKE NICHOLS, to provide it a copy of the Oracle software license for WorkForce WV. The CI is unclear as to why Sagitec wants this item.

6) The CI has been told the Consortium is preparing a supplemental budget request to be submitted to the US Department of Labor by October 23rd (per JEFF GREEN). GREEN is reported to have said, *"…if the request is refused, the Consortium will end…"* It is the CI's perception that part of the funding requested will flow to Sagitec if the request is approved.

7) Management at WorkForce WV does not want the WV Treasurer's office involved in the new system being developed by Sagitec. For example, under the existing system employer payments flow through the State Treasurer's office. MICHELLE PAINTER, who is currently a WorkForce WV employee, was previously an employee of the Treasurer's office, and has told Management consistently that State statute requires the involvement of the State Treasurer. Since taking this position, she is no longer invited to management meetings where this issue is discussed.

8) Sagitec has expressed the desire to utilize a methodology called "split tunneling" in the new system, however the Governor's Office of Technology has thus far refused to allow this. Split Tunneling is described as a communication method where data flows between two "virtual machines" thereby making it very difficult to track the entire path of the communication.

---

[1] At the conclusion of the interview, the CI stated he has prepared the document requested by Mike Nichols, but has yet to provide it to him. The CI asked the Investigators whether he should give Nichols the document. It was noted in discussion of this issue that Nichols is not the CI's supervisor. The Investigators suggested it would likely be safer for the CI to bring the issue up to his actual supervisor, Jeff Green, and then act in accordance with his Supervisor's wishes, whatever these might be.

Page 2 of 3

CONFIDENTIAL

9) RAY MARIOTTI of CSG, and COREY RUSSELL (a CSG Business Analyst) are in Charleston this week. PRAHALAD PATEL of the Maryland staff is expected to come to Charleston in the near future.

10) The CI opined the Sagitec staff has no concept of how to deal with network printing in the new system. He pointed out that WorkForce WV has a number of network printers whose physical dimensions are roughly 4 x 4 x 16 feet. As a test, he caused an inquiry to Sagitec asking if they were recommending these printers simply be placed on an employee's desk, to which Sagitec responded in the affirmative, indicating thereby they had no idea what they were dealing with.

11) The CI stated WorkForce WV also has two Stream Weaver document inserters which it relies heavily on (a machine roughly the size of a typical office). These are machines that insert correspondence and forms into envelopes and make them ready for mailing. According to the CI these machines typically process about 35,000 pieces of mail per month. Under the scheme suggested by Sagitec for the new system, this task would be handled by humans.

Jim Powers
Deputy Director, CSI

_____
Charles R. Bedwell
Director, CSI

JSP:lmw
2017-09-18
E-Attachments

Page **3** of **3**

DOJ_00369156

CONFIDENTIAL

SAGITEC-DEL_02374367

# EXHIBIT 27

SAGITEC-DEL_02374368

**West Virginia Legislature**
**Commission on Special Investigations**



**Memorandum of Interview**

**In RE:** Workforce WV – US DOL Grant

**Case No.:** 2173-16

**Date of Event:** January 28, 2020

**Participants:** Teresa L. Smith, Payroll Manager, Kanawha County Board of Education
Residence: ▮▮▮▮▮▮▮▮▮▮▮▮▮
Cell: ▮▮▮▮▮▮
Jim Powers, Investigator, CSI

**Subject:** Follow-up Interview re Sagitec Solutions, LLC and MD/WV Consortium Project

This subject was previously interviewed on August 16, 2018 (see memorandum to case file).

On Tuesday, January 28, 2020, at 1:50 PM, the Undersigned interviewed TERESA SMITH (hereafter SMITH) at the offices of the Kanawha County Board of Education. The subject of this interview was the attached document which had not been identified by the Investigators as being associated with SMITH when she was interviewed previously.

It is noted the document in question bears a State of New Mexico logo, and its metadata bears the company name "Deloitte". It was last modified June 6, 2014, by *TERESA L. SMITH, (Workforce)*. The author of the document is *PHILIP L. TACKETT*. The document was found on a computer server at Workforce WV circa September 27, 2017, and was turned over to the Undersigned by a Cooperating Individual.

SMITH generally recognized the document and stated she believes it to be a sample which was likely solicited by her from one of two sources when she was developing specifications for the WV/MD/VT Consortium Project. She explained that she and other team members had been in touch with other Consortium Projects at the time to gather input from them, and they may have spoken with someone in New Mexico. She stated the other possibility she can think of is it might have been a sample provided by LOU ANSALDI, who was involved with the WV/MD/VT Consortium Project from its inception.[1]

---

[1] LOU ANSALDI is the Technical Director at the National Association of State Workforce Agencies, which is closely associated with the US Department of Labor.

Page 1 of **2**

CONFIDENTIAL

Case 1:23-cv-00325-WCB Document 326 Filed 07/31/25 Page 9 of 14 PageID #:
Case 2:22-cv-00163-WCB Document 150-2 Filed 04/27/23 Page 9 of 14 PageID #:
21598

SMITH is sure she would not have obtained the document direct from either Deloitte or
Sagitec, and noted she was unaware of Sagitec's existence in June 2014.

Jim Powers
Deputy Director, CSI

Charles R. Bedwell
Director, CSI

JSP:sml
2020-01-28
E-Attachments

DOJ_00369277

CONFIDENTIAL

SAGITEC-DEL_02374370

# EXHIBIT 28

SAGITEC-DEL_02374371

**West Virginia Legislature**
**Commission on Special Investigations**



**Memorandum of Activity**

---

**In RE:** Work Force WV – US DOL Grant

**Case No.:** 2173-16

**Date of Event:** September 29, 2017

**Participants:** Greg Keene, Programmer/Analyst, WorkForce WV, 112 California Avenue, Charleston, WV
Steve Staton, Senior Investigator, CSI
Jim Powers, Deputy Director, CSI

**Subject:** Information Received from Greg Keene

On Wednesday, September 27, 2017, the Undersigned contacted the CI and inquired as to whether he had ever seen any MW Consortium related document files for which the file properties indicated they may have originated with Deloitte. The CI stated he had not, but neither had he ever actively looked for any such files. At this time, the Undersigned asked the CI to search within the files accessible to him for any such files he might be able to find.

The CI called the Undersigned later the same date and stated he had discovered a significant number of such files and had made copies of same. Arrangements were made to meet with the CI to take possession of same later the same week.

On Thursday, September 29, 2017, at 3:05 PM, the CI met with CSI Investigator STEVE STATON and the Undersigned at the CSI offices, at which time he placed a thumb drive in the possession of the Investigators. The thumb drive contains the following:

- Seven files relating to ECM Implementation which the CI had provided to the Undersigned on an earlier date. These files are irrelevant to this memorandum.
- One folder marked *Deloitte C drive* which contains five files downloaded by the CI to his assigned PC at WorkForce WV.
- A second folder marked *Deloitte network drive* which contains 29 files which the CI found on the WorkForce WV Network drive for the Consortium project.

The CI explained he had personally downloaded the five files found on his assigned computer for use on the Consortium project, but had never bothered to examine the file properties of same. It is noted the properties of these files all show they were last modified by the CI.

Page **1** of **3**

CONFIDENTIAL

DOJ_00369158

SAGITEC-DEL 02374372

The CI explained further it is his perception the remaining 29 files were downloaded from a *Sharepoint* site maintained by Sagitec for the Consortium project to the WorkForce WV server by various members of the Consortium staff for use on the project. He pointed out that most of this group appear to have been downloaded by ANNETTE L. CORLEY, whom he described as a contract employee working as a business analyst on the Consortium project. CORLEY is physically located at the WorkForce WV offices, and the CI believes she is assigned a computer which belongs to the State. The CI stated the following are other employees, similarly situated, who work with CORLEY:

WATSON, JOYCE (a retired Workforce WV employee)
RAGUBE, DAISY
PATEL, BHAVIK
BHATTI, SHAH (terminated circa July 2017)

The CI pointed out that in addition to the 29 documents he found on the WorkForce WV server, there could be additional documents that various of the above individuals or other WorkForce WV employees have downloaded directly to their assigned PCs.

After receipt of the thumb drive from the CI, the Undersigned examined the content of same. The file property information for each file was printed out and incorporated into a MS Word document such that it can be easily viewed. In addition, an Excel table was created to summarize the information found within the file properties. Two files of Deloitte origin provided by CHRISTINA ARCHER-WALKER pursuant to her interview are also included within this examination.

Summary of File Properties:

1) A total of 36 files is listed (including the two from CHRISTINA ARCHER-WALKER). Of these, 24 should be considered individual, unique files, as there are 12 files which appear to be duplicate copies made by ANNETTE CORLEY after she downloaded the files. Each of these duplicates ends in the characters "alc".

2) Of the 24 unique files, the "Company" field within file properties reads "Deloitte" for all but one file, total of 23 files. The exception is the single Excel file authored by LOU ANSALDI. This file apparently was copied because the CI searched for the term Deloitte, and this term does appear within the body of the Excel file created by ANSALDI.

3) Of the 23 files for which the "Company" field reads Deloitte, the "Author" for 16 is PHILIP L. TACKETT, a former Deloitte employee who worked on the New Mexico UI project for Deloitte. Two files are authored by other individuals who also worked on the New Mexico project for Deloitte. The remaining five files show the "Author" as being RAHUL MAZUMDAR, a Sagitec employee since October 2015, which is approximately when work began on the MW Consortium

Page 2 of 3

DOJ_00369159

CONFIDENTIAL

SAGITEC-DEL_02374373

project. In 2011, when the New Mexico project was ongoing, MAZUMDAR was employed by HCL Technologies, a competitor to Deloitte.

4) Of the three dates which appear within the file properties, the "Last Printed Date" is typically the earliest of the three. Of the 23 files listed, 16 show a "Last Printed Date" in 2011, when the New Mexico UI project was active. Note also that the two files from CHRISTINA ARCHER-WALKER are headed with New Mexico logos.

5) The seven remaining files show a "Last Printed Date" in April 2016. Two of these show RAHUL MAZUMDAR (Sagitec) as the "Author", while the remaining five show PHILIP L. TACKETT as the "Author". Since TACKETT left Deloitte and accepted employment with IBM Corporation in April 2013, this indicates the documents were re-printed long after he left Deloitte and the New Mexico project was completed.

6) The three files which show a "Last Printed Date" in May 2011, but show RAHUL MAZUMDAR as the "Author" are similarly inconsistent, since MAZUMDAR has never worked for Deloitte.

The following will be included with this memorandum:

- The 34 files provided by the CI, and the two files provided by CHRISTINA ARCHER-WALKER.
- The Excel table summarizing the file properties.
- The document which shows the file properties or each file.

Jim Powers
Deputy Director, CSI

Charles R. Bedwell
Director, CSI

JSP:lmw
2017-09-27
E-Attachments

Page **3** of **3**

DOJ_00369160

CONFIDENTIAL

SAGITEC-DEL_02374374

# EXHIBIT 29

CONFIDENTIAL

SAGITEC-DEL_02374375

**West Virginia Legislature**
**Commission on Special Investigations**



**Memorandum of Interview**

**In RE:** Work Force WV – US DOL Grant

**Case No.:** 2173-16

**Date of Event:** December 20, 2017

**Participants:** Greg Keene, Programmer/Analyst, WorkForce WV, 112 California Avenue, Charleston, WV
Jim Powers, Deputy Director, CSI

**Subject:** Files Retrieved from SharePoint

On Tuesday, December 19, 2017, at 6:00 PM, the Undersigned received a call from GREG KEENE, as styled above. KEENE stated he had just made what he considered an important discovery. He had downloaded a document from Sagitec via SharePoint which he needed to review prior to a meeting the following day. Upon examining this document, he observed the metadata (file properties) showed the author to be PHILIP TACKETT. TACKETT is known to have been employed by Deloitte on the New Mexico UI project, circa 2014. Available information indicates he is now employed by IBM Corporation and is residing in Kentucky. To the best knowledge of the Undersigned, TACKETT has never worked for or been associated with Sagitec.

The CI said that having observed TACKETT's name on the document, he performed a search of the Sagitec site/server for any other documents bearing TACKETT's name. He discovered there are approximately 278 such documents, primarily MS Word files.

The Undersigned asked the CI if he would be able to download copies of the documents without Sagitec discovering he had done so, and if so, how long this might take. The CI stated it might be possible, and would likely take at least two hours. There was also discussion of whether discovery of such a download by the CI would get him in trouble with his superiors at WorkForce WV. The CI responded this would be difficult to predict, but that various of the WorkForce staff involved in the project download such documents on a regular basis, and that he was accessing the SharePoint site via a legitimate login and password which are assigned to him for project work.

The final advice from the Undersigned to the CI at the conclusion of this call was," … *do nothing until I can speak with the attorneys handling this investigation; the documents will be of no use to us if the Court views us as having obtained them by inappropriate means…"*

Page **1** of **2**

DOJ_00378136

CONFIDENTIAL

SAGITEC-DEL_02374376

At 7:11 PM, the same date, the Undersigned spoke by telephone with AUSA ANDREW COGAR, at which time he explained all the above. AUSA COGAR's advice was that the CI should not download the files.

It was the intent of the Undersigned to convey the above to the CI at the start of business the following morning.

At 7:37 AM, Wednesday, December 20, 2017, the Undersigned e-mailed the CI as follows, *"Please call at your convenience…jim"*.

At 8:14 AM, the Undersigned received a call from the CI in which the CI stated he had gone ahead and downloaded the files discussed the evening prior.

At 2:09 PM, the Undersigned spoke with AUSA COGAR and advised him of what had occurred. It was agreed Investigator STEVE STATON and the Undersigned would accept the files downloaded by the CI, but would seal them, unexamined, and place them in the custody of CSI Director CHARLES BEDWELL, pending whatever future disposition was determined appropriate.

At 4:20 PM, the same date, Investigators STATON and POWERS met with the CI at the CSI offices and accepted a thumb drive containing the files downloaded the night prior. The Investigators also cautioned the CI against repeating his search of the previous night. The thumb drive was sealed in an envelope, and placed in the custody of Director BEDWELL.

JSP:lmw
2017-12-20

DOJ_00378137

CONFIDENTIAL                                                                    SAGITEC-DEL_02374377

# EXHIBIT 30

CONFIDENTIAL

SAGITEC-DEL_02374378

**West Virginia Legislature
Commission on Special Investigations**



**Memorandum of Interview**

| | |
|---|---|
| **In RE:** | Work Force WV – US DOL Grant |
| **Case No.:** | 2173-16 |
| **Date of Event:** | August 7, 2018 |
| **Participants:** | Greg Keene, Programmer/Analyst, WorkForce WV, 112 California Avenue, Charleston, WV<br>Jim Powers, Deputy Director, CSI |
| **Subject:** | Information received from CI – Source Code Files and Recent Meetings |

On Tuesday, August 7, 2018, at 7:45 AM, the Undersigned met with Greg KEENE at the CSI offices on Eagle Mountain Road. KEENE initiated this meeting during a telephone call the day prior.

Upon arriving, KEENE placed a thumb drive in the possession of the Undersigned. As of this writing, the Undersigned has not viewed or examined the content of this device. KEENE explained the events leading up to his acquisition of the data on this drive as follows:

- During the previous week, Bernt PETERSON of Sagitec communicated with Greg KEENE and others at Workforce that he would not (refused) explain to them how Sagitec was developing the Tax Performance System. (KEENE stated this system in itself is a minor component of the Sagitec system overall.) As opposed to explaining how this item is being developed, PETERSON said the West Virginia staff should feel free to examine the source code for the item in the Sand Box Environment.

- The prior Wednesday, August 1, 2018, at 10:00 AM (and subsequent to the above), there was a weekly call with Siva SAMBASIVAM and others from Sagitec. During this meeting, the Tax Performance System was one of about 26 different issues to be discussed. During discussion of this item, KEENE pointed out that he has never been granted access to the Sand Box Environment nor

Page **1** of **3**

DOJ_00386583

CONFIDENTIAL

SAGITEC-DEL_02374379

> does he have access to the Team Foundation Server Code Library where the project source code resides.[1]

- As a result of the discussion during this meeting, KEENE was granted the two levels of access needed to access the project source code. KEENE explained he had never asked for this access previously because he feared it would draw unwanted attention to him. It is his understanding Mike NICHOLS and Jeremy PARSONS have had such access for approximately one year, and more recently, Mark McNEELY was granted such access as well.

With reference to the content of the thumb drive, KEENE said the files are written in VB2015 (Visual Basic) which is a development tool. He opined this particular tool would not have existed when Deloitte originally developed its product, but he did not consider this a significant issue.

Other

- KEENE stated the above meeting was the last for Ray MARIOTTI of CSG, whose position is being taken over by Becky ROSIER. He commented there are those in Maryland and with Sagitec who want to see MARIOTTI off the Consortium Project as he is perceived to be an impediment. Becky ROSIER who is taking Ray MARIOTTI's place at CSG is described as a former long-term State of Florida employee who was hired by CSG to work on the Sagitec project in South Carolina.

- KEENE stated it is also rumored there was a recent attempt to remove Prahalad PATEEL from the Project as well. (Maryland employee and project director.) Jeff GREEN has stated Prahalad PATEEL's behavior/attitude seems to have changed markedly of late. GREEN attributes PATEEL's new "quiet" attitude as a result of his learning the Project Steering Committee wanted rid of him.

- There was meeting on Friday, August 3, 2018 which consisted of about two dozen Workforce WV personnel, but no outsiders. This was the third such meeting since the project began, and KEENE stated the previous two have been simply what he characterizes as "bitch and moan" sessions which yield no result. At this meeting, however, Jeff GREEN made a point of expressing his thanks and gratitude for everyone's work on the Consortium Project. It appears to the CI this attitude on GREEN's part developed after the investigation became known at Workforce.

- A paralegal with Workforce, Peggy IMLER, told others she had the opportunity to view UI related correspondence which is generated by the system Sagitec developed for the State of South Carolina, and it is obvious Sagitec copied the business correspondence used by West Virginia for the South Carolina system.

---

[1] KEENE explained these are two distinct types of access. Access to the Sand Box Environment allows one to run the applications in development and test them, but does not allow the user to view the source code which drives the application. A second access to the Team Foundation Server is required to actually view the source code.

DOJ_00386584

CONFIDENTIAL

SAGITEC-DEL_02374380

- During a recent meeting, Dani ASSEFF suggested Workforce should download the entire content of SharePoint both from the standpoint of evaluating what is there and to insure West Virginia has a copy of the project documentation. Jeff GREEN and Jonathan LINK were opposed to this suggestion, stating Sagitec would see such a move as "bad faith" and get angry about it. KEENE explained what is meant by the content of SharePoint as "thousands of documents which explain how the system works." The CI said he does not understand what GREEN and LINK's thinking is on this issue, but opined the explanation about offending Sagitec is nonsense.

- Also during a recent meeting, a member of the West Virginia staff asked GREEN what it is that the Executive Director, Russell FRYE, wants from the Consortium Project. GREEN is reported to have responded that he does not know if FRYE wants to remain in or get out.

- At this point, Sagitec has been sent 4 different "cure" letters, which the CI characterized as some type legal document. He has been told these letters have had no apparent effect on Sagitec as yet.

- The ITSC has suggested Maryland and West Virginia send employees to watch Sagitec do its system testing, because of the belief Sagitec is cheating on the results.[2] Sagitec is reported to have agreed with this, knowing the States do not have the staff to follow through and nothing will come of it.

Jim Powers
Deputy Director, CSI

Charles R. Bedwell
Director, CSI

JSP:sml
2018-08-07

---

## [2] ITSC - **NASWA** Information Technology Support Center

www.**itsc**.org information on IT tools and solutions related to the UI program. UI Learning Center Online UI program and technical training for all federal and state employees within the UI Program.

Page **3** of **3**

CONFIDENTIAL

DOJ_00386585

SAGITEC-DEL_02374381

# EXHIBIT 31

SAGITEC-DEL_02374382

Case 1:23-cv-00325-WGC Document 32 Filed 02/03/25 Page 162 of 178 PageID #:
Case 2:32-cr-00253-WGC Document 50-2 Filed 02/3 Page 10 Page 162 of 178 PageID #:
21611



**WEST VIRGINIA LEGISLATURE**
**Commission on Special Investigations**
CHARLESTON, WEST VIRGINIA 25311-1061

301 Eagle Mountain Road
Room 218

Phone: (304) 347-4120
Fax: (304) 347-4129
CSI@wvcsi.gov

Date: 10-05-2018
To: AUSA Andrew Cogar
From: Jim Powers, CSI
Re: Maryland/West Virginia Consortium Project

Per our recent conversation, the content of this thumb drive is provided for use by the Consultant, as you deem appropriate. I may have provided a little more information than you wish to turn over, but felt it better to allow you to make that call. The following is a summary of what is being provided.

Folder 001
A memorandum detailing information provided by the CI circa September 29, 2017; the data itself; a spreadsheet listing the files and relevant metadata information; and a pdf showing the file property screens.

Folder 002
Several files turned over by the CI, also circa September 18, 2017, along with a memorandum documenting the CI turning over this information.

Folder 003
Content of a thumb drive containing material/files turned over by the CI circa December 20, 2107, along with a memorandum documenting this event. The spreadsheet included in this folder lists both files turned over December 20, 2017, and files turned over August 7, 2018.

Folder 004
Content of a thumb drive containing material/files turned over by the CI circa August 7, 2018, along with a spreadsheet which lists both files turned over December 20, 2017, and files turned over August 7, 2018.

Folder 005
Copy of a single file turned over by the CI September 6, 2018.

Jim Powers
Deputy Director

DOJ_00369223

CONFIDENTIAL

SAGITEC-DEL_02374383

# EXHIBIT 44



January 15, 2017

Jessica Carter, Assistant Attorney General
500 North Calvert Street – Suite 406
Baltimore, Maryland 21202-3659

Dear Ms. Carter,

This letter is in response to your letter of December 7, 2016.  You requested additional information related to matters discussed in a meeting held on November 10, 2016 between Sagitec and representatives of the MW Consortium, including Project Steering Committee members.

As stated in our letter dated August 23, 2016 and restated at the November 10, 2016 meeting, we ask that the Department accept our assurance that Sagitec has not provided the Department any software improperly obtained from another company.  This is consistent with Sagitec's business ethics and practices.  It is also consistent with the terms of the Contract, which include representations and warranties regarding both Sagitec's ownership of the subject software, as well as the freedom of that software from the infringement of third party intellectual property rights.

In the attachment, we provide a detailed response to each of your concerns as you requested.  The responses include confidential information and we request that this information is protected from public disclosure.

In addition, we have provided a great deal of information in this response, in previous correspondence and in meetings with you.  Gathering the requested information and preparing those responses has been time consuming, but we think it has been important to address your concerns as best we reasonably can.  We believe the effort we have made and the information we've provided should be sufficient, and we would like to focus our attention and energy on the project.

We respectfully ask that you agree and that you consider this matter closed.

Regards,

Senior Partner | Sagitec Solutions, LLC.

| 612-759-7738 | david.minkkinen@sagitec.com

---

CONFIDENTIAL    SAGITEC-DEL_02588547



The following provides Sagitec's detailed response to the questions you raised:

1. We understand that the solution underlying Sagitec's proposal has multiple layers as depicted in your diagram below.



   a. When did Sagitec develop the "Sagitec Framework" for Enterprise Framework Services (gray box above), and when was it first commercially marketed?

**Sagitec Response:** Sagitec developed the "Sagitec Framework" for Enterprise Framework Services (gray box above) beginning in April 2004 and has since enhanced the Framework with new versions. It was commercially marketed in September 2004 to the Kansas Public Employees Retirement System and has been in use by nearly two dozen clients, beginning with the first implementation in 2005. Please see the following press release regarding this implementation:

http://www.prweb.com/releases/2005/12/prweb317829.htm

Since 2004, we have upgraded the Framework in parallel with Microsoft's .NET platform, incorporating new features into our products and solutions. Our product roadmap is strategically defined every two years to ensure our customers have access to updated products that integrate newer technology trends and business functionality. The following diagram demonstrates our current product roadmap that highlights the evolution of Sagitec's software products through 2017. Sagitec is in the process of updating the product roadmap beyond 2017.

CONFIDENTIAL

SAGITEC-DEL_02588548





**Sagitec's Current Product Road Map**

Sagitec continues to enhance its framework and product offerings for the benefit of the MW consortium. The following tables highlight the upgrades and evolution of our products and solutions over the past 12 years, illustrating our ongoing commitment to and investment in our solutions and products.

| Evolution of the Sagitec Framework™ from 2004 to 2009 | | | |
|---|---|---|---|
| **Area of Evolution** | **Framework 1.0 (2004)** | **Framework 2.0 (2005)** | **Framework 3.0 (2009)** |
| Enterprise Architecture | First release based on .NET 1.1; N-tier architecture; XML-based representation | Implemented generics, master pages and multi-threaded batch services | Implemented asynchronous messaging; Introduced NeoFlow based on Windows Workflow Foundation (WWF) |
| Enterprise Integration | SQL server database. | Implemented DB2/400 database; LDAP authentication, ECM integration adaptors; Financial (GL) integration adaptors | Implemented multi-factor authentication framework (RSA/PassMark/Entrust); MSMQ integration |

CONFIDENTIAL



| Evolution of the Sagitec Framework™ from 2004 to 2009 | | | |
|---|---|---|---|
| **Area of Evolution** | **Framework 1.0 (2004)** | **Framework 2.0 (2005)** | **Framework 3.0 (2009)** |
| Security & Control | Deployed role-based security; fine grained security at control level | Data-based security; Rule-based security; Fine grained auditing at field level | Implemented Exception management framework; Fine-grained user activity logging |
| Usability | 100% browser based; Based on ASP.NET Web forms | Allow user preferences; Updated Web controls; Smart Navigation | Implemented AJAX controls; Seamless Workflow-driven processes; CSS styling |
| Business/ System Management | Manage reference values, messages, security, etc.; Batch Process Monitor | Enhanced Batch Monitor across servers; Integrated exception management | Implemented Workload monitoring |
| SDLC Management | Deployed Studio for designing Web Forms and Business Rules (Validations) | Support for designing Correspondence, Reports, and interface file layout | Support for Workflow Diagram design; Studio support for Prototype; Automated migration using Cruise Control; Automated code review using Code-Gym |

The Sagitec Framework™ Evolution from 2004 to 2009

| Sagitec Framework™ Evolution from 2010 through 2015 | | | |
|---|---|---|---|
| **Area of Evolution** | **Framework V4.0 (2010)** | **Framework V4.0 (2011)** | **Framework V4.5 (2014)** |
| Enterprise Architecture | Implemented parallel computing extensions; Enriched asynchronous messaging; 64-Bit version; Multi-processor computing; Updated Workflow Engine | Implemented "on the fly" ADA compliance; OpenXML; architecture for multilingual support | Migration to MVVM architecture; Migration to Web API from WCF; Upgraded Rule Engine performance with DLR |
| Enterprise Integration | Added SharePoint integration adaptor; Upgraded ECM adaptors; | First deployment on Oracle | |
| Security & Control | Added encryption at database, file, and document level | Implemented Full audit; Full tracing; Performance monitoring; Addressed sans top 25 security vulnerability | |

CONFIDENTIAL



| Sagitec Framework™ Evolution from 2010 through 2015 | | | |
|---|---|---|---|
| **Area of Evolution** | **Framework V4.0 (2010)** | **Framework V4.0 (2011)** | **Framework V4.5 (2014)** |
| Usability | Implemented JQuery UC controls | Implemented Spell checking; Accordion panels; Enhanced user preferences; Enhanced experience such as cascading dropdown, automated grid formatting, etc. | Implemented Kendo UC controls; Enhanced charting controls; CSS3 styling; Advanced HTML 5.0 features; Native Mobile Application Support |
| Business/ System Management | Performance and control reports | Dashboard; Calendaring/Scheduling | Added Decision Tables and Logical Rules to Rules Engine; Implemented Process Modeling and Execution using BPMN 2.0 Standards |
| SDLC Management | Launched NeoCertify for Unit testing, Regression testing, Build Verification testing Enhanced support for file design and correspondence design | Enhanced Sagitec Test Studio™ for Performance testing Automated System Test case documentation Updated Studio with WPF controls and provided run time view during design | Deployed the Sagitec Analyst Studio™ for modeling and testing business rules independent of the solution Deployed the Sagitec Modeling Studio™ to model business processes and automate execution |

*The Sagitec Framework™ Evolution from 2010 to 2015*

This aforementioned information was disclosed in our proposal.

    b.   When did Sagitec develop the "Sagitec Framework" for Enterprise Application Management Services (blue box above), and when was it first commercially marketed?

**Sagitec Response:** Sagitec developed the Sagitec Framework in April 2004 and has since enhanced it with major upgrades. It was first commercially marketed in September 2004 and has been operating in production environments since September 2005.

    c.   When did Sagitec develop the "Sagitec Framework" for Neosurance Solution – Benefit Services (orange box above), and when was it first commercially marketed?

**Sagitec Response:** Sagitec developed our Neosurance Solution – Benefit Services (orange box above) beginning in August 2013 and has since been enhancing the Neosurance Solution with new features and functions. The Neosurance solution was developed using the Sagitec Framework and Sagitec design and development tools. No other software can work on top of the Sagitec Framework unless it has been developed using Sagitec's design and development tools. Neosurance was first commercially marketed in 2013 and implemented in production in October 2014.

CONFIDENTIAL

SAGITEC-DEL_02588551



    d.   Is Sagitec in possession of all source code for all of the above components?

    **Sagitec Response:** Yes. Sagitec possesses and owns the source code for all of the above software components.

    e.   Who were the lead developers for each component?

    **Sagitec Response:** Sagitec assigns teams to maintain and enhance each of these software components. We do not assign lead developers to design and develop these software platforms. Please see below the teams assigned to the software components outlined above:

- Enterprise Framework Services – Sagitec's Framework Team
- Enterprise Application Management Services – Sagitec's Framework Team
- Neosurance Solution – Benefit Services – Sagitec's Neosurance Product Team

    Sagitec is a matrix organization and the resources assigned to these teams change frequently.

2.   To the extent that pre-existing Sagitec frameworks or other code are being customized for the MW Consortium, who are the key developers?

    **Sagitec Response:** Sagitec Enterprise Framework Services or Enterprise Application Management Services are the core building blocks of our solution offering and are used by all of our clients in the UI and Public Pension domain. Therefore, these components are maintained only by the Sagitec Framework team. If any changes are required to these two components of the framework to support a function required for the MW consortium, the Sagitec Framework team evaluates these needs and incorporates them into these two components by ensuring the change does not adversely affect any of our existing clients.

    Modifications to the Neosurance Solution Benefit Services are made by either the product team or the project team depending on the nature of the change. Sagitec evaluates each change that is needed for the MW Consortium and determines if this change has to be made at the product level in order to roll this feature on to all of our clients. If it is determined to be a change that will be made at the product level, the change is made by our product team to the base solution which is then made available to the MW consortium and other project teams. If the change is not planned to be incorporated into the base solution, then the change is made by the project team.

3.   Of the individuals identified in response to Question #2, which of these were formerly employed by Deloitte, and what dates were they employed by Deloitte? What was the scope of their responsibilities at Deloitte?

    **Sagitec Response:** Sagitec did not recruit developers from Deloitte to work on our solutions and products. The type of resources who left Deloitte and subsequently joined Sagitec included technical architects, project management, development management, data conversion analysts and UI subject matter experts. Each of these resources was hired based on their experience and

---

CONFIDENTIAL                                                          SAGITEC-DEL_02588552



expertise in implementing unemployment insurance solutions.  The table below outlines the 13 individuals that were formerly employed by Deloitte:

| Name | Dates of Employment | Responsibilities |
|---|---|---|
| David Minkkinen | May 2009 – June 2013 | UI Practice Leader |
| Sivaraman Sambasivam | May 2009 – September 2013 | Project Management (Director) |
| Pankaj Sharma | May 2009 – December 2013 | Technical Architect |
| Bernt Peterson | May 2009 – December 2013 | Functional team manager |
| Sindhu Nair | May 2009 – September 2015 | Technical Architect |
| Srinivas Kurra | May 2009 – December 2014 | Data Conversion Lead |
| Revathy Rajaraman | May 2009 – February 2015 | Development Manager |
| Praveen Rengaraj | May 2009 – June 2014 | Functional team lead |
| Karthik Sadasivam | May 2009 – November 2012 | Technical Architect |
| Prabhu Tegur | May 2009 – February 2015 | Development Manager |
| Deepa Sundaram | June 2012 – December 2015 | Subcontractor to Deloitte – Data Conversion Analyst |
| Venkat Kakula | May 2009 – December 2015 | Development Manager |
| Marcel Mascarenhas | May 2009 – October 2014 | Technical Architect |

4.  Did any of those individuals have access to Deloitte source code used in Unemployment Insurance (UI) systems while employed at Deloitte?  If so, describe their level of access.

    **Sagitec Response:**  Development management resources identified in the table above would have had access to portions of Deloitte source code used in Unemployment (UI) systems while employed at Deloitte.

5.  Did any of those individuals retain any software, source code, data tables, data structures, data dictionaries, documentation, deliverables, or other works of authorship authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client after leaving Deloitte's employment?  If so, who and what?

    **Sagitec Response:**  To our knowledge, none of those individuals retained any software, source code, or any other tangible artifacts authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client after leaving Deloitte's employment.

6.  Did Sagitec or Sagitec personnel ever obtain copies of any software, source code, data tables, data structures, data dictionaries, documentation, deliverable or other works of authorship authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client?  If so, who, what, when and how?

    **Sagitec Response:**  Sagitec has not obtained copies of any software, source code, or any other tangible software artifacts authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client.

CONFIDENTIAL    SAGITEC-DEL_02588553



7. Have Sagitec or Sagitec personnel ever incorporated any software, source code, data tables, data structures, data dictionaries, documentation, deliverable or other works of authorship authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client into anything delivered to the MW Consortium?  If so, who, what, when and how?

   **Sagitec Response:**  Sagitec has not incorporated any software, source code, or any other tangible software artifacts authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client into anything delivered to the MW Consortium.

8. How is the Sagitec Framework/Neosurance Solution code similar to and/or different from the solution that was provided by Deloitte UI solutions to its clients, including the system developed for Massachusetts?

   **Sagitec Response:**  Based on our knowledge, the Sagitec Framework/Neosurance Solution software code is completely different from the solution that was provided by Deloitte UI solutions to its clients, including the system developed for Massachusetts.  The following tables outline the significant differences between the two solutions.

   Sagitec Framework components – Enterprise Framework Services (gray box above) and Enterprise Application Management Services (blue box above) have been in existence since 2004 and implemented at 25 State and Local governments over the last 12 years.  The Sagitec Framework is consistently enhanced/upgraded by our product team to integrate technology advancements in the industry.  To the best of our knowledge, the following table highlights the technology used by the Sagitec Framework components and the equivalent offering from the Deloitte Framework:

   | Component | Sagitec Solution Offering | Deloitte Solution Offering |
   | --- | --- | --- |
   | Database | SQL Server | Oracle or DB2 |
   | Source Code | .Net 5.0 | .Net 3.5 |
   | HTML | HTML 5.0 | HTML 2.0 |
   | XML based processing for online screens | Yes | No |

   Furthermore, Sagitec's Framework provides multiple integrated features that offer the following services which are not included in Deloitte's solution framework:

   | Component | Sagitec Solution Offering | Deloitte Solution Offering |
   | --- | --- | --- |
   | Workflow Engine | Sagitec's proprietary workflow engine | 3rd party workflow engine such as FileNet BPM |
   | Batch Scheduler | Sagitec's proprietary batch schedule | 3rd party batch schedule such as Argent or UC7 |
   | Rules Engine | Sagitec's proprietary Rules Engine | None |
   | Correspondence Generation Engine | Sagitec's proprietary correspondence engine | 3rd party correspondence generation tools such as Pitney Bowes or HP Extreme. |

CONFIDENTIAL                                                                    SAGITEC-DEL_02588554



The Neosurance Solution code is developed by the Sagitec product team to execute using Sagitec Framework components – Enterprise Framework Services (gray box above) and Enterprise Application Management Services (blue box above) using the proprietary Sagitec design and development tools.  The differences between Sagitec and Deloitte's design and development tools are outlined in the table below:

| Component | Sagitec Solution Offering | Deloitte Solution Offering |
|---|---|---|
| Screen development | Sagitec Design Studio | Deloitte's proprietary tool |
| Interface File processing development | Sagitec Design Studio | Microsoft Visual Studio |
| Rules Engine | Sagitec Analyst Studio | None |
| Workflow | Sagitec Modeling Studio | FileNet BPM |
| Correspondence Development | Sagitec Design Studio | 3rd party correspondence generation tools such as Pitney Bowes or HP Extreme. |

9.  With what other Federal, State, local government entities has the Sagitec Framework or the Neosurance Framework (or any of their components) been utilized or adapted?  Describe Sagitec's activities with that government entity, including the dates that the Sagitec Framework or the Neosurance Solution (or components) project was utilized or adapted.

> **Sagitec Response:**  Sagitec's Framework has been utilized or adapted by the following Federal, State, local government entities.  Following are the names, Sagitec's activities and the dates during which the Sagitec Framework has been utilized or adapted:

| Entity | Sagitec's Activity Description | Date |
|---|---|---|
| 21 State and Local Pension Administration agencies.<br><br>A confidential list of clients can be provided upon request. | Implementation of Sagitec Framework and Neospin Solution (Pension Solution) | 2004 - 2016 |
| Washington DC Department of Employment Services (DOES) | Implementation of Sagitec Framework and Neosurance Solution (UI Solution) | Implemented in October 2014 |
| South Carolina Department of Employment and Workforce (SCDEW) | Implementation of Sagitec Framework and Neosurance Solution (UI Solution) | Planned for implementation in August 2017 |

10. Of those individuals identified in response to Question #2 above, which of those worked on Sagitec activities with government entities identified in response to question #9?

> **Sagitec Response:**  Members of the Sagitec Framework team, Neosurance Product Team and Sagitec Project Team assigned to the specific project.

---

CONFIDENTIAL



11. Has Sagitec bid on or been awarded a contract for any other UI modernization project? If so, please describe these projects, including the dates of these projects, and identify any of these projects Sagitec is currently working.

> **Sagitec Response:** Sagitec has bid and been awarded the following contracts for UI Modernization Projects:

| Entity | Sagitec's Activity Description | Date |
|---|---|---|
| Washington DC Department of Employment Services (DOES) | Implementation of employer tax services to maintain their accounts, file wages, make payments and perform UI Tax business processes. Operation and Maintenance Services. | March 2014 – current date. The Sagitec Framework and the Neosurance Solution was implemented in October 2014.<br><br>Most recent contract extension is through September 2018. |
| South Carolina Department of Employment and Workforce (SCDEW) | Modernization of SCDEW UI Tax System. Operation and Maintenance and Infrastructure as a Service provider. | May 2016 – current date; The Contract is through August 2023.<br><br>Implementation is planned for August 2017. |

> Sagitec submitted bids on the following UI Modernization RFPs and the outcome of these RFPs are listed in the table below:

| Entity | RFP Goal | Outcome |
|---|---|---|
| Tennessee | UI Benefits Modernization | Not Awarded to Sagitec – awarded to another vendor |
| Washington State | UI Benefits Modernization | Not Awarded to Sagitec – awarded to another vendor |
| Pennsylvania | UI Benefits Modernization | Proposal evaluation in progress |

12. Of those individuals identified in response to Question #2 above, which of whose worked on the other UI modernization projects identified in response to Question #11?

> **Sagitec Response:** Members of the Sagitec Framework team, Neosurance Product Team and Sagitec Project Team assigned to the specific project.

---

CONFIDENTIAL

SAGITEC-DEL_02588556



13. Documentation for the MW Consortium project data-mapping sessions, as well as the project's ER diagram, referenced the Massachusetts One-Stop Employment System (MOSES). Additionally, some of the code tables included pre-populated Massachusetts- specific county codes. Please explain why these anomalies, which have since been removed, occurred. From where and why did they originate?

> **Sagitec Response:** The Neosurance Solution includes generic tables for workforce integration due to the fact each state client requires integration with a different workforce system. As a result, these tables are not included in our base solution because the integration is specific to each state. In terms of the MOSES reference, Sagitec hired a new data conversion resource that previously worked on the Massachusetts UI implementation. During the table mapping exercise, this resource inadvertently referred to the workforce tables as MOSES due to their previous experience in Massachusetts. The workforce tables that will be included in the MWC solution will be specific to the MAC integration in West Virginia and the Geographic Solution's integration in Maryland. This integration will include a customized set of tables that will integrate with the different workforce systems in each state. In addition, the Neosurance Solution includes system code parameter tables. These tables are used to identify system parameters that are unique to a specific state. Due to the fact we have multiple implementations and we have provided Neosurance demonstrations to over 30 states, these system code parameter tables could include references to other states. During product configuration sessions, these system parameters will be configured to reflect Maryland and West Virginia business rules.

14. Are there prior versions and/or predecessors of the Sagitec Neosurance Solutions or Sagitec Framework that are built on the same technologies and/or platform on which the MOSES system was developed?

> **Sagitec Response:** No. The MOSES system was a custom developed workforce system used specifically for the Commonwealth of Massachusetts. This system was developed over 15 years ago and used legacy COBOL/mainframe technology.

15. What support can you provide for your statement in the November 10 meeting that a replication of Deloitte's source code in the Sagitec system would be "technically impossible."

> **Sagitec Response:** As discussed in our response to question #8, the technologies used by the Sagitec solution and the Deloitte solution are significantly different. The design and development process used by Sagitec and Deloitte use different tools, processes and techniques. Due to these significant differences, the replication of Deloitte's source code in Sagitec's product and solutions is technically impossible.

---

CONFIDENTIAL                                                SAGITEC-DEL_02588557



16. Please address the concern that Sagitec has been unable to make certain changes in its system requested by West Virginia during development, which suggested that Sagitec might not have access to all original source code.  In particular, the concern focused on Sagitec's unwillingness to modify its database design, such as the use of any Massive Unified Code Key table and a lack of junction tables.

    **Sagitec Response:**  Sagitec has provided responses to the concerns raised by MWC technical team regarding the database design utilized in Neosurance and Sagitec frameworks in our previous responses to these concerns.

    In summary, our database design utilizes third normal form design with the exception of few tables that utilize second normal form.  Utilization of second normal form is limited to very few instances where the data is stored temporarily.  MWC technical staff have reviewed our responses to the concerns raised and subsequently approved the Database design deliverables for the T01, B01, T02 and B02 iterations.  The unified code key table design used by our code tables is a part of the Sagitec Framework used by all of our clients from both our Retirement Solution Practice and Unemployment Insurance Practice for the last 12 years.  Sagitec has stated to MWC technical team that any tables starting with SGS_, SGW_ are part of Sagitec framework used by all of our clients and are not subject to change by the project team.  Sagitec makes changes to the database (tables starting with SGT_) and application code to address the gaps identified during the fit-gap session.

17. Is Sagitec aware of any allegations or questions raised by Deloitte or other third parties (other than those raised by the MW Consortium itself) about the possibility of misappropriation by Sagitec of Deloitte's intellectual property?

    **Sagitec Response:**  No.

18. Has Deloitte made any allegations that any partner, employee or other representative of Sagitec has violated his or he non-compete agreement with Deloitte?

    **Sagitec Response:**  No.

19. At the time Sagitec was formed, was there any discussion or controversy with representatives of Deloitte over Sagitec's use of any Deloitte framework or intellectual property or any knowledge in the possession of former Deloitte employees?  If so, what and when?

    **Sagitec Response:**  No.

20. Following DLLR's letter of July 25, 2016, or the "cease and desist" letter to Sagitec from Deloitte dated October 3, 2016, did Sagitec perform any internal inquiry or investigation into the allegations, and, if so, what if any actions were taken as a result?

    **Sagitec Response:**  Sagitec performed an internal audit of the source code to ascertain if there were any references to Deloitte intellectual property in our products.  This audit confirmed that there were no references to Deloitte intellectual property.

---

CONFIDENTIAL                                                                                                      SAGITEC-DEL_02588558



21. Are there any further steps that Sagitec can take to assure the Consortium members that concerns about possible misappropriation have no basis in fact, such as, for example, a third party source code review?

   **Sagitec Response:** We do not believe there are any additional steps to be taken by Sagitec.

   We would not agree to expose Sagitec proprietary information to a third-party in a code review. In addition, we would not agree to assume the expense of such a review. More importantly, we cannot agree to disclose to any third-party any of the confidential information that we have provided in response to your inquiries. We also cannot agree to the disclosure of even the fact that you have made these inquiries.

   Sagitec has a reasonable concern that the disclosure of this matter, and any information disclosed in this matter, could cause damage to Sagitec's business reputation. Involving third-parties would increase that risk.

   We are also concerned about our employees. Our employees have a right to be concerned about their professional reputations. There is no reason to think any Sagitec employee has done anything wrong, and it is unreasonable to suggest otherwise.

   Finally, it is our understanding that one individual's ongoing and baseless allegations are the root cause of this matter. We would appreciate your help in addressing that problem. We believe that resolving it is the best way to bring this matter to a conclusion.

   We do not believe there are any additional steps to be taken by Sagitec.

22. In Attachment N to the RFP, Sagitec responded that, at the time of Bid/Proposal Submission, it had no plans to perform any services required under the Contract outside the United States. Please explain whether, since the commencement of the Contract, Sagitec is or has been providing services required under the Contract outside the United States and, if so, what services.

   **Sagitec Response:** Sagitec has a project team of approximately 40-45 staff on site at Baltimore who work on the MW consortium project. In addition, Sagitec has a product team of 10 staff at our headquarters in Minnesota who work on the Neosurance product and support the various projects including the MW Consortium Project. Our work for the MW Consortium project is performed by these teams. Sagitec does have a Framework product team based out of our offices in India. This was disclosed in our proposal. However, our product teams in India specifically works on product development activities, Sagitec design and development tools and Sagitec Framework upgrades pertaining to our base solution.

23. Please state whether members of your product team in India are employed by Sagitec Solutions, LLC, by an affiliate of Sagitec Solutions, LLC, or by some other entity. If by anyone other than Sagitec Solutions, LLC itself, please identify each such entity and the role of its personnel in the development of the UI solution for the MW Consortium.

   **Sagitec Response:** Members of our product team in India are employed by Sagitec Solutions Pvt. Limited., which is Sagitec Solutions LLC's fully owned India operations entity. Sagitec Solutions Private Limited is a captive unit that provides services only to Sagitec Solutions, LLC.

---

CONFIDENTIAL                                                                           SAGITEC-DEL_02588559

# EXHIBIT 45

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 46

**REDACTED IN ITS ENTIRETY**