IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DELOITTE CONSULTING LLP and DELOITTE DEVELOPMENT LLC,

Plaintiffs,

v.

SAGITEC SOLUTIONS, LLC,

Defendant.

C.A. No. 23-325-WCB

**REDACTED VERSION**
**Filed: August 21, 2025**

# DECLARATION OF RAJIN S. OLSON IN SUPPORT OF SAGITEC'S OPPOSITION TO DELOITTE'S MOTION FOR SANCTIONS - VOLUME II

**(Exhibits 15 - 34)**

OF COUNSEL:

Christopher K. Larus
David A. Prange
Rajin S. Olson
Brandon A. Carmack
Demitri M. Dawson
ROBINS KAPLAN LLP
800 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500
clarus@robinskaplan.com
dprange@robinskaplan.com
rolson@robinskaplan.com
bcarmack@robinskaplan.com
ddawson@robinskaplan.com

Rebecca Bact
ROBINS KAPLAN LLP
800 Boylston Street
Boston, MA 02199
(617) 859-2740
rbact@robinskaplan.com

Dated: August 14, 2025

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Robert Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Defendant Sagitec Solutions, LLC*

# Exhibits 15 through 20 Redacted in Their Entirety

# Exhibit 21

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

________________________________

DELOITTE CONSULTING LLP,

Plaintiff,

v. Case No.

SAGITEC SOLUTIONS LLC, 23CV325WCB

Defendant.

________________________________

TELEPHONIC HEARING

DATE: Wednesday, September 13, 2023

TIME: 2:00 p.m.

BEFORE: Honorable William C. Bryson

LOCATION: Remote Proceeding

Wilmington, DE 19801

REPORTED BY: Ciarra Armstrong, Notary Public

JOB NO.: 6101336

APPEARANCES

ON BEHALF OF PLAINTIFF DELOITTE CONSULTING LLP:

JOHN W. SHAW, ESQUIRE (by telephone)
Shaw Keller LLP
1105 North Market Street, 12th Floor
Wilmington, DE 19801
jshaw@shawkeller.com
(302) 298-0700

JOSHUA L. SIMMONS, ESQUIRE (by telephone)
Kirkland & Ellis LLP
601 Lexington Avenue, Floor 50
New York, NY 10022
joshua.simmons@kirkland.com
(212) 446-4989

PATRICK ARNETT, ESQUIRE (by telephone)
Kirkland & Ellis LLP
1301 Pennsylvania Avenue Northwest
Washington, DC 20004
patrick.arnett@kirkland.com
(202) 389-5160

APPEARANCES (Cont'd)

ON BEHALF OF DEFENDANT SAGITEC SOLUTIONS LLC:

ANNE SHEA GAZA, ESQUIRE (by telephone)
ROBERT VRANA, ESQUIRE (by telephone)
Young Conaway Stargatt & Taylor LLP
1000 North King Street, Rodney Square
Wilmington, DE 19801
agaza@ycst.com
rvrana@ycst.com
(302) 571-6600

CHRISTOPHER LARUS, ESQUIRE (by telephone)
DAVID PRANGE, ESQUIRE (by telephone)
BRANDON A. CARMACK, ESQUIRE (by telephone)
Robins Kaplan LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
clarus@robinskaplan.com
dprange@robinskaplan.com
bcarmack@robinskaplan.com
(612) 349-8500

EXHIBITS

| NO. | DESCRIPTION | ID/EVD |
| --- | --- | --- |
| | (None marked.) | |

PROCEEDINGS

MR. SHAW: Good afternoon, Your Honor. This is John Shaw from Shaw Keller LLP, and joining me are Josh Simmons and Patrick Arnett from Kirkland & Ellis.

THE COURT: Okay. And who is going to be speaking today?

MR. SIMMONS: Your Honor, this is Mr. Simmons. I'll be addressing the motion to stay and motion for more definite statement. Mr. Arnett will address any questions on the motion with regard to personal jurisdiction and venue.

THE COURT: Okay. Now who do we have for the defendant?

MS. GAZA: Good afternoon, Your Honor. It's Anne Gaza and Rob Vrana from Young Conaway on behalf of Defendant Sagitec Solutions. And we are joined by Chris Larus, David Prange, and Brandon Carmack of Robins Kaplan.

THE COURT: Okay. And who will be speaking today?

MR. LARUS: Good afternoon, Your Honor. This is Chris Larus, and I will be addressing the motion to stay, and my partner, David Prange, will be

addressing the motion to dismiss and the motion for a more definite statement.

MR. PRANGE: Good afternoon.

THE COURT: Okay. All right. Very good. Why don't we start right in? I wanted to talk about -- this may not be the most logical way to proceed, but I wanted to focus first because I have a few questions on the motion to stay.

Now I will try to allow you since our time is somewhat limited, I'll give you 45 minutes, I think is what I've allocated for this. For each side, but you need to cover all the ground in those 45 minutes.

I will try to give you an opportunity to say your piece without interrupting you unduly, but I will have a few questions along the way I'm pretty sure.

So let's start with the stay motion and as for the movement for the stay. Sagitec, and in the person of Mr. Larus, why don't you tell me why in the circumstances of this case in particular, where the criminal indictment has been dismissed and right now is pending appeal but is not in place, and the defendant is not one of the criminal defendants in the

criminal action, why is this stay appropriate in those circumstances?

MR. LARUS: Thank you, Your Honor. Your Honor, we believe overarchingly that the stay is entirely warranted under the facts of this case pursuant to the multi-factor tests that are applied by the District of Delaware as reflected in the Maloney vs. Gordon and Breyer vs. Jefferson matters.

That's the controlling framework for the analysis. We note that Deloitte's opposition largely fails to apply this Delaware law, and instead seeks to apply a framework from cases outside of the district, which it claims supports some bright-line tests precluding a stay. We think that those --

THE COURT: Now I want to question you on your assertion right at the outset that I'm bound by -- I think you said something to that effect, by Delaware authority.

And normally, one district judge's opinion on something doesn't bind other district judges even in the district.

Is there something different about this area of law that would suggest that something that was said by another district court judge in Delaware would

bind the other judges in Delaware?

MR. LARUS: Your Honor, there's nothing unique about the procedural posture of a motion to stay that requires that the court be bound by an analysis applied by other judges in this district.

However, there is a framework that has been consistently and repeatedly applied by courts in this district, and that's the framework in which we present --

THE COURT: Those case -- cases being the -- the two cases that you cited being the authority that you're relying on for that consistent line of cases?

MR. LARUS: Yes, Your Honor.

THE COURT: Yeah. All right. Okay --

MR. LARUS: But even if the court were to apply the framework urged by Deloitte, as set forth in the Crest [ph] case, that case wouldn't support the kind of bright-line approaches that Deloitte urges.

So I'll move through the substantive factors, if the court would like, as laid out in the two Delaware cases we identified, but we think that the analysis, again, is not -- that even if the court were to apply the standard set forth in the Crest [ph]

case, that case would not support the bright-line analyses that are urged by Deloitte.

THE COURT: So let me -- I -- I will give you an opportunity to say your piece about the factors, the various factors.

I have read the briefs, so I am -- you don't have to walk me through the factors as a matter of first principle, but I do want you to focus on the two facts, that seem to me to perhaps distinguish this case from some of the more classic cases, in which a criminal defendant has been civilly charged and the criminal case is pending trial.

And that's sort of the strongest case for a stay, I think. In this case, there are two features that I mentioned earlier that seem different from that. One of which is that the criminal proceeding has been dismissed.

Now it may be brought back into being, but -- if the appeal is successful by the government. But for now, the criminal proceeding, except for the charges of false statement, is gone.

And also that the Sagitec is not a defendant in the criminal case in any event. So why is it that in that particular circumstance, a stay is

called for?

MR. LARUS: Sure. So let me take, if I could Your Honor, those two factors in reverse order.

While we agree that the cases make clear that situations in which a civil defendant is the party who has been indicted perhaps sets forth the clearest case for a stay, courts don't apply a bright-line test in limiting the application of a stay only to those situations.

And we have cited Your Honor to cases, especially in our reply brief, in which courts have recognized that the -- the burdens applicable and the risks applicable to a corporate defendant when critical employees or individuals affiliated with the corporation have been indicted nevertheless support a stay.

Even though in those cases there's not a complete identity between the corporate civil defendant and the indicted party.

And we cite Your Honor specifically to Medical Investment Company vs. International Portfolio and Delphi Connection Systems vs. Koehlke Components.

Both of which involve situations in which individuals affiliated with a civil defendant

were indicted, and the court nevertheless supported a stay of the civil case pending resolution of those criminal indictments.

And that was through recognition of the substantial challenges that are faced when employees who are critical to the defense of a civil action are the subject of criminal jeopardy and are the subject of a -- an ongoing criminal matter.

And that's exactly the situation that we have here. This is not a case in which there's simply some doubt about whether a corporate defendant such as Sagitec can have some employee testify on its behalf.

Deloitte's complaint in this case is focused on the actions of two specifically identified former Deloitte employees: Mr. Minkkinen and Mr. Sambasivam.

And Deloitte's complaint alleges that those two individuals took trade secrets when they left Deloitte's employ, and later utilized those trade secrets in connection with their work for Sagitec.

That's the gravamen of the underlying case before Your Honor. Those are the exact sets of facts that are at issue in connection with the

criminal investigation that is current -- or the criminal proceeding that involves Mr. Minkkinen and Mr. Sambasivam.

So there's a complete identity of the core underlying facts between the civil action pending before Your Honor, and the criminal matter that Deloitte itself has chosen to stress in front of Your Honor.

So again, and Your Honor has read the pleadings and is aware of the complaint, but as reflected in paragraph 43 of the complaint, the core fundamental assertion of Deloitte here is that Mr. Minkkinen, Mr. Sambasivam copied, downloaded, retained, or transmitted Deloitte's allegedly confidential and trade secret information.

And that's reflected in paragraph 43. Deloitte itself cites to the existence of these criminal proceedings numerous times.

At least nine times by my count in its complaint in this action, demonstrating the overlap of the fundamental facts at issue.

And in fact, when Deloitte filed its stipulation relating to the timing of certain scheduling issues in this very case, it recognized

that the criminal proceedings quote, relate to this action, and that's said at docket entry 19 at page 1.

So although there are different parties involved, the individuals who are at issue in the criminal proceedings are absolutely central to the underlying facts at issue in this case.

Now Your Honor also raised a question about the fact that certain claims against those individuals have been dismissed, and it is those claims that are up currently on appeal. But while those --

THE COURT: I'm going to interrupt for a second. Do --

MR. LARUS: Yes, sir. Yes, Your Honor.

THE COURT: With respect to the appeal, do you know whether the Solicitor General has authorized an appeal in this case?

MR. LARUS: We don't have a specific understanding. We know that there has been a -- a schedule set for the briefing in the appeal, and that --

THE COURT: Right. But the Solicitor General, as you probably know, has to authorize any appeal taken to a Federal Court of Appeals from a

civil or criminal case in which the government is the appellant.

So if the Solicitor General has not authorized an appeal or does not authorize an appeal, regardless of whether an appeal has been noted and a schedule has been set for briefing, the appeal does not go forward.

So I wonder if anybody has checked to see if the Solicitor General has in fact authorized the appeal. The posture of the case will be very different if the Solicitor General does not authorize the appeal. I think that's pretty clear.

MR. LARUS: Yes. So we are aware of that requirement, and we certainly agree with Your Honor that the posture of the case would be very different if the appeal is not authorized and does not go forward. That's only going to hasten the resolution of these criminal matters.

THE COURT: Well, except that it takes all of the arguments about the similarity between the charges against the individuals and the claims against Sagitec, if not all of it, it takes the bulk of that argument off the table it would seem to me.

So does the other side happen to know

whether or not authorization has been granted here, if I can hear from Deloitte on this?

MR. SIMMONS: Your Honor, this is Mr. Simmons. We don't have that information, but we do know a prior appeal from the same case was appealed and then dismissed before briefing occurred. I don't know what the status of this appeal is.

THE COURT: Okay. I mean it's something you can check; it's public information, so if someone wants to check with the Department of Justice if an appeal has been authorized, they will tell you.

All right. Well continue then with the argument, Mr. Larus.

MR. LARUS: Sure. So actually that's a -- Your Honor, that's a great lead into your second question, which is a question about the current status and why the current status of the criminal matter and the appeal supports a stay.

There is in place a briefing schedule. It is possible, as Your Honor just noted, that the appeal may be resolved even more quickly if the matter -- the appeal does not go forward.

But even under the schedule that's

currently set -- the briefing on the appeal is going to be completed November 10th, so this is not a lengthy process. That we expect that the matter will proceed.

But while it will proceed apace, and that the resolution of the appeal is not likely to -- you know, should not take a great deal of time.

In fact, there's information on the Fourth Circuit's website that suggests that their average time to resolution from entry of judgement is only six months.

And obviously, under the Federal Rules of Appellate Procedure, there's precedence given to appellate matters.

But while that appeal remains pending, claims against the two individual defendants who are referenced by name in Deloitte's complaint remain at issue. Those two individuals face criminal jeopardy as it relates to trade secret related claims.

And if those claim -- if the dismissal stands on appeal, then the claims against Mr. Sambasivam are all dismissed, and the claims against Mr. Minkkinen are more limited.

But until that resolution on appeal,

those trade secret related claims, which have complete overlap with the trade secret related claims here, are very much at issue and are very much likely to lead the two individual defendants to invoke their Fifth Amendment privileges.

THE COURT: Okay. I understand that, and I've -- I've dealt with this issue in my former life pretty extensively, so I'm familiar with the basic principles in the area.

But one thing that sticks in my head is that a lot of this is contingent on events that have not occurred yet, so I would ask you this. Why not continue with this civil case?

There is a lot that can be done in the civil case without having to get into deposing or otherwise seeking to obtain information from the two individuals, and why not do that until at least the time that we see we have more clarity as to the status of the criminal case.

So I'm offering to you the suggestion that it may be a course to follow to say that the stay should be done tonight, for now, but then perhaps reconsidered if things develop such that Mr. Minkkinen and -- I've forgotten the pronunciation of the other

gentlemen's name, but the two gentlemen who are under indictment.

If it becomes clear that they're in the clear, then that's one result that they argue in favor of no stay.

If it turns out that they are back in district court subject to trial, that may suggest a different result. Why isn't that an appropriate resolution?

MR. LARUS: Your Honor, first of all, the other individual's name is Mr. Sambasivam --

THE COURT: Sambasivam?

MR. LARUS: Samba -- I believe it's Sambasivam.

THE COURT: Sambasivam. Okay. I'll do my best.

THE COURT: Okay. Your Honor, we don't believe that that's the most appropriate resolution for a number of reasons.

First of all, while those individuals, who again are central to the very gravamen of this complaint, remain under the threat of criminal jeopardy, that fact impacts the likelihood that they're going to be cooperative with Sagitec --

THE COURT: Well, I understand that. I -- I start with the proposition that they will be completely unavailable to either party. Let's assume that. If I were their lawyer, I would say, "Don't talk to anybody."

That's fine, but there's a lot else that can be done in the case.

And my question to you was, why not proceed with everything else that can be done in the case, thereby not putting this case on a dead hold for an unknown period of time until we see how things develop?

MR. LARUS: Yes, Your Honor. So I think there are two reasons. One is that their particular unavailability will have an impact beyond simply their provision of documents or their ability to sit for deposition.

And for example, if this case were to proceed on a track in which certain written discovery were allowed, and Deloitte were to propound what would be entirely expected discovery, asking for the underlying facts or an admission or denial of certain facts asserted -- certain allegations in the complaint, that relate again because the gravamen of

the complaint relates to the conduct of these two individuals.

Sagitec's ability to respond to those, even in written discovery, will be severely impacted if it doesn't have the benefit of being able to talk to the individuals who are central to that fundamental allegation.

The second thing I would raise as a function of that, is that even if some limited discovery were allowed to proceed, we think there would be substantial inefficiencies in that kind of bifurcated approach, given that we're likely to have resolution of the criminal appeal within a relatively confined period of time.

Think it may be appropriate to revisit the issue -- if a stay is entered, to revisit the issue upon resolution of the appeal, at which point there would be perhaps a -- the scope of overlap would be more crystallized.

But proceeding in the interim without that ability to have these individuals participate, even to respond to basic discovery or an answer responding to specific factual allegations regarding their behavior, is certainly, we think, prejudicial to

Sagitec.

And I would add, if I could, Your Honor, just one other point that I think is germane to this. And that is the comparative burden against Deloitte or as is borne by Deloitte.

We don't dispute, and the cases are clear, that a plaintiff has some interest in expeditiously pursuing its claim. But that's not the situation that's reflected in the facts before Your Honor.

The -- the gravamen of this complaint is that these two individuals improperly took certain information when they left Deloitte's employ in 2013.

And at least by 2016, Deloitte was aware of underlying facts or alleged harm resulting from the claimed misappropriation of trade secrets, enough to write Sagitec a cease and desist letter.

And nevertheless, Deloitte waited seven years to initiate this case.

There's no -- we think if there comes a point in time in which Sagitec will be responding to the substantive allegations, Deloitte is going to face a substantial statute of limitations defense.

But even without that, there is no

showing here, the facts don't reflect that Deloitte is going to face any significant burden if there's a limited stay to allow for the resolution of these pending trade secret related issues that are currently up on appeal.

THE COURT: Okay. Mr. Larus, you've used up 15 minutes, and I'm not counting the time I'm speaking against you. Do you want to end there and let me go back to Deloitte on this issue, or do you want to keep going?

You're free to use as much time as you want, but I'm going to hold you to the 45-minute total.

MR. LARUS: Yes, Your Honor. I'm happy to end there unless Your Honor has any questions.

THE COURT: No. I think I've asked the questions that I was interested in asking, so let's go to Deloitte on this issue. And I guess that's Mr. Simmons?

MR. SIMMONS: Simmons, Your Honor.

THE COURT: Yeah.

MR. SIMMONS: Yes, Your Honor. Your Honor, Sagitec, you know -- Sagitec's request to stay the entire litigation should be denied now.

I think your suggestion that we deny it and if we get more clarity of facts later, you know, this could be an issue that gets re-raised, is fine from our perspective.

I don't think that, you know, from our perspective it would make a difference down the line, but given the lack of clarity with the appeal, which has already been pending for, I think, four or five months, and we still don't know what's going to happen there, all of those questions of uncertainty only go to buoy why the motion should be denied and the case set for discovery.

If I can just address a little bit of sort of the animating principle here.

You know, as we all know, this whole thing is about the Fifth Amendment, and whether that is going to risk something for the indicted individuals, and I guess potentially for Sagitec.

But, you know, the reason that that exists is for criminal defendants not to have to disclose their case theories beforehand. I'm sure, Your Honor, from your prior experience has a lot of familiarity with that.

But the cases are crystal clear that

it's not a mechanism for staying a case every time the Fifth Amendment could be a concern. Otherwise --

THE COURT: Yeah. I would -- I would take some issue with your suggestion that it is just to prevent the defendants from disclosing their case.

Their lawyers don't want them to say anything because of the chance that they might say something that they come to regret later, even if it doesn't disclose the nature of their defense.

No criminal defense lawyer in his right mind would have his defendant sitting for a deposition in a civil case in a circumstance in which he's exposed to a pending indictment.

I don't think that's -- that's not something that you learn after ten years as a criminal defense lawyer.

MR. SIMMONS: I certainly agree, Your Honor, that, you know, there are other reasons that a criminal defense attorney would advise his client not to testify at a deposition.

I didn't mean to suggest otherwise, but a few things that came out of this oral argument from my friend on the other side is worth emphasizing.

First of all, I think I heard my

friends admit in the oral argument that these are former employees.

So when he's talking about answering the complaint or responding to interrogatories, these aren't current employees as far as I can tell, and as they said in their prior briefing.

And so we're not dealing with the classic example of an actual employee who's been indicted. So I think that's --

THE COURT: Well, let's pin that. Let's pin that down, because that was an issue that was left a little bit up in the air.

And I think I read the materials the same way you do, that they were former, but let's just check with Mr. Larus.

Are these gentlemen still employed by Sagitec or not? We'll pin it down.

MR. LARUS: Your Honor, my understanding is that Mr. Sambasivam is still employed, albeit on leave, and that Mr. Minkkinen is not currently employed, but retains some ownership interest in Sagitec.

THE COURT: Oh. Okay. That's sufficient for present purposes. Go ahead, Mr.

Page 26

Simmons.

MR. SIMMONS: Your Honor, the second issue is, you know, despite all of the briefing and the oral argument today, I still haven't heard what specific information these two individuals have that isn't available through other means.

And I think that's where Your Honor started out. You know, there's documents, emails, other employees who worked there.

My expectation is that if we started discovery, we'd get access to the Neosurance software we've accused of misappropriation, and we'd see through the documents how Sagitec used the uFACTS trade secrets and copyrights to build it.

And so, you know, there are cases including In Re 655th and the Louis Vuitton case that talk about in circumstances like that, that's even more of a reason to deny a motion to stay.

We already talked about the speculative nature of where we are in the appeal, and of course as you know, one of our lead arguments on this issue is, you know, you can't as a corporation rely on your indicted employees to claim that the Fifth Amendment prevents a case from going forward.

Page 27

That's In Re 655th Avenue, which we cited. I know Sagitec suggested that those employees in that case did not have Fifth Amendment rights that they were going to assert, but that's wrong. They actually didn't have a civil claim to bring.

That's why they weren't in the civil case, but they did have Fifth Amendment issues, which is raised on the next page after that.

And that's why the court denied the motion, is although they weren't -- the employees, you know, had Fifth Amendment rights they might assert, they weren't in the civil case.

And it was basically the view of the court there, you know, that's a risk that you take in many different litigations. It's the same thing that came up in the SEC vs. First Jersey case.

My friend on the other side also referenced Medical Investment vs. International Portfolio case that was raised for the first time in their reply.

I'd note that there, the employee was the sole principal, and according to the court, the only witness available. So that case is really quite distinguishable from a situation where you have a

Page 28

company with many available witnesses and documents.

And Delphi similarly -- indicted employee actually was a codefendant, so the concerns that animate the normal way these cases are raised were at issue there. So from our perspective, I agree we should deny it now.

I think we'd still argue that even if these individuals, you know, were faced -- had said, you know, they have specific information they're not going to testify, I still think our position would be the motion should be dismissed at that point in time, but it doesn't change Deloitte's perspective that at least the motion as framed today should be denied.

I'd be happy to walk through the factors for Your Honor, but I know you read the briefing, so I don't want to belabor the point if there's not due -- familiar with those factors and how they play out.

Other than to just emphasize where my opposing counsel left off, which is there was a period of time between our initial cease and desist letter and bringing the lawsuit.

What Sagitec did not address in its briefing is that as we allege in the complaint in

Page 29

paragraphs six and seven, Sagitec said it didn't misappropriate, and said it did an internal investigation showing that, and that is why there was a delay.

It was not until the indictment was unsealed that we learned that, you know, at least from the government's perspective and Deloitte's perspective, that was not the case.

So to blame us for delaying when now we know the truth, and we know that they're still selling this software, particularly as it will come up in the next motion, in Delaware.

To Delaware, continuing to pitch it to other states, means that my client will be severely prejudiced by staying this case now, while a competitor is out there selling a product using their technology.

THE COURT: You're seeking, as I recall from the complaint, an injunction. Are you going to seek a preliminary injunction in this case?

MR. SIMMONS: Your Honor, we have in the complaint alleged -- or sought both in the prayer for relief.

I think what is hindering us a little

bit from deciding whether to seek a preliminary injunction is we don't have the documents, and it's a little hard to bring a preliminary injunction to Your Honor without having those.

You know, we have sort of seen the indictment, obviously. We'd like to actually know what's going on, but we're not taking a preliminary injunction off the table.

But certainly a permanent injunction is certainly something that Deloitte is seeking.

THE COURT: Okay. If that is all you have, I have read the briefs and I'm aware of the factors, so I think you have covered the areas other than simply walking through the factors, which I think would not be all that useful.

So let's move on. Actually, I tell you what. I will give, if he wants it, Mr. Larus an opportunity to rebut on this if there's anything that he would like to say. Keeping in mind that the time is moving along. Mr. Larus?

MR. LARUS: Thank you, Your Honor. Very briefly, and I will be cognizant of time.

Counsel for Deloitte has said that it was unclear to him what facts would be at issue, or we

would be obstructed from knowing in terms of if we were forced to respond now to the complaint and engage in discovery.

We would start with exactly what's reflected in paragraph 43 of Deloitte's complaint, which contains specific factual allegations regarding the conduct of Mr. Sambasivam and Mr. Minkkinen that forms the very underlying basis of this entire trade secret claim.

That's the information that we don't have access to during the limited period of time in which these two individuals are subject to criminal jeopardy --

THE COURT: Let me ask you this question. Let me ask you this question.

In the nature of things that could be done in the civil case without tramping on the rights of any indicted individuals or otherwise of getting in the way of the criminal proceedings, wouldn't it be useful as a means of moving the civil case along for discovery to be conducted, such that the source code of the Neosurance was made available to the plaintiffs, for example?

MR. LARUS: Well, Your Honor, I think

that this question bridges into the next motion or one of the sub -- future motions about our request for a more definite statement, but --

THE COURT: Okay. Well, I'm throwing this out because it seems to me that there are some things that could be done in the civil case, and this is one that comes immediately to mind, and it was alluded to, I think, by Mr. Simmons.

But I would think that that would be very revealing. If it turns out that the source code doesn't look anything like Deloitte's product, then who knows? Maybe the case is over.

If it looks exactly like what Deloitte's product is, then that would be pretty significant.

Why isn't that something that could advance the civil case without creating the kinds of risks that you've been emphasizing or presented by having two criminal defendants who are, I think we can all agree, more or less in the middle of the civil as well as the criminal case?

MR. LARUS: Your Honor, if we had a sufficient identification of Deloitte's purported claimed secrets, that type of comparison might well be

something that could move forward.

There would be some inefficiencies, perhaps, of a bifurcated discovery like that, but we would agree that that would be something that could potentially move forward. We're quite confident of what we understand the outcome of that to be.

We believe it would be appropriate only after there was a clear identification of the claimed trade secrets so that we don't have a situation in which Deloitte is obtaining discovery regarding Sagitec's perhaps most confidential information.

Poking around and then trying to identify what it contends might support a trade secret claim. But if there were a proper identification, I don't disagree that that's a limited scope that might be appropriate.

THE COURT: All right. Okay. let's move on now. I think that logically now, we've already crossed over the logical threshold, but let's move to the motion to dismiss and the motion to transfer.

Who is going to speak on that from the defendant's point of view? Is that Mr. Prange?

MR. PRANGE: Yes, Your Honor. David

Prange with Robins Kaplan on behalf of Sagitec.

THE COURT: Okay. Why don't you tell me what your view is on jurisdiction? And on this, let me just start off.

Again, I've read the cases and I've read the materials, and I think to me, the question is when you have a contract that has been negotiated and effective between two parties involving a resident of a particular state, and that contract has ongoing impact on the people in that state, that sounds like something that comes pretty close in and of itself to purposeful availment. Why not?

MR. PRANGE: Your Honor -- sorry. I got some feedback there. Your Honor, it does not come to the point of purposeful availment because that assumption and conclusion wraps in more activity than what actually has occurred.

That assumption is that the -- you are extending the effect of the contract and imputing the effect of the contract to Sagitec in this case, when in fact their only contact is to the state of Delaware.

And because the -- the contact is only to the state of Delaware, that is what ought to be

analyzed in whether there is personal jurisdiction, not the continuing flow.

But only to the point of where Sagitec had actual activity, which is to negotiate and perform a contract all occurring outside of the state of Delaware with the state of Delaware.

Now I'm not going to -- the ultimate nutshell is that, you know, Sagitec believes there should be no personal jurisdiction asserted over it by the court.

In that in fact, this -- this dispute, you know, if it has to proceed, should appropriately proceed in a different district, which would be the District of Minnesota.

I want to spend a little bit of time to talk about really, the different factors that go into the analysis when you look at what Deloitte has actually asserted are the context that should establish personal jurisdiction, and then spend probably a minute about the issue of a venue transfer for convenience.

I'm not going to belabor over what is the -- the law about personal jurisdiction; I think we all know it; we generally agree with it.

Although, I think that the one point of clarification is when you look at the analysis, there is both looking at the application of the Long-Arm Statute of Delaware and then in addition to that, there is a constitutional analysis that has to occur. Those are not over the --

THE COURT: That -- just so that we know we're on the same page here. As I understand Delaware law, and this is true, of course, of a lot of states, but I think Delaware is apparently one of them.

The Delaware courts have held that the Delaware Long-Arm Statute extends to the full extent of the Due Process Clause, and therefore, as the courts typically say in that setting, the two-part inquiry collapses into a single part, which is the due process issue. Why is that not so here?

MR. PRANGE: It is not necessarily so because there may be some nuance in the analysis of the application of --

THE COURT: Like what, for example? That -- that part of your brief, I have to say, left me somewhat confused as to whether you were saying that there actually is some role that the Delaware

Long-Arm Statute and restrictions on the scope of that statute, some role that that has to play in the analysis in this case.

And given the Delaware law, which I -- I didn't see you citing any cases to the contrary.

But given the Delaware law that the scope of the Long-Arm Statute is fully as extensive as the Due Process Clause, then I don't see where there is any room for a different outcome here other than to look at the Due Process Clause.

MR. PRANGE: Well, I think ultimately, I look at the Due Process Clause as well. I think in our initial briefing, you know, we -- we have argued, and we believe that even under just simply the Delaware statute, there is -- there is not enough to satisfy personal jurisdiction.

But really, you can go beyond that and where we have focused our argument is based on what the Due Process Clause applies.

And that gets to here, which is Deloitte has identified two separate events that it says satisfy personal -- specific personal jurisdiction.

One is a 2020 POA contract between --

Page 38

and that is where most of the -- where the venue discovery has really focused on. And the second is a 2023 pitch or RFP response that Sagitec made in response to a request from Delaware.

Now, what we know is that in Burger King, the Supreme Court case, it indicates that a single contract is not enough by itself in order to establish personal jurisdiction -- specific personal jurisdiction, excuse me.

And it -- it indicates that you have to go into more, and that the analysis should continue in order to evaluate the negotiations, the -- the obligations that are coming out of the contract, the contract itself, as well as the course of dealing between the parties.

We've gone through those in detail in our reply brief and frankly have addressed some of them also in our opening brief.

And so I'm not going to go through every one of those and the application of every one of those, because I think what it shows is that there is simply no activity of Sagitec independently reaching into Delaware in order to initiate and bring to fruition the contract.

Page 39

It occurred outside, it was based on activity that occurred outside of Delaware, and everything that -- in terms of completing the contract, including hosting as well as other training in addressing issues and questions, all occur remotely. And in fact that --

THE COURT: You -- are you taking the position -- I'm sorry. Mr. Prange, just a question. Are you taking the position that this case would come out differently if Mr. Peretto, I -- I think that's his name, had actually gone to Delaware and negotiated the contract as opposed to doing it by email?

MR. PRANGE: I think that -- not necessarily, because in this instance the initial initiation of the entire relationship came from outside and came from -- our understanding is it came from Delaware. And because of that -- that issue --

THE COURT: Why does that matter? I noticed you say that in your brief. Why does that matter? If, for example, I am trying to decide whether to buy a car.

So if I call the car agency and say, "I'm coming over to look at one of your cars," that seems to me not very different from the car agency

Page 40

calling me and saying, "Why don't you come over and take a look at one of our cars?"

In either case, the two parties are engaged in a transaction, which both are eager to commit. And why is that not pretty much the same thing?

MR. PRANGE: Because in the cases that we have seen, we have seen that there is a distinction in terms of the solicitation of whether a party and a defendant is actually injecting itself into the business of the state in which jurisdiction is asserted.

THE COURT: Well, I understand that, but what I'm having trouble with is in other words, is there a difference between a material difference?

Between -- suppose Mr. Peretto had taken the first step and written to the Delaware Department of Labor people and said, "We have this great software. We'd like to give you an opportunity to use it," versus Mr. Peretto having met the Delaware people at some place other than in Delaware, and then having said, as he did in his email, "It was great to meet you. We have some great software."

What's the difference between those

Page 41

two?

MR. PRANGE: I believe, Your Honor, that the difference is -- it gets down to who has initiated the relationship.

The cases put scrutiny on what is the starting point of the relationship, and whether that activity occurred from the defendant, who is being subject to personal -- the question is whether they are subject to personal jurisdiction and did they make an inroad into the state, as opposed to someone from the state reaching out. That in a nutshell --

THE COURT: What's your best case for that proposition? The proposition that you're now voicing.

MR. PRANGE: I will find that case for you, Your Honor. If I may continue, let me give you -- I will give you that case --

THE COURT: Yeah. Yeah. Go ahead. That's fine. And you can give it to me on your rebuttal if you like.

MR. PRANGE: Thank you. But I think the one point I want to make about the -- the factors that Burger King and its progeny identify relating to what are the various relatable aspects of the

contractual relationship, is the one about what do the contractual terms say themselves.

Deloitte in its -- in its opposition briefing cites to the forum selection clause of the contract between Sagitec and the state of Delaware.

And we submit, and as we've explained in our reply briefing and specifically identifying the Whirlpool v. Cadbury case, which is 2022 West Law 1421126 at 13, those types of consent provisions only apply to those causes of action that are identified in the consent provision itself.

Expanding is that that type of consent provision has no relationship to the analysis here, and specifically whether we have overall consented to Delaware, because those types of consent provisions are evaluated narrowly and applied narrowly that they only apply to the specific contract that is in the claims arising out of that contract.

Deloitte is not a party to that contract. In fact, what is significant here is Deloitte is not a party to the contract at all.

And it is a specifically separate business relationship in that Deloitte really has no standing in order to assert anything like that.



THE COURT: Okay. Did you want to speak to the transfer issue?

MR. PRANGE: Let me speak briefly to the transfer issue, and that is, you know -- is summarized succinctly, I think, in our reply.

The one point that is worth noting is that there seems to be agreement that there are quite a few factors that line up and support a transfer to Minnesota, which is that Sagitec is headquartered in Minnesota; their people are in Minnesota; they have access to information in Minnesota; and in fact, the only item that is cited by Deloitte as from a -- a private factor standpoint of Jamara [ph], is that it is registered -- it is incorporated in Delaware.

Now the case law is a little unclear, and it is not decided that simply because it is registered or incorporated in Delaware itself, that is dispositive.

And in fact, what the -- the cases instead indicate, is that -- and it's -- it's discussed or noted in McRo, which is M-C-R-O v. Activision, which is 2013 West Law 6571618 at note 18, is that really what is looked at instead of just simply is Deloitte incorporated in Delaware, instead



it is what is the connection of the plaintiff to the form, and the weaker of that connection of the plaintiff to the form of the lawsuit is -- instead supports that it is easier for the defendant to show inconvenience.

I'll leave it at this, and that is simply that it is all said in the complaint. And that is in the complaint Deloitte identifies activity, and all of the activity that it identifies as purportedly giving rise to its claims, has not occurred in Delaware.

It has occurred in Minnesota; it has occurred in India; it has occurred in other locations than Delaware. In fact, the information in the computer software is hosted outside of Delaware.

But going further is that the harm that Deloitte asserts is not felt in Delaware. It says in its complaint itself that the harm that it has experienced is attributed to New York.

And we submit because of that, there is virtually zero interest that Delaware has from a public perspective, and even from a private perspective, of maintaining the suit in Delaware. And it should be transferred to Minnesota.



THE COURT: Okay. Let's hear from the plaintiff on this. Let's see. Who was this going to be?

MR. ARNETT: This will be Mr. Arnett, Your Honor.

THE COURT: Yeah. Okay. Go ahead. You're on the clock.

MR. ARNETT: Thank you. And it's hard to imagine an occurrence more connected to Delaware than a contract with the state to provide software for its residents to use as you noted. You know, put simply, Deloitte alleges --

THE COURT: Well, that's a bit of an overstatement. I think I can think of a greater context than that, and so can you. So that's probably not a great way to start and to say it's difficult to think of more contact.

MR. ARNETT: Yes, sir. I will --

THE COURT: I know you'll find that if we remain partners in this case throughout the length of the case that I react badly to overstatement. So --

MR. ARNETT: Understood, Your Honor. And I will aim to get to the point here, but let me

Page 46

just pick up on, understanding that you've read all the briefing, a few points that Mr. Prange made in his colloquy with you.

At one point, it was mentioned that the activity that we attribute to Sagitec wraps in more than just the contract itself, and I think that is appropriate under the Delaware Long-Arm Statute and the Due Process Clause.

In this case, we see that according to our allegations that Sagitec built its Neosurance software using the uFACTS copyright computer program and trade secrets, then submitted multiple proposals to the state of Delaware, negotiated contract over several days to sell that software to the state.

Sagitec then worked closely with the state employees to configure Neosurance to meet their states requirements, and then implemented that software over a lengthy period of time.

Having earned revenues from that transaction, then they then went on to submit another proposal to provide additional unemployment insurance software for the state of Delaware, also based on the infringing Neosurance solution. Now that --

THE COURT: Let me -- can I interrupt

Page 47

for just a second to ask you a factual question on this.

That the evidence before me on the question of what involvement Sagitec had in the post-execution period, execution of the contract with respect to the implementation of the contract was a little thin.

I take it between, I think it was April 21st and April 29, there were negotiations. I think the contract, if I recall correctly, was signed on May 1st.

And then there's a statement in the record that an agreement was made to pay a certain amount of a monthly fee plus maintenance fees. Is there any enlightenment in the materials that I have as to what was contemplated by maintenance fees?

MR. ARNETT: Yes, Your Honor. And if you give me a moment, I can point you to the exact exhibit there. There was a statement of work that Sagitec submitted to Deloitte, and if you just give me just a moment, I can point it to you.

It is -- and just to clarify the purpose of that. The contract or the transaction was structured with both upfront fees, monthly fees, as

Page 48

well as implementation fees that would be, you know, owed to Sagitec only upon Deloitte satisfaction that the work was being completed at various milestones.

And so this was a complex transaction that had more than --

THE COURT: You mean Delaware's satisfaction. Not Deloitte.

MR. ARNETT: Correct, Your Honor. Delaware's satisfaction.

THE COURT: Okay. But I guess what I'm getting at is the argument that Mr. Prange is making is that once this contract was signed, then that was the last that Sagitec had anything to do with anything. They were out of the picture.

So this was a one-shot deal. The suggestion in the argument you just made was well, no, they were still involved in the implementation and maintenance of the contract, and I was just wondering where I would look to see what that entailed.

MR. ARNETT: Certainly. And that is in many of the exhibits that were attached to docket index 37, and I'm happy to walk through any that would be helpful. When it comes to the maintenance fees, that's actually located at Exhibit 6.

Page 49

I'm sorry. I'm wrong. It is Exhibit 5, and it is at production number 1448, which includes the price proposal, the various prices that are being paid at different milestones for the project, which include configuration, user acceptance testing, and implementation of the product.

In terms of the timeline, the remaining exhibits, you know, moving on from the correspondence in Exhibit 7 through 15, all relate to negotiation over the scope and specific terms of the statement of work.

And then it was not until -- it was not until later that year that they were able to actually announce that they had completed and implemented the software.

THE COURT: Now where is that fact reflected in the record?

MR. ARNETT: And that would be in Exhibit 19 to our motion where Sagitec and the Department of Laborer, excuse me, issued a press release stating that they had implemented the solution.

Even so, there was additional work after that time because Delaware itself actually

requested change orders. There were at least fourteen of them that they were aware over the following year --

THE COURT: And those are reflected where in the record?

MR. ARNETT: Those are compiled in one exhibit. That's docket index 37, Exhibit 28. All of the change orders that reflected Sagitec's implementation of additional features at Delaware's request occurred over that time.

And they were paid additional fees for that work as far as we can see from those records.

THE COURT: All right. Go ahead.

MR. ARNETT: To pick up on a few other things that --

THE COURT: Oh. By the way, let me ask you one other question while I've interrupted you. I think it was February 2023 contact by Mr. Peretto with the Delaware Department of Labor.

Mr. Peretto's declaration, I think, was dated May 15th or thereabouts, 2023. Do you know if there has been any further development with respect to the proposal that was discussed in that contact?

MR. ARNETT: Your Honor, our

understanding is that the Department of Labor at Delaware has not rendered any final decisions on bids that have been submitted.

So to our understanding, both Deloitte and Sagitec are still in active contention for that project.

THE COURT: Is it the case that Sagitec has submitted a bid, actually, as opposed to simply exploring the possibility of bidding?

MR. ARNETT: Absolutely, Your Honor. And we have included that RFP response as Exhibit 32.

THE COURT: Okay --

MR. ARNETT: I'm sorry. Sorry, Exhibit 32 is the RFP itself. Exhibit 33 is Sagitec's response to that RFP proposing to implement UI software for the state.

THE COURT: And what's the date of that response if you have it in front of you?

MR. ARNETT: Yes, Your Honor. That was emailed from Mr. Peretto on February 27, 2023.

THE COURT: Oh. Well that was the original date, I think. So what you're saying is that initial proposal of what was described, I think, in paragraph 16, if I recall correctly of Mr. Peretto's

declaration, was actually the response to the request for proposal?

MR. ARNETT: Yes, Your Honor. And we were only able to excerpt a fairly small portion of it due to its volume, but it is a very voluminous response.

Provides all of the terms of the scope and price, and details of the project that Sagitec was proposing to implement for Delaware.

THE COURT: Okay. Well, you can go ahead.

MR. ARNETT: Certainly, Your Honor. I want to just respond to the idea that, as Mr. Prange mentioned, that this activity was a -- side Delaware.

What we've seen from the cases, including the Burger King case, which was as long ago as 1985, recognized that activity that was purposely directed at a forum cannot escape jurisdiction simply because the defendant is not physically present.

And when we look at all of the cases that we cited on page 89 of our brief, you see that many of those defendants made the same arguments.

They did not have physical plant or material personnel in Delaware, and yet their

activities, especially when it relates to providing products that have been asserted to infringe intellectual property rates, they are nonetheless required to show up in court.

And it really is an issue of the fairness and foreseeability of the defendant's conduct bringing them into jurisdiction. I'll note that we are not arguing that the choice of law, choice of form provision is binding or that it accrues to Deloitte.

However, even the court in Burger King noted that a defendant, you know, agreement to a choice of law provision can be informative in whether or not it would be fair and foreseeable for them to face suit in that forum at a later date due to conduct related to that contract.

THE COURT: What do you think is the best case for you?

That is to say, the closest case on this question of jurisdiction predicated on activity that is not physically within the state where the lawsuit is brought, but nonetheless is deemed to be sufficient to satisfy the Due Process Clause.

MR. ARNETT: Well, Your Honor, if you'll allow me two best cases, I'll give you two, but

if I have to give you one, I would point you towards --

THE COURT: You can give me two. I -- two is fine.

MR. ARNETT: I'd point you toward the Rockwell Automation case. That's 2022 West Law 357-6231, and specifically, it's star pages 2 and 3.

In that case, the defendant never stepped foot in the state, didn't have any physical presence. They engaged in a only three-step process of a consummating sales, and nonetheless that was enough for them to be subject to jurisdiction.

I'd also point to the RMG Media LLC vs. iBoats Incorporated case. That's 2021 West Law 1227730, and this was activity that occurred solely over a website.

And it was sufficient that two Delaware residents were using the website in relation to infringing activity on the website, and that was enough for jurisdiction to lie.

THE COURT: All right. Go ahead.

MR. ARNETT: Realizing I have very little time to address venue, unless you have additional questions about jurisdiction, I will pivot

to that, Your Honor.

THE COURT: Actually, your time is -- you still have, by my calculation, almost 30 minutes. So just so you're up to date as to where you are on time.

MR. ARNETT: Understood. Okay. And I understand we also will be discussing the motion for more definite statement in a bit.

THE COURT: Correct. That's correct. So you have 30 minutes for those two motions.

MR. ARNETT: Understood. You also, Your Honor, had a question about whether or not who initiates the transaction or who starts the process that leads to the transaction is relevant.

Again, the Rockwell Automation case is pretty clear on that point.

In that multi-step transaction that was at issue there, the prospective customer actually called the seller first, and nonetheless that did not change the analysis for purposeful direction.

And finally, the one thing I would say is we agree that the Delaware courts have treated the Long-Arm Statute as coterminous with due process, and our intent in the briefing was to analyze under both.

We believe that the Long-Arm Statute provides numerous avenues for showing purposeful direction, and that Sagitec's activity falls under several different versions of those.

But, you know, as Judge Farnan said in the Tri-State case, which I think I have handy. Tri-State Energy Solutions vs. KVAR Energy Savings.

A defendant's acts should quote, not be viewed in isolation, but in aggregate within the context of the broader business arrangement contemplated by the parties. That's a 2008 West Law 5245712 at star page 5.

And that's precisely the case here. An unduly narrow focus on just the POA contract ignores the very highly integrated business relationship that Sagitec had with the state for the purpose of delivering this software to the state and to its people.

And so with that, unless you have any other questions about the jurisdiction aspect, I'm happy to move on to venue.

THE COURT: Good. All right.

MR. ARNETT: There are not too many points to make here, Your Honor. I think that when it

comes to the private factors, we obviously believe the cases are clear that a in-state plaintiff or a plaintiff that is incorporated in Delaware as Deloitte is, is entitled to treat this district as their home turf, you know, subject to any showing that there is some kind of gamesmanship or tactical activity taking place, which Sagitec has not argued, let alone shown.

As again Judge Farnan wrote in Mallinckrodt, Inc vs. E-Z-Em, "A transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of transfer."

And what we see here is at most, a small number of factors might weigh slightly in favor, but in view of Deloitte's rational and legitimate decision to litigate here, Sagitec has not shown any -- any factors that weigh strongly in favor of transfer, as they would be required to do.

So I'll turn to another item that Mr. Prange mentioned, which is the location that the claims allegedly arose. Now, I believe that Mr. Prange is misreading what we stated in our complaint.

And it's true that in paragraph 60 we do state Deloitte has suffered all the foregoing harms in New York. In foregoing, as our intent, was to

refer to paragraphs 57 through 59, which itemize some of the harms experienced.

Now nowhere in the complaint or in any of the briefing has Deloitte claimed that we are solely and exclusively experiencing harm from Sagitec's activities in New York and nowhere else.

And so I think as a misreading of the situation on the ground and completely ignores the fact that, as we just spent a great deal of time talking about, Sagitec has and continues to seek business with the state of Delaware with its software.

And thus there is a very rational and legitimate connection to this forum on top of Deloitte being incorporated here.

We also just want to point out that many of the convenience-related factors are really not as pertinent here in a case where both of the companies are sophisticated and already operate throughout the world, including doing business throughout the United States remotely and managing data that can be easily transferred.

A lot of discovery happens electronically now, and we expect that will be no different here. Moreover, the public factors that

relate to court congestion are obviously not really in play here since Your Honor is a visiting judge.

Were this to move to Minnesota, that would certainly impact -- their congestion is another factor to consider. And finally, Sagitec has not identified any cognizable public costs that strongly justify transfer for certain.

At most, they pointed to their own private costs and inconvenience, including that of retaining local counsel. For one, Sagitec did not raise that argument in its opening brief, and therefore, we think it should be disregarded.

But even so, in the Intellectual Ventures case on which they rely, that case found the parties there were quote, more than capable of bearing the additional expense of retaining local counsel, and Sagitec has not made a showing otherwise.

So weighing all these factors, none weigh strongly in favor of transfer. Several weigh against transfer, so we disagree that many of them weigh towards transfer.

And so most importantly and most important factor, which Sagitec does not dispute, is that Deloitte's choice form as a resident of the state

should not be disturbed.

How much credit that's given may be subject to dispute, but there's no dispute that we are a U.S. headquartered company that is incorporated in Delaware. So we respectfully request that the motion to transfer be denied.

THE COURT: Let me, if I could, return you for a moment to the jurisdictional question.

One case that was cited that we haven't discussed today, but I would like your views on it, is the decision from the Eastern District of Wisconsin in University Accounting Service against Scholarchip, 2017 W Law, 4877418. You're familiar with it, I assume, because it was cited in the opposing parties brief. Could you comment on that case?

MR. ARNETT: Yes, Your Honor. And --

THE COURT: The facts in that case are actually not terribly different from the facts of this case, and it does come out differently from the outcome that you're asking for in this case.

MR. ARNETT: Yes, Your Honor. Well, we would -- maybe digging into the facts would be worthwhile to show there are some differences there.

We do know that they rely on University

Accounting Service vs. Scholarchip Card.

It's a case from the Eastern District of Washington, and Sagitec's claim is that that stands for the proposition that remotely hosted and maintained websites cannot confer jurisdiction.

I do not believe that holding goes that far. One thing that was important to the court's decision in that case is that the software's end users themselves were scattered across the entire country.

That's at star page 7, and therefore had no connection to Wisconsin, the forum where the planet was attempting to exercise -- or asking the court to keep jurisdiction.

Here, however, Sagitec implemented the Neosurance software for Delaware, not a private corporation, and for Delaware residents only to use. This is unlike the party in University Accounting Service, where, you know, that defendant was -- or sorry.

Plaintiff in that case was quote, just as easily able to uproot to Alaska, Alabama, or any other state without the other party's involvement. That's also at star page 7. In this --

THE COURT: You -- you said in passing,

Page 62

I think, that there was no connection to Wisconsin. I saw on the facts of that case Wisconsin was one of numerous states in which there was a connection.

There were contracts, and if I recall correctly, and correct me if I'm wrong, but I think there were contracts entered into with Wisconsin residents as well as residents of other states. Am I wrong on that?

MR. ARNETT: I would have to look a bit closer, but the core of that contract was not centered in Wisconsin or with a Wisconsin state agency that was acting on behalf or dispensing benefits to residents of Wisconsin. That's certainly --

THE COURT: Well, that they did, but is it not also the case that you are alleging that Sagitec has engaged in a pattern of trade secret theft that includes not just Delaware, but numerous other states?

MR. ARNETT: That is true, Your Honor. And --

THE COURT: So I'm not sure I see the distinction you're drawing with the University Accounting Service case.

MR. ARNETT: Well, I think there are

Page 63

two things. One is when it comes to whether personal jurisdiction is proper or based off of the transaction with Delaware.

Even though there is a larger pattern of using the trade secrets here, this is a specific transaction that Sagitec undertook in order to get business with Delaware and to provide software to its residents. So --

THE COURT: I hear the words you're saying, but I'm not sure I understand the argument you're making. Can you run that back before me again and tell me the difference between this case and University Accounting? Because I didn't hear a difference in what you were saying.

MR. ARNETT: Yes, Your Honor. I will -- I will try to do that.

So in the Scholarchip case, the -- whereas in this instance, in order to get the business with Delaware Sagitec had to engage in negotiation with the state of Delaware, and then implement Neosurance to meet Delaware's specific requirements and work in partnership with the state to implement and make that software available, in the University Accounting Service case, the defendant there

Page 64

independently provided and hosts its own software for use broadly in education markets, and did not maintain any accounts in Wisconsin or do any business with entities in Wisconsin other than the plaintiffs.

THE COURT: Okay. Let me put the ball back into the, I guess -- let's see. I've lost track of who -- Mr. Arnett [sic], I guess, is the lawyer that's arguing this point for Sagitec, and give him an opportunity for rebuttal.

MR. PRANGE: Your Honor, briefly, this is David Prange for Sagitec --

THE COURT: Oh. I'm sorry. It was Mr. Prange, yeah. I lost track of where I was in my notes. Yes, Mr. Prange. Sorry.

MR. PRANGE: No problem. It may be an honor to be called Mr. Arnett. I'm not sure --

THE COURT: Well, I -- I won't go there. So let's see if you have anything that you'd like to raise with respect to this issue.

MR. PRANGE: Well one, I want to do my homework first, Your Honor, and provide you the case. The best case, I think, that addressed your question earlier, and that is Seiden for South China Livestock Inc. vs. Schwartz, which is 2018 West Law 5818540.

Page 65

It's a district of Delaware case from 2018. I want to comment. I'm glad that the University Accounting Service case came up because I think it is necessary also just to provide some clarification to our argument that we are not taking a narrow view of what has occurred.

It -- it is based on the POA 2020 contract, there is the development and provision of services that are hosted outside of Delaware. They're hosted in Virginia on behalf of Delaware, and that activity is occurring outside.

And that there are these additional activities, which is providing support services, providing hosting services, all which are remote.

Which is why the University Accounting Service case is, as Your Honor has observed, is very similar because in that case, similarly there is the remote development, there is the remote implementation, and there is the remote additional support services that are provided by the defendant, which is Scholarchip Card.

In fact, that case even goes -- in terms of getting to the point of finding that there is no personal jurisdiction, there's even the fact in

that case that the defendant there actually went and negotiated with University Accounting Services in Wisconsin, which is different from the facts here where we have no footprint in Delaware.

And -- and while those services then are spread out all over the country, presumably they are also in Wisconsin because they do not say that they are not. I think --

THE COURT: Okay.

MR. PRANGE: I can leave it there. I think the only other comment I have is at least on Rockwell Automation in these cases that are cited about activity in the state, those are generally cases where there is other activity of the defendants of reaching into and offering services and/or supplying services to Delaware residents.

That's not the case here. In this --

THE COURT: Okay.

MR. PRANGE: -- it's important to be cautious on the application of those cases that have been cited by my friend.

THE COURT: All right. I think we probably should move on to the last issue, which is the motion for a more definite statement. So I think

Mr. Prange, are you up on that one?

MR. PRANGE: I am up on that one as well, Your Honor.

THE COURT: Okay. Why don't you go ahead?

MR. PRANGE: Thank you, Your Honor. As my partner --

THE COURT: You have got about 11, almost 12 minutes.

MR. PRANGE: Thank you, Your Honor. As my partner and colleague Mr. Larus has already alluded to, we believe that there ought to be ordered a more definite statement provided by Deloitte on the scope and description of its trade secrets.

They are encompassed, while having been developed over, I think, a decade, and spending millions and millions of dollars, they are described in approximately 400 words and 5 paragraphs.

I think that's striking considering how long they have spent in terms of developing it, that it suggests to me that there ought to be a lot more detail that can be provided, but there is not.

In the Third Circuit, it is clarified in the Oakwood Laboratories case vs. Thanoo, 999 F.3d

892 that there is both a substantive requirement and a procedure requirement to pleading a trade secret that is allegedly misappropriated.

Here as we've detailed both in our opening brief and in our reply brief, Deloitte fails at both of those. I want to spend my time though, so I can reserve a few minutes in order to rebut, focusing on the substantive requirement.

Because even going through and reading Deloitte's opposition and even the sur-reply, the substantive obligation that they have is never addressed.

And on that basis alone, Deloitte ought to be ordered to provide a more definite statement to provide shape and understanding of what exactly the trade secrets are that they are asserting have been misappropriated.

Oakwood observes that not only does it have to satisfy the procedure requirement, which is defined in 12E, but also that the pleading has to describe what is the trade secret with enough particularity to separate it from matter of general knowledge or knowledge of one's skill in the art.

That separation is separating and

identifying what is specifically potentially a trade secret versus information that is agreed on that is not a trade secret.

So by extension, you can look at other opinions that then say certain information that is identified cannot be a trade secret. And Deloitte expresses apparent confusion of why we are citing to other cases that are at other procedural postures.

Those cases identify, and one is for example Agency Solutions vs. Trizetto Group, which is 819 F. Supp 2D1001, which is an Eastern District of California case from 2011, as well as IDX Systems, which is at 285 F.3d 581, a Seventh Circuit case from 2022.

They make the point of what cannot be a trade secret. And so applying those and you look at what is identified by Deloitte, it circles around and uses terms and phrases that are not trade secrets.

And because of that, that failing there is a substantive failing of the pleading, and it needs either to be dismissed or in our case, we can't quite understand what it is, and we ask for a more definite statement before we can make a decision on that additional motion.

THE COURT: Given the notice pleading provisions of the federal rules, why isn't the question of specificity, at least on facts such as this case, one that's best postponed until discovery?

MR. PRANGE: Because from -- Your Honor, there is a -- while there is a notice pleading standard within the federal rules, that doesn't allow you to simply say anything that you want.

And you have to provide to us the proper notice of the grounding of the trade secret.

What is -- that you are talking about. That's exemplified in a number of cases where parties submit trade secret -- or identification trade secret of additional information, either attaching documents or other things in order to provide that definition.

And failing to do so and just simply addressing it in discovery, simply what that can do and what we'll do here is create more confusion.

And creates a problem where there is not enough definition around how it is and how do you approach discovery. I think the other point on from a pleading standpoint --

THE COURT: How about a contention interrogatory? If you have a contention

interrogatory, you ask with specificity what exactly is the convention that was the trade secret that was appropriated in this case.

Then you get an answer with, perhaps, I would expect more specificity than what would appear in a pleading.

I'm not sure why you are prejudiced by having to wait until the contention interrogatory for your more specific answer, as long as the pleading at least gives you a general idea of what the nature of the claim against you is.

MR. PRANGE: The need for having more specificity within the complaint and not waiting until discovery is that with the vague and ambiguous statements that exist right now, we cannot challenge the plausibility of the complaint.

We can't make that determination of whether anything is actually said, and that becomes apparent when you look at the allegations itself, which indicates that the apparent alleged trade secrets are information that is publicly disclosed, either through the operation of the software from users looking at the software.

That information cannot be a trade

secret, so it becomes a moving target and completely unclear.

Ultimately, what this is is that this -- the question you have reflects what is also the issue that had been in the criminal case.

And the defendants in the criminal case, the indicted gentleman, moved for a bill of particulars to ask the government to identify specifically what are at the trade secrets that are asserted to be stolen from Deloitte.

At the hearing, the -- the government stated to the court that it would have to again confer with Deloitte in order to gain an understanding of what that would be.

And after that point that the court ordered a bill of materials to be provided, the claim for the theft of Deloitte's trade secrets was dropped.

We think that's a problem, and that's why we ask now for that identification of what are the trade secrets that are being asserted because we think we need that clarity in order to figure out whether there is actually anything that is a trade secret in view of publicly disclosed pieces of that system. As well as, as we've identified in our reply briefing,

that much of these systems, having been developed by federal government money, are themselves -- the ownership of that is ceded to the government.

And because of that, we don't believe and we very much are going to be investigating whether any of this is actually owned by Deloitte.

THE COURT: Right. But that's not something that you can fairly expect to show up in the pleading, I would think. I mean, you can't expect Deloitte to say, "Well, you know, a lot of this is owned by the government."

That's something that seems to me it has to be developed over the course of the litigation. I can't -- I can't see that that's a problem with the pleading.

MR. PRANGE: Your Honor, some of that meat may have to be put in through further discovery, but it leads back to the plausibility issue of the complaint.

And we want and believe that we are entitled to more definition of what the trade secrets are so we can understand both the scope of discovery that they may ask of us, as well as to understand whether there is anything that is actually asserted.

In view of both the relationships between the -- the government and Deloitte's predecessor BearingPoint, as well as the information and how it gets disclosed through use of the system.

THE COURT: Okay. Anything else for now or do you want to save the rest of your time for rebuttal?

MR. PRANGE: I will save the rest of my time for rebuttal, Your Honor. Thank you.

THE COURT: Okay. Let's go back to Deloitte, then. Let's see for Deloitte. I guess, Mr. Simmons, are you going to speak to this issue?

MR. SIMMONS: Yes, Your Honor.

THE COURT: All right. Go ahead.

MR. SIMMONS: Okay. Let me start with my friend on the other side seems to, in oral argument, this wasn't I think clear from the briefing, want a more definite statement to get more detail to test the plausibility.

But they didn't move to dismiss. The time to move to dismiss has passed. And the request for more detail is exactly the kind of request that the core in Gordian Medical vs. Vaughn, which we cited in our sur-reply, says it is inappropriate. The

question is, is this unintelligible. If you're asking for more detail, you're out. Rule 12E is not the place to do that.

THE COURT: Let me ask you this question, and I think he can speak for himself, but I think your opposing counsel will say that the reason they didn't move to dismiss is because they found the pleadings to be insufficiently specific to know what they were shooting at.

But suppose your complaint had simply said there has been a theft of trade secrets in connection with the provision of the software involved in this contract. You think that would be sufficient to satisfy your pleading obligations?

MR. SIMMONS: I don't think so for two reasons. One, that sounds like most of that allegation is a legal conclusion. Counts as a factual assertion, and two, that wouldn't go as far as the Third Circuit required in the Oakwood case that my friend was citing to.

But that's not our case because our allegations in the complaint go so far beyond what the Third Circuit in Oakwood found to be sufficient.

And I know Your Honor has read the

briefing, and I'll just cite you to page 907 of the Oakwood decision, where the court lays out what the allegations were that's about three sentences.

And we, instead of having, you know, three sentences, which are, you know, fairly similar to what we wrote, you know, we have specifically identified what our trade secret is in three categories.

We've described the categories, we've gone into detail in additional paragraphs, and even when you get to the misappropriation paragraphs at 46 through 48 of the complaint, we describe it in more detail and even start talking about specific documents, which notably, the document that we referenced, the uFACTS solution framework, which is the hundreds of pages of detailed descriptions of functionality, that was the same document that when Sagitec in reply put in the superseding indictment, that's the same document that it turns out was misappropriated.

So, you know, we're so far beyond what Oakwood did. Now, I think practically, Your Honors' questions are where my head is at, which is the way to approach this is they can answer the complaint based

on the information they have.

If they say, you know, "Oh. We don't have knowledge or information of your trade secrets," the normal way to do that is you say, "I deny knowledge or information of your trade secrets."

And then they will no doubt ask a contention interrogatory, which we will respond to.

We will issue requests for production, and I'll note this came up on our first go around of the motions, the suggestion of "Oh. Could they turn over the source code?

"You know, source code would be useful. We also would want the design documents," because I suspect there's emails back and forth of using our material.

But usually in a trade secret case, that's sort of the procedure. We say, you know, here's some detail. They say, "Give us more."

You know what, with a protective order in place and a contention interrogatory, and we say, "Give us some documents." And you go back and forth, and these issues are eventually addressed in summary judgment.

And, you know, we're happy to go into

Page 78

discovery and provide, you know, contention interrogatory responses.

We think that's appropriate, but to ask us in a public complaint to sort of before we can even get the benefit of sort of going into discovery, that's just asking a lot of, not just Deloitte, but any trade secret owner who would have to go into such great detail in their complaint.

And that's exactly what the Third Circuit in Oakwood didn't want people to be doing. That, you know, as Your Honor is probably aware, the District Court --

THE COURT: Yeah. I've read that passage that you relied on, and then the catch 22. I don't remember if they used that expression, but that's the gist of what they had to say, I think.

MR. SIMMONS: That's correct. And then just to address my friend's references to -- well, two things. I want to address his references to sort of the substantive arguments, and then the bill of particulars issue.

On the substantive arguments, even if there were public information or pieces of this that were not owned, we've alleged that we own the non-

Page 79

public material in the complaint.

There's no question about the ability to understand that's what we're asserting.

And the Third Circuit in Mallet [ph], which is one of the cases they cited in their opening brief, makes clear that when you combine public material with non-public material, you can have a combination trade secret that's confidential.

As you can imagine for software that's typical because the computer programming language might be C++, which is publicly known, but then my particular implementation of that is the trade secret.

So it's not uncommon to have those things, and what normally happens is a defendant through discovery points them out and says "Oh. Here's these things that are public. Show me why the, you know, overall combination is not public," or is, you know, it's a trade secret.

And again, that's what happens in discovery. In terms of the bill of particulars issue, two things. One, that came up after the government had the benefit of years of investigation and discovery.

So they were much further along than

Page 80

Deloitte is at the start of the case.

And two, the government's theory there was that the software was the trade secret, and the Magistrate Judge was hostile to the idea that despite the -- all of the discovery they had had, that you should be describing the software at that level.

We don't think that's correct certainly under Third Circuit law under Mallet, but regardless, there was a disagreement between the government and the Magistrate Judge in that case that resulted in the bill of particulars fight.

We're nowhere near that. That sounds like summary judgment discussions at the end of discovery, rather than here at the start of the case when we are just asking to get in the door.

And we think that the motion for more definite statement should be denied as a result.

THE COURT: Okay. Let me give Mr. Prange an opportunity to have rebuttal on this. Mr. Prange, you have about three and a half minutes.

MR. PRANGE: Thank you, Your Honor. I want to begin simply at the point of the -- the scope of identification. And Oakwood indicates -- and as that as the example and really the floor that my

Page 81

friend of the court has used to say that he has gone so far beyond that, and Deloitte has gone so far beyond that in identifying it -- what their trade secrets are.

Now one, Oakwood indicates that actually, there is a very specific document that they point to in that which is described in as page 907 or noted at 907.

And at least in the case of the complaint here, we only have generalities that are used. General types of documents and not a specific document.

And the cases that are cited, including ones that Deloitte indicates they have done more, if you look at those cases, they have actually attached the documents.

Attached information, and I would submit they could be attached under seal in order for us to understand what it is that they are asserting is the actual trade secret.

So in that case, I think what I hear is that, "Oh. We should just rush to discovery."

And that ignores the substantive obligation of them actually making a disclosure of

what their trade secrets are, rather than describing generalized categories, which the cases that we have cited in our brief have said that is not enough.

But really it gets to the practical point of the problem, which is, from what I have heard today, is that Deloitte wants to go on a fishing expedition.

What they want to do, and the concern that we have, is they want to get to discovery in order to have a disclosure of our source code, in order to look at that, and tailor their identification based on what our source code does.

That's not appropriate. What is appropriate is that right now Deloitte should be able to identify exactly what their trade secrets are because that is what it means when they sign the complaint; is that they have done their due diligence to say they have trade secrets.

If that's the case, then they can disclose them now.

And so that we don't have this issue, so we can understand the plausibility of their complaint and figure out whether they are actually stating something that we can then go either to

challenge on a 12C motion or proceed into discovery. Thank you, Your Honor.

THE COURT: All right. I tell you what? I would like to hear from Mr. Summers briefly on one point that was raised in rebuttal that I think had not come up before or at least had not come up with specificity, and that is the reference to the specific document in Oakwood that Mr. Prange alluded to.

Mr. Simmons, do you have any response on that point?

MR. SIMMONS: Yes, Your Honor. So I think the document was just one of the allegations.

There were other -- you know, the court actually describes in page 907 a variety of things that it said are sufficient, including the description and the document.

But as I said in my opening remarks, we did reference a document. We referenced the uFACTS solution framework documentation at paragraph 48 of the complaint.

And that document is hundreds of pages of detailed descriptions of the functionality of the uFACTS framework, and we allege that Sagitec took it,

and used it to build Neosurance.

And what I would say about that is, you know, we think our other allegations are sufficient, but even that, you know, is in line with Oakwood.

And I would just direct the court back to the You Map vs. Snap case that we cited in our -- in our briefing, which said that if you find that there is sufficient trade secret identification for anything, then the better course is deny the Rule 12E motion because we're going to end up in discovery anyway.

And it sort of is putting the cart before the horse and delaying the case, which is exactly why the case is like Shadler, "Hey. You shouldn't be spending the courts time on a motion for more definite statement if it's just going to delay the case."

THE COURT: Okay. All right. I think we've exhausted the subject matter, if not all of us and the court reporter, but thank you for your arguments. And I thank the court reporter for hanging with us on this.

It was a long session, but I think one that had a lot of substance in it, and I appreciate

the attorney's presentations.

What I'm going to do is I will adjourn the session, and then I will stay on the line for a couple of minutes with the court reporter to help out if there were any case names or names of parties or other things that the court reporter may not have caught and try to assist. So for now, we're adjourned, and off the record.

(Whereupon, at 3:44 p.m., the proceeding was concluded.)

Page 86

CERTIFICATE OF DEPOSITION OFFICER

I, CIARRA ARMSTRONG, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or ot outcome of this action.

CIARRA ARMSTRONG
Notary Public in and for the
State of New Jersey

Page 87

CERTIFICATE OF TRANSCRIBER

I, EBELIN MORALES, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

EBELIN MORALES

# Exhibit 22

Discovery Dispute

Deloitte Consulting, et al. vs. Sagitec Solutions

Civil Action No. 23-325-WCB

Moderated by Honorable William Bryson

Monday, February 24, 2025

10:00 a.m.

Remote Proceeding

Wilmington, DE 19801

Reported by: Carlo Florio

JOB NO: 7187375

A P P E A R A N C E S

List of Attendees:
Andrew Russell, Shaw Keller LLP
Nick Teleky, Kirkland & Ellis
Patrick Arnett, Kirkland & Ellis
Stephany Kim, Kirkland & Ellis
Anne Gaza, Young Conaway Stargatt & Taylor, LLP
Robert Vrana, Young Conaway Stargatt & Taylor, LLP
Christopher Larus, Robins Kaplan LLP
Rebecca Bact, Robins Kaplan LLP
Rajin Olson, Robins Kaplan LLP

P R O C E E D I N G S

THE COURT: All right. This is a discovery dispute in Deloitte Consulting, LLP against Sagitec Solutions number 23-325 District of Delaware.

Let's hear who we have for the plaintiffs and then for the defendants. The plaintiffs could identify themselves and let me know who's going to be speaking.

MR. RUSSELL: Good morning, Your Honor. This is Andrew Russell from Shaw Keller for Plaintiff Deloitte. And with me on the line are Patrick Arnett, Nick Teleky, and Stephany Kim from Kirkland & Ellis. Mr. Teleky will be arguing for Deloitte.

THE COURT: Okay. Mr. "Geleky," let me make sure I have -- oh, Teleky. Yeah. All right. Teleky.

MR. TELEKY: Good morning, Your Honor.

THE COURT: Good morning. All right. And who do we have for Sagitec, et al.?

MS. GAZA: Good morning, Your Honor. It's Anne Gaza from Young Conaway Stargatt & Taylor. I'm joined by my colleague Robert Vrana as well as Christopher Larus, Rebecca Bact, and Rajin Olson of Robins Kaplan. Ms. Bact and Mr. Olson will be

presenting on behalf of Sagitec.

THE COURT: Okay. Well, I've read your briefs and I've read into some of the rather voluminous appendices that you've gifted me. And I have some points on which I may be able to rule right here, and some points that I may have to, depending on how the argument goes, may have to take under submission.

But let's see how much ground we can cover now. I want to begin with the Deloitte request for depositions for additional people.

But before I get into the merits of that, please update me on the status of the criminal case against Mr. Minkkinen and Mr. Sambasivam. Maybe, well, Deloitte, it's your request, so why don't you tell me what you know about the state of that criminal action?

MR. TELEKY: Yeah. Sure, Your Honor. So our understanding at this point is that there's been a -- there was a motion to dismiss that went up on appeal on the fourth, to the Fourth Circuit. And we're still waiting on a decision from the Fourth Circuit as to the status of that appeal.

THE COURT: When was it argued?

MR. TELEKY: I believe it was last May. I have that right.

THE COURT: Yeah. Everybody, I recall when the stay application was made, everybody was saying, "Oh, this will all be wrapped up in a few more months." I was skeptical, and I think my skepticism appears to be well founded.

All right. So Mr. Minkkinen and Mr. Sambasivam are still hanging out there without knowing exactly what their situation is going to be.

All right. Well, Deloitte, I understand your arguments with respect to the first two witnesses. And Mr. Lanterman and Mr. Madell, I guess, are the names. But I think I have some real qualms about your request with respect to Minkkinen and Sambasivam.

So it seems to me based on, certainly, on many years of experience in criminal law, that there is not a snowball's chance in hell that their lawyer is going to permit them to sit for a deposition in a civil case. So what you're looking at, I think, is an exercise in futility.

Now, you said in your papers that you want to establish the bounds of their privilege claim.

Page 6

Well, my supposition, which you may or may not yet have confirmed, is that their lawyers will probably allow them to say their names and maybe allow them to say their addresses.

But everything south of that is going to be, "Sorry, we're going to assert our Fifth Amendment right against compelled self-incrimination." Do you have any reason to think that is not the case?

MR. TELEKY: Your Honor, I mean, based off of our correspondence with Counsel, I think it's probably very likely that that is what will happen. They'll assert the Fifth Amendment and go from there.

And so I think our concern there is that because we've been requesting information and trying to get information from Sagitec and from their witnesses about the use and possession of Deloitte's materials, is that now that it's become clear that Sagitec simply doesn't possess some of that information.

It's important for us to be able to make the record of, "Well, these are the two folks that Sagitec has pointed us to, and they're taking the Fifth Amendment." And so that way we can make use of that testimony or lack thereof as the case goes on.

Page 7

THE COURT: Well, as far as making use of it, I certainly regard -- if the lawyers have made representations to you of what's going to happen in any deposition, as far as I'm concerned, that's good enough to establish that that in fact is what's going to happen.

Particularly in light of the circumstances, because there's just no way that they're going to suddenly change their mind and say, "Oh, fellas, why don't you go in and just spill the beans?" That's not going to happen unless there's a dramatic change in the situation in the criminal case.

So for now, at least, and I think this is -- I can't imagine a circumstance in which that would change. I don't see that there's any real need for you to go through what seems to me a pointless exercise; pointless, but nonetheless expensive, for both sides.

Exercise of bringing them in for a deposition, having them claim the Fifth Amendment to everything, and then saying, "Okay, we have made our record."

As far as I'm concerned, you've made your record if you have a representation from their

Page 8

lawyers that they're not going to testify substantively.

So and as far as for later events that you alluded to, I cannot imagine that the fact of the criminal prosecution against these two is going to be an admissible piece of evidence for either side here.

Their absence, if anyone wants to make an issue of it, I will try to find a way to make the absence of these two as neutral a factor in the case as it can possibly be made under the circumstances.

These situations arise with not that unusual -- they're not that unusual and not that infrequently.

So I have seen the situation arise before and I think the best way to handle it is just not to call them in for the pointless exercise of having them assert their Fifth Amendment privilege, but also to prohibit either side from making use, whatever use it might think it could profitably make, of the fact that they have been under criminal indictment.

Now, does the -- Sagitec, do you have any problem with that lay of the land?

MR. OLSON: Your Honor, this is Rajin

Page 9

Olson on behalf of Sagitec Solutions. No, we do not have a problem with that approach.

THE COURT: All right. And, Deloitte, you understand where I'm coming from. I know you would, at least as of your papers, you would like to have the deposition, but would you like to make any further argument on why you should be entitled to that deposition?

MR. TELEKY: No, Your Honor. I think we understand the Court's guidance. I guess one question I might have is whether it would be appropriate for us to try to seek some sort of a stipulation or a representation from each attorney for the criminal defendants as to that effect.

THE COURT: You can seek a stipulation from the attorneys if you are concerned that the letters that you've received -- I take it you've received letters. Did I hear you right?

MR. TELEKY: That's right.

THE COURT: Yeah.

MR. TELEKY: At least from Mr. Sambasivam's attorney.

THE COURT: If you think that the letters are insufficient, you can seek a stipulation.

Page 10

As far as I'm concerned, I think the letters are sufficient. But that's something that if you wish to seek it, I certainly wouldn't discourage you from doing so.

All right. Now, the other two. Frankly, I've dug into the case law on this a bit and I understand the basic principles here, which are pretty sensible, that ten is a reasonable starting point subject to court orders, allowing more under certain circumstances.

One of the circumstances, and in fact in some of the cases one of the principal circumstances, is if the party seeking additional depositions can point to the prior depositions as having been necessary. And so as to form a predicate for the need for additional deposition.

Now, of course, you were limited in by pages, so you weren't in a position to write me ten pages of explaining why your prior ten witnesses were necessary. But that's the one thing that I wanted to use this opportunity to see if you have something to say to fill that gap.

So if you want to comment, I don't really have you to go into great detail, but if you

Page 11

want to comment on the ten witnesses that you have already called or otherwise provided the intent to depose, you can do so.

MR. TELEKY: Certainly, Your Honor. So the other ten individuals that have been deposed so far are different Sagitec employees that have different roles in the company, in different experience using or being part of the development of the Sagitec's product at issue.

So of those 10, one of them is Sagitec's 30(b)(6) witness, or 30(b)(6) deposition. Four of them are developers that worked on different parts of the UI solution after leaving Deloitte's team. And all of them were part of sending and receiving Deloitte material while they were building Sagitec's product, from the documents we've seen.

THE COURT: They were prior Deloitte employees?

MR. TELEKY: That's right, Your Honor.

THE COURT: So that's four?

MR. TELEKY: Yes, Your Honor. That's right.

THE COURT: Not counting, of course, Minkkinen and Sambasivam?

Page 12

MR. TELEKY: Right, Your Honor.

THE COURT: Okay. So we're up to five.

MR. TELEKY: Then one of them is the head of Sagitec's unemployment insurance business unit right now. Knows a lot about sales, marketing, the business strategies. One of the individuals focuses on marketing and sales.

And then two of Sagitec's senior partners and Sagitec's CEO, who each were identified as knowledgeable by Sagitec about different parts of Sagitec's business, the sales, the recruitment of Mr. Minkkinen and Mr. Sambasivam and those other employees, and then the possession and use of Deloitte's material.

And so in our view, these 10 individuals, including Sagitec's 30(b)(6) deposition, all have different knowledge on the different scope of the use of this material, how it came to be used or possessed. And then other questions about the sales and marketing of that.

These are people that, at least I think it's six of them if my count is right, were actually brought up by Sagitec in their own initial disclosure. So only a few of them are folks that those developers

Page 13

I mentioned that were all over the documents around the use and possession of these materials.

And so our view is that these ten people were themselves necessary and reasonable in trying to figure out in this very complex intellectual property litigation exactly what is the scope of what happened, what material was used, what material was possessed, and what did Sagitec know about that.

THE COURT: All right. Let me hear from Sagitec on this.

MR. OLSON: Your Honor, I would agree generally with the identification of the ten witnesses that Mr. Teleky listed. I think where the rub is for Sagitec is the four developers that he identified. These are not developers that Sagitec listed on its initial disclosures.

There's certainly emails that refer to these developers, but our position is that Deloitte has not shown that those depositions are not duplicative and cumulative of each other and of Sagitec's 30(b)(6) deposition. From our perspective -- sorry, go ahead, Your Honor.

THE COURT: Yeah. Well, my concern here, and it was featured in Deloitte's response, is

that Mr. Kotcherlakota, I believe his name is --

MR. OLSON: That's right.

THE COURT: -- in his testimony, pointed to these two individuals as having knowledge on subjects that he had been called to testify on, but either declined or lacked the knowledge to testify, and pointed to them.

That seems to me an invitation almost for saying, "Go talk to those folks." I view that as pretty strong evidence that these folks have some information that they have sought but have not been able to obtain in the 30(b)(6). So that's my concern on Lanterman and Madell.

As far as the case law goes, you've cited a number of cases, but when you actually look at the cases, and I've read them, quite a number of them actually do permit additional witnesses even while articulating the correct standard.

The standard being you must show that you actually need them, you must show that you are not backloaded, your list, so that the first ten are people you don't really care about, but you really want to have additional witnesses, so you put those into the ones you really care about into the add-on

list.

That does not strike me as this case. And as I say, many of these cases have been reasonably flexible about allowing additional depositions.

Now, the ones that have not, by and large look quite different from this case. They have involved one case in which the party sought 75 additional depositions, another one I think 26 additional depositions, and many of them looked conspicuously cumulative.

This does not strike me that that way. So I think I'm going to -- what I'm going to do is argue, or rather order, that the depositions of Lanterman and Madell be permitted, not Minkkinen and Sambasivam, and that they should be held promptly.

Now, I don't know what the schedule is that they could necessarily meet, but "promptly" to me means in the next couple of weeks. Now, that would involve an extension of the period for fact discovery, but I think it's justified in this case.

And rather than putting an artificial date out there, I will rely on the parties to work together in light of the witnesses' schedules to come up with dates for this testimony.

I don't want it to be put off for a long period of time, which would interfere with other scheduled events in the case.

So that, as far as I'm concerned, is what all that needs to be said about the Deloitte request.

Now, with respect to Sagitec's requests, these are more difficult in the sense that they are more technical. And I would like to hear from the parties on these.

And particularly, let me start by asking Deloitte. How many 30(b)(6) topics did you request testimony on, Deloitte?

MR. TELEKY: I'd have to go back and check to get the exact number, but I believe it was in the ballpark of around 50.

THE COURT: Fifty. Okay. Well, these kinds of numbers are to me, 50, and in the case of Sagitec, 127, are mighty large. I don't know what your experience is, but I've been sitting by designation for now, I guess, 14 years.

And I've seen a lot of disputes over 30(b)(6) topics and so forth. I've never seen 127 topics. So this has, I have to confess, affected my

eagerness to allow even marginal topics.

127 is a mighty large number. For that matter, 50 strikes me as quite a large number, although not obviously as great as 127. But I don't know whether that has become fashionable these days to serve those kinds of numbers.

But if it has, then it seems to me the district of Delaware needs a new local rule limiting the number of topics in 30(b)(6) settings, because the same exact thing that happened with regard to interrogatories and with regard to depositions may be happening with respect to 30(b)(6) topics.

Some districts do have such a rule. The District of Utah, I've noticed, has a rule that limits the number of topics to 20. Subject, of course, to the courts expanding the number upon request.

But for -- I don't know if there's going to be any future need with respect to me at least. But if you want one data point of one judge that has a reaction to numbers like 127 and even 50, it's surprise and a reluctance to indulge that type of claiming.

Now, having made that speech, I will

Page 18

allow Sagitec to explain to me why 127 is a reasonable number of topics.

MS. BACT: Thank you so much, Your Honor. Rebecca Bact for Sagitec. And I appreciate very much that 127 is a large number. This --

THE COURT: Have you ever encountered a larger number?

MS. BACT: I have not personally.

THE COURT: Okay.

MS. BACT: And I appreciate your observation there, Your Honor. The intention behind our long list of topics, which is long, was to give very precise information to Deloitte's corporate representative as to what we hope that they could prepare on.

And many of these topics are overlapping. Many of them are just slightly different flavors of each category of information. And this was intended such that we would not have to get into arguments over what we were actually seeking via our topics.

And in fact, the topics that we are asking Your Honor for assistance with today are in two categories, which perhaps we could have collapsed into

Page 19

single topics. When we were serving our notice, we made a strategic choice to give precise direction that ended up resulting in a long list of topics.

So that's why we ended up with, you know, over 100 topics. May I address the specific categories?

THE COURT: Yes. Yes, please do. I was going to -- just wanted to give you an opportunity to respond to my venting there.

MS. BACT: Not taken at all as venting and very much appreciated to understand where you're coming from, Your Honor.

So the two topics, or the two -- I shouldn't say the two topics, the two categories of topics that we're interested in Your Honor's assistance with relate to the ownership of the asserted intellectual property and to the scope of the copyrights that are asserted.

If I could address each in turn --

THE COURT: Sure.

MS. BACT: -- I would love to. So the first category of topics related to ownership is because Deloitte bears the burden of proving that it owns the intellectual property that it asserts. And

Page 20

it has in fact contended that it does own that based on the terms, at least with regard to the Massachusetts project, of the Massachusetts contracts.

And the Massachusetts contracts include a provision that Deloitte has relied on in its interrogatories of a defined term called "contractor property".

And contractor property involves various factual inquiries to determine what is contractor property. For example, whether Deloitte had previously developed this property or whether it was customized and modified for Massachusetts requirements.

And I can get more into the sort of factual underpinnings that are outlined in those contractual provisions.

But what these topics largely seek to inquire into is the factual basis for Deloitte's contentions that the trade secrets, the purported trade secrets and copyrighted material, are in fact contractor property because they were not, in fact, customized for Massachusetts.

We have now had testimony that was being given while our brief was being filed on

Page 21

Wednesday from one of Deloitte's rule 30(b)(6) designees that the software delivered was in fact -- the software asserted was in fact delivered to Massachusetts and was in fact customized for Massachusetts. And that Deloitte does not know how to distinguish between what was modified and what was not modified.

But there are other documents asserted in this case. For example, dozens of the trade secrets relate to project documents like use cases and specifications that we do not have testimony on what was modified and what was not modified.

And that is what we are really seeking with these ownership topics. If that clarifies for Your Honor.

THE COURT: Yes. Okay. I understand that. Here's my concern. And it was, I think, voiced in Deloitte's response. That several of these topics look like they are asking for legal interpretation of contract language.

And that is something which my understanding of 30(b)(6) testimony doesn't really fit. This sounds more like a contention interrogatory.

Now, I understand your argument that you feel that that Deloitte has stiffed you with respect to other means of getting the same information, so you were required to go into the 30(b)(6) depositions to get the information.

But it really is not suitable to ask a 30(b)(6) witness to testify as to something like contract interpretation. You know, factual basis, fine. The interpretation of the contract -- and that is the way several of these topics struck me.

The first four, for example, largely seemed to be asking for a legal position. Asking in part for facts that support the legal position, but what's your legal position?

Now that, again, just feels more like a contention interrogatory. There are a couple of the topics that did strike me as being factual. I would identify topic number 119, 126, and I think probably 127.

And then down in the second group, topic 60, that seemed to me legitimate deposition topics for a 30(b)(6) witness.

The others I have a problem with. If you want to go through any of the others -- so let me

just say where I am right now is I'm inclined to allow you to continue to question on the topics I just mentioned.

The rest of them, I'm troubled by. So if you want to go through those in any detail, I'm certainly willing to listen and then we'll hear from Deloitte.

MS. BACT: Thank you, Your Honor. I very much appreciate your perspective. With regard to the first four ownership topics, 114 through 117. We did attempt to clarify and narrow the scope during meet and confer to the last phrase.

If you are able to reference topic 114, the specific facts and documents upon which Deloitte bases its contention that certain things qualify as contractor property, for example.

So we are really looking for these facts of what was modified versus what was preexisting. And that --

THE COURT: Now let me -- for clarity, let me be sure. The topics that I pulled out of your exhibits were the topics as -- were they as the topics as originally submitted or as modified through your clarification process?

MS. BACT: The topics that were submitted as an exhibit, Your Honor? Is that what your question is?

THE COURT: Yeah. Yeah. I forget the number of the exhibit, but there was an exhibit that had each of the topics laid out and I pulled all of those out.

MS. BACT: Yes.

THE COURT: Is that what you are now asking for --

MS. BACT: So --

THE COURT: -- testimony on?

MS. BACT: Excuse me for interrupting, Your Honor.

THE COURT: Well, no, let me just clarify because that was a poor question. Let me put it this way.

Do the topics that I have, which I pulled out of the exhibit, I don't remember the number, but are those topics, do they reflect the changes you may have made in your discussions with Deloitte about how the testimony can be limited, for example, to the facts and documents, et cetera?

MS. BACT: No, Your Honor. Those

are -- what I believe we submitted as an exhibit were Deloitte's objections and responses to our topics, which would have been to our original topics.

THE COURT: Right.

MS. BACT: We also submitted correspondence between the parties that purported to reflect our discussions on narrowing. So I can get you those exhibit numbers, but --

THE COURT: Yeah, why don't you give me those exhibit numbers? Because I was assuming -- and this is one of the problems with submitting 900 pages of exhibits, which is a judge who has only a weekend to look at everything is probably not going to read 900 pages from each side.

So sometimes I think fewer exhibits is better when you have a relatively limited amount of judge time that is available.

But that said, why don't you tell me the exhibit numbers in which the compromised product was set forth?

MS. BACT: Sure. So I believe it's Exhibit C to Sagitec's brief. And I'm just trying -- and I see it as Exhibit 4 to Deloitte's brief.

THE COURT: Okay. All right. And so

you think, as limited, these topics really focus in just on factual matters and not on legal contentions? Is that, sort of put briefly, is that your position?

MS. BACT: Yes, that is my position. And to the extent that's not clear from the exhibits as attached, I wish to clarify it for Your Honor now.

THE COURT: All right.

MS. BACT: We are only looking for facts.

THE COURT: Okay. Understood. Now, let me turn to Deloitte and see if they have a response to your position on that.

MR. TELEKY: Yeah, sure. I mean, I think our -- the overarching theme, I think, for us is that, you know, we've tried very hard to go through these 127, and then it was amended to 130, topics. And tried to provide witnesses and compromise where we could on what we view as the permissible scope of each topic.

And so to that end, we've actually already agreed to provide witnesses on a lot of the factual bases that Sagitec now seems to seek; right?

So this is about the deliverables that were provided to these states, the contracts and their

negotiation, the copyright applications and registrations, any third-party materials that were used by Deloitte or considered while building its product.

And so really, our problem is that the specific topics that we're looking at here go beyond those factual bases into areas where we view them as not really being appropriate for 30(b)(6) depositions.

Because as Your Honor mentioned, they're asking about legal conclusions or contentions, they get into content that's outside of Deloitte's possession, or because they're just things that are unduly burdensome to prepare a witness on.

And so to that end, you know, our view here is that especially if you take a look at Exhibit C to Sagitec's opening brief, I think it is, we lay out what our objections are to those specific topics that we're discussing today in some detail.

And why we view we've provided witnesses on, for example, the contracts for Massachusetts or the contracts for New Mexico, and why it would be then impermissible or unnecessary for us to provide another witness on the factual basis around the definition of contractor property, for example,

inside of those contracts.

THE COURT: Well, yeah. Let me -- okay. I'm trying to draw a line between the facts that a 30(b)(6) witness can testify to versus the contentions.

Now, what I understand Ms. Bact is saying is that through the process of compromise and negotiation, essentially, the contentions have been stripped out of what Sagitec is seeking.

Now, is that -- let me put it this way. To what extent do you think that is inaccurate and that the requests as modified through negotiation now still are unacceptable because they contain an amount to contention interrogatories in a different cloth?

MR. TELEKY: Sure. I think our view is that these particular topics are asking for -- we're always asking for these contentions, and I'm not sure that we fully understood them to be stripping all of those legal contentions out of those topics through our negotiation.

Which is why one of our concerns here is that we've already offered witnesses on the factual basis for the contracts and how they came to be in their negotiation.

And so to the extent these topics were actually -- to the extent Opposing Counsel believes that these topics are co-extensive, maybe, with things we've already offered, then we would say that they're duplicative and we've already provided a witness on those topics.

THE COURT: Well, now, let's make sure we understand what's in play here. As far as I'm concerned, I'm prepared to authorize questioning on several of the topics that I went through with Ms. Bact. Topic 119, topic 126, topic 127 and topic 60.

Do you have anything that you would like to add with respect to those? Because right now, at least unless I hear something from you that moves the needle, I'm prepared to authorize those topics and then focus on the remaining topics.

MR. TELEKY: Sure.

THE COURT: So I'll give you an opportunity to address that.

MR. TELEKY: Sure. So for topic 119, our position here is that we've already offered a witness on the design and development and the scope of these trade secrets. So that's topic 59. We've

Page 30

already offered a witness on the deliverables of those projects. That's topics 39 and 40.

On any third-party materials incorporated into that material, that's topic 64 through 66. The ownership and authorship of those materials, topics 63 and 120. On the contracts, topics 43 and 45.

And so to the extent topic 119 goes beyond that, it starts to get into material that would be unduly burdensome and of an overly broad scope.

Asking about any document, any and all materials, things that we think would be -- that to the extent we've already offered a witness on it, we can do it, but otherwise we're not really sure what the scope of that topic would be. So that's our thought on 192.

THE COURT: Let me -- rather than having you go through all of them, let me go back to Ms. Bact right now and focus on a instance by instance analysis.

Ms. Bact, you've heard that argument. And what is the answer in your view to what more you expect to get from a 30(b)(6) witness that you have not already gotten from witnesses on these other

Page 31

topics?

MS. BACT: Sure, Your Honor. Thank you. And I think what we're looking to understand are -- you know, and we understood through our process of negotiation by Deloitte offering witnesses on certain topics and not offering witnesses, including on any narrowed scope, to the topics that we're discussing; that they were not offering, for example, to do this delineation between what was developed prior to the project, what was modified for the states, and for example, an association, which is part of topic 119 of the individual trade secrets with their time of development and for what project.

So that's material that we view as factual predicate for whether something qualifies as contractor property, a contention that Deloitte has made in its interrogatories and which we would like to test factually. So that's what we would be looking for overall from these topics.

THE COURT: All right. Now, Deloitte, what response to that?

MR. TELEKY: Sure. And so for 119, I mean, our thought on that is that we have, in fact, agreed to offer these witnesses on the deliverables.

Page 32

And to the extent we've already produced a witness to discuss, for example, the deliverables as they were given to, you know, New Mexico, to Massachusetts, to these various states; Sagitec has already had the opportunity to, and has already asked questions about, when were these materials developed, who developed them.

And so in our view, this would be a duplicative exercise to allow another topic, topic 119, on when we've already provided a witness on a variety of related similar -- the topics that just have that factual basis that we can agree to.

THE COURT: All right. Well, okay. I have your respective positions. I'm going to allow questioning on 119.

It may be somewhat duplicative, but it seems to me the risk of leaving a gap in the evidence that is being sought is here probably more mischievous than the risk of a little bit of duplication.

So anything else among the topics that I have already indicated an inclination to authorize, and that's 126, 127, and 60. Mr. Teleky?

MR. TELEKY: Sure. So for --

THE COURT: Is your name pronounced

Page 33

Teleky or Teleky? I'm sorry.

MR. TELEKY: Teleky, like "telephone."

THE COURT: Teleky. Okay, very good.

MR. TELEKY: So for topics 126 and 127, I think we can probably do those together. So these topics get into the factual bases for Deloitte's applications and registrations for its copyrights.

And so for both of these, we've already actually offered a witness on topic 61, which is Deloitte's registrations with the copyright office and any applications therefore, the deposits, and any related communications.

And so in our view, what topics 126 and 127 are doing is getting into this legal conclusion intention exercise such as, for example, legally, what it would mean for somebody to be listed as an author on a copyright registration or the validity of the transfer of ownership from one company to another.

And so our view is that Sagitec would be free to ask about the facts around that under the topics we've already provided, but it wouldn't be appropriate to take that extra step that 126 seems to be going and ask for a witness on those legal conclusions.

Page 34

THE COURT: Yeah. Well --

MR. TELEKY: 127. Sorry, go ahead.

THE COURT: Okay. Go ahead. I'm sorry.

MR. TELEKY: And 127 we think is similar because this is getting into what the definition would be legally of a derivative work or what would legally need to be disclosed as being authored on a copyright registration.

Which similarly, we think gets into the legal requirements for applying for a copyright and goes outside of the factual bases that Deloitte relied on, which Deloitte has already provided a witness on in topics 61, 63, and to some degree, 120.

THE COURT: All right. Ms. Bact, response?

MS. BACT: Thank you, Your Honor. I just want to clarify again that we are not at all seeking legal conclusions. We are looking for the factual basis for the statements that Deloitte made and its copyright applications and registrations that relate to ownership.

And again, we did not understand these topics to necessarily cover the specifics of 126 and

Page 35

127 because Deloitte did not agree to provide a witness. So --

THE COURT: All right. Go ahead. Go ahead. Were you done?

MS. BACT: I can be.

THE COURT: Well, no, if you have something else, please share.

MS. BACT: I was just going to conclude that, you know, our understanding as these depositions were taking place, and these depositions were taking place concurrently with the meeting and conferring because of the way that things developed between the parties, was that Deloitte was not offering witnesses for these, you know, ownership type of factual matter.

THE COURT: Well, Mr. Teleky seems to indicate that there are witnesses who either have or will testify on the factual underpinnings that relate to topics 126 and 127. What's the gap that has to be filled there?

MS. BACT: I think that the gap that I can point to is, for example, the specificity that we were asking for preparation with regard to the underlying factual investigation into ownership claims by Massachusetts and any other factual assertions that

Page 36

would have related to the authorship or ownership of the material Deloitte was applying to have as its copyrighted material.

THE COURT: Yes. Well, the line between fact and law here is perhaps not as clear-cut as we sometimes pretend. But I'm going to allow those two topics.

Subject, of course, to the understanding that this will be limited to developing facts and not seeking a legal theory here. That's one line, it seems to me, we can draw with some certitude.

But I think the topics are, on their face, legitimate. There may be some overlap with some of the other topics that are addressed in other witnesses' testimony, but I'm think I'm willing to abide that risk and go ahead and authorize those.

Now, topic 60, any comments on that from Mr. Teleky? Anything on 60?

MR. TELEKY: Yes, Your Honor. And so this topic asks about a program called iCON that is run by the US Department of Labor and a third-party organization called the National Association for State Workforce Agencies.

And so as phrased, you know, this topic

Page 37

is not -- is asking about the requirements of that software program, which is not run or owned by Deloitte and is in fact run by these other organizations.

And so what Sagitec says in its letter is that it would like to depose Deloitte witnesses on essentially whether this third-party material was used or considered by Deloitte during its development of its product.

And so to the extent we -- you know, we agree that that would be appropriate, which is why we identified a witness on four related topics.

Those are topics, I think, it's 64 through 66 and then 69, which get into any third-party material used considered while building that product.

And so what topic 60 does is takes that next step and goes into the actual requirements of that third-party platform and what that might look like. And so we view that as being something that would be outside the scope of Deloitte's possession and control.

And to the extent Sagitec is looking for information about the requirements or information that iCON or the US Department of Labor puts out about

Page 38

that program, what those requirements would be, they're actually deposing that witness this coming Friday, if I have my dates right, which would be an appropriate time to ask about those issues in our view.

But to the extent this is just looking at, you know, has Deloitte used third-party material, has it been incorporated into Deloitte's program, we think that that's something we've already provided in topic 64 to 66. And so topic 60 takes another step that we shouldn't have to prepare a witness on.

THE COURT: Yeah. Ms. Bact, on 60, 60 does strike me as a little bit more of a reach than some of the others that I've authorized because it is directed at information that is principally in the possession of an entirely unrelated party.

Why is this not like asking "What's the maximum speed limit in Montana" when the best people to tell you what the maximum speed limit in Montana are the Montana officials?

MS. BACT: Thank you, Your Honor. And understood. And this is one where I think we did clarify pretty clearly and meet and confer that we wanted to restrict this topic to Deloitte's knowledge

Page 39

of the iCON requirements and Deloitte's receipt of iCON materials.

So that it would be information within Deloitte's possession, custody, and control, and relevant to how Deloitte incorporated these materials at Deloitte without regard to the general universe, which is in fact why Sagitec is deposing Nassau in the near future.

But we -- I do believe that the correspondence between the parties was clear on that point, and that Deloitte's extent of knowledge or Deloitte's lack of knowledge about these iCON requirements, we believe, is relevant to the copyright claims.

THE COURT: Why is that? Explain that last point. Why is that relevant? That --

MS. BACT: Sure. So --

THE COURT: Suppose they have a misapprehension as to what exactly the requirements of the program are. Why is that relevant to the anything?

MS. BACT: I suppose, Your Honor, that, you know, our review is that their knowledge of the requirements and how that played into their

Page 40

formulation of their copyright contentions as to what was protected expression would be important.

THE COURT: Because?

MS. BACT: Because it would be a basis for us to test whether that was an appropriate contention.

THE COURT: Well, that strikes me as somewhat marginal, but it also seems -- this is not -- I take it we're not talking about something here that is going to take two hours of deposition time to play out. Presumably this is something that could be dealt with in a minute and a half.

Am I wrong about that or is there more complexity here than -- I'm reluctant to suggest that a US government program may be simple enough to explain that it can be dealt within a minute and a half, but still, it doesn't look like this is asking for a, you know, a treatise on differential equations.

MS. BACT: I agree, Your Honor. And I would appreciate, to the extent you permit Sagitec to take questioning on this topic, longer than a minute and a half, but I agree that it would not be lengthy.

THE COURT: Yeah. All right. Well, a minute and a half may be an exaggeration, but okay.

Page 41

Now, so I think we're really down to the time. I'm going to allow that topic.

So I want to talk a little bit about two of the other topics that we haven't discussed, I don't think we've discussed yet, 62 and 125.

Sixty-two looks a lot like a contention interrogatory. What is it that you're looking for there?

MS. BACT: We are looking to understand the scope of what Deloitte contends as expressive content that is protected by copyright. It's not clear from the face of the registrations, it's not totally clear to us from their written discovery responses.

THE COURT: But that really sounds -- that sounds like you're asking them for "What is your copyright contention?"

MS. BACT: I think that we have requested their copyright contentions and they have submitted a lengthy response to our interrogatory number 13, and it is still unclear to us of the material identified, what is protectable expression versus the remainder of the source code.

So I think there is a flavor of conduct

to it --

THE COURT: Have you gone back to them on that interrogatory and asked for more specificity?

MS. BACT: Multiple times, Your Honor.

THE COURT: Well, it seems to me that my task here is to police the appropriate bounds of deposition of 30(b)(6) witnesses and not to simply substitute in what could have been done, perhaps should have been done, in a contention interrogatory, and put it in a setting in which it doesn't really fit.

So I'm not going to go with your request that testimony be offered on that topic.

Let's go to 125. Deloitte is saying that would require an examination of thousands of lines of source code. And why don't you give me -- there wasn't much said about this topic in the papers. Why don't you explain to me why this is a legitimate topic for the 30(b)(6) witness?

MS. BACT: Sure. So we hope that that would not be the case, Your Honor. You know, Deloitte has asserted these copyrights and they've identified certain files.

But they have, in their interrogatory

responses, they have said, you know, files within this larger folder are protected by X, Y, Z registration. But we don't know, you know, which files within that folder may not be protected by that registration.

And their copyright contentions are exemplary. They've used language that says, you know, "We're certainly asserting A through Z files, but we might assert other ones," and we would like to understand the scope of what they might assert against us so that we can defend against that.

And we view this as a simple exercise that, you know, should be easily done. And --

THE COURT: Well, again, that really does sound, particularly as you articulate it, like a request for contention interrogatories. That doesn't feel very "30(b)(6)y" to be honest with you.

So I -- let me turn to Mr. Teleky and see if he has a response on 60 and 125.

MR. TELEKY: Sure, Your Honor. For 125 and I think one -- 62 is the other one. We basically agree; right? Our position --

THE COURT: Yeah, 62. I'm sorry, not 60.

MR. TELEKY: No, of course. Our

position is that, right, these are ultimately contention topics that are asking Deloitte to say, you know, "Here's what is covered under your copyright registrations." And for 125 in particular, on a file by file basis.

You know, there are thousands of source code files that were produced on the source code computer.

And so to ask a witness to prepare to sort between each individual source code file on that computer and say, "Well, this one goes with registration 1, this one goes with registration 2," that's something that we don't think would be appropriate for a deposition.

It's something that we think falls more squarely in the place of a contention interrogatory, like interrogatory 13, which we've already provided.

We've already provided at length Deloitte's contentions about what content would be protected, what content would be part of which registrations, and what content we're actually asserting.

And so to the extent that Counsel has questions about those, we'd be happy to look at the --

you know, look at those interrogatories. But at least as we're talking about the deposition specifically, we don't think this is something that's appropriate for a 30(b)(6) deposition.

THE COURT: Well, they have questions about the interrogatories, as Ms. Bact has explained. I don't know, given where we are in discovery, there's not a whole lot of time here.

But if you, in good faith, are willing to discuss supplementation of the contention and interrogatories, then I think that goes a long way towards supporting your argument that we shouldn't use the 30(b)(6) witness's deposition as a way of curing problems that may have been present in the responses to the contention interrogatories.

I'm going to count on the parties with respect to those two topics to confer and work in good faith to try to supplement the contention interrogatories.

To the extent that there are, for example, areas where, as Ms. Bact has said, the contention interrogatory responses were exemplary. And by that, I think she meant "exemplary" in the sense of just providing examples as opposed to being

Page 46

perfect.

So I think this is one that I will effectively remand to the parties to try to see if you can reach some agreement on with respect to being more specific on your contentions.

You know, it's to say that "Our contentions are X and Y and maybe others," is not really a complete answer. So I would expect that you can probably do better if her description of the responses to the contention interrogatories was accurate.

So that's where we are as far as I'm concerned on topics, I guess, it's 62 and 125. Let's go back for a moment to 114 through 117, which I think are the only remaining topics.

So what I would intend to do is to look at the characterization of those topics as modified as a product of your efforts at negotiation and compromise. And you've given me the citation in the exhibits where I can find the redacted or modified version of those topics. And I will give close attention to those.

I will tell you that my initial reaction to the topics as written was to foreclose

Page 47

questioning on those four topics. But if I think that the compromise version of those topics substantially cures problems that I detected in the topics themselves, then I may be prepared to authorize questioning on those topics.

Okay. Now, that covers everything that I had. Do you have anything to add? Because I'm willing to listen to any other points that you haven't had a chance to make.

Mr. Teleky, since you're on right now, why don't you tell me if there's anything further?

MR. TELEKY: No, Your Honor, I think that makes sense. And with respect to those last few topics related to Deloitte's contentions, we're certainly willing to work cooperatively with Sagitec on that.

You know, to our understanding, we haven't received any specific deficiencies or anything on that. So we'll need to discuss with them exactly what they view as not being sufficient there.

THE COURT: I will expect them to do that. And on this -- specificity is the gold standard. I mean, each side should attempt -- on the side of Sagitec, to say, "This is exactly what we

Page 48

need." And on your side, you should be prepared to say, "This is exactly what we are contending."

Is it -- contentions, if someone goes into trial without knowing what the other side is contending, that is really an unfair difficulty to oppose on the other side. So I'm sensitive to vague contentions that end up becoming clear during one party's closing argument.

Now, Ms. Bact, anything further from you?

MS. BACT: I'll defer to my colleague Mr. Olson for an additional topic.

MR. OLSON: Thank you. Your Honor, just two quick housekeeping points.

THE COURT: Sure.

MR. OLSON: One, we want to note there's no other disputes that are ripe at this time. We have, Your Honor, raised some concerns regarding Deloitte's 30(b)(6) preparation. We're confident that the parties will be able to work through that.

THE COURT: Right.

MR. OLSON: And Your Honor sees us again in short order. Obviously, that has failed, but we'll do our best to resolve that --

Page 49

THE COURT: Right.

MR. OLSON: -- without needing to come back before Your Honor.

THE COURT: Right. I would hope you will do your very best.

MR. OLSON: Absolutely.

THE COURT: I enjoy the opportunity to get to know the lawyers, but I don't enjoy having to spend a weekend preparing for one of these sessions and then having to make the decisions on the fly.

So resolution of these things in house is, as far as I'm concerned, very much preferred. But if you can't, then you know where to reach me.

MR. OLSON: We'll do our best, Your Honor.

THE COURT: All right.

MR. OLSON: And one -- sorry, one other housekeeping point.

THE COURT: Oh, yes, go ahead.

MR. OLSON: When we had spoke last year, I think Your Honor indicated that trial might take place late fall at the earliest. We were just wondering if Your Honor had any updates or if you anticipated trial occurring at a different time?

Page 50

THE COURT: Well, I don't think that there's any chance of having a trial before fall. I have -- not to trouble you with my schedule, but I will trouble you with my schedule anyway.

But I have a trial some every month between April and October, November, and December scheduled. And with sitting in the Court of Appeals every month, I really can't do more than one, or in the case of very short trials, maybe two trials in a month.

So I'm not expecting that there will be able to be a trial before probably maybe December, but probably not until January or later.

Now, you all had a -- there was a mediation stay as I recall, and that kind of threw things a little bit off-kilter for timing.

In the meantime, not knowing what would happen with the mediation, I was filling slots for trials. But now, I think we're really looking to pushing it back to the beginning of 2026, realistically.

It's possible, and you never know, but something may open that will allow me to schedule a trial before then. And if so, then I will get back to

Page 51

you and see if that's acceptable, given your schedules.

I would like to get these cases disposed of as quickly as possible, but I haven't had a whole lot of settlements in cases recently for whatever reason. And as a result, I'm pretty much booked through the end of the year. Okay?

All right. If no one has anything further, we'll be adjourned. I'll stay on the line with the court reporter for any questions that he may have that I can help with names, or I don't know that we cited any cases, but any information that he needs that I can help with.

But for everyone else, we're adjourned and I hope that you can work the remaining issues out.

I think in light of what we've agreed to today or what I've ordered and you've agreed to do, I think there's nothing that I need to put in an order at this point.

If one of you would like an order, I'm happy to do it. If you'd feel more comfortable with a written order, I'm happy to do that. But if you think that you've got the information you need going forward without an order, I'm happy not to enter an order on

Page 52

this and to go with just what we've said on the transcript.

Anything, Mr. Olson? Any preference on that?

MR. OLSON: We would defer to Your Honor's preference.

THE COURT: All right. And, Ms. Bact?

MS. BACT: Same.

THE COURT: Same. Okay.

MS. BACT: We're on the same side. I -- excuse me, Your Honor, if you want to ask Mr. Teleky as well.

THE COURT: Oh, I'm sorry. That's right. Mr. Teleky, I'm sorry. I've got confused between where Mr. Olson fit in the great scheme of things.

Mr. Teleky, would you like an order or would you feel more comfortable with one? I -- you know, I can do it. It's not that much work, but I don't want to leave you wondering, "Well, what did he say about X?"

MR. TELEKY: Think the only issues that might -- where an order might be helpful would be the decisions on topics 114 through, I think, it's 117,

Page 53

because I don't know if we got --

THE COURT: Okay. I'll do a brief order expressing my intention to let you sort out what is -- well, I would like you all to try to work together on those as well as the ones that we focused on in the group too.

But I will read the compromised versions. And in the event that I draw a conclusion that the compromised versions really do change the landscape, I will incorporate that in an order.

Because you're right, that that was one point I think that was left kind of hanging out there, and I will give you some guidance on that.

MR. TELEKY: Thank you, Your Honor. We appreciate it.

THE COURT: Okay. All right. Then we're adjourned.

(Whereupon, the meeting concluded at 11:03 a.m.)

Page 54

CERTIFICATE

I, CARLO FLORIO, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

CARLO FLORIO
Notary Public in and for the
State of Delaware

Page 55

CERTIFICATE OF TRANSCRIBER

I, DONOVAN RUSH, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

DONOVAN RUSH

# Exhibits 23 through 25 Redacted in Their Entirety

# Exhibit 26

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Delaware

| | | |
|---|---|---|
| Deloitte Consulting LLP and Deloitte Development LLC<br>*Plaintiff*<br>v.<br>Sagitec Solutions, LLC<br>*Defendant* | ) | Civil Action No. 23-325-WCB |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: David G. Minkkinen
9209 Preston Pl, Eden Prairie, MN 55347

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

Set forth on Schedule A, attached.

| Place: David A. Prange, Esq., Robins Kaplan, LLP<br>800 LaSalle Avenue, Suite 2800<br>Minneapolis, MN 55402 | Date and Time:<br>02/29/2024 5:00 pm |
|---|---|

❒ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 2/8/2024

*CLERK OF COURT*

OR

/s/ David A. Prange

*Signature of Clerk or Deputy Clerk* — *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Sagitec Solutions, LLC, who issues or requests this subpoena, are:

David A. Prange, Esq., Robins Kaplan LLP, 800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402, 612.349.8500, dprange@robinskaplan.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 23-325-WCB

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ____________ .

❒ I served the subpoena by delivering a copy to the named person as follows: ______________________
______________________ on *(date)* ____________ ; or

❒ I returned the subpoena unexecuted because: ______________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of
$ ____________ .

My fees are $ ________ for travel and $ ________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________

______________________
*Server's signature*

______________________
*Printed name and title*

______________________
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SCHEDULE A**

**INSTRUCTIONS**

1. In order to fully comply with this Subpoena, you should produce all responsive documents that are in your possession, custody, or control, as they are kept in the ordinary course of business, including, where applicable, any index tabs, file dividers, labels, designations, or information as to the location of the documents.

2. You should resolve any perceived ambiguity in favor of the most complete disclosure, and you should describe what you feel is ambiguous and why, responding in the alternative where possible. To the extent that it results in a more complete disclosure, the singular shall be construed to include the plural and vice versa, and the present tense shall be construed to include the past tense, and vice versa.

3. Production is requested of documents in full, without abbreviation or expurgation. A copy of both side of the requested documents shall be produced, unless the reverse side of the documents is completely blank. Any computerized data shall be produced both on disk in its native format and in its printed form. If copies of the documents are produced, the copies must be identical to the original. For example, if a document contains multiple stapled, clipped, or otherwise collated pages, then the copy shall contain each attached page and be similarly collated. All documents shall be duplicated and attached to the copy in the exact manner and location as such items are appended to the original document.

4. Your response shall not be deemed complete until documents and things are produced or a date certain is provided as to when the requested documents and things will be produced.

5. If no documents are responsive to a particular request, You are to state that no responsive documents exist.

6.    In the event You object to any request herein or any part thereof, You shall state with specificity the grounds of objection and respond to the fullest extent that such production is not subject to objection.

7.    In the event You object to the production of any document or thing on the ground that it is protected from discovery under the attorney-client privilege or work product immunity or is otherwise not discoverable, You shall identify each such document or thing on a separate schedule to be produced to Sagitec, such identification to include at least the following::

    a.    The basis on which the privilege is claimed;

    b.    The title of the document;

    c.    The nature of the document (e.g., interoffice memorandum, report, office procedure, etc.);

    d.    The date of the document;

    e.    The number of pages in such document;

    f.    The names and positions of the author of the document and all other person participating in the preparation of the document;

    g.    The name and position of each individual or other person to whom the document, or a copy thereof, was sent or otherwise disclosed;

    h.    A description of any accompanying material transmitted with or attached to such document;

    i.    The particular request(s) to which such document is responsive;

    j.    Whether any business or non-legal matter is contained or discussed in such document; and

       k.      A summary statement of the subject matter of the document or of the communication in sufficient detail to permit the Court to rule on the propriety of the objection.

8.      In the event that any requested document has been lost or destroyed, that document shall be identified by indicating the date, the subject matter, number of pages, originator, and all persons to whom it was distributed. The date of loss or destruction, manner of loss or destruction, reasons for destruction, person(s) authorizing destruction, person(s) losing or destroying the document, and custodian(s) of the document at the time of the loss or destruction shall be identified.

## DEFINITIONS

1.      "You" or "Your" mean David Gerald Minkkinen.

2.      "Deloitte," or "Plaintiffs," means Deloitte Consulting LLP, Deloitte Development LLC, or any affiliated entities, including without limitation any parent, predecessors (including BearingPoint, Inc.), successor, wholly or partially owned subsidiaries, and other persons from whom Deloitte has the alleged legal right to obtain the information sought by this discovery.

3.      "Supporting" means tending to prove, establish, or corroborate.

4.      The terms "and" and "or" will be understood as either conjunctive or disjunctive, whichever is more inclusive on context.

5.      The terms "any," "each," and "all" will be understood to include "each and every."

6.      The term "including" will be construed to mean "without any limitation."

7.      The terms "regarding," "relating to," and "related to" are to be given their broadest possible meaning, including but not limited to referring to, describing, evidencing,

concerning, constituting, mentioning, containing, supporting, discussing, analyzing, pertaining to, being connected with, resulting from, reflecting upon, in whole or in part, directly or indirectly, the stated subject matter.

8. The singular form of a noun or pronoun shall include the plural form of the noun or pronoun, and vice versa.

9. The past tense shall include the present tense and the present tense shall include the past tense as to make the request inclusive rather than exclusive.

10. "Document" and "documents" have the broadest meaning ascribed to them by Rule 34(a) of the Federal Rules of Civil Procedure and encompass any writing of any kind, including originals and non-identical copies (whether different from the original by reason of any notation made on such copies or otherwise). The terms "document" and "document(s)" include, without limitation, the following items, whether printed or reproduced by any process, or written or produced by hand or stored in computer memory, magnetic or hard disk, or other data storage medium, and whether or not claimed to be privileged, confidential, or otherwise excludable from discovery, including without limitation: copyrights, copyright applications, patents, patent applications, articles, publications, presentations, posters, slides, electronic presentations, notes, letters, correspondence, Communications, telegrams, memoranda, summaries or records of telephone conversations, summaries or records of personal conversations or meetings, diaries, reports, laboratory and research reports and notebooks, recorded experiments, charts, plans, drawings, diagrams, schematic diagrams, HDL, Verilog, source code or other computer code, illustrations, product descriptions, labels, product inserts, product analyses, requests for proposals, documents related to proposals or actual product improvements or changes, user manuals or guides, installation guides or manuals, technical descriptions or specifications,

product repair manuals or guides, photographs, video images, software flow charts or descriptions or specifications, product functional descriptions or specifications, minutes or records of meetings, summaries of interviews, reports, or investigations, opinions or reports of consultants, reports of patent searches, patent appraisals, opinions of counsel, agreements, reports or summaries of negotiations, brochures, pamphlets, advertisements, circulars, trade letters, press releases, drafts of documents, and all other material fixed in a tangible medium of whatever kind.

11. "Communication(s)" means the transmittal of information by any means, and includes any transfer of information, facts, ideas, opinions, inquiries, or thoughts by any means, written, oral, or otherwise, at any time or place under any circumstances. The definition is not limited to transfers between persons but also includes other transfers, such as records and memoranda to file; any written letter, memorandum, or other document which was sent by one or more individuals to another or others; any telephone call between one or more individuals and another or others, whether such call was by chance or prearranged, formal or informal; and any conversation or meeting between one or more individuals and another, whether such contact was by chance or prearranged, formal or informal.

**DOCUMENTS TO BE PRODUCED**

1. All data storage devices in Your possession, custody, or control containing any and all Documents, Communications, or other artifacts that were originally created during Your employment at Deloitte, or that were ever stored on Deloitte servers or computer equipment.

2. All data storage devices in Your possession, custody, or control that were provided to you by Deloitte at or about the time that your employment with Deloitte terminated in 2013.

# Exhibit 27

# MINKKINEN0000001

(CONFIDENTIAL)

Minkkinen flash drive produced to Deloitte on 03/25/24

# Exhibits 28 through 30 Redacted in Their Entirety

# Exhibit 31

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

---

**Statement of Work**
**Between**
**The Division of Unemployment Assistance**
**And**
**BearingPoint, Inc.**
**For the**
**DUA Quality Unemployment System Transformation (QUEST) Project**

**May 18, 2007**

---

Massachusetts Department of
Workforce
Development
Division of Unemployment Assistance

BearingPoint

1

HIGHLY CONFIDENTIAL

DEL00067743

**Table of Contents**

1. INTRODUCTION ........ 4
2. OVERVIEW, EFFECTIVE DATE AND TERM ........ 4
3. SINGLE POINT OF CONTACT ........ 5
4. SYSTEM SECURITY ........ 6
5. ACCEPTANCE OR REJECTION PROCESS ........ 6
6. PROJECT MANAGEMENT ........ 7
6.1 Project Managers ........ 7
6.1.1 DUA Project Manager ........ 7
6.1.2 Vendor Project Manager ........ 8
6.2 Issue Resolution ........ 9
6.3 Changes in Scope of Work ........ 9
6.4 Key Personnel ........ 9
6.5 Equipment, Work Space, Office Supplies ........ 10
6.6 Related Project Knowledge ........ 11
6.7 IP Agreement for Vendor's Employees, Contractors and Agents ........ 11
6.8 Project Responsibilities ........ 11
7. ADDITIONAL TERMS ........ 11
7.1 Definitions ........ 11
7.2 Code Review ........ 11
7.3 Warranty ........ 12
7.4 Title and Intellectual Property Rights ........ 12
7.4.1 Definition of Property ........ 12
7.4.2 Source of Property ........ 13
7.4.3 Contractor Property and License ........ 13
7.4.4 Commonwealth Property ........ 15
7.4.5 Clearance ........ 16
7.5 DUA's Responsibilities ........ 16
7.6 Software Configuration Management Procedures ........ 17
7.7 Other Terms ........ 17
8. PROJECT SCOPE AND MILESTONES ........ 18
8.1 Project Scope ........ 18
8.2 Task Descriptions ........ 18
8.3 Milestones by Fiscal Year (FY2007 – FY2011) ........ 22
9. DELIVERABLE SCHEDULE AND PAYMENT TERMS ........ 23
9.1 FY2007 (June 2007) ........ 24
9.2 FY2008 (July 2007 to June 2008) ........ 24
9.3 FY2009 (July 2008 to June 2009) ........ 25
9.4 FY2010 (July 2009 to June 2010) ........ 26
9.5 FY2011 (July 2010 to June 2011) ........ 28
9.6 Total Cost, all Deliverables ........ 29
9.7 Statement of Work Assumptions and Conditions ........ 29
9.8 Project Tools ........ 36

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

Appendix A: Deliverable Acceptance Criteria (Example) ... 40
Appendix B: Deliverable Acceptance Form ... 41
Appendix C: CORI ... 42
Appendix D: Information Technology Resource Policy ... 43
Appendix E: Confidentiality Statement ... 48
Appendix F: IP Agreement for Vendor's employees etc. ... 49
Appendix G: Scope, Use Case Statements ... 53
    Revenue Increment ... 53
    Benefits Increment ... 65
Appendix H: DOR Confidentiality Acknowledgement ... 94

Massachusetts Department of
Workforce
Development
Division of Unemployment Assistance

BearingPoint

3

HIGHLY CONFIDENTIAL DEL00067745

# 1. INTRODUCTION

This document will serve as a statement of work (SOW) between the Department of Workforce Development (DWD), Division of Unemployment Assistance (DUA), and BearingPoint, Inc. ("BearingPoint") to apply to work on the DUA QUEST Project (QUEST). For the purposes of this Statement of Work, BearingPoint will function as the prime contractor. Any subcontractors identified by BearingPoint in their proposal to DUA are hereby accepted and approved by DUA. The entire agreement between the parties (the "Agreement") consists of the following documents in the following order of precedence:

The Standard Terms and Conditions

The Commonwealth's Standard Form Contract

RFR ITS23

BearingPoint's response to RFR ITS23

This SOW

RFQ DUA_QUEST_06-06 as amended plus Vendor Questions and Answers

BearingPoint's Response to RFQ DUA_QUEST_06-06

# 2. OVERVIEW, EFFECTIVE DATE AND TERM

The Vision of the DUA QUEST Project is to design and implement a comprehensive set of Unemployment Insurance (UI), UI Health Insurance processes and an Unemployment information system solution that when completed defines the standard of quality in state unemployment services.

1. Re-engineer the UI business model (subject to approval from Sponsors and Steering Committee).
2. Define the Business Requirements
3. Design and implement a software solution that represents the process model, business requirements and the needs of DUA.
4. Design appropriate technology architecture to support solution and business requirements
5. Develop an Implementation plan that minimizes any risk to the DUA business.
    a. System Performance and User Acceptance Testing
    b. Data Migration, (historical data)

c. Training Plan

d. Cutover Plan, (open claims, active accounts)

6. The DUA Project Manager will ensure that sufficient DUA process and technical expertise is created internal to DUA to provide design, development and implementation skills throughout the duration of the project and more importantly, these experts will remain in-house to maintain and adapt the completed QUEST solution to future demands.

Each Deliverable agreed to be provided under this SOW will be approved by the DUA Project Manager after review and acceptance by the DUA QUEST Project Team and Steering Committee pursuant to the acceptance process specified in section 5 of this SOW.

This SOW shall become effective on the date on which it is executed by both parties and shall terminate on July 31, 2011, unless terminated or expired earlier pursuant to the terms of this SOW. Notwithstanding the foregoing, sections 7.3, 7.4 and 9 shall survive the termination of this SOW.

The term of this SOW, subject to the terms, assumptions and conditions of this Agreement, shall be 50 months commencing on June 1, 2007 and ending on July 31, 2011.

# 3. SINGLE POINT OF CONTACT

BearingPoint and DUA will each assign a single point of project management contact with respect to this SOW. It is anticipated that the contact person will not change during the period the SOW is in force. In the event that a change is necessary, the party requesting the change will provide prompt written notice to the other. In the event a change occurs because of a non-emergency, two-week written notice is required. For a change resulting from an emergency, prompt notice is required.

BearingPoint's contact person is:

David Czelusniak
Senior Manager
2 Hampshire Street Suite 410
Foxboro, MA 02035
Phone: 508-216-2397
Email: david.czelusniak@bearingpoint.com

DUA's contact person is:

Robert Velten
Director DUA Technology
19 Staniford Street
Boston, MA 02114
Phone: 617-626-6599

Email: rvelten@detma.org

# 4. SYSTEM SECURITY

As part of its work effort, BearingPoint will be required to use Commonwealth data and IT resources in order to fulfill part of its specified tasks. For purposes of this work effort, "Commonwealth Data" shall mean data provided by DUA to BearingPoint, which will physically reside at a DUA location. In connection with such data that would be in BearingPoint's possession and custody for the purposes of the Project, BearingPoint will implement commercially reasonable safeguards necessary to:

- Prevent unauthorized access to Commonwealth Data from any public or private network
- Prevent unauthorized physical access to any information technology resources involved in the development effort and
- Prevent interception and manipulation of data during transmission to and from any servers.

BearingPoint will notify DUA immediately when it learns if any breaches to any system have occurred causing possible unauthorized access to, interception of and/or manipulation of Commonwealth Data.

# 5. ACCEPTANCE OR REJECTION PROCESS

BearingPoint will submit the required deliverables specified in this SOW to the DUA Project Manager for approval and acceptance. DUA will review work product for each of the deliverables and evaluate whether each deliverable has clearly met in all material respects the criteria established in this SOW and the relevant specifications.

BearingPoint and DUA will incorporate the use of Deliverable Expectations Documents (DED) in order to further define the contents and scope of each deliverable. The DED documents will include the purpose of each deliverable, the assumptions and constraints for each deliverable and the approach for each deliverable. DUA will develop acceptance criteria for each deliverable and achieve agreement with BearingPoint on the Acceptance Criteria. In the event the parties cannot agree on any DED or the Acceptance Criteria, the parties shall escalate the issue for resolution pursuant to clause 6.2 herein. DUA and the QUEST project will use the acceptance criteria documented by DUA, using the process described above, in order to determine if deliverables are complete and accepted. Once reviewed and favorably evaluated, the deliverables will be deemed acceptable.

Unless another acceptance period has been agreed to in a DED for a particular deliverable, within ten (10) business days of receipt of each deliverable, the DUA Project Manager will notify BearingPoint, in writing, of the acceptance or rejection of said deliverable using the acceptance criteria specified in this section or as specifically agreed pursuant to this SOW between the parties for the particular deliverable. A form signed by DUA shall indicate acceptance or rejection, (see the form attached in Appendix B). BearingPoint shall acknowledge receipt of the form in writing. Any rejection will

include a written description of the defects of the deliverable. Failure of DUA to accept or reject the deliverable within the specified period, or DUA's using the deliverable in its business environment, will constitute acceptance by DUA and the Commonwealth of the said deliverable. Deliverables accepted at any stage of the QUEST project shall be deemed accepted for any subsequent stages of QUEST.

Unless another specific period has been agreed to in a DED for a particular deliverable, BearingPoint upon receipt of a deliverable rejection will act within ten (10) business days to correct the specified defects and deliver an updated version of the deliverable to DUA. DUA will then have an additional 5 (five) business days from receipt of the updated deliverable to notify BearingPoint, in writing, of the acceptance or rejection of the updated deliverable. Any such rejections will include a description of the way in which the updated deliverable fails to correct the previously reported deficiency. No additional deficiencies will be raised through additional review. Rather, the additional DUA review is to confirm that previously reported deficiencies have been addressed. DUA and BearingPoint will each have the opportunity to negotiate an extended Acceptance/Rejection date or cure period, as applicable, if the work product or deliverable is of significant size to warrant it. Following any acceptance of a deliverable which requires additional work to be entirely compliant with the pertinent deliverable design specifications, and until the next delivery, BearingPoint will use reasonable efforts to provide a prompt correction or workaround.

# 6. PROJECT MANAGEMENT

## *6.1 Project Managers*

### 6.1.1 DUA Project Manager

Project management of this engagement will be performed by DUA. DUA's project manager will:

- Work closely with BearingPoint's Project Manager to ensure successful completion of the project.
- Ensure that the DUA QUEST Project Team and BearingPoint are working together to complete project tasks and deliverables.
- Work with BearingPoint's Project Manager to develop the Project Management Plan and approve any/all plans.
- Agree with BearingPoint on all project artifacts to be created and maintained as part of the project.
- Review weekly status reports and conduct weekly meetings with BearingPoint and DUA QUEST Project Team, as necessary.
- Coordinate participation with assistance from DUA QUEST Project Team from DUA, DWD, other Agencies or software vendors as required during the engagement.

BearingPoint

- Coordinate DUA's review of the deliverables and sign an acceptance form to signify acceptance for each accepted deliverable.
- Provide DUA dedicated project staff as follows, (dedicated staff will arrange for additional DUA staff participation as needed):
    - Benefits Team Leader: Jane Welch, (3 additional members)
    - Revenue Team Leader: Theresa DeMarco, (2 additional members)
    - Appeals/Hearings Team Lead: Mark Dobbins
    - Program Integrity Team Lead: Joan Pearson
    - QUEST Project Team Lead: Harriet Mermes, (BOR Team Lead)
    - QUEST Technical Team Lead: Ken Zimmerman, (5 additional members)

      4 .NET developers provided by DUA will be focused on the following:
        - System Interfaces, such as 1099/IRS, TPA downloadable files and legacy system interfaces
        - Reports such as ETA, economic research and other management reports
        - QUEST development tasks as assigned
    - Finance/Economic Research Team Lead: TBD

DUA's Project Manager reports to Ed Malmborg, DUA Director, who reports to Suzanne Bump, Secretary, Executive Office of Labor and Workforce Development.

Robert Velten, DUA Project Manager will work directly with BearingPoint's Project Manager. Ed Malmborg, Director DUA will sign this SOW and all amendments hereto on behalf of DUA.

### 6.1.2 Vendor Project Manager

The BearingPoint Project Manager will:

- Serve as an interface between the DUA Project Manager and all BearingPoint personnel participating in this engagement.
- Develop and maintain the Project Management Plan, in consultation with the DUA Project Manager.
- Facilitate regular communication with the DUA Project Manager, including weekly status reports/updates, and review the project performance against the project plan.
- Facilitate weekly project status meetings for the duration of the engagement.
- Update the project plan on a weekly basis and distribute plan with status at weekly meetings for the duration of the engagement.

- Develop plans to mitigate project issues or risks and obtain approval from the DUA Project Manager.
- Sign acceptance forms to acknowledge their receipt from DUA.
- Be responsible for the management and deployment of BearingPoint personnel.

  Jonathan Slusarz, BearingPoint's Project Manager reports to David Minkkinen, Project Managing Director, who reports to Kathy Karich, Regional Managing Director, who reports to Catherine Pomanti, Executive Vice President and SLED Leader. Either Kathy Karich or Catherine Pomanti, being the authorized signatories named in BearingPoint's response to ITS23, will sign this SOW and all amendments thereto on behalf of BearingPoint.

## 6.2 Issue Resolution

The project managers from each organization bear the primary responsibility for ensuring issue resolution. If they determine that they are unable to resolve an issue, they are responsible for escalating the issue to Ed Malmborg, DUA Director and Kathy Karich, BearingPoint Regional Managing Director for resolution.

## 6.3 Changes in Scope of Work

The project manager who would like to request a change in scope, schedule or price for this engagement will provide the suggested change in writing to the other parties' project manager. The project managers will jointly determine whether the change impacts the schedule and/or cost. The parties can mutually agree to the change through a written amendment to this SOW but any scope, schedule or price change requires the approval of the Steering Committee. No change shall become effective unless agreed upon in writing by both parties. If either party's act or omission to perform its obligation(s) hereunder has an adverse effect on the performance of the project, including without limitation causing delays, the affected party shall notify the other party of such adverse effect in writing. If, in the opinion of the affected party, the adverse effect requires any change in the project's scope, schedule or pricing, such party should propose such change pursuant to this clause 6.3. If the project managers cannot agree on any change proposed pursuant to this clause 6.3 in a reasonable time (not to exceed 5 days), the issue shall be escalated for resolution pursuant to clause 6.2 above. It is anticipated that early in the project the parties will develop and mutually agree a Change Order Procedure that will be applicable for any changes in scope, schedule or price proposed pursuant to this SOW.

## 6.4 Key Personnel

BearingPoint agrees to provide the following personnel for the following amounts of time for the duration of this project:

**TABLE 1**

**KEY PERSONNEL**

| Staff Members | Role | Time Commitment expressed as percentage of full time |
|---|---|---|
| Jonathan Slusarz | Project Manager | 100% |
| Joe Valorose | Benefits Leader | 100% during Benefits Increment |
| Harpreet Kaur | Revenue Leader | 100% during Revenue Increment |
| Marcellus Mascarenhas | Technical Team Leader | 100% |

BearingPoint will assign all of the foregoing key personnel to this engagement on the time basis set forth in Table 1. DUA requires that all key personnel remain on the project throughout the life of their specific project assignment, (exclusive of vacation, sick leave, training or administrative tasks). BearingPoint's key personnel on this project and under this SOW is defined as follows: 1) Project Manager; 2) Benefits Leader; 3) Revenue Leader; 4) Technical Team Leader. In the event that a change in the key personnel is necessary as a result of an emergency or other event, prompt written notice shall be provided by the BearingPoint Project Manager. In the event of a replacement of the key personnel due to circumstances beyond BearingPoint's reasonable control (including without limitation due to the key personnel's illness or incapacity, departure from BearingPoint, personal reasons or if the personnel's performance is in BearingPoint's opinion unsatisfactory), BearingPoint shall tender to the DUA Project Manager resume(s) of the proposed replacement within ten (10) business days of BearingPoint's knowledge of the key personnel's departure. BearingPoint is expected to provide replacement personnel with equal or better skill sets and experiences as the departing personnel.

Non-key personnel assigned by BearingPoint must meet with DUA approval, such approval will not be unreasonably withheld and will not interfere with BearingPoint's ability to deliver the project.

BearingPoint will be required to complete a "request" for Criminal Offender Record Information (Appendix C) for all staff participating in this engagement. Each member of the BearingPoint Team read and sign an Information Technology Resource Policy (Appendix D), the Confidentiality Statement (Appendix E), and the DOR Confidentiality Acknowledgement for wage records (Appendix H) as designated by DUA and attached as indicated. Failure to complete and/or sign these documents or if the CORI reveals matters that DUA deems inappropriate will disqualify the individual/s from participating in this engagement.

## 6.5 Equipment, Work Space, Office Supplies

DUA will provide one office, workspace for up to 35 BearingPoint Project team members, standard office equipment, and standard network connectivity and access to DUA systems provided to state employees for BearingPoint team members working on-

site for activities defined in Project deliverables, as required by this SOW. DUA is providing a common Project workspace for all DUA and BearingPoint project team members. Two conference rooms (capacity 8-10) will be made available to the project team during the project and testing and training areas will be provided by DUA. DUA will provide administrative support to BearingPoint for scheduling meetings. BearingPoint will submit a list of employees who will need access to the building and to state systems as required for execution of this SOW.

### 6.6 Related Project Knowledge

In addition to the "Statewide Contract IT Specifications" and all other terms of ITS23, BearingPoint shall, prior to commencing any other work under this SOW, become familiar with the following documents: DUA QUEST Program Initiation Document and DUA QUEST BPR Vision Document.

### 6.7 IP Agreement for Vendor's Employees, Contractors and Agents

BearingPoint shall ensure that all BearingPoint personnel providing services under this SOW, regardless of whether they are BearingPoint's employees, contractors, or agents, shall, prior to rendering any services under this SOW, sign the "Intellectual Property Agreement for Vendor's Employees, Contractors and Agents," in a form attached as Appendix F hereof which is included as one of the ITS23 documents, and return signed copies of the same to the DUA Project Manager prior to the delivery of any services under this SOW.

### 6.8 Project Responsibilities

Due to the size and complexity of the QUEST Project, DUA and BearingPoint each have responsibilities to the project and each other to ensure that the project is delivered successfully. To the extent that either party can not meet their responsibilities for any reason, either party can invoke the procedures outlined in section 6.2 and/or 6.3 of this SOW.

## 7. ADDITIONAL TERMS

### 7.1 Definitions

The terms used in this SOW, unless defined herein, shall have the meaning ascribed to them in the other documents that constitute the Agreement between the parties as stated within section 1 of this document.

### 7.2 Code Review

BearingPoint shall comply with the code review policy as mutually agreed to in writing between the parties.

## 7.3 Warranty

BearingPoint's services shall be performed in a professional and workmanlike manner and in accordance with the detailed design specifications as agreed between the parties in writing (referred to herein also as "Rational Design Artifacts"). BearingPoint warrants that for a period of ninety (90) days following delivery ("Warranty Period") (1) the deliverables will substantially conform to the detailed design specifications as agreed between the parties in writing; (2) all media on which BearingPoint provides any software under this SOW shall be free from defects; (3) all code developed and delivered by BearingPoint, (exclusive of third party software purchased by DUA) under this SOW shall be free of Trojan horses, back doors, and other malicious code in the code developed by BearingPoint for this QUEST project; and (4) all software delivered by BearingPoint shall perform in all material respects in conformance with the detailed design specifications ('Rational Design Artifacts') agreed to in writing between the parties. Any material nonconformance that prevents the operation of a system component identified in Appendix G (a Use Case or collection of Use Cases), or prevents users from proceeding with the correct workflow which requires a workaround that is identified in writing during the Warranty Period (defined hereinafter as "Defect") will be repaired by BearingPoint at their expense. All other non-conformities will be addressed internally by DUA personnel or pursuant to a separate maintenance agreement that may be agreed between the parties. In no event shall BearingPoint be responsible for non-conformities caused by DUA or its personnel or contractors, or caused by third party products or services, including without limitation network or connection based non-conformities. It is DUA's responsibility to assess the cause and severity of an issue prior to invoking BearingPoint warranty. In the event BearingPoint concludes that an issue claimed by DUA under the preceding warranty is not covered by the BearingPoint warranty and DUA agrees with this conclusion, BearingPoint may charge DUA based on its standard rates for the time spent investigating or fixing the issue. THESE ARE THE EXPRESS WARRANTIES WITH RESPECT TO THE DELIVERABLES AND SOFTWARE UNDER THIS PROJECT. BEARINGPOINT DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. Any changes, repairs, modifications, adjustments or other fixes made by DUA, its personnel or contractors to the QUEST solution and not approved in writing by BearingPoint shall void BearingPoint warranty for the impacted portion of QUEST. If the parties cannot come to agreement, the issue will be escalated in accordance with section 6.2 of this SOW in order to determine if the issue is within or outside the warranty and where such item is outside of the warranty, DUA shall compensate BearingPoint as provided for above.

## 7.4 Title and Intellectual Property Rights

### 7.4.1 Definition of Property

The intellectual property required by BearingPoint to develop, and/or install and test QUEST (hereinafter the "Property") may consist of computer programs (in object and source code form), scripts, data, documentation, the audio, visual and audiovisual content

related to the layout and graphic presentation of the QUEST solution, text, photographs, video, pictures, animation, sound recordings, training materials, images, techniques, methods, algorithms, program images, text visible on the Internet, HTML code and images, illustrations, graphics, pages, storyboards, writings, drawings, sketches, models, samples, data, other technical or business information, and other works of authorship fixed in any tangible medium. The QUEST solution is an unemployment insurance information system involving intellectual property derived from three sources described below in clause 7.4.2 and with technical and functional specifications in accordance with this SOW ("QUEST").

### 7.4.2 Source of Property

This engagement will involve intellectual property derived from three different sources: (1) third party software and other products' (as specified in section 9.8 of this SOW to be licensed/obtained by DUA, including without limitation Microsoft, Oracle, IIS, Filenet) and any derivative works thereof ("Third Party Property"); (2) BearingPoint owned or licensed preexisting or proprietary software, solutions or other proprietary material and information (including without limitation ProvenCourse Methodology and uFACTS, but excluding Third Party Property and derivative works thereof.) and derivative works created for DUA based on the BearingPoint owned or licensed preexisting or proprietary software, solutions or other proprietary material and information (altogether herein "Contractor Property") and (3) software and material and information developed by BearingPoint in the course of developing the QUEST solution and specifically for the purposes of delivering QUEST to DUA under this SOW and other than Contractor Property or Third Party Property or derivative work thereof ("QUEST IP") . Ownership of the first category of intellectual property is addressed in separate agreements between the DUA and the third party contractors and resellers of such software. The following paragraphs of the Statement of Work address ownership rights in the second and third categories of intellectual property. For the purposes of this SOW, derivative works shall mean works defined as derivative works in 17 U.S.C.§ 101 and further defined as all Developments and Property associated with the migration of the uFACTS Solution Framework to a .NET architecture/application including but not limited to all core unemployment insurance functions but excluding specific Commonwealth of Massachusetts requirements that are developed originally and exclusively for DUA.

### 7.4.3 Contractor Property and License

BearingPoint will retain all right, title and interest in and to all Contractor Property. DUA acknowledges and agrees that its possession, installation or use of Contractor Property will not transfer to it any title or ownership to such Contractor Property. DUA further acknowledges and agrees that the uFACTS Unemployment Insurance Solution (which will be the basis for the QUEST solution), excluding the Third Party Property, is BearingPoint's proprietary technology and/or is licensed to BearingPoint such that the technology and its source code are considered a trade secret of BearingPoint or third party licensor.

DUA acknowledges that the Contractor Property contains or constitutes commercially valuable and proprietary trade secrets of the Contractor or other third parties, the development of which involved the expenditure of substantial time and money and the use of skilled development experts. DUA acknowledges that the Contractor Property is being disclosed to DUA to be used only as expressly permitted under the terms of this SOW and the license specified herein. DUA will take no affirmative steps to disclose such information to third parties, and, if required to do so under the Commonwealth's Public Records Law, M.G.L. c. 66, S 10, or by legal process, will promptly notify BearingPoint of the imminent disclosure so that BearingPoint can take steps to defend itself against such disclosure.

Except as expressly authorized in this clause 7.4 of the Statement of Work, DUA will not copy, modify, distribute or transfer by any means, display, sublicense, rent, reverse engineer, decompile or disassemble the Contractor Property.

Subject to the terms herein and upon the full and final payment for the deliverables containing the Contractor Property, BearingPoint grants to DUA and the Commonwealth a fully-paid, royalty-free, non-exclusive, non-transferable, worldwide, irrevocable, perpetual, license to use the Contractor Property by DUA with the deliverable provided to DUA by BearingPoint, and to make, or grant a limited sublicense to third party contractors to make, use, reproduce, distribute, modify, reverse engineer, decompile or disassemble or create derivative works based upon the Contractor Property solely for DUA's needs related to the QUEST solution, in any media now known or hereafter known, but only to the extent reasonably necessary for DUA's use and exploitation of the deliverables within the QUEST solution. The foregoing license expressly prohibits DUA or DUA's contractors to make, use, license, modify or create derivative works of the Contractor Property for reasons other than for the use in relation with the QUEST solution by DUA. In the event the Commonwealth does not provide funding for the work under this SOW, or does not fully fund the work hereunder at any stage, the license granted pursuant to this paragraph of 7.4.3 is hereby restricted so that no third party vendors or contractors of DUA will be authorized to make, use, license, the Contractor Property. In the event of agency reorganization within Commonwealth, the rights and obligations of DUA herein shall be applicable to DUA's successor agency.

Notwithstanding anything contained herein to the contrary, and notwithstanding DUA's use of the Contractor Property under the license created herein, BearingPoint shall have all the rights and incidents of ownership with respect to the Contractor Property, including the right to use such property for any purpose whatsoever and to grant licenses in the same to third parties.

During the term of the associated Statement of Work and immediately upon any expiration or termination thereof for any reason, BearingPoint will provide to DUA the most current copies of any Contractor Property to which DUA has rights pursuant to the foregoing, including any related documentation.

### 7.4.4 Commonwealth Property

In conformance with the Commonwealth's Standard Terms and Conditions, on the date on which DUA reimburses BearingPoint for a deliverable accepted by DUA under the terms of this Statement of Work, all of BearingPoint's right, title and interest in the QUEST IP developed originally and exclusively by BearingPoint under the terms of this Statement of Work for the purposes of DUA's QUEST project shall pass to and vest in the Commonwealth, including all copyright, patent, trade secret, trademark and other intellectual property rights created by BearingPoint in the QUEST IP, and any causes of action relating to or based upon such work (hereinafter the "Commonwealth Property"). Subject to clause 7.4.3., BearingPoint hereby assigns to the Commonwealth as of the date on which DUA reimburses BearingPoint for such deliverables, all intellectual property rights in the QUEST IP that it may now or hereafter possess in the Commonwealth Property related to such deliverable and all derivative works thereof. BearingPoint also agrees to execute all documents and take all actions that may be reasonably necessary to confirm such rights, including providing any code originally developed under this SOW and used exclusively to develop such Commonwealth Property for DUA and the documentation for such code. BearingPoint acknowledges that there are currently and that there may be future rights that the Commonwealth may otherwise become entitled to with respect to Commonwealth property that does not yet exist, as well as new uses, media, means and forms of exploitation, current or future technology yet to be developed, and that BearingPoint specifically intends the foregoing ownership or rights by the Commonwealth to include all such now known or unknown uses, media and forms of exploitation.

BearingPoint agrees to take such actions as may be reasonably requested by DUA to evidence the transfer of ownership of or license to intellectual property rights described in this section.

DUA expressly acknowledges that BearingPoint will continue to market and sell Contractor Property, including the uFACTS Framework and Solution and its derivative works to other clients. Nothing in this SOW shall be deemed to transfer or assign BearingPoint's rights in or concerning the uFACTS framework and solution, including without limitation BearingPoint's right to continue to use, modify, enhance, expand and create derivatives of the uFACTS framework or solution for itself or others. For the purposes of clarification, DUA acknowledges that nothing in this clause 7.4.4 or the SOW prevents BearingPoint from developing and using deliverables similar to the deliverables provided to DUA under this SOW for its own purposes or for third parties, as long as BearingPoint does not use or disclose DUA's confidential information or material. Any knowledge, principles or experience learned, obtained or remembered by BearingPoint in implementing QUEST for DUA can be used by BearingPoint and its personnel again for BearingPoint or others.

DUA and BearingPoint expressly acknowledge the rights, obligations and interest associated with the ownership and licensing of the intellectual property rights herein, including but not limited to this Section 7.4 and Appendix F, are material to both parties and reflect the parties' agreement and intent. The parties further acknowledge the clarifications to the intellectual property rights in this Statement of Work were negotiated and entered into with the expectation they are fully enforceable. Should any questions or issues arise relative to the clarifications; the parties agree to negotiate in good faith to resolve the questions or issues in a way that gives the greatest effect to the parties' agreement and intent. In the event any of the Contractor Property, as defined herein, is subsequently determined to be the Commonwealth Property then all such transferred Contractor Property shall be subject to the following: DUA hereby grants to BearingPoint permission to use the Commonwealth Property with a right to copy, reproduce, distribute, reverse engineer, decompile, disassemble, modify, license, sub-license, create and use all derivative works based upon the Commonwealth Property for itself or others, to the extent that no confidential information of DUA is disclosed to any third parties.

### 7.4.5 Clearance

BearingPoint will not be responsible for providing any third party hardware or software for the purposes of the QUEST solution implementation. All third party software and hardware for the QUEST solution will be purchased or licensed directly by DUA. DUA represents to BearingPoint that it has obtained or will obtain all rights, grants, assignments, conveyances, licenses, permissions and authorizations necessary or incidental to any materials owned by third parties supplied or specified by it for incorporation in the deliverables to be used or developed for DUA under the QUEST solution. With respect to any services performed on the QUEST solution's deliverables by BearingPoint subcontractors, BearingPoint represents to DUA that it has obtained or will obtain all rights, grants, assignments, conveyances, licenses, permissions and authorizations necessary or incidental to any materials owned by these subcontractors supplied or specified by it for incorporation in the deliverables to be developed for DUA under QUEST.

## *7.5 DUA's Responsibilities*

In addition to the tasks set forth in section 6.5 Equipment, Work Space, Office Supplies, DUA shall be responsible for the following:

DUA's Project Manager will procure all hardware and third party software for the QUEST software solution including development, test, production and Disaster Recovery hardware; required commercial off the shelf software including Microsoft O/S, IIS, Oracle and Filenet. A Microsoft Sharepoint Project Server will be provided to maintain project documentation and IBM Requisite Pro software will be provided with 25 virtual licenses to record and track "requirements".

**Changes to Source Systems** – DUA is responsible for any application modifications (if necessary) to existing DUA legacy systems.

**Hardware and Software –** DUA will provide the network and operating infrastructure necessary to support the QUEST System such as network connectivity, server back ups, appropriate fire walls, redundant equipment (e.g., Application Servers), etc. DUA will provide the Oracle database software and sufficient licenses to support the QUEST System. DUA will purchase, install and configure for use, all required hardware and software prior to the development of the QUEST System. DUA will pay for all hardware and software and its installation and configuration, (non-UI solution software) for all technical environments.

**Software Licensing -** DUA will provide third party software for the project as indicated in section 9.8 Project Tools.

**Network Operations** – DUA is responsible for network redundancy, performance and availability (e.g., redundant NICs, switches, capacity, etc.).

**Systems Management** – DUA will use its existing network management tools and processes for monitoring hardware performance, security threats, backup, disaster recovery, etc.

DUA shall cooperate with BearingPoint in its rendering of the Services, including, without limitation, making timely decisions, providing BearingPoint with timely access to appropriate data, information and personnel of DUA according to agreed upon Timeframes and Project Plans.

## 7.6 Software Configuration Management Procedures

BearingPoint will ensure DUA that at a minimum the following are met:

The basic functions of Configuration Management:

- **Identification** - specifying and identifying all components of the final product.
- **Control** - the ability to agree and 'freeze' products and then to make changes only with the agreement of appropriate named authorities. Once a product has been approved, the motto is 'Nothing moves and nothing changes without authorization'.
- **Status accounting** - the recording and reporting of all current and historical data concerned with each product.
- **Verification** - a series of reviews and configuration audits to ensure that there is conformity between all projects products and the authorized state of products as registered in the Configuration Management records.
- **Source Safe will be used.**

This will be met by BearingPoint as part of the Fiscal Year 2008 Plan as identified in section 8.

## 7.7 Other Terms

- In clarification of the Commonwealth Terms and Conditions (clause 4), prior to any termination or suspension of BearingPoint for breach pursuant to the Commonwealth Terms and Conditions (clause 4), DUA shall provide a written

notice of and a reasonable opportunity to BearingPoint (at least 15 business days) to remedy any material breach or BearingPoint's failure to perform or fulfill its material obligations.

- In the event of any termination of this SOW by DUA for reasons other than for the uncured material breach by BearingPoint pursuant to the preceding paragraph, DUA shall reimburse BearingPoint for fees and expenses associated with the services performed prior to the termination date, including any deliverables or services in progress, and for any reasonable fees, costs or expenses documented by BearingPoint as incurred due to such termination of the Contract by DUA.

# 8. PROJECT SCOPE AND MILESTONES

This section describes the tasks and deliverables that BearingPoint will provide to DUA and the tasks that BearingPoint will complete by the end of the engagement described in this SOW. Deliverables will be considered "complete" when all the acceptance criteria set forth in this SOW have been met or the prescribed review period for each deliverable or task has expired without written response from DUA. The task/deliverable numbers are referred to in subsequent sections throughout this SOW.

**DUA will use a Microsoft Sharepoint Collaboration site to maintain all documentation for the project. All project Team Members including BearingPoint will use this site to store and manage project documents and artifacts.** All written documents shall be delivered in electronic format, capable of being completely and accurately reproduced by computer software on a laser printer. All itemized and/or annotated lists shall be delivered in computer spreadsheets, capable of being imported to Microsoft Excel, PowerPoint or Word. All meetings shall be held in the Hurley Building QUEST Project Area unless agreed to otherwise by the Project Managers. Meetings must be scheduled in advance, with reasonable accommodation of attendees' schedules. All meeting results will be described in a follow-up report generated by the BearingPoint Project Manager and approved by the DUA Project Manager.

## *8.1 Project Scope*

The scope of the QUEST project is defined by the tasks and deliverables specified below and the Use Case Statements in Appendix G.

## *8.2 Task Descriptions*

The following task list describes the major tasks to be performed on the QUEST project. These tasks will be expanded upon to create a detailed project work plan that will be used to monitor progress throughout the project.

| Task Name | Task Description |
|---|---|
| Task 1. Project Management | Perform project management activities for the life of the project. |
| Task 1.1. Develop and Maintain Project Work Plan | Develop a detailed project plan that outlines tasks, resources, timeframes, milestones, and deliverables for the QUEST Project and update the project plan regularly to track progress and plan for future tasks. |
| Task 1.2. Execute FasTrack Tasks | Begin using the Capability Maturity Model Integration (CMMI) quality processes and process controls. CMMI defined processes are important tools for managing project risk and for managing quality in the application development process. |
| Task 1.3. Conduct Project Execution and Control | Manage the success of the QUEST project through experienced planning, careful tracking, and accurate reporting. |
| Task 1.4. Conduct Contract Closeout | Finalize the QUEST project and close out the contract. |
| Task 2. Project Initiation | Perform project initiation activities. |
| Task 2.1. Conduct Project Kickoff | Initiate the QUEST project and make the plans necessary for a successful project. |
| Task 2.2. Develop a Communications Strategy and Plan | Detail the guiding principles for project communication and outline all communications events and messages to be deployed during the life of the project. |
| Task 3. Project Inception | Perform overall requirements definition, business process design and technical architecture design.. |
| Task 3.1. Develop Business Requirements | Perform an overall functional decomposition for QUEST and assist DUA in deciding which major system component (benefits / revenue) will be developed and implemented as Increment 1 and which will be Increment 2.<br><br>Develop the requirements for all functions of the QUEST system using the uFACTS Solution Framework design artifacts and DUA's unique requirements and MA laws as a baseline. Track each requirement by business area, technical area, functional release, and stage of development. Document changes needed in the uFACTS Solution Framework. |
| Task 3.2. Design Business Processes | Develop the business processes for all functions of the QUEST system using the uFACTS Solution Framework, the existing Massachusetts process flows, and the project goals as input. Document changes needed in the uFACTS Solution Framework. |

| Task Name | Task Description |
|---|---|
| Task 3.3. Design the Technical Architecture | Design the technical architecture for the QUEST system and integrate it with the existing DUA infrastructure based on DUA's needs and the architecture requirements from the RFQ and proposal. This includes developing a final architecture diagram and confirming what hardware and software will be needed and in what quantity. The architecture will address design, development, and testing. |
| Task 3.4. Develop the Technical Infrastructure | Build the technical foundation for developing and implementing the UI system. |
| Task 3.5. Plan the Knowledge Transfer | Define a strategy to transfer knowledge to members of the QUEST project team for the respective functional releases, including knowledge of technical areas, project management, and business process reengineering, requirements, and training and testing leading practices. |
| Task 4. Increment 1 | Perform the design, development and implementation tasks for the Increment 1 functionality. |
| Task 4.1. Perform Increment 1 Inception Tasks | Review Increment 1 requirements and plan functions to be developed. |
| Task 4.1.1. Review Requirements and Process Flows | Review the process flows, usability requirements, data design, and requirements for Increment 1 functionality that was developed as part of the project inception task. |
| Task 4.1.2. Determine Functions Included in Increment 1 | Work collaboratively with DUA to identify the functions that will be part of Increment 1. |
| Task 4.2. Elaborate Increment 1 | Design Increment 1 functionality. |
| Task 4.2.1. Conduct JAD Sessions | Identify where the uFACTS Solution Framework design meets the needs of DUA and where additions, deletions, or changes need to occur. The JAD sessions are vital to providing DUA with a forum for validating that the QUEST system meets their needs and requirements. |

| Task Name | Task Description |
|---|---|
| Task 4.2.2. Design Use Cases | Move from requirements and process flows into detailed use case system modeling and design by further defining the business processes and modeling the web-server-based objects and batch business objects. These objects will be further defined during detail design. |
| Task 4.3. Construct Increment 1 | Build and test Increment 1 functionality. |
| Task 4.3.1. Develop System Functionality | Develop, unit test, and perform initial integration testing of the application components associated with the increment. Unit testing will be conducted in an informal manner and used to verify that transactions and business processes are working according to their design specifications. |
| Task 4.3.2. Test System Functionality | Thoroughly test Increment 1 functionality to help verify that the application is ready to be deployed. |
| Task 4.4. Transition to the New System | Transition Increment 1 functionality into production use. |
| Task 4.4.1. Test User Acceptance | Assist DUA in conducting user acceptance testing (UAT) of the QUEST system. The UAT team will use the UAT plan to test the application. During UAT, the project team will support the testers in the execution of their test plans and use the testing tools to provide additional verification of system performance. |
| Task 4.4.2. Convert QUEST Data | Convert necessary data and develop the bridging interfaces necessary to support the QUEST system. |
| Task 4.4.3. Create the Production Infrastructure | Create the production environment and integrate it with DUA production infrastructure. |
| Task 4.4.4. Develop a Contingency and Disaster Recovery Plan | Define and implement a contingency plan for protecting project assets. Identify disaster recovery procedures and locations based on DUA standards and uFACTS artifacts. |

| Task Name | Task Description |
|---|---|
| Task 4.4.5. Train Users | Develop and implement plans that address the specific needs of DUA end users and help effectively transition them to the new business processes. Conduct technical training and support end-user training for the implementation and use of the increment. |
| Task 4.4.6. Develop System Documentation | Build and deliver technical and user documentation to support system administration and training. System documentation comprises user manuals and the operations manual. |
| Task 4.4.7. Deploy Increment 1 | Implement an operational QUEST increment and deploy it to DUA and its users. |
| Task 5. Increment 2 | **NOTE: The tasks and sub-tasks for Increment 2 will be the same as those performed for Increment 1. Along with the other project tasks, these will be identified in detail and tracked on the approved project plan.** |
| Task 6. Operations | Plan for and operate QUEST system in production. |
| Task 6.1. Establish Maintenance and Confirm Transition | Develop the maintenance procedures and system operations agreements. |
| Task 6.2. Operate and Support the System | Provide systems operations support including warranty support for a three-month period. |

## *8.3 Milestones by Fiscal Year (FY2007 – FY2011)*

The table below lists the major project milestones by fiscal year.

| Fiscal Year | QUEST Milestone | Completion Date |
|---|---|---|
| FY 2008 | Functional Decomposition of QUEST functionality | July 2007 |

| Fiscal Year | QUEST Milestone | Completion Date |
|---|---|---|
| FY 2008 | Installation of uFACTS Solution Framework | August 2007 |
| FY 2008 | Completion of documented business process design (To be Process Model) and requirements definition | March 2008 |
| FY 2008 | Design appropriate technology architecture to support solution and business requirements | April 2008 |
| FY 2009 | Final detailed software design specification for Increment 1 core function: Benefits or Revenue. Decisions to be made on Appeal and Hearing, Program Integrity, and Economic Research. | September 2008 |
| FY 2009 | Final system construction for Increment 1 core function. | May 2009 |
| FY 2010 | System and User Acceptance Testing of Increment 1 core function | September 2009 |
| FY 2010 | Conversion/go-live of Increment 1 core function | October 2009 |
| FY 2010 | Final Detailed software design specification of Increment 2 core function: Benefits or Revenue | March 2010 |
| FY 2011 | Final system construction for Increment 2 core function. | November 2010 |
| FY 2011 | System and User Acceptance Testing of Increment 2 core function | March 2011 |
| FY 2011 | Conversion/go-live of Increment 2 core function | April 2011 |
| FY 2012 | Contract Close out | July 2011 |

# 9. DELIVERABLE SCHEDULE AND PAYMENT TERMS

BearingPoint agrees to invoice DUA for the deliverables or work completed per the requirements set forth in the Statement of Work. DUA will make payments to BearingPoint only after receiving an accurate invoice for deliverables completed and accepted pursuant to Section 5 of this SOW. Payment for specific tasks and deliverables shall be made in accordance with the tables in sections 9.1 through 9.6 below.

Payments will be made in accordance with the Commonwealth's bill paying policy.

## *9.1 FY2007 (June 2007)*

| Deliverable | | Price |
|---|---|---|
| **Project Work Plan and Project Management Plan Deliverable** | Details the tasks to be performed and associated time frames in Microsoft Project. DUA and BearingPoint will jointly review, revise, detail, and submit the project plan associated with this work effort. Also includes a communication plan and other project management procedures for the project team. | **$800,000** |
| **Deliverable Expectation Documents.** | Contains a description of all deliverables to be produced on the project. Outlines, at a high level, the purpose, assumptions and constraints, and approach of each deliverable. This has proven to be a very successful tool in setting expectations for project deliverables. | **$280,000** |
| **Sub-Total FY2007** | | **$1,080,000.00** |

## *9.2 FY2008 (July 2007 to June 2008)*

| Deliverable | | Price |
|---|---|---|
| **Functional Design Definition Deliverable** | The Functional Design Definition Deliverable will contain a high-level decomposition of the functionality to be delivered for the entire QUEST system. This deliverable will identify the high-level use case definitions, groupings of use cases into functional components and a mapping of DUA business objectives and use case functionality. | $600,000 |
| **Initial CMMI Plans Deliverable** | Contains the project-management plans required by CMMI, including the issue-management, change-management, software quality assurance (SQA), software quality management (SQM), and risk management plans. | $1,400,000 |
| **uFACTS Framework Installation Deliverable** | Certifies that the uFACTS framework is installed at the QUEST project site. The Rational environment will be set-up and design artifacts loaded before requirements and to-be process flows are customized for DUA. | $1,080,000 |
| **Requirements and Business Process Plan Deliverable** | Defines the requirements management and business process design discipline to be executed throughout the duration of the project. Finalizes the Rational artifacts that will be produced as part of requirements and business process flows. | $600,000 |

| Deliverable | | Price |
|---|---|---|
| **Requirements Definition Deliverable** | Contains the requirements for all system functions. DUA and BearingPoint will collaboratively develop this deliverable, using the results of the gap analysis between the requirements needed for QUEST and the uFACTS functionality. | $2,480,000 |
| **Business Process Design Deliverable** | Contains the process flows for all the new system's functions and other Rational artifacts. | $2,560,000 |
| **Technical Architecture Deliverable** | Details the components of the architecture, including version levels and configuration. Consists of network diagrams, server placement, access requirements, firewall ports and services needed, security requirements, backup requirements, and bandwidth requirements. | $400,000 |
| **Increment 1 Increment Plan Deliverable** | Defines the scope of functionality in Increment 1. The plan will address when Appeals and Hearing, Program Integrity, and Economic Research will be designed and developed. | $440,000 |
| **Increment 1 Knowledge Transfer Plan Deliverable** | Describes how we will manage the mentoring, coaching, and knowledge transfer to DUA team members throughout all Increment 1 project activities. | $200,000 |
| **Initial Increment 1 Detailed Design Deliverable** | Provides an initial set of design documents for an initial subset of components included in the first iteration of Increment 1. Includes use cases and activity diagrams. | $1,800,000 |
| **Sub-Total FY2008** | | **$11,560,000.00** |

### *9.3 FY2009 (July 2008 to June 2009)*

| Deliverable | | Price |
|---|---|---|
| **Systems Configuration Plan Deliverable** | Defines the configuration management discipline to be executed throughout the duration of the project for the QUEST application. | $400,000 |
| **Final Increment 1 Detailed Design Deliverable** | Provides final design documentation for the components included in Increment 1. Includes a requirements-to-design traceability matrix to document that all requirements are captured in the design. | $1,400,000 |
| **Increment 1 Interface Integration Plan** | Describes the approach to develop the necessary Increment 1 system interfaces and integrate them into the QUEST system. | $240,000 |

| Deliverable | | Price |
|---|---|---|
| **Increment 1 Training Plan Deliverable** | Provides an overview of training methodology and approach. Identifies the Increment 1 training courses, number of sessions, and associated course objectives, including the training method for all training material to be developed (such as classroom, computer-based training [CBT], etc.). Addresses procedures for implementing and maintaining a training database. | $920,000 |
| **Increment 1 Conversion and Data Migration Plan Deliverable** | Includes the approach for designing and developing data conversion programs, testing the conversion process, and converting the data for the Increment 1 functionality.<br>Elaborates how the integrity and confidentiality of the data will be protected throughout the conversion process. Include a crosswalk of each system data structure and the relevant conversion rules. Defines the approach to migrating historical data and cutover planning for open claims and active employer data. | $1,280,000 |
| **Increment 1 System Test Plan** | Outline the system performance testing, system testing, and UAT approach and acceptance criteria. | $560,000 |
| **Increment 1 Construction Deliverable** | Documents that Increment 1 system code components have been developed and unit tested. | $2,040,000 |
| **Increment 1 System Test Deliverable** | Documents that Increment 1 system code components have completed an initial round of system testing. Includes a traceability matrix between the test scripts and the use cases documenting that all application functionality was tested. | $1,800,000 |
| **Increment 1 Contingency and Disaster Recovery Plan Deliverable** | Plans for resolving risks and maintaining the current production capability if the Increment 1 implementation is delayed. Addresses strategies for business and system continuity in the case of implementation issues. Addresses disaster recovery procedures and physical locations. | $300,000 |
| **Sub-Total FY2009** | | **$8,940,000.00** |

### *9.4 FY2010 (July 2009 to June 2010)*

| Deliverable | | Price |
|---|---|---|
| **Increment 1 Training Completion Letter** | States that technical training and user train-the-trainer training for Increment 1 has been completed. Includes training materials. | $400,000 |
| **Increment 1 UAT Completion Deliverable** | States that support for state-sponsored UAT procedures is complete. | $440,000 |

| Deliverable | | Price |
|---|---|---|
| **Increment 1 Conversion Completion Deliverable** | Documents that conversion of legacy data necessary to support the Increment 1 implementation is complete. | $1,080,000 |
| **Increment 1 System Documentation Deliverable** | Contains the maintenance manual, data dictionary, and help text. For some of the components, this deliverable may reference online material rather than paper copy. | $676,000 |
| **Increment 1 Maintenance Procedures Deliverable** | Describes the Increment 1 maintenance, operations, and support procedures. | $600,000 |
| **Increment 1 Implementation Completion Deliverable** | States that all implementation activities have been completed and Increment 1 functionality is operational. | $1,040,000 |
| **Increment 1 Transition Completion Letter Deliverable** | States that Increment 1 transition activities are complete. The application and infrastructure components are in production. | $840,000 |
| **Increment 2 Increment Plan Deliverable** | Defines the scope of functionality in Increment 2. Contains the approach to integrating the Increment 2 functionality with the implemented Increment 1 functionality. | $440,000 |
| **Increment 2 Knowledge Transfer Plan Deliverable** | Describes how we will manage the mentoring, coaching, and knowledge transfer to DUA team members throughout all Increment 2 project activities. | $200,000 |
| **Initial Increment 2 Detailed Design Deliverable** | Provides an initial set of design documentation for an initial subset of components included in the first iteration of Increment 2. Includes use cases and activity diagrams. | $1,800,000 |
| **Final Increment 2 Detailed Design Deliverable** | Provides final design documentation for the components included in Increment 2. Includes a requirements-to-design traceability matrix to document that all requirements are captured in the design. | $1,400,000 |
| **Increment 2 Interface Integration Plan** | Describes the approach to develop the necessary Increment 2 system interfaces and integrate them into the QUEST system. | $240,000 |

| Deliverable | | Price |
|---|---|---|
| **Increment 2 Training Plan Deliverable** | Provides an overview of training methodology and approach. Identifies the Increment 2 training courses, number of sessions, and associated course objectives, including the training method for all training material to be developed (such as classroom, computer-based training [CBT], etc.). Addresses procedures for implementing and maintaining a training database. | $180,000 |
| **Increment 2 Conversion and Data Migration Plan Deliverable** | Includes the approach for designing and developing data conversion programs, testing the conversion process, and converting the data for the Increment 2 functionality.<br>Elaborates how the integrity and confidentiality of the data will be protected throughout the conversion process. Include a crosswalk of each system data structure and the relevant conversion rules. Defines the approach to migrating historical data and cutover planning for open claims and active employer data. | $272,000 |
| **Sub-Total FY2010** | | **$9,608,000.00** |

## *9.5 FY2011 (July 2010 to June 2011)*

| Deliverable | | Price |
|---|---|---|
| **Increment 2 System Test Plan** | Outline the system performance testing, system testing, and UAT approach and acceptance criteria for Increment 2. | $560,000 |
| **Increment 2 Construction Deliverable** | Documents that Increment 2 system code components have been developed and unit tested. | $1,800,000 |
| **Increment 2 System Test Deliverable** | Documents that Increment 2 system code components have completed an initial round of system testing. Includes a traceability matrix between the test scripts and the use cases documenting that all application functionality was tested. | $1,680,000 |
| **Increment 2 Contingency and Disaster Recovery Plan Deliverable** | Plan for resolving risks and maintaining the current production capability if the Increment 2 implementation is delayed. Addresses strategies for business and system continuity in the case of implementation issues. Addresses disaster recovery procedures and physical locations. | $300,000 |
| **Increment 2 Training Completion Letter** | States that technical training and user train-the-trainer training for Increment 2 has been completed. Includes training materials. | $400,000 |
| **Increment 2 UAT Completion Deliverable** | States that support for state-sponsored UAT procedures is complete. | $440,000 |

| Deliverable | | Price |
|---|---|---|
| **Increment 2 Conversion Completion Deliverable** | Documents that conversion of legacy data necessary to support the Increment 2 implementation is complete. | $1,080,000 |
| **Increment 2 System Documentation Deliverable** | Contains the maintenance manual, data dictionary, and help text. For some of the components, it may reference online material rather than paper copy. | $676,000 |
| **Increment 2 Maintenance Procedures Deliverable** | Describes the Increment 2 maintenance, operations, and support procedures. | $200,000 |
| **Increment 2 Implementation Completion Deliverable** | States that all implementation activities have been completed and Increment 2 functionality is operational. | $760,000 |
| **Increment 2 Transition Completion Letter Deliverable** | States that Increment 2 transition activities are complete. The application and infrastructure components are in production. | $640,000 |
| **Contract Closeout Deliverable** | Contains verification that issues have been addressed and formal deliverables accepted. It also contains lessons learned. | $276,000 |
| **Sub-Total FY2011** | | **$8,812,000.00** |

## *9.6 Total Cost, all Deliverables*

| **Total Deliverables** | **Total Price** |
|---|---|
| **Total: FY2007 through FY2011** | **$40,000,000.00** |

## *9.7 Statement of Work Assumptions and Conditions*

This Statement of Work was developed based on and is subject to the following factors, assumptions and conditions:

- **Scope** - This document serves to provide a common understanding of the DUA QUEST project scope; however, the final scope will be defined during the project in Joint Requirement Management (JRM) sessions and Joint Application Design (JAD) sessions, resulting in a final set of requirements and an approved design.

- **Sequencing Functions** - The combined DUA and BearingPoint project management team will collaborate on the decision regarding how to sequence the major QUEST functions (Revenue and Benefits). This decision will be made early in the project and the final project work plan will be revised based on the sequencing decision.

- **Project Work Plan** - The project work plan, included in this statement of work (SOW) assumes a May 2007 project start date. A more detailed final project work plan will be developed early in the project.

- **Methodology** – This Statement of Work assumes the use of BearingPoint's ProvenCourse methodology. BearingPoint believes the use of this methodology will help deliver an unemployment system that meets the requirements of this SOW while minimizing the risks of the project. BearingPoint and DUA will work together during the inception phase of the project to develop the final work plan for this SOW.

- **User Representative Authority** – BearingPoint's approach to system design and implementation is highly concentrated, visual, and relies heavily on focus group work sessions with the user representatives to validate business and technical requirements. The project work plan will assume and require that user representatives attending design sessions have full authority necessary to direct BearingPoint's analysts and make final decisions regarding the functionality of the system.

- **DUA Involvement on Project Team** – BearingPoint has not included any direct labor costs for DUA staff in the cost of any project deliverables. DUA will provide staff with an adequate level of experience and authority that can be fully integrated into the project team as an important part of the knowledge transfer process that will allow DUA to take full ownership of the project upon implementation. In the Engagement Definition task, BearingPoint and DUA will work together to define the participation requirements and expectations for the DUA staff. DUA's commitment of staff resources to this project is essential to the success of the project and to DUA's ability to operate the system after implementation. DUA staff assigned to the project will complete their detailed assignments as defined in the mutually agreed to work plan within the time frames identified.

- **Access to DUA Staff and Subject Matter Experts** –BearingPoint will have timely access to DUA subject matter experts to assist in identifying business rules, resolving business process discrepancies, and answering ad hoc questions. These subject matter experts will, in turn, solicit input from division managers on any areas where policy or procedure is undefined. The follow up on issues requiring DUA input and decision-making will be completed within the time frames identified in the work plan.

- **Prompt Deliverable Sign-off** – Approval and sign-off on all deliverables will occur promptly within ten (10) business days of submittal unless a different time period has been agreed to between the parties in the deliverable expectation document (DED) for a particular deliverable, in which case such period specified in the DED shall be used for acceptance pursuant to the DED and section 5 of this SOW. If formal sign-off has not occurred within the specified timeframe, the deliverable will be considered accepted. Refer to Section 5 of the SOW for general acceptance terms.

- **Schedule Adjustments** – BearingPoint has estimated the hours and costs required to complete this project on the basis of their understanding of QUEST scope, the information provided in the RFQ, and their previous system implementation experience. During any given phase of this project, some tasks may not take as long as estimated and other tasks may take longer than estimated. In these instances, BearingPoint and DUA will work together to adjust deliverable time schedules and dates to make the most efficient use of the time and budget allocated, including pursuant to section 6.3 of the SOW.

- **Requirements for Additional Hours/Budget** – If BearingPoint has problems meeting their responsibilities because of situations outside of their control or because of additional tasks or requirements identified during the project that were not originally estimated, they will assess and determine the impact to the project, and adjust the project schedule to remedy the situation if possible. However, BearingPoint and DUA may agree that the unexpected problems or scope requirements necessitate an increase in the scope of the project by approving a change order that adds budget and/or time to the project pursuant to section 6.3 of the SOW. Examples of problems outside of BearingPoint control include, without limitation:
    - Delays in delivery of the hardware and licensed software that is required prior to system implementation
    - Changes to legislation
    - Changes to validated business requirements
    - Turnover of key DUA staff
    - Low or infrequent DUA participation
    - Inadequate communication with or cooperation from DUA Sponsors, staff and external stakeholders, including untimely provision of required information, materials, staff or approvals
    - Late, incomplete, or inconsistent information from DUA Sponsors, or other external stakeholders
    - Lack of testing or training facilities or staff to complete their responsibilities
    - Changes to DUA Architecture Standards
    - Changes to Project Management/Reporting Requirements
    - Changes to Federal contracting requirements
    - Changes to Federal funding availability

- **System Training Requirements** – The following assumptions and conditions apply to DUA training requirements:
    - ***Training Participants' Baseline Knowledge and Skill Level*** – DUA training participants will enter the classroom with a thorough understanding of DUA business rules upon which the new System is based. Training participants will have a basic knowledge of PCs and operating system functions before attending system functionality training.

- ***End-User Training*** – The project team will address the training requirements in accordance with Section 6.2 of the RFQ and the answer to question #57C in the bidder's question and answer document. If DUA determines that there is a need for additional training, BearingPoint will work with DUA to identify the additional required training. In accordance with the requirements of the RFQ, the project will utilize a "train the trainer" approach combined with self-paced training for the overall end-user training approach.
- ***Technical Training*** – BearingPoint will provide technical and operations training for DUA technical and system administration staff. The details and number of sessions performed will be discussed and agreed between BearingPoint and DUA during the project and documented in the deliverable expectation document (DED) for technical training. DUA will assign system administration and technical resources with the requisite knowledge and skill to learn how to provide long-term support to the QUEST System. These staff will also work with the project team during the development and deployment of the QUEST System to allow for a more effective knowledge transfer.

- **DUA Acceptance Testing Requirements** – The following assumptions and conditions apply to DUA acceptance testing:
  - User Acceptance Testing (UAT) is the responsibility of DUA. DUA, with BearingPoint's assistance, will prepare the User Acceptance Test Plan, and DUA will execute that plan agreed between the parties. BearingPoint's Project team will create an acceptance test region and a test database structure. It is the responsibility of DUA to populate the acceptance test database. DUA may use test scenarios and test scripts that BearingPoint develops for the System Test as part of the Acceptance Test. BearingPoint and DUA will work together to define acceptance criteria and this criteria will be documented in the deliverable expectation document (DED) for user acceptance testing. DUA will not unreasonably withhold or delay acceptance of the system.
  - BearingPoint will review and comment on the User Acceptance Test plan. BearingPoint will provide technical assistance to DUA's acceptance test team in the maintenance of the acceptance test region. Where necessary, BearingPoint will assist DUA's acceptance test team in interpreting the results of the test. BearingPoint will discuss the findings with DUA and resolve agreed upon defects in a timely manner.
  - DUA will provide staffing to assist with and participate in the system, performance, parallel, and user acceptance testing of the application in the timeframes allocated in the final detailed work plan that is accepted by DUA.
  - There will be an acceptance testing period of 60-90 days for each of the QUEST System core functions. If acceptance testing extends beyond this duration due to reasons outside of BearingPoint's control, upon agreement BearingPoint will negotiate additional support for DUA acceptance testing activities.

- Upon DUA acceptance of each QUEST system core function, DUA and BearingPoint will work together to implement the core function according to the approved project work plan. DUA will not unreasonably delay the implementation of a QUEST system core function after it has been accepted.

- **Performance Testing** – BearingPoint will develop a Performance Test Plan as a part of the overall System Test Plan. The Performance Test Plan will define the scope and duration of the performance testing activities as well as the mutually agreed upon acceptable performance criteria for the application. These criteria will be documented in the deliverable expectation document (DED) for The Performance Test Plan. BearingPoint will execute that plan to test the performance of the QUEST System in accordance with the criteria specified in the DED. The Mercury Interactive Suite of tools will be used for performance testing.

- **System Design Artifacts** – The system design, including all appropriate Rational Design artifacts, will be based on current Federal, state and local policies and procedures. Any requested modifications to these policies and procedures after the detailed design has been approved will be negotiated for determination of priority and contractual impact.

- **Data Conversion** – The budget proposed for data conversion under QUEST in BearingPoint's proposal is based on the information provided in the RFQ and the questions answered through the procurement process (specifically answer #57D). BearingPoint will provide services to convert the required data from the following 8 primary databases: UI Benefits, UI Hearings (Appeals), UI Trade Readjustment Allowances, Revenue (TAX), Wage Records, Revenue (Reimbursable Employer), Revenue (Universal Health Insurance – UHI) and AAA/WPA. BearingPoint will work collaboratively with DUA in order to determine which data elements from these 8 databases should be converted to the new system. If data from additional systems is required for QUEST or additional conversion support, such change will be agreed between the parties via a change order pursuant to section 6.3 of the SOW.

  DUA will perform any data purification processes necessary to cleanse the data and provide the data in the format BearingPoint requests. BearingPoint's approach to conversion requires the provision of "scrubbed" ASCII extract files from the existing production systems. DUA and BearingPoint agree that converting errors into the new System database should be avoided. Unnecessary and incomplete data will be identified and dealt with by DUA staff. Consequently, while BearingPoint will provide DUA with the specifications for these extract files, DUA is responsible for identifying and correcting such errors prior to conversion. Data conversion for production is assumed to be a one-time process. In order to perform the data mapping, BearingPoint resources will need access to knowledgeable technical staff that understand the legacy data sources and data structures. DUA will provide access to that staff and will assist in the mapping of legacy data.

- **Integration and Interface Design and Development** – The budget for integration and interfaces is based on the information provided in the RFQ Section 4.3. As a

result, BearingPoint will provide services to develop inbound/outbound interfaces for the following systems:

- UIRR
- CSC (SAVE)
- BOA/Sovereign
- MMARS
- Intercept
- DOR
- Industrial Accident Board
- Mass Highway
- State Police
- IRS
- Railroad Retirement
- Placement Accountable System
- MOSES
- SDDS
- MSP
- 202 System
- HR/Personnel
- Secretary of State (incoming e-mail)

BearingPoint will work collaboratively with DUA in order to determine the requirements for these interfaces in the Inception Phase of the project. Detailed specifications for these interfaces will be created in the Elaboration Phase of the project. In order to perform the mapping necessary to design system interfaces, BearingPoint resources will need access to knowledgeable technical staff that understands the legacy data sources and data structures. DUA will provide timely access to that staff. If additional interfaces are required for QUEST, BearingPoint will negotiate with DUA for the necessary additional interface design and development support.

- **Interfacing to Existing Employment System (MOSES)** – QUEST will be designed to capture certain re-employment data for purposes of interfacing with MOSES system. The planned QUEST solution supports these interface capabilities.
- **FileNet Integration Services** - BearingPoint's scope of services includes integrating the QUEST solution with FileNet's P8 document imaging platform. BearingPoint and DUA will work together in the project to determine any necessary upgrades to the FileNet software. FileNet upgrades will be the responsibility of DUA. BearingPoint is not responsible for any upgrades to the FileNet software under this SOW. Under this SOW, BearingPoint is responsible for providing integration services between QUEST and FileNet P8. DUA is responsible for obtaining any necessary FileNet software licenses and/or upgrades and in a timely manner enabling BearingPoint to perform the integration services hereunder.
- **Change Management Services** - DUA will manage Change Management and Communications activities on the project. BearingPoint will provide advice and reasonable assistance in these areas of the project. BearingPoint is not responsible for conducting any additional activities in this area of the project.
- **Disaster Recovery Services** - BearingPoint will provide design recommendations for disaster recovery as follows: technical design, hardware configuration, network

design and contingency planning. BearingPoint is not responsible for the implementation of or costs for a Disaster Recovery site.

- **MSP Program** – The MSP program is considered out of scope for the QUEST project.
- **IVR Integration Assumptions** – The following assumptions and conditions apply to IVR integration:
    - The current functional services offered through the Massachusetts DUA IVR will be maintained and implemented with the QUEST project. No functions will be added, nor reduced, through the IVR self service delivery channel.
    - The IVR will be integrated with the QUEST application, calling business rules developed in the QUEST application.
    - Any change to the Avaya physical architecture and hardware is out of scope for the QUEST project. BearingPoint is not responsible for any changes to the Avaya production environment needed to support the new QUEST system. DUA is responsible for upgrading the current Avaya IVR/Call center to a recent release in order to integrate the IVR functions with the QUEST Benefits functionality providing both a development and production capability for the QUEST project. BearingPoint will develop the useable API's within the QUEST system for the Avaya IVR CTI/PBX solution to use.
    - BearingPoint is not responsible for call routing outside of the IVR (e.g. how a call presents to the IVR, or bounces out to a staff member).
- **Hardware and Software Specifications** – Hardware, software and physical infrastructure specifications and pricing will be prepared by the DUA and BearingPoint project team during the first phase of the project. The QUEST hardware and network topology implementation will be a collaborative effort between DUA and BearingPoint in order to optimize system performance and minimize risk points in the topology.
- **Data Warehouse** – The creation of a data warehouse is not in BearingPoint's scope for the QUEST project.
- **Fail-Over Expectations** – Meeting the fail over expectations identified in the QUEST RFQ is a joint responsibility between BearingPoint and DUA. The expectations for system fail-over are met in as far as the uFACTS Solution Framework is concerned, as specified in BearingPoint's proposal in response to the RFQ. However, meeting these expectations for the overall QUEST solution goes beyond the core uFACTS Solution Framework. There are several other variables that will impact the QUEST solution's ability to meet these expectations, such as, the network infrastructure and operating system, the physical hardware being used, the Avaya (IVR/ACD) system, the FileNet and Crystal Reports software, as well as various other integral components to the overall QUEST solution. These components need to be implemented with the fail-over expectations in mind. Several of these

components are the responsibility of DUA, including without limitation the management and implementation of the network infrastructure and physical technical infrastructure. BearingPoint and DUA will work together to define an appropriate enterprise-wide solution to meet the fail-over expectations, given these variables.

- **System Response Time and Up Time Expectations** – The satisfaction of these expectations is a joint responsibility between BearingPoint and DUA. The system response time for the uFACTS Solution Framework is on average within the 3-8 second range specified in the RFQ, based on previous production implementations. Based on the business requirements defined by DUA, the QUEST system may need to perform additional calculations that may exceed this average response time for certain scenarios. BearingPoint and DUA will work together to identify these more resource-intensive scenarios and work to optimize them to the extent possible within the project scope. BearingPoint and DUA will also discuss and agree to system response time and system up time acceptance criteria which will be documented in the deliverable expectation document (DED) for production implementation. These criteria will include recognition of the execution of the nightly batch processes and database backup processes.
- **Requirements** – Unless a system or business requirement has been mutually agreed to between the parties and is specified as such in the SOW, a mutually agreed to DED, or an approved project deliverable, it is deemed aspirational only. Such aspirational or undocumented requirements are not the responsibility of BearingPoint and are not covered by the warranty provisions of this contract. For the purposes of clarification, system expectations and project success criteria in the RFQ are aspirational only and not considered agreed upon requirements.

## *9.8 Project Tools*

The project tools to be utilized during the project are listed below. BearingPoint is not responsible for providing any third party hardware or software for the purposes of QUEST. All third party software and hardware for QUEST will be purchased or licensed directly by DUA. The parties will coordinate throughout the project to ensure that licensing and purchasing of the third parties software and hardware does not adversely affect the project schedule.

| **Project Phase** | | | | |
|---|---|---|---|---|
| **Activity / Technique** | **Tool** | **Provided By** | **Estimated Number of Licenses** | **Available For Use By** |
| **Project Management Phase** | | | | |
| Project Methodology | BearingPoint ProvenCourse™ Methodology | BearingPoint | Unlimited | Project Start |

| **Project Phase** | | | | |
|---|---|---|---|---|
| **Activity / Technique** | **Tool** | **Provided By** | **Estimated Number of Licenses** | **Available For Use By** |
| Collaboration | Microsoft SharePoint (version 2007) | DUA | 75 | Project Start |
| Project Documentation | Microsoft Office (version 2007) | DUA | 41 | Project Start |
| Project Plans Management & Maintenance | Microsoft Project (version 2007) | DUA | 10 | Project Start |
| Quality Management | FasTrack Templates | BearingPoint | Unlimited | Project Start |
| **BPR and Inception Phase** | | | | |
| Requirements Management & Traceability | IBM Rational Suite (RequisitePro) version 7.0 | DUA | 20 Named , 10 Floating | July 2007 |
| Process Modeling | Microsoft Visio (version 2007) | DUA | 10 | Project Start |
| Base-line UI Requirements | BearingPoint uFACTS Solution Framework (excluding Third Party Property) | BearingPoint | Unlimited | July 2007 |
| Use Case Development | IBM Rational Suite (Rational Rose Modeler) version 7.0 | DUA | 20 Named and 5 Floating | July 2007 |
| Use Case Modeling | IBM Rational Suite (Rational Rose Modeler) version 7.0 | DUA | 20 Named and 5 Floating | July 2007 |
| Activity Diagramming | IBM Rational Suite (Rational Rose Modeler) version 7.0 | DUA | 20 Named and 5 Floating | July 2007 |
| Use Case Development | Dreamweaver 8 | DUA | 13 | July 2007 |
| **Elaboration Phase** | | | | |
| Base-line UI Use Cases | BearingPoint uFACTS Solution Framework (excluding Third Party Property) | BearingPoint | Unlimited | July 2007 |
| UML Analysis & Design Artifacts | IBM Rational Suite (Rational Rose Modeler) version 7.0 | DUA | 20 Named and 5 Floating | July 2007 |

| **Project Phase** | | | | |
|---|---|---|---|---|
| **Activity / Technique** | **Tool** | **Provided By** | **Estimated Number of Licenses** | **Available For Use By** |
| Architectural Diagrams | IBM Rational Suite (Rational Rose Modeler), Microsoft Visio, Microsoft Visual SourceSafe, Microsoft Office | DUA | N/A | July 2007 |
| Base-line UI Data Model | BearingPoint uFACTS Solution Framework (excluding Third Party Property) | BearingPoint | Unlimited | July 2007 |
| Database Modeling | Oracle Designer (version 10g) | DUA | 5 | July 2007 |
| **Construction Phase** | | | | |
| Base-line UI System Components | BearingPoint uFACTS Solution Framework (excluding Third Party Property) | BearingPoint | Unlimited | July 2007 |
| Code Generation & Unit/Integration Testing | Visual Studio Team System 2007 | DUA | 35 | July 2007 |
| System Testing & Regression Testing | Mercury Interactive Suite (specific products below all provided by DUA) | DUA | Licensing by product below | Dec 2007 |
| | Test Director for Quality Center 9.0 | | 15 users | |
| | Quick Test Pro | | 5 concurrent | |
| | Test Director Defect Manager | | 10 concurrent | |
| | LoadRunner 8.1 Controllers and Monitors | | Site license | |
| | LoadRunner Web Virtual User | | 500 licenses | |
| | Client Side Monitors | | Site license | |
| | Web Server Performance Monitors | | Site license | |
| | Web Application Server Performance Monitors | | Site license | |

| **Project Phase** | | | | |
|---|---|---|---|---|
| **Activity / Technique** | **Tool** | **Provided By** | **Estimated Number of Licenses** | **Available For Use By** |
| | Database Server Resource Monitors | | Site license | |
| Database Management, Development & Testing | Oracle Designer (version 10g) | DUA | 5 | July 2007 |
| Reporting | Crystal Reports Developer Edition XI | DUA | 10 | Oct 2007 |
| Reporting | Crystal Reports Server | DUA | 10 concurrent | March 2008 |
| Correspondence Generation | SoftArtisans OfficeWriter for .NET | DUA | None | Oct 2007 |
| Development Artifact Version & Change Control | Microsoft Visual Studio Team Foundation Server (Visual SourceSafe) | DUA | 35 | July 2007 |
| User Managed Rules Engine | ILOG Rules for .NET Rule Starter Pack Development | DUA | 10 | Oct 2007 |
| User Managed Rules Engine | ILOG Rules for .NET Rule Prod and Test | DUA | 20CPU | March 2008 |
| Online Help generation | RoboHelp Office Professional for .NET (version 6) | DUA | 5 | March 2008 |
| Database Manage and Query | Toad for Oracle Professional 9.0 | DUA | 60 | July 2007 |
| **Transition Phase** | | | | |
| Self-paced / Computer Based Training | Macromedia Captivate (version 2) | DUA | 5 | March 2008 |
| User Acceptance Testing | Mercury Interactive Suite | DUA | See above | Dec 2007 |

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Appendix A: Deliverable Acceptance Criteria (Example)

Massachusetts Department of
Workforce
Development
Division of Unemployment Assistance

BearingPoint
40

HIGHLY CONFIDENTIAL DEL00067782

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

# Appendix B: Deliverable Acceptance Form

## DELIVERABLE ACCEPTANCE FORM

***DUA QUEST PROJECT***

| **DELIVERABLE NAME AND NUMBER:** | **DESCRIPTION:** |
|---|---|
| **ACCEPTANCE CRITERIA:** | |

Project Manager Acceptance

☐ Approved ☐ Disapproved

Name ____________ Signature ________________ Date ________

Steering Committee review date, (if required):

Remarks:

Conditions to Acceptance

| Description | Resolution Date | Assigned to: |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

Disapproved Deliverable

New Deliverable complete by date:

| Reason/Issue Description | Resolution Date | Assigned to: |
|---|---|---|
| | | |
| | | |
| | | |

Massachusetts Department of
Workforce
Development
Division of Unemployment Assistance

BearingPoint

41

HIGHLY CONFIDENTIAL DEL00067783



THE COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF WORKFORCE DEVELOPMENT

# Appendix C: CORI

DEVAL L. PATRICK
GOVERNOR

TIMOTHY P. MURRAY
LT. GOVERNOR

SUZANNE M. BUMP
DIRECTOR

Executive Office of Public Safety
Criminal History Systems Board
200 Arlington Street, Suite 2200
Chelsea, MA 02150

GMADET
G

Dear Sirs:

The Department has been certified by the Criminal History Systems Board for access to conviction and pending criminal case data concerning prospective, otherwise-qualified employees. As an applicant for the position of ________________________ within the ______________________________ department/career center, I understand that a criminal record check will be conducted for conviction and pending criminal case information only and that it will not necessarily disqualify me. The information below is correct to the best of my knowledge.

**APPLICANT INFORMATION (PLEASE PRINT)**

**LAST NAME** **FIRST NAME** **MIDDLE NAME**

**MAIDEN NAME or ALIAS (if applicable)** **PLACE OF BIRTH**

**DATE OF BIRTH** **SOCIAL SECURITY NUMBER** **MOTHER'S MAIDEN NAME**

**ADDRESS:** ____________________________________________

**APPLICANT'S SIGNATURE** **DATE**

**The following information must be verified by the <u>hiring Manager</u> by reviewing a form of government issued photographic identification and attaching a copy of that identification.**

**SEX:** ______ **HEIGHT:** ____**ft.** ____**in.** **WEIGHT:** ___________ **EYE COLOR:** _______________

**STATE DRIVER'S LICENSE NUMBER:** ___________________________

The above information was verified by: _________________________________ from _______________ on ____________
Manager's Name Unit/Office Date

**Send <u>original</u> form, copy of ID AND resume to:** Internal Control & Security Department
19 Staniford Street, Boston, MA 02114

**REQUESTED BY:** _ Internal Control & Security Department ___________________________
19 Staniford Street, Boston, MA 02114 - Phone: (617) 626-6680

# Appendix D: Information Technology Resource Policy

Massachusetts Department of
Workforce
Development

## Information Technology Resources Policy

**Effective: July, 1998** **Last revision: December 2006**

This document formalizes the policy for employees of the Department of Workforce Development,
contractors and other authorized users (hereafter "users") on the use of information technology resources ("Agency ITRs"), including computers, printers and other peripherals, programs, data, local and wide area networks, the Internet, E-mail, facsimile machines, photocopiers, pagers, telephone and cellular phones, voicemail and two-way radios. Use of Agency ITRs by any users shall constitute acceptance of the terms of this policy and any such additional policies.

### 1. User Responsibilities

It is the responsibility of any user of Agency ITRs to read, understand, and follow this policy. In addition, users are expected to exercise reasonable judgment in interpreting this policy and in making decisions about the use of Agency ITRs. Any user with questions regarding the application or meaning of this policy should seek clarification from appropriate management. The Agency reserves the right to recoup any costs incurred for unauthorized use of ITR. Failure to observe this policy may subject users to disciplinary action, including termination of employment.

### 2. Acceptable Uses

The Department of Workforce Development firmly believe that Agency ITRs empower users and make their jobs more fulfilling by allowing them to deliver better services at lower costs. As such, users are encouraged to use Agency ITRs to the fullest extent in pursuit of the Agency's goals and objectives.

### 3. Unacceptable Uses of Agency ITRs

It is unacceptable for any user to use Agency ITRs:

o in furtherance of any illegal act, including violation of any criminal or civil laws or regulations, whether state or federal;
o for any political purpose;
o for any commercial purpose;
o to send threatening or harassing messages, whether sexual or otherwise;
o to access or share sexually explicit, obscene, or otherwise inappropriate materials;
o to infringe any intellectual property rights;

o to gain, or attempt to gain, unauthorized access to any computer or network;
o for any use that causes interference with or disruption of network users and resources, including propagation of computer viruses or other harmful programs;
o to intercept communications intended for other persons;
o to misrepresent either the Agency or a person's role at the Agency;
o to distribute chain letters;
o to access on-line gambling sites; or
o to libel or otherwise defame any person.

**4. Data Confidentiality**

In the course of performing their jobs, users may often have access to confidential or proprietary information, such as personal data about identifiable individuals or commercial information about business organizations. Under no circumstances is it permissible for users to acquire access to confidential data unless such access is required by their jobs. Under no circumstances may users disseminate any confidential information, unless such dissemination is required by their jobs.

**5. Copyright Protection**

Computer programs are valuable intellectual property. Software publishers can be very aggressive in protecting their property rights from infringement. In addition to software, legal protections can also exist for any information published on the Internet, such as the text and graphics on a web site. As such, it is important that users respect the rights of intellectual property owners. Users should exercise care and judgment when copying or distributing computer programs or information that could reasonably be expected to be copyrighted.

**6. Computer Viruses**

Users should exercise reasonable precautions in order to prevent the introduction of a computer virus into the local area or wide area networks. Virus scanning software should be used to check any software downloaded from the Internet or obtained from any questionable source. In addition, executable files (program files that end in ".exe") should not be stored on or run from network drives. Finally, it is a good practice to scan floppy disks periodically to see if they have been infected.

**7. Network Security**

Most desktop computers are connected to a local area network, which links computers within the Agency and, through the wide area network, to most other computers in state government. As such, it is critically important that users take particular care to avoid compromising the security of the network. Most importantly, users should never share their passwords with anyone else, and should promptly notify the DWD Information Security Office (part of the DWD Internal Control & Security Department) if they suspect their passwords have been compromised. In addition, users who will be leaving their PCs unattended for extended periods should either log off the network or have a password protected screensaver in operation. Finally, no user is allowed to access the

Internet or other external networks via modem unless they have received specific permission from DWD Information Security Office.

**8. E-mail**

When using e-mail, there are several points users should consider. First, because e-mail addresses identify the organization that sent the message (user@detma.org), users should consider e-mail messages to be the equivalent of letters sent on official letterhead. For the same reason, users should ensure that all e-mails are written in a professional and courteous tone. Finally, although many users regard e-mail as being like a telephone in offering a quick, informal way to communicate, users should remember that e-mails can be stored, copied, printed, or forwarded by recipients. As such, users
should not write anything in an e-mail message that they would not feel just as comfortable putting into a memorandum.

**9. No Expectation of Privacy**

Agency ITRs are the property of the Commonwealth of Massachusetts and are to be used in conformance with this policy. The Agency retains, when reasonable and in pursuit of legitimate needs for supervision, control, and the efficient and proper operation of the workplace, the right to inspect any user's computer, any data contained in it, and any data sent or received by that computer. Users should be aware that network administrators, in order to ensure proper network operations, routinely monitor network traffic. Use of Agency ITRs constitutes express consent for the Agency to monitor and/or inspect any data that users create or receive, any messages they send or receive, and any web sites that they access. The Agency does not intend to monitor the content of telephone conversations without prior notice. However, the usage of telephone communication is monitored for the performance of agency operations, maintenance, auditing, security, or investigative functions.

**10. Remote Access**

Some users will be authorized by the Agency for remote access to e-mail and other applications. Access is authorized for the same purposes as other Agency resources, i.e., business use. Managers should approve remote access only for those users which have a job-related need to access Agency resources remotely. Users authorized for remote access to e-mail and other applications are required to read, sign and comply with the terms and conditions explained in the Remote Access User Certification Agreement, which is Attachment B to this policy.

**All users of the Agency's Information Technology Resources are required to read and comply with this policy. Additionally, all users are required to sign (along with the responsible Department of Workforce Development manager) and submit Attachment A to this policy, the ITR Policy Acknowledgement Form.**

**Users requesting remote access are required to read, comply, sign (along with the responsible Department of Workforce Development manager) and submit the Remote Access User Certification Agreement, which is Attachment B to this policy.**

**ATTACHMENT "A"**

**INFORMATION TECHNOLOGY RESOURCES POLICY**

**ACKNOWLEDGMENT FORM FOR EMPLOYEES & NON-EMPLOYEES**

**Section 1: to be completed by employee or non-employee**

I hereby acknowledge receipt of the Policy concerning the use of Department of Workforce Development (DWD) Information Technology Resources. I understand that as:

Check One: ☐ an employee ☐ a non-employee

using ITR resources of the Commonwealth, it is my responsibility to read and comply with the requirements of this Policy.

____________________________ ____________________________

**PRINT NAME (non-employees)** **ORGANIZATION / COMPANY**

____________________________ ____/____/____

**SIGNATURE** **DATE**

**Section 2: to be completed by Manager responsible for employee or non-employee**

As the DWD's Manager responsible for the above named individual, I understand that it is my responsibility to monitor the above named individual's compliance with the ITR Policy and to notify the Internal Control and Security (ICS) Department of any violations. I also understand that I must notify ICS when the above named individual's services conclude so that his/her access is promptly terminated.

**PRINT NAME**

____________________________ ____/____/____

**SIGNATURE** **DATE**

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

**Please return completed original Acknowledgement form to:**

Department of Workforce Development
Internal Control and Security Department
19 Staniford Street, 4th Floor
Boston, MA 02114

Rev. 12/06

Massachusetts Department of
Workforce
Development
Division of Unemployment Assistance

BearingPoint
47

HIGHLY CONFIDENTIAL DEL00067789

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

## Appendix E: Confidentiality Statement

Confidentiality 202006.pdf

Massachusetts Department of
Workforce
Development
Division of Unemployment Assistance

BearingPoint

48

HIGHLY CONFIDENTIAL

DEL00067790

# Appendix F: IP Agreement for Vendor's employees etc.

Intellectual Property Agreement for Contractor's Employees, Consultants and Agents Confidentiality, Assignment of Inventions and Representation of Non-Infringement Agreement; Other Representations

The undersigned hereby acknowledges that he or she is an employee or consultant to of the following contractor of the Commonwealth of Massachusetts:

Name of Contractor: ______________________ ("Contractor")

and desires to be assigned by the Contractor to perform services for the Commonwealth, and that the Contractor desires to assign you to perform services on one or more projects for the Commonwealth, but only under the condition that you sign this Agreement and agree to be bound by all of its terms and conditions.

NOW THEREFORE, in consideration of your assignment to work for the Commonwealth, the access you have to the confidential information of the Commonwealth, and for other good and valuable consideration, the parties agree as follows:

1. Confidentiality of the Commonwealth's Materials. You agree that both during your assignment at the Commonwealth and thereafter you will not use for your own benefit, divulge or disclose to anyone except to persons within the Commonwealth whose positions require them to know it, any information not already lawfully available to the public concerning the Commonwealth ("Confidential Information"), including but not limited to information regarding any web site of the Commonwealth, any e-commerce products or services, any web development strategy, any financial information or any information regarding users of or vendors to the Commonwealth's web sites. Confidential Information also includes, without limitation, any technical data, design, pattern, formula, computer program, source code, object code, algorithm, subroutine, manual, product specification, or plan for a new, revised or existing product or web site; any business, marketing, financial or sales information; and the present or future plans of the Commonwealth with respect to the development of its web sites and web services.

2. All Developments the Property of the Commonwealth. All confidential, proprietary or other trade secret information and all other works of authorship, trademarks, trade names, discoveries, invention, processes, methods and improvements, conceived, developed, or otherwise made by you, alone or with

others, and in any way relating to the Commonwealth or any of its web development projects, whether or not patentable or subject to copyright protection and whether or not reduced to tangible form or reduced to practice during the period of your assignment with the Commonwealth ("Developments") shall be the sole property of the Contractor's customer, the Commonwealth. To the maximum extent permitted by law, you hereby waive all moral rights in any Developments. You agree to disclose all Developments promptly, fully and in writing to the Commonwealth promptly after development of the same, and at any time upon request. You agree to, and hereby do assign to the Commonwealth all your right, title and interest throughout the world in and to all Developments without any obligation on the part of the Commonwealth to pay royalties or any other consideration to you in respect of such Developments. You agree to assist the Contractors customer the Commonwealth, (without charge, but at no cost to you) to obtain and maintain for itself such rights.

3. Return of the Commonwealth's Materials. At the time of the termination of your assignment with the Commonwealth, you agree to return to the Commonwealth all Commonwealth materials, documents and property, in your possession or control, including without limitation, all materials relating to work done while assigned by the Contractor to projects for Commonwealth or relating to the processes and materials of the Commonwealth. You also agree to return to the Commonwealth all materials concerning past, present and future or potential products and/or services of the Commonwealth. You also agree to return to the Commonwealth all materials provided by persons doing business with the Commonwealth and all teaching materials provided by the Commonwealth.

4. Representation of Non-Infringement. You hereby represent and warrant that, to your best knowledge, no software, no web content and no other intellectual property that you develop during your assignment to and deliver to the Commonwealth, and no Developments made by you and assigned to the Commonwealth pursuant to Section 2 above, shall infringe a patent, copyright, trade secret or other proprietary or intellectual property right of any third party.

5. No Conflicting Agreements. You represent and warrant that you are not a party to any agreement or arrangement which would constitute a conflict of interest with the obligations undertaken hereunder or would prevent you from carrying out your obligations hereunder. The existence of an Employment or similar agreement with BearingPoint or if you are an employee or consultant to a BearingPoint subcontractor on this project, then with that subcontractor by which you assign ownership of Intellectual Property rights to BearingPoint or the Subcontractor shall not constitute a conflict with this Agreement regarding Intellectual Property rights.

6. Tax Payments. You hereby represent and warrant that you have paid all due state and federal taxes, or, if your tax status is in dispute or in the process of

settlement, that you have responded as directed and within the required timeframes to all communications received from the state or federal government.

7. You acknowledge that you are not an employee of any Massachusetts state or municipal government agency, and are not entitled to any benefits, guarantees or other rights granted to state or municipal government agencies, including but not limited to group insurance, disability insurance, paid vacations, sick leave or other leave, retirements plans, health plans, or premium overtime pay. Should you be deemed to be entitled to receive any such benefits by operation of law or otherwise, you expressly waive any claim or entitlement to receiving such benefits from Massachusetts state or municipal government agencies.

8. Miscellaneous:

(a) The Commonwealth is a third party beneficiary of this Agreement with full rights to enforce its terms directly.

(b) With respect to section 1 of this Agreement and for the purposes of this engagement, BearingPoint employees, independent consultants and subcontractors' employees and consultants are considered "persons within the Commonwealth".

(c) This Agreement contains the entire agreement between the parties with respect to the subject matter hereof, superseding any previous oral or written agreements.

(d) Your obligations under this Agreement shall survive the termination of your assignment with the Commonwealth regardless of the manner of or reasons for such termination. Your obligations under this Agreement shall be binding upon and shall inure to the benefits of the heirs, assigns, executors, administrators and representatives of the parties.

(e) You agree that the terms of this Agreement are reasonable and properly required for the adequate protection of our customer the Commonwealth's legitimate business interests. You agree that in the event that any of the provisions of this Agreement are determined by a court of competent jurisdiction to be contrary to any applicable statute, law, rule, or policy or for any reason unenforceable as written, then such court may modify any of such provisions so as to permit enforcement thereof to the maximum extent permissible as thus modified. Further, you agree that any finding by a court of competent jurisdiction that any provision of this Agreement is contrary to any applicable stature, law, or policy or for any reason unenforceable as written shall have no effect upon any other provisions and all other provisions shall remain in full force and effect.

(f) You agree that any breach of this Agreement will cause immediate and irreparable harm to the Contractor's customer the Commonwealth not compensable by monetary damages and that the Commonwealth will be entitled to obtain injunctive relief, in addition to all other relief, in any court of competent jurisdiction, to enforce the terms of this Agreement, without having to prove or show any actual damage to the Commonwealth.

(g) No failure to insist upon strict compliance with any of the terms, covenants, or conditions hereof, and no delay or omission in exercising any right under this Agreement, will operate as a waiver of such terms, covenants, conditions or rights. A waiver or consent given on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

(h) This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to the doctrine of conflicts of law. This Agreement is executed under seal.

The undersigned believes that this agreement imposes reasonable standards of conduct for all of the employees and the contractors on assignment at the Commonwealth, and that this agreement will serve to best protect the interests of all involved parties. If you agree with the terms set forth herein, please sign and return this Agreement.

Agreed and Accepted:

Name of Employee or Consultant: ______________________

Signature: ______________________

Date: ______________________

Name of Contractor: ______________________

Signature: ______________________

Name: ______________________

Title: ______________________

Date: ______________________

# Appendix G: Scope, Use Case Statements

## Revenue Increment

- Register Employer Account Subsystem
- Wage Detail and Tax Report Subsystem
- Payment Processing Subsystem
- Collections Subsystem
- Maintain Employer Account Subsystem
- Tax Rate Calculation Subsystem
- Benefit Paid Charge Subsystem
- Field Audit Subsystem
- Third Party Administrator Interface Subsystem

### Register Employer Account Subsystem

BearingPoint will develop the functionality to register a new employer account; this includes calling the necessary functionality to compute an experience rate for liability determinations; determining reporting status; and triggering the appropriate correspondence. BearingPoint will develop the capability for Employers to self-register based on formally accepted DUA specific business requirements.

Major functions will be made available online. We will address functionality of employer registration, such as employer liability, employer entity types (i.e., LLC and Corporations), and reimbursing accounts; additionally, we will address third party administrator (agent) registration. Each account type, or process, will be managed through a slightly different – yet similar – process. The following use cases and business processes have been identified for this module:

**Register Employer Account Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Initiate Existing Employer Self-Service Account** | This use case is designed specifically for employer and third party administrator conversion and new system adoption. The process allows currently registered employers and agents to logon to the system, using an established security profile, and access their self-service account. The process displays current employer data, and request employers to complete or update missing data. Upon completion, the employer will have established a permanent username and password, updated their account data, and initiated their self-service system. |
| **Create and Register Employer Account** | This use case begins when a Registrant provides required registration information using the Employer Self Service portal; or, an authorized UI Staff assists a Registrant to register an Unemployment Insurance (UI) Employer Account. This use case ends when the Business Entity is assigned the appropriate dates of service and has established an Employer Profile. The use case calls several rate calculation use cases; validates an employer's data; and determines current and future liability, pending fees, and open reporting requirements. Includes getting a DUA ID number. Includes the initiation of appropriate Contributory or Reimbursable payment method. |

| Use Case | Brief Use Case Description |
|---|---|
| **Register Third Party Administrator / Employer Agent** | This use case begins when a new Employer Representative (Third Party Administrator or Agent) provides the necessary information to represent Massachusetts companies in Unemployment Insurance. The process creates an Agent Account and allows employers to select the agency for representation based on established roles (power of attorney). |
| **Reactivate Employer Account** | This use case begins when an Employer wishes to Reinstate their Employer Account after a period of termination. The System reinstates the Employer Account and calculates the experience rate including experience factors from the previously terminated account. This use case ends when the System updates the Employer Account and sends notification of the Reinstate Adjustment. Includes Staff view. |

**Tax Rate Calculation Subsystem**

The Tax Rate Calculation subsystem holds the logic to manage employer tax rates; or the changes of those rates. The module manages the annual rate assignment to all employers, individual employer liability determinations, and modifications in rate due to mergers, acquisitions, or change in legal entity. The rate computation will factor in special conditions, such as Tax and Revenue executions and delinquencies that might impact the calculation. The following use cases have been identified for this module:

**Tax Rate Calculation Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Determine Employer Liability** | This use case begins after a business entity submits required information to register for an Unemployment Insurance Account. If data submitted during the registration portion of the process indicates potential liability, this process will determine if the entity has met its liability threshold and a liability determination will be made. This use case ends when the business entity receives notification of the liability determination. |
| **Assign Initial Premium Rate** | This use case begins once the Registrant has submitted the required information to register for an Unemployment Insurance Account and has met the liability threshold necessary to assign an initial premium rate. This use case ends when the business entity receives notification of the assigned initial premium rate. Includes industry specific rate calculation. |
| **Process Succession-Merger Adjustment** | This use case begins when a Succession Adjustment is initiated on an employer account. This occurs when a business entity takes over all or part of an existing business entity in Massachusetts. An Employer or Authorized UI Staff initiates this type of adjustment while maintaining the Employer Account. This use case ends with the determination of the succession adjustment is approved or denied via the system workflow and rates are calculated. Includes mergers/consolidations. |
| **Process Change of Legal Entity Adjustment** | This use case begins when a business changes its legal entity type. The change can trigger a rate adjustment. This use case ends with the determination of the entity adjustment is approved or denied via the system workflow and rates are calculated. |

| Use Case | Brief Use Case Description |
|---|---|
| **Process Tax-Paying to Reimbursing / Reimbursing to Tax-Paying Adjustment** | This use case holds the rules to change an employer's reporting status from contributory to reimbursing. The use case assigns the appropriate rates, transfers the necessary experience, and modifies the employer's status. |
| **Calculate or Adjust Individual Employer Rates** | This use case is designed to re-calculate an individual employer's rate due to a change in business situation; assign a new rate based on UI staff decisions; or modify rates due to historic account changes. |
| **Voluntary Contributions Adjustment** | This use case begins when a contributing employer submits a voluntary contribution in order to buy down the premium rate assigned to their Employer Account. Once the amount of the buy down is decided and payment is confirmed, the system adjusts the rate for that employer account. This use case ends when the system updates the employer account with the voluntary contribution adjustment information and the Employer is issued the new premium rate confirmation. |
| **Calculate Annual Rate** | This use case is triggered by the trigger date that initiates the annual rate calculation. The system will calculate the annual rate for the next year for each active, liable, premium paying employer account. This approach allows the core function for calculating a rate to be available to other adjustments that require a rate re-calculation. A notification of the rate will be generated and sent. The flow ends with the Employer Account updated for the next year. The primary functional areas are: Generating certain rate calculation parameters, Accepting certain rate calculation parameters entered by authorized UI staff, Issuing the rate notification to the employer, Updating the Employer Profile. |
| **Calculate Solvency Rate** | Will be part of above Use Case or a stand-alone. |

**Maintain Employer Account Subsystem**

The system will support account maintenance via employer or agent self-service or staff use; this will allow users to control information such as demographics, contact information, security roles and power of attorney, and business change information. The following use cases have been identified for this module:

**Maintain Employer Account Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Change of Reporting Method Adjustment** | The Change of Reporting Method Adjustment use case begins when the authorized user requests a Change of Reporting Method. Authorized UI staff approves or denies the Change of Reporting Method request. The employer accounts are updated and, if appropriate, the rate is calculated and assigned. This use case ends when determination of Change of Reporting Method is sent. Includes Staff ability. |

| Use Case | Brief Use Case Description |
|---|---|
| **Assign Worker Status Determinations** | This use case begins when a request is made to review certain information provided by a firm and/or worker in order to properly classify a particular worker or class of workers. The use case ends when authorized UI staff issues a formal determination classifying the worker(s) in question as an employee or independent contractor. Includes Staff request (Benefits to Status/Field to Status/ Employer to Status by mail). |
| **View Employer Account Profile and History** | This use case begins when an authorized user enters the Employer Self Service Portal for viewing employer account information. The profile and history outlines major components (i.e., status, entity type, threshold dates, etc) within the employer's account; this includes history. This use case ends when the authorized user views the necessary information and exits the application. |
| **Maintain Third Party Administrator Roles (Power of Attorney)** | This use case outlines the process for employers to assign "Update and Submit" or "View Only" roles, based on system functions, to Third Party Administrators. The online Power of Attorney agreement allows an authorized agent to act on an employer's behalf and/or receive the employer's nonpublic information in certain defined situations. |
| **Maintain User (Employer) Roles** | This use case allows employers to manage individual staff responsibilities (roles) within the system. The roles can be defined by system function down to the reporting unit level. |
| **Suspend or cease Employer Account** | The use case outlines how an employer, agent, staff or system can suspend or cease an employer's account. |
| **Maintain Reporting Units** | This use case manages the location information for an employer's reporting units. Each reporting unit is assigned a number (cross-matched with wage reporting) and provided an address. The process allows employers to create new, update current, or close old reporting units. |
| **Maintain Owner Officer Information** | This use case manages owner/officer information and history; including percent of ownership, dates, and contact information. |
| **Maintain Third Party Administrator Mailing Address** | This use case manages the mailing addresses of third party administrators. The centralized address maintenance prevents one agent from holding multiple addresses for the same function. |
| **Maintain Employer Mailing Address** | This use case manages employer mailing addresses; this includes management of multiple addresses for the purposes of appropriate correspondence management. This includes all addresses as defined by DUA. |
| **Maintain Employer Name** | This use case allows employers to change their "doing business as" and "legal name". Legal documentation is required before a legal name change can take place in the system. |

| Use Case | Brief Use Case Description |
|---|---|
| **Administrate Employer and Third Party Administrator Searches** | This use case outlines the agent and staff functions of searching for employer accounts. The process also includes staff functionality for searching agent accounts. The agent – employer search only allows agents to search on employers with which they hold a power of attorney. |
| **View, Hold or Cancel Correspondence** | This use case provides the logic to view sent correspondence; hold created but not sent correspondence for later delivery; and, cancel correspondence. This is a staff function. |
| **Administer Account Resolution** | This use case provides UI Staff the ability to review delinquent accounts via a report or on-line views, determine their true account status, and terminate or update the account as necessary. |

**Wage Detail and Tax Report Subsystem**

The QUEST system will accept employer and third party wage detail information from a variety of sources; however, electronic file transfer and manual submission of records will be the primary modes of submission. The Wage Detail and Tax Report subsystem provides for the collection of wage detail and tax reports; calculation of taxes (based on specific Massachusetts factors); adjusting wage records and tax reports; viewing wage record and submission history; and forecasting future tax liabilities. The sub module also assigns appropriate penalties and fees, and provides a report to track potential SUTA dumping activity. The following use cases have been identified for this module, and include the business processes directly related to the wage report:

**Wage Detail and Tax Report Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Submit Wage Detail Report** | This use case begins when an employer or employer representative receives a reminder to submit wage detail and uses Employer Self Service to prepare, review, verify, and submit, a wage detail report. The process also allows staff to submit wage records as necessary. This use case calls the "Process and Calculate Taxes Due" use case and integrates closely with the payments sub module and processes. The design incorporates FTP, file upload, manual, copy-from-previous, zero-wage, and estimate/exception wage reporting models. The use case will include, or require extension, the UHI and other fund collection and tax-report only functionality. This use case ends when the employer has submitted the quarterly (calendar quarter) wage information. |
| **DOR Wage Detail** | DUA is currently seeking to change the way Wage Detail is collected today. Employers submit wages to DOR and DOR then provides a file back to DUA which we receive/hold in a separate Wage Record DB. We are building a business case and are will attempt to reverse this process having employers submit wage detail directly to us. |

| Use Case | Brief Use Case Description |
|---|---|
| **Process and Calculate Taxes Due** | This use case begins when an employer, staff or employer representative has successfully entered, and the System has validated, a Wage Detail Report. The System must then calculate the taxable wages, necessary fees (i.e., healthcare assessment), and total amount due. This use case ends when the taxes due calculations are complete, and the data is displayed and/or applied to the employers account. |
| **Process Non-Submission Penalties** | This use case begins when an employer does not submit a wage detail on the necessary due date. The non-submission triggers a series of penalties and statements; these penalties are designed to motivate the employer to submit the required wage report. This use case ends when the delinquent employer submits the wage detail report; or, when the penalty(ies) is/are forwarded onto the Collections and Account Resolution for processing. |
| **Submit Wage Adjustments** | This use case begins when an Employer, Staff, or employer representative accesses the system to review and edit a previously submitted wage report. This use case ends when the System captures the wage adjustment information and re-calculates / updates the employer's tax liability. |
| **Transfer Wage Detail Adjustments** | The use case begins when a UI Staff identifies a need to shift previously reported wage detail records from one employer's account to another; this situation is usually the result of a succession between two businesses or a multi-business owner reporting wages in error. UI Staff move appropriate employee records/wages between employer accounts, and the System modifies the tax due to each employer. The use case ends when the wage detail is removed from an employer account and added to another employer account, the employer accounts are updated, and statements are sent. |
| **View Wage Detail History** | This use case begins when a user enters an employer's account, for the purposes of managing a UI Revenue Account, to view individual or a select quarter of wage records. This use case ends when the user views the necessary information. |
| **View Wage and Tax Report Submission History** | This use case begins when an employer, staff or employer representative enters the system to view the submission transactions, error reports, and results for each original or adjusted wage or tax reporting transaction. This use case ends when the user views the necessary information. |
| **Process SUTA Dumping Report** | This use case is managed within the general Tax Services Reporting module. The reports logic creates a list of employers who share common employees between quarters. SUTA dumping report needs more parameters other than similar employees between quarters: Owners / officers' legal address business type etc. Will be determined during design. |

**Payment Processing Subsystem**

The QUEST Tax and Revenue system will provide a standard interface to receive payment data from other systems, such as ACH Credit and ACH Debit. The payment process will also incorporate paper check processing and voucher creation. BearingPoint will use uFACTS to guide the design for managing employer, agent, Massachusetts's

HIGHLY CONFIDENTIAL

state-agency, out-of-state and Federal payments. Payments received will be automatically allocated based on allocation or hierarchy rules provided by DUA.

The design will include error management from external systems (i.e., dishonored checks or incorrectly assigned ACH Credit payments), and reversal or adjustment of those transactions. QUEST will provide functionality to accept reversal and adjustment transactions via a file and to perform the appropriate accounting adjustments. Refund processing, fiscal reporting, and re-certification management are also included. The following use cases have been identified for this module, and encompass business processes related to funds processing:

**Payment Processing Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Employer Makes Payment** | This use case begins when an employer has identified a debt on the account and has opted to make a payment. The employer, in a single and secure transaction, submits a full or partial payment. This use case ends when receipt of payment has been confirmed. Includes processing paper check payments. |
| **Agent Makes Payment** | This use case begins when an employer representative has identified a debt on their client's accounts and has opted to make an individual or bulk payment. The employer representative, in a single and secure transaction, submits a full or partial payment on behalf of the employer(s). This use case ends when receipt of payment has been confirmed. |
| **Other State and Federal Government Makes Payment**<br><br>**When?** | This use case begins when another state or Federal Government submits a payment. The agency, in a single and secure transaction, submits a full or partial payment on behalf of the employer(s). This use case ends when receipt of payment has been confirmed.<br><br>Move to employer charge. |
| **Submit and Reconcile Payment** | This use case begins when a UI Staff identifies an electronic payment error; the situation occurs when an employer submits an ACH Credit file to the correct bank account but does not complete other components of the file correctly. The staff member maps the correct employer account to the completed payment, assigns the payment to the employer's account, and transfers the appropriate funds. |
| **Post and Deposit Payment**<br><br>**Also PID** | This use case begins when an employer payment has been accepted by the System. The system will deposit payments from employers to the financial institutions and post payments to the employer accounts. These payments include current and past due UI Tax and Fees, current and past due reimbursable charges, penalty and interest charges, collection costs, and fees. The use case ends when the payment is deposited into the UI Account.<br><br>Revenue requires electronic payments; PID may need credit cards/EFT. During design, we will address how payments are applied against what hierarchy. |
| **Process Dishonored Payment** | This use case begins with a notification from the banking institutions that a payment has been rejected. The rejected payment is "backed-out" of the employers account (following the reverse hierarchy) and assigns the necessary penalties and/or fees to the account. |

| Use Case | Brief Use Case Description |
|---|---|
| **Process Employer Requests for Refunds** | The use case begins when an employer identifies an account credit and wishes to reclaim the funds. The employer requests the funds through the System. The use case ends when the System submits the refund, updates the account, and notifies the employer of actions taken. Thresholds and rules will be determined during design. |
| **Produce IRS Certification and Re-Certification File** | This use case begins when the IRS sends an annual FUTA Identification Data Tape to DUA. The FUTA Certification process is the method the IRS uses to verify with the Department that the credit for UI taxes claimed by employers on their annual Federal Tax and Revenue return was actually paid to the Massachusetts Unemployment Fund. The system creates the necessary re-certification file for submission to the IRS. The use case ends when the system returns a FUTA Certification data file to the IRS. |
| **Re-Certification of Tax Paid** | This use case begins when an employer or IRS agent or employer requests a certification of wages and taxes paid for a specific calendar quarter and year. The system allows employers, staff, or employer representatives to view Re-Certification information (940C) information online; appropriate correspondence can be submitted to the IRS if requested online. The use case ends when the employer either prints a copy of the certification report; or, the UI staff sends an electronic or paper copy to the employer/IRS agent. |
| **Staff Review Account Details** | This use case provides staff an opportunity to review employer and employer representative payments; this includes groups of payments (i.e., ACH Debit, Paper Checks, and ACH Credit) down to the individual payment level. |
| **Fiscal and Revenue Reporting** | Fiscal and Revenue reporting is housed in the base reporting infrastructure of uFACTS; however, there are critical base criteria that need inclusion in the payments process. The Fiscal and Revenue reporting component includes tracking of Benefits Paid Charges, Contributory Employer Payments, Receivables, Daily Balancing, Fund allocation, and Collected Debt. Overpayments collections are included here. |
| **Processing accounts without DUA id number** | Processing and tracking payments of accounts that have not been assigned a DUA id number.<br>We will examine the opportunity to modify this process with an improved process that does not allow payments without proper registration. |
| **Payment Deferral** | This use case describes deferring two-thirds or some other partial payment of quarterly payments to be paid in full by the third quarter. |

**Collections Subsystem**

The QUEST system will include functionality and specific subcomponents designed to support the collections business process. QUEST will support aging and tracking of receivables, and allow collections specialists to choose from a variety of collections mechanisms. Reporting and correspondence will be developed to support the system functionality. The following use cases have been identified for this module:

**Collections Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Collect Established Debt** | This use case begins when an employer account becomes past due. The main flow is only applied to established debt. An Overdue Account Statement is sent to the employer indicating the employer must pay the debt within a stated timeframe after which the debt, if it meets referral rules, will be referred to debt collection within DUA. The use case ends when the debt is resolved. |
| **Conduct Debtor Resolution Activities** | This use case identifies and executes steps that need to be taken to prepare owner/officer information for a Personal Liability Determination. Specifically, this will involve the System finding Owner/Officer records that are out of date or incomplete and routing them to UI Staff to be updated. |
| **Compromise of Penalty, Interest and Fees** | This use case begins when an Employer requests a compromise of penalty, interest or fees. This use case ends when the UI Staff has acted on the request, and the System notifies the employer of actions taken. |
| **Establish Payment Plan** | This use case describes the process of creating a payment plan. The use case progresses with UI Staff negotiating the terms of the proposed payment plan and gathering the require information for the proposed plan. It also covers the steps the System uses to monitor the plan status after it is put into place. |
| **Manually Hold Debt** | This use case manages individual debt items and prevents them from collection referral. The process also incorporates electronically recalling a debt from collections. Includes lien and bankruptcy processing identified by reason codes for debt holds. |
| **Process Delinquent Debt** | This use case covers the flow of established, delinquent debt from the System. It begins when debt is established. The system will indicate when debt has reached the necessary conditions for processing debt (i.e., First Notice, Second Notice, and Payment Plan/Compromise). This use case also covers the activity of establishing interest or penalties on delinquent debts. |

**Benefits Paid Charge Subsystem**

The QUEST Tax and Revenue system will accept benefit paid charges and adjustments from benefits processing activity. The sub module tracks benefits paid charge transactions, and allows staff to manually adjust transactions, and creates a downloadable charge file for employers. Accounts for reimbursable employers are assigned the appropriate debits to their account. In many States, State Agency Accounts are treated specially. The following use cases have been identified for this module:

**Benefits Paid Charge Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Process Benefit Paid Charge and Non-Charge Data** **(This use case may need to be implemented with Benefits Increment.)** | This use case documents how to process the benefits paid and charge to employer accounts. It is the process effects of Benefits Paid/Charged on Benefit Account. Benefits Paid/Charged is not considered a separate "system", but rather one component of an integrated whole. |
| **Process Manual Benefits Paid Charge Adjustments** **(This use case may need to be implemented with Benefits Increment.)** | This use case begins when a UI Staff person wishes to adjust charges for an employer. It describes the steps needed to accomplish manual adjustments to the Benefits Charge transaction. A manual adjustment is an adjustment that is not accommodated by the automatic adjustment process; these adjustments are considered anomalies, but may be required to accommodate an employer's account. This use case ends when charges have been successfully adjusted. |
| **View Online Benefits Paid Charge Statement** | This use case begins when an employer wishes to view their charge statement of account, or charges in general. It describes the steps that an employer goes through to view their statement of account. The statement of account includes the employer charges from the last period and historically, along with any outstanding balance due, if a reimbursable employer. The use case ends after an employer has successfully viewed their charges. |
| **Create Employer Benefits Paid Charge Statement** | This use case describes the steps necessary for generating an employer charge statement. It begins when the system starts the process based on an automated batch scheduler. The charge statements can take a variety of forms, but each type must communicate the same content – employer charge activity for that period. The use case has slightly different requirements depending on the employer type, and the communication option that the employer has chosen; paper or electronic. The process ends when the employer charge statements have been generated. |
| **Create Employer Benefits Paid Charge Download File** | This use case describes the steps necessary for generating a delimited file of Benefits Paid Charge transactions. The file is created and displayed to be downloaded by employers online. |
| **Employer Protest Charges** | This is a placeholder for design concerns. This use case describes the employer's ability to protest benefit charges on a particular statement. There would be a connection from Appeals back to Accounts control to handle any adjustment. |

**Field Audit Subsystem**

The QUEST system will provide a set of data validation routines that automatically identify discrepancies between wage reports, Tax and Revenue reports and payments (integrity checks). Where possible, these routines will force employers to reconcile as

part of the wage submission process to eliminate any manual effort associated with reconciliation or data cleansing. However, we realize that the QUEST system must support the full range of balancing and reconciliation activities.

Additionally, the QUEST system will provide mechanisms to randomly and conditionally generate data for initiating, tracking, and executing field audits. This includes generating notices, notifying employers of scheduled activities, assigning resources, creating data extracts, and recording findings, as well as others. The following use cases have been identified for this module:

**Field Audit Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Generate Field Audit** | This use case describes the automated process of random selection, or targeted random selection, of employer accounts. The employer accounts are placed in a queue for field audit staff to process; based on pre-determined auditor factors (i.e., zip code or industry type). |
| **Administer Field Audit** | This use case begins when the System and/or Field Auditor selects an employer for an audit. The Use Case involves the activities necessary for required Federal Employer Audit Compliance. These audits may be triggered by a random selection process or by targeted criteria. This use case ends when an audit is complete, findings letter is submitted, and the audit is saved and approved by management. This excludes an offline process. Audits will be done via connection to QUEST system. |
| **Administer Field Audit Referrals** | This use case begins when a UI Field Auditor receives a referral or investigation request from another UI Staff member; or to respond to an employer request for assistance. The use case ends when the field auditor has addressed the referral/request, documented the actions, and updated the System as necessary. |
| **Review Field Audit** | This use case outlines the process necessary for management review of field audits; managing quality control. The process incorporates workflow functionality to return audits to staff once audit is complete or if quality is not met based on design. |

**Third Party Administrator Interface Subsystem**

The Third Party Administrator Interface subsystem provides a set of functionality that focuses on processing large volume, multi-employer records. The following use cases have been identified for this module in order to provide this functionality:

**Third Party Administrator Interface Subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **Process Agent FTP Wage Report File** | The design artifact outlines the file format and processing rules for submitting an agent file – containing multiple employer records. This includes error handling and file rejection rules. |
| **Create Agent FTP Wage Report Acknowledgement File** | The design artifact outlines the file format submitted to large agents upon processing a bulk agent file. The file provides validation of submission and error information. |

| Use Case | Brief Use Case Description |
|---|---|
| **Process Agent Role Assignment File** | The design artifact outlines the file format submitted by large agents to self-assign power-of-attorney in a bulk fashion. NOTE: The process is recommended for conversion purposes only. |
| **Process Agent FTP Benefits Paid Charge File** | The design artifact outlines the file format for providing Benefits Paid Charge transaction detail for agents on all their client accounts. |
| **Process Agent Employer Rate File** | The design artifact outlines the file format for providing agents rate information for their client accounts. |
| **Process Other Bulk Filing** | Will be determined if needed during design. |

**Unemployment Health Insurance (UHI)**

| Use Case | Brief Use Case Description |
|---|---|
| **Match Revenue Processes** | The system will be fully integrated and follow similar processes to Revenue collections. |

## Benefits Increment

BearingPoint will implement a Benefits module that aligns with the specific business requirements of Massachusetts Department of Unemployment Assistance. The module will include initial and continued claims, monetary and non-monetary determinations, adjudication, benefit payments and control, 1099 processing, fraud detection and recovery, as well as implementing and supporting various other programs and services such as Work Share, UHI, TRA, Child Support Recovery, and Trust Fund accounting. The tasks required to deliver this module will include:

- Design
- Construction
- Conversion
- Testing

BearingPoint will customize uFACTS' Benefits Services components to DUA's specific business and technical requirements. uFACTS will be modified based on subject matter experts and claimant focus group sessions. BearingPoint will also develop, based on formally accepted DUA project management requirements, the necessary interfaces to new and existing external and internal entities; exact interfaces or interface portions will be determined during detail design. Interface channels (i.e., s FTP, Online, and magnetic tape) will be examined for each interface. BearingPoint will deliver the following subsystems and assess the associated subsystem use cases for implementation:

- Initial Claim Subsystem
- Process Benefit Determination
- Benefit Payments
- View and Maintain Benefit Account
- Integrations Services
- Appeal Processing
- Program Integrity
- Economic Research
- Unemployment Health Insurance

#### Initial Claim subsystem

Initial Claim subsystem includes the necessary functionality for supporting claimants, employers and UI Staff throughout the initial claim application process. The design of this subsystem will include designing customer-facing functionality that allows claimants to apply for existing types of program benefits, including Standard Unemployment Insurance, Disaster Unemployment Assistance (DUA), Work Share, UHI, Extensions, and Trade Readjustment Allowance (TRA). The following use cases have been identified for the Initial Claim Subsystem:

**Initial Claim subsystem**

| Use Case | Brief Use Case Description |
|---|---|
| **View Preliminary Information** | This use case begins when a claimant selects "Apply for Unemployment Benefits Online" from the self-service website. The purpose of this use case is to provide cursory education on the following topic areas: When Should I File, Information Checklist, Who Qualifies for Benefits, How Benefits are Calculated, Web Page Viewing Tips, and System Security. This use case is complete when the claimant selects "Start the Unemployment Benefit Application" and then agrees to the data privacy authorization. |
| **Process Initial Questions** | The use case begins after the claimant selects "yes" to the data privacy authorization and submits. The system then displays the Initial Questions, which determine:<br>• If the potential claimant is able to apply for unemployment benefits.<br>• The type of application format presented to the claimant in order to obtain the appropriate data to establish a benefit account.<br>• The use case ends when the claimant has successfully answered the required initial questions. |
| **Authenticate Claimant** | This use case begins after the claimant has answered the initial questions. The claimant will enter personal information that will be sent to SSA and US CIS through an interface for verification. If a claimant's information is not validated by SSA or US CIS, he/she will have limited system access, and the system will place a non-monetary hold on his/her account. The claimant will then be directed to assign him/herself a password. This use case ends when the claimant has successfully chosen a password. During the design we will determine which entities need to cross-referenced and how; real-time versus batch. |
| **Collect General Information** | This use case begins after the claimant has assigned him/herself a password. The purpose of this use case is to collect the claimant's demographic information for statistical and work search purposes. This use case ends when the claimant has answered all the required questions. Capture profiling, dependency information and claimants preferred method of payment. Will determine this during design. |
| **Collect Employment Information** | This use case begins after the claimant has answered the general questions. The purpose of this use case is to collect the claimant's Massachusetts, federal, military and/or combined wage employment information from the beginning of his/her base period date to the current date. The use case ends when the claimant's employment information has been successfully entered and validated by the system. |

| Use Case | Brief Use Case Description |
|---|---|
| **Activate DUA Option** | This use case begins after multiple off line preconditions steps are completed when an authorized Disaster Administrator has received notification from the Department of Labor that a Disaster has been declared in a Massachusetts County (ies). This Use case involves establishing the system framework that will be used to initiate the availability of benefits once a disaster has been declared. The administrator will define a new disaster record, or modify an existing record within the Disaster Benefits Framework. This creates a new disaster master record, to be stored in the framework that will then allow the system to accept and validate applications. Using the defined system framework criteria, the system could then compare, approve or deny eligibility for benefits for Disaster Unemployment Assistance. This use case ends when a DUA framework record has been successfully created or modified by an authorized administrator. |
| **Process DUA Application** | This use case begins when a claimant applies for DUA benefits. The claimant is required to submit specific information for making a determination of Disaster Unemployment Assistance (DUA) benefits. This use case ends when a claimant has completed all the necessary sections of the DUA application. |
| **Process RED Application** | Applies to Section 30/RED, similar to above. |
| **Activate Extension Option** | This use case begins when an authorized user wishes to define a new extension program within the Benefits Module. This creates a new extension option that can then be subsequently applied for by claimants when their account meets the necessary qualifying characteristics. This use case ends when an extension option has been successfully activated. |
| **Process Work Share Application** | The purpose of this use case is to describe the steps that an employer would need to perform to process an application to become a work share employer. An employer is required to meet several business requirements before their organization is considered by UI for work share eligibility. Once an employer has submitted all required information for the employer work share application, this use case is complete. Includes workflow to staff for approval. |
| **Process Trade Readjustment Allowance** | This use case begins when an authorized TRA worker completes the applicable sections of the TRA application into the Benefits Module for consideration of TRA benefits. From this application, the Benefits module will determine if the claimant is eligible for any of the TRA programs. These include Alternative Trade Adjustment Assistance (ATAA), Trade Readjustment Allowance (TRA), and / or Health Coverage Tax Credit (HCTC). This use case ends when the authorized TRA Worker has completed all the necessary sections of the TRA application. This use case needs to modified during design to include a "SHORT" version of UI claim/denial then work flowed to TRA |
| **Process Extension Application** | This use case begins when a claimant decides to apply for an extension of benefits. When a claimant decides to apply for an extension, several questions must be asked that pertain to the original account, plus the claimant's current circumstances. This use case ends when a claimant has completed all the necessary sections of the extension application. |

| Use Case | Brief Use Case Description |
|---|---|
| **Review, Edit, & Confirm** | This use case begins when the claimant has completed one or more sections of the application for benefits, and wishes to review his/her responses. This use case will describe the steps that the claimant goes through in the process of reviewing their registration questions and answers, and to edit those answers if necessary, as well as to submit the final confirmation of those answers. The use case ends after the claimant has either saved their application for later processing or submitted it after confirmation. |
| **Establish Claim** | The purpose of this use case is to describe the steps that the system must proceed through in order to create an account based on information submitted within an application. The system creates accounts when the claimant submits the application. Applications are analyzed by the system to determine the program and account type, along with all applicable information necessary for determining benefit amounts. This use case is complete once an account has been established, along with any necessary issues for UI Staff to review. |
| **Login Claimant** | This use case begins when a claimant has selected "Existing Account" from the "Getting Started with Massachusetts Unemployment Insurance Benefits". The claimant will then enter his/her ID (TBD) and password. If the claimant cannot remember his/her password, he/she will have an opportunity to reassign one. The use case ends when the claimant has logged into the system using the correct SSN and password. |
| **LADT** | This Use Case describes the functionality needed for UI to interface with the Interstate Statistical Data Exchange (commonly called the LADT) which in turn supports the exchange (incoming/ outgoing) of claims and related statistical data between States. The interface sends out initial and continued claims data for commuters and claimants that have Massachusetts Benefit Accounts but have residences out of Massachusetts. The interface receives and processes initial and continued claims data for commuters and claimants who have claims in other states but reside in Massachusetts. This Use Case details of the data to be exchanged, the record layout, and the process for exchanging the data. |

**Process Benefit Determination**

The purpose of this subsystem is to determine claimant eligibility for Regular and Special UI program benefits. The use cases in this subsystem will: Identify claimant monetary and non-monetary eligibility and issues; Calculate the Weekly Benefit Amount (WBA) and the Maximum Benefit Amount (MBA) specific to the claimant program type; and Issue a single or combined benefit determination to the employer or claimant. The following use cases have been identified for the Process Benefit Determination Subsystem:

**Process Benefit Determination**

| Use Case | Brief Use Case Description |
|---|---|
| **Collect Eligibility Information** | This use case begins when the claimant is requested to answer non-monetary eligibility information. Based upon the claimant's answers, the claimant will be required to provide additional fact-finding information, which is stored for review by UI staff. The use case ends when the claimant has completed entry of the eligibility information. |
| **Collect Separation Information** | This use case begins when the claimant is requested to enter separation Information. For each employer the claimant indicates the reason for separation. The claimant can select only one reason for separation for each employer. Based on the reason, claimants may be required to provide additional information (fact-finding) which is stored on the database for later review by UI staff. This use case ends when the claimant has completed entry of the required separation information. |
| **Manage Non Monetary Issues** | This use case was created in order to consolidate the documentation of all non-monetary issues that will be tracked by the system. The use case defines the list of issues and for each describes what processes/ use cases create the issue, how the issue will affect the claimant and how the issue will be routed to adjudication staff for processing. This use case ends when the issue has been routed to the appropriate workflow queue. |
| **Gather Fact Finding** | This use case begins when a non-monetary issue has been identified. The use case describes the fact-finding questionnaire that will be sent to the issues interested parties (claimants, employers, doctors, etc). The use case also describes the functionality for receiving fact-finding questionnaires. The use case ends when all questionnaires have been returned or when the time limit set for the return of the questionnaires has past. |
| **Adjudication** | This use case begins when UI staff selects a Non-Monetary issue from Workflow. UI staff reviews all information associated with the Non-Monetary issue and determines if the Non-Monetary issue is correct, if additional information is needed, or if another Non-Monetary issue has been identified. UI staff makes a determination by selecting the findings, conclusions and statute. UI staff determines if the Non-Monetary determination should be combined with other determinations. This use case ends when the system updates the claimant and employer accounts. The level of complexity will be reviewed during design. |
| **Auto Adjudicate Non-Monetary** | This use case begins when the issue identified by the system meets the user defined business rules for an auto adjudicated determination. System will make the determination and issue the correspondence to the employer or claimant as applicable. This use case ends when correspondence is issued and the system updates the claimant and/or employer account. The level of complexity will be reduced in design. |
| **Modify Non Monetary Determination** | This use case begins when UI Staff identify that a previous non-monetary determination should be modified. Once UI Staff has entered the data for modification, the system updates the system processes that are affected by the update and issues correspondence to the claimant and/or employer as necessary. This use case ends when correspondence is issued and the claimant and/or employer account is updated. |

| Use Case | Brief Use Case Description |
|---|---|
| **View Non-Monetary** | This use case begins when a User accesses the "View Non-Monetary" functionality. The system will display the non-monetary determination and status. This use case ends when user exits this functionality. |
| **Calculate Pre-monetary (internal)** | This use case begins when authorized staff accesses the Pre-monetary Review screen. The user will enter an SSN and determine which base period the system should use to calculate a potential claimant's Weekly Benefit Amount and Maximum Benefit Amount. This use case ends once the system has retrieved and displayed the appropriate wage detail records and calculated and displayed both the Weekly Benefit Amount and Maximum Benefit Amount. |
| **Calculate Pre-monetary external** | This use case begins when the claimant wishes to receive a pre-monetary estimate of his/her unemployment benefits. The purpose of this use case is to provide the claimant with an estimate of his/her weekly benefit amount and maximum benefit amount based on the claimant's wage detail records. This use case ends after the claimant has viewed his/her pr-monetary estimate. |
| **Request and Receive Wages** | This use case begins after an initial application has been filed. If during the initial application the claimant indicated federal, military, and/or other state employment this use case processes the wage response(s) from ICON. If the claimant failed to indicate these types of employment upfront but later indicate missing wages this use case incorporates the functionality for staff invoked wage requests as well as the processing of wage responses. Finally, if a claimant indicates missing or incorrect MA wages this use case incorporates the functionality to modify MA wages. This use case ends once the wages (MA, other state, federal, and/or military) are received and handed over to the Calculate Monetary use case. |
| **Calculate Monetary** | This use case begins when the claimant has completed registration and has indicated they are requesting Regular or Special Program UI benefits. Special Programs include: Temporary Extended Unemployment Compensation (TEUC), state Extended Benefits (EB), Disaster Unemployment Assistance (DUA), and Shared Work. The purpose of this use case is to identify the employers that will be charged when a claimant receives benefits and to determine if the claimant has the wages necessary to be monetarily eligible to receive regular UI benefits or meets the monetary guidelines associated with Special Program UI benefits. This use case contains the business rules necessary to determine the claimants Regular or Special Program Weekly Unemployment Benefit Amount (WBA) and Maximum Unemployment Benefit Amount (MBA). Business rules will determine if a combined determination is issued to the claimant. This use case ends when the system calculates the claimants WBA and MBA and issues the necessary correspondence. Includes: Automatic calculations of monetary by Ma. Program; TRA/Red and/or workers comp., seasonal, school. Updates to payment records, overpayments.<br>Notification to claimant/employer of eligibility or payment charge<br>Appeal form must be sent to either claimant or employer |

| Use Case | Brief Use Case Description |
|---|---|
| **Process Amended Monetary** | This use case may be initiated based on the following: Claimant request for wage information has been returned through the ICON system or returned by a Massachusetts employer, claimant account updates (determination or appeal decision), employer correction to wage detail or the claimant has requested an alternate base period. This use case contains business rules that address Regular and Special Program re-determinations. The system will include internet based, and integrated voice response (IVR) service channels, for this option. Staff workflow would be created for monetary information received on paper. Upon receipt of the information the system re-calculates the claimants Regular or Special Program WBA and MBA and updates the benefit charge and wage detail processes. Business rules will determine if a combined determination is issued to the claimant. This use case ends when the claimant and employer account are updated to reflect the wage information and the necessary correspondence is issued to the claimant and employer. |
| **Process Effective Dated Monetary** | This use case begins when a claimant has submitted an application with employment identified by business rules as having a wage limitation. The system will use the wages in wage detail to calculate the MBA/WBA and based on the effective begin and end dates identified by the claimant will establish the effective date of the monetary and calculate the MBA/WBA. One the claimant has reached the end date of the limitation, the system releases the wages, issues the correspondence to the employer/claimant and updates the claimant account. |
| **Process Combined Wage Claim** | This use case begins when another state requests wages from MA by sending an IB4 request (either through the ICON interface or via mail). This use case describes the steps taken to determine whether there are wages that can be transferred from MA to the other state for the SSN being requested. The use case ends with the sending of an IB4 response to the other state which will either transfer wages or notify the other state that wages could not be transferred and why. This use case includes billing of other states for their share of combined wage claims, and reporting of that activity to state and federal agencies. In addition this use case incorporates Interfacing with electronic flows of funds from other systems (e.g. the payments from other states that are received in Massachusetts through the federal UTF financial transfer system) |

**Benefit Payments Subsystem**

The Benefit Payments subsystem incorporates functionality to determine continued weekly or bi-weekly eligibility as well as functionality to correlate payments with the proper program type. The Benefit Payment process also includes the calculation of payment based on monetary benefit entitlement, non-monetary holds, disqualifications and eligibility deductions, and deductions such as wages earned, child support and/or overpayment offsets, etc. The System will dispense payments and update the claimant benefit account to reflect payments and/or payment adjustments as well as the employer account benefits paid records. This subsystem also includes use cases related to the calculation, establishment, and recovery of overpayments. The following use cases have been identified for the Benefit Payments Subsystem:

**Benefit Payments Subsystem**

| Use Cases | Brief Use Case Description |
|---|---|
| **Collect Claimant Earnings Information** | This use case will collect all earnings that the claimant would have had during the request for payment period. The Claimant would have supplied all earnings from any wages, military income, and self employment income. The system would also ask the claimant if he/she had returned to work during the requested week's period. |
| **Collect Claimant Separation Information** | This use case gathers the fact-finding necessary to adjudicate separation issues. Will utilize questionnaires developed by the Determinations process. In addition, information can be gathered if a claimant indicates they have refused work, or identify an additional separation in the request payment. |
| **Collect Availability Information** | This use case gathers information regarding the claimant's ability and availability for work. If potential issues are identified related to the claimant's ability and availability, the claimant will be prompted to complete the appropriate questionnaire. |
| **Collect Other Source of Income Information** | This Use case begins when a claimant indicates within the Request for Payment Process that they have Other Income. The system routes the claimant to complete the necessary information regarding Other Income. |
| **Confirm Request Benefit for Payment** | This use case describes the functionality associated with the claimant's request for payment, including the data elements that appear, and which are editable. |
| **Determine Benefit Payment Distribution** | This use case describes the technical requirements needed to correctly distribute benefit payment monies to the proper entities (i.e., child support, state and federal taxes, etc.). |
| **Process DUA Request for Benefit Payment** | This use case describes the unique functionality and information captured when the claimant is applying for benefits under the Disaster Unemployment Assistance program. |
| **Generate Benefit Payment** | This use case begins when a claimant or UI Staff has successfully submitted a request for payment for a week, or if UI Staff makes an adjustment to a payment (PFRC) to be made. This use case ends when the all weeks requested to be paid have been processed. |
| **Initiate Cross Match Detection** | This use case begins when the System runs or UI staff initiates one of several cross match queries This use case ends when the requested cross match query is complete. |
| **Process Claimant Account Adjustments** | This use case begins when an adjustment to a processed Overpayment debt payment is required. This use case end when the Overpayment debt payment has been updated. |
| **Process Check Cancellations** | This use case documents requirements related to the processing of cancelled checks. |
| **Process Check Reconciliation** | This use case describes the process to reconcile outgoing checks with US Bank. |

| Use Cases | Brief Use Case Description |
|---|---|
| **View and Generate 1099-G** | This use case begins when a claimant or UI Staff wishes to view a 1099-G. The System will display the most recent year available for the claimant, and will allow a claimant or UI Staff to view and print previous years' data as well, in the proscribed 1099-G format. This use case also includes the necessary business rules for processing the annual 1099 job that generates the annual 1099-Gs. This use case ends when a user has successfully viewed a 1099-G. |
| **Process Overpayments**<br>**Applies to PID** | This use case begins when a regular or special program overpayment has been identified due to a monetary re-determination, account update, appeal decision, or discovered via one of the cross match queries. This use case ends when the system updates the account to accurately reflect the debt and the necessary correspondence is issued to the employer or claimant. |
| **Process Request for Benefit Payment**<br>**Applies to PID** | This use case begins when a claimant accesses the continued request option via IVR or the internet to process a weekly or bi-weekly request for Regular or Special Program benefit payment. This use case ends when the Claimant has successfully submitted their request for payment. Upon submission, the System deducts any overpayment offset or other deductions and calculates the benefit payment. |
| **Process Underpayments** | This use case begins when it has been determined that a claimant has been underpaid resulting from an appeal or adjudication. The system will issue the appropriate payment resulting from the underpayment. |
| **Process Shared Work Request for Benefit Payment** | This use case begins when a claimant requests partial Unemployment Insurance Benefits while continuing to work for a pre-approved employer of the Shared Work Program. This use case ends when the claimant receives payment. |
| **Process TRA Request for Benefit Payment** | This use cases describes the unique functionality and information captured when the claimant is applying for benefits under the Trade Adjustment Assistance Act. |
| **Validate Payment Calculation** | This use case begins when a claimant has successfully submitted his/her request for payment and received a confirmation notice This use case ends when the weeks requested have been validated and/or calculated |
| **Validate Work Search Verification** | This use case will validate the claimant's ongoing work search effort. |
| **Work Search Verification** | This use case will gather information regarding the claimant's ongoing search for employment. Claimants will be randomly identified and selected during the request for benefit payment. |
| **Process Claimant Payment Plan**<br>**Applies to PID** | This use case begins when a claimant requests a payment plan. This use case ends when the system updates the account to reflect the creation of an approved payment plan. |

| Use Cases | Brief Use Case Description |
|---|---|
| **Process Claimant Refund**<br>**Applies to PID** | This use case is initiated when UI has over-collected Claimant debt. This use case begins when either the System or UI Staff identifies a refund is due the Claimant. This use case ends when the check is cashed or cancelled. Credit balances should not automatically be refunded by the system. Hold and verify must be done. |
| **Process Debt Payment**<br>**Applies to PID** | This use case begins when the Claimant initiates a debt payment transaction. This use case ends when the System has been updated with debt payment information and has generated a payment confirmation number. This use case includes electronic access to Lockbox Transactions images for improved reporting capability. |
| **Process Collections** | This use case begins when a debt has been determined uncollectible through available UI collection methods and ends when the debt has been assigned for additional collection actions |
| **Refer Debt for Revenue Recapture** | This use case begins when the system determines a claimant account debt meets business rule eligibility for referred to the State of Massachusetts Department of Revenue (DOR) for tax intercept. This use case ends when the debt is satisfied and tax intercept is no longer necessary. |
| **Process Online Underpayments** | The Use Case begins when manual intervention is required for the generation of an Underpayment. The use case ends when an Underpayment is created, and the determination has been updated. |
| **Process Online Overpayments**<br>**Applies to PID** | The Use Case begins when manual intervention is required for the generation of an overpayment. The use case ends when an overpayment is created, and the determination has been updated. |
| **Employer Workshare** | Employer will verify and enter work schedules. Will be determined during design. |

**View and Maintain Benefit Claim**

This subsystem describes the ability of the claimant to maintain information about their claim, and for UI Staff to maintain information about a claimant. For the claimant, this includes the claimant's ability to maintain information including address, requesting a wage correction, viewing their payment and withholding history, requesting a check replacement, viewing and printing a 1099-G, and submitting any tax withholding and direct deposit information. A claimant will only have access to their account through the authentication of their identity using a UI-assigned user ID and self-assigned password. For a UI Staff person, the view and maintenance features will be enhanced from that functionality available only to claimants, and will include enhanced access to claimant and claim history, as well as appropriate internal maintenance functions, such as appeals and determinations. Employer access to claimant information will include viewing information directly related to unemployment charges and employer fact-finding, as well as applicable appeal updates. The following use cases have been identified for the View and Maintain Benefit Account Sub-System:

**View and Maintain Benefit Claim**

| Use Case | Brief Use Case Description |
|---|---|
| **Resolve Authentication Issue** | This use case begins when a claimant attempts to access the UI System. This is a UCS to re-authenticate claimants who were not authenticated via SSA - possibly due to basic transposition of SSN. Allows staff to authenticate those claimants. Simple process and uses authentication process code. |
| **Determine Correct Path** | The purpose of this use case is to describe the steps that the system must take to determine the available options for the claimant, and the message(s) to display to the claimant. Both of these items (options and messages) are dependent on many factors related to the program and account status for the individual. This use case is complete once the System has successfully analyzed the program and account status, and determined the appropriate options and messages to display to the individual. |
| **Manage Password** | This use case begins when a claimant chooses to change their password. The System will allow the claimant to change their password to another value. The use case ends when the claimant's password has been successfully changed. |
| **Reactivate Account** | The purpose of this use case is to document the steps and business rules for the Reactivate Account process. A claimant must reactivate their account after a predetermined amount of time has passed since their last request for payment. The claimant must confirm existing key information before reactivation, and then is required to provide information based on their response to a series of preliminary questions. The use case is complete when the claimant has submitted their account reactivation. |
| **View and Maintain General Information**<br><br>**QAS/Pitney Bowes?** | This use case begins when a claimant wishes to update their general information regarding name, address, phone number, and birth date. This use case ends when the claimant has successfully changed their general information, chooses to view other account information, or ends the session.<br><br>If a new address is added, system will check for overpayment and activates collections if collection was inactive. |
| **View & Maintain Payment and Deduction Information** | This use case begins when a claimant or UI Staff wishes to view Claimant payment information. It describes the steps that the Claimant or UI Staff must go through to view payment information from previous requests, including deductions (earnings, eligibility, etc.), payment distribution (taxes, child support, etc.) and net payment amount. This use case ends when the claimant or UI Staff has successfully viewed payment information, chosen to view other account information, or ended the session. |
| **Manage Payment Method** | The Manage Payment Method use case is initiated when a claimant or Authorized UI Staff has accessed the Current Payment Method screen. This will allow the user to view and, if their security allows, update the Claimant's current payment method. This use case ends when the user has exited this functionality or has successfully updated the Claimant's payment method. |

HIGHLY CONFIDENTIAL

| Use Case | Brief Use Case Description |
|---|---|
| **Update Tax Withholding** | The Update Tax Withholding use case is initiated when a claimant or Authorized UI Staff have opted to access the Current Tax Withholding Status screen which allows the user to view and initiate an update to the Claimant's tax withholding status. This use case ends when the user has exited this functionality or has successfully updated the Claimant's tax withholding status. |
| **Customer Service Representative Interface/Views** | The purpose of this use case is to describe the functionality that will be available to internal UI Staff to view history of a claimant's account information. It is assumed that there are two types of account history information that need to be available to UI Staff. One type of information is a comprehensive transaction log, and the other is an individual history of categorical information, such as address. This use case is complete when UI Staff have viewed the history of an account. |
| **Claimant Views and Maintains Monetary Determinations** | The purpose of this use case is to describe the steps and functionality that exist to support claimants and UI Staff in viewing determination information for an account. This use case starts when any of the actors mentioned wish to view monetary determination information. The actors will need the ability to view determination information for an account at some level. This use case ends when determination information has been successfully retrieved and viewed. |
| **Employer Views and Maintains Monetary Determinations** | The purpose of this use case is to describe the steps and functionality that exist to support employers and UI Staff in viewing determination information for an account. This use case starts when any of the actors mentioned wish to view monetary determination information. The actors will need the ability to view determination information for an account at some level. This use case ends when determination information has been successfully retrieved and viewed. |
| **Claimant Views Non-Monetary Determinations** | The purpose of this use case is to describe the steps and functionality that exist to support claimants and UI Staff in viewing determination information for an account. This use case starts when any of the actors mentioned wish to view non-monetary determination information. The actors will need the ability to view determination information for an account at some level. This use case ends when determination information has been successfully retrieved and viewed. |
| **Employer Views Non-Monetary Determinations** | The purpose of this use case is to describe the steps and functionality that exist to support employers and UI Staff in viewing determination information for an account. This use case starts when any of the actors mentioned wish to view monetary determination information. The actors will need the ability to view determination information for an account at some level. This use case ends when determination information has been successfully retrieved and viewed |
| **Adjust an Account** | The purpose of this use case is to allow UI Staff to withdraw a claimant's account; or adjust the key data on the specific account. |
| **Employer Search** | The use case is designed to be an extension of the Tax Services Employer Search functionality. The scope is limited to add street address only. |
| **Claimant Search** | The use case is designed to aide UI Staff to search for individual claimants. The search functions will provide access to security-based claimant data. |

| Use Case | Brief Use Case Description |
|---|---|
| **Modify Extension and DUA Program** | The use case is designed to update existing extension/DUA data.<br>PID will participate in use case modification; Federal rules apply. |
| **Maintain Informational Lists** | The use case will allow users to update system lists. Some lists could include the following: State UI Addresses/Phone Numbers; Interpreters; Department Contacts for Appeals; etc. |
| **Modify Shared Work Plan** | The use case is designed to update existing shared work plans for employers. |
| **Maintain Claimant Address Information** | The use case provides claimants and UI staff the necessary functionality to update claimant address information. |
| **Manage Non-U.S. Citizen Certification** | The use case provides UI staff the ability to review available documentation and update the claimant's account. |
| **Audit Trail** | This use case provides the production of easy-to-follow audit trails, enabling program managers, internal control staff, and outside auditors to determine the "who/what/when/where" of any transaction taking place in the system. Will be determined during design. |

**Integration Services**

The Integration Services Sub-system describes several common functions that are utilized across Benefits functional areas. These common functions include Interactive Voice Recognition (IVR) applications, ICON Interface applications, Check Printing.

The following use cases documents have been identified for the Integration Services Sub-system:

**Integration Services: May apply to all groups and needs to be evaluated during design**

| Use Case or Supplemental Specification Document | Brief Use Case Description |
|---|---|
| **Document/Fax Management** | Use case scope needs to be defined. |
| **Health Coverage Tax Credit** | Health coverage tax credit management. |
| **Track Data Access** | The use case will track user views of SSA provided data. Will be determined during design. |
| **Record Management (Purge)** | The use case will organize all purge requirements for Revenue and Benefits System tables. |

| Use Case or Supplemental Specification Document | Brief Use Case Description |
|---|---|
| **BYE Account Status** | Benefit Year End Batch Process that updates certain flags and fields in the system. For example, after five weeks changes active to inactive and triggers a reactivate flag. |
| **Retirement Verification Batch Process** | Monthly batch process to detect those claimants that have turned 62 or full retirement age during the account. |
| **Print Checks** | This use case begins when the system receives data indicating that checks and/or statement of accounts need to be printed by the printing room. The recording of the warrant numbers and control of the checks are logged by the printing room and the insert room. The checks and/or statement of accounts are inserted into envelopes by an inserting machine. The envelopes are then sorted by zip code and delivered to the USPS. The use case ends when the checks and/or statements of account are mailed by the mailroom. |
| **Employer Request for Refunds**<br>**Revenue function**<br>**Verify this and Use Case in Revenue section.** | The use case begins when a credit on an Employer's account is identified and the Employer or Employer's agent requests a refund or UI Staff person requests a refund on behalf of the employer. The refund requests are requested through the System. The use case starts when the employer or the UI staff person selects the link on the system to request a refund. The use case ends when the System or UI Staff approves or denies the request, the Employer account and Event Log is updated, the requester (Agent or Employer) is notified of the action taken, and if approved, the refund check is generated and mailed to an Employer. Decided during design. |
| **ICON – IB6 Incoming** | This use case describes the interface for charges coming from other states on Interstate claims through the IB6 process. |
| **ICON – IB6 Outgoing** | This use case describes the interface for charges being sent to other states on Interstate claims through the IB 6 process. |
| **ICON - INSW** | This use case describes the creation and maintenance of user IDs, mailing lists, and ate characteristic information. |
| **ICON – IB13** | This use case describes the interface for Interstate memorandums. |
| **ICON – Handbook** | This use case describes the interface for the IB Handbook which lists information on claim filing in other states. This information includes each state's monetary determinations rules. |
| **ICON –Vessels View and Maintain** | This use case describes the viewing of the incoming interface for the central listing of vessels information and the process to maintain the MA central listing of vessels information for outgoing interface. |
| **ICON – WRIS Incoming/Outgoing** | This use case describes the wage record interface system. This process provides data to the hub for the Distributed Database Index, which is an index file stored at the hub with a list of each SSN from each state that has wages. |

| Use Case or Supplemental Specification Document | Brief Use Case Description |
|---|---|
| **IVR Integration - File a New Claim** | The purpose of this use case is to describe the steps the system must proceed through to create an account based on information submitted from an application. Applications are analyzed by the system to determine the program and account type, along with information necessary for determining benefit amounts and eligibility. The system will allow the claimant to create a password, which will be used to authenticate the claimant in future, interactions with the department's database. This use case is complete once an account has been established, along with any necessary issues for UI Staff to review. |
| **IVR Integration - Continued Claims** | This use case processes the claimant request for benefits. As part of this process, the system will collect claimant's earnings during the reporting term, collect claimant's availability information, ability information and verify some of the claimants' work search. The system will determine holds, deductions, timeliness of the request, if human intervention is needed. If appropriate, the system processes the check. |
| **IVR Integration - Re-open Claim** | The purpose of this use case is to document the steps and business rules for the Reactivate Account process. This use case begins when a claimant must reactivate his/her account after a predetermined amount of time has passed since their last request for payment. The claimant must confirm existing key information before reactivation, and then is required to provide information based on his/her response to a series of preliminary questions. The use case is complete when the claimant has submitted his/her account reactivation. |
| **IVR Integration - PIN Request** | This use case describes how a caller requests a PIN for the IVR. |
| **IVR Integration - Address Change** | This use case will support the claimants wish to update their general information. This information includes name, address, phone number, direct deposit, tax withholding and birth date. This use case ends when the claimant has successfully changed their general information, chooses to review other account information, or ends the session. |
| **IVR Integration - Claim Status** | This use case begins when a claimant chooses to access his/her account information. This category of information includes Weekly Unemployment Benefit Amount (WBA), Maximum Unemployment Benefit Amount (MBA), transactional history, current balance of their account, request a 1099G, check replacement. It describes the steps that the claimant must go through to access this information and complete these functions. This use case ends when the claimant has successfully accessed his/her account information, made request(s) of their account and/or ended the session. |
| **IVR Integration - Provide Office Hours and Locations** | This use case describes how the system will use a claimant's ZIP code information to provide information on the closest WorkForce Center. The claimant will be able to access the address, hours of operation, basic directions and phone number to the closest WorkForce Center. The claimant will also be given various services and resources available at that location. |

| Use Case or Supplemental Specification Document | Brief Use Case Description |
|---|---|
| **IVR Integration - Integrate IVR and QUEST Database** | This use case describes database history integration. |
| **IVR Integration - Workload Distribution** | This use case allows the authorized user to instruct the system to direct the workflow and distribute the workload. The system will sort calls not only by skill level groups of the customer contact center personnel, but also to specific individuals. The system will allow customer contact personnel to be put into skill groups of various sizes and varying availabilities. Each individual may be assigned language ability levels, a variety of skills and those skills will be changeable with proper authorization. The system may vary routing of calls by the one of these variables, or others (like time since last call, or availability). The system assesses if additional information is needed from a claimant and accordingly route the work/call. The result of this use case gives better control of the work flow and workload for a more efficient operation. |
| **IVR Integration - Language Selection** | The purpose of this flow is to allow claimants to choose the language of the IVR. The claimant will have the choice of English, Spanish, Somali, or Hmong. The claimant's selection will ask all of the questions and play all confirming statements in that specific language as recorded by state personnel. The system will always ask the claimant their language preference, but if the system recognizes the ANI (Automatic Number Identification) then the greeting and the language choice question will be played in the language chosen with the last call. The system will also recognize if the claimant needs to speak to a customer contact center that the agent has the appropriate language skill. |
| **IVR Integration - Speech to Text** | The result of this use case the claimant is able to have their statements recorded, and then the system could convert these voice files into printed text. The claimant statement would be responses to questionnaires, rebuttals, testimony or other request for information from the department. |

## Appeals and Hearings

The Appeals process in Massachusetts:
Any determination may result in an appeal. There are two levels of appeal: the lower authority is the DUA Appeals department; the higher authority is the Board of Review. After this, an appeal can be made to the District Court.
Workflow will be used to notify other departments once appeal is received and again when decision is entered into system.

### Appeal Processing

The purpose of this subsystem is to provide DUA with a comprehensive subsystem that supports the claimant and employer appeals needs of the UI department. The new claimant and employer appeals functionality will support creating case files that track appeals to completion and resolution, and then subsequently integrate with the necessary information for the claimant and process automatic updates to claimant and employer accounts. The following use cases have been identified for the Appeal Processing Sub-System:

### Appeal Processing: Will be used by BOR as well

| Use Case | Brief Use Case Description |
|---|---|
| **File Appeal Request**<br>**BOR** | The File Appeal use case documents the functionality necessary for a claimant, Employer, Agent or Staff (on behalf of a claimant or Employer) to file an appeal. This use case begins when the User selects the appropriate determination or document within the Claimant/Employer self-service and selects "File Appeal". The System will determine if other methods of account resolution are more beneficial for the User and present these options before creating an appeal level for the issue. This use case ends when the User chooses to resolve the issue through an alternative method or when the System creates an appeal level and generates appropriate correspondence. |
| **Prepare case for scheduling** | Cases are reviewed for a variety of criteria including complexity prior to scheduling. |
| **Schedule Appeal Hearing (Self-Service)**<br>**BOR** | This use case begins after the appellant party completes their request to file an appeal. Appeal requests received on paper (mail or fax) will be imaged and routed to staff workflow for scheduling. Scheduling an appeal determines the logistics of the appeal hearing. The use case ends when the system schedules the hearing and returns to the File Appeal process which will provide confirmation information and generate the necessary correspondence to the claimant, employer and/or other interested parties. |
| **Schedule or Reschedule Appeal Hearing (Staff)**<br>**BOR** | This use case begins after workflow has been created to prompt staff to schedule or reschedule an appeal hearing. Staff scheduling an initial appeal hearing will be rare but will occur when an in person hearing is required or when a paper appeal request is received. Workflow will be created when appellants mail or fax in appeal requests and when interested parties request a reset of their appeal schedule either by mail, fax, IVR or Web. This use case also includes the functionality needed for Review Examiner or other staff to update the RE schedule of availability. Dependent on design. |

| Use Case | Brief Use Case Description |
|---|---|
| **Withdraw/Void Appeal**<br>**BOR** | The Withdraw Appeal use case documents the functionality necessary for an Appellant or Staff on behalf of an Appellant to withdraw an appeal. This use case begins when the User selects the appropriate pending appeal issue within the Claimant/Employer self-service and selects "Withdraw Appeal". This use case ends when the System withdraws the appeal issue and generates the appropriate correspondence. Merged with Process Appeal decision. |
| **Receive, Route & Mail Exhibits**<br>**What about printing case folder material? BOR** | This use case documents the functionality necessary to receive, store, route and mail exhibits. This use case begins when new evidence/exhibits are received by mail or fax. Documents are scanned and become part of the appeal's electronic case file. Evidence that cannot be scanned (video tapes, policy manuals, etc) will be logged and referenced as part of the electronic case file. Copies of exhibits will be made available to all interested parties. Will be defined during design. |
| **Maintain Appeal Record**<br>**BOR** | This use case documents the functionality necessary to allow staff to view and maintain Appeal specific details after an appeal has been filed and scheduled. Examples include adding witnesses, changing contact telephone numbers, etc. Should have the ability to receive and process remands or remand to a lower authority. |
| **Conduct Appeal Hearing**<br>**BOR: or review** | The conduct hearing functionality will allow the hearing process to be recorded via the telephone. This use case begins when the Review Examiner (RE) conducts the hearing as scheduled. The RE confirms the demographic information of the appellant and interested parties. This use case ends when the hearing is concluded and the recording has been stored.<br>Digital recording options will be evaluated during design. |
| **Process Appeal Decision**<br>**BOR** | This use case documents the functionality necessary for Staff to generate an appeal decision. Staff reviews the electronic case file. System tree logic will guide staff in processing the decision based on the appeal type. Based on the outcome of the decision the System will notify the following processes: Determine Multiple Days Denied, Benefits Paid Charge, Determine Potential Over/Underpayment, Revenue and Process Amended Monetary. This use case ends when the System issues correspondence to the appropriate parties.<br>Will be determined during design. |
| **Modify Appeal Decision**<br>**BOR** | This use case documents the functionality necessary for Staff to modify an appeal decision. This use case begins when Staff reviews a completed appeal decision and creates a level of one of the following: Modify – Corrected, Modify – Nullified, Modify – Amended, Modify – Exception Level, or Modify – End Indefinite Denial. After the Modify level is created System tree logic will guide Staff in processing the decision. Based on the outcome of the decision the System will notify the following processes: Determine Multiple Days Denied, Benefits Paid Charge, Determine Potential Over/Underpayment, Revenue and Process Amended Monetary. This use case ends when the System issues correspondence to the appropriate parties. |

# Program Integrity

**Program Integrity**

The purpose of this subsystem is to provide conformance to federal quality assurance and benefit integrity requirements, assist in identification of fraudulent account situations, and to provide continuous quality improvement support. The following use cases have been identified for the Program Integrity Sub-System:

**Program Integrity Processing**

| Use Case | Brief Use Case Description |
|---|---|
| **Update/entry-repayments** | Consider during design along with other sub system payment processes. |
| **Write-off of Overpayment** | Consider during design along with other sub system collection processes. |
| **Special processing of Appeals** | Waiver, late appeals, tax intercept appeals<br>Consider during design along with other payment processes |
| **Special processing of Overpayment** | Bankruptcy, death notification will be defined during design.<br>Bounced checks, void check covered in payment processes |
| **Integrated cross match system** | May need more cross matches but also need an integrated system that produced a "hit" list with established priorities. This implies the use of filters, checking of new information to old information etc. This process will determine list of cases to be investigated and routed.<br>Contingent upon DW tool like SAS |
| **Process New Hire Cross Match** | This use case will identify claimant accounts that have been paid benefits the week of or after their date of hire as reported in the New Hires database. |
| **Process Wage Detail Cross Match** | The purpose of this use case is to identify potential overpayments that result from Claimants not reporting or under-reporting their earnings. This is accomplished by comparing earnings reported by employers within wage detail versus those reported (or not reported at all) by Claimants at the time of payment request. |
| **Process Interstate (ICON) Cross Match** | This use case involves the process of sending wage detail and account information to the FCCC to detect overpayments that result from a claimant receiving benefits in one state while working in another. |
| **Process Workers' Comp Cross Match** | The purpose of this use case is to identify overpayments (which can be fraud) that result from Claimant's not reporting that they have received or are receiving worker's compensation while collecting unemployment benefits. Other eligibility issues can arise such as: ability to work, actively seeking and/or availability to work. |
| **Process Border Check Cross Match** | The purpose of this use case is to identify potential overpayments to those individuals who live in "border" communities (those cities on the border with other states) to determine if the claimant has earnings in another state but is not reporting said earnings. |

| Use Case | Brief Use Case Description |
|---|---|
| **Process Duplicate Address Cross Match** | The purpose of this use case is to identify individuals who are fraudulently receiving benefits from multiple accounts (formerly known as Eagle Pass). |
| **Process Quality Control Sample** | The scope of this use case seems to be handled within the Benefits Accuracy Measurement (BAM) SRS document. |
| **Fraud Investigation**<br>**Routing** | Fraud use case scope is currently under review. The scope may simply create a workflow and/or issue type.<br>This Use Case must have routing to auditors (maybe based on cross-match hit list.) |

## Economic Research

**Economic Research**

The purpose of this subsystem is to provide Labor Market Information to the Federal Department of Labor, DUA Management and the constituents of the Commonwealth of Massachusetts. This module includes the production of UI federal operating reports and other activity summaries that can be validated against state and federal reporting requirements and can be recreated as needed to support internal quality and performance reviews and external audit engagements. The following use cases have been identified for the Economic Research Sub-System:

**Economic Research**

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 191**<br>**Statement of Expenditures and Financial Adjustments** | Is used by each State employment security agency (SESA) to report to the National Office (NO):<br>1. The quarterly summary of UCFE and UCX expenditures and adjustments, and<br>2. The total amount of benefits paid by the SESA to claimants of specific agencies.<br>Section B of the ETA 191 is the only source document used by the Office of Workforce Security to bill Federal and military agencies for the recovery of UCFE and UCX benefit payments. |
| **ES 202 - Quarterly Census of Employment and Wages (QCEW)** | The Covered Employment and Wages program, commonly called the ES-202 program. Using quarterly data submitted on magnetic media or electronically by the agencies, BLS summarizes employment and wage data for workers covered by State unemployment insurance (UI) laws and for civilian workers covered by the program of Unemployment Compensation for Federal Employees (UCFE). |

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 203, Characteristics of the Insured Unemployed** | The ETA 203 report provides information, by State and for the Nation, about the characteristics of Unemployment Insurance claimants. This data is useful in describing the population of claimants and determining how that population changes over time and under various conditions. It can also be compared with characteristic figures of the total unemployed as published by the Bureau of Labor Statistics (BLS). |
| **ETA 204 - Experience Rating Report** | Data submitted annually on the ETA 204 enables Employment and Training Administration (ETA) to project revenues for the Unemployment Insurance (UI) program on a State by State basis and to measure the variations in assigned contribution rates which result from different experience rating systems. When used in conjunction with data from the ES 202, Employment Wages, and Contributions report, the ETA 204 data will assist in determining the effects of various factors (e.g., seasonality, stabilization, expansion, or contraction in employment and payroll, etc.) on the employment experience of various groups of employers. The data will also provide to States and the National Office an early signal for potential solvency problems, be useful in analyzing factors which give rise to the potential problems, and permit an evaluation of the effectiveness of the various approaches available to correct the problems detected. Moreover, the data are required as a basis for estimating State average tax rates for the rate year. Finally, the data are the basis for determining an experience rating index; the index will allow for the evaluation of the extent to which benefits in States are effectively charged, non-charged, and ineffectively charged. Comparisons in a single State over time will be possible. |
| **ETA 205, Preliminary Estimates of Average Employer Contribution Rates** | The Average Employer Tax Rate report collects annual information about the taxing efforts in States relative to both taxable and total wages and allows comparison between States. |
| **ETA 207, Non-monetary Determination Activities** | The data reported on the ETA 207 provides current information on the volume and nature of non-monetary determinations and denials under State, UCFE and UCX unemployment insurance programs. Agencies use the data to budget workloads, evaluate law changes, appraise disqualification processes and relate to benefit appeals. The National Office uses it to determine workload counts, to analyze the ratio of disqualifications to determinations, and to examine and evaluate the program effect of non-monetary activities. |
| **ETA 2112 UI Financial Transaction Summary** | Form ETA 2112 is a monthly summary of transactions in a State unemployment fund which includes the Clearing Account, Unemployment Trust Fund Account, and Benefit Payment Account. All payments by employers (and employees where applicable) into a State unemployment fund for contributions, payments in lieu of contributions, penalty and interest, or special assessments should be accounted for in the report. Form ETA 2112 provides a summary of data pertaining to State UI tax collections, regular benefits paid, Federal and State shares of extended benefits paid, third tier program benefits paid, and other transactions affecting the unemployment trust fund. |

HIGHLY CONFIDENTIAL

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 218 Benefit Rights and Experience** | The number of eligible claimants with potential maximum duration, the average potential duration for all eligible claimants, and their distribution by number of full weeks of potential duration show the extent of protection, in terms of weeks of benefits, available to potential beneficiaries. |
| **ETA 227 Overpayment Detection and Recovery Activities** | Form ETA-227 provides information on determinations, overpayments, and recoveries of overpayments on intrastate and liable interstate claims under State unemployment compensation (UI) and under Federal unemployment insurance programs, i.e., programs providing unemployment compensation for Federal employees (UCFE) and ex-servicepersons (UCX), established under Chapter 85, Title 5, U.S. Code. |
| **ETA 5130 Benefit Appeals Report** | The ETA 5130 report is the basic source of information on the appeals case workload in each State under the regular programs of State unemployment insurance, unemployment compensation for Federal employees, and unemployment compensation for ex-service members (referred to as UI, UCFE, and UCX respectively). |
| **ETA 5159 Claims and Payment Activities** | The ETA 5159 report contains monthly information on claims activities and on the number and amount of payments under State unemployment insurance laws (State UI) and Federal unemployment insurance laws for Federal workers (UCFE) and for ex-service members (UCX). There are separate ETA 5159 reports labeled Regular, Extended Benefits (EB), and Short Time Compensation (STC). |
| **ETA 538 Advance Weekly Initial and Continued Claims Report** | This report provides for an advance national compilation and release of initial claims and weeks claimed data that, on a national basis, should conceptually be the same as the total of initial claims and weeks claimed data reported on the ETA 539, Weekly Claims and Extended Benefits Trigger Data. |
| **ETA 539 Weekly Claims and Extended Benefits Trigger Data** | This report serves as the State Administrator's initial notice to the Employment and Training Administration (ETA) National Office that a State extended benefit period will begin or end for a specified week. |
| **ETA 581 Contribution Operations** | The ETA 581 report provides information on volume of work and State agency performance in determining the taxable status of employers and the processing of wage items; in the collection of past due contributions and payments in lieu of contributions, and delinquent reports; and in field audit activity. The ETA 581 report for each calendar quarter is due in the Employment and Training Administration National Office on the 20th day of the second month following the quarter to which it relates, i.e., May 20, August 20, November 20, and February 20. This report will be transmitted electronically. |
| **ETA 586 Interstate Arrangement for Combining Employment and Wages** | This report will enable the Employment and Training Administration to measure the scope of wage-combining activities and to determine the effects of the program in terms of the number of claims filed, amount of benefits involved, and promptness of first payments and employment and wage transfers. |

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 8401 Monthly Analysis of Benefit Payment Account** | The ETA 8401 is a record of benefit payment account transactions recorded in the books of each State. |
| **ETA 8403 Summary of Financial Transactions - Title IX Funds** | Provides a cumulative summary of expenditures of State unemployment funds pursuant to Section 903(c)(2) of the Social Security Act (SSA), the "Reed Act" as amended. |
| **ETA 8405 Monthly Analysis of Clearing Account** | The ETA 8405 report is a record of clearing account transactions recorded in the books of each State. |
| **ETA 8413 Income-Expense Analysis, UC Fund Benefit Payment** | The ETA 8413 is a monthly analysis of daily transactions in a State benefit payment account from the books of the bank on which benefit checks or warrants are issued. |
| **ETA 8414 Income-Expense Analysis, UC Fund Clearing Account** | This report is a monthly analysis of activity in a State clearing account from the books of the bank in which employer contributions and payments in lieu of contributions are deposited and transferred to the U.S. Treasury. |
| **ETA 9016 Alien Claims Activity Report** | The Immigration Reform and Control Act (IRCA) of 1986, Public Law 99-603, amended the Social Security Act by adding to Section 1137 - "Income and Eligibility Verification System". Section 1137 provisions require states to verify, through the Immigration and Naturalization Service (INS), the legal status of all aliens applying for benefits under certain federally assisted and federally funded programs, including Unemployment Compensation. To facilitate the required verification, INS developed the Systematic Alien Verification for Entitlement (SAVE) system. SAVE consists of automated and manual procedures by which states obtain information about an alien=s immigration status that will allow them to determine the alien=s eligibility for unemployment compensation. The information provided on the ETA 9016 Report is used by the Department of Labor to: C Assess the magnitude of alien claims and issues affecting eligibility; C Make decisions as to the appropriateness and value of state use of the SAVE system; and C Determine whether a state's administrative costs associated with SAVE are reasonable. |

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 9048 Worker Profiling and Reemployment Services Activity** | The ETA 9048 report provides quarterly information on the Worker Profiling and Reemployment Service activities of claimants who are profiled to assess their likelihood of exhausting benefits. Worker profiling allows for the targeting of reemployment services to those most in need. The data on this report is used for evaluation and monitoring of the Worker Profiling and Reemployment Services system on a national level. It includes breakouts of those who reported to services and those who completed services to be able to track service utilization. The mandatory participation requirement of the profiling legislation does not pertain to education/training or to services provided under a State's Self Employment Assistance program. Data is captured in each of these categories to provide additional information about the range of services provided to profiled claimants. |
| **ETA 9049 Worker Profiling and Reemployment Services Outcomes** | The ETA 9049 report contains information on the outcomes of reemployment service activities of claimants who, through the Worker Profiling and Reemployment Services (WPRS) program, are identified as likely to exhaust their UI benefits, selected for referral to reemployment services and referred to such services. The report uses existing administrative data and allows evaluations such as comparison over time of the numbers and percentages of individuals selected through the Worker Profiling and Reemployment Services (WPRS) system and referred from the selection pool who subsequently become reemployed in covered employment within the same State, and what percent of their former wages the new jobs represent. |
| **ETA 9050 First Payment Time Lapse** | The ETA 9050 report contains monthly information on first payment time lapse. This report concerns the time it takes States to pay benefits to claimants for the first compensable week of unemployment. Similar time lapse data was formerly reported in Section C of the ETA 5159 report. That data addressed first payment time lapse for total unemployment only. This report contains monthly time lapse data for all first payments, i.e., total, partial and part-total. A separate section of this report is reserved for Workshare (Short-Time Compensation) first payments only. Workshare will be reported separately and is excluded from that part of the report for "ALL" first payments. |
| **ETA 9051 Continued Weeks Compensated Time Lapse** | The ETA 9051 report contains monthly information on continued weeks compensated time lapse. This report concerns the time it takes States to pay benefits to claimants for compensable weeks of unemployment other than the "first payment." Continued weeks compensated time lapse data was not formerly reported. This report contains monthly time lapse data for all continued weeks compensated, i.e., total, partial and part-total. A separate entry screen will be used for a breakout of partial and part-total continued weeks compensated. Workshare (Short-Time Compensation) continued weeks compensated will be reported on a third entry screen. Workshare continued weeks compensated are not reported in the total count of "All" continued weeks compensated. |

| Use Case | Brief Use Case Description |
|---|---|
| **ETA 9052 Non-monetary Determination Time Lapse, Detection Date** | The ETA 9052 report contains monthly information on the time it takes States to issue non-monetary determinations from the date the issues are first detected by the agency. Single-claimant and multi-claimant non-monetary determinations are included in the report. Non-monetary determinations made by organizational units such as Benefits Accuracy Measurement (BAM) and Benefit Payment Control (BPC) are also included in the report. Note: Overpayment notices on uncontested earnings detected by any method (e.g., cross match) should not be included. A separate section of this report is reserved for multi-claimant determinations only. |
| **ETA 9053 Non-monetary Issue Detection Time Lapse, Affected Week** | The ETA 9053 report contains monthly information on the time it takes States to detect an issue on a claim. The measure is days elapsed from the week ending date of the first affected week to the date on which the agency first detects an issue. Single-claimant and multi-claimant non-monetary determinations are included in the report. Non-monetary determinations made by organizational units such as Benefits Accuracy Measurement (BAM) and Benefit Payment Control (BPC) are also included in the report. BPC cross match determinations, however, are excluded, as are all monetary determinations, regardless of point of origin. A separate section of this report is reserved for multi-claimant determinations only. |
| **ETA 9054 Appeals Time Lapse** | The ETA 9054 report contains monthly information on the time it take States to issue lower authority and higher authority appeals decisions from the date the request for a lower authority hearing or a higher authority appeal is filed to the date on the decision. |
| **ETA 9055 Appeals Case Aging** | The ETA 9055 report contains monthly information on the inventory of lower authority and higher authority appeals which have been filed but not resolved. The universe of appeals included in this measure is all lower and higher authority appeals which are not resolved at the end of the month covered by the report. Case aging provides information about the number of days from the time an appeal is filed and the end of the month covered by the report. |
| **ETA 9056 Non-monetary Determination Quality Review** | The ETA 9056 report provides quarterly information on the quality of non-monetary determinations that State agencies issue to claimants and employers in the report period. Intrastate and Interstate single-claimant and multi-claimant separation and non-separation non-monetary determinations are included in the report. Non-monetary determinations made by organizational units such as Benefits Accuracy Measurement (BAM) and Benefit Payment Control (BPC) are also included in the report. Notices of overpayments on uncontested earnings detected by any method (e.g., cross match) are excluded from the report. |
| **ETA 9057 Lower Authority Appeals Quality Review** | The ETA 9057 report provides quarterly information on the quality of State agencies' single and two party lower authority appeals hearings and decisions in the report period. |

| Use Case | Brief Use Case Description |
|---|---|
| **Management and Ad Hoc Reports** | This use case includes the production of financial and program activity reports that are timely, auditable, and credible (electronic reports that replace current manual reports must combine data from several sources and programs into summary reports that meet the needs and requirements of external audiences, e.g. the U.S. Department of Labor). This use case will provide the ability for management to track financial and programmatic activity, detect and document trends, and produce forecasts of key activities (e.g. monthly claims workload) and financial outlays and trust fund condition. In addition this use case includes the production of timely and consistent responses to regular and ad hoc requests for information about the operation of the UI program, the customers served, and the financial results (e.g. through use of an integrated database with user-driven reporting views). |
| **Labor Market Data Extracts** | This use case includes the set of standard Labor Market Information data extracts used by Massachusetts to publish LMI statistics for the constituents of the Commonwealth. |

## Application Infrastructure & System Administration

These tasks establish the overall application infrastructure and system administration components. It consists of design, development, and testing of the following components:

- Security Component
- Rules Component
- Interfaces Component
- Edit Checks Component
- System Logging Component
- System Management Component
- Code Table Maintenance Component
- Reports Component
- Correspondence Component
- Document Management and Workflow Component

Increment 1 is vital to setting the foundation for the QUEST project. The increment focuses on the underlying components used for developing benefits, tax, and future system functionality. BearingPoint will bring many of the standard application and database objects to the project. The importance of this Increment cannot be overemphasized; it serves as the foundation for subsequent tax and benefits development Increments. Experience has shown that ample time and attention devoted to developing a comprehensive, robust architecture and set of common objects will translate into less re-work, less maintenance and more code efficiencies in the future. The uFACTS solution framework, along with our tool-kit of .NET common objects, will help support these project tasks.

### Security Component

BearingPoint recognizes the confidential nature of UI information: security must be designed into the system to comply with State and DUA security requirements and standards. We have, therefore, allocated a significant amount of time and resources to develop the Security Plan and application components.

The system's security model will include: physical, application, and data level security. In collaboration with DUA resources, we will prepare a Security Model that will identify how security features will be implemented. Specifically:

- Products to be used
- Proposed levels of security
- Limitations of capabilities
- Required protocols
- Security tables format and content
- Recommended starting point for establishing security profiles

**Rules Component**

BearingPoint recognizes the need to change the business rules governing the UI System due to legislative changes or other driving factors. To accomplish these changes in a long-term cost effective way, we have allocated a significant amount of time and resources to develop the Rules management component.
The rules component will include:

- Rules Engine configuration
- Rules Engine integration with .NET application
- Rules definition
- Recommended starting point for establishing rules

**Interfaces Component**

In order to interface with various DUA and other systems, the Interface component will have to be robust and dependent. To accomplish this, we have allocated a significant amount of time and resources to develop the Interface component.
The interface component will include:

- Finalizing the technology to use for interfacing with other systems
- Finalizing the protocols for interfacing
- Finalizing the online and batch interfacing processes
- Creating the processes to support the interface process

**Edit Checks Component**

BearingPoint recognizes the need for the UI System to validate the user input effectively to maximize the data integrity. In order to accomplish a very high level of data integrity, the data entered must be validated in a very efficient and modular fashion. Modular and object oriented design will help significantly increase the organization of the software, thereby contributing directly to the data integrity by uniformly applying the business rules and edits.
The edit checks component will include:

- Software design to modularize edit checks and business rules
- Creation of non-business specific common edits
- Creation of placeholders for business specific common edits

- Creation of placeholders for business specific edits that are not common

**System Logging Component**

BearingPoint recognizes the need for the UI System to keep track of certain important system events that will track system activities by users. In order to accomplish this, the system logging component must be designed in such a fashion, that the important system activities are recorded by common code, thereby eliminating the need for individual Java classes and JSPs to focus on this.

The system logging component will include:

- Identification of important system logging events
- Software design to enable system logging
- Database design to enable system logging
- Creation of software to handle system logging

**System Management Component**

BearingPoint recognizes the need for the UI System to manage the system effectively based on the various system users and activities. For example, there may be a need to allow certain type of users to access the system for maintenance purposes, while the other types of users are locked out of the system.

The system management component will include:

- Identification of the various system open/close events
- Identification of the various system user types and their privileges
- Database design to enable system management
- Creation of software to handle system management functionality

**Code Table Maintenance Component**

The Code Table Maintenance component will provide system administrators the ability to modify systems codes defined in database tables within the system. This will ease system maintenance tasks and allow for greater flexibility in responding to changes in program and policy.

**Reports Component**

The UI System will produce and display various standard and ad-hoc reports to the system users. The reports in the system will be created using Crystal Reports software and will be published either as downloadable PDF (or other agreed-upon format) documents or viewable via Crystal Reports Viewer. The reports viewed by the Crystal Reports Viewer will be served by the Crystal Enterprise Server.

The Reports component will include:

- Finalization and creation of Report User Groups
- Integration of Crystal Enterprise with Java application
- Development and publication of sample reports in PDF or other agreed-upon format
- Development and publication of sample reports via Crystal Enterprise and Crystal Viewer

**Correspondence Component**

BearingPoint recognizes the need for the UI System to send various types of correspondence to the various stakeholders of the system. Some of the common methods of correspondence include e-mails and printed letters. The correspondence component will have the functionality to generate and distribute various system related correspondence to the intended recipients.

The Correspondence component will include:

- Finalization of the various correspondence modes to be built in the system
- Building interfaces with other systems for correspondence purposes
- Building functionality to view previously sent correspondence

**Document Management & Workflow Component**

The FileNet document management and workflow components will be purchased and installed toward the end of the Overall Project Inception Phase, after the validation of the overall technical architecture is complete. (See Page 13-85 of BearingPoint's proposal)

During Increment 1 – Infrastructure, the UI TIP Team will integrate FileNet into a common development environment, so that its components can be used in Increments 2 and 3. During Increments 2 and 3, FileNet will be an integral component to both the self-service and core tax service components. DUA can expect the following document imaging/workflow functionality to be available in the first two years:

- Ability to define specific workflow scenarios and apply these scenarios to the UI TIP application
- Ability to automatically route correspondence to employers and applicants through workflow scenarios
- Ability to notify through email correspondence that follow up is required by either the employer or applicant
- Ability to index and scan employer related correspondence

# Appendix H: DOR Confidentiality Acknowledgement

**INTERDEPARTMENTAL MEMORANDUM**

TO: Distribution

FROM: DWD

RE: Confidentiality of the Department of Revenue's Information

DATE: January 2, 2007

---

The attached Summary of the Laws is being provided to you because as part of your job duties you may have access to confidential tax, wage reporting, financial institution match, 14-day new hire and child support information, as well as "personal data" provided to the Department of Workforce Development by the Department of Revenue. The access and disclosure of this information is governed by the attached state and federal laws. Violation of the laws provide for specific sanctions including civil and criminal penalties, as well as dismissal from employment and disqualification from holding office in the Commonwealth for up to three years.

If you have any questions regarding this form, please contact Wayne Kallman at 617-626-5901.

---

***ACKNOWLEDGMENT REGARDING THE CONFIDENTIALITY OF THE DEPARTMENT OF REVENUE'S INFORMATION***

I, ______________________, a full-time or part-time employee, contract employee, individual consultant, volunteer, trainee, student intern, member, director, officer, partner, agent or subcontractor of the Department of Workforce Development, hereby acknowledge that I have received a copy of the "Summary of the Massachusetts and Federal Laws Pertaining to Confidential Information of the Massachusetts Department of Revenue" which governs the access and disclosure of information to include, without limitation, tax information, wage reporting information, financial institution match information, 14-day new hire information and child support information, as well as "personal data" as defined in G.L. c. 66A (collectively, the "Information"). I also

acknowledge that it is my responsibility to read this Notice and to comply with the laws pertaining to the Information.

______________________________ ______________________

Signature Date

______________________________

Name in print

**Distribution: All persons with access to DOR confidential information.**

**SUMMARY OF MASSACHUSETTS AND FEDERAL LAWS PERTAINING TO CONFIDENTIALITY OF INFORMATION OF THE MASSACHUSETTS DEPARTMENT OF REVENUE**

1) Fair Information Practices Act (FIPA), G.L. c. 66A: Prohibits the unauthorized disclosure of "personal data," as defined in G.L. c. 66A. Data subjects may make a claim for damages under the Massachusetts Tort Claims Act. General Laws chapter 214, section 3B also provides for injunctive and other nonmonetary relief for violation of this statute.

2) G.L. c. 62C, § 21: Prohibits unauthorized disclosure of tax information or returns as defined in 830 CMR 62C.21.1. A return is defined very broadly in 830 CMR 62C.21.1 and includes information developed by the Department. Violation of this statute is punishable by a fine of not more than $1,000 and/or by imprisonment for not more than six months, and by disqualification from holding office in the Commonwealth for a period not exceeding three years.

3) G.L. c. 62C, § 21B: Prohibits unauthorized willful inspection ("browsing") of tax information or returns as defined in 830 CMR 62C.21.1. A return is defined very broadly in 830 CMR 62C.21.1 and includes information developed by the Department. Violation of this statute is punishable by a fine of not more than $1,000 per return, document or taxpayer and/or by imprisonment for not more than one year, and by disqualification from holding office in the Commonwealth for a period not exceeding three years. This section also provides that "browsing" by an employee shall be grounds for dismissal of the employee.

HIGHLY CONFIDENTIAL

4) G.L. c. 62E, § 8: Prohibits unauthorized disclosure of information obtained from the wage reporting and financial institution match system. Violation of this statute is punishable by a fine of $100 per offense and by administrative discipline.

5) G.L. c. 119A, § 5A: Prohibits unauthorized willful inspection ("browsing") or unauthorized disclosure of child support personal data, including data stored in a computer system or computer files. Any such inspection or disclosure is punishable by a fine of not more than $1,000 with respect to each person concerning whom information has been disclosed or inspected and/or by imprisonment for not more than one year, and by disqualification from holding office in the Commonwealth for a period not exceeding three years. This section provides that unauthorized disclosure or "browsing" of child support data by an employee shall be grounds for dismissal of the employee. This law also places additional restrictions on the disclosure of location information about a parent or child when the agency is provided with reasonable evidence of a risk of harm.

6) I. R. C. § 6103: Prohibits unauthorized disclosure of federal tax returns or return information by employees and former employees of state and IV-D agencies.

7) I. R. C. § 7213: Makes any unauthorized disclosure of federal tax returns or return information a felony punishable by a fine of up to $5,000 and/or imprisonment for not more than five years, together with the costs of prosecution.

8) I. R. C. § 7213A: Prohibits the unauthorized willful inspection ("browsing") of federal tax returns or return information and makes such inspection punishable by a fine of up to $1,000 and/or imprisonment for not more than one year, together with the costs of prosecution.

9) I. R. C. § 7431: Permits a taxpayer to bring a civil action for damages in a federal district court against a person who unlawfully browsed or disclosed federal return or return information.

DOCS# 223762

*DUA QUEST Project*
*Division of Unemployment Assistance*
BearingPoint SOW- Revision 4.0 Final

The undersigned hereby represent that they are duly authorized to execute this SOW on behalf of their respective organizations.

| Division of Unemployment Assistance | BearingPoint |
|---|---|
| Edward T. Malmborg, Director | Kathy Karich, Regional Managing Director |
| Date: May 21, 2007 | Date: May 21, 2007 |

97

HIGHLY CONFIDENTIAL DEL00067839

# Exhibits 32 through 34 Redacted in Their Entirety

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 14, 2025, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Joshua L. Simmons
Dana DeVlieger
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

Gregg F. LoCascio
Patrick Arnett
Nicholas Teleky
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave NW
Washington, DC 20004

John F. Hartmann
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654

Ariel Deitchman
KIRKLAN & ELLIS LLP
Three Brickell City Centre
98 S.E. 7th Street, Suite 700
Miami, FL 33131

Miranda D. Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116

*Deloitte-Sagitec@kirkland.com*

John W. Shaw
Andrew E. Russell
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
*jshaw@shawkeller.com*
*arussell@shawkeller.com*

*Attorneys for Plaintiffs Deloitte Consulting LLPand Deloitte Development LLC*

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Robert M. Vrana*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street

Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Sagitec Solutions, LLC*