**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DELOITTE CONSULTING LLP and DELOITTE DEVELOPMENT LLC, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 23-325-WCB |
| SAGITEC SOLUTIONS LLC, | § § | **FILED UNDER SEAL** |
| Defendant. | § § § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Deloitte Consulting LLP and Deloitte Development LLC (collectively, "Deloitte") filed this action against defendant Sagitec Solutions LLC ("Sagitec") on March 23, 2023. In its Complaint, Deloitte asserted claims for copyright infringement under federal law, trade secret misappropriation under New York and federal law, unfair competition under New York law, and unjust enrichment under New York law. Dkt. No. 1. The parties have now filed a total of six pretrial motions.

1. Deloitte has moved for partial summary judgment on Sagitec's affirmative defenses of fair use and unclean hands. Dkt. Nos. 268, 269. Sagitec has filed a responsive brief in opposition, Dkt. No. 302, and Deloitte has filed a brief reply, Dkt. No. 337. Deloitte's motion is granted.

2. Sagitec has moved for summary judgment on several grounds. First, Sagitec argues that Deloitte lacks ownership of the material it sought to register for copyright protection. Second, Sagitec argues that Deloitte's trade secret claims were not timely filed under the applicable statutes of limitation. Third, Sagitec argues that Deloitte has failed to show that its trade secrets have independent economic value. Fourth, Sagitec argues that Deloitte's unfair competition and unjust

1

enrichment claims must be dismissed because they are duplicative of other asserted claims or are preempted. Dkt. Nos. 277, 278. Deloitte has filed a responsive brief in opposition, Dkt. No. 299, and Sagitec has filed a brief reply. Dkt. No. 332. Sagitec's motion is granted in part and denied in part.

3. Sagitec has moved to strike certain "late-disclosed theories and related portions" of the report of one of Deloitte's experts. Dkt. Nos. 271, 272. Deloitte has filed a responsive brief in opposition, Dkt. No. 309, and Sagitec has filed a brief reply, Dkt. No. 335. That motion is denied.

4. Sagitec has also moved to exclude certain opinions from Deloitte's experts as insufficiently reliable to be admissible in evidence. Dkt. Nos. 274, 275. Deloitte has filed a responsive brief, Dkt. No. 307, and Sagitec has filed a reply brief. Dkt. No. 334. That motion is denied.

5. In response to Deloitte's opposition to Sagitec's motion to exclude the opinions of Deloitte's experts (Dkt. Nos. 274, 275), Sagitec has moved to strike portions of a declaration filed by Deloitte in support of the opposition. Dkt. Nos. 329, 330. Deloitte has filed a responsive brief in opposition, Dkt. No. 356, and Sagitec has filed a reply brief. Dkt. No. 362. Sagitec's motion is denied.

6. Finally, Deloitte has moved for sanctions based on the alleged spoliation of evidence by Sagitec. Dkt. Nos. 296, 297. Sagitec has filed a responsive brief in opposition, Dkt. No. 350, and Deloitte has filed a reply brief, Dkt. No. 363. Deloitte's motion is denied.

## I.    Background

Among other products and services, Deloitte offers software products that enable state governments to manage their unemployment insurance programs efficiently. Deloitte's software is branded as "Unemployment Framework for Automated Claim & Tax Servies," commonly

2

referred to as "uFACTS."  The uFACTS program can be tailored to fit the needs of different states, and between 2007 and 2013, Deloitte and its predecessor-in-interest, BearingPoint Inc., created a version of uFACTS known as QUEST for the Commonwealth of Massachusetts.

In 2013, David Minkkinen, the former head of Deloitte's unemployment insurance practice, was hired by Sagitec to lead Sagitec's unemployment insurance practice.  Shortly thereafter, Sagitec began offering unemployment insurance software branded as Neosurance.

In 2016, federal investigators began an investigation of Neosurance to determine whether Sagitec stole the software used in the Neosurance product from Deloitte.  In 2018, Deloitte filed applications to register copyrights on various versions of uFACTS.  Eventually, criminal charges were brought against Mr. Minkkinen and another former Deloitte employee charging them with misappropriating Deloitte's trade secrets.  Shortly after that indictment was unsealed, Deloitte filed this lawsuit.

## II.    Legal Standards

### A. Summary Judgment Standard

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine and material, and thus sufficient to defeat a motion for summary judgment, if a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On an issue as to which the moving party bears the burden of proof at trial, the party seeking summary judgment must "establish the absence of a genuine factual issue."  *Resol. Tr. Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992).  If the motion does not persuasively establish that there is no such disputed factual issue, summary judgment must be denied "even if no opposing evidentiary

matter is presented." *Id.* Once the moving party with the burden of proof makes a showing that there is no genuine issue of material fact, that party is entitled to summary judgment "unless the non-moving party comes forward with probative evidence that would demonstrate the existence of a triable issue of fact." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson*, 477 U.S. at 250.

On an issue as to which the nonmoving party has the burden of proof at trial, the party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (1986) (quoting Fed. R. Civ. P. 56(c) as of 1986). Alternatively, the moving party can show that there is no genuine issue of material fact by pointing out to the district court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once such a showing is made, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).

### B. Motion to Strike Standard

When a party moves to exclude evidence for violation of a rule or court order governing pretrial disclosure, the Third Circuit has instructed district courts to apply a set of considerations known as the *Pennypack* factors. Those factors are: (1) the prejudice or surprise to the party against which the evidence would be admitted; (2) the ability of that party to cure the prejudice; (3) the extent to which waiver of the rule in question would disrupt the orderly and efficient trial of the case; (4) any bad faith or willfulness on the part of the party offering the evidence in failing to comply with the rule or court order; and (5) the importance of the excluded evidence. *See Meyers*

*v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904–05 (3d Cir. 1977); *Quinn v. Consol. Freightways Corp.*, 283 F.3d 572, 577 (3d Cir. 2002). In instances in which the *Pennypack* factors disfavor exclusion of the evidence in question, courts applying those factors have admitted the evidence despite the violation of the rule or court order requiring the prior disclosure of that evidence.

### C. Daubert Standard

The admissibility of expert testimony is governed by the Supreme Court's decision in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. Under *Daubert* and Federal Rule of Evidence 702, the trial court is assigned the task of ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand. *Id*. at 597. In particular, the court must determine whether the reasoning or methodology underlying the expert's testimony is scientifically valid and whether the reasoning or methodology can properly be applied to the facts at issue in the case. *Id*. at 593. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999), the Supreme Court made clear that the *Daubert* framework applies broadly to "scientific, technical, or other specialized knowledge," and that the Federal Rules of Evidence require the trial judge to determine "whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id*. (quoting *Daubert*, 509 U.S. at 592).

### D. Spoliation Standard

The Third Circuit has held that actionable spoliation occurs if: (1) "the evidence was in the party's control"; (2) "the evidence is relevant to the claims or defenses in the case"; (3) "there has been actual suppression or withholding of evidence"; and (4) "the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012). The party asserting a claim of spoliation must prove the facts on which that claim is based

5

by a preponderance of the evidence. *See Hoffer v. Tellone*, 128 F.4th 433, 439–40 (2d Cir. 2025); *Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018).

Rule 37(e) of the Federal Rules of Civil Procedure provides that "[i]f electronically stored information ["ESI"] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," the court may take steps to cure any prejudice from the loss of the evidence. In order to justify an instruction to the jury that it may or must presume the information in question was unfavorable to the party accused of spoliation, there must be a finding that the party acted with intent to deprive the opposing party of the information's use in the litigation. Fed. R. Civ. P. 37(e)(2); *see* Advisory Committee Notes on 2015 Amendment to Rule 37 ("Negligent or even grossly negligent behavior" is not sufficient to justify imposing the sanctions listed in Rule 37(e)(2), including an adverse-inference instruction); *Hoffer*, 128 F.4th at 437–39 (citing cases to the same effect from six other federal courts of appeals).

## III. Discussion

### A. Deloitte's Motion for Partial Summary Judgment (Dkt. Nos. 268, 269, 302, and 337).

In its motion for partial summary judgment, Deloitte seeks dismissal of Sagitec's "fair use" defense, which Sagitec has raised in response to Deloitte's copyright infringement claims. Deloitte also moves for dismissal of Sagitec's "unclean hands" defense, which Sagitec has raised in response to Deloitte's copyright infringement and trade secret claims. Dkt. No. 269.

#### 1. Fair Use

Deloitte argues that Sagitec has "failed to disclose any theory or factual support for its [fair use] defense" against the claim that it copied Deloitte's uFACTS software in its Neosurance

product, Dkt. No. 269 at 2.  Deloitte first argues that Sagitec failed to disclose that in response to Deloitte's copyright infringement claim, Sagitec intended to raise the affirmative defense of fair use on a timely basis.  For that reason, Deloitte contends, Sagitec should be foreclosed from raising that defense at trial.  *Id.* at 8–9.

Deloitte contends that Sagitec failed to preserve its fair use claim.  Sagitec alluded to fair use in only a single statement in its Answer, where it asserted that "[t]o the extent there is copying of copyrightable expression, that copying constitutes fair use."  *Id.* at 8.  Deloitte served an interrogatory on Sagitec seeking "the complete factual and legal basis for each affirmative defense" that Sagitec would be asserting in the case.  Dkt. No. 270-4, Exh. 4 at 38.  In its response to that interrogatory, Sagitec made no reference to fair use as a defense.   Sagitec later supplemented its response to Deloitte's interrogatory regarding Sagitec's proposed defenses without making any reference to fair use, which led Deloitte to conclude that Sagitec would not be asserting that defense.  Nor did Sagitec offer any expert testimony relating to its fair use defense, despite bearing the burden of proof on that defense.  *Id.* at 38–41.  *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994); *Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 309 n.17 (3d Cir. 2011); *Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 342 F.3d 191, 197 (3d Cir. 2003); *Moore v. Kulicke & Soffa Indus., Inc.*, 318 F.3d 561, 573 (3d Cir. 2003).

Sagitec has not acted diligently to preserve its fair use defense.  Sagitec's failure to raise that defense in response to Deloitte's interrogatory or to re-assert it after originally raising it in its Answer could have led Deloitte to reasonably believe that Sagitec had abandoned it as a defense.  However, because the evidence on which Sagitec relies would not give rise to a successful fair use defense, I need not reach the question whether Sagitec has forfeited that defense through its failure to allude to it at any point during pretrial discovery.

Viewing the facts in the light most favorable to Sagitec, there are no disputed facts on which a jury could rely to find that Sagitec's alleged copying constituted fair use of Deloitte's material.  The Copyright Act directs a court to address four "factors for consideration" in determining whether copying in a particular case is permissible under the fair use exception to copyright infringement.  Those factors are: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion of the material used in relation to the copyrighted work as a whole; and (4) the effect of the use on the potential market for or value of the copyrighted work.  17 U.S.C. § 107.

The first statutory factor "focuses on whether an allegedly infringing use has a further purpose or different character, which is a matter of degree, and the degree of difference must be weighed against other considerations, like commercialism." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 525 (2023); *id.* at 527–28 ("This factor considers the reasons for, and nature of, the copier's use of an original work.  The 'central' question it asks is 'whether the new work merely "supersede[s] the objects" of the original creation . . . ("supplanting" the original), or instead adds something new, with a further purpose or different character.'" (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. at 579).

Sagitec's Neosurance program is similar in character to Deloitte's uFACTS program.  Both are unemployment administration software programs designed for use by state governments in administering their unemployment benefits programs.  While differences in the specific details and operation of each product may be subject to factual dispute, Sagitec has not argued that Neosurance is different in purpose or character from uFACTS.  The fact that Neosurance is a program developed for commercial purposes to be sold as a product, while not dispositive, is a further

indication that the alleged copying does not qualify as fair use. As such, the first factor weighs against Sagitec.

The second statutory fair use factor takes into consideration that "some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. at 586 (collecting cases). This factor often requires an assessment of whether the work is better characterized as "creative expression" rather than "factual works," with creative expression being entitled to more copyright protection than factual works. *Murphy v. Millennium Radio Grp.*, 650 F.3d at 309 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. at 586-87). In the context of copyrighted software, the cost and time required to develop the software that was allegedly copied is also relevant to the second factor. *See Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't*, 447 F.3d 769, 780 (9th Cir. 2006).

Sagitec's principal responses with respect to the second fair use factor are (1) that Deloitte's uFACTS program does not contain copyrightable material, Dkt. No. 302 at 6-9, and (2) that there are disputes of fact as to the authorship of certain files that form part of the Neosurance program. *Id.* at 7–9. In addition, Sagitec argues that certain portions of the uFACTS code are functional in nature and not creative, an argument that it supports with opinions from its expert, Monty G. Myers. *Id.* at 8.

Sagitec's arguments relating to the copyrightability of the uFACTS software are of little relevance to the second statutory factor, as fair use "presumes that unauthorized copying has occurred," and courts routinely evaluate fair use without addressing the question whether the underlying material was copyrightable. *See Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2012); *Google LLC v. Oracle Am. Inc.*, 593 U.S. 1, 29 (2021) ("the Court assumes for

9

argument's sake that the copied lines can be copyrighted and focuses on whether Google's use of those lines was a 'fair use'").  While Sagitec argues that some specific portions of the uFACTS code are functional rather than creative, it is unclear whether that argument is directed to the entirety of the uFACTS code, to specific portions of code that Deloitte accuses Sagitec of copying, or to code that falls outside of Deloitte's copyright claims.  Even if some portions of the uFACTS code are functional, Deloitte necessarily had to make creative choices in designing other portions of the software, and at least some portions of the uFACTS software are creative.  While a full determination of this factor might depend on resolving underlying disputes regarding the portions of uFACTS at issue, Sagitec has not produced sufficient evidence to show why this factor would be any more than neutral regarding the issue of fair use.

The third statutory fair use factor "calls for thought not only about the quantity of the materials used, but about their quality and importance, too."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. at 587.  Deloitte alleges that Sagitec copied "nearly the entirety of the uFACTS computer program" onto its servers, and then further copied "critical portions" into Neosurance.  Dkt. No. 269 at 13.  In response, Sagitec argues that Deloitte's expert identified "fewer than 2% of Neosurance files [making up only 0.3% of the total lines of Neosurance source code] as allegedly containing copied content."  Dkt. No. 302 at 9.  Sagitec does not make an affirmative argument regarding the qualitative value of the allegedly copied material.  Instead, Sagitec argues that Deloitte has "provided no evidence of the qualitative value of the allegedly copied material."  *Id*.  Because Sagitec bears the burden of proof on the fair use defense, its reliance on Deloitte's alleged failure to point to particular copied materials is insufficient to establish that the material had a low qualitative value.

While 0.3-2% of the code is a small percentage, that quantity alone is of limited relevance to the third factor. That factor is concerned with the amount of the copied "portion used in relation to the copyrighted work as a whole," not the percentage of the resulting work that contains copyrighted material.[1] *See Murphy v. Millennium Radio Grp.*, 650 F.3d at 298–99 (finding that reproducing a single image on two websites constituted copying "the Image in its entirety" and weighed against a finding of fair use under the third statutory fair use factor). Sagitec bears the burden of showing that it copied only a small portion of Deloitte's uFACTS software, and it has not pointed to sufficient evidence to meet that burden.

As for Deloitte's allegations that Sagitec copied the entirety of the uFACTS software onto its servers and then further copied specific portions into Neosurance, Dkt. No. 269 at 6–7, Sagitec does not appear to dispute Deloitte's allegations that all, or nearly all, of the uFACTS software was copied onto Sagitec's servers. Instead, Sagitec argues that "intermediate infringement" has "very little weight" when the "final product does not itself contain infringing material." Dkt. No. 302 at 10 (quoting *Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 606 (9th Cir. 2000)). However, the *Sony* case, on which Sagitec relies, differs significantly from this one. In *Sony*, the crux of the court's determination was its observation that the Copyright Act "protects expression only, not ideas or the functional aspects of a software program" and that copying "could be protected as a fair use if it was 'necessary' to gain access to the functional elements of the software itself." *Sony*, 203 F.3d at 603. In fact, the *Sony* court explicitly noted that "intermediate copying could constitute copyright infringement even when the end product did not itself contain

---

[1] For example, if someone copied the entirety of a poem and re-printed it in a collection of 1000 poems, the percentage of the copyrighted material that was copied would be 100% (the entire poem), and not 0.1% (the portion of the resulting work that consists of the copyrighted material).

11

copyrighted material." *Id.* at 602–03.[2]  The court also ruled that such copying still weighs against a finding of fair use, even if it carries "very little weight" when "the final product does not itself contain infringing material."[3]  *Sony*, 203 F.3d at 606.  Because Sagitec has not argued that any copying it engaged in was somehow necessary to gain access to unprotectable functional aspects of uFACTS, and because Sagitec does not appear to contest Deloitte's accusations that it engaged in intermediate copying, this factor weighs against a finding of fair use.

The fourth statutory fair use factor relates to the commercial value of the allegedly copied material, and the effect that the copying of that material is likely to have on the market value of the product.  *E.g., Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. at 590.  To negate fair use "one need only show that if the challenged use 'should become widespread, it would adversely affect the *potential* market for the copyrighted work.'"  *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 568 (1985) (emphasis in original) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984)).

Sagitec again bears the burden of proof on this factor.  But rather than addressing the commercial value of the allegedly copied material, Sagitec focuses its argument on asserting that Deloitte has failed to prove that it suffered any harm as a result of the alleged copying.  Dkt. No. 302 at 13–14.  Additionally, Sagitec argues that there are material factual disputes as to the impact of its product on Deloitte's potential market.  *Id.*  While there may be grounds for dispute as to the

---

[2] *Sony* was, in essence, a case about whether copying necessary to discover non-copyrightable features of a work could be considered fair use when the end product did not contain any copyrighted material.  That is not the situation here, given that Deloitte alleges not only that Sagitec engaged in intermediate copying, but also that the end product contains significant amounts of copyrighted material.

[3] Sagitec's argument depends on Sagitec's prevailing in its argument that Neosurance does not contain any of Deloitte's copyrighted materials and that the only copying at issue is the intermediate copying of the uFACTS code.

exact extent of market effects, no reasonable jury could conclude that Sagitec's copying, if proved by Deloitte, would have had no effect, or at most only a de minimis effect, on the market for Deloitte's uFACTS software. This is not a case in which Sagitec copied some limited amount of Deloitte's code to produce a transformative product that competed in an entirely different market. Here, Deloitte has accused Sagitec of copying that resulted in Sagitec releasing a functionally similar, if not identical, product that Sagitec marketed to the same limited pool of customers, in direct competition with Deloitte's uFACTS system. While there may be disputes as to the strength of this factor, there is no question that it weighs against a finding of fair use.

Because each of the statutory fair use factors either weighs against a finding of fair use or is neutral, and because Sagitec has failed to present evidence that a reasonable jury could rely on to find otherwise, summary judgment dismissing the affirmative defense of fair use is appropriate.

### 2. Unclean Hands

In support of its "unclean hands" defense, Sagitec argues that Deloitte made "knowing misrepresentations to the copyright office" and "false claims over purported trade secrets it does not own." *Id.* Deloitte moves for summary judgment on that affirmative defense, contending that Sagitec has failed to proffer evidence that Deloitte engaged in any "unconscionable acts" sufficient to justify dismissing Deloitte's claims of copyright infringement and trade secret misappropriation. *Id.* at 24.[4]

---

[4] As in the case of Sagitec's fair use defense, Deloitte argues that Sagitec has failed to preserve its unclean hands defense because it made only fleeting references to that defense during discovery. As in the case of Deloitte's similar argument with respect to the fair use defense, it is not necessary for me to address the issue of waiver or forfeiture, since Sagitec's showing with regard to the unclean hands defense is insufficient to survive summary judgment, even assuming it was preserved.

Deloitte argues that Sagitec has not pointed to evidence that could support a decision in its favor on the merits of Sagitec's unclean hands defense.  In particular, Deloitte alleges that Sagitec cannot prove that Deloitte engaged in an "unconscionable act," which is a necessary element of an unclean hands defense.  Dkt. No. 269 at 17–18.

In response, Sagitec argues that disputes of material fact preclude summary judgment on its unclean hands defense.  Specifically, Sagitec argues that Deloitte has made "false statements to the copyright office regarding its purported ownership of the registered works" that constitute "unconscionable and/or bad faith acts sufficient for unclean hands."  Dkt. No. 302 at 15.  Sagitec's unclean hands argument is essentially the same as the argument it has raised in its own summary judgment motion, discussed below—that Deloitte had no ownership interest in the uFACTS software—but with the additional allegation that Deloitte intentionally misled the Copyright Office through misrepresentations designed to obtain the registration of material to which Deloitte lacked any claim of ownership.  *Id.* at 15–16.

> The Third Circuit has described the unclean hands doctrine as follows:
>
> The unclean hands doctrine is "derived from the unwillingness of a court, originally and still nominally one of conscience, to give its peculiar relief to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge." *Gaudiosi v. Mellon*, 269 F.2d 873, 882 (3d Cir. 1959) (quotation marks and citation omitted).  The doctrine "applies when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 174 (3d Cir. 2001) (citing *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)).  Thus, a party seeking to invoke the doctrine must show: (1) the party seeking equitable relief committed an unconscionable act; and (2) the act is related to the claim upon which equitable relief is sought.

*Scherer Design Grp., LLC v. Ahead Eng'g LLC*, 764 F. App'x 147, 149–50 (3d Cir. 2019).  The doctrine of unclean hands requires "clear, convincing evidence of egregious misconduct" that is "rooted in 'fraud, unconscionable conduct, or bad faith' . . . that injures the other party and affects

14

the balance of equities." *Kars 4 Kids Inc. v. Am. Can!*, 98 F.4th 436, 450 (3d Cir. 2024) (quoting *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 129 (3d Cir. 2004)).

As discussed below in connection with Sagitec's summary judgment motion, Sagitec's arguments regarding Deloitte's lack of ownership are unconvincing.  Furthermore, Sagitec has not pointed to any evidence that would support its claim that Deloitte engaged in willful misrepresentations to or manipulation of the Copyright Office, as opposed to, at most, simply negligent conduct, which is not sufficient to support a claim of unclean hands.  *See In re Thorpe*, 755 F. App'x 177, 182 (3d. Cir. 2018) (finding that the plaintiff's actions that were "seemingly negligent" and violated the Pennsylvania Rules of Disciplinary Enforcement were insufficient to bar recovery based on the doctrine of unclean hands).  There is no evidence that any mistakes that Deloitte may have made in its representations to the Copyright Office would "shock the moral sensibilities of the judge" or rise to the level of an unconscionable act.  *Scherer*, 764 F. App'x at 150.

Accordingly, notwithstanding potential underlying factual disputes between the parties as to Deloitte's ownership of the copyrighted material, as discussed below, Sagitec has not met its burden to point to evidence of an unconscionable act on Deloitte's part.  Sagitec's unclean hands defense will therefore be dismissed.

**B. Sagitec's Summary Judgment Motion (Dkt. Nos. 277, 278, 299, and 332).**

Sagitec asks that each of Deloitte's claims be dismissed.  First, Sagitec argues that Deloitte's copyright infringement claim (Count I) should be dismissed because Deloitte cannot prove that it registered the allegedly infringed work.  Second, Sagitec argues that the remaining claims (Counts II–V) are barred by the applicable statutes of limitations.  Third, Sagitec argues that all of Deloitte's claims should be dismissed because Deloitte does not own the rights to the

intellectual property at issue, having assigned its claims to that property.  Fourth, Sagitec argues that its asserted trade secret claims (Counts II–III) should be dismissed because Deloitte has not shown that those trade secrets have economic value.  Finally, Sagitec argues that Deloitte's state law unfair competition and unjust enrichment claims (Counts IV–V) should be dismissed as duplicative and preempted.

### *1.    Copyright Registration (Count I).*

To obtain registration, the author of a work must submit to the Register of Copyrights a copy of the work and an application.  17 U.S.C. §§ 408, 409.  The application must provide information about the work.  *Id.* § 409.  Some of the required information is purely factual, but some of it incorporates legal conclusions.  *Id*.  If the Register determines that the work is copyrightable and meets other statutory requirements, the Register will issue a certificate of registration.  *Id.* § 410(a); *see generally Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 595 U.S. 178, 181 (2022).  Although a copyright owner's rights exist apart from the act of registration, the owner must register the material before suing to enforce its ownership rights.  *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 586 U.S. 296, 301 (2019).  The scope of the registration defines the scope of the claim of infringement that the copyright owner can assert in litigation.  *See TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*, 966 F.3d 46, 51 (1st Cir. 2020); *Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 207–08 (3d Cir. 2005) ("Copying refers to the act of infringing any of the exclusive rights that accrue to the owner of a valid copyright, as set forth at 17 U.S.C. § 106").  Where there are multiple different versions of a particular work, each version constitutes a separate work.  17 U.S.C. § 101.

Sagitec makes two arguments as to why Deloitte cannot meet its burden of proving its copyright infringement claims. First, Sagitec argues that Deloitte failed to produce versions of the

uFACTS code that it claims Sagitec copied, and thus Deloitte cannot meet its burden of proving the content of the copyrighted work that it claims was infringed.  Second, Sagitec argues that Deloitte's copyright registrations do not include any of the material that Deloitte accused Sagitec of having copied.

### a.  Production of Proper uFACTS versions

Sagitec acknowledges that Deloitte has registered three versions of the uFACTS program with publication dates of June 7, 2010 (the "Massachusetts Tax" or "Mass: Tax" version); June 6, 2013 (the "New Mexico Tax and Benefits" or "New Mexico" version); and October 17, 2013 (the "Massachusetts Benefits" or "Mass: Benefits" version), and that Deloitte has alleged that Sagitec has copied the Massachusetts (June 7, 2010 and October 17, 2013) versions.[5]  Dkt. No. 278 at 7. But Sagitec argues that Deloitte did not produce the Mass: Tax (June 2010) or Mass: Benefits (October 2013) versions of the uFACTS program in discovery.  *Id.*  Instead, Sagitec argues that Deloitte produced source code with modification dates of May 14, 2014, or later.  *Id.*  Therefore, Sagitec contends, Deloitte has not produced evidence sufficient to prove the content of its registered source code, and that its copyright infringement claim should therefore be dismissed.

---

[5] The parties' respective understandings of the copying allegations with regard to the New Mexico version appear to differ.  Sagitec appears to believe that Deloitte accuses it of copying only the Massachusetts code.  Dkt. No. 278 at 7; January 30, 2026,Motions Hearing at 1:14:42 (Sagitec's counsel characterizing the Massachusetts code versions as the ones "that are alleged to have been infringed").  However, Deloitte has made comments indicating that it believes the New Mexico version is still relevant to, and part of, the case.  January 30, 2026, Motions Hearing at 1:24:00 (Deloitte's counsel commenting that "the New Mexico registration and the production of code related to that registration is not the subject of this motion. So even if you grant this motion . . . that stays in the case").  Because Sagitec's arguments are limited to issues relating to the Massachusetts versions of uFACTS, I need not address at this time the issues related to the New Mexico version, or the parties' differing understandings of the copying allegations as they relate to the New Mexico version.

Sagitec further alleges that Deloitte failed to produce a source code repository or other documentation showing the specific modifications made to the uFACTS source code over time, and that Deloitte did not register the version of uFACTS that corresponds to the source code produced in this case. Accordingly, Sagitec contends that Deloitte cannot show that it met its statutory obligations under 17 U.S.C. § 411(a), as required to support its copyright infringement claim. *Id.* at 8.

Deloitte disputes Sagitec's contentions. Dkt. No. 299 at 5–8. In support of its argument in response, Deloitte points to a declaration from one of its employees, Anil Gosu, in which Mr. Gosu explains that certificates of registration that the Copyright Office issued for uFACTS are consistent with the code that Sagitec is accused of copying, which is the code that was produced to Sagitec in this case. Dkt. No. 301. Mr. Gosu stated that the complete code that was registered with the Copyright Office is stored on a SharePoint site when the code is not actively being worked on. In order to ensure that the produced computer program was the same version that was registered with the Copyright Office, Mr. Gosu stated that he collected it from Deloitte's SharePoint site. *Id.* at ¶ 9. Mr. Gosu further stated the following:

> I have reviewed the certificates of registration that the Copyright Office issued for uFACTS. They are consistent with my knowledge and review of the code that was produced in this case. Although I understand that Sagitec has pointed to "last modified" dates in the metadata of some of the files in the folders that Deloitte produced, the code was not changed or modified. Instead, it is consistent with my knowledge and experience that any files that have "last modified date" metadata after the date of publication in the registrations' certificates, it likely is because the computer system changed it when folders were moved on the system, or when certain system components run on a machine, such as maintenance checks, compiling and system backups.

*Id.* at ¶ 11.

In support of its contention that the modification dates in the metadata of the uFACTS program do not reflect changes to the code, Deloitte also relies on the expert report and deposition

testimony of its expert, Jonathan Krein, which is consistent with Mr. Gosu's declaration.  Dkt. No. 270-8, Exh. 8 at ¶¶ 204–05; Dkt. No. 300-2, Exh. 27 at 128:8–133:1.  Deloitte argues that resolving the factual dispute over whether the code was modified will involve a determination of witness credibility, which must be made by the jury.  *Id.* at 7.

In reply, Sagitec notes that it has challenged Mr. Gosu's declaration through a motion to strike, based on asserted inconsistencies between his deposition testimony and his declaration.  *See* Dkt. Nos. 329, 330.[6]  But even if Mr. Gosu's declaration is not struck, Sagitec argues that the declaration does not create a genuine dispute of material fact, because it does not establish that no changes were made to the uFACTS program; rather, according to Sagitec, the declaration speculates about whether changes were made.  Dkt. No. 332 at 2.  Similarly, Sagitec argues that Deloitte's expert, Dr. Krein, did not testify that the program was unchanged, but rather admitted that he did not know whether changes were made.  *Id.*  In fact, however, Mr. Gosu's declaration is not equivocal, as Sagitec contends.  To the contrary, Mr. Gosu states in his declaration that based on his examination of the certificates of registration and his knowledge and review of the code that was produced in this case, "the code was not changed or modified."  Dkt. No. 301 at ¶ 11.

The parties' presentations make it clear that there is a factual dispute over whether the code was modified between the time it was registered and the time it was produced.  Resolving that dispute will require evaluating witness testimony and assessing the credibility of at least Mr. Gosu and Dr. Krein.  Accordingly, whether the code that was produced is the same as the code that was registered is a question that will have to be submitted to the jury.

---

[6]  I address Sagitec's challenge to the admissibility of Mr. Gosu's declaration in section III.E of this opinion, below.

### b. *Proper Registration of Allegedly Copied Materials*

Sagitec argues that Deloitte cannot demonstrate that the Mass: Benefits (October 17, 2013) material that Deloitte asserts was copied by Sagitec is covered by any of Deloitte's registrations. In particular, Sagitec contends that Deloitte's registration of the October 17, 2013, version of uFACTS expressly excluded all prior published code.  Dkt. No. 278 at 8.[7]  In support of that argument, Sagitec points to an earlier version of the October 2013 program that was published on July 1, 2013, when Deloitte delivered the uFACTS program to Massachusetts pursuant to its QUEST program contract.  *Id.*  After that time, according to Sagitec, Deloitte continued to develop the program, but Deloitte has not produced source code or other documents showing what additional copyrightable content was added to the program after the delivery of the July 1, 2013, version of the program, nor has Deloitte demonstrated when any of the allegedly infringed content was developed or published.  For that reason, Sagitec contends, Deloitte cannot show that the allegedly copied material is covered by Deloitte's copyright registrations.  Deloitte's copyright claim, according to Sagitec, therefore fails as a matter of law.  *Id.* at 8–9.

This dispute involving Deloitte's copyright registration is properly characterized as a dispute over the scope of work that was registered.  Sagitec argues that Deloitte has not shown that the assertedly copied material is registered, because the registration for the October 17, 2013, work excludes all previously published code.  Dkt. No. 278 at 8.  That exclusion is important, Sagitec argues, because on July 1, 2013, Deloitte provided Massachusetts with source code, but Deloitte

---

[7] Sagitec's argument on this issue is limited to the October 17, 2013, Mass. Benefits code only. Notably, the Mass. Tax (June 7, 2010) registration does not have any such exclusion for prior published code, and instead only excludes prior licensed code.  Dkt. No. 280, Exh. 28 (Certificate of Registration for TX 8-559-594).

has not shown what additional copyrightable materials were added to the program between the July 1 publication and the October 13 registration. *Id.* at 8–9.

Deloitte responds that a copyright owner may register an original work at any time, and that if the owner registers a derivative work, the registration covers the elements of the original work as well. Dkt. No. 299 at 7. Deloitte argues that it is entitled to assert all previously unregistered code that is included in the registration, regardless of whether the registered code is derivative. *Id.* Deloitte also contends that providing copies to a limited group does not constitute a publication of the copyrighted material. *Id*. Therefore, Deloitte argues that a reasonable juror could find that the code distributed to Massachusetts prior to its registration in October 2013 was not a publication of the work. *Id.* Sagitec replies that Deloitte's distinction between derivative and original work is immaterial in view of Deloitte's express representation disclaiming previously published material that Deloitte included in its registration. Dkt. No. 332 at 3.

I agree with Sagitec that Deloitte's distinction between original and derivative work is immaterial to the question at hand. "Derivative works are works that build upon and improve a previous work, such as a remix of an old song." *Brownstein v. Lindsay*, 742 F.3d 55, 67 (3d Cir. 2014); *see* 17 U.S.C. § 103. While the original work may be copyrightable, "a derivative work is copyrightable on its own basis." *Brownstein*, 742 F.3d at 67. "Derivative work protection only extends to those parts of the derivative work that are novel beyond the original work and the author or authors of the underlying work retain their rights to their original work." *Id*.; *see generally* 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 3.04[A] (2025). While a derivative is primarily intended to cover additions to the original work, "when a derivative work includes copyrightable elements of the unregistered original work, the owner's registration of the derivative work also registers the included elements of the original work." *Enter. Mgmt. Ltd., Inc.*

21

*v. Construx Software Builders, Inc.*, No. 22-35345, 2023 WL 4554536 (9th Cir. July 17, 2023) (collecting cases).

The distinction between derivative work and original work can be important in copyright infringement lawsuits because "where the preexisting work is registered, but the derivative work is not, a suit for infringement may be maintained as to any protected element contained in the registered preexisting work, but not as to any element original to the unregistered derivative work." *Purohit v. Legend Pictures*, *LLC*, 448 F. Supp. 3d 382, 390 (D. Del. 2020) (citing *Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, 210 F. Supp. 2d 147, 158 (E.D.N.Y. 2002)). Conversely, "a registered copyright in a derivative work (such as a catalog containing photographs of items) necessarily encompasses all the original works within the derivative work, if the owner of the copyright in the derivative work also holds all ownership rights in the original works upon which the derivative works are based." *Oskar Sys., LLC v. Club Speed, Inc.*, 745 F. Supp. 2d 1155, 1162 (C.D. Cal. 2010).

In this case, however, the dispute is not over whether the October 13, 2013, computer code was a derivative work of the code provided to Massachusetts in July 2013 (which the parties sometimes refer to as the "go-live" version); the dispute is over whether Deloitte excluded the code provided to Massachusetts from registration when it designated "prior published code and licensed code" as "material excluded from this claim" in its copyright registration application. *See* Dkt. No. 280, Exh. 30 at 53. The question to be resolved is therefore what, if any, code was "published" or "licensed" prior to Deloitte's submission of the registration application.

The answer to that question will inform the issue of the scope of Deloitte's rights under its copyright registration, as any portions of the October 13, 2013, code that were published prior to registration would fall outside the scope of Deloitte's registration. 17 U.S.C. § 103(b) ("The

22

copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material."); U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 512.1, § 507.2 (3d ed. 2017) (Noting that "If the work is unpublished, there is generally no need to register each version of that work.  In most cases, the applicant may submit the most recent or the most complete version" and that "there is generally no need to limit the claim if the derivative work is solely based on or derived from unpublished material, unregistered material, or copyrightable material that is owned by the claimant named in the application.").  The copyright statutes define "publication" as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication."  17 U.S.C. § 101.  The "display" of a work is further defined as showing "a copy of it, either directly or by means of a film, slide, television image, or any other device or process."  *Id.*

Deloitte cites two cases in support of its position that "providing copies to a limited group is not publication."  Dkt. No. 299 at 8.  In *Kunycia v. Melville Realty Co.*, 755 F. Supp. 566, 574 (S.D.N.Y. 1990), the court was determining whether drawings that were the subjects of a copyright registration had previously been published and therefore were in the public domain and not copyrightable.  Citing 17 U.S.C. § 101, the court reasoned that "[d]istribution of plaintiff's architectural drawings to contractors, landlords and building authorities does not constitute a publication requiring copyright notice" because "[i]mplicit in these business relationships is the understanding that such a distribution does not convey the right further to diffuse, reproduce,

23

distribute or sell the drawings without the architect's permission." *Kunycia*, 755 F. Supp. at 574. The court concluded that whether the distribution was a "'limited publication' or no publication at all, the effect is the same: plaintiff's drawings did not pass into the public domain." *Id.*

Similarly, in *Lish v. Harper's Mag. Found.*, 807 F. Supp. 1090, 1101–02 (S.D.N.Y. 1992), amended, No. 91 CIV. 0782, 1993 WL 7576 (S.D.N.Y. Jan. 7, 1993), the court considered whether a copyrighted work had been published. The court held that whether a work was published "turns on the question whether there were 'implicit restrictions' on further distribution or disclosure of the document's contents." *Id.* The court explained that the Copyright Act defines "publication" as "distribution of copies of a work to the public." The court noted that although the term "public" is not defined in the Act, the House Report on the Act explained that the public, in this context, "refers to persons 'under no explicit or implicit restrictions with respect to disclosure of its contents.' H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. 138 (1976)." *Lish*, 807 F. Supp. at 1101.

Sagitec argues that those cases are inapposite because neither involved the distribution of copyrighted work pursuant to a sale or license. Dkt. No. 332 at 3 n.2. Although it is true that the specific facts of those cases differ from the facts of the present case, I find the *Lish* case persuasive given its reliance on the Copyright Act and the legislative history of the Act.[8] Moreover, Deloitte does not argue that the court in *Lish* was using the word "published" in a different way when it used that word to describe material that was excluded from the plaintiff's copyright registration. There is therefore no reason to ascribe a different meaning to the term "publish" as used in Deloitte's copyright registration application than the meaning of "publication" as used in the Copyright Act. *See* 17 U.S.C. § 101. That conclusion does not resolve the question whether

---

[8] *Kunycia* is less relevant because the court did not address the question whether the distribution was a publication but rather focused on whether the work was in the public domain.

24

Deloitte's action in providing uFACTS code to Massachusetts constituted a publication. Answering that question will require evaluation of at least the relationship between the Commonwealth of Massachusetts and Deloitte, and the scope of Massachusetts' rights to the code. That is a fact question for the jury to resolve.

I therefore find that there are genuine disputes of material fact regarding whether Deloitte's registration covers Deloitte's allegedly infringed work. Sagitec's motion for summary judgment as to Deloitte's copyright claim will therefore be denied.

### 2.    Sagitec's Statute of Limitations Defense (Counts II–V)

#### a. The Federal Defend Trade Secrets Act (Count III)

The statute of limitations for claims under the federal Defend Trade Secrets Act ("DTSA") is three years from when the "misappropriation is discovered, or by the exercise of reasonable diligence should have been discovered." 18 US.C. § 1836(d). That standard, according to Sagitec, is satisfied by "inquiry notice," which Sagitec characterizes as requiring "no more than that 'red flags' be raised that would prompt a reasonable party to investigate and discover its claims." Dkt. No. 278 at 9. Sagitec argues that Deloitte's federal trade secrets claim is barred because Deloitte discovered Sagitec's alleged misappropriation before March 28, 2019, which was three years before Deloitte and Sagitec entered into the tolling agreement of March 28, 2022, and more than three years before the Complaint in this case was filed, on March 23, 2023. *Id.*[9]

---

[9] The March 28, 2022, tolling agreement tolled the statute of limitations between March 28, 2022, and September 28, 2022. Neither party argues that any statute of limitations period would be affected by the running of the limitations period between September 28, 2022, and March 23, 2023, so for simplicity I will treat the relevant date for the statute of limitations analysis of the claims at issue as March 28, 2022.

In support of its statute of limitations argument, Sagitec relies heavily on a cease-and-desist letter that Deloitte sent to Sagitec on September 12, 2018, in which Deloitte asserted that Sagitec had "misappropriated the copyrighted source code and trade secrets underlying Deloitte's proprietary uFACTS solution," and that Sagitec had "used and continues to use Deloitte's source code and trade secrets to develop and deploy Neosurance." *Id.* at 10 (citing Exh. 31 at 4). Sagitec also cites communications between Deloitte and government investigators, as well as an earlier cease-and-desist letter that Deloitte sent to Sagitec in October 2016. *Id.* at 10–12. In addition, Sagitec refers to a letter from Deloitte's in-house counsel to government investigators sent on March 18, 2019, raising statute of limitations "considerations" and Deloitte's subsequent request that Sagitec sign a tolling agreement, which Sagitec declined to execute until March 2022. *Id.* at 12.

Deloitte responds that the three-year statute of limitations in the DTSA begins to run when the misappropriation is "discovered" or "should have been discovered" and that a fact is not "discovered" until the plaintiff has sufficient information to plead that fact in a complaint such that the pleading would be sufficient to survive a motion to dismiss. Dkt. No. 299 at 8. That standard is typically referred to as the "discovery" test. Under that test, Deloitte argues, the statute of limitations had not run by the time Deloitte filed this action on March 23, 2023.

Sagitec challenges Deloitte's contention that the "discovery" test applies to the statute of limitations in the DTSA, arguing that the "discovery" test has not been applied to DTSA claims by the Third Circuit or any court in this district. Dkt. No. 332 at 4. Instead, Sagitec argues, the court should apply the "inquiry notice," or "red flag" standard, under which the running of the statute of limitations would be triggered by facts informing the plaintiff of the need to investigate further, as opposed to information that would have led a reasonably diligent plaintiff to discover

26

facts constituting a violation. As to the applicable standard, I agree with Deloitte that the "discovery" standard applies to the running of the statute of limitations under the DTSA, for the following reasons.

The DTSA provides that a civil action "may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836. Deloitte notes that 28 U.S.C. § 1658(b), the general statute of limitations for civil actions arising under Acts of Congress, contains language similar to that in the DTSA, and that when interpreting section 1658(b), the Supreme Court rejected the "inquiry notice" standard advocated for by Sagitec. Dkt. No. 299 at 9 (citing *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010)). Deloitte points out that the Third Circuit has applied the Supreme Court's decision in *Merck* to other statutes containing similar language, citing *Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization Transactions, Inc.*, 730 F.3d 263 (3d Cir. 2013). In *Pension Trust*, the Third Circuit rejected the inquiry notice standard and instead applied the discovery accrual rule to the limitations period found in both the Securities Act and the Exchange Act. *Id.* at 273–75. The Third Circuit based its holding in that case both on the Supreme Court's decision in *Merck* and on the language of the statute of limitations provision in the Securities Act, which states, "No action shall be maintained to enforce any liability created under [the Securities Act] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of due diligence." *Id.* at 273 (citing 15 U.S.C. § 77m).

27

Because the language of the statute of limitations provision in the DTSA so closely tracks the language of the statutes at issue in *Merck* and *Pension Trust*, it follows that the "discovery rule," not the "inquiry notice rule," governs the running of the limitations period in DTSA cases.[10]

Notably, although the Third Circuit in *Pension Trust* held that the inquiry notice standard does not apply to the Securities Act and the Exchange Act, the Merck Court acknowledged that "terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating. This information may be helpful because the limitations period puts plaintiffs who fail to investigate once on 'inquiry notice' at a disadvantage because it lapses a certain time after a reasonably diligent plaintiff would have discovered the necessary facts, and a plaintiff who fails entirely to investigate or delays investigating may well not have discovered those facts by that time." *Id.* at 275 (cleaned up).

The burden is on the defendant to show that the plaintiff had sufficient information regarding possible wrongdoing to place the plaintiff on notice of its claim, at which point "the burden shifts to [the plaintiff] to show that it exercised reasonable due diligence and yet was unable to discover its injuries."[11] *William A. Graham Co. v. Haughey*, 568 F.3d 425, 438 (3d Cir. 2009) (citation modified); *Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*, 435 F.3d 396,

---

[10]   In a particularly thorough opinion, Chief Judge Saylor of the District of Massachusetts recently reached the same conclusion as to the accrual of a cause of action under the DTSA. Although he noted that other courts had reached a different conclusion, he regarded the Supreme Court's decision in *Merck* as requiring the conclusion that the "discovery" rule, not the "inquiry notice" rule applies to the DTSA's limitations statute, as do I. *See Insulet Corp. v. EOFlow Co.*, 755 F Supp. 3d 70, 84–87 (D. Mass. 2024).

[11]   Deloitte also argues that Sagitec must prove its statute of limitations defense as to each trade secret, which Deloitte asserts that Sagitec has failed to do in its summary judgment motion. Dkt. No. 299 at 10.

401 (3d Cir. 2006); *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 252 (3d Cir. 2001). The DTSA uses the phrase "discovered or by the exercise of reasonable diligence should have been discovered," which the Supreme Court and the Third Circuit have interpreted to require the plaintiff to have had sufficient information to lead a reasonable plaintiff to discover the claim.

While I reject Sagitec's argument in support of the "inquiry notice" standard and conclude that Sagitec can prevail on its statute of limitations argument only if it can show that Deloitte knew of Sagitec's misappropriation or that a reasonable party in Deloitte's position would have known of the misappropriation, I nonetheless conclude that even under Deloitte's standard, Sagitec has shown that the statute of limitations had run on Deloitte's DTSA claim before Deloitte filed this action.

Sagitec has pointed to various items in the record to support a conclusion that Deloitte had sufficient information of possible wrongdoing to put it on notice of its claim under the DTSA, including in particular the cease-and-desist letter Deloitte sent to Sagitec in September 2018. In that letter, Deloitte wrote that on October 3, 2016, "Sagitec was notified that Deloitte had reason to believe that Sagitec had misappropriated, and was improperly using, Deloitte's unemployment insurance intellectual property." Dkt. No. 280, Exh. 31 at 1. Deloitte continued, "Deloitte has now obtained further information confirming the veracity of its allegations of theft and infringement by Sagitec." *Id.* Deloitte further accused Sagitec of misappropriating the "trade secrets underlying Deloitte's proprietary uFACTS solution" and continuing to use Deloitte's "trade secrets to develop and deploy Neosurance." *Id.* The letter then set forth background information regarding the uFACTS solution as well as the details of Mr. Minkkinen's resignation from Deloitte and his subsequent hiring by Sagitec. *Id.* at 2. The letter also noted that the "Neosurance data model that was published by the District of Columbia is identical or nearly identical in a number

29

of significant respects to the data model for Deloitte's uFACTS framework," and that "the substantial overlap and similarity of field names, including arbitrary names and elements used in the data models, are striking evidence of Sagitec's copying." *Id.* The letter further referenced the development timeline, representations made in a bid that Sagitec submitted to the State of Washington, and the inclusion of a Deloitte logo in a Sagitec client demonstration in 2017 as evidence of misappropriation. *Id.* at 2–3. Finally, the letter stated that "Sagitec's unlawful misappropriation, use, and copying of the uFACTS Solution, and its false representations in connection with the promotion of Neosurance, give rise to legal claims under the federal Defend Trade Secrets Act." *Id.* at 3.

In its response to Sagitec's motion for summary judgment, Deloitte tries to walk back those assertions. It now characterizes the September 2018 letter as making "general assertions of possible misappropriation" and argues that the "letter does not show Deloitte had actually *discovered* the misappropriation by this point" but rather shows that "Deloitte was engaging in a diligent investigation to *try* to discover the misappropriation." Dkt. No. 299 at 12 (emphasis in original). The problem with that argument is that it is inconsistent with the plain language of the September 2018 cease-and-desist letter. The letter does not refer to the unconfirmed possibility of misappropriation; instead, the letter states that Deloitte had obtained information confirming the veracity of its allegations of theft and misappropriation. Dkt. No. 280, Exh. 31. Deloitte's efforts to downplay the significance of the allegations in the September 2018 letter constitute no more than attorney argument, and attorney argument that contradicts record evidence cannot defeat summary judgment. *Ferring B.V. v. Barr Lab'ys, Inc.*, 437 F.3d 1181, 1193 (Fed. Cir. 2006*); Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1562 (Fed. Cir. 1995*); Genes Industry, Inc. v. Custom Blinds & Components, Inc.*, No. SACV 15-0476, 2016 WL

11744792, at *2 (C.D. Cal. Sept. 26, 2016) (citing *Invitrogen Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005).

Deloitte separately argues that Sagitec denied the allegations of misappropriation and refused to provide source code or documentation in response to those allegations. For that reason, Deloitte argues, a reasonable jury could conclude that Deloitte would not have been able to plead a viable claim as of September 2018. Dkt. No. 299 at 12.

The first problem with that reasoning is that it would protect any plaintiff from exposure to a statute of limitations defense in any case in which the defendant denied misconduct, as will be true in any contested case, which is the precise setting in which the limitations issue is most likely to arise. The second problem is that Deloitte's Complaint contained allegations that tracked the charges set forth in Deloitte's September 2018 cease-and-desist letter. *See* Dkt. No. 1 at ¶¶ 40–44 (allegations about employees leaving Deloitte to join Sagitec), and ¶ 46 (allegations about the overlap and similarity of the uFACTS solution and the Neosurance product sold to the District of Columbia). The only factual allegation in the Complaint that was not included in the September 2018 cease-and-desist letter is that

> [o]n information and belief, state and federal agents began to investigate Sagitec's possession and use of the uFACTS Trade Secrets. On August 23, 2022, a federal grand jury, having reviewed the evidence from that investigation, indicted [David] Minkkinen and [Sivaraman] Sambasivam on a range of criminal charges, including criminal trade secret misappropriation, conspiracy, and making false statements, for their part in stealing and covering up the theft of Deloitte's uFACTS Trade Secrets while they were Sagitec employees working on Sagitec's infringing Neosurance solution.

*Id.* at ¶ 52. The other allegations that are included in the Complaint, but not in the cease-and-desist letter are all allegations based "information and belief," and therefore do not add meaningfully to the allegations in the letter.

31

Similarly, Deloitte argues that prior to the unsealing of the August 23, 2022, indictment Deloitte did not have the documentation it needed to know that its source code had been misappropriated.  Dkt. No. 299 at 10.  Again, the indictment was not the basis for the Complaint. And the Complaint includes only one allegation regarding source code or documentation that was derived from the criminal investigation and included in the indictment.  *See* Dkt. No. 1 at ¶ 5 ("the indictment states that 'numerous Deloitte files' including trade secret information such as source code were used by 'numerous Sagitec employees' to design and develop Neosurance").

In short, Deloitte's argument that it could not have pleaded its trade secret misappropriation claim at the time of the September 2018 cease-and-desist letter is rebutted by the fact that the allegations made in the cease-and-desist letter served as the basis for the Complaint that Deloitte actually filed.  It is thus clear that Deloitte had enough information at the time of the cease-and-desist letter to file an action for trade secret misappropriation.  For that reason, Deloitte has not put forth any evidence from which a reasonable jury could conclude that Deloitte was not on notice of its claims as of September 2018, nor any evidence that Deloitte exercised reasonable diligence and yet was unable to discover that it had a cause of action for trade secret misappropriation by that time.  Given that Deloitte had knowledge of the misappropriation by September 2018, which is more than three years before Deloitte filed its lawsuit, even setting aside the period during which the tolling agreement was in effect, I need not address whether the evidence on the limitations issue shows that Deloitte had knowledge of the misappropriation even earlier than September 2018.  Deloitte's claim under the federal Defend Trade Secrets Act (Count III of the Complaint) will therefore be dismissed as untimely.

### b. State Law: Trade Secret Misappropriation (Count II)

Sagitec argues that Deloitte's New York state law claim of trade secret misappropriation is barred by the applicable state statute of limitations.[12]   Under New York law, a trade secret claim accrues "either when the defendant discloses the trade secret or when he first makes use of the plaintiff's ideas."  *Medcenter Holdings Inc. v. WebMD Health Corp.*, No. 20-cv-53, 2025 WL 965853, at *4 (S.D.N.Y. Mar 31, 2025); *Inspired Capital, LLC v. Conde Nast*,  No. 18 Civ. 712, 2019 WL 2191249, at *5 (S.D.N.Y. May 21, 2019); *Lemelson v. Carolina Enters., Inc.*, 541 F. Supp. 645, 659 (S.D.N.Y. 1982) (citing *Petnel v. Am. Tel. & Tel. Co.*, 117 N.Y.S.2d 294 (N.Y. App. Div. 1953)).[13]   While the parties agree with that proposition, they disagree about the statute of limitations period that applies in this case.  Deloitte argues that the applicable limitations period under New York law is six years, while Sagitec argues that the applicable period is three years.

Under New York law, "the choice of the applicable Statute of Limitations depends on the substantive remedy which the plaintiff seeks."  *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 272 (N.Y. 2009) (citing *Loengard v. Santa Fe Indus.*, 514 N.E.2d 113, 115 (N.Y. 1987)).  When the plaintiff seeks a purely monetary remedy for an injury to property, the New York courts apply the three-year statute of limitations in section 214(4) of the New York Civil Practice Law and Rules, which provides that "an action to recover damages for an injury to property" must be "commenced within three years."  When the relief sought is equitable in nature,

---

[12]   The parties agree that New York law is the applicable source for Deloitte's claim of common law trade secret misappropriation.

[13]   In this respect, New York's accrual rule with respect to trade secret misappropriation differs from the federal rule, under which (as discussed above) accrual occurs when the plaintiff discovers, or reasonably should have discovered, the misappropriation.  The state-law accrual rule is thus less permissive than the federal rule.  *See Zirvi v. Flatley*, 433 F. Supp. 3d 448, 461 (S.D.N.Y. 2020), *aff'd*, 838 F. App'x 582 (2d Cir. 2020).

33

the New York courts apply the six-year statute of limitations in section 213(1) of the New York Civil Practice Law and Rules. *IDT Corp.*, 907 N.E.2d at 272. Those two rules apply to all claims asserting misappropriation of trade secrets. A claim for damages for trade secret misappropriation is subject to the three-year statute of limitations, while a claim for equitable relief for such misappropriation is subject to the six-year statute of limitations. *See Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 49 (2d Cir. 2019).

While that distinction is easy to state, it can be challenging to apply. In particular, the situation becomes complex in cases in which both legal and equitable remedies are available, and in which the plaintiff has invoked both remedies.

New York state courts have long held that "where a legal and equitable remedy exists as to the same subject matter, the latter is under control of the same statutory bar as the former." *Colodney v. N.Y. Coffee & Sugar Exch.*, 163 N.Y.S.2d 283, 286 (N.Y. App. Div. 1957) (citing *Keys v. Leopold*, 149 N.E. 828, 829 (N.Y. 1925)). That rule traces its origins to the early 19th century. *See Rundle v. Allison*, 34 N.Y. 180, 182 (1866); *Kane v. Bloodgood*, 7 Johns. Ch. 90, 127–28 (N.Y. Ch. 1823). As the New York Court of Appeals put it in *Hanover Fire Ins. Co. v. Morse Dry Dock & Repair Co.*, 200 N.E. 589, 590 (N.Y. 1936):

> In an action in equity the [equity statute of limitations] prescribed by section 53 of the Civil Practice Act is applicable unless, in a particular action, a party has a choice of two remedies, one at law, the other in equity, both complete and adequate, and he selects the action in equity. In that event the party whose cause of action would be barred under the [statute of limitations for actions at law], if he should elect to proceed at law, may not enlarge this time by electing to proceed in equity. Such is the rule where the remedies are concurrent.

200 N.E. at 590. That principle remains in effect in New York. *See IDT Corp.*, 907 N.E.2d at 272; *ABS Ent., Inc. v. CBS Corp.*, 163 F. Supp. 3d 103, 108–09 (S.D.N.Y. 2016).

34

In cases in which both legal and equitable relief is sought, the New York courts have looked to "'the reality' or the 'essence' of the action and not its form." *In re Paver & Wildfoerster (Catholic High School Ass'n)*, 382 N.E.2d 565, 674 (1976); *IDT Corp.*, 907 N.E.2d at 272. In cases in which monetary damages are the appropriate remedy for the particular injury, New York courts have prohibited plaintiffs from extending an otherwise-expired statute of limitations for the damages remedy by adding a request for equitable relief. *See ABS Ent.*, 163 F. Supp. 3d at 108 (citing *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, No. 04-cv-2389, 2007 WL 1601491, at *3–4 (S.D.N.Y. June 4, 2007)); *Colodney*, 163 N.Y.S.2d at 286. If a plaintiff can be afforded full relief through a legal remedy, "he cannot enlarge the period of limitation which governs that proceeding by resorting to [an] action in equity." *Colodney*, 163 N.Y.S.2d at 286 (quoting *Riesner v. Young*, 100 N.Y.S.2d 488, 490 (N.Y. Sup. Ct. 1950)). More broadly, in cases in which the plaintiff primarily seeks legal relief, with equitable claims being only ancillary to the legal claims, New York courts have held that the claims are substantively legal and that the shorter three-year claim therefore applies. *See, e.g.*, *IDT Corp.*, 907 N.E.2d at 272 ("IDT primarily seeks damages . . . and the equitable relief it seeks, including disgorgement of profits, is incidental to that relief. . . . Thus, looking to the reality, rather than the form, of this action . . . we conclude that IDT seeks a monetary remedy . . . and that the three-year limitations period of CPLR 214(4) applies."); *Universal Instruments*, 924 F.3d at 50 ("[B]ecause the reality of the cause of action is that it is one for damages, not injunctive relief, the three-year statute of limitations applies."). On the other hand, in cases in which a legal remedy alone would not be adequate to provide full relief, a plaintiff may be able to proceed on its equitable claims, even when legal claims would be time-barred. *See IDT Corp.*, 907 N.E.2d at 272 (citing *Loengard*, 514 N.E.2d at 115); *ABS Ent.*, 163 F. Supp. 3d at 108–09 (collecting cases).

35

The case law is less clear when the relief being sought is primarily equitable, but the plaintiff's complaint includes ancillary legal claims.  In that setting, the New York courts have taken varying positions as to whether the longer equitable limitations period should apply to both the legal and equitable claims or instead should apply only to the equitable claims, with the legal claims continuing to retain their shorter three-year limitations period.  *Compare People ex rel. Spitzer v. Grasso*, No. 401620/04, 2006 WL 3016952, at *23 (N.Y. Sup. Ct. 2006) ("Generally, a six-year limitations period applies to actions such as this, where, although monetary relief is sought on certain claims, the action is ultimately equitable in nature."), *and Spitzer v. Schussel*, 792 N.Y.S.2d 798, 801 (N.Y. Sup. Ct. 2005) ("[A]lthough the relief sought in these claims is a mix of both equitable and monetary remedies, the gravamen of the complaint is equitable in nature. . . . Thus, the complaint, read as a whole, is primarily equitable in nature, and the longer six-year statute of limitations should apply to the claims in dispute."), *with ABS Ent.*, 163 F. Supp. 3d at 108–09 ("if legal remedies provide an incomplete or imperfect remedy, equitable claims remain separate and subject to their own six-year statute of limitations period"), *and Gass v. Nelson*, 82 N.Y.S. 2d 641, 643 (N.Y. Sup. Ct. 1948) (finding that the requested relief was legal but noting that if the plaintiff could "trace and identify the specific property or res alleged to have been misappropriated, he can, of course, allege a cause of action to impress a trust upon such property. Such a cause of action would be governed by the equitable statute of limitations").  As the New York state courts themselves have acknowledged, "[u]nfortunately, the case law provides no clear guidance on which limitations period is applicable to [certain claims] when both legal and equitable relief are sought." *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 164 (N.Y. App. Div. 2003).

Although New York law appears somewhat unsettled on this issue, the better reading of the New York cases is that in instances in which legal remedies would provide an incomplete remedy,

36

the most appropriate course of action is to allow the legal and equitable claims to remain separate and subject to their own respective statutes of limitation. *See ABS Entertainment*, 163 F. Supp. 3d at 108–09. That interpretation of New York law more closely conforms with New York cases finding that an otherwise time-barred legal claim cannot be made timely simply by including it within a timely equitable claim. *See Colodney*, 163 N.Y.S.2d at 286; *Hanover Fire Ins. Co.*, 200 N.E. at 590. New York courts have historically allowed equitable claims in at least some circumstances to proceed independently from otherwise time-barred claims stemming from the same operative facts. *Hanover Fire ins. Co.*, 200 N.E. at 590 (discussing *Schenck v. State Line Tel. Co.*, 144 N.E. 592 (N.Y. 1924) ("If relief may be had at law in an action for damages and in equity for rescission of a contract on the ground of fraud with a reconveyance of land and an accounting for profits, the action in equity is subject to the ten-year limitation though the action for damages is barred under the six-year statute.")).

While Deloitte requests both legal and equitable remedies, a review of the prayer for relief in the Complaint shows that Deloitte's overall request primarily seeks equitable relief. The essence of the action is therefore equitable, with additional legal claims being ancillary to the equitable claims and providing only incomplete relief. Deloitte seeks equitable relief relating to its trade secrets, including (1) a preliminary and permanent injunction enjoining Sagitec from, among other things, "using or disclosing Deloitte's trade secrets," (2) an order requiring Sagitec to return all copies of the allegedly misappropriated Trade Secrets, and (3) an accounting of all "business opportunities received, and costs or expenses avoided" from the alleged misappropriation. Dkt. No. 1 at 27–28.

To be sure, Deloitte has also requested monetary damages, but Deloitte's prayer for relief makes it clear that Deloitte's request for monetary relief is secondary to the requested equitable

37

remedies and would not provide Deloitte the complete relief it seeks. The requests for equitable relief are more numerous, are more prominent among Deloitte's list of requested forms of relief, and are quite detailed with regard to the specific injunctive measures sought and actions to be taken with regard to the allegedly misappropriated trade secrets. *Id.* In contrast, Deloitte's requests for monetary relief do not contain nearly the level of specificity that is found in the requests for equitable relief. *Id.*

Moreover, this is the type of case in which legal remedies alone do not provide an adequate remedy, and in which equitable relief would be necessary to make Deloitte whole. New York courts have historically found that trade secret misappropriation by a former employee entering into a competing business is the type of harm that cannot be adequately addressed by legal remedies, and which often requires equitable relief to effect an appropriate remedy. *See, e.g.*, *The McCall Co. v. Wright*, 91 N.E. 516, 520 (N.Y. 1910) ("The cases which have already been cited, sustaining actions to restrain a vendor or former employé from entering into a competing business, necessarily established the other principle involved in the maintenance of this action that an action at law will not furnish an adequate remedy, and that therefore resort may be had to equity."); *Spiselman v. Rabinowitz*, 61 N.Y.S.2d 138, 141 (N.Y. App. Div. 1946) (finding that in remedying trade secret misappropriation, an "injunction is usually resorted to because an action at law does not furnish an adequate remedy").

For those reasons, I conclude that Deloitte's request for monetary damages for the alleged violation of New York trade secret law is subject to the three-year statute of limitations in section 214(4) of the New York Civil Procedure Law and Rules. *See Universal Instruments*, 924 F.3d at 50 (citing *IDT*, 907 N.E.2d at 272). However, Deloitte's request for equitable remedies for the alleged violation of New York trade secret law is subject to the six-year statute of limitations in

38

section 213(1) of the New York Civil Procedure Law and Rules.  Neither party has argued that Deloitte's claims should be barred to the extent that the six-year statute of limitations is applicable.[14]  Deloitte's requests for equitable relief are therefore not time-barred.

### c.   *State Law: Continuing Tort Doctrine*

As a second ground for avoiding the preclusive effect of the three-year statute of limitations for legal claims, Deloitte argues that its claims should not be time-barred because New York has adopted the "continuing tort doctrine" (also known as the "separate accrual" rule) for trade secret misappropriation claims.  Under the continuing tort doctrine, if the tortfeasor has continued to use the trade secret, a new limitations period starts to run each time the trade secret is used, for as long as the information remains confidential.[15]  Dkt. No. 299 at 13.  As the New York courts have explained, the date of accrual for trade secret misappropriation causes of action may be extended "'where the plaintiff alleges that a defendant has kept a secret confidential but continued to use it for commercial advantage.'" *CDx Lab'ys, Inc. v. Zila, Inc.*, 79 N.Y.S.3d 285, 287 (N.Y. App. Div. 2018) (quoting *Andrew Greenberg, Inc. v. Svane, Inc.*, 830 N.Y.S.2d 358, 362 (N.Y. App. Div. 2007)).  "The [continuing tort] rule is based on the principle that continuous injuries create separate causes of action barred only by the running of the statute of limitations against each successive [injury]." *Covington v. Walker*, 819 N.E.2d 1025, 1027–28 (N.Y. 2004).

---

[14]  Sagitec confirmed at the hearing on these motions that Deloitte would not be time-barred from pursuing equitable claims to which a six-year statute of limitations applied.  January 30, 2026, Motions Hearing at 36:58–37:39.

[15]  What Deloitte refers to as the "separate accrual" doctrine under New York law is more commonly referred to as the "continuing tort doctrine" or "continuing tort theory."  *See, e.g., Estreicher v. Oner*, 49 N.Y.S.3d 530, 532 (N.Y. App. Div. 2017) ("continuing tort doctrine"); *Andrew Greenberg, Inc. v. Svane, Inc.*, 830 N.Y.S.2d 358, 362 (N.Y. App. Div. 2007) ("continuing tort theory").

Deloitte argues that Sagitec did not publicly disclose the trade secrets, but rather continued to use the trade secrets through the year 2020.  Dkt. No. 299 at 13.  Under the continuing tort doctrine, Deloitte contends that even the three-year statute of limitations for legal claims had not run at the time the Complaint was filed.  *Id.  A fortiori*, according to Deloitte, the six-year limitations period for its equitable claims had not run by the time the Complaint was filed.  *Id.*

Sagitec responds that the continuing tort doctrine is inapplicable in this case to any conduct by Sagitec once Deloitte became aware of the alleged misappropriation of its trade secrets.  Dkt. No. 332 at 6.  In pressing that argument, Sagitec relies on a line of cases from some federal courts that have held that under New York law the continuing tort theory does not apply once a plaintiff has "knowledge of [the defendant's] alleged misappropriation and use of its trade secret." *Universal Instruments*, 924 F.3d at 50 (citing *PaySys Int'l, Inc. v. Atos Se*, No. 14-10105, 2016 WL 7116132, at *9 (S.D.N.Y. Dec. 5, 2016), and *VoiceOne Commc'ns, LLC v. Google Inc.*, No. 12-9433, 2014 WL 10936546, at *10 (S.D.N.Y. Mar. 31, 2014)).

Statutes of limitation are considered substantive, not procedural, under the principles of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), and therefore New York law governs the manner in which the statute of limitations applies to the New York tort of trade secret misappropriation when that state tort is asserted in federal litigation.  *See Sun Oil Co. v. Wortman*, 486 U.S. 717 (1988); *Enter. Mortg. Acceptance Co., LLC, Secs. Litig. v. Enter. Mortg. Acceptance Co.*, 391 F.3d 401 (2d Cir. 2004).  As the Third Circuit has explained:

> When a state's highest court has yet to speak on a particular issue, it becomes the role of the federal court to "predict how [the state's highest court] would decide the issue were it confronted with the problem." *Packard* [*v. Provident Nat'l Bank*, 994 F.2d 1039, 1046 (3d Cir. 1993)]. To that end, we should give careful consideration to decisions of the state's intermediate appellate courts, see *McKenna v. Pac. Rail Serv.*, 32 F.3d 820, 825 (3d Cir. 1994), and should aim to "eliminate inconsistency between the federal and state courts in the application of state substantive law," *see Nationwide Ins. Co. v. Patterson*, 953 F.2d 44, 47 (3d Cir. 1991).

*Jaworowski v. Ciasulli*, 490 F.3d 331, 333 (3d Cir. 2007).

The New York courts have held that the continuing tort doctrine applies when the defendant continues to exploit the trade secret, at least until the trade secret is publicly disclosed. New York appellate courts have not adopted Sagitec's theory that the continuing tort doctrine ceases to apply if and when the plaintiff first learns of the misappropriation of the trade secret by the defendant.[16] While there do not appear to be any New York state court decision that explicitly reject the "knowledge exception" to the continuous tort doctrine, there is one opinion by an intermediate New York appellate court that did so by clear implication. In *CDx Laboratories, Inc.*, the court noted that the plaintiffs had knowledge "as early as 2008, and as late as 2009" of trade secret misappropriation that occurred in 2002, yet the court affirmed the inapplicability of the continuing tort doctrine because the plaintiffs failed to demonstrate that there had been any "successive use" sufficient to "constitute a new actionable tort" during the three-year period beginning in 2010 until the filing of their 2013 complaint. 79 N.Y.S.3d at 287. If knowledge of misappropriation were sufficient to render the continuous tort doctrine inapplicable, then any discussion of successive use would have been unnecessary, because any complaint filed after 2012, at the latest, would have been time-barred.

Sagitec argues that under New York law, the plaintiff's knowledge of the misappropriation renders the continuing tort doctrine inapplicable, even if the defendant continues to exploit the trade secret. Deloitte responds to Sagitec's argument, contending that it is based on a misreading of New York law. Under the correct application of New York law, according to Deloitte, the

---

[16] The one exception, the decision of the Appellate Division in *American Entrance Services, Inc. v. Roeder*, 10 N.Y.S.3d 442 (N.Y. App. Div. 2015), is discussed below.

application of the continuing tort theory turns on whether the defendant has improperly published the trade secrets, not on whether the plaintiff has become aware of the misappropriation. Dkt. No. 299 at 13 n.8.

A review of the relevant New York cases supports Deloitte's argument and demonstrates that under New York law the statute of limitations begins to run when the defendant makes use of the trade secret or discloses it. With each use of the secret by the defendant, a new tort occurs, and the statute of limitations begins to run anew for that tort. In light of that principle, the plaintiff's prior knowledge of the misappropriation is irrelevant. In *Lemelson v. Carolina Enters., Inc.*, 541 F. Supp. 645, 659 (S.D.N.Y. 1982), the court stated that principle as follows, citing New York state cases:

> In New York, the rule may be stated as follows. If a defendant misappropriates and discloses a trade secret, he becomes liable to plaintiff upon disclosure. On the other hand, if the defendant keeps the secret confidential, yet makes use of it to his own commercial advantage, each successive use constitutes a new, actionable tort for the purpose of the running of the Statute of Limitations. . . .
>
> The obverse of the rule also applies. If the defendant publicizes or otherwise discloses the secrets revealed to him, there can be no continuing tort of unlawful use.

*See also Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 433 (S.D.N.Y. 1996) ("This rule reflects the principle that 'once the information is no longer secret or confidential, there is no property to protect.'" (citing *Construction Tech., Inc. v. Lockformer Co.*, 704 F. Supp. 1212, 1225 (S.D.N.Y. 1989)).

The rationale for the continuing tort doctrine and its relation to continued secrecy by the wrongdoer lies in the principle that "continuing use of a trade secret constitutes continuous jeopardy to the rightful owner's protection (because) the wrongful user might tend to make the secret generally known." *Lemelson*, 541 F. Supp. at 660 (quoting *M & T Chems., Inc. v. Int'l Bus.*

*Machs. Corp.*, 403 F. Supp. 1145, 1149 (S.D.N.Y. 1975)).  As stated in the 1943 New York case of

*Sachs v. Cluett Peabody & Co.*, 39 N.Y.S.2d 853, 857 (N.Y. App. Div. 1943), quoting Judge (later

Chief Justice) Taft in *Cincinnati Bell Foundry Co. v. Dodds*, 10 Ohio Dec. Reprint 154, 155 (Ohio

Super. Ct. 1887)), "[T]he property in a secret process is the power to make use of it to the exclusion

of the world.  If the world knows the process, then the property disappears.  There can be no

property in a process, and no right of protection if knowledge of it is common to the world."

Analyzing this issue is made more difficult by the fact that in several instances federal

courts in New York (including the Court of Appeals for the Second Circuit) have held that where

"the plaintiff had knowledge of the defendant's misappropriation and use of its trade secret, the

continuing tort doctrine does not apply."  *Universal Instruments*, 924 F.3d at 50.  The recent

decision by the Second Circuit in the *Universal Instruments* case appears to be the first instance in

which the Second Circuit has endorsed that view of New York law, although several district judges

in the Southern District of New York had previously interpreted New York law in that manner.  *See*

*PaySys Int'l, Inc. v. Atos Se*, No. 14-10105, 2016 WL 7116132, at *9 (S.D.N.Y. Dec. 5, 2016);

*VoiceOne Commc'ns, LLC v. Google Inc.*, No. 12-9433, 2014 WL 10936546, at *10 (S.D.N.Y.

Mar. 31, 2014); *Synergetics USA, Inc. v. Alcon Lab'ys, Inc.*, No. 08-3669, 2009 WL 2016872, at

*2 (S.D.N.Y. July 9, 2009).[17]

---

[17]  Not surprisingly, in light of the Second Circuit's decision in *Universal Instruments*, several subsequent federal district court decisions in New York have followed the rule adopted by the Second Circuit in *Universal Instruments*.  *See SS&C Techs. Holdings, Inc. v. D.E. Shaw & Co.*, No. 23-CV-9158, 2025 WL 1591012, at *11 (S.D.N.Y. June 5, 2025); *Medcenter Holdings Inc. v. WebMD Health Corp.*, No. 20-cv-53, 2025 WL 965853, at *4 (S.D.N.Y. Mar. 31, 2025); *DM Manager LLC v. Fidelity Nat'l Info. Servs., Inc.*, No. 23-cv-617, 2024 WL 1347724, at *13 (S.D.N.Y. Mar. 29, 2024).

The language used by the Second Circuit in *Universal Instruments* originated with the *Synergetics* case, which in turn cited the earlier district court decision in *M & T Chemicals* in support of that proposition. *See Synergetics*, 2009 WL 2016872, at *2 (citing *M & T Chems.,* 403 F. Supp. at 1150). But a review of *M & T Chemicals* does not support the proposition for which it was cited in *Synergetics* and, by extension, in *Universal Instruments*.

*M & T Chemicals* primarily addressed the well-established principle that public disclosure destroys a trade secret and thus renders the continuing tort doctrine inapplicable. *M & T Chemicals¸* 403 F. Supp. at 1148–50. In doing so, the *M & T Chemicals* court relied on *Sachs v. Cluett Peabody & Co.*, *supra*, which was the only New York state court decision the *M & T Chemicals* court cited in its opinion. The *M & T Chemicals* court did not disagree or reach a conclusion different from that expressed in *Sachs*: that a trade secret must remain secret for the continuing tort doctrine to apply. However, the *M & T Chemicals* court went on to discuss whether the plaintiff's knowledge of the alleged misappropriation can also serve to render the continuing tort doctrine inapplicable. *M & T Chemicals*, 403 F. Supp at 1150. The court's brief analysis of that secondary issue was based entirely on two cases from outside New York that did not apply New York law, as well as a law review article that discussed one of those two out-of-state cases.[18] The entirety of the court's analysis of the issue is reproduced below:

> Third, if, as it has been suggested, the court in *Underwater Storage*[*, Inc. v. United States Rubber Co.*, 371 F.2d 950 (D.C. Cir. 1966),] construed trade secret misappropriation and use as a continuing tort "presumably to assure the injured owner judicial relief which might otherwise be foreclosed if the statute were to run only from the date of the misappropriation, since knowledge of the misappropriation might not be forthcoming until the statute had run," Comment, 42

---

[18] "The states are split over the continuing tort theory as applied in the trade secret context." *Lemelson*, 541 F. Supp. at 659. For that reason, state law and policy considerations from states other than New York are of limited usefulness in the analysis here.

> N.Y.U.L. Rev. [553], at 567, then that rationale finds no resting place here where plaintiff had imputed knowledge of the misappropriation since November, 1967. See note 4, *supra*; *see also Lockridge* [*v. Tweco Prods., Inc.*, 209 Kan. 389 (Kan. 1972)], *supra*, 497 P.2d at 138.

*M & T Chemicals*, 403 F. Supp. at 1150.

Contrary to the conclusion reached by the district court in *M & T Chemicals*, New York courts have not treated the plaintiff's knowledge of the alleged misappropriation as determinative in deciding whether the continuing tort doctrine is applicable. For example, in *CDx Laboratories*, the plaintiffs had "knowledge of injury as early as 2008, and as late as 2009" but "failed to commence [the] action until February 1, 2013," which was after the three-year statute of limitations would have expired absent a tolling or other extension. As noted, even though the facts showed that the plaintiffs were aware of the misappropriation, the court based its analysis of the accrual of the plaintiffs' claim not on the date the plaintiffs learned of the misappropriation, but on the date of the defendant's last use of the misappropriated information.

The district court's conclusion in *M & T Chemicals* that knowledge by a plaintiff of an alleged trade secret misappropriation renders the continuing tort doctrine inapplicable does not appear to have any basis in New York law. Furthermore, both of the out-of-state cases cited by the court in *M & T Chemicals* concerned questions similar to the issue presented in *Sachs,* which related to whether a trade secret had been made available to the public generally, not whether the plaintiff was aware of the misappropriation. *See Underwater Storage, Inc. v. United States Rubber Co.*, 371 F.2d 950 (D.C. Cir. 1966); *Lockridge v. Tweco Prods., Inc.*, 497 P.2d 131, 138 (Kan. 1972) ("In our case we have the defendants' breach of confidence, resulting in the publication of plaintiff's secret to the world at large"). In fact, the *Underwater Storage* case held that a plaintiff could recover even if a trade secret had been made public under certain circumstances. *Underwater Storage*, 371 F.2d at 955 ("We do not believe that a misappropriator or his privies can

'baptize' their wrongful actions by general publication of the secret.  Nor do we believe that the fact of the destruction of the secret prevents the continued use by the misappropriator or his privies from being a continuing wrong vis-a-vis the original possessor of the secret. . . .  [T]he rule should be that in trade secret cases where the secret has been misappropriated the wrongdoer and his privies are amenable to suit for any use of the secret so long as the use has occurred within the statutory period of limitations.").

While the decisions of the federal courts in *Universal Instruments* and in the *Synergetics* line of district court cases have not generally been followed by New York state courts, one New York Appellate Division panel has endorsed the endorsed the *Synergetics* line of cases to at least some degree.  That case, *American Entrance Servs., Inc. v. Roeder*, 10 N.Y.S.3d 442 (N.Y. App. Div. 2015), held that the continuing tort doctrine did not apply because the plaintiffs had knowledge of the defendants' alleged use of their trade secrets more than seven years before they filed suit.  The *American Entrance* case, however, is the only New York appellate court case cited by Sagitec for the proposition that a plaintiff's knowledge of the defendant's trade secret misappropriation renders the continuing tort doctrine inapplicable.  Moreover, the court's brief, three-paragraph opinion in that case cites no New York cases for that proposition, but relies entirely on the federal district court's opinion in *Synergetics*.  As such, *American Entrance Services* provides little guidance as to the status of New York law on this issue.[19]

---

[19] Sagitec cites two decisions of trial courts in New York in support of its argument, *Zhang v. Trusted Insight, Inc.*, No. 154570/2020, 2021 WL 2688487 (N.Y. Sup. Ct. June 20, 2021), and *Cont'l Indus. Grp., Inc. v. Ustuntas*, No. 65321/2012, 2020 N.Y Misc. LEXIS 10940 (N.Y. Sup. Ct. Dec. 31, 2020), *aff'd in part and vacated in part on other grounds,* 181 N.Y.S.3d 527 (N.Y. App. Div. 2022).  The *Zhang* case, however, cites only *Universal Instruments* for the principle that a plaintiff's knowledge of the misappropriation renders the continuing tort doctrine inapplicable,

46

At least one other federal district court has reviewed the same evolution of the continuing tort doctrine in New York state and federal courts and has reached the conclusion that the bounds of the asserted "knowledge exception" to the continuing tort doctrine "is murky, to say the very least." *Greenfield v. Mold-Rite Plastics, LLC*, No. 8:20-CV-639, 2020 WL 14024164 at *4 (N.D.N.Y. Dec. 16, 2020). The *Greenfield* court concluded that the Second Circuit "may be overstating this limitation, because it cites to a Southern District of New York case, not any New York court"; the *Greenfield* court then noted that the relevant language in *Universal Instruments* is "dicta, because that case involved a public disclosure of an alleged trade secret, not the discreet use of a trade secret for profit, and thus would not have been subject to the continuing violation doctrine in any case." *Id.* at *4. In summarizing the history of the knowledge exception, the *Greenfield* court observed that this exception comes from:

> (1) several district court opinions [(*Synergetics* and its progeny)] that seem to use language for a meaning that language was not intended to carry; (2) a Second Circuit opinion's [(*Universal Instruments*)] reliance on those district court cases in dicta; and (3) a First Department case [(*American Entrance Services*)] that also relies on those district court cases but which may or may not be factually inapposite.

*Id.* at *4. That summary is consistent with my own review of the case law relating to the knowledge exception that Sagitec argues should apply.

Outside the context of trade secret misappropriation, the Court of Appeals of New York has held that

> the cause of action if any there be, should accrue at the time the injury is sustained. To hold that it somehow came into being prior thereto would defy both logic and experience. "(I)t is all but unthinkable that a person should be time-barred from prosecuting a cause of action before he ever had one."

and the *Continental Industries Group* case cites only *Synergetics* and *American Entrance* (which in turn relied only on *Synergetics*) for that proposition. The two trial court opinions cite no other authority from New York courts and thus are not persuasive as indicators of how the New York courts apply the continuing tort doctrine.

47

*Victorson v. Bock Laundry Mach. Co.*, 335 N.E.2d 275, 278 (N.Y. 1975) (quoting *Mendel v. Pittsburgh Plate Glass Co.*, 253 N.E.2d 207, 211 (N.Y. 1969) (Breitel, J., dissenting)).

The continuing tort doctrine "is based on the principle that continuous injuries create separate causes of action barred only by the running of the statute of limitations against each successive [injury]." *Covington*, 819 N.E.2d at 1027–28; *Bloomingdales, Inc. v. New York City Transit Auth.*, 859 N.Y.S.2d 22, 25 (N.Y. App. Div. 2008); *CDx Lab'ys*, 79 N.Y.S.3d at 287. Each subsequent use of a misappropriated trade secret under the continuing tort doctrine is a separate cause of action that accrues when it occurs, and the proposition that a plaintiff's knowledge of prior related misappropriation would render the later misappropriations time-barred would require that they be untimely before they even existed – a proposition that the New York Court of Appeals has characterized as being "all but unthinkable." *Victorson*, 335 N.E.2d at 278; *see also CDx Lab'ys*, 79 N.Y.S.3d at 287 (applying continuing tort doctrine to trade secret misappropriation).

The New York Court of Appeals has not spoken directly on this issue as applied to the limitations period for trade secret misappropriation. However, based on the rationale underlying the New York courts' adopting of the continuing tort doctrine in general, it seems likely that it would not adopt a knowledge exception to the continuing tort doctrine. The *Greenfield* court reached a similar conclusion in its analysis, ultimately concluding that "[i]n the absence of any meaningful guidance as to how New York's Court of Appeals would rule on the issue, the Court is loath to affirmatively hold that plaintiff's trade secret misappropriation claim is entirely time-barred." *Greenfield*, 2020 WL 14024164 at *5.

I agree with the *Greenfield* court's interpretation of New York law; accordingly, I conclude that Deloitte's claims may survive under the continuing tort doctrine despite evidence that Deloitte was aware of Sagitec's prior misappropriation of Deloitte's trade secrets.

While Deloitte's knowledge does not prevent it from relying on the continuing tort doctrine, that does not mean that the continuing tort doctrine will automatically apply to all the injuries Deloitte claims to have suffered from the alleged misappropriation. Under the continuing tort doctrine, "damages are recoverable only to the extent that they were sustained during the [limitations period] immediately prior to the commencement of the respective actions." For that reason, any damages or equitable relief stemming from injuries that occurred more than three or six years, respectively, before the filing of the Complaint will be time-barred. *Kearny v. Atlantic Cement Co.*, 306 N.Y.S.2d 45, 47 (App. Div. 1969) (citing *Reisert v. City of New York*, 66 N.E. 731, 734 (N.Y. 1903) (limiting damages to "6 years immediately preceding the beginning of the action" for a continuing tort where 16 years of damages were originally sought)); *General Precision, Inc. v. Ametek, Inc.*, 20 N.Y.2d 898, 899 (N.Y. 1967) (affirming lower court's holding that "although a total and complete breach gave rise to a cause of action on the date of the breach, a cause of action for a continued breach arose on each occasion of alleged failure to perform, and that therefore the motion could be granted only to the extent of barring the causes of action for the period prior to six years before the commencement of the action.").

There may be additional questions as to what actions, if any, by Sagitec during the relevant period would constitute misappropriation and whether any of those actions would be sufficient to establish a continuing tort. *See, e.g.*, *Lemelson*, 541 F. Supp. 645 (first sale of a toy made with misappropriated trade secrets caused the claim for misappropriation to accrue, and subsequent sales did not renew the action under the continuing tort doctrine). Furthermore, there appear to be disputes as to whether Sagitec disclosed certain trade secrets, including the source code and "uFACTS Solution Framework," to third parties, and whether such disclosures would be sufficient to qualify as a public disclosure necessary to render the continuing tort doctrine inapplicable.

49

However, any such events would appear likely to involve the resolution of factual disputes, and the parties have not developed these issues in their motions, so such issues are not ripe for decision at this time.[20]

### d.  Equitable Tolling

Deloitte next argues that the statutes of limitation for both its federal and state trade secret claims should be equitably tolled because of Sagitec's alleged fraudulent concealment of its misappropriation.  Dkt. No. 299 at 14–15.  Deloitte argues that Sagitec's repeated denials that it possessed, was using, or had misappropriated any of Deloitte's trade secrets as well as the actions Sagitec allegedly took to delete or conceal evidence of its misappropriation constitute fraudulent concealment sufficient to toll the statute of limitations.  *Id.*

Tolling of the statute of limitations for federal trade secret misappropriation claims requires a plaintiff to establish that: "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled."  *Zirvi v. Flatley*, 838 F. App'x 582, 587 (2d Cir. 2020) (quoting *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012); *see also Hydrogen Master Rts., Ltd. v. Weston*, 228 F. Supp. 3d 320, 331 (D. Del. 2017) ("[A]cts occurring after a plaintiff was aware of his rights do not toll the statute of limitations.").

---

[20]  Deloitte argues that its claims of unfair competition (Count IV) and unjust enrichment (Count V) are not subject to dismissal on statute of limitations grounds because they are saved by the continuing tort doctrine and equitable tolling.  Dkt. No. 299 at 13.  In addition, Deloitte seems to contend that those claims seek equitable relief and thus are subject to the six-year limitations period under New York law.  It is unnecessary to decide those issues with respect to Counts IV and V, because those claims are foreclosed as preempted and duplicative for the reasons set forth in section III.C.5 of this opinion, below.

"'[E]quitable tolling may be appropriate if (1) the defendant has actively misled the plaintiff, (2) if the plaintiff has "in some extraordinary way" been prevented from asserting his rights, or (3) if the plaintiff has timely asserted his rights mistakenly in the wrong forum.'" *U.S. v. Midgley*, 142 F.3d 174, 179 (3d Cir. 1998) (quoting *Kocian v. Getty Refin. & Mktg. Co.*, 707 F.2d 748, 753 (3d Cir. 1983)); *Veltri v. Bldg. Serv. 32B-J Pension Fund¸* 393 F.3d 318, 322 (2d Cir. 2004) ("Equitable tolling is an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances."). "Federal courts invoke the doctrine of equitable tolling 'only sparingly,' and will not toll a statute because of 'what is at best a garden variety claim of excusable neglect' on the part of the defendant." *Midgley*, 142 F.3d at 179 (quoting *Irwin v. Dept. of Veterans Affairs*, 498 U.S. 89, 96 (1990)); *id.* ("Absent a showing of intentional inducement or trickery by the defendant, a statute of limitations should be tolled only in the 'rare situation where equitable tolling is demanded by sound legal principles as well as the interests of justice.'") (quoting *Alvarez-Machain v. United States*, 96 F.3d 1246, 1251 (9th Cir. 1996)).

Deloitte's evidence falls short of meeting that exacting standard, and therefore Deloitte is not entitled to equitable tolling of the statute of limitations for its federal trade secrets claim. As discussed above, Deloitte has not pointed to any evidence from which a reasonable jury could conclude that Deloitte was unaware of its claims as of September 2018, nor has Deloitte pointed to any evidence that it was unable to discover its injuries notwithstanding the exercise of reasonable diligence. Because Deloitte discovered the nature of its claim within the limitations period, no actions taken by Sagitec were responsible for successfully concealing the alleged misappropriation. For the same reason, Deloitte is also ineligible for equitable tolling of its state law trade secrets claim. *See Zumpano v. Quinn*, 849 N.E.2d 926, 929 (N.Y. 2006) (It is

fundamental to the application of equitable estoppel "for plaintiffs to establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit.").

### 3. Intellectual Property Ownership (All Counts).

Sagitec next argues that Deloitte does not have any property rights in the alleged copyrighted materials or trade secrets, and that Deloitte therefore cannot assert claims for the alleged copying or misappropriation of that material.  Dkt. No. 278 at 14–19.  Specifically, Sagitec argues that Deloitte has assigned to the Commonwealth of Massachusetts all its interests in the copyrights and trade secrets at issue, as well as the right to bring legal claims relating to those rights.  *Id.*  Sagitec's argument is based on the language in the contract governing the work that Deloitte did for Massachusetts in developing its QUEST Project and the agreements that accompanied that contract.

In response, Deloitte argues that the contract with Massachusetts makes it clear that Deloitte retained its property rights in uFACTS, and that the only property that was assigned to Massachusetts was the derivative work that was created for Massachusetts specifically.  Dkt. No. 299 at 15–18.  Deloitte argues that uFACTS is "contractor property" under the terms of that agreement, which specifically provides that uFACTS is to remain the property of the contractor, Deloitte, and that Deloitte did not transfer that property to Massachusetts incident to the contract. *Id.*  Alternatively, Deloitte argues that Sagitec's arguments demonstrate, at most, that the contractual agreements with Massachusetts were ambiguous with respect to the rights of the parties in uFACTS, which means that there are factual disputes that preclude granting summary judgment for Sagitec on the ownership issue.  *Id.* at 16–18.

As part of Deloitte's development of the QUEST project, Deloitte's predecessor, BearingPoint Inc., entered into an agreement with the Massachusetts Division of Unemployment

52

Assistance ("DUA"), which included a Statement of Work ("SOW") that set forth the terms of the project. Dkt. No. 279-1 at 449, Exh. 2.[21]  The SOW listed the documents that formed the agreement between the parties with a designated order of precedence.  *Id.* at 453.  The two documents on which the parties focus their arguments are the SOW itself (*id.* at 449) and the Commonwealth of Massachusetts Standard Terms and Conditions (Standard Terms) (*id.* at 547).  While the parties dispute the effect of the order of precedence on whether the SOW or the Standard Terms should control, the two documents are consistent for purposes of the dispute at issue in this case, and there is no conflict between them that would require reliance on the order of precedence.

Both the Standard Terms and the SOW discuss deliverables and their relevant assignment and ownership.  The Standard Terms document defines "deliverables" as follows: "A deliverable shall include any tangible product to be delivered as an element of performance under a Contract." It further provides that Massachusetts "is entitled to ownership and possession of all deliverables purchased or developed with State funds."  Dkt. No. 279-1, Exh. 3 at 548.  The Standard Terms document is silent regarding the rights of the parties in any intellectual property other than "deliverables."  The SOW does not provide any explicit definition for what is considered a "deliverable," but it contains a list of specific deliverables that BearingPoint was required to provide to Massachusetts as part of the project.  Dkt. No. 279-1, Exh. 2 at 472–78.

The SOW contains a section dedicated to intellectual property, in which it describes three categories of intellectual property:

> (1)    third party software and other products[] (as specified in section 9.8 of this SOW to be licensed/obtained by [the Massachusetts] DUA, including without limitation Microsoft, Oracle, IIS, Filenet) and any derivative works thereof ("Third Party Property");

---

[21]  After acquiring Bearing Point, Deloitte assumed the role of contracting partner with Massachusetts with respect to the QUEST project.

53

(2)    BearingPoint owned or licensed preexisting or proprietary software, solutions or other proprietary material and information (including without limitation ProvenCourse Methodology and uFACTS, but excluding Third Party Property and derivative works thereof.) and derivative works created for DUA based on the BearingPoint owned or licensed preexisting or proprietary software, solutions or other proprietary material and information (altogether herein "Contractor Property") and

(3)    software and material and information developed by BearingPoint in the course of developing the QUEST solution and specifically for the purposes of delivering QUEST to DUA under this SOW and other than Contractor Property or Third Party Property or derivative work thereof ("QUEST IP").

Dkt. 279-1, Exh. 2 at 462.  The SOW further describes ownership of these different categories of property; it specifies that

BearingPoint will retain all right, title and interest in and to all Contractor Property. DUA acknowledges and agrees that its possession, installation or use of Contractor Property will not transfer to it any title or ownership to such Contractor Property. DUA further acknowledges and agrees that the uFACTS Unemployment Insurance Solution (which will be the basis for the QUEST solution), excluding the Third Party Property, is BearingPoint's proprietary technology and/or is licensed to BearingPoint such that the technology and its source code are considered a trade secret of BearingPoint or third party licensor.

. . .

all of BearingPoint's right, title and interest in the QUEST IP developed originally and exclusively by BearingPoint under the terms of this Statement of Work for the purposes of DUA's QUEST project shall pass to and vest in the Commonwealth, including all copyright, patent, trade secret, trademark and other intellectual property rights created by BearingPoint in the QUEST IP, and any causes of action relating to or based upon such work

*Id.* at 463–64.

Based on that language, it is clear that BearingPoint and the Massachusetts DUA did not intend to effect a transfer of any Bearing Point's assets to the DUA, other than those specifically identified as QUEST IP.  The SOW explicitly recited that uFACTS remained the property of BearingPoint, making clear that it was the intention of the parties that BearingPoint would retain

54

the rights to its preexisting intellectual property.  Interpreting the agreements between the parties as Sagitec urges would require the conclusion that BearingPoint had relinquished all rights to its uFACTS product, which would prevent Deloitte from seeking to market versions of uFACTS to other potential customers and even prevent it from using its trade secrets to develop other software. Such a conclusion is unreasonable and inconsistent with the parties' clear intention to transfer only QUEST IP, as defined in the SOW, and related deliverables.  *See Flemings v. Contributory Retirement Appeal Bd.*, 727 N.E.2d 1147, 1148 (Mass. 2000); *Markus v. Boston Edison Co.*, 56 N.E.2d 910, 912 (Mass. 1944) ("Moreover, in construing an agreement between two parties, the court should avoid unjust and unreasonable results").

While there may be factual disputes as to what specific intellectual property falls into the category of "Contractor Property," as opposed to being part of "QUEST IP," those are not questions that can be resolved on summary judgment.

### 4. Trade Secret Economic Value (Counts II–III).

Sagitec argues that Deloitte has failed to establish that the trade secrets that form the bases for Deloitte's misappropriation claims have economic value, as required under both Deloitte's federal and state law claims.  Dkt. No. 278 at 19–20.  Sagitec also argues that Deloitte must show the value of each alleged trade secret individually.  *Id.*  In response, Deloitte argues that it has presented evidence of the economic value of its trade secrets by pointing to the resources it expended to develop those trade secrets, the precautions it took to protect its trade secrets from disclosure, the profits it made from licensing its trade secrets, and the value of the trade secrets in enabling a competitor to compete more effectively and in providing advancements over then-existing solutions.  Dkt. No. 299 at 18–20.  Deloitte also argues that it is not required to show value

55

for each trade secret individually and that secrets can be considered in groups, as long as conclusions may be drawn with respect to each individual trade secret's value. *Id.*

Because Deloitte's federal trade secret claim is barred as untimely, the question whether Deloitte has presented sufficient evidence of the economic value of its trade secrets for that purpose is moot.

As for Deloitte's state law trade secrets claim, Sagitec argues that New York common law requires Deloitte to show various factors to establish that particular information qualifies as a trade secret, including showing "the value of the information to the business and its competitors." Dkt. No. 278 at 19 (quoting *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 498 (S.D.N.Y. 2002)). The New York courts consider that factor among others in determining whether the information at issue qualifies as a trade secret:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Ashland Mgmt. Inc. v. Janien*, 624 N.E.2d 1007, 1012–13 (N.Y. 1993); *see also N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999). The question whether Deloitte has presented enough evidence with respect to those factors to establish that its alleged trade secrets qualify as trade secrets under New York law is a jury question. *See Schroeder v. Pinterest Inc.*, 17 N.Y.S.3d 678, 691 (N.Y. App. Div. 2015) (citing *Ashland*, 624 N.E.2d at 1007) ("whether information constitutes a trade secret is generally a question of fact").

Some courts have held that "because independent economic value is one part of the definition of a 'trade secret,' . . . a basis exists in the statutory language for concluding that evidence

56

of independent economic value must be proven as to each item that a plaintiff seeks to have identified as a distinct 'trade secret.'" *Synopsis, Inc. v. Risk Based Security, Inc.*, 70 F.4th 759, 772–73 (4th Cir. 2023). Despite this requirement to show independent value for each asserted trade secret, the *Synopsis* court noted that this independent value requirement "would not necessarily prohibit a court, the parties, or an expert witness from discussing the independent economic value of individual trade secrets by groups so long as the same evidence relates to more than one of the alleged trade secrets and permitted a conclusion to be drawn with respect to each individual trade secret's value." *Id.* at 773. New York law does not impose the explicit requirement discussed in *Synopsis* that there be independent economic value for each trade secret.[22] Given the *Synopsis* court's endorsement of the practice under an arguably even more rigid standard that the one at issue here, there is no justification to foreclose Deloitte from using grouping to prove the value of its asserted trade secrets in supporting an argument that the trade secrets qualify as trade secrets under New York law.

As to its ability to prove the economic value of its alleged trade secrets, Deloitte has provided deposition testimony, expert reports, and other evidence supporting its position that its alleged trade secrets have value. Dkt. No. 299 at 19 (summarizing evidence). Because that evidence and other evidence bearing on the required showing under New York law is sufficient to

---

[22] *Synopsis* involved allegations of trade secret misappropriation under the federal DTSA and Virginia law. Both the DTSA and Virginia law require a trade secret to have "independent economic value," Va. Code § 59.1-336; 18 U.S.C. § 1839(3)(B) – a requirement that is absent from the New York state definition of a trade secret. *See Ashland*, 624 N.E.2d at 1012–13 (endorsing the definition of a trade secret found in section 757 of the Restatement of Torts, as "any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Restatement (First) of Torts, § 757 cmt. b (A.L.I. 1939)).

raise a jury question as to the existence of a trade secret, summary judgment on that issue would be inappropriate.

### 5. State Law Unfair Competition and Unjust Enrichment Claims (Counts IV–V).

Sagitec argues that Deloitte's state law unjust enrichment and unfair competition claims are duplicative of the claim of misappropriation of trade secrets and are preempted by the federal Copyright Act.  Dkt. No. 278 at 20.

Deloitte responds that its unjust enrichment and unfair competition claims are not duplicative of its state trade secret misappropriation claims and are not preempted by the Copyright Act, because those claims, as applied to the allegations of unlawful copying, contain other elements in addition to the elements of copyright infringement.  Dkt. No. 299 at 20.

#### a.  Unjust Enrichment

Under New York law, an unjust enrichment claim "is not available where it simply duplicates, or replaces, a conventional contract or tort claim."  *Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012).  Rather, the claim "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff."  *Id.*; *see also Continental Indus. Grp., Inc. v. Altunkilic*, No. 14-cv-790, 2018 WL 1508566, at *9 (S.D.N.Y. Mar. 27, 2018), *aff'd in relevant part and vacated in part on other grounds,* 788 F. App'x 37, 43 (2d Cir. 2019) (dismissing unjust enrichment and unfair competition claims as duplicative; an "unjust enrichment theory [cannot be pleaded] in terms that restate[] other torts, specifically . . . trade secret misappropriation"); *DFO Glob. Performance Com. Ltd. v. Mirmel*, No. 20-CV-6093, 2021 WL 3475596, at *5–6 (S.D.N.Y. Aug. 6, 2021) (unjust enrichment claims based on trade

secret misappropriation "fail as duplicative of the DTSA and common law misappropriation claims"); *Shaw v. Empire Stock Transfer Inc.*, 381 F. Supp. 3d 286, 292 (S.D.N.Y. 2019) (unjust enrichment claim "is unnecessarily duplicative of any claims arising in tort, contract, or under the statute").

An unjust enrichment claim is also preempted by the Copyright Act when the unjust enrichment claim is based on alleged infringement of the plaintiff's rights in copyright protected materials. *See Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004) ("The Copyright Act exclusively governs a claim when: (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106"); 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* §1.15[G] & n.335 (2025) ("[A] state-law cause of action for unjust enrichment . . . should be regarded as an 'equivalent right' and, hence preempted insofar as it applies to copyright subject matter.") (citing numerous cases).

Deloitte argues that its unjust enrichment claim is not duplicative of its trade secret claims or preempted by its copyright claim, based on the principle that a cause of action that contains an extra element is not duplicative of or preempted by an otherwise similar cause of action. *See Briarpatch*, 373 F.3d at 305 (The state law claim is not preempted if it includes "any extra elements that make it qualitatively different from a copyright infringement claim."); *see also Comp. Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992) ("A state law claim is not preempted if the 'extra element' changes the 'nature of the action so that it is *qualitatively* different from a copyright infringement claim.") (citing *Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F. Supp.

59

1523, 1535 (S.D.N.Y. 1985)); *Harper & Row, Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 200 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985).

Courts have taken a "restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim." *Briarpatch*, 373 F.3d at 306. The Second Circuit has emphasized that "not all 'extra elements' are sufficient to remove the claim from the 'general scope' of copyright." *In re Jackson*, 972 F.3d 25, 43 (2d Cir 2020). Rather, an action "will not be saved from preemption by elements . . . which alter the action's *scope* but not its *nature*." *Id.* at 44.

Deloitte asserts that the additional element in its unjust enrichment claim is found in its allegations that Sagitec employees "took affirmative steps to conceal its [copyright] infringement and [trade secret] misappropriation" by falsely asserting that they had not obtained any protected information from Deloitte and made "materially false, fictitious, and fraudulent statements" to the government in connection with the government's investigation of the alleged trade secret misappropriation. Dkt. No. 1 at ¶¶ 54–55.

The problem with Deloitte's argument is that its allegations of concealment and fraudulent statements to the government are simply additional facts relating to Sagitec's conduct in the course of and in the aftermath of its alleged misappropriation of Deloitte's trade secrets; those allegations are not directed to any "extra element" found in New York's unjust enrichment cause of action. The allegations therefore do not serve to avoid duplication of Deloitte's unjust enrichment claim by its trade secret misappropriation claims or preemption of the unjust enrichment claims by Deloitte's claim of copyright infringement.

An unjust enrichment claim under New York law requires proof that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting

defendant to retain what plaintiff is seeking to recover." *Briarpatch*, 373 F.3d at 306 (citing *Clark v. Daby*, 751 N.Y.S.2d 622, 623 (N.Y. App. Div. 2002)).  As in the *Briarpatch* case, the second and third elements of unjust enrichment are satisfied by the showing required to prove copyright infringement.  As for the first element—enrichment of the defendant—the Second Circuit in the *Briarpatch* case held that although "enrichment is not required for copyright infringement, we do not believe that it goes far enough to make the unjust enrichment claim qualitatively different from a copyright infringement claim," because while "the enrichment element here limits the scope of the [enrichment] claim, it "leaves its fundamental nature unaltered."  373 F.3d at 306; *see also Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424,  432 (2d Cir. 2012) (An unjust enrichment claim, under which "the plaintiff need only prove that the defendant was unjustly enriched through the use of her idea or work. . . is not materially different from a claim for copyright infringement that requires a plaintiff to prove that the defendant used, reproduced, copied, or displayed a copyrighted work.").

### b.  *Unfair Competition*

With regard to Deloitte's unfair competition claim, Sagitec relies on the presumption in New York law that "[t]wo claims are duplicative of one another if they 'arise from the same facts . . . and do not allege distinct damages.'"  *NetJets Aviation, Inc. v. LHC Commc'ns,* LLC, 537 F.3d 168, 175 (2d Cir. 2008) (quoting *Sitar v. Sitar*, 854 N.Y.S.2d 536, 538 (N.Y. App. Div. 2008)); *see also Chalmers v. Nat'l Collegiate Athletic Ass'n*, No. 25-1307, 2025 WL 3628416, at *6 (2d Cir. Dec. 15, 2025); *Continental Indus. Grp.*, 788 F. App'x at 43 (The plaintiff's unfair competition claim "merely duplicates [its] other claims and, accordingly, should be dismissed."); *Exec. Trim Constr., Inc. v. Gross,* 525 F. Supp. 3d 357, 376 (N.D.N.Y. 2021) ("A claim for unfair competition

based on the same allegations as a claim for misappropriation of trade secrets is treated as a single cause of action.") (citing numerous cases).

While Deloitte argues that its allegations regarding Sagitec's fraudulent conduct and concealment are relevant to the unfair competition claim asserted in Count IV of the Complaint, Deloitte has not explained how its unfair competition claim is not merely duplicative of its other causes of action. *Ebin v. Kangadis Food Inc.*, 13-CV-2311, at *7 (S.D.N.Y. Dec. 11, 2013); *see also Nelson v. MillerCoors, LLC*, 246 F. Supp. 3d 666, 679 (E.D.N.Y. 2017).

In addition, Deloitte's unfair competition claim is based on the same conduct that underlies its copyright infringement claim. For that reason, the unfair competition claim is preempted by the federal Copyright Act. *See* 17 U.S.C. § 301(a); *Continental Indus. Grp.*, 788 F. App'x 37, 43 (2d Cir. 2019); *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 909 (2d Cir. 2011) (Raggi, J., concurring) ("[U]nfair competition, misappropriation, or unjust enrichment claims are preempted when based on alleged acts such as distribution or reproduction.") (collecting cases); *Genius Media Grp Inc. v. Google LLC*, No. 19-CV-7279, 2020 WL 5553639, at *12–13 (E.D.N.Y. Aug. 10, 2020).

The allegations that Deloitte has made in its unfair competition claim differ significantly from the allegations in the cases Deloitte cites to support its argument, in which the two causes of action at issue were distinctly different. *See* Dkt. No. 229 at 20; *Hayden v. Int'l Bus. Machs. Corp.*, Civ. No. 21-2485, 2025 WL 1697021, at *20 (S.D.N.Y. June 17, 2025 ("plaintiff's allegations underlying this claim are different than the allegations underlying his misappropriation claims"); *Amphenol Corp. v. Paul*, No. 3:12CV543, 2013 WL 12251356, at *7 (D. Conn. Mar. 28, 2013) ("There are two distinct causes of action here. The breach of contract claim relies upon the legal

and contractual obligations outlined in the IPA while the unfair competition claim focuses upon the misappropriation and misuse of Amphenol's confidential information.").

Deloitte's unfair competition claim is based on Sagitec's alleged misappropriation of Deloitte's trade secrets and its financial exploitation of the misappropriated material. As such, those claims are duplicative of Deloitte's state law trade secret misappropriation claim and must be dismissed.

### C.    Sagitec's Motion to Strike Opinions of Dr. Krein Based on Late Production of Discovery Materials (Dkt. Nos. 271, 272, 309, and 335).

Sagitec next asks the court to strike certain opinions of Jonathan Krein, one of Deloitte's experts, alleging that those opinions rely on material that was not properly disclosed during fact discovery. Specifically, Sagitec argues that those documents upon which Dr. Krein relies were not timely disclosed: a document titled "uFACTS Overview," upon which Dr. Krein relies to support Deloitte's trade secret claims, and two source code files, "BatchRateDataProcess.cs" and "busConstants.cs," upon which Dr. Krein relies to support Deloitte's copyright claims. Dkt. No. 272. In particular, Sagitec argues that those materials were not identified in any of Deloitte's copyright infringement contentions, including a final March 2025 supplemental contention filed just weeks before Dr. Krein's expert report was served in May 2025. *Id.* at 3.

In response, Deloitte argues that Dr. Krein does not rely on the "uFACTS Overview" document as a trade secret in and of itself; instead, he contends that the document shows how Sagitec relied on the document to "build out its documentation for Neosurance" since "independently developed technology could not possibly correspond so closely to another company's documentation." Dkt. No. 309 at 7–8. Deloitte also argues that Sagitec knew about the uFACTS Overview document because it was cited in an earlier investigative report, and that

Deloitte "expressly incorporated by reference" all the documents cited within that report. Dkt. No. 309 at 10. As for the source code files, Deloitte does not appear to dispute Sagitec's allegations that Deloitte failed to identify those files until the service of Dr. Krein's expert report. Rather, Deloitte argues that identifying the source code files during expert discovery was sufficient to satisfy its discovery obligations. *Id.* at 11–12. Given the complex nature of software cases, Deloitte argues that expert discovery was necessary to identify materials that were copied. In addition, Deloitte points to limitations and reservations that Deloitte made in its discovery responses on that issue. *Id.*

In its reply brief, Sagitec argues that even if it were appropriate for Deloitte to use the uFACTS Overview in support of its underlying trade secret arguments, the uFACTS Overview should still be excluded because Deloitte failed to identify that document in its response to Interrogatory No. 2, which asked Deloitte to identify any documents that Deloitte intended to rely on to prove its trade secret misappropriation claims. Dkt. No. 335 at 4–5 (quoting Dkt. No. 273-1, Exh. 1 at 38–39).

Given Deloitte's representation that it does not contend that the uFACTS Overview document itself is a trade secret, the *Pennypack* factors, viewed as a whole, weigh against striking Dr. Krein's reliance on that document. There is little potential surprise or prejudice to Sagitec from Dr. Krein's testimony about the uFACTS Overview, as Dr. Krein relies on the document primarily to argue that Sagitec copied the underlying trade secrets and basic functionality/operation of uFACTS – an argument that is at the core of Deloitte's trade secret misappropriation allegations. Furthermore, Sagitec's own experts have had the opportunity to analyze and rebut Dr. Krein's testimony, and thus Sagitec has had the opportunity to cure any prejudice that might have resulted from limiting the inability of Sagitec's experts to address the material in the uFACTS Overview

document.  Nor is there any suggestion in the record that the failure to produce the uFACTS Overview document was the product of bad faith or willfulness on Deloitte's part.

Similarly, the *Pennypack* factors weigh against excluding the late-disclosed source code files.  Unlike the uFACTS Overview document, Deloitte has made clear that it intends to rely on the BatchRateDataProcess.cs and busConstants.cs source code documents as part of its copyright infringement case.  *See* Dr. Krein's opening report, Dkt. No. 273-1, Exh. 5 at 251–65.  It appears uncontested that Deloitte failed to identify those files in any of its copyright infringement contentions, including in its March 28, 2025, supplemental response to Interrogatory No. 13, which was served less than two months before Dr. Krein's May 23, 2025, opening expert report.  Dkt. No. 273-1, Exh. 3 at 13–320; Exh. 5 at 1–330.

While Deloitte should have disclosed those files at the latest in response to Interrogatory No. 13, the belated disclosure of those files does not appear to have resulted in significant prejudice to Sagitec.  Throughout its multiple responses to Sagitec's Interrogatory No. 13, Deloitte identified hundreds of specific source code files that it contends Sagitec copied.  Dkt. No. 273-1, Exh. 3 at 13–320.  Although the two specific files on which Sagitec now focuses do not appear on that list, Sagitec was on notice of Deloitte's arguments regarding source code copying, and it is not clear how Sagitec's course of action with regard to discovery, or its overall strategy, would have been different if those two additional files had been included in the earlier productions.  Given that the allegations that involve those files are allegations that Sagitec's own source code contains copied material, it appears unlikely that Sagitec would need to rely on much, if any, evidence or opinions outside its own control in seeking to disprove that there was copying of the two files at issue.  Furthermore, because the two files were disclosed and discussed in Dr. Krein's opening report, Sagitec had the opportunity to rely on its own expert to cure any prejudice resulting from the

65

belated disclosure of those files.  Finally, as in the case of the uFACTS Overview, there is no indication that Deloitte's late disclosure of the files was the product of bad faith or willfulness.  To the contrary, the complex nature of source code and the large volume of the material at issue lend credibility to Deloitte's contention that it did not act in bad faith when it failed, prior to Dr. Krein's analysis, to identify those specific files as potentially containing copied materials.

In sum, because the *Pennypack* factors weigh against the exclusion of Dr. Krein's reliance on the disputed materials, Dr. Krein will be permitted to rely on those materials consistent with his expert report.

**D.    Sagitec's Motion to Exclude Certain Opinions of Dr. Krein and Mr. Britven (Dkt. Nos. 274, 275, 307, and 343).**

Sagitec asks that I exclude certain opinion testimony from Dr. Krein and from Thomas Britven, another Deloitte expert witnesses.  Sagitec argues that certain of Dr. Krein's opinions are improper because (1) they express views as to the parties' intent, motivation, and state of mind; (2) they consist of speculation; and (3) they fail to rely on proper analysis or methodology.  Dkt. No. 275 at 3–4.  Sagitec argues that Mr. Britven's opinions should be excluded because (1) they consist of improper opinions regarding state-of-mind; (2) they lack support; and (3) they fail to properly apportion damages between Deloitte's trade secret and copyright claims.  *Id.* at 3.

### *1.    Dr. Krein's opinions*

First, Sagitec argues that section 11 of Dr. Krein's report, which is titled "Sagitec Misled Deloitte and Others About its Use," should be excluded in its entirety.  Dkt. No. 275 at 5.  Sagitec argues that Dr. Krein's opinions expressed in that portion of his report consist of improper opinion testimony regarding Sagitec's intent, motivation, and state of mind.  *Id.*  Deloitte responds that Dr. Krein's testimony does not relate to intent, motivation, and state of mind, but instead consists of

Dr. Krein's opinions that Sagitec made false statements regarding its possession of uFACTS-related material.  Dkt. No. 307 at 1.

It is clear that at least some of the material in section 11 of Dr. Krein's report consists of improper opinion testimony regarding Sagitec's intent, motivation, and state of mind.  For example, Dr. Krein states at one point in that section of his report that "Sagitec affirmatively attempted to mislead Deloitte"; at another point he states that Sagitec made communications that "attempted to turn the tables"; and at various points throughout that section of his report he states that Sagitec sought to mislead Deloitte.  Dkt. No. 276-1, Exh. 1 at 268–70.  Dr. Krein will not be allowed to provide opinions to that effect at trial.  However, section 11 of Dr. Krein's report also contains opinion testimony that is not improper, such as his opinions relating to the accuracy of certain statements of Sagitec representatives, the steps Deloitte took to ensure non-disclosure of its material, actions that Sagitec took that may indicate it was attempting to conceal wrongdoing, and the truthfulness of Sagitec's assertions that it had conducted a "review" of whether it possessed Deloitte's information.  *Id.* at 268–75.  Overall, section 11 of Dr. Krein's opening report is best characterized as generally consisting of permissible opinions, along with a few impermissible conclusions regarding Sagitec's intent, motivation, and state of mind.

Dr. Krein will not be permitted to testify as to his opinions regarding the intent, motivations, or state of mind of Sagitec or its employees, including his opinions that Sagitec attempted to mislead Deloitte or attempted to accomplish certain objectives in its communications.  However, Dr. Krein will be permitted to provide opinions relating to Deloitte's conduct and representations, which may be relevant to the jury's assessment of Sagitec's knowledge and intent.

Second, Sagitec argues that Dr. Krein's report contains improper opinions regarding the state of discovery in this case.  For example, Sagitec argues that Dr. Krein's report improperly

67

alleges that Sagitec refused to produce its "source code repository" and certain releases of Neosurance.  Dr. Krein's report also states that he was "unable to rule out" the possibility that Sagitec is in possession of additional evidence that has not been produced, and it set forth speculation about the reasons for certain gaps in the evidence.  Dkt. No. 275 at 6–8.  Deloitte defends the admissibility of that evidence on the ground that experts may permissibly draw conclusions from the absence of evidence, and that Dr. Krein's testimony does not constitute opinion testimony about the "state of discovery."  Dkt. No. 307 at 1–2.  Deloitte also contends that Dr. Krein should be permitted to testify that the Neosurance source code contains inconsistencies between previous versions, lacks certain "binaries" that one would expect to be present in the code, and contains other "binaries" that indicate that portions of the code were created in later years.  *Id.* at 6.  Deloitte argues that those opinions are admissible even if Sagitec disagrees with them, and that they are the type of opinions that should be challenged through cross-examination or contradiction, not by exclusion.  *Id.*

With respect to Sagitec's objection to any testimony by Dr. Krein that Sagitec improperly withheld certain requested materials, Deloitte has now represented that Dr. Krein will not express an opinion regarding Sagitec's unwillingness" or refusal" to produce source code or that it "declined to produce" or "withheld" such code.  *Id.* at 7–8 n.2.  It therefore appears that one of the primary grounds of dispute between the parties is no longer at issue.  Sagitec's remaining objections to Dr. Krein's report are directed to Dr. Krein's opinions regarding inconsistencies between the code produced by Sagitec and what an expert would expect to see.  That testimony includes Dr. Krein's opinion as to possible explanations for his observations and the reasons he is not able to confirm which explanation is correct, given the limited source code that was produced. Dkt. No. 275 at 6 (citing Krein Opening Report ¶¶ 563, 567, 569, 572, 588, 341 n.546, 342 n.547,

68

432, 565, 584, and 585).   Those opinions are admissible, provided that Dr. Krein does not improperly refer to unproduced source code in a manner that would imply a discovery violation by Sagitec.  *See Norman v. Leonard's Express, Inc.*, No. 7:22cv96, 2023 WL 3244002, at *3 (W.D. Va. May 4, 2023) ("The probative value of any such testimony would be substantially outweighed by the risk of undue prejudice, because it would unfairly suggest that Norman is hiding something damaging in her medical records when the defendant had procedural avenues to rectify any perceived discovery abuses, and the records at issue simply do not support such a claim.").

Third, Sagitec argues that Dr. Krein provides conclusory opinions in Appendices A and B of his report,[23] in which he maps certain Sagitec source code to corresponding Deloitte source code.  Based on that analysis, Dr. Krein proposes to testify that it is his opinion that the material was copied.  Dkt. No. 275 at 8–9.  Sagitec argues that simply listing certain file paths is improper because it fails to provide any meaningful assessment of their similarities.  *Id.*  In response, Deloitte argues that Dr. Krein provided a thorough analysis of his opinions on copying, including nearly 100 paragraphs of side-by-side comparisons, and that it was necessary to include the side-by-side comparisons in Appendices A and B given the large number of files that were allegedly copied. Dkt. No. 307 at 8–9.  Deloitte also argues that Dr. Krein explained how he conducted his analysis through the specific comparisons discussed in his report, and that those same "tools to understand the key components of software and source code" are applicable to the code identified in the Appendices as well.

---

[23]  Dr. Krein's opening report also contains a similar Appendix C that maps data definition files and class between Deloitte's and Sagitec's source code.  Dkt. No. 276-1, Exh. 1 following page 351.  Sagitec does not appear to contest Dr. Krein's reliance on that information.

Sagitec's arguments as to Appendices A and B are unpersuasive. Dr. Krein's report contains an extensive side-by-side analysis of the source code as part of his presentation, which was designed to show copying by Sagitec. *Id.* at 9; Dkt. No. 276-1, Exh. 1 at 233–65 (¶¶ 337–432). Appendices A and B are referenced immediately after that analysis, and Dr. Krein's description of the two appendices as examples of code copying, in addition to the specific examples discussed in the body of the report, makes clear that the same methodology would apply to the materials presented in the appendices as to the materials discussed in the body of the report. As such, Dr. Krein's opinions are sufficiently supported by his explanations of the methodology he employed in reaching those opinions. Challenges to those opinions are therefore properly addressed through the presentations of contrary evidence or argument, and not through the exclusion of Dr. Krein's opinions.

Lastly, Sagitec challenges Dr. Krein's "head start" opinion as lacking any appropriate methodology. Dkt. No. 275 at 9–10. Specifically, Sagitec argues that Dr. Krein should not be permitted to state that Sagitec's alleged copying and/or misappropriation gave Sagitec a "head start" that allowed it to reduce the development period for its Neosurance product by "3 to 5" years. *Id.* at 9–11. Sagitec argues that the only basis for that opinion is information from Deloitte employee Scott Malm, who asserted that it took Deloitte three to five years to develop the first version of uFACTS, and that Mr. Malm provided no independent analysis or justification for that opinion. *Id.* at 11.

Deloitte responds that Dr. Krein properly discussed the benefits that a competitor would obtain through copying, and in particular how copying would reduce the time needed to develop software such as Neosurance. Dkt. No. 307 at 9–10. In particular, Deloitte argues that Dr. Krein explains that Deloitte spent 10 years developing its uFACTS solution as it existed in 2013, and

70

that it would be reasonable to assume that Sagitec saved three to five years of development time, given the amount of time it took Deloitte to develop the initial version of uFACTS. *Id.*

Dr. Krein's report provides a reasonable description and analysis of the factors that may have reduced Sagitec's development time as a result of the alleged copying. While Dr. Krein's opinion that Sagitec reduced its development time by three to five years is based on the assumption that Sagitec's development process would have been similar to Deloitte's, that opinion is not so baseless as to warrant exclusion. Although there are certainly differences between Sagitec's and Deloitte's development processes that could have affected the time required for the independent development of their respective products, those differences are factual in nature and go to the weight, not the admissibility, of Dr. Krein's opinion.

### 2. Mr. Britven's opinions

Sagitec objects to the admission of the testimony of Deloitte expert Thomas Britven on several grounds.

First, Sagitec argues that Mr. Britven's testimony should be excluded because it consists of improper opinions as to the state of mind of Deloitte representatives in 2016 and 2023. Dkt. No. 275 at 11–12. Deloitte responds that Mr. Britven's opinions on those issues merely provide context for his other opinions that are the principal focus of his testimony. Dkt. No. 307 at 11–12. Deloitte highlights Mr. Britven's statements that he does not intend to express an opinion as to the state of mind of Deloitte's representatives. *Id.*

A review of Mr. Britven's opinions does not suggest that his testimony can fairly be characterized as expressing views regarding the state of mind of Deloitte's representatives. His opinions relating to Deloitte's corporate knowledge and understanding at certain times appear to

71

be simply factual observations as to when Deloitte became aware of certain facts relevant to the case.

Second, Sagitec argues that Mr. Britven's opinion that Sagitec's conduct caused injury to Deloitte in connection with a project involving the District of Columbia government should be excluded because there is no link between that project and Deloitte's allegations. Dkt. No. 275 at 13–15. Deloitte argues that Sagitec's argument is based on an overly narrow definition of trade secret misappropriation, and that the record and Dr. Krein's opinions support a finding that Sagitec used Deloitte's trade secrets in connection with the District of Columbia project, even if Sagitec did not engage in direct copying of Deloitte's materials in connection with that project. Dkt. No. 307 at 12–14. Additionally, Deloitte argues that Sagitec's arguments are largely based on self-serving statements that the District of Columbia project did not include misappropriation, which is an assertion that Deloitte disputes. *Id.* at 14.

Mr. Britven's opinions about the District of Columbia project are not excludable. Deloitte may be able to prove that the District of Columbia project was developed through the use of misappropriated trade secrets, even if Deloitte is unable to show that Sagitec engaged in direct copying in connection with that project. While the parties may dispute whether there was any such copying occurred, that question goes to the weight of the evidence and is not a proper basis for excluding Mr. Britven's testimony on that subject.

Third, Sagitec argues that Mr. Britven's opinions as to Deloitte's lost profits should be excluded because Deloitte did not compete with Sagitec on most of the projects that Sagitec was awarded. Dkt. No. 275 at 15–17. Sagitec argues that it bid on nine projects between January 1, 2014, and December 31, 2024, and that Deloitte did not bid against Sagitec in eight of those projects. *Id.* at 16–17. Sagitec acknowledges that Deloitte bid against Sagitec on one project that

72

was eventually awarded to Sagitec, but Sagitec contends that the project on which they competed went through three rounds of bidding, and that Deloitte declined to submit a bid in the final round of bidding. *Id.*

In response, Deloitte argues that it is not necessary for there to have been head-to-head bidding to show that Deloitte suffered lost profits as a result of Sagitec's misappropriation. Dkt. No. 307 at 14–16. In any event, Deloitte argues that Sagitec and Deloitte have bid head-to-head on at least one project that Sagitec won. *Id.* at 16.

Even though Deloitte did not submit a bid in the last round of bidding on the District of Columbia project, that does not mean that Deloitte did not suffer lost profits as a result of Sagitec's participation in that project. For example, Deloitte may argue that absent Sagitec's competing bids, it could have won an earlier round of bidding, or that it chose not to participate in the final round of bidding because it was clear that Sagitec was more likely to win based on the earlier rounds of bidding. Deloitte is entitled to make its arguments regarding lost profits, and Sagitec's arguments go to the weight, not the admissibility, of Mr. Britven's opinions.

Fourth, Sagitec argues that Mr. Britven's opinions rely on undisclosed opinions of Dr. Krein and therefore lack legally sufficient support. Dkt. No. 275 at 17–19. Sagitec lists a number of specific opinions from Mr. Britven to which it objects, and it notes that Mr. Britven supports each of those opinions by citing to an "interview" with Dr. Krein, but that none of the information allegedly provided to Mr. Britven in those interviews is disclosed in Dr. Krein's expert report. *Id.*

Deloitte responds that the underlying information on which Mr. Britven relies on each of his opinions is disclosed in Dr. Krein's report. Deloitte provides a table providing citations to the portions of Dr. Krein's report that, according to Deloitte, support each of Mr. Britven's contested opinions. Dkt. No. 307 at 16–17. Deloitte also argues that Mr. Britven's opinions are not required

73

to match Dr. Krein's opinions verbatim, but instead must simply be "consistent with" or a "reasonable synthesis and/or elaboration of" Dr. Krein's opinions. *Id.* Additionally, Deloitte notes that Sagitec had the opportunity to depose both Dr. Krein and Mr. Britven regarding their opinions, but that Sagitec chose not to do so. *Id.* at 18.

Although Mr. Britven's opinions do not perfectly mirror Dr. Krein's opinions, the excerpts from Dr. Krein's report to which Deloitte refers provide support for Mr. Britven's opinions. *Id.* at 16–18. That evidence is sufficient to justify the admission of Mr. Britven's opinions. If Sagitec wishes to challenge Mr. Britven's reliance on Dr. Krein's opinions, it will be free to do so through cross-examination of Mr. Britven.

Finally, Sagitec argues that Mr. Britven's disgorgement and lost profits opinions should be excluded on the ground that Mr. Britven failed to apportion damages between Deloitte's trade secret misappropriation claims and its copyright infringement claim. Dkt. No. 275 at 19–20. Deloitte argues that Mr. Britven conducted such an apportionment. In support of that contention, Deloitte points to a chart that Mr. Britven provided illustrating the damages attributable to each cause of action. Dkt. No. 307 at 19. Deloitte argues that the damages it suffered from each set of claims overlap, because the damages were all caused by the sale of Neosurance, which was developed using both Deloitte's copyright-protected material and its misappropriated trade secrets. *Id.* at 19–20. Deloitte also contends that Sagitec's arguments with respect to disgorgement would impose a burden of proof beyond what is legally required, because the Copyright Act requires only that Deloitte present evidence of Sagitec's revenue, at which point the burden shifts to Sagitec to prove "expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.* at 20 (citing 17 U.S.C. § 504(b) and *Mon Cheri Bridals, Inc. v. Wen Wu*, 383 F. App'x 228, 239 (3d Cir. 2010).

As highlighted by Deloitte, Mr. Britven has divided his damages opinions between those attributable to the alleged trade secret misappropriation and those attributable to copyright infringement.  Dkt. No. 276-1 at 9–10.  To the extent that Sagitec disagrees with Mr. Britven's apportionment analysis, the parties' disagreement over that issue amounts to a factual dispute between the parties that is suitable for resolution at trial.

### E.    Sagitec's Motion to Strike Portions of the Declaration of Anil Gosu (Dkt. Nos. 329, 330, 356, and 362).

Sagitec asks that I strike paragraphs 9–12 of the declaration of Deloitte employee Anil Gosu, Dkt. No. 301, which Deloitte filed with its response brief in opposition to Sagitec's motion for summary judgment.  Sagitec argues that the statement Mr. Gosu made in his declaration regarding his involvement in collecting source code and selecting deposit copies for Deloitte's copyright registrations conflicted with the testimony he gave in earlier depositions.  I those depositions, Sagitec contends, Mr. Gosu stated that he had no memory of being involved with collecting and selecting that material.[24]  Dkt. No. 330.  In its response to Sagitec's motion to strike, Deloitte argues that Mr. Gosu's declaration does not contradict his deposition testimony, and that any discrepancies between the two can be explained.  Dkt. No. 356 (citing *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 209 (3d Cir. 2022)).

The paragraphs that Sagitec seeks to strike from Mr. Gosu's declaration relate to the process by which Deloitte selected source code for registration with the Copyright Office, and to Mr. Gosu's involvement in that process.  In particular, Sagitec targets portions of Mr. Gosu's

---

[24]   Mr. Gosu was deposed as a Rule 30(b)(6) witness, but at his first deposition he was unprepared to testify on certain of the designated topics.  For that reason, I permitted Sagitec to take a second deposition of Mr. Gosu limited to the topics about which he had been unprepared to testify at his first deposition.  Dkt. Nos. 236, 237.

declaration in which he confirmed that he was the person who collected the uFACTS code for the deposit Deloitte made with the Copyright Office, that the code is stored at Deloitte's SharePoint site, that he collected the same version that Deloitte registered from the SharePoint site and compared the deposit  copies with the folders from the SharePoint site that were produced in this case.  Dkt. No. 301 at ¶ 9.  Mr. Gosu also identified the versions of the uFACTS program that Deloitte registered and produced in this case, *id.* at ¶ 10, and he stated that he reviewed the certificates of registration issued for the versions of the uFACTS code that were registered and determined that they are consistent with his review of the code produced to Sagitec, *id.* at ¶ 11. With respect to the "last modified" dates in the metadata for some of the files in the folders that Deloitte produced, Mr. Gosu explained that the "last modified" dates did not indicate that the code was changed, but likely occurred "when folders were moved on the system, or when certain system components run on a machine, such as maintenance checks compiling, and system backups."  *Id.* Finally, in paragraph 12 of his declaration, Mr. Gosu stated that Deloitte registered an instance of uFACTS called uFACTS (Mass: Benefits), which was from the 2013 version of the Massachusetts implementation of the uFACTS solution, on which he was a developer.  *Id.* at ¶ 12.  He stated that as part of that project, Deloitte supplied Massachusetts with a July 1, 2013, "go-live" version of the program that was a draft of the uFACTS code.  *Id.*

At his first deposition, which took place before Mr. Gosu executed his declaration, he was asked a number of questions regarding the development and registration of the uFACTS program. In particular, he was asked how long he worked on the Massachusetts project, to which he answered about six to eight months.  Dkt. No. 331-1, Exh. 1 at 32:16–36:2.  He was also asked, repeatedly, whether he had been involved with the collection or selection of code relating to the deposit for copyright registration.  He answered that he did not recall whether he had done anything

specific with respect to copyright registration of the materials relating to the Massachusetts project. *Id.* at 195:14–205:15.

At his second deposition, Mr. Gosu was asked if he could determine whether any source code files produced in this case were modified in any way in connection with the Massachusetts QUEST project. He answered that he would not be able to answer that question "without knowing the date and time stamp." Dkt. No. 331, Exh. 2 at 345:13–346:5. He also testified that he did not know when any of the specific portions of the uFACTS source code were drafted or by whom. *Id.* at 344:11–345:2.

In support of its motion to strike Mr. Gosu's declaration, Sagitec invokes the "sham affidavit" line of cases. Those cases hold that a party may not avoid summary judgment by trying to overcome a witness's damaging admissions in a deposition by having the witness submit an affidavit that contradicts earlier deposition testimony without providing a plausible explanation for the witness's reversal of position. Such a declaration is termed a "sham affidavit," and if the court concludes that "no reasonable jury could accord the affidavit evidentiary weight," the court can disregard the affidavit for purposes of defending against the opposing party's summary judgment motion. *Crawford v. George & Lynch, Inc.*, 19 F. Supp. 3d 546, 557–58 (D. Del. 2013) (citing *Jimenez v. All Am. Ratskeller*, 503 F.3d 247, 253 (3d Cir. 2007)). As Sagitec points out, a court may conclude that a declaration is a "sham affidavit" when it contains facts that the affiant previously testified he could not remember. *Crawford*, 19 F. Supp. 3d at 557 (citing *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012)).

While the differences between Mr. Gosu's testimony during his depositions and his statements in his declaration may raise questions for the finder of fact as to the credibility of the positions Mr. Gosu espoused in his declaration, the conflicts are not so stark as to justify striking

77

the declaration altogether.  Instead, any differences between the positions Mr. Gosu took during his depositions and in his declaration (or between the testimony he gave in his depositions and the testimony he may ultimately give at trial) can be exploited by Sagitec on cross-examination.

In *SodexoMAGIC, LLC v. Drexel University*, 24 F.4th 185 (3d Cir. 2022), the Third Circuit recently addressed the "sham affidavit" rule and emphasized that it should be applied narrowly. To begin with, the court explained that because summary judgment "does not present an occasion to make credibility assessments," the sham affidavit rule "does not apply to noncontradictory portions of the declarations"; it permits striking "only contradictory statements in later-provided affidavits or declarations." *Id.* at 210.  The court added that the sham affidavit rule "does not reject later statements solely because they conflict with prior deposition testimony." *Id.*  For example, the court stated, "[w]hen a later statement is supported by independent record evidence, courts generally refuse to strike those statements." *Id.*

In this case, Mr. Gosu's declaration did not contradict his deposition testimony.  After having testified that he did not recall whether he had been the person who collected the code for the deposits for Deloitte's copyright registrations, Mr. Gosu stated in his declaration that after his deposition he "confirmed that I am the one who collected the code for the deposit." Dkt. No. 301 at ¶ 9.

An asserted lack of memory, corrected after an opportunity to confirm the facts about which the witness was questioned, is not the type of contradictory statement that typically triggers the sham affidavit rule.  *See Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004); *Martin v. Merrell Dow Pharms., Inc.*, 851 F.2d 703, 705 (3d Cir. 1988).  It is not unusual, or necessarily suspect, for a witness to have a lack of recollection of a subject on which the witness is questioned, but to refresh

78

his recollection after his initial testimony. In such situations, a "subsequent correcting or clarifying affidavit may be sufficient to create a material dispute of fact." *Martin*, 851 F.2d at 705.

Contrary to Sagitec's argument, there is also no reason to strike the portions of Mr. Gosu's declaration in which he stated that the "last modified" date in the metadata of the produced source code files does not reflect later edits to the code, but instead is likely due to computer system changes. Dkt. No. 301 at ¶ 11. It is true that at his deposition Mr. Gosu could not identify when certain source code files were created or modified in connection with the QUEST project. But he was not asked about the meaning of the "last modified" date in the source code metadata at that time. There was thus no contradiction in that respect between Mr. Gosu's deposition testimony and his declaration.

Finally, Mr. Gosu's statements in his declaration as to who collected the code for the copyright registration and what the "last modified" date meant were corroborated by deposition testimony from other witnesses—Deloitte employees Scott Malm and Annica Jin-Hindel. *See* Dkt. Nos. 357-2, Exh. 2, and 357-7, Exh. 7. The presence of such corroborating evidence is another factor that weighs against exclusion of a post-deposition affidavit on "sham affidavit" grounds. *See Baer*, 392 F.3d at 625 ("When there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit"); *Quest Integrity USA, LLC v. Cokebusters USA Inc.*, 924 F.3d 1220, 1234 (Fed. Cir. 2019); *McLaughlin v. Bayer Essure Inc.*, No. 14-cv-7315, 2019 WL 9171008, at *2 (E.D. Pa. Oct. 21, 2019); *Bumbarger v. New Enterprise Stone & Lime Co.,* 170 F. Supp. 3d 801, 819 (W.D. Pa. 2016).

I therefore deny Sagitec's motion to strike Mr. Gosu's declaration for purposes of consideration in connection with Deloitte's response to Sagitec's motion for summary judgment, and I will not bar him from testifying at trial on the issues he addressed in his declaration.

**F. Deloitte's Motion for Sanctions (Dkt. Nos. 296, 297, 350, and 363).**

Deloitte argues that Sagitec maintained folders containing wrongfully acquired copies of uFACTS, which Sagitec used in developing Neosurance. Dkt. No. 297 at 1. Deloitte argues that Sagitec intentionally deleted those folders and the files within them at the direction of Mr. Minkkinen in order to conceal them from Deloitte during litigation. *Id.* at 12. At the time those materials were deleted, Deloitte argues, it was reasonably foreseeable that Deloitte would file suit based on the misappropriation of Deloitte's protected materials. For those reasons, Deloitte submits that Sagitec's deletion of the folders constitutes spoliation of evidence. Deloitte asks that I sanction Sagitec by instructing the jury to draw an adverse inference that the deleted folders "contained the uFACTS solution, including the instance asserted by Deloitte in this case, and the associated uFACTS use cases" and by striking Sagitec's statute of limitations defenses. *Id.* at 19–20.

Sagitec responds that even though specific folders may have been deleted, Sagitec has produced all the allegedly missing materials from other locations, including the specific "uFACTS Application" and "uFACTS use cases" that Deloitte contends were deleted. Dkt. No. 350 at 1. Sagitec argues that no data has been lost, and therefore that sanctions for spoliation would be inappropriate. *Id.* Even if the data in question was lost, Sagitec argues that Deloitte has failed to meet its burden to prove that Sagitec acted with bad faith or with the intent to deprive Deloitte of the information, and for that reason the "extreme sanctions" Deloitte requests would not be justified. *Id.* at 1–2.

In reply, Deloitte challenges Sagitec's assertion that all the allegedly missing material has been produced. Deloitte argues that while it has received some uFACTS material from Sagitec, it has not received the full contents of the deleted folders. Dkt. No. 363 at 1–2. In addition, Deloitte

correctly notes that Sagitec proposes an incorrect legal standard for spoliation by arguing that Deloitte must prove spoliation by "clear and convincing evidence." As Deloitte points out, the preponderance of the evidence standard is the appropriate standard for proving spoliation. *Id.* at 2–3 (citing *Hoffer v. Tellone*, 128 F.4th 433, 439–440 (2d. Cir. 2025); *Tolbert v. Baldwin*, 2025 WL 1361284, at *3 (E.D. Pa. May 9, 2025)). Finally, Deloitte argues that Sagitec was under a duty to preserve evidence at the time the files were deleted. *Id.* at 3. Sagitec disagrees and contends that its duty to preserve evidence did not arise until much later, after the files in question had been deleted.

While the exact date when the folders were deleted is uncertain, it appears that they were deleted at some point between 2018, when Sagitec's Neosurance developer Karthik Sadasivam was allegedly instructed to delete the folders, and 2020, when Sagitec first issued a litigation hold with respect to prospective evidence in this case. *Id.* at 4–5.[25]

The central question that I must consider in assessing whether spoliation sanctions are appropriate is whether "there has been actual suppression or withholding of the evidence." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012)). In order to find that there has been sanctionable suppression or withholding of evidence, a court must find that the party in possession of the evidence acted intentionally and in bad faith. *See* Fed. R. Civ. P. 37(e)(2) (sanctions are appropriate "only upon finding that the party acted with the intent to deprive another party of the

---

[25] During his deposition in this case, Mr. Sadasivam asserted his Fifth Amendment right against compelled self-incrimination and refused to answer questions relating to whether he had deleted the folders. Dkt. No. 297 at 12. Available statements and documents show that he was instructed to delete the folders at some time in 2018. Sagitec does not appear to dispute that assertion other than by challenging it as hearsay. However, Sagitec does dispute whether the deletion of the folders was actually carried out at that time, as directed in those instructions. *Id.* at 12; Dkt. No. 350 at 7.

information's use in the litigation"); *see also Bull*, 665 F.3d at 77 (party seeking sanctions has the burden to prove the other party's bad faith); *id.* at 79 (inference of actual suppression or withholding of evidence arises when destruction of evidence was intentional and indicates fraud and a desire to suppress the truth) (citing *Brewer v. Quaker State Oil Refin. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995)).

It is unclear from the parties' briefs what, if anything, Deloitte believes has been rendered unrecoverable as a result of the deletion of the folders and has not been produced from other sources. Deloitte asks me to direct the jury to draw an adverse inference that "Sagitec's internal SharePoint server, and the deleted uFACTS SharePoint Folders in particular, contained the uFACTS solution, including the asserted uFACTS Application as delivered to Massachusetts and produced by Deloitte, as well as the uFACTS use cases asserted by Deloitte." Dkt. No. 297 at 3. However, Sagitec asserts that it has in fact produced "(1) the 'uFACTS backup' folder containing a complete version of Massachusetts QUEST Project code, and (2) use case libraries from Massachusetts and New Mexico" and that Deloitte has failed to identify any additional information that it alleges was deleted and not produced elsewhere. Dkt. No. 350 at 13.

Deloitte argues that the material to which Sagitec refers may be similar to, but is not the same as, the material Deloitte alleges was deleted. Dkt. No. 363 at 8. However, Deloitte's argument appears to be that the folders and their structure constitute the information that was deleted and is unrecoverable, not that the underlying information itself has not been produced elsewhere. *Id.* Deloitte has not shown that the materials that Sagitec has produced differ from the materials that were contained in the now-deleted folders. Given that it is Deloitte's burden to make such a showing in order to be entitled to a finding of spoliation and the imposition of sanctions, I decline to impose sanctions based on the evidence currently before me.

82

To be sure, Deloitte will be free to offer further evidence at trial that Mr. Minkkinen (or others at Sagitec) arranged for the destruction of the folders in question, and the effect that the destruction of the folders has had on Deloitte's case.  If it does so successfully, Deloitte can seek reconsideration at that time of its request for sanctions.

Even in the absence of additional evidence on this issue, Deloitte will be free to argue that Mr. Minkkinen's conduct with respect to the copied files is indicative of an awareness of culpability.  *See* Advisory Committee Note on the 2015 Amendment to Fed. R. Civ. P. 37  (stating that Rule 37(e)(2) "would not prohibit a court from allowing the parties to present evidence to the jury concerning the loss and likely relevance of information and instructing the jury that it may consider that evidence, along with all the other evidence in the case, in making its decision.").

On the facts of this case, Deloitte's requested sanction of instructing the jury to draw an adverse inference that Sagitec's SharePoint server contained the uFACTS material would be only marginally more helpful to Deloitte than the evidence of Mr. Minkkinen's instructions to dispose of the files.  As for Deloitte's other requested sanction—to strike Sagitec's statute of limitations defense—that sanction bears no relation to the alleged misconduct.  Had the files not been removed, the best outcome for Deloitte would have been that Deloitte would have been able to obtain the files in discovery.  That would have had no apparent effect in enhancing Deloitte's ability to avoid the statute of limitations problem, which stemmed from Deloitte's failure, at a much earlier point, to file suit on a timely basis.

## IV.    Conclusion

Deloitte's motion for summary judgment on the issues of fair use and unclean hands is GRANTED.  Sagitec's motion for summary judgment on copyright registration is DENIED. Sagitec's motion for summary judgment on the statute of limitations defense is GRANTED IN PART and DENIED IN PART.  Sagitec's motion to strike the opinions of Dr. Krein and Mr. Britven is DENIED.  Sagitec's motion to strike portions of the declaration of Mr. Gosu is DENIED.  And Deloitte's motion for sanctions is DENIED.

\* \* \* \* \*

A number of the parties' submissions relating to their pretrial motions have been filed under seal.  For that reason, this order is being filed under seal to avoid the inadvertent disclosure of confidential materials.  Within five business days of the filing of this order, the parties are directed to file with the court a redacted version of this order, redacting any materials that the parties believe should be sealed because of confidentiality concerns.  Any claim that particular material should be sealed must be supported by a compelling showing of particularized need for the designated material to be protected against disclosure.

IT IS SO ORDERED.

SIGNED this 19th day of February, 2026.

_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

84