IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DELOITTE CONSULTING LLP and DELOITTE DEVELOPMENT LLC, | ) ) ) | |
| Plaintiffs, | ) ) | **Redacted - Public Version** |
| v. | ) ) | C.A. No. 23-325-WCB |
| SAGITEC SOLUTIONS LLC, | ) ) ) | |
| Defendant. | ) | |

**PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO SAGITEC SOLUTIONS LLC'S MOTION FOR A COPYRIGHTABILITY HEARING**

OF COUNSEL:
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Gregg F. LoCascio
Nicholas Teleky
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave NW
Washington, DC 20004
(202) 389-5000

John F. Hartmann
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorney for Plaintiffs Deloitte Consulting LLP and Deloitte Development LLC*

Miranda D. Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7419

Ariel Deitchman
KIRKLAND & ELLIS LLP
Three Brickell City Centre
98 S.E. 7th Street, Suite 700
Miami, FL 33131
(305) 432-5676

Julien Jean-George Crockett
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
(415) 439-1400

Dated: March 13, 2026

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS AND SUMMARY OF THE
     ARGUMENT.................................................................................................................. 1

RESPONSE TO SAGITEC'S STATEMENT OF FACTS ........................................................ 2

ARGUMENT............................................................................................................................ 4

I.     Copyrightability Should Be Decided by the Jury ............................................. 4

II.    A Copyrightability Hearing is Unnecessary in This Case............................... 7

III.   Sagitec Should Not Be Allowed a Second Summary Judgment Motion .................... 12

CONCLUSION ........................................................................................................................ 13

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABR Benefits Servs., Inc. v. NCO Grp.*,
  1999 WL 695596 (E.D. Pa. Sept. 9, 1999) ................................................................4

*Beijing Meishe Network Technology Co., Ltd. v. TikTok Inc.*,
  No. 3:23-cv-06012-SI (N.D. Cal. Sept. 2, 2025), ECF No. 731 .......................................10, 11

*BUC Int'l Corp. v. Int'l Yacht Council Ltd.*,
  489 F.3d 1129 (11th Cir. 2007) ................................................................4

*Coston v. Prod. Movers*,
  1990 WL 56516 (E.D. Pa. May 2, 1990) ................................................................7

*Eng'g Dynamics, Inc. v. Structural Software, Inc.*,
  26 F.3d 1335 (5th Cir. 1994) ................................................................7

*Ets-Hokin v. Skyy Spirits, Inc.*,
  225 F.3d 1068 (9th Cir. 2000) ................................................................4

*Freeman v. Deebs-Elkenaney*,
  2025 WL 3493747 (S.D.N.Y. Dec. 5, 2025) ................................................................11

*Griffin v. Sheeran*,
  351 F. Supp. 3d 492 (S.D.N.Y. 2019)................................................................4, 5

*Matthew Bender & Co. v. W. Pub. Co.*,
  158 F.3d 674 (2d Cir. 1998)................................................................5

*Morelli, v. Tiffany & Co.*,
  2001 WL 179898 (E.D. Pa. Jan. 10, 2001) ................................................................5

*Motorola Sols. Inc. v. Hytera Commc'ns Corp.*,
  No. 17 Civ. 1973 (N.D. Ill. Feb. 14, 2020), ECF No. 895................................................................8

*Oracle Am., Inc. v. Google Inc.*,
  750 F.3d 1339 (Fed. Cir. 2014)................................................................7

*Paul Morelli Design, Inc. v. Tiffany & Co.*,
  200 F. Supp. 2d 482 (E.D. Pa. 2002) ................................................................4, 8

*Publ'ns Int'l, Ltd. v. Meredith Corp.*,
  88 F.3d 473 (7th Cir. 1996) ................................................................7

*Real View, LLC v. 20-20 Technologies, Inc.*,
    683 F. Supp. 2d 147 (D. Mass. 2010) ...................................................................9

*Real View, LLC v. 20-20 Techs., Inc.*,
    No. 1:07-cv-12157-PBS (D. Mass. 2009), ECF No. 36 ..........................................9

*SAS Inst., Inc. v. World Programming Ltd.*,
    64 F.4th 1319 (Fed. Cir. 2023) ...................................................................7, 8, 9, 12

*Southco, Inc. v. Kanebridge Corp.*,
    390 F.3d 276 (3d Cir. 2004)...................................................................................6

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*,
    No. 1:15-cv-00211-LGS-SDA (S.D.N.Y. June 30, 2025), ECF No. 931 .................8

*TD Bank, N.A. v. Hill*,
    2015 WL 4523570 (D.N.J. July 27, 2015)..............................................................6, 7

*Thomson Reuters Enterprise Center GmbH et al. v. Ross Intelligence, Inc.*,
    No. 1:20-cv-00613-SB (D. Del. July 18, 2024).....................................................11

*Webloyalty.com, Inc. v. Consumer Innovations, LLC*,
    2005 WL 468496 (D. Del. Feb. 17, 2005) .............................................................6

*Whelan Assocs, Inc. v. Jaslow Dental Lab'y., Inc.*,
    797 F.2d 1222 (3d Cir. 1986)...............................................................................8, 9

*William A. Graham Co. v. Haughey*,
    2006 WL 1704539 (E.D. Pa. June 14, 2006) ........................................................4

*Woodley Architectural Grp., Inc. v. Lokal Communities, LLC*,
    2025 WL 2774035 (D. Colo. Sept. 26, 2025)........................................................10

*Yankee Candle Co. v. Bridgewater Candle Co., LLC*,
    259 F.3d 25 (1st Cir. 2001)...................................................................................7

*Zahourek Sys., Inc. v. Balanced Body Univ., LLC*,
    965 F.3d 1141 (10th Cir. 2020) ............................................................................4

**Statutes**

17 U.S.C. § 101.......................................................................................................5

**Rules**

Fed. R. Civ. P. 16....................................................................................................12

**Other Authorities**

National Commission on New Technological Uses of Copyrighted Works, Final Report 1 (1979) .................................................................................................5

Nimmer on Copyright ...........................................................................................5

## NATURE AND STAGE OF THE PROCEEDINGS AND SUMMARY OF THE ARGUMENT

Sagitec's Motion for a Copyrightability Hearing (D.I. 379 (the "Motion")) bears all the hallmarks of a last-ditch attempt by Sagitec to further delay a trial in which it will have to answer for its malfeasance before a jury.  Among other problems, the Motion seeks a burdensome and time-consuming pre-trial evidentiary hearing that has never before been granted by any Court in this Circuit and does so on the highly dubious basis that what has routinely been found in this Circuit to be a question of mixed law and fact (and therefore one on which the jury decides based on instructions), should instead be treated in this case as a pure question of law.  Moreover, in the few jurisdictions in which a copyrightability hearing has been granted, the issue was almost uniformly decided before, or in conjunction with, the defendant's summary judgment motion.  As the Court knows, that time has passed in this case, with the Court having allowed Deloitte's copyright and New York trade secrets causes of action to be tried to a jury.  After years of litigation, the time has come for the jury to hear the evidence and no prior hearing on copyrightability is warranted.

Sagitec's motion should be denied for at least three reasons.  ***First***, whether particular elements of a copyrighted work are "copyrightable" is relevant to substantial similarity, which requires assessing whether a defendant copied sufficient protectable expression from a plaintiff to constitute "actionable" copying.  In the Third Circuit, substantial similarity is decided by the fact-finder.  As to mixed questions of law and fact such as this one, courts in the Third Circuit—and courts generally in the vast majority of copyright cases around the country—proceed by instructing the jury on the law, and having the jury apply that law to the facts of the case to determine whether the defendant copied protectable expression.  Indeed, Sagitec's own Brief raises a host of factual disputes, including conflicting positions between the parties and their experts as to the content of

the copyrighted material and the extent of Sagitec's copying. Br. 1–2, 6. In other words, there is simply no Third Circuit support for treating copyrightability as a pure question of law to be decided by the Court alone.

*Second*, Sagitec argues that courts "regularly conduct (or at least schedule) copyrightability hearings before a jury is tasked with evaluating substantial similarity at trial." Br. 4. Again, Sagitec misstates the law. The very cases Sagitec cites demonstrate that copyrightability hearings, if held at all, take place in very specific situations: typically, to assist the court in deciding motions for summary judgment. In other words, such procedures make sense where there are no genuine disputes of material fact, such that no jury need be empaneled. Here, Sagitec moved for summary judgment on Deloitte's copyright claim, and the Court denied the motion it made due to, among other things, factual disputes requiring resolution by the jury.

*Third*, Sagitec contends that "[c]opyrightability is a central, unresolved legal issue in this case." Br. 6. But even if the Court were to accept the dubious proposition that copyrightability involves a pure question of law, Sagitec provides no justification for the improper timing of its motion. Nothing prevented Sagitec from raising the issue as part of its summary judgment motion, which was largely denied. Its tactical decision to defer this issue until after a trial date had been set is telling, to say the least. This Court should deny Sagitec's motion and direct the parties to prepare for the trial scheduled for July 13.

### RESPONSE TO SAGITEC'S STATEMENT OF FACTS

Although the Court is familiar with the facts of this case from the parties' summary judgment motions, as Sagitec's motion misstated the scope of the claims and the copying at issue, Deloitte herein provides further context on what will be at issue at trial.

**uFACTS**. Deloitte developed uFACTS in 2007 and registered uFACTS with the Copyright Office as Registration Nos. TX 8-559-593 (uFACTS (NM: Tax and Benefits)); TX 8-

2

559-594 (uFACTS (Mass: Tax)); and TX 8-559-595 (uFACTS (Mass: Benefits)).  D.I. 299 (Pl.'s Opp. Def.'s Summ. J. Mot.) at 3.

**Sagitec's Copyright Infringement**.  Sagitec copied uFACTS, including copying entire copies of uFACTS onto its servers so it had "backup" copies.  *See id.* at 1, 3-4; *see also* D.I. 376 (Summ. J. Op.) at 11 ("Sagitec does not appear to dispute Deloitte's allegations that all, or nearly all, of the uFACTS software was copied onto Sagitec's servers.").  In addition to the copies of the entire uFACTS code on Sagitec's servers, Sagitec's employees ████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████  *See* D.I. 307 (Pl.'s Opp. Def.'s *Daubert* Mot.) at 8; D.I. 299 (Pl.'s Opp. Def.'s Summ. J. Mot.) at 1.

Sagitec incorrectly states that Dr. Krein "asserts that two primary groups of source code files were copied into Sagitec's Neosurance software: (1) ICON interface files, and (2) database tables."  Br. 1.  Although these instances of copying are significant, Dr. Krein opined that Sagitec copied much more into Neosurance, including ████████████████████

████████████████  D.I. 270-08 (Krein Rpt.) ¶¶ 392–420, and ████████████

████████████  *id*. ¶¶ 421–432.  Further, Sagitec's portrayal of the ICON interface files and database tables is misleading.  Br. 1–2.  As to the ICON interface files, rather than "autogenerated," the copied files include customized code that Deloitte wrote to ████████████████████████  D.I. 270-08 (Krein Rpt.) ¶¶ 374–391.  Similarly, the database tables include specific inputs from Deloitte. *See id.* at ¶ 436.  Dr. Krein provides a detailed analysis of how Deloitte's copyrighted materials were created and how they were copied by Sagitec.  *See generally id.* at ¶¶ 204-209, 333–436.

3

## ARGUMENT

### I.    COPYRIGHTABILITY SHOULD BE DECIDED BY THE JURY

Holding a "copyrightability hearing" to determine which portions of the copied uFACTS source code are protectable is improper because it would impermissibly usurp the role of the jury. Contrary to Sagitec's representations, courts in the Third Circuit reserve copyrightability for the factfinder, deciding summary judgment **only** if there are no disputed material facts. *See, e.g., William A. Graham Co. v. Haughey*, 2006 WL 1704539, at \*2 (E.D. Pa. June 14, 2006) ("copyrightability presented a triable issue"); *Paul Morelli Design, Inc. v. Tiffany & Co.*, 200 F. Supp. 2d 482, 486 (E.D. Pa. 2002) (charging the jury with deciding copyrightability); *ABR Benefits Servs., Inc. v. NCO Grp.*, 1999 WL 695596, at \*1 (E.D. Pa. Sept. 9, 1999) (denying summary judgment "[b]ecause the question of whether Plaintiff's works are deserving of copyright protection is a mixed question of law and fact about which genuine issues of material fact remain[.]").[1]

---

[1] Courts across the country, including panels in the Second Circuit, Ninth Circuit, Tenth Circuit, and Eleventh Circuit have similarly held that copyrightability is a mixed question of fact and law. *See Zahourek Sys., Inc. v. Balanced Body Univ., LLC*, 965 F.3d 1141, 1143 (10th Cir. 2020) ("[W]e consider the copyrightability of the [work] as a mixed question of law and fact."); *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1073 (9th Cir. 2000) ("Whether a particular photograph is protected by copyright law is a mixed question of law and fact"); *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1151 (11th Cir. 2007) ("[t]he jury's determination that [plaintiff's] copyrights were valid was necessarily based on several factual findings, including that [plaintiff's] compilation contained original elements of creative authorship"); *Griffin v. Sheeran*, 351 F. Supp. 3d 492, 497 (S.D.N.Y. 2019) ("Courts 'treat the question whether particular elements of a work

This makes good sense: whether particular elements of a work are copyrightable is a fact-specific inquiry, implicating facts about the creativity involved, whether the material was independently created, and whether a given element of a work is commonplace or *scenes-a-faire*.[2] Indeed, courts have recognized that "[o]riginality is the indispensable prerequisite for copyrightability" and "[t]he issue of the 'originality' of plaintiff's [works] is a question of fact for the factfinder to determine." *Morelli, v. Tiffany & Co.*, 2001 WL 179898, at *1 (E.D. Pa. Jan. 10, 2001) (refusing defendant's request that the court preliminarily determine copyrightability); *see also Griffin*, 351 F. Supp. 3d at 497; Nimmer on Copyright § 12.10 ("threshold factual determinations in this regard, of course, are for the jury" and if the defense to copying "is that the plaintiff's work itself lacked originality because it is copied from prior sources" that "almost always involves a triable issue of fact, therefore precluding summary disposition."). Such issues of fact are clearly present here as demonstrated by Sagitec's Motion, including whether certain

---

demonstrate sufficient originality and creativity to warrant copyright protection as a question for the factfinder.'") (citing *Matthew Bender & Co. v. W. Pub. Co.*, 158 F.3d 674, 681 (2d Cir. 1998)).

[2] Sagitec confuses this concept with a separate issue: whether a work constitutes "copyright protected subject matter." Br. 6. But there is no question that the work at issue is within the subject matter of copyright. The National Commission on New Technological Uses of Copyrighted Works ("CONTU") recommended that the Copyright Act be amended to make explicit that computer programs are the proper subject matter of copyright back in *1979*. National Commission on New Technological Uses of Copyrighted Works, Final Report 1 (1979). Congress adopted those suggestions and added "computer program" as a defined term in the Copyright Act in 1980. 17 U.S.C. § 101.

content was "dictated by the Department of Labor[]" or whether certain ICON interface files are "autogenerated," which are factual questions that must be resolved by the jury.  Br. 2.

To argue that copyrightability is a pure question of law in the Third Circuit, Sagitec quotes cases out of context or cites to cases where the issues of copyrightability could be decided as a matter of law on summary judgment.  Br. 3–4.  For example, Sagitec cites *Southco, Inc. v. Kanebridge Corp.* as "referring to copyrightability as a 'legal issue[,]'" Br. 3, but omits that the portion it quotes comes from is a dissenting opinion stating an appeals court may review the decisions of the Copyright Office *de novo*.  390 F.3d 276, 299 (3d Cir. 2004).  Similarly, Sagitec cites *Webloyalty.com, Inc. v. Consumer Innovations, LLC* as finding the "protectability of copyrighted material . . . is an issue of law I will have to determine at a later time[,]" Br. 3, but again omits the context of the statement: it is dicta within a motion *in limine* decision where the court noted that "the protectability of copyrighted material" was improperly raised at the pre-trial conference and the court determined that because "there was no indication in the pre-trial order that this was an unresolved issue" it would determine the protectability of copyrighted materials "at a later time."  2005 WL 468496, at *2 (D. Del. Feb. 17, 2005).  Sagitec also cites *TD Bank, N.A. v. Hill* for the proposition that "copyright protectability 'becomes a matter of law for the Court to decide[,]'" Br. 3, but leaves out that in that case it "became" a matter of law because the court was deciding a summary judgment motion on the issue where there were no material factual disputes.  2015 WL 4523570, at *13–14 (D.N.J. July 27, 2015) (recognizing if "copying is found, then 'the fact-finder is to determine whether a 'lay-observer' would believe that the copying was of protectible aspects of the copyrighted work.'"), *aff'd but criticized*, 928 F.3d 259 (3d Cir.

2019).[3]  Similarly, Sagitec cites *Coston v. Prod. Movers* for the same proposition, Br. 3, but here again the court was deciding the issue on summary judgment.  1990 WL 56516, at *3 (E.D. Pa. May 2, 1990).[4]

## II.    A COPYRIGHTABILITY HEARING IS UNNECESSARY IN THIS CASE

In almost every copyright case that goes to a jury, the jury is instructed as to what constitutes protectable content and how to conduct the substantial similarity analysis in the relevant

---

[3] In *TD Bank*, the defendant alleged that what the defendant copied was unprotectable *scenes-a-faire* and the court found that did not apply as a matter of law because of "Defendant's significant verbatim copying."  *Id.* at *17.

[4] Sagitec also cites decisions from the First Circuit, Fifth Circuit, and Seventh Circuit, but fails to mention that these Circuits apply the "abstraction-filtration-test," which as discussed in Section II is not applied in the Third Circuit.  Further,  these cases are not as clear cut as Sagitec wants them to seem when there are factual disputes at play.  *SAS Inst., Inc. v. World Programming Ltd.*, 64 F.4th 1319, 1329 (Fed. Cir. 2023) (applying Fifth Circuit law and finding copyrightability is "a legal issue that may involve subsidiary factual findings"); *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1378-79 n.3 (Fed. Cir. 2014) ("We need not address [whether copyrightability is a question of law or a mixed question of law and fact], because the parties here agreed that the district court would decide copyrightability, and both largely agree that we may undertake a review of that determination de novo."); *Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 259 F.3d 25 (1st Cir. 2001) (applying First Circuit law); *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1342 (5th Cir. 1994), opinion supplemented on denial of reh'g, 46 F.3d 408 (5th Cir. 1995) (recognizing "factual content" of copyrightability); *Publ'ns Int'l, Ltd. v. Meredith Corp.*, 88 F.3d 473 (7th Cir. 1996) (applying Seventh Circuit law).

jurisdiction.  *See, e.g.,* Jury Instructions, *Motorola Sols. Inc. v. Hytera Commc'ns Corp.*, No. 17 Civ. 1973 (N.D. Ill. Feb. 14, 2020), ECF No. 895 at 43, 45–56 (Ex. A) (charging jury with deciding whether defendant "copied protected expression from the work" and defining "what constitutes protected expression and what does not, in order to aid [the jury] in this process"); Jury Verdict, *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.,* No. 1:15-cv-00211-LGS-SDA (S.D.N.Y. June 30, 2025), ECF No. 931 (Ex. B) (similar); *Paul Morelli Design, Inc.*, 200 F. Supp. 2d at 486 (charging the jury with deciding copyrightability).  There is no reason to diverge from this standard procedure here.

The cases Sagitec cites that have held copyrightability hearings demonstrate why one is not appropriate here.  **First**, in *SAS Inst.*, the principal case on which Sagitec relies, the court was faced with analyzing on summary judgment the copyrightability of nonliteral elements of a computer program, *i.e.*, aspects of the computer program other than the computer code itself.  64 F.4th at 1326.  That is different from this case for two principal reasons.  First, the court held a hearing to assist it on summary judgment.  Here, Sagitec already moved for summary judgment, and the motion was denied.  Second, the *SAS* court performed what is called the abstraction-filtration-comparison test to determine which portions of the copyrighted program are protectable. By contrast, courts in the Third Circuit apply the *Whelan* test.  The *Whelan* test is a far more permissive and straightforward test.  Under *Whelan*, the overall function of the computer program **is** the unprotectable "idea," and all elements in the computer program that are not strictly "necessary" to effectuate the function of the program, constitute expression, not ideas. *Whelan Assocs, Inc. v. Jaslow Dental Lab'y., Inc.*, 797 F.2d 1222, 1236 (3d Cir. 1986).  Moreover, substantial similarity is determined as part of a single analysis, rather than in stages as in the abstraction-filtration-comparison test, by simply comparing the two works and considering both

expert and lay testimony on their similarity. *Id.* There is no reason that the jury cannot do this and simply rely on jury instructions, lay testimony, and expert testimony to inform their assessment. Neither the jury nor the Court (which, tellingly, has not even been asked to decide substantial similarity as a matter of law) needs to conduct anything close to the complex abstraction analysis that occurred in *SAS* to assess substantial similarity.[5]

Moreover, unlike in *SAS*, Sagitec copied ***literal*** elements of an ***entire*** computer program, *i.e.* virtually all of the uFACTS source code. *See* D.I. 376 (Summ. J. Op.) at 11 ("Sagitec does not appear to dispute Deloitte's allegations that all, or nearly all, of the uFACTS software was copied onto Sagitec's servers."). This makes Sagitec's request even more questionable. It would be like conducting an evidentiary hearing to determine which aspects of the idea of a wizarding school are unprotectable in a case where a pirate copied the entirety of "Harry Potter"—a pointless exercise. To the extent that there are portions of code that are not original to Deloitte, the jury will already be instructed on how to approach unprotectable content in the substantial similarity

---

[5] Sagitec also cites *Real View, LLC v. 20-20 Technologies, Inc.* and there, too, the court held a copyrightability hearing as part of a "abstraction-filtration-comparison" in conjunction with summary judgment. 683 F. Supp. 2d 147, 153 (D. Mass. 2010); *see also* Memorandum in Support of Motion for Pre-Trial Hearing on Copyrightability, *Real View, LLC v. 20-20 Techs., Inc.*, No. 1:07-cv-12157-PBS (D. Mass. 2009), ECF No. 36 at 3 (Ex. C) ("The copyrightability of the similarities identified by 20-20 is the focus of Real View's summary judgment motion. 20-20 will have filed its opposition to that motion by July 1, 2009. Thus, the question of which items in the 20-20 software are appropriate for copyright protection will be before the Court in the form of those motions, and little or no additional briefing would be required.").

analysis and will be instructed on what qualifies as protectable under the law.  Both sides have disclosed experts to assist the jury in analyzing the material.  D.I. 270-8 (Krein Rpt.); D.I. 310-01 (Myers Rpt.).  And the parties can then argue to the jury about what should and should not be part of that comparison.

*Second*, all but one of Sagitec's cases was in connection with or prior to a pending summary judgment motion, making this case different from the procedural posture in which a copyrightability hearing virtually always takes place.  In *Woodley Architectural Grp., Inc. v. Lokal Communities, LLC,* for example, the court held that a copyrightability hearing could be used "in lieu of following the Court's procedures for filing a summary judgment motion."  2025 WL 2774035, at *2 (D. Colo. Sept. 26, 2025) ("resolving certain disputes regarding whether elements . . . are not protectable may require the parties to present expert testimony and other evidence").[6]

---

[6] Sagitec also cites an order in *Beijing Meishe Network Technology Co., Ltd. v. TikTok Inc.*, but that order for a copyrightability hearing came prior to summary judgment.  No. 3:23-cv-06012-SI (N.D. Cal. July 24, 2025), ECF No. 643 (Ex. D). In its later order on summary judgment, the Court noted that it was "not convinced by defendants' contention that these [copyrightability issues] are necessarily decisions for the judge to make before a case is presented to the jury. Certainly a judge must decide issues of copyrightability before issuing summary judgment on the question infringement. But when there are disputed issues of material fact, courts have tasked juries with applying the extrinsic test. . . . Since the parties' experts disagree about the extent of originality within plaintiff's copyrighted source code, the Court finds this question better suited for the ultimate fact finder in this case. . . . These issues can and should be decided at trial through the presentation of evidence to the jury and the crafting of appropriate jury instructions."  Order,

The only case Sagitec cites where a copyrightability hearing took place after summary judgment was *Freeman v. Deebs-Elkenaney*, but even that out-of-Circuit case involved a district court judge who noted that "the court should have used the summary judgment motions to parse out what aspects of the works at issue are copyrightable and what aspects are not." 2025 WL 3493747, at *1 (S.D.N.Y. Dec. 5, 2025).

  ***Finally***, Sagitec cites to Orders entered in *Thomson Reuters Enterprise Center GmbH et al. v. Ross Intelligence, Inc.*, as a recent Delaware case where the court "ordered the parties to submit briefing for a filtration analysis, although it ultimately did not filter out specific content in that case." Br. 5. *Thomson Reuters*, however, aptly demonstrates why such a hearing is not necessary here.[7]  To start, the court ultimately decided ***not*** to hold a copyrightability hearing. No. 1:20-cv-00613-SB (D. Del. July 18, 2024), ECF Nos. 612, 613 (Ex. F).  And that was despite the case concerning copying of tens of ***thousands*** of individual headnotes from Westlaw, and the court expressing concern about how all of that material could be presented to the jury.  *Id.*  The court ordered the parties to submit lists with all the Westlaw headnotes that were verbatim copies of judicial opinions, so that the jury would consider only the Westlaw headnotes that differed from the judicial opinions.  This case presents no similar unwieldy evidentiary issues.

---

*Beijing Meishe Network Technology Co., Ltd. v. TikTok Inc.*, No. 3:23-cv-06012-SI (N.D. Cal. Sept. 2, 2025), ECF No. 731 (Ex. E) at 26-28.

[7] Sagitec also cites *Lerch Bates, Inc. v. Michael Blades & Assocs., Ltd.*, but *Lerch* simply cites to *SAS* and states that the Court may hold a pretrial copyrightability hearing.  2023 WL 6276643, at *12 n. 13 (D.D.C. Sept. 26, 2023).

11

### III. SAGITEC SHOULD NOT BE ALLOWED A SECOND SUMMARY JUDGMENT MOTION

Ultimately, Sagitec's motion is nothing more than a thinly veiled attempt at a second bite at summary judgment. This is demonstrated by Sagitec's contention that "although the Court held at summary judgment that there are factual disputes about Deloitte's copyright registrations, Sagitec's requested copyrightability hearing is directed to a ***separate, unresolved legal issue[]***" and "[c]opyrightability is a ***central, unresolved legal issue*** in this case." Br. 5-6. It is too late for Sagitec to raise purported "unresolved legal issues," as confirmed by Sagitec's cited caselaw. *Id.* Despite citing the Court's "broad discretion under Fed. R. Civ. P. 16(c)(2)(L) to hold an evidentiary pretrial copyrightability hearing," and stating without support that a "copyrightability hearing is often held after summary judgment," no case Sagitec cites applies Fed. R. Civ. P. 16(c)(2)(L) to hold such a hearing.[8] And no issue precluded Sagitec from raising these arguments at the appropriate juncture despite this court's clear warning that Sagitec "will not be allowed to file multiple summary judgment motions in this case." D.I. 107 at 2.

Trial is set to begin on July 13. Now, instead of preparing for trial, the parties face the prospect of preparing for another hearing to resolve issues that, were they truly pure issues of law involving no underlying disputed facts, should have been raised and resolved on summary

---

[8] The only case to have invoked Fed. R. Civ. P. 16(c)(2)(L) to hold a copyrightability hearing is *SAS* but as discussed above, the request to hold a copyrightability hearing in *SAS* was in the context of summary judgment. *SAS, Inst.*, 64 F.4th at 1324 ("Both parties moved for summary judgment on non-infringement and copyrightability. The district court decided to hold a special hearing to assist it in deciding the scope of protection provided under copyright law to the elements asserted by SAS.").

judgment.  Moreover, Sagitec's amorphous request does not explain how the outcome of that hearing would have any bearing on the task now before the Court to hold a jury trial to determine Sagitec's copyright liability and damages.  Sagitec's request comes too late and is unnecessary.

## CONCLUSION

For the foregoing reasons, Deloitte requests that the Court deny Sagitec's motion for a copyrightability hearing, and direct the parties to begin preparation for their upcoming trial.

OF COUNSEL:
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Gregg F. LoCascio
Nicholas Teleky
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave NW
Washington, DC 20004
(202) 389-5000

John F. Hartmann
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Miranda D. Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7419

/s/ Andrew E. Russell
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorney for Plaintiffs Deloitte Consulting LLP and Deloitte Development LLC*

13

Ariel Deitchman
KIRKLAND & ELLIS LLP
Three Brickell City Centre
98 S.E. 7th Street, Suite 700
Miami, FL 33131
(305) 432-5676

Julien Jean-George Crockett
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
(415) 439-1400

Dated: March 13, 2026

14

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2026, this document was served on the persons listed below in the manner indicated:

**BY EMAIL:**

Anne Shea Gaza
Robert M. Vrana
YOUNG CONAWAY STARGATT
  & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

Christopher K. Larus
Rajin S. Olson
William E. Manske
THOMPSON HINE LLP
800 Nicollet Ave., Suite 2925
Minneapolis, MN 55402
(877) 628-5500
christopher.larus@thompsonhine.com
rajin.olson@thompsonhine.com
william.manske@thompsonhine.com

/s/ Andrew E. Russell
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Plaintiffs Deloitte Consulting LLP and Deloitte Development LLC*

# **EXHIBIT A**

PK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

### Before the Honorable Judge Charles R. Norgle, Sr.

MOTOROLA SOLUTIONS, INC., ET AL.,

      Plaintiffs,

      v.

HYTERA COMMUNICATIONS CORPORATION LTD., ET AL.,

      Defendants.

Case No. 1:17-cv-01973

# JURY INSTRUCTIONS

# FILED

### FEB 14 2020

JUDGE CHARLES R. NORGLE
U.S. District Court Judge

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MOTOROLA SOLUTIONS, INC.,
and
MOTOROLA SOLUTIONS
MALAYSIA
SDN. BHD.

              Plaintiffs,

       v.

HYTERA COMMUNICATIONS
CORPORATION LTD.,
HYTERA AMERICA, INC., and
HYTERA COMMUNICATIONS
AMERICA (WEST), INC.
            Defendants.

Case No. 1:17-CV-01973

Honorable Charles R. Norgle Sr.

## FINAL JURY INSTRUCTIONS

## Instruction No. 1 - Functions of the Court and Jury

Members of the jury, you have seen and heard all the evidence and arguments of the attorneys. Now I will instruct you on the law.

You have two duties as a jury. Your first duty is to decide the facts from the evidence in the case. This is your job, and yours alone.

Your second duty is to apply the law that I give you to the facts. You must follow these instructions, even if you disagree with them. Each of the instructions is important, and you must follow all of them.

Perform these duties fairly and impartially. Do not allow sympathy, prejudice, fear, or public opinion to influence you. You should not be influenced by any person's race, color, religion, national ancestry, or sex.

Nothing I say now, and nothing I said or did during the trial, is meant to indicate any opinion on my part, about what the facts are or about what your verdict should be.

**Instruction No. 2 - No Inference from Judge's Questions**

During this trial, I have asked witnesses questions myself. Do not

assume that because I asked questions I hold any opinion on the matters

I asked about, or on what the outcome of the case should be.

**Instruction No. 3 - What is Evidence**

The evidence consists of the testimony of the witnesses, the exhibits admitted in evidence, and stipulations. A stipulation is an agreement between both sides that certain facts are true. The following are stipulated facts:

1. Motorola Solutions, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois. Motorola Solutions, Inc. provides radio equipment and infrastructure technologies to thousands of customers in manufacturing, education, utility, transport and logistics, oil and gas, hospitality, and retail throughout the United States and around the world.

2. Motorola Solutions Malaysia SDN. BHD. is a subsidiary of Motorola Solutions, Inc. It was founded in 1974, and its principal place of business is in Kuala Lumpur, Malaysia. It offers communication devices and systems including analog and digital radios, accessories, and communication infrastructure.

3. Motorola Solutions, Inc. and Motorola Solutions Malaysia SDN. BHD. (collectively, "Motorola") provides two-way digital radio communications for business and government customers.

4. Motorola's digital two-way radio technology and solutions are sold and used throughout the United States.

5. Hytera Communications Corporation Ltd. (previously known as HYT) was founded in Shenzhen, China, in 1993. The company started as a dealer/distributor for two-way radios

3

and began manufacturing its own two-way radio products in 1995.

6. Hytera America, Inc. is a Florida company with its principal place of business in Miramar, Florida. Hytera America, Inc. sells two-way radio products and provides customer service for those products.

7. Hytera Communications America (West), Inc. is a California company with its principal place of business in Irvine, California. Hytera Communications America (West), Inc. sells two-way radio products and provides customer service for those products.

8. Motorola launched its MotoTRBO professional digital radios in 2006 and first sold them in early 2007.

9. The U.S. Copyright Office issued registration certificates relating to certain software associated with Motorola's DMR radio products at issue in this case.

10. Hytera launched its DMR professional radios in early 2010.

11. Motorola Malaysia hired G.S. Kok in February 1987 as a hardware engineer. When G.S. Kok left Motorola Malaysia in 2008, he was a Senior Engineering Manager.

12. Motorola Malaysia hired Y.T. Kok in May 1997 as a software engineer. When Y.T. Kok left Motorola Malaysia in 2008, he was a Senior Software Engineer.

13. Motorola Malaysia hired Samuel Chia in August 1999 as a software engineer. When he left Motorola Malaysia in 2008, he was an Engineering Section Manager for Motorola.

14. G.S. Kok joined Hytera on February 18, 2008 as a Director, Shenzhen R&D Center, Government and Industry Terminal Product Department. When G.S. Kok left Hytera in

4

November 2018, he was a Deputy General Manager, Hytera UK.

15. Y.T. Kok joined Hytera on June 10, 2008 as a Section Head, Shenzhen R&D Center, Government and Industry Terminal Product Department. When Y.T. Kok left Hytera in October 2018, he was a Senior Sales Manager in the Overseas Sales Department Headquarters.

16. Samuel Chia joined Hytera on June 16, 2008 as a Section Head, Shenzhen R&D Center, Government and Industry Terminal Product Department. When Samuel Chia left Hytera in October 2018, he was Senior Technical Consultant, Terminal Platform Center Line.

17. Motorola filed this lawsuit on March 14, 2017.

## Instruction No. 4 - Deposition Testimony

During the trial, certain testimony was presented to you by the reading of the depositions and video. You should give this testimony the same consideration you would give it had the witnesses appeared and testified here in court.

**Instruction No. 5 - What is Not Evidence**

Certain things are not to be considered as evidence. I will list them for you:

First, if I told you to disregard any testimony or exhibits or struck any testimony or exhibits from the record, such testimony or exhibits are not evidence and must not be considered.

Second, anything that you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded. This includes any press, radio, Internet or television reports you may have seen or heard. Such reports are not evidence and your verdict must not be influenced in any way by such publicity.

Third, questions and objections or comments by the lawyers are not evidence. Lawyers have a duty to object when they believe a question is improper. You should not be influenced by any objection, and you should not infer from my rulings that I have any view as to how you should decide the case.

Fourth, the lawyers' opening statements and closing arguments to you are not evidence. Their purpose is to discuss the issues and the

7

evidence. If the evidence as you remember it differs from what the

lawyers said, your memory is what counts.

**Instruction No. 6 - Consideration of All Evidence Regardless of Who Produced It**

In determining whether any fact has been proved, you should consider all of the evidence bearing on the question regardless of who introduced it.

**Instruction No. 7 - Weighing the Evidence**

You should use common sense in weighing the evidence and consider the evidence in light of your own observations in life.

In our lives, we often look at one fact and conclude from it that another fact exists. In law we call this "inference." A jury is allowed to make reasonable inferences. Any inference you make must be reasonable and must be based on the evidence in the case.

**Instruction No. 8 - Direct vs. Circumstantial Evidence**

You may have heard the phrases "direct evidence" and "circumstantial evidence." Direct evidence is proof that does not require an inference, such as the testimony of someone who claims to have personal knowledge of a fact. Circumstantial evidence is proof of a fact, or a series of facts, that tends to show that some other fact is true.

As an example, direct evidence that it is raining is testimony from a witness who says, "I was outside a minute ago and I saw it raining." Circumstantial evidence that it is raining is the observation of someone entering a room carrying a wet umbrella.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence. You should decide how much weight to give to any evidence. In reaching your verdict, you should consider all the evidence in the case, including the circumstantial evidence.

11

## Instruction No. 9 - Testimony of Witnesses

You must decide whether the testimony of each of the witnesses is truthful and accurate, in part, in whole, or not at all. You also must decide what weight, if any, you give to the testimony of each witness.

In evaluating the testimony of any witness, including any party to the case, you may consider, among other things:

- the ability and opportunity the witness had to see, hear, or know the things that the witness testified about;

- the witness's memory;

- any interest, bias, or prejudice the witness may have;

- the witness's intelligence;

- the manner of the witness while testifying;

- and the reasonableness of the witness's testimony in light of all the evidence in the case.

**Instruction No. 10 - Prior Inconsistent Statements**

You may consider statements given by one of the parties or a witness under oath before trial as evidence of the truth of what he or she said in the earlier statements, as well as in deciding what weight to give his or her testimony.

With respect to other witnesses, the law is different. If you decide that, before the trial, one of these witnesses made a statement not under oath or acted in a manner that is inconsistent with his or her testimony here in court, you may consider the earlier statement or conduct only in deciding whether his or her testimony here in court was true and what weight to give to his or her testimony here in court.

In considering a prior inconsistent statement, you should consider whether it was simply an innocent error or an intentional falsehood and whether it concerns an important fact or an unimportant detail.

**Instruction No. 11 - Absence of Evidence**

The law does not require any party to call as a witness every person who might have knowledge of the facts related to this trial. Similarly, the law does not require any party to present as exhibits all papers and things mentioned during this trial.

## Instruction No. 12 - Expert Witnesses

You have heard witnesses give opinions about matters requiring special knowledge or skill. You should judge this testimony in the same way that you judge the testimony of any other witness. The fact that such person has given an opinion does not mean that you are required to accept it. Give the testimony whatever weight you think it deserves, considering the reasons given for the opinion, the witness's qualifications, and all of the other evidence in the case.

**Instruction No. 13 - Translated Language**

You have heard testimony of witnesses who testified in the Chinese language, and seen documents written in Chinese. Witnesses who do not speak English, or are more proficient in another language, testify through an official Court certified interpreter. In addition to the witnesses' interpreter, a check interpreter was also present. Although some of you may know Chinese, it is important that all jurors consider the same evidence. You should consider only the evidence provided through the official interpreter. Therefore, you must base your decision on the evidence presented in the English translation. Therefore, you must accept the interpreter's translation of the witnesses' testimony, or of Chinese text in documents.

You must not make any assumptions about a witness or a party based solely on the use of an interpreter to assist that witness or a party.

## Instruction No. 14 - Demonstrative Exhibits

Certain slides, diagrams, and illustrations prepared by attorneys have been shown to you.  Generally, those demonstratives are used for convenience and to help explain the facts of the case.  They are not themselves evidence or proof of any facts.  Certain demonstratives, however, have been admitted as evidence in the case and will be provided as exhibits.

**Instruction No. 15 - Destruction of Evidence**

You have heard evidence that certain computers and files may have been lost, destroyed, and/or altered, and that those computers and files may have contained information that is relevant to this case. You may assume that such information would have been unfavorable to Hytera only if you find by a preponderance of the evidence that:

1.  The information should have been preserved by Hytera in anticipation of or during the conduct of litigation;

2.  Hytera destroyed the information with the intent to deprive Motorola of the information's use in this litigation; and

3.  Hytera destroyed the information or caused the evidence to be destroyed in bad faith.

"Bad faith" in this context means destruction for the purpose of hiding adverse information, and requires a showing of more than negligence or even gross negligence on Hytera's part. You cannot infer that Hytera engaged in intentional, bad faith destruction of evidence simply because a subordinate employee acted in violation of Hytera's document retention policies and procedures, or simply because a party was unable to locate or produce certain documents.

## Instruction No. 16 - Fifth Amendment

During the depositions of G.S. Kok, Y.T. Kok, and Samuel Chia, which were presented at our trial, they invoked their right not to incriminate themselves under the Fifth Amendment in our Bill of Rights. This was their right to do so. You may, but you need not, infer by such refusal that the answers would have been adverse to those individuals or Hytera. However, you can only draw reasonable inferences to the extent they are justified by independent corroborating evidence in this case, and you cannot speculate based on the witnesses' invocation of the Fifth Amendment alone.

To the extent that you draw any inferences adverse to G.S. Kok's, Y.T. Kok's, or Samuel Chia's respective positions from their decisions to invoke the Fifth Amendment right, those inferences would not necessarily be the same as an inference that is adverse to the position of Hytera. You are not required to find that any answer to a particular question by one of those witnesses would have been adverse to that witness or to any party in this case.

## Instruction No. 17 - Burden of Proof

When I say a particular party must prove something by "a preponderance of the evidence," this is what I mean: When you have considered all the evidence in the case, you must be persuaded that it is more probably true than not true.

When I say a particular party must prove something by "clear and convincing evidence," this is what I mean: When you have considered all of the evidence, you are convinced that it is highly probable that it is true.

**Instruction No. 18 - Multiple Claims; Multiple Defendants**

You will be instructed as to each element of each claim and defense. You must give separate consideration to each claim and defense in this case and each party in this case. Although there are three defendants—Hytera Communications Corporation Ltd., Hytera America, Inc. and Hytera Communications America (West), Inc.—it does not follow that if one is liable that any of the others is also liable. Unless otherwise stated, when I refer to "Hytera" in an instruction, that instruction applies to all three defendants, but you must apply the instruction separately as to each defendant.

**Instruction No. 19 - Motorola's Claims for Misappropriation of Trade Secrets**

Now I will instruct you on the elements of Motorola's claims for trade secret misappropriation under the Illinois Trade Secrets Act and the federal Defend Trade Secrets Act.

Under the Illinois Trade Secrets Act, in order to establish a claim for misappropriation of trade secrets, Motorola has the burden of proving the following propositions by a preponderance of the evidence:

1. That Motorola owned the information at issue;

2. That the information at issue is a trade secret;

3. That the information at issue was misappropriated by Hytera in Illinois; and

4. That the information was used by Hytera in its business.

Under the federal Defend Trade Secrets Act, in order to establish a claim for misappropriation of a trade secret, Motorola has the burden of proving the following propositions by a preponderance of the evidence:

1. That Motorola owned the information at issue;

2. That the information at issue is a trade secret;

3. That the information at issue was misappropriated by Hytera; and

22

4.     That the trade secret is related to a product used in, or intended for use in, interstate or foreign commerce.

23

**Instruction No. 20 - Respondeat Superior**

You have heard testimony about whether certain individuals were employed by Motorola or Hytera throughout the course of this trial. Hytera can be held liable for harm resulting to Motorola from the conduct of another if Hytera knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other.

In addition, a corporation can be liable, that is, responsible, for its employees' conduct whenever the employee is acting within the scope of his or her employment. An employee is acting within the scope of his or her employment if:

- The employee's conduct is of a kind he or she is employed to perform or reasonably could be said to have been contemplated as part of his or her employment; and

- The employee's conduct occurs substantially within the authorized time and space limits of his or her employment; and

- The employee's conduct is motivated, at least in part, by a purpose to serve the employer.

Conduct is within the scope of employment when actuated, at least in part, by a purpose to serve the employer. A corporation knows what its

24

employees know about subjects that are within the scope of the employees' duties and responsibilities.

An illegal act may still be within the scope of employment, so as to impose liability on the corporation.

A different rule applies with regard to punitive damages.

## Instruction No. 21 - Trade Secret Definition Generally

A trade secret is information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers that (1) is sufficiently secret to derive independent economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

I will explain what these terms mean.

**Instruction No. 22 - Trade Secret Concreteness**

In articulating a trade secret, it is not enough for Motorola to point to broad areas of technology. Instead, it is Motorola's burden to identify concrete information that it contends to constitute its trade secrets.

## Instruction No. 23 - Independent Economic Value

To derive independent economic value from not being generally known means that the information gives a business a competitive advantage over other businesses that do not know the information. Information that is generally known or understood within an industry, even if not known to the public at large, does not qualify as a trade secret. But information that requires considerable time, effort, and expense to duplicate, even if it is derived from public sources, can still qualify as a trade secret. Absolute secrecy, in the sense that no one else in the world possesses the information, is not required.

**Instruction No. 24 - Definition of Misappropriation**

If you find that Motorola has proven by a preponderance of the evidence that a trade secret existed, then you must decide whether that trade secret information was misappropriated by Hytera.

To prove that a misappropriation occurred, Motorola must prove by a preponderance of the evidence that:

1.  Hytera acquired Motorola's trade secret knowing or having reason to know that the trade secret was acquired by improper means; or

2.  Hytera disclosed or used Motorola's trade secret without Motorola's express or implied consent, and Hytera:

    a)  Used improper means to acquire knowledge of the trade secret; or

    b)  At the time of the disclosure or use of the trade secret, knew or had reason to know that knowledge of the trade secret was:

        (i)  Derived from or through a person who used improper means to acquire it; or

        (ii)  Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

        (iii)  Derived from or through a person who owed a duty to Motorola to maintain its secrecy or limit its use.

29

## Instruction No. 25 - Improper Means

The phrase "improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means.

On the other hand, the phrase "improper means" does not include acquiring information through reverse engineering or independent development.

## Instruction No. 26 - Modifications or Improvements

You may find that a person used another's trade secret even if he uses it with modifications or improvements, so long as the substance of the resulting product is substantially derived from the other's trade secret.

31

**Instruction No. 27 - Trade Secret / Statute of Limitations**

Hytera contends that Motorola's trade secret misappropriation claims are barred by the statute of limitations. The statute of limitations is called an "affirmative defense." That means Hytera bears the burden of proof by a preponderance of the evidence.

The Defend Trade Secrets Act requires Motorola to bring its trade secret claim within three years after the alleged misappropriation was discovered or should have been discovered by the exercise of reasonable diligence. The Illinois Trade Secrets Act requires Motorola to bring its trade secret claim within five years after the alleged misappropriation was discovered or should have been discovered by the exercise of reasonable diligence. Concerns and suspicions do not start the clock of the statute of limitations.

Motorola filed suit on its federal and state law trade secret claims on March 14, 2017.

32

## Instruction No. 28 - Fraudulent Concealment

The statute of limitations can be tolled if Motorola can prove by clear and convincing evidence that:

1.   Hytera intentionally took affirmative acts or made affirmative representations designed to prevent Motorola from discovering its trade secret misappropriation claims; and

2.   Hytera's affirmative acts or representations prevented Motorola from discovering its claims.

Mere silence by Hytera and failure by Motorola to learn of its cause of action do not amount to fraudulent concealment.  If you find that Motorola learned of information that would have led to the discovery of its trade secret claims through diligence, you must find that the statute of limitations began to run at that time, regardless of concealment.

**Instruction No. 29 - Trade Secret / Damages Generally**

I will now instruct you on the law you must follow in determining compensatory damages. The purpose of compensatory damages is to award, as far as possible, just and fair compensation for the loss, if any, which resulted from a defendant's violation of a plaintiff's rights. Compensatory damages are not intended to punish the defendant. Motorola is also seeking exemplary damages. I will instruct you on that later.

You should not interpret the fact that I am giving instructions about Motorola's potential damages as an indication in any way that I believe that Motorola should, or should not, prevail on any claim. It is your task to decide first whether Hytera is liable. I am instructing you on damages only so that you will have guidance in the event that you decide that Hytera is liable and that Motorola is entitled to recover money from Hytera. You will be asked to determine Motorola's damages through June 30, 2019, if any.

If you find that Motorola proved that Hytera misappropriated Motorola's trade secrets and that Hytera has not proved its statute of

34

limitations defense, then you must decide whether Motorola is entitled to damages on its claim for misappropriation of trade secrets.

Motorola has the burden of proving whether Hytera caused the damage that Motorola is claiming by a preponderance of the evidence. Motorola must prove the amount of damages with reasonable certainty, but need not prove the amount of damages with mathematical precision. However, Motorola is not entitled to damages that are remote or speculative.

**Instruction No. 30 - Trade Secret / Actual Loss**

In determining Motorola's actual loss, you should determine what profits Motorola proves that it would have made, if any, had Hytera not misappropriated Motorola's trade secret. To recover its actual loss, Motorola must prove:

1. A reasonable probability that, if Hytera had not misappropriated trade secrets, Motorola would have made additional sales of DMR products that Hytera made; and

2. The amount of profit Motorola would have made on those sales.

**Instruction No. 31 - Trade Secret / Unjust Enrichment**

Unjust enrichment is the amount Hytera benefited as a result of any misappropriation to the extent it exceeds Motorola's actual loss.

If you find that Motorola has proven by a preponderance of the evidence the amount that it is entitled to unjust enrichment damages in excess of its actual loss, you must deduct the costs and expenses that Hytera proves by a preponderance of the evidence that it incurred related to that benefit.

**Instruction No. 32 - Geographic and Temporal Scope of Trade Secret Damages**

You will be asked to determine Motorola's damages under the ITSA and the DTSA, if any. Under the ITSA, Motorola is seeking damages from 2010 through June 30, 2019. For Motorola's ITSA claim, if you find that Hytera misappropriated Motorola's trade secrets in or from Illinois, Motorola is entitled to recover all damages that occurred in Illinois that are a proximate and foreseeable result of that misappropriation.

Under the DTSA, Motorola is seeking damages from May 11, 2016 through June 30, 2019. For Motorola's DTSA claim, if you find that Hytera misappropriated Motorola's trade secrets anywhere in the world and an act in furtherance of the misappropriation was committed in the United States, Motorola is entitled to recover all damages that Motorola proved are a proximate and foreseeable result of that misappropriation, including any unjust enrichment that Hytera received anywhere in the world or profits Motorola lost anywhere in the world as a result of misappropriation on or after May 11, 2016.

## Instruction No. 33 - Trade Secret / Exemplary Damages

If you find for Motorola on its trade secret claims, you may, but are not required to, assess exemplary damages against Hytera. The purposes of exemplary damages are to punish Hytera for its conduct and to deter Hytera and others from engaging in similar conduct in the future.

In order for Motorola to recover exemplary damages, you must find that Motorola has proved by a preponderance of the evidence that Hytera's acts were willful and malicious. That is, you may assess exemplary damages only if you find Hytera's conduct was malicious or in reckless disregard of Motorola's rights. Conduct is malicious if it is accompanied by ill will or spite, or it is done for the purpose of injuring Motorola. Conduct is in reckless disregard of Motorola's rights if, under the circumstances, it reflects complete indifference to Motorola's rights, and not simply that Hytera was aware that the information was a trade secret.

Exemplary damages may be awarded against an employer because of an act by its employee if, but only if you find:

39

1. The employer authorized the doing and the manner of the act; or

2. The employee was unfit and the employer was reckless in employing him or her; or

3. The employee was employed in a managerial capacity and was acting in the scope of his or her employment; or

4. The employer or a manager of the employer ratified or approved the act.

In determining whether an employee is acting in a managerial capacity, you should consider the employee's authority and discretion to make decisions and not only the employee's title.

If you find that exemplary damages are appropriate, then you must use sound reason in setting the amount of those damages. Exemplary damages, if any, should be in an amount sufficient to fulfill the purposes that I have described to you, but should not reflect bias, prejudice, or sympathy toward either party. In determining the amount of any exemplary damages, you should consider the following factors:

1. The reprehensibility of the conduct;

2. The impact of the conduct on Motorola;

3. The relationship between Motorola and Hytera;

4. Hytera's financial condition;

5. The likelihood that such conduct would be repeated by Hytera or others if an award of exemplary damages is not made; and

6. The relationship of any award of exemplary damages to the amount of actual harm Motorola suffered.

If you find that Hytera acted willfully and maliciously, you may award Motorola an amount of exemplary damages up to two times the amount of the compensatory damages you award Motorola for trade secret misappropriation for the time during which it acted willfully and maliciously.

## Instruction No. 34 - Copyright Allegation Generally

Motorola claims that Hytera has infringed Motorola's copyright in four works, respectively titled, MOTOTRBO Mobile Subscriber FW Package R01.00.01, MOTOTRBO Portable Subscriber FW Package R01.00.01, MOTOTRBO CYPHER R01.00.01, and MOTOTRBO Portable R01.03 by copying original elements of those works into Hytera's own DMR program.

## Instruction No. 35 - Copyright Infringement

To succeed on its claim as to each of the asserted works, Motorola must prove the following things by a preponderance of the evidence:

1.      Motorola owns a valid copyright in the asserted work; and

2.      Hytera copied protected expression from the work in the United States.

I will explain what these words mean.

If you find that Motorola has proved each of these things, then you must find for Motorola.  However, if you find that Motorola did not prove each of these things, then you must find for Hytera.

## Instruction No. 36 - Copyright Ownership

Motorola owns a copyright in an asserted work if it was prepared by Motorola employees within the scope of their employment; or specially commissioned as a contribution to a collective work and there was a prior agreement, signed by Motorola, and if those that prepared it agreed that the work would be a work made for hire.

## Instruction No. 37 - Copying

As I stated, Motorola must prove that Hytera copied protected expression in its work.  You may infer that Hytera copied Motorola's work if Hytera had the opportunity to view or read the original before creating its own work and the two works are so similar that a reasonable person would conclude Hytera took protected expression from Motorola's work.  You may also infer that Hytera copied Motorola's work if the similarities between the two works can be explained only by copying, rather than by coincidence.

In making that determination, the focus is on similarities between the works.  Hytera cannot excuse its infringement by pointing to portions of its work that it did not copy from Motorola.  The test is whether Hytera's work is so similar to Motorola's work that an ordinary reasonable person would conclude that Hytera unlawfully appropriated Motorola's protectible expression by taking material of substance and value.

**Instruction No. 38 - Protected and Non-Protected Expression**

I will now give you some examples of what constitutes protected expression and what does not, in order to aid you in this process.

"Protected expression" means expression in Motorola's work that was created independently, involving some creativity.

Copyright law protects only original expression in the work. This includes the way that facts; ideas; procedures; processes; systems; methods of operation; concepts; principles; discoveries; devices are expressed in the work. It does not include the facts; ideas; procedures; processes; systems; methods of operation; concepts; principles; discoveries; devices themselves.

**Instruction No. 39 - Copyright Damages Generally**

If you find that Motorola has proved that Hytera has infringed Motorola's copyright by a preponderance of the evidence, then you must determine the amount of damages, if any, Motorola is entitled to recover. You will be asked to determine Motorola's damages resulting from copyright infringement, if any. If you find that Motorola has failed to prove the claim, then you will not consider the question of damages.

Motorola must prove damages by a preponderance of evidence.

**Instruction No. 40 - Copyright / Defendants' Profits**

Motorola is entitled to recover the profits that Hytera made through June 30, 2019, because of Hytera's copyright infringement. Hytera's profits are revenues that Hytera made because of the infringement, minus Hytera's expenses in producing and selling the infringing DMR radios. Motorola must prove Hytera's revenues and a causal relationship between the infringement and those revenues. Hytera must prove its own expenses and any portion of its profits that resulted from factors other than infringement of Motorola's copyright.

**Instruction No. 41 - Limitations of Copyright**

You may award Motorola damages under the Copyright Act for infringement by Hytera that occurred in the United States. You may also award copyright damages for infringing acts outside the United States that were a consequence or a result of an initial infringing act by Hytera that occurred inside the United States.

## Instruction No. 42 - No Double Recovery

If you award Motorola damages for both its trade secret misappropriation claims and its copyright claims, you must not award damages in a manner that results in double recovery for the same injury.

**Instruction No. 43 - Selection of Presiding Juror; General Verdict**

Upon retiring to the jury room, you must select a presiding juror. The presiding juror will preside over your deliberations and will be your representative here in court.

Forms of verdict have been prepared for you.

[Forms of verdict read.]

Take these forms to the jury room, and when you have reached unanimous agreement on the verdict, your presiding juror will fill in and date the appropriate form, and all of you will sign it.

51

## Instruction No. 44 - Communication with the Court

I do not anticipate that you will need to communicate with me. If you do need to communicate with me, the only proper way is in writing. The writing must be signed by the presiding juror, or, if he or she is unwilling to do so, by some other juror. The writing should be given to the marshal, who will give it to me. I will respond either in writing or by having you return to the courtroom so that I can respond orally.

If you do communicate with me, you should not indicate in your note what your numerical division is, if any.

**Instruction No. 45 - Disagreement among Jurors**

The verdict must represent the considered judgment of each juror. Your verdict, whether for or against the parties, must be unanimous.

You should make every reasonable effort to reach a verdict. In doing so, you should consult with one another, express your own views, and listen to the opinions of your fellow jurors. Discuss your differences with an open mind. Do not hesitate to reexamine your own views and change your opinion if you come to believe it is wrong. But you should not surrender your honest beliefs about the weight or effect of evidence solely because of the opinions of other jurors or for the purpose of returning a unanimous verdict.

All of you should give fair and equal consideration to all the evidence and deliberate with the goal of reaching an agreement that is consistent with the individual judgment of each juror. You are impartial judges of the facts.

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SYNTEL STERLING BEST SHORES MAURITIUS LIMITED, and SYNTEL, INC., <br><br> Plaintiffs and Counterclaim-Defendants, <br><br> v. <br><br> THE TRIZETTO GROUP, INC. and COGNIZANT TECHNOLOGY SOLUTIONS CORP., <br><br> Defendants and Counterclaim-Plaintiffs. | 1:15-CV-00211 (LGS) (SDA) <br><br> Hon. Lorna G. Schofield |

## VERDICT FORM

ALL JURORS MUST AGREE TO ALL ANSWERS

1

**Instructions:** Please read and answer the questions below, beginning with Question 1. After you have answered each question, follow the instructions that correspond to your answer. The instructions will either direct you to answer another question or direct you to stop.

## THE PARTIES' CLAIMS

### TriZetto & Cognizant's Claims

TriZetto's Misappropriation of Trade Secret Claims

**1.   Has TriZetto proved that it possessed one or more trade secrets that was/were misappropriated by Syntel in violation of federal law (Defend Trade Secrets Act) for the period May 11, 2016, to October 18, 2020?**

Yes __ X __   (for TriZetto)

No _____   (for Syntel)

*Please proceed to Question 2.*

**2.   Has TriZetto proved that it possessed one or more trade secrets that was/were misappropriated by Syntel in violation of New York law for the period January 1, 2012, to October 18, 2020?**

Yes __ X __   (for TriZetto)

No _____   (for Syntel)

*Please proceed to Question 3.*

TriZetto's Copyright Infringement Claim

**3.   Has TriZetto proved that Syntel infringed one or more of TriZetto's copyrights?**

Yes __ X __ (for TriZetto)

No _____ (for Syntel)

*Please proceed to Question 4.*

2

**Syntel's Claims**

Syntel Mauritius' Breach of Contract Claim

**4. Has Syntel Mauritius proved that TriZetto breached the Master Services Agreement?**

> Yes _____ (for Syntel Mauritius)
>
> No ___✗___ (for TriZetto)

*Please proceed to Question 5.*

Syntel Mauritius' Misappropriation of Confidential Information Claim

**5. Has Syntel Mauritius proved that TriZetto or Cognizant misappropriated Syntel Mauritius's confidential information?**

> Yes _____ (for Syntel Mauritius)
>
> No ___✗___ (for TriZetto/Cognizant)

*Please proceed to Question 6.*

Syntel's Intentional Interference with Contract Claim

**6. *Answer only if you answered YES to Question 4:* Has Syntel proved that Cognizant intentionally interfered with Syntel Mauritius's contract with TriZetto?**

> Yes _____ (for Syntel)
>
> No _____ (for Cognizant)

*Please proceed to Question 7.*

Syntel Inc.'s Intentional Interference with Contractual Relations Claims

**7. Did TriZetto or Cognizant intentionally interfere with Syntel, Inc.'s contractual relations with Swapnil Dilip Adhav, Atul Shirdhar Patil, Parul Kumar, Abhishek Thakur, and/or Ankit Shah?**

> Yes _____ (for Syntel, Inc.)
>
> No ___✗___ (for TriZetto/Cognizant)

*Please proceed to Question 8.*

3

**DAMAGES**

**Compensatory Damages for TriZetto's Claims**

8.   *Answer only if you answered YES to Question 1:* **What is the dollar amount of compensatory damages, if any, TriZetto is entitled to receive from Syntel, for the misappropriation of trade secrets under federal law, which permits recovery of avoided costs?**

$ *284,855,192*

*Please proceed to Question 9.*

9.   *Answer only if you answered YES to Question 2:* **What is the dollar amount of compensatory damages, if any, TriZetto is entitled to receive from Syntel, for the misappropriation of trade secrets under New York law, which does not permit recovery of avoided costs?**

$ *142,427,596*

*Please proceed to Question 10.*

10.   *Answer only if you answered YES to Question 3:* **What is the dollar amount of compensatory damages, if any, TriZetto is entitled to receive from Syntel, for copyright infringement?**

$ *59,100,000*

*Please proceed to Question 11.*

11.  **Being mindful of not awarding damages that result in double or multiple recovery for the same injury, what is the total amount of compensatory damages, if any, TriZetto is entitled to receive from Syntel in light of your answers to the previous three questions?**

$ *284,855,192*

*Please proceed to Question 12.*

4

<u>**Compensatory Damages for Syntel's Claims**</u>

**12.** *Answer only if you answered YES to Question 4 or 6:* **What is the dollar amount of compensatory damages, if any, Syntel is entitled to receive for TriZetto's breach of the Agreement's confidentiality provision (section 19.01) and/or Cognizant's intentional interference with the Agreement?**

$ _____

*Please proceed to Question 13.*

**13.** *Answer only if you answered YES to Question 5:* **What is the dollar amount of compensatory damages, if any, that Syntel Mauritius is entitled to receive for the misappropriation of confidential information?**

$ _____

*Please proceed to Question 14.*

**14.** *Answer only if you answered YES to Question 7:* **What is the dollar amount of compensatory damages, if any, Syntel Inc. is entitled to receive for intentional interference with the five employment contracts of Swapnil Dilip Adhav, Atul Shirdhar Patil, Parul Kumar, Abhishek Thakur, and/or Ankit Shah?**

$ _____

*Please proceed to Question 15.*

**15.** **Being mindful of not awarding damages that result in double or multiple recovery for the same injury, what is the total amount of compensatory damages, if any, Syntel is entitled to receive from TriZetto/Cognizant in light of your answers to the previous three questions?**

$ ____ 0 _____

*Please proceed to Question 16.*

<u>**Punitive Damages**</u>

**16.** *Answer only if you answered YES to Question 8 or 9:* **Do you find that TriZetto is entitled to receive punitive damages?**

Yes __X__ (finding for TriZetto)

No _____ (finding for Syntel)

*If you answered "YES" to Question 16, please proceed to Question 17.*

*If you answered "NO" to Question 16, please proceed to Question 18.*

**17. What is the dollar amount of the punitive damages TriZetto is entitled to receive from Syntel?**

$ *569,710,384*

*Please proceed to Question 18.*

**18.** *Answer only if you answered YES to Question 12 and awarded damages for Cognizant's intentional interference, or YES to Question 13:* **Is Syntel entitled to receive punitive damages from TriZetto/Cognizant?**

Yes   _____ (finding for Syntel)

No   _____ (finding for TriZetto/Cognizant)

*If you answered "YES" to Question 18, please proceed to Question 19.*

*If you answered "NO" to Question 18, please proceed to Question 20.*

**19. What is the dollar amount of the punitive damages Syntel is entitled to receive from TriZetto or Cognizant?**

$_____

*Please proceed to Question 20.*

## DEFENSES

### Syntel's Affirmative Defenses

Laches

**20.** *Answer only if you answered YES to Question 1 or 2:* **For any trade secrets that you find Syntel misappropriated, has Syntel proved its affirmative defense of laches?**

Yes, for all   _____ (for Syntel)

Yes, for some   _____ (for Syntel)

No       X (for TriZetto)

*Please proceed to Question 21.*

**21.** *Answer only if you answered YES to Question 3:* **For any copyrights that you find Syntel infringed, has Syntel proved its affirmative defense of laches?**

Yes _____ (for Syntel)

No ___X___ (for TriZetto)

*Please proceed to Question 22.*

Waiver

**22.** *Answer only if you answered YES to Question 1:* **For any trade secrets that you find Syntel misappropriated under federal law, has Syntel proved its affirmative defense of waiver by a preponderance of the evidence?**

Yes, for all _____ (for Syntel)

Yes, for some _____ (for Syntel)

No ___X___ (for TriZetto)

*Please proceed to Question 23.*

**23.** *Answer only if you answered YES to Question 2:* **For any trade secrets that you find Syntel misappropriated under state law, has Syntel proved its affirmative defense of waiver by clear proof?**

Yes, for all _____ (for Syntel)

Yes, for some _____ (for Syntel)

No ___X___ (for TriZetto)

*Please proceed to Question 24.*

**24.** *Answer only if you answered YES to Question 3:* **For any copyrights that you find Syntel infringed, has Syntel proved its affirmative defense of waiver?**

Yes _____ (for Syntel)

No ___X___ (for TriZetto)

*Please proceed to Question 25.*

7

Estoppel

**25.** *Answer only if you answered YES to Question 1:* **For any trade secrets that you find Syntel misappropriated under federal law, has Syntel proved its affirmative defense of estoppel?**

Yes, for all   _____ (for Syntel)

Yes, for some _____ (for Syntel)

No            \_\_X\_\_ (for TriZetto)

*Please proceed to Question 26.*

**26.** *Answer only if you answered YES to Question 2:* **For any trade secrets that you find Syntel misappropriated under state law, has Syntel proved its affirmative defense of estoppel by clear and convincing evidence?**

Yes, for all   _____ (for Syntel)

Yes, for some _____ (for Syntel)

No            \_\_X\_\_ (for TriZetto)

*Please proceed to Question 27.*

**27.** *Answer only if you answered YES to Question 3:* **For any copyrights that you find Syntel infringed, has Syntel proved its affirmative defense of estoppel?**

Yes _____(for Syntel)

No \_\_X\_\_(for TriZetto)

*Please proceed to Question 28.*

**Unclean Hands**
**28. Has Syntel proved the defense of unclean hands?**

Yes _____(for Syntel)

No \_\_X\_\_(for TriZetto/Cognizant)

*Please proceed to Question 29.*

**29. Has TriZetto/Cognizant proved the defense of unclean hands?**

Yes _____X_____ (for TriZetto/Cognizant)

No _____ (for Syntel)

You have now reached the end of the verdict form and should review it to ensure it accurately reflects your unanimous determinations. Each juror should then sign the verdict form in the spaces below and notify the Court Security Officer that you have reached a verdict.

9

Each juror should place his or her signature on the lines below.
I attest that the foregoing accurately reflects the jury's decision.

1. _Susan Jones_____
   Foreperson

2. _Deborah Werner_____

3. _Jennifer Weiss_____

4. _Carl Molina_____

5. _____

6. _Ryan V._____

7. _____

Dated: _October 27_, 2020

*You are finished. Please provide this completed form in a sealed envelope to the Marshal.*

10

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| REAL VIEW, LLC, <br><br>       Plaintiff and Counterclaim <br>       Defendant <br><br>       v. <br><br> 20-20 TECHNOLOGIES, INC., <br><br>       Defendant and Counterclaim <br>       Plaintiff <br><br> BORIS ZELDIN AND LEONID PERLOV <br> Additional Party Defendants <br> in Counterclaim. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    CIVIL ACTION NO. 07-12157 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM IN SUPPORT OF DECLARATORY JUDGMENT PLAINTIFF
AND COUNTERCLAIM DEFENDANTS' MOTION FOR PRE-TRIAL
HEARING ON COPYRIGHTABILITY OF ALLEGED SIMILARITIES IN
<u>COMPUTER SOFTWARE PROGRAM</u>**

Realview, LLC, Boris Zeldin and Leonid Perlov (collectively "Real View") respectfully

move that the Court schedule a pre-trial hearing to determine which items in the user interface of

the 20-20 software program are and are not protected by copyright law, and that the Court stay

required actions under the Pretrial Order pending the outcome of that hearing. Real View

respectfully suggests that the Court request that the parties demonstrate the software programs at

issue at the hearing, to assist the Court in understanding the copyright issues in this case and

make rulings on copyrightability.

**INTRODUCTION**

This is a copyright infringement case in which 20-20 alleges that Real View has infringed 20-20's copyright in the user interface of a computer program. There are no allegations of infringement based on copying of source code or object code. [1]

Since counsel last appeared before the Court on April 14, 2009, the parties have been preparing for trial, which is scheduled for July 20, 2009. However, the issues in the case have been greatly focused since April. 20-20 Technologies, Inc., which is claiming copyright infringement of the user interface of its software program, served a detailed expert report on Real View on May 5, 2009. Real View served its expert rebuttal report on 20-20 on June 3, 2009, and filed a motion for summary judgment on June 4, 2009. 20-20's opposition is due July 1, 2009 (per the Court's June 19, 2009 Electronic Order granting 20-20's motion for extension of time). The parties have exchanged pretrial disclosures, and between them have designated 18 trial witnesses. There have been no settlement communications since the Status Conference held on April 14, 2009.

The parties are in fundamental disagreement on a key issue in this case: whether the judge or the jury performs the "filtration" or "analytic dissection" common to copyright cases, and particularly central to copyright cases involving computer software. As discussed below, Real View contends that the law requires the judge to rule on which elements of the 20-20 user interface are uncopyrightable. Real View contends that Seventh Circuit Chief Judge Frank H. Easterbrook stated the law on this concisely and emphatically in Pivot Point Intern., Inc. v. Charlene Products, Inc. 932 F.Supp. 220 (N.D. Ill. 1996) where, sitting by designation, he stated "[w]hether [items at issue in the case] . . . are copyrightable is a **question of law**, which the court will decide (perhaps in response to dispositive motions soon to be filed.) **A jury has nothing to**

---

[1]   There are counterclaims of Lanham Act violations and violations of state law – however, Real View anticipates that most of the trial proceedings will relate to the allegations of copyright infringement.

1

**do with this subject**.”  Id. at 225, citing Markman v. Westview Instruments, Inc., 517 U.S. 370

(1996)(emphasis added).

If the parties must prepare jury instructions, exhibits, opening statements, witness

testimony, a pre-trial memorandum and motions in limne without knowing which elements of the

20-20 software are protected by copyright law, it will require vast over-preparation, and an

inefficient use of the resources of the Court when trial begins.  Determining whether any

elements of the 20-20 software are unprotected by copyright law (and Real View contends this is

the vast majority) will simplify the trial and reduce the time and financial expense the parties will

have to incur without such a ruling.  It will allow the jury to be empanelled and the trial to

proceed without uncertainty as to which elements of the 20-20 software are part of the case for

purposes of substantial similarity analysis.

Real View contends that most of the similarities identified in 20-20’s expert report fall

outside the protection of copyright law.  For example, much of the expert report describes

similarities in the menu commands of the two programs.  If, as Real View argues, the menu

commands are unprotected under the First Circuit’s decision in Lotus v. Borland, 49 F.3d 807,

816 (1st Cir. 1995), aff’d by an equally divided court, 516 U.S. 233 (1996), the scope of the trial

will be greatly reduced.  Moreover, Real View has argued that many of the alleged similarities

are  uncopyrightable “methods of operation” under 17 U.S.C. §102(b), or are unprotectable

under one or more of the “limiting doctrines” - merger, lack of originality, public domain, scènes

à faire, words and short phrases, standard techniques or practices or external factors (such as

market/industry demands, efficiency or compatibility).[2]  The court should make a determination

on these items before trial, as well.

---

[2]  In its Summary Judgment Motion Real View argued that after “filtering out” the protectable elements
from the non-protectible, there are no similarities between the copyrighted work and the alleged
infringing work.

2

Case 1:07-cv-12157-PBS   Document 36   Filed 06/23/09   Page 4 of 8

The copyrightability of the similarities identified by 20-20 is the focus of Real View's summary judgment motion.  20-20 will have filed its opposition to that motion by July 1, 2009.  Thus, the question of which items in the 20-20 software are appropriate for copyright protection will be before the Court in the form of those motions, and little or no additional briefing would be required.

## ARGUMENT

As discussed in Real View's summary judgment memorandum, the process for judging copyright infringement in a case involving computer software relies upon the conceptual framework known as "abstraction, filtration and comparison" (the "Altai Test") to aid in separating idea from expression and identifying protectable expression.  See Computer Associates v. Altai, 982 F.2d 693 (2d Cir. 1992).  The middle step[3] ("filtration", or "analytic dissection"),  requires the Court to "filter out" the similarities in the software that are not protected by copyright law.  Only after the judge rules on which elements are protected by copyright does the issue of substantial similarity go to the trier of fact.

Several court have analogized this process to claim construction under patent law.   As U.S. District Court Judge Harold Baer, Jr. observed in Harbor Software, Inc. v. Applied Systems, Inc., 925 F. Supp. 1042, 1046 (S.D.N.Y. 1996), just as the judge determines claim construction in a patent case, the judge performs the "filtration" in a copyright case.[4]

---

[3]  As discussed in the Summary Judgment Motion, the "abstraction" step is bypassed where the copyright holder alleges specific items that are the basis for infringement.  Even if this step were necessary, it would be performed by the Court, not the jury.

[4]  To quote Harbor Software in full, the court stated:

> This decision addresses the first two stages of the Altai analysis: abstraction and filtration. **I determined that the filtration analysis is a matter of law for the Court, rather than for the jury**.  I based this decision on an analogy to the Federal Circuit's holding in Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed.Cir.1995), aff'd, 517 U.S. 370 (1996), that interpretation of patent claims is an issue of law.  Just as patent claims determine the boundaries

The federal courts in the First Circuit have followed this procedure.  In <u>Yankee Candle</u>

<u>Co. v. Bridgewater Candle Co., LLC</u>, 259 F.3d 25, 34 (1st Cir. 2001), the court stated: "[t]he

extent to which the Yankee labels contain protected expression is a matter of law, determined by

the court. Once this determination is made, the question of whether two works are substantially

similar (and corresponding application of the ordinary observer test) is a matter for the trier of

fact unless summary judgment is proper."  In <u>Yankee Candle</u> the court cited this statement to

<u>Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc.</u>, 843 F.2d 600, 608-609) (1st Cir.

1988), where <u>the court</u> stated that

> under the "ordinary observer test "the court first must determine whether there has been 'copying' . . .. This step involves "dissection" of the work, perhaps aided by expert testimony, to assess whether there are sufficient articulable similarities to justify a finding that the defendant has copied from the protected work. . . .  Second, once "copying" is established, **the court** must determine whether the copying is sufficiently substantial to constitute "unlawful appropriation". . .. Under this second step of the analysis, therefore, the **trier of fact** applies the "ordinary observer" test, unaided by dissection or expert testimony, to determine whether the copying resulted in substantial similarity between the works.

> This test provides a workable, flexible framework for copyright infringement analysis. . . . By dissecting the accused work and identifying those features which are protected in the copyrighted work, **the court** may be able to determine as a matter of law whether or not the former has copied protected aspects of the latter.  . . . Assuming copying of protected aspects is established, **the trier of fact** can then assess pursuant to the "ordinary observer" test whether there is substantial similarity between the protected expression and the accused work.  (Emphasis added).

---

> of an inventor's monopoly, "filtration serves 'the purpose of defining the scope of plaintiff's copyright.' " <u>Altai</u>, 982 F.2d at 707 (quoting <u>Brown Bag Software v. Symantec Corp.</u>, 960 F.2d 1465, 1475 (9th Cir.), <u>cert</u>. <u>denied</u>, 506 U.S. 869, . . . (1992)).  I find further support for my decision in the more broadly based unanimous decision by the Supreme Court affirming the Federal Circuit in <u>Markman</u>.  . . .  ("[J]udges, not juries, are ... better suited to find the acquired meaning of patent terms."); <u>id</u>. at ___, 116 S.Ct. at 1396 ("Uniformity would, however, be ill served by submitting issues of document construction to juries."); <u>see also</u> <u>Lotus Dev. Corp. v. Borland Int'l, Inc.</u>, 788 F.Supp. 78, 94-96 (D. Mass. 1992*).  (Emphasis added).

4

In Skinder-Strauss Associates v. Massachusetts Continuing Legal Educ., Inc., 914 F.Supp. 665, 674 (D. Mass. 1995), this U.S. District Court Judge cited these precedents and performed analytical dissection, stating:

> The court must dissect the works and determine whether "there are sufficient articulable similarities to justify a finding that the defendant has copied from the protected work."…. At this stage of the analysis, "[t]he court can determine, in at least a general way, those aspects of the [copyrighted] work that are protected by the copyright and that should be considered in  the subsequent comparative analysis[.]" . . . .  Dissection follows.

In Lotus Development Corp. v. Borland Intern., Inc., 788 F.Supp. 78, 85 and 94-96 (D. Mass. 1992),[5] Judge Keeton engaged in an extensive discussion of this issue, and held that  "all questions of law and fact bearing on copyrightability of elements of a computer software program are to be decided by a court, not a jury."   As Professor Nimmer observes, although the First Circuit reversed Judge Keeton's judgment in favor of Lotus, "it implicitly accepted, to at least some extent the proposition that copyright subsistence should be determined solely by the court, rather than by a jury."   M. Nimmer & D. Nimmer, Nimmer on Copyright § 12.10[B][1] , at 12-182 (2008).

Most courts in other circuits have held to the same effect. As noted above, in Pivot Point Circuit Judge Easterbrook, sitting by designation, stated "[w]hether [items at issue in the case] . . . are copyrightable is a question of law, which the court will decide …**A jury has nothing to do with this subject**."  932 F.Supp. at 225.  See also Eagle Servs. Corp. v. H20 Indus. Servs., Inc., No. 02-36, 2005 WL 2406041, *4 (N.D. Ind. 2005) (**"[D]eterminations of copyrightability in all instances" are always reserved to the judge** and are therefore appropriate for summary judgment, citing M. Nimmer & D. Nimmer, Nimmer on Copyright § 12.10[B], at 3-12 (2005)); Collezione Europa U.S.A., Inc. v. Hillsdale House, Ltd., 243 F.Supp.2d 444, 452

---

[5]  Rev'd on other grounds, 49 F.3d 807, 816 (1st Cir. 1995), aff'd by an equally divided court, 516 U.S. 233 (1996).

(M.D.N.C. 2003)(quoting <u>Pivot</u>, <u>supra</u>, and Nimmer, supra, "[c]ertain matters of law, including "determinations of copyrightability in all instances," are always reserved to the judge); <u>Newton v. Diamond</u>, 204 F. Supp. 2d 1244, 1253 (C.D. Cal. 2002) ("The protectability of elements of a copyrighted work **is a question of law for the court**"). (Emphasis added to foregoing citations).

Only after the "filtraton/dissection" has been performed does the trier of fact, in this case the jury, consider substantial similarity.  <u>See</u>, <u>e.g.</u>, <u>T-Peg,Inc. v. Vermont Timber Works, Inc.</u>, 459 F.3d 97, 112 (1st Cir. 2006): "The substantial similarity inquiry . . . . focuses not on every aspect of the copyrighted work, but on those aspects of the plaintiff's work that are protectable under copyright laws and whether whatever copying took place appropriated those protected elements."

In this case the Court has never had the opportunity to view the computer programs at issue.  Real View is confident that when the Court views the programs it will conclude that 20-20 has vastly overreached, building its case on similarities that are non-copyrightable.  Rather than put Real View and the Court to the time and expense of preparing for trial a case that presents legal issues that the Court must address, and commencing a trial with these issues unresolved, Real View respectfully moves for an Order setting a hearing on copyrightability sufficiently far in advance of trial that the parties will not be forced to prepare unnecessarily for a trial on issues that may be ruled outside of copyright protection.  Real View respectfully suggests that an in-court demonstration of the user interfaces of the two programs, to be presented by the parties and their experts, is the most efficient way to proceed on these issues.  This will supplement the static graphics and "screen shots" in the expert reports.  It will allow the Court to become familiar with the programs, question the parties and experts as necessary, and streamline trial of the case.

## CONCLUSION

For the foregoing reasons, Real View respectfully moves that the Court schedule a

hearing on copyrightability prior to trial in this case, and that the Court further stay all required

actions under the Pretrial Order so that the parties may take the Court's rulings into consideration

in complying with the Pretrial Order.

<div align="right">

Respectfully submitted,


/s/ Lee T. Gesmer
Lee T. Gesmer, BBO #190260
Gesmer Updegrove LLP
40 Broad Street
Boston, Massachusetts 02109
Telephone:  (617) 350-6800
Facsimile:  (617) 350-6878

</div>

Dated:  June 23, 2009

## Certificate of Service

I hereby certify that on June 23, 2009 I electronically filed the foregoing with the Clerk for the
United States District Court for the District of Massachusetts by using the CM/ECF system. I
certify that all participants in the case are registered CM/ECF users and that service will be
accomplished by the CM/ECF system.

<div align="right">

/s/ Lee T. Gesmer
Lee T. Gesmer

</div>

<div align="center">

7

</div>

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

BEIJING MEISHE NETWORK
TECHNOLOGY CO., LTD.,

        Plaintiff,

        v.

TIKTOK INC., TIKTOK PTE. LTD.,
BYTEDANCE LTD., and BYTEDANCE INC.,

        Defendants.

Case No. 3:23-cv-06012-SI

[~~PROPOSED~~] ORDER
GRANTING DEFENDANTS'
ADMINISTRATIVE MOTION
FOR BRIEFING AND HEARING
ON COPYRIGHTABILITY

Before the Court is the Administrative Motion for Briefing and Hearing on Copyrightability filed by Defendants TikTok Inc., TikTok Pte. Ltd., Bytedance Ltd., and Bytedance Inc. (collectively "Defendants"). Having considered the parties' motion and all materials submitted in relation thereto, and good cause having been shown,

**IT IS HEREBY ORDERED THAT:**

1. Defendants' Administrative Motion for Briefing and Hearing on Copyrightability is GRANTED; and

2. The briefing and hearing will be scheduled as follows:

| Deadline | Event |
|---|---|
| July 25, 2025 | Defendants to file an opening brief, not to exceed 25 pages, together with supporting evidence that was produced in accordance with the fact and expert discovery deadlines, on the protectable elements (assuming any exist), and the degree of protection (i.e., "broad" or "thin") applicable to those elements, in Meishe's allegedly infringed works. |
| August 8, 2025 | Meishe to file a responsive brief, not to exceed 25 pages, and supporting evidence that was produced in accordance with the fact and expert discovery deadlines. |
| August 15, 2025 | Defendants to file a reply brief, not to exceed 15 pages. |

- 1 -

| 8/29/2025 | Hearing on the parties' motion. |

3. Because both parties have had the opportunity to address copyrightability in expert reports, neither side is permitted to submit with their briefs any expert opinion other than the previously-served expert reports and deposition testimony.

DATED: __July 24, 2025__

_____
HONORABLE SUSAN ILLSTON
United States District Judge

- 2 -

# EXHIBIT E

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEIJING MEISHE NETWORK TECHNOLOGY CO., LTD., | Case No. 23-cv-06012-SI |
| Plaintiff, | |
| v. | **ORDER RE: SUMMARY JUDGMENT, SANCTIONS, AND COPYRIGHTABILITY** |
| TIKTOK INC., et al., | Re: Dkt. Nos. 591, 608, 609, 650 |
| Defendants. | |

In this heavily litigated case, the parties have presented cross motions for summary judgment and presented further briefing on the issue of copyrightability. Defendants have also moved for sanctions. The Court held hearings on these issues on August 15 and 29, 2025. The Court considers these questions below. The parties also filed nine *Daubert* motions that are discussed in a separate order.

## BACKGROUND

### I. Procedural Background

Plaintiff Meishe initiated this lawsuit in the Western District of Texas on May 18, 2021. Dkt. No. 1. The case was reassigned to this Court on November 28, 2023. Dkt. No. 380. The operative complaint is the Fourth Amended Complaint, filed by Meishe on May 14, 2024. Dkt. No. 433 ("FOAC"). The FOAC included four claims: copyright infringement (17 U.S.C. § 501), misappropriation of trade secrets in violation of federal law (18 U.S.C. § 1836(b)(1)), misappropriation of trade secrets in violation of state law (Tex. Civ. Prac. & Rem. Code Ann. § 134A), and false advertising (15 U.S.C. § 1125). This Court dismissed the false advertising count but allowed the others to proceed. Dkt. No. 465. On April 24, 2025, plaintiff's counsel informed

defendants that Meishe was withdrawing its state law trade secrets claim, leaving at issue only the federal law claims for copyright infringement and misappropriation of trade secrets.[1] Dkt. No. 644-10.[2] Meishe has identified five versions of its software that constitute the scope of its copyrighted material: the registered Chinese copyright 2015SR227927 and four unregistered copyrighted versions: Meishe App v1.0, Meishe App v1.3 rev. 2631, Meishe App v1.5, and Meishe App v2.5.4. Dkt. No. 644-9. Meishe brings its claims against four related entities: TikTok Inc., TitTok Pte. Ltd., ByteDance Ltd., and ByteDance Inc. FOAC ¶¶ 20-23.

The Court appointed a Special Master to manage discovery, Dkt. No. 423, and the parties engaged in protracted and at times acrimonious discovery proceedings. The Special Master issued at least fifteen substantive orders and held numerous informal discovery conferences after his appointment on April 4, 2024. On June 16, 2025, defendants filed a motion for terminating or evidentiary sanctions against Meishe for its actions during the discovery process. Dkt. No. 591. Plaintiff opposed, Dkt. No. 613, and defendants replied, Dkt. No. 654.

The parties filed cross-motions for summary judgment or partial summary judgment on July 11, 2025. Dkt. Nos. 608, 609. The parties filed oppositions, Dkt. Nos. 647, 648, and replies, Dkt. Nos. 657, 658. The Court held a hearing on the motion for sanctions and the motions for summary judgment on August 15, 2025.

In addition, the parties have collectively filed nine *Daubert* motions seeking to exclude expert testimony. Dkt. Nos. 625-642. With leave from the Court, the parties filed separate briefs on the issue of the copyrightability of Meishe's source code on July 25, 2025. Dkt. Nos. 650, 681, 715. A hearing on these issues occurred on August 29, 2025.

---

[1] The letter also informed defendants that Meishe would seek monetary damages only in regard to copyright infringement and trade secret misappropriation for the TikTok and CapCut apps, but would continue to seek injunctive relief against all of defendants' accused apps: TikTok, CapCut, Faceu, Lemon8, Qinyang, and BytePlus Video Editor SDK. Dkt. No. 644-10.

[2] Due to an error, defendants filed Docket Number 644 to replace Docket Number 607, the original sealed filing of its supporting exhibits for summary judgment.

United States District Court
Northern District of California

## II.    Relevant Factual Background

### A.    Meishe's Origin

Beijing Meishe Network Technology Co., Ltd. originated within the Chinese company Xin Ao Te (XAT).[3]  For many years, XAT focused on providing video technology solutions to the TV broadcasting industry.  Dkt. No. 608-4 at 108.  In 2010, XAT released a sophisticated "visual effects and video compositing system" called Dunhuang.  *Id.* at 146.  XAT then started developing code for a mobile video editing application in 2013.  Dkt. No. 610-5 (Zheng Dep. Day 1) at 63.  The business unit responsible for this work was the Video 360 department led by Pengcheng Zheng.  *Id.* at 61, 64, 69.  That department completed version 1.0 of the mobile application on September 26, 2014 and XAT obtained a Chinese copyright (Registration No. 2014SR205312) for the software program on December 22, 2014.  Dkt. No. 612-11.

In late 2014 and 2015, XAT spun off the Video 360 department into Beijing Meishe.  On September 30, 2014, XAT entered into an investment agreement with Mr. Zheng and one other entity to establish Beijing Meishe Network Technology Co., Ltd.  Dkt. No. 610-18 at 1.  Article 12.2 of the agreement noted that it "represents the complete consensus of the parties regarding the matters under this agreement and supersedes any prior written or oral agreements or other documents made by the parties regarding these matters."  *Id.* at 14.  The agreement stated that XAT would contribute ten million yuan in "intangible assets" and receive 40% of the shareholder equity, while Mr. Zheng would contribute five million yuan in cash and receive a 20% equity share.  *Id.* at 2.  On June 29, 2015, the three parties to the original investment agreement signed a supplemental agreement confirming that XAT had completed its investment in the company of its ten million yuan in intangible assets by transferring thirteen patents listed in the supplemental agreement's appendix.  Dkt. No. 590-7.

Exactly when Meishe started operating independently is a little unclear from the record.  The investment agreement stated that Meishe's expenses shall be covered by Meishe starting October 1,

---

[3] In the record, XAT is sometimes referred to as China Digital Video or New Auto Beijing Video Technology, *see* Dkt. No. 610-5 (Zheng Dep. Day 1) at 60, and Beijing Meishe is sometimes referred to as Beijing Meicam.

3

2014, but Mr. Zheng testified in deposition that Meishe commissioned XAT to handle financial matters for the company until "maybe 2018." Dkt. No. 610-18 at 2; Zheng Dep. Day 1 at 71. Meishe's Chinese business license lists an establishment date of October 23, 2014. Dkt. No. 610-17, ¶ 6, Ex. B. Meishe created employment agreements for its employees starting March 1, 2015, but Mr. Zheng testified that he started working for Meishe prior to that date. Zheng Dep. Day 1 at 67-69; Dkt. No. 644-7. At Meishe's inception, Mr. Zheng became Meishe's chief executive officer (CEO) and Liang Jian became the chief technology officer (CTO). Zheng Dep. Day 1 at 67; Dkt. No. 610-19 (Jian Dep.) at 54.

### B. Source Code Development from Dunhuang to Meishe

The parties have disputed the extent to which Dunhuang source code, created by XAT, is present within Meishe's source code at issue in this litigation. The operative complaint refers to "Meishe's asserted highly confidential, independently-developed registered and unregistered source code." Dkt. No. 433 ¶ 1. In a hearing before this Court on defendants' motion to dismiss the operative fourth amended complaint, plaintiff's counsel repeated that the code at issue was Meishe's "independently developed source code," not "any third-party source code." Dkt. No. 590-13 at 9.

Defendants noticed, however, that a 2016 filing from XAT to the Hong Kong stock exchange boasted that XAT launched the Meishe mobile application "[u]tilizing [XAT's] visual effects and video compositing technologies in the *Dunhuang*-series, which are normally deployed in large-scale TV stations."[4] Dkt. No. 591-29 at 147. Defendants then asked the Special Master to compel Meishe to produce Dunhuang code. Dkt. No. 564 at 5. In opposition to this request, Meishe submitted a December 2024 declaration from CTO Jian stating that "[t]he Meishe software is independently developed from the ground up and no Dunhuang source code has been incorporated into the Meishe software." Dkt. No. 590-15.

Later in discovery, plaintiff discovered it had possession of old Dunhuang code on a

---

[4] In an appendix, the same filing lists two registered Chinese copyrights for the Dunhuang Visual Effects Composing and Editing Systems, registered in 2011 and 2013. Dkt. No. 608-4 at IV-18, IV-23.

4

computer in storage and produced this code to defendants, allowing for a comparison between Dunhuang and Meishe code. Dkt. No. 612-12 at 7. A Meishe employee's deposition then revealed that, while "the Dunhuang app and the Meishe app are two completely different products or programs," the Video 360 group in XAT (that later spun off as Meishe) "evolved" the Meishe software from the Dunhuang software. Dkt. No. 590-18 (Li Dep.) at 68. When defendants took CTO Jian's deposition on April 16, 2025, he acknowledged that he was a primary developer of the source code for the Meishe app and then admitted that the Meishe app used "very little" of Dunhuang source code, but he also said that Meishe used a different "video editing architecture" compared to Dunhuang. Jian Dep. at 96-97. Mr. Jian then submitted a letter to the Special Master two days later in an attempt to clarify the discrepancy between his sworn declaration and sworn deposition testimony:

> Regarding the Dunhuang declaration, the statements I made were truthful based on my understanding at the time. I was familiar with both the Meishe app and the Dunhuang app, and based on my memory I believed there was no overlap of the code between the two. At the time I did not have any Dunhuang code to review, so I could only testify from my memory. However, later we located an old copy of Dunhuang code and produced it to Defendants, and it appears that some Dunhuang code and some Meishe code in some files is similar. I testified to that fact in my recent deposition.

Dkt. No. 590-17.

### C.     Publication of the First Version of the Meishe App

Meishe asserts that its app version 1.0—the application associated with Chinese copyright registration 2014SR205312 (re-registered with Meishe as 2015SR227927)—was first made available to the Chinese app stores AppChina, Huawei, Baidu, and 360/Qihoo on or around September 27, 2014. Dkt. No. 644-5 at 50. On September 29, 2014, XAT human resources emailed company employees announcing the launch of the Meishe app and inviting them to download it from the following app stores: "Baidu Mobile Assistant, 360 Mobile Assistant, Wandoujia, Application Treasure, Anzhi Market, Meizu App Store, Huawei App Store, Oppo App Store." Dkt. No. 646-6.

Defendants argue that the Meishe app was first sent to the Apple store, pointing to a

5

September 1, 2014 email to Jian Liang from the iTunes store showing he submitted an app for review. Dkt. No. 644-15. Plaintiff contends that this app was not the Meishe app, highlighting that the Chinese name of the app in this email translates to "Little Video Expert" and that "the 'App SKU' identifies it as a 'test' file." *See id.*; Dkt. No. 647 at 5. Plaintiff points instead to an October 15, 2014 email from the iTunes store to Jian Liang acknowledging the submission of an app named Meishe with an SKU of "com.cdv.video360.1.0." Dkt. No. 646-7.

According to XAT's submission to the Hong Kong Stock Exchange, the Meishe app launched on the Android and iOS operating systems in October and November 2014. Dkt. No. 608-4 at 147.

### D.       Transfer of Ownership of Copyright and Trade Secrets

In October 2015, XAT and Meishe signed a written "Computer Software Transfer Agreement" in which XAT transferred "the various copyrights"[5] over the Meishe Mobile-phone Video Shooting and Editing Software, version 1.0, registration number 2014SR205312. Dkt. No. 610-6. The agreement gives Meishe the copyright or copyrights to the Software from the date of execution, October 10, 2015. *Id.* Meishe registered the copyright to the software in its name on November 20, 2015, receiving a new registration number (2015SR227927) from the Chinese copyright administration. Dkt. No. 610-6.

On August 18, 2021, Meishe submitted a declaration from XAT to the Chinese court for the purpose of advancing similar litigation against ByteDance in that country. Zheng Dep. Day 1 at 148; Dkt. No. 610-6. XAT's declaration stated the following:

> It is hereby declared that: China Digital Video (Beijing) Limited (hereinafter referred to simply as "the Company") began research and development of "MEISHE Mobile-phone Video Shooting and Editing Software" ("the Software") in October 2013 and completed its development of version V1.0 on September 26th, 2014.

---

[5] The parties offer different English translations of the agreement. Plaintiff's version translates Article 2 as follows: "Party A [XAT] hereby transfers to Party B [Meishe] gratuitously and without geographical restrictions *the various copyrights over the Software*." Dkt. No. 610-6 (emphasis added). Defendants' version translates the same article as follows: "Party A transfers *all rights to the copyright of the software* to Party B free of charge and without geographical restrictions." Dkt. No. 590-4 (emphasis added).

6

Subsequently, the Company applied for registration of its copyrights to the Software with the National Copyright Administration, which approved the copyright registration for the "MEISHE Mobile-phone Video Shooting and Editing Software [referred to simply as: MEISHE] V1.0" on December 22nd, 2014. **In February 2015, the Company transferred the "MEISHE Mobile-phone Video Shooting and Editing Software" to Beijing Meishe Network Technology Co., Ltd. Beijing Meishe Network Technology Co., Ltd. has since become copyright owner and trade secret owner of the "MEISHE Mobile-phone Video Shooting and Editing Software", and there exists no ownership dispute between the Company and Beijing Meishe Network Technology Co., Ltd. with respect to the Software.**

Dkt. No. 610-6 (emphasis added). The statement is signed with a corporate seal. *Id.*

After reviewing this declaration, defendants proceeded to seek evidence of the purported February 2015 transfer through discovery in this litigation. *See* Dkt. No. 591 at 3. On July 29, 2022, defendants served the following interrogatory: "Identify all current, former, and claimed ownership interests in each of the Asserted Copyrights, Alleged Nonpublic Source Code, or Related Products, and all agreements and negotiations related to those actual or claimed ownership interests and/or changes in ownership interest." Dkt. No. 591-5, Interrogatory No. 14. In response, plaintiff directed defendants to the October 2015 transfer agreement, the 2021 XAT declaration, the September 30, 2014 investment agreement, and the subsequent supplemental investment agreement. Dkt. No. 590-6. Through Hague Convention letters rogatory to XAT, defendants also received XAT's Intellectual Property Management Policy, revised in 2012, which states that "[w]hen the company's intellectual property rights are transferred externally, a written contract must be signed in accordance with legal provisions . . . ." Dkt. No. 590-25.

As the question of ownership over the relevant copyrights and trade secrets persisted, on December 16, 2014 the Special Master ordered Meishe to produce a declaration addressing

a. The relationship between Meishe and XAT from inception to present,

b. Whether any documents or agreements exist that bear on the terms of Meishe's separation from XAT, including any cooperation agreements, and including any documents addressing intellectual property as between Meishe and XAT

c. If such documents exist, Meishe's declaration shall clearly state this and shall also clearly state whether any copies of such documents will be provided with the declaration.

d. How that relationship has evolved from inception to present; . . .

7

Dkt. No. 519 at 32. In a subsequent sworn declaration dated January 27, 2025, Mr. Zheng stated, "when Meishe was formed as its own company, XAT transferred ownership of all the IP the Meishe product team had been working on to the new Meishe company (including all copyrights and trade secrets) and provided some early assistance, as described below, to help Meishe establish itself as a company." Dkt. No. 610-17 ¶ 4. Mr. Zheng then asserted that "Meishe previously produced the one document we had where XAT assigned IP rights to the Meishe IP to Meishe," referring to the October 2015 transfer agreement. *Id.* ¶ 5. The declaration also referenced the 2021 statement from XAT to the Chinese courts. *Id.*

Defendants pressed Mr. Zheng further about any agreements transferring intellectual property from XAT to Meishe during Mr. Zheng's deposition on April 14, 2025. Mr. Zheng testified that there was only one IP transfer agreement and confirmed it was the October 2015 agreement. Zheng Dep. Day 1 at 124, 145. When asked about the discrepancy between the October date in the written agreement and the February date in XAT's 2021 declaration to the Chinese court, Mr. Zheng first asserted that XAT submitted the declaration to the Chinese court but then conceded that Meishe was the party in that litigation that submitted the declaration to the court. *Id.* at 145-48. Meishe did not try to change the February date listed in the XAT declaration. *Id.* at 148.

Ten days after Mr. Zheng's deposition, Yanfang Wang, a Chinese law professor and former judge, submitted an expert report affirming the validity of an "oral agreement" between XAT and Mr. Zheng to transfer intellectual property. Dkt. No. 610-2 (Wang Report). The fact section of the Wang report contained the following statements:

> 9. On April 21, 2025, I communicated with the CEO, CTO, and Vice President of R&D of Meishe Company, who confirmed the following facts:
>
> 10. Before October 2014, Mr. Zheng Pengcheng (currently the CEO of Meishe Company), who was an employee of China Digital Video (Beijing) Limited (hereinafter referred to as "Xin Ao Te Company"), began discussions with Xin Ao Te Company regarding the independent commercialization of the Meishe APP software. Based on mutual consensus, it was proposed to advance the project through the establishment of a new company for market operations. Before formally signing a written agreement, both parties had formed an oral agreement that they believed to have legal binding effect, with core terms stipulating that upon the establishment of Meishe Company, Xin Ao Te Company would need to transfer all rights (including copyrights and trade secrets) related to the Meishe APP software to

United States District Court
Northern District of California

8

Meishe Company as an investment in the newly established company. After Meishe Company acquired these rights, Meishe Company would then transfer a portion of its shares to Xin Ao Te Company as consideration.

11. Meishe Company was officially established on October 23, 2014, and received its business license. In February 2015, based on the oral agreement, Xin Ao Te Company transferred the Meishe APP software and all its intellectual property rights to Meishe Company.

*Id.* at 6-7.[6] Judge Wang summarized her legal conclusions as follows:

17. Based on relevant Chinese laws, the facts, evidence, and materials of this case, combined with my judicial practice and academic research experience, I have formed the following opinions: First, the "oral agreement" reached between Xin Ao Te Company and Meishe Company is legal and valid; second, as early as February 2015, when Xin Ao Te Company transferred the Meishe APP software and all its intellectual property rights to Meishe Company, Meishe Company obtained all copyrights and trade secrets of the Meishe APP software as stipulated in the "oral agreement," including the copyright and trade secrets of the "Dunhuang Software" source code within the Meishe APP; third, the fact that Xin Ao Te Company has never asserted any ongoing rights to the Meishe APP software against Meishe Company indicates that the rights transfer stipulated in the "oral agreement" has been completed, and the status of rights is stable; fourth, the "Statement" issued by Xin Ao Te Company further supports and confirms Xin Ao Te Company's acknowledgment of the prior rights transfer (that all copyrights and trade secrets of the Meishe APP software have been transferred to Meishe Company).

*Id.* at 10.

Judge Wang's report also details how in 2023 and 2024 the Supreme People's Court in China recognized Meishe's ownership of intellectual property, including copyrights and trade secrets, in a couple of versions of Meishe's software. *Id.* at 23-24; *see also* Dkt. Nos. 647-9, 647-10, 647-11 (full text of Chinese court opinions). The report notes that not all the versions at issue in the U.S. litigation were at issue in the Chinese litigation, but that the "Meishe SDK software mentioned in the Chinese litigation is essentially the same software involved in the U.S. litigation concerning the Meishe APP software."[7] Dkt. No. 610-2 at 8.

---

[6] In later deposition testimony, Judge Wang stated that she learned the facts of the case from phone calls with plaintiff's counsel, wrote a draft report, and then confirmed the facts in her draft report with Meishe executives. Dkt. No. 655-3 at 74-76, 164-171. The confirmation came in the form of a group WeChat thread, where plaintiff's counsel shared specific language and the Meishe executives approved it. *Id.* at 170; Dkt. No. 655-4.

[7] In her deposition, Judge Wang clarified that she is not a software expert and that this statement relied on a characterization of similarity provided by plaintiff's counsel. Dkt. No. 655-3 at 159. Defendants note that, in a separate *Daubert* motion, plaintiff seeks to exclude expert

9

Defendants' expert Judge Xiangjun Kong offers a contrary opinion as to the validity of any transfer of intellectual property from XAT to Meishe. Dkt. No. 610-3 (Kong Report). Judge Kong offered the following summary of his opinions:

> Meishe did not obtain any copyrights or trade secrets pursuant to any oral agreement in 2014 or in February 2015. Put simply, Meishe has not been able to articulate any specific terms of the alleged oral agreement, nor has Meishe provided evidence of a purported oral agreement between XAT and Mr. Zheng. In fact, Prof. Wang's description of the core terms of the alleged oral agreement reveals that it merely states that XAT "would need to transfer" certain IP rights to Meishe in the future [footnote omitted]; the purported oral agreement **did not** state that XAT was obligated to transfer any rights when the oral agreement was allegedly made. Therefore, in my opinion, any oral discussions between XAT and Mr. Zheng in 2014 were, at most, negotiations or a mere statement of intent to transfer certain IP rights in the future.

*Id.* ¶ 10. Judge Kong also opined that any oral agreement would not be valid under Chinese laws, the 2021 declaration from XAT is not evidence of an oral agreement, the capital contribution agreements did not transfer copyrights or trade secrets, and the October 2015 transfer agreement did not transfer trade secrets or rights to Dunhuang code. *Id.* ¶¶ 11-14. While Judge Kong acknowledged the decisions of the Chinese courts in favor of Meishe, he suggested that the information considered by those courts was more limited than what is available here. *Id.* ¶ 83.

After the release of Judge Wang's report, Mr. Zheng submitted an errata sheet attempting to make substantive changes to his testimony on the issue of transfer agreements. Dkt. No. 590-12. In response to the question, "Are you aware that there's only one IP transfer agreement between Xin Ao Te and Meishe, yes or no?", Mr. Zheng sought to change his answer from yes to no. *Id.* He also sought to add the following unspoken statements into the transcript: (1) "The Meishe app source code and all associated intellectual properties belong to Meishe after they were transferred to Meishe

---

testimony regarding SDK code as "irrelevant" since that code is not being asserted in this case. Dkt. No. 659-1 at 8 (citing Dkt. No. 632 at 16-17). The Court remarks that earlier in this litigation, the parties argued the opposite of what they are arguing now in regard to the similarity between the Chinese litigation and the claims here. In seeking a stay of this litigation, defendants argued previously that the issues and parties in the Chinese litigation were like those here. Dkt. No. 36-2 at 10 (seeking a stay of the U.S. litigation to avoid "duplicative litigation" and the "risk of inconsistent findings"). In opposing that motion, plaintiff wrote "there is little similarity between the issues and products of the Chinese litigation and the current action." Dkt. No. 46-1 at 9. Now, plaintiff asserts that the favorable judgment of the Chinese litigation applies here, while defendants argue the opposite.

during February 2015" and (2) "The February 2015 agreement was an oral agreement." *Id.* At the point where he was asked to confirm again that there was only one transfer agreement, Mr. Zheng requested to change his answer from "Yes" to "Yes there is only one written agreement." *Id.* He also sought to insert testimony affirming that Meishe did not attempt to correct the February date in the 2021 XAT declaration "because it is accurate." *Id.*

More recently, after the parties filed their opening briefs for summary judgment, XAT and Meishe signed on July 24, 2025 a written agreement concerning intellectual property rights in the source code used for the Meishe application. Dkt. No. 646-5. The agreement states that the parties have always agreed that Meishe owns all rights to the source code used in its app, even if that source code had been used first in Dunhuang products. *Id.* The agreement confirms the understanding set forth in Judge Wang's expert report that an oral agreement led to the transfer of rights in February 2015 and that the October 2015 written agreement confirmed the prior oral agreement and included the transfer of trade secret rights. *Id.* The agreement further states,

> To the extent there remains any question about or challenge to the validity of the transfer of rights in the Meishe App, the parties hereby agree that all rights in the Meishe App are hereby and were in February 2015 transferred from Xin Ao Te to Meishe, including any source code in the Meishe App that was also used in other Xin Ao Te projects. That includes all copyrights, trade secrets, patents, and all other rights to the Meishe App, effective retroactively to February 2015. This agreement assigns to Meishe the right to enforce any and all rights to the Meishe App including against third parties based on these rights, including litigation or settlement, at any time since February 2015. This agreement is effective immediately upon execution by the parties and retroactively to February 1, 2015.

*Id.*

### E.    Meishe Employee Leaves Meishe and Joins Affiliate of Defendants

Central to this lawsuit is an individual named Xie Jing, who worked for XAT from 2007 to 2015 and then moved to Meishe, signing a labor contract with Meishe on March 1, 2015. Dkt. No. 610-16 at MEISHE-TT_00342486. Mr. Xie's labor contract with Meishe prohibited him from disclosing Meishe's confidential information, including trade secrets, to any third parties. *Id.* at MEISHE-TT_00342573-74. Mr. Xie and Meishe mutually agreed to part ways in June 2015. *Id.* at

11

MEISHE-TT_00342581. When Mr. Xie left the company's employment, he took all the code of the Meishe app with him. Dkt. No. 611-10 (Xie Dep.) at 52.

Mr. Xie started working for a ByteDance company in China in 2017. Xie Dep. at 87. After Meishe initiated the Chinese litigation, Mr. Xie told his supervisor at that ByteDance company, Jianchao Yang,[8] that Mr. Xie had used code while working for ByteDance that he had written before he joined Bytedance. Dkt. No. 611-9 (Yang Dep.) at 139-42.[9] Mr. Xie and his ByteDance-affiliated employer entered into several iterations of a Termination Agreement in August through November 2023, resulting in his ultimate termination on November 22, 2023. Dkt. No. 611-8. The termination agreement reserved a right for the company to bring a legal claim against Mr. Xie in relation to the Meishe litigation, but the company also agreed to pay Mr. Xie's legal fees related to his deposition in the Meishe lawsuit. *Id.* at 3.

### F. Meishe's Pre-Suit Investigation and Related Documents

In the operative FOAC, plaintiff detailed the following allegations:

> 79. In March 2021, Meishe discovered that a series of apps belonging to ByteDance, Ltd. had infringed Meishe's Copyrighted Works since at least 2018. These apps included, but were not limited to, TikTok, Douyin, Jianying, and CapCut. Meishe personnel conducted an analysis between code of Meishe app and that of TikTok app shows that the code used to implement video and audio editing functions in the two apps is strikingly similar, proving that Defendants copied Meishe's copyrighted work.

> 80. At that time, though Meishe could not obtain the source code of TikTok app, Meishe was able to conduct a comparison between decompiled "TikTok v8.5.0" object code and decompiled "Meishe v2.5.4" object code. On the Android platform, object code of an app is in the form of Android application package ("APK") file. The release version refers to the APK file. "TikTok v8.5.0" APK file can be obtained from public channels. In March 2021, Meishe downloaded "TikTok v8.5.0" APK file from a third-party android app store. Meishe's analysis showed that numerous source code methods contained identical names to Meishe's copyrighted source code, including typographical errors.

FOAC ¶¶ 79-80. Defendants sought the documentary evidence of this object code comparison in

---

[8] Mr. Yang worked for a different ByteDance entity, defendant ByteDance, Inc. Dkt. No. 614-19 ¶ 2.

[9] At his deposition, Mr. Xie testified that he did not recall this interaction. Xie Dep. at 91.

12

discovery, but plaintiff told defendants on November 27, 2024 that "Meishe did not generate files of decompiled object code." Dkt. No. 591-16. Plaintiff asserted that it used a software that "can display the decompiled code directly in the software window, so no decompiled code files were generated." *Id.*

After defendants further moved to compel decompiled object code files, Meishe submitted a declaration from CTO Jian reiterating that "the process of decompiling the code was carried out internally with the IDA Pro software, and no decompiled code files were generated." Dkt. No. 590-24. The Special Master granted defendants' motion, ordering that Meishe produce responsive materials to the extent it had any, "including through Plaintiff's ability to access any IDA Pro database containing records of Plaintiff's comparison of code as part of its investigations prior to its initiation of this action." Dkt. No. 531 at 13-14. On February 14, 2025, Meishe then produced IDA Pro files but no comparison documents. Dkt. No. 591-27.

At Meishe CTO Jian's deposition on April 16, 2025, he testified that Meishe had created an Excel spreadsheet file comparing plaintiff's and defendants' decompiled object code at the time of its pre-suit investigation. Jian Dep. at 142. Several days later, the Special Master convened an informal discovery conference to discuss production of this spreadsheet. Dkt. No. 560 at 2. Plaintiff's counsel argued the spreadsheet was created in 2022 at the direction of Meishe's Chinese counsel and was privileged. *Id.* The Special Master ultimately ordered production of the spreadsheet with redactions of notations by counsel and Meishe produced the redacted file. *Id.*

### G.     Comparison of Plaintiff Meishe's and Defendants' Source Codes

Plaintiff's expert Michael Shamos compared Meishe's code with defendants' codes and found, in his opinion, that 89 of the 98 produced versions of defendants' code infringed Meishe's intellectual property. Dkt. No. 610-9 (Shamos Report) ¶ 62. Dr. Shamos alleges finding evidence of similar comments and misspellings in plaintiff's and defendants' code across various versions of defendants' code. *Id.* ¶¶ 71-81. Dr. Shamos submitted detailed comparisons of three exemplary versions of defendants' code. *Id.* ¶¶ 82-102. In a rebuttal report, defendants' expert Nigel Jones contends that about 90% of Meishe's asserted code consists of unprotectable material. Dkt. No.

649-12 (Jones Report) ¶¶ 1245-47.

**DISCUSSION**

**I.      Summary Judgment and Copyrightability**

**A.      Legal Standard**

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting then Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c).

United States District Court
Northern District of California

14

When considering cross-motions for summary judgment, the Court must review each motion "on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotation marks and citation omitted). The Court must consider the evidence presented in support of each motion "to determine whether it present[s] a disputed issue of material fact precluding summary judgment" on the other motion. *Id.* at 1135. In other words, the Court collectively considers all of the evidence presented, then decides each motion for summary judgment separately based on the sum of the evidence.

### B. Ownership

As a threshold matter, the Court must first determine whether summary judgment is appropriate on the question of plaintiff's ownership of the underlying intellectual property. Defendants assert that there is no evidence to show that XAT transferred to plaintiff ownership of the intellectual property at issue in this case when plaintiff became its own company. Consequently, defendants maintain plaintiff lacks standing. Plaintiff argues that its ownership of the rights to the Meishe app is undisputed between XAT and plaintiff.

#### 1. Relevant Evidence and Admissibility Considerations

The Court first examines the evidence presented on this issue and evaluates its admissibility.

##### a. September 2014 and June 2015 Investment Agreements

The investment agreements between XAT, Zheng, and a third party memorialize the establishment of Meishe and XAT's investment in the company in the form of thirteen patents, ostensibly worth ten million yuan. *See* Dkt. Nos. 610-18, 590-7. These documented agreements were produced in discovery and are admissible.

##### b. October 2015 Copyright Transfer Agreement

The October 2015 agreement transferring copyright of the Meishe software version 1.0 from XAT to Meishe was produced in discovery and is similarly admissible.

15

United States District Court
Northern District of California

### c. XAT's 2021 Declaration to the Chinese Court

In the Chinese litigation, plaintiff submitted a declaration from XAT dated August 18, 2021 stating that XAT transferred the rights to the copyrights and trade secrets of the Meishe software to plaintiff in February 2015 and that there was no ownership dispute between the two companies regarding the software. Dkt. No. 610-6. Defendants argue this declaration is inadmissible as anonymous, unsworn hearsay that Meishe cannot offer in Court because it disclosed no XAT witnesses on its witness list in discovery. Dkt. No. 608 at 9. Plaintiff counters that the use of a corporate seal in place of a personal signature is a common Chinese custom and that the statement is exempt from hearsay as a legal or verbal act. Dkt. No. 647 at 10-11; Dkt. No. 657 at 6. The Court finds the document admissible.

### d. Evidence of Prior Oral Agreement

Meishe asserts that XAT and Mr. Zheng entered into an oral agreement prior to October 2014 that effected a transfer of intellectual property in the Meishe software to plaintiff in February 2015. Defendants object to the evidence that supports the existence of an oral agreement.

### i. Zheng Testimony

Meishe CEO Zheng submitted a declaration on January 27, 2025 stating that XAT transferred the ownership of all intellectual property the Meishe team had been working while still at XAT. Dkt. No. 610-17 ¶ 4. When defendants took Mr. Zheng's deposition in April, he stated that there was only one transfer agreement, the October 2015 agreement. Zheng Dep. Day 1 at 124, 145. Mr. Zheng then submitted an errata sheet to the deposition transcript seeking to make numerous substantive edits to his testimony, including inserting references to a previously unmentioned oral agreement. Dkt. No. 590-12. The submission of deposition errata "is to be used for corrective, and not contradictory, changes." *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1226 (9th Cir. 2005). The Court will not consider Mr. Zheng's inappropriate errata as facts to be considered at summary judgment.

#### ii.     Wang Report

Judge Wang's expert report states that, on April 21, 2025, Meishe executives confirmed that Mr. Zheng had discussions with XAT before October 2014 about creating the new company, that the parties formed a binding oral agreement, and the transfer of intellectual property rights occurred in February 2015 based on this oral agreement. Wang Report at 6-7. Judge Wamg explained in a later deposition that she first learned these facts from plaintiff's counsel, wrote her draft report, then received approval of the specific language from the Meishe executives in a group WeChat threat. Dkt. No. 655-3 at 74-76, 164-171; Dkt. No. 655-4. Based in part on these facts, Judge Wang concluded that Meishe owns the intellectual property rights at issue in this case. Wang Report at 10.

Without commenting on Judge Wang's legal analysis, the Court finds it inappropriate at the summary judgment stage to consider facts relied upon in an expert report that have not been independently produced in discovery. Meishe produced no evidence of an oral agreement during fact discovery prior to Judge Wang's report.

#### iii.     July 2025 Agreement

XAT and Meishe signed another written agreement on July 24, 2025, after the cross motions for summary judgment had been filed in this case. Dkt. No. 646-5. This new agreement confirms Judge Wang's understanding that an oral agreement transferred the rights to the copyrights and trade secrets at issue in this case. *Id.* While written in English—a language Mr. Zheng said he cannot read—it is signed by an XAT director and Mr. Zheng. *Id.*; Zheng Dep. Day 1 at 9. The Court gives minimal consideration to the agreement, produced in the heat of litigation, only noting that it maintains the consistent position of XAT and Meishe that all rights to the Meishe app were previously transferred from XAT to Meishe.

#### e.     Chinese Court Judgments

As detailed in Judge Wang's report, the Supreme People's Court in China recognized

17

Meishe's ownership of copyrights and trade secrets in related versions of Meishe software. Wang Report at 23-24; Dkt. Nos. 647-9, 647-10, 647-11 (full text of Chinese court opinions). The Court will take notice of these opinions as a material fact bearing on the question of ownership in this case.

### f.     Additional Licensing Agreements

Meishe has submitted evidence of licensing agreements from 2018 and 2024 wherein Meishe allowed XAT to use its software for a fee. Dkt. Nos. 646-13, 646-14. These agreements are admissible.

### 2.     Evaluating Plaintiff's Ownership of Asserted Copyrights

Five versions of Meishe's software are at issue in its copyright infringement claim: the registered Chinese copyright 2015SR227927 and four unregistered copyrighted versions: Meishe App v1.0, Meishe App v1.3 rev. 2631, Meishe App v1.5, and Meishe App v2.5.4. *See* Dkt. No. 644-9.

It is undisputed that XAT transferred the copyright of Meishe App v1.0 to Meishe via the October 2015 transfer agreement. *See* Dkt. No. 610-6. Meishe then updated the registration of the copyright in China to reflect its ownership, receiving registration number 2015SR227927. *Id.* It is likewise undisputed that the Meishe app source code "evolved" from the Dunhuang code. Li Dep. at 68.

Defendants argue that XAT did not transfer rights to any underlying Dunhuang code in the application so Meishe's copyright only includes "Meishe code's non-trivial 'evol[ution]' from the Dunhuang code." Dkt. No. 608 at 12. Ninth Circuit authority recognizes that copyright protection for derivative works "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b); *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1016 (9th Cir. 2012); *DC Comics v. Towle*, 802 F.3d 1012, 1023 (9th Cir. 2015). Defendants argue that Meishe "must prove with admissible evidence that the copied code *was not* from Dunhuang" and that Meishe has not done so. Dkt. No. 608 at 13.

<div style="writing-mode: vertical-rl">United States District Court
Northern District of California</div>

The Court first considers whether Meishe owns the rights to the underlying Dunhuang code in its application. The Court notes that Meishe app v1.0 was created by employees of XAT, before the creation of Meishe as an independent entity. The app was published to Chinese app stores on September 27, 2014, a few days before the investment agreement creating Meishe was signed and a month before Meishe received its business license. Dkt. No. 644-5 at 50; Dkt. No. 610-18 at 1; Dkt. No. 610-17, ¶ 6, Ex. B. Depending on the English translation, the October 2015 transfer agreement gave Meishe "the various copyrights over the Software" or "all rights to the copyright of the software." Dkt. No. 610-6; Dkt. No. 590-4. Meishe's expert opined that this agreement confirmed that a prior oral agreement included a transfer of the copyright for the Dunhuang source code embedded in the Meishe software. Wang Report ¶ 42. Defendants' expert concludes the agreement does not transfer the rights of any Dunhuang code. Kong Report ¶ 50.

While the mechanism of transfer is unclear, the Court finds that the record establishes that Meishe owns all the rights to the source code in the Meishe app, including any Dunhuang code carried over into the Meishe app. Notwithstanding Judge Kong's opinion to the contrary, the Court finds no evidence to overrule the shared conclusions of the parties to the transfer and the Chinese courts that have since ruled on the effect of the transfer. Further, the subsequent licensing agreements in the record confirm that XAT believes plaintiff owns the Meishe application—indeed, XAT has paid plaintiff to use the software.

If plaintiff owns full rights to the original version of the software, it follows that plaintiff owns full rights to the subsequent versions for which plaintiff claims an unregistered copyright. No record evidence suggests any intervening acts have disrupted or severed plaintiff's ownership of the copyright of the software it has continued to develop and refine.

### 3. Evaluating Plaintiff's Ownership of Trade Secrets

Defendants likewise dispute plaintiff's ownership of the trade secrets in the Meishe software, contending that, to the extent any trade secrets exist, they still reside in XAT's ownership. The October 2015 transfer agreement does not mention trade secrets. Nonetheless, XAT asserted in its 2021 declaration that it transferred the trade secrets in the Meishe software to plaintiff. Dkt. No.

610-6. And in a 2024 ruling, the Chinese court determined that Meishe owned the trade secrets in version 1.5 of the Meishe software. Dkt. No. 647-11 at 30-31. The Court does not see how a jury could find otherwise. Thus, the Court finds that plaintiff Meishe owns the trade secrets at issue in this litigation and defendants' motion for summary judgment on the grounds of lack of ownership is DENIED.

### 4. Ownership Conclusion

The Court determines that there is not a triable issue of fact regarding the ownership of the copyrights and trade secrets asserted in this case. The record shows that plaintiff owns the intellectual property at issue.

### C. Applicability of Copyright Registration Requirement

Defendants next contend that plaintiff's copyright infringement claim must fail because plaintiff has not registered its copyrights with the U.S. Copyright Office. Plaintiff responds that it is exempt from the registration requirement.

Foreign works are exempt from registering with the U.S. Copyright Office under 17 U.S.C. § 411(a), but for United States works, registration is generally a prerequisite for pursuing copyright infringement in federal court. *See Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 586 U.S. 296, 301 (2019). The Copyright Act defines a "United States work" differently depending on whether the alleged work is a published work or an unpublished work. *See* 17 U.S.C. § 101. A published "United States work" is defined as a work that is first published –

> (A) in the United States;
> (B) simultaneously in the United States and another treaty party . . .
> (C) simultaneously in the United States and a foreign nation that is not a treaty party; or
> (D) in a foreign nation that is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of audiovisual work legal entities with headquarters in, the United States[.]

*Id.* An unpublished "United States work" is defined as a work in which "all the authors of the work are nationals, domiciliaries, or habitual residents of the United States . . . ." *Id.*

20

The parties dispute whether the copyrighted works in question were published and, if so, whether they were published in a manner that renders them "United States works" under the statute.

### 1.     Published or Unpublished Works

Meishe admits that it made at least four of the five versions included in its copyright claim available on online app stores.[10]  Meishe argues, however, that the sale of a software application does not constitute publication of the copyright-protected source code, since an end-user can only derive the object code from the publicly available application, not the source code.  The Ninth Circuit has explained the relationship between source code and object code as follows:

> Computer programs are works of authorship entitled to protection under the Copyright Act. 17 U.S.C. § 101, 102. The Copyright Act defines a computer program as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101. Computer programs can be expressed in either source code or object code. "Source code is the computer program code as the programmer writes it, using a particular programming language." Compendium of Copyright Office Practices, § 321.01. Source code is a high level language that people can readily understand. "Object code is the representation of the program in machine language [binary] ... which the computer executes." *Id.* at § 321.02. Source code usually must be compiled, or interpreted, into object code before it can be executed by a computer. Object code can also be decompiled into source code. Source code and object code are "two representations of the same computer program. For registration purposes, the claim is in the computer program rather than in any particular representation of the program." *Id.* at § 321.03. However, source code created by decompiling object code will not necessarily be identical to the source code that was compiled to create the object code.

*Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 779 (9th Cir. 2002).

The parties have not presented case law that directly answers whether publication of object code in the form of a computer program constitutes publication of copyright-protected source code in the context of determining whether a work is a United States work.  Defendants rely on the above passage from *Syntek* to argue that distribution of the software application meets the statutory definition of publication for the underlying source code, since the Ninth Circuit wrote that "[s]ource

---

[10] As discussed below, the parties dispute whether the asserted copyright attached to app1.3 rev. 2631 was published.

21

code and object code are 'two representations of the same computer program.'"[11]  *See id.*  Plaintiff directs the Court to *GCA Corp. v. Chance*, where a prior court likewise determined that source code and associated object code are to be treated as one work.  No. C-82-1063-MHP, 1982 WL 1281, at *1-2 (N.D. Cal. Aug. 31, 1982).  As such, that court determined that a copyright of a source code protects the object code as well.  *Id.* at *1. However, the court concluded that prior publication of the object code did not invalidate the copyright of the source code because the source code itself had never been published.  *Id.*

While this question of law may be a close one,[12] the Court chooses not to extend the determination in *GCA Corp.* to the circumstances and disputed issue here—what constitutes publication for the purposes of determining whether copyrighted material is a "United States work." The Court finds the analysis in *Syntek* that lumps source code and object code together persuasive and relevant.  The court in *GCA Corp.*, on the other hand, considered the two codes as one program for purposes of protection but not publication.  This Court is not persuaded that this bifurcation is proper in this instance.  Accordingly, the Court holds that, as a matter of law, the publication of the software's object code constitutes publication of a copyrighted source code.

### 2.    Foreign, Domestic, or Simultaneous Publication

Plaintiff made version 1.0 of the Meishe app available in Chinese app stores on or around September 27, 2014.  Dkt. No. 644-5 at 50.  Defendants contend that plaintiff's works "were at least simultaneously published worldwide, including in the U.S., by submitting the app's object code to 'Chinese app stores.'"  Dkt. No. 608 at 21.  Defendants highlight an email exchange suggesting that

---

[11] 17 U.S.C. § 101 defines publication as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending.  The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication.  A public performance or display of a work does not of itself constitute publication."

[12] On considering this issue in the motion to dismiss the fourth amended complaint, the Court wrote that it "cannot conclude as a matter of law based on *GCA Corp.* and the other out-of-circuit authorities defendants cite in their reply that Meishe's Copyrighted Works were published, but does not resolve this dispute because . . . it finds that Meishe's allegations are sufficient to allege the works are not United States works regardless of whether they are deemed published or unpublished." Dkt. No. 465 at 11 n.5.  At that stage, the parties had not pointed the Court to the language in *Syntek*.

United States District Court
Northern District of California

CTO Jian's brother downloaded and used the app in the United States from a Chinese app store as early as October 2, 2014. Dkt. No. 644-16. Plaintiff counters that the publication of a mobile application comes in two steps: (1) sending to an app store for approval, then (2) distribution to the public via the app store. Dkt. No. 657 at 8-9. Since the statute defines publication as including "offering to distribute copies . . . to a group of persons for purposes of further distribution . . . constitutes publication," plaintiff argues that the first step was the initial "publication." *See id.*; 17 U.S.C. § 101. And if correct on this point, plaintiff has put forward evidence suggesting that this first step occurred only in China, which would disqualify the works from being considered "United States works." *See*, *e.g.*, Dkt. No. 647-15.

The Court finds that plaintiff's description of app publication has persuasive value—the works should not be considered simultaneously published in the United States if they were only sent to Chinese app stores initially, even if users can subsequently access those online stores worldwide. The question then becomes one of fact: were the versions at issue here first sent to Chinese app stores? The evidence presents a genuine dispute of material fact on this point as to at least some of the asserted copyrights.

For example, defendants argue that the Meishe app v1.0 was first sent to the Apple store, pointing to a September 21, 2014 email to Jian Liang from the iTunes store showing he submitted an app for review. Dkt. No. 644-15. Plaintiff contends that this transmission was a test file, not the Meishe app. *See id.*; Dkt. No. 647 at 5. Plaintiff points instead to an October 15, 2014 email from the iTunes store acknowledging the submission of an app named Meishe with an SKU of "com.cdv.video360.1.0." Dkt. No. 646-7. This presents a dispute of fact for version 1.0. There is some question as to whether these same facts also cover the registered copyright and the unregistered copyright for app1.3 rev. 2631. *See* Dkt. No. 644-19 at 19 (highlighting evidence showing that app1.0, registered copyright 2015SR227927, and app1.3 rev. 2631 are related to the same program); Dkt. No. 646-1 at 5 (citing a declaration suggesting app1.3 rev. 2631 was not sent to app stores). Considering these disputed facts, summary judgment regarding whether the registration requirement

23

applies is inappropriate for these three asserted copyrights.[13]

The parties likewise present conflicting evidence about whether version 2.5.4 was released first to Chinese app stores or U.S.-based app stores, but plaintiff's evidence regarding this version is inadmissible. Defendants present an email showing that the version was sent to the U.S.-based Apple Store on October 26, 2016. Dkt. No. 644-5. A separate document produced by plaintiff shows this version was released to Wandoujia, a Chinese app store, two weeks later on November 10, 2016. Dkt. No. 647-7. In its opposition brief, Meishe attached a previously undisclosed email from an employee showing submission of an app to a different Chinese app store on October 24, 2016. Dkt. No. 646-15. While the email does not specify the version number, Meishe submitted a new declaration from the employee in the email thread stating that the email concerned version 2.5.4, and that Meishe's practice in general was "to submit the app to a number of app stores in China before submitting it to any app stores outside China." Dkt. No. 647-15. However, defendants rightfully object that this email was not disclosed during discovery, and the employee was never identified as a potential witness. The Court therefore considers the email and declaration inadmissible. Without other evidence that helps plaintiff meet its burden, defendants are therefore entitled to summary judgment as to version 2.5.4. This version is a "United States work" and the absence of registration bars plaintiff's claim for infringement as to this version.

Defendants' motion for summary judgment on the basis of a lack of registration is therefore DENIED in part and GRANTED in part.

### D. Liability for Copyright Infringement

Plaintiff seeks summary judgment on its claim that defendants infringed upon its copyrights.

To establish copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). The copying prong "contains two separate

---

[13] The parties do not discuss publication dates for version 1.5 and the Court cannot say on summary judgment whether this version was published first or simultaneously in the United States.

United States District Court
Northern District of California

components: 'copying' and 'unlawful appropriation.'" *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020). Copying may be proven through direct evidence or "circumstantially by showing that the defendant had access to the plaintiff's work and that the two works share similarities probative of copying." *Id.* "Access is proven when the plaintiff shows that the defendant had an opportunity to view or to copy plaintiff's work." *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977). "[A]n opportunity to view or to copy plaintiff's work . . . is often described as providing a 'reasonable opportunity' or 'reasonable possibility' of viewing the plaintiff's work." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000) (citations omitted). Copying may also be established by showing "that the two works in question are strikingly similar." *Malibu Textiles, Inc. v. Label Lane International, Inc.*, 922 F.3d 946, 952 (9th Cir. 2019). "Where two works are strikingly similar, access may be inferred." *Id.* (citing *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 987-88 (9th Cir. 2017)).

As to unlawful appropriation, courts in the Ninth Circuit have held that "the hallmark of 'unlawful appropriation' is that the works share *substantial* similarities. *Skidmore*, 952 F.3d at 1064 (citing *Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004). *Skidmore* explains that this inquiry involves a two-part test. *Id.*

> The first part, the extrinsic test, compares the objective similarities of specific expressive elements in the two works. Crucially, because only substantial similarity in protectable expression may constitute actionable copying that results in infringement liability, it is essential to distinguish between the protected and unprotected material in a plaintiff's work. The second part, the intrinsic test, tests for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance. Both tests must be satisfied for the works to be deemed substantially similar.

*Id.* (internal quotation marks, alterations, and citations omitted). The extrinsic test contains several steps, including an "analytic dissection" that separates "unprotectable ideas" from "potentially protectable expression" and a determination as to whether the copyrighted work is entitled to "broad" or "thin" protection. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994). If a work is in an area where there is a wide range of expression, broad protection applies and the factfinder considers whether the allegedly infringing work is "substantially similar" to the

United States District Court
Northern District of California

copyrighted work. *Mattel, Inc. v. MGA Ent., Inc.*, 616 F.3d 904, 913-14 (9th Cir. 2010), *as amended on denial of reh'g* (Oct. 21, 2010). If a work is in an area where only a narrow range of expression is possible, thin protection applies and the factfinder uses a more stringent "virtually identical" standard. *Id.* When a factfinder determines that the extrinsic test is met, it need not proceed to the intrinsic test. *See Skidmore*, 952 F.3d at 1065 ("Because the extrinsic test was not satisfied, the jury did not reach the intrinsic test.").

Plaintiff has requested summary judgment on the issue of copyright infringement, but the Court's analysis in this regard is preempted by its holding on registration. Since a genuine dispute of material fact exists as to whether the remaining copyrights needed to be registered—a threshold issue—the Court need not proceed further on the copyright infringement claim at summary judgment.[14]

### E. Copyrightability Analysis

In separate briefing, defendants ask the Court to make a series of rulings about the copyrightability of the material contained within plaintiff's copyright before the case proceeds to trial. Dkt. No. 651-3. First, relying on the expert report of Mr. Jones, defendants argue that the vast majority of source code in plaintiff's asserted copyrights is not protectable, and thus must be dissected out of plaintiff's copyright and not considered in the comparative analysis. As part of their proposed analytic dissection, defendants apply the doctrines of merger and scènes à faire. Second, considering that only a small portion of plaintiff's source code remains protectable, defendants argue that the Court should determine that the virtually identical standard applies.

In response, plaintiff argues that the "extrinsic" test should not be applied to copyrighted source code because it is a "literal" element. Dkt. No. 680-15. Further, plaintiff argues that the doctrines of merger and scènes à faire are considered affirmative defenses to infringement in the Ninth Circuit, not relevant to the threshold copyrightability analysis. Plaintiff takes issue with Mr.

---

[14] To the extent the parties present no genuine dispute about where version 1.5 was first published, the Court still finds summary judgment inappropriate as to that version for the reasons explained in the Court's discussion of copyrightability.

United States District Court
Northern District of California

Jones' granular analysis, as discussed by this Court separately in regard to plaintiff's *Daubert* motion seeking to exclude Mr. Jones' testimony. And unsurprisingly, plaintiff argues that its works are entitled to broad protection and that the substantial similarity test should apply.

As an initial matter, the Court is not convinced by defendants' contention that these are necessarily decisions for the judge to make before a case is presented to the jury. Certainly a judge must decide issues of copyrightability before issuing summary judgment on the question infringement. But when there are disputed issues of material fact, courts have tasked juries with applying the extrinsic test. *See Skidmore*, 952 F.3d at 1065 (jury deciding the extrinsic test); *Moonbug Ent. Ltd. v. BabyBus (Fujian) Network Tech. Co.*, No. 21-CV-06536-EMC, 2023 WL 11922845, at *11-13 (N.D. Cal. Mar. 7, 2023) (leaving to jury questions related to protectability and the standard for the scope of protection to be applied). Since the parties' experts disagree about the extent of originality within plaintiff's copyrighted source code, the Court finds this question better suited for the ultimate factfinder in this case.

Similarly, the Court finds genuine disputes of material fact exist as to the range of possible expression that was available to plaintiff in its development of its audio-visual editing source code. Accordingly, the Court will allow the jury to determine this range and the resulting scope of protection.

Next, the parties dispute whether merger and scènes à faire figure into the question of what material is copyrightable or the subsequent question of whether defendants have unlawfully appropriated copyrightable material. The Ninth Circuit has made clear that these doctrines are affirmative defenses to be applied in the context of infringement, not copyrightability. *See Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000); *see also Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1358 (Fed. Cir. 2014) (summarizing Ninth Circuit law). But ultimately, as this Court has previously found, this is a distinction without a difference in the final result, at least when both stages of analysis will be determined by the same factfinder. *See* Dkt. No. 650-21 (*Ets-Hokin v. Skyy Spirits, Inc., et al.*, No. C 96-3690 SI (N.D. Cal. Nov. 5, 2001), Dkt. No. 187 at 6 ("In the instant case, the Court finds that both approaches to the limiting doctrines yield the same result.").

Finally, plaintiff contends that the Ninth Circuit's extrinsic test should not be applied to a

27

case where the alleged copying is purely literal. As the extrinsic/intrinsic test feels less than intuitive, plaintiff's position has some appeal.[15] But it is unclear what plaintiff's replacement test would be. If plaintiff is suggesting that there need be no separation of unprotectable elements before making an ultimate determination, the suggestion is not well-taken.

In conclusion, the parties have not convinced the Court that it is in the position to make judgments on copyrightability as a matter of law at this stage of the case. These issues can and should be decided at trial through the presentation of evidence to the jury and the crafting of appropriate jury instructions.

### F.    Liability for Misappropriation of Trade Secrets

A "trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) (citing 18 U.S.C. §§ 1839(3), (5)). To prove misappropriation of a trade secret, the plaintiff must show that "(1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *Id.* at 657-58. Misappropriation can include the improper acquisition, disclosure, or use of a trade secret under certain circumstances. 18 U.S.C. § 1839.[16]

[15] The two-part extrinsic/intrinsic test was developed in the context of a case involving non-literal copying. See *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977). One leading treatise distinguishes "nonliteral similarly"—"when the fundamental essence or structure of one work is duplicated in another"— from "fragmented literal similarity"—"when there is some literal similarity (virtually, though not necessarily, completely word for word)." Melville B. Nimmer and David Nimmer, 4 *Nimmer on Copyright* § 13D.11 (Matthew Bender, Rev. Ed. 2025). According to Nimmer, the essential inquiry in cases of fragmented literal similarity is whether the copied work constitutes a substantial portion of plaintiff's work, an inquiry that includes quantitative and qualitative aspects. *Id.* § 13D.12.

[16] The relevant definitions in the statute are as follows:

(5) the term "misappropriation" means-

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without

United States District Court
Northern District of California

28

Defendants challenge whether Meishe has established that defendants acted with actual or constructive knowledge of misappropriation, as required by 18 U.S.C. § 1839(5). Defendants further contend that Meishe did not take reasonable steps to protect its trade secrets, as required by 18 U.S.C. § 1839(3)(A). Defendants assert the source code at issue can be reverse engineered and that Meishe had weak internal controls to protect the trade secrets.

Based on the current record, the Court determines there is a genuine dispute of material fact as to defendants' liability for misappropriation of trade secrets. Plaintiff's request for summary judgment on this claim is DENIED.

express or implied consent by a person who-

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was-

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that-

(I) the trade secret was a trade secret; and

(II) knowledge of the trade secret had been acquired by accident or mistake;

(6) the term "improper means"-

(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and

(B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition; . . . .

18 U.S.C. § 1839.

29

### G. Applicability of Extraterritorial Damages

Plaintiff seeks summary judgment establishing its entitlement to damages for defendants' actions outside of the United States. Federal trade secret law "applies to conduct occurring outside the United States if . . . an act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837. Under the federal Copyright Act, a plaintiff "is entitled to recover damages flowing from exploitation abroad of the domestic acts of infringement committed by defendants," so long as the domestic infringement occurred entirely within the United States. *Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 990-92 (9th Cir. 1998), *as amended on denial of reh'g and reh'g en banc* (Aug. 25, 1998). The extraterritorial reach of the Defend Trade Secrets Act is broader than that of the Copyright Act, because the Defend Trade Secrets Act "does not require a completed act of domestic misappropriation, nor does it impose a specific causation requirement." *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 486 (7th Cir. 2024).[17]

It is undisputed that Mr. Xie—the alleged source of improper acquisition—lived and worked in China, so plaintiff relies on unlawful further distribution and use. Plaintiff points to declarations from defendants' employees stating that U.S.-based employees work with Google and Apple for distribution of the TikTok application in those companies' respective app stores. Dkt. No. 611-16 ¶¶ 17, 19. Plaintiff also highlights how defendants develop the "video editing functionality" of TikTok and other allegedly infringing apps in China and in ByteDance, Inc.'s Mountain View, California office. Dkt. No. 614-19 ¶¶ 7-11. Defendants argue that plaintiff "gets things backward," contending that domestic acts of misappropriation that occur as a result of or in parallel with foreign acts are not "act[s] in furtherance of the offense." Dkt. No. 649-1 at 14. Defendants' argument carries more weight in the copyright context but reads too much into the law in the trade secret context—at least according to the Seventh Circuit.[18]

Regardless, the Court cannot declare that plaintiff is entitled to extraterritorial damages at

---

[17] Defendants cite to *Motorola* but seem to misread its reasoning. *See* Dkt. No. 649-1 at 13-14. In *Motorola*, the Seventh Circuit explicitly rejected a requirement that extraterritorial damages under the Defend Trade Secrets Act be directly caused by acts inside the United States. 108 F.4th at 486-88.

[18] The parties have not identified any relevant Ninth Circuit law on this issue.

the summary judgment stage. Whether defendants misappropriated or infringed plaintiff's intellectual property at all remains in dispute, so the Court cannot determine whether any infringing domestic acts occurred. Plaintiff's request for summary judgment on the issue of extraterritorial damages is DENIED.

### H. Liability of ByteDance, Ltd. as a Holding Company

Defendants seek summary judgment relieving defendant ByteDance Ltd., a Cayman Islands-based holding company, of liability under either claim. Dkt. No. 608 at 22-23, 25. Plaintiff argues that ByteDance Ltd. is vicariously liable for infringing actions under both claims. Dkt. No. 646-1 at 20-21, 24. Defendants have the better argument.

"[V]icarious infringement's roots lie in the agency principles of *respondeat superior*." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 802 (9th Cir. 2007) (citation omitted). "To state a claim for vicarious copyright infringement, a plaintiff must allege that the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." *Id.* (footnote and citation omitted).

The Court may limit its discussion to the first element. Plaintiff alleges that the infringement occurred through the actions of Mr. Xie. Mr. Xie worked for Meishe then later for ByteDance entities, Beijing ByteDance Network Technology Co., Ltd and Beijing Zitiao Network Technology Co., Ltd. Dkt. Nos. 611-6, 611-7, Dkt. No. 614-19 ¶ 10. The leader of Mr. Xie's work group was employed by defendant ByteDance, Inc. Yang Dep. at 61-62, 213; Dkt. No. 614-19 ¶ 8. These facts do not raise a genuine dispute as to whether defendant ByteDance, Ltd. has the "right and ability to supervise the infringing conduct" because they do not involve ByteDance, Ltd. *See Perfect 10, Inc.*, 494 F.3d at 802.

Subject to exceptions, "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks and citation omitted). Plaintiff only argues in a conclusory manner that ByteDance, Ltd. "developed and controls the accused software

31

and wholly owns, directs, and controls the other defendants." Dkt. No. 646-1 at 21. Plaintiff has not presented any facts to suggest that ByteDance, Ltd. exercises direct control over the activities of its many subsidiaries. Absent evidence that the Court should collapse corporate distinctions, "the demand to respect corporate formalities remains." *Dewberry Grp., Inc. v. Dewberry Eng'rs Inc.*, 145 S. Ct. 681, 687 (2025). Both of plaintiff's claims against ByteDance, Ltd. fail as a matter of law.[19]

The Court GRANTS defendants' motion to dismiss the remaining two claims against defendant ByteDance, Ltd.

## II. Defendants' Request for Sanctions

Defendants have also filed a motion for terminating or alternatively evidentiary sanctions based on plaintiff's conduct during discovery in relation to three separate issues. Dkt. No. 592-1.

### A. Legal Standard

District courts have inherent power to impose sanctions for "conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). "Dismissal is an available sanction when 'a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings' because 'courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice.'" *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (quoting *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995)).

Terminating sanctions should be imposed only in extreme circumstances, "where the violation is 'due to willfulness, bad faith, or fault of the party.'" *In re Exxon Valdez*, 102 F.3d 429, 432 (9th Cir. 1996) (quotation omitted). In deciding whether to impose terminating sanctions, courts consider the following factors: "(1) the public's interest in expeditious resolution of litigation;

---

[19] While the above analysis focuses on copyright infringement, plaintiff argues that the standard for vicarious liability is similar for misappropriation of trade secrets. Dkt. No. 646-1 at 24. Plaintiff's arguments thus fall together.

(2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Leon*, 464 F.3d at 958 (quoting *Anheuser-Busch*, 69 F.3d at 348). While the district court need not make explicit findings regarding each of the five factors, a finding of "willfulness, fault, or bad faith" is required for dismissal or default judgment to be proper. *See Leon*, 464 F.3d at 958. "In deciding whether to impose case-dispositive sanctions, the most critical factor is not merely delay or docket management concerns, but truth." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007). The Court has "broad fact-finding powers" with respect to sanctions, and its findings warrant "great deference." *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1366 (9th Cir. 1990).

### B. Evidence of Oral Agreement

Defendants seek terminating sanctions based on plaintiff's late introduction of evidence of an oral agreement transferring intellectual property from XAT to Meishe after the close of fact discovery, via Judge Wang's report. As discussed above, the Court finds some of Meishe's conduct in this regard to be questionable—in particular the attempt to substantively change or add new deposition testimony through errata. However, the Court has concluded that Meishe owns the intellectual property in question based on evidence outside of the oral agreement. The Court therefore finds no prejudice to defendants and denies their request for terminating or evidentiary sanctions on this point.

### C. Evidence of Meishe Code's Evolution from Dunhuang Code

Defendants also seek terminating sanctions based on plaintiff's incorrect assertions to the Court and the Special Master that the source code at issue was independently developed. Plaintiff made these statements in its complaints, at hearing, and in a sworn declaration from CTO Jian. Dkt. No. 592-1 at 7-8. Plaintiff's position on this question undisputedly changed at the end of discovery, when it admitted that its code had evolved from XAT's Dunhuang code. Defendants then sought XAT's Dunhuang code and the Special Master ordered plaintiff to provide it. Dkt. No. 564. Plaintiff

United States District Court
Northern District of California

objected to the Special Master's order, arguing that it did not have a legal right to XAT's code, and the Court agreed. *See* Dkt. No. 619. However, plaintiff received from XAT "the Dunhuang source code version that existed just prior to the development of Meishe app v1.0 in 2014" and provided this code to defendants. Dkt. No. 587-2.

The shifting statements from CTO Jian are of particular concern to the Court. In December 2024, he submitted a declaration under penalty of perjury that "[t]he Meishe software is independently developed from the ground up and no Dunhuang source code has been incorporated into the Meishe software." Dkt. No. 590-15. But then at his deposition, he admitted that the Meishe code incorporated a small amount of Dunhuang code. Jian Dep. at 96-97. He explained the discrepancy by saying that the declaration was "truthful based on my understanding at the time" but that a later review of Dunhuang code showed some similarities between Dunhuang and Meishe code. Dkt. No. 590-17. CTO Jian helped write some Dunhuang code and agreed that he was a "primary developer" of the Meishe app code. Jian Dep. at 91-92, 96. The Court shares defendants' skepticism about the credibility of Mr. Jian's explanation for his changing answers.

Nonetheless, the Court does not believe that terminating sanctions are warranted for this conduct. To be sure, defendants are correct to raise concerns about the truthfulness of Mr. Jian's testimony. But the Court has concluded that Meishe owns the rights to any underlying Dunhuang code in the Meishe application, so defendants suffer no prejudice here.

The Court also will not grant defendants' requested evidentiary sanction—finding that all of the Meishe code was copied unlawfully from Dunhuang code. *See* Dkt. No. 592-1 at 24. Considering the evidence presented, the Court does not find such a sanction to be warranted.

### D.     Production of Object Code Comparison Document

Defendants' third basis for seeking sanctions is plaintiff's belated production of decompiled object code and a document from its pre-suit investigation that compared decompiled object code from one version of the TikTok and Meishe apps. Defendants claim an earlier production of this document could have helped them mitigate damages from any future infringement, if necessary. Plaintiff responds that it was initially not aware of decompiled object code files and that the

United States District Court
Northern District of California

United States District Court
Northern District of California

comparison document was attorney work product.

Plaintiff's explanation is not convincing, but defendants have not suffered substantial prejudice from the late disclosure. The document at issue is a comparison of decompiled object code, which is different from the original source code. *See Syntek*, 307 F.3d at 779 ("However, source code created by decompiling object code will not necessarily be identical to the source code that was compiled to create the object code."). As the Court has previously noted, earlier in the litigation defendants refused an opportunity to use software to compare the original source code at issue. *See* Dkt. No. 620 at 7-8.

The belated disclosure here does not merit terminating sanctions. Nor will the Court grant defendants' requested alternative sanction that "the Court deem admitted that Meishe's pre-suit comparison demonstrated no copyright infringement or trade secret misappropriation." Dkt. No. 592-1 at 25. Such a finding would not impact this case, as the comparison involved decompiled object and plaintiff's claims are based on subsequent comparisons of the actual source code. Should the case proceed to a stage where the mitigation of damages are at issue, defendants may raise this issue again to argue that it was prevented from promptly mitigating its unlawful activity, if any is found.

### CONCLUSION

For the foregoing reasons and for good cause shown, the Court grants summary judgment for plaintiff on the question of its ownership of the copyrights and trade secrets at issue. The Court holds that, as a matter of law, the publication of the software's object code constitutes publication of a copyrighted source code, but there is a disputed issue of material fact regarding where this publication first occurred for all versions except version 2.5.4, which is an unregistered United States work. The Court grants summary judgment in favor of defendants on the issue of defendant ByteDance, Ltd.'s non-liability. The Court denies the parties' requests for summary judgment in all other respects.

The Court likewise declines to issue judgment on questions of copyrightability, finding enough disputed facts for these issues to be presented to the jury.

35

Finally, the Court denies defendants' request for sanctions.

**IT IS SO ORDERED**.

Dated: September 2, 2025

_____

SUSAN ILLSTON
United States District Judge

# EXHIBIT F

STAYED,APPEAL,MEDIATION-MPT,Multi-Media Docs

# U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:20-cv-00613-SB

Thomson Reuters Enterprise Centre GmbH et al v. ROSS Intelligence Inc.
Assigned to: Judge Stephanos Bibas
Cause: 17:101 Copyright Infringement

Date Filed: 05/06/2020
Jury Demand: Both
Nature of Suit: 820 Copyright
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 07/18/2024 | 612 | ORAL ORDER: I have considered both parties' arguments regarding a filtration hearing. See D.I. 604 , 610 . I ORDER Ross to submit a list of all headnotes it believes are verbatim quotations, or vary trivially from verbatim quotations, of judicial opinions by Monday, July 29, at noon EDT. ROSS should use the same format used for Exhibit A in D.I. 604-1. If Thomson Reuters wishes to submit comments on the list, it must do so by Monday, August 5, at noon EDT. This Court will not filter out any headnotes that are neither direct quotations nor trivial variations on direct quotations. The jury must consider all headnotes that it could reasonably find are original and thus eligible for copyright protection. D.I. 547 , at 7-8. Ordered by Judge Stephanos Bibas on 7/18/2024. (mpb) (Entered: 07/22/2024) |
| 07/19/2024 | 613 | ORAL ORDER: I ORDER both parties to confer and submit to the Court by July 26, 2024, their availability in September for potential oral argument on the antitrust summary judgment issues. D.I. 590 . We will not address these issues at the trial beginning August 26, 2024, because that trial is on the copyright issues. D.I. 581 . Ordered by Judge Stephanos Bibas on 7/19/2024. (mpb) (Entered: 07/22/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/13/2026 16:21:07 | | | |
| **PACER Login:** | aerussell | **Client Code:** | 10484.01AER |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-00613-SB Start date: 1/1/1975 End date: 3/13/2026 Starting with document: 612 Ending with document: 613 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |