IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| DELOITTE CONSULTING LLP and DELOITTE DEVELOPMENT LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 23-325-WCB |
| v. | ) ) ) | **REDACTED - PUBLIC VERSION** |
| SAGITEC SOLUTIONS, LLC, | ) ) | **Filed May 21, 2026** |
| Defendant. | ) ) ) | |

## SAGITEC'S OPENING BRIEF REGARDING THE NON-COPYRIGHTABILITY OF CERTAIN ASSERTED SOURCE CODE MATERIAL

OF COUNSEL:

Christopher K. Larus
William E. Manske
Rajin S. Olson
THOMPSON HINE LLP
800 Nicollet Avenue, Suite 2925
Minneapolis, MN 55402
(612) 605-5900
Chris.Larus@ThompsonHine.com
William.Manske@ThompsonHine.com
Rajin.Olson@ThompsonHine.com

Dated:  May 14, 2026

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Robert Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Defendant*
*Sagitec Solutions, LLC*

**TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................................................... 1

FACTUAL BACKGROUND ........................................................................................................ 2

I.    Unemployment Insurance Programs and the UI Software Industry. ..................................... 2

II.    The Department of Labor's Requirements and Guidance. ..................................................... 2

III.    Requirements and Guidance Provided by the National Association of State Workforce Agencies (NASWA) for the Interstate Connectivity Network (ICON). ................................... 4

IV.    Deloitte's Allegations in this Case. ....................................................................................... 6

    A.    The asserted █████████████████ ............................................................................... 7

    B.    The asserted ███████████ ........................................................................................... 8

LEGAL STANDARD FOR COPYRIGHTABILITY ................................................................. 11

ARGUMENT ............................................................................................................................... 13

I.    The Asserted ████████ Do Not Include Any Protectable Expression. .............................. 14

    A.    The autogenerated files lack human authorship. ............................................................... 14

    B.    Because the asserted █████████ are dictated by NASWA and the DOL, they are unoriginal and not copyright protectable. ................................................................................. 15

    C.    All of the asserted █████████ are functional processes that merge with any underlying expression. .............................................................................................................. 17

    D.    Compatibility requirements and standard programming practices render the █████████ uncopyrightable *scènes à faire*. .............................................................................. 17

II.    The Allegedly Copied █████████████ Are Not Copyrightable. ......................................... 19

    A.    The individual field names within ██████████████ are unoriginal and unprotectable. 19

    B.    The █████████ themselves are electronic blank forms that record, rather than convey, information. ................................................................................................................................. 23

    C.    Any expression in the ██████████ merges with their underlying idea or function. ..... 24

    D.    To the extent any purported expressive aspects exist in the ███████████, they are nothing more than uncopyrightable *scènes à faire*. ................................................................... 24

CONCLUSION ............................................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Bd. of Internal Med. v. Rushford*,
841 F. App'x 440 (3d Cir. 2020) ...................................................................................13

*Baker v. Selden*,
101 U.S. 99 (1879)........................................................................................................23

*Bus. Mgmt. Int'l v. Labyrinth Bus. Sol's, LLC*,
2009 U.S. Dist. LEXIS 24900 (S.D.N.Y. Mar. 24, 2009) .......................................18

*Chaplin v. Coca Cola Bevs. Ne.*,
2022 U.S. Dist. LEXIS 56716 (D. Del. Mar. 29, 2022) ...........................................19

*Douglas v. Osteen*,
317 F. App'x 97 (3d Cir. 2009) ...................................................................................19

*Dun & Bradstreet Software Servs. v. Grace Consulting, Inc.*,
307 F.3d 197 (3d Cir. 2002)...............................................................................11, 12, 18, 25

*eScholar, LLC v. Otis Educ. Sys.*,
2005 U.S. Dist. LEXIS 40727 (S.D.N.Y. Nov. 3, 2005).........................................18

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991)................................................................................................12, 15

*Kay Berry, Inc. v. Taylor Gifts, Inc.*,
421 F.3d 199 (3d Cir. 2005)........................................................................................12

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
387 F.3d 522 (6th Cir. 2004) ................................................................................17, 25

*M-I L.L.C. v. Q'Max Sols., Inc.*,
No. H-18-1099, 2020 U.S. Dist. LEXIS 140419 (S.D. Tex. Aug. 6, 2020) ......................14, 15

*McEnroe v. Mantissa Corp.*,
2016 U.S. Dist. LEXIS 205795 (D. Mass. Feb. 29, 2016) .......................................24

*Merch. Transaction Sys. v. Nelcela, Inc.*,
2009 U.S. Dist. LEXIS 25663 (D. Ariz. Mar. 17, 2009) ...........................................19, 22, 24

*O.P. Solutions, Inc. v. Intellectual Prop. Network, Ltd.*,
1999 U.S. Dist. LEXIS 979 (S.D.N.Y. Jan. 21, 1999) .............................................19

*Pyrotechnics Mgmt. v. XFX Pyrotechnics, LLC*,
  38 F.4th 331 (3d Cir. 2022) .................................................................................15, 17, 22

*Real View, LLC v. 20-20 Techs., Inc.*,
  683 F. Supp. 2d 147 (D. Mass. 2010) ...............................................................................18

*SAS Inst., Inc. v. World Programming Ltd.*,
  64 F.4th 1319 (Fed. Cir. 2023) .........................................................................................13

*Silvertop Assocs. Inc. v. Kangaroo Mfg. Inc.*,
  931 F.3d 215 (3d Cir. 2019).............................................................................................17

*Sony Comp. Ent'mt, Inc. v. Connectix Corp.*,
  203 F.3d 596 (9th Cir. 2000) ...........................................................................................12

*Southco, Inc. v. Kanebridge*,
  390 F.3d 276 (3d Cir. 2004)........................................................................................ *passim*

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
  580 U.S. 405 (2017)..........................................................................................................11

*TD Bank, N.A. v. Hill*,
  No. 12-7188 (RBK/JS), 2015 U.S. Dist. LEXIS 97409 (D.N.J. July 27, 2015)................12, 13

*Tetris Hold., LLC v. Xio Interactive, Inc.*,
  863 F. Supp. 2d 394 (D.N.J. 2012) ...................................................................................12

*Thaler v. Perlmutter*,
  130 F.4th 1039 (D.C. Cir. 2025).................................................................................12, 14

*Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.*,
  797 F.2d 1222 (3d Cir. 1986).....................................................................................19, 23, 24

*Williams v. Crichton*,
  84 F.3d 581 (2d Cir. 1996)...............................................................................................12

**Statutes**

17 U.S.C. § 101.............................................................................................................12

17 U.S.C. § 102......................................................................................................12, 14, 15

**Other Authorities**

37 C.F.R. § 202.1 ....................................................................................................19, 23, 24

Copyright Office, *Compendium of U.S. Copyright Office Practices* (3d ed. 2021) ................14, 15

4 Nimmer on Copyright § 13D.37[D][2]...............................................................................18

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Copyright law protects creative expression, not ideas, processes, or functional requirements. This distinction is especially important in computer software, where elements necessary for compatibility and compliance with external standards do not constitute protectable expression. In this case regarding Unemployment Insurance ("UI") software, Deloitte asserts infringement of (1) certain ███████████████████████████████████████████, and (2) certain ███████████. None of this material is protectable. The files either were ███████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████ or were directly copied from—or rigidly dictated by—regulations and requirements necessary to interface with the national ICON system. This includes field names that NASWA defines and that state agencies are *required* to use to interface with the ICON system, such as "SSN," "claimantsName," "ICON_MessageTrain," and "personalIdentificationNumber." Deloitte's asserted ███████████ are essentially electronic blank forms for recording data rather than conveying it. The field names used in those ███████████ are dictated or guided by reporting *requirements*, such as recording in every table when a UI record is created or modified and which user is responsible for the creation or modification. As a result, the asserted material is not original, and the meaning of these field names merges with their functional purpose. To the extent that there is any non-functional expression in the asserted material, it is subsumed by the doctrine of *scènes à faire* through standard software coding practices. Deloitte cannot meet its burden to show that any of this material is copyright protectable expression, so the Court should find that this material is not copyrightable.[1]

---

[1] The parties have agreed to 25 pages for opening and opposition briefs and 6 pages for reply.

1

## FACTUAL BACKGROUND

**I.    Unemployment Insurance Programs and the UI Software Industry.**

The joint federal-state UI system was originally created by the Social Security Act ("SSA") of 1935. Ex. 2 (Building Resilience PDF). State UI systems are designed to comply with and implement both SSA and Federal Unemployment Tax Act (FUTA) requirements, as well as various state-specific statutes, regulations, and rules. Ex. 3 (DEL00740431) (UI Directors' Guide) at '437. Deloitte's proffered expert, Dr. Krein, asserts that "[a] state UI system is a software platform used by a state's labor or workforce agency to administer its unemployment insurance program." Ex. 4 (Krein Report) ¶ 85. "A UI Software solution helps to manage and organize this process for state agencies, employers, and claimants, including by: Filing and processing claims; Determining eligibility; Paying benefits; Collecting employer taxes; Managing fraud detection and overpayments." *Id.* Starting in the early 1990s, several states began UI modernization efforts. In 1994, the Department of Labor ("DOL") created a UI Information Technology Support Center (ITSC) to aid states in their efforts. Ex. 5 (UIPL No. 33-94). Since then, the functions of UI software systems have been dictated by the DOL and state laws, regulations, and agency directives.

**II.    The Department of Labor's Requirements and Guidance.**

All states follow guidelines established by the DOL (and federal law) for their UI programs. Ex. 6 (UI Fact Sheet). Dr. Krein concedes that "[i]n UI systems, we expect to see certain components that are common to all state solutions." Ex. 4 ¶ 87. These common components are driven by DOL requirements. *Id.* (citing Ex. 7 (https://oui.doleta.gov/unemploy/, a DOL website)).

The DOL's Employment and Training Administration ("ETA") provides detailed documentation directing implementation of UI programs. The UI 401 Handbook, for example, imposes strict reporting requirements that must be implemented "by State Workforce Agencies (SWAs)" in their UI systems. Ex. 8 (SAGITEC-DEL_05400475) at '479. The 401 Handbook's

"Reporting Policy" specifically states:

> It is the policy of the Office of Workforce Security (OWS) to assure accuracy, uniformity, and comparability in the reporting of statistical data derived from state unemployment insurance operations through state adherence to Federal definitions of reporting items, use of specific formats, observance of reporting due dates, and regular verification of reporting items.
>
> The National Office assists SWAs in meeting these requirements by setting forth definitions in specific instructions and through the Data Validation process. (See ETA Handbook No. 361)

*Id.* The 401 Handbook also refers SWAs to "Other Reporting Requirements" across eight additional handbooks. *Id.* at '481.

The 402 Handbook, in turn, "provides instructions for operating the [Unemployment Insurance Reports] web applications." Ex. 9 (SAGITEC-DEL_03317824) at '830. This includes a "Reports" chapter and a corresponding "Appendix A" including "Report Forms with Data Maps" with "report forms on which cell names for data elements have been indicated." *Id.* at '882, '886. The 402 Handbook expressly provides that "[d]ata tables for required reports generally contain some identical information on each record" *Id.* at '886. The 402 Handbook also expressly identifies these "[u]seful common data elements" to include the "Date the Record was Created" or "Last Modified," the "User ID of the Individual Who Created or Last Revised the Record," and the "Number of Times the Record was Revised." *Id.*

In addition to the 401 Handbook, the 402 Handbook, and the ETA forms, the DOL provides thousands of publicly available documents broadly categorized as ETA Advisories. *See* Ex. 10 at 57:20-58:2; ETA Advisories, *available at* https://www.dol.gov/agencies/eta/advisories (reflecting nearly 4,000 advisories). The most important ETA Advisories are Unemployment Insurance Program Letters or UIPLs, which "are ways that the Department of Labor's Employment and Training Administration directs states to implement specific rules or attributes or functions of the

Unemployment Insurance system." Ex. 10 at 58:13-19. States are required to follow UIPLs. *Id.* at 58:20-23. Other types of ETAs include Training and Employment Guidance Letters (or TEGLs) and Training and Employment Notices (or TENs). *Id.* at 59:4-60:8. As reflected at the DOL website cited by Dr. Krein, there are numerous other webpages and materials made available to the public regarding the federal UI program and its requirements. Ex. 7.

**III.    Requirements and Guidance Provided by the National Association of State Workforce Agencies (NASWA) for the Interstate Connectivity Network (ICON).**

Among other features, UI systems must integrate with other systems. One such system is the Interstate Connectivity Network ("ICON"), which is administered by the National Association of State Workforce Agencies ("NASWA"). Ex. 10 (NASWA Dep. Tr.) at 35:6-16. As explained by NASWA's corporate deponent, "ICON is a system that has been around since the early 1980s that is used by the states and federal agencies to support multiple set[s] of use cases all related to the processing of unemployment claims and other workforce development activities as performed by the states." Ex. 10 at 24:12-19. The ICON system is a "hub-and-spoke technology system" that is used to facilitate data exchanges between states or between state and federal entities to support UI claims. Ex. 10 at 34:9-35:9; Ex. 15 (Deloitte 30(b)(6) (Gosu Vol. II) Dep. Tr.) at 306:5-307:6. Except for recent efforts to convert to a cloud system, ICON has generally functioned the same for several decades. Ex. 10 at 36:2-38:11.

To assist states in implementing ICON functionality, the DOL, NASWA, and NASWA's subcontractors have historically provided states with a host of resources including schema, guides, Web Services Description Language (.wsdl) files, and more recently, actual source code. Ex. 10 at 49:10-52:18. States and their UI vendors are free to use these resources to implement ICON functionality. Ex. 10 at 53:10-54:20. Although particular implementation details may differ, state UI systems must interface with ICON, and they must use the same data formats, data schema,

4

requirements, and business rules to communicate with the ICON interface. Ex. 10 at 38:17-39:23, 43:17-48:22, 169:22-171:25. Some of the detailed documentation that NASWA provides is broadly applicable to the ICON system overall. *See, e.g.*, Ex. 16 (SAGITEC-DEL_07114452) (Insight on ICON (Up Close & Personal)); Ex. 17 (SAGITEC-DEL_07114368) (UI-ICON Modernization). Other documents are focused on specific "transactions" in the ICON network. *See* Ex. 10 at 36:2-19. Each of these "transactions" is essentially a type of data exchange between states or between state and federal entities to support UI claims, and that data exchange only works if every participant in ICON is using the same data and messaging formats.

NASWA also provides materials regarding messaging formats for the ICON transactions. *See* Ex. 18 (SAGITEC-DEL_07114496) (UI-ICON Web Services Information Guide Version 1.7 (March 2016)). For example, NASWA provides "XML Schemas," which "have been created for all of the ICON applications." *Id.* at '500. "These schemas detail the message format requirements and will be given to States to help them with the proper formatting of ICON data as they embark on their own modernization projects." *Id.* NASWA also provides Web Services Description Language files, or .wsdl files. *Id.* "Many web service client libraries can use the [uiicon.]WSDL to **automatically** configure the communication portion of the client, allowing the State developers to focus instead on the data being passed back and forth." *Id.* (emphasis added). Both parties in this case produced the uiicon.wsdl file. Ex. 19 (DEL00064071 (uiicon.wsdl)); Ex. 20 (SAGITEC-DEL_07114367 (uiicon.wsdl)).

The table below provides examples of the ICON transactions at issue in this case, along with the many materials provided by NASWA or the DOL dictating requirements and providing guidance for those transactions. These transaction-specific materials include installation guides, variable descriptions, and schema—providing everything a State Workforce Agency or its UI

software vendor needs to implement the specific transactions and interface with ICON.

| Name and Description (bolding added) | Materials from NASWA or the DOL |
|---|---|
| "Interstate Benefit Inquiry (ICON **IBIQ**): Retrieves detailed information about an interstate claim." Ex. 4 ¶ 91. | Ex. 26 (NASWA00000490) (IBIQ Schema Support Guide).<br><br>Ex. 27 (NASWA00000557) (IBIQ-Inbound-To-State-Schema.xsd).<br><br>Ex. 28 (NASWA00000558) (IBIQ-Schema.xsd).<br><br>*See also* Ex. 29 (NASWA00000028) (UI-ICON SOAP IBIQ Interface Cloud Interface & Variable Description); Ex. 30 (NASWA00000559) (ICONnect .Net Client Implementation Guide) at 5-8; Ex. 31 (NASWA00000578) (ICONnect IBIQ Application Specifics). |
| "State Identification Inquiry (ICON **SID**): Helps identify which state holds a claimant's base wages." Ex. 4 ¶ 91. | Ex. 32 (NASWA00000618) (SID Schema Support Guide).<br><br>Ex. 60 (NASWA00000642) (SID-Schema.xsd).<br><br>*See also* Ex. 33 (NASWA00000003) (ICONnect SID Application); Ex. 34 (NASWA00000041) (UI-ICON SOAP SID Interface Cloud Interface & Variable Description); Ex. 30 (NASWA00000559) (ICONnect .Net Client Implementation Guide) at 8-9. |
| "Unemployment Insurance Inquiry (ICON **UIQ**): Checks if a claimant has an existing UI claim in another state." Ex. 4 ¶ 91. | Ex. 42 (NASWA00000080) (UIQ Schema Support Guide).<br><br>Ex. 43 (NASWA00000206) (UIQ-Schema.xsd).<br><br>*See also* Ex. 44 (NASWA00000007 (ICONnect UIQ Application)); Ex. 45 (NASWA00000049 (UI-ICON SOAP IBIQ Interface Cloud Interface & Variable Description)); Ex. 30 (NASWA00000559 (ICONnect .Net Client Implementation Guide)) at 12-15. |
| "**WIC2** is an application that has both model code and the web. Users can enter withdrawn claim for their State and/or view withdrawn claims in other States." Ex. 16 at '461. | Ex. 46 (NASWA00000207) (WIC Schema Support Guide).<br><br>Ex. 47 (NASWA00000262) (WIC Schema.txt)*; see also* Ex. 48 (DEL00168942) (WIC2-Schema.xsd).<br><br>*See also* Ex. 30 (NASWA00000559 (ICONnect .Net Client Implementation Guide)) at 9-12; Ex. 49 (NASWA00000608 (ICONnect WIC Application)); Ex. 50 (NASWA00000643 (SOAP WIC Interface Cloud Interface & Variable Description)). |

## IV.  Deloitte's Allegations in this Case.

Deloitte asserts that only ███ % (i.e., ███ files) of its "uFACTS 2013 – MA" source code

6

(comprising ███ total files) was copied into Sagitec's Neosurance software implementations. Ex. 51 (Myers Decl.) ¶ 19; Ex. 4 ¶ 526. These allegedly copied files fall into two primary groups: (1) certain ICON interface files, and (2) certain database tables. Ex. 4 ¶¶ 338-91 and at Apps. A-B (addressing only file paths involving "ICON" or "Tables"), App. C (providing comparisons of twenty database tables). Sagitec provided detailed expert opinions and analysis addressing these same two primary groups of allegedly-copied source code files. *See* D.I. 303 (Myers Decl.) ¶ 16.

A.    The asserted ███████████

Dr. Krein's report identifies ████████████████████ that he contends are substantially similar to files appearing in Neosurance software implementations, listed below in the order they appear in Dr. Krein's report. Although Dr. Krein identifies these ████████ by name in his report, his report only discloses *specific* allegedly copied material within the first *three* (████████████████████████):

1. ██████████. *See* Ex. 52 (DEL-SC-001241); Ex. 4 ¶¶ 338-73, App. A rows 92-105.

2. ████████████. *See* Ex. 53 (DEL-SC-001817); Ex. 4 ¶¶ 338-73 and at App. A, rows 23-41.

3. ██████████. *See* Ex. 54 (DEL-SC-001248); Ex. 4 ¶¶ 374-91 and at App. A rows 66-69.

4. ████████████. *See* Ex. 55 (DEL-SC-001704); Ex. 4 at App. A, rows 1-19.

5. ██████████████. *See* Ex. 56 (DEL-SC-001859); Ex. 4 at App. A, rows 47-65.

6. ████████████. *See* Ex. 57 (DEL-SC-001231); Ex. 4 at App. A, rows 70-87.

7. ████████. *See* Ex. 4 at App. A, rows 114-127.

8. ██████. *See* Ex. 59 (DEL-SC-001829); Ex. 4 at App. A, rows 128-141.

9. ████████. *See* Ex. 4 at App. A, rows 142-155.

10. ▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. 61 (DEL-SC-001418); Ex. 4 at App. A, rows 156-157.

11. ▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. 62 (DEL-SC-001417); Ex. 4 at App. B, row 1.

12. ▮▮▮▮▮▮▮▮ *See* Ex. 63 (DEL-SC-001419); Ex. 4 at App. B, row 2.

13. ▮▮▮▮▮▮▮▮▮. *See* Ex. 64 (DEL-SC-001420); Ex. 4 at App. B, row 3.

14. ▮▮▮▮▮▮▮ *See* Ex. 65 (DEL-SC-001281); Ex. 4 at App. B, row 4.

15. ▮▮▮▮▮▮▮▮▮▮. *See* Ex. 66 (DEL-SC-001288); Ex. 4 at App. B, row 5.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ Ex. 15 at 317:24-320:4; Ex. 4 ¶¶ 346-47.

**B.     The asserted** ▮▮▮▮▮▮▮

Dr. Krein further identifies certain aspects of some ▮▮▮▮▮▮▮ that he contends are substantially similar to certain aspects of some ▮▮▮▮▮▮ appearing in Sagitec's Neosurance implementations. Ex. 4 at App. C. Dr. Krein's report identifies ▮▮▮▮▮▮▮ (out of more than 1200) appearing in Sagitec's accused Neosurance implementations that he contends, via side-by-side comparison, contain specific fields (or columns) substantially similar to those appearing in Deloitte's "uFACTS 2013 – MA" source code production. *See* Ex. 4 ¶ 436 and at App. C. Dr. Krein's side-by-side comparisons purport to line up the fields (or columns) within both sides' ▮▮▮▮▮▮. As shown in the example below for the "▮▮▮▮▮▮▮▮▮" table, gaps throughout these tables apparently reflect (1) fields in the asserted Deloitte tables that are not alleged to correspond to any fields in the accused Sagitec tables, and (2) fields in the accused Sagitec tables that are not alleged to correspond to any fields in the asserted Deloitte tables. *Id.* As shown in the example below, the asserted fields (or columns) include common terms like SSN, as well as functional abbreviations like "▮▮▮▮▮▮▮" for Employer Account ID, and

8

███████ for Report Year. Ex. 4 at App. C. The only identical term shown in Dr. Krein's side-by-side comparison ("SSN") is highlighted below:



Ex. 4 at App. C.

To prepare the ██████████ for the Massachusetts QUEST project, Deloitte's predecessor, BearingPoint, was required to follow a set of Database Standards developed with the input, approval, and direction of the Massachusetts Department of Unemployment Assistance ("DUA"). Ex. 67 (DEL00394044) at '045 ████████████████, '051 ████████████████████████████ ████████████████ The QUEST Database Standards include consistent naming guidelines for the functional "column names," such as:





*Id.* at '171-72. The QUEST Database Standards also incorporate the "[u]seful common database elements" from the 402 Handbook (Ex. 9 at '830) regarding tracking the creation and modification of UI records:



*Id.* at '171-72. The QUEST Database Standards further provide:



*Id.* at '172. ███████████████████████████████████████████████

███████████████████████████████████████ *Id.* at '185-235 and '227 (SSN).

Some of the asserted database tables are also based in their entirety on specific blank forms (ETA reports 581 and 2112 from the 401 Handbook) provided by the DOL. *Compare* Ex. 4 at App. A, Row 187 ███████████████████ ), App. B, Row 119 ( ███████████████████ ), *with* Ex. 8 at '570 (ETA 581 Form), '589 (ETA 2112 Form); *see also* Ex. 51 ¶ 16.

Dr. Krein's report stops comparing the specific field/column names after 20 tables. Though he identifies ███████████████████████ that he contends were somehow copied into Sagitec's Neosurance SQL (.sql) database tables, he does not identify any specific lines, elements, or other components that were allegedly copied between these different file types. Ex. 4 at App. A, Rows 20-22, 42-46, 88-91, 106-113, 158-191, and at App. B rows 6-132; Ex. 155 (Krein Dep. Tr.) at 10:13-12:11███████████████████████████████████████ ███████████████ One of these files comprises fields of information that are dictated by a 1099 form required by the IRS. *See* Ex. 4 at App. B, row 6 ███████████████. Certain of these additional files comprise fields of information that are dictated by ETA reports 581 and 2112 from the 401 Handbook. *Compare* Ex. 4 at App. A, Row 187 ███████████████ and at App. B, Row 119 ███████████████, *with* Ex. 8 at '570 (ETA 581 Form) and at '589 (ETA 2112 Form). Sagitec's expert Mr. Myers explained that this subject content was clearly dictated by the Department of Labor. Ex. 51 ¶ 16. Mr. Myers provided side-by-side comparisons showing the origin of specific asserted database table components in ETA Forms 581 and 2112 from the 401 Handbook. *Id.* at Exs. D and E thereto.[2]

## LEGAL STANDARD FOR COPYRIGHTABILITY

To establish a claim of copyright infringement, a plaintiff must establish: (1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work. *Dun & Bradstreet Software Servs. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir. 2002). "[A] valid copyright extends only to copyrightable subject matter," *Star Athletica, L.L.C. v. Varsity*

---

[2] Given Deloitte's failure to identify any alleged substantially similar material for these additional files, however, Sagitec does not address them in detail here.

*Brands, Inc.*, 580 U.S. 405, 411 (2017), and the "mere fact that a work is copyrighted does not mean that every element of the work may be protected." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991). Software is no different. 17 U.S.C. §§ 101, 102(a); *Sony Comp. Ent'mt, Inc. v. Connectix Corp.*, 203 F.3d 596, 599 (9th Cir. 2000) ("Copyrighted software ordinarily contains both copyrighted and unprotected or functional elements."). Section 102(b) of the Copyright Act provides: "In no case does copyright protection for an **original** work of **authorship** extend to any **idea**, procedure, **process**, system, method of operation, concept, principle, or discovery[.]" (emphasis added).

Thus, the Court must "delineate between the copyrightable expression . . . and the unprotected elements of the program" before there is any evaluation of substantial similarity. *Tetris Hold., LLC v. Xio Interactive, Inc.*, 863 F. Supp. 2d 394, 403 (D.N.J. 2012); *see also TD Bank, N.A. v. Hill*, No. 12-7188 (RBK/JS), 2015 U.S. Dist. LEXIS 97409, at \*37 (D.N.J. July 27, 2015) ("Where a work contains both protectable and nonprotectible elements, the proper inquiry is whether **the protectable elements, standing alone**, are substantially similar.") (emphasis added) (citing *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996)); *Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 208 (3d Cir. 2005) ("The focus in this second step is "whether the substantial similarities relate to **protectible material**.") (emphasis added). In determining which portions of a software program contain protectable expression, the Court may consider at least the following: (1) the idea/expression dichotomy; (2) lack of originality; (3) lack of authorship; (4) the doctrine of merger; and (5) the doctrine of externalities or *scènes à faire. See* § 102(b); *Southco, Inc. v. Kanebridge*, 390 F.3d 276, 281 (3d Cir. 2004) (originality); *Dun & Bradstreet Software Servs.*, 307 F.3d at 214 (externalities and scènes à faire); *Thaler v. Perlmutter*, 130 F.4th 1039, 1044-47 (D.C. Cir. 2025) (lack of authorship); *Tetris Hold., LLC*, 863 F. Supp. 2d at 400-03

12

(idea/expression, merger, *scènes à faire*).

Evidence of a timely obtained copyright registration only creates a rebuttable presumption of copyrightability and validity. *See SAS Inst., Inc. v. World Programming Ltd.*, 64 F.4th 1319, 1330 (Fed. Cir. 2023). Thus, when a defendant shows that "at least a substantial portion of the allegedly infringed elements . . . are not protectable," the burden shifts back to the plaintiff to "identify the constituent elements of the work that are protectable." *Id.* at 1330-31; *see also TD Bank, N.A.*, 2015 U.S. Dist. LEXIS 97409, at *39 ("a plaintiff must show . . . that the defendant copied **protected** elements.") (emphasis added). Thus, defendants are not required to identify that each and every element accused of infringement is protectable before the burden shifts back to the party claiming infringement. Only a "substantial portion" is required to shift the burden. *Id.*[3]

## ARGUMENT

Deloitte cannot meet its burden to establish copyrightability of the asserted content. The allegedly copied files at issue in this case fall into two primary groups: (1) certain ███████████ ██ and (2)█████████████████.[4] Neither of these groups of files or tables enjoy copyright

---

[3] Per the Court's guidance, Sagitec omits argument that copyrightability is a question of law.

[4] Beyond (1) ███████ and (2)███████████, Deloitte has asserted copyright infringement for only two categories of additional material, as Deloitte itself summarized in another brief. D.I. 383 at 3. This includes (3) ████████████████████████████████████████ ████████████████████████ and (4) two source code files in a prototype version of Neosurance, ████████████████ and██████████████ *Id.* (referring to these files as ██████ █████████████████████████████████████). These two additional categories were allegedly copied entirely outside of the Copyright Act's applicable three-year statute of limitation and are thus barred, so Sagitec does not address them here. *See Am. Bd. of Internal Med. v.*

13

protection because they lack human authorship, lack originality, or are subject to the doctrines of merger and *scènes à faire.*

**I.    The Asserted ▮▮▮▮▮ Do Not Include Any Protectable Expression.**

**A.    The autogenerated files lack human authorship.**

Four of the fifteen ▮▮▮▮ Dr. Krein relies on are not protectable because they lack human authorship. Deloitte admits that its asserted ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮. Ex. 15 at 317:24-320:4. Because the autogenerated files lack a human author, they are ineligible for copyright protection.

Only human beings can create a copyrightable "work of authorship" as that term is used in 17 U.S.C. § 102. "As a matter of statutory law, the Copyright Act requires all work to be authored in the first instance by a human being." *Thaler*, 130 F.4th at 1044-47 (affirming the denial of a copyright where the work was created by artificial intelligence); *see also* Copyright Office, *Compendium of U.S. Copyright Office Practices* (3d ed. 2021), at 22 ("The crucial question is . . . whether the traditional elements of authorship in the work . . . were actually conceived and executed not by man but by a machine.").

Additionally, courts have found that where code is created with automated tools such as the Microsoft SVC tool ▮▮▮▮▮▮, the result is unprotectable because it lacks the originality required by copyright law. *See M-I L.L.C. v. Q'Max Sols., Inc.*, No. H-18-1099, 2020 U.S. Dist. LEXIS 140419, at *22-23 (S.D. Tex. Aug. 6, 2020) (finding that output of Microsoft SVC tool was "not an original choice" protectable under copyright law.)

Deloitte admits that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

*Rushford*, 841 F. App'x 440, 441 (3d Cir. 2020).

14

███████████████████████████████████████████████████████████

██ *Id.* at 331:22-332:22. **Everything else** in these files was autogenerated by a machine. To the extent Deloitte claims that its limited inputs into the ████ tool were some form of human expression, courts have rejected claims that such inputs transform autogenerated code into copyright-protectable material. *See Pyrotechnics Mgmt. v. XFX Pyrotechnics, LLC*, 38 F.4th 331, 339 (3d Cir. 2022) (holding that selecting values within a fixed, predetermined format lacked the "creative spark" required for copyright protection); *M-I L.L.C.*, 2020 U.S. Dist. LEXIS 140419, at *21 (holding that labels such as "well geometry," "casing," and "length" were unprotectable because "idea of users inputting variables therefore merges with the functional labels that show where each variable should be placed and renders the labels unprotectable"). Thus, the Court should hold the ██████████████████████ are not protected by copyright as a matter of law.

**B.      Because the asserted ████████ are dictated by NASWA and the DOL, they are unoriginal and not copyright protectable.**

None of the ████████████ identified by Dr. Krein are protectable because they were either directly copied from NASWA or their creation was rigidly dictated by NASWA requirements and guidelines, depriving the files of any meaningful originality or creativity.

Only "original works" are eligible for copyright protection. 17 U.S.C. § 102(a). "In order to satisfy the 'original works' requirement, a work must be original in the sense that it was not copied from another's work and in the sense that it shows creativity ('the creativity requirement')." *Southco, Inc.*, 390 F.3d at 281 (citing *Feist Publ'ns, Inc.*, 499 U.S. at 346). Although the creativity requirement does not present a high bar, the requirement is not satisfied if "the creative spark is utterly lacking or so trivial as to be virtually nonexistent." *Pyrotechnics*, 38 F.4th at 339 (citing *Southco*, 390 F.3d at 281; *Feist*, 499 U.S. at 358-59).

The record clearly demonstrates that the ICON files Deloitte has placed at issue were

15

copied from or largely dictated by external sources. Every state UI solution must have common components required by the DOL. *See* Ex. 4 ¶ 87; Ex. 10 at 57:20-58:2; Ex. 8 at '479, '481; Ex. 9 at '830, '882, '886; Ex. 7. And UI systems must integrate with NASWA's interstate and interagency system, including the use of common data formats, schema, and message formats. Ex. 4 ¶¶ 89, 91; Ex. 10 at 35:6-16, 38:17-39:23, 43:17-48:22, 169:22-171:25.

For example, Dr. Krein argues that Deloitte's "█████████████████" file (Ex. 53) is similar to a portion of code from a Neosurance file. Ex. 4 ¶¶ 338-73. But this Deloitte file consists of numerous elements taken **verbatim** from NASWA's UIQ Schema Support Guide that are short character strings merely describing the element's function. *See* Ex. 42. A small sample of these elements is identified below:

| Verbatim Element appearing in Deloitte's ███ ███████ file | Exemplar location in Deloitte's ███████ ██████████ | Exemplar location in NASWA's UIQ Schema Support Guide |
|---|---|---|
| UIQ_InquiryType | Ex. 53 at '17. | Ex. 42 at '80. |
| UIQ_Header | Ex. 53 at '17. | Ex. 42 at '80. |
| ICON_MessageTrain | Ex. 53 at '17. | Ex. 42 at '80. |
| personalIdentificationNumber | Ex. 53 at '18. | Ex. 42 at '80. |
| SSN | Ex. 53 at '19. | Ex. 42 at '80. |
| UIQ_ResponseType | Ex. 53 at '19. | Ex. 42 at '80. |
| claimantAccountNumber_BIC | Ex. 53 at '21. | Ex. 42 at '80. |
| claimantsName | Ex. 53 at '21. | Ex. 42 at '80. |
| claimantsDateOfBirth | Ex. 53 at '21. | Ex. 42 at '80. |
| claimantsSexCode | Ex. 53 at '21. | Ex. 42 at '80. |

Deloitte used elements because NASWA required them. In fact, each of the ██████████ asserted by Deloitte traces directly to one of NASWA's defined transactions (IBIQ, SID, UIQ, WIC2) or to NASWA's defined "message format requirements." Ex. 18 at '500; *see supra* Factual Background Section IV.A (detailing Deloitte's 15 asserted ICON files), Section III (explaining

16

materials provided by NASWA). As such, none of the ICON files contain sufficient creativity or originality under *Southco* or *Pyrotechnics*.

  **C.  All of the asserted ███████ are functional processes that merge with any underlying expression.**

  Even assuming the Court found that the ███████ were sufficiently original, they are not protectable because of the doctrine of merger. Under the merger doctrine, "when the idea and the expression of the idea coincide, then the expression will not be protected in order to prevent creation of a monopoly on the underlying 'art.'" *Pyrotechnics*, 38 F.4th at 339 n.7 (citation omitted). Thus, functional ideas that control expression are not protectable. *Id.* at 338-39.

  The asserted ███████ are functional in nature. As NASWA's designee testified, state UI systems ***must*** interface with ICON, and to do so they all ***must*** use the same data formats, data schema, requirements, and business rules to communicate with the ICON interface. Ex. 10 at 38:17-39:23, 43:17-48:22, 169:22-171:25. Deloitte's ███████ implement the functional requirements of NASWA's ICON system—otherwise, Deloitte's UI systems would not work. The functional implementation of NASWA-directed functions do not provide Deloitte "a monopoly" over the functional ideas in the ICON files. *Pyrotechnics*, 38 F.4th at 339 n.7.

  **D.  Compatibility requirements and standard programming practices render the ███████ uncopyrightable *scènes à faire*.**

  Even if Deloitte argues that any remaining aspects of the ███████ are not functional in nature, at best those remaining aspects represent standard programming techniques unprotectable under the doctrine of externalities or *scènes à faire*. *Scènes à faire* limits copyright protection for "standard, stock, or common" elements and those "that necessarily follow from a common theme or setting." *Silvertop Assocs. Inc. v. Kangaroo Mfg. Inc.*, 931 F.3d 215, 223 (3d Cir. 2019) (citations omitted). In the software context, such *scènes à faire* include "the elements of a program dictated by practical realities[.]" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d

17

522, 535 (6th Cir. 2004); *see also* 4 Nimmer on Copyright § 13D.37[D][2] (For software programs, "[a]lthough, theoretically, many ways may exist to implement a particular idea, efficiency concerns can make one or two choices so compelling as to virtually eliminate any other form of expression."). For example, "programmers often must employ standard techniques to write a program that performs certain functions[.]" *eScholar, LLC v. Otis Educ. Sys.*, 2005 U.S. Dist. LEXIS 40727, at *80 (S.D.N.Y. Nov. 3, 2005). These "extrinsic considerations" often include: "(1) the mechanical specifications of the computer on which a particular program is intended to run; (2) compatibility requirements of other programs with which a program is designed to operate in conjunction; (3) computer manufacturers' design standards; (4) demands of the industry being serviced; and (5) widely accepted programming practices within the computer industry." *Dun & Bradstreet*, 307 F.3d at 214; *see also Real View, LLC v. 20-20 Techs., Inc.*, 683 F. Supp. 2d 147, 152 (D. Mass. 2010); *Bus. Mgmt. Int'l v. Labyrinth Bus. Sol's, LLC*, 2009 U.S. Dist. LEXIS 24900, at *47 (S.D.N.Y. Mar. 24, 2009).

As discussed *supra* Section III, the DOL and NASWA have created thorough criteria to which all UI systems, including uFACTS, must adhere. If these guidelines do not defeat Deloitte's claim of originality in the ▇▇▇▇▇ (which they do), any remaining asserted expression nonetheless constitutes *scènes à faire* because it is "standard, stock, or common" to all UI systems. Deloitte's ▇▇▇▇▇ are little more than NASWA-required elements, and anything not rigidly dictated by NASWA is merely the use of "widely accepted programming practices" to connect the obvious dots. Deloitte has failed to put forth evidence that its asserted files include anything other than a combination of the very "extrinsic considerations" contemplated by the Third Circuit in *Dun & Bradstreet*. 307 F.3d at 214. The asserted ▇▇▇▇▇ are thus uncopyrightable under the doctrine of *scènes à faire*, too.

18

**II.     The Allegedly Copied ▮▮▮▮▮▮▮ Are Not Copyrightable.**

None of the 20 ▮▮▮▮▮▮▮ Deloitte accuses are protectable. Significantly, Dr. Krein does not assert that the structure or schema contained within these tables was copied. Rather, he identifies alleged similarities in only the names and ordering of various "fields (or columns)" used to record such data. Ex. 4 ¶¶ 65-66. However, these fields or columns are not protectable because they lack the originality and creativity required for protectable expression. In the alternative, any expression in these fields or columns merges with their idea and function.

**A.     The individual field names within the ▮▮▮▮▮▮▮ are unoriginal and unprotectable.**

The individual field names used within the ▮▮▮▮▮▮▮ are not protectable because they stem from the functional DOL requirements applied to the QUEST Database Standards' functional naming convention. Thus, they lack the requisite creativity needed for the originality requirement. *See Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1234 (3d Cir. 1986); *Southco*, 390 F.3d at 282. Furthermore, "words and short phrases," such as names, titles, and slogans, "are excluded from copyright protection." *Douglas v. Osteen*, 317 F. App'x 97, 99 (3d Cir. 2009); *Chaplin v. Coca Cola Bevs. Ne.*, 2022 U.S. Dist. LEXIS 56716, at *5 (D. Del. Mar. 29, 2022); *see also* 37 C.F.R. § 202.1(a). In the software context, isolated field names "are not original, are within the public domain, and are not entitled to individual protection," because they do not exhibit the "minimal level of creativity" necessary to warrant copyright protection. *O.P. Solutions, Inc. v. Intellectual Prop. Network, Ltd.*, 1999 U.S. Dist. LEXIS 979, at *41 (S.D.N.Y. Jan. 21, 1999) (citing 1 Nimmer on Copyright § 2.01[B] at 2-13-18 (1985)); *see Merch. Transaction Sys. v. Nelcela, Inc.*, 2009 U.S. Dist. LEXIS 25663, at *44-45 (D. Ariz. Mar. 17, 2009). The individual field names throughout Deloitte's 20 asserted ▮▮▮▮▮▮▮ are no different.

The QUEST Database Standards are designed to reflect the functional meaning of each

19

field in a consistent way across all tables. If the field names varied from the QUEST Database Standards, the Massachusetts employees and their contractors operating the QUEST system would not understand their functional meaning. Ex. 67 at '051. If the field names were inconsistent across tables, the QUEST program would not work. To illustrate this, consider the "████████████" table excerpted from Dr. Krein's report below:



Ex. 4 at App. C.

First, consider the only identical term between these tables: ████████ The functional concept of an "Agent" is reflected in numerous UI-related documentation, such as IRS Form 2678 ("Employer/Payer Appointment of Agent"). Ex. 68 (https://www.irs.gov/pub/irs-pdf/f2678.pdf). Besides being a common abbreviation, the QUEST Database Standards **defines** ████████ ████████████████████ Ex. 67 at '207. The QUEST Database Standards further require that ████████████████████████ *Id.* at '171. These rules, as applied to the concept of ████████████ uncreatively lead to the field name ████████ This is uncopyrightable.

Consider now the functional concept of an Employer Account ID, which is also reflected in numerous UI-related documentation, such as the 401 Handbook. Ex. 8 at '564-65 (e.g., "accounts for employers" and "employer's account"). Per the QUEST Database Standards, in addition to the requirements listed above, Deloitte was also required to ███████████ ██████████████████████████████. Ex. 67 at '172. Applying these requirements, Deloitte arrived at the field name █████████████ Ex. 67 at '171, '185, '202. This, too, is unoriginal and uncopyrightable.

Finally, compare the last five asserted uFACTS fields (left) with the QUEST Database Standards (right) relating to mandatory creation and modification data for UI records:



Ex. 4 at App. C; Ex. 67 at '172. These fields appear in ***all 20*** asserted tables. Ex. 4 at App. C. This repetition is not surprising, as the QUEST Database Standards explain that ██████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ *Id.* at '171 (emphasis added). Consistent with the QUEST Database Standards, the 402 Handbook expressly provides that "[d]ata tables for required reports generally contain some identical information on each record" and expressly identifies these five fields as "[u]seful common data elements." Ex. 9 at '886. The table below compares the 402 Handbook's description of these "common data elements" (*id.*) with the fields used by each of Deloitte and Sagitec:

21

| 402 Handbook "common data elements" | Deloitte Field Name | Sagitec Field Name |
|---|---|---|
| "Date the Record was Created" | ██████████ | ██████████ |
| "User ID of the Individual Who Created or Last Revised the Record" | ██████████ | ██████████ |
| "Date the Record was Last Modified" | ██████████ | ██████████ |
| "User ID of the Individual Who Created or Last Revised the Record" | ██████████ | ██████████ |
| "Number of Times the Record was Revised" | ██████████ | ██████████ |

Deloitte should not be permitted to claim a monopoly over these functional, "common data elements"—especially when Sagitec does not even use Deloitte's field names for them.

The ████████████ table is just one example. As shown in Exhibit 9 and the citations therein, each field (or column) in each of the 20 asserted database tables comes from publicly available functional UI requirements and guidelines.[5] Under *Pyrotechnics* and *Southco*, the mechanical application of these functional UI requirements and guidelines to the QUEST Database Standards is insufficient as a matter of law to establish the requisite creativity for copyright protection. *Pyrotechnics*, 38 F.4th at 340; *Southco*, 390 F.3d at 282.

Furthermore, to the extent some of the field names are not strictly dictated by QUEST Database Standards, they are unprotectable as "industry standard abbreviations of a wide variety of data elements and data fields that are used commonly throughout the industry." *Merch. Transaction Sys.*, 2009 U.S. Dist. LEXIS 25663, at *44-45. These database tables include field names like ████████████████████████ Ex. 4, App. C at 359-

---

[5] In Exhibit 9, Sagitec has included each of Dr. Krein's 20 comparison tables verbatim on the left side, and on the right side, provided corresponding quotations from UI requirements and guidelines with citations to publicly available documents. Sagitec also greyed out the entries that are not alleged to be substantially similar, i.e., because they are lined up with "blanks."



The well-known acronyms "SSN" and "FEIN," for example, are plainly unprotectable. So too fails any claim for protection over "ZIP." And while selections like ███████████ ███████████ may not be as immediately recognizable examples, they are still "fragmentary words and phrases" that do not exhibit the minimum creativity required for copyright protection.

**B.      The ███████████ themselves are electronic blank forms that record, rather than convey, information.**

Deloitte's asserted ███████████ are also unprotectable because they are just blank forms in an electronic format. Blank forms are ineligible for copyright protection if they are "necessary incidents" to a functional method. *Whelan*, 797 F.2d at 1235-36 (citing *Baker v. Selden*, 101 U.S. 99 (1879)); *see also* 37 C.F.R. § 202.1(c) ("Blank forms, such as time cards, graph paper, account books, diaries, bank checks, scorecards, address books, report forms, order forms and the like, which are ***designed for recording information*** and do not in themselves convey information," are "not subject to copyright.") (emphasis added). Only blank forms that "by their arrangement and organization convey some information can be copyrighted." *Whelan*, 797 F.2d at 1243.

Each table at issue has a series of fields (or columns) that is used to store actual data under that field. For example, in the "SSN" field, individual social security numbers are stored. These blank forms are "necessary incidents" to a functioning UI system. *Id.* at 1235-36. For example, a UI system must collect certain information about each claim and about each employer. Ex. 4 ¶ 87. Deloitte's asserted database tables for ███████████ and ███████████ are essentially electronic versions of blank forms that do exactly that. *See id.* at App. C. These tables are designed for **recording** information, not conveying it. To illustrate this point, some of the asserted database tables are based in their entirety on specific blank forms provided by the DOL. *Compare* Ex. 4 at App. A, Row 187 ███████████, App. B, Row 119 ███████████, *with*

23

Ex. 8 at '570 (ETA 581 Form), '589 (ETA 2112 Form); *see also* Ex. 51 ¶ 16. Because these database tables do not actually **convey** information, and because they merely **record** it for functional purposes, they are ineligible for copyright protection. 37 C.F.R. § 202.1(c); *Whelan*, 797 F.2d at 1235-36.

  **C.**  **Any expression in the ▮▮▮▮▮▮▮▮ merges with their underlying idea or function.**

  Even if the Court were to find that the ▮▮▮▮▮▮ relied on by Dr. Krein comprise original expression, they are nonetheless not protectable under the doctrine of merger. When a field name "is a form of the word (or words) describing the field's function, and there are only a few ways to designate that function," then the expression "merges with the idea" and is not copyrightable. *McEnroe v. Mantissa Corp.*, 2016 U.S. Dist. LEXIS 205795, at *28-29 (D. Mass. Feb. 29, 2016). Such field names are a "prime example of the merger doctrine," because "programmers generally use stereotypical expressions and [choose] field names that express the content of the data elements." *Merch. Transaction*, 2009 U.S. Dist. LEXIS 25663, at *46. "[T]hey do not use arbitrary field names." *Id.* at *45-46.

  Here, the descriptive natures of Deloitte's stereotypical field names—for example, "SSN," "FEIN," and "ZIP"—reflect a merger between ideas and the expressions of those ideas. Deloitte's other field names fare no better. In *McEnroe*, for example, the court acknowledged that the field name "Action_code" expressed "the action code contained in the message"; in other words, "the name of the field [was] a form of the word (or words) describing the field's function[.]" 2016 U.S. Dist. LEXIS 205795, at *28-29. But "there are only a few ways to designate that function." *Id.* at *29. It is no different here.

  **D.**  **To the extent any purported expressive aspects exist in the ▮▮▮▮▮▮ they are nothing more than uncopyrightable *scènes à faire*.**

  Similar to the ▮▮▮▮▮ at most any remaining aspects of the ▮▮▮▮▮▮ represent

standard programming techniques unprotectable under the doctrine of externalities or *scènes à faire*. *Dun & Bradstreet*, 307 F.3d at 214; *Lexmark*, 387 F.3d at 535. To the extent Deloitte attempts to identify any limited protectable aspects of its asserted ███████, Deloitte cannot show that those aspects are the result of anything other than a combination of "extrinsic considerations" common in software contexts. *Dun & Bradstreet*. 307 F.3d at 214. The doctrine of *scènes à faire* thus renders any remaining aspects of the ████████ unprotectable.

## CONCLUSION

For the foregoing reasons, Sagitec respectfully requests that the Court find as a matter of law that all of the ████████ and the ████████ asserted by Deloitte are not copyright protectable, and Deloitte has failed to meet its burden to prove otherwise.

Dated: May 14, 2026

Of Counsel:

Christopher K. Larus
William E. Manske
Rajin S. Olson
THOMPSON HINE LLP
800 Nicollet Avenue, Suite 2925
Minneapolis, Minnesota 55402
Telephone:   612.605.5900
Facsimile:    612.605.5901
Chris.Larus@ThompsonHine.com
William.Manske@ThompsonHine.com
Rajin.Olson@ThompsonHine.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Anne Shea Gaza*

Anne Shea Gaza (No. 4093)
Robert Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Sagitec Solutions, LLC*

25

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 14, 2026, a copy of the foregoing document

was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Joshua L. Simmons
Dana DeVlieger
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

Gregg F. LoCascio
Nicholas Teleky
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave NW
Washington, DC 20004

John F. Hartmann
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654

Ariel Deitchman
KIRKLAN & ELLIS LLP
Three Brickell City Centre
98 S.E. 7th Street, Suite 700
Miami, FL 33131

Miranda D. Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116

Julien Jean-George Crockett
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
julien.crockett@kirkland.com

Deloitte-Sagitec@kirkland.com

John W. Shaw
Andrew E. Russell
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
*jshaw@shawkeller.com*
*arussell@shawkeller.com*

*Attorneys for Plaintiffs Deloitte Consulting*
*LLP and Deloitte Development LLC*

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Sagitec Solutions, LLC*

Dated: May 14, 2026

2